U.S. DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION

GERRY ARMBRUSTER #S02006,

              Plaintiff,

v.

WEXFORD HEALTH CARE, INC.;
BHARAT SHAH; RON VITALE; LORETTA
WILFORD,

              Defendants.

No. 3:16-cv-00544-MJR-SCW

Judge Michael J. Reagan

Magistrate Judge Stephen C. Williams

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants, BHARAT SHAH, M.D., WEXFORD HEALTH SOURCES,

INC., and LORETTA WILFORD, by and through their attorneys, CASSIDAY SCHADE LLP,

and pursuant to Federal Rule of Civil Procedure 56, and for their MEMORANDUM OF LAW

IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, state as follows:

## INTRODUCTION

Gerry Armbruster, a former IDOC inmate, filed the instant 42 U.S.C. § 1983 lawsuit on

May 17, 2016. (Doc. 1). Plaintiff's Third Amended Complaint outlines his current 42 U.S.C. §

1983 claims against Defendants Shah, M.D., Wilford, and Wexford as Count I: Denial of

Medical Care and Count II: Failure to Intervene. (Doc. 123).[1] Additionally, Plaintiff has alleged

a medical malpractice claim under Illinois law, against Defendants Shah, M.D. and Wexford.

(Doc. 123).

First, Plaintiff's claims against Loretta Wilford and Wexford are barred by the applicable

statute of limitations. Next, Plaintiff cannot set forth any admissible evidence demonstrating that

---

[1] These claims are also alleged against co-defendant Ronald Vitale. (Doc. 123).

Dr. Shah, Wilford, or Wexford were deliberately indifferent to his medical needs or failed to intervene. Finally, Plaintiff has not set forth a sufficient report from a qualified health professional demonstrating that, based on review of the medical records and with an understanding of this case, Plaintiff has a meritorious claim against Dr. Shah and Wexford for medical malpractice. Similarly, Plaintiff failed to produce evidence of proximate cause, thus the Court should grant summary judgment in their favor. As the uncontroverted material facts show that Defendants did not violate Plaintiff's Eighth Amendment rights or violate Illinois law, Defendants should be dismissed from this case.

<u>**UNDISPUTED MATERIAL FACTS**</u>

1.      Dr. Bharat Shah, a physician, started working for Health Professionals Ltd. as the Medical Director at Southwestern Illinois Correctional Center ("SWICC") in 2005. (Exhibit B, Deposition Transcript of Dr. Bharat Shah, 113:6-114:17).

2.      In 2011, Wexford Health Sources Inc., contracted with the State of Illinois to provide certain healthcare at SWICC. (Ex. B, 114:14-15).

3.      Dr. Shah's practice at SWICC did not change as a result of Wexford's new contract. (Ex. B, 182:3-22).

4.      On or about January 16, 2013, Plaintiff Gerry Armbruster, a prisoner within the Illinois Department of Corrections, was transferred to SWICC. (Exhibit A, Plaintiff's Illinois Department of Corrections Medical Records, 196-197).

5.      Throughout 2014, Dr. Shah was the Medical Director, employed by Wexford at SWICC. (Ex. B, 113:6-114:17).

6.      Dr. Shah is a licensed physician in Illinois and Missouri.  He was Board certified in general surgery until 2011, but he is/was not an orthopaedic surgeon, neurologist, or neurosurgeon. (Ex. B, 98:5-105:11; 115; 19-24; 116:12-117:6).

7.      Throughout 2014, Loretta Wilford was a nurse employed by Wexford at SWICC. (Exhibit H, Deposition Transcript of Loretta Wilford, 33:20-34:23).

8.      Prior to May 13, 2014, Mr. Armbruter had been seen by Dr. Shah on several occasions, mainly for pain medication for the gunshot wounds in his knees and for gastroesophageal reflux ("GERD").  (Ex. A, 198-229).

9.      Mr. Armbruster first complained of "pain in the right shoulder blade, and my arms and fingers tingle, and it hurts all the time. It started about three weeks ago," on May 13, 2014.   (Ex. A, 230); (Exhibit D, Deposition Transcript of Plaintiff Gerry Armbruster, 38:8-23; 40:4-6; 50:7-16); (Ex. H, 141:2-12).

10.    Loretta Wilford documented this complaint, completed the questions on the nursing protocol form, educated Mr. Armbruster to be more active, and referred him to Dr. Shah.  (Ex. A, 230); (Ex. H, 141:2-142:15).

11.    The next day, May 14, 2014, Mr. Armbruster saw Dr. Shah regarding his complaints of "pain/tingling in arms."  (Ex. A, 231).

12.    Loretta Wilford was not in Dr. Shah's examination room during any of Mr. Armbruster's doctor's appointments. (Ex. H, 160:4-7).

13.    Dr. Shah documented Mr. Armbruster's subjective complaints as "complaints of numbness of fingertips, no history of recent trauma, and complains of backache, leg pain. No GI or GU complaints offered. History of cocaine abuse in past. Denies ETOH use." (Ex. A, 231); (Ex. B, 214:1-23).

14.     Dr. Shah documented his clinically significant observations that Mr. Armbruster was "Not in acute distress, walks with back pain. C (cervical) spine ROM (range of movement) full. No gross neurological deficit of arm. Claims can't grip with the hand. Hand grip and ROM full. All joints ROM full. Lumbosacral spine ROM full. Straight leg raising 90 degrees. No spasm of paravertebral muscle. No deformity of LS (lumbosacral) spine." (Ex. A, 231); (Ex. B, 215:12-216:16; 225:3-7).

15.     Dr. Shah's observations were based on the neurological and musculoskeletal testing he performed on Mr. Armbruster due to his complaints of backache, tingling, and numbness, which yielded no positive neurological deficits at the time of the exam. (Ex. B, 220:12-222:22; 225:13-226:21; 229:24-230:24; 233:12-234:22; 236:20-237:8).

16.     Based on subjective symptoms of tingling, numbness, pain, difficulty or weakness in ambulating, Dr. Shah's neurological examination included taking a medical history, a full systems review, and a focused examination of the arms and legs.   The focused examination encompassed inspection of any obvious deformities in the area of complaint, including watching the patient walk; palpation by moving the areas of complaint; observation; and physical examination by motor reflexes and sensory testing. (Ex. B, 49:16-51:20; 57:6-63:21).

17.     Although he does not recall much of his encounters with Dr. Shah, Mr. Armbruster recalls that Dr. Shah performed some neurological testing, including a grip strength test.  (Ex. D, 61:21-64:1).

18.     Dr. Shah's assessment was that Mr. Armbruster self-reported "tingling of fingers, no evidence of neurological deficit; history of cocaine abuse; history of GSW (gunshot wound) knees and arthritis of LS spine or sprain." (Ex. A, 231); (Ex. B, 216:20-24).

19.     Dr. Shah uses the phrase "self-reported" in the assessment section of the medical records to mean that Dr. Shah's examination did not find any positive findings consistent with the subjective complaint.  (Ex. B, 266:18-23).

20.     As Mr. Armbruster presented with no objective neurological deficits upon examination, based on his knowledge, skill, experience, and training, Dr. Shah did not believe Mr. Amrbruster was experiencing a serious medical issue, including a spinal cord compression.  (Ex. B, 226:9-227:227:9; 240:23-241:19).

21.     On May 14, 2014, Dr. Shah's treatment plan was to advise Mr. Armbruster to perform "back and hand exercises; continue ibuprofen; follow up in two weeks" for previous laboratory testing results.  Also, Dr. Shah thought Mr. Armbruster could have hypertension so he ordered that Mr. Armbruster's blood pressure be checked twice a day for one week. (Ex. A, 231); (Ex. B, p. 217:7-24).

22.     Many conditions can cause tingling and numbness, including diabetes, arthritis, and hypertension. (Ex. B, 226:9-19; 262:5-12); (Exhibit C, Deposition Transcript of Dr. Frank Petkovich, 47:3-48:2); (Exhibit E, Deposition Transcript of Dr. Gregory Bailey, 91:2-19); (Exhibit G, Deposition Transcript of Dr. Peter Brown, 66:3-5; 67:3-10).

23.     After having his blood pressure checked twice daily for a week, Mr. Armbruster saw Dr. Shah for follow up treatment at the hypertension Chronic Clinic on May 28, 2014, where he documented "vague low back pain, groin pain, tingling and numbness. Gunshot wound of the legs 13 years ago with surgery. History of substance abuse. Cocaine. History of GERD, history of restless leg syndrome."  (Ex. A, 239-240); (Ex. B, 243:20-12; 246:7-14).

24.    Dr. Shah performed another detailed neurological examination on Mr. Armbruster on May 28, 2014.  (Ex. B, 252:7-14).

25.    Upon examination of Mr. Armbruster, Dr. Shah found no transient (short lived) weakness and no objective neurological deficits.  (Ex. A, 239-240); (Ex. B, 244:13-21, 247:20-24; 249:4-7).

26.    Dr. Shah thought Mr. Armbruster's hypertension (high blood pressure) may be causing the subjective symptoms of tingling and numbness so he ordered blood pressure medication, increased the ibuprofen dosage, and ordered a series of laboratory tests for Mr. Armbruster. (Ex. A, 239-240); (Ex. B, 246:1-6; 261:9-23).

27.    Dr. Shah saw Mr. Armbruster for follow up care within a week, on June 3, 2014, and documented Mr. Armbruster's complaints as "vague body ache. Does not like ibuprofen." (Ex. A, 242); (Ex. B, 253:1-10; 255:24-256:1).

28.    On June 3, 2014, Mr. Armbruster did not complain about any pain, tingling, or weakness in his upper extremities.  (Ex. A, 242); (Ex. B, 255:24-256:1); (Ex. D, 45:17-46:1; 79:4-7).

29.    Dr. Shah documented his observations as "alert, chest clear, heart normal sinus rhythm, S1, S2 normal. Neurological nonfocal." (Ex. A, 242); (Ex. B. 256:2-7).

30.    Based on his examination of Mr. Armbruster, Dr. Shah's assessment was "Hypertension. Questionable borderline diabetes mellitus." (Ex. A, 242); (Ex. B, 256:2-7).

31.    A well-known complication of diabetes is tingling and numbness. (Ex. G, 66:3-5).

32.    Dr. Shah ordered testing of Mr. Armbruster's fasting blood sugar to test for diabetes, ordered naprosyn in lieu of ibuprofen, and ordered a follow up appointment in two weeks.  (Ex. A, 242); (Ex. B, 256:8-257:4).

33.    Dr. Shah tested Mr. Armbruster's blood sugar as an indicator of diabetes and a possible contributor to his subjective symptoms of tingling and numbness.  (Ex. B, 261:9-21).

34.    Dr. Shah next saw Mr. Armbruster on June 17, 2014, where he documented that Mr. Armbruster was argumentative because he wanted to go to an outside hospital.  Dr. Shah also documented that Mr. Armbruster complained of vague "tingling and numbness, backache and knee pains. History of gunshot wound, both legs, 2000, with surgery. History of substance abuse. Cocaine and marijuana."  (Ex. A, 243); (Ex. B, 258:7-15).

35.    On June 17, 2014, Mr. Armbruster again did not complain about any pain, tingling, or weakness in his upper extremities.  (Ex. A, 243); (Ex. B, 258:7-15); (Ex. D, 45:17-46:1; 79:4-7).

36.    Dr. Shah examined Mr. Armbruster and documented that he was "alert, argumentative. Chest clear. Heart, normal sinus rhythm. Abdomen nontender. Scar of surgery of gunshot wound of the knees. Range of movement slightly painful." (Ex. A, 243); (Ex. B, 258:16-21).

37.    Dr. Shah's assessment of Mr. Armbruster's presentation on June 17, 2014 was "History of gunshot wound both legs. HTN controlled. History of drug abuse. Leg complaints of numbness. No evidence of metabolic disorder. Rule out diabetes mellitus." (Ex. A, 243); (Ex. B, 258:20-259:7).

38.     Dr. Shah informed Mr. Armbruster of the results of his fasting blood sugar testing, ordered an x-ray of his knees, and continued the naprosyn medication.  (Ex. A, 243); (Ex. B, 259:8-15).

39.     Dr. Shah again saw Mr. Armbruster within a week, June 23, 3014, and documented that Mr. Armbruster's blood pressure was controlled and Mr. Armbruster reported that he "feels better. Minimal numbness of tip of fingers."  (Ex. A, 246); (Ex. B, 263:18-264:14).

40.     Dr. Shah observed that upon examination Mr. Armbruster presented with "No neurological deficit, chest clear. Abdomen soft, nontender. Right knee mild pain on ROM. No effusion (swelling in his joints)."  (Ex. A, 246); (Ex. B, 264:15-20).

41.     It was Dr. Shah's assessment that Mr. Armbruster had "arthritis (in his) right knee. Self-reported numbness in fingers. No metabolic disorder. Chronic dyspepsia (indigestion)."  (Ex. A, 246); (Ex. B, 264:21-265:3).

42.     On June 23, 2014, upon examination, Dr. Shah again found no neurological deficits supporting Mr. Armbruster's subjective complaints of minimal numbness.  (Ex. B, 266:18-23).

43.     Dr. Shah continued Mr. Armbruster on the hypertension medication, noting that his symptoms were better. (Ex. A, 246); (Ex. B, 265:21-23).

44.     Dr. Shah next saw Mr. Armbruster on July 2, 2014, for a follow up from his x-ray and Mr. Armbruster reported numbness and pain in his fingers without any other symptoms, including no reported gait (walking) issues.  (Ex. A, 247); (Ex. B, 270:15-18).

45.     Dr. Shah observed that Mr. Armbruster was unhappy but "both hands, fingers had no neurological disease or deficit. C spine range of movement full. Both knees range of movement full with mild pain, no deformity." (Ex. A, 247); (Ex. B, 270:15-271:5).

46.     Dr. Shah's assessment was "posttraumatic arthritis knees. No neurological deficit. Self-reported numbness in pain, fingers and hands," and he advised Mr. Armbruster that there were "no neurological deficit for the symptoms of vague numbness and pain on the tips of his fingers," and advised him to follow up with the healthcare unit as needed.  (Ex. A, 247); (Ex. B, 271:6-18).

47.     Mr. Armbruster never complained of neck pain to Dr. Shah or anyone in the healthcare unit.  (Ex. D, 82:13-20).

48.     Dr. Shah did not believe that Mr. Armbruster had a spinal cord compression at any time that he treated Mr. Armbruster because he had no objective neurological deficit. Dr. Shah also did not believe that Mr. Armbruster had a cervical injury as the location of his pain was mainly in the lower back and the knees, not the neck.  (Ex. B, 298:5-15).

49.     Dr. Shah considered whether Mr. Armbruster's subjective symptoms of intermittent tingling and numbness could have been caused by neuropathy (damage to peripheral nerves from an underlying condition like hypertension) or arthritis.  (Ex. B, 271:24-272:6).

50.     Arthritis in the spine can lead to symptoms of tingling and numbness.  (Ex. G, 67:3-10).

51.     Based on his medical judgment, Dr. Shah did not believe an MRI or specialist referral was medically necessary and therefore did not order one.  This determination was

made because of the condition of the patient, not a Wexford policy, procedure, or practice.  (Ex. B, 68:11-18; 166:12-14).

52.    From review of the medical records, Dr. Frank Petkovich, an Orthopaedic surgeon who has diagnosed thousands of patients with spinal cord compressions, performed hundreds of spinal decompression surgeries, and worked extensively with neurosurgeons, would not have ordered an MRI because the neurological examination identified no objective deficits. (Ex. C, 10:15-23; 12:9-22; 13:23-17:17; 24:2-18; 26:18-27:6; 43:1-6; 48:10-50:2; 65:24-66:14; 190:6-18; 193:17-194:1; 226:15-227:16; Deposition Exhibit 2).

53.    From review of the medical records, Dr. Petkovich also found there was no indication that Mr. Armbruster had any objective neurologic deficit or a spinal cord compression while under Dr. Shah's care.  (Ex. C, 145:8-21).

54.    Even though Mr. Armbruster had additional appointments with Dr. Shah, the medical records show that he did not complain of tingling and numbness after July 2, 2014.   (Ex. A, 248-252).   Mr. Armbruster also does not recall any dates that he complained to Dr. Shah about tingling and numbness after July 2, 2014.  (Ex. D, 45:17-46:1; 79:4-7; 83:7-84:21).

55.    Mr. Armbruster relies on the medical records as the best evidence of when he presented and who did what treatment.  (Ex. D, 45:17-46:1; 79:4-7).

56.    Mr. Armbruster refused medical treatment on September 9, 2014.  (Ex. A, 251).

57.    Loretta Wilford, as a nurse, is not qualified to diagnose or treat any condition. (Ex. H, 212:9-18).

58.    Loretta Wilford did not believe that Mr. Armbruster had a spinal cord compression while he was incarcerated at SWICC.  (Ex. H, 202:16-205:14).

59.    Despite language in a report Dr. Brown approved, Dr. Peter Brown is not an expert in nursing care and will not testify regarding the standard of care for Loretta Wilford. (Ex. G, 21:20-22: 6; 134:12-15).

60.    From November 2013 through September 4, 2014, Mr. Armbruster worked for the safety and sanitation crew, where he would mop, strip, wax, and buff all the floors on campus. (Ex. D, 59:23-60:7; 165:21-170:5, Deposition Exhibit 4); (Exhibit I, Deposition Transcript for Christopher Barber, 54:1-57:24; 64:5-67:12; 73:2-13).

61.    As part of his job as the safety and sanitation crew, Mr. Armbruster was required to assist in carrying an approximately 150 pound machine up two flights of stairs and compress a power paddle on the handlebar of the scrubbing and buffing machines for over an hour.  (Ex. I, 67:7-69:21; 93:22-96:18).

62.    Being able to grip an object for over an hour was an essential part of the safety and sanitation crew job.  Similarly, it was essential to the job that the offender was able to walk.  If an offender could not do the essential functions of the job he would have been replaced, but that never happened. (Ex. I, 58:1-61:4; 93:22-96:18).

63.    Of the approximate 8 years that Christopher Barber was the sole supervisor of the safety and sanitation crew at SWICC, 5-6 offenders stand out by name because of their good work and desire to do extra work.  Mr. Armbruster is one of those offenders.  (Ex. I, 17:15-25:1; I, 58:1-61:4).

64.    Mr. Barber never observed Mr. Armbruster have any grip or walking issues.  (Ex. I, 58:1-61:4; 63:7-23; 85:2-86:19).

65.    Mr. Armbruster was released from prison on September 15, 2014 and was no longer under the care of Wexford, Dr. Shah, or Loretta Wilford. (Ex. D, 85:1-5)

66.     Mr. Armbruster was diagnosed with a spinal cord compression on September 26, 2014, when Dr. Gregory Bailey performed decompression surgery due to the signal change in the spinal canal. (Ex. E, 41:19-42:8); (Exhibit J, Medical Records from St. Mary's Hospital, 82-87).

67.     A spinal cord compression occurs when there is pressure on a spinal disc that causes disc material to extrude into the spinal canal.  (Ex. E, 19:7-24).

68.     Many people who have a disc extrusion do not require surgery.  (Ex. E, 20:22-21:9).

69.     Subjective complaints of tingling and numbness does not mean that the patient has a spinal cord compression.  (Ex. C, 47:3-48:2).

70.     A spinal cord compression is not a serious medical condition when it does not create neurological deficits (i.e. objective findings not just symptoms), which is a very common finding. (Ex. C, 39:7-40:22; 207:21-208:11).

71.     A person with a significant cervical spinal cord compression will exhibit neurological deficits upon examination. (Ex. C, 37:1-12).

72.     A signal change is when "there's enough pressure on the… spinal cord to cause edema (swelling) and changes within the spinal cord itself because of the pressure." (Ex. E, 13:10-17; 17:9-18:2; 43:8-24).

73.     A spinal cord compression can be acute (it happened within a week) or chronic (present for a longer period of time).  (Ex. C, 66:15-67:6).

74.     "Most of the time if there's significant cord edema or signal change, it's (the compression) usually acute," meaning that the onset is sudden.  (Ex. E, 30:11-22).  This is because a person who has a spinal cord compression over an extended period of time

often presents as normal, because the spinal canal adapts.  Conversely, if the compression occurs rapidly the spinal cord does not adapt and it causes trauma that manifests in symptoms.  (Ex. E, 28:16-29:15).

75.    The spinal cord is not durable and pressure on the spinal cord will affect the function of all the nerves below that level. (Ex. E, 24:25-25:3).

76.    The longer a spinal cord is compressed the more damage there can be to the cord, causing post-operative residual effects.  (Ex. E, 41:19-42:14; 49:5-50:9); (Ex. C, 212:12-213:1).  Therefore, if a patient has a good neurological recovery, it is indicative that the compression was acute and not present for long.  (Ex. C, 68:14-69:5).

77.    According to his surgeon, the signal changes that appeared on Mr. Armbruster's imaging on September 26, 2014, could have occurred 24 hours beforehand, i.e. on September 25, 2014. (Ex. E, 100:25-102:13).

78.    Dr. Bailey performed a focused neurological examination on Mr. Armbruster before surgery and documented the positive findings.  (Ex. E, 35:2-36:6; 38:5-21); (Ex. J, 82-83).

79.    Dr. Bailey does not consider cervical spinal cord decompression surgery to be a major surgery.   He has had three cervical discs operated on and still performs neurosurgery.  (Ex. E, 44:22-45:6).

80.    Mr. Armbruster was discharged from the hospital the morning after surgery, within 24 hours, on September 27, 2014.  (Ex. D, 96:11-15); (Ex. E, 94:9-14); (Ex. J, 101).

81.    Prior to discharge, Mr. Armbruster was able to walk in his room.  (Ex. E, 92:14-93:1); (Ex. J, 101).

82.     After a spinal cord decompression surgery a patient can continue to recover up to two years post-surgery.  (Ex. E, 69:25-70:5; 77:8-15).

83.     By November 12, 2014, Mr. Armbruster showed significant improvement, his cervical collar was removed, and his pain medication was discontinued by Dr. Bailey. (Ex. D, 98:13-22); (Ex. E, 95:11-96:6); (Ex. J, 254-255).

84.     On January 4, 2015, Mr. Armbruster presented to the emergency room and a complete neurological examination showed no neurological deficits. (Ex. E, 96:7-100:2); (Exhibit K, Medical Records from Gateway Regional Medical Center, 243-248).

85.     On March 18, 2015, Mr. Armbruster was assessed by Dr. Kristina Naseer, a pain management specialist, who opined that Mr. Armbruster was much improved, did not need an interventional procedure, and with pain medication she is "sure" he will be able to hold a consistent job.  (Exhibit F, Medical Records from Dr. Hsieh, 65-66).

86.     In early 2015, Mr. Armbruster requested that Dr. Bailey assist him in obtaining disability benefits and Dr. Bailey submitted the letter attached to Plaintiff's Third Amended Complaint for that purpose, not in furtherance of this present action. (Ex. D, 103:15-104:9); (Doc. 123-1, p. 6).

87.     Dr. Bailey did not review any of Mr. Armbruster's medical records in writing the letter attached to Plaintiff's Third Amended Complaint and does not remember why he wrote it.  (Ex. E, 88:1-10; 105:4-15); (Doc. 123-1, p. 6).

88.     Dr. Bailey's letter attached to Plaintiff's Third Amended Complaint incorrectly states that Mr. Armbruster has encephalomalacia (loss of brain tissue).  (Ex. E, 83:4-20); (Doc. 123-1, p. 6).

89.    Dr. Bailey expects Mr. Armbruster will reach maximum medical improvement two years after surgery, i.e. September 2016. Dr. Bailey has not examined Mr. Armbruster since March 2015 and does not know the extent of Mr. Armbruster's recovery. (Ex. E, 104:6-20).

90.    Despite language in a report Dr. Brown approved, Dr. Brown does not know nor does he have an opinion on Mr. Armbruster's current condition and will not testify that Mr. Armbruster has any disability.  (Ex. G, 132:19-133:16; 134:17-135:14).

91.    Mr. Armbruster has no complaints with the surgery he received because all his symptoms are better, including that he can ambulate without assistance, can grip, and his pain is controlled.  (Ex. D, 95:20-96:10; 98:1-4; 123:14-19).

92.    After surgery in 2015, Mr. Armbruster committed a burglary and was re-incarcerated.  (Ex. D, 121:2-7; 121:15-122:13).

93.    Mr. Armbruster is physically able to work and did manual work during his re-incarceration post-surgery.  (Ex. D, 181:23-183:20; 189:24-190:11); (Ex. F, 65-66).

94.    Based on Mr. Armbruster's neurological recovery post-surgery, the damage to his spinal cord was not significant, indicating that the compression was acute, meaning the onset was less than a week before his surgery on September 26, 2014. (Ex. C, 66:15-67:6; 194:12-195:9; 210:3-211:16)

95.    Mr. Armbruster presented to the Gateway Emergency Room on May 2, 2011 with subjective symptoms of tingling and numbness.  Mr. Armbruster did not have an MRI and did not see a specialist after these complaints.  Mr. Armbruster also did not inform Defendants about this encounter.  (Ex. D, 133:4-137:16); (Ex. F, 185-192).

96.     On May 16, 2016, Mr. Armbruster filed his Complaint naming Dr. Bharat Shah and Wexford, but not Loretta Wilford. (Doc. 1).

97.     The Court determined that Plaintiff's Complaint only stated a claim against Dr. Shah, not Wexford. (Doc. 6).

98.     On October 18, 2016, Plaintiff filed his Amended Complaint adding claims against Wexford and Loretta Wilford. (Doc. 33).

## **ARGUMENT**

A court should grant summary judgment if the pleadings, discovery documents, and affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986).

The moving party bears the burden of producing "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Carett*, 477 U.S. 317, 323 (1986). The moving party may meet their burden by "showing…an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has satisfied their burden, the non-moving party must plead specific facts to show a genuine issue exists. Fed.R.Civ.P. 56; *Anderson*, 477 U.S. at 250. Disputes that would not affect the outcome of the suit will not satisfy the requirement to show a genuine issue of material fact exists. *McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 298 (7th Cir. 1996). If the plaintiff does not show evidence exists that would reasonably allow a fact-finder to decide

in the plaintiff's favor on a material issue, the court must enter summary judgment against the plaintiff. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

**I.      Statute of Limitations- Loretta Wilford and Wexford**

As a preliminary matter, all claims against Wexford Health Sources, Inc. and Loretta Wilford should be dismissed as they fall outside the applicable statute of limitations.  The statute of limitations for actions brought pursuant to 42 U.S.C. § 1983 is governed by the personal injury statute of limitations of the state where the alleged injury occurred. *Wilson v. Garcia*, 471 U.S. 261, 276 (1985). Therefore, the relevant statute of limitations for both the § 1983 claims and the state law medical malpractice claim is two years. 735 ILCS 5/13-202; *Kalimara v. Illinois Dep't of Corrections*, 879 F.2d 276, 277 (7th Cir. 1989).

It is undisputed that Mr. Armbruster's first reported his alleged symptoms to Defendant Wilford on May 13, 2014 and was no longer under any Defendant's care after September 15, 2014.  His surgery was on September 26, 2014.  Mr. Armbruster filed his Complaint on May 16, 2016, naming Dr. Bharat Shah and Wexford Health Sources, Inc.; however, he failed to state a claim against Wexford.  (Docs. 1; 6).  Plaintiff's Complaint did not name Loretta Wilford either by name, title, or description.  (Doc. 1)   Mr. Armbruster first filed a claim against Loretta Wilford and Wexford on October 18, 2016.  (Doc. 33).  Even assuming that the statute of limitations was tolled during his care at SWICC, Plaintiff did not file his allegations against Loretta Wilford and Wexford within two years of leaving their care as required under Illinois law, thus his § 1983 and medical malpractices claims against them are barred by the statute of limitations.

A plaintiff cannot amend the complaint to add defendants or claims if they are barred by the statute of limitations at the time of the amended complaint, unless the amended complaint

"relates back" to the original complaint.  *Henderson v. Bolanda*, 253 F.3d 928, 931, 2001 U.S. App. LEXIS 9321, *6 (7th Cir. 2001).  Under Federal Rule of Civil Procedure 15(c) an amended complaint relates back when:

> (A) the law that provides the applicable statute of limitations allows relation back;
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Illinois law allows for relation back when a cause of action does not originally name a defendant in the following circumstances:

> (1) the time prescribed or limited had not expired when the original action was commenced; (2) the person, within the time that the action might have been brought or the right asserted against him or her plus the time for service permitted under Supreme Court Rule 103(b), received such notice of the commencement of the action that the person will not be prejudiced in maintaining a defense on the merits and knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him or her; and (3) it appears from the original and amended pleadings that the cause of action asserted in the amended pleading grew out of the same transaction or occurrence set up in the original pleading, even though the original pleading was defective in that it failed to allege the performance of some act or the existence of some fact or some other matter which is a necessary condition precedent to the right of recovery when the condition precedent has in fact been performed, and even though the person was not named originally as a defendant. 735 ILCS 5/2-616(d).

To the extent Plaintiff argues that his Amended Complaint "relates back" to his original Complaint, this argument is not successful for Wexford as the Court already determined that his Complaint did not articulate a claim against it.  (Doc. 6).  Plaintiff's Complaint did not plead sufficient facts or circumstances to put Wexford on notice of the claims he subsequently filed in his Amended Complaint.  To the extent the Court finds that Wexford was on notice of a claim, the Complaint did not put Wexford on notice of all claims, specifically the failure to protect or

medical malpractice claims.  Therefore, under Rule 15 and Illinois law, his claims against Wexford do not relate back to the original Complaint and must be dismissed as they are barred by the statute of limitations.

Further, Plaintiff's Complaint did not name Loretta Wilford whatsoever and he did not misidentify her as he did not name any treating nurses.  Plaintiff also did not put her on notice of a claim as he did not allege any issues with his May 13, 2014 appointment whatsoever or any issues with nursing care at that time.  In fact, he did not allege any deliberate indifference based on nursing care at any time in his original Complaint.  Similarly, Plaintiff did not allege any failure to protect claims against any Defendant, let alone against Loretta Wilford.  Instead, the facts and circumstances of his Complaint were concerning doctor care.  Until filing his Amended Complaint, more than two years after leaving her care, Plaintiff did not put Loretta Wilford on notice of his claims against her.  Therefore, as a matter of law, under Rule 15 and Illinois law, all claims against Loretta Wilford do not relate back to the original Complaint and must be dismissed as they are barred by the statute of limitations.

## II.     Count I- Deliberate Indifference Against All Defendants

In order to establish an Eighth Amendment claim for deliberate indifference under 42 U.S.C. §1983, a plaintiff must establish (1) plaintiff had an objectively serious medical need; (2) defendant had actual knowledge of the serious medical need but disregarded it; and (3) plaintiff sustained substantial harm from such disregard.  *Thomas v. Walton*, 461 F.Supp 2d 786, 793-795 (S.D. Ill. 2006); *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

First, to be sufficiently serious "a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997)(quoting *Farmer v. Brennan*, 511 U.S. 825 (1994).  "A 'serious' medical need is

one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (citation omitted).

Second, "[d]eliberate indifference implies ***at a minimum actual knowledge*** of impending harm easily preventable, so that a conscious, culpable refusal to prevent harm can be inferred from the defendant's failure to prevent it." (emphasis added); *Thomas*, 461 F.Supp 2d at 793, citing *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985). The Seventh Circuit has noted that the standard for deliberate indifference is a high hurdle…because it requires a "showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821-822 (7th Cir. 2012)(quoting *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006)).

"Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). Thus, a difference of opinions as to how to treat a medical condition does not give rise to a deliberate indifference claim. *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001). A court should examine the totality of care the prisoner received to determine whether he received "adequate medical care," not "unqualified access to health care." *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000); *Johnson v. Doughty, et al.*, 433 F.3d 1001, 1013 (7th Cir. 2006). "A prisoner's dissatisfaction with a physician's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996); *Johnson*, 433 F.3d at 1012-1013.

Deliberate indifference "is merely a synonym for intentional or criminally reckless conduct." *Thomas*, 461 F.Supp2d at 793. Negligence or even gross negligence, does not equate deliberate indifference. *Garvin*, 236 F.3d at 898; *Johnson*, 433 F.3d at 1012-1013. "Thus, an inadvertent failure to provide adequate medical care does not amount to deliberate indifference." *Thomas*, 461 F.Supp 2d at 793.

Third, plaintiff cannot succeed in his claim if he did not sustain "substantial harm" from the alleged deliberate disregard. *Id.* at 794. Further, "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston*, 100 F.3d at 1240-41; (citation omitted).

### A.    Serious Medical Need

Defendants do not deny that on September 26, 2014, Mr. Armbruster presented to the Gateway Regional Emergency Room with a spinal cord compression that constituted a serious medical need. Mr. Armbruster's neurosurgeon, Dr. Gregory Bailey, explained, however, that the signal change necessitating the need for surgery could have occurred on September 25, 2014. It is undisputed that Mr. Armbruster was not in Defendants' care on September 25, 2014; therefore, this fact is not dispositive.

The question on this issue before the Court is two part. First, whether there is any evidence that Mr. Armbruster had a spinal cord compression from May 13, 2014 through July 2, 2014. There is no evidence that Mr. Armbruster reported symptoms of tingling and numbness to the Defendants after July 2, 2014.[2] Defendants could not have addressed any unreported complaints, thus this is the only relevant period of time for Plaintiff's claims against Defendants.

---

[2] Plaintiff's failure to recall nearly all of his medical history, including any general time frames he was seen by Dr. Shah, is not evidence sufficient to create a disputed fact.

Second, assuming arguendo that the Court determines there is evidence that Mr. Armbruster had a spinal cord compression from May 13, 2014 through July 2, 2014, it is undisputed that a spinal cord compression is not always serious.  Therefore, Plaintiff must put forth some evidence that if Mr. Amrbruster had a spinal cord compression during that time that it was a serious medical need.  As Plaintiff has failed to produce evidence on either point, Defendants' Motion for Summary Judgment should be granted.

First, Mr. Armbruster presented to the healthcare unit over the course of a month and a half with varying symptoms, including tingling and numbness.  These symptoms were very similar to symptoms he reported on May 2, 2011 that did not require medical intervention.  Like the symptoms in 2011, the subjective symptoms Mr. Armbruster reported from May 13, 2014 through July 2, 2014 apparently resolved as Mr. Armbruster stopped reporting them.  It is undisputed that tingling and numbness can be caused by many different conditions and does not mean that the patient has a spinal cord compression.  The medical evidence that Mr. Armbruster was repeatedly tested and never displayed a positive objective neurological deficit, combined with the observations that Mr. Armbruster was able to successfully work a manual labor job, requiring walking and gripping for over an hour throughout this time frame, indicate that Mr. Armbruster did not have a spinal cord compression at that time.

Further, whether Mr. Armbruster had a spinal cord compression on May 13, 2014 through July 2, 2014 is a medical determination.  It cannot be inferred that since Mr. Armbruster had a spinal cord compression on September 26, 2014, that he also had it on May 13, 2014 through July 2, 2014.  Specialists Dr. Bailey and Dr. Petkovich agree that Mr. Armbruster's imaging and symptoms on September 26, 2014 were acute (sudden onset).  Dr. Petkovich, an Orthopaedic surgeon who has treated thousands of spinal cord compression cases, did not find

any evidence that Mr. Armbruster had a spinal cord compression while incarcerated, but instead his neurological recovery indicates that the compression he had on September 26, 2014 occurred within the same week and was not chronic.   A chronic spinal cord compression, over time, causes irreversible damage to the spinal cord despite surgical intervention.   Mr. Armbruster admits that all his symptoms are better and he has no complaints with his surgery.  Dr. Petkovich opined that Mr. Armbruster's neurological recovery indicates that his spinal cord compression was not present May 13, 2014 through July 2, 2014.   Regardless, this is clearly not a subject matter for inferences.   As Plaintiff has not produced admissible evidence that Mr. Armbruster had a spinal cord compression from May 13, 2014 through July 2, 2014,[3] he has not established that he was suffering from a serious medical condition at the time of his allegations against Defendants and Defendants' Motion for Summary Judgment should be granted.

Second, even assuming arguendo, that Mr. Armbruster had a spinal cord compression from May 13, 2014 through July 2, 2014, there is no evidence that it was a serious medical condition.  As testified by specialists Dr. Bailey and Dr. Petkovich, a spinal cord compression is not always a serious medical condition.   When a spinal cord compression does not cause objective neurological deficits it is not serious, but instead is very common.   Additionally, a spinal cord compression often does not require surgery.   Conversely, a spinal cord compression with signal change that causes neurological deficits is a serious medical condition.   Most obviously, as Mr. Armbruster worked a manual labor job carrying a 150 pound machine up and down two flights of stairs until September 4, 2014, any spinal cord compression he had was not serious.   Similarly, of the numerous neurological tests that Dr. Shah performed, Mr. Armbruster never presented with objective neurological deficits.  Additionally, Dr. Bailey did not review Mr.

---

[3] To the extent Plaintiff implies that the letter attached to the Third Amended Complaint dates Mr. Armbruster's spinal cord compression, it is a gross misrepresentation of his testimony, which was that he never reviewed Mr. Armbruster's IDOC medical records and cannot date the spinal cord compression.

Armbruster's IDOC medical records and did not opine on the existence or severity of Mr. Armbruster's alleged spinal cord compression before September 26, 2014. However, both specialists agree that Mr. Armbruster's presentation on September 26, 2014 was acute, meaning something happened after Mr. Armbruster was released from incarceration, before he reported to the emergency room, which caused the signal change and necessitated his surgery. Therefore, there is no evidence that Mr. Armbruster suffered from a serious medical condition from May 13, 2014 through July 2, 2014 and Defendants' Motion for Summary Judgment should be granted.

### B.    Deliberate Disregard

#### i.    Dr. Shah

Plaintiff's allegations originally pled that Dr. Shah was deliberately indifferent to Mr. Armbruster for five months, May through September 2014. After the conclusion of discovery, however, it is undisputed that Mr. Armbruster's complaints of tingling and numbness of any kind stopped on July 2, 2014. Mr. Armbruster continued to see Dr. Shah for his hypertension, but does not remember reporting any tingling or numbness at that time. Mr. Armbruster does not dispute the medical records when it comes to the dates he complained and who he presented to. Therefore, the allegation that Dr. Shah failed to treat him for 5 months is unsupported by all the evidence.

Next, the analysis is whether Dr. Shah was deliberately indifferent to Mr. Armbruster's medical needs. When Mr. Armbruster first presented with subjective symptoms of numbness and tingling, Dr. Shah inquired into Mr. Amrbruster's complaints and medical history; inspected his general presentation, including his gait; and palpated Mr. Armbruster's cervical spine, arm, hand, legs, and lumbosacral spine. Dr. Shah also testified that he conducted sensory testing,

which is supported by his general practice and his documentation that there was no evidence of objective neurological deficit.  The lack of objective neurological findings indicated to Dr. Shah that Mr. Armbruster did not have a spinal cord compression.  Dr. Shah did not stop the inquiry once there were no objective findings, instead Dr. Shah continued to look for underlying conditions that could cause tingling and numbness.

It is undisputed that many conditions can cause tingling and numbness, including diabetes, arthritis, and hypertension.  At the first appointment, Dr. Shah documented that Mr. Armbruster may have arthritis of the lumbosacral spine or sprain.  Based on this assessment, he advised Mr. Armbruster to do exercises, began monitoring his blood pressure, and scheduled a follow up appointment.  In fact, Dr. Shah was monitoring Mr. Armbruster's care so closely that Mr. Armbruster had 6 doctor's appointments during the month and a half that he complained.  Throughout his care, Dr. Shah ordered tests for diabetes, arthritis, and hypertension.[4]   Mr. Armbruster had hypertension and after being put on hypertension medication Mr. Armbruster reported that his symptoms were improving and were minimal.  He then stopped complaining on July 2, 2014.  Even assuming that Mr. Armbruster had a spinal cord compression at the time, which has not been established, in the month and a half of diagnostic testing, it was confirmed that Mr. Armbruster had a condition that could cause tingling and numbness, he was treated for that condition, and the symptoms improved.  Even if the symptoms were not caused by Mr. Armbruster's hypertension, Dr. Shah's care was not deliberately indifferent.

Plaintiff's claim not only assumes he had a spinal cord compression, it also assumes that it is a constitutional violation not to diagnose and provide surgery within a month and a half.  As Mr. Armbruster's surgeon explained it, however, it is very difficult to identify a spinal cord

---

[4] To the extent Plaintiff's counsel takes issue with the x-ray Dr. Shah ordered of Mr. Armbruster's knees, Mr. Armbruster repeatedly complained of back or body aches and had a history of gunshot wounds to his knees.  Dr. Shah treated Mr. Armbruster comprehensively.

compression.  This is compounded as Mr. Armbruster's subjective symptoms were vague and inconsistent, both in duration and location, and he was a poor medical historian.  Further, Plaintiff's allegations assume Mr. Armbruster needed surgical care from May through July 2, 2014, which is unsupported by the record.  As noted above, even if Mr. Armbruster had a spinal cord compression at that time, Mr. Armbruster's surgeon stated that does not mean he needed surgical intervention.  Plaintiff claims that he should have received an MRI, but Plaintiff has submitted no evidence that it would have shown that he needed surgical care in May 14, 2014 through July 2, 2014.

Dr. Petkovich found Dr. Shah's care appropriate, a far cry from deliberate indifference. Dr. Bailey, Mr. Armbruster's surgeon endorsed by Plaintiff, did not review the IDOC records or opine on the care Dr. Shah gave.  Plaintiff's only witness that opines on Dr. Shah's actions is Dr. Peter Brown, a family medicine doctor in California.  Dr. Brown has no specialty in orthopedics or neurology and accordingly has never testified in court in or a deposition in a spinal case.  (Ex. G, 6:10-7:4; 9:11-24).  Dr. Brown approved a report that stated Dr. Shah should have ordered an MRI, referred Mr. Armbruster to a neurologist, or had him sent to an emergency room.  Dr. Brown's opinion is based on his practice as a family medicine doctor, but Dr. Brown has never treated a patient with a spinal cord compression, but instead would send them to a specialist for treatment.  (Ex. G, 32:1-4).  His opinion is more indicative of his inexperience with spinal cord compressions as, according to Dr. Petkovich, an Orthopaedic surgeon who has diagnosed thousands of spinal cord compressions, the opinions in the report Dr. Brown approved are not consistent with the general practice.  (Ex. C, 226:15-227:16).

Of note, when Mr. Armbruster presented to the emergency room on May 2, 2011 with similar, and arguably more severe, symptoms he was not admitted, there is not documentation

26

that a complete neurological examination was done (to Dr. Brown's standards), he did not get an MRI, and no surgery was performed.  Dr. Brown also opines that Mr. Armbruster did not need to go to the neurologist after this appointment as the symptoms could have resolved on their own. (Ex. G, 114:2-116:17).  Dr. Brown's opinions are not consistent.

When questioned about what Dr. Brown believes Dr. Shah should have done, Dr. Brown said that Dr. Shah did not document each positive and negative finding of each neurological testing; therefore, it is Dr. Brown's position that without that level of documentation the testing did not occur.  On many occasions when Dr. Shah documented that Mr. Armbruster did not have neurological deficits,[5] Dr. Brown did not consider that evidence that Dr. Shah conducted neurological examinations.  (Ex. G, 48:24-50:20; 78:10-79:2; 80:4-18; 94:12-95:7; 103:3-14). Further, when Dr. Shah documented that Mr. Armbruster's grip was full, it was not evidence to Dr. Brown of neurological testing of his grip.  (Ex. G, 48:24-50:20).  Mr. Armbruster remembers and testified that Dr. Shah tested his grip, but somehow this is not sufficient for Dr. Brown to believe it happened.  Therefore, even Mr. Armbruster's sworn testimony contradicts Dr. Brown's opinion.  As the undisputed facts show that Dr. Shah did neurological testing, all Dr. Brown's opinions based on the premise that no neurological testing was done are irrelevant to this case and create no inferences or dispute here.

Dr. Brown repeatedly opined that just observing the patient is a deviation from the standard of care, but again it is undisputed that Dr. Shah ordered several tests to try and identify what, if anything, was causing Mr. Armrbuster's subjective symptoms.  Dr. Shah considered arthritis, diabetes, and hypertension in the month and a half he treated Mr. Armbruster's

---

[5] When Mr. Armbruster presented to the emergency room on September 26, 2014 the neurological examination was also documented "no neuro deficits."  (Ex. G, 129:3-5). Of the numerous medical records in this case, one medical record contains the documentation specifications that Dr. Brown requires, yet Dr. Brown does not believe that exam occurred either. (Ex. G, 136:3-138:18).

subjective symptoms.  Dr. Brown starts with the improper, unsupported assumption that Mr. Armbruster had a spinal cord compression and discounts any testing to identify other conditions that could cause the same subjective symptoms.  Any of Dr. Brown's opinions based on the premise that Dr. Shah only observed Mr. Armbruster are irrelevant to this case and create no inferences or disputes here.  Dr. Brown's opinion is essentially that when any patient presents with tingling and numbness for a week that an MRI or referral is required under the standard of care.  Again, he contradicts his own opinion with regard to Mr. Armbruster's May 2, 2011 ER visit.  Regardless, this opinion is not the deliberate indifference standard and creates no dispute with regard to this claim.

Dr. Petkovich, who undeniably has more specialized training, education, and experience than Dr. Brown, was able to digest the records and opined on Dr. Shah's actual care.  After reviewing and considering Dr. Shah's testimony along with all the medical records in this case, Dr. Petkovich would not have ordered further testing, including an MRI, because there was no evidence Mr. Armbruster had a spinal cord compression.  Accordingly, Dr. Shah's treatment was not a constitutional violation.

Dr. Shah examined and tested Mr. Armbruster repeatedly for his subjective complaints and Dr. Shah is allowed to rely on his medical findings.  Dr. Shah did not believe Mr. Armbruster had a spinal cord compression, but instead was attempting to find out if Mr. Armbruster had one of the numerous conditions that cause tingling and numbness, including diabetes, hypertension, and arthritis.  This is part of the diagnostic process and the Court should not use hindsight to find that every patient that reports inconsistent, varied subjective complaints of tingling and numbness is constitutionally entitled to an MRI, specialist, or emergency room visit.  Therefore, Plaintiff's deliberate indifference claim should be dismissed.

ii.     **Loretta Wilford**

It is undisputed that Loretta Wilford is a nurse.  Diagnosis and treatment is outside nursing practice.  225 ILCS 65/50-10; 225 ILCS 65/50-25; 735 ILCS 5/2-622; 735 ILCS 5/8-2501; *Cummings v. Jha*, 394 Ill. App.3d 439, 451 (5th Dist. 2009).  *Quoting Alm v. Loyola University Medical Center*, 373 Ill.App. 3d 1, 6, 866 N.E.2d 1243, 310 Ill. Dec. 641 (2007); *Sullivan v. Edward Hosp.*, 335 Ill.App. 3d 265, 269 (2nd Dist. 2002); *Shanks v. Memorial Hosptial*, 170 Ill. App.3d 736, 739, 525 N.E.2d 177 (5th Dist. 1988); *Shasteen v. Shelby Mem. Hosp.*, 2011 Il. App. Unpub. LEXIS 158 *12, 405 Ill. App. 3d 1222, 997 N.E.2d 1019 (5th Dist. 2011).  To the extent Plaintiff alleges she should have changed Mr. Armbruster's diagnosis or treatment plan, his claim against her must be dismissed.

Mrs. Wilford was the first person in the healthcare unit that Mr. Armbruster presented to with complaints of tingling and numbness.  Mrs. Wilford referred Mr. Armbruster to Dr. Shah and he was seen by Dr. Shah the next day.  From May 14, 2014, Mr. Armbruster remained under Dr. Shah's follow up care.  Mr. Armbruster saw Dr. Shah 6 times within a month and a half for his subjective symptoms.  No matter what tangential complaints Mr. Armbruster may have against Mrs. Wilford, there is nothing else within Loretta Wilford's practice that she could have done regarding Mr. Armbruster's subjective complaints.  In is undisputed that Mr. Armbruster had access to medical care, specifically Dr. Shah; therefore, all claims against her should be dismissed.  Plaintiff has produced no expert testimony that states that Mrs. Wilford should have done anything differently.  To the extent the report that Dr. Brown approved says there should have been more documentation, he testified under oath that he is not offering an opinion regarding the nursing care and does not have the expertise to offer such opinions.[6]  Mrs. Wilford

---

[6] To the extent Plaintiff's claim relies on a misstatement she made in her deposition about another offender complaining to the healthcare unit, she clarified her misstatement during Plaintiff counsel's

did not disregard Mr. Armbruster's complaints, instead Mrs. Wilford did everything she is authorized to do: immediate referral to the doctor.   Mrs. Wilford was not deliberately indifferent to Mr. Armbruster and summary judgment should be granted in her favor.

      **iii.   Wexford**

A private corporation such as Wexford Health Sources, Inc., cannot be held liable under §1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself.  *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014). It is undisputed that Dr. Shah treated Mr. Armbruster and based on his medical judgment did not request a referral for an MRI or a specialist.  Dr. Shah has the medical training, experience, and education to make those clinical determinations.  Dr. Shah worked at SWICC for over a decade and before Wexford was contracted to provide medical care there.  His practice did not change once Wexford won the contract.

Although there is a Collegial Review process where referrals are submit for review, it is undisputed that a Collegial Review request was not submitted for Mr. Armbruster.  Therefore, that process was never initiated and any policies concerning it are irrelevant.

Further, to the extent Plaintiff alleges that a policy drove Dr. Shah's decision making, there is simply no evidence indicating that Wexford Health Sources, Inc., directed Mr. Armbruster's care.  There is no testimony from any witness that any policy, procedure, or practice prohibited Dr. Shah from making a referral to Collegial Review for any treatment he believed to be medically necessary.  Instead, it is undisputed that Dr. Shah did not request an MRI or specialist referral because Mr. Armbruster presented with no objective neurological

---

questioning and again during Defense counsel's questioning in the same deposition.  (Ex. H, 202:16-205:14).  Regardless, this testimony does not change Mr. Armbruster's care.

deficits and Dr. Shah did not believe he had a spinal cord compression or a serious medical need. This is simply not a case about policies and procedures, thus Wexford must be dismissed.

### C.      Substantial Harm

Finally, Mr. Armbruster's surgery was successful and all of his symptoms are better.  Mr. Armbruster can and has regained his normal activity and has been able to work and commit a burglary post-surgery.   Dr. Petkovich, the only specialist who reviewed the entirety of the medical records in this case, called Mr. Armbruster's neurological recovery "miraculous."  (Ex. C, 194:12-195:9).  The remaining experts have all acknowledge that they cannot opine on Mr. Armbruster's current medical condition; therefore, Mr. Armbruster has presented no evidence that even if he had spinal decompression surgery on May 14, 2014, assuming arguendo that he needed it, that his outcome would be any different.  Plaintiff has not placed "verifying medical evidence in the record to establish the detrimental effect of delay in medical." *Langston*, 100 F.3d at 1240-41; (citation omitted).   Accordingly, there is no genuine issue of material fact remaining and summary judgment should be granted in Defendants' favor.

### III.      Count II- Failure to Protect Against All Defendants

To state a failure to intervene claim under § 1983, the plaintiff must allege that a constitutional violation has been committed and the defendant had a realistic opportunity, but failed to intervene to prevent the harm from occurring.  *Abdullahi v. City of Madison*, 423 F.3d 763, 744 (7th Cir. 2005).

Plaintiff's claim is essentially assuming any defendant was deliberately indifferent, the remaining defendants failed to intervene.  Therefore, as the undisputed material facts show that no defendant was deliberately indifferent, Plaintiff's claim here must also be dismissed.

Regardless, there is no evidence that the Defendants had a realistic opportunity to intervene in another Defendants' actions.  In fact, Plaintiff does not allege that any act was committed by one defendant in front of the others.  Instead, Plaintiff's allegations are that he was treated on separate dates by Loretta Wilford and Dr. Shah.  The uncontroverted evidence is that Loretta Wilford was not in the examination room with Dr. Shah and Mr. Armbruster.[7]

Further, it is undisputed that Loretta Wilford is a nurse.  As Loretta Wilford cannot diagnose and treat an alleged spinal cord compression, she had no reasonable opportunity to intervene in Mr. Armbruster's care for subjective complaints of tingling and numbness.  It is outside her experience, education, and training to determine that a physician's care was inappropriate.  Even if she disagreed with any medical care, it is outside her training, education, and experience to change a diagnosis or treatment plan. Specifically, Loretta Wilford is not able to order the treatment Mr. Armbruster claims he required.

Additionally, Wexford did not have a realistic opportunity to review every offender's medical chart to second guess their treatment, nor is that an established practice in the medical field.  Instead, Wexford has monthly quality assurance meetings and ongoing peer reviews of the doctors and nurses, but were never put on notice of any issue with Mr. Armbruster.  Again, no request was sent for Collegial Review.  As such, there is no material dispute and Plaintiff's failure to protect claim should be dismissed.

### IV.   Count III- Medical Malpractice

"To prove a claim of medical malpractice a plaintiff must show that (1) there was a standard of care by which to measure the defendants' conduct, (2) the defendant negligently

---

[7] To the extent Plaintiff alleges Defendants failed to intervene with regard to Defendant Vitale, as the undisputed evidence is that Ronald Vitale is not a medical provider and Mr. Armbruster was provided access to Dr. Shah at all times alleged in the Third Amended Complaint, Plaintiff's failure to intervene claim fails against all Defendants.

breached that standard of care, and (3) the defendant's breach was the proximate cause of the plaintiff's injury." *Cummings v. Jha*, 394 Ill. App.3d 439, 451 (5th Dist. 2009). Quoting *Alm v. Loyola University Medical Center*, 373 Ill.App. 3d 1, 6, 866 N.E.2d 1243, 310 Ill. Dec. 641 (2007). "Each element must be presented by expert testimony." *Cummings*, 394 Ill. App.3d at 451. Quoting *Alm*, 373 Ill. App. 3d at 6-7. *See also Sullivan v. Edward Hosp.*, 335 Ill.App. 3d 265, 269 (2nd Dist. 2002). Specifically, the Plaintiff must produce an affidavit in accordance with 735 ILCS 5/2-622. This affidavit must include that the Plaintiff has consulted and reviewed the facts of the case with a health professional who the affiant reasonably believes the health professional:

> (i) is knowledgeable in the relevant issues involved in the particular action; (ii) practices or has practiced within the last 6 years… in the same area of health care or medicine that is at issue in the particular action; and (iii) is qualified by experience or demonstrated competence in the subject of the case; that the reviewing health professional has determined in a written report, **after a review of the medical record and other relevant material involved in the particular action that there is a reasonable and meritorious cause for the filing of such action**; and that the affiant has concluded on the basis of the reviewing health professional's review and consultation that there is a reasonable and meritorious cause for filing of such action… A copy of the written report, clearly identifying the plaintiff and the reasons for the reviewing health professional's determination that a reasonable and meritorious cause for the filing of the action exists, must be attached to the affidavit, but information which would identify the reviewing health professional may be deleted from the copy so attached. 735 ILCS 5/2-622 (emphasis added).

In an apparent attempt to comply with these requirements, Plaintiff's counsel attached to the Third Amended Complaint an affidavit and report from Dr. Gregory Bailey. (Doc. 123-1). It is undisputed that this affidavit fails to comply with 735 ILCS 5/2-622 and Plaintiff's medical malpractice claim must be dismissed.

On May 3, 2018, Dr. Gregory Bailey, during his deposition testimony, stated that he has not reviewed any of Mr. Armbruster's medical records during Dr. Shah's care in this case. 735 ILCS 5/2-622 requires a report from a qualified health professional that had reviewed the

medical records. This requirement is explicit and clear, yet Plaintiff's report is not in compliance and Plaintiff's claim must be dismissed.

Further, Dr. Gregory Bailey has not spoken with anyone concerning Dr. Shah's treatment of Mr. Armbruster.  Notably, Dr. Bailey's letter does not name a defendant in this action nor does it speak to any specifics of their treatment.  In fact, Dr. Bailey, at his deposition, did not give an opinion as to Dr. Shah's care.  It is unclear if Dr. Bailey even knows the names Bharat Shah or Wexford Health Sources, Inc.  Dr. Bailey does not remember the context in which he wrote the letter that Plaintiff proffers to be the report to comply with 735 ILCS 5/2-622.  Dr. Bailey certainly does not allege that a medical malpractice claim against Dr. Shah and/or Wexford is "reasonable and meritorious."  Again, Dr. Bailey's letter cannot be used to show compliance under 735 ILCS 5/2-622.

Instead, Mr. Armbruster explains that Dr. Bailey's letter was created, based solely on Mr. Armbruster's medical history according to him, to help Mr. Armbruster attempt to receive state disability benefits.  Leaving aside the fact that Dr. Bailey admits he wrote the wrong diagnosis in the letter, he did not write his letter intending that it be used in this action.  Therefore, although Dr. Bailey has experience as a neurosurgeon, he does not have sufficient knowledge concerning the details of this case, has not reviewed any medical records in this case, and has not opined on the meritorious, or not, nature of Plaintiff's medical malpractice claim against Dr. Shah and Wexford.  Defendants are entitled to summary judgment and Plaintiff's claim must be dismissed.

Further, a separate affidavit and report shall be filed as to each defendant. 735 ILCS 5/2-622 (b).  To the extent Dr. Bailey's letter is a report regarding Dr. Shah's care, Plaintiff failed to file a separate report regarding Wexford.  This is essential as Dr. Bailey's care of Mr. Armbruster in no way gives him insight or knowledge into Wexford policies and procedures.

Accordingly, Dr. Bailey's letter does not attempt to opine on Wexford, their policies, or quality of Plaintiff's claim against it.   Therefore, at minimum, the claim against Wexford should be dismissed.

Finally, as noted in detail above, Mr. Armbruster's surgery was successful and all of his symptoms are better.   Mr. Armbruster has presented no evidence that even if he had spinal decompression surgery on May 14, 2014, assuming arguendo that it was required under the standard of care, that his outcome would be any different.   Accordingly, there is no evidence that Dr. Shah's or Wexford's care was the proximate caused of any alleged injury and summary judgment should be granted in Defendants' favor.

## CONCLUSION

For the foregoing reasons, Defendants pray that this Court enter Summary Judgment in their favor and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

CASSIDAY SCHADE LLP

By: _/s/ Jaclyn Kinkade_
    Attorneys for Defendants, BHARAT SHAH, M.D., WEXFORD HEALTH SOURCES, INC., and LORETTA WILFORD

Jaclyn Kinkade
MO Bar 63935
CASSIDAY SCHADE LLP
100 North Broadway, Suite 1580
St. Louis, MO 63102
(314) 241-1377
(314) 241-1320 (Fax)
jkinkade@cassiday.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 22, 2018, I electronically filed the foregoing with the Clerk of the Southern District of Illinois using the CM/ECF system.  The electronic case filing system sent a "Notice of E-Filing" to the following:

Arthur Loevy, Esq.
Sarah Copeland Grady, Esq.
Jon I. Loevy, Esq.
Katherine A. Roche, Esq.
Michael Knovitz, Esq.
Loevy & Loevy
311 North Aberdeen Street
Third Floor
Chicago IL 60607
jon@loevy.com
Katie@loevy.com
mike@loevy.com
loevylaw@loevy.com
sarah@loevy.com

Rachel D. Schwarzlose
Assistant Attorney General
500 South Second Street
Springfield, IL 62701
rschwarzlose@atg.state.il.us

*/s/ Jaclyn Kinkade*