**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| GERRY ARMBRUSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16 C 0544 |
| | ) | |
| WEXFORD HEALTH SOURCES, *et al.*, | ) | Judge Michael J. Reagan |
| | ) | |
| Defendants. | ) | Mag. Judge Stephen C. Williams |

# Exhibit 2

## Page 1

1   IN THE UNITED STATES DISTRICT COURT FOR THE
2   SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION
3
4   GERRY ARMBRUSTER,
5
6       PLAINTIFF,
7
8   VS.          CASE NO. 16 C 0544
9
10  WEXFORD HEALTH SOURCES, et al.,
11
12      DEFENDANTS.
13
14
15
16
17      DEPOSITION OF BHARAT SHAH, MD
18    TAKEN ON BEHALF OF THE PLAINTIFF
19       DECEMBER 7, 2017
20
21
22
23
24

## Page 2

1            INDEX
2                  PAGE
3   Examination by Ms. Grady          6
4   Examination by Mr. Dugan          297
5          EXHIBITS
6                  MARKED
7   Plaintiff's Exhibit 1       150
8      (Wexford Health Medical Policies and
9   Procedures.  Region:  Illinois)
10  Plaintiff's Exhibit 2       155
11     (Job descriptions)
12  Plaintiff's Exhibit 3       186
13     (Wexford Health Operations Policies
14  and Procedures.  Region:  Global)
15  Plaintiff's Exhibit 4       212
16     (Offender outpatient progress notes.
17  5/14/14)
18  Plaintiff's Exhibit 5       243
19     (Offender outpatient progress notes.
20  5/28/14)
21  Plaintiff's Exhibit 6       250
22     (Offender outpatient progress notes.
23  5/15/14)
24

## Page 3

1   Plaintiff's Exhibit 7       253
2      (Offender outpatient progress notes.
3   6/3/14)
4   Plaintiff's Exhibit 8       257
5      (Offender outpatient progress notes.
6   6/17/14)
7   Plaintiff's Exhibit 9       263
8      (Offender outpatient progress notes.
9   6/23/14)
10  Plaintiff's Exhibit 10      268
11     (Offender outpatient progress notes.
12  6/25/14)
13  Plaintiff's Exhibit 11      273
14     (Offender outpatient progress notes.
15  8/1/14)
16  Plaintiff's Exhibit 12      277
17     (Offender outpatient progress notes.
18  8/7/14)
19  Plaintiff's Exhibit 13      283
20     (Letter from Gregory Bailey, MD
21  dated 3/26/15)
22
23  (Original exhibits returned to Mr. Dugan with original
    transcript.)
24

## Page 4

1   IN THE UNITED STATES DISTRICT COURT FOR THE
2   SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION
3
4   GERRY ARMBRUSTER,
5
6       PLAINTIFF,
7
8   VS.          CASE NO. 16 C 0544
9
10  WEXFORD HEALTH SOURCES, et al.,
11
12      DEFENDANTS.
13      Deposition of BHARAT SHAH, MD, produced,
14  sworn and examined on the 7th day of December, 2017,
15  between the hours of ten o'clock in the forenoon and
16  six o'clock in the evening of that day, at the offices
17  of Cassiday Schade, 100 North Broadway, Suite 1580, in
18  the City of St. Louis, State of Missouri, before
19  Catherine L. Turner, IL-CSR, MO-CCR, RPR in a certain
20  cause now pending in the United States District Court
21  for the Southern District of Illinois, East St. Louis
22  Division, between Gerry Armbruster, Plaintiff, vs.
23  Wexford Health Sources, et al., Defendants, on behalf
24  of the Plaintiff.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

**BHARAT SHAH, MD  12/7/2017**

## Page 5

APPEARANCES

FOR THE PLAINTIFF GERRY ARMBRUSTER:
SARAH GRADY
KATIE ROCHE
Loevy & Loevy
311 North Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312)243-5900
sarah@loevy.com
katie@loevy.com

FOR THE DEFENDANT WEXFORD HEALTH SOURCES, et al.:
TIMOTHY P. DUGAN
JACLYN A. KINKADE
Cassiday Schade
100 North Broadway, Suite 1580
St. Louis, Missouri 63102
(314) 241-1377
tdugan@cassiday.com
jkinkade@cassiday.com

FOR THE STATE OF ILLINOIS:
(Via telephone)
LOUIS LAUGGES
Illinois Attorney General's Office
500 South 2nd Street
Springfield, Illinois 62701
llaugges@atg.state.il.us

Court Reporter:
Catherine L. Turner, IL-CSR, MO-CCR, RPR
Alaris Litigation Services
711 North Eleventh Street
St. Louis, Missouri 63101
(314) 644-2191
1-800-280-3376

## Page 6

1    IT IS HEREBY STIPULATED AND AGREED by and
2    between counsel for the Plaintiff and counsel for the
3    Defendants that this deposition may be taken in
4    shorthand by Catherine L. Turner, IL-CSR, MO-CCR, RPR,
5    and afterwards transcribed into typewriting: and the
6    signature of the witness is expressly reserved.
7                        *   *   *   *   *
8    (Starting time of the deposition:  10:26 a.m.)
9                        BHARAT SHAH, MD,
10    of lawful age, produced, sworn and examined on behalf
11    of the Plaintiff, deposes and says as follows:
12                        EXAMINATION
13    QUESTIONS BY MS. GRADY:
14        Q:  Can you please state and spell your name for
15    the record?
16        A:  Bharat, B-h-a-r-a-t, T as in Tom.
17        Q:  And your last name?
18        A:  Shah, S-h-a-h.
19        Q:  Thank you, Dr. Shah.  I introduced myself
20    before we began, but I'll do it again for the record.
21    My name is Sarah Grady.  I'm an attorney for the
22    plaintiff in this case, Gerry Armbruster.
23        Q:  Have you ever sat for a deposition before?
24        A:  Yes.

## Page 7

1        Q:  Okay.  Then you'll likely know the rules I'm
2    going to go over, but I'll go over them just one time
3    so that we're both on the same page.
4        If you have any confusion about any of the
5    questions I ask today, please feel free to let me know
6    and I will rephrase my question or make sure it's
7    clear to you what I'm asking.  Okay?
8        A:  (Witness nodding).
9        Q:  The second rule is that you have to keep
10    your answers audible and verbal, so instead of nodding
11    or shaking your head, I'd ask that you say yes or no.
12        And the same goes for an uh-huh or huh-uh.
13    It has to be a yes or no.  That's for the court
14    reporter who can't take down head movements or
15    uh-huhs, which maybe don't reflect which answer is
16    which.
17        A:  Yes.
18        Q:  And also please keep your voice up so that
19    the person on the phone can hear you and the court
20    reporter can get your testimony accurately, okay?
21        Q:  The fourth guideline is one for both of us,
22    really.  Please do your best to let me finish my
23    question even if you know where I'm going or what I'm
24

## Page 8

1    asking.  And I will do my best to let you finish your
2    answer before starting my next question.  Again,
3    that's so the record can be clear.  Okay?
4        A:  Yes.
5        Q:  The last is that the attorneys will be
6    objecting to one or more of my questions today.  You
7    should still answer unless your attorneys instruct you
8    not to answer.  Okay?
9        A:  Yes.
10        Q:  That's for a judge to decide later on, but
11    for purposes of the deposition here today, again,
12    unless your attorney instructs you not to answer when
13    someone objects, that means you should still go ahead
14    and answer.  Okay?
15        A:  Yes.
16        Q:  I'm going to apologize in advance.  These
17    next set of questions are ones I have to ask you, but
18    I apologize.  I realize they might be a bit intrusive.
19        Do you have any conditions that might affect
20    your memory or your ability to answer truthfully and
21    honestly?
22        A:  No.
23        Q:  Okay.  Are you taking any medications that
24    would affect your memory?

**ALARIS LITIGATION SERVICES**
**www.alaris.us**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**

**BHARAT SHAH, MD  12/7/2017**

Page 9

1    A: I am taking blood pressure medication.
2    Q: And as you understand it, does that blood
3  pressure medication affect your memory?
4    A: No.
5    Q: And are you taking any medications including
6  the blood pressure medication that would affect your
7  ability to testify truthfully here today?
8    A: No.
9    Q: Anything else that might affect your memory
10  or your ability to testify honestly?
11    A: No.
12    Q: I'd like to start out by talking about what
13  independent recollection you might have of Gerry
14  Armbruster.  And before I get into those questions, I
15  want to make sure you understand what I mean when I
16  say "independent recollection."
17     When I use that phrase, I mean a memory that
18  you have in your mind without having to rely on
19  reviewing documents or what someone else may have told
20  you about Gerry Armbruster, but something you recall
21  sitting here today without the use of documents or
22  something that you've been told by someone else.
23    A: No.
24    Q: Okay.  So then getting to my question, which

Page 10

1  I think you have anticipated.  Do you have any
2  independent memory of Gerry Armbruster?
3    A: No.
4    Q: Is it fair to say that you don't remember,
5  as you sit here today, any complaints that Mr.
6  Armbruster may or may not have made back in 2014?
7    A: Not without referring to the records.
8    Q: Okay.  And we'll get to the records and
9  we'll talk about -- we'll talk about what, if
10  anything, that jogs in your memory.
11     But as you sit here today, do you have any
12  recollection of any complaints that Mr. Armbruster did
13  or didn't make?
14    A: No.
15    Q: And as you sit here today, without any
16  documents in front of you, do you have any independent
17  recollection of any objective signs of medical -- one
18  or more medical conditions Mr. Armbruster was
19  exhibiting?
20    A: No.
21    Q: Fair to say you don't remember any actions
22  that you took in response to any complaints that he
23  may have made in 2014?
24    A: No.  Not without referring to records.

Page 11

1    Q: Do you have any independent recollections of
2  any communications you had with Mr. Armbruster?
3    A: No.
4    Q: And do you have any independent recollection
5  of any communications you had with anyone else about
6  Mr. Armbruster before the filing of this lawsuit?
7    A: No.
8    Q: Tell me everything you did to prepare for
9  today's deposition.
10    A: First I reviewed the complaint of the
11  plaintiff, then reviewed the medical records that was
12  supplied to me by my attorney.
13    Q: Any other documents that you reviewed to
14  prepare for today's deposition?
15    A: Not besides whatever was given to me by the
16  attorney.
17    Q: Okay.  Well, let's talk about what you do
18  recall reviewing.  One of the things you said you
19  recalled reviewing was the plaintiff's complaint?
20    A: Yes.
21    Q: And when did you review that?
22    A: When the court papers came to me and
23  whatever was mentioned there.
24    Q: Was that around the time you learned you had

Page 12

1  been named as a defendant in this lawsuit?
2    A: Yes.
3    Q: Okay.  So that was some time ago, correct?
4    A: I think so.
5    Q: And since that first time reviewing the
6  complaint, have you reviewed it since?
7    A: No.  I reviewed the medical records.
8    Q: And then the medical records, when did you
9  review those?
10    A: The records were given to me by attorney.
11  That was part of the record, and then subsequently, I
12  got them, I think, I believe, last month, some
13  complete records.
14    Q: Okay.  When you say you reviewed records,
15  let me just make sure I'm clear.  You believe you
16  reviewed some portion of the records in April of this
17  year?
18    A: Yes.
19    Q: And then you reviewed some approximately one
20  month ago which would be in October/November?
21    A: I think so.
22    Q: Do you recall which of the documents you
23  reviewed in April and which you received in
24  October/November, generally speaking?

3 (Pages 9 to 12)

BHARAT SHAH, MD  12/7/2017

Page 13

1   A:  I think I got the record that were
2   pertaining to last three or four months of his stay in
3   that prison, and rest of the complete records I got it
4   in last month if I mistake not.
5   Q:  The records that you received, were those
6   records that pertained only to the notes you had
7   created, or did you also review medical records
8   created by people other than yourself?
9   A:  I reviewed the medical records of his stay
10  at Southwestern Illinois Correctional Center.
11  Q:  So you haven't reviewed records from other
12  facilities he may have been at, correct?
13  A:  I haven't seen them.
14  Q:  And what, if anything, do you recall from
15  your review of them?
16  A:  Outside the court or --
17  Q:  For the records reflecting care provided at
18  facilities other than at Southwestern.
19  A:  I reviewed the records of the patient's care
20  after he left Southwestern.
21  Q:  And were those records, as you understand
22  it, from someone other than Wexford or IDOC?
23  A:  Yeah.
24  Q:  Tell me what you recall from your review of

Page 14

1   those records.
2   A:  That Mr. Armbruster had visited the
3   emergency room of Gateway.
4   Q:  What else do you recall?
5   A:  And then he was transferred to St. Mary's
6   Hospital in Clayton, Missouri.
7   Q:  And do you recall why he was treated in the
8   ER and then transferred to St. Mary's?
9   A:  Well, he was seen in the ER for his
10  complaints, and then he was evaluated for his gait,
11  which was abnormal, and then he was referred to --
12  after the workup, he was referred to St. Mary's
13  Hospital in Clayton.
14  Q:  What was the point of that referral, if you
15  recall?
16  A:  That was for the treatment of his condition.
17  Q:  And what treatment was that, if you recall?
18  A:  The treatment was given to him was surgery
19  for the spine.
20  Q:  Do you recall what issue prompted the need
21  for surgery?
22  A:  He had a problem with his cervical C5-C6
23  degenerative disc disease.
24  Q:  And anything else you recall from your

Page 15

1   review of those records?
2   A:  And he had effect on the compression of the
3   nerves, nerves of the neck.
4   Q:  Anything else?
5   A:  No.
6   Q:  Are there any other records that you
7   reviewed pertaining to care that Mr. Armbruster
8   received outside of Southwestern, whether at another
9   IDOC facility or from someone who's --
10  A:  Yeah.
11  Q:  -- not affiliated with IDOC?
12  A:  Yeah.  I had reviewed his records from
13  Taylorville.
14  Q:  And were those records --
15  A:  After he left Southwestern.
16  MR. DUGAN:  Let her finish her question,
17  Doctor, before you start to answer.
18  THE WITNESS:  Sorry.
19  MR. DUGAN:  That's okay.
20  Q:  (By Ms. Grady)  What, if anything, stood out
21  to you about those records?
22  A:  On which records?
23  Q:  From the records you reviewed from
24  Taylorville after Mr. Armbruster left Southwestern.

Page 16

1   A:  That he was treated for his regular
2   conditions.  He had no specific treatment
3   specifically.
4   Q:  Any other records you reviewed reflecting
5   care Mr. Armbruster received not at Southwestern and
6   before he went to Southwestern or after he left?
7   A:  Before he went to Southwestern, I remember
8   having reviewed his one record before.
9   Q:  And do you remember, were those IDOC
10  records?
11  A:  No.
12  Q:  So these were records generated by someone
13  that was not Wexford or IDOC, correct?
14  A:  No.  Yeah.  It was somebody else.
15  Q:  Okay.  Tell me what you recall from your
16  review of those records.
17  A:  Which records?
18  Q:  The records you were just talking about.
19  A:  That he had attended emergency room.
20  Q:  So those were the records we talked about
21  earlier from Gateway emergency room and St. Mary's,
22  correct?
23  A:  No.  Gateway emergency room was after he
24  left Southwestern.

4 (Pages 13 to 16)

## BHARAT SHAH, MD  12/7/2017

Page 17

1     Q:  Okay.  You're talking about records from an
2 emergency room visit before he arrived at
3 Southwestern?
4     A:  Yeah.  Much before.  I don't exactly recall
5 as to when it was.
6     Q:  Tell me what you recall from those records.
7     A:  That he had reported for some complaints of
8 his pain.
9     Q:  And did you review in those records what was
10 done in response to those complaints?
11     A:  That he was advised to go and see some
12 outside physician.
13     Q:  Did you review any records from that
14 physician?
15     A:  He had not gone to any physician.
16     Q:  Tell me how you know that.
17     A:  From the record that he was advised to go to
18 the physician.
19     Q:  And did you see a record wherein Mr.
20 Armbruster said he did not go to see that physician?
21     A:  Yeah.  Because from the records, that he did
22 not see anybody.
23     Q:  So in other words, your understanding that
24 he did not go see someone is based on the fact you

Page 18

1 weren't given records to review from that physician,
2 correct?
3     A:  Yes.  Before any -- before as any admission
4 to any doctor.
5     Q:  Understood.  Any other records that you
6 reviewed pertaining to Mr. Armbruster's care before or
7 after he left Southwestern?
8     A:  After he left Southwestern, he went to
9 Gateway and to St. Mary's.  I reviewed those records,
10 and I reviewed his physician's follow-up visit.
11     Q:  And you also reviewed the records from
12 Taylorville, correct?
13     A:  Yeah.  Yes.
14     Q:  And you reviewed the records from the ER
15 visit before.
16     Any other records you reviewed from care not
17 given at Southwestern?
18     A:  No.  I have not seen any.
19     Q:  Did you review records of Mr. Armbruster's
20 care while at Graham Correctional Center or any other
21 facility he was at before he came to Southwestern?
22     A:  I have not seen any record.
23     Q:  Do you know Dr. Kayira?
24     A:  Yes, in my professional.

Page 19

1     Q:  Did you review any records pertaining to Dr.
2 Kayira's treatment of Mr. Armbruster?
3     A:  Yes.  I remember his -- but whether it was
4 after he left or before he came to, I don't -- before
5 he came to Southwestern, I don't know.
6     Q:  My understanding is Dr. Kayira is a
7 physician at Graham Correctional Center.
8     A:  I think so.
9     Q:  Is that consistent with your understanding
10 as well?
11     A:  Well, I have seen his record, but I don't
12 exactly recall as to what facility did he see.
13     Q:  To the best of your understanding, did you
14 receive Mr. Armbruster's full IDOC medical records to
15 review?
16     MR. DUGAN:  When, please?
17     A:  Which records?
18     Q:  Sure.  You testified you received some
19 records in April and some records in October and
20 November.  Including both of those sets of records, is
21 it your understanding that you received Mr.
22 Armbruster's full IDOC medical record?
23     A:  I have seen some records before he came to
24 Southwestern.  That was sometime probably '11 or

Page 20

1 something, 2011.
2     Q:  The records that you reviewed from
3 Southwestern, did those include records generated by
4 nursing staff or people other than yourself?
5     A:  Yes.
6     Q:  And what, if anything, do you recall
7 reviewing -- strike that.
8     What, if anything, stood out to you about
9 those records based on your review?
10     A:  That he had been visiting the healthcare
11 unit multiple number of times since his admission to
12 Southwestern for his complaints of GERD and arthritis.
13     Q:  Anything else?
14     A:  No.
15     Q:  Other than the records we've just talked
16 about and the complaint, which we also discussed, are
17 there any other records you have reviewed in
18 connection with this case?
19     A:  Not outside the Southwestern.  I saw the
20 Southwestern, and I saw the Taylorville records, but
21 there are some records before he came to Southwestern,
22 2011 or something.
23     Q:  Sure.  My question is slightly different, so
24 let me try and say it a different way.

5 (Pages 17 to 20)

**BHARAT SHAH, MD  12/7/2017**

Page 21

1     We have talked a lot about all of the
2  different medical records you've looked at so far.
3  We've also talked about the complaint.
4     Other than those records that we've talked
5  about and the complaint, are there other documents
6  that we haven't talked about today that you've
7  reviewed?
8     A: I don't recall any.
9     Q: Can you tell me who -- other than your
10  attorneys, who, if anyone, have you spoken with about
11  your deposition here today?
12     A: Nobody else.
13     Q: And in that one or more meetings you had
14  with your attorneys, who, if anyone else, was present
15  during those conversations?
16     A: I have seen my attorney total number of
17  times, three times.
18     Q: And other than yourself and one or more of
19  your attorneys, who else has been present during those
20  meetings?
21     A: Nobody.
22     Q: You talked about receiving some documents in
23  April. Was that the time that you had learned you had
24  been named as a defendant in this lawsuit?

Page 22

1     A: Yes.
2     Q: Can you tell me --
3     A: No. I have been given the court notice.
4  That was in last September, I believe, 2016 or so. I
5  believe. Okay. I do not exactly recall the date of
6  notice.
7     Q: Understood. Can you tell me what your
8  understanding of what this lawsuit is about?
9     A: That he complained about the medical care he
10  received at Southwestern.
11     Q: And you understand that you've been named as
12  a defendant in this lawsuit, correct?
13     A: Yes.
14     Q: And what is your understanding of Mr.
15  Armbruster's claims against you?
16     A: That he is not taken care of very quickly at
17  Southwestern.
18     Q: After learning of this lawsuit, who, if
19  anyone, have you spoken with about either the lawsuit
20  itself or Mr. Armbruster other than your attorneys?
21     A: Nobody.
22     Q: Have you discussed this lawsuit with Loretta
23  Wilford?
24     A: Nobody.

Page 23

1     Q: I understand your answer, and just so that I
2  can have -- for the record, I'm going to ask you the
3  other defendant's names. If the answer is no, that's
4  fine.
5     A: Yeah.
6     Q: I just want to warn you I'm going to ask.
7     Have you discussed this lawsuit with Phyllis
8  Maston?
9     A: No.
10     Q: Have you discussed this lawsuit with Leanda
11  Davis?
12     A: No.
13     Q: Have you discussed this lawsuit with Rhonda
14  Bennett?
15     A: No.
16     Q: Have you discussed this lawsuit with Lynn
17  Johnson?
18     A: No.
19     Q: Have you discussed this lawsuit with Susan
20  Hardin?
21     A: No.
22     Q: Have you discussed this lawsuit with Ron
23  Vitale?
24     A: No.

Page 24

1     Q: You said that you have been deposed before.
2  How many times, excluding today, have you sat for a
3  deposition?
4     A: One time.
5     Q: When was that?
6     A: I can tell it was in nineties.
7     Q: Were you a defendant in that case, if you
8  know?
9     A: Yes.
10     Q: That was a case involve -- did that case
11  involve your work in a correctional facility?
12     A: No.
13     Q: Tell me generally the subject matter of the
14  medical care that prompted you to sit for a
15  deposition?
16     A: Because I was a defendant in that case.
17     Q: What, generally speaking, were the claims in
18  that lawsuit?
19     A: It was pertaining to the self-inflicted
20  gunshot wound suffered by the victim.
21     Q: And the person who is bringing that claim
22  was complaining about the care he received for the
23  gunshot wound?
24     A: No. It was lawsuit filed by his mother.

6 (Pages 21 to 24)

BHARAT SHAH, MD  12/7/2017

## Page 25

1    Q:  The mother was bringing a claim against you
2  related to the care --
3    A:  Yes.
4    Q:  -- the decedent received for the gunshot
5  wound?
6    A:  Yes.
7    Q:  Do you recall the name of that case?
8    A:  No.  I don't remember the name of the
9  patient.
10    Q:  Do you remember the name of the plaintiff?
11    A:  I don't remember the name of the plaintiff.
12    Q:  You said you don't recall the name of the
13  patient.
14    A:  And plaintiff also.
15    Q:  You don't recall the name of either of those
16  two, correct?
17    A:  Yeah.
18    Q:  Have you ever testified in court?
19    A:  Yes.
20    Q:  How many times have you testified in court?
21    A:  One time.
22    Q:  When was that?
23    A:  That was related to one of the victims of a
24  stab wound.

## Page 26

1    Q:  Were you a defendant in that case, if you
2  know?
3    A:  No.  I was called as a -- I don't recall,
4  but I was called for the court.  Maybe I was one of
5  the defendants.
6    Q:  Do you know whether you were a witness or a
7  defendant?
8    A:  No.
9    Q:  You don't know either way?
10    A:  (Witness nodding).
11    MR. DUGAN:  Is that a no, Doctor?
12    THE WITNESS:  No.  I say no.
13    MR. DUGAN:  Oh, okay.
14    Q:  (By Ms. Grady)  When did that testimony
15  occur?
16    A:  I do not recall.
17    Q:  Can you give me an estimate?  Was it within
18  the last 15 years?
19    A:  No.
20    Q:  So it was sometime in the nineties?
21    A:  Probably eighties or nineties, I believe.
22    Q:  Do you recall whether or not when you
23  finished testifying you stayed in the courtroom or
24  left?

## Page 27

1    A:  Left.
2    Q:  Can you tell me how many times, to your
3  knowledge, you have been named as a defendant in a
4  lawsuit?
5    A:  Means going to court or outside?
6    Q:  Well, you testified that for this case where
7  you're a defendant, you received notice around last
8  September notifying you that you had been named as a
9  defendant, correct?
10    A:  Yes.
11    Q:  So including all the times that you have
12  been notified of being named as a defendant, whether
13  you went to court or sat for a deposition or answered
14  discovery or anything, how many times have you been
15  named as a defendant, to your knowledge?
16    A:  To my knowledge, one time besides the one I
17  told you already, the stab wound case.
18    Q:  And what case -- what is the other case?
19    A:  That was a case of the surgery for patient's
20  hand.
21    Q:  So to your knowledge -- and that was -- when
22  was that?
23    A:  Can I rephrase my answer?
24    Q:  Sure.

## Page 28

1    A:  Because I was named as a defendant on
2  another inmate in last two years, two-three years, I
3  think.  It's been two years.  Last two years only
4  since I left Southwestern.
5    And there I think I talked to -- I was named
6  as a defendant when it was -- I don't know what is the
7  technical term, but it was denied by the court.
8    Q:  You think the lawsuit was dismissed?
9    A:  Yeah.  I don't know the term.
10    Q:  That's okay.  We get paid a lot of money to
11  know the answer to that.  Just kidding.
12    The case that you just mentioned where you
13  were named as a defendant by another prisoner, did you
14  get deposed in that case?
15    A:  There was no deposition.  I just talked to
16  my lawyer.
17    Q:  I see.  And in the case regarding the
18  surgery for the patient's hand, did you get deposed in
19  that case?
20    A:  No.
21    Q:  So by my count, then, including the gunshot
22  wound case, this case, the case involving the other
23  prisoner and the surgery for the patient's hand, to
24  the best of your knowledge, you have been named as a

7 (Pages 25 to 28)

BHARAT SHAH, MD  12/7/2017

## Page 29

1   defendant four times; is that right?
2       A:  Well, I cannot tell you because, I mean,
3   there was another case that was dismissed by the
4   Court.  This is happening last two years only,
5   everything.
6       Q:  So that would be a fifth case where you were
7   named as a defendant?
8       A:  Well, I got two cases there.  And there's
9   one case still pending.  Two cases were dismissed by
10  the Court.  This has happened in last two years since
11  I left Southwestern.
12      Q:  One in addition to this one is still
13  pending, correct?
14      A:  Yes.
15      Q:  Okay.  And the two cases that were dismissed
16  and the one that is still pending, those are all
17  related to your work --
18      A:  At Southwestern.
19      Q:  -- at Southwestern?
20          Please do your best to let me finish my
21  question.
22      A:  Yes.
23      Q:  Three of those cases, did you sit for a
24  deposition in any of them?

## Page 30

1       A:  No.
2       Q:  Do you expect to sit for a deposition in the
3   one that is still pending?
4       A:  I do not know.
5       Q:  You don't have any -- a deposition in that
6   case hasn't been scheduled; is that fair to say?
7       A:  Yes.
8       Q:  These three cases, are those the only cases,
9   to your knowledge, that have ever been brought against
10  you regarding your work at Southwestern?
11      A:  Yes.
12      Q:  In addition to this one?
13      A:  Last two years, they've all been brought up
14  till I left Southwestern.
15      Q:  Can you tell me what the three other cases,
16  what sort of allegations were made against you?
17      A:  Allegation in one case was about complaints
18  regarding hernia, inguinal hernia.
19      Q:  Do you recall the plaintiff's name in that
20  case?
21      A:  I remember his name, I believe, Mr. William
22  Jones or Willie Jones or something.
23      Q:  Okay.  And what about the next one?
24      A:  The other one I remember was a complaint

## Page 31

1   regarding the care of the foot infection.
2       Q:  Do you remember the plaintiff's name --
3       A:  No.
4       Q:  -- in that case?
5       A:  I do not recall right now at this moment.
6       Q:  Sure.  And what about the third case?
7       A:  In the third case that is pending is
8   allegation of not proper care for his back complaints.
9       Q:  And do you remember the plaintiff's name in
10  that one?
11      A:  Yes, I remember.  It's Anthony Shefford,
12  Shepherd or Shefford, one of the two.
13      Q:  And the inguinal hernia, what was the result
14  of that case, if you know?
15      A:  It is dismissed.
16      Q:  And the foot infection, what is the result
17  of that case?
18      A:  It is -- I don't know whether it is
19  dismissed or it was withdrawn or something was done.
20  Did not proceed.
21      Q:  And the lawsuit regarding the back
22  complaints, that's still pending, correct?
23      A:  Yes.
24      Q:  Have you ever been retained as an expert

## Page 32

1   witness?
2       A:  No.
3       Q:  I'm going to talk to you about the spinal
4   cord.
5          Can you tell me what the spinal cord is in
6   general, on a general level?
7       A:  Spinal cord is a neural tissue that extends
8   in a cord-like fashion from the Cervical 1 vertebra
9   down to the cauda equina.
10      Q:  And what function does the spinal cord serve
11  in the body?
12      A:  Spinal cord is both motor function as well
13  as sensory function.
14      Q:  Can you explain what you mean by that?
15      A:  It transmits the impulses from peripheral to
16  body, but that is a neurological central nervous
17  system.
18      Q:  Fair to say it is an important part of our
19  ability to walk and talk and do other activities of
20  daily life?
21      A:  It does not help in talking.
22      Q:  Fair enough.  Does it help in walking?
23      A:  Walking, yes.
24      Q:  You mentioned earlier about the C5 and C6.

8 (Pages 29 to 32)

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

**BHARAT SHAH, MD  12/7/2017**

---

Page 33

1   Can you explain what those are?

2   A: I did not say C5 and C6. But I mean C5-C6

3 is one part of the seven vertebrae of the cervical

4 spine.

5   Q: And where are those vertebrae located?

6   A: Neck.

7   Q: Do those play a particular role in the

8 spinal cord?

9   A: They transmit the information from the

10 periphery to central nervous system and transmit the

11 impulses from the brain to the extremity.

12   Q: What happens if those vertebrae are damaged

13 in some way?

14   A: Vertebrae are damaged, it can cause some

15 pressure. I don't know what the cause.

16   Q: You said that if they're damaged, they can

17 cause pressure?

18   A: Pressure on the nerves or the cord.

19   Q: Can they also disrupt the brain's ability to

20 communicate with the extremities?

21   A: Not exactly because they cause upper

22 motor --

23   Not exactly. If the spinal cord is damaged,

24 it can't transmit information.

---

Page 34

1   Q: I don't think I caught the last half of that

2 answer. If the spinal cord is damaged, what?

3   A: It can interrupt the transmission of the

4 information, brain to periphery and periphery to

5 brain.

6   Q: And C5 and C6 are part of the spinal cord,

7 right?

8   A: Yeah. C5 and C6 are vertebrae. Not part of

9 the spinal cord. They are bone tissues.

10   Q: So tell me, then, how, if at all damage to

11 the C5 and C6 would have an impact on the brain's

12 communication with the extremities?

13   A: That can cause some symptoms. If there is

14 damage to the spinal cord, it can cause pressure on

15 the extremity, and neck up some part of the

16 disturbance of sensory system or motor system.

17   MS. GRADY: Can you read back that last

18 answer?

19   (The following portion of the record was

20 read by the reporter:

21   "ANSWER: That can cause some symptoms. If

22 there is damage to the spinal cord, it can cause

23 pressure on the extremity, and neck up some part of

24 the disturbance of sensory system or motor system.")

---

Page 35

1   Q: (By Ms. Grady) When you say "pressure on

2 the extremity," can you tell me what you mean by that?

3   A: Pressure on the nerves.

4   Q: What would a patient who had that pressure

5 feel?

6   A: He can complain of sensory disturbance, or

7 he can complain of motor disturbance.

8   Q: Can you tell me in laymen's terms what types

9 of complaints you would expect to hear from a patient

10 who has a symptom of sensory or motor disturbance?

11   A: Sensory disturbance can be manifested by

12 either tingling, numbness, lack of feeling, of the

13 touch, if it is advanced.

14   Q: If it is advanced?

15   A: Yeah.

16   Q: What about the motor component?

17   A: Motor component maybe transmits into pain,

18 and then the symptoms affect on the muscles.

19   Q: Tell me what you mean by that.

20   A: That can cause weakness of the muscles or

21 lack of mobility of the muscles, or in advanced cases,

22 it can cause atrophy of the muscles.

23   Q: What is atrophy?

24   A: Atrophy means muscles become visibly weak

---

Page 36

1 and not well developed.

2   Q: Are you familiar with spinal cord

3 compression?

4   A: Theoretically, yes.

5   Q: I'm sorry. I didn't get that.

6   A: Theoretically, yes.

7   Q: Okay. Can you tell me theoretically what

8 spinal cord compression is?

9   A: The spinal cord compression can become in

10 acute stage due to trauma. Spinal cord compression

11 can occur due to bone conditions which are chronic

12 like displacement of the bone.

13   So displacement of the bone can occur in

14 case either the vertebrae sliding on another vertebra.

15 That is called spondylolisthesis.

16   Q: You've just --

17   A: Spinal --

18   Q: Please continue.

19   A: Spinal cord compression can be caused by

20 extrusion of the disc.

21   Q: Explain that last one, please.

22   A: Extrusion of the disc can occur because of

23 either trauma, or it can be because of degeneration.

24   Q: Anything else that can cause spinal cord

---

9 (Pages 33 to 36)

BHARAT SHAH, MD  12/7/2017

Page 37

1    compression to the best of your knowledge?
2        A:  Well, depends upon the lumen of the spine
3    through which the spinal cord travels, and if that
4    lumen is narrowed by one reason or another --
5        Q:  You are saying lumen?
6        A:  Lumen, the space that the spinal cord goes,
7    it can be narrowed.  That is called spinal stenosis.
8        Q:  So you've described what can cause spinal
9    compression.  My question is a general one, though.
10   What is spinal cord compression?
11       A:  Pressure on the spinal cord.
12       Q:  In your opinion, is that a serious medical
13   condition?
14       A:  It could be.  It could be acute or chronic,
15   like I say.  Yes, it is serious.
16       Q:  In your opinion, can chronic cases of spinal
17   cord compression be a serious medical condition?
18       A:  It can over time become.
19       Q:  So we've talked about what causes spinal
20   cord compression.  Can you tell me what it means to
21   have spinal cord compression with cord change?
22       A:  With cord change?
23       Q:  Correct.
24       A:  In what respect?

Page 38

1        Q:  I'm asking you to explain it to me.
2        A:  No.  But what do you want me to tell you?
3        Q:  What does it mean to have cord change, have
4    a spinal compression with cord change?
5        A:  Can cause degeneration of the cord,
6    compression on the cord.
7        Q:  And does the fact that cord change has
8    occurred reflect a severe spinal cord compression?
9        A:  If there is a pressure or degeneration of
10   the cord, yes, it is severe, but it depends upon the
11   time.  Sometimes chronic cases, it may not be bad.
12       Q:  Right.  I understand your testimony to be --
13   and please correct me if I am wrong -- that spinal
14   cord compression can be a serious medical issue
15   depending on how it manifests.
16       My question is spinal cord compression that
17   causes cord change, does that reflect a severe spinal
18   cord compression?
19       A:  Yes, it does reflect.
20       Q:  And do you agree with me that spinal cord
21   compression that has caused a cord change is therefore
22   a serious medical condition?
23       A:  It is.
24       Q:  We talked a bit about the sensory or motor

Page 39

1    issues that a patient who had spinal cord damage --
2        A:  Uh-huh.
3        Q:  -- might experience.
4        Can you tell me what signs or symptoms a
5    patient who had spinal cord compression would
6    experience?  Are those the same?
7        A:  I think it's actually the pressure on the
8    neural tissue.  Okay.  So the secondary effect of
9    pressure on the spine is on the nerve that transmits
10   the impulses, so the symptoms are affected because of
11   that.
12       Q:  So tell me what symptoms, to the best of
13   your knowledge, a patient who is experiencing spinal
14   cord compression would have?
15       A:  There are various things.  Like I told you,
16   sensory disturbance as well as motor disturbance.  And
17   sensory disturbance is like pain, tingling or
18   numbness, lack of sensation sometimes in advanced
19   cases.
20       And motor disturbance is weakness, and
21   inability to move sometimes.  And in advanced cases or
22   acute cases like trauma, it can be paralysis.
23       Q:  One of the things that you said could cause
24   spinal cord compression was extrusion of the disc.  Do

Page 40

1    you remember saying that?
2        A:  It's not spinal cord compression.
3        Q:  Okay.
4        A:  Extrusion of the disc causes pressure on the
5    nerve.
6        Q:  Thank you for correcting me.  So then help
7    me understand how that fit in with what we were
8    talking about earlier that's related to spinal cord
9    compression because spinal cord compression puts
10   pressure on the nerves like extrusion of the disc; is
11   that correct?
12       A:  Disc causes the pressure on the nerve.
13   Spinal cord does not extrude itself.
14       Q:  Okay.  I think I understand.  Can you tell
15   me what it means to have extrusion of the disc?
16       A:  Yes.  There are parts of the disc which are
17   two parts.  One is a peripheral part or circular part.
18   That is the pulp part, fibrocartilaginous part.  And
19   central part is more or less like a soft part, just
20   disc.
21       So when the degeneration occurs, the disc
22   soft part extrudes, and that causes the pressure.
23       Q:  And when you say it extrudes, it extrudes
24   where?

10 (Pages 37 to 40)

**BHARAT SHAH, MD  12/7/2017**

Page 41

1    A: It can extrude on the spine.  It can go on
2  the nerves, on foramina.
3        Q:  What risk is there for a patient
4  experiencing disc extrusion?
5        A:  It can be -- in many cases, it is
6  symptomatic by pain.  There's a prominent symptom.
7  That's called radiculopathy.
8        Q:  Any other signs or symptoms you'd expect a
9  patient suffering from extrusion of the disc to
10  experience?
11       A:  As I told you, it can be various sensory or
12  motor disturbances.
13       Q:  Those same sensory or motor disturbances we
14  discussed earlier?
15       A:  Yeah.
16       Q:  I want to flip and talk about it the other
17  way.
18          When a patient presents with some or all of
19  those symptoms we talked about reflecting sensory or
20  motor disturbance, how, if at all, to your knowledge
21  can a physician determine that the issue is spinal
22  cord compression as opposed to anything else that
23  could cause those sort of disturbances?
24       A:  By working up the patient, examining the

Page 42

1  patient.
2        Q:  Can you tell me exactly what you mean by
3  "working up the patient," or are you using "working
4  up" and examining to be --
5        A:  The same, yeah.
6        Q:  Okay.
7        A:  Examining the patient first and obtaining
8  the history.
9        Q:  When you say "examining the patient," are
10  you talking about a gross examination or some other
11  form of examination?
12       A:  Gross examination first.
13       Q:  What are you looking for during a gross
14  examination with a patient who has presented with one
15  or more sensory or motor disturbances?
16       A:  It depends upon the degree of the symptom
17  and associated conditions.
18       Q:  Can you read back the last part of that
19  answer?  Associated?
20       A:  Conditions.
21       Q:  That's fine.  Thank you, Doctor.
22       A:  Oh.  I'm sorry.
23       MR. DUGAN:  You're fine, Doctor.
24       Q:  Tell me what you mean by the "degree of the

Page 43

1  symptom."
2        A:  Whether they're mild, acute, chronic.
3        Q:  And how does that play into your
4  determination whether those symptoms are due to spinal
5  cord compression or due to something else?
6        A:  Yes.  It depends upon the associated
7  conditions.
8        Q:  Describe for me, if you can, in a general
9  level how those reports about the severity and onset
10  of the symptoms point one way or the other with spinal
11  cord compression?
12       A:  Because there are certain conditions which
13  are local of the nerves without pressure.
14       Q:  I'm not sure I understand that last part.
15       A:  Because there are symptoms of nerve -- the
16  same symptoms can be caused not by pressure, but some
17  degeneration of the nerve, and that can be caused by
18  other conditions.
19       Q:  So then how, based on those things we
20  discussed, severity and onset of the symptoms, does
21  nerve degeneration tend to be more acute versus more
22  chronic, mild versus more severe?
23          Can you tell me how spinal cord compression
24  and degeneration of the nerve differs in terms of a

Page 44

1  patient's onset of symptoms?
2        MR. DUGAN:  Object to form.  Compound.
3  Subject to that, Doctor, go ahead.
4        Q:  Go ahead.
5        A:  I mentioned before that condition can be
6  acute or chronic.  Condition can be with trauma,
7  without trauma.  So there might be other causes of no
8  symptoms.  And basically speaking, they could be
9  peripheral neuropathy.  That's the difference.
10       Q:  What is neuropathy?
11       A:  Neuropathy is just effect on the nerve,
12  degeneration that can cause symptoms.
13       Q:  Neuropathy and degeneration of the nerves,
14  are those the same?
15       A:  They are both the same, yes.
16       Q:  So you said that compression of the spinal
17  cord can be acute or it can be chronic, correct?
18       A:  Uh-huh.
19       Q:  Is that a yes?
20       A:  Yes.  Sorry.
21       Q:  That's okay.  So can you tell me, then, how
22  learning about whether the patient's onset of symptoms
23  is acute or chronic helps you to rule out compression
24  or neuropathy?

11 (Pages 41 to 44)

## BHARAT SHAH, MD  12/7/2017

### Page 45

1    A:  Yes.  If it is acute due to trauma and
2  depending upon the location of the trauma, one can go
3  and clinically evaluate the patient and then do
4  workup.
5    Q:  I guess I'm asking for a more substantive
6  response.  Is there something about the onset of
7  symptoms, acute versus chronic?
8    For example, a patient with acute onset due
9  to trauma tends more likely to have spinal cord
10  compression as compared to neuropathy, whereas a
11  patient with more chronic onset of symptoms tends to
12  have neuropathy more than --
13    A:  Yes.
14    Q:  -- than spinal cord compression.
15    That's the sort of thing I'm envisioning and
16  what I'm asking.  So let me figure out a way to phrase
17  it that's clear.
18    Is there something about the onset or
19  severity of symptoms that tends to indicate spinal
20  cord compression more likely than other conditions
21  that cause similar symptoms?
22    A:  Yes.  Spinal cord compression can be
23  insidious.  It can cause symptoms for a long time.
24    Q:  Tell me what you mean by "insidious."

### Page 46

1    A:  Slowly progressing.
2    Q:  When you say that the other thing you ask
3  about during a gross examination is the associated
4  conditions, can you tell me what, if any, associated
5  conditions tend to indicate that a patient with motor
6  or sensory disturbance has spinal cord compression as
7  opposed to something else?
8    A:  Yeah.  A patient can have history of other
9  metabolic conditions.  Can patient have history
10  hypertension.  Can patient have history of drug abuse.
11    Q:  The presence of those other conditions tends
12  to point more strongly toward spinal cord compression;
13  is that correct?
14    A:  No, not spinal cord compression.  I mean
15  neuropathy.
16    Q:  The presence of those conditions tends to
17  point more strongly towards neuropathy?
18    A:  Yes.
19    Q:  Are there conditions that, when present,
20  tend to point more strongly toward spinal cord
21  compression?
22    A:  No.
23    Q:  So would I be correct in saying that the
24  absence of certain associated conditions is what tends

### Page 47

1  to point more strongly to spinal cord compression?
2    A:  No, they can co-exist.  Patient with
3  multiple comorbidities, multiple comorbidities,
4  patient can have symptoms of spinal cord compression.
5  Patient can have symptoms from other conditions which
6  are patient suffering.  So they can be overlapping
7  symptoms.
8    Q:  You said, when we were discussing the
9  examination, that the gross examination happens first,
10  correct?
11    A:  Yes.
12    Q:  What happens next?
13    A:  Gross examination happens first, then you
14  try to sort out what is the status of the patient,
15  what is the condition of the patient and try to treat
16  accordingly.
17    Q:  So a patient who reports motor or sensory
18  disturbance, a gross examination is always required,
19  correct?
20    A:  Every patient requires clinical examination.
21    Q:  But a patient -- and so a patient who is
22  reporting gross -- strike that.
23    So a patient reporting sensory or motor
24  disturbances does require gross examination in every

### Page 48

1  instance, correct?
2    A:  Yes.
3    Q:  And am I understanding you correctly when
4  you say the next step after gross examination depends
5  on the result of that gross examination?
6    A:  Yes.
7    Q:  When you do a gross examination for patients
8  suffering motor or sensory disturbance, is your gross
9  examination of the body at large, or is it focused on
10  a particular part of the body or system of the body?
11    A:  Well, initial encounter requires patient's
12  comprehensive evaluation.  Then you examine all the
13  patients for all system review, all system review.
14  And then you can focus on patient's particular symptom
15  and do focal exam or whatever local exam you require.
16    Q:  So a patient reporting the things we
17  discussed earlier, tingling, numbness, pain,
18  difficulty or weakness in ambulating, how, if at all,
19  would you focus your exam based on those complaints
20  after conducting --
21    A:  I do gross examination.  And I also do
22  examination pertaining to the particular area of the
23  body patient complains.
24    Q:  So you would do an examination of whatever

12 (Pages 45 to 48)

BHARAT SHAH, MD  12/7/2017

Page 49

1    part of the body the patient was complaining was --
2        A:  Is part of the examination.
3        Q:  So let me, then, see if I can understand by
4    posing a hypothetical.
5        If a patient complained of difficulty or
6    weakness while walking and tingling in one or both
7    arms, you would do a full system review, correct?
8        A:  Yes.
9        Q:  And then you would do a focused review of
10   the arms and legs?
11       A:  Yes.
12       Q:  Both the arms and legs, correct?
13       A:  Pay attention to the particular parts of the
14   body patient complains.
15       Q:  And then would you do any focused
16   examination of the patient's spinal cord or nervous
17   system?
18       A:  Spinal cord is not examined separately.
19   Spinal cord is a part of a neurological assessment.
20       Q:  A neurological assessment, tell me how --
21   tell me what's involved in that.
22       A:  Neurological examination is inspection,
23   palpation, observation and then physical examination.
24       MS. GRADY:  Can you read back that answer,

Page 50

1    please.
2        (The following portion of the record was
3    read by the reporter:
4        "ANSWER:  Neurological examination is
5    inspection, palpation, observation and then physical
6    examination.")
7        Q:  (By Ms. Grady)  Those are each separate; is
8    that right?
9        A:  No.  It's part of the clinical evaluation,
10   comprehensive, physical examination.
11       Q:  Let's talk about the inspection.  What is
12   inspected as part of a neurological exam?
13       A:  Well, first of all, I would go for history
14   of the patient and what is his main complaint.
15       Q:  And that's what you mean by inspection?
16       A:  No.  I'm talking about first time history
17   part of it.
18       Q:  And you said that earlier, and I will get
19   back to the history, but I do want to focus on the
20   inspection part of what you just said.
21       A:  Yeah.
22       Q:  In the neurological exam, when you perform
23   an inspection.  What are you inspecting?
24       A:  Inspecting any deformities which are

Page 51

1    obvious, okay.
2        Q:  On all parts of the body --
3        A:  Yeah.
4        Q:  -- or focused?
5        A:  Initially all parts of the body, then you
6    focus in on the main complaint.
7        Q:  I think we may be talking past each other.
8        My understanding is that you say you do a
9    gross examination.  You look all over the body.  But
10   maybe I'm wrong, so please correct me if this is
11   wrong.  Then the neurological exam, I took you to
12   mean, was a focused exam.
13       A:  Comprehensive but focused.  But you focus
14   more on the part that the patient complains.
15       Q:  Okay.  Tell me.  Anything else that you do
16   as part of the inspection?
17       A:  Well, you observe how patient walks.
18       Q:  Do you ask the patient to walk?
19       A:  Yeah.  Patient comes to you walking.  You
20   inspect the patient when he comes to you.
21       Q:  And do you know when the patient comes to
22   you what his or her complaint is?
23       A:  No.
24       Q:  So if you are conducting a neurological --

Page 52

1    do you conduct a neurological exam on every patient
2    regardless of the complaint?
3        A:  Initially everyone is getting comprehensive
4    exam.
5        Q:  When you say "initially," what do you mean?
6        A:  Means when you see the patient first
7    encounter, you get comprehensive exam.  But then you
8    focus on the patient's complaint, and then you focus
9    more on that particular complaint and do pertaining to
10   that detailed examination.
11       Q:  The comprehensive exam, that happens the
12   first time you see a patient?
13       A:  Yeah.
14       Q:  And when you say the first time you see a
15   patient, do you mean during a physical?
16       Do you mean the first time you, yourself, as
17   opposed to any other doctor has actually seen the
18   patient --
19       A:  No.
20       Q:  -- or do you mean something else?
21       A:  When I saw --
22       MR. DUGAN:  Let her finish her question
23   before you start to answer, Doctor.
24       A:  When I saw the patient, what he complains I

13 (Pages 49 to 52)

BHARAT SHAH, MD  12/7/2017

Page 53

1  do.
2      Q:  I don't think that's quite what I'm asking.
3  You say that the first time you see a patient you do a
4  complete exam.
5      Does that mean the first time I see you, I
6  do a complete exam even if another doctor saw you
7  yesterday, or does that mean the first time the
8  patient arrives at the facility --
9      A:  Yeah.
10     Q:  -- they get a complete exam?
11     A:  That's what I mean.
12     Q:  Okay.
13     A:  Talking about pertaining to the particular
14  environment in that facility.
15     Q:  I see.  So the first time in Southwestern
16  that a prisoner arrives at Southwestern, they get a
17  complete exam, correct?
18     A:  He gets examination when he sees me first
19  time, yes.
20     Q:  Again, I just want to make sure that I am on
21  the same page as you.
22     There was no other doctor at Southwestern,
23  correct?
24     A:  Yes, there was nobody else.

Page 54

1      Q:  And so typically the first time that you saw
2  a patient was the first time that the patient was
3  actually seen at Southwestern by a doctor, correct?
4      A:  (Witness nodding).
5      Q:  Is that a yes?
6      A:  Yes.
7      Q:  Thank you.  If, however, a patient had just
8  received a physical before being transferred to
9  Southwestern -- strike that.
10     Does your complete physical exam, is that
11  recorded as a physical?
12     A:  When you have first encounter with the
13  patient, you focus on all parts of the body.  That's
14  called physical.
15     Q:  So when we're talking about doing this
16  comprehensive exam that looks, in detail, at all
17  systems, that's part of the physical prisoners receive
18  when they arrive at the facility, correct?
19     A:  Yes.
20     Q:  And so when you see the patient in
21  subsequent encounters, you are not necessarily doing
22  that comprehensive --
23     A:  No.
24     Q:  -- all systems review; is that correct?

Page 55

1      A:  Yes.  Yes.
2      Q:  When a patient comes to you following a
3  medical complaint, as medical director at
4  Southwestern, would you typically know what that
5  patient's complaint was before you laid eyes on them
6  on the day they were to see you for MD line?
7      A:  No.
8      Q:  How, if at all, did you learn as part of
9  your typical practice at Southwestern, what the
10  patient's complaint was such that you were seeing them
11  on a given day?
12     A:  By referral of the patient by the nurse.
13     Q:  But what you just said was when you
14  encounter a patient on January 1st, 2014 --
15     A:  '14?
16     Q:  I'm just giving you a hypothetical date.
17     When you encounter a patient on a given day
18  and you see that patient and they are there for sick
19  call, do you know before you encounter the patient the
20  reason that they've been brought to you for medical
21  evaluation or care?
22     A:  No.  He come on the sick call.  I go by the
23  complaints they offer to the nurse.
24     Q:  So you see some record or some oral report

Page 56

1  from the nurse?
2      A:  If available.  That's all.
3      Q:  And typically, would there be a medical
4  record or an oral report from a nurse at Southwestern
5  telling you why --
6      A:  Yeah.
7      Q:  -- a patient was in front of you?
8      A:  Yes.
9      Q:  And that would happen before the patient
10  came to be examined by you; is that right?
11     A:  Yes.
12     Q:  Where did you see patients at Southwestern?
13     A:  In my office.
14     Q:  So they would be brought to your office?
15     A:  Yeah.
16     Q:  And they would walk into your office?
17     A:  Depending upon their condition.
18     Q:  Fair enough.  I guess my question is would
19  you stay in your office while patients were brought
20  into your office and out of your office for
21  examination or care?
22     A:  Yeah.  Unless I'm called to the place,
23  trauma or something.  I have to walk out of my office,
24  go to the building or so.

14 (Pages 53 to 56)

**BHARAT SHAH, MD  12/7/2017**

Page 57

1    Q:  Okay.  Barring that, though, you stay in
2  your office while --
3    A:  Yeah.
4    Q:  -- patients come and go?
5    A:  For routine medical examinations.
6    Q:  Okay.  Let's get back to this neurological
7  exam.  If this is part of a sick call, then one of the
8  things you observe was how the patient walked into the
9  room, correct?
10   A:  Yes.
11   Q:  What else would you do as part of your
12 inspection?
13   A:  Whether the patient is alert or not.
14   Q:  What else?
15   A:  Just watch, look at the patient and see if
16 there's anything obvious.
17   Q:  And what would you palpate as part of a
18 neurological exam?
19   A:  Palpate various parts of the body.
20   Q:  All parts of the body?
21   A:  Yes.  Depending upon the complaints, but
22 otherwise you inspect.  And if there are no
23 complaints, you do not examine that particular part in
24 certain individuals.

Page 58

1    Q:  So the palpation depends on what localized
2  part of the body the patient is complaining about
3  having --
4    A:  Yes.
5    Q:  -- motor or sensory disturbance, correct?
6    A:  Yes.
7    Q:  And is there a physical exam that occurs
8  separate from the inspection or palpitation [sic]?
9    A:  Palpation.
10   Q:  Palpation.  Thank you.
11   Is there a physical exam that occurs
12 separate from the palpation or inspection as you've
13 described them?
14   A:  You can examine all the parts of the body in
15 various instances by trying to mobilize them, move
16 them.
17   Q:  And do you do that as part of your
18 neurological exam or do you only move the parts of the
19 body that the patient has complained about?
20   A:  No.  You do examination of the body
21 completely.
22   Q:  So a patient who is complaining of --
23   A:  In particular, it pertains to the part he
24 complains.

Page 59

1    Q:  But you.
2    A:  Do everything comprehensive.
3    Q:  A patient complaining of motor or sensory
4  disturbance, do you perform any tests to assess those
5  disturbances?
6    A:  Yes.  You do the assessment of the motor
7  reflexes.
8    Q:  And how do you do that?
9    A:  By using the hammer and hitting on
10 particular joints to see the reflexes.  In upper
11 extremities, you do normally three of them.
12   Q:  What, if any, information does that give
13 you?
14   A:  That way the patient is motor system wise
15 active or not.  His motor system is active or not.
16   Q:  What other tests do you perform for a
17 patient complaining of motor or sensory disturbances?
18   A:  Test the senses.  Gross and fine senses.
19   Q:  How do you test those?
20   A:  Gross senses, just by touch.  Okay.
21   Q:  So you touch the patient --
22   A:  Yeah.
23   Q:  -- and say can you feel this?
24   A:  Yes.  Exactly.  And then you do detail

Page 60

1  sensation by fine touch, and that is like pinprick or
2  something like that.  And there is another sensory
3  test is a vibration sense.
4    Vibration sense is done by using the
5  hammer -- I mean fork, tuning fork, not hammer.
6  Sorry.  Tuning fork.  In certain cases where
7  indicated, not in every case, you can assess the
8  temperature sensation also.
9    Q:  How do you do that?
10   A:  Temperature sense is by touch of warm, the
11 patient feels it or not.
12   Q:  What sorts of complaints would prompt you to
13 test the temperature sensation?
14   A:  Oh.  That is not routinely done.
15   Q:  When is it done?
16   A:  In certain cases of paralysis, certain cases
17 of degenerative disease.
18   Q:  The testing of the senses, assessing the
19 reflexes and vibration, those are all done in any
20 case --
21   A:  Yes.
22   Q:  -- where you are conducting a
23 neurological --
24   A:  Yes.

15 (Pages 57 to 60)

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## BHARAT SHAH, MD  12/7/2017

Page 61

1   Q: -- exam; is that correct?
2   A: Yes.
3       Q:  All right.  Let's go back and talk about the
4   history.  A patient who's complaining of sensory or
5   motor disturbances, can you tell me about the history
6   you would conduct of that patient?
7       A:  Ask everything about how long is going on,
8   how did it occur and whether any injury was associated
9   with it, whether any other conditions which can cause
10  that.  So that's a part of the comprehensive history.
11  And his social history and the personal history also a
12  part of it.
13      Q:  Are there particular parts of a social or
14  personal history that you are interested in a
15  patient reporting sensory or motor disturbances?
16  A:  Yes.
17      Q:  Tell me what those are.
18  A:  Like occupation.
19      Q:  What information does that give you?
20  A:  Well, it depends upon the exposure can cause
21  certain damage sometimes in certain individuals.
22      Q:  What else in the social or personal history
23  are you focusing on?
24  A:  I ask them about personal habits.

Page 62

1       Q:  Like what?
2   A:  Like smoking, drinking, use of drugs.
3       Q:  And what information does that give you?
4   A:  That gives you patient's chronic habits.
5       Q:  Sure.  I mean it gives you that information,
6   but how, if at all, does that give you -- how, if at
7   all, does that help you -- let me finish.
8       MR. DUGAN:  Let her finish.
9       Q:  How does that help you to make a diagnosis?
10  A:  You can list the patient's symptoms.  You
11  can try to assess them together in view of his history
12  and his findings.
13      Q:  Well, let's take the smoking.  How, if at
14  all, does the fact that a patient smokes impact your
15  exam?
16      I mean it gives you more information, sure,
17  but does that point somewhere on the tree in terms of
18  a differential diagnosis?
19  A:  Yeah.  Smoking can cause a lot of conditions
20  in the body.
21      Q:  Does it tend to cause -- well, let's say
22  between neuropathy and spinal cord compression, is
23  there one that it tends to cause more than the other?
24  A:  No.  But I mean smoking aggravates

Page 63

1   everything.
2       Q:  Anything else you do as part of your
3   history?
4   A:  You can ask sexual habits.
5       Q:  What information does that provide you?
6   A:  Sexual habits can make them vulnerable to
7   certain diseases or conditions.
8       Q:  In the neurological context, is that still
9   true?
10  A:  In every context, it's true.
11      Q:  Okay.  And is that something -- so is asking
12  about sexual habits something you do as part of the
13  history you take for every neurological focused exam?
14  A:  For every patient, we take sexual history.
15      Q:  That's something you do for every patient no
16  matter what?
17  A:  Yeah.
18      Q:  And getting back to this idea of a physical
19  versus a sick call, are you taking this complete and
20  exhaustive history when you do a physical?
21  A:  When I do physical, yes.
22      Q:  And are you also taking that complete
23  exhaustive history when you see a patient for sick
24  call?

Page 64

1   A:  Not exactly.
2       Q:  Tell me what you mean.
3   A:  Because when you do the sick call, you don't
4   particularly focus on that particular part of the
5   complaint.
6       Q:  So I want to talk about the history that you
7   would obtain just for a patient who was there for sick
8   call coming to you with complaints of sensory or motor
9   disturbances.
10      You would ask about the severity and onset
11  of that complaint, correct?
12  A:  Yes.
13      Q:  You would ask about the injury -- any injury
14  that caused it or conditions associated --
15  A:  Uh-huh.
16      Q:  -- with the condition, correct?
17  A:  Yes.
18      Q:  Would you still ask about social or personal
19  history?
20  A:  When you see first time.  Not every time
21  patient comes you ask.
22      Q:  So if a patient were coming to you
23  complaining of sensory or motor disturbances, you
24  would not always ask them about their social or

16 (Pages 61 to 64)

## BHARAT SHAH, MD  12/7/2017

Page 65

1    personal history, correct?
2        A:  First time you see them, yes, you do.  Part
3    of the --
4        Q:  Well, when you -- I'm sorry.  Please go
5    ahead.
6        A:  First time when you see the patient, you ask
7    comprehensive history, but when the patient comes for
8    follow-up in that same -- after the first visit, you
9    do not ask them that history again.
10       Q:  What I'm trying to understand is when you
11   say "first time," are you meaning the first time a
12   patient has seen you for --
13       A:  Yeah.
14       Q:  -- a physical --
15       A:  Yeah.
16       Q:  -- or are you meaning the first time a
17   patient has come to you with a new complaint?
18       A:  No.  In this Southwestern, for instance, the
19   patient comes, he gets evaluated first time by me.
20   That's the time I ask.
21       Q:  Okay.  So then if a patient comes to you in
22   sick call with complaints of motor or sensory
23   disturbances, you would not necessarily conduct a
24   social or personal history, correct?

Page 66

1        A:  Not if I've seen that patient before.
2        Q:  And what about sexual history?  Do you take
3    a sexual history for a patient who is coming not for a
4    physical but for a complaint of sensory or motor
5    disturbances?
6        A:  You asked comprehensive history.  When you
7    see patient first time, that particular patient,
8    whether has come for neurological complaint or any
9    other complaint, any patient that comes to
10   Southwestern or anywhere, if he sees me first time,
11   that is the time I go through that.  And for follow-up
12   examination, we do not repeat the same question.
13       Q:  Is there anything else you would do as part
14   of a history -- strike that.
15           Is there anything else you would ask about
16   as part of the history taken specifically for the
17   purpose of a person complaining about sensory or motor
18   disturbances?
19       A:  Depending upon what is his history.  His
20   history has been asked before.  Anything you ask him
21   again pertaining to a particular part of the body they
22   are complaining.
23       Q:  Can you give me an example of what you mean?
24       A:  Because this patient particularly complain

Page 67

1    about complaint of the knees and history of his
2    gunshot wound of the knees.  That was his complaint.
3        Q:  And so in that instance when a patient had
4    prior complaints of knee pain or trauma, what sorts of
5    questions would you ask this part of a history when
6    the patient complained of sensory or motor
7    disturbances?
8        A:  He complained of pain in the knees.  We
9    asked the history what was the problem.  And then if
10   he says he has a gunshot wound, you can ask the
11   details as much as he can offer you.  That's part of
12   the history.
13       Q:  You said that the -- after the gross
14   examination, including the tests we talked about, the
15   next step would depend on the results of those.  Can
16   you tell me when -- strike that.
17           Let me ask this a different way.  Do you
18   agree that a spinal cord compression could be
19   diagnosed with use of an MRI?
20       A:  Pardon?
21       Q:  Do you agree that a spinal cord compression
22   could be diagnosed with use of an MRI?
23       A:  Could be diagnosed with spinal cord
24   compression.  Can be diagnosed with use of MRI.

Page 68

1        Q:  You agree with that, correct?
2        A:  Yes.
3        Q:  What about an x-ray?  Can an x-ray be used
4    to diagnose spinal cord compression?
5        A:  No.
6        Q:  Why not?
7        A:  X-ray gives you some structural changes
8    only.  It shows condition of the bone, position of the
9    bone and status of the, in particular, to the spine.
10   Shows the inner space between the vertebrae.
11       Q:  So can you tell me what, in your gross
12   examination, as part of your typical practice at
13   Southwestern, would lead you to determine that an MRI
14   was appropriate for a patient?
15       A:  Depending upon the condition of the patient.
16       Q:  Can you tell me what you mean by that?
17       A:  Yes.  Depends upon his extent of the
18   complaint and evaluation of the physical exam.
19       Q:  Can spinal cord compression resolve on its
20   own?
21       A:  I don't think so.
22       Q:  What about neuropathy?  Can it resolve on
23   its own?
24       A:  Can improve sometimes.  Usually it requires

17 (Pages 65 to 68)

BHARAT SHAH, MD  12/7/2017

Page 69

1   only symptomatic treatment, but if there's a pressure
2   or anything, the symptoms can improve if they are
3   relieved.
4       Q:  Tell me what you mean by neuropathy
5   "requires only symptomatic treatment."
6       A:  Long-standing cases of neuropathy, you treat
7   the primary condition.  Metabolic neuropathy, then any
8   condition related to the drug abuse initially related
9   to hypertension, all these things can be treated and
10   watched whether they respond to it or not.  In cases,
11   they respond and improve sometimes.
12       Q:  Would I be correct in saying that in the
13   case of neuropathy, there is some condition that is
14   causing the nerves to deteriorate?
15       A:  Yeah.  Like I said, it can be degenerative
16   or it can be compression.  In compression, if it is
17   progressing, then it can deteriorate.
18       Q:  Is there some underlying condition that
19   causes spinal cord compression?
20       A:  No.
21       Q:  Right.  Spinal cord compression is, itself,
22   a condition, right?
23       A:  No, it's not.  It's an effect.  Spinal cord
24   compresses spine.  Spinal cord is a particular

Page 70

1   anatomical structure which can be pressed by other
2   structure.  So spinal cord does not compress itself.
3       MS. GRADY:  Can we take a quick break?
4       MR. DUGAN:  Yeah.
5       (Recess.)
6       Q:  (By Ms. Grady)  Dr. Shah, before the break,
7   we were talking about some things related to spinal
8   cord and how to diagnose various conditions.  Can an
9   MRI diagnose neuropathy?
10       A:  Can MRI?
11       Q:  Correct.
12       A:  I don't know.
13       Q:  You don't know one way or the other,
14   correct?
15       A:  No.  MRI can demonstrate pressure on the
16   nerve.  That doesn't mean it is a neuropathy.
17       Q:  Tell me what you mean by that.
18       A:  Neuropathy means that degeneration occurs in
19   the nerve.  MRI does not show that as far as I know.
20       Q:  Okay.
21       A:  It just shows the pressure.
22       Q:  I want to talk to you about the treatment
23   for spinal cord compression.  Can you tell me all of
24   the appropriate treatments for a patient who has been

Page 71

1   diagnosed with spinal cord compression?
2       MR. DUGAN:  Object to the foundation in that
3   he's not a neurosurgeon.  Subject to that, go ahead,
4   Doctor.
5       A:  As far as my knowledge goes, the spinal cord
6   compression can be relieved in acute conditions or
7   helped in chronic conditions.
8       Q:  Can you read back that answer?
9       (The following portion of the record was
10   read by the reporter:
11       "ANSWER:  As far as my knowledge goes, the
12   spinal cord compression can be relieved in acute
13   conditions or helped in chronic conditions.")
14       Q:  When you say "relieved," do you mean fixed?
15       A:  Well, I mean to say that in acute conditions
16   like acute trauma, you try to take the pressure off
17   the cord itself and prevent any paralysis which has
18   not occurred.
19       In chronic conditions, the spinal cord
20   compression is manifested by painful symptoms.  You
21   relieve them.  Okay?  That does not always mean that
22   it's completely cured.
23       Q:  In a patient whose spinal cord condition
24   that is chronic, is it your testimony that that

Page 72

1   patient's compression itself cannot be fixed?
2       A:  Fixed in the sense that the patient is
3   relieved.  So the further effects that prevent it.
4       Q:  Tell me what that means, "relieved."
5       A:  Relieved means that if the patient has
6   pressure symptoms, they can be relieved.
7       Q:  How?
8       A:  By decompressing them.
9       Q:  Is that a surgical procedure?
10       A:  Yes.
11       Q:  And decompressing the spinal cord through
12   surgery, would that always sometimes or never fix the
13   spinal cord compression --
14       A:  No.
15       Q:  -- in your opinion?
16       A:  The pressure symptoms can be relieved, but
17   there are certain symptoms that occurred and they
18   cannot completely go away.
19       Q:  Like what?
20       A:  Like effects from degeneration which might
21   occur due to chronic pressure.
22       Q:  And what effects are those?
23       A:  Like the patient has atrophy of the muscles
24   or something, you do not expect it to recover.

18 (Pages 69 to 72)

BHARAT SHAH, MD  12/7/2017

Page 73

1    Q:  What about tingling?
2    A:  Tingling can be relieved in majority of
3    cases.
4    Q:  What about numbness?
5    A:  It can be relieved.  Even after surgery,
6    which is apparently successful, there can be residual
7    symptoms.
8    Q:  You say that atrophy of the muscles can't be
9    relieved.  What about weakness in the muscles that
10   hasn't reached the level of atrophy?
11   A:  Yeah, it can be improved.  But then again,
12   it requires therapy.
13   Q:  What kind of therapy?
14   A:  Physical therapy.
15   Q:  Does the surgery itself improve the
16   weakness?
17   A:  It helps.
18   Q:  How?
19   A:  By taking the pressure off.
20   Q:  And the pressure is what's causing the
21   weakness, correct?
22   A:  Yes.
23   Q:  Does delaying surgery -- well, other than
24   surgical intervention, is there any way to remove the

Page 74

1    pressure of a spinal cord compression?
2    A:  No.  I think mechanical pressure has to be
3    relieved by the compression.
4    Q:  And that can only occur through surgery,
5    correct?
6    A:  Yeah, it has to be done.
7    Q:  For cases of acute spinal cord compression,
8    are there treatments other than surgical -- strike
9    that.
10   For acute spinal cord compression, are there
11   any ways other than surgery to relieve the pressure?
12   A:  Well, there's usually some edema in acute
13   conditions.  Edema is swelling, which is swelling in
14   acute conditions.  That can be relieved by certain
15   medications to some extent.
16   Q:  Would you agree with me that surgery is
17   typically required even with medications to reduce
18   edema for acute spinal cord compression?
19   A:  Medications are ancillary treatment.
20   Q:  And surgery would still be required,
21   correct?
22   A:  Ancillary medication is a support to
23   treatment.
24   Q:  And so surgery would be still required?

Page 75

1    A:  Surgery would be in acute condition.
2    Q:  In your opinion, are there any instances of
3    a patient who is suffering from spinal cord
4    compression where surgery is not required to alleviate
5    the pressure?
6    MR. DUGAN:  Object to foundation.  Go ahead
7    and answer if you can, Doctor.
8    A:  I think one of the modalities to alleviate
9    the mechanical pressure is surgery only.
10   Q:  It's the only modality --
11   A:  Yeah.
12   Q:  -- to relieve the pressure?
13   A:  Yeah.  Mechanical pressure, I said.
14   Q:  You -- at Southwestern, were you able to
15   perform spinal surgery?
16   A:  First of all, I'm surgeon, but not
17   neurosurgeon.
18   Q:  And it would require a neurosurgeon to
19   perform spinal cord surgery, correct?
20   A:  Yes.
21   Q:  And even had you wanted to, did you have the
22   tools available to you to perform that kind of surgery
23   on a patient at Southwestern?
24   A:  Not allowed.  There are no facilities for

Page 76

1    surgery.
2    Q:  So a patient who required surgery -- strike
3    that.
4    So a patient who required spinal cord
5    surgery would require referral to an outside care
6    provider, correct?
7    A:  Yes.
8    Q:  I want to talk for a minute about
9    neuropathy.  As I understand it, neuropathy is the
10   result of an underlying condition.  Is that an
11   accurate description?
12   A:  Yes.
13   Q:  And so when a patient is suffering from
14   neuropathy, the appropriate course of treatment is to
15   determine what condition is causing the neuropathy; is
16   that fair to say?
17   A:  Yes.
18   Q:  The treatment would depend on what that
19   underlying condition is, correct?
20   A:  Treatment depends on the underlying
21   condition.
22   Q:  Other than neuropathy and spinal cord
23   compression, can you tell me what other conditions a
24   patient reporting sensory or motor disturbances may

19 (Pages 73 to 76)

## BHARAT SHAH, MD  12/7/2017

Page 77

1   have?

2       A: He can have metabolic diseases.

3       Q: What else?

4       A: Can have systemic conditions.

5       Q: What is that?

6       A: That is like neuropathy can be caused by --

7   some symptoms of neuropathy can be caused by

8   hypertension.

9       Q: Right. We --

10      A: No. I'm just saying, then it can be caused

11  by metabolic conditions, can be caused by degenerative

12  conditions. Many of them different conditions

13  neuropathy can be caused.

14      Q: Spinal cord compression is different from

15  neuropathy, right?

16      A: Yeah.

17      Q: So neuropathy itself can have a number of

18  things that cause neuropathy, right?

19      A: Yes.

20      Q: What I'm asking is the sensory or motor

21  disturbances that a patient reports, you said that

22  could be caused by spinal cord compression or instead

23  could be caused by neuropathy, which, itself, could be

24  caused by many things.

Page 78

1       Is there anything else that could, by

2   itself, cause sensory and motor disturbances?

3       A: No. Not without degenerative or pressure

4   condition on the nerve.

5       Q: So anything that eventually might cause a

6   patient to report sensory or motor disturbances would

7   be secondary to the neuropathy?

8       A: Exactly, right.

9       Q: Is there any way to rule out a spinal cord

10  compression leaving you only neuropathy for the reason

11  for sensory or motor disturbances?

12      A: No. By examination and by test. There's

13  only two ways that can come to the conclusion that

14  something is causing damage to the spinal cord.

15      Q: You said that MRI could tell you whether

16  there is a spinal cord compression, right?

17      A: It could.

18      Q: And a patient who's reporting sensory or

19  motor disturbances, their report itself could not

20  definitively rule out neuropathy as compared to spinal

21  cord compression, correct?

22      A: Yes, I believe so.

23      Q: But an MRI could, right?

24      A: It could.

Page 79

1       Q: Because an MRI would tell you whether or not

2   spinal cord compression was present, right?

3       A: Yes.

4       Q: Whereas it would not tell you, as you

5   understand it, anything about whether neuropathy was

6   occurring or not?

7       A: Yes.

8       Q: Other than MRI, is there anything else you

9   could do to definitively determine whether the

10  patient's sensory or motor disturbances were the

11  result of neuropathy as opposed to spinal cord

12  compression or vice versa?

13      A: You just treat the condition and they

14  improve, then it can cause -- it can say it is caused

15  by different condition than compression. And the --

16  can I hear your question again?

17      Q: Sure.

18      MS. GRADY: Can you read it back?

19      (The following portion of the record was

20  read by the reporter:

21      "QUESTION: Other than MRI, is there

22  anything else you could do to definitively determine

23  whether the patient's sensory or motor disturbances

24  were the result of neuropathy as opposed to spinal

Page 80

1   cord compression or vice versa?")

2       THE WITNESS: No. You can do other tests.

3   You can do CT scan.

4       Q: (By Ms. Grady) Are there other -- strike

5   that.

6       Is there any treatment for a patient

7   suffering from neuropathy that is appropriate

8   regardless of the primary cause regardless of the

9   condition that's causing the neuropathy?

10      A: Symptomatic treatment.

11      Q: Well, I guess what I'm asking is, if a

12  patient has neuropathy caused by hypertension, then I

13  assume that the treatment that is appropriate is

14  something that would address the hypertension.

15      A: (Witness nodding).

16      Q: Is there anything that -- sorry. Was that a

17  yes?

18      A: Yes.

19      Q: Okay. Is there anything in the treatment of

20  neuropathy that is designed to address the neuropathy

21  itself as opposed to the underlying condition?

22      A: There is not single treatment that cause

23  effect on neuropathy. It only cause impact on the

24  symptoms that's caused by neuropathy.

20 (Pages 77 to 80)

## BHARAT SHAH, MD  12/7/2017

Page 81

1    Q:  Okay.  So what is that?  What treatment is
2    that that treats the effects of symptoms caused by
3    neuropathy?
4        A:  The pain.  The pain is mainly treated by
5    symptomatic treatment.
6        Q:  So what treatment is appropriate for that?
7        A:  You can give some pain-relieving
8    medications, which can range from Tylenol to opioids.
9        Q:  Is there any difference in the level of pain
10   that patients with spinal cord compression typically
11   suffer as compared to patients with neuropathy?
12       A:  Not that I know of because spinal cord
13   compression eventually can cause paralysis.  But pain
14   parts are the same.
15       Q:  What about tingling?  As comparing spinal
16   cord compression and neuropathy, does tingling tend to
17   be greater in one versus the other?
18       A:  No, I don't think so.
19       Q:  And is that true for numbness as well?
20       A:  These are all mechanical symptoms.
21       Q:  So in other words, the symptoms that a
22   patient suffers, the severity of those symptoms
23   doesn't tell you one way or the other whether it's
24   neuropathy versus spinal cord compression, correct?

Page 82

1        A:  Yes.
2        Q:  Can you tell me what risks that you know of
3    a patient faces when they have a spinal cord
4    compression that is not addressed?
5        A:  If it is not addressed, it can become
6    serious.  It can become progressive, and it can cause
7    secondary effects like paralysis, inability to move
8    and cause more sensory symptoms, more pain, but
9    ultimately paralysis.
10       Q:  It can cause the muscles to become weaker?
11       A:  Weaker, right.
12       Q:  And eventually atrophy, correct?
13       A:  Yeah, it can, if they are not used.
14       Q:  Muscle atrophy is different than paralysis,
15   correct?
16       A:  Yes.
17       Q:  And are those risks also present when
18   treatment is delayed?
19       A:  Depends on the severity of illness.
20       Q:  Tell me what you mean by that.
21       A:  Means if it's serious, it can progress.  If
22   it is progressing slowly, then it can cause effect
23   over long duration.  Not immediately.
24       Q:  Does spinal cord compression progress

Page 83

1    quickly or slowly or somewhere in between?
2        A:  As I told you, an acute condition, it is a
3    quick condition, quickly.  It can progress because
4    there is trauma and there is edema, so that causes
5    more effect.  And depending upon the level of the
6    damage, the effects are severe.
7        Q:  And when you say it can progress quickly,
8    can you give me an idea how quickly?  Are we talking
9    about minutes, seconds, hours, days, weeks?
10       A:  In acute condition, it can be seconds and
11   minutes.
12       Q:  What about in a chronic condition?
13       A:  In a chronic condition, as I said, it can be
14   insidious and it takes long time.
15       Q:  Is that true of every chronic spinal cord
16   compression case?
17       A:  Yes.
18       Q:  It takes a long time --
19       A:  Yes.
20       Q:  -- to progress?
21       How long from the first time a patient
22   experiences a symptom of chronic spinal cord
23   compression can it take for the patient to suffer
24   paralysis?

Page 84

1        A:  Depends.
2        Q:  Tell me in a typical case.
3        A:  It depends upon the extent of the damage and
4    extent of the pressure.  If it is caused by
5    inflammation, that is different.  If it's caused by
6    space-occupying lesion, it is different.
7        Q:  And how do you determine the cause of the
8    spinal cord compression?
9        A:  As I said, through test, meaning CT scan.
10       Q:  MRI or CT scan?
11       A:  CT scan, MRI.
12       Q:  Any other way you could definitively
13   determine the cause of a spinal cord compression?
14       A:  You get the idea of cause of spinal cord
15   compression by these two tests only.  But there are
16   other tests done to see the effect of the spinal cord
17   compression.
18       Q:  Tell me what those are.
19       A:  Like EMG can be done, electromyography.
20       Q:  EMG, is that different than EKG?
21       A:  Yeah.  EMG is electromyography.  And it is
22   also associated with another test which is known as
23   NCS, and that is nerve conduction study.
24       Q:  Say it again.

21 (Pages 81 to 84)

## BHARAT SHAH, MD  12/7/2017

### Page 85

1    A:  Nerve conduction study.  Nerve conduction
2  study.
3    Q:  Null?
4    A:  Nerve.
5    Q:  Neuro?
6    A:  Nerve.  N-e-r-v-e, nerve.
7    Q:  Nerve.  Thank you.
8    A:  I'm sorry.
9    Q:  No.  Obviously, it was my fault.  Okay.  Any
10  others?
11    A:  Well, in case of this spinal cord, I think
12  these other conditions can assess the peripheral
13  effects of the compression.
14    Q:  And the EMG and NCS, those don't tell you
15  what's causing the spinal cord compression, correct?
16    A:  They only show the effect.
17    Q:  And what effects do they show?
18    A:  Like I mentioned, EMG can show the condition
19  of the muscles, and that is the muscle atrophy or not.
20  Nerve conduction study shows the impulses across the
21  nerves, so they can be slow by pressure.
22    Q:  Do either of these tests tell you
23  objectively whether a patient is experiencing
24  tingling?

### Page 86

1    A:  No.  Because patient's experiences is
2  patient's own subjective feeling.
3    Q:  The EMG tells you only about the condition
4  of the muscles, correct?
5    A:  That's what I believe.
6    Q:  The NCS tells you only about the nerve
7  impulses; is that correct?
8    A:  Yes.
9    Q:  Do those tests -- would the results of those
10  tests be similar or the same whether the patient was
11  experiencing neuropathy versus spinal cord
12  compression?
13    A:  I say the NCS and EMG only show the effects
14  of the degeneration or pressure of the nerve.  They
15  would not, by themselves, show the cause of it.
16    Q:  So you would expect a patient with
17  neuropathy to potentially have the same results --
18    A:  Yes.
19    Q:  -- in these tests as a patient who had
20  spinal cord compression, correct?
21    A:  Yes.
22    Q:  And for chronic spinal cord condition, the
23  cause of the compression determines how quickly
24  progression occurs, correct?

### Page 87

1    A:  Yes.
2    Q:  Are there some causes of chronic spinal cord
3  compression that cause the compression to progress
4  quickly?
5    A:  Chronic, even if it is due to pressure, you
6  know, like a tumor or something, it can cause quick
7  problem.  With acute displacement, any acute condition
8  can cause progress quickly, but compression can go
9  slowly.
10    Q:  Right.  But are there some causes that can
11  prompt a faster progression in chronic spinal cord
12  compression.
13    You know what?  Let me strike that question.
14  Let me make sure I understand the difference between
15  those two things.  I think I probably confused.
16    What is the difference between an acute
17  spinal cord compression and a chronic spinal cord
18  compression?
19    A:  Acute condition, first of all, immediate
20  period or short period.  And it is due to any acute
21  condition like trauma or infection, inflammation,
22  meningitis, something like that.  Those are acute
23  conditions.
24    Q:  So by its nature acute spinal cord

### Page 88

1  compression is something that manifests and progresses
2  quickly?
3    A:  Very quickly.
4    Q:  And can you tell me the difference in terms
5  of a range between acute and chronic?
6    A:  Depends upon the cause of the acute
7  condition.
8    Q:  I'm not sure I understand that.
9    A:  Because causes -- in acute condition person,
10  they will see trauma in just a nick.  Then it progress
11  instantly.  Patient can die right away.
12    Q:  Sure.  So at the shortest end, it could be
13  milliseconds.  What's the outside end in which the
14  patient would still have acute spinal cord
15  compression?
16    A:  It can exist over long time without causing
17  serious problems.
18    Q:  Even for an acute spinal cord compression?
19    A:  No.  Chronic condition.
20    Q:  Right.  So I'm trying to figure where the
21  dividing line is from, let's say, milliseconds at the
22  very short end of acute and years at the long end of
23  chronic.
24    Where does the spinal cord compression, in

22 (Pages 85 to 88)

**BHARAT SHAH, MD  12/7/2017**

Page 89

1  your opinion, switch from acute to chronic; what's
2  sort of the dividing line?
3        A: Depends upon the condition of the patient.
4  Depends upon the cause of the condition.  Some causes
5  progress fast like I told you in trauma, edema,
6  infection.
7        Q: Can trauma cause a chronic spinal cord
8  compression?
9        A: Well, if the trauma is occurring over long
10  time.  The trauma is due to, say, a pressure of the
11  osteophyte.
12        Q: Fair to say that a spinal cord compression
13  that occurs over a week or more is a chronic spinal
14  cord compression?
15        A: Pardon?  Phrase it again.
16        Q: Fair to say that a chronic spinal cord --
17  strike that.
18             Fair to say that a spinal cord compression
19  that occurs over two weeks or more is a chronic spinal
20  cord compression?
21        A: No.
22        Q: Okay.  Tell me how that statement is wrong.
23        A: Because I mean extent of the thing is not
24  chronic.  It occurs over long time.  I would call it

Page 90

1  insidious, slowly progressive.
2        Q: So two weeks or more would be insidious --
3        A: Yeah.
4        Q: -- spinal cord compression?
5             So that would be even more chronic than
6  chronic?
7        A: Yeah.  No.  It's not more chronic.  It's
8  chronic.
9        Q: Okay.
10        A: Chronic is slowly-occurring.  When chronic
11  is long-term existing, that is called chronic.
12             Acute is cause immediately.  Causes effect
13  immediately.  But if it is not relieved, then it
14  becomes chronic.
15        Q: I see.  And that would occur when the spinal
16  cord compression existed for more than one week?
17        A: I could not say the duration in time length.
18  Okay?
19        Q: Okay.  But certainly by two weeks, the
20  spinal cord compression is chronic; is that correct?
21        A: I would not say that also.
22        Q: It could be acute even at two weeks?
23        A: It can exist, and then become subacute, and
24  then it becomes chronic, and condition can be

Page 91

1  progressive.  It can be fast and it can be insidious,
2  which is slow.
3        Q: Can a chronic spinal cord compression or
4  insidious spinal cord compression become acute?
5        A: I doubt it.
6        Q: Is there any instance in which it's
7  appropriate to do nothing to a patient who has been
8  diagnosed with spinal cord compression?
9        A: After he's diagnosed with spinal cord
10  compression, you don't do nothing.  You treat it.
11        Q: So that would be an inappropriate response,
12  correct?
13        A: Not to treat it.  After the diagnosis, yes.
14        Q: Are you familiar with posterior disc
15  calcification?
16        A: What is it?
17        Q: Posterior disc calcification.
18        A: It's a part of degenerative calcification.
19  It's not acute condition.
20        Q: Well, can you explain to me what that is,
21  posterior disc calcification?
22        A: Part of the disc is calcified.  Becomes
23  hard.
24        Q: And is that a normal thing that happens in

Page 92

1  the human body?
2        A: No.
3        Q: Why does it happen, if you know?
4        A: In some patients it is chronic.  Some
5  patients it is long time.  It is due to some
6  individual factors.  Not everybody gets calcification.
7        Q: Is calcified disc a serious medical
8  condition?
9        A: It's a chronic condition.  It's a serious
10  condition, depending upon the extent of it, again.
11        Q: So it can be a serious medical condition,
12  but is not always; is that fair to say?
13        A: Uh-huh.
14             MR. DUGAN: Is that a yes, Doctor?
15        A: Yes.  I'm sorry.
16        Q: Can you give me, on a general level, what
17  causes disc calcification?
18        A: Degeneration.  Calcification is a
19  degeneration.
20        Q: What does that phrase mean, "degeneration"?
21        A: Can occur in various parts of the body when
22  calcium deposition occurs.  It can occur in spine.  It
23  can occur in blood vessels, anywhere.
24        Q: So degeneration -- my understanding of that

**ALARIS LITIGATION SERVICES**

www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## BHARAT SHAH, MD  12/7/2017

Page 93

1      term is just that a structure of the body degenerates
2      in some way that is abnormal.  Is that how you are
3      using that term?
4           A:  Yes.
5           Q:  And so for calcification, am I correct that
6      what you're saying is that it refers to the deposit of
7      calcium?
8           A:  Yes.
9           Q:  What kinds of -- what causes that to happen?
10          A:  Could not tell you.
11          Q:  What circumstances is disc calcification a
12     serious medical condition?
13          A:  Depends upon if it causes any effect.
14          Q:  If it does cause an effect --
15          A:  Yes.
16          Q:  -- it's a serious medical condition,
17     correct?
18          A:  Otherwise it's just present.  You can only
19     see it by x-ray.
20          Q:  So if it does cause an effect, it is a
21     serious medical condition, correct?
22          A:  Depends upon the extent of the effect.
23     Again, effect can be minor or major.
24          Q:  What effects does disc calcification cause?

Page 94

1           A:  It's a part of degeneration.  Unless the
2      disc causes pressure, it does not cause any effect.
3      It stays in place.
4           Q:  The fact -- well, can you explain to me what
5      does it mean that the disc is calcified?  Does it
6      means that it's harder?  Does it mean that it --
7           A:  It's harder.
8           Q:  -- changes shape?
9           A:  It's harder.  It's harder, and it changes
10     appearance also.  It becomes opacified.
11     O-p-a-c-i-f-i-e-d.
12          Q:  The fact that it becomes harder, does that
13     itself have an impairment to the spinal cord?
14          A:  No.
15          Q:  So some people could have disc calcification
16     that does absolutely nothing?
17          A:  No.
18          Q:  That's correct?
19          A:  Yes.
20          Q:  My statement was correct?
21          A:  Yes.
22          Q:  It can have an effect, though, correct?
23          A:  Depends upon the status of the disc whether
24     it degenerates and causes extrusion of the soft tissue

Page 95

1      of the disc, which is cartilaginous in the center.  It
2      comes out.
3           Q:  And when that happens, patients typically
4      experience effects, correct?
5           A:  Pressure symptoms.
6           Q:  Were those the same motor and sensory
7      disturbance that we discussed earlier?
8           A:  Depends upon what nerves pressed.
9           Q:  Tell me about that.
10          A:  There are certain nerves in the body which
11     is sensory nerves only.  Certain nerves are motor
12     nerves.  Certain nerves are mixed nerves.
13          Q:  And is that something that as a doctor you
14     know, that this nerve -- looking at a diagram of
15     spinal cord, for example, this nerve is a
16     sensory-related nerve versus this nerve that we've
17     identified is a mixed nerve?
18          A:  It can.
19          Q:  While you were at Southwestern, was there an
20     MRI machine?
21          A:  No.
22          Q:  Patients who needed an MRI had to be sent
23     off site, correct?
24          A:  Yes.

Page 96

1           Q:  What about a CT scan?
2           A:  No.  It was done outside.
3           Q:  What about EMG?  Was there an ability to
4      conduct an EMG?
5           A:  I think all these tests are done by
6      specialists.
7           Q:  Okay.  So in your course of practice at
8      Southwestern, you wouldn't actually conduct an EMG,
9      correct?
10          A:  No.  We are primary care doctors there.  So
11     we evaluate the patient, treat them, and then if they
12     require further treatment for evaluation, we send them
13     to specialist.
14          Q:  And is that true of the NCS test as well?
15          A:  Those are all decisions made by the
16     neurologist, not by primary care doctor.
17          Q:  Well, we'll get into Wexford's policies and
18     sending people out, but my understanding is you can
19     request, as a medical director at a facility, to send
20     a patient out for the purpose of obtaining an MRI or
21     CT scan; is that correct?
22          A:  In acute condition, you send them out to
23     emergency room.
24          Q:  Not sure that that is quite an answer to my

24 (Pages 93 to 96)

BHARAT SHAH, MD  12/7/2017

Page 97

1  question.
2      A: No.
3      Q: Can you, as a medical director -- well,
4  strike that.
5          While you worked as medical director for
6  Southwestern Correctional Center, did you have the
7  ability to send a patient for the purpose of obtaining
8  an MRI?
9      A: I have to refer them to specialist.
10     Q: Okay. I want to go back and talk about your
11 medical background. Can you tell me where you grew
12 up?
13     A: I group up in India.
14     Q: Whereabouts in India?
15     A: I was born in Ehmedabad, E-h-m-e-d-a-b-a-d.
16     Q: And where did you graduate high school?
17     A: Ehmedabad.
18     Q: Where did you attend college?
19     A: Ehmedabad and Bombay.
20     Q: Ehmedabad and Bombay?
21     A: Uh-huh.
22     Q: And what was the name of the university that
23 you attended or the name of the universities?
24     A: I did my premedical in -- would you like

Page 98

1  university? That is Ehmedabad, India.
2      Q: Okay.
3      A: And I did my medical at Bombay University,
4  Bombay, India.
5      Q: And did you obtain an MD from Bombay
6  University?
7      A: It is called MBBS. The medical degree in
8  Bombay or India is called MBBS.
9      Q: What does that stand for, if you know?
10     A: Bachelor of medicine and bachelor of
11 surgery. It is equivalent to MD here.
12     Q: And after you obtained -- it's the MBBS?
13     A: (Witness nodding).
14     Q: After you obtained your MBBS, did you enroll
15 in a residency program?
16     A: Yes.
17     Q: And where did you enroll in residency?
18     A: That is Bombay University. Hospital is KEM
19 Hospital in Bombay. KEM, King Edward Memorial
20 Hospital in Bombay.
21     Q: And can you tell me when you obtained your
22 MBBS?
23     A: 1958.
24     Q: And what, if anything, were you studying in

Page 99

1  residency?
2      A: I did a rotation through first initial
3  internship like here, and then the internship was
4  going through all the specialties.
5      Q: And how long was the internship?
6      A: The intensive is one year.
7      Q: And then were there additional years as part
8  of the residency as well?
9      A: Yeah. And then residency. Then I did
10 residency, rotate through -- before you do the post
11 graduation, you do multiple specialties. I did a few
12 multiple specialties.
13     Q: Was that through your residency?
14     A: During my residency.
15     Q: Okay. And what specialties did you
16 participate in through residency?
17     A: Mainly general surgery, cardiac surgery and
18 part of my exposure was to orthopedic surgery and
19 neurosurgery.
20     Q: Before neurosurgery you said what?
21     A: Orthopedic surgery.
22     Q: How long did you study neuro surgery?
23     A: A few months, six months.
24     Q: And that was in the late fifties, early

Page 100

1  sixties?
2      A: Yes.
3      Q: How long was your residency total including
4  your internship here?
5      A: I did my residency from '59 to '63.
6      Q: And did you complete a fellowship program?
7      A: Yes.
8      Q: And what was your fellowship program?
9      A: My fellowship was in the research. In
10 India, there is no fellowship. That is done like here
11 that in specialties.
12     Q: So your fellowship was a research position
13 where you weren't treating patients, correct?
14     A: No. Yes.
15     Q: How long was your fellowship?
16     A: If I recall it right, it was about one year.
17     Q: And did you do that fellowship in India as
18 well?
19     A: Yes.
20     Q: Was that also at Bombay University?
21     A: Yeah. KEM Hospital.
22     Q: After your fellowship, where, if anywhere,
23 did you work?
24     A: After I did my fellowship and after I

25 (Pages 97 to 100)

**BHARAT SHAH, MD  12/7/2017**

## Page 101

1    obtained my master of surgery degree.
2         Q:  Your master of surgery degree, we'll get to
3    where you worked after that, but I want to ask about
4    the master of surgery.
5              Was that a degree you obtained because you
6    successfully completed residency and your fellowship?
7         A:  You have academic training in that, and
8    you're to go through testing and everything.
9    Residency does not just make you master of surgery.
10        Q:  I see.  Are you required to obtain a
11   separate license in order to practice medicine in
12   India?
13        A:  Yeah.  You got a license to practice which
14   is MBBS.
15        Q:  And is that --
16        A:  After that, you don't have to have a
17   license.  The fact that you got MBBS, you can
18   practice.
19        Q:  I see.  So after you obtained your master of
20   surgery, what was your next position?
21        A:  Then I worked in Bombay as a private
22   practitioner or surgeon.  I practiced surgery in
23   Bombay.
24        Q:  You said as a neurosurgeon?

## Page 102

1         A:  No, general surgeon.
2         Q:  Oh.  General surgeon.  Okay.  How long did
3    you work as a general surgeon in Bombay?
4         A:  Till I came here.  That was five years.
5         Q:  Can you tell me the approximate dates?  By
6    year is fine.
7         A:  Yeah, I think '65 to '70.
8         Q:  Did you obtain your master of surgery in
9    1965?
10        A:  Yes.
11        Q:  And then you immigrated to the United
12   States, correct?
13        A:  In '70.
14        Q:  And my understanding is here even if you are
15   licensed to practice medicine in a different country,
16   you have to become licensed in order to practice here;
17   is that correct?
18        A:  You obtain a residence, first of all, to
19   come here in my time at least.  There was an
20   examination that you had to take in India, which is
21   known as the ECFMG exam.
22        Q:  So there was an examination to see if you
23   could even come here to practice medicine?
24        A:  Yeah.

## Page 103

1         Q:  Then did you have to take an additional exam
2    to obtain a medical license once you were in the
3    United States?
4         A:  No.  Means you have to do the residency.
5         Q:  I see.
6         A:  Then you get the license.
7         Q:  That's right.  Where did you complete your
8    residency in the United States?
9         A:  Well, I came to St. Louis, and I was
10   associated with first a hospital which is Missouri
11   Pacific Railroad Hospital in St. Louis.  And after
12   that, I did my residency, part of my residency, at
13   City Hospital.
14        Q:  That's the name of the hospital?
15        A:  Homer G. Phillips Hospital.
16        Q:  What was your residency training in?
17        A:  General surgery.
18        Q:  No neurosurgery?
19        A:  No.
20        Q:  Were you working in the emergency
21   department, with the emergency department, or was this
22   patients who were coming for outpatient procedures?
23        A:  For what?
24        Q:  During your residency, were you working

## Page 104

1    through an emergency room?  Were you working with
2    outpatients?
3         A:  No.  Inpatient.
4         Q:  And what years were you completing the
5    residency program?
6         A:  I came here in 1970, and I completed my
7    residency program in three years.
8         Q:  Does that make you eligible to sit for a
9    board exam?
10        A:  Yes.
11        Q:  Or sit for a licensing exam, I suppose?
12        A:  Licensing exam is different than a board
13   exam.  So licensing exam is known to practice -- you
14   have to do the flex examination or license of the
15   state where you want to practice, so I did license for
16   Missouri and also for Illinois.
17        Q:  So in 1973 when you completed your residency
18   program, you took the licensing exam; is that right?
19        A:  No.  Licensing exam I took it in '72.
20        Q:  Got it.  And did you pass?
21        A:  Yes.
22        Q:  Did you pass the first time?
23        A:  Yeah.
24        Q:  Did you have to take exams for both states?

**ALARIS LITIGATION SERVICES**
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334

## BHARAT SHAH, MD  12/7/2017

Page 105

1   A: Yes.
2   Q: Or did you also become board certified in
3   one or more fields of medicine at that time?
4   A: Yes.
5   Q: What field of medicine did you become board
6   certified?
7   A: General surgery.
8   Q: You first became board certified in '73?
9   A: No.
10  Q: Oh. When did you become board certified?
11  A: '76.
12  Q: Following your graduation from the residency
13  program in '73, where did you go?
14  A: I was a supervisor in Sauget at Homer G.
15  Phillips Hospital.
16  Q: Is that different from an attending?
17  A: Yeah.
18  Q: That was in St. Louis; is that right?
19  A: Yeah.
20  Q: How long did you stay with -- stay in that
21  position?
22  A: I stayed in that hospital till it closed.
23  Q: And when did it close?
24  A: '79.

Page 106

1   Q: And during that time, did you hold other
2   jobs as well?
3   A: Yes.
4   Q: What other jobs?
5   A: I was practicing surgery.
6   Q: During that time, did you work at any other
7   places?
8   A: I was doing surgery. I mean I was
9   practicing in my private practice.
10  Q: When did you open your private practice?
11  A: '74.
12  Q: Was that operated out of St. Louis as well?
13  A: No. It was in Illinois.
14  Q: Where?
15  A: East St. Louis, Illinois, St. Mary's
16  Hospital.
17  Q: St. what?
18  A: St. Mary's Hospital.
19  Q: Is that different from the St. Mary's
20  Hospital where Mr. Armbruster went?
21  A: What?
22  Q: Is it different than the St. Mary's Hospital
23  that you said you reviewed records for Mr. Armbruster?
24  A: No.

Page 107

1   Q: I'll strike the question. It doesn't
2   matter.
3   A: No. That St. Mary's, that is in Clayton,
4   Missouri.
5   Q: Okay.
6   A: This is in East St. Louis, Illinois.
7   Q: Yeah. I just didn't -- I thought maybe
8   they'd be affiliated. But anyway . . .
9   A: No.
10  Q: Tell me how long you operated that private
11  practice.
12  A: I was in private practice until 2004.
13  Q: And were there any other doctors who joined
14  your practice?
15  A: No. I was a solo practitioner.
16  Q: And was that private practice, were you
17  doing primary care or surgery or both or something
18  else?
19  A: Surgery and primary care, and also trauma
20  surgery.
21  Q: When you stopped working at the Phillips
22  hospital in 1979, did you work anywhere else other
23  than your private practice?
24  A: No. I had -- when I was working at Homer G.

Page 108

1   Phillips Hospital as a supervisor, I was working in
2   emergency room at St. Anthony's Hospital sometimes.
3   Part-time.
4   Q: What emergency room?
5   A: St. Anthony's Hospital.
6   Q: And where was that?
7   A: In St. Louis.
8   Q: That was a part-time job?
9   A: It was called moonlighting.
10  Q: How long did you work there?
11  A: For about a couple years, I believe.
12  Q: Sometime in the '73 to '79 range?
13  A: Yeah. '76, I know. Maybe between '73 and
14  '76.
15  Q: And anywhere else that you worked during
16  this period of, like, during the seventies that we
17  haven't talked about?
18  A: Not anywhere else except that after the
19  Homer G. Phillips closed down, they absorbed me in the
20  corporate system for some clinic job.
21  Q: Tell me about that. What do you mean?
22  A: I was working at the primary care clinics as
23  a part-time.
24  Q: Is this run through the city or --

27 (Pages 105 to 108)

**BHARAT SHAH, MD  12/7/2017**

Page 109

1    A:  Yeah, city.  Municipal corporation.
2    **Q:  You were providing primary care?**
3    A:  Yeah.
4    **Q:  Not surgery, correct?**
5    A:  No.
6    **Q:  When did you work there?**
7    A:  Around in seventies, before eighties.
8    **Q:  Late seventies?**
9    A:  Yeah.
10   **Q:  That was the City of St. Louis, right?**
11   A:  Yeah.
12   **Q:  Tell me about the next job you had.**
13   A:  That's all.  That's only job I had.  And
14   after that, I practice in surgery for until 2004, my
15   own practice.
16   **Q:  When did you stop working for the corporate**
17   **system and the clinics?**
18   A:  Which clinic?
19   **Q:  When did you stop working at this primary**
20   **care clinic position?**
21   A:  That was part-time only.  I was practicing
22   at the same time.
23   **Q:  Okay.  So fair to say that after Phillips**
24   **Hospital closed, you were primarily working through**

Page 110

1    your private practice?
2    A:  Even when I was working at Phillips
3    Hospital, I was in private practice.
4    **Q:  And that was sort of your main job?**
5    A:  Yeah.  That was my main vocation.
6    **Q:  And you closed your private practice in**
7    **2004?**
8    A:  I retired from my private practice --
9    **Q:  All right.**
10   A:  -- in 2004.
11   **Q:  You answered my next question.  You retired?**
12   A:  From private practice in 2004.
13   **Q:  Why did you decide to retire at that time**
14   **from private practice?**
15   A:  Well, I was finding that private practice
16   was little more difficult environment.
17   **Q:  Tell me what you mean.**
18   A:  Private practice was becoming more difficult
19   environment because of a lot of social and political
20   pressures.  So private practice was becoming slow.
21   **Q:  Where did you go in 2004?**
22   A:  After that, from surgery, I took up
23   employment with Southwestern.  And I didn't see which
24   was working at Southwestern.  That was known as HPL.

Page 111

1    And they were contracting drug clinics both in
2    Illinois as well as Missouri.
3        So initially I worked for about six months
4    to one year for clinics in prisons and jails in
5    Missouri.
6        **Q:  So when you first got hired by HPL in 2004,**
7    **do you recall what time of year it was?**
8    A:  Pardon?
9        **Q:  Do you recall what time of year you were**
10   **hired by HPL?**
11   A:  Well, I start my practice sometime in 2004,
12   middle of the year, and then I worked for Missouri
13   jails with HPL --
14   **Q:  Uh-huh.  Yes.**
15   A:  -- from 2004 until 2005, and that was
16   part-time again.
17   **Q:  Were you -- did you hold any other**
18   **employment while you were working part-time for HPL in**
19   **the Missouri jail system?**
20   A:  No.  I was in practice at that time
21   initially.
22   **Q:  Oh, okay.  So when you started working for**
23   **HPL, you had not yet retired from private practice,**
24   **correct?**

Page 112

1    A:  Yeah.
2        **Q:  And these were various Missouri jails where**
3    **HPL had a contract to provide medical care, correct?**
4    A:  Yes.
5        **Q:  What was your job title?**
6    A:  Medical director.
7        **Q:  Were you also the sole physician at those**
8    **jails you were visiting to provide care?**
9    A:  Yes.
10   **Q:  How many jails are under your purview at**
11   **that time?**
12   A:  Going part-time only, so two times a week I
13   would go St. Charles jail, St. Charles County, then
14   one time a week I used to go to St. Genevieve,
15   Missouri.  Those are two main ones.  Sometimes they
16   sent me to Scot clinic that is part of Missouri.
17   **Q:  You'd be filling in for other doctors?**
18   A:  No.  They had part-time contract there also.
19   The doctor goes out once or twice a week or something
20   like that.  Scot clinic, that is in Missouri.  Not the
21   Scot clinic in Illinois.
22   **Q:  Okay.  What happened in 2005?**
23   A:  2005, because I was winding down my
24   practice, I requested that I want to take up a

28 (Pages 109 to 112)

**BHARAT SHAH, MD  12/7/2017**

## Page 113

1  full-time assignment.  And so full-time assignment was
2  in Illinois.  And my practice was also in Illinois, so
3  it became more convenient for me to work in the same
4  town, East St. Louis where this Southwestern is
5  located.
6        Q:  So in 2005, you started working at
7  Southwestern?
8        A:  Yes.
9        Q:  What was your job title?  Was HPL still your
10  employer at that time?
11        A:  Yeah.
12        Q:  What was your job title when you first
13  started?
14        A:  Medical director.
15        Q:  When did you stop working as medical
16  director at Southwestern?
17        A:  When did I stop working?
18        Q:  Correct.
19        A:  I never left Southwestern.
20        Q:  Are you currently working there now?
21        A:  No.  No.  I never left Southwestern until I
22  retired in 2015, but HPL lost the contract and
23  somebody else took it up.
24        Q:  Understood.  Of the ten years that you

## Page 114

1  worked as medical director at Southwestern, who was,
2  of those ten years, your employer for the longest
3  amount of time?
4        A:  HPL.
5        Q:  When did they lose the contract?
6        A:  Sometime -- no, they did not.  They merged
7  with another system which was out of Colorado,
8  Correction Care System or something like that, and
9  they worked together.
10        HPL was brought over by them, so I was
11  employed under their title, but it was the same
12  company, combined company.  And then they lost a
13  contract and Wexford took it over.
14        Q:  When did Wexford take it over, if you know?
15        A:  I believe it was in '11, 2011, August '11.
16        Q:  You left Southwestern in 2015?
17        A:  Yes.
18        Q:  Between 2005 and 2015, did you work anywhere
19  else --
20        A:  No.
21        Q:  -- other than your private practice that you
22  were winding down?
23        A:  No.  I did not work -- I wound my practice
24  down completely in 2004.

## Page 115

1        Q:  Okay.  And you didn't work anywhere else
2  then --
3        A:  No.
4        Q:  -- while you were working at Southwestern,
5  correct?
6        A:  No.  Nowhere else.
7        Q:  Are you working anywhere now?
8        A:  No.  I'm retired since 2015.
9        Q:  Was the decision to retire, was that your
10  decision or someone else's decision?
11        A:  Partly my wife.
12        Q:  You and your wife together made that
13  decision?  No one else -- Wexford wasn't involved in
14  that decision, correct?
15        A:  No.  My wife was sick, so I left.
16        Q:  Since leaving in 2015, have you practiced
17  medicine in any capacity?
18        A:  No.
19        Q:  Are you currently licensed to practice
20  medicine?
21        A:  Yes.
22        Q:  In what states are you currently licensed to
23  practice medicine?
24        A:  Both, Missouri and Illinois.

## Page 116

1        Q:  Have you ever been disciplined by either the
2  state medical board of Missouri or the state medical
3  board in Illinois?
4        A:  Never.
5        Q:  Have you ever lost your license to practice
6  medicine in either state for any reason?
7        A:  No.
8        Q:  Have you ever lost your ability or license
9  to practice medicine while you were in India?
10        A:  No.  In India, once you are a doctor, you
11  are a doctor forever.  You don't have to be licensed.
12        Q:  Okay.  Good to know.  Are you still board
13  certified in general surgery?
14        A:  I was certified, recertified and
15  recertified.
16        Q:  You said recertified and decertified?
17        A:  Recertified.
18        Q:  You were recertified?
19        A:  Two times.  Two times.  Two cycles.
20        Q:  When were you recertified?
21        A:  I believe it was eighties, middle of
22  eighties and 2000.  Exact years I couldn't recollect
23  now.
24        Q:  And after that, you did not become

29 (Pages 113 to 116)

## BHARAT SHAH, MD  12/7/2017

### Page 117

1    recertified, correct?

2        A:  I did not because I joined full-time job.

3    Leave my general surgery practice.

4        Q:  Do you know when your board certification

5    lapsed?

6        A:  Sometime in 2011 or something like that.

7        Q:  Were you ever board certified in any other

8    field of medicine?

9        A:  No.

10       Q:  Have you ever been fired or demoted from any

11   job involving the practice of medicine for any reason?

12       A:  No.

13       Q:  Have you ever received any discipline

14   related to your work in the field of medicine?

15       A:  No.

16       Q:  Did you ever receive a performance review of

17   any kind while you worked at Southwestern?

18       A:  Yes.  They call it field review, the same as

19   performance review, and they do it periodically.

20       Q:  How frequently?

21       A:  If I recall it right, it's every six months.

22       Q:  And were you given some form of annual job

23   performance review?

24       A:  Yes.

### Page 118

1        Q:  Was that different from the peer review?

2        A:  No.  Just depending upon the peer review,

3    they ask for peer review approval again, and they

4    approve it, so then you can continue doing the work.

5        Q:  Tell me what a peer review is.

6        A:  Peer review is somebody from the

7    administration or somebody from the company, some

8    other doctor who is considered to be senior than you

9    or something like that, they come in and do on-site

10   review of all the medical records.

11       Q:  Not all the medical records, though, right?

12       A:  Means they've selected, say, 15 records.

13   Then they talk to you also after reviewing and give

14   their own assessment initially.  And I also use to do

15   peer review.

16       Q:  So was that someone who you believed was

17   your supervisor or someone above you in the

18   hierarchal --

19       A:  Well, initially it happened like that.  The

20   person who was director of the Department of

21   Corrections, IDOC, Dr. Elyea, he used to come in and

22   review me because he was also employed with -- he was

23   employed with HPL when he left the job in the

24   Department of Corrections.  Then he used to review me.

### Page 119

1        And afterwards it happened that established

2    a system where their own doctors internally go in and

3    review each other.  So under the prison doctor, he

4    would come interview me, and I would review the prison

5    doctors.

6        Q:  Would they still do that on site at your

7    facility?

8        A:  If I had to go to, say, Centralia, I would

9    go review the doctor there and a doctor from another

10   place would come and review me.

11       Q:  And that person would be essentially the

12   same position as you, correct?

13       A:  Same position, medical director at some

14   place.

15       Q:  And that happened, you believe, about every

16   six months?

17       A:  Every six months.

18       Q:  And in your work conducting a peer review,

19   can you tell me what paperwork you created?

20       A:  Yeah.  They used to give us jobs from the

21   facility.  There are about 30 jobs.  And their system,

22   prison system, there are clinics, you know, chronic

23   clinics, like hypertension clinic, diabetes clinic,

24   all those.

### Page 120

1        So they select five charts from each of the

2    clinics and review them.  Then there are some

3    facilities which are infirmaries.  Patients are kept

4    in infirmary, and they review their charts also, some

5    of them.

6        Q:  And were charts selected that reflected

7    general medical care through sick call or otherwise?

8        A:  Everything, yeah.

9        Q:  So when you say there were about 15

10   charts --

11       A:  Thirteen charts.  If I'm not mistaken, I

12   could be wrong, 25 to 13 charts.

13       Q:  So you're certain that those charts included

14   charts that were not chronic care clinic or infirmary?

15       A:  Yeah, sick call.

16       Q:  So they included sick call clinics?

17       A:  Yeah.

18       Q:  And when you would perform peer reviews,

19   that would be only for other doctors, correct?

20       A:  When I reviewed, I used to go only one

21   place.

22       Q:  And where was that?

23       A:  Centralia.

24       Q:  And was there a person who would always come

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## BHARAT SHAH, MD  12/7/2017

Page 121

1 to review your work?
2     A: No.  I think initially Dr. Elyea came, but
3 then after when Wexford came, there was the doctor
4 from Centralia coming to my place.
5     Q: So you essentially switched places with
6 Centralia.  And whoever the medical director at any
7 given point would be the one conducting the peer
8 review, correct?
9     A: That was the system that I experienced.
10     Q: Who was the medical director at Centralia
11 when Wexford first began operating the contract?
12     A: I think it was Dr. Santos.
13     Q: And what about when you retired?
14     A: I don't know who's there that time.
15     Q: What other medical directors do you remember
16 being there whose records you reviewed?
17     A: Nobody else.
18     Q: You just remember reviewing Dr. Santos'
19 records?
20     A: Yes.
21     Q: Was he the medical director for some time at
22 Centralia?
23     A: He has been for a long time, yes.
24     Q: Was he the one who, to your knowledge, would

Page 122

1 come and conduct peer reviews of your work?
2     A: Yes.
3     Q: Was there a document or something else that
4 you would create as part of your peer reviews?
5     A: No.  We had to fill out the form, pro forma,
6 and just review the doctor.
7     Q: So there would be a form that you were given
8 that you would complete as you were  --
9     A: Yes.
10     Q: -- reviewing the charts; is that right?
11     A: Yes.
12     Q: And was there a separate form for each chart
13 you reviewed?
14     A: Yes.
15     Q: What other paperwork would you complete as
16 part of these chart reviews?
17     A: That's all.  Send the report.
18     Q: So you would generate a summary report?
19     A: Yeah.
20     Q: And was that a report that you would review
21 with Dr. Santos?
22     A: I was supposed to talk to him.
23     Q: Does that mean that you didn't talk to him?
24     A: If he was on site, yes, we talked because he

Page 123

1 sometimes working somewhere else, so I talked to him
2 on the phone or something.
3     Q: Okay.  And when your peer reviews would
4 happen, would Dr. Santos talk to you about what he
5 found?
6     A: The same.  If I'm not there, he would not
7 talk to me.
8     Q: Would he call you if you weren't there?
9     A: Yeah.
10     Q: And I mean, when you were talking about
11 this, were you talking about it in summary fashion or
12 were you going over every chart?
13     A: No.  Summary fashion.
14     Q: Was there any document that you generated
15 separate from your summary report that you used to
16 discuss with Dr. Santos?
17     A: No.
18     Q: So the three -- well, the documents that you
19 said you did as part of this review were the form you
20 completed for each chart you reviewed?
21     A: And completed and submitted to the expert.
22     Q: We'll get to what you did with it in a
23 second.  I just want to make sure I understand the
24 documents that were created.

Page 124

1     You would complete a form for each chart you
2 reviewed of Dr. Santos's, and you would, at the end,
3 draft a summary report.  No other documents were
4 created as part of his peer review; is that correct?
5     A: Yes.
6     Q: When you were finished with the summary
7 report and the forms, what, if anything, did you do
8 with those documents?
9     A: They submit it to expert.
10     Q: And who specifically did you submit them to?
11     A: There is a office, whole set.
12     Q: Okay.  So you weren't submitting them to any
13 person in particular?  How did you submit them?
14     A: It was sent by mail.
15     Q: By mail?
16     A: I gave it to the authorities there.
17     Q: So that's what I'm trying to get a sense of.
18 From your hands, you have a stack of documents?
19     A: Yeah.
20     Q: Plus a summary report.  What did you do with
21 the documents?  Did you put them in the mail yourself?
22     A: No.  Give to the facility.
23     Q: You gave it to someone at Southwestern or
24 someone at Centralia?

31 (Pages 121 to 124)

## BHARAT SHAH, MD  12/7/2017

Page 125

1    A: In Centralia.
2        Q: Was that an office manager who worked for
3    Wexford or someone else?
4        A: I think the director, the administrator.
5        Q: The healthcare unit administrator?
6        A: Yeah.  Yeah.
7        Q: My understanding is that the healthcare unit
8    administrators are typically IDOC employees?
9        A: Yeah.
10       Q: Is that the same as your understanding?
11       A: I think so.
12       Q: But you handed them to her or him to send
13   off?
14       A: Send off.
15       Q: And it was your understanding those
16   documents got sent to Wexford, correct?
17       A: Yes.
18       Q: Did Wexford -- other than Dr. Santos
19   himself, did anyone from Wexford ever talk to you
20   about the results of that peer review or the summary
21   report?
22       A: No.
23       Q: And was it your understanding that the
24   summary report was required to be drafted as part of

Page 126

1    this peer review?
2        A: Yes, it was.
3        Q: Did you ever receive any negative feedback
4    from Dr. Santos at any point?
5        A: No.
6        Q: Did you ever receive any negative feedback
7    from any doctor who performed a peer review --
8        A: No.
9        Q: -- at any point?
10       Your answer was no?
11       A: No.  No.
12       Q: Did you ever receive any -- we'll call it
13   constructive criticism about how to improve patient
14   care at Southwestern Correctional Center?
15       A: No.  In part of the report, there was a
16   short report, you know, peer review reports that it
17   was reviewed and it was found to be all right,
18   something like that.
19       Q: To your knowledge, was Southwestern
20   accredited by the National Commission on Correctional
21   Healthcare?
22       A: Yes.
23       Q: And when did it obtain that accreditation?
24       A: I think it was obtained -- I mean, the

Page 127

1    reason accreditation was not given at least once if I
2    mistake not.
3        Q: Do you know when that occurred?
4        A: No, I don't recall it.
5        Q: And who is responsible for the NCCHC
6    accreditation?
7        A: There was some doctor who came there and
8    talked to us and everybody after reviewing the charts
9    and everything.
10       Q: Do you recall that doctor's name?
11       A: No.
12       Q: I mean was that toward the end of your
13   tenure?  Was it toward the beginning?
14       A: Sometime toward the end of my tenure.
15   Almost Wexford was the contractor, vendor.
16       Q: And what makes you think this was about
17   NCCHC accreditation?
18       A: Because it was told to us.
19       Q: So you were told by this doctor the purpose
20   of his visit was for --
21       A: Accreditation.
22       Q: Did you play any role in obtaining the
23   accreditation?
24       A: No.  We were all in there together, I think,

Page 128

1    because my job and everything was part of the review.
2    One section is medical healthcare unit review.  Rest
3    of the facility also reviewed by them.
4        Q: I understand.  But were you tasked with
5    taking steps to comply with NCCHC guidelines in order
6    to obtain accreditation?
7        A: No, not particularly.  Charts up to date and
8    everything.  That was part of the instruction of the
9    authorities.
10       Q: Were you tasked with taking any steps to
11   contact NCCHC and arrange for be accreditation?
12       A: No.
13       Q: Do you know whether that was something --
14   the doctor that came to visit, whether that's
15   something Wexford did as opposed to IDOC?
16       A: I don't know who arranged for the doctors
17   come, whether organization or whether it belonged to
18   somebody else.
19       Q: As part of the efforts or process to obtain
20   NCCHC accreditation, did anything about the practices
21   of medical care itself at Southwestern Correctional
22   Center change?
23       A: No, I don't think.
24       Q: Okay.  We can go off the record.

32 (Pages 125 to 128)

**BHARAT SHAH, MD  12/7/2017**

Page 129

```
 1          (Lunch recess.)
 2          Q:  I want to talk to you about your schedule.
 3   Did you work a set schedule each week?
 4          A:  You asking me?
 5          Q:  Correct.  Did you work a set schedule at
 6   Southwestern during the time you were medical director
 7   there?
 8          A:  Yeah.
 9          Q:  What was that schedule?
10          A:  It was I start working around nine or a
11   little before then and around five o'clock end of our
12   day.
13          Q:  That was Monday through Friday?
14          A:  Yeah.
15          Q:  Did you work on the weekends on site?
16          A:  No.
17          Q:  Did you have responsibility for providing
18   on-call services?
19          A:  Yes.  24 hours, 24/7.
20          Q:  You alone carried that responsibility?
21          A:  Yes.  When I was available.
22          Q:  When you say when you were available, if you
23   were not available, were you required to find someone
24   to be available for 24/7 coverage?
```

Page 130

```
 1          A:  Usually Wexford used to arrange for that.
 2          Q:  You would notify them for times you would be
 3   unavailable?
 4          A:  Yes.
 5          Q:  Were you required to do that?
 6          A:  Yes.
 7          Q:  That schedule of Monday through Friday
 8   approximately nine to five, was that consistent
 9   throughout your tenure as medical director at
10   Southwestern?
11          A:  Yes.
12          Q:  I want to talk about your job duties and
13   responsibilities.
14          Can you tell me when you first became
15   medical director of the facility what were your
16   day-to-day job duties and responsibilities?
17          A:  My responsibility was to coordinate the care
18   in that, but I was only mainly handling the medical
19   part.  Administrative part was handled by healthcare
20   unit administrator.  And also the nursing part was
21   handled by a nurse supervisor, which was employee of
22   the Wexford.
23          Q:  So when you first began working for
24   Southwestern, there was a healthcare unit
```

Page 131

```
 1   administrator?
 2          A:  Yes.
 3          Q:  And that person handled the administrative
 4   portion of medical care provisions?
 5          A:  Yes, she was an IDOC employee.
 6          Q:  Who was that person when you first started?
 7          A:  She started as Nona Borror, and she became
 8   known Honsbien (phonetic).
 9          Q:  Could you spell that the last name?
10          A:  It's very difficult.
11          Q:  Okay.
12          A:  First one was easier, B-o-r-r-o-r.
13          Q:  Can you say her last name one more time for
14   me?
15          A:  Borror, B-o-r-r-o-r.
16          Q:  Her married name.
17          A:  Married name is difficult for me also.
18   Honsbien or something like that.  German name.
19          Q:  Okay.
20          A:  H-o-e-n-s-h-i-e-n, something like that.  A
21   "b" is there.  I don't know.
22          Q:  How long did she serve as healthcare unit
23   administrator?
24          A:  She was there when I started, and she was
```

Page 132

```
 1   there when I left.
 2          Q:  She retained -- she was there throughout
 3   your whole tenure?
 4          A:  Yeah.
 5          Q:  And the person that you talked about that
 6   was tasked with overseeing nurses, was that a director
 7   of nursing?
 8          A:  Yeah.
 9          Q:  That person was an employee of Wexford, you
10   said?
11          A:  Yes.
12          Q:  And who was that person -- well, when HPL
13   had the contract, was there also a director of
14   nursing?
15          A:  If I mistake not, there was not.
16          Q:  The director of nursing position, did that
17   first open up when Wexford took over the contract?
18          A:  It was there, but there was no available
19   director of nursing when I was initially employed, but
20   I remember under that individual came after Wexford
21   come.
22          Q:  So the director of nursing position was
23   vacant when you first became medical director?
24          A:  Yes.
```

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

**BHARAT SHAH, MD  12/7/2017**

Page 133

1    Q: When did it first get filled?
2    A: I think when Wexford came, after that.
3    Q: In 2011?
4    A: Not exactly 2011 because she was there for
5    short time only.
6    Q: So she came sometime after Wexford took over
7    the contract, but then left shortly after?
8    A: Yeah.  She was transferred by Wexford.
9    Q: Where was she transferred to?
10   A: That I don't recall, but she might have been
11   transferred to either Pinckneyville or Taylorville.  I
12   don't know which exact place.
13   Q: Another place?
14   A: Yeah.
15   Q: What was her name, if you recall?
16   A: Shelly Sipley.
17   Q: Shelley Sipley?
18   A: Yeah, something like that.
19   Q: And did she first start -- I understand she
20   was there only for a brief time.
21        Did she first start shortly after Wexford
22   took over the contract?
23   A: No.  After the -- during the tenure of
24   Wexford, she came, but initially she was not there.

Page 134

1    Q: So when Wexford took over, that position was
2    still vacant?
3    A: Yeah.
4    Q: You don't know exactly when she took over?
5    A: No, I can't recall.
6    Q: Can you give me an approximate number of
7    months she worked at the facility?
8    A: Less than two years, I believe.
9    Q: But more than a year?
10   A: More than a year, I think.
11   Q: And it was sometime before you retired,
12   correct?
13   A: She left before I retired.
14   Q: Right.  Did anyone else ever fill that
15   position?
16   A: Not when I was there.
17   Q: Was anyone temporarily assigned to that
18   position?
19   A: No.  I could not say specifically.
20   Q: Did anyone take over the duties and
21   responsibilities of the director of nursing while the
22   position was vacant?
23   A: It could be healthcare unit administrator.
24   Q: When you say "it could be," do you know?

Page 135

1    A: No.
2    Q: Is there anyone you know of that took over
3    the responsibilities of the director of nursing while
4    that position was vacant?
5    A: No.
6    Q: You told me that your responsibility was
7    to -- your day-to-day role was to coordinate care and
8    handle the medical care, specifically the medical
9    aspect of medical care?
10   A: Yes.
11   Q: Can you explain what you mean by that second
12   part?
13        Tell me how it was you handled the medical
14   portion of medical care?
15   A: Well, only thing is that most of the
16   protocols was set by Wexford.  I did not have to
17   modify the routine.  And there were other employees
18   who were medical employees.
19        So I was supposed to review them locally or
20   approve their applications and other things.  That was
21   part of my job.  But anything like procurement and all
22   this was nothing to do with me.  And even the nursing
23   schedule also was not my duty.
24        So my duties pretty much restricted to my

Page 136

1    own job.  Plus I'm supervision of other people.  But
2    my job was mainly coordinated through healthcare unit
3    administrator.
4    Q: How?
5    A: Means I communicate with her and she
6    communicates with me.  We both communicate to the
7    prison authorities.
8    Q: To take care of the administration of
9    healthcare, correct?
10   A: Yeah.  Yeah.  And my contact with warden or
11   assistant warden was also not direct as part of
12   management was concerned.  It was through healthcare
13   unit administrator.
14   Q: Well, let me ask you this first.  Did
15   anything about your job duties and responsibilities
16   change throughout your tenure as medical director?
17   A: Not that I know.
18   Q: Well, with all due respect, I don't know how
19   someone's job responsibilities would change without
20   them knowing.
21   A: Yeah.  So I was not aware that I was
22   elevated or demoted or anything like that.  Nothing
23   was changed.
24   Q: Not just whether you were promoted or

34 (Pages 133 to 136)

BHARAT SHAH, MD  12/7/2017

Page 137

```
 1    demoted, but someone telling you hey, now you need to
 2    start doing this, this is something that's part of
 3    your job now or don't worry about doing this anymore,
 4    that's no longer part of your job.
 5         A:  No.  It was nothing like that.  I
 6    consistently did the same thing.
 7         Q:  And nothing changed as far as you are aware?
 8         A:  Yes.
 9         Q:  How many other physicians worked at
10    Southwestern at any point while you were medical
11    director there?
12         A:  At any point when I'm not available, they
13    were there.  But when I was there, nobody else worked
14    there.  There's only place for one doctor.
15         Q:  When you say you were not available, you
16    mean when you would take periods of leave?
17         A:  When on leave.
18         Q:  Barring periods of leave, you were the only
19    physician, correct?
20         A:  Yes.  Leave or vacation and whatever it is
21    because --
22         Q:  Okay.  Was there a nurse practitioner or
23    physician's assistant assigned to the facility?
24         A:  Not that I recall.  I don't think.
```

Page 138

```
 1         Q:  At any point during your tenure?
 2         A:  No.
 3         Q:  Do any correctional medical technicians work
 4    at Southwestern?
 5         A:  In what capacity do you mean?
 6         Q:  Well, in any capacity.  Have there ever
 7    been, at any point while you were medical director,
 8    people working at the facility whose job title was
 9    correctional medical technician?
10         A:  I don't know, but I think if you call
11    part-time radiologic technician the one that used to
12    come once a week.
13         Q:  My understanding of correctional medical
14    technicians is not that they are like x-ray techs, but
15    instead, they are like people who either have a lower
16    level of nursing education or might not have education
17    in the medical field at all, just so you know what I'm
18    talking about.
19              To your knowledge, was there anyone who
20    worked with nurses that were not employed as nurses at
21    Southwestern on medical staff?
22         A:  I recall, in retrospect, that not the
23    technician, but there was nursing supervisor even when
24    Wexford was there.  I mean when they came, there was a
```

Page 139

```
 1    temporary nursing supervisor.
 2         Q:  While Wexford held the contract or --
 3         A:  Yeah.
 4         Q:  -- before?
 5         A:  Wexford had the contract.
 6         Q:  That person was a Wexford employee?
 7         A:  Yes.
 8         Q:  And what was that person's name?
 9         A:  That was Mr. Honsbien or something.  It
10    was --
11         Q:  Honsbien?
12         A:  Yeah, Nona's husband.
13         Q:  Was that person employed as the director of
14    nursing if you know?
15         A:  He was handling the duties of nursing
16    supervisor.
17         Q:  Okay.  When did he work for the -- at
18    Southwestern?
19         A:  When I was -- the contract of Wexford in my
20    tenure was from 11 to 11/15 at least.  So he was there
21    a part of the time before Shipley came as a
22    supervisor.
23         Q:  He was there before Shipley --
24         A:  Yeah.
```

Page 140

```
 1         Q:  -- arrived?
 2         A:  Yeah.
 3         Q:  How long was he there?
 4         A:  If I mistake not, he was there for also more
 5    than a year or so.
 6         Q:  Between one and 1 1/2 years?
 7         A:  I think so.  I'm not sure.  I did not pay
 8    attention to their tenures.
 9         Q:  Are those people you would work directly
10    with?
11         A:  Yeah.
12         Q:  How so?
13         A:  Pardon?
14         Q:  How so?
15         A:  They used to communicate their needs and I
16    used to communicate my needs to them.
17         Q:  How many nurses in the fall of 2014 --
18    strike that.
19              How many nurses in the summer of 2014 worked
20    at Southwestern, approximately?
21         A:  Few of them full-time, few of them
22    part-time.
23         Q:  How many full-time nurses were there?
24         A:  I think I can remember four to five of them
```

35 (Pages 137 to 140)

## BHARAT SHAH, MD  12/7/2017

Page 141

1  at least.
2      Q:  And then were there a consistent number of
3  nurses who worked part-time?
4      A:  Yeah.  Part-time and they change, turn over.
5      Q:  How many nurses would be on shift at any
6  given shift?
7      A:  At least two.
8      Q:  And how many shifts were there in a day at
9  Southwestern?
10     A:  Well, they used to come in around seven
11  o'clock, go at three o'clock, then three o'clock nurse
12  would go at eleven o'clock, and then eleven o'clock
13  nurses come.
14     Q:  Three shifts?
15     A:  Yeah, three shifts.
16     Q:  And you would overlap with the morning shift
17  and the afternoon shift?
18     A:  Morning and afternoon because I used to
19  leave about five o'clock.
20     Q:  How many of the nurses who worked at
21  Southwestern were employed by Wexford?
22     A:  All of them.
23     Q:  Any IDOC nurses?
24     A:  No.

Page 142

1      Q:  How many vacancies were there for nursing
2  staff while you were there?
3      A:  They were short of nurses.  They were always
4  complaining getting the part-time nurses.
5      Q:  They were complaining about being unable --
6      A:  Yeah.
7      Q:  -- to find part-time nurses?
8      A:  Not available, uh-huh.
9      Q:  So in other words, they were complaining
10  about the shortage of staff, correct?
11     A:  Yes.
12     Q:  And was that true in 2014 as well?
13     A:  I think so.
14     Q:  Do you know how many vacancies there were?
15     A:  No.
16     Q:  Can you tell me generally as a matter --
17  well, can you tell me generally who were responsible
18  for deciding how many nurses worked at Southwestern?
19     A:  I have no idea about that.  It was not part
20  of my job.
21     Q:  It wasn't you who decided --
22     A:  No.
23     Q:  -- in other words?
24         Can you tell me what responsibility you had

Page 143

1  for supervising nurses at Southwestern?
2      A:  Well, the only thing is that I would
3  supervise as to how they are conducting the patient
4  care at the time when I was there.  When I'm not
5  there, I didn't do anything else.
6      Q:  What do you mean when you were not there?
7  Do you mean when you were on periods of leave?
8      A:  Yeah.  So they were under the supervision of
9  supervisor, nursing supervisor technically.  So their
10  scheduling was arranged by nursing supervisor.
11     Q:  Right.  You said you didn't do scheduling or
12  procurement?
13     A:  I was just part of the clinical part only.
14     Q:  So you were responsible for supervising the
15  quality of care nurses provided to patients, correct?
16     A:  Part of it.  I was one of the team members
17  in that unit.
18     Q:  Who else was part of that team?
19     A:  Nursing supervisor and healthcare
20  administrator.  Not disciplining part, but I meant
21  supervising part.
22     Q:  The healthcare unit administrator didn't
23  have any power to you --
24     A:  Discipline, yeah.

Page 144

1      Q:  You got to let me finish my question, if you
2  please.
3      A:  Oh, I'm sorry.
4      Q:  That's okay.
5      A:  I'm sorry.
6      Q:  During periods when there was no nursing
7  supervisor, that role of supervising the quality of
8  care nurses provided fell to just you and the
9  healthcare unit administrator, correct?
10     A:  I believe so.
11     Q:  Can you tell me what steps you took to
12  ensure that the nursing staff provided quality care to
13  patients at Southwestern?
14     A:  Well, I was helping them when I was needed,
15  one.  I was not directly supervising them.  Means
16  their day-to-day work wasn't anything like that.
17     Q:  Other than being available to help when they
18  asked --
19     A:  Yeah.
20     Q:  -- was there any other steps that you took
21  to supervise --
22     A:  No.
23     Q:  -- the nursing staff?
24     A:  No.

36 (Pages 141 to 144)

BHARAT SHAH, MD  12/7/2017

Page 145

1    Q:  Did you ever conduct any chart reviews of
2  nursing staff?
3    A:  Yes.  Yes, I had to.  It was part of my job
4  to review nursing protocols.
5    Q:  Well, my understanding is those two things
6  are different.  Nursing protocols, as I understand
7  them, are policies promulgated to help nurses --
8    A:  Yeah.
9    Q:  -- make decisions, whereas --
10    A:  But --
11    Q:  Sorry.  Let me finish my question.
12    -- whereas nursing charts are documents
13  created by nursing staff following an encounter with a
14  patient.
15    A:  Exactly.  That's what I say.  When I do the
16  review of nursing protocols every month, the nursing
17  charts I have to review.
18    Q:  So your monthly protocol review, were those
19  protocols that had been completed by the nursing
20  staff?
21    A:  Yes.  Exactly.
22    Q:  And you did that monthly?
23    A:  Yeah.
24    Q:  How many did you review?

Page 146

1    A:  Each nurse had some charts I had to review,
2  five charts which I believe again.
3    Q:  You reviewed five charts for each nurse?
4    A:  Right.
5    Q:  How were those charts selected?
6    A:  They were selected by them, not by me.
7    Q:  So the nurse could say to you --
8    A:  No, not nurse.
9    Q:  Oh.
10    A:  Medical records used to select them.
11    Q:  And you said each nurse you'd review five
12  records from each nurse.  Is that just the full-time
13  nurses or did you review five records from part-time
14  nurses as well?
15    A:  Part-time nurses review also.
16    Q:  How many part-time nurses would you have on
17  staff at any given time?
18    A:  I don't know, but at least two or three of
19  them.
20    Q:  What, if any, documentation would you make
21  that would reflect that you had reviewed --
22    A:  I had to present the forms for them.
23    Q:  So was that form generated by Wexford?
24    A:  Yes.

Page 147

1    Q:  That was a form you were required to
2  complete?
3    A:  I complete.
4    Q:  For each nurse whose charts you reviewed?
5    A:  Yes.
6    Q:  Was it one form per chart or was it one form
7  per nurse?
8    A:  There was a chart to be reviewed for each
9  nurse, you know.  And each chart had criteria that I
10  decide, and then I mark the criteria on one form.
11    Q:  Can you say it again?  I'm not sure I
12  understand.
13    A:  I reviewed certain criteria for all charts
14  and see whether they follow criteria, and then for
15  each patient I have to enter that.
16    Q:  So it would be a different form for each
17  chart you reviewed?
18    A:  No.  It was on the one form only.
19    Q:  So Phyllis Maston who was a nurse at
20  Southwestern at one time, when you reviewed five of
21  her charts, would you have five pieces of paper or
22  would you have one piece of paper documenting that?
23    A:  One piece of paper documenting that.
24    Q:  And would that identify what charts in

Page 148

1  particular you reviewed?
2    A:  Yeah.  Name of the chart or name of the
3  inmate or number of the inmate.
4    Q:  Any other documentation you would create as
5  part of your review of the nursing protocols?
6    A:  No.  No.
7    Q:  Did you write a summary of your review?
8    A:  It was on the same form.
9    Q:  And what, if anything, did you do with those
10  forms once you were finished?  Strike that.
11    Did you do all of the nurses at once?
12    A:  Yeah.
13    Q:  So you would have a number of forms?
14    A:  Yeah.
15    Q:  For all the nurses at one time?
16    A:  All at the same time.
17    Q:  And would you -- what would you do with
18  those forms once you finished?
19    A:  They were presented at the monthly meeting.
20  It was given to the medical record, and then they
21  present it at medical meeting every month.
22    Q:  To your knowledge, is the medical records --
23  strike that.
24    To your knowledge, are the employees in

37 (Pages 145 to 148)

BHARAT SHAH, MD  12/7/2017

Page 149

1  medical records Wexford employees or IDOC employees?
2      A: To my knowledge, Wexford employees.
3      Q: To your knowledge, did medical records
4  transmit those forms to the administration at Wexford?
5      A: Must have.  Once it was out of my hands, it
6  was presented by me to the meeting, and then it became
7  part of the record.
8      Q: Right.  But do you know whether it just
9  stayed on site until -- I mean hard copies are --
10  electronic copies stayed on site until you presented
11  them and no one from the administration ever saw them,
12  or was it, to your knowledge, routine?
13      A: That I do not know.
14      Q: Any other ways you would supervise nursing
15  staff that we haven't talked about here today?
16      A: No.
17      Q: Were you responsible for reviewing the form
18  protocols that nurses would use?
19      A: No.  I was part of the team that when they
20  every year modify the forms.  Wexford used to
21  modify -- state used to modify.  Forms were created by
22  state, the protocol forms.
23          All the forms were identical for most of the
24  facilities with certain modifications that facilities

Page 150

1  made locally.  But basically, forms are about the same
2  per clinic protocols.
3      Q: And those are protocols for nursing staff,
4  specifically?
5      A: Yeah.  And doctors also.  Because there's a
6  hypertension clinic, there's a set form, pro form,
7  that they're to fill out.
8      Q: Okay.  Mark this as Exhibit 1.
9          (Plaintiff's Exhibit 1 marked for
10  identification.)
11      Q: You have been handed what's been marked as
12  Exhibit 1.  Is this one of the documents that you
13  testified to reviewing on an annual basis?
14          And while you're looking at that, I'll note
15  for the record that these are excerpts which contain
16  all of the pages through the table of contents, and
17  then selected excerpts following that?
18      A: I had no part in formulating these forms.
19      Q: Okay.  So the protocols that you were
20  talking about being involved in adapting, were those
21  nursing protocols?
22      A: Yeah.  And that was locally reviewed.  If I
23  wanted to suggest any changes, that doesn't mean they
24  were instituted.

Page 151

1      Q: Who was the person at the last instance
2  responsible for signing off on those nursing protocols
3  to your knowledge?
4      A: Director of Wexford, medical director.
5      Q: Who was that person?
6      A: When I wasn't working, it was Dr. Lehman,
7  Tom Lehman.
8      Q: L-e-h-m-a-n, I think.
9          Did you ever suggest any changes to the
10  nursing protocols?
11      A: Not that I remember.
12      Q: When you said you were part of a team who
13  else was on that team from Southwestern?
14      A: Well, state was the one who was forming
15  that, so healthcare unit administrator was mainly
16  responsible.
17      Q: My understanding of the nursing protocols is
18  that they are created by Wexford, but it's your
19  understanding those protocols are created by the
20  Illinois Department of Corrections?
21      A: I think so.  That's my understanding.  I
22  just saw the finished product.
23      Q: Sure.  Any other ways you would be
24  responsible for supervising the quality of care

Page 152

1  provided to nurses -- strike that.  Sorry.
2          Any other ways you would be responsible for
3  ensuring that nurses provided quality care to
4  patients?
5      A: Not that I know of.
6      Q: You said that another responsibility of
7  yours -- well, strike that.
8          Was there anybody else you supervised at
9  Southwestern other than nursing staff?
10      A: No.
11      Q: Were there any other Wexford employees --
12      A: Supervise in the sense that I was
13  coordinating care.  It was part of being medical
14  director, as I told you, of the medical staff.  I used
15  the approval form for them and when the privileges, so
16  I was to approve them.
17      Q: Other than --
18      A: Like dentist and --
19      Q: Oh, dentist.
20      A: -- mental health professional.  And
21  everybody comes there.
22      Q: So other than nursing staff -- and leaving
23  to the side temporary staff who would, for example,
24  cover when you were on vacation or leave, what other

ALARIS LITIGATION SERVICES

## BHARAT SHAH, MD  12/7/2017

Page 153

1  employees of Wexford worked at Southwestern?  You said
2  dentist.  Who else?
3      A:  Mental health professional, then part-time
4  psychiatrist, then there was optometrist.
5      Q:  And were you responsible for supervising the
6  quality of care of those people as well?
7      A:  No.
8      Q:  Okay.  You talked about coordinating care.
9  I think you just expanded on it a little bit now, but
10  can you tell me in a whole sense what it means to have
11  the responsibility to coordinate care at Southwestern
12  in your role as medical director there?
13      A:  No.  I just tell you whatever I did.
14      Q:  So you reviewed -- one of the things you
15  said was reviewed requests for outside treatment,
16  right?
17      A:  No.  I did not review outside treatment
18  requests.
19      Q:  You were not responsible for reviewing, for
20  example, utilization management requests?
21      A:  No.  I was actually forwarding my own
22  requests to peer review.  That was off site, and they
23  approve it.
24      Q:  Right.  There is a central --

Page 154

1      A:  Yeah.
2      Q:  -- utilization management --
3      A:  Yeah.
4      Q:  -- group.
5      But were you responsible as the site medical
6  direct for gathering the requests from the dentist or
7  other people and either approving that request to go
8  to the central utilization management group?
9      A:  Yes.  I did.  For dentist particularly.  Not
10  mental health purpose, no.
11      Q:  Oh.  So those requests wouldn't go through
12  you, correct?
13      A:  Huh-uh.
14      Q:  But you had the power, in the first
15  instance, for the dentist at least to approve or deny
16  their request for outside treatment?
17      A:  Yeah.  I forward.  They were supposed to
18  forward it to me.
19      Q:  Could nurses submit requests for a patient
20  to receive off-site care?
21      A:  Not that I know of.
22      Q:  If a nurse felt that a patient should
23  receive an evaluation or treatment by a specialist,
24  how, if at all, could that nurse voice that concern?

Page 155

1      A:  She can talk to the doctor.
2      Q:  And that doctor would have been you,
3  correct?
4      A:  Yeah.
5      Q:  Did that ever happen while you were at
6  Southwestern?
7      A:  No.
8      (Plaintiff's Exhibit 2 marked for
9  identification.)
10      Q:  I will represent to you that this is an
11  excerpt of the contract between Wexford and the IDOC,
12  and this portion of the contract contains, from its
13  title, job description for on-site medical director.
14      Have you ever seen this document before, Dr.
15  Shah?
16      A:  I don't recall this.  I might have seen, but
17  I don't recall it.
18      Q:  Fair enough.  Can you take just a minute and
19  review the description that is laid out here from
20  pages 1, 2 and then continuing onto the beginning of
21  page 3?  And let me know once you have had an
22  opportunity to review that.
23      A:  I saw -- I read this page.
24      Q:  Just the first page?

Page 156

1      A:  Yeah.
2      Q:  Okay.  Let me ask you this.  Do you agree
3  this is a fair summary of your job duties and
4  responsibilities as medical director at Southwestern?
5      A:  Yes.
6      Q:  Okay.  Can you turn --
7      A:  That was the duties that was written down.
8  But practically was limited work.
9      Q:  Tell me what you mean by that.
10      A:  Means I was not hiring.  I was not firing.
11  I was not doing that.  I was coordinating the unit
12  care with the healthcare unit administrator and
13  nursing supervisor.
14      And I used to contact the Wexford as in when
15  required and supervisor from Wexford who used to look
16  over this unit who would visit us and come and talk
17  with me, and then decide.  So all decisions were left
18  to the corporation, not locally.
19      Q:  A supervisor would come and visit and decide
20  what?
21      A:  Everything that is to be done for the
22  medical part or the contractor part of the Wexford.
23  Contractual part with the state which was handled by
24  the Wexford personnel.

39 (Pages 153 to 156)

## BHARAT SHAH, MD  12/7/2017

### Page 157

1  The supervisor who was assigned for the
2  region who would come and talk to us and they would
3  promulgate policies.  I had no participation or part
4  in the promulgating policies.
5  Q:  Okay.  Who was the supervisor who would come
6  and visit?
7  A:  I forgot his name right now because there
8  were two before.  One came -- I forgot his name right
9  now, to be honest.
10  Q:  Okay.  This was a person who was employed by
11  Wexford?
12  A:  Yeah.  He was regional director.  So he's
13  the one that coordinate the region's needs with the
14  Wexford.  And we used to have meetings for Wexford
15  every quarter, but that was mainly clinical meetings.
16  They were not administrative meetings.
17  Q:  Okay.  We're going to get into all those
18  meetings in a bit, but right now I just want to stay
19  on --
20  A:  My duties.
21  Q:  -- your duties.
22  So I think maybe what's best is to maybe go
23  through these one by one.  In the first instance, it
24  says that the medical director shall provide the

### Page 158

1  overall supervision for clinical services, that the
2  contract facility shall attend patients, provide
3  medical consultation for the staff and correctional
4  executives and conduct the liaison function for
5  clinical matters with medical providers, outside the
6  center.
7  Did I read that first paragraph correctly?
8  A:  Yes.
9  Q:  And is that a fair and accurate reflection
10  of one of your job duties and responsibilities as
11  medical director at Southwestern?
12  A:  Yes.
13  Q:  In the third paragraph, it says, The medical
14  director shall be responsible for ensuring that
15  services of the center's healthcare unit are conducted
16  in accord with standards of medical care delineated by
17  state regulations and community practice guidelines.
18  Did I read that paragraph correctly?
19  A:  Well, I used to carry out the policies
20  instituted.  I was not formulating any.
21  Q:  Okay.  First my question is did I read that
22  paragraph correctly?
23  A:  You read it right.
24  Q:  So you disagree this was a duty and

### Page 159

1  responsibility you had as medical director at
2  Southwestern; is that correct?
3  A:  Yes.
4  Q:  Okay.  Tell me what, if any, responsibility
5  you had for ensuring that services at -- strike that.
6  Tell me what, if any, responsibility you had
7  for ensuring that the medical services healthcare unit
8  complied with community practice guidelines.
9  A:  I had no duty in that.
10  Q:  In your opinion -- or to your knowledge, did
11  you have any responsibility for ensuring that your own
12  medical care complied with community practice
13  guidelines?
14  A:  This was my own approach, to do the
15  community guideline practice.
16  Q:  Do you agree with me that it was your job
17  responsibility to practice medicine yourself in a way
18  that complied with community practice guidelines?
19  A:  Yes, it is.
20  Q:  And to your knowledge, did Wexford have a
21  policy which required you to practice medicine at
22  Southwestern in compliance with community practice
23  guidelines?
24  A:  In theory, yes.

### Page 160

1  Q:  Tell me what you mean by that.
2  A:  Means if I want to do something which was
3  not normally done and which I thought I need to get it
4  done, I have to get approval.
5  Q:  Even if taking that step was consistent with
6  community --
7  A:  Yes.
8  Q:  -- practice guidelines?
9  A:  Yes.  Yes.
10  Q:  And were there one or more occasions when
11  your request for approval to take those steps denied?
12  A:  Yes.  It does happen in course of duties.
13  Q:  Even in instances where you felt the
14  community practice guidelines required it?
15  A:  Yes.  Because the practice guidelines are
16  different depending on the environment.
17  Q:  Sure.  But my question was a little
18  different.
19  Were there ever instances in which you felt
20  that the community practice guidelines required you to
21  do something that despite your request for
22  authorization from Wexford, you could not do because
23  they had denied the authorization?
24  A:  It was possible that it was denied, and then

40 (Pages 157 to 160)

**BHARAT SHAH, MD  12/7/2017**

Page 161

1    again submitted for re-review.
2        Q:  How often did you have to do that?
3        A:  I had to do it on occasion.
4        Q:  How often?
5        A:  I cannot tell you the number of times how
6    often I did that.
7        Q:  Was it more than a hundred times?
8        A:  No, not those many times.
9        Q:  Was it more than ten times?
10       A:  No.
11       Q:  Less than ten times?
12       A:  Less than ten times, I say.
13       Q:  And can you tell me at the general level
14   what it means that you required authorization?
15       A:  Yes.  If I feel that patient requires
16   outside care, I'm supposed to submit a request to the
17   central utilization committee.
18       Q:  And that was required in every instance of
19   nonemergent care, correct?
20       A:  Yes.
21       Q:  And when I use the word "emergent," I'm
22   meaning something that -- someone who is in imminent
23   risk for life -- for losing their life, correct?  Is
24   that your understanding?

Page 162

1        A:  Emergency care means that it requires
2    emergency.  No.  I'm just saying that a person don't
3    lose life if they don't get emergency care.
4        Q:  That's your definition of emergent?
5        A:  Yes.  Yeah.  Emergency means it requires
6    emergency attention.
7        Q:  In order to save the life?
8        A:  To help the life.  I say person may not die
9    also if you don't get emergency care.
10       Q:  Well, but a patient's complaint of a broken
11   leg, is that an emergency?
12       A:  It is an emergency.
13       Q:  Okay.  What about a patient's complaint
14   of -- a patient suffering a seizure; is that an
15   emergency?
16       A:  It is an emergency, but it can be handled at
17   location.
18       Q:  Okay.  I'm just trying to get a sense of --
19   you agree with me that Wexford's policies requires
20   authorization for outside care absent an emergency,
21   right?
22       A:  Yes.
23       Q:  As you understand it, how does Wexford
24   define that phrase "emergency"?

Page 163

1        MR. DUGAN:  Object to foundation.
2        A:  Wexford does not tell me what is emergency.
3        Q:  Okay.
4        A:  I decide what is emergency, and I refer the
5    patient in emergency situation, but then I'm still
6    required to notify Wexford and get their approval as
7    soon as possible.
8        That is obtaining a form of -- a form that I
9    have to fill it out and submit it to them, and then
10   they approve it or disapprove it.
11       Q:  Would spinal cord compression in any
12   circumstance be an emergency?
13       A:  I said that it can be chronic symptom or it
14   can be acute symptom, so it is not emergency.
15       Q:  The neuropathy is that an emergency?
16       A:  No.
17       Q:  So both of those things would require prior
18   authorization from Wexford, correct?
19       A:  Yes.
20       Q:  Central utilization management reviews and
21   makes a decision about your request for outside care,
22   correct?
23       A:  Well, what happens, the procedure that I
24   recall is that I submit a request to them.  They get

Page 164

1    the request, and then they are presented to them, you
2    know, at a meeting every week.  And that is the
3    time -- because if they are not emergent, they review
4    it once a week.
5        And then I talk to them on the phone,
6    conference call, and explain to them the situation.
7    They discuss it and deny it or approve it.
8        Q:  Do you play any role in accessing the
9    Interqual criteria to decide whether to approve or
10   deny a request for outside care?
11       A:  I do not have any authority denying or
12   approving.  It is done by central utilization, not me.
13       Q:  I understand.  Let me phrase it in a
14   different way.  As part of your decision-making at any
15   point in whether a patient should receive outside
16   care, do you use Interqual criteria?
17       A:  What is Interqual criteria?  I do not know.
18       Q:  That answers my question, Doctor.  Thank
19   you.
20       A:  If you explain to me, I can give you my
21   opinion.
22       Q:  My understanding is it's proprietary
23   software that is used.
24       A:  No.

41 (Pages 161 to 164)

BHARAT SHAH, MD  12/7/2017

Page 165

1    Q:  The process, if your request for outside
2    care is denied, you may re-request; is that correct?
3    A:  Yeah.  But when they deny, they give me some
4    their argument or plausible cause, and then they
5    recommend me something as an option.  I am supposed to
6    carry out that option.
7         And if I find that during that stage of
8    exercising that option, I still find that the patient
9    needs to be reviewed again, I submit it again.  So
10   it's a routine that we can resubmit it also.
11       Q:  And the less than ten times that you've --
12   is it more or less than five, if you know?
13       A:  I cannot tell you how many times it happened
14   because there were plenty of cases, but I did not many
15   occasions because I think in my case, at least I
16   recall personally, that more than 90 percent of my
17   requests were approved.
18       Q:  Can you tell me approximately how often you
19   would request a patient receive outside evaluation or
20   treatment?
21       A:  Many times.
22       Q:  Can you give me an approximate number?
23       A:  Well, at least every week there were four or
24   five things were going out, four or five requests.

Page 166

1    Q:  And some of those were people who would go
2    out for multiple treatments, correct?
3    A:  Like what?
4    Q:  Well, like in a two-month time period, you
5    might have one person who went out more than once,
6    correct?
7    A:  Well, they go out in response to whatever
8    specialist wants, then if I defer to some specialists,
9    then they may have to go out for follow-up visit,
10   follow-up procedure.  Not everything is done at one
11   stage.
12       Q:  Did you ever submit a utilization management
13   request for Gerry Armbruster?
14       A:  No.
15       Q:  All right.  Let's go back to Exhibit 2.
16       A:  What is Exhibit 2?  This one?
17       Q:  That is your job description.  So with the
18   exception of the request for outside care that were
19   occasionally denied despite, in your opinion, being
20   required by community practice guidelines, you
21   agree with me leaving aside that situation, it was
22   your job responsibility to practice medicine in a way
23   that complied with community practice guidelines?
24       A:  It is my personal responsibility to carry

Page 167

1    out my duties that were based off my knowledge.
2    Q:  Understood.  My question is slightly
3    different.
4         Was it your understanding of your
5    responsibility in your job as medical director --
6    whether your personal practice or personal
7    responsibility or not, was it your understanding that
8    your job required you to practice medicine consistent
9    with community practice guidelines with the exception
10   we just discussed?
11       A:  Yes, it does.
12       Q:  And do you agree that it was part of your
13   job responsibility to ensure that the services
14   provided by nursing staff at the healthcare unit were
15   conducted in accord with community practice
16   guidelines?
17       A:  I think community practice guidelines are
18   the medical practice guidelines which are the same
19   everywhere.  Okay?  So I mean usually medical practice
20   guidelines are community practice guidelines.
21       Q:  Sure.  So do you agree that it was your
22   responsibility to ensure that nursing staff at
23   Southwestern Illinois Correctional Center -- strike
24   that.

Page 168

1         Do you agree with me that it was your
2    responsibility to ensure that nursing staff at the
3    prison provided services in the healthcare unit
4    consistent with general medical practice guidelines?
5    A:  Yes.  Generally speaking, yes.  Practically
6    speaking, it was coordinated with entire staff that
7    healthcare unit administrator and also the nursing
8    supervisor.  So these are the things.  If the nurses
9    are not providing adequate care or our expectation, we
10   discuss it at the meetings and then carry out.
11       Q:  You said that you did not fire anybody.  Who
12   was responsible for firing?
13       A:  Wexford.
14       Q:  But you were an employee of Wexford, so who
15   at Wexford was responsible for firing employees at
16   Southwestern that needed to be employed -- fired?
17       A:  Must be medical director.  Executive medical
18   director.
19       Q:  Dr. Lehman?
20       A:  Yeah.
21       Q:  Was anyone fired during your tenure as
22   medical director at Southwestern?
23       A:  Anyone means nursing staff?
24       Q:  Any Wexford employee.

42 (Pages 165 to 168)

**BHARAT SHAH, MD  12/7/2017**

Page 169

1    A: I don't think, practically speaking, anybody
2    was fired, but they were transferred, two of them.  So
3    they did not firing, but they were transferred.
4        Q: Involuntary transfer?
5        A: Yeah.
6        Q: And who made that decision?
7        A: That must have been made by both, the
8    Wexford as well as the state.
9        Q: Let me ask it this way:
10       Did you play any role in making that
11   decision?
12       A: No.
13       Q: Under administrative, the second bullet
14   point, Medical director shall assist in designing and
15   implementing policies, procedures and protocols for
16   healthcare unit and medical staff.
17       Do you see that on page -- the first page?
18       A: Uh-huh.  What number are we talking about?
19       Q: Number 2.
20       A: Number 2, medical assistant designing and
21   implementing policies, procedures and protocols for
22   healthcare unit and medical staff.  Who do I assist?
23       Q: Well, let me just ask first do you agree
24   that this is an accurate reflection of your job duties

Page 170

1    and responsibilities while you were medical director
2    at Southwestern?
3        A: Yes.  They are put down on the paper like
4    that.
5        Q: Well, what I'm asking is not what's written
6    here.  I can read that.  But what I'm asking is
7    whether it accurately reflects what, in fact, were
8    your job duties and responsibilities?
9        A: That was one of the expectations, yes.
10       Q: Under paragraph 4, Medical director shall
11   attend staff meetings and participate on various
12   committees as requested by the chief administrative
13   officer, his designee?
14       A: Yes.
15       Q: Do you agree that's an accurate reflection
16   of one of your job duties and responsibilities?
17       A: Yes.
18       Q: Jumping back up for a minute under No. 1
19   right underneath administrative, Medical director
20   shall evaluate all existing medical programs and asses
21   the healthcare needs of the inmate population making
22   recommendations regarding medical programs or services
23   as appropriate.
24       Do you agree that was -- does that

Page 171

1    accurately reflect one of your job duties and
2    responsibilities?
3        A: That was not part of my duty anyway.
4    Practically speaking I'm talking.
5        Q: Under training and orientation, No. 1,
6    subheading 1.  Medical director shall be responsible
7    for ensuring that all new healthcare personnel are
8    provided with orientation on site at the center
9    regarding medical practices.
10       Do you agree that that accurately reflects
11   one of your duties and responsibilities as medical
12   director at Southwestern?
13       A: It was part of the duty coordinating with
14   the general medical director.
15       Q: Under No. 2 under inservice training,
16   Medical director shall be responsible for ensuring
17   that staff receives as necessary to ensure proper
18   performance of their job duties.
19       Do you agree that that accurately reflects
20   one of your duties and responsibilities as medical
21   director?
22       A: That was also done by the nursing supervisor
23   for the nurses.
24       Q: Under -- on page 2 -- and just to be clear,

Page 172

1    when you say that was also part of the healthcare unit
2    administrator and nursing supervisor, you agree that
3    it was partially your responsibility, though, correct?
4        A: No.  It was not solely my responsibility.
5        Q: Well, I'm not asking about solely your
6    responsibility.  What I'm asking, when you say that
7    was also the healthcare unit administrator and nursing
8    supervisor --
9        A: Yes.
10       Q: -- what I take you to mean is that that was
11   your responsibility that you shared with those other
12   individuals.
13       A: They coordinate.
14       Q: So together the three of you shared that
15   responsibility, correct?
16       A: Yes.
17       Q: And when there was no nursing supervisor,
18   that responsibility was shared between you and the
19   healthcare unit administrator, correct?
20       A: Yes.
21       Q: On page 2 of this Exhibit, letter C,
22   subsection 2.
23       A: Letter C, subsection 2.  Uh-huh.  Yes.  I
24   got it.

43 (Pages 169 to 172)

BHARAT SHAH, MD  12/7/2017

Page 173

1    Q:  Okay.  Medical director shall supervise and
2    direct the clinical activities of all healthcare staff
3    including supervising infirmary rounds made on
4    patients by other physicians reviewing and approving
5    all referrals to outside hospitals or specialists,
6    evaluating services and treatment provided by other
7    staff physicians, physicians' assistants and other
8    healthcare staff, properly completing an employee
9    evaluation for those employees under medical
10   director's direct supervision and participating in
11   disciplinary hearings and assisting in planning
12   schedules of healthcare staff.
13       Do you agree that those accurately
14   reflect --
15       A:  My unit was very small.  There was no other
16   physician working there.  There was no physician
17   assistants there.  The only ancillary medical staff
18   was dentist, optometrist and mental health
19   professional.
20       So I did not formulate any policies for
21   them.  They would come directly from Wexford and/or
22   state.
23       Q:  Right.  But there were also --
24       A:  So I did not have day-to-day supervision on

Page 174

1    them.
2        Q:  But there were also nursing staff present,
3    correct?
4        A:  Nursing staff also was in the care of
5    nurses, nursing supervisor.
6        Q:  They were under your supervision as well,
7    correct?
8        A:  Yes, medical supervision.  But their
9    organizational supervision was not mine.
10       Q:  Under quality assurance?
11       A:  Uh-huh.
12       Q:  On page 2?
13       A:  Uh-huh.
14       Q:  Medical director shall develop and implement
15   a quality assurance program that may include but is
16   not limited to audit and medical chart procedure?
17       A:  No.  That was not done by me.
18       Q:  Okay.  You did perform audit and medical
19   chart procedures?
20       A:  Yes.  But I did not formulate the quality
21   criteria or anything like that.  Formulation was done
22   by Wexford.
23       Q:  Done by someone in the administration of
24   Wexford?

Page 175

1    A:  Wexford, yes.
2        Q:  Under page 3 at the very top, which is one
3    of the clinical duties under that subheading, at the
4    very top, the first paragraph, formulating written
5    individual treatment plans for inmates with medical
6    problems which include directions to healthcare and
7    other personnel regarding their roles in the care and
8    supervision of these parties.
9        First, did I read that correctly?
10       A:  You read it correctly.
11       Q:  And does that accurately reflect one of your
12   job duties and responsibilities as medical director at
13   Southwestern?
14       A:  As I say, the formula policies were
15   formulated at Wexford.  They were all state level.  I
16   had to implement them.  I was not formulating them.
17       Q:  Well, but my understanding of this job duty
18   as it's laid out here is not about formulating policy,
19   but instead formulating written individual treatment
20   plans for inmates and setting out the role that other
21   staff would have and participating in that individual
22   treatment plan?
23       A:  I said I did not have to formulate any
24   clinical or administrative policies.  It might be

Page 176

1    written here, but practically was not.
2        Q:  But again, I don't take this to mean that
3    this one particular paragraph to be discussing
4    formulation of policies.  Instead, I take it to be
5    formulating individualized patient treatment plans per
6    patient.
7        A:  Yeah.  I mean, once I coordinate the care of
8    the patient, once the patient comes in my hands and
9    afterwards -- but when they are handling the sick
10   calls, they do it on their own protocol.  And
11   ultimately, they can be reviewed by me.  But I do not
12   do it day-to-day supervision.
13       Q:  Okay.  But do you play any role in
14   developing written individualized treatment plans for
15   prisoners who see you for a problem?
16       A:  I formulate the plans when they see me
17   there.
18       Q:  Okay.  And do you supervise the execution of
19   those plans?
20       A:  Yes.  Whatever orders I give, I see that
21   they are carried out or why not.
22       Q:  How do you supervise the execution of those
23   plans?
24       A:  Means if they are done in an orderly fashion

44 (Pages 173 to 176)

## BHARAT SHAH, MD  12/7/2017

Page 177

1  or not.  If I instructed or written down certain
2  requirements for the patient care whether they are
3  followed or not.  That I make sure.
4  .      Q:  My question is a little different.  How do
5  you make sure?  What do you do to make sure that your
6  treatment plan is executed?
7      A:  Well, my treatment plan only few, that I --
8  I treat the patient on the spot and write the orders
9  for that patient and prescriptions are given.  They
10  are carried out or not, that it's done timely fashion.
11      Second thing, I order the lab tests.  And
12  third thing is I would refer the patients outside.  So
13  all these things are done according to my orders, or
14  they will be apparent to me sooner or later.
15      Q:  Do you create treatment plans -- strike
16  that.
17      What you are saying is that your treatment
18  plan is just a one-time here is the plan at this time
19  I have seen the patient, correct?
20      A:  Yes.
21      Q:  But how do you determine whether nursing
22  staff have followed your treatment plan?  In other
23  words, processed your prescription, followed through
24  on what you ordered for labs, et cetera, et cetera?

Page 178

1      A:  Yeah.  They are done -- their labs are done
2  on a routine manner according to my requirements.
3      Q:  But how do you determine that?  How do you
4  know they were done in a routine manner?
5      A:  Because they put the stamp on that it is
6  done.
7      Q:  And do you review those charts periodically?
8      A:  Yeah.  Yeah.  And the results come back, and
9  then I review them.
10      Q:  Okay.  You can put that to the side.  If you
11  would, please, go back to Exhibit 1.
12      Can you tell me how, if at all, you
13  determine whether a patient -- strike that.
14      Can you tell me how, if at all, you
15  determine whether to request outside evaluation or
16  care by a specialist for a patient at Southwestern?
17      A:  I determine by my own clinical judgment.
18      Q:  And is that judgment subject to review by
19  anyone at Wexford?
20      A:  Yes.
21      Q:  And tell me what you mean by that.
22      A:  My determination subjective review by the
23  patient clinical judgment when they review my charts,
24  and they can point out to me my deficiencies or their

Page 179

1  requirements.
2      Q:  Are you familiar with the term "differential
3  diagnosis"?
4      A:  Yes.
5      Q:  Can you tell me what you understand that
6  term to mean?
7      A:  When you see a patient fr any particular
8  symptoms, you evaluate them clinically.  And when you
9  evaluate them, you just examine them.  And by
10  according to appropriate signs and symptoms, you
11  decide what are the possible causes, and that would be
12  the differential diagnosis.
13      Q:  And a differential diagnosis can include
14  multiple possibilities, correct?
15      A:  Yes.
16      Q:  And so how do you use the differential
17  diagnosis at a really abstract level?  Can you explain
18  how you use the differential diagnosis to help
19  evaluate and treat a patient?
20      A:  Yes.  Basic things.  Common things are
21  common.  In differential diagnosis, many things can
22  figure in, but then likely cause or proximal cause is
23  usually common one.
24      Q:  And if your primary potential diagnosis,

Page 180

1  which it sounds like you might consider the most
2  common to be that first one, if the treatment for that
3  doesn't work, do you go to the next one to see whether
4  that's --
5      A:  Yes.
6      Q:  -- the potential cause?
7      A:  It would be.
8      Q:  Would you agree with me that part of the
9  purpose of a differential diagnosis is to be able to
10  rule out what is and is not causing a patient's signs
11  and symptoms?
12      A:  Yes.
13      Q:  And do you agree that it is important for
14  medical -- strike that.
15      Do you agree that it's important for a
16  physician to perform a differential diagnosis on a
17  patient?
18      A:  Yes.
19      Q:  That that should be done in every instance?
20      A:  Yes.
21      Q:  And is that something you do as a matter of
22  your practice while you were a medical director at
23  Southwestern when you saw patients --
24      A:  Yes.

45 (Pages 177 to 180)

**BHARAT SHAH, MD 12/7/2017**

Page 181

1    Q:  -- in the sick call?
2    A:  Yes.  I would consider all possibilities in
3  my clinical judgment.
4        Q:  When Wexford took over the contract --
5  strike that.
6        Can you tell me what training you received
7  when you were hired by HPL?
8    A:  The particular, there's no formal training.
9        Q:  Were you given on-site training by anyone?
10   A:  Yes.  They introduce you to the clinic over
11  there.  They explain to you the protocols and they
12  explain to you their medical needs and all.  Plus for
13  a newcomer like me, that environment, they tell me
14  what's going on in the facilities, and that's how they
15  train you.
16       Q:  What did they tell you about that?
17   A:  What are the procedures, what are the
18  locations of the patients' care, what are the
19  locations of other things and all.  So you get
20  oriented with that.  They take you around and show you
21  that also.  So they familiarize with you the working
22  policies.
23       Q:  Can you tell me what training, if any, you
24  received when Wexford took over the contract?

Page 182

1    A:  No, nothing special.  It was continuous what
2  I was doing.
3        Q:  And I know you talked about your job duties
4  and responsibilities and how they did not change
5  throughout your tenure.
6        Did anything other than the peer review
7  process change when Wexford took over the contract for
8  the IDOC?
9    A:  Nothing particularly, no.
10       Q:  Something generally?
11   A:  No.
12       Q:  Can you tell me what, in your opinion --
13  strike that.
14       In your opinion, did anything change about
15  the quality of medical care that was being provided at
16  Southwestern or anywhere else that you knew about?
17   A:  No, not that I know of.
18       Q:  As far as you know, the quality of care
19  stayed about the same?
20   A:  Quality of care I was a part of it at
21  Wexford -- I mean at Southwestern, and rest of the
22  places I had no concern about them.
23       Q:  Understood.  My question is not about
24  adequacy of care.  My question is about increase or

Page 183

1  decrease in quality of care.
2    A:  I don't think so.
3        Q:  Did you see any increase in quality of care
4  or decrease in quality of care when Wexford took over?
5    A:  No, I think about the same.
6        Q:  Did you ever receive, at any point, during
7  your tenure as medical director at Southwestern any
8  training on the Illinois Department of Corrections
9  administrative directive?
10   A:  Yes.  We were given a manual for that also.
11       Q:  You were given a manual?
12   A:  Two manuals.  One was the Wexford policy
13  procedure.  Other was administrative manual by the
14  state.
15       Q:  And was that something you were given to
16  take home or something that was kept in --
17   A:  It was kept at site.
18       Q:  Dr. Shah, please try to let me finish my
19  question.
20   A:  I'm sorry.
21       Q:  Even though I know you know what I'm about
22  to ask.
23   A:  I'm sorry about that.
24       Q:  No problem.  Were you given an opportunity

Page 184

1  to sit down and review those policies, or were you
2  told here's where the policies are; if you need to
3  review them, they're there?
4    A:  Yeah.  You're supposed to review them, and
5  that's it.
6        Q:  Okay.  You were told that you should review
7  them?
8    A:  Yes.
9        Q:  And when -- did the manuals with those
10  policies, did they remain in the healthcare unit
11  throughout your tenure there?
12   A:  Yeah.
13       Q:  Do you know whether they were updated?
14   A:  Yes, from time to time.
15       Q:  Did you, in fact, review those policies as
16  part of your job as medical director?
17   A:  As in when required, yes.
18       Q:  Tell me what that means, "as in when
19  required."
20   A:  When there is something carried out, I would
21  refer to healthcare unit administrator and we go by
22  that policy.
23       Q:  Can you tell me what policy manuals you
24  require being part of that Wexford binder?

46 (Pages 181 to 184)

## BHARAT SHAH, MD  12/7/2017

Page 185

1  A: Well, the Wexford policies and procedures
2  was one manual. And there are some clinical parts in
3  there, that what the doctor is supposed to carry out
4  in certain conditions.
5  Q: Were nursing protocols -- was it a physical
6  binder?
7  A: I think, yes.
8  Q: Were the nursing protocols part of that
9  binder?
10  A: Yes.
11  Q: And was what's depicted on Exhibit 1 the
12  medical policies and procedures, was that included in
13  that binder?
14  A: I recall that they are policies and
15  procedures that Wexford has clinical procedures,
16  certain policies for getting out administrative
17  things.
18  Q: You said earlier that you don't recall
19  specifically whether Exhibit 1 was in that binder; is
20  that correct?
21  A: No.
22  Q: Did you ever provide training to any members
23  of the Wexford staff?
24  A: No.

Page 186

1  Q: Did you ever provide any training to any of
2  the members -- any employees of IDOC?
3  A: No. Training in what respect?
4  Q: Any training.
5  A: No.
6  (Plaintiff's Exhibit 3 marked for
7  identification.)
8  Q: The court reporter has handed you what's
9  been marked as Exhibit 3. Take a minute and just
10  glance over this and let me know whether you've ever
11  seen this document before.
12  A: It's not referring to me for page of the
13  document, so this is the same document that I have
14  seen or different I don't know.
15  Q: Do you know whether you have seen some
16  iteration of an operations policies and procedures
17  manual from Wexford?
18  A: Yes.
19  Q: So you just don't recall if it's this
20  particular one?
21  A: Yeah, or something.
22  Q: Okay. Can you tell me whether -- well, were
23  you given this document by -- the operations policy
24  manual, were you given that document by Wexford staff?

Page 187

1  A: Yes.
2  Q: And were you told that it reflects Wexford's
3  policies and procedures?
4  A: Yes.
5  Q: Can you turn to page 50, please?
6  A: Fifty?
7  Q: Correct. Five zero.
8  A: Yes, please.
9  Q: This is a discussion of the nursing
10  assessment protocols. Do you see that?
11  A: Yeah.
12  Q: And on paragraph A under process, the second
13  sentence states that you will review -- the medical
14  director will review at least annually, revise the
15  protocols as necessary, review the protocols at least
16  annually with the nursing staff, document the annual
17  review on the protocol. Do you see that?
18  A: Yes.
19  Q: Do you agree that that's an accurate
20  reflection of one of your job duties and
21  responsibilities as --
22  A: This is written down as a policy.
23  Q: Is it your testimony that it was not a
24  practice that was in effect at Southwestern?

Page 188

1  A: It was in effect, but then we used to review
2  the protocols and suggest the changes, but whether
3  they were done or not, it is up to Wexford.
4  Q: Okay. Can you turn to page 53, please?
5  A: Yes.
6  Q: This is a policy that discusses orientation
7  for health staff?
8  A: Uh-huh.
9  Q: And at the very bottom after discussing what
10  should be included with a basic orientation, it says
11  that the orientation will be -- program will be
12  approved by the responsible health authority and the
13  facility administrator and is reviewed, at a minimum,
14  every two years. Do you see where that's written?
15  A: Yeah.
16  Q: Do you agree that this is an accurate
17  reflexion of Wexford's policy?
18  A: Yes.
19  Q: Do you agree that it was therefore a
20  responsibility on you as responsibile health
21  authority?
22  A: No.
23  Q: You don't agree that that is an accurate
24  recollection of your job duties and responsibilities?

47 (Pages 185 to 188)

**BHARAT SHAH, MD  12/7/2017**

Page 189

1     A: No.
2     Q: Whose duty and responsibility was this?
3     A: The Wexford central location and the
4 healthcare unit administrator or state.
5     Q: Okay. If you would, turn to page 48,
6 please.
7     A: Uh-huh.
8     Q: This is a discussion of who is the
9 responsibile health authority.
10     A: Uh-huh.
11     Q: And you'll see that the policy states that
12 Wexford will have a designated health authority at
13 each facility responsible for healthcare services. Do
14 you see that?
15     A: Yes.
16     Q: And then underneath that, it says, The
17 responsible health authority for the facility is
18 Wexford health's facility medical director?
19     A: Uh-huh.
20     Q: Do you agree that you, as medical director
21 at Southwestern, were the responsible health
22 authority?
23     A: In what respect?
24     Q: As that word is used in these policies and

Page 190

1 procedures.
2     A: No. I think my only responsibility was to
3 carry out the duties -- the policies created by
4 healthcare -- I mean by the Wexford or by state.
5     Q: Let me ask it this way:
6     Did anyone from Wexford ever tell you
7 were the responsible healthcare authority?
8     A: I am the responsible medical director, not
9 authority.
10     Q: So no one from Wexford ever told you
11 you were the responsible health authority --
12     A: No.
13     Q: -- correct?
14     And when you were given these policies by
15 Wexford, did you, in fact, review them?
16     A: Yes.
17     Q: Do you know whether the version that you
18 reviewed contained a definition for responsible health
19 authority like that that appears here?
20     A: No.
21     Q: Okay. I'll represent to you that I'm not
22 familiar with one that differs from this definition,
23 although I haven't seen all the iterations of this
24 document.

Page 191

1     Do you recall specifically reviewing this
2 policy about responsible health authority?
3     A: No, I don't recall.
4     Q: Do you recall reviewing the policy about
5 orientation for health staff?
6     A: I reviewed that. But I mean what aspect of
7 it is it?
8     Q: On page 53, the policy we were discussing
9 that at the end makes the responsible health authority
10 responsible for approving the orientation program at a
11 minimum every two years along with the facility
12 administrator. It's on page --
13     A: Fifty-three?
14     Q: Yeah.
15     A: That was not done by me.
16     Q: In other words, that wasn't a part of your
17 job?
18     A: No. It was not asked to be done by me.
19     Q: Okay.
20     A: I only did what was asked of me.
21     Q: Do you have recollection reviewing this
22 policy when you were given the operations policies
23 manual?
24     A: I don't recall.

Page 192

1     Q: When you reviewed -- when you were given
2 this policy manual, were you told that there would be
3 parts of your job that would be specified in this
4 manual?
5     A: They were not all the part of my job. They
6 were in the policy manual, but they were all carried
7 out by Wexford.
8     Q: Okay. I understand your testimony about who
9 had responsibility over what. What I'm trying to
10 understand is what you were told when you were given
11 this document. Were you told to review this document?
12     A: Yes.
13     Q: And were you told anything about what had --
14 whether it had to say anything about your duties as
15 medical director?
16     A: Whatever is specified in my duties.
17     Q: So in reviewing this document, you
18 understood it to lay out, in part, your duties and
19 responsibilities, correct?
20     A: Uh-huh. Yes. I say it wrong.
21     Q: Thank you. No problem.
22     How, if at all, were you notified of any
23 changes to Wexford's policies and procedures?
24     A: Pardon?

48 (Pages 189 to 192)

**BHARAT SHAH, MD  12/7/2017**

Page 193

1  Q:  How, if at all, were you notified to changes
2  to policies and procedures from Wexford?
3      A:  Forwarded to us in writing.
4      Q:  Were they emailed or mailed to you?
5      A:  Mailed to us.
6      Q:  Did you have an email address through
7  Wexford?
8      A:  No.  The electronic system was not
9  instituted when I was there.
10     Q:  Not even at the end?
11     A:  They were going to institute institution
12  wide and ours was October.  Later on.
13     Q:  And just so we're on same page -- I'm not
14  questioning what you said.  What I mean is email, not
15  electronic medical record system.
16     A:  No.
17     Q:  You didn't have an email address from
18  Wexford?
19     A:  (Witness nodding).
20     Q:  That was a no?
21     A:  Yeah.
22     Q:  Did you use your personal email address to
23  communicate about Wexford -- about your job as medical
24  director at all?

Page 194

1      A:  I used to -- through the medical records I
2  used to email.
3      Q:  Tell me what that means.
4      A:  They were sending my messages if I had any.
5  I did not use myself.
6      Q:  I'm still not sure I understand.
7      A:  My messages to expert was sent through email
8  by the medical record.
9      Q:  By medical records department?
10     A:  Yeah.
11     Q:  Okay.  So they would email?
12     A:  Yeah.  Whatever I wanted, my message or
13  anything.
14     Q:  And who was it?  Was there a particular
15  person in the medical records department that you
16  would turn to with that request?
17     A:  Medical record personnel.
18     Q:  Who?
19     A:  Two of them were there mainly.
20     Q:  Who?
21     A:  One was Terry Franklin.
22     Q:  Okay.
23     A:  Another is -- I call her Chris.  I forget
24  her last name.

Page 195

1      Q:  Her first name is Chris or Christina?
2      A:  Yes.
3      Q:  Okay.  And they would, to your knowledge,
4  would email folks at Wexford for you?
5      A:  Yeah.  Mostly Terry Franklin it was, the
6  medical record supervisor.
7      Q:  And what kinds of messages would they email
8  for you?
9      A:  Very rarely.
10     Q:  But when they would email, what sorts of
11  things would they be emailing for you?
12     A:  My communications in response to them.
13     Q:  For what?
14     A:  Meetings or something like that.
15     Q:  How, if at all, would you receive agendas
16  for a meeting?
17     A:  They were sent to us by -- in writing.
18     Q:  Hard copy mail?
19     A:  Yes.
20     Q:  How, if at all, were you notified of changes
21  to the administrative directives and institutional
22  directives from IDOC?
23     A:  Not that I recall how many number of times.
24  In my tenure, there were not many times that there was

Page 196

1  changes.
2      Q:  Were there ever changes that you know of?
3      A:  Could be.
4      Q:  As you sit here today, do you recall any
5  changes to the --
6      A:  No.
7      Q:  -- IDOC's policies?
8      A:  I do not recall much.
9      Q:  Did you ever ask anyone to increase the
10  number of staff --
11     A:  No.
12     Q:  -- at Southwestern?
13     A:  Not me.
14     Q:  Did someone else?
15     A:  I did not ask.
16     Q:  If you can turn back to Exhibit 3 really
17  quickly --
18     A:  This is 3?
19     Q:  Yes.  And if you would turn back to page 48,
20  the responsible health authority?
21     A:  Yes, ma'am.
22     Q:  Under Section D for process, you agree that
23  this policy states, The medical director is
24  responsible for making and reviewing all medical and

49 (Pages 193 to 196)

## BHARAT SHAH, MD  12/7/2017

### Page 197

1 clinical decisions.  Do you see that?
2     A: Uh-huh.  Yes.
3         Q:  Do you agree that was one of your job duties
4 and responsibilities as medical director at
5 Southwestern?
6     A: I was making medical decisions myself.
7         Q:  Sure.  But were you also responsible for
8 supervision of medical decisions that were being made?
9         And let's leave to the side -- because it's
10 not relevant to this case, we'll leave to the side
11 mental health?
12     A: No.
13         Q:  Mental health professional and the
14 psychiatrist or psychologist --
15     A: No.
16         Q:  -- we'll leave those people aside.
17         Other than those people, do you agree that
18 clinical decisions that were made by someone other
19 than yourself still fell under your responsibility?
20     A: Medical decisions made by whom?
21         Q:  Well, any medical and clinical decisions,
22 nursing staff or dentist or --
23     A: No.
24         Q:  You don't agree?

### Page 198

1     A: No.
2         Q:  Who was responsible for reviewing those
3 decisions?
4     A: It was not me.
5         Q:  Okay.  And how -- like, tell me about -- I'm
6 looking at a written policy here.
7         Tell me about what you looked to, what was
8 told to you that made you understand that this was not
9 your responsibility?
10     A: Yeah.  I did not say it was not my
11 responsibility.  It was not done.
12         Q:  Okay.
13     A: Because they are written themselves.
14 Wexford themselves through the director.  I was not
15 handling them to the department nor mental health
16 department nor was I.
17         Q:  Right.  Just be to clear, I'm leaving, for
18 this case, totally to the side everything about mental
19 health because it's not relevant to our case.  And so
20 if that comes up again, just understand we're not
21 talking about mental health today.
22         Can you tell me who was your immediate
23 supervisor while you were medical director at
24 Southwestern?

### Page 199

1     A: Yeah.  My medical supervisor was general
2 medical director like I told you.
3         Q:  There were two people who filled that role
4 during your tenure?
5     A: Yes.  One only.
6         Q:  Oh, was that just Dr. Lehman?
7     A: No.  He was the chief of the entire Wexford
8 medical director.
9         Q:  So your --
10     A: Regional director was Illinois director, and
11 Illinois also had some parts, north part, south part,
12 something like that.
13         Q:  Do you know whether it was Dr. Funk?
14     A: No.  Dr. Funk was in the north part, and the
15 other doctor was in the south part.  How come I forget
16 his name today?
17         Q:  Well, if you think about it as we're going,
18 please let me know.
19         Did he stay your immediate supervisor
20 throughout your tenure at Wexford?
21     A: I think so.  There was one doctor that I
22 knew after Wexford came.
23         Q:  So it was after Wexford maintained the
24 contract, you think it was just one person?

### Page 200

1     A: Uh-huh.
2         Q:  How, to your knowledge, did that supervisor
3 ensure that you were performing satisfactorily?
4     A: That is his judgment.  It's not mine.
5         Q:  Understood.  And to be clear, I understand
6 that there may be additional things that he would say
7 he did to supervise you you may not be aware of.
8         What I'm asking is only what you actually
9 are aware of he did to review your work or supervise
10 you in any way.
11     A: Well, if he wanted to check with me, he
12 would check with me about some person care, or if he
13 had any recommendations from another person in the
14 unit, he would recommend to me something to be done.
15         Q:  You say check with you.  Is that something
16 he did on a regular basis?
17     A: Used to come there once a month.
18         Q:  And what would he do when he would visit
19 monthly?
20     A: The entire medical unit he would visit as a
21 representative of Wexford, review everything and talk
22 to everybody, and that everybody included me.
23         Q:  And what would he do when he would talk to
24 you?  Would he talk to you about your work,

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

**BHARAT SHAH, MD  12/7/2017**

## Page 201

1  socializing?  What would you talk about?
2      A:  Both.
3          Q:  Did he conduct any chart reviews while he
4  was there?
5      A:  Not that I recall.
6          Q:  Did he participate in any meetings, regular
7  or otherwise, with the staff to discuss quality of
8  care, administration of care?
9      A:  I think I know meetings Wexford used to hold
10  and state was there.  That time he did used to
11  participate, but he did not used to come to monthly
12  meetings.
13          Q:  What were the meetings he used to
14  participate in?
15      A:  Annual meetings.
16          Q:  Annual meetings.
17      A:  Uh-huh.
18          Q:  Was there a quarterly meeting that occurred
19  as well?
20      A:  Yeah.  But all monthly meetings were there
21  at the location, but he did not -- I don't recall he
22  came.
23          Q:  Okay.  Any other ways he, to your knowledge,
24  supervised you?

## Page 202

1      A:  Director, when he came there.
2          Q:  Sorry?
3      A:  When he came to the location, he directly
4  talked to me, but otherwise I don't know remotely how
5  he did it.
6          Q:  Have you ever had any conversations with any
7  of the Wexford staff, up or down, about any of the
8  lawsuits against you?
9      A:  I had never had a lawsuit when I was at
10  Wexford.
11          Q:  Fair enough.  You did say that.  And you
12  haven't had any conversations with them since you were
13  sued after you left?
14      A:  Not unless to communicate and tell them I
15  received the notice about the case.  So I had to call
16  the central location at Wexford and they said we are
17  aware of it.
18          Q:  During the time you were employed by
19  Wexford, did you receive any bonus?
20      A:  Not except for annual turkey that they used
21  to give.
22          Q:  Okay.  I want to talk to you a little bit
23  about the occasions that you would actually come to
24  see a patient face to face.

## Page 203

1      A:  Pardon?
2          Q:  I want to talk about occasions where you
3  would come to see a patient face to face.
4      A:  Uh-huh.
5          Q:  One of the reasons that that would occur is
6  because of the physical; is that right?
7      A:  Yes.
8          Q:  And to my understanding, there is a
9  requirement by either Wexford or IDOC that a prisoner
10  receives a physical every X number of years depending
11  on their age?
12      A:  Yes.
13          Q:  Are you familiar with that policy?
14      A:  Yes.
15          Q:  Is there also a policy in place at
16  Southwestern that they receive a physical upon
17  admission?
18      A:  Yes.
19          Q:  And is that a policy that you put into
20  place, or is that a policy someone else put in place?
21      A:  It has been there since I was there, before
22  I was there even.
23          Q:  Okay.  And is that a policy that, to your
24  knowledge, is unique to Southwestern or something that

## Page 204

1  happens at every facility?
2      A:  I'm only aware of Southwestern.
3          Q:  That physical, is that conducted by you at
4  every instance or sometimes by -- well, excepting the
5  times you are on leave or on vacation, is that always
6  conducted by you, or is that sometimes conducted by
7  nursing staff?
8      A:  No.  Nursing staff make their own
9  evaluation.
10          Q:  So the physical that happens when a patient
11  first arrives at Southwestern, that's done by you,
12  correct?
13      A:  Yeah.  Initial examination is done by me
14  when they referred to me.  Some of them come right
15  away.  Some of them later, in course of time.
16          Q:  When you say later on, how long are we
17  talking?
18      A:  It may be a time period before they see --
19          Q:  Like a year?
20      A:  Couple weeks.
21          Q:  Couple weeks.  What other circumstances
22  would you see a patient face to face?
23      A:  When they come to me.
24          Q:  Sure.  But can you tell me -- I'll give you

51 (Pages 201 to 204)

## Page 205

1 an example that I was thinking of.  Sick call?
2      A:  Yeah.  Sick call means the nurses refer to
3 me.  They don't come directly to me.
4      Q:  Are you aware of a policy whereby a patient
5 can see a doctor if the patient submits at least three
6 sick call slips regardless of whether the nurses feel
7 it's appropriate to see a physician?
8      A:  How often they are allowed to submit a sick
9 call request slip before they're seen by a nurse or by
10 me, that's not made by me.
11      Q:  Okay.  I'm just asking whether you know of
12 any policy that says regardless if the nursing staff
13 thinks the patient needs to be seen by a doctor, if
14 the patient has dropped three sick call slips for
15 nursing staff and pays the copay, then the fourth time
16 they go see a doctor, are you aware of such policy?
17      A:  Oh.  They can come see me after the first
18 sick call.
19      Q:  Okay.  Who makes the decision whether --
20 strike that.
21          When a patient submits a sick call slip, he
22 doesn't specify whether to see nursing staff or the
23 physician, right?
24      A:  Yeah.

## Page 206

1      Q:  He sees nursing staff in the first instance
2 almost every time?
3      A:  I think so, yes.
4      Q:  And nursing staff makes that decision,
5 right?
6      A:  Yeah.
7      Q:  And that's the practice as it was at
8 Southwestern during your tenure as medical director,
9 correct?
10      A:  Yes.
11      Q:  Fair to say, then, that when a patient is
12 seeing you, it's a condition that either through
13 protocol or a nurse's concern warrants -- it's serious
14 enough that it warrants your eyes, correct?
15      A:  Yes.
16      Q:  What about medication renewal?  Do you
17 require -- at Southwestern, is there a policy or
18 practice that you actually see the patient before you
19 will renew their medications?
20      A:  Patient request when I see them first time,
21 I prescribe them.
22      Q:  Okay.
23      A:  And then I prescribe for acute condition for
24 certain limited number of days.  And for chronic

## Page 207

1 conditions, we give them for few months at a time.
2      Q:  Okay.  Let's say you prescribe someone
3 medication for a three-month period for a chronic
4 condition that persists outside of that three months.
5          In order to renew that medication, do you
6 actually see the patient for an encounter?
7      A:  They are requested refill, and they come to
8 us to fill it.
9      Q:  So specifically, they see you --
10      A:  Yeah.
11      Q:  -- right?
12      A:  Uh-huh.
13      Q:  Before you encounter a patient, do you get a
14 list of all the patients you are going to see?
15      A:  They make MD line.  And in that line, we
16 write number of patients that we see.  And some come
17 for acute outside the line also.  Add-ons are what
18 they call them.
19      Q:  Add-ons?
20      A:  Add-ons because somebody is acute.  Some
21 emergency come without any protocol.
22      Q:  And is that a separate -- the names that are
23 on your MD line for that day, is that a separate
24 document that you get handed?

## Page 208

1      A:  Yeah.
2      Q:  Do you get handed that document every day?
3      A:  Yes.
4      Q:  And what is included on that document?
5      A:  It's patient name, number, location.
6      Q:  Anything about the complaint or issue that
7 has brought the patient to the healthcare unit?
8      A:  Nature of the visit, you know.  They say
9 clinic visit or whatever the visit is.  They mentioned
10 the patient has a boil, they write it as boil.
11      Q:  Has boil?
12      A:  Yeah, something like that.
13      Q:  So those two seem actually different.  The
14 nature of the visit might be sick call, but the
15 specific issue is leg pain.
16      A:  Yeah.
17      Q:  Are both of those things included in the
18 form?
19      A:  No.  They don't write sick call.  They write
20 in the chart.  They don't write on my line.  My line,
21 they just write the name of the patient.
22      Q:  So we'll get to the charts in a second.  But
23 on that document that you get with everybody's name,
24 does that include any details about the patient,

52 (Pages 205 to 208)

### BHARAT SHAH, MD  12/7/2017

---

Page 209

1  either the reason for the visit, chronic clinic versus
2  sick call, or the issue that the patient is there to
3  address, broken leg or --
4      A: Symptom, that's all.
5      Q: So it does have information about the
6  symptom?
7      A: Some.  I recall.  Really I don't recall too
8  much detail on that.
9      Q: Got it.  And when you are done with that
10 document, what did you do with it?
11     A: Either I can keep it if I want to --
12     Q: Or?
13     A: -- or it goes back.
14     Q: So you talked about physicals, sick call
15 slip, refill, medication refill, chronic clinic is
16 another reason you'd see people, right?
17     A: Uh-huh.
18     Q: What else?
19     A: They are all on one line on my list.  That's
20 all.
21     Q: Okay.  What other circumstances or reasons
22 would you see a patient?
23     A: Nothing else that I can imagine.
24     Q: And those kind of all get mixed together on

---

Page 210

1  the MD line --
2      A: Yes.
3      Q: -- for every day?
4      A: Uh-huh.
5      Q: So you might see one patient for a sick
6  call, the next patient is a physical, et cetera, et
7  cetera?
8      A: Yes.
9      Q: Prior to actually laying eyes on the
10 patient, do you actually review that patient's medical
11 record?
12     A: When they come to me.
13     Q: Tell me what you mean by that.
14     A: Uh-huh.  When they are brought to me, that
15 is the time I see the record.
16     Q: So you actually are reviewing their medical
17 record as you are laying eyes on them?
18     A: Yeah.
19     Q: And as part of your practice, did you review
20 that medical record as you are talking to them?
21     A: Yes.
22     Q: Is it arranged most recent to oldest or the
23 other way around?
24     A: I don't follow that question.

---

Page 211

1      Q: When you open the chart, does it have the
2  most recent record or the oldest record?
3      A: One record only.  All patients have one
4  record.
5      Q: Okay.  How do you determine which records to
6  review?
7      A: There are records.  Some are old records.
8  Some are new records.  So the current record comes to
9  me.
10     Q: So you see the most recent records?
11     A: Yeah.
12     Q: In terms of what you do during the -- during
13 the encounter, do you document all the things that you
14 observe about the patient?
15     A: I do.
16     Q: And do you document all of the tests that
17 you perform on the patient?
18     A: Yes.
19     Q: Do you document the treatment that you've
20 decided for the patient?
21     A: Yes.  It goes under the plan.
22     Q: And yeah.  We'll get to the SOAP note.  Do
23 you document your differential diagnosis?
24     A: No.

---

Page 212

1      Q: Okay.  Why not?
2      A: Differential diagnosis not written down on
3  paper.
4      Q: Something that you keep in your head?
5      A: Yes.
6      Q: And how many patients would you see in a
7  given day on an MD line?
8      A: I think sometimes it was about around 20 to
9  25 in my facility.  I would say it's a really, really
10 small facility.
11     Q: Were you able to track the care of those
12 patients over time?  I mean were you familiar?
13     A: As in when they come to me?
14     Q: Right.  But when you'd see a patient -- you
15 just said you didn't write differential diagnosis
16 down.
17         My understanding is that differential
18 diagnosis can evolve and narrow or expand potentially
19 over time, correct?
20     A: Yes.
21     Q: Why don't we take a quick break.
22        (Recess.)
23        (Plaintiff's Exhibit 4 marked for
24 identification.)

---

53 (Pages 209 to 212)

**BHARAT SHAH, MD  12/7/2017**

---

Page 213

```
 1        Q:  Okay.  I want to talk to you now about the
 2   medical care that Mr. Armbruster received at
 3   Southwestern.  I want to first ask you whether based
 4   on your review of the documents, you believe that Mr.
 5   Armbruster received adequate medical care at
 6   Southwestern.
 7        A:  Yes.
 8        Q:  It's your opinion he did receive adequate
 9   medical care?
10        A:  Yes.
11        Q:  And is that your opinion -- strike that.
12        It's your opinion you provided adequate
13   medical care, correct?
14        A:  Yes.
15        Q:  And is it your opinion the nursing staff
16   provided Mr. Armbruster adequate medical care as well?
17        A:  I think so.  Can I talk to him?
18        Q:  There's not a question pending, so sure.
19        (Discussion off the record.)
20        Q:  I want to turn to Exhibit 4.  And I'm going
21   to admit to you, Doctor, I have a lot of difficulty
22   reading your writing.  Some of this is going to be
23   asking you to read your medical records to me.
24        A:  Yes.
```

Page 214

```
 1        Q:  So I understand that the first few lines of
 2   print here are not written -- were not written by you,
 3   but can you read to me what you did, in fact, write in
 4   this medical record in Exhibit 4, P360?
 5        A:  On the date 5/14/14, is that the date you
 6   are talking about?
 7        Q:  Yes, is that your handwriting?
 8        A:  Yes.
 9        Q:  Okay.  Tell me the next place that your
10   handwriting appears.
11        A:  Below the nurse's handwriting.
12        Q:  Okay.  And please read to me what's written
13   there.
14        A:  I write 11:30 a.m., the time I saw the
15   patient.
16        Q:  Okay.
17        A:  Then I write S means subjective.
18        Q:  Okay.
19        A:  Complaints of numbness of fingertips, no
20   history of recent trauma, and complains of backache,
21   leg pain.  No GI or GU complaints offered. ███████
22   ████████████.  Denies ETOH use.  Means
23   alcohol use.
24        MR. DUGAN:  ETOH.
```

Page 215

```
 1        A:  Then under side bar I have written weight
 2   gain 172 to 183.  Then O means objective or --
 3        Q:  Before we get there, you said that the first
 4   line was complaint of numbness of fingertips?
 5        A:  Yes.
 6        Q:  Anything else written in that second line?
 7        A:  No history of recent trauma.
 8        Q:  Okay.  I thank you.  What is GU?
 9        A:  G means genitourinary.
10        Q:  Okay.  Please continue.
11        A:  ██████████████████
12        Q:  Oh, no.  I'm sorry.  Please continue with
13   the objective portion.
14        A:  Okay.  Not in acute distress, walks with
15   back pain.  C spine ROM, range of movement.  C spine
16   ROM full.  No gross neurological deficit of arms.
17   Claims can't grip with the hand.  Hand grip and range
18   of movement full.
19        Q:  Hold on one second, please.
20        A:  Sorry.  Too fast?
21        Q:  Claims no grip?
22        A:  Claims can't grip with the hand.
23        Q:  Okay.  And what's next?
24        A:  Hand grip and right ROM full.  All joints
```

Page 216

```
 1   ROM full.  Lumbosacral spine, range of movement full.
 2   Straight leg raising 90 degrees.  On the left side in
 3   the side bar written no spasm, vertebral muscles, no
 4   deformity of lumbosacral spine, LS spine.
 5        Q:  Sorry.  No spasm paravertebral muscles?
 6        A:  And no deformity of LS spine.
 7        Q:  LS spine, what does that stand for?
 8        A:  Lumbosacral spine.
 9        Q:  What is that?
10        A:  Lumbosacral, lumbar back.  Mid to lower
11   back.
12        Q:  Okay.  And you said under all joints range
13   of motion full.  Right underneath that says what?
14        A:  All joint ROMs full, LS spine ROM full.
15        Q:  What is LS spine?
16        A:  Lumbosacral spine.
17        Q:  Same.  And then continuing on to the
18   A portion as well?
19        A:  Then written SL 90 degrees.
20        Q:  Okay.  And then under the A portion?
21        A:  Under assessment, self-reported tingling of
22   fingers, no evidence of neurological deficit, ██████
23   ███████████, history of gunshot wound knees and
24   arthritis of LS spine or sprain.
```

54 (Pages 213 to 216)

**BHARAT SHAH, MD  12/7/2017**

Page 217

1    Q:  That's what's written immediately above the
2  figure P?
3    A:  Oh, yes.
4    Q:  Can you read that portion of it again?
5    A:  Arthritis spine versus sprain.  Alter
6  option, sprain.
7    Q:  Okay.  And then in the P portion?
8    A:  P portion I have written advise back
9  exercises.
10    Q:  Is there one that's the level above that?
11    A:  No.  That's scratched out.
12    Q:  Okay.
13    A:  I started, I think, something and I said --
14  or I write something else.
15    Q:  Okay.
16    A:  Number 1 is advise back exercises and hand
17  exercises.
18        Number 2, continue medications.  That's
19  medicines, ibuprofen ordered on 4/6/14.
20    Q:  Okay.
21    A:  Number 3 is follow up in two weeks.
22    Q:  Okay.
23    A:  And No. 4 is chart blood pressure a.m.
24  and p.m. into one week.

Page 218

1    Q:  Okay.  And then that's your signature?
2    A:  Yes.
3    Q:  The B?
4    A:  Yeah.
5    Q:  Got it.  Okay.  I want to talk to you, then,
6  about the substance of this report.  The subjective
7  portion of the medical record, that's Mr. Armbruster's
8  report of his symptoms, correct?
9    A:  Uh-huh.
10    Q:  And the objective portion, that's what you
11  have been able to observe or see from your assessment
12  of the patient, correct?
13    A:  Yes.
14    Q:  And can you tell me what if -- so if the
15  numbness that Mr. Armbruster reported, you agree that
16  that is one of the motor or sensory disturbances we
17  discussed earlier today, correct?
18    A:  Yes.
19    Q:  And the pain in the back and legs, that's
20  another motor or sensory disturbance, correct?
21    A:  That's under the condition.
22    Q:  Well, but you said the pain was one of the
23  manifestations of --
24    A:  Primary joint condition or wound condition

Page 219

1  or --
2    Q:  I understand that pain can indicate a lot.
3  But it is one of the manifestations of a motor or
4  sensory disturbance as well, correct?
5    A:  Yes.  Uh-huh.
6    Q:  Okay.  And the ambulation with pain in the
7  back, that's another manifestation of sensory and
8  motor disturbance, correct?
9    A:  That is evidence of some pain.
10    Q:  Well, all right.  Let me back up and ask
11  this.  You have noted the walking with back pain under
12  the objective portion of the medical record, correct?
13    A:  Uh-huh.
14    Q:  So that was something you were able to
15  observe, not just something he reported, but something
16  you were able to observe yourself, correct?
17    A:  Yes.
18    Q:  That would mean you were able to see the
19  patient express --
20    A:  Pain.
21    Q:  -- express pain as he's walking, right?
22    A:  (Witness nodding).
23    Q:  Is that correct?
24    A:  Yes.

Page 220

1    Q:  And I thought that you had said earlier that
2  difficulty ambulating was one of the motor and sensory
3  disturbances; is that correct?
4    A:  Yes.
5    Q:  And could that manifestation come through
6  ablation that is painful?
7    A:  Yes.
8    Q:  The inability to grip, that's another
9  manifestation of sensory or motor disturbances,
10  correct?
11    A:  Yes.
12    Q:  And I want to ask you about range of motion.
13  When a person has either a decompensation of the
14  nerves or has a spinal cord compression, that person
15  may report or experience an inability to feel or move
16  a part of their body that, through your movements,
17  could still have full range of motion, correct?
18    A:  No.  He demonstrated range of movement.  He
19  does not say the region of movement.  When I
20  evaluated, I tried to move all his joints, ask him to
21  move.  And move it actively, passively.  And he could
22  move all that.
23    Q:  Well, so that's my question.  When you note
24  range of motion, is that something you, as the

55 (Pages 217 to 220)

## BHARAT SHAH, MD  12/7/2017

Page 221

1    examiner, are doing, moving his leg around?
2        A:  Yes.  It is active and passive, both.
3        Q:  So you do both your own movement and you ask
4    the patient to move his leg or arm or whatever it is?
5        A:  Yes.
6        Q:  Is that correct?
7        A:  Yes.
8        Q:  Okay.  And can you tell me here where you
9    have noted that you've done both of those?
10       A:  Just written it is range of motion full, so
11   that means it has been done.
12       Q:  You agree there's nowhere here that
13   indicates --
14       A:  No.  I was just explaining to you --
15       MR. DUGAN:  Let her finish her question,
16   Doctor.
17       Q:  You agree that there's nowhere here where
18   you have written that both, the active and passive
19   range of --
20       A:  No.
21       Q:  Let me finish my question, please.
22           You agree that there's nothing in this
23   document that indicates that you have performed both,
24   an active and passive range of motion test?

Page 222

1        A:  No.
2        Q:  You don't agree with me?
3        A:  I agree that I have not written.
4        Q:  Okay.  So that's based on your general
5    practice?
6        A:  Yes.
7        Q:  Does reviewing this medical record jog any
8    independent recollection of Gerry Armbruster that you
9    may have?
10       A:  No.
11       Q:  You don't look at this and recall this
12   interaction or any other interaction with Mr.
13   Armbruster, correct?
14       A:  No.  No.
15       Q:  And you don't recall making any of these
16   observations that you made in May of 2014?
17       A:  I won't write it down without having done
18   that.
19       Q:  And if it's not written down, you didn't
20   observe it or test it, right?
21       A:  I observe and test, but I write down the
22   salient features.
23       Q:  So there are other things you may have seen
24   that you didn't record here, correct?

Page 223

1        A:  I recall my clinical examination the way I
2    did.
3        Q:  I'm not sure I understand that.
4        A:  Means I did the examination and I wrote my
5    findings.
6        Q:  Okay.  Including what you observed about the
7    patient?
8        A:  Yes.
9        Q:  Including both normal and abnormal findings,
10   right?
11       A:  No.  Didn't write down normal findings.
12       Q:  But you have written down normal findings
13   here.
14       A:  I mentioned that those findings rule out
15   something negative.
16       Q:  Okay.  Let's talk about that.
17           What does the fact that there's full range
18   of movement for the C spine.  First tell me how you
19   determine that.
20       A:  I determine C spine movement by asking the
21   patient to move.  (Witness indicating).  First side to
22   side, and then up and down is flexion, and then
23   extension.  These are the movements basically patient
24   carry out.  And if he carries out without pain or

Page 224

1    restriction, I write range of movement full.
2        Q:  Just for the record, when you say you asked
3    the patient to move up and down and side to side, you
4    are meaning your head, correct?
5        A:  Yes.  The C spine that is.
6        Q:  You don't ask the patient to move their C
7    spine, right?
8        A:  No.  Their head.
9        Q:  Right.  And what does the fact that that
10   range of movement is full tell you?
11       A:  There is less difficult and no more
12   difficulty.
13       Q:  But what you had said earlier with these
14   normal findings were recorded because they indicated
15   something to you about what the patient was suffering,
16   right?
17       A:  No.  They indicate to me whether the patient
18   is suffering or not.  And from this I said they did
19   not have difficulty.
20       Q:  But isn't that true of any normal finding?
21   A normal finding indicates that the patient is not
22   suffering whatever it is that's normal?
23       A:  Yeah.
24       Q:  But you said just minutes ago you don't

56 (Pages 221 to 224)

## BHARAT SHAH, MD  12/7/2017

Page 225

1    write down every normal finding, right?
2         A: Yeah.
3         Q: Let me ask it in a different way.
4              Do you write down all normal and abnormal
5    findings from your observation of the patient?
6         A: Yes.  Most of them.  Clinically significant
7    or relating to the condition.
8         Q: So how is this observation relevant to the
9    condition?
10        A: Relevant to the condition whatever he
11   complained.  I examined him and I found out and
12   decided what was going on.
13        Q: Well, but we have the benefit of his record,
14   so why don't you tell me based solely on what you have
15   recorded here why it is you assessed his range of
16   movement and his C spine?
17        A: Because it's part of my examination.
18        Q: Is that something you do with everyone?
19        A: Yeah.  If they have complaints of -- when
20   I'm doing the neurological examination and
21   musculoskeletal examination, I do move the patient and
22   ask them to move so that I can decide whether the
23   range of movement is affected or not.
24        Q: So the C spine range of movement is

Page 226

1    something you do as part of your neurological
2    examination --
3         A: Exactly, yes.
4         Q: -- and your musculoskeletal examination?
5         A: Yes.  Exactly right.
6         Q: But that's not something you do in every
7    instance, correct?
8         A: No.  No.
9         Q: Tell me what about the patient's complaints
10   indicate to you that a neurological or musculoskeletal
11   exam was required.
12        A: Because he was complaining of backache.  He
13   was complaining of tingling and numbness.
14        Q: Backache indicates a musculoskeletal issue?
15        A: Backache indicates bone or muscle, yes.
16        Q: And tingling and numbness indicates a
17   neurological issue?
18        A: Anything can cause pain on tingling and
19   numbness.
20        Q: It could indicate a neurological issue?
21        A: It could indicate.
22        Q: So what does the fact that this test was
23   normal indicate about the condition Mr. Armbruster was
24   experiencing on May 14th, 2014?

Page 227

1         A: Well, the subjective feeling that he was
2    complaining of tingling and numbness, but I did not
3    have any indication he had any serious condition at
4    that time on my examination.
5         Q: Okay.  Can a patient be experiencing spinal
6    cord compression and have normal range of movement in
7    their C spine?
8         A: Well, C spine normal range of movement would
9    indicate that he does not have a serious problem.
10        Q: That wasn't quite my question.  Can a
11   patient who has a spinal cord compression have normal
12   range of movement in the C spine?
13        A: No.
14        Q: Okay.  So in fact, what that indicates to
15   you is that as a matter of science, he did not have a
16   spinal cord compression at this time?
17        A: I just wrote that he has good movement.
18   That was my assessment.
19        Q: But that's not quite my question.
20             Does this fact, the fact that the range of
21   movement in the C spine is full, does that rule out
22   spinal cord compression for Mr. Armbruster?
23        A: Yes.  He would not have any significant
24   problem.

Page 228

1         Q: Again, that's not quite my question.
2              I just want to make sure we're on the same
3    page.  Not whether it would indicate a problem or not.
4    I imagine all normal findings would tend to indicate
5    less serious problems than more serious problems.
6              But the specific assessment, the C spine
7    range of movement is full, did that itself
8    definitively rule out Mr. Armbruster having a spinal
9    cord compression on May 14th, 2014?
10        A: It does not mean cannot exist.
11        Q: Do you know how -- what percentage of
12   patients who have severe spinal cord compression
13   nevertheless have full range of movement?
14        A: No.  I cannot tell you percentage.
15        Q: The other thing -- the next thing you
16   noted -- when you note that Mr. Armbruster was not in
17   acute distress, does that jog any independent
18   recollection of exactly how Mr. Armbruster appeared?
19        A: Yes, not in distress.
20        Q: I understand that.  Are you saying that
21   because those are the words you wrote, or are you
22   saying that now that you've read that you can picture
23   Mr. Armbruster in your mind?
24        A: No.  I do not recall him at all.

57 (Pages 225 to 228)

## BHARAT SHAH, MD  12/7/2017

Page 229

1    Q:  Is there something you particularly mean
2    when you use that phrase "not in acute distress"?
3        A:  Yes.  It shows the severity of his
4    condition.
5        Q:  Tell me the dividing factor.  What indicates
6    acute distress to you as an objective finding?
7        A:  The patient is writhing with pain.
8        Q:  Weeping with pain?
9        A:  Writhing.
10       Q:  Reading?
11       A:  Writhing, I guess.  W-r-i-t-h-i-n-g.
12       Q:  Writhing with pain.
13       A:  I'm sorry.
14       Q:  No problem.
15       A:  Writhing with pain or he's restless,
16   fidgeting.  These are all indicator of some distress
17   or difficulty to breathe or breathless, you know.
18       Q:  So the absence of those is what led you
19   to --
20       A:  Yeah.
21       Q:  -- remark that Mr. Armbruster was not in
22   acute distress?
23       A:  Yes.
24       Q:  The next thing that you have written here is

Page 230

1    that there are no gross neurological deficits of arms.
2    Can you tell me what you mean by that?
3        A:  Yes.  Both sensation as well as motor
4    system.
5        Q:  Well, earlier I thought we had discussed
6    there was no way to determine whether or not a patient
7    was suffering tingling in their arms or fingertips or
8    anywhere in that area?
9        A:  Just check the sensation.  That's what I
10   wrote, that there's no neurological deficit.
11   Neurological deficit means that there is some evident
12   objective sign of loss of sensation or loss of motor
13   function.
14       Q:  And how would that manifest?
15       A:  By saying when you touch the patient, he
16   does not feel the touch.  When you pinprick the
17   patient, also he does not feel the pinpoint sensation
18   or does not feel the pain.
19       And when you try to ask him to move, he does
20   not experience pain.  When you palpate the muscles,
21   there is no spasm.  So all this part of the
22   neurological assessment, but unusual finding I don't
23   write down.  Here it is written overall picture, but
24   no neurological deficit.

Page 231

1        Q:  Can a patient who has a spinal cord
2    compression be negative for gross neurological
3    deficits of arms?
4        A:  I cannot tell you that.
5        Q:  You don't know one way or the other?
6        A:  Yeah.  I could not tell you that.
7        Q:  Then you have written, Claims can't grip
8    with hand?
9        A:  That was subjective feeling.
10       Q:  Okay.  And then the next entry is hand grip?
11       A:  Full.  Means it was.
12       Q:  With range of movement full?
13       A:  Yes.  Hand grip is good.  It was good.
14       Q:  Okay.
15       A:  So he exhibited hand grip well.
16       Q:  I mean what I'm finding confusing is even if
17   a patient were totally making up out of whole cloth
18   that they had no hand grip why then they would have a
19   passive hand grip that was full.  Do you understand
20   what I'm saying?
21       A:  Hand grip was normal.  That's what I say.
22   It was with enough power.
23       Q:  Right.  I guess what I'm struggling to
24   understand is how -- well, strike that.  Let me ask it

Page 232

1    this way:
2        From that entry, can you tell me whether or
3    not this was active or passive range of movement?
4        A:  Active.
5        Q:  And active is the one that refers to the
6    patient doing it themselves?
7        A:  No.  He does it with me.
8        Q:  So you are actually moving his hand?
9        A:  He is supposed to grasp my hand and I feel
10   his power.  That's the way I test his hand grip.
11       Q:  So based on this record, you agree that he
12   said, I can't grip with my hand?
13       A:  Yes.
14       Q:  And what you observed was him fully gripping
15   your hand?
16       A:  He was able to do it.
17       Q:  And my incredulity comes from a patient who
18   reports I can't grip with my hand why that patient
19   would then grip with his hand?
20       MR. DUGAN:  Object to form.  Foundation.
21   Argumentative.
22       A:  I do not know.  When he complained of
23   something, I checked it and it was not.
24       Q:  Did you confront him about that fact?

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

BHARAT SHAH, MD 12/7/2017

Page 233

1    A: Pardon?
2       Q: Did you confront Mr. Armbruster about the
3    fact --
4       A: Yes. I told him there was no neurological
5    deficit.
6       Q: And what did he say in response?
7       A: He did not say. I don't know whether he
8    said anything to me. It's not written down here.
9       Q: And you're not saying that from any
10   independent recollection?
11      A: I don't recall. I don't recall.
12      Q: All joints range of movement full. Is there
13   anything about this document that indicates to you
14   that that was active or passive?
15      A: No. Mostly it's active.
16      Q: And active -- I'm sorry. I don't mean to
17   belabor the point. That's when the patient himself --
18      A: Executes in response to my order. I will
19   ask him move the shoulder like this, elbow like this,
20   bend elbow like that. Those are active movements.
21      Q: Okay. So those are all -- you did active
22   and not passive; is that correct?
23      A: Passive is not done unless you've found
24   there is a condition preexisting. And in that case,

Page 234

1    basically a stiffness or something, and then you try
2    to move them through the full range. And even then
3    they sometimes can't move it because if the joint is
4    full -- stiff, that won't move through the total
5    range. That's when the passive movement comes.
6       Q: Okay. And but there's nothing from the face
7    of this document that indicates passive versus active
8    range of movement?
9       A: No. Mostly active.
10      Q: And that's just based on your
11   recollection --
12      A: Yes.
13      Q: -- of your general practice, right?
14      A: Yes.
15      Q: Straight leg raise, is that something that
16   the doctor -- is that passive or active movements
17   that's done?
18      A: It's active.
19      Q: It's active.
20      A: It could be passive when the patient can't
21   move because then you want to feel that where the
22   patient experiences the pain when you raise the leg.
23      Q: Your assessment was self-reported tingling
24   of hand.

Page 235

1    A: Uh-huh.
2       Q: Can you tell me why you noted it as self-
3    reported?
4       A: Because he reported it.
5       Q: I have not seen the self-reported part in an
6    assessment before. Tell me what it means to assess
7    that someone is self-reporting a condition.
8          Why doesn't that just appear only in the
9    subjective portion?
10      A: Because it is reported by the patient. You
11   don't report tingling and numbness of the patient.
12      Q: Right.
13      A: Patient tells you whether he has tingling or
14   numbness.
15      Q: And so every record that you generate that
16   assesses tingling is reported as self-reported; is
17   that correct?
18      A: Yes. Uh-huh. Or you can complain of two
19   things, complains of tingling or numbness or
20   self-reported.
21      Q: But in this case, you made an assessment
22   that it was self-reported.
23      A: It's not assessment. It's my diagnosis he
24   self-reported. He reported. I did not find any

Page 236

1    evidence of that.
2       Q: I understand, but it's written under the
3    assessment portion of the SOAP note.
4       A: Yeah. Because that is a symptom that was
5    complained. And in that second thing, no evidence of
6    neurological deficit.
7       Q: You agree that you did not determine a cause
8    for the tingling assuming for purposes --
9       A: No.
10      Q: Hold on.
11         MR. DUGAN: Let her finish.
12      Q: Let me finish.
13         You agree that you did not determine a cause
14   for the tingling in May 14th of 2014, assuming that it
15   was a correct report?
16      A: Yes. That he reported tingling and
17   numbness, but I did not find anything.
18      Q: You did not find a cause, correct?
19      A: Yeah. Uh-huh.
20      Q: Tell me how you assessed the normalcy of the
21   paravertebral muscles?
22      A: Paravertebral muscles, when you try to feel
23   them, they my be supple, they may be tight, they may
24   be spastic, you know. And when you do some reflex

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## BHARAT SHAH, MD  12/7/2017

Page 237

1  movement, they go into spasm.
2      Q:  Okay.
3      A:  Means when you hit it with a hammer, you can
4  feel it become tense.
5      Q:  What did you do to determine the condition
6  of the lumbosacral spine?
7      A:  I palpated the paravertebral muscles and
8  asked him to move the spine.
9      Q:  Can you tell me where the paravertebral
10  muscles are?
11      A:  Paravertebral muscles by the side of the
12  spine.
13      Q:  Somewhere on the lower back?
14      A:  Yeah.  All along the spine.
15      Q:  I see.
16      A:  All means C spine onward down to the
17  tailbone.
18      Q:  You know that -- oh.  Let me ask you this:
19      Can a person, a patient, with severe spinal
20  compression have full range of movement in their hand
21  grip?
22      A:  They can have full range of movement or
23  limited movement, one of the two, they can be.
24      Q:  You did note that your assessment was

Page 238

1  self-reported tingling, ███████████████████
2  history of gunshot wound to the knee and then osteo --
3  sorry, arthritis --
4      A:  Of the spine or sprain of the spine because
5  backache.
6      Q:  So the history we'll leave to the side, but
7  tell me about what led you to the determination that
8  it was arthritis or sprain of the spine?
9      A:  Because of his backache on movement with the
10  back, that he was moving with pain.
11      Q:  Is arthritis of the spine a serious medical
12  condition?
13      A:  It is a common medical condition.
14      Q:  Is it a serious medical condition?
15      A:  It could become serious.
16      Q:  Is it reversible without treatment?
17      A:  Not reversible.
18      Q:  What about a spine sprain?  Is that a
19  serious medical condition?
20      A:  Spine does not sprain.  Muscle sprains.
21      Q:  So if there were -- I thought you had
22  described it as a sprain of the spine?
23      A:  No.  Lumbar sprain.
24      Q:  Lumbar sprain.  Is that a serious medical

Page 239

1  condition?
2      A:  No.
3      Q:  Is that something that can resolve on its
4  own?
5      A:  Yes.
6      Q:  Tell me about how -- why did you determine
7  that Mr. Armbruster should continue his ibuprofen?
8      A:  Because he had a long-standing gunshot
9  wound, pain of the knees posttraumatic.
10      Q:  You didn't decide to increase his pain
11  medication --
12      A:  No.
13      Q:  -- either by class or by dosage, correct?
14      A:  Not until he requested that he says that
15  ibuprofen does not help.  It was second visit he told
16  me.
17      Q:  Okay.  And that was based on your review of
18  records?
19      A:  Yeah, definitely.  And that's when I change
20  it.
21      Q:  Why did you decide to order blood pressure
22  to be measured?
23      A:  Because his blood pressure is elevated.
24      Q:  Okay.  Was that related to his -- do you

Page 240

1  know whether that was related to his condition as he
2  presented to you on May 14, 2014?
3      A:  It was blood pressure detected.  It was high
4  at that time, so I wanted to rule out his condition as
5  essential hypertension.
6      Q:  In trying to rule that out, were you
7  considering neuropathy?
8      A:  I was considering blood pressure problem.
9      Q:  But I thought that we discussed that blood
10  pressure problems can manifest through neuropathy,
11  which then causes --
12      A:  It's one of the side effects of blood
13  pressure.
14      Q:  Okay.  Were you considering that neuropathy
15  might be one of the issues here?
16      A:  It can be issues.
17      Q:  I'm asking specifically based on your review
18  of this note and your --
19      A:  No.  I was -- first of all, I wanted to
20  assess whether he had a blood pressure that is present
21  and that is causing the problem.
22      Q:  Okay.  Please let me finish my question.
23      What I want to know is whether based on your
24  review of this record, understanding you have no

60 (Pages 237 to 240)

BHARAT SHAH, MD  12/7/2017

Page 241

1  independent recollection, would this record suggest to
2  you whether or not you considered neuropathy as one of
3  the issues Mr. Armbruster might be facing as his
4  condition existed on February -- or on May 14th, 2014?
5      A: At that time, I was trying to decide about
6  his blood pressure, about his conditional blood
7  pressure.
8      Q: You agree there was nothing from this record
9  itself that tells you one way or the other whether you
10 considered neuropathy as an issue Mr. Armbruster may
11 have faced?
12     A: I did not consider at that time because I
13 did not find any deficit.
14     Q: Okay.  And let's talk about spinal cord
15 compression.  Is there anything from this medical
16 record that told you that you did or did not consider
17 a spinal cord compression as one of the possible
18 medical issues Mr. Armbruster faced?
19     A: I did not consider at that stage.
20     Q: Tell me what about this medical record tells
21 you you did not consider it.
22     A: I have not written down.
23     Q: When we spoke earlier, though, you said that
24 you would not necessarily write down your differential

Page 242

1  diagnosis, correct?
2      A: Depends.  Not everything not written down.
3  It is just written down the factual finding here, that
4  there's no evidence of neurological deficit.
5      Q: Okay.  Spine compression, spinal cord
6  compression, can be one of the possible parts of a
7  differential diagnosis, right?
8      A: Yes.
9      Q: As one of the causes of a patient's
10 condition, correct?
11     A: Yes.
12     Q: And so when you say that you wouldn't write
13 down your differential diagnosis, do you agree with me
14 that that -- is what you're saying that you wouldn't
15 write down the possible causes that were in your
16 mind --
17     A: Yes.
18     Q: -- but not yet confirmed --
19     A: Yeah.
20     Q: -- as to Mr. Armbruster's condition,
21 correct?
22     A: Yes.
23     Q: And so you agree that there's nothing about
24 this record that indicates whether or not in your mind

Page 243

1  one of the things in your differential diagnosis could
2  have been spinal cord compression?
3      A: It would be in my mind, but there was no
4  neurological deficit, as I mentioned, so it is not
5  written down.
6      Q: So you hadn't confirmed that there was
7  spinal cord compression, correct?
8      A: Yeah.  I did not confirm anything.
9      Q: But you agree that there wouldn't be
10 documentation that would tell you whether you
11 considered it in your mind, correct?
12     A: Yes.  It is not written down.
13     (Plaintiff's Exhibit 5 marked for
14 identification.)
15     Q: Okay.  Doctor, you have been handed what's
16 been marked as Exhibit 5.  Is this one of the
17 documents you reviewed as part of your review of this
18 case?
19     A: Yes.
20     Q: Okay.  Can you tell me -- by my review of
21 the medical records, this was the next time that you
22 saw Mr. Armbruster on May 28th, 2014, which would be
23 in line with your order for a follow-up in two weeks.
24     Can you tell me why this appears in a

Page 244

1  different form?
2      A: Because he comes for -- enroll him in
3  hypertension clinic.  So when we find hypertension, we
4  have to enroll him for the first visit of hypertension
5  clinic.
6      Q: Okay.  Can you just tell me what's written
7  here, then?
8      A: Yes.  Hypertension history.  Regular low
9  back pain, groin pain, tingling and numbness.  Gunshot
10 wound of the legs 13 years ago with surgery.  ▮▮▮▮
11 ▮▮▮▮▮▮▮.  History of GERD,
12 history of restless leg syndrome.
13     Q: Okay.  And then what about under -- well,
14 let me see if I can do it.  Symptoms, none, correct?
15     A: No.  Symptoms of headaches, transient
16 weakness.  This is the assessment by protocol we are
17 supposed to do.
18     Q: Okay.  What's written underneath that?
19     A: Symptoms of headaches, transient weakness,
20 chest pain, dyspnea, claudication, visual acuity loss.
21 None of them present.
22     Q: Okay. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23 ▮▮▮▮▮▮▮▮
24     A: ▮▮▮▮

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## BHARAT SHAH, MD  12/7/2017

Page 245

1    Q:  And under obesity, you've written "not
2    present"?
3    A:  No.
4    Q:  Correct?
5    A:  Yes.
6    Q:  Under family history?
7    A:  No history of hypertension.
8    Q:  Under diet?
9    A:  In diet including alcohol and caffeine, he
10   denies alcohol.
11   Q:  Does it just say denies or does it actually
12   say denies alcohol?
13   A:  Denies, that's all.
14   Q:  Under diabetes?
15   A:  No history of diabetes.
16   Q:  Under exercise?
17   A:  Not much of exercise.
18   Q:  Under medications past?
19   A:  Not treatment.  Not followed.
20   Q:  Not followed?
21   A:  Uh-huh.
22   Q:  I read that as not for hypertension.
23   A:  Oh, yeah.  I'm sorry.  I combined the words
24   there.  It's not followed.  You're right.

Page 246

1    Q:  And then medication current?
2    A:  To start hypertension medications.
3    Q:  And what are the medications that you
4    prescribed?
5    A:  I prescribed him HCTZ.  That is 25
6    milligrams PO OD means once a day.
7    Q:  What does it mean that Mr. Armbruster
8    complained -- that you noted vague low back pain?
9    A:  Because he had vague low back pain.
10   Q:  What does the word "vague" mean?
11   A:  Vague means he just said some pain.  Some
12   pain.
13   Q:  Okay.  So is it the same as mild, then?
14   A:  Yeah.
15   Q:  And again, this doesn't jog any independent
16   recollection, correct?
17   A:  No.  This is from the record.
18   Q:  Okay.  And you said he also complained of
19   pelvic pain?
20   A:  Groin pain.
21   Q:  Groin pain.  Thank you.
22   And then just quickly, I believe most of
23   this is not present or none.  Under peripheral pulses?
24   MR. DUGAN:  Page 2 now?

Page 247

1    MS. GRADY:  Yes.  Page 2 of the record.
2    THE WITNESS:  We are finished with this
3    page?
4    Q:  (By Ms. Grady)  We are.
5    A:  Lisinopril and ibuprofen, those are two of
6    the medications I gave him.
7    Q:  Okay.
8    MR. DUGAN:  Doctor, turn to page 2.
9    Q:  If you would turn to page 2, yeah.
10   A:  Yes.
11   Q:  And if you could just read what you've
12   recorded under heart first?
13   A:  What line are you talking about?  Heart is
14   NSR, N S1 S2 normal.  N means normal.
15   Q:  Okay.  What about peripheral pulses?
16   A:  Peripheral pulses, DP and PT 2 plus.
17   Q:  What does that mean?
18   A:  Dorsalis pedis, that is the one in the foot
19   and posterior tibia, one in the back of the ankle.
20   Q:  What about neurological exam?
21   A:  Neurological examination nonfocal.
22   Q:  What does that mean?
23   A:  Nonfocal means there's no evidence of any
24   focal abnormality.

Page 248

1    Q:  You reported earlier that Mr. Armbruster
2    reported tingling, right?
3    A:  Report.  I'm finding, I'm just saying this
4    is nonfocal is a finding.
5    Q:  You agree that you haven't put anything here
6    that you actually did to assess Mr. Armbruster's
7    neurological condition, correct?
8    A:  Yes.  Assessment, that's how it is written,
9    nonfocal.
10   Q:  Okay.  What did you do?
11   A:  The same examination that we do.
12   Q:  Okay.  You didn't remark on any --
13   A:  No.
14   Q:  -- normal findings, correct?
15   A:  No.
16   Q:  Did you assess whether Mr. Armbruster's eyes
17   were -- or whether his pupils were equal and reactive
18   to light?
19   A:  No.  The part of examination is endoscopic
20   exam.  Small detail.
21   Q:  Tell me about that.
22   A:  With the ophthalmoscope.
23   Q:  And you performed that on Mr. Armbruster?
24   A:  Yes.

62 (Pages 245 to 248)

**BHARAT SHAH, MD  12/7/2017**

Page 249

1  Q:  That is where you assessed his pupils?
2  A:  Yes.  Within normal limits I've written.
3  Within normal limits, WNL.
4  Q:  What did you do as part of the neurological
5  exam?
6  A:  Neurological exam is the routine physical
7  exam that I mentioned before.
8  Q:  And at the bottom there under hypertension,
9  tell me what that means.
10  A:  Hypertension, that was his clinic visit
11  diagnosis.
12  Q:  Yes.  I'm sorry.  Can you tell me what's
13  written?
14  A:  Low back pain.
15  Q:  Okay.
16  A:  Arthritis versus lumbar sprain.
17  Q:  And you would have seen your prior note
18  during this encounter with Mr. Armbruster on May 28th,
19  correct?
20  A:  Yeah.  No.  I have seen it.  But I mean this
21  was the visit for the hypertension.
22  Q:  Understood.  But I'm saying you would have
23  seen as part of your decision about the cause of his
24  back pain?

Page 250

1  A:  Yes.
2  Q:  That you had previously assessed it was
3  arthritis or a lumbar sprain, correct?
4  A:  Uh-huh.
5  Q:  Is that a yes?
6  A:  Yes.  Uh-huh.
7  (Plaintiff's Exhibit 6 marked for
8  identification.)
9  Q:  Doctor, I'm going to go back to -- the
10  documents in Exhibit 6 reflect care provided between
11  your first and second visit.  I want to turn your
12  attention to the last page.
13  Okay.  If you would read the subjective
14  portion of this exam.
15  A:  Which date?
16  Q:  The very last page here, so it would be a
17  date of treatment on May 28th, treatment protocol.
18  A:  This one?
19  MR. DUGAN:  Yeah.
20  Q:  Yes.
21  A:  Started one month.  Has progressively gotten
22  worse looks like, you know.
23  Q:  Uh-huh.  And so Doctor, you can just read
24  this to yourself, but there are also reports that Mr.

Page 251

1  Armbruster reported can barely walk, no grip of hand,
2  tingling and numbness in fingertips of both hands.
3  Hurts the most when he gets up.  Something his back.
4  When he walks, feels sharp pain in his lower back all
5  the way through the back or across back.  Do you see
6  that?
7  A:  Uh-huh.
8  Q:  Okay.  And that wasn't noted in your note of
9  May 28th, 2014, correct?
10  A:  Well, I will say that he was complaining of
11  backache.
12  Q:  Well, but you said based on your review of
13  the record that he was just complaining of mild low
14  back pain?
15  A:  Uh-huh.
16  Q:  You agree that this record, which was taken
17  just less than an hour before your record reflects
18  that Mr. Armbruster reports a pain so great he can
19  barely walk?
20  A:  Yes, it's in there.
21  Q:  And just getting back to your record of
22  Exhibit 5, it's my understanding that nonfocal means
23  that no detailed exam is done.
24  A:  No.  The conclusion of the examination.

Page 252

1  Q:  Okay.
2  A:  Because this is not a neurological
3  examination, per se.  It is a part of the total
4  evaluation that pertains in clinic.  At that time, we
5  are to write assessment of the neurological thing as a
6  part of hypertension evaluation.
7  Q:  So you do for every patient who's in the
8  hypertension clinic, you do that same very --
9  A:  Yes.
10  Q:  -- detailed neurological exam that you do
11  for a patient who comes reporting tingling and
12  numbness; is that correct?
13  A:  The same routine examination for
14  neurological.
15  Q:  And how often do patients come to the clinic
16  for hypertension?
17  A:  This is the first clinic, that is for
18  initial clinic, and then they have follow-up clinics
19  every three months.
20  Q:  Okay.  And during those follow-up clinics,
21  you also do that very detailed neurological exam?
22  A:  No.  Only the follow-up clinic for blood
23  pressure assessment and for any other abnormal finding
24  related to cardiovascular system.

63 (Pages 249 to 252)

**BHARAT SHAH, MD  12/7/2017**

Page 253

1    (Plaintiff's Exhibit 7 marked for
2    identification.)
3        Q:  You have been handed what's been marked as
4    Exhibit 7, which, by my review, is the next time you
5    saw Mr. Armbruster on June 3rd.
6        Can you tell me, based on your review of
7    this record, what was the purpose of his visit to you?
8        A:  Purpose of his visit was follow-up for
9    increased blood sugar and evaluation of the EKG that I
10   ordered.
11       Q:  And what was your purpose of ordering those
12   exams, if you know?
13       A:  EKG is a part of the -- the first clinic
14   that he came to hypertension.  I noted all the tests
15   that I required by protocol to be done so they were
16   all ordered.
17       Q:  And EKG is required for each --
18       A:  Each.
19       Q:  Please just let me finish, Doctor.
20       EKG is required for each patient who comes
21   for the first time to the cardiac clinic?
22       A:  Yes.
23       Q:  And is that true of blood sugar as well?
24       A:  Yes.

Page 254

1        Q:  So the fact you conducted that exam doesn't
2    say anything about any differential diagnosis you were
3    forming for Mr. Armbruster for anything, correct?
4        A:  No, not for that.
5        Q:  Just routine?
6        A:  Routine.
7        Q:  Okay.  Can you tell me, then, what time did
8    you see the patient based on this report?
9        A:  What date?
10       Q:  On June 3rd, 2014?
11       A:  That was 4:10.
12       Q:  And under the subjective portion, can you
13   tell me what you've written there?
14       A:  Subjective complaints of vague body ache.
15       Q:  And again, it's your practice when you write
16   "vague," you mean mild?
17       A:  All over vague.  Not completely, but not
18   particular portion.  All body ache.
19       Q:  Those, to me, sound like different things.
20   A person, as I understand it, can have a very severe
21   level of pain, but it can be all over, or a person can
22   have a very slight minimal pain, but it's localized.
23       So does vague refer to the severity or does
24   it instead refer to the location?

Page 255

1        A:  Nature.
2        Q:  That's neither of those.  So tell me what
3    that means, "nature."
4        A:  Nature means how he's very specific about it
5    or just backache.
6        Q:  The patient's nature --
7        A:  Yeah.
8        Q:  -- in reporting it?
9        A:  Yeah.  Not nature in that respect.  Nature
10   of the patient.  Not nature of the patient.
11       Q:  But is the vagueness, is that a word that
12   the patient used or is that a word that you used with
13   a specific meaning as part of your practice?
14       A:  I use.  I use.
15       Q:  Just explain to me what is the opposite of
16   vague.
17       A:  Opposite of vague is definitely I got
18   throbbing pain or I got this type of pain, quality
19   pain or anything.  But he just says I have backache, I
20   would say vague backache.
21       Q:  So what if he says I have a throbbing
22   backache?
23       A:  Yeah, then it's different.
24       Q:  Okay.  What is the next phrase?

Page 256

1        A:  Vague body ache.  Does not like ibuprofen.
2        Q:  Okay.  What's next?
3        A:  So on examination, alert, chest clear, heart
4    normal sinus rhythm, S1, S2 normal.  Neurological
5    nonfocal.  Assessment.  Hypertension.  Questionable
6    borderline diabetes mellitus.  Under that I have
7    written 5/29 report of FBS 128.
8        Q:  And then the plan?
9        A:  Plan was I ordered No. 1, hemoglobin A1C.
10       Q:  Okay.  And No. 2?
11       A:  Number 2, discontinue ibuprofen.
12       Q:  And No. 3?
13       A:  Number 3 is Naprosyn 500 milligrams po bid
14   three months.
15       Q:  And then No. 4?
16       A:  Return to clinic two weeks.
17       Q:  Is that a long period of time, short period
18   of time or somewhere in between?
19       A:  In between because I ordered some lab tests
20   which takes time to collect and get the report, and
21   then he comes back.
22       Q:  What was the purpose of you ordering lab
23   tests?
24       A:  I ordered fasting blood sugar which was

64 (Pages 253 to 256)

## BHARAT SHAH, MD  12/7/2017

### Page 257

1    elevated.  So that gave me something he might have
2    borderline diabetes mellitus.  To rule out diabetes
3    mellitus, we order hemoglobin A1C, and that was the
4    purpose of calling him back.
5        Q:  When you saw Mr. Armbruster on June 3rd,
6    2014, would you have seen the prior encounters that
7    were documented by nursing staff?
8        A:  On that one, no.
9        Q:  Why?
10       A:  Because he came for follow-up of the
11   evaluation of the lab test.
12       Q:  So you would not review prior medical
13   records when someone came for a follow-up of a test;
14   is that correct?
15       A:  Not at that time.
16       Q:  Okay.
17       A:  Not necessarily.
18       Q:  Would you review prior medical records when
19   a patient came to you for a clinic?
20       A:  Yes.
21       Q:  You can put that to the side.
22           (Plaintiff's Exhibit 8 marked for
23   identification.)
24       Q:  Was this one of the records you reviewed,

### Page 258

1    Doctor?
2        A:  Yes.
3        Q:  And can you tell me -- can you read first --
4    let's start with what time you saw the patient based
5    on this record.
6        A:  Around two o'clock.
7        Q:  Can you read what you've written there?
8        A:  Follow up for lab workup.  Patient
9    argumentative.  Said he did not get help and wants to
10   go outside hospital outside for help.
11       Q:  What else have you written there?
12       A:  Complains of leg, tingling and numbness,
13   backache and knee pains.  History of gunshot wound,
14   both legs, 2000, with surgery.  ████████████████
15   ███████████████████████████
16       On examination, alert, argumentative.  Chest
17   clear.  Heart, normal sinus rhythm.  Abdomen
18   nontender.  Scar of surgery of gunshot wound of the
19   knees.  Range of movement slightly painful.
20   Assessment.  History of gunshot wound both legs.  HTN
21   controlled.
22       Q:  HTN control?
23       A:  Yeah.
24       Q:  Okay.  What else?

### Page 259

1        A:  ████████████████████
2        Q:  Okay.
3        A:  Leg complaints of numbness.  No evidence of
4    metabolic disorder.
5        Q:  What is a metabolic disorder?
6        A:  Rule out diabetes mellitus, so it was not
7    evident.
8        Q:  I see.  And what was your plan?
9        A:  My plan was to obtain x-ray of both knees.
10       Q:  Okay.
11       A:  Continue Naprosyn.  Patient was told he has
12   no evidence of diabetes mellitus on hemoglobin A1C,
13   into bracket, 5.2, bracket complete.
14       Q:  And then the follow-up?
15       A:  The follow-up in four weeks.
16       Q:  Is that a long period of time or a short
17   period or somewhere in between?
18       A:  In between.
19       Q:  I want you to look back just very briefly at
20   Exhibit No. 7.  You discontinued the ibuprofen at that
21   time and you started the patient on Naprosyn.
22       How do those medicines compare to relieve
23   pain?  Is one stronger than the other in terms of pain
24   relief?

### Page 260

1        A:  Generally speaking, I mean, Naprosyn is the
2    lower one.  Ibuprofen is lower one and Naprosyn is
3    little bit more potent.
4        Q:  Okay.
5        A:  But both are the same class of drugs.
6        Q:  So here again, you noted a vague --
7        A:  Numbness.
8        Q:  -- numbness.  And that, again, means mild?
9        A:  Yes.
10       Q:  Yet the patient was so upset that you have
11   noted twice that he was argumentative?
12       A:  Yes.
13       Q:  And his argumentative nature was because he
14   felt he was not getting helped, correct?
15       A:  Yeah.  He wanted to go outside for help.
16       Q:  Despite that fact, it was your understanding
17   based on your practice and record creation that vague
18   means mild unless he was only complaining of mild
19   tingling?
20       A:  Yes.
21       Q:  Tell me why you decided to x-ray both knees?
22       A:  Because he was complaining of pain and
23   long-standing complaint, so I just wanted to make sure
24   that there was nothing significant going on besides

65 (Pages 257 to 260)

## BHARAT SHAH, MD  12/7/2017

### Page 261

1    arthritis.
2         Q:  Would the x-ray have caught any issues that
3    would have caused tingling?
4         A:  No.
5         Q:  And you agree that the tingling, at this
6    point, would have been going on for some time as well,
7    correct?
8         A:  Yes.
9         Q:  You didn't order any tests to assess what
10   might have caused the tingling?
11        A:  I ordered the test.
12        Q:  What test did you order?
13        A:  Diabetes test, hypertension, everything I
14   ordered that I thought.
15        Q:  So the diabetes test that you ordered was to
16   determine whether the tingling was caused by the
17   diabetes?
18        A:  Yes.
19        Q:  And the test ruled out that diabetes was the
20   cause for the tingling?
21        A:  Yes.
22        Q:  You also looked at hypertension, correct?
23        A:  Yes.  And I started treating it.
24        Q:  Right.  And you put him on medication.  But

### Page 262

1    at this point, he had been receiving medication for
2    hypertension and the tingling, so --
3         A:  Not for long time.
4         Q:  Let me finish my question, Doctor.
5         So at this point, he had been receiving
6    hypertension medication, and the tingling was still
7    present, correct?
8         A:  Yes.  It was present according to him.
9         Q:  And tingling that was caused by
10   hypertension, how quickly would that subside if the
11   causative factor was hypertension?
12        A:  It takes time.
13        Q:  How long?
14        A:  Depends.  I could not tell you time limit,
15   but it can improve with the improvement of the
16   patient.
17        Q:  And can you tell from your note whether you
18   asked Mr. Armbruster about what, if any, improvement
19   or the opposite of that happened with his tingling?
20        A:  No.  He just complained that time to me.
21        Q:  Did you ask him about whether the tingling
22   improved at that point?
23        A:  No.  I didn't write it if it had improved or
24   not.

### Page 263

1         Q:  And you would have written down if you asked
2    him that question?
3         A:  No.  I did not recall that I asked him.
4         Q:  Just so the record is clear, does reviewing
5    this record generate any independent recollection that
6    you have of encountering Mr. Armbruster in June 2014
7    or any other time?
8         A:  I do not remember that guy.
9         Q:  And looking at this record doesn't remind
10   you of him?
11        A:  No, I still don't remember him.
12        Q:  So nothing that you had done had led to you
13   a conclusion about why Mr. Armbruster was reporting
14   tingling, correct?
15        A:  Not that I knew.
16        (Plaintiff's Exhibit 9 marked for
17   identification.)
18        Q:  The court reporter has handed you what's
19   been marked as Exhibit 9.  Can you tell me what time
20   you encountered Mr. Armbruster June 23rd, 2014, which,
21   by my review of the records, is the next time you saw
22   him.
23        A:  Next time I saw him on 6/23/14, I think I
24   have written, it looks like, 1:45 or something.

### Page 264

1         Q:  And can you tell me what's written under the
2    subjective portion there?
3         A:  He came for the renewal of Zantac.
4         Q:  Can you say that again?
5         A:  Renewal of Zantac his visit.
6         Q:  What is Zantac?
7         A:  For his GERD.
8         Q:  It's a renewal of his GERD medication?
9         A:  Yes.  That's what he requested.
10        Q:  And under the subjective portion, can you
11   tell me what he has said?
12        A:  He says patient feels better.  Minimal
13   numbness of tingling -- minimal numbness of tip of
14   fingers.  BP controlled.
15        Q:  Okay.  And then under the objective portion?
16        A:  No neurological deficit, chest clear.
17   Abdomen soft, nontender.  Right knee mild pain on ROM.
18   No effusion.
19        Q:  What does that mean, no effusion?
20        A:  Means no collection of fluid in the joint.
21        Q:  Under assessment?
22        A:  Yes.  Assessment arthritis right knee.
23        Q:  And then?
24        A:  Self-reported numbness fingers.  No

66 (Pages 261 to 264)

## BHARAT SHAH, MD  12/7/2017

Page 265

1    metabolic disorder.  Chronic dyspepsia.
2        Q:  What is that?
3        A:  Chronic indigestion.
4        Q:  And then what?
5        A:  Then I've written the report of the x-ray of
6    the knees which was done on 6/18/2014 report.
7        Q:  And can you tell me what you've written
8    there about the report?
9        A:  Yeah.  Left knee, no fracture or significant
10   arthritis.  No significant arthritis or arthritis
11   changes.
12       Q:  And the right knee?
13       A:  Right knee irregularity of medial femoral
14   condyle and heterogenous density.  That is bony in the
15   bracket.  Bony density, according to the description
16   of the radiologist.
17           Then question about arthritis, and then
18   corticated, corticated, c-o-r-t-i-c-a-t-e-d,
19   corticated density along anterior aspect of knee.
20   Questionable entire particular body.
21       Q:  And your plan?
22       A:  My plan was just to continue his ranitidine
23   150 milligrams po bid.  Ranitidine,
24   r-a-n-i-t-i-d-i-n-e.

Page 266

1        Q:  I know it's getting late, Doctor, but
2    especially with these medical terms, I think it might
3    help everybody out if you try to enunciate as much as
4    possible.
5        A:  Means just pronounce?
6        Q:  Pronounce dramatically.
7        A:  I say very fast.
8        Q:  Right.  At the very bottom there, it looks
9    to me like you have a plan to return to clinic?
10       A:  Yes.  In three months for Zantac
11   particularly.
12       Q:  Say that part again.
13       A:  For Zantac.
14       Q:  And can you tell me -- you've reported under
15   subjective that the patient feels better and has only
16   minimal numbness, correct?
17       A:  (Witness nodding).
18       Q:  Yet why, again, under your assessment do you
19   note the self-reported numbness in the fingers?
20       A:  That's my way of writing.
21       Q:  Tell me what that means.
22       A:  Self-reported means that he reported it, but
23   I did not find any finding.
24       Q:  Understood.  And that's been present in

Page 267

1    other records as well.  But here in this case, you are
2    documenting some improvement according to your record.
3        A:  That is what he reported.
4        Q:  And so I'm wondering why, despite that
5    record under subjective, that there is better minimal
6    numbness why you nevertheless assess there was
7    self-reported numbness.
8        A:  Because he reported it.  He has reported
9    bad part, and he has reported good part also.
10       Q:  Okay.  So he's reporting that the numbness
11   remain?
12       A:  Numbness better.
13       Q:  But remaining?
14       A:  Yeah.
15       Q:  And at this point, would you expect the
16   hypertension medication to resolve the numbness, if
17   that was the cause?
18       A:  No.
19       Q:  When would you expect that to resolve?
20       A:  I cannot tell you that.  There's no way of
21   telling that.  The hypertension resolves means
22   hypertension goes away and comes back.  Hypertension
23   does not go away.  It is controlled.
24       Q:  I thought your statement was you thought

Page 268

1    perhaps the tingling was caused by the hypertension.
2        A:  Could be.
3        Q:  And would you expect when the hypertension
4    was controlled that the numbness would go away?
5        A:  I said not go away.  It can improve.
6        Q:  So there's no cure for numbness that's
7    caused by hypertension?
8        A:  Just as there's no cure for hypertension.
9        Q:  All patients who suffer hypertension do not
10   experience numbness, correct?
11       A:  Yeah.  I agree.
12       Q:  And patients with a spinal cord compression
13   that causes numbness can experience a waxing and
14   waning of that numbness, correct?
15       A:  Possibly.
16           (Plaintiff's Exhibit 10 marked for
17   identification.)
18       Q:  The court reporter has handed you what's
19   been marked as Exhibit 10.  This, by my records, is
20   the next time you've encountered Mr. Armbruster on
21   June 25th, 2014.
22       A:  Uh-huh.
23       Q:  Can you tell me, is this your handwriting
24   here on Exhibit 10?

67 (Pages 265 to 268)

**BHARAT SHAH, MD  12/7/2017**

Page 269

```
 1          A: Yes.
 2          Q: Can you tell me what you've written there
 3    under the -- starting with the S portion?
 4          A: Yes.  He was placed on my line for a
 5    follow-up x-ray.
 6          Q: For follow-up on the x-ray?
 7          A: Yes.  Uh-huh.
 8          Q: And what's next?
 9          A: I wrote, Patient here for follow-up on x-ray
10    report.  Patient says he has been told about his
11    x-ray.
12          Q: Okay.  What's next?
13          A: Then history of gunshot wound --
14          Q: Okay.
15          A: -- of the knees.
16          Q: What's written to the left of that?
17          A: To the left of ████████████████.
18          Q: Okay.
19          A: ███████████████.
20          Q: Okay.
21          A: Grainy or questionable history of bipolar
22    disorder.  That's all.
23          Q: And what is that last one?  Is that just
24    history that wasn't completed?
```

Page 270

```
 1          A: No.  There was nothing written there.  I
 2    just thought of something and did not write anything.
 3          Q: Okay.  And what's after -- I believe it
 4    starts rehab.  Immediately to the left of the brackets
 5    reading history of gunshot wound, does that say rehab?
 6          A: Reports person knows about his x-ray
 7    reports.  Patient says he has been told --
 8          Q: What is this word, Doctor?
 9          A: Reports.
10          Q: Reports.  Okay.
11          A: Patient says about x-ray reports.
12          MR. DUGAN: It's a continuation from the
13    line above.
14          A: That continued sentence.
15          Q: Okay.  And then the next line under that
16    starting with patient?
17          A: Patient continues to complain of numbness
18    and pain of the fingers without any other symptoms.
19          Q: Okay.  And then under objective?
20          A: On objective, patient unhappy.
21          Q: Okay.
22          A: Both hands, fingers.
23          Q: Both hands, fingers?
24          A: Yeah.  No gross neurological disease or
```

Page 271

```
 1    deficit.
 2          Q: Okay.
 3          A: C spine for range of movement full.  Both
 4    knees range of movement full with mild pain, no
 5    deformity.
 6          Q: Okay.
 7          A: Assessment, posttraumatic arthritis knees.
 8    No neurological deficit.  Self-reported numbness in
 9    pain, fingers and hands.
10          Q: And under your plan?
11          A: Plan was patient has been advised about his
12    x-ray findings.  That's No. 1.
13          Q: Okay.
14          A: Number 2, patient has been told there's no
15    neurological deficit for the symptoms of vague
16    numbness and pain on the tips of his fingers.
17          Q: Okay.
18          A: And follow-up prn.
19          Q: Can you tell me -- you agree at this point,
20    you still have not determined any cause for the
21    numbness, correct?
22          A: I did not find any neurological deficit for
23    that.  That's what I wrote.
24          Q: Okay.  So you haven't determined what, if
```

Page 272

```
 1    anything, was causing the numbness, correct?
 2          A: I was suspecting the numbness was caused by
 3    some sort of neuropathy.
 4          Q: At this point, you believed it was caused by
 5    some kind of neuropathy?
 6          A: Or arthritis.
 7          Q: What about the medical record indicates to
 8    you?
 9          A: And arthritis, one of the two things.
10          Q: Tell me what about Exhibit 10 indicates to
11    you that what you thought was neuropathy or arthritis?
12          A: I said no neurological deficit per his
13    numbness on tips of the fingers, so there was no focal
14    deficit I found.
15          Q: Is there anything on Exhibit 10 that
16    indicates to you that you considered and believed it
17    to be neuropathy?
18          A: No.
19          Q: Is there anything in Exhibit 10 that
20    indicates to you on Exhibit 10 that you believed it to
21    be arthritis?
22          A: Yes.
23          Q: What?
24          A: Arthritis of the knee, posttraumatic
```

68 (Pages 269 to 272)

## BHARAT SHAH, MD  12/7/2017

Page 273

1   arthritis of the knee.
2        Q:  All right.  And you believe and it's your
3   understanding you believe that was causing the
4   tingling on the fingertips?
5        A:  That was causing the symptoms in the legs
6   and back.
7        Q:  Okay.  Do you have any reason to believe
8   that you thought the tingling was caused by
9   osteoarthritis or any other part of the body?
10       A:  It could be.
11       Q:  Is there anything about Exhibit 10 that
12  indicated to you that you believed that to be the
13  cause?
14       A:  Arthritis of the knee.
15       Q:  You didn't write about arthritis anywhere
16  else?
17       A:  Not on that one.  But I had written before
18  arthritic spine.
19       Q:  Yeah.  And can you tell me, based on your
20  review of the records up till now, whether or not you
21  considered spinal cord compression?
22       A:  No.
23       (Plaintiff's Exhibit 11 marked for
24  identification.)

Page 274

1        Q:  The court reporter has handed you what's
2   been marked as Exhibit 11.  I don't believe you have
3   any handwriting on here, so luckily this will go
4   quickly.
5        Can you tell me -- my understanding of
6   Exhibit 11 is that on August 1st, 2014, there's an
7   entry for med line follow-up.  And then there's
8   another entry by one of the nursing staff that there
9   was no need to be seen by MD.  To be seen prn as
10  written on 6/23/2014.
11       A:  That was nurse's note.  I do not know what
12  she wrote for, but I presume it must be for the
13  follow-up for the blood pressure or follow-up for the
14  chronic complaints of arthritis and for GERD.
15       GERD means -- that upon which zantac was
16  given, so he had prescription enough to last for three
17  months.
18       Q:  Okay.  Is there anything about this note
19  that jogs any independent recollection that you have?
20       A:  No.
21       Q:  Okay.  Is there anything about this note
22  that indicates to you whether the decision to have Mr.
23  Armbruster not seen by you on August 1st, 2014 was a
24  decision that was not made by you, but was instead

Page 275

1   made by someone else?
2        A:  By nurse.
3        Q:  What about this note indicates to you that
4   the nurses made that decision as opposed to you?
5        A:  Because I've not written anything.
6        Q:  So even if in a situation, for example, if a
7   patient had been put on your list and you looked at
8   his medical record and said I don't need to see him,
9   in that instance, you would make a medical record --
10  you would make a note yourself?
11       A:  No.
12       Q:  Okay.  So there are instances where you
13  might decide not to see a patient?
14       A:  I do not decide.  If a patient is lying and
15  nurses follow up and they decide he does not need to
16  see me, then he doesn't come to me.
17       Q:  If the patient is lying, is that what you
18  said?
19       A:  No.  No.  Patient request a sick call.
20  Patient decides not to see the doctor for one reason
21  or the other.
22       Q:  Right.
23       A:  And second thing is nurses decided that for
24  whatever patient was talking to her, it was not time

Page 276

1   for him to see me.  And what transpired between
2   patient and nurse I do not know.
3        Q:  Okay.  Let me see if I can just understand
4   this, then.
5        You never make the decision not to see a
6   patient who's been placed in the MD line, correct?
7        A:  No.
8        Q:  Okay.  Thanks.  You can put that to the
9   side.  Can we go back to Exhibit 10 for one minute?
10       Is paralysis a neurological deficit?
11       A:  Paralysis is a neurological deficit.
12       Q:  Is pain a neurological deficit?
13       A:  No.  No, I said.
14       Q:  Is difficulty ambulating a neurological
15  deficit?
16       A:  No.
17       Q:  Is -- well, difficult walking could be a
18  neurological deficit --
19       A:  Could be.
20       Q:  -- if the cause was paralysis, right?
21       A:  Paralysis, yes, but paralysis means a
22  patient cannot execute the movement, and that's why he
23  can't walk.
24       Q:  Could pain be a neurological deficit?

69 (Pages 273 to 276)

BHARAT SHAH, MD  12/7/2017

Page 277

1    A: Pain is just a symptom.
2    Q: So a neurological deficit is not a symptom?
3    A: No.
4    Q: It's a what?
5    A: Objective assessment.
6    Q: Okay.
7        (Plaintiff's Exhibit 12 marked for
8    identification.)
9    Q: Okay. The court reporter has handed you
10   what's been marked as Exhibit 12. This, by my count,
11   is the next time you saw Mr. Armbruster.
12       Can you tell me what date and time you saw
13   him according to this record?
14   A: This record states he's there for
15   hypertension cardiovascular clinic. He came back on
16   8/7/14. I saw him 3:10 p.m.
17   Q: Okay. And can you tell me what's written
18   under the subjective?
19   A: No complaints of headache, dizziness, chest
20   pain or shortness of breath.
21   Q: And the next line?
22   A: Takes medicines regularly.
23   Q: And under the objective, the vital signs, is
24   that your handwriting or is that someone else's?

Page 278

1    A: Nurse's handwriting.
2    Q: And there's something written here. And I'm
3    not sure what it is. Can you read what that is?
4    A: Where? By whom?
5    Q: Right underneath in the objective portion
6    here. I'll point to it.
7    A: Can you please point it out?
8    Q: Right where that arrow is pointing, if you
9    can read, I don't believe it's your handwriting, but
10   if you can read it.
11   A: This is blood pressure 120/90, then this is
12   written date 8/7/14.
13   Q: Okay. And then to the right of that, I
14   think it might be Ms. Maston's signature all the way
15   to the right.
16   A: Uh-huh.
17   Q: But there's -- it's like an upside down
18   triangle, and then a word written there. Can you read
19   that?
20   A: Which one are you talking? This one I can
21   do for you. 2:15 p.m.
22       MR. DUGAN: The triangle is the P in her
23   name.
24   Q: Oh, my mistake.

Page 279

1    A: What?
2    Q: You know what? It doesn't matter. I was
3    mistaken about what that was.
4        Under physical exam, can you tell me what's
5    written there that's in your handwriting?
6    A: Blood pressure 110/80.
7    Q: And so just before you continue, that's
8    different from the blood pressure that's written in
9    the nurse's handwriting?
10   A: Yes.
11   Q: Does that mean you took the blood pressure a
12   second time?
13   A: Uh-huh.
14   Q: Why did you do that?
15   A: Just a part of my exam.
16   Q: Okay. Please continue.
17   A: Chest clear, heart normal sinus rhythm, S1,
18   S2 normal, edema none, JVD none. JVD means jugular
19   venous distention.
20   Q: And the last one?
21   A: And abdomen nontender.
22   Q: Okay.
23   A: And lab review none because none was
24   ordered.

Page 280

1    Q: Okay. And then on the second page under
2    assessment, can you tell me what's been written there?
3    A: This one is --
4        MR. DUGAN: Second page, Doctor.
5    A: No, I know. Second page. Return
6    hypertension. Now condition good. Control good.
7    Status stable.
8    Q: And under the medication?
9    A: No. I also mention MSR 9/15/14.
10   Q: What is MSR?
11   A: Means medical schedule release.
12   Q: Mandatory supervised release.
13   A: Yeah. Something like that. Going out of
14   the prison.
15   Q: How do you determine when someone is going
16   to be released?
17   A: Pardon?
18   Q: How do you know when someone is going to be
19   released?
20   A: They mention it in the medical records or
21   they communicate to the medical records office by the
22   administration.
23   Q: And so is that something you would learn
24   prior to, during or after your encounter with the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## BHARAT SHAH, MD  12/7/2017

### Page 281

1  patient?

2  A: I may learn or may not learn even.

3  Q: And can you tell me why you remarked on

4  that?

5  A: No.  Just usually ask the patient and he

6  must have mentioned it.  He's going by 15th of

7  September.  Somehow I got the knowledge that he's

8  leaving by 9/15/14.

9  Q: And then under medication, what's written

10  there?

11  A: In the medications, I have written profile.

12  Profile means this is a continued medication to be

13  continued on regular basis.

14  Q: When encountering Mr. Armbruster on August

15  7, 2014, would you, based on your knowledge of your

16  typical practice, have reviewed his prior medical

17  records?

18  A: I'm aware of them.  Do not go through and

19  review the entire thing, but I usually am aware of

20  them.

21  Q: You make sure you are aware of what

22  happened --

23  A: Yes.

24  Q: -- with the patient in the recent history?

### Page 282

1  A: Yes.  Whatever is mentioned to me, that's

2  all here.

3  Q: Okay.  Let's take a break.  I think I just

4  have a few questions.

5  (Recess.)

6  Q: Okay.  Doctor, we've been talking about

7  neurological deficits and neurological focal findings.

8  I just want to make sure I understand.

9  It's my understanding that numbness is

10  itself a focal neurological deficit finding.  Do you

11  agree with that statement?

12  A: No.

13  Q: Tell me how that statement is wrong.

14  A: It is symptom to be assessed again.

15  Q: Something that requires investigation?

16  A: To be assessed clinically as well.

17  Q: What does it mean to clinically assess?

18  A: Try to feel the patient's senses and try to

19  see whether the patient has any sensory deficit.

20  Q: Well, numbness is a sensory deficit?

21  A: Well, you can objectively see that he does

22  not feel.  He does not feel your touch.  He does not

23  feel the pain senses.  This is a part of the deficit.

24  Q: And if you conducted that test, you would

### Page 283

1  have noted it, correct?

2  A: Yes.  Uh-huh.

3  Q: An MRI or CT scan would be able to diagnose

4  most neurological issues.  Do you agree with that

5  statement?

6  A: Yes.

7  Q: Yet you did not ask for either a referral to

8  a neurological specialist or an MRI --

9  A: Not in that stage.

10  Q: -- at any point for Mr. Armbruster through

11  his --

12  A: Not this stage.

13  Q: -- release, correct?

14  A: Not until this stage.

15  Q: Never.  You never requested an MRI or a

16  referral to a specialist, correct?

17  A: Yes.

18  Q: Do you believe that had you done so, Mr.

19  Armbruster's -- well, strike that.  Let me mark this

20  as Exhibit 13.

21  (Plaintiff's Exhibit 13 marked for

22  identification.)

23  Q: Have you seen this document before, Doctor?

24  A: Yes.

### Page 284

1  Q: Was this one of the documents you reviewed

2  from St. Mary's Hospital?

3  A: Yes.

4  Q: So since you've reviewed it, you can feel

5  free to take all the time to review it in its

6  entirety, but I want to point your attention to the

7  end, and I'll just summarize part of it reflects that

8  he was transferred.

9  Mr. Armbruster was transferred from Gateway

10  Regional Hospital to St. Mary's for emergency

11  surgery -- or immediate surgery the same day of his

12  transfer.

13  Is that consistent with your review of the

14  records?

15  A: Yes.

16  Q: And at the time he was seen in the emergency

17  room, they performed an MRI that indicated severe

18  spinal cord compression?

19  A: Yes.

20  Q: They did that shortly after within six weeks

21  of the last time you saw him, correct?

22  A: I don't know when they did it, but from the

23  record, it seems the date, 9/25 or 9/26.

24  Q: Right.  From this record, it indicates they

71 (Pages 281 to 284)

## BHARAT SHAH, MD  12/7/2017

Page 285

1   saw him on 9/25 or 9/26.  And that medical staff
2   determined in the first instance to conduct the MRI,
3   correct?
4   .    A:  They conducted the MRI.
5        Q:  And so in your opinion, the spinal cord
6   compression that Mr. Armbruster suffered as of
7   September 26th, was that an acute or a chronic spinal
8   cord compression?
9        MR. DUGAN:  If you know.
10       Q:  If you know.
11       A:  I do not know.
12       Q:  Okay.  You testified at length about acute
13   versus chronic spinal cord compression.
14            Is there anything from this record that
15   indicates to you one way or the other what he had?
16       A:  He had spinal cord compression.
17       Q:  Is there anything from this record or any of
18   the other records that you reviewed that indicated
19   whether it was acute or chronic in nature?
20       A:  It could be either way.
21       Q:  Did you note any trauma that would have
22   caused the spinal cord compression?
23       A:  Not that I know of.  It is not mentioned
24   anyway.

Page 286

1        Q:  And you would expect that to be mentioned in
2   a medical record, correct?
3        A:  Trauma, yes.
4        Q:  Is there any other infection that caused an
5   acute spinal cord compression that you are aware of
6   based on your review?
7        A:  No.
8        Q:  If it was, in fact, a chronic spinal cord
9   compression, that would have progressed over a period
10   of weeks or more, correct?
11       A:  Yes.  I mentioned before it would go on for
12   long time.
13       Q:  Can you say again?
14       A:  As I mentioned before, it could go on for a
15   long time.
16       Q:  And so if this were, in fact, a chronic
17   spinal cord compression, then it's possible that Mr.
18   Armbruster was experiencing a spinal cord compression
19   with cord change while he was incarcerated at
20   Southwestern Correctional Center, right?
21       A:  If it is possible it was for long time.
22       Q:  And nothing that you did -- you didn't do
23   anything to treat a spinal cord compression, correct?
24       A:  I did not have any evidence of that at that

Page 287

1   time.
2        Q:  That wasn't quite my question.
3            In any of the records we reviewed, did you
4   take any actions that did or would have treated a
5   spinal cord compression?
6        A:  I treated him for the arthritis.
7        Q:  Understood.  Was any of that treatment
8   something that would have addressed the spinal cord
9   compression?
10       A:  It was not for -- directed particularly for
11   that.
12       Q:  Is there anything that would have addressed
13   it?
14       A:  Not at that time when I was thinking.
15       Q:  At the end of this note, Dr. Bailey who
16   wrote it said that the patient really cannot function
17   in a normal work place.  And most likely reason is
18   lack of appropriate treatment while patient was in
19   prison for five months causing continued damage to the
20   spinal cord making it a more irreversible nature.
21       A:  I don't know how doctor would have made that
22   judgment.
23       Q:  Do you disagree with that statement?
24       A:  I have no way of knowing why he made that

Page 288

1   judgment.
2        Q:  Okay.  My question is whether you disagree
3   with it.
4        A:  I cannot say I disagree, but I don't know
5   how he determined what was the duration of the
6   patient's complaint and how he determined that it
7   progressed only during those four months.
8        Q:  So if he or anyone else who assessed Mr.
9   Armbruster's condition on September 26th, 2014 was
10   able to determine that the spinal cord compression
11   most likely existed while Mr. Armbruster was in
12   prison, do you agree that he did not receive adequate
13   care for that condition?
14       A:  It was not the condition that was considered
15   at that time depending upon patient's objective
16   findings.  And there is no way for anybody to tell as
17   to how long the patient had particular condition, how
18   soon or how fast it progressed, and when it progressed
19   for what reason it progressed.
20       Q:  That wasn't quite my question.
21            My question was, do you agree that if, in
22   fact, Dr. Bailey or anyone else who saw Mr. Armbruster
23   on September 26th, could determine that he had been
24   suffering from a spinal cord compression for

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## BHARAT SHAH, MD  12/7/2017

Page 289

1  approximately five months?
2      A: Not -- he cannot determine that.
3      Q: Okay.  Earlier your testimony was that you
4  didn't know how he knew.  Now it is your testimony
5  that you know definitively he could not know?
6      A: He could not know how it was related to
7  those four or five months.  How he came to that
8  determination I cannot tell you.  And he probably has
9  no way of knowing as to how long the patient had
10  condition.
11      And if he had inquired into patient's
12  symptoms, how long they were present, he would know
13  that patient had problems long time back.
14      Q: Have you talked to Dr. Bailey?
15      A: I don't know him.
16      Q: Okay.
17      A: I never met him.
18      Q: Do you know what, if any, specialty he has?
19      A: From what I hear, he's a neurosurgeon.
20      Q: Okay.  And you don't have neurosurgery
21  training, correct?
22      A: As I mentioned, part of my training in
23  neurosurgery, but it was very initial phase of my
24  training.

Page 290

1      Q: Tell me what, if any, training you received
2  during that time on the ability to date a spinal cord
3  compression?
4      A: You can't date it.
5      Q: So you received training that it was
6  impossible?
7      A: It's not received the training.  I know it
8  from my knowledge.
9      Q: Okay.  Tell me what training you received on
10  the inability to date spinal cord compressions.
11      A: Because there is no way of determining the
12  chronicity.  Okay?  There is no way objectively to say
13  how long it is present whether with MRI, CT scan or do
14  any clinical evaluation, you cannot say the duration
15  of the condition.
16      Q: Okay.
17      A: Because some conditions are present without
18  being symptomatic.
19      Q: That wasn't quite my question.
20      My question was, what training did you
21  receive on the inability to date a spinal cord
22  compression?
23      A: No training.
24      Q: And how many neurological surgeries on the

Page 291

1  spinal cord, if any, have you performed?
2      A: None.
3      Q: And how -- what, if any, training have you
4  received on viewing and interpreting a magnetic and
5  resonance imaging exam?
6      A: There is no training formal.  We just go by
7  experience.
8      Q: So you actually interpret those results
9  yourself?
10      A: No.  That's what I said.  There's no
11  training for general surgeon or even any of the
12  surgeon to read the MRIs.  They are only read by
13  radiologists.
14      Q: Right.
15      A: And general surgeons may discuss with them
16  and in the process learn something.
17      Q: Okay.  And so where -- tell me what the
18  source of your knowledge is that it is impossible to
19  date spinal cord compressions?
20      A: Because I have seen a lot of MRIs, and a lot
21  of patients.  And MRIs are done at a very different
22  stage than the patient's complaints.  So patient's
23  complaints are present in many instances without any
24  apparent symptoms.  Patient's condition may be

Page 292

1  present, but it is apparent afterwards.
2      Q: Between you and a radiologist, who is more
3  qualified to discuss the appearance of a spinal cord
4  compression on exam?
5      A: Of course a radiologist.
6      Q: And between you and a spinal cord surgeon or
7  neurological surgeon, who is more qualified to discuss
8  the appearance of a spinal cord compression during
9  surgery?
10      A: Neurosurgeon.
11      Q: The fact the disc material has been pushed
12  posteriorly into the spinal cord, does that say
13  anything about the severity of the spinal cord
14  compression?
15      A: No.  It shows the level of the extrusion.
16  It can be lateral also, and it may not press on the
17  spinal cord at all.  It may press on the nerve also.
18  Okay?
19      Q: Sure.  But if there is disc material that is
20  so far extruded that it's pushed posteriorly into the
21  spinal cord, does that indicate a particularly severe
22  spinal cord compression?
23      A: Yes, it does.
24      Q: And do you know, absent trauma, whether

73 (Pages 289 to 292)

BHARAT SHAH, MD  12/7/2017

Page 293

1    that's something that would have developed over time?
2        A:  It can be develop over time.  But as I
3    mentioned, it is difficult to judge the duration.
4        Q:  Did you have any experience with spinal cord
5    trauma during your work as a general surgeon?
6        A:  Yes.
7        Q:  Tell me what that experience is.
8        A:  The patient has injury to the spine, injury
9    with the trauma.
10       Q:  And would you refer those patients out or
11   would you actually treat --
12       A:  No.
13       Q:  -- those patients yourself?
14       A:  I refer out.
15       Q:  Okay.  Did you have any responsibility for
16   reviewing grievances at Southwestern?
17       A:  No.
18       Q:  Did you have responsibility for setting the
19   budget at Southwestern?
20       A:  No.
21       Q:  Are you aware of any cases where you have
22   been named as a defendant that settled?
23       A:  Pardon?  Again?  Can you rephrase?
24       Q:  Are you aware of any cases where you were

Page 294

1    named as a defendant that settled?
2        A:  Yes.
3        Q:  And how many of those cases settled?
4        A:  Two.
5        Q:  Those were cases through your private
6    practice?
7        A:  Yes.  Yes.
8        Q:  I want to talk very briefly about the
9    different kinds of meetings you did through CQI.  One,
10   you said, was an annual meeting?
11       A:  Which state meetings are you talking?
12       Q:  That was with the IDOC?
13       A:  IDOC meetings were quarterly.
14       Q:  There were quarterly meetings with IDOC?
15       A:  Yeah.
16       Q:  Were there also quarterly meetings that
17   Wexford had --
18       A:  The same day.
19       Q:  And was that held at Southwestern or
20   somewhere else?
21       A:  Springfield.
22       Q:  Did you receive an agenda for those?
23       A:  Yes.
24       Q:  Did you take notes?

Page 295

1        A:  No.
2        Q:  And there were monthly meetings as well?
3        A:  There were monthly meetings at the local
4    facility.
5        Q:  Were you responsible for being in charge of
6    those meetings?
7        A:  No.
8        Q:  Who was?
9        A:  Healthcare unit administrator.
10       Q:  Was there agenda for those meetings?
11       A:  Yes.
12       Q:  Did you take notes at those meetings?
13       A:  I did not.
14       Q:  Were you responsible for presenting cases at
15   those meetings?
16       A:  No.  But there were reviews, yes.  Whatever
17   was reviewed and whatever was referred outside,
18   everything was discussed about certain patients, so
19   they represented to the entire committee.
20       Q:  Were those put on the agenda?
21       A:  They were not put on the agenda, but I mean
22   every time we use to review certain topics, this one:
23   and second thing, I used to present to them regularly
24   the hepatitis C cases for further treatment and

Page 296

1    assessment.
2        Q:  Were notes taken by someone?
3        A:  Yes.
4        Q:  Were they circulated?
5        A:  Notes were not circulated, but the notes
6    were read out to us by us, you know.
7        Q:  So they were circulated amongst you?
8        A:  Yes.
9        Q:  So was there an annual meeting?  You talked
10   at one point about an annual meeting.
11       A:  Yeah.  Annual meeting was state director was
12   to visit the location.
13       Q:  Was that done on site at Southwestern?
14       A:  Yeah.
15       Q:  Were there any agendas created?
16       A:  Yes.
17       Q:  Were there notes taken by someone?
18       A:  Yeah.
19       Q:  Did you ever present at the quarterly
20   meeting?
21       A:  Yes.  No.  Presentation, which quarterly
22   meeting are you referring to?
23       Q:  The one that was half the day with IDOC and
24   half the way with Wexford?

74 (Pages 293 to 296)

**BHARAT SHAH, MD  12/7/2017**

Page 297

1    A: No.  I did not present anything.
2    Q:  And what about the annual meetings?  Were
3  you part of the presentation at that one?
4    A: I did not present anything.  I was part of
5  the audience.
6    Q:  Okay.  Do you agree that numbness can
7  indicate a serious medical condition?
8    A: It can.
9    Q:  Do you agree it is important to rule out
10  neurological conditions that could -- strike that.
11    Do you agree it would be important to
12  consider and rule out neurological conditions that
13  could cause numbness?
14    A: Yes.
15    Q:  Do you -- would you consider that part of
16  basic medical judgment?
17    A: It figures into the differential diagnosis.
18    Q: I don't have anything else.
19    MR. DUGAN:  Louis, do you have anything?
20    MR. LAUGGES:  No questions from this side.
21
22
23    EXAMINATION
24  QUESTIONS BY MR. DUGAN:

Page 298

1    Q:  Very briefly.  Doctor, we know now from some
2  of the tests that were run in the fall of 2014 that
3  Mr. Armbruster was diagnosed with spinal cord
4  compression.
5    During the period of time that you were
6  caring for him, did you think he had a spinal cord
7  compression?
8    A: I had no reason to suspect at that time from
9  my findings that related to his symptoms.
10    Q:  Specifically why did you not believe he had
11  a spinal cord compression while you were treating him?
12    A: Because I had no neurological deficit found,
13  and I had location of the pain that was mainly in the
14  lower back and the knees.  He never complained of neck
15  pain to me.
16    Q:  That's all the questions I have for you,
17  Doctor.  Thank you.
18    MS. GRADY: I don't have anything based on
19  that.
20    MR. DUGAN:  We'll read.  We're don, Doc.
21    MS. GRADY:  The parties have -- I guess the
22  Wexford defendants and the plaintiff have stipulated
23  to forgo questioning about punitive damages and assets
24  until after summary judgment is decided.

Page 299

1    MR. DUGAN:  By "punitive damages," you mean
2  assets?  We are not going to get back into conduct and
3  all that good stuff, right?
4    MS. GRADY:  Correct.
5    MR. DUGAN:  Okay.  That's fine.
6    THE REPORTER:  Louis?
7    MR. LAUGGES:  Yes.
8    THE REPORTER: Do you need this transcript?
9    MR. LAUGGES:  We are not ordering a
10  transcript at this time, but that might change later
11  on.
12    THE REPORTER:  Okay.  Thank you.  Sarah?
13    MS. GRADY:  Yes.  We -- I can't make the
14  decision to order, so I will have to get back to you.
15    MR. DUGAN:  We'll take electronic, please.
16    (WHEREIN, the deposition was concluded at
17  5:41 p.m. )
18
19
20
21
22
23
24

Page 300

1    CERTIFICATE OF REPORTER
2    I, Catherine L. Turner, IL-CSR, MO-CCR, RPR,
3  do hereby certify that the witness whose testimony
4  appears in the foregoing deposition was duly sworn by
5  me; that the testimony of said witness was taken by me
6  to the best of my ability and thereafter reduced to
7  typewriting under my direction: that I am neither
8  counsel for, related to, nor employed by any of the
9  parties to the action in which this deposition was
10  taken, and further that I am not a relative or
11  employee of any attorney or counsel employed by the
12  parties thereto, nor financially or otherwise
13  interested in the outcome of the action.
14
15
16
17  _____
18    Catherine L. Turner, IL-CSR, MO-CCR, RPR
19
20
21
22
23
24

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334

## Page 301

1   Alaris Litigation Services
       711 North Eleventh Street
2      St. Louis, Missouri 63101
       Phone (314) 644-2191 * Fax (314) 644-1334
3
4    December 21, 2017
5    TIMOTHY P. DUGAN
     Cassiday Schade
6    100 North Broadway, Suite 1580
     St. Louis, Missouri 63102
7    (314) 241-1377
     tdugan@cassiday.com
8
     In Re:
9    Gerry Armbruster vs. Wexford Health Sources, et al.
10   Dear Counsel:
11   Please find enclosed your copy of the deposition of
     BHARAT SHAH, MD taken on December 7, 2017, in the
12   above-referenced case.  Also enclosed is the original
     signature page and errata sheet.
13
     Please have the witness read your copy of the
14   transcript, indicate any changes and/or corrections
     desired on the errata sheet, and sign the signature
15   page before a notary public.
16   Please return the errata sheet and notarized signature
     page for filing prior to trial date to:
17
     Alaris Litigation Services
18   711 North 11th Street
     St. Louis, Missouri 63101
19
     Thank you for your attention to this matter.
20
     Sincerely,
21
22
     Catherine L. Turner, IL-CSR, MO-CCR, RPR
23   Enclosures
24   Cc:  Timothy P. Dugan

## Page 303

1    STATE OF          )
                         )
2    COUNTY OF          )
3
     I, BHARAT SHAH, MD, do hereby certify:
4        That I have read the foregoing deposition:
         That I have made such changes in form and/or
5    substance to the within deposition as might be
     necessary to render the same true and correct:
6        That having made such changes thereon, I hereby
     subscribe my name to the deposition.
7        I declare under penalty of perjury that the
     foregoing is true and correct.
8
9
10        BHARAT SHAH, MD
11        Executed this      day of          ,
12   2017, at                    .
13
14
15   Notary Public:
16   My Commission Expires:
17
18
19
20
21
22
23
24

## Page 302

1    WITNESS ERRATA SHEET
     Witness:  BHARAT SHAH, MD
2    Case:
     Gerry Armbruster vs. Wexford Health Sources, et al.
3
     Date Taken:  December 7, 2017
4
5    Page #_____ Line #_____
6    Should Read: _____
7    Reason for Change: _____
8
     Page #_____ Line #_____
9
     Should Read: _____
10
     Reason for Change: _____
11
12
     Page #_____ Line #_____
13
     Should Read: _____
14
     Reason for Change: _____
15
16   Page #_____ Line #_____
17   Should Read: _____
18   Reason for Change: _____
19
20   Page #_____ Line #_____
21   Should Read: _____
22   Reason for Change: _____
23
24   Witness Signature: _____

76 (Pages 301 to 303)

BHARAT SHAH, MD  12/7/2017

**A**

**a.m** 6:8 214:14
217:23
**A1C** 256:9
257:3 259:12
**abdomen**
258:17 264:17
279:21
**Aberdeen** 5:5
**ability** 8:20 9:7
9:10 32:19
33:19 96:3
97:7 116:8
290:2 300:6
**ablation** 220:6
**able** 75:14
180:9 212:11
218:11 219:14
219:16,18
232:16 283:3
288:10
**abnormal** 14:11
93:2 223:9
225:4 252:23
**abnormality**
247:24
**above-refere...**
301:12
**absence** 46:24
229:18
**absent** 162:20
292:24
**absolutely**
94:16
**absorbed**
108:19
**abstract** 179:17
**abuse** 46:10
69:8 214:22
215:11 216:23
238:1 244:11
258:15 259:1
269:17
**academic** 101:7
**accessing**
164:8

**accord** 158:16
167:15
**accreditation**
126:23 127:1,6
127:17,21,23
128:6,11,20
**accredited**
126:20
**accurate** 76:11
158:9 169:24
170:15 187:19
188:16,23
**accurately** 7:20
170:7 171:1,10
171:19 173:13
175:11
**ache** 254:14,18
256:1
**action** 300:9,13
**actions** 10:21
287:4
**active** 59:15,15
221:2,18,24
232:3,4,5
233:14,15,16
233:20,21
234:7,9,16,18
234:19
**actively** 220:21
**activities** 32:19
173:2
**acuity** 244:20
**acute** 36:10
37:14 39:22
43:2,21 44:6
44:17,23 45:1
45:7,8 71:6,12
71:15,16 74:7
74:10,12,14,18
75:1 83:2,10
87:7,7,16,19
87:20,22,24
88:5,6,9,14,18
88:22 89:1
90:12,22 91:4
91:19 96:22

163:14 206:23
207:17,20
215:14 228:17
229:2,6,22
285:7,12,19
286:5
**adapting**
150:20
**Add-ons** 207:17
207:19,20
**addition** 29:12
30:12
**additional** 99:7
103:1 200:6
**address** 80:14
80:20 193:6
193:17,22
209:3
**addressed**
82:4,5 287:8
287:12
**adequacy**
182:24
**adequate** 168:9
213:5,8,12,16
288:12
**administration**
118:7 136:8
149:4,11
174:23 201:8
280:22
**administrative**
130:19 131:3
157:16 169:13
170:12,19
175:24 183:9
183:13 185:16
195:21
**administrator**
125:4,5
130:20 131:1
131:23 134:23
136:3,13
143:20,22
144:9 151:15
156:12 168:7

172:2,7,19
184:21 188:13
189:4 191:12
295:9
**administrators**
125:8
**admission** 18:3
20:11 203:17
**admit** 213:21
**advance** 8:16
**advanced**
35:13,14,21
39:18,21
**advise** 217:8,16
**advised** 17:11,17
271:11
**affect** 8:19,24
9:3,6,9 35:18
**affiliated** 15:11
107:8
**afternoon**
141:17,18
**age** 6:10 203:11
**agenda** 294:22
295:10,20,21
296:15
**agendas** 195:15
296:15
**aggravates**
62:24
**ago** 12:3,20
224:24
244:10
**agree** 38:20
67:18,21 68:1
74:16 156:2
159:16 162:19
166:21 167:12
167:21 168:1
169:23 170:15
170:24 171:10
171:19 172:2
173:13 180:8
180:13,15
187:19 188:16
188:19,23
189:20 196:22

197:3,17,24
218:15 221:12
221:17,22
222:2,3
232:11 236:7
236:13 241:8
242:13,23
243:9 248:5
251:16 261:5
268:21 271:19
282:11 283:4
288:12,21
297:6,9,11
**AGREED** 6:1
**ahead** 8:13 44:3
44:4 65:5 71:3
75:6
**al** 1:10 4:10,23
5:8 301:9
302:2
**Alaris** 5:22
301:1,17
**alcohol** 214:23
245:9,10,12
**alert** 57:13
256:3 258:16
**allegation**
30:17 31:8
**allegations**
30:16
**alleviate** 75:4,8
**allowed** 75:24
205:8
**Alter** 217:5
**ambulating**
48:18 220:2
276:14
**ambulation**
219:6
**amount** 114:3
**anatomical** 70:1
**ancillary** 74:19
74:22 173:17
**and/or** 173:21
301:14 303:4
**ankle** 247:19

**BHARAT SHAH, MD  12/7/2017**

**annual** 117:22
150:13 187:16
201:15,16
202:20
294:10 296:9
296:10,11
297:2
**annually** 187:14
187:16
**answer** 7:15 8:2
8:7,8,12,14,20
15:17 23:1,3
27:23 28:11
34:2,18,21
42:19 49:24
50:4 52:23
71:8,11 75:7
96:24 126:10
**answered** 27:13
110:11
**answers** 7:10
164:18
**anterior** 265:19
**Anthony** 31:11
**Anthony's**
108:2,5
**anticipated** 10:1
**anybody** 17:22
152:8 168:11
169:1 288:16
**anymore** 137:3
**anyway** 107:8
171:3 285:24
**apologize** 8:16
8:18
**apparent** 177:14
291:24 292:1
**apparently**
73:6
**appear** 235:8
**appearance**
94:10 292:3,8
**appeared**
228:18
**appears** 190:19
214:10 243:24

300:4
**applications**
135:20
**approach**
159:14
**appropriate**
68:14 70:24
76:14 80:7,13
81:6 91:7
170:23 179:10
205:7 287:18
**approval** 118:3
152:15 160:4
160:11 163:6
**approve** 118:4
135:20 152:16
153:23 154:15
163:10 164:7,9
**approved**
165:17 188:12
**approving**
154:7 164:12
173:4 191:10
**approximate**
102:5 134:6
165:22
**approximately**
12:19 130:8
140:20 165:18
165:22
**April** 12:16,23
19:19 21:23
**area** 48:22
230:8
**argument** 165:4
**argumentative**
232:21 258:9
258:16 260:11
260:13
**arm** 221:4
**Armbruster** 1:4
4:4,22 5:3
6:22 9:14,20
10:2,6,12,18
11:2,6 14:2
15:7,24 16:5

17:20 19:2
22:20 106:20
106:23 166:13
213:2,5,16
218:15 222:8
222:13
226:23
227:22 228:8
228:16,18,23
229:21 233:2
239:7 241:3
241:10,18
243:22 246:7
248:1,23
249:18 251:1
251:18 253:5
254:3 257:5
262:18 263:6
263:13,20
268:20
274:23 277:11
281:14 283:10
284:9 285:6
286:18 288:11
288:22 298:3
301:9 302:2
**Armbruster's**
18:6,19 19:14
19:22 22:15
218:7 242:20
248:6,16
283:19 288:9
**arms** 49:7,10,12
215:16 230:1,7
231:3
**arrange** 128:11
130:1
**arranged**
128:16 143:10
210:22
**arrive** 54:18
**arrived** 17:2
140:1
**arrives** 53:8,16
204:11
**arrow** 278:8

**arthritic** 273:18
**arthritis** 20:12
216:24 217:5
238:3,8,11
249:16 250:3
261:1 264:22
265:10,10,10
265:17 271:7
272:6,9,11,21
272:24 273:1
273:14,15
274:14 287:6
**aside** 166:21
197:16
**asked** 66:6,20
67:9 144:18
191:18,20
224:2 237:8
262:18 263:1
263:3
**asking** 7:7 8:1
38:1 45:5,16
53:2 63:11
77:20 80:11
129:4 170:5,6
172:5,6 200:8
205:11 213:23
223:20
240:17
**aspect** 135:9
191:6 265:19
**asses** 170:20
**assess** 59:4
60:7 62:11
85:12 235:6
240:20 248:6
248:16 261:9
267:6 282:17
**assessed**
225:15
236:20 249:1
250:2 282:14
282:16 288:8
**assesses**
235:16
**assessing**

60:18
**assessment**
49:19,20 59:6
118:14 187:10
216:21 218:11
227:18 228:6
230:22
234:23 235:6
235:21,23
236:3 237:24
244:16 248:8
252:5,23
256:5 258:20
264:21,22
266:18 271:7
277:5 280:2
296:1
**assets** 298:23
299:2
**assigned** 134:17
137:23 157:1
**assignment**
113:1,1
**assist** 169:14,22
**assistant** 136:11
137:23 169:20
**assistants** 173:7
173:17
**assisting** 173:11
**associated**
42:17,19 43:6
46:3,4,24 61:8
64:14 84:22
103:10
**assume** 80:13
**assuming**
236:8,14
**assurance**
174:10,15
**atrophy** 35:22
35:23,24
72:23 73:8,10
82:12,14 85:19
**attend** 97:18
158:2 170:11
**attended** 16:19

BHARAT SHAH, MD  12/7/2017

97:23
**attending**
105:16
**attention** 49:13
140:8 162:6
250:12 284:6
301:19
**attorney** 5:14
6:21 8:12 11:12
11:16 12:10
21:16 300:11
**attorneys** 8:5,7
21:10,14,19
22:20
**audible** 7:10
**audience**
297:5
**audit** 174:16,18
**August** 114:15
274:6,23
281:14
**authorities**
124:16 128:9
136:7
**authority** 164:11
188:12,21
189:9,12,17,22
190:7,9,11,19
191:2,9 196:20
**authorization**
160:22,23
161:14 162:20
163:18
**available** 56:2
75:22 129:21
129:22,23,24
132:18 137:12
137:15 142:8
144:17
**aware** 136:21
137:7 200:7,9
202:17 204:2
205:4,16
281:18,19,21
286:5 293:21
293:24

| **B** |
| --- |

**b** 131:21 218:3
**B-h-a-r-a-t** 6:16
**B-o-r-r-o-r**
131:12,15
**bachelor** 98:10
98:10
**back** 10:6 31:8
31:21 34:17
42:18 49:24
50:19 57:6
61:3 63:18
71:8 79:18
97:10 166:15
170:18 178:8,11
196:16,19
209:13 215:15
216:10,11 217:8
217:16 218:19
219:7,10,11
237:13 238:10
244:9 246:8
246:9 247:19
249:14,24
250:9 251:3,4
251:5,5,14,21
256:21 257:4
259:19
267:22 273:6
276:9 277:15
289:13 298:14
299:2,14
**backache**
214:20 226:12
226:14,15
238:5,9 251:11
255:5,19,20
255:22
258:13
**background**
97:11
**bad** 38:11 267:9
**Bailey** 3:20
287:15
288:22
289:14

**bar** 215:1 216:3
**barely** 251:1,19
**Barring** 57:1
137:18
**based** 17:24
20:9 43:19
48:19 167:1
213:3 222:4
225:14 232:11
234:10 239:17
240:17,23
251:12 253:6
254:8 258:4
260:17 273:19
281:15 286:6
298:18
**basic** 179:20
188:10 297:16
**basically** 44:8
150:1 223:23
234:1
**basis** 150:13
200:16 281:13
**becoming**
110:18,20
**began** 6:20
121:11 130:23
**beginning**
127:13 155:20
**behalf** 1:18 4:23
6:10
**belabor** 233:17
**believe** 12:12,15
22:4,5 26:21
30:21 78:22
86:5 108:11
114:15 116:21
119:15 134:8
144:10 146:2
213:4 246:22
270:3 273:2,3
273:7 274:2
278:9 283:18
298:10
**believed** 118:16
272:4,16,20

273:12
**belonged**
128:17
**bend** 233:20
**benefit** 225:13
**Bennett** 23:14
**best** 7:23 8:1
19:13 28:24
29:20 37:1
39:12 157:22
300:6
**better** 264:12
266:15 267:5
267:12
**Bharat** 1:17 4:13
6:9,16 301:11
302:1 303:3,9
**bid** 256:13
265:23
**binder** 184:24
185:6,9,13,19
**bipolar** 269:21
**bit** 8:18 38:24
153:9 157:18
202:22 260:3
**blood** 9:1,2,6
92:23 217:23
239:21,23
240:3,8,9,12
240:20 241:6
241:6 252:22
253:9,23
256:24
274:13 278:11
279:6,8,11
**board** 104:9,12
105:2,5,8,10
116:2,3,12
117:4,7
**body** 32:11,16
48:9,10,10,23
49:1,14 51:2,5
51:9 54:13
57:19,20 58:2
58:14,19,20
62:20 66:21

92:1,21 93:1
95:10 220:16
254:14,18
256:1 265:20
273:9
**boil** 208:10,10
208:11
**Bombay** 97:19
97:20 98:3,4
98:5,8,18,19
98:20 100:20
101:21,23
102:3
**bone** 34:9 36:11
36:12,13 68:8
68:9 226:15
**bonus** 202:19
**bony** 265:14,15
**borderline**
256:6 257:2
**born** 97:15
**Borror** 131:7,15
**bottom** 188:9
249:8 266:8
**BP** 264:14
**bracket** 259:13
259:13 265:15
269:19
**brackets** 270:4
**brain** 33:11 34:4
34:5
**brain's** 33:19
34:11
**break** 70:3,6
212:21 282:3
**breath** 277:20
**breathe** 229:17
**breathless**
229:17
**brief** 133:20
**briefly** 259:19
294:8 298:1
**bringing** 24:21
25:1
**Broadway** 4:17
5:10 301:6

**BHARAT SHAH, MD  12/7/2017**

**broken** 162:10 209:3
**brought** 30:9 30:13 55:20 56:14,19 114:10 208:7 210:14
**budget** 293:19
**building** 56:24
**bullet** 169:13

**C**

**C** 1:8 4:8 5:1 172:21,23 215:15,15 223:18,20 224:5,6 225:16,24 227:7,8,12,21 228:6 237:16 271:3 295:24
**c-o-r-t-i-c-a-t-...** 265:18
**C5** 32:24 33:2 34:6,8,11
**C5-C6** 14:22 33:2
**C6** 32:24 33:2 34:6,8,11
**caffeine** 245:9
**calcification** 91:15,17,18,21 92:6,17,18 93:5,11,24 94:15
**calcified** 91:22 92:7 94:5
**calcium** 92:22 93:7
**call** 55:19,22 57:7 63:19,24 64:3,8 65:22 89:24 117:18 120:7,15,16 123:8 126:12 138:10 164:6

181:1 194:23 202:15 205:1 205:2,6,9,14 205:18,21 207:18 208:14 208:19 209:2 209:14 210:6 275:19
**called** 26:3,4 36:15 37:7 41:7 54:14 56:22 90:11 98:7,8 108:9
**calling** 257:4
**calls** 176:10
**capacity** 115:17 138:5,6
**cardiac** 99:17 253:21
**cardiovascular** 252:24 277:15
**care** 13:17,19 15:7 16:5 18:6 18:16,20 22:9 22:16 24:14 24:22 25:2 31:1,8 55:21 56:21 76:5 96:10,16 107:17,19 108:22 109:2 109:20 112:3,8 114:8 120:7,14 126:14 128:21 130:17 131:4 135:7,8,9,14 136:8 143:4,15 144:8,12 151:24 152:3 152:13 153:6,8 153:11 154:20 156:12 158:16 159:12 161:16 161:19 162:1,3 162:9,20

163:21 164:10 164:16 165:2 166:18 168:9 174:4 175:7 176:7 177:2 178:16 181:18 182:15,18,20 182:24 183:1,3 183:4 200:12 201:8,8 212:11 213:2,5,9,13 213:16 250:10 288:13
**caring** 298:6
**carried** 129:20 176:21 177:10 184:20 192:6
**carries** 223:24
**carry** 158:19 165:6 166:24 168:10 185:3 190:3 223:24
**cartilaginous** 95:1
**case** 1:8 4:8 6:22 20:18 24:7,10,10,16 25:7 26:1 27:6 27:17,18,18,19 28:12,14,17,19 28:22,22,22 29:3,6,9 30:6 30:17,20 31:4 31:6,7,14,17 36:14 60:7,20 69:13 83:16 84:2 85:11 165:15 197:10 198:18,19 202:15 233:24 235:21 243:18 267:1 301:12 302:2
**cases** 29:8,9,15 29:23 30:8,8

30:15 35:21 37:16 38:11 39:19,21,22 41:5 60:6,16 60:16 69:6,10 73:3 74:7 165:14 293:21 293:24 294:3 294:5 295:14 295:24
**Cassiday** 4:17 5:9 301:5
**Catherine** 4:19 5:21 6:4 300:2,18 301:22
**cauda** 32:9
**caught** 34:1 261:2
**causative** 262:11
**cause** 4:20 33:14,15,17,21 34:13,14,21,22 35:20,22 36:24 37:8 38:5 39:23 41:23 44:12 45:21,23 61:9 61:20 62:19,21 62:23 77:18 78:2,5 79:14 80:8,22,23 81:13 82:6,8 82:10,22 84:7 84:13,14 86:15 86:23 87:3,6 87:8 88:6 89:4,7 90:12 93:14,20,24 94:2 165:4 179:22,22 180:6 226:18 236:7,13,18 249:23 261:20 267:17

271:20 273:13 276:20 297:13
**caused** 36:19 38:21 43:16,17 64:14 77:6,7 77:10,11,13,22 77:23,24 79:14 80:12 80:24 81:2 84:4,5 261:3 261:10,16 262:9 268:1,7 272:2,4 273:8 285:22 286:4
**causes** 37:19 38:17 40:4,12 40:22 44:7 69:19 83:4 87:2,10 88:9 89:4 90:12 92:17 93:9,13 94:2,24 179:11 240:11 242:9 242:15 268:13
**causing** 69:14 73:20 76:15 78:14 80:9 85:15 88:16 180:10 240:21 272:1 273:3,5 287:19
**Cc** 301:24
**center** 13:10 18:20 19:7 95:1 97:6 126:14 128:22 158:6 167:23 171:8 286:20
**center's** 158:15
**central** 32:16 33:10 40:19 153:24 154:8 161:17 163:20 164:12 189:3 202:16

**BHARAT SHAH, MD  12/7/2017**

**Centralia** 119:8
120:23 121:4,6
121:10,22
124:24 125:1
**certain** 4:19
43:12 46:24
57:24 60:6,16
60:16 61:21,21
63:7 72:17
74:14 95:10,11
95:12 120:13
147:13 149:24
177:1 185:4,16
206:24
295:18,22
**certainly** 90:19
**CERTIFICATE**
300:1
**certification**
117:4
**certified** 105:2
105:6,8,10
116:13,14 117:7
**certify** 300:3
303:3
**cervical** 14:22
32:8 33:3
**cetera** 177:24
177:24 210:6,7
**change** 37:21
37:22 38:3,4
38:7,17,21
128:22 136:16
136:19 141:4
182:4,7,14
239:19 286:19
299:10 302:7
302:10,14,18
302:22
**changed**
136:23 137:7
**changes** 68:7
94:8,9 150:23
151:9 188:2
192:23 193:1
195:20 196:1,2

196:5 265:11
301:14 303:4
303:6
**charge** 295:5
**Charles** 112:13
112:13
**chart** 122:12,16
123:12,20
124:1 145:1
147:6,8,9,17
148:2 174:16
174:19 201:3
208:20 211:1
217:23
**charts** 120:1,4,6
120:10,11,12,13
120:14 122:10
127:8 128:7
145:12,17 146:1
146:2,3,5
147:4,13,21,24
178:7,23
208:22
**check** 200:11,12
200:15 230:9
**checked**
232:23
**chest** 244:20
256:3 258:16
264:16 277:19
279:17
**Chicago** 5:5
**chief** 170:12
199:7
**Chris** 194:23
195:1
**Christina** 195:1
**chronic** 36:11
37:14,16 38:11
43:2,22 44:6
44:17,23 45:7
45:11 62:4
71:7,13,19,24
72:21 83:12,13
83:15,22
86:22 87:2,5

87:11,17 88:5
88:19,23 89:1
89:7,13,16,19
89:24 90:5,6
90:7,8,10,10,11
90:14,20,24
91:3 92:4,9
119:22 120:14
163:13 206:24
207:3 209:1
209:15 265:1
265:3 274:14
285:7,13,19
286:8,16
**chronicity**
290:12
**circular** 40:17
**circulated**
296:4,5,7
**circumstance**
163:12
**circumstances**
93:11 204:21
209:21
**city** 4:18 103:13
108:24 109:1
109:10
**claim** 24:21 25:1
**claims** 22:15
24:17 215:17
215:21,22
231:7
**class** 239:13
260:5
**claudication**
244:20
**Clayton** 14:6,13
107:3
**clear** 7:7 8:3
12:15 45:17
171:24 198:17
200:5 256:3
258:17 263:4
264:16 279:17
**clinic** 108:20
109:18,20

112:16,20,21
119:23,23
120:14 150:2,6
181:10 208:9
209:1,15
244:3,5
249:10 252:4
252:8,15,17,18
252:22
253:13,21
256:16 257:19
266:9 277:15
**clinical** 47:20
50:9 143:13
157:15 158:1,5
173:2 175:3,24
178:17,23
181:3 185:2,15
197:1,18,21
223:1 290:14
**clinically** 45:3
179:8 225:6
282:16,17
**clinics** 108:22
109:17 111:1,4
119:22,23
120:2,16
252:18,20
**close** 105:23
**closed** 105:22
108:19 109:24
110:6
**cloth** 231:17
**co-exist** 47:2
**cocaine** 214:22
215:11 216:23
238:1 244:11
244:23,24
258:15 269:19
**collect** 256:20
**collection**
264:20
**college** 97:18
**Colorado** 114:7
**combined**
114:12 245:23

**come** 55:22
57:4 65:17
66:8 78:13
102:19,23
118:9,21 119:4
119:10 120:24
122:1 128:17
132:21 138:12
141:10,13
156:16,19
157:2,5 173:21
178:8 199:15
200:17 201:11
202:23 203:3
204:14,23
205:3,17
207:7,16,21
210:12 212:13
220:5 252:15
275:16
**comes** 51:19,20
51:21 55:2
64:21 65:7,19
65:21 66:9
95:2 152:21
176:8 198:20
211:8 232:17
234:5 244:2
252:11 253:20
256:21
267:22
**coming** 64:8,22
66:3 103:22
121:4
**Commission**
126:20 303:16
**committee**
161:7 295:19
**committees**
170:12
**common**
179:20,21,23
180:2 238:13
**communicate**
33:20 136:5,6
140:15,16

BHARAT SHAH, MD  12/7/2017

193:23 202:14
280:21
**communicates**
136:6
**communicati...**
34:12
**communicati...**
11:2,5 195:12
**community**
158:17 159:8
159:12,15,18
159:22 160:6
160:14,20
166:20,23
167:9,15,17,20
**comorbidities**
47:3,3
**company** 114:12
114:12 118:7
**compare**
259:22
**compared**
45:10 78:20
81:11
**comparing**
81:15
**complain** 35:6
35:7 51:14
66:24 235:18
270:17
**complained**
22:9 49:5
58:19 67:6,8
225:11 232:22
236:5 246:8
246:18
262:20
298:14
**complaining**
24:22 49:1
58:2,22 59:3
59:17 61:4
64:23 66:17
66:22 142:4,5
142:9 226:12
226:13 227:2

251:10,13
260:18,22
**complains**
48:23 49:14
52:24 58:24
214:20 235:19
258:12
**complaint** 11:10
11:19 12:6
20:16 21:3,5
30:24 50:14
51:6,22 52:2
52:8,9 55:3,5
55:10 64:5,11
65:17 66:4,8
66:9 67:1,2
68:18 162:10
162:13 208:6
215:4 260:23
288:6
**complaints** 10:5
10:12,22 14:10
17:7,10 20:12
30:17 31:8,22
35:9 48:19
55:23 57:21
57:23 60:12
64:8 65:22
67:4 214:19,21
225:19 226:9
254:14 259:3
274:14 277:19
291:22,23
**complete** 12:13
13:3 53:4,6,10
53:17 54:10
63:19,22
100:6 103:7
122:8,15 124:1
147:2,3
259:13
**completed**
101:6 104:6,17
123:20,21
145:19 269:24
**completely**

58:21 71:22
72:18 114:24
254:17
**completing**
104:4 173:8
**compliance**
159:22
**complied** 159:8
159:12,18
166:23
**comply** 128:5
**component**
35:16,17
**Compound**
44:2
**comprehensi...**
48:12 50:10
51:13 52:3,7,11
54:16,22 59:2
61:10 65:7
66:6
**compress** 70:2
**compresses**
69:24
**compression**
15:2 36:3,8,9
36:10,19 37:1
37:9,10,17,20
37:21 38:4,6,8
38:14,16,18,21
39:5,14,24
40:2,9,9
41:22 43:5,11
43:23 44:16
44:23 45:10
45:14,20,22
46:6,12,14,21
47:1,4 62:22
67:18,21,24
68:4,19 69:16
69:16,19,21
70:23 71:1,6
71:12,20 72:1
72:13 74:1,3,7
74:10,18 75:4
76:23 77:14

77:22 78:10,16
78:21 79:2,12
79:15 80:1
81:10,13,16,24
82:4,24 83:16
83:23 84:8,13
84:15,17 85:13
85:15 86:12
86:20,23 87:3
87:3,8,12,17,18
88:1,15,18,24
89:8,12,14,18
89:20 90:4,16
90:20 91:3,4
91:8,10 163:11
220:14 227:6
227:11,16,22
228:9,12
231:2 237:20
241:15,17
242:5,6 243:2
243:7 268:12
273:21 284:18
285:6,8,13,16
285:22 286:5
286:9,17,18
286:23 287:5
287:9 288:10
288:24 290:3
290:22 292:4
292:8,14,22
298:4,7,11
**compressions**
290:10 291:19
**concern** 154:24
182:22 206:13
**concerned**
136:12
**concluded**
299:16
**conclusion**
78:13 251:24
263:13
**condition** 14:16
37:13,17 38:22
44:5,6 47:15

56:17 64:16
68:8,15 69:7
69:8,13,18,22
71:23 75:1
76:10,15,19,21
78:4 79:13,15
80:9,21 83:2
83:3,10,12,13
85:18 86:3,22
87:7,19,21
88:7,9,19 89:3
89:4 90:24
91:19 92:8,9
92:10,11 93:12
93:16,21
96:22 206:12
206:23 207:4
218:21,24,24
225:7,9,10
226:23 227:3
229:4 233:24
235:7 237:5
238:12,13,14
238:19 239:1
240:1,4 241:4
242:10,20
248:7 280:6
288:9,13,14,17
289:10
290:15 291:24
297:7
**conditional**
241:6
**conditions** 8:19
10:18 16:2
36:11 42:17,20
43:7,12,18
45:20 46:4,5
46:9,11,16,19
46:24 47:5
61:9 62:19
63:7 64:14
70:8 71:6,7,13
71:13,15,19
74:13,14 76:23
77:4,11,12,12

BHARAT SHAH, MD  12/7/2017

85:12 87:23
185:4 207:1
290:17 297:10
297:12
**conduct** 52:1
61:6 65:23
96:4,8 122:1
145:1 158:4
201:3 285:2
299:2
**conducted**
158:15 167:15
204:3,6,6
254:1 282:24
285:4
**conducting**
48:20 51:24
60:22 119:18
121:7 143:3
**conduction**
84:23 85:1,1
85:20
**condyle** 265:14
**conference**
164:6
**confirm** 243:8
**confirmed**
242:18 243:6
**confront**
232:24 233:2
**confused** 87:15
**confusing**
231:16
**confusion** 7:4
**connection**
20:18
**consider** 180:1
181:2 241:12,16
241:19,21
297:12,15
**considered**
118:8 241:2,10
243:11 272:16
273:21 288:14
**considering**
240:7,8,14

**consistent** 19:9
130:8 141:2
160:5 167:8
168:4 284:13
**consistently**
137:6
**constructive**
126:13
**consultation**
158:3
**contact** 128:11
136:10 156:14
**contain** 150:15
**contained**
190:18
**contains** 155:12
**contents** 150:16
**context** 63:8,10
**continuation**
270:12
**continue** 36:18
118:4 215:10
215:12 217:18
239:7 259:11
265:22 279:7
279:16
**continued**
270:14 281:12
281:13 287:19
**continues**
270:17
**continuing**
155:20 216:17
**continuous**
182:1
**contract** 112:3
112:18 113:22
114:5,13 121:11
132:13,17
133:7,22
139:2,5,19
155:11,12
158:2 181:4,24
182:7 199:24
**contracting**
111:1

**contractor**
127:15 156:22
**Contractual**
156:23
**control** 258:22
280:6
**controlled**
258:21 264:14
267:23 268:4
**convenient**
113:3
**conversations**
21:15 202:6,12
**coordinate**
130:17 135:7
153:11 157:13
172:13 176:7
**coordinated**
136:2 168:6
**coordinating**
152:13 153:8
156:11 171:13
**copay** 205:15
**copies** 149:9,10
**copy** 195:18
301:11,13
**cord** 32:4,5,7
32:10,12 33:8
33:18,23 34:2
34:6,9,14,22
36:2,8,9,10,19
36:24 37:3,6
37:10,11,17,20
37:21,21,22
38:3,4,5,6,7,8
38:10,14,16,17
38:18,20,21
39:1,5,14,24
40:2,8,9,13
41:22 43:5,11
43:23 44:17
45:9,14,20,22
46:6,12,14,20
47:1,4 49:16
49:18,19
62:22 67:18

67:21,23 68:4
68:19 69:19,21
69:23,24 70:2
70:8,23 71:1,5
71:12,17,19,23
72:11,13 74:1,7
74:10,18 75:3
75:19 76:4,22
77:14,22 78:9
78:14,16,21
79:2,11 80:1
81:10,12,16,24
82:3,24 83:15
83:22 84:8,13
84:14,16 85:11
85:15 86:11,20
86:22 87:2,11
87:17,17,24
88:14,18,24
89:7,12,14,16
89:18,20 90:4
90:16,20 91:3
91:4,8,9 94:13
95:15 163:11
220:14 227:6
227:11,16,22
228:9,12 231:1
241:14,17
242:5 243:2,7
268:12 273:21
284:18 285:5
285:8,13,16
285:22 286:5
286:8,17,18,19
286:23 287:5
287:8,20
288:10,24
290:2,10,21
291:1,19 292:3
292:6,8,12,13
292:17,21,22
293:4 298:3
298:6,11
**cord-like** 32:8
**corporate**
108:20 109:16

**corporation**
109:1 156:18
**correct** 12:3
13:12 16:13,22
18:2,12 22:12
25:16 27:9
29:13 31:22
37:23 38:13
40:11 44:17
46:13,23
47:10,19 48:1
49:7,12 51:10
53:17,23 54:3
54:18,24 57:9
58:5 61:1 64:11
64:16 65:1,24
68:1 69:12
70:11,14 73:21
74:5,21 75:19
76:6,19 78:21
81:24 82:12,15
85:15 86:4,7
86:20,24
90:20 91:12
93:5,17,21
94:18,20,22
95:4,23 96:9
96:21 100:13
102:12,17
109:4 111:24
112:3 113:18
115:5,14 117:1
119:12 120:19
121:8 124:4
125:16 129:5
134:12 136:9
137:19 142:10
143:15 144:9
154:12 155:3
159:2 161:19
161:23 163:18
163:22 165:2
166:2,6 172:3
172:15,19
174:3,7 177:19
179:14 185:20

**BHARAT SHAH, MD  12/7/2017**

187:7 190:13
192:19 204:12
206:9,14
212:19 213:13
218:8,12,17,20
219:4,8,12,16
219:23 220:3
220:10,17
221:6 222:13
222:24 224:4
226:7 233:22
235:17 236:15
236:18 239:13
242:1,10,21
243:7,11
244:14 245:4
246:16 248:7
248:14 249:19
250:3 251:9
252:12 254:3
257:14 260:14
261:7,22
262:7 263:14
266:16 268:10
268:14 271:21
272:1 276:6
283:1,13,16
284:21 285:3
286:2,10,23
289:21 299:4
303:5,7
**correcting** 40:6
**Correction**
114:8
**correctional**
13:10 18:20
19:7 24:11
97:6 126:14
126:20 128:21
138:3,9,13
158:3 167:23
286:20
**corrections**
118:21,24
151:20 183:8
301:14

**correctly** 48:3
158:7,18,22
175:9,10
**corticated**
265:18,18,19
**counsel** 6:2,2
300:8,11
301:10
**count** 28:21
277:10
**country** 102:15
**County** 112:13
303:2
**couple** 108:11
204:20,21
**course** 76:14
96:7 160:12
204:15 292:5
**court** 1:1 4:1,20
5:21 7:13,19
11:22 13:16
22:3 25:18,20
26:4 27:5,13
28:7 29:4,10
186:8 263:18
268:18 274:1
277:9
**courtroom**
26:23
**cover** 152:24
**coverage**
129:24
**CQI** 294:9
**create** 122:4
148:4 177:15
**created** 13:7,8
119:19 123:24
124:4 145:13
149:21 151:18
151:19 190:3
296:15
**creation** 260:17
**criteria** 147:9,10
147:13,14
164:9,16,17
174:21

**criticism** 126:13
**CT** 80:3 84:9,10
84:11 96:1,21
283:3 290:13
**cure** 268:6,8
**cured** 71:22
**current** 211:8
246:1
**currently** 113:20
115:19,22
**cycles** 116:19

---

**D**

**D** 196:22
**daily** 32:20
**damage** 34:10
34:14,22 39:1
61:21 78:14
83:6 84:3
287:19
**damaged** 33:12
33:14,16,23
34:2
**damages**
298:23 299:1
**date** 22:5 55:16
128:7 214:5,5
250:15,17
254:9 277:12
278:12
284:23 290:2
290:4,10,21
291:19 301:16
302:3
**dated** 3:21
**dates** 102:5
**Davis** 23:11
**day** 4:14,16
55:6,11,17
129:12 141:8
207:23 208:2
210:3 212:7
246:6 284:11
294:18
296:23 303:11
**day-to-day**

130:1 135:7
144:16 173:24
176:12
**days** 83:9
206:24
**Dear** 301:10
**decedent** 25:4
**December** 1:19
4:14 301:4,11
302:3
**decertified**
116:16
**decide** 8:10
110:13 147:10
156:17,19
163:4 164:9
179:11 225:22
239:10,21
241:5 275:13
275:14,15
**decided** 142:21
211:20 225:12
260:21
275:23
298:24
**decides** 275:20
**deciding** 142:18
**decision** 115:9
115:10,10,13,14
163:21 169:6
169:11 205:19
206:4 249:23
274:22,24
275:4 276:5
299:14
**decision-mak...**
164:14
**decisions** 96:15
145:9 156:17
197:1,6,8,18
197:20,21
198:3
**declare** 303:7
**decompensa...**
220:13
**decompressi...**

72:8,11
**decrease** 183:1
183:4
**defendant** 5:8
12:1 21:24
22:12 24:7,16
26:1,7 27:3,7
27:9,12,15
28:1,6,13 29:1
29:7 293:22
294:1
**defendant's**
23:3
**defendants** 1:12
4:12,23 6:3
26:5 298:22
**defer** 166:8
**deficiencies**
178:24
**deficit** 215:16
216:22 230:10
230:11,24
233:5 236:6
241:13 242:4
243:4 264:16
271:1,8,15,22
272:12,14
276:10,11,12,15
276:18,24
277:2 282:10
282:19,20,23
298:12
**deficits** 230:1
231:3 282:7
**define** 162:24
**definitely**
239:19 255:17
**definition** 162:4
190:18,22
**definitively**
78:20 79:9,22
84:12 228:8
289:5
**deformities**
50:24
**deformity** 216:4

**BHARAT SHAH, MD  12/7/2017**

216:6 271:5
**degenerates**
93:1 94:24
**degeneration**
36:23 38:5,9
40:21 43:17,21
43:24 44:12,13
70:18 72:20
86:14 92:18,19
92:20,24 94:1
**degenerative**
14:23 60:17
69:15 77:11
78:3 91:18
**degree** 42:16
42:24 98:7
101:1,2,5
**degrees** 216:2
216:19
**delayed** 82:18
**delaying** 73:23
**delineated**
158:16
**demonstrate**
70:15
**demonstrated**
220:18
**demoted** 117:10
136:22 137:1
**denied** 28:7
160:11,23,24
165:2 166:19
**denies** 214:22
245:10,11,12,13
**density** 265:14
265:15,19
**dentist** 152:18
152:19 153:2
154:6,9,15
173:18 197:22
**deny** 154:15
164:7,10 165:3
**denying** 164:11
**department**
103:21,21
118:20,24

151:20 183:8
194:9,15
198:15,16
**depend** 67:15
76:18
**depending**
38:15 45:2
56:17 57:21
66:19 68:15
83:5 92:10
118:2 160:16
203:10 288:15
**depends** 37:2
38:10 42:16
43:6 48:4 58:1
61:20 68:17
76:20 82:19
84:1,3 88:6
89:3,4 93:13
93:22 94:23
95:8 242:2
262:14
**depicted** 185:11
**deposed** 24:1
28:14,18
**deposes** 6:11
**deposit** 93:6
**deposition** 1:17
4:13 6:3,8,23
8:11 11:9,14
21:11 24:3,15
27:13 28:15
29:24 30:2,5
92:22 299:16
300:4,9 301:11
303:4,5,6
**Describe** 43:8
**described** 37:8
58:13 238:22
**description**
76:11 155:13,19
166:17 265:15
**descriptions**
2:11
**designated**
189:12

**designed**
80:20
**designee**
170:13
**designing**
169:14,20
**desired** 301:14
**despite** 160:21
166:19 260:16
267:4
**detail** 54:16
59:24 209:8
248:20
**detailed** 52:10
251:23 252:10
252:21
**details** 67:11
208:24
**detected** 240:3
**deteriorate**
69:14,17
**determination**
43:4 178:22
238:7 289:8
**determine** 41:21
68:13 76:15
79:9,22 84:7
84:13 177:21
178:3,13,15,17
211:5 223:19
223:20 230:6
236:7,13
237:5 239:6
261:16 280:15
288:10,23
289:2
**determined**
271:20,24
285:2 288:5
288:6
**determines**
86:23
**determining**
290:11
**develop** 174:14
293:2

**developed** 36:1
293:1
**developing**
176:14
**diabetes** 119:23
245:14,15
256:6 257:2
257:2 259:6
259:12 261:13
261:15,17,19
**diagnose** 68:4
70:8,9 283:3
**diagnosed**
67:19,22,23
67:24 71:1
91:8,9 298:3
**diagnosis** 62:9
62:18 91:13
179:3,12,13,17
179:18,21,24
180:9,16
211:23 212:2
212:15,18
235:23 242:1
242:7,13 243:1
249:11 254:2
297:17
**diagram** 95:14
**die** 88:11 162:8
**diet** 245:8,9
**difference** 44:9
81:9 87:14,16
88:4
**different** 20:23
20:24 21:2
67:17 77:12,14
79:15 82:14
84:5,6,20
102:15 104:12
105:16 106:19
106:22 118:1
145:6 147:16
160:16,18
164:14 167:3
177:4 186:14
208:13 225:3

244:1 254:19
255:23 279:8
291:21 294:9
**differential**
62:18 179:2,12
179:13,16,18,21
180:9,16
211:23 212:2
212:15,17
241:24 242:7
242:13 243:1
254:2 297:17
**differs** 43:24
190:22
**difficult** 110:16
110:18 131:10
131:17 224:11
276:17 293:3
**difficulty** 48:18
49:5 213:21
220:2 224:12
224:19 229:17
276:14
**direct** 136:11
154:6 173:2,10
**directed** 287:10
**direction** 300:7
**directions**
175:6
**directive** 183:9
**directives**
195:21,22
**directly** 140:9
144:15 173:21
202:3 205:3
**director** 55:3
96:19 97:3,5
112:6 113:14,16
114:1 118:20
119:13 121:6,10
121:21 125:4
129:6 130:9,15
132:6,13,16,19
132:22,23
134:21 135:3
136:16 137:11

**BHARAT SHAH, MD  12/7/2017**

138:7 139:13
151:4,4 152:14
153:12 155:13
156:4 157:12
157:24 158:11
158:14 159:1
167:5 168:17
168:18,22
169:14 170:1
170:10,19 171:6
171:12,14,16,21
173:1 174:14
175:12 180:22
183:7 184:16
187:14 189:18
189:20 190:8
192:15 193:24
196:23 197:4
198:14,23
199:2,8,10,10
202:1 206:8
296:11
**director's**
173:10
**directors** 121:15
**disagree**
158:24
287:23 288:2
288:4
**disapprove**
163:10
**disc** 14:23
36:20,22
39:24 40:4,10
40:12,15,16,20
40:21 41:4,9
91:14,17,21,22
92:7,17 93:11
93:24 94:2,5
94:15,23 95:1
292:11,19
**disciplinary**
173:11
**discipline** 117:13
143:24
**disciplined**

116:1
**disciplining**
143:20
**discontinue**
256:11
**discontinued**
259:20
**discovery** 27:14
**discuss** 123:16
164:7 168:10
201:7 291:15
292:3,7
**discussed**
20:16 22:22
23:7,10,13,16
23:19,22 41:14
43:20 48:17
95:7 167:10
218:17 230:5
240:9 295:18
**discusses**
188:6
**discussing** 47:8
176:3 188:9
191:8
**discussion**
187:9 189:8
213:19
**disease** 14:23
60:17 270:24
**diseases** 63:7
77:2
**dismissed** 28:8
29:3,9,15
31:15,19
**disorder** 259:4
259:5 265:1
269:22
**displacement**
36:12,13 87:7
**disrupt** 33:19
**distention**
279:19
**distress** 215:14
228:17,19
229:2,6,16,22

**District** 1:1,2 4:1
4:2,20,21
**disturbance**
34:16,24 35:6
35:7,10,11
39:16,16,17,20
41:20 46:6
47:18 48:8
58:5 59:4
95:7 218:20
219:4,8
**disturbances**
41:12,13,23
42:15 47:24
59:5,17 61:5
61:15 64:9,23
65:23 66:5,18
67:7 76:24
77:21 78:2,6,11
78:19 79:10
79:23 218:16
220:3,9
**dividing** 88:21
89:2 229:5
**Division** 1:2 4:2
4:22
**dizziness**
277:19
**Doc** 298:20
**doctor** 15:17
18:4 26:11
42:21,23 44:3
52:17,23 53:6
53:22 54:3
71:4 75:7
92:14 95:13
96:16 112:19
116:10,11 118:8
119:3,9,9 121:3
122:6 126:7
127:7,19
128:14 137:14
155:1,2 164:18
185:3 199:15
199:21 205:5
205:13,16

213:21 221:16
234:16 243:15
247:8 250:9
250:23
253:19 258:1
262:4 266:1
270:8 275:20
280:4 282:6
283:23
287:21 298:1
298:17
**doctor's** 127:10
**doctors** 96:10
107:13 112:17
119:2,5 120:19
128:16 150:5
**document**
122:3 123:14
155:14 186:11
186:13,13,23
186:24 187:16
190:24 192:11
192:11,17
207:24 208:2
208:4,23
209:10 211:13
211:16,19,23
221:23 233:13
234:7 283:23
**documentation**
146:20 148:4
243:10
**documented**
257:7
**documenting**
147:22,23
267:2
**documents**
9:19,21 10:16
11:13 12:22
21:5,22 123:18
123:24 124:3
124:8,18,21
125:16 145:12
150:12 213:4
243:17 250:10

284:1
**doing** 54:15,21
106:8 107:17
118:4 137:2,3
156:8,11 182:2
221:1 225:20
232:6
**don** 298:20
**Dorsalis** 247:18
**dosage** 239:13
**doubt** 91:5
**DP** 247:16
**Dr** 6:19 18:23
19:1,6 70:6
118:21 121:2,12
121:18 122:21
123:4,16 124:2
125:18 126:4
151:6 155:14
168:19 183:18
199:6,13,14
287:15
288:22
289:14
**draft** 124:3
**drafted** 125:24
**dramatically**
266:6
**drinking** 62:2
**dropped**
205:14
**drug** 46:10
69:8 111:1
244:22 259:1
**drugs** 62:2
260:5
**due** 36:10,11
43:4,5 45:1,8
72:21 87:5,20
89:10 92:5
136:18
**Dugan** 2:4 3:23
5:8 15:16,19
19:16 26:11,13
42:23 44:2
52:22 62:8

**BHARAT SHAH, MD  12/7/2017**

70:4 71:2 75:6
92:14 163:1
214:24 221:15
232:20 236:11
246:24 247:8
250:19 270:12
278:22 280:4
285:9 297:19
297:24
298:20 299:1
299:5,15
301:5,24
**duly** 300:4
**duration** 82:23
90:17 288:5
290:14 293:3
**duties** 130:12,16
134:20 135:24
136:15 139:15
156:3,7
157:20,21
158:10 160:12
167:1 169:24
170:8,16 171:1
171:11,18,20
175:3,12 182:3
187:20 188:24
190:3 192:14
192:16,18
197:3
**duty** 135:23
158:24 159:9
171:3,13 175:17
189:2
**dyspepsia**
265:1
**dyspnea**
244:20

**E**

**E** 5:1,1
**E-h-m-e-d-a-...**
97:15
**earlier** 16:21
32:24 40:8
41:14 48:17

50:18 95:7
185:18 218:17
220:1 224:13
230:5 241:23
248:1 289:3
**early** 99:24
**easier** 131:12
**East** 1:2 4:2,21
106:15 107:6
113:4
**ECFMG** 102:21
**edema** 74:12,13
74:18 83:4
89:5 279:18
**education**
138:16,16
**Edward** 98:19
**effect** 15:2 39:8
44:11 69:23
80:23 82:22
83:5 84:16
85:16 90:12
93:13,14,20
93:22,23 94:2
94:22 187:24
188:1
**effects** 72:3,20
72:22 81:2
82:7 83:6
85:13,17 86:13
93:24 95:4
240:12
**efforts** 128:19
**effusion** 264:18
264:19
**Ehmedabad**
97:15,17,19,20
98:1
**eighties** 26:21
109:7 116:21
116:22
**either** 22:19
25:15 26:9
35:12 36:14
36:23 85:22
116:1,6 133:11

138:15 154:7
203:9 206:12
209:1,11
220:13 239:13
283:7 285:20
**EKG** 84:20
253:9,13,17
253:20
**elbow** 233:19
233:20
**electromyogr...**
84:19,21
**electronic**
149:10 193:8
193:15 299:15
**elevated**
136:22
239:23 257:1
**eleven** 141:12,12
**Eleventh** 5:22
301:1
**eligible** 104:8
**else's** 115:10
277:24
**Elyea** 118:21
121:2
**email** 193:6,14
193:17,22
194:2,7,11
195:4,7,10
**emailed** 193:4
**emailing** 195:11
**emergency**
14:3 16:19,21
16:23 17:2
96:23 103:20
103:21 104:1
108:2,4 162:1
162:2,3,5,6,9
162:11,12,15,16
162:20,24
163:2,4,5,12
163:14,15
207:21 284:10
284:16
**emergent**

161:21 162:4
164:3
**EMG** 84:19,20
84:21 85:14,18
86:3,13 96:3,4
96:8
**employed** 114:11
118:22,23
132:19 138:20
139:13 141:21
157:10 168:16
202:18 300:8
300:11
**employee**
130:21 131:5
132:9 139:6
168:14,24
173:8 300:11
**employees**
125:8 135:17
135:18 148:24
149:1,1,2 152:11
153:1 168:15
173:9 186:2
**employer** 113:10
114:2
**employment**
110:23 111:18
**enclosed** 301:11
301:12
**Enclosures**
301:23
**encounter**
48:11 52:7
54:12 55:14,17
55:19 145:13
207:6,13
211:13 249:18
280:24
**encountered**
263:20
268:20
**encountering**
263:6 281:14
**encounters**
54:21 257:6

**endoscopic**
248:19
**enroll** 98:14,17
244:2,4
**ensure** 144:12
167:13,22
168:2 171:17
200:3
**ensuring** 152:3
158:14 159:5,7
159:11 171:7,16
**enter** 147:15
**entire** 168:6
199:7 200:20
265:20 281:19
295:19
**entirety** 284:6
**entry** 231:10
232:2 274:7,8
**enunciate**
266:3
**environment**
53:14 110:16
110:19 160:16
181:13
**envisioning**
45:15
**equal** 248:17
**equina** 32:9
**equivalent**
98:11
**ER** 14:8,9 18:14
**errata** 301:12,14
301:16 302:1
**especially**
266:2
**essential** 240:5
**essentially**
119:11 121:5
**established**
119:1
**estimate** 26:17
**et** 1:10 4:10,23
5:8 177:24,24
210:6,6 301:9
302:2

**BHARAT SHAH, MD  12/7/2017**

**ETOH** 214:22 214:24
**evaluate** 45:3 96:11 170:20 179:8,9,19
**evaluated** 14:10 65:19 220:20
**evaluating** 173:6
**evaluation** 48:12 50:9 55:21 68:18 96:12 154:23 165:19 173:9 178:15 204:9 252:4,6 253:9 257:11 290:14
**evening** 4:16
**eventually** 78:5 81:13 82:12
**everybody** 92:6 127:8 152:21 200:22 200:22 266:3
**everybody's** 208:23
**evidence** 216:22 219:9 236:1,5 242:4 247:23 259:3 259:12 286:24
**evident** 230:11 259:7
**evolve** 212:18
**exact** 116:22 133:12
**exactly** 17:4 19:12 22:5 33:21,23 42:2 59:24 64:1 78:8 133:4 134:4 145:15 145:21 226:3 226:5 228:18

**exam** 48:15,15 48:19 50:12 50:22 51:11,12 52:1,4,7,11 53:4,6,10,17 54:10,16 57:7 57:18 58:7,11 58:18 61:1 62:15 63:13 68:18 102:21 103:1 104:9,11 104:12,13,13,18 104:19 226:11 247:20 248:20 249:5 249:6,7 250:14 251:23 252:10,21 254:1 279:4 279:15 291:5 292:4
**examination** 2:3,4 6:12 42:10,11,12,14 46:3 47:9,9,13 47:18,20,24 48:4,5,7,9,21 48:22,24 49:2 49:16,22,23 50:4,6,10 51:9 52:10 53:18 56:21 58:20 66:12 67:14 68:12 78:12 102:20,22 104:14 204:13 223:1,4 225:17,20,21 226:2,4 227:4 247:21 248:11 248:19 251:24 252:3,13 256:3 258:16 297:23
**examinations** 57:5

**examine** 48:12 57:23 58:14 179:9
**examined** 4:14 6:10 49:18 56:10 225:11
**examiner** 221:1
**examining** 41:24 42:4,7,9
**example** 45:8 66:23 95:15 152:23 153:20 205:1 275:6
**exams** 104:24 253:12
**excepting** 204:4
**exception** 166:18 167:9
**excerpt** 155:11
**excerpts** 150:15 150:17
**excluding** 24:2
**execute** 276:22
**executed** 177:6 303:11
**Executes** 233:18
**execution** 176:18,22
**Executive** 168:17
**executives** 158:4
**exercise** 245:16,17
**exercises** 217:9 217:16,17
**exercising** 165:8
**exhaustive** 63:20,23
**Exhibit** 2:7,10 2:12,15,18,21 3:1,4,7,10,13

3:16,19 150:8 150:9,12 155:8 166:15,16 172:21 178:11 185:11,19 186:6,9 196:16 212:23 213:20 214:4 243:13 243:16 250:7 250:10 251:22 253:1,4 257:22 259:20 263:16,19 268:16,19,24 272:10,15,19 272:20 273:11 273:23 274:2 274:6 276:9 277:7,10 283:20,21
**exhibited** 231:15
**exhibiting** 10:19
**exhibits** 2:5 3:23
**exist** 88:16 90:23 228:10
**existed** 90:16 241:4 288:11
**existing** 90:11 170:20
**expand** 212:18
**expanded** 153:9
**expect** 30:2 35:9 41:8 72:24 86:16 267:15,19 268:3 286:1
**expectation** 168:9
**expectations** 170:9
**experience** 39:3,6 41:10

95:4 220:15 230:20 268:10,13 291:7 293:4,7
**experienced** 121:9
**experiences** 83:22 86:1 234:22
**experiencing** 39:13 41:4 85:23 86:11 226:24 227:5 286:18
**expert** 31:24 123:21 124:9 194:7
**Expires** 303:16
**explain** 32:14 33:1 36:21 38:1 91:20 94:4 135:11 164:6,20 179:17 181:11,12 255:15
**explaining** 221:14
**exposure** 61:20 99:18
**express** 219:19 219:21
**expressly** 6:6
**extends** 32:7
**extension** 223:23
**extent** 68:17 74:15 84:3,4 89:23 92:10 93:22
**extremities** 33:20 34:12 59:11
**extremity** 33:11 34:15,23 35:2
**extrude** 40:13 41:1

BHARAT SHAH, MD  12/7/2017

extruded
    292:20
extrudes 40:22
    40:23,23
extrusion
    36:20,22
    39:24 40:4,10
    40:15 41:4,9
    94:24 292:15
eyes 55:5
    206:14 210:9
    210:17 248:16

F

face 202:24,24
    203:3,3
    204:22,22
    234:6
faced 241:11,18
faces 82:3
facilities 13:12
    13:18 75:24
    120:3 149:24
    149:24 181:14
facility 15:9
    18:21 19:12
    24:11 53:8,14
    54:18 96:19
    119:7,21
    124:22 128:3
    130:15 134:7
    137:23 138:8
    158:2 188:13
    189:13,17,18
    191:11 204:1
    212:9,10
    295:4
facing 241:3
fact 17:24 38:7
    62:14 94:4,12
    101:17 170:7
    184:15 190:15
    214:3 223:17
    224:9 226:22
    227:14,20,20
    232:24 233:3

254:1 260:16
286:8,16
288:22 292:11
factor 229:5
    262:11
factors 92:6
factual 242:3
fair 10:4,21 30:6
    32:18,22
    56:18 76:16
    89:12,16,18
    92:12 109:23
    155:18 156:3
    158:9 202:11
    206:11
fall 140:17
    298:2
familiar 36:2
    91:14 179:2
    190:22 203:13
    212:12
familiarize
    181:21
family 245:6
far 21:2 70:19
    71:5,11 137:7
    182:18 292:20
fashion 32:8
    123:11,13
    176:24 177:10
fast 89:5 91:1
    215:20 266:7
    288:18
faster 87:11
fasting 256:24
fault 85:9
Fax 301:2
FBS 256:7
features
    222:22
February 241:4
feedback 126:3
    126:6
feel 7:5 35:5
    59:23 161:15
    205:6 220:15

230:16,17,18
232:9 234:21
236:22 237:4
282:18,22,22
282:23 284:4
feeling 35:12
    86:2 227:1
    231:9
feels 60:11
    251:4 264:12
    266:15
fell 144:8 197:19
fellowship
    100:6,8,9,10
    100:12,15,17
    100:22,24
    101:6
felt 154:22
    160:13,19
    260:14
femoral 265:13
fibrocartilagi...
    40:18
fidgeting
    229:16
field 105:5 117:8
    117:14,18
    138:17
fields 105:3
fifth 29:6
fifties 99:24
Fifty 187:6
Fifty-three
    191:13
figure 45:16
    88:20 179:22
    217:2
figures 297:17
filed 24:24
filing 11:6 301:16
fill 122:5 134:14
    150:7 163:9
    207:8
filled 133:1
    199:3
filling 112:17

financially
    300:12
find 129:23
    142:7 165:7,8
    235:24
    236:17,18
    241:13 244:3
    266:23
    271:22 301:11
finding 110:15
    224:20,21
    225:1 229:6
    230:22 231:16
    242:3 248:3,4
    252:23
    266:23
    282:10
findings 62:12
    223:5,9,11,12
    223:14 224:14
    225:5 228:4
    248:14 271:12
    282:7 288:16
    298:9
fine 23:4 42:21
    42:23 59:18
    60:1 102:6
    299:5
fingers 216:22
    264:14,24
    266:19 270:18
    270:22,23
    271:9,16
    272:13
fingertips
    214:19 215:4
    230:7 251:2
    273:4
finish 7:23 8:1
    15:16 29:20
    52:22 62:7,8
    144:1 145:11
    183:18 221:15
    221:21 236:11
    236:12
    240:22

253:19 262:4
finished 26:23
    124:6 148:10
    148:18 151:22
    247:2
fire 168:11
fired 117:10
    168:16,21
    169:2
firing 156:10
    168:12,15
    169:3
first 11:10 12:5
    42:7,12 47:9
    47:13 50:13,16
    52:6,12,14,16
    53:3,5,7,15,18
    54:1,2,12
    64:20 65:2,6
    65:8,11,11,16
    65:19 66:7,10
    75:16 83:21
    87:19 99:2
    102:18 103:10
    104:22 105:8
    111:6 113:12
    121:11 130:14
    130:23 131:6
    131:12 132:17
    132:23 133:1
    133:19,21
    136:14 154:14
    155:24 157:23
    158:7,21
    169:17,23
    175:4,9 180:2
    195:1 204:11
    205:17 206:1
    206:20 213:3
    214:1 215:3
    223:18,21
    240:19 244:4
    247:12 250:11
    252:17 253:13
    253:21 258:3
    285:2

BHARAT SHAH, MD  12/7/2017

**fit** 40:7
**five** 102:4 120:1
129:11 130:8
140:24 141:19
146:2,3,11,13
147:20,21
165:12,24,24
187:7 287:19
289:1,7
**fix** 72:12
**fixed** 71:14 72:1
72:2
**flex** 104:14
**flexion** 223:22
**flip** 41:16
**Floor** 5:5
**fluid** 264:20
**focal** 48:15
247:24 272:13
282:7,10
**focus** 48:14,19
50:19 51:6,13
52:8,8 54:13
64:4
**focused** 48:9
49:9,15 51:4
51:12,13 63:13
**focusing** 61:23
**folks** 195:4
**follow** 147:14
210:24 217:21
258:8 275:15
**follow-up** 18:10
65:8 66:11
166:9,10
243:23
252:18,20,22
253:8 257:10
257:13 259:14
259:15 269:5
269:6,9
271:18 274:7
274:13,13
**followed** 177:3
177:22,23
245:19,20,24

**following** 34:19
50:2 55:2
71:9 79:19
105:12 145:13
150:17
**follows** 6:11
**foot** 31:1,16
247:18
**foramina** 41:2
**foregoing**
300:4 303:4,7
**forenoon** 4:15
**forever** 116:11
**forget** 194:23
199:15
**forgo** 298:23
**forgot** 157:7,8
**fork** 60:5,5,6
**form** 42:11 44:2
117:22 122:5,7
122:12 123:19
124:1 146:23
147:1,6,6,10,16
147:18 148:8
149:17 150:6,6
152:15 163:8,8
208:18
232:20 244:1
303:4
**forma** 122:5
**formal** 181:8
291:6
**forming** 151:14
254:3
**forms** 124:7
146:22 148:10
148:13,18
149:4,20,21
149:22,23
150:1,18
**formula** 175:14
**formulate**
173:20 174:20
175:23 176:16
**formulated**
175:15

**formulating**
150:18 158:20
175:4,16,18,19
176:5
**formulation**
174:21 176:4
**forward** 154:17
154:18
**Forwarded**
193:3
**forwarding**
153:21
**found** 123:5
126:17 225:11
233:23 272:14
298:12
**foundation** 71:2
75:6 163:1
232:20
**four** 13:2 29:1
140:24 165:23
165:24 259:15
288:7 289:7
**fourth** 7:22
205:15
**fr** 179:7
**fracture** 265:9
**Franklin** 194:21
195:5
**free** 7:5 284:5
**frequently**
117:20
**Friday** 129:13
130:7
**front** 10:16 56:7
**full** 19:14,22
49:7 215:16,18
215:24 216:1,1
216:13,14,14
220:17 221:10
223:17 224:1
224:10 227:21
228:7,13
231:11,12,19
233:12 234:2
234:4 237:20

237:22 271:3
271:4
**full-time** 113:1,1
117:2 140:21
140:23 146:12
**fully** 232:14
**function** 32:10
32:12,13 158:4
230:13 287:16
**Funk** 199:13,14
**further** 72:3
96:12 295:24
300:10

———————
**G**
**G** 103:15 105:14
107:24 108:19
215:9
**gain** 215:2
**gait** 14:10
**Gateway** 14:3
16:21,23 18:9
284:9
**gathering** 154:6
**general** 32:6,6
37:9 43:8
92:16 99:17
102:1,2,3
103:17 105:7
116:13 117:3
120:7 161:13
168:4 171:14
199:1 222:4
234:13 291:11
291:15 293:5
**General's** 5:14
**generally** 12:24
24:13,17
142:16,17
168:5 182:10
260:1
**generate**
122:18 235:15
263:5
**generated**
16:12 20:3

123:14 146:23
**Genevieve**
112:14
**genitourinary**
215:9
**GERD** 20:12
244:11 264:7
264:8 274:14
274:15
**German** 131:18
**Gerry** 1:4 4:4,22
5:3 6:22 9:13
9:20 10:2
166:13 222:8
301:9 302:2
**getting** 9:24
52:3 63:18
142:4 185:16
251:21 260:14
266:1
**GI** 214:21
**give** 26:17
59:12 61:19
62:3,6 66:23
81:7 83:8
92:16 118:13
119:20 124:22
134:6 164:20
165:3,22
176:20 202:21
204:24 207:1
**given** 11:15
12:10 14:18
18:1,17 22:3
55:11,17 117:22
121:7 122:7
127:1 141:6
146:17 148:20
177:9 181:9
183:10,11,15,24
186:23,24
190:14 191:22
192:1,10 212:7
274:16
**gives** 62:4,5,16
68:7

BHARAT SHAH, MD  12/7/2017

giving 55:16
glance 186:10
Global 2:14
go 7:2,2 8:13
17:11,17,20,24
41:1 44:3,4
45:2 50:13
55:22 56:24
57:4 61:3 65:4
66:11 71:3
72:18 75:6
87:8 97:10
101:8 105:13
110:21 112:13
112:14 119:2,8
119:9 120:20
128:24 141:11
141:12 154:7,11
157:22 166:1,7
166:9,15 178:11
180:3 184:21
205:16 237:1
250:9 258:10
260:15
267:23 268:4
268:5 274:3
276:9 281:18
286:11,14
291:6
goes 7:12 37:6
71:5,11 112:19
209:13 211:21
267:22
going 7:2,24
8:16 23:2,6
27:5 32:3 61:7
99:4 112:12
123:12 157:17
165:24 181:14
193:11 199:17
207:14 213:20
213:22 225:12
250:9 260:24
261:6 280:13
280:15,18
281:6 299:2

good 116:12
227:17 231:13
231:13 267:9
280:6,6
299:3
gotten 250:21
graduate 97:16
graduation
99:11 105:12
Grady 2:3 5:3
6:13,21 15:20
26:14 34:17
35:1 49:24
50:7 70:3,6
79:18 80:4
247:1,4
298:18,21
299:4,13
Graham 18:20
19:7
Grainy 269:21
grasp 232:9
great 251:18
greater 81:17
Gregory 3:20
grew 97:11
grievances
293:16
grip 215:17,17,21
215:22,24
220:8 231:7
231:10,13,15,18
231:19,21
232:10,12,18
232:19 237:21
251:1
gripping 232:14
groin 244:9
246:20,21
gross 42:10,12
42:13 46:3
47:9,13,18,22
47:24 48:4,5
48:7,8,21 51:9
59:18,20
67:13 68:11

215:16 230:1
231:2 270:24
group 97:13
154:4,8
GU 214:21 215:8
guess 45:5
56:18 80:11
229:11 231:23
298:21
guideline 7:22
159:15
guidelines
128:5 158:17
159:8,13,18,23
160:8,14,15,20
166:20,23
167:9,16,17,18
167:20,20
168:4
gunshot 24:20
24:23 25:4
28:21 67:2,10
216:23 238:2
239:8 244:9
258:13,18,20
269:13 270:5
guy 263:8

_____

H

H-o-e-n-s-h-i-...
131:20
habits 61:24
62:4 63:4,6
63:12
half 34:1
296:23,24
hammer 59:9
60:5,5 237:3
hand 27:20
28:18,23
215:17,17,22
215:24 217:16
231:8,10,13,15
231:18,19,21
232:8,9,10,12
232:15,18,19

234:24
237:20 251:1
handed 125:12
150:11 186:8
207:24 208:2
243:15 253:3
263:18 268:18
274:1 277:9
handle 135:8
handled 130:19
130:21 131:3
135:13 156:23
162:16
handling 130:18
139:15 176:9
198:15
hands 124:18
149:5 176:8
251:2 270:22
270:23 271:9
handwriting
214:7,10,11
268:23 274:3
277:24 278:1
278:9 279:5,9
happen 56:9
92:3 93:9
123:4 155:5
160:12
happened
29:10 112:22
118:19 119:1,15
165:13 262:19
281:22
happening
29:4
happens 33:12
47:9,12,13
52:11 91:24
95:3 163:23
204:1,10
hard 91:23
149:9 195:18
harder 94:6,7,9
94:9,12
Hardin 23:20

HCTZ 246:5
head 7:11,14
212:4 224:4,8
headache
277:19
headaches
244:15,19
health 1:10 2:8
2:13 4:10,23
5:8 152:20
153:3 154:10
173:18 188:7
188:12,20
189:9,12,17,21
190:11,18 191:2
191:5,9
196:20 197:11
197:13 198:15
198:19,21
301:9 302:2
health's 189:18
healthcare
20:10 125:5,7
126:21 128:2
130:19,24
131:22 134:23
136:2,9,12
143:19,22
144:9 151:15
156:12 158:15
159:7 167:14
168:3,7 169:16
169:22 170:21
171:7 172:1,7,19
173:2,8,12
175:6 184:10
184:21 189:4
189:13 190:4,7
208:7 295:9
hear 7:19 35:9
79:16 289:19
hearings 173:11
heart 247:12,13
256:3 258:17
279:17
held 139:2

BHARAT SHAH, MD  12/7/2017

294:19
**help** 32:21,22
  40:6 62:7,9
  144:17 145:7
  162:8 179:18
  239:15 258:9
  258:10
  260:15 266:3
**helped** 71:7,13
  260:14
**helping** 144:14
**helps** 44:23
  73:17
**hemoglobin**
  256:9 257:3
  259:12
**hepatitis**
  295:24
**hernia** 30:18,18
  31:13
**heterogenous**
  265:14
**hey** 137:1
**hierarchal**
  118:18
**high** 97:16
  240:3
**hired** 111:6,10
  181:7
**hiring** 156:10
**history** 42:8
  46:8,9,10
  50:13,16,19
  61:4,5,10,11,11
  61:14,22 62:11
  63:3,13,14,20
  63:23 64:6,19
  65:1,7,9,24
  66:2,3,6,14,16
  66:19,20 67:1
  67:5,9,12
  214:20,21
  215:7,11
  216:22,23
  238:1,2,6
  244:8,10,11,12

245:6,7,15
  258:13,14,20
  259:1 269:13
  269:17,21,24
  270:5 281:24
**hit** 237:3
**hitting** 59:9
**hold** 106:1 111:17
  201:9 215:19
  236:10
**home** 183:16
**Homer** 103:15
  105:14 107:24
  108:19
**honest** 157:9
**honestly** 8:21
  9:10
**Honsbien** 131:8
  131:18 139:9,11
**hospital** 14:6,13
  98:18,19,20
  100:21 103:10
  103:11,13,14,15
  105:15,22
  106:16,18,20
  106:22 107:22
  108:1,2,5
  109:24 110:3
  258:10 284:2
  284:10
**hospitals** 173:5
**hour** 251:17
**hours** 4:15 83:9
  129:19
**HPL** 110:24 111:6
  111:10,13,18,23
  112:3 113:9,22
  114:4,10 118:23
  132:12 181:7
**HTN** 258:20,22
**huh-uh** 7:12
  154:13
**human** 92:1
**hundred** 161:7
**Hurts** 251:3
**husband** 139:12

**hypertension**
  46:10 69:9
  77:8 80:12,14
  119:23 150:6
  240:5 244:3,3
  244:4,8 245:7
  245:22 246:2
  249:8,10,21
  252:6,8,16
  253:14 256:5
  261:13,22
  262:2,6,10,11
  267:16,21,22
  267:22 268:1
  268:3,7,8,9
  277:15 280:6
**hypothetical**
  49:4 55:16

───────────

**I**

**ibuprofen**
  217:19 239:7
  239:15 247:5
  256:1,11
  259:20 260:2
**idea** 63:18 83:8
  84:14 142:19
**identical** 149:23
**identification**
  150:10 155:9
  186:7 212:24
  243:14 250:8
  253:2 257:23
  263:17 268:17
  273:24 277:8
  283:22
**identified** 95:17
**identify** 147:24
**IDOC** 13:22
  15:9,11 16:9,13
  19:14,22 118:21
  125:8 128:15
  131:5 141:23
  149:1 155:11
  182:8 186:2
  195:22 203:9

294:12,13,14
  296:23
**IDOC's** 196:7
**IL-CSR** 4:19
  5:21 6:4
  300:2,18
  301:22
**Illinois** 1:2 2:9
  4:2,21 5:5,13
  5:14,15 13:10
  104:16 106:13
  106:15 107:6
  111:2 112:21
  113:2,2 115:24
  116:3 151:20
  167:23 183:8
  199:10,11
**illness** 82:19
**imagine**
  209:23 228:4
**imaging** 291:5
**immediate**
  87:19 198:22
  199:19 284:11
**immediately**
  82:23 90:12
  90:13 217:1
  270:4
**immigrated**
  102:11
**imminent**
  161:22
**impact** 34:11
  62:14 80:23
**impairment**
  94:13
**implement**
  174:14 175:16
**implementing**
  169:15,21
**important** 32:18
  180:13,15
  297:9,11
**impossible**
  290:6 291:18
**improve** 68:24

69:2,11 73:15
  79:14 126:13
  262:15 268:5
**improved** 73:11
  262:22,23
**improvement**
  262:15,18
  267:2
**impulses** 32:15
  33:11 39:10
  85:20 86:7
**inability** 39:21
  82:7 220:8,15
  290:10,21
**inappropriate**
  91:11
**incarcerated**
  286:19
**include** 20:3
  174:15 175:6
  179:13 208:24
**included** 120:13
  120:16 185:12
  188:10 200:22
  208:4,17
**including** 9:5
  19:20 27:11
  28:21 67:14
  100:3 173:3
  223:6,9
  245:9
**increase**
  182:24 183:3
  196:9 239:10
**increased**
  253:9
**incredulity**
  232:17
**independent**
  9:13,16 10:2,16
  11:1,4 222:8
  228:17 233:10
  241:1 246:15
  263:5 274:19
**INDEX** 2:1
**India** 97:13,14

**BHARAT SHAH, MD  12/7/2017**

98:1,4,8
100:10,17
101:12 102:20
116:9,10
**indicate** 45:19
46:5 219:2
224:17 226:10
226:20,21,23
227:9 228:3,4
292:21 297:7
301:14
**indicated** 60:7
224:14 273:12
284:17 285:18
**indicates** 221:13
221:23 224:21
226:14,15,16
227:14 229:5
233:13 234:7
242:24 272:7
272:10,16,20
274:22 275:3
284:24
285:15
**indicating**
223:21
**indication**
227:3
**indicator**
229:16
**indigestion**
265:3
**individual** 92:6
132:20 175:5
175:19,21
**individualized**
176:5,14
**individuals**
57:24 61:21
172:12
**infection** 31:1,16
87:21 89:6
286:4
**infirmaries**
120:3
**infirmary** 120:4

120:14 173:3
**inflammation**
84:5 87:21
**information**
33:9,24 34:4
59:12 61:19
62:3,5,16
63:5 209:5
**inguinal** 30:18
31:13
**initial** 48:11 99:2
204:13 252:18
289:23
**initially** 51:5
52:3,5 69:8
111:3,21 118:14
118:19 121:2
132:19 133:24
**injury** 61:8
64:13,13
293:8,8
**inmate** 28:2
148:3,3 170:21
**inmates** 175:5
175:20
**inner** 68:10
**Inpatient** 104:3
**inquired** 289:11
**inservice** 171:15
**insidious** 45:23
45:24 83:14
90:1,2 91:1,4
**inspect** 51:20
57:22
**inspected**
50:12
**inspecting**
50:23,24
**inspection**
49:22 50:5,11
50:15,20,23
51:16 57:12
58:8,12
**instance** 48:1
65:18 67:3
91:6 151:1

154:15 157:23
161:18 180:19
204:4 206:1
226:7 275:9
285:2
**instances** 58:15
75:2 160:13,19
275:12 291:23
**instantly** 88:11
**institute** 193:11
**instituted**
150:24 158:20
193:9
**institution**
193:11
**institutional**
195:21
**instruct** 8:7
**instructed** 177:1
**instruction**
128:8
**instructs** 8:12
**intensive** 99:6
**interaction**
222:12,12
**interested** 61:14
300:13
**internally** 119:2
**internship** 99:3
99:3,5 100:4
**interpret** 291:8
**interpreting**
291:4
**Interqual** 164:9
164:16,17
**interrupt** 34:3
**intervention**
73:24
**interview** 119:4
**introduce**
181:10
**introduced**
6:19
**intrusive** 8:18
**investigation**
282:15

**Involuntary**
169:4
**involve** 24:10,11
**involved** 49:21
115:13 150:20
**involving** 28:22
117:11
**irregularity**
265:13
**irreversible**
287:20
**issue** 14:20
38:14 41:21
208:6,15
209:2 226:14
226:17,20
241:10
**issues** 39:1
240:15,16
241:3,18 261:2
283:4
**iteration** 186:16
**iterations**
190:23

**J**

**JACLYN** 5:9
**jail** 111:19 112:13
**jails** 111:4,13
112:2,8,10
**January** 55:14
**jkinkade@ca...**
5:12
**job** 2:11 108:8
108:20 109:12
109:13 110:4
112:5 113:9,12
117:2,11,22
118:23 128:1
130:12,16
135:21 136:1,2
136:15,19
137:3,4 138:8
142:20 145:3
155:13 156:3
158:10 159:16

166:17,22
167:5,8,13
169:24 170:8
170:16 171:1,18
175:12,17
182:3 184:16
187:20 188:24
191:17 192:3,5
193:23 197:3
**jobs** 106:2,4
119:20,21
**jog** 222:7
228:17 246:15
**jogs** 10:10
274:19
**Johnson** 23:17
**joined** 107:13
117:2
**joint** 216:14
218:24 234:3
264:20
**joints** 59:10
215:24 216:12
220:20
233:12
**Jones** 30:22,22
**judge** 8:10
293:3
**judgment**
178:17,18,23
181:3 200:4
287:22 288:1
297:16
298:24
**jugular** 279:18
**Jumping** 170:18
**June** 253:5
254:10 257:5
263:6,20
268:21
**JVD** 279:18,18

**K**

**KATIE** 5:4
katie@loevy....
5:7

BHARAT SHAH, MD  12/7/2017

**Kayira** 18:23 19:6
**Kayira's** 19:2
**keep** 7:9,18 209:11 212:4
**KEM** 98:18,19 100:21
**kept** 120:3 183:16,17
**kidding** 28:11
**kind** 73:13 75:22 117:17 209:24 272:5
**kinds** 93:9 195:7 294:9
**King** 98:19
**KINKADE** 5:9
**knee** 67:4 238:2 258:13 264:17,22 265:9,12,13,19 272:24 273:1 273:14
**knees** 67:1,2,8 216:23 239:9 258:19 259:9 260:21 265:6 269:15 271:4 271:7 298:14
**knew** 182:16 199:22 263:15 289:4
**know** 7:1,5,24 17:16 18:23 19:5 24:8 26:2,6,9 28:6 28:9,11 30:4 31:14,18 33:15 51:21 55:4,19 70:12,13,19 81:12 82:2 87:6,13 92:3 95:14 98:9 108:13 114:14 116:12 117:4 119:22 121:14

126:16 127:3 128:13,16 131:21 133:12 134:4,24 135:2 136:17 136:18 138:10 138:17 139:14 142:14 146:18 147:9 149:8,13 152:5 154:21 155:21 164:2 164:17 165:12 178:4 182:3,17 182:18 183:21 183:21 184:13 186:10,14,15 190:17 196:2 199:13,18 201:9 202:4 205:11 208:8 228:11 229:17 231:5 232:22 233:7 236:24 237:18 240:1 240:23 250:22 253:12 266:1 274:11 276:2 279:2 280:5 280:18 284:22 285:9 285:10,11,23 287:21 288:4 289:4,5,5,6 289:12,15,18 290:7 292:24 296:6 298:1
**knowing** 136:20 287:24 289:9
**knowledge** 27:3,15,16,21 28:24 30:9 37:1 39:13 41:20 71:5,11 121:24 126:19

138:19 148:22 148:24 149:2 149:3,12 151:3 159:10,20 167:1 195:3 200:2 201:23 203:24 281:7 281:15 290:8 291:18
**known** 84:22 102:21 104:13 110:24 131:8
**knows** 270:6

---

**L**

**L** 4:19 5:21 6:4 300:2,18 301:22
**L-e-h-m-a-n** 151:8
**lab** 177:11 256:19,22 257:11 258:8 279:23
**labs** 177:24 178:1
**lack** 35:12,21 39:18 287:18
**laid** 55:5 155:19 175:18
**lapsed** 117:5
**large** 48:9
**late** 99:24 109:8 266:1
**lateral** 292:16
**LAUGGES** 5:14 297:20 299:7 299:9
**lawful** 6:10
**lawsuit** 11:6 12:1 21:24 22:8,12 22:18,19,22 23:7,10,13,16 23:19,22 24:18,24 27:4 28:8 31:21

202:9
**lawsuits** 202:8
**lawyer** 28:16
**lay** 192:18
**laying** 210:9,17
**laymen's** 35:8
**lead** 68:13
**Leanda** 23:10
**learn** 55:8 280:23 281:2 281:2 291:16
**learned** 11:24 21:23
**learning** 22:18 44:22
**leave** 117:3 137:16,17,18 137:20 141:19 143:7 152:24 197:9,10,16 204:5 238:6
**leaving** 78:10 115:16 152:22 166:21 198:17 281:8
**led** 229:18 238:7 263:12
**left** 13:20 15:15 15:24 16:6,24 18:7,8 19:4 26:24 27:1 28:4 29:11 30:14 113:19,21 114:16 115:15 118:23 132:1 133:7 134:13 156:17 202:13 216:2 265:9 269:16,17 270:4
**leg** 162:11 208:15 209:3 214:21 216:2 221:1,4 234:15 234:22 244:12 258:12

259:3
**legs** 49:10,12 218:19 244:10 258:14,20 273:5
**Lehman** 151:6,7 168:19 199:6
**length** 90:17 285:12
**lesion** 84:6
**let's** 11:17 50:11 57:6 61:3 62:13,21 88:21 166:15 197:9 207:2 223:16 241:14 258:4 282:3
**letter** 3:20 172:21,23
**level** 32:6 43:9 73:10 81:9 83:5 92:16 138:16 161:13 175:15 179:17 217:10 254:21 292:15
**liaison** 158:4
**license** 101:11,13 101:17 103:2,6 104:14,15 116:5,8
**licensed** 102:15 102:16 115:19 115:22 116:11
**licensing** 104:11 104:12,13,18,19
**life** 32:20 161:23,23 162:3,7,8
**light** 248:18
**limit** 262:14
**limited** 156:8 174:16 206:24 237:23
**limits** 249:2,3
**line** 55:6 88:21

BHARAT SHAH, MD  12/7/2017

89:2 207:15
207:15,17,23
208:20,20
209:19 210:1
212:7 215:4,6
243:23 247:13
269:4 270:13
270:15 274:7
276:6 277:21
302:5,8,12,16
302:20
**lines** 214:1
**Lisinopril** 247:5
**list** 62:10
207:14 209:19
275:7
**Litigation** 5:22
301:1,17
**little** 110:16
129:11 153:9
160:17 177:4
202:22 260:3
**llaugges@atg...**
5:16
**local** 43:13
48:15 295:3
**localized** 58:1
254:22
**locally** 135:19
150:1,22
156:18
**located** 33:5
113:5
**location** 45:2
162:17 189:3
201:21 202:3
202:16 208:5
254:24
296:12 298:13
**locations** 181:18
181:19
**Loevy** 5:4,4
**long** 45:23 61:7
82:23 83:14
83:18,21 88:16
88:22 89:9

89:24 92:5
99:5,22 100:3
100:15 102:2
105:20 107:10
108:10 121:23
131:22 140:3
204:16 256:17
259:16 262:3
262:13 286:12
286:15,21
288:17 289:9
289:12,13
290:13
**long-standing**
69:6 239:8
260:23
**long-term** 90:11
**longer** 137:4
**longest** 114:2
**look** 51:9 57:15
156:15 222:11
259:19
**looked** 21:2
198:7 261:22
275:7
**looking** 42:13
95:14 150:14
198:6 263:9
**looks** 54:16
250:22
263:24 266:8
**Loretta** 22:22
**lose** 114:5 162:3
**losing** 161:23
**loss** 230:12,12
244:20
**lost** 113:22
114:12 116:5,8
**lot** 21:1 28:10
62:19 110:19
213:21 219:2
291:20,20
**Louis** 1:2 4:2,18
4:21 5:10,14
5:23 103:9,11
105:18 106:12

106:15 107:6
108:7 109:10
113:4 297:19
299:6 301:2,6
301:18
**low** 244:8
246:8,9
249:14 251:13
**lower** 138:15
216:10 237:13
251:4 260:2,2
298:14
**LS** 216:4,6,7,14
216:15,24
**luckily** 274:3
**lumbar** 216:10
238:23,24
249:16 250:3
**lumbosacral**
216:1,4,8,10,16
237:6
**lumen** 37:2,4,5
37:6
**Lunch** 129:1
**lying** 275:14,17
**Lynn** 23:16

─────────
**M**
**ma'am** 196:21
**machine** 95:20
**magnetic** 291:4
**mail** 124:14,15
124:21 195:18
**mailed** 193:4,5
**main** 50:14 51:6
110:4,5 112:15
**maintained**
199:23
**major** 93:23
**majority** 73:2
**making** 169:10
170:21 196:24
197:6 222:15
231:17 287:20
**management**
136:12 153:20

154:2,8
163:20 166:12
**manager** 125:2
**Mandatory**
280:12
**manifest**
230:14 240:10
**manifestation**
219:7 220:5,9
**manifestations**
218:23 219:3
**manifested**
35:11 71:20
**manifests** 38:15
88:1
**manner** 178:2,4
**manual** 183:10
183:11,13 185:2
186:17,24
191:23 192:2,4
192:6
**manuals** 183:12
184:9,23
**marijuana**
258:15
**mark** 147:10
150:8 283:19
**marked** 2:6
150:9,11 155:8
186:6,9
212:23 243:13
243:16 250:7
253:1,3
257:22
263:16,19
268:16,19
273:23 274:2
277:7,10
283:21
**married** 131:16
131:17
**Mary's** 14:5,8,12
16:21 18:9
106:15,18,19
106:22 107:3
284:2,10

**master** 101:1,2,4
101:9,19 102:8
**Maston** 23:8
147:19
**Maston's**
278:14
**material** 292:11
292:19
**matter** 24:13
63:16 107:2
142:16 180:21
227:15 279:2
301:19
**matters** 158:5
**MBBS** 98:7,8,12
98:14,22
101:14,17
**MD** 1:17 3:20
4:13 6:9 55:6
98:5,11 207:15
207:23 210:1
212:7 274:9
276:6 301:11
302:1 303:3,9
**mean** 9:15,17
29:2 32:14
33:2 35:2,19
38:3 42:2,24
45:24 46:14
50:15 51:12
52:5,15,16,20
53:5,7,11 60:5
62:5,16,24
64:2 66:23
68:16 69:4
70:16,17 71:14
71:15,21 82:20
89:23 92:20
94:5,6 106:8
108:21 110:17
122:23 123:10
126:24 127:12
135:11 137:16
138:5,24
143:6,7 149:9
150:23 156:9

**BHARAT SHAH, MD  12/7/2017**

160:1 167:19
172:10 176:2,7
178:21 179:6
182:21 190:4
191:6 193:14
210:13 212:12
219:18 228:10
229:1 230:2
231:16 233:16
246:7,10
247:17,22
249:20
254:16 260:1
264:19 279:11
282:17 295:21
299:1
**meaning** 65:11
65:16 84:9
161:22 224:4
255:13
**means** 8:13
27:5 35:24
37:20 40:15
52:6 70:18
72:4,5 82:21
94:6 103:4
118:12 136:5
144:15 153:10
156:10 160:2
161:14 162:1,5
168:23 176:24
184:18 194:3
205:2 214:17
214:22 215:2
215:9 221:11
223:4 230:11
231:11 235:6
237:3,16
246:6,11
247:14,23
249:9 251:22
255:3,4
260:8,18
264:20 266:5
266:21,22
267:21 274:15

276:21 279:18
280:11 281:12
**meant** 143:20
**measured**
239:22
**mechanical**
74:2 75:9,13
81:20
**med** 274:7
**medial** 265:13
**medical** 2:8
10:17,18 11:11
12:7,8 13:7,9
19:14,22 21:2
22:9 24:14
37:12,17 38:14
38:22 55:3,3
55:20 56:3
57:5 92:7,11
93:12,16,21
96:19 97:3,5
97:11 98:3,7
103:2 112:3,6
113:14,15 114:1
116:2,2 118:10
118:11 119:13
120:7 121:6,10
121:15,21 128:2
128:21 129:6
130:9,15,18
131:4 132:23
135:8,8,9,13
135:14,18
136:16 137:10
138:3,7,9,13,17
138:21 146:10
148:20,21,22
149:1,3 151:4
152:13,14
153:12 154:5
155:13 156:4
156:22 157:24
158:3,5,11,13
158:16 159:1,7
159:12 167:5
167:18,19

168:4,17,17,22
169:14,16,20
169:22 170:1
170:10,19,20
170:22 171:6,9
171:11,14,16,20
173:1,9,17
174:8,14,16,18
175:5,12
180:14,22
181:12 182:15
183:7 184:16
185:12 187:13
189:18,20
190:8 192:15
193:15,23
194:1,8,9,15,17
195:6 196:23
196:24 197:4
197:6,8,20,21
198:23 199:1,2
199:8 200:20
206:8 210:10
210:16,20
213:2,5,9,13
213:16,23
214:4 218:7
219:12 222:7
238:11,13,14,19
238:24 241:15
241:18,20
243:21 257:12
257:18 266:2
272:7 275:8,9
280:11,20,21
281:16 285:1
286:2 297:7
297:16
**medication** 9:1
9:3,6 74:22
206:16 207:3
207:5 209:15
239:11 246:1
261:24 262:1
262:6 264:8
267:16 280:8

281:9,12
**medications**
8:23 9:5 74:15
74:17,19 81:8
206:19 217:18
245:18 246:2
246:3 247:6
281:11
**medicine** 98:10
101:11 102:15
102:23 105:3
105:5 115:17
115:20,23
116:6,9 117:8,11
117:14 159:17
159:21 166:22
167:8
**medicines**
217:19 259:22
277:22
**meeting** 148:19
148:21 149:6
164:2 195:16
201:18 294:10
296:9,10,11,20
296:22
**meetings** 21:13
21:20 157:14
157:15,16,18
168:10 170:11
195:14 201:6,9
201:12,13,15
201:16,20
294:9,11,13,14
294:16 295:2
295:3,6,10,12
295:15 297:2
**mellitus** 256:6
257:2,3
259:6,12
**members**
143:16 185:22
186:2
**Memorial** 98:19
**memory** 8:20
8:24 9:3,9,17

10:2,10
**meningitis**
87:22
**mental** 152:20
153:3 154:10
173:18 197:11
197:13 198:15
198:18,21
**mention** 280:9
280:20
**mentioned**
11:23 28:12
32:24 44:5
85:18 208:9
223:14 243:4
249:7 281:6
282:1 285:23
286:1,11,14
289:22 293:3
**merged** 114:6
**message** 194:12
**messages**
194:4,7 195:7
**met** 289:17
**metabolic** 46:9
69:7 77:2,11
259:4,5 265:1
**Mid** 216:10
**middle** 111:12
116:21
**mild** 43:2,22
246:13 251:13
254:16 260:8
260:18,18
264:17 271:4
**milligrams**
246:6 256:13
265:23
**milliseconds**
88:13,21
**mind** 9:18
228:23
242:16,24
243:3,11
**mine** 174:9
200:4

**BHARAT SHAH, MD  12/7/2017**

minimal 254:22
264:12,13
266:16 267:5
minimum 188:13
191:11
minor 93:23
minute 76:8
155:18 170:18
186:9 276:9
minutes 83:9,11
224:24
Missouri 4:18
5:10,23 14:6
103:10 104:16
107:4 111:2,5
111:12,19 112:2
112:15,16,20
115:24 116:2
301:2,6,18
mistake 13:4
127:2 132:15
140:4 278:24
mistaken 120:11
279:3
mixed 95:12,17
209:24
MO-CCR 4:19
5:21 6:4
300:2,18
301:22
mobility 35:21
mobilize 58:15
modalities 75:8
modality 75:10
modifications
149:24
modify 135:17
149:20,21,21
moment 31:5
Monday 129:13
130:7
money 28:10
month 12:12,20
13:4 145:16
148:21 200:17
250:21

monthly 145:18
145:22 148:19
200:19 201:11
201:20 295:2
295:3
months 13:2
99:23,23 111:3
117:21 119:16,17
134:7 207:1,4
252:19 256:14
266:10 274:17
287:19 288:7
289:1,7
moonlighting
108:9
morning 141:16
141:18
mother 24:24
25:1
motion 216:13
220:12,17,24
221:10,24
motor 32:12
33:22 34:16
34:24 35:7,10
35:16,17
38:24 39:16
39:20 41:12,13
41:20 42:15
46:5 47:17,23
48:8 58:5
59:3,6,14,15
59:17 61:5,15
64:8,23
65:22 66:4,17
67:6 76:24
77:20 78:2,6
78:11,19 79:10
79:23 95:6,11
218:16,20
219:3,8 220:2
220:9 230:3
230:12
move 39:21
58:15,18 82:7
220:15,20,21

220:21,22
221:4 223:21
224:3,6
225:21,22
230:19 233:19
234:2,3,4,21
237:8
movement
215:15,18
216:1 220:18
220:19 221:3
223:18,20
224:1,10
225:16,23,24
227:6,8,12,17
227:21 228:7
228:13 231:12
232:3 233:12
234:5,8 237:1
237:20,22,23
238:9 258:19
271:3,4
276:22
movements
7:14 220:16
223:23
233:20
234:16
moving 221:1
232:8 238:10
MRI 67:19,22
67:24 68:13
70:9,10,15,19
78:15,23 79:1
79:8,21 84:10
84:11 95:20
95:22 96:20
97:8 283:3,8
283:15 284:17
285:2,4
290:13
MRIs 291:12,20
291:21
MSR 280:9,10
multiple 20:11
47:3,3 99:11

99:12 166:2
179:14
Municipal 109:1
muscle 82:14
85:19 226:15
238:20
muscles 35:18
35:20,21,22
35:24 72:23
73:8,9 82:10
85:19 86:4
216:3,5
230:20
236:21,22
237:7,10,11
musculoskel...
225:21 226:4
226:10,14

───────────
**N**
───────────

N 5:1 247:14,14
N-e-r-v-e 85:6
name 6:14,17,21
25:7,8,10,11,12
25:15 30:19,21
31:2,9 97:22
97:23 103:14
127:10 131:9,13
131:16,17,18
133:15 139:8
148:2,2 157:7
157:8 194:24
195:1 199:16
208:5,21,23
278:23 303:6
named 12:1
21:24 22:11
27:3,8,12,15
28:1,5,13,24
29:7 293:22
294:1
names 23:3
207:22
Naprosyn
256:13 259:11
259:21 260:1

260:2
narrow 212:18
narrowed 37:4
37:7
National 126:20
nature 87:24
208:8,14
255:1,3,4,6,9
255:9,10
260:13 285:19
287:20
NCCHC 127:5
127:17 128:5,11
128:20
NCS 84:23
85:14 86:6,13
96:14
necessarily
54:21 65:23
241:24 257:17
necessary
171:17 187:15
303:5
neck 15:3 33:6
34:15,23
298:14
need 14:20
137:1 160:3
184:2 274:9
275:8,15
299:8
needed 95:22
144:14 168:16
needs 140:15,16
157:13 165:9
170:21 181:12
205:13
negative 126:3
126:6 223:15
231:2
neither 255:2
300:7
nerve 39:9
40:5,12 43:15
43:17,21,24
44:11 70:16,19

**BHARAT SHAH, MD  12/7/2017**

78:4 84:23
85:1,1,4,6,6,7
85:20 86:6,14
95:14,15,16,16
95:17 292:17
**nerves** 15:3,3
33:18 35:3
40:10 41:2
43:13 44:13
69:14 85:21
95:8,10,11,11
95:12,12,12
220:14
**nervous** 32:16
33:10 49:16
**neural** 32:7
39:8
**neuro** 85:5
99:22
**neurological**
32:16 49:19
49:20,22
50:4,12,22
51:11,24 52:1
57:6,18 58:18
60:23 63:8,13
66:8 215:16
216:22
225:20 226:1
226:10,17,20
230:1,10,11,22
230:24 231:2
233:4 236:6
242:4 243:4
247:20,21
248:7 249:4,6
252:2,5,10,14
252:21 256:4
264:16
270:24 271:8
271:15,22
272:12 276:10
276:11,12,14,18
276:24 277:2
282:7,7,10
283:4,8

290:24 292:7
297:10,12
298:12
**neurologist**
96:16
**neuropathy**
44:9,10,11,13
44:24 45:10
45:12 46:15,17
62:22 68:22
69:4,6,7,13
70:9,16,18
76:9,9,14,15
76:22 77:6,7
77:13,15,17,18
77:23 78:7,10
78:20 79:5,11
79:24 80:7,9
80:12,20,20
80:23,24 81:3
81:11,16,24
86:11,17 163:15
240:7,10,14
241:2,10
272:3,5,11,17
**neurosurgeon**
71:3 75:17,18
101:24 289:19
292:10
**neurosurgery**
99:19,20
103:18 289:20
289:23
**never** 72:12
113:19,21 116:4
202:9 276:5
283:15,15
289:17 298:14
**nevertheless**
228:13 267:6
**new** 65:17 171:7
211:8
**newcomer**
181:13
**nick** 88:10
**nine** 129:10

130:8
**nineties** 24:6
26:20,21
**nodding** 7:8,10
26:10 54:4
80:15 98:13
193:19 219:22
266:17
**Nona** 131:7
**Nona's** 139:12
**nonemergent**
161:19
**nonfocal**
247:21,23
248:4,9
251:22 256:5
**nontender**
258:18 264:17
279:21
**normal** 91:24
223:9,11,12
224:14,20,21
224:22 225:1
225:4 226:23
227:6,8,11
228:4 231:21
247:14,14
248:14 249:2
249:3 256:4,4
258:17 279:17
279:18 287:17
**normalcy**
236:20
**normally** 59:11
160:3
**north** 4:17 5:5
5:10,22 199:11
199:14 301:1,6
301:18
**notarized**
301:16
**notary** 301:15
303:15
**note** 150:14
211:22 220:23
228:16 236:3

237:24
240:18 249:17
251:8 262:17
266:19 274:11
274:18,21
275:3,10
285:21 287:15
**noted** 219:11
221:9 228:16
235:2 246:8
251:8 253:14
260:6,11 283:1
**notes** 2:16,19
2:22 3:2,5,8
3:11,14,17 13:6
294:24
295:12 296:2
296:5,5,17
**notice** 22:3,6
27:7 202:15
**notified** 27:12
192:22 193:1
195:20
**notify** 130:2
163:6
**notifying** 27:8
**November**
19:20
**NSR** 247:14
**Null** 85:3
**number** 20:11
21:16 77:17
134:6 141:2
148:3,13 161:5
165:22 169:18
169:19,20
195:23 196:10
203:10
206:24
207:16 208:5
217:16,18,21
256:11,13
271:14
**numbness**
35:12 39:18
48:17 73:4

81:19 214:19
215:4 218:15
226:13,16,19
227:2 235:11
235:14,19
236:17 244:9
251:2 252:12
258:12 259:3
260:7,8
264:13,13,24
266:16,19
267:6,7,10,12
267:16 268:4
268:6,10,13,14
270:17 271:8
271:16,21
272:1,2,13
282:9,20
297:6,13
**nurse** 55:12,23
56:1,4 130:21
137:22 141:11
146:1,3,7,8,11
146:12 147:4,7
147:9,19
154:22,24
205:9 275:2
276:2
**nurse's** 206:13
214:11 274:11
278:1 279:9
**nurses** 132:6
138:20,20
140:17,19,23
141:3,5,13,20
141:23 142:3,4
142:7,18 143:1
143:15 144:8
145:7 146:13
146:14,15,16
148:11,15
149:18 152:1,3
154:19 168:8
171:23 174:5
205:2,6
275:4,15,23

**BHARAT SHAH, MD  12/7/2017**

nursing 20:4
130:20 132:7
132:14,16,19
132:22 134:21
135:3,22
138:16,23
139:1,14,15
142:1 143:9,10
143:19 144:6
144:12,23
145:2,4,6,12
145:13,16,16,19
148:5 149:14
150:3,21 151:2
151:10,17
152:9,22
156:13 167:14
167:22 168:2
168:7,23
171:22 172:2,7
172:17 174:2,4
174:5 177:21
185:5,8 187:9
187:16 197:22
204:7,8
205:12,15,22
206:1,4 213:15
257:7 274:8

O

O 215:2
o'clock 4:15,16
129:11 141:11,11
141:11,12,12,19
258:6
O-p-a-c-i-f-i-e...
94:11
obesity 245:1
Object 44:2
71:2 75:6
163:1 232:20
objecting 8:6
objective 10:17
215:2,13
218:10 219:12
229:6 230:12

264:15 270:19
270:20 277:5
277:23 278:5
288:15
objectively
85:23 282:21
290:12
objects 8:13
observation
49:23 50:5
225:5,8
observations
222:16
observe 51:17
57:8 211:14
218:11 219:15
219:16 222:20
222:21
observed
223:6 232:14
obtain 64:7
98:5 101:10
102:8,18 103:2
126:23 128:6
128:19 259:9
obtained 98:12
98:14,21 101:1
101:5,19
126:24
obtaining 42:7
96:20 97:7
127:22 163:8
obvious 51:1
57:16
Obviously 85:9
occasion 161:3
occasionally
166:19
occasions
160:10 165:15
202:23 203:2
occupation
61:18
occur 26:15
36:11,13,22
61:8 72:21

74:4 90:15
92:21,22,23
203:5
occurred 38:8
71:18 72:17
127:3 201:18
occurring 79:6
89:9
occurs 40:21
58:7,11 70:18
86:24 89:13
89:19,24
92:22
October 19:19
193:12
October/Nov...
12:20,24
OD 246:6
off-site 154:20
Offender 2:16
2:19,22 3:2,5
3:8,11,14,17
offer 55:23
67:11
offered 214:21
office 5:14
56:13,14,16,19
56:20,20,23
57:2 124:11
125:2 280:21
officer 170:13
offices 4:16
oh 26:13 42:22
60:14 102:2
105:10 111:22
144:3 146:9
152:19 154:11
199:6 205:17
215:12 217:3
237:18
245:23
278:24
okay 7:1,7,20
8:3,8,14,23
9:24 10:8 11:17
12:3,14 15:19

16:15 17:1 22:5
26:13 28:10
29:15 30:23
36:7 39:8
40:3,14 42:6
44:21 51:1,15
53:12 57:1,6
59:20 63:11
65:21 70:20
71:21 80:19
81:1 85:9
89:22 90:9,18
90:19 96:7
97:10 98:2
99:15 102:2
107:5 109:23
111:22 112:22
115:1 116:12
123:3 124:12
128:24 131:11
131:19 137:22
139:17 144:4
150:8,19 153:8
156:2,6 157:5
157:10,17
158:21 159:4
162:13,18
163:3 167:19
173:1 174:18
176:13,18
178:10 184:6
186:22 188:4
189:5 190:21
191:19 192:8
194:11,22
195:3 198:5,12
201:23
202:22
203:23 205:11
205:19
206:22 207:2
209:21 211:5
212:1 213:1
214:9,12,16,18
215:8,10,14,23
216:12,17,20

217:7,12,15,20
217:22 218:1,5
219:6 221:8
222:4 223:6
223:16 227:5
227:14 231:10
231:14 233:21
234:6 237:2
239:17,24
240:14,22
241:14 242:5
243:15,20
244:6,13,18
244:22
246:13,18
247:7,15
248:10,12
249:15 250:13
251:8 252:1
252:20 254:7
255:24 256:2
256:10 257:16
258:24 259:2
259:10 260:4
264:15 267:10
269:12,14,18
269:20 270:3
270:10,15,19
270:21 271:2
271:6,13,17,24
273:7 274:18
274:21 275:12
276:3,8 277:6
277:9,17
278:13 279:16
279:22 280:1
282:3,6
285:12 288:2
289:3,16,20
290:9,12,16
291:17 292:18
293:15 297:6
299:5,12
old 211:7
oldest 210:22
211:2

BHARAT SHAH, MD  12/7/2017

on-call 129:18
on-site 118:9
  155:13 181:9
once 103:2
  112:19 116:10
  127:1 138:12
  148:10,11,18
  149:5 155:21
  164:4 166:5
  176:7,8
  200:17 246:6
one-time 177:18
ones 8:17 112:15
onset 43:9,20
  44:1,22 45:6,8
  45:11,18 64:10
onward 237:16
opacified 94:10
open 106:10
  132:17 211:1
operated
  106:12 107:10
operating 121:11
operations 2:13
  186:16,23
  191:22
ophthalmosc...
  248:22
opinion 37:12
  37:16 72:15
  75:2 89:1
  159:10 164:21
  166:19 182:12
  182:14 213:8,11
  213:12,15
  285:5
opioids 81:8
opportunity
  155:22 183:24
opposed 41:22
  46:7 52:17
  79:11,24 80:21
  128:15 275:4
opposite
  255:15,17
  262:19

option 165:5,6
  165:8 217:6
optometrist
  153:4 173:18
oral 55:24 56:4
order 101:11
  102:16 128:5
  162:7 177:11
  207:5 233:18
  239:21
  243:23 257:3
  261:9,12
  299:14
ordered 177:24
  217:19 253:10
  253:16 256:9
  256:19,24
  261:11,14,15
  279:24
ordering 253:11
  256:22 299:9
orderly 176:24
orders 176:20
  177:8,13
organization
  128:17
organizational
  174:9
orientation
  171:5,8 188:6
  188:10,11 191:5
  191:10
oriented 181:20
original 3:23,23
  301:12
orthopedic
  99:18,21
osteo 238:2
osteoarthritis
  273:9
osteophyte
  89:11
outcome
  300:13
outpatient 2:16
  2:19,22 3:2,5

3:8,11,14,17
  103:22
outpatients
  104:2
outside 13:16
  15:8 17:12
  20:19 27:5
  76:5 88:13
  96:2 153:15,17
  154:16 158:5
  161:16 162:20
  163:21 164:10
  164:15 165:1
  165:19 166:18
  173:5 177:12
  178:15 207:4
  207:17 258:10
  258:10
  260:15 295:17
overall 158:1
  230:23
overlap 141:16
overlapping
  47:6
overseeing
  132:6

_____
         P
_____
P 5:1,1,8 217:2,7
  217:8 278:22
  301:5,24
p.m 217:24
  277:16 278:21
  299:17
P360 214:4
Pacific 103:11
page 2:2 7:3
  53:21 155:21
  155:23,24
  169:17,17
  171:24 172:21
  174:12 175:2
  186:12 187:5
  188:4 189:5
  191:8,12 193:13
  196:19 228:3

246:24 247:1
  247:3,8,9
  250:12,16
  280:1,4,5
  301:12,15,16
  302:5,8,12,16
  302:20
pages 150:16
  155:20
paid 28:10
pain 17:8 35:17
  39:17 41:6
  48:17 67:4,8
  81:4,4,9,13
  82:8 208:15
  214:21 215:15
  218:19,22
  219:2,6,9,11
  219:20,21
  223:24
  226:18 229:7
  229:8,12,15
  230:18,20
  234:22
  238:10 239:9
  239:10 244:9
  244:9,20
  246:8,9,11,12
  246:19,20,21
  249:14,24
  251:4,14,18
  254:21,22
  255:18,18,19
  259:23,23
  260:22
  264:17 270:18
  271:4,9,16
  276:12,24
  277:1,20
  282:23
  298:13,15
pain-relieving
  81:7
painful 71:20
  220:6 258:19
pains 258:13

palpate 57:17
  57:19 230:20
palpated 237:7
palpation
  49:23 50:5
  58:1,9,10,12
palpitation
  58:8
paper 147:21,22
  147:23 170:3
  212:3
papers 11:22
paperwork
  119:19 122:15
paragraph
  158:7,13,18,22
  170:10 175:4
  176:3 187:12
paralysis 39:22
  60:16 71:17
  81:13 82:7,9
  82:14 83:24
  276:10,11,20
  276:21,21
paravertebral
  216:5 236:21
  236:22 237:7
  237:9,11
Pardon 67:20
  89:15 111:8
  140:13 192:24
  203:1 233:1
  280:17
  293:23
part 12:11 32:18
  33:3 34:6,8,15
  34:23 40:17,17
  40:18,18,19,19
  40:22 42:18
  43:14 48:10
  49:1,2,19 50:9
  50:12,17,20
  51:14,16 54:17
  55:8 57:7,11,17
  57:23 58:2,17
  58:23 61:10,12

63:2,12 64:4
65:2 66:13,16
66:21 67:5,11
68:12 91:18,22
94:1 99:7,18
103:12 112:16
122:4,16
123:19 124:4
125:24 126:15
128:1,8,19
130:19,19,20
135:12,21
136:11 137:2,4
139:21 142:19
143:13,13,16,18
143:20,21
145:3 148:5
149:7,19
150:18 151:12
152:13 156:22
156:22,23
157:3 164:14
167:12 171:3,13
172:1 180:8
182:20 184:16
184:24 185:8
191:16 192:5
192:18 199:11
199:11,14,15
210:19 220:16
225:17 226:1
230:21 235:5
243:17 248:19
249:4,23
252:3,6
253:13 255:13
266:12 267:9
267:9 273:9
279:15
282:23 284:7
289:22 297:3
297:4,15
**part-time** 108:3
108:8,23
109:21 111:16
111:18 112:12,18
138:11 140:22
141:3,4 142:4,7
146:13,15,16
153:3
**partially** 172:3
**participate**
99:16 170:11
201:6,11,14
**participating**
173:10 175:21
**participation**
157:3
**particular** 33:7
48:10,14,22
49:13 52:9
53:13 57:23
58:23 59:10
61:13 64:4
66:7,21 68:9
69:24 124:13
148:1 176:3
179:7 181:8
186:20 194:14
254:18
265:20
288:17
**particularly**
64:4 66:24
128:7 154:9
182:9 229:1
266:11 287:10
292:21
**parties** 175:8
298:21 300:9
300:12
**Partly** 115:11
**parts** 40:16,17
49:13 51:2,5
54:13 57:19
57:20 58:14
58:18 61:13
81:14 92:21
185:2 192:3
199:11 242:6
**pass** 104:20,22
**passive** 221:2
221:18,24
231:19 232:3
233:14,22,23
234:5,7,16,20
**passively**
220:21
**patient** 25:9,13
35:4,9 39:1,5
39:13 41:3,9
41:18,24 42:1
42:3,7,9,14
45:3,8,11 46:5
46:8,9,10 47:2
47:4,5,6,14,15
47:17,20,21,21
47:23 48:16
48:23 49:1,5
49:14 50:14
51:14,17,18,19
51:20,21 52:1
52:6,12,15,18
52:24 53:3,8
54:2,2,7,13,20
55:2,12,14,17
55:18,19 56:7
56:9 57:8,13
57:15 58:2,19
58:22 59:3,14
59:17,21 60:11
61:4,6,15
62:14 63:14,15
63:23 64:7,21
64:22 65:6,7
65:12,17,19,21
66:1,3,7,7,9
66:24 67:3,6
68:14,15
70:24 71:23
72:2,5,23
75:3,23 76:2
76:4,13,24
77:21 78:6,18
80:6,12 81:22
82:3 83:21,23
85:23 86:10
86:16,19 88:11
88:14 89:3
91:7 96:11,20
97:7 126:13
143:3 145:14
147:15 154:19
154:22 161:15
162:14 163:5
164:15 165:8
165:19 176:5,6
176:8,8 177:2
177:8,9,19
178:13,16,23
179:7,19
180:17 202:24
203:3 204:10
204:22 205:4
205:5,13,14,21
206:11,18,20
207:6,13
208:5,7,10,21
208:24 209:2
209:22 210:5
210:6,10
211:14,17,20
212:14 214:15
218:12 219:19
221:4 223:7
223:21,23
224:3,6,15,17
224:21 225:5
225:21 227:5
227:11 229:7
230:6,15,17
231:1,17 232:6
232:17,18
233:17
234:20,22
235:10,11,13
237:19 252:7
252:11 253:20
254:8 255:10
255:10,12
257:19 258:4
258:8 259:11
259:21
260:10
262:16 264:12
266:15 269:9
269:10 270:7
270:11,16,17
270:20 271:11
271:14 275:7
275:13,14,17
275:19,20,24
276:2,6,22
281:1,5,24
282:19 287:16
287:18 288:17
289:9,13
293:8
**patient's** 13:19
27:19 28:18
28:23 44:1,22
48:11,14 49:16
52:8 55:5,10
62:4,10 72:1
79:10,23 86:1
86:2 162:10,13
180:10 210:10
226:9 242:9
255:6 282:18
288:6,15
289:11 291:22
291:22,24
**patients** 48:7,13
56:12,19 57:4
81:10,11 92:4,5
95:3,22
100:13 103:22
120:3 143:15
144:13 152:4
158:2 173:4
177:12 180:23
207:14,16
211:3 212:6,12
228:12 252:15
268:9,12
291:21 293:10
293:13 295:18
**patients'** 181:18
**pay** 49:13 140:7
**pays** 205:15

**BHARAT SHAH, MD  12/7/2017**

pedis 247:18
peer 118:1,2,3,5
  118:6,15 119:18
  120:18 121:7
  122:1,4 123:3
  124:4 125:20
  126:1,7,16
  153:22 182:6
pelvic 246:19
penalty 303:7
pending 4:20
  29:9,13,16
  30:3 31:7,22
  213:18
people 13:8
  20:4 94:15
  96:18 136:1
  138:8,15 140:9
  153:6 154:7
  166:1 197:16,17
  199:3 209:16
percent 165:16
percentage
  228:11,14
perform 50:22
  59:4,16 75:15
  75:19,22
  120:18 174:18
  180:16 211:17
performance
  117:16,19,23
  171:18
performed
  126:7 221:23
  248:23 284:17
  291:1
performing
  200:3
period 87:20
  87:20 108:16
  166:4 204:18
  207:3 256:17
  256:17 259:16
  259:17 286:9
  298:5
periodically

117:19 178:7
periods 137:16
  137:18 143:7
  144:6
peripheral
  32:15 40:17
  44:9 85:12
  246:23
  247:15,16
periphery 33:10
  34:4,4
perjury 303:7
persists 207:4
person 7:19
  24:21 66:17
  88:9 118:20
  119:11 120:24
  124:13 131:3,6
  132:5,9,12
  139:6,13 151:1
  151:5 157:10
  162:2,8 166:5
  194:15 199:24
  200:12,13
  220:13,14
  237:19
  254:20,21
  270:6
person's 139:8
personal 61:11
  61:14,22,24
  64:18 65:1,24
  166:24 167:6
  167:6 193:22
personally
  165:16
personnel
  156:24 171:7
  175:7 194:17
pertained 13:6
pertaining 13:2
  15:7 18:6 19:1
  24:19 48:22
  52:9 53:13
  66:21
pertains 58:23

252:4
phase 289:23
Phillips 103:15
  105:15 107:21
  108:1,19
  109:23 110:2
phone 7:19
  123:2 164:5
  301:2
phonetic 131:8
phrase 9:17
  45:16 89:15
  92:20 162:24
  164:13 229:2
  255:24
Phyllis 23:7
  147:19
physical 49:23
  50:5,10 52:15
  54:8,10,11,14
  54:17 58:7,11
  63:18,20,21
  65:14 66:4
  68:18 73:14
  185:5 203:6
  203:10,16
  204:3,10
  210:6 249:6
  279:4
physicals
  209:14
physician 17:12
  17:14,15,18,20
  18:1 19:7 41:21
  112:7 137:19
  173:16,16
  180:16 205:7
  205:23
physician's
  18:10 137:23
physicians
  137:9 173:4,7
physicians'
  173:7
picture 228:22
  230:23

piece 147:22,23
pieces 147:21
Pinckneyville
  133:11
pinpoint 230:17
pinprick 60:1
  230:16
place 56:22
  94:3 119:10,14
  120:21 121:4
  133:12,13
  137:14 203:15
  203:20,20
  214:9 287:17
placed 269:4
  276:6
places 106:7
  121:5 182:22
plaintiff 1:6,18
  4:6,22,24 5:3
  6:2,11,22 11:11
  25:10,11,14
  298:22
plaintiff's 2:7,10
  2:12,15,18,21
  3:1,4,7,10,13
  3:16,19 11:19
  30:19 31:2,9
  150:9 155:8
  186:6 212:23
  243:13 250:7
  253:1 257:22
  263:16 268:16
  273:23 277:7
  283:21
plan 175:22
  177:6,7,18,18
  177:22 211:21
  256:8,9
  259:8,9
  265:21,22
  266:9 271:10
  271:11
planning 173:11
plans 175:5,20
  176:5,14,16,19

176:23 177:15
plausible 165:4
play 33:7 43:3
  127:22 164:8
  169:10 176:13
please 6:14 7:5
  7:18,23 19:16
  29:20 36:18
  36:21 38:13
  50:1 51:10
  65:4 144:2
  178:11 183:18
  187:5,8 188:4
  189:6 199:18
  214:12 215:10
  215:12,19
  221:21 240:22
  253:19 278:7
  279:16 299:15
  301:11,13,16
plenty 165:14
plus 124:20
  136:1 181:12
  247:16
po 246:6
  256:13
  265:23
point 14:14
  43:10 46:12,17
  46:20 47:1
  62:17 121:7
  126:4,9 137:10
  137:12 138:1,7
  164:15 169:14
  178:24 183:6
  233:17 261:6
  262:1,5,22
  267:15 271:19
  272:4 278:6,7
  283:10 284:6
  296:10
pointing 278:8
policies 2:8,13
  96:17 145:7
  157:3,4 158:19
  162:19 169:15

**BHARAT SHAH, MD  12/7/2017**

169:21 173:20
175:14,24
176:4 181:22
184:1,2,10,15
185:1,12,14,16
186:16 187:3
189:24 190:3
190:14 191:22
192:23 193:2
196:7
**policy** 159:21
175:18 183:12
184:22,23
186:23 187:22
188:6,17 189:11
191:2,4,8,22
192:2,6
196:23 198:6
203:13,15,19
203:20,23
205:4,12,16
206:17
**political** 110:19
**population**
170:21
**portion** 12:16
34:19 50:2
71:9 79:19
131:4 135:14
155:12 215:13
216:18,20
217:4,7,8
218:7,10
219:12 235:9
236:3 250:14
254:12,18
264:2,10,15
269:3 278:5
**posing** 49:4
**position** 68:8
100:12 101:20
105:21 109:20
119:12,13
132:16,22
134:1,15,18,22
135:4

**possibilities**
179:14 181:2
**possible**
160:24 163:7
179:11 241:17
242:6,15
266:4 286:17
286:21
**Possibly** 268:15
**post** 99:10
**posterior** 91:14
91:17,21
247:19
**posteriorly**
292:12,20
**posttraumatic**
239:9 271:7
272:24
**potent** 260:3
**potential**
179:24 180:6
**potentially**
86:17 212:18
**power** 143:23
154:14 231:22
232:10
**practically**
156:8 168:5
169:1 171:4
176:1
**practice** 55:9
68:12 96:7
101:11,13,18
102:15,16,23
104:13,15
106:9,10
107:11,12,14,16
107:23 109:14
109:15 110:1,3
110:6,8,12,14
110:15,18,20
111:11,20,23
112:24 113:2
114:21,23
115:19,23
116:5,9 117:3,11

158:17 159:8
159:12,15,17,18
159:21,22
160:8,14,15,20
166:20,22,23
167:6,8,9,15
167:17,18,19
167:20 168:4
180:22 187:24
206:7,18
210:19 222:5
234:13 254:15
255:13 260:17
281:16 294:6
**practiced**
101:22 115:16
**practices**
128:20 171:9
**practicing**
106:5,9
109:21
**practitioner**
101:22 107:15
137:22
**preexisting**
233:24
**premedical**
97:24
**prepare** 11:8,14
**prescribe**
206:21,23
207:2
**prescribed**
246:4,5
**prescription**
177:23 274:16
**prescriptions**
177:9
**presence** 46:11
46:16
**present** 21:14,19
46:19 79:2
82:17 93:18
146:22 148:21
174:2 240:20
244:21 245:2

246:23 262:7
262:8 266:24
289:12 290:13
290:17 291:23
292:1 295:23
296:19 297:1
297:4
**presentation**
296:21 297:3
**presented**
42:14 148:19
149:6,10 164:1
240:2
**presenting**
295:14
**presents** 41:18
**press** 292:16,17
**pressed** 70:1
95:8
**pressure** 9:1,3
9:6 33:15,17
33:18 34:14,23
35:1,3,4 37:11
38:9 39:7,9
40:4,10,12,22
43:13,16 69:1
70:15,21 71:16
72:6,16,21
73:19,20 74:1
74:2,11 75:5,9
75:12,13 78:3
84:4 85:21
86:14 87:5
89:10 94:2
95:5 217:23
239:21,23
240:3,8,10,13
240:20 241:6
241:7 252:23
274:13 278:11
279:6,8,11
**pressures**
110:20
**presume**
274:12
**pretty** 135:24

**prevent** 71:17
72:3
**previously**
250:2
**primarily**
109:24
**primary** 69:7
80:8 96:10,16
107:17,19
108:22 109:2
109:19 179:24
218:24
**print** 214:2
**prior** 67:4
163:17 210:9
249:17 257:6
257:12,18
280:24 281:16
301:16
**prison** 13:3
119:3,4,22
136:7 168:3
280:14 287:19
288:12
**prisoner** 28:13
28:23 53:16
203:9
**prisoners** 54:17
176:15
**prisons** 111:4
**private** 101:21
106:9,10
107:10,12,16
107:23 110:1,3
110:6,8,12,14
110:15,18,20
111:23 114:21
294:5
**privileges**
152:15
**prn** 271:18
274:9
**pro** 122:5 150:6
**probably** 19:24
26:21 87:15
289:8

BHARAT SHAH, MD  12/7/2017

problem 14:22
67:9 87:7
176:15 183:24
192:21 227:9
227:24 228:3
229:14 240:8
240:21
problems 88:17
175:6 228:5,5
240:10 289:13
procedure 72:9
163:23 166:10
174:16 183:13
procedures 2:9
2:14 103:22
169:15,21
174:19 181:17
185:1,12,15,15
186:16 187:3
190:1 192:23
193:2
proceed 31:20
process 128:19
165:1 182:7
187:12 196:22
291:16
processed
177:23
procurement
135:21 143:12
produced 4:13
6:10
product 151:22
professional
18:24 152:20
153:3 173:19
197:13
profile 281:11,12
program 98:15
100:6,8 104:5
104:7,18
105:13 174:15
188:11 191:10
programs
170:20,22
progress 2:16

2:19,22 3:2,5
3:8,11,14,17
82:21,24 83:3
83:7,20 87:3
87:8 88:10
89:5
progressed
286:9 288:7
288:18,18,19
progresses
88:1
progressing
46:1 69:17
82:22
progression
86:24 87:11
progressive
82:6 90:1 91:1
progressively
250:21
prominent 41:6
promoted
136:24
prompt 60:12
87:11
prompted
14:20 24:14
promulgate
157:3
promulgated
145:7
promulgating
157:4
pronounce
266:5,6
proper 31:8
171:17
properly 173:8
proprietary
164:22
protocol 145:18
149:22 176:10
187:17 206:13
207:21 244:16
250:17 253:15
protocols

135:16 145:4,6
145:16,19
148:5 149:18
150:2,3,19,21
151:2,10,17,19
169:15,21
181:11 185:5,8
187:10,15,15
188:2
provide 63:5
112:3,8 157:24
158:2 185:22
186:1
provided 13:17
143:15 144:8
144:12 152:1,3
167:14 168:3
171:8 173:6
182:15 213:12
213:16 250:10
provider 76:6
providers 158:5
providing 109:2
129:17 168:9
provisions 131:4
proximal
179:22
psychiatrist
153:4 197:14
psychologist
197:14
PT 247:16
public 301:15
303:15
pulp 40:18
pulses 246:23
247:15,16
punitive
298:23 299:1
pupils 248:17
249:1
purpose 66:17
96:20 97:7
127:19 154:10
180:9 253:7,8
253:11 256:22

257:4
purposes 8:11
236:8
purview 112:10
pushed 292:11
292:20
put 124:21 170:3
178:5,10
203:19,20
248:5 257:21
261:24 275:7
276:8 295:20
295:21
puts 40:9

_____

Q

qualified 292:3
292:7
quality 143:15
144:7,12
151:24 152:3
153:6 174:10
174:15,20
182:15,18,20
183:1,3,4
201:7 255:18
quarter 157:15
quarterly
201:18 294:13
294:14,16
296:19,21
question 7:6,24
8:2 9:24 15:16
20:23 29:21
37:9 38:16
52:22 56:18
66:12 79:16,21
87:13 97:1
107:1 110:11
144:1 145:11
158:21 160:17
164:18 167:2
177:4 182:23
182:24 183:19
210:24 213:18
220:23 221:15

221:21 227:10
227:19 228:1
240:22 262:4
263:2 265:17
287:2 288:2
288:20,21
290:19,20
questionable
256:5 265:20
269:21
questioning
193:14 298:23
questions 6:13
7:5 8:6,17 9:14
67:5 282:4
297:20,24
298:16
quick 70:3 83:3
87:6 212:21
quickly 22:16
83:1,3,7,8
86:23 87:4,8
88:2,3 196:17
246:22
262:10 274:4
quite 53:2
96:24 227:10
227:19 228:1
287:2 288:20
290:19

_____

R

R 5:1
r-a-n-i-t-i-d-i-...
265:24
radiculopathy
41:7
radiologic
138:11
radiologist
265:16 292:2
292:5
radiologists
291:13
Railroad 103:11
raise 234:15,22

**BHARAT SHAH, MD  12/7/2017**

**raising** 216:2
**range** 81:8 88:5
  108:12 215:15
  215:17 216:1,12
  220:12,17,18
  220:24 221:10
  221:19,24
  223:17 224:1
  224:10 225:15
  225:23,24
  227:6,8,12,20
  228:7,13
  231:12 232:3
  233:12 234:2
  234:5,8
  237:20,22
  258:19 271:3
  271:4
**ranitidine**
  265:22,23
**rarely** 195:9
**re-request**
  165:2
**re-review** 161:1
**reached** 73:10
**reactive** 248:17
**read** 34:17,20
  42:18 49:24
  50:3 71:8,10
  79:18,20
  155:23 158:7
  158:18,21,23
  170:6 175:9,10
  213:23 214:3
  214:12 217:4
  228:22
  245:22 247:11
  250:13,23
  258:3,7 278:3
  278:9,10,18
  291:12,12
  296:6 298:20
  301:13 302:6
  302:9,13,17,21
  303:4
**reading** 213:22

229:10 270:5
**realize** 8:18
**really** 7:23
  179:17 196:16
  209:7 212:9,9
  287:16
**reason** 37:4
  55:20 78:10
  116:6 117:11
  127:1 209:1,16
  273:7 275:20
  287:17 288:19
  298:8 302:7
  302:10,14,18
  302:22
**reasons** 203:5
  209:21
**recall** 9:20 11:18
  12:22 13:14,24
  14:4,7,15,17,20
  14:24 16:15
  17:4,6 19:12
  20:6 21:8
  22:5 25:7,12
  25:15 26:3,16
  26:22 30:19
  31:5 100:16
  111:7,9 117:21
  127:4,10
  133:10,15
  134:5 137:24
  138:22 155:16
  155:17 163:24
  165:16 185:14
  185:18 186:19
  191:1,3,4,24
  195:23 196:4
  196:8 201:5,21
  209:7,7
  222:11,15
  223:1 228:24
  233:11,11
  263:3
**recalled** 11:19
**receive** 19:14
  54:17 117:16

126:3,6,12
  154:20,23
  164:15 165:19
  183:6 195:15
  202:19 203:16
  213:8 288:12
  290:21
  294:22
**received** 12:23
  13:5 15:8 16:5
  19:18,21 22:10
  24:22 25:4
  27:7 54:8
  117:13 181:6,24
  202:15 213:2
  213:5 290:1,5
  290:7,9 291:4
**receives** 171:17
  203:10
**receiving** 21:22
  262:1,5
**recertified**
  116:14,15,16,17
  116:18,20 117:1
**recess** 70:5
  129:1 212:22
  282:5
**recollect** 116:22
**recollection**
  9:13,16 10:12
  10:17 11:4
  188:24 191:21
  222:8 228:18
  233:10 234:11
  241:1 246:16
  263:5 274:19
**recollections**
  11:1
**recommend**
  165:5 200:14
**recommenda...**
  170:22 200:13
**record** 6:15,20
  8:3 12:11 13:1
  16:8 17:17,19
  18:22 19:11,22

23:2 34:19
  50:2 55:24
  56:4 71:9
  79:19 128:24
  148:20 149:7
  150:15 193:15
  194:8,17 195:6
  210:11,15,17,20
  211:2,2,3,4,8
  213:19 214:4
  218:7 219:12
  222:7,24
  224:2 225:13
  232:11 235:15
  240:24 241:1
  241:8,16,20
  242:24
  246:17 247:1
  251:13,16,17,21
  253:7 258:5
  260:17 263:4
  263:5,9
  267:2,5 272:7
  275:8,9
  277:13,14
  284:23,24
  285:14,17
  286:2
**recorded** 54:11
  224:14 225:15
  247:12
**records** 10:7,8
  10:24 11:11 12:7
  12:8,10,13,14
  12:16 13:3,5,6
  13:7,9,11,17,19
  13:21 14:1 15:1
  15:6,12,14,21
  15:22,23 16:4
  16:10,12,16,17
  16:18,20 17:1,6
  17:9,13,21 18:1
  18:5,9,11,14,16
  18:19 19:1,14,17
  19:19,19,20,23
  20:2,3,9,15,17

20:20,21 21:2
  21:4 106:23
  118:10,11,12
  121:16,19
  146:10,12,13
  148:22 149:1,3
  194:1,9,15
  211:5,7,7,8,10
  213:23 239:18
  243:21 257:13
  257:18,24
  263:21 267:1
  268:19
  273:20
  280:20,21
  281:17 284:14
  285:18 287:3
**recover** 72:24
**reduce** 74:17
**reduced** 300:6
**refer** 97:9 163:4
  177:12 184:21
  205:2 254:23
  254:24
  293:10,14
**referral** 14:14
  55:12 76:5
  283:7,16
**referrals** 173:5
**referred** 14:11,12
  204:14 295:17
**referring** 10:7
  10:24 186:12
  296:22
**refers** 93:6
  232:5
**refill** 207:7
  209:15,15
**reflect** 7:15
  38:8,17,19
  146:21 171:1
  173:14 175:11
  250:10
**reflected** 120:6
**reflecting** 13:17
  16:4 41:19

**BHARAT SHAH, MD  12/7/2017**

reflection 158:9
169:24 170:15
187:20
reflects 170:7
171:10,19 187:2
251:17 284:7
reflex 236:24
reflexes 59:7
59:10 60:19
reflexion 188:17
regarding 28:17
30:10,18 31:1
31:21 170:22
171:9 175:7
regardless
52:2 80:8,8
205:6,12
region 2:9,14
157:2 220:19
region's 157:13
regional 157:12
199:10 284:10
regular 16:1
200:16 201:6
244:8 281:13
regularly
277:22
295:23
regulations
158:17
rehab 270:4,5
related 25:2,23
29:17 40:8
69:8,8 70:7
117:14 239:24
240:1 252:24
289:6 298:9
300:8
relating 225:7
relative 300:10
release 280:11
280:12 283:13
released
280:16,19
relevant 197:10
198:19 225:8

225:10
relief 259:24
relieve 71:21
74:11 75:12
259:22
relieved 69:3
71:6,12,14 72:3
72:4,5,6,16
73:2,5,9 74:3
74:14 90:13
rely 9:18
remain 184:10
267:11
remaining
267:13
remark 229:21
248:12
remarked 281:3
remember 10:4
10:21 16:7,9
19:3 25:8,10,11
30:21,24 31:2
31:9,11 40:1
121:15,18
132:20 140:24
151:11 263:8,11
remind 263:9
remotely 202:4
remove 73:24
render 303:5
renew 206:19
207:5
renewal 206:16
264:3,5,8
repeat 66:12
rephrase 7:6
27:23 293:23
report 55:24
56:4 78:6,19
122:17,18,20
123:15 124:3,7
124:20 125:21
125:24 126:15
126:16 218:6,8
220:15 235:11
236:15 248:3

254:8 256:7
256:20 265:5
265:6,8
269:10
reported 17:7
218:15 219:15
235:3,4,10,16
235:24
236:16 248:1
248:2 251:1
266:14,22
267:3,8,8,9
reporter 5:21
7:14,20 34:20
50:3 71:10
79:20 186:8
263:18 268:18
274:1 277:9
299:6,8,12
300:1
reporting 47:22
47:23 48:16
61:15 76:24
78:18 252:11
255:8 263:13
267:10
reports 43:9
47:17 77:21
126:16 232:18
250:24 251:18
270:6,7,9,10
270:11
represent
155:10 190:21
representative
200:21
represented
295:19
request 96:19
154:7,16 160:11
160:21 161:16
163:21,24
164:1,10 165:1
165:19 166:13
166:18 178:15
194:16 205:9

206:20
275:19
requested
112:24 170:12
207:7 239:14
264:9 283:15
requests 153:15
153:18,20,22
154:6,11,19
165:17,24
require 47:24
48:15 75:18
76:5 96:12
163:17 184:24
206:17
required 47:18
74:17,20,24
75:4 76:2,4
101:10 125:24
129:23 130:5
147:1 156:15
159:21 160:14
160:20 161:14
161:18 163:6
166:20 167:8
184:17,19
226:11 253:15
253:17,20
requirement
203:9
requirements
177:2 178:2
179:1
requires 47:20
48:11 68:24
69:5 73:12
161:15 162:1,5
162:19 282:15
research 100:9
100:12
reserved 6:6
residence
102:18
residency
98:15,17 99:1
99:8,9,10,13

99:14,16 100:3
100:5 101:6,9
103:4,8,12,12
103:16,24
104:5,7,17
105:12
residual 73:6
resolve 68:19
68:22 239:3
267:16,19
resolves 267:21
resonance
291:5
respect 37:24
136:18 186:3
189:23 255:9
respond 69:10
69:11
response 10:22
17:10 45:6
91:11 166:7
195:12 233:6
233:18
responsibile
188:20 189:9
responsibilities
130:13,16
134:21 135:3
136:15,19
156:4 158:10
170:1,8,16
171:2,11,20
175:12 182:4
187:21 188:24
192:19 197:4
responsibility
129:17,20
130:17 135:6
142:24 152:6
153:11 159:1,4
159:6,11,17
166:22,24
167:5,7,13,22
168:2 172:3,4
172:6,11,15,18
188:20 189:2

**BHARAT SHAH, MD  12/7/2017**

190:2 192:9
197:19 198:9,11
293:15,18
**responsible**
127:5 142:17
143:14 149:17
151:2,16,24
152:2 153:5,19
154:5 158:14
168:12,15 171:6
171:16 188:12
189:13,17,21
190:7,8,11,18
191:2,9,10
196:20,24
197:7 198:2
295:5,14
**rest** 13:3 128:2
182:21
**restless** 229:15
244:12
**restricted**
135:24
**restriction**
224:1
**resubmit** 165:10
**result** 31:13,16
48:5 76:10
79:11,24
**results** 67:15
86:9,17
125:20 178:8
291:8
**retained** 31:24
132:2
**retire** 110:13
115:9
**retired** 110:8,11
111:23 113:22
115:8 121:13
134:11,13
**retrospect**
138:22
**return** 256:16
266:9 280:5
301:16

**returned** 3:23
**reversible**
238:16,17
**review** 11:21
12:9 13:7,15
13:24 15:1
16:16 17:9,13
18:1,19 19:1,15
20:9 48:13,13
49:7,9 54:24
117:16,18,19,23
118:1,2,3,5,6
118:10,15,22
118:24 119:3,4
119:9,10,18
120:2,4 121:1,8
122:6,20
123:19 124:4
125:20 126:1,7
126:16 128:1,2
135:19 145:4
145:16,17,18
145:24 146:1,11
146:13,15
148:5,7 153:17
153:22 155:19
155:22 164:3
178:7,9,18,22
178:23 182:6
184:1,3,4,6,15
187:13,14,15,17
188:1 190:15
192:11 200:9
200:21 210:10
210:19 211:6
213:4 239:17
240:17,24
243:17,20
251:12 253:4
253:6 257:12
257:18 263:21
273:20
279:23 281:19
284:5,13
286:6 295:22
**reviewed** 11:10

11:11,13 12:6,7
12:14,16,19,23
13:9,11,19 15:7
15:12,23 16:4
16:8 18:6,9,10
18:11,14,16
20:2,17 21:7
106:23 120:20
121:16 122:13
123:20 124:2
126:17 128:3
146:3,21 147:4
147:8,13,17,20
148:1 150:22
153:14,15
165:9 176:11
188:13 190:18
191:6 192:1
243:17 257:24
281:16 284:1,4
285:18 287:3
295:17
**reviewing** 9:19
11:18,19 12:5
20:7 118:13
121:18 122:10
127:8 149:17
150:13 153:19
173:4 191:1,4
191:21 192:17
196:24 198:2
210:16 222:7
263:4 293:16
**reviews** 120:18
122:1,4,16
123:3 145:1
163:20 201:3
295:16
**revise** 187:14
**Rhonda** 23:13
**rhythm** 256:4
258:17 279:17
**right** 29:1 31:5
34:7 38:12
50:8 56:10
61:3 69:21,22

77:9,15,18
78:8,16,23
79:2 82:11
87:10 88:11,20
100:16 103:7
104:18 105:18
109:10 110:9
117:21 118:11
122:10 126:17
134:14 143:11
146:4 149:8
153:16,24
157:7,8,18
158:23 162:21
166:15 170:19
173:23 198:17
203:6 204:14
205:23 206:5
207:11 209:16
212:14 215:24
216:13 219:10
219:21 222:20
223:10 224:7
224:9,16
225:1 226:5
231:23 234:13
235:12 242:7
245:24 248:2
261:24 264:17
264:22
265:12,13
266:8 273:2
275:22
276:20 278:5
278:8,13,15
284:24
286:20 291:14
299:3
**risk** 41:3 161:23
**risks** 82:2,17
**ROCHE** 5:4
**role** 33:7
127:22 135:7
144:7 153:12
164:8 169:10
175:20 176:13

199:3
**roles** 175:7
**ROM** 215:15,16
215:24 216:1
216:14 264:17
**ROMs** 216:14
**Ron** 23:22
**room** 14:3 16:19
16:21,23 17:2
57:9 96:23
104:1 108:2,4
284:17
**rotate** 99:10
**rotation** 99:2
**rounds** 173:3
**routine** 57:5
135:17 149:12
165:10 178:2,4
249:6 252:13
254:5,6
**routinely** 60:14
**RPR** 4:19 5:21
6:4 300:2,18
301:22
**rule** 7:9 44:23
78:9,20
180:10 223:14
227:21 228:8
240:4,6 257:2
259:6 297:9
297:12
**ruled** 261:19
**rules** 7:1
**run** 108:24
298:2

———— **S** ————
**S** 5:1 214:17
269:3
**S-h-a-h** 6:18
**S1** 247:14 256:4
279:17
**S2** 247:14
256:4 279:18
**salient** 222:22
**Santos** 121:12

**BHARAT SHAH, MD  12/7/2017**

122:21 123:4
123:16 125:18
126:4
**Santos'** 121:18
**Santos's** 124:2
**Sarah** 5:3 6:21
299:12
**sarah@loevy....**
5:6
**sat** 6:23 24:2
27:13
**satisfactorily**
200:3
**Sauget** 105:14
**save** 162:7
**saw** 20:19,20
52:21,24 53:6
54:1 149:11
151:22 155:23
180:23 214:14
243:22 253:5
257:5 258:4
263:21,23
277:11,12,16
284:21 285:1
288:22
**saying** 37:5
40:1 46:23
69:12 77:10
93:6 162:2
177:17 228:20
228:22
230:15 231:20
233:9 242:14
248:3 249:22
**says** 6:11 67:10
157:24 158:13
188:10 189:16
205:12 216:13
239:14 255:19
255:21 264:12
269:10 270:7
270:11
**scan** 80:3 84:9
84:10,11 96:1
96:21 283:3

290:13
**Scar** 258:18
**Schade** 4:17
5:9 301:5
**schedule** 129:2
129:3,5,9
130:7 135:23
280:11
**scheduled**
30:6
**schedules**
173:12
**scheduling**
143:10,11
**school** 97:16
**science** 227:15
**Scot** 112:16,20
112:21
**scratched**
217:11
**se** 252:3
**second** 7:9
123:23 135:11
169:13 177:11
187:12 208:22
215:6,19
236:5 239:15
250:11 275:23
279:12 280:1
280:4,5
295:23
**secondary**
39:8 78:7
82:7
**seconds** 83:9
83:10
**section** 128:2
196:22
**see** 17:11,19,20
17:22,24 19:12
28:17 49:3
52:6,12,14
53:3,5,15
54:20 55:6,18
55:24 56:12
57:15 59:10

63:23 64:20
65:2,6 66:7
84:16 88:10
90:15 93:19
101:10,19
102:22 103:5
110:23 147:14
169:17 176:15
176:16,20
179:7 180:3
183:3 187:10
187:17 188:14
189:11,14 197:1
202:24 203:3
204:18,22
205:5,7,16,17
205:22
206:18,20
207:6,9,14,16
209:16,22
210:5,15
211:10 212:6
212:14 218:11
219:18 237:15
244:14 251:5
254:8 259:8
275:8,13,16
275:20 276:1
276:3,5
282:19,21
**seeing** 55:10
206:12
**seen** 13:13 14:9
18:18,22 19:11
19:23 21:16
52:17 54:3
65:12 66:1
155:14,16
177:19 186:11
186:14,15
190:23 205:9
205:13
222:23 235:5
249:17,20,23
257:6 274:9,9
274:23

283:23
284:16 291:20
**sees** 53:18
66:10 206:1
**seizure** 162:14
**select** 120:1
146:10
**selected** 118:12
120:6 146:5,6
150:17
**self-** 235:2
**self-inflicted**
24:19
**self-reported**
216:21 234:23
235:5,16,20
235:22,24
238:1 264:24
266:19,22
267:7 271:8
**self-reporting**
235:7
**send** 96:12,19
96:22 97:7
122:17 125:12
125:14
**sending** 96:18
194:4
**senior** 118:8
**sensation** 39:18
60:1,8,13
230:3,9,12,17
**sense** 60:3,4,10
72:2 124:17
152:12 153:10
162:18
**senses** 59:18,18
59:20 60:18
282:18,23
**sensory** 32:13
34:16,24 35:6
35:10,11 38:24
39:16,17 41:11
41:13,19 42:15
46:6 47:17,23
48:8 58:5

59:3,17 60:2
61:4,15 64:8
64:23 65:22
66:4,17 67:6
76:24 77:20
78:2,6,11,18
79:10,23 82:8
95:6,11 218:16
218:20 219:4
219:7 220:2,9
282:19,20
**sensory-relat...**
95:16
**sent** 95:22
112:16 124:14
125:16 194:7
195:17
**sentence**
187:13 270:14
**separate** 50:7
58:8,12 101:11
122:12 123:15
207:22,23
**separately**
49:18
**September**
22:4 27:8
281:7 285:7
288:9,23
**serious** 37:12,15
37:17 38:14,22
82:6,21 88:17
92:7,9,11
93:12,16,21
206:13 227:3
227:9 228:5
228:5 238:11
238:14,15,19
238:24 297:7
**serve** 32:10
131:22
**services** 5:22
129:18 158:1
158:15 159:5,7
167:13 168:3
170:22 173:6

**BHARAT SHAH, MD 12/7/2017**

189:13 301:1,17
**set** 8:17 124:11
129:3,5 135:16
150:6
**sets** 19:20
**setting** 175:20
293:18
**settled** 293:22
294:1,3
**seven** 33:3
141:10
**seventies**
108:16 109:7,8
**severe** 38:8,10
38:17 43:22
83:6 228:12
237:19
254:20
284:17 292:21
**severity** 43:9
43:20 45:19
64:10 81:22
82:19 229:3
254:23
292:13
**sexual** 63:4,6
63:12,14 66:2
66:3
**Shah** 1:17 4:13
6:9,18,19 70:6
155:15 183:18
301:11 302:1
303:3,9
**shaking** 7:11
**shape** 94:8
**shared** 172:11,14
172:18
**sharp** 251:4
**sheet** 301:12,14
301:16 302:1
**Shefford** 31:11
31:12
**Shelley** 133:17
**Shelly** 133:16
**Shepherd** 31:12
**shift** 141:5,6,16

141:17
**shifts** 141:8,14
141:15
**Shipley** 139:21
139:23
**short** 87:20
88:22 126:16
133:5 142:3
256:17 259:16
**shortage** 142:10
**shortest** 88:12
**shorthand** 6:4
**shortly** 133:7,21
284:20
**shortness**
277:20
**shoulder**
233:19
**show** 70:19
85:16,17,18
86:13,15
181:20
**shows** 68:8,10
70:21 85:20
229:3 292:15
**sic** 58:8
**sick** 55:18,22
57:7 63:19,23
64:3,7 65:22
115:15 120:7
120:15,16
176:9 181:1
205:1,2,6,8,14
205:18,21
208:14,19
209:2,14
210:5 275:19
**side** 152:23
178:10 197:9
197:10 198:18
215:1 216:2,3
223:21,22
224:3,3 237:11
238:6 240:12
257:21 276:9
297:20

**sign** 230:12
301:14
**signature** 6:6
218:1 278:14
301:12,14,16
302:24
**significant**
225:6 227:23
260:24 265:9
265:10
**signing** 151:2
**signs** 10:17 39:4
41:8 179:10
180:10 277:23
**similar** 45:21
86:10
**Sincerely**
301:20
**single** 80:22
**sinus** 256:4
258:17 279:17
**Sipley** 133:16,17
**sit** 10:5,11,15
24:14 29:23
30:2 104:8,11
184:1 196:4
**site** 95:23 119:6
122:24 129:15
149:9,10
153:22 154:5
171:8 183:17
296:13
**sitting** 9:21
**situation** 163:5
164:6 166:21
275:6
**six** 4:16 99:23
111:3 117:21
119:16,17
284:20
**sixties** 100:1
**SL** 216:19
**sliding** 36:14
**slight** 254:22
**slightly** 20:23
167:2 258:19

**slip** 205:9,21
209:15
**slips** 205:6,14
**slow** 85:21 91:2
110:20
**slowly** 46:1
82:22 83:1
87:9 90:1
**slowly-occurr...**
90:10
**small** 173:15
212:10 248:20
**smokes** 62:14
**smoking** 62:2
62:13,19,24
**SOAP** 211:22
236:3
**social** 61:11,13
61:22 64:18
64:24 65:24
110:19
**socializing**
201:1
**soft** 40:19,22
94:24 264:17
**software**
164:23
**sole** 112:7
**solely** 172:4,5
225:14
**solo** 107:15
**somebody**
16:14 113:23
118:6,7 128:18
207:20
**someone's**
136:19
**soon** 163:7
288:18
**sooner** 177:14
**sorry** 15:18 36:5
42:22 44:20
60:6 65:4
80:16 85:8
92:15 144:3,5
145:11 152:1

183:20,23
202:2 215:12
215:20 216:5
229:13 233:16
238:3 245:23
249:12
**sort** 30:16 41:23
45:15 47:14
89:2 110:4
272:3
**sorts** 60:12
67:4 195:10
**sound** 254:19
**sounds** 180:1
**source** 291:18
**Sources** 1:10
4:10,23 5:8
301:9 302:2
**south** 5:15
199:11,15
**Southern** 1:2
4:2,21
**Southwestern**
13:10,18,20
15:8,15,24
16:5,6,7,24
17:3 18:7,8,17
18:21 19:5,24
20:3,12,19,20
20:21 22:10,17
28:4 29:11,18
29:19 30:10,14
53:15,16,22
54:3,9 55:4,9
56:4,12 65:18
66:10 68:13
75:14,23
95:19 96:8
97:6 110:23
110:24 113:4,7
113:16,19,21
114:1,16 115:4
117:17 124:23
126:14,19
128:21 129:6
130:10,24

BHARAT SHAH, MD 12/7/2017

137:10 138:4
138:21 139:18
140:20 141:9
141:21 142:18
143:1 144:13
147:20 151:13
152:9 153:1,11
155:6 156:4
158:11 159:2
159:22 167:23
168:16,22
170:2 171:12
175:13 178:16
180:23 182:16
182:21 183:7
187:24 189:21
196:12 197:5
198:24 203:16
203:24 204:2
204:11 206:8
206:17 213:3
213:6 286:20
293:16,19
294:19 296:13
**space** 37:6
68:10
**space-occup...**
84:6
**spasm** 216:3,5
230:21 237:1
**spastic** 236:24
**speaking** 12:24
24:17 44:8
168:5,6 169:1
171:4 260:1
**special** 182:1
**specialist** 96:13
97:9 154:23
166:8 178:16
283:8,16
**specialists**
96:6 166:8
173:5
**specialties**
99:4,11,12,15
100:11

**specialty**
289:18
**specific** 16:2
208:15 228:6
255:4,13
**specifically**
16:3 66:16
124:10 134:19
135:8 150:4
185:19 191:1
207:9 240:17
298:10
**specified** 192:3
192:16
**specify** 205:22
**spell** 6:14 131:9
**spinal** 32:3,5,7
32:10,12 33:8
33:23 34:2,6
34:9,14,22
36:2,8,9,10,17
36:19,24 37:3
37:6,7,8,10,11
37:16,19,21
38:4,8,13,16,17
38:20 39:1,5
39:13,24 40:2
40:8,9,13
41:21 43:4,10
43:23 44:16
45:9,14,19,22
46:6,12,14,20
47:1,4 49:16
49:18,19
62:22 67:18
67:21,23 68:4
68:19 69:19,21
69:23,24 70:2
70:7,23 71:1,5
71:12,19,23
72:11,13 74:1,7
74:10,18 75:3
75:15,19 76:4
76:22 77:14
77:22 78:9,14
78:16,20 79:2

79:11,24 81:10
81:12,15,24
82:3,24 83:15
83:22 84:8,13
84:14,16 85:11
85:15 86:11,20
86:22 87:2,11
87:17,17,24
88:14,18,24
89:7,12,13,16
89:18,19 90:4
90:15,20 91:3
91:4,8,9 94:13
95:15 163:11
220:14 227:5
227:11,16,22
228:8,12 231:1
237:19 241:14
241:17 242:5
243:2,7
268:12 273:21
284:18 285:5
285:7,13,16
285:22 286:5
286:8,17,18
286:23 287:5
287:8,20
288:10,24
290:2,10,21
291:1,19 292:3
292:6,8,12,13
292:17,21,22
293:4 298:3
298:6,11
**spine** 14:19 33:4
37:2 39:9 41:1
68:9 69:24
92:22 215:15
215:15 216:1,4
216:4,6,7,8,14
216:15,16,24
217:5 223:18
223:20 224:5
224:7 225:16
225:24 227:7
227:8,12,21

228:6 237:6,8
237:12,14,16
238:4,4,8,11
238:18,20,22
242:5 271:3
273:18 293:8
**spoke** 241:23
**spoken** 21:10
22:19
**spondylolisth...**
36:15
**spot** 177:8
**sprain** 216:24
217:5,6 238:4
238:8,18,20
238:22,23,24
249:16 250:3
**sprains** 238:20
**Springfield** 5:15
294:21
**St** 1:2 4:2,18,21
5:10,23 14:5,8
14:12 16:21
18:9 103:9,11
105:18 106:12
106:15,15,17,18
106:19,22
107:3,6 108:2
108:5,7 109:10
112:13,13,14
113:4 284:2,10
301:2,6,18
**stab** 25:24
27:17
**stable** 280:7
**stack** 124:18
**staff** 20:4
138:21 142:2
142:10 144:12
144:23 145:2
145:13,20
146:17 149:15
150:3 152:9,14
152:22,23
158:3 167:14
167:22 168:2

168:6,23
169:16,22
170:11 171:17
173:2,7,8,12,17
174:2,4 175:21
177:22 185:23
186:24 187:16
188:7 191:5
196:10 197:22
201:7 202:7
204:7,8
205:12,15,22
206:1,4 213:15
257:7 274:8
285:1
**stage** 36:10
165:7 166:11
241:19 283:9
283:12,14
291:22
**stamp** 178:5
**stand** 98:9
216:7
**standards**
158:16
**start** 9:12 15:17
52:23 111:11
129:10 133:19
133:21 137:2
246:2 258:4
**started** 111:22
113:6,13 131:6
131:7,24
217:13 250:21
259:21 261:23
**starting** 6:8 8:2
269:3 270:16
**starts** 270:4
**state** 4:18 5:13
6:14 104:15
116:2,2,6
149:21,22
151:14 156:23
158:17 169:8
173:22 175:15
183:14 189:4

**BHARAT SHAH, MD  12/7/2017**

190:4 201:10
294:11 296:11
303:1
**statement**
89:22 94:20
267:24 282:11
282:13 283:5
287:23
**states** 1:1 4:1,20
102:12 103:3,8
104:24 115:22
187:13 189:11
196:23 277:14
**status** 47:14
68:9 94:23
280:7
**stay** 13:2,9
56:19 57:1
105:20,20
157:18 199:19
**stayed** 26:23
105:22 149:9
149:10 182:19
**stays** 94:3
**stenosis** 37:7
**step** 48:4 67:15
160:5
**steps** 128:5,10
144:11,20
160:11
**stiff** 234:4
**stiffness** 234:1
**stipulated** 6:1
298:22
**stood** 15:20
20:8
**stop** 109:16,19
113:15,17
**stopped** 107:21
**Straight** 216:2
234:15
**Street** 5:5,15
5:22 301:1,18
**strike** 20:7
47:22 54:9
66:14 67:16

74:8 76:2
80:4 87:13
89:17 97:4
107:1 140:18
148:10,23
152:1,7 159:5
167:23 177:15
178:13 180:14
181:5 182:13
205:20 213:11
231:24 283:19
297:10
**stronger**
259:23
**strongly** 46:12
46:17,20 47:1
**structural** 68:7
**structure** 70:1,2
93:1
**struggling**
231:23
**study** 84:23
85:1,2,20
99:22
**studying** 98:24
**stuff** 299:3
**subacute**
90:23
**subheading**
171:6 175:3
**subject** 24:13
44:3 71:3
178:18
**subjective** 86:2
178:22 214:17
218:6 227:1
231:9 235:9
250:13 254:12
254:14 264:2
264:10 266:15
267:5 277:18
**submit** 124:9,10
124:13 154:19
161:16 163:9
163:24 165:9
166:12 205:8

**submits** 205:5
205:21
**submitted**
123:21 161:1
**submitting**
124:12
**subscribe**
303:6
**subsection**
172:22,23
**subsequent**
54:21
**subsequently**
12:11
**subside** 262:10
**substance**
218:6 244:11
258:14 269:17
303:5
**substantive**
45:5
**successful** 73:6
**successfully**
101:6
**sued** 202:13
**suffer** 81:11
83:23 268:9
**suffered** 24:20
285:6
**suffering** 41:9
47:6 48:8
75:3 76:13
80:7 162:14
224:15,18,22
230:7 288:24
**suffers** 81:22
**sugar** 253:9,23
256:24
**suggest** 150:23
151:9 188:2
241:1
**Suite** 4:17 5:10
301:6
**summarize**
284:7
**summary**

122:18 123:11
123:13,15
124:3,6,20
125:20,24
148:7 156:3
298:24
**summer** 140:19
**supervise** 143:3
144:21 149:14
152:12 173:1
176:18,22
200:7,9
**supervised**
152:8 201:24
280:12
**supervising**
143:1,14,21
144:7,15
151:24 153:5
173:3
**supervision**
136:1 143:8
158:1 173:10
173:24 174:6,8
174:9 175:8
176:12 197:8
**supervisor**
105:14 108:1
118:17 130:21
138:23 139:1
139:16,22
143:9,9,10,19
144:7 156:13
156:15,19
157:1,5 168:8
171:22 172:2,8
172:17 174:5
195:6 198:23
199:1,19
200:2
**supple** 236:23
**supplied** 11:12
**support** 74:22
**suppose** 104:11
**supposed**
122:22 135:19

154:17 161:16
165:5 184:4
185:3 232:9
244:17
**sure** 7:6 9:15
12:15 19:18
20:23 27:24
31:6 43:14
53:20 62:5,16
79:17 87:14
88:8,12 96:24
123:23 140:7
147:11 151:23
160:17 167:21
177:3,5,5
194:6 197:7
204:24 213:18
223:3 228:2
260:23 278:3
281:21 282:8
292:19
**surgeon** 75:16
101:2 102:1,2
102:3 291:11
291:12 292:6
292:7 293:5
**surgeons**
291:15
**surgeries**
290:24
**surgery** 14:18,21
27:19 28:18
28:23 72:12
73:5,15,23
74:4,11,16,20
74:24 75:1,4,9
75:15,19,22
76:1,2,5 98:11
99:17,17,18,21
99:22 101:1,2
101:4,9,20,22
102:8 103:17
105:7 106:5,8
107:17,19,20
109:4,14
110:22 116:13

**BHARAT SHAH, MD  12/7/2017**

117:3 244:10
258:14,18
284:11,11
292:9
**surgical** 72:9
73:24 74:8
**Susan** 23:19
**suspect** 298:8
**suspecting**
272:2
**swelling** 74:13
74:13
**switch** 89:1
**switched** 121:5
**sworn** 4:14 6:10
300:4
**symptom** 35:10
41:6 42:16
43:1 48:14
83:22 163:13
163:14 209:4
209:6 236:4
277:1,2 282:14
**symptomatic**
41:6 69:1,5
80:10 81:5
290:18
**symptoms**
34:13,21 35:18
39:4,10,12
41:8,19 43:4
43:10,15,16,20
44:1,8,12,22
45:7,11,19,21
45:23 47:4,5
47:7 62:10
69:2 71:20
72:6,16,17
73:7 77:7
80:24 81:2,20
81:21,22 82:8
95:5 179:8,10
180:11 218:8
244:14,15,19
270:18 271:15
273:5 289:12

291:24 298:9
**syndrome**
244:12
**system** 32:17
33:10 34:16,16
34:24,24
48:10,13,13
49:7,17 59:14
59:15 108:20
109:17 111:19
114:7,8 119:2
119:21,22
121:9 193:8,15
230:4 252:24
**systemic** 77:4
**systems** 54:17
54:24

_____ **T** _____

**T** 6:16
**table** 150:16
**tailbone** 237:17
**take** 7:14 62:13
63:13,14 66:2
70:3 71:16
83:23 102:20
103:1 104:24
112:24 114:14
134:20 136:8
137:16 155:18
160:11 172:10
176:2,4 181:20
183:16 186:9
212:21 282:3
284:5 287:4
294:24
295:12 299:15
**taken** 1:18 6:3
22:16 66:16
251:16 296:2
296:17 300:5
300:10 301:11
302:3
**takes** 83:14,18
256:20
262:12

277:22
**talk** 10:9,9 11:17
32:3,19 41:16
50:11 61:3
64:6 70:22
76:8 97:10
118:13 122:22
122:23 123:4,7
125:19 129:2
130:12 155:1
156:16 157:2
164:5 200:21
200:23,24
201:1 202:22
203:2 213:1,17
218:5 223:16
241:14 294:8
**talked** 16:20
20:15 21:1,3,4
21:6,22 28:5
28:15 37:19
38:24 41:19
67:14 108:17
122:24 123:1
127:8 132:5
149:15 153:8
182:3 202:4
209:14 289:14
296:9
**talking** 9:12
16:18 17:1
32:21 40:8
42:10 50:16
51:7 53:13
54:15 70:7
83:8 123:10,11
138:18 150:20
169:18 171:4
198:21 204:17
210:20 214:6
247:13 275:24
278:20 282:6
294:11
**tasked** 128:4,10
132:6
**Taylorville**

15:13,24 18:12
20:20 133:11
**tdugan@cass...**
5:11 301:7
**team** 143:16,18
149:19 151:12
151:13
**technical** 28:7
**technically**
143:9
**technician**
138:9,11,23
**technicians**
138:3,14
**techs** 138:14
**telephone** 5:13
**tell** 11:8 13:24
16:15 17:6,16
21:9 22:2,7
24:6,13 27:2
29:2 30:15
32:5 34:10
35:2,8,19 36:7
37:20 38:2
39:4,12 40:14
42:2,24 43:23
44:21 45:24
46:4 49:20,21
51:15 61:5,17
64:2 67:16
68:11,16 69:4
70:17,23 72:4
76:23 78:15
79:1,4 81:23
82:2,20 84:2
84:18 85:14
85:22 88:4
89:22 93:10
95:9 97:11
98:21 102:5
107:10 108:21
109:12 110:17
118:5 119:19
130:14 135:13
142:16,17,24
144:11 153:10

153:13 156:9
159:4,6 160:1
161:5,13 163:2
165:13,18
178:12,14,21
179:5 181:6,13
181:16,23
182:12 184:18
184:23 186:22
190:6 194:3
198:5,7,22
202:14
204:24 210:13
214:9 218:14
221:8 223:18
224:10 225:14
226:9 228:14
229:5 230:2
231:4,6 232:2
235:2,6
236:20 237:9
238:7 239:6
241:20 243:10
243:20,24
244:6 248:21
249:9,12
253:6 254:7
254:13 255:2
258:3 260:21
262:14,17
263:19 264:1
264:11 265:7
266:14,21
267:20
268:23 269:2
271:19 272:10
273:19 274:5
277:12,17
279:4 280:2
281:3 282:13
288:16 289:8
290:1,9 291:17
293:7
**telling** 56:5
137:1 267:21
**tells** 86:3,6

**BHARAT SHAH, MD  12/7/2017**

235:13 241:9
241:20
**temperature**
60:8,10,13
**temporarily**
134:17
**temporary**
139:1 152:23
**ten** 4:15 113:24
114:2 161:9,11
161:12 165:11
**tend** 43:21 46:5
46:20 62:21
81:16 228:4
**tends** 45:9,11,19
46:11,16,24
62:23
**tense** 237:4
**tenure** 127:13,14
130:9 132:3
133:23 136:16
138:1 139:20
168:21 182:5
183:7 184:11
195:24 199:4
199:20 206:8
**tenures** 140:8
**term** 28:7,9
93:1,3 179:2,6
**terms** 35:8
43:24 62:17
88:4 211:12
259:23 266:2
**Terry** 194:21
195:5
**test** 59:18,19
60:3,13 78:12
84:9,22 96:14
221:24
222:20,21
226:22
232:10 257:11
257:13 261:11
261:12,13,15,19
282:24
**testified** 19:18

25:18,20 27:6
150:13 285:12
**testify** 9:7,10
**testifying** 26:23
**testimony** 7:20
26:14 38:12
71:24 187:23
192:8 289:3,4
300:3,5
**testing** 60:18
101:8
**tests** 59:4,16
67:14 80:2
84:15,16
85:22 86:9,10
86:19 96:5
177:11 211:16
253:14 256:19
256:23 261:9
298:2
**thank** 6:19 40:6
42:21 54:7
58:10 85:7
164:18 192:21
215:8 246:21
298:17 299:12
301:19
**Thanks** 276:8
**theoretically**
36:4,6,7
**theory** 159:24
**therapy** 73:12
73:13,14
**thereon** 303:6
**thereto** 300:12
**they'd** 107:8
**thing** 45:15
46:2 89:23
91:24 135:15
137:6 143:2
177:11,12
228:15,15
229:24 236:5
252:5 275:23
281:19 295:23
**things** 11:18

39:15,23
43:19 48:16
57:8 69:9
70:7 77:18,24
87:15 135:20
145:5 153:14
163:17 165:24
168:8 177:13
179:20,20,21
181:19 185:17
195:11 200:6
208:17 211:13
222:23
235:19 243:1
254:19 272:9
**think** 10:1 12:4
12:12,21 13:1
19:8 28:3,5,8
34:1 39:7
40:14 51:7
53:2 68:21
74:2 75:8
81:18 85:11
87:15 96:5
102:7 121:2,12
125:4,11
126:24 127:16
127:24 128:23
133:2 134:10
137:24 138:10
140:7,24
142:13 151:8,21
153:9 157:22
165:15 167:17
169:1 183:2,5
185:7 190:2
199:17,21,24
201:9 206:3
212:8 213:17
217:13 263:23
266:2 278:14
282:3 298:6
**thinking** 205:1
287:14
**thinks** 205:13
**third** 31:6,7

158:13 177:12
**Thirteen** 120:11
**thought** 107:7
160:3 220:1
230:5 238:21
240:9 261:14
267:24,24
270:2 272:11
273:8
**three** 13:2 21:17
29:23 30:8,15
59:11 104:7
123:18 141:11,11
141:14,15
146:18 172:14
205:5,14
207:4 252:19
256:14 266:10
274:16
**three-month**
207:3
**throbbing**
255:18,21
**tibia** 247:19
**tight** 236:23
**till** 30:14 102:4
105:22
273:20
**time** 6:8 7:2
11:24 12:3,5
21:23 24:4
25:21 27:16
37:18 38:11
45:23 50:16
52:12,14,16
53:3,5,7,15,19
54:1,2 64:20
64:20 65:2,6
65:11,11,16,19
65:20 66:7,10
66:11 83:14,18
83:21 88:16
89:10,24
90:17 92:5
102:19 104:22
105:3 106:1,6

109:22 110:13
111:7,9,20
112:11,14 113:10
114:3 121:14,21
121:23 129:6
131:13 133:5
133:20 139:21
143:4 146:17
147:20 148:15
148:16 164:3
166:4 177:18
184:14,14
201:10 202:18
204:15,18
205:15 206:2
206:20 207:1
210:15 212:12
212:19 214:14
227:4,16
240:4 241:5
241:12 243:21
252:4 253:4
253:21 254:7
256:17,18,20
257:15 258:4
259:16,21
261:6 262:3
262:12,14,20
263:7,19,21
263:23
268:20
275:24 277:11
277:12 279:12
284:5,16,21
286:12,15,21
287:1,14
288:15 289:13
290:2 293:1,2
295:22 298:5
298:8 299:10
**timely** 177:10
**times** 20:11
21:17,17 24:2
25:20 27:2,11
27:14 29:1
112:12 116:19

**BHARAT SHAH, MD  12/7/2017**

116:19 130:2
161:5,7,8,9,11
161:12 165:11
165:13,21
195:23,24
204:5
**Timothy** 5:8
301:5,24
**tingling** 35:12
39:17 48:17
49:6 73:1,2
81:15,16 85:24
216:21 226:13
226:16,18
227:2 230:7
234:23 235:11
235:13,16,19
236:8,14,16
238:1 244:9
248:2 251:2
252:11 258:12
260:19 261:3
261:5,10,16,20
262:2,6,9,19
262:21 263:14
264:13 268:1
273:4,8
**tip** 264:13
**tips** 271:16
272:13
**tissue** 32:7
39:8 94:24
**tissues** 34:9
**title** 112:5 113:9
113:12 114:11
138:8 155:13
**today** 7:5 8:6,11
9:7,21 10:5,11
10:15 21:6,11
24:2 149:15
196:4 198:21
199:16 218:17
**today's** 11:9,14
**told** 9:19,22
27:17 39:15
41:11 83:2

89:5 127:18,19
135:6 152:14
184:2,6 187:2
190:10 192:2
192:10,11,13
198:8 199:2
233:4 239:15
241:16 259:11
269:10 270:7
271:14
**Tom** 6:16 151:7
**tools** 75:22
**top** 175:2,4
**topics** 295:22
**total** 21:16
100:3 234:4
252:3
**totally** 198:18
231:17
**touch** 35:13
59:20,21 60:1
60:10 230:15
230:16
282:22
**town** 113:4
**track** 212:11
**train** 181:15
**training** 101:7
103:16 171:5,15
181:6,8,9,23
183:8 185:22
186:1,3,4
289:21,22,24
290:1,5,7,9
290:20,23
291:3,6,11
**transcribed** 6:5
**transcript** 3:23
299:8,10
301:14
**transfer** 169:4
284:12
**transferred**
14:5,8 54:8
133:8,9,11
169:2,3 284:8

284:9
**transient**
244:15,19
**transmission**
34:3
**transmit** 33:9
33:10,24
149:4
**transmits** 32:15
35:17 39:9
**transpired**
276:1
**trauma** 36:10
36:23 39:22
44:6,7 45:1,2
45:9 56:23
67:4 71:16
83:4 87:21
88:10 89:5,7
89:9,10 107:19
214:20 215:7
285:21 286:3
292:24 293:5
293:9
**travels** 37:3
**treat** 47:15 69:6
79:13 91:10,13
96:11 177:8
179:19 286:23
293:11
**treated** 14:7 16:1
69:9 81:4
287:4,6
**treating** 100:13
261:23 298:11
**treatment** 14:16
14:17,18 16:2
19:2 69:1,5
70:22 74:19
74:23 76:14,18
76:20 80:6,10
80:13,19,22
81:1,5,6 82:18
96:12 153:15
153:17 154:16
154:23 165:20

173:6 175:5,19
175:22 176:5
176:14 177:6,7
177:15,17,22
180:2 211:19
238:16 245:19
250:17,17
287:7,18
295:24
**treatments**
70:24 74:8
166:2
**treats** 81:2
**tree** 62:17
**trial** 301:16
**triangle** 278:18
278:22
**tried** 220:20
**true** 63:9,10
81:19 83:15
96:14 142:12
224:20
253:23 303:5
303:7
**truthfully** 8:20
9:7
**try** 20:24 47:14
47:15 62:11
71:16 183:18
230:19 234:1
236:22 266:3
282:18,18
**trying** 58:15
65:10 88:20
124:17 162:18
192:9 240:6
241:5
**tumor** 87:6
**tuning** 60:5,6
**turkey** 202:20
**turn** 141:4 156:6
187:5 188:4
189:5 194:16
196:16,19
213:20 247:8
247:9 250:11

**Turner** 4:19
5:21 6:4
300:2,18
301:22
**twice** 112:19
260:11
**two** 25:16 28:2
28:3,3 29:4,8
29:9,10,15
30:13 31:12
40:17 78:13
84:15 87:15
89:19 90:2,19
90:22 112:12
112:15 116:19
116:19,19 134:8
141:7 145:5
146:18 157:8
169:2 183:12
188:14 191:11
194:19 199:3
208:13 217:21
235:18
237:23
243:23 247:5
256:16 258:6
272:9 294:4
**two-month**
166:4
**two-three** 28:2
**Tylenol** 81:8
**type** 255:18
**types** 35:8
**typewriting** 6:5
300:7
**typical** 55:9
68:12 84:2
281:16
**typically** 54:1
55:4 56:3
74:17 81:10
95:3 125:8

---
**U**
**uh-huh** 7:12
39:2 44:18

BHARAT SHAH, MD 12/7/2017

64:15 92:13
97:21 111:14
142:8 169:18
172:23 174:11
174:13 188:8
189:7,10,19
192:20 197:2
200:1 201:17
203:4 207:12
209:17 210:4
210:14 218:9
219:5,13 235:1
235:18 236:19
245:21 250:4
250:6,23
251:7,15
268:22 269:7
278:16 279:13
283:2
**uh-huhs** 7:15
**ultimately** 82:9
176:11
**unable** 142:5
**unavailable**
130:3
**underlying**
69:18 76:10,19
76:20 80:21
**underneath**
170:19 189:16
216:13 244:18
278:5
**understand** 9:2
9:15 13:21
22:11 23:1
38:12 40:7,14
43:14 49:3
65:10 76:9
79:5 87:14
88:8 123:23
128:4 133:19
145:6 147:12
162:23 164:13
179:5 192:8,10
194:6 198:8
198:20 200:5

214:1 219:2
223:3 228:20
231:19,24
236:2 254:20
276:3 282:8
**understanding**
17:23 19:6,9
19:13,21 22:8
22:14 48:3
51:8 92:24
96:18 102:14
125:7,10,15,23
138:13 145:5
151:17,19,21
161:24 164:22
167:4,7 175:17
203:8 212:17
240:24
251:22 260:16
273:3 274:5
282:9
**understood**
18:5 22:7
113:24 167:2
182:23 192:18
200:5 249:22
266:24 287:7
**unhappy**
270:20
**unique** 203:24
**unit** 20:11 125:5
125:7 128:2
130:20,24
131:22 134:23
136:2,13
143:17,22
144:9 151:15
156:11,12,16
158:15 159:7
167:14 168:3,7
169:16,22
172:1,7,19
173:15 184:10
184:21 189:4
200:14,20
208:7 295:9

**United** 1:1 4:1
4:20 102:11
103:3,8
**universities**
97:23
**university**
97:22 98:1,3,6
98:18 100:20
**unusual** 230:22
**updated** 184:13
**upper** 33:21
59:10
**upset** 260:10
**upside** 278:17
**usage** 244:22
**use** 9:17,21
62:2 67:19,22
67:24 118:14
149:18 161:21
164:16 179:16
179:18 193:22
194:5 214:22
214:23 229:2
255:14,14
295:22
**usually** 68:24
74:12 130:1
167:19 179:23
281:5,19
**utilization**
153:20 154:2
154:8 161:17
163:20 164:12
166:12

---

**V**

**vacancies** 142:1
142:14
**vacant** 132:23
134:2,22
135:4
**vacation** 137:20
152:24 204:5
**vague** 246:8,9
246:10,11
254:14,16,17

254:23
255:16,17,20
256:1 260:6
260:17 271:15
**vagueness**
255:11
**various** 39:15
41:11 57:19
58:15 70:8
92:21 112:2
170:11
**vendor** 127:15
**venous** 279:19
**verbal** 7:10
**versa** 79:12
80:1
**version** 190:17
**versus** 43:21,22
45:7 63:19
81:17,24 86:11
95:16 209:1
217:5 234:7
249:16 285:13
**vertebra** 32:8
36:14
**vertebrae** 33:3
33:5,12,14
34:8 36:14
68:10
**vertebral** 216:3
**vessels** 92:23
**vibration** 60:3
60:4,19
**vice** 79:12 80:1
**victim** 24:20
**victims** 25:23
**view** 62:11
**viewing** 291:4
**visibly** 35:24
**visit** 17:2 18:10
18:15 65:8
127:20 128:14
156:16,19
157:6 166:9
200:18,20
208:8,9,9,14

209:1 239:15
244:4 249:10
249:21 250:11
253:7,8 264:5
296:12
**visited** 14:2
**visiting** 20:10
112:8
**visual** 244:20
**vital** 277:23
**Vitale** 23:23
**vocation** 110:5
**voice** 7:18
154:24
**vs** 1:8 4:8,22
301:9 302:2
**vulnerable**
63:6

---

**W**

**W-r-i-t-h-i-n-g**
229:11
**walk** 32:19
51:18 56:16,23
251:1,19
276:23
**walked** 57:8
**walking** 32:22
32:23 49:6
51:19 219:11,21
276:17
**walks** 51:17
215:14 251:4
**waning** 268:14
**want** 9:15 23:6
38:2 41:16
50:19 53:20
64:6 70:22
76:8 97:10
101:3 104:15
112:24 123:23
129:2 130:12
157:18 160:2
202:22 203:2
209:11 213:1,3
213:20 218:5

**BHARAT SHAH, MD  12/7/2017**

220:12 228:2
234:21
240:23 250:11
259:19 282:8
284:6 294:8
**wanted** 75:21
150:23 194:12
200:11 240:4
240:19 260:15
260:23
**wants** 166:8
258:9
**warden** 136:10
136:11
**warm** 60:10
**warn** 23:6
**warrants**
206:13,14
**wasn't** 115:13
142:21 144:16
151:6 191:16
227:10 251:8
269:24 287:2
288:20
290:19
**watch** 57:15
**watched** 69:10
**waxing** 268:13
**way** 20:24 26:9
33:13 41:17
43:10 45:16
59:14 67:17
70:13 73:24
78:9 81:23
84:12 93:2
159:17 164:14
166:22 169:9
190:5 200:10
210:23 223:1
225:3 230:6
231:5 232:1,10
241:9 251:5
266:20
267:20
278:14 285:15
285:20

287:24
288:16 289:9
290:11,12
296:24
**ways** 74:11
78:13 149:14
151:23 152:2
201:23
**we'll** 10:8,9,9
96:17 101:2
123:22 126:12
197:10,16
208:22 211:22
238:6 298:20
299:15
**we're** 7:3 54:15
157:17 193:13
198:20 199:17
228:2 298:20
**we've** 20:15
21:3,4 37:19
95:16 282:6
**weak** 35:24
**weaker** 82:10,11
**weakness**
35:20 39:20
48:18 49:6
73:9,16,21
244:16,19
**week** 89:13
90:16 112:12
112:14,19 129:3
138:12 164:2,4
165:23 217:24
**weekends**
129:15
**weeks** 83:9
89:19 90:2,19
90:22 204:20
204:21 217:21
243:23
256:16 259:15
284:20
286:10
**Weeping** 229:8
**weight** 215:1

**went** 16:6,7
18:8 27:13
106:20 166:5
**weren't** 18:1
100:13 123:8
124:12
**Wexford** 1:10
2:8,13 4:10,23
5:8 13:22
16:13 114:13,14
115:13 121:3,11
125:3,16,18,19
127:15 128:15
130:1,22 132:9
132:17,20
133:2,6,8,21
133:24 134:1
135:16 138:24
139:2,5,6,19
141:21 146:23
149:1,2,4,20
151:4,18 152:11
153:1 155:11
156:14,15,22
156:24 157:11
157:14,14
159:20
160:22 162:23
163:2,6,18
168:13,14,15
168:24 169:8
173:21 174:22
174:24 175:1
175:15 178:19
181:4,24 182:7
182:21 183:4
183:12 184:24
185:1,15,23
186:17,24
188:3 189:3,12
189:18 190:4,6
190:10,15
192:7 193:2,7
193:18,23
195:4 198:14
199:7,20,22

199:23 200:21
201:9 202:7
202:10,16,19
203:9 294:17
296:24
298:22 301:9
302:2
**Wexford's**
96:17 162:19
187:2 188:17
192:23
**Whereabouts**
97:14
**wide** 193:12
**wife** 115:11,12,15
**Wilford** 22:23
**William** 30:21
**Willie** 30:22
**winding** 112:23
114:22
**wise** 59:14
**withdrawn**
31:19
**witness** 6:6 7:8
15:18 26:6,10
26:12 32:1
54:4 80:2,15
98:13 193:19
219:22 223:21
247:2 266:17
300:3,5
301:13 302:1,1
302:24
**WNL** 249:3
**wondering**
267:4
**word** 161:21
189:24 246:10
255:11,12
270:8 278:18
**words** 17:23
81:21 142:9,23
177:23 191:16
228:21
245:23
**work** 24:11

29:17 30:10
100:23 102:3
106:6 107:22
108:10 109:6
113:3 114:18,23
115:1 117:14
118:4 119:18
121:1 122:1
129:3,5,15
138:3 139:17
140:9 144:16
156:8 180:3
200:9,24
287:17 293:5
**worked** 97:5
101:3,21
108:15 111:3,12
114:1,9 117:17
125:2 134:7
137:9,13
138:20 140:19
141:3,20
142:18 153:1
**working** 41:24
42:3,3 103:20
103:24 104:1
107:21,24
108:1,22
109:16,19,24
110:2,24 111:18
111:22 113:6,15
113:17,20 115:4
115:7 123:1
129:10 130:23
138:8 151:6
173:16 181:21
**workup** 14:12
45:4 258:8
**worry** 137:3
**worse** 250:22
**wouldn't** 96:8
154:11 242:12
242:14 243:9
**wound** 24:20
24:23 25:5,24
27:17 28:22

BHARAT SHAH, MD  12/7/2017

67:2,10 114:23
216:23 218:24
238:2 239:9
244:10 258:13
258:18,20
269:13 270:5
**write** 148:7
177:8 207:16
208:10,19,19
208:20,21
212:15 214:3
214:14,17
217:14 222:17
222:21 223:11
224:1 225:1,4
230:23
241:24 242:12
242:15 252:5
254:15
262:23 270:2
273:15
**writhing** 229:7
229:9,11,12,15
**writing** 193:3
195:17 213:22
266:20
**written** 156:7
170:5 175:4,19
176:1,14 177:1
187:22 188:14
198:6,13 212:2
214:2,2,12
215:1,6 216:3
216:19 217:1,8
221:10,18
222:3,19
223:12
229:24
230:23 231:7
233:8 236:2
241:22 242:2
242:3 243:5
243:12 244:6
244:18,23
245:1 248:8
249:2,13

254:13 256:7
258:7,11 263:1
263:24 264:1
265:5,7
269:2,16
270:1 273:17
274:10 275:5
277:17 278:2
278:12,18
279:5,8
280:2 281:9,11
**wrong** 38:13
51:10,11 89:22
120:12 192:20
282:13
**wrote** 223:4
227:17 228:21
230:10 269:9
271:23 274:12
287:16

---

## X

**X** 203:10
**x-ray** 68:3,3,7
93:19 138:14
259:9 260:21
261:2 265:5
269:5,6,9,11
270:6,11
271:12

---

## Y

**yeah** 13:23
15:10,12 16:14
17:4,21 18:13
23:5 25:17
28:9 34:8
35:15 41:15
42:5 46:8
50:21 51:3,19
52:13 53:9
56:6,15,22
57:3 59:22
62:19 63:17
65:13,15 69:15
70:4 73:11
74:6 75:11,13

77:16 82:13
84:21 90:3,7
99:9 100:21
101:13 102:7
102:24 104:23
105:17,19
107:7 108:13
109:1,3,9,11
110:5 112:1
113:11 119:20
120:8,15,17
122:19 123:9
124:19 125:6,6
125:9 129:8,14
132:4,8 133:8
133:14,18
134:3 136:10
136:10,21
139:3,12,24
140:2,11 141:4
141:15 142:6
143:8,24
144:19 145:8
145:23 148:2
148:12,14
150:5,22 154:1
154:3,17 155:4
156:1 157:12
162:5 165:3
168:20 169:5
176:7 178:1,8,8
184:4,12
186:21 187:11
188:15 191:14
193:21 194:10
194:12 195:5
198:10 199:1
201:20 204:13
205:2,24
206:6 207:10
208:1,12,16
210:18 211:11
211:22 218:4
224:23 225:2
225:19
229:20 231:6

236:4,19
237:14 239:19
242:19 243:8
245:23
246:14 247:9
249:20
250:19 255:7
255:9,23
258:23
260:15 265:9
267:14 268:11
270:24
273:19 280:13
294:15 296:11
296:14,18
**year** 12:17 99:6
100:16 102:6
111:4,7,9,12
134:9,10 140:5
149:20 204:19
**years** 26:18
28:2,2,3,3
29:4,10 30:13
88:22 99:7
102:4 104:4,7
108:11 113:24
114:2 116:22
134:8 140:6
188:14 191:11
203:10 244:10
**yesterday** 53:7

---

## Z

**zantac** 264:3,5
264:6 266:10
266:13 274:15
**zero** 187:7

---

## 0

**0544** 1:8 4:8

---

## 1

**1** 2:7 32:8 140:6
150:8,9,12
155:20 170:18
171:5,6 178:11
185:11,19

217:16 256:9
271:12
**1-800-280-3...**
5:24
**1/2** 140:6
**1:45** 263:24
**10** 3:10 268:16
268:19,24
272:10,15,19
272:20 273:11
276:9
**10:26** 6:8
**100** 4:17 5:10
301:6
**11** 3:13 19:24
114:15,15
139:20
273:23 274:2
274:6
**11/15** 139:20
**11:30** 214:14
**110/80** 279:6
**11th** 301:18
**12** 3:16 277:7,10
**120/90** 278:11
**128** 256:7
**13** 3:19 120:12
244:10
283:20,21
**14** 55:15 240:2
**14th** 226:24
228:9 236:14
241:4
**15** 26:18 118:12
120:9
**150** 2:7 265:23
**155** 2:10
**1580** 4:17 5:10
301:6
**15th** 281:6
**16** 1:8 4:8
**172** 215:2
**183** 215:2
**186** 2:12
**1958** 98:23
**1965** 102:9

**BHARAT SHAH, MD  12/7/2017**

**1970** 104:6
**1973** 104:17
**1979** 107:22
**1st** 55:14 274:6
 274:23

___

**2**

**2** 2:10 155:8,20
 166:15,16
 169:19,20
 171:15,24
 172:21,22,23
 174:12 217:18
 246:24 247:1
 247:8,9,16
 256:10,11
 271:14
**2:15** 278:21
**20** 212:8
**2000** 116:22
 258:14
**2004** 107:12
 109:14 110:7
 110:10,12,21
 111:6,11,15
 114:24
**2005** 111:15
 112:22,23
 113:6 114:18
**2011** 20:1,22
 114:15 117:6
 133:3,4
**2014** 10:6,23
 55:14 140:17
 140:19 142:12
 222:16
 226:24 228:9
 236:14 240:2
 241:4 243:22
 251:9 254:10
 257:6 263:6
 263:20
 268:21 274:6
 274:23 281:15
 288:9 298:2
**2015** 113:22

114:16,18 115:8
 115:16
**2016** 22:4
**2017** 1:19 4:14
 301:4,11 302:3
 303:12
**21** 301:4
**212** 2:15
**23rd** 263:20
**24** 129:19
**24/7** 129:19,24
**241-1377** 5:11
 301:7
**243** 2:18
**25** 120:12 212:9
 246:5
**250** 2:21
**253** 3:1
**257** 3:4
**25th** 268:21
**263** 3:7
**268** 3:10
**26th** 285:7
 288:9,23
**273** 3:13
**277** 3:16
**283** 3:19
**28th** 243:22
 249:18 250:17
 251:9
**297** 2:4
**2nd** 5:15

___

**3**

**3** 2:12 155:21
 175:2 186:6,9
 196:16,18
 217:21 256:12
 256:13
**3/26/15** 3:21
**3:10** 277:16
**30** 119:21
**311** 5:5
**312)243-5900**
 5:6
**314** 5:11,23

301:2,2,7
**3rd** 5:5 253:5
 254:10 257:5

___

**4**

**4** 2:15 170:10
 212:23 213:20
 214:4 217:23
 256:15
**4/6/14** 217:19
**4:10** 254:11
**48** 189:5 196:19

___

**5**

**5** 2:18 243:13,16
 251:22
**5.2** 259:13
**5/14/14** 2:17
 214:5
**5/15/14** 2:23
**5/28/14** 2:20
**5/29** 256:7
**5:41** 299:17
**50** 187:5
**500** 5:15
 256:13
**53** 188:4 191:8
**59** 100:5

___

**6**

**6** 2:3,21 250:7
 250:10
**6/17/14** 3:6
**6/18/2014**
 265:6
**6/23/14** 3:9
 263:23
**6/23/2014**
 274:10
**6/25/14** 3:12
**6/3/14** 3:3
**60607** 5:5
**62701** 5:15
**63** 100:5
**63101** 5:23
 301:2,18
**63102** 5:10

301:6
**644-1334** 301:2
**644-2191** 5:23
 301:2
**65** 102:7

___

**7**

**7** 1:19 3:1 253:1
 253:4 259:20
 281:15 301:11
 302:3
**70** 102:7,13
**711** 5:22 301:1
 301:18
**72** 104:19
**73** 105:8,13
 108:12,13
**74** 106:11
**76** 105:11 108:13
 108:14
**79** 105:24
 108:12
**7th** 4:14

___

**8**

**8** 3:4 257:22
**8/1/14** 3:15
**8/7/14** 3:18
 277:16 278:12

___

**9**

**9** 3:7 263:16,19
**9/15/14** 280:9
 281:8
**9/25** 284:23
 285:1
**9/26** 284:23
 285:1
**90** 165:16 216:2
 216:19