**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| GERRY ARMBRUSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16 C 0544 |
| | ) | |
| WEXFORD HEALTH SOURCES, *et al.*, | ) | Judge Michael J. Reagan |
| | ) | |
| Defendants. | ) | Mag. Judge Stephen C. Williams |

# <u>Exhibit 5</u>



# Transcript of Roderick Matticks, M.D., Corporate Designee

**Date:** May 30, 2018
**Case:** Armbruster -v- Wexford Health Sources, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
 1       IN THE UNITED STATES DISTRICT COURT
 2       FOR THE SOUTHERN DISTRICT OF ILLINOIS
 3            EAST ST. LOUIS DIVISION
 4
   GERRY ARMBRUSTER,            )
 5                             )
      Plaintiff,                )
 6                             ) Case No.
   vs.                         ) 16-CO-544
 7                             )
   WEXFORD HEALTH SERVICES,     )
 8 ET AL.,                      )
                               )
 9    Defendants.               )
10
11      THE DISCOVERY DEPOSITION of RODERICK
12 MATTICKS, M.D., called for examination pursuant
13 to the provisions of the Illinois Code of Civil
14 Procedure and Rules of the Illinois Supreme Court
15 as they apply to the taking of discovery
16 depositions, taken before Kathy L. Johnson,
17 C.S.R., a Notary Public in and for the County of
18 Henry, State of Illinois, on May 30th, 2018, at
19 the hour of 9:01 a.m., at the Law Offices of
20 Cassiday Schade, LLP, 2nd Floor, 111 North 6th
21 Street, Springfield, Illinois, 62701.
22
23
24
```

**Page 2**

```
 1              I N D E X
 2
 3 WITNESS:  RODERICK MATTICKS, M.D.
 4 EXAMINATION BY:                       PAGE:
 5 MS. GRADY                               4
 6 MS. KINKADE                           218
 7 MS. GRADY                             231
 8
 9          E X H I B I T S
10    Exhibit No. 1                       35
11    Exhibit No. 2                       59
12    Exhibit No. 3                       59
13    Exhibit No. 4                       82
14    Exhibit No. 5                       86
15    Exhibit No. 6                       92
16    Exhibit No. 7                      140
17    Exhibit No. 8                      183
18    Exhibit No. 9                      187
19    Exhibit No. 10                     192
20    Exhibit No. 11                     210
21    (Attached.)
22
23 CERTIFICATE OF REPORTER                234
24
```

**Page 3**

```
 1              A P P E A R A N C E S
 2
 3 LOEVY & LOEVY
   BY:  MS. SARAH GRADY
 4 311 N. Aberdeen Street
   3rd Floor
 5 Chicago, IL  60607
   312-243-5900
 6 sarah@loevy.com
   Appeared on behalf of the Plaintiff;
 7
   ASSISTANT ATTORNEY GENERAL
 8 BY:  MS. LISA A. COOK
   500 South Second Street
 9 Springfield, IL, 62706
   217-524-6533
10 lcook@atg.state.il.us
   Appeared on behalf of
11 Defendant Ronald Vitale;
12 CASSIDAY SCHADE, LLP
   BY:  MS. JACLYN A. KINKADE
13 100 North Broadway
   Suite 1580
14 St. Louis, MO  63102
   314-241-1377
15 JKINKADE@CASSIDAY.COM
   Appeared on behalf of Dr. Shaw
16 and Wexford.
17
   ALSO PRESENT:
18
19 Kathy Johnson, Court Reporter
20
21
22
23
24
```

**Page 4**

```
 1        (Deposition start time:  9:01 a.m.)
 2        (Witness sworn.)
 3             RODERICK MATTICKS, M.D.,
 4   being first duly sworn on oath, was examined and
 5   testified as follows:
 6             EXAMINATION BY
 7               MS. GRADY:
 8       Q.  Could you state your name and spell it
 9   for the record?
10       A.  Roderick Matticks.  M-a-t-t-i-c-k-s, M.D.
11       Q.  And Dr. Matticks, you've sat for several
12   depositions before, correct?
13       A.  Yes
14       Q.  Okay.  I'm going to go over a few basic
15   rules anyway that I hope will help us be efficient
16   as we move forward in this deposition.  The first
17   is that if you have confusion about any of the
18   questions that I've asked please let me know and
19   I'll be happy to rephrase so that we understand
20   one another.  Okay?
21       A.  Yes.
22       Q.  On the flip side of that, if you don't
23   ask me to rephrase my question or let me know that
24   you haven't understood something I'm going to
```

---

5

1 assume that you have understood the question I'm
2 asking and that your response is in answer to it.
3 Fair?
4    **A. Fair.**
5    Q. The second, which you're doing a great
6 job of already, is that I'd ask you to keep your
7 answers audible and verbal, so please make sure to
8 keep your voice up and make sure to say yes or no
9 instead of a nod or shake of the head or an
10 uh-huh. That way our record can be clear. Okay?
11    **A. Yes.**
12    Q. The next one is a rule for both of us.
13 I'd ask that you let me finish my question in its
14 entirety, even if you know what I'm asking. And
15 similarly, I'll do my best to let you finish your
16 answer in its entirety before beginning my next
17 question. Again, that's so the record can be
18 clear. Okay?
19    **A. Yes.**
20    Q. Okay. Are you, do you suffer from any
21 conditions or take any medications that would
22 affect your ability to provide truthful and
23 accurate testimony here today?
24    **A. No.**

---

6

1    Q. Okay. You're here today because you've
2 been designated by Wexford as its designee to
3 provide testimony, and we're going to go over the
4 particular subject matters, but you've been
5 designated. But first I'd like to get a little
6 bit of background about your employment with
7 Wexford. You are currently employed by Wexford,
8 is that correct?
9    **A. Yes.**
10    Q. And what is your job title?
11    **A. Lead Regional Medical Director for**
12 **Illinois.**
13    Q. What does it mean to be the Lead Regional
14 Director?
15    **A. As the lead I will provide more**
16 **coordination for our quarterly meetings that we**
17 **have with the Medical Directors. It's the agenda**
18 **for the educational meeting that we typically**
19 **have. I provide some liaison between Wexford and**
20 **the Agency Medical Director.**
21    Q. And who is the Agency Medical Director?
22    **A. Currently it's Dr. Steven Meaks.**
23    Q. And in 2014 who was it at that time?
24    **A. Doctor Lou Shicker, if I recall 2014.**

---

7

1    Q. Other than coordinating the quarterly
2 meetings and serving as a liaison can you give me
3 a description of your other duties and
4 responsibilities as Lead Regional Director for the
5 State of Illinois?
6    **A. As Regional Medical Director we share the**
7 **responsibilities for supervising all the clinical**
8 **activities that occur in the State. I'm**
9 **responsible pretty much for the southern half of**
10 **the State.**
11       **So we work with the Medical Directors**
12 **to resolve any issues they may have, available for**
13 **questions regarding clinical care within the**
14 **facilities, supervise the Medical Directors, train**
15 **them, orient them, work with recruiting the**
16 **staffing and recruiting department in screening**
17 **and interviewing prospective Medical Directors,**
18 **provide direct patient care when necessary, report**
19 **to the corporate medical staff of physicians, and**
20 **help with educational initiatives.**
21    Q. Are there other Regional Medical
22 Directors employed by Wexford for the State of
23 Illinois?
24    **A. Yes.**

---

8

1    Q. How many?
2    **A. One.**
3    Q. And who is that person?
4    **A. Doctor Arthur Funk.**
5    Q. He is primarily responsible for the
6 northern half of the State, is that correct?
7    **A. Correct.**
8    Q. And is it your testimony that as Lead
9 Regional Medical Director, are you his supervisor?
10    **A. No, not technically.**
11    Q. Okay. Is he, he's not also a Lead
12 Regional Medical Director though?
13    **A. Correct.**
14    Q. Do you play any role in the Utilization
15 Management process?
16    **A. In what capacity? What do you mean?**
17    Q. Well, are you aware of Wexford, are you
18 aware of what Utilization Management process --
19    **A. Yes.**
20    Q. -- that Wexford uses?
21    **A. Yes.**
22    Q. And do you play any role in that process?
23    **A. The role I may play with, yes.**
24    Q. Can you describe for me what role you

---

Transcript of Roderick Matticks, M.D., Corporate Designee

Conducted on May 30, 2018

3 (9 to 12)

9

1 play?

2     **A.  If there were a need for an urgent**
3 **referral from a site, a Medical Director or a site**
4 **practitioner, that would need to be approved.  In**
5 **the absence of a UM physician out in the Corporate**
6 **office in Pittsburgh then I can, I'm authorized to**
7 **approve an urgent request.**

8     Q.  Who is your direct supervisor?

9     **A.  That would be Dr. Hector Garcia, the**
10 **National Medical Director, and Dr. Tom Leeman, the**
11 **Corporate Medical Director.**

12     Q.  What is the difference between those two
13 roles as you understand them?

14     **A.  Dr. Leeman provides most of the primary**
15 **oversight for all the activities that occur**
16 **through the Corporate office in Pittburgh as the**
17 **Corporate Medical Director.  Dr. Garcia does a lot**
18 **of traveling.  He pretty much provides oversight**
19 **and guidance for most of the contracts throughout**
20 **the State.  The corporate contracts that I know**
21 **of.**

22     Q.  As Lead Regional Medical Director of
23 Illinois do you have any responsibilities or
24 participate in medical care provided by Wexford to

10

1 anyone outside of the State of Illinois?

2     **A.  No.**

3     Q.  Wexford has a contract with the Illinois
4 Department of Corrections to provide care in its
5 prisons here in the State, and you play a role in
6 that process, correct?

7     **A.  Yes.**

8     Q.  Does Wexford provide medical care in any
9 County jails or other non-IDOC facilities within
10 the State of Illinois to your knowledge?

11     **A.  Yes.**

12     Q.  How many other facilities?

13     **A.  There is one in Southern.  That's**
14 **correct, I do provide some oversight for the St.**
15 **Clair County Jail.  And there's another one up**
16 **north, I believe it's Kane County.  We also help**
17 **provide some supervision for the treatment and**
18 **detention facility in Rushville, but I'm pretty**
19 **peripherally involved in that.  I have very little**
20 **involvement in that.**

21     Q.  Okay.  Do you provide supervision of
22 Wexford's operations at Kane County Jail?

23     **A.  No, not directly.  If Dr. Funk is not**
24 **available then I may.**

11

1     Q.  Do you have responsibility for overseeing
2 Wexford's operations within the St. Clair County
3 Jail?

4     **A.  Yes.**

5     Q.  Do they have a contract with the jail?

6     **A.  I do not know specifically how that**
7 **contractual arrangement is made, but to my**
8 **knowledge I believe they do have one.**

9     Q.  And you said you are peripherally
10 involved in Rushville.  Who's the Regional staff
11 member who's primarily responsible for overseeing
12 any effort, any action by Wexford, as it relates
13 to care at Rushville?

14     **A.  For administrative responsibilities or**
15 **for healthcare?**

16     Q.  Healthcare.

17     **A.  Typically those are handled by the**
18 **Corporate Medical Directors.**

19     Q.  When you say those are handled, are you
20 referring to like non-correctional secure
21 facilities or are you referring to all clinics
22 where Wexford provides medical care at large?

23     **A.  I was referring only to Rushville.**

24     Q.  Okay.  You said that you provide direct

12

1 patient care when necessary.  Can you tell, can
2 you explain to me what you mean by that?

3     **A.  If there were a need or a vacancy or**
4 **somebody was on vacation and we could not find**
5 **coverage, if they needed assistance then I will go**
6 **in and actually provide on-site services.  Or if**
7 **there were times when they needed some assistance**
8 **with review of a patient, a particular patient**
9 **care, then I may travel to the facility and do the**
10 **review or assist with determining the patient's**
11 **plan of care.**

12     Q.  Are you currently doing that?

13     **A.  Yes.**

14     Q.  At what facility?  I don't mean is that
15 your current responsibility.  I meant the first
16 category is that you, that you described, was that
17 you might be on-site to provide patient care if
18 there is a vacancy or an absence that can't be
19 filled.  Are you currently serving as an on-site
20 physician in any IDOC facility?

21     **A.  Yes.  If I can clarify, it's not that**
22 **they can't be filled, they're in the process of**
23 **being filled.**

24     Q.  Okay.  Understood.  What facility are you

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

4 (13 to 16)

---

13

1  currently working as an on-site physician for?
2      A.  Western.
3      Q.  And what about in 2014?  During the
4  calendar year of 2014 did you serve as an on-site
5  physician for any period of time longer than one
6  or two days?
7      A.  I don't recall specifically for that time
8  frame.
9      Q.  Let's back up.  When did you start
10 working for Wexford?
11     A.  2012.
12     Q.  And what was your job title when you
13 first began working for them?
14     A.  Regional Medical Director.
15     Q.  Were you the Lead Regional Medical
16 Director at that time?
17     A.  No.
18     Q.  When you were hired you were the Regional
19 Medical Director for the State of Illinois,
20 correct?
21     A.  Yes.
22     Q.  And when you were first hired did you
23 have responsibility for the southern half of the
24 State?

---

14

1      A.  Yes.
2      Q.  Prior to working for Wexford in 2012 can
3  you give me your general background as, you're a
4  physician, correct?
5      A.  Yes.
6      Q.  Can you give me your education history
7  and then your employment, background of your
8  employment history?
9      A.  Yes.  I was a graduate of Southern
10 Illinois University School of Medicine, then a
11 graduate of the Residency program in Family
12 Medicine at Southern Illinois University School of
13 Medicine here in Springfield.
14         I was a Board certified family
15 physician.  I was in private practice for the
16 Springfield Clinic, did some administrative
17 experience work with the State of Illinois as a
18 Physician Consultant with Department of Public
19 Aid, which is now HFS; Then DHS, Department of
20 Human Services.
21         Did some work as a duty physician at
22 Menard Correctional Center in 2000, then became
23 the Medical Director for Graham Medical, Graham
24 Correctional Center, for approximately three

---

15

1  years.  Began some jail work with Advanced
2  Correctional Healthcare as I continued to work
3  with DHS; then became full-time with Advanced
4  Correctional Healthcare as Assistant Medical
5  Director; then became the Corporate Medical
6  Director.
7          Worked there for approximately six
8  years or so, and then started working with Wexford
9  Health Sources.
10     Q.  In 2012 immediately prior to being hired
11 by Wexford you were employed as Corporate Medical
12 Director for ACH, is that correct?
13     A.  Correct.
14     Q.  And your departure from that position,
15 was that your decision or someone else's decision?
16     A.  It was mine.
17     Q.  And why did you leave?
18     A.  ACH is a, was a very busy company.  We
19 were based out of Peoria, I lived in Springfield.
20 We had contracts in 17 different states, primarily
21 for jails.  That required a great deal of travel
22 for me and a lot of on-call time, and it was just
23 time to slow down a little bit.  So this
24 opportunity was available with Wexford Health.

---

16

1      Q.  When did you first begin, you said that
2  you worked for ACH I think while you were, you
3  began working for ACH while still working, was it
4  for the Department of Human Services?
5      A.  Yes.
6      Q.  And when did you begin working for ACH?
7      A.  Around 2004 or '05.
8      Q.  And were you, were your responsibilities
9  specific to one or more facilities or did you have
10 a general corporate responsibility like when you
11 eventually became the Corporate Medical Director?
12     A.  A little of both.
13     Q.  Tell me about that.
14     A.  The Corporate Medical Director position I
15 supervised all the County contracts that we had
16 that help with training the Medical Directors who
17 are providing the care for as oversight for them,
18 on-call responsibilities for them.
19         And when we had staffing vacancies or
20 if we needed some assistance with particular site
21 coverage then I would travel and also provide
22 that, excuse me, provide that service.
23     Q.  My question though was, I meant to target
24 when you first began working for them.  What was

---

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

5 (17 to 20)

17

1  your, were you first hired by ACH to work as a
2  Corporate Medical Director when you began working
3  for them in 2004-2005?
4      A.  No.  My first experience being hired by
5  them was as a physician providing care at Sangamon
6  County Jail, which I provided their coverage.
7  They they took over the contract from, I believe
8  it was HPL that had the contract at the time
9  because I was, they asked me to help provide
10 services there, so I did that.  Then ACH got the
11 contract and I started working increasingly more
12 hours for them.  ACH.
13     Q.  And when you first began working for ACH
14 what was your job with Department of Human
15 Services?
16     A.  I was a Physician Administrator for the
17 Office of Clinical and Pharmacy Support Services.
18     Q.  And were you ever employed by HPL?
19     A.  Yes.
20     Q.  You were employed by HPL when they had
21 the contract to provide care at Sangamon County
22 Jail?
23     A.  Yes.
24     Q.  When did you begin working for HPL?

18

1      A.  In 2000 HPL had the contract for some of
2  the State facilities, for the prisons, and I began
3  working as the Duty Physician at Menard.  And from
4  there they asked me to become the Medical Director
5  to Graham Correctional Center.
6      Q.  How long did you work as the Duty Doctor
7  at Menard?
8      A.  Approximately nine or 10 months.
9      Q.  Was there a Medical Director working
10 there at the time?
11     A.  Yes.
12     Q.  So you were a physician underneath that,
13 being supervised by the Medical Director?
14     A.  Yes.
15     Q.  And when you worked at Graham did you
16 have other physicians working under your
17 supervision?
18     A.  I had some physicians that came in and
19 provided some assistance but I had a Nurse
20 Practitioner who was working for me.
21     Q.  At Menard your work was full-time?
22     A.  Yes.
23     Q.  And at Graham your work was also
24 full-time there as well?

19

1      A.  Yes.
2      Q.  You said you worked at Graham for
3  approximately three years?
4      A.  Yes.
5      Q.  And why did you stop working at Graham?
6  Was that your, let me ask you this first.  Was it
7  your decision to stop working as the Medical
8  Director at Graham, or was that someone else's
9  decision?
10     A.  It was mine.
11     Q.  Why did you stop?
12     A.  The malpractice rates were climbing at
13 that point in time.  HPL was not self insured, so
14 they asked that I adjust my salary down, and it
15 just didn't meet my needs so we parted ways at
16 that time.
17     Q.  And when was the next time you began
18 working for HPL again after that?
19     A.  Approximately 2003 or '04.
20     Q.  And that was at the Sangamon County Jail?
21     A.  Yes.
22     Q.  Were you the Medical Director there?
23     A.  I don't believe it was the title of
24 Medical Director, I was just a provider.

20

1      Q.  Were you the sole provider for that
2  facility?
3      A.  I was the sole on-site provider but I was
4  not providing on-call coverage at that time, so
5  that was covered by HPL physicians, the other
6  physicians.
7      Q.  And was that full-time work or part-time
8  work?
9      A.  Part-time.
10     Q.  Your work for DHS, was that full-time
11 work or part-time work?
12     A.  Full-time.
13     Q.  You left the Sangamon County Jail when, I
14 know that you said ACH took over the contract and
15 then they began employing you.  When did you stop
16 working all together at Sangamon County Jail?
17     A.  When I became the Corporate Medical
18 Director I moved into the corporate position, we
19 still had a Sangamon County contract.  So
20 technically I can say it would have been 2012 when
21 I left ACH.
22     Q.  Okay.  So there was no break in your
23 employment between when you stopped working solely
24 on-site at the Sangamon County Jail and when you

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

6 (21 to 24)

21

1  became Corporate Medical Director for ACH; is that
2  correct?
3      **A. Yes.**
4      Q. When did you stop working for DHS?
5      **A. Approximately, it would have been around**
6  **2008 or '09.**
7      Q. And why, why did you leave?
8      **A. Because I was working a full-time**
9  **position at ACH and I couldn't provide them**
10 **anymore hours.**
11     Q. 2008 or 2009, that was when you became
12 the Corporate Medical Director for ACH?
13     **A. I was the Corporate Medical Director for**
14 **ACH for about six or seven years, so the contract**
15 **I had with DHS was very part-time at that time.**
16     Q. So when did you begin working as
17 Corporate Medical Director? Was that in 2006?
18     **A. It would have been approximately 2006,**
19 **yes. So I would have gone very part-time with DHS**
20 **at that time, and I finally ended up terminating**
21 **the contract.**
22     Q. They terminated it or you terminated it?
23     **A. It was a mutual agreement.**
24     Q. Leaving your work as Corporate Medical

22

1  Director for ACH to the side, have you ever
2  provided medical care to anyone outside of the
3  State of Illinois?
4      **A. Would you restate that?**
5      Q. Yes. Leaving your work as Corporate
6  Medical Director for ACH to the side, have you
7  ever provided medical care to anyone outside of
8  the State of Illinois? Let's strike that. I'll
9  ask a more focused question. I'll ask it in two
10 parts actually.
11         Again, leaving aside your work as
12 Corporate Medical Director for ACH, have you ever
13 held a job in which you were responsible for
14 either providing medical care or supervising the
15 provision of medical care for patients outside of
16 the State of Illinois?
17     **A. No, not that I recall. I can't think of**
18 **any instance where I would have done that.**
19     Q. And have we discussed today every job
20 that you have held in the field of Correctional
21 Healthcare?
22     **A. To the best of my recall at this time,**
23 **yes.**
24     Q. When did you obtain your M.D.?

23

1      **A. 1988.**
2      Q. And when did you complete your Residency
3  in Family Medicine?
4      **A. 1991.**
5      Q. How long is that Residency?
6      **A. Three years.**
7      Q. And you completed that at the Southern
8  Illinois University Hospital, is that right?
9      **A. Southern Illinois University School of**
10 **Medicine and Affiliated Hospitals in Springfield.**
11     Q. You said that you were or are Board
12 certified in Family Medicine?
13     **A. Yes.**
14     Q. Are you currently Board certified?
15     **A. Yes.**
16     Q. When did you first become Board
17 certified?
18     **A. 1991.**
19     Q. And have you remained Board certified
20 from, consistently from 1991 to the present?
21     **A. With the exception of time that I had a**
22 **license on probation that it was not considered to**
23 **be Board certified at that time.**
24     Q. And when was that?

24

1      **A. 1994 until 2002 approximately.**
2      Q. Okay. Are you Board certified in any
3  other fields of medicine?
4      **A. No.**
5      Q. Are you familiar with the National
6  Commission on National Healthcare?
7      **A. Yes.**
8      Q. And are you familiar with a certification
9  called a Correctional, Certified Correctional
10 Healthcare Provider?
11     **A. Yes.**
12     Q. Are you a Certified Correctional
13 Healthcare Provider?
14     **A. Yes.**
15     Q. And when did you first obtain that
16 certification?
17     **A. Approximately 2013 or so.**
18     Q. When did you first begin seeking
19 certification?
20     **A. Then.**
21     Q. Why did you decide to seek certification
22 through NCCHC?
23     **A. The company asked that I do that.**
24     Q. That would be Wexford?

25

1      A.  Correct.
2      Q.  What was your understanding of why they
3  asked you to become a Certified Correctional
4  Healthcare Provider?
5      A.  So that we were, pardon me, certified by
6  them and were aware of the policies, or the
7  guidelines that they had in NCCHC for jails and
8  prisons.
9      Q.  And you, have you been a Certified
10  Correctional Healthcare Provider consistently
11  between 2013 and the present?
12      A.  Yes.
13      Q.  To your understanding who in the
14  hierarchy of Wexford staff do Wexford ask to
15  become CCHP's?
16      A.  That was a corporate request, and it
17  involved the Vice President of Operations and the
18  Corporate Medical Directors.
19      Q.  Do you consider yourself a Corporate
20  Medical Director?
21      A.  No.
22      Q.  But they asked, so they asked you, did
23  they ask other Regional Medical Directors?
24      A.  Yes, they encouraged all of us to become

26

1  Board certified.
2      Q.  What about on-site Medical Directors?
3      A.  Yes, we encouraged them too if they can.
4      Q.  What, if anything, is required to make --
5  well, strike that.  Let me ask this.  What is
6  required to obtain a Certified Correctional
7  Healthcare Provider certification?
8      A.  Testing.
9      Q.  Testing in the field of Correctional
10  Healthcare?
11      A.  Yes.
12      Q.  And what is required to maintain that
13  certification?
14      A.  It involves maintaining CME related to
15  Correctional Healthcare on an ongoing basis.  May
16  I have some water, please?
17          MS. GRADY:  Could you read back the
18  last answer?  Sorry, I got distracted.
19          (Last answer read back by reporter.)
20  BY MS. GRADY:
21      Q.  You don't have to continue to retest to
22  maintain that, correct?
23      A.  Correct.
24      Q.  And what about Board certification, do

27

1  you have to retake the test to maintain, do you
2  have to retake one or any tests to maintain your
3  Board certification?
4      A.  Yes.
5      Q.  How often do you have to retest?
6      A.  The American Board of Family Medicine at
7  the present time requires recertification every
8  seven years through testing, or you can extend it
9  to 10 years by maintenance of ongoing
10  certification outlined by the American Board of
11  Family Medicine, and then retest at that time.
12      Q.  When is the last time you sat for a test
13  for the Board of Family Medicine?
14      A.  Approximately nine years ago.
15      Q.  So you've got a test coming up?
16      A.  Yes.
17      Q.  You said that Wexford encouraged all
18  physicians to become Certified Correctional Health
19  Providers if they can.  What did you mean by if
20  they can?
21      A.  Well, if they choose to.  It's not a
22  requirement.
23      Q.  Do you have any other certifications from
24  the National Commission on Correctional

28

1  Healthcare?
2      A.  No.
3      Q.  Do you have any other certifications that
4  we haven't talked about today from any body?
5      A.  No.  Define certification.
6      Q.  Well, have you been, I mean, I don't
7  know.  That's a good question.  Has anyone
8  provided you any -- well, strike that.  I know
9  about Board certifications.  I know about
10  certifications related to NCCHC, and perhaps
11  related correctional organizations like the ACA or
12  others.
13          But are there any other certifications
14  related to your work as a doctor of which I may
15  not know that we haven't discussed today?
16      A.  Well, there's Advanced Cardiac Life
17  Support.
18      Q.  Okay.
19      A.  Certification for Buprenorphine
20  prescribing.
21      Q.  Okay.  Any others?
22      A.  Those are the ones that I recall at this
23  point in time.
24      Q.  Okay.  What did you do for HFS?

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

8 (29 to 32)

---

29

1      A.  As HFS I provided consulting services
2  primarily in the area of durable medical equipment
3  supplies and pharmacy drug utilization and review
4  activities.
5      Q.  Am I correct that your work for the
6  State, HFS, which I think you said, what was it
7  before when you were employed with them?
8      A.  Department of Public Aid.
9      Q.  Okay.  Am I correct that your work for
10 the State, both the Department of Public Aid and
11 DHS, did not involve direct patient care?
12     A.  Correct.
13     Q.  And it did not, your work for the State
14 for those two agencies did not involve work in a
15 Correctional setting, right?
16     A.  Correct.
17     Q.  Okay.  You are currently licensed to
18 practice medicine by the State of Illinois, is
19 that correct?
20     A.  Yes.
21     Q.  Are you licensed by any other state to
22 practice medicine?
23     A.  Yes.
24     Q.  What other states are you licensed to

---

30

1  practice medicine in?
2      A.  Currently I maintain a license in
3  Missouri, Texas, Mississippi, Georgia and
4  Illinois.
5      Q.  Illinois, Missouri, Texas, Mississippi,
6  Georgia?
7      A.  Correct.
8      Q.  Have you ever been licensed to practice
9  medicine in states other than those that you just
10 listed?
11     A.  Yes.
12     Q.  Tell me those states.
13     A.  Well, there were 17 total.  Whew.  I can
14 give you an idea.  Let's see if I can cover them.
15 Nebraska, Iowa, Wisconsin, Michigan, Oklahoma,
16 Kansas, Missouri, Kentucky, Tennessee, Indiana,
17 Ohio.  How many is that?  That's like, there's a
18 bunch of them.
19         MS. COOK:  I think you got to 11.
20         MS. GRADY:  11.
21         THE WITNESS:  11?  Oh, boy.  I need a
22 map.  Where else?  See, we got Kansas.  Anyway,
23 17.  Do you really want them all still?
24 BY MS. GRADY:

---

31

1      Q.  Well, we can come back to it.
2      A.  Okay.
3      Q.  When were you first licensed to practice
4  medicine by the State of Illinois?
5      A.  1990 approximately.
6      Q.  Was that the first State in which you
7  obtained a license to practice medicine?
8      A.  Yes.
9      Q.  And between the time you first obtained
10 your license and today has your license ever been
11 suspended or revoked for any reason?
12     A.  No.
13     Q.  Have you ever been subject to formal or
14 informal discipline by the licensing body that
15 issued your license to practice medicine in the
16 State of Illinois?
17     A.  Yes.
18     Q.  Tell me about that.
19     A.  I had pled guilty to a charge of public
20 indecency in Shelby County in approximately 19, in
21 19, 1993.  So in 1994 the State of Illinois placed
22 my license on probation.
23     Q.  And how long were you, was your license
24 on probation?

---

32

1      A.  It went until approximately 2000 when I
2  had it modified so that I could work in
3  Corrections at that time.  And then in 2002 it was
4  released on unencumbered status.
5      Q.  Tell me what practically, tell me what it
6  meant that your license was on probation?  What
7  impact did that have on your ability to practice
8  medicine in the State of Illinois?
9      A.  I agreed not to provide face-to-face
10 patient care during that time period.
11     Q.  Any other restrictions imposed by the
12 probation of your license?
13     A.  No.
14     Q.  And when you say you had it modified,
15 tell me what you mean by that?
16     A.  When the opportunity presented itself to
17 work at Menard, when HPL asked me to work there I
18 saw the opportunity to finally get my license off
19 probation, so I asked them and they agreed to
20 allow me to provide patient care for the males
21 down there at Menard while in Corrections.
22     Q.  And you said in 2002 your license was
23 released?
24     A.  Yes.

Transcript of Roderick Matticks, M.D., Corporate Designee

9 (33 to 36)

Conducted on May 30, 2018

---

**33**

1    Q.  Was that something you took action to,
2  either through a petition or some other form to
3  have it released or did the licensing body inform
4  you without any action on your behalf that it was
5  being released?
6    **A.  The, I took action, yes.**
7    Q.  Tell me about that.
8    **A.  I had attorneys working with me and we**
9  **went before the Board and presented my case.  Or**
10 **not the Board, the disciplinary panel.**
11   Q.  The IDFPR?
12   **A.  Yes.**
13   Q.  Have you ever been, have you ever had
14 your licenses to practice medicine in any other
15 states suspended or revoked for any reason?
16   **A.  No.**
17   Q.  Have you ever been subject to formal or
18 informal discipline by any of the other states in
19 which you have ever been licensed to practice
20 medicine?
21   **A.  No.**
22   Q.  As of 2002 when your license was released
23 or unencumbered, were you licensed to practice
24 medicine in any other State at that time?

**34**

1    **A.  No.**
2    Q.  Fair to say that you did not obtain any
3  additional licenses to practice medicine from any
4  other states until after 2002?
5    **A.  Yes.**
6    Q.  Why do you have, why do you maintain
7  these states as, why do you maintain licenses to
8  practice medicine in these states?
9    **A.  I'm trying to figure that out also right**
10 **now.  Because I just like those states.**
11   Q.  Okay.  Okay.  You don't work in those
12 states currently, right?
13   **A.  Correct.**
14   Q.  Okay.  And you said that you were
15 previously licensed to practice medicine in 17
16 states.  Was that during the time that you were
17 working as Corporate Medical Director for ACH?
18   **A.  Yes.**
19   Q.  Did you, for any states other than
20 Illinois did you have to sit for a Board exam or
21 other examination in order to obtain your license
22 to practice medicine?
23   **A.  No.  Let me, let me correct that.  Some**
24 **of the States did require like an online ethics**

**35**

1  **test or licensing informational tests.**
2    Q.  Okay.  Then let me ask it this way.  Did
3  any of the other states in which you are now or
4  ever were licensed other than Illinois, require
5  you to sit for a Board exam or other examination
6  designed to test your competence to practice
7  medicine?
8    **A.  No.**
9      (Exhibit No. 1 marked for identification.)
10   Q.  The court reporter has handed you what's
11 been marked as Exhibit One.  This is a notice of a
12 deposition being conducted pursuant to Rule
13 30(b)(6).  Are you familiar with that Federal Rule
14 of Civil Procedure?
15   **A.  Yes.**
16   Q.  Have you ever, to your knowledge, been
17 designated as a Rule 30(b)(6) witness by Wexford
18 Health Sources prior to today?
19   **A.  Yes.**
20   Q.  And can you tell me approximately how
21 many times that has happened?
22   **A.  Approximately 20.**
23   Q.  And that would be between 2012 and today,
24 right?

**36**

1    **A.  Yes.**
2    Q.  When was the last time you sat for a
3  deposition through, as a Rule 30(b)(6) designee to
4  your knowledge?
5    **A.  Within the last two to three months.**
6    Q.  Have you also given deposition testimony,
7  not as a 30(b)(6) witness, but as a witness or
8  defendant?
9    **A.  Yes.**
10   Q.  And since you began working for Wexford
11 in 2012 approximately how many depositions have
12 you sat for not as a Rule 30(b)(6) witness?
13   **A.  Approximately four to five maybe?**
14   Q.  Were all of those depositions in
15 connection with your work for Wexford Health
16 Sources?
17   **A.  Yes.**
18   Q.  And in any of those depositions were you
19 named as a defendant?
20   **A.  Yes.**
21   Q.  How many of those four to five were you
22 named as a defendant?
23   **A.  Most of them.  Three, four if I recall.**
24 **That's to the best of my knowledge at this time.**

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

10 (37 to 40)

37

1    Q.  Can you give me an estimate of how many
2  depositions you sat for in the course of your
3  career?
4    **A.  Approximately 20 to 25.**
5    Q.  Did you ever sit for a deposition in your
6  role, during your employment with ACH?
7    **A.  Yes.**
8    Q.  How many?
9    **A.  One or two.**
10    Q.  Was that related to your work as a
11 Corporate Medical Director or related to your work
12 providing direct patient care, or both?
13    **A.  As the Corporate Medical Director.**
14    Q.  Did you ever sit for a deposition during
15 your tenure with Health Professionals Limited?
16    **A.  None that I recall.**
17    Q.  Did you ever sit for a deposition through
18 your work for the State of Illinois?
19    **A.  No.**
20    Q.  Did any of the depositions, well, we'll
21 get to the 30(b)(6) depositions.  Did those four
22 to five depositions that you sat for deal with
23 your work as a supervisor, your work providing
24 direct patient care, or both?

38

1    **A.  I'm sorry, which group of depositions are**
2  **we talking about now?**
3    Q.  The four to five depositions that you
4  said that you've sat for since working for Wexford
5  that aren't 30(b)(6) depositions, did those
6  depositions concern your work providing direct
7  patient care, your work as a supervisor, or both
8  of those things?
9    **A.  Both, to my recall.**
10    Q.  Did either of them concern prisoners who
11 were housed at Southwestern Illinois Correctional
12 Center?
13    **A.  None that I recall.**
14    Q.  You said that you, of the four to five
15 depositions you were named as a defendant in most
16 of them.  How many times to your recollection have
17 you been named as a defendant since working for
18 Wexford?
19    **A.  As a defendant.  Oh, approximately 12 to**
20 **15 or so.**
21    Q.  Have you ever attended a trial?
22    **A.  Yes.**
23    Q.  Okay.  How many trials have you attended?
24    **A.  One that I recall.**

39

1    Q.  And you sat through the entirety of that
2  trial?
3    **A.  No, I was called as a Wexford rep,**
4  **witness.**
5    Q.  Okay.  To your knowledge has a case in
6  which you were named as a defendant ever gone to
7  trial?
8    **A.  No.**
9    Q.  How many times have you been named as a
10 defendant in a lawsuit to your knowledge in the
11 course of your career?
12    **A.  Well, it would be approximately 15 to 20.**
13 **It depends on the day.**
14    Q.  What was the case?  Am I correct in
15 saying that you have testified one time at a
16 trial?  A civil trial?
17    **A.  Are you referring to a jury trial?**
18    Q.  Well, trials can actually happen in front
19 of judges, but a trial in which evidence is
20 elicited by both sides and a fact finder reaches a
21 decision.
22    **A.  Okay.  Then that would be about two or**
23 **three that I recall.**
24    Q.  Is there other type of testimony other

40

1  than trial testimony or deposition testimony that
2  you have given for any reason?
3    **A.  Affidavits have been submitted, yes.**
4    Q.  Those are Affidavits regarding Wexford
5  for the record and submitted to your knowledge and
6  to the court -- strike that.  Bad question.  I'm
7  sorry.  Okay.
8        Other than Affidavits any other type
9  of testimony, other than Affidavits, deposition
10 testimony and trial testimony, any other type of
11 testimony that we haven't talked about today?
12    **A.  No.**
13    Q.  The trial that you testified in as a
14 30(b)(6) witness, when did that happen
15 approximately?
16    **A.  Approximately a year ago.  Six months to**
17 **a year.**
18    Q.  And what was the case about, if you know?
19    **A.  One was a case about a dispute over a**
20 **hernia.  The other case was about, I'm trying to**
21 **remember.  It was a glaucoma.  Not glaucoma, a**
22 **cataract concern.**
23    Q.  Is that, those are the only cases that
24 you recall?

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

11 (41 to 44)

41

1    A. There was another case regarding knee,
2 knee complaints.
3    Q. Was that to your understanding an
4 Orthopedic issue or a Neurological issue or both?
5    A. Orthopedic.
6    Q. And were you testifying in all of these
7 cases as a witness as opposed to a defendant?
8    A. Witness.
9    Q. And do you know how many of these three
10 cases, you think there were three times you gave
11 trial testimony right?
12    A. That I recall, yes.
13    Q. How many of these three cases were you
14 testifying as a designated representative for
15 Wexford as opposed to on behalf of yourself as an
16 individual?
17    A. All of them.
18    Q. Okay. Let's take the knee case. Was
19 that the most recent one? Was that the most
20 recent one or the earliest?
21    A. That would probably be the earliest.
22    Q. And where did you testify, like what city
23 and State?
24    A. East St. Louis, Illinois.

42

1    Q. Was that in Federal Court to your
2 knowledge?
3    A. Yes.
4    Q. Do you remember the name of the case?
5    A. No.
6    Q. What about the hernia case?
7    A. The same venue.
8    Q. East St. Louis?
9    A. Yes.
10    Q. Do you remember the name of that case?
11    A. No.
12    Q. And what about the cataract case?
13    A. The same venue.
14    Q. Do you remember the name of the case?
15    A. It may have been Barrows. B-a-r-r-o-w-s.
16 It didn't, now that I am, there is one more case
17 here in Federal Court in Springfield where I
18 testified, and it was regarding a dermatitis case.
19    Q. Do you remember the name of that case?
20    A. No.
21    Q. That was in Federal Court to your
22 understanding?
23    A. Yes.
24    Q. And were you testifying as a Rule

43

1 30(b)(6) witness?
2    A. Yes.
3    Q. The case that happened six months to a
4 year ago, was that the cataract case or the hernia
5 case?
6    A. It would likely have been the cataract
7 case.
8    Q. Okay. Do you know the outcome of that
9 cataract case?
10    A. I don't recall the outcome.
11    Q. What about the knee case?
12    A. The same.
13    Q. What about the hernia case?
14    A. I believe there was injunctive relief for
15 evaluation by a surgeon.
16    Q. And what about the dermatitis case?
17    A. It just continued ongoing site care that
18 was being provided.
19    Q. Do you know whether any of these cases
20 resulted in an award of damages or money to the
21 prisoner?
22    A. No, I do not recall or know.
23    Q. Have you ever paid any money out of your
24 own pocket to settle any lawsuits against you?

44

1    A. Yes.
2    Q. Tell me about that.
3    A. In 1994 or '05 I had a dispute with
4 contract with the Springfield Clinic, and we just
5 agreed that we would pay them some money back.
6    Q. Any other instances?
7    A. No.
8    Q. To your knowledge has an insurance
9 company or any other entity, including Wexford,
10 ever paid money on your behalf to settle a lawsuit
11 against you?
12    A. No.
13    Q. The Springfield Clinic, was that part of
14 your private practice work in Springfield?
15    A. Yes.
16    Q. Okay. And what was the dispute about the
17 contract?
18    A. It was repayment of a sign-on bonus.
19    Q. Okay. So today you've been designated as
20 a Rule 30(b)(6) witness. And you've probably gone
21 through these things already, but we have to do
22 them. Have you seen this particular document
23 served by me in this particular case before today?
24    A. Yes.

Transcript of Roderick Matticks, M.D., Corporate Designee

Conducted on May 30, 2018

12 (45 to 48)

---

45

1     Q.  Okay.  So I'd like you to read through
2  each of these topics.  You don't have to do it on
3  the record.  Normally I do it on the record but
4  since you're designated for all of these topics
5  with the exception of topic number 11 and there
6  are modifications to three of these topics, which
7  I'll go over, but I'd like you to review each of
8  the topics in this document and let me know once
9  you've had a chance to do that.  Okay?
10     **A.  Yes.**
11        (Witness reading document.)
12        MS. GRADY:  Go off the record just for
13  a second.
14        (Off the record.)
15        THE WITNESS:  You can ask your
16  question.
17  BY MS. GRADY:
18     Q.  Okay.  Have you had a chance to review
19  Exhibit One and all of the topics numbers one
20  through 12 that appear within this document?
21     **A.  Yes.**
22     Q.  Okay.  And it was actually not issued by
23  me, it was issued by my colleague but issued by
24  plaintiff nonetheless.  I'm going to take you

---

46

1  through each of these and ask you whether you
2  agree to be designated by Wexford to provide
3  binding testimony on its behalf.  So let's look at
4  first the topic one as laid out there.  I won't
5  ask you to read it aloud, but it generally deals
6  with the contract between Wexford and the IDOC and
7  the interpretation and responsibilities regarding
8  that contract.  Do you see that portion, that
9  section of the deposition notice?
10     **A.  Yes.**
11     Q.  And I will tell you and state for the
12  record that the parties have agreed to exempt from
13  this topic the subjects of dental and mental
14  health care as it relates to the contract between
15  Wexford and IDOC.
16        So I won't be asking you questions and
17  you are not designated to provide binding
18  testimony on those topics.  Okay?
19     **A.  Yes.**
20     Q.  And I will take you actually one step
21  further and say that I'm not interested in talking
22  about dental or mental health care at all today.
23  So I may be asking you questions, the response to
24  which if you were to consider those as categories

---

47

1  that are relevant, may require you to provide
2  responses that are broader than what I'm
3  interested in.  So for the rest of the discussion
4  today I want you to leave all dental care and
5  mental health care provided by Wexford or required
6  by the IDOC to the side.  Okay?
7     **A.  Yes.**
8     Q.  Okay.  Do you agree to be designated, to
9  provide binding testimony on behalf of Wexford
10  with respect to topic number one as limited as I
11  just stated?
12     **A.  Provided that it's mostly related to the**
13  **medical care that's provided.  There's some**
14  **specifics about the financial aspects of the**
15  **contract, which I'm not familiar.**
16     Q.  Okay.  Well, we can discuss that. I am
17  going to be interested in talking to you about the
18  annual Hospital Utilization Threshold.  Annual
19  Hospital Utilization Threshold and other
20  provisions to that effect.
21        And so perhaps what we should do is if
22  in response to any of my questions you feel you
23  cannot provide binding testimony on behalf of
24  Wexford, you will let me know, okay?

---

48

1     **A.  Yes.**
2     Q.  Okay.  And turning to topic two, which is
3  laid out in Exhibit One, I will tell you that the
4  parties have agreed to limit this topic only to
5  policies, practices, customs, rules, regulations
6  and/or systems in effect at Southwestern Illinois
7  Correctional Center particularly.
8        With that limitation do you agree to
9  provide binding testimony on Wexford's behalf as
10  it relates to topic two in Exhibit Number One?
11     **A.  Yes.**
12     Q.  And if you would, do you agree to provide
13  binding testimony on Wexford's behalf as it
14  relates to topic three?
15     **A.  Yes.**
16     Q.  And do you agree to provide binding
17  testimony on Wexford's behalf as it pertains to
18  topic four?
19     **A.  Yes.**
20     Q.  And do you agree to provide testimony on
21  Wexford's behalf as it relates to topic five?
22     **A.  Yes.**
23     Q.  For topic six the parties have agreed to
24  restrict that topic to the policies, practices,

---

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

13 (49 to 52)

49

1  customs, rules, regulations and/or systems in
2  effect at Southwestern Illinois Correctional
3  Center.  With that limitation do you agree to
4  provide binding testimony on Wexford's behalf for
5  topic six?
6      A.  Yes.
7      Q.  Do you agree to provide binding testimony
8  on Wexford's behalf for topic seven?
9      A.  Yes.
10     Q.  Do you agree to provide binding testimony
11 on Wexford's behalf as it relates to topic eight?
12     A.  Yes.
13     Q.  Topic nine deals with training for the
14 topics that we've discussed earlier.  Do you agree
15 to provide binding testimony on Wexford's behalf
16 for topic nine?
17     A.  Yes.
18     Q.  And topic 10 deals with policy-making
19 authority for the topics identified in one through
20 nine that we've just discussed.  Do you agree to
21 provide binding testimony on Wexford's behalf for
22 topic 10?
23     A.  Yes.
24     Q.  Topic 11 you are not being designated for

50

1  and we will not be discussing today.  And topic 12
2  discusses the preparation of you to provide
3  binding testimony on Wexford's behalf.  I'll be
4  asking you some questions about your preparation,
5  so we can actually get started there.
6      A.  Yes.
7      Q.  Can you tell me what documents you
8  reviewed in order to prepare for today's
9  deposition?
10     A.  I have reviewed some aspects of the
11 medical record that were presented to me, some
12 limited portions of the medical record.  Reviewed
13 this document that you, Exhibit One.  Those are
14 primarily the documents that were reviewed by me
15 in preparation for this.
16     Q.  And when you say you reviewed the medical
17 record, are you referring to the medical record
18 for Gerry Armbruster?  And Gerry is spelled
19 G-e-r-r-y.
20     Q.  Can you tell me what you recall sticking
21 out to you from your review of the medical records
22 for Mr. Armbruster?
23     A.  That Mr. Armbruster had presented himself
24 to nursing staff for nursing sick call and he was

51

1  scheduled to see the Medical Director, Dr. Shah.
2  And he was evaluated multiple times by Dr. Shah
3  for his complaints of back pain and numbness, and
4  some of the actions that Dr. Shah took when
5  reviewing, or crafting a plan of care for this
6  patient.
7      Q.  And what was your opinion of the actions
8  taken by Dr. Shah?
9      A.  I felt that the, that what he had done
10 was appropriate for that given presentation.
11     Q.  Tell me what you mean by that for that
12 presentation.
13     A.  Dr. Shah designed a patient care plan for
14 this patient based upon his clinical presentation
15 and it was appropriate --
16     Q.  Can you read that --
17     A.  -- in my opinion.
18         MS. GRADY:  Can you read back that
19 last answer?
20     (Last answer read back by the reporter.)
21 BY MS. GRADY:
22     Q.  What's a patient care plan?
23     A.  A patient visit usually, typically
24 involves review of the patient's complaints,

52

1  objective findings and assessment and a plan.
2      Q.  Okay.  Is that different than a SOAP
3  note?
4      A.  No.  The SOAP note is just the format in
5  which the note is written, which is the format
6  that we use in the IDOC.
7      Q.  So if a SOAP note is filled out
8  completing all the S-O-A-P, that would be the
9  creation of a patient care plan, correct?
10     A.  That summarizes the visit for which the
11 plan of care was made.
12     Q.  Okay.  Any other documents you reviewed
13 that we haven't discussed to prepare for your
14 deposition here today?
15     A.  No.
16     Q.  And who, if anyone, other than Miss
17 Kinkade or someone from her office have you spoken
18 with to discuss the deposition today or your
19 anticipated testimony at it?
20     A.  No one.
21     Q.  You met with Miss Kinkade or someone from
22 her office?
23     A.  Yes.
24     Q.  Was anyone else present during that

53

1 meeting?
2    A. No.
3    Q. The, have you, you supervised -- strike
4 that. Have you talked with Dr. Shah about Mr.
5 Armbruster's care at any point?
6    A. Not that I recall.
7    Q. Is there anything in your review of the
8 medical records that led you to believe that you
9 had a discussion with Dr. Shah about Mr.
10 Armbruster?
11    A. No, not that I recall.
12    Q. You didn't see any Utilization Management
13 paperwork, correct?
14    A. Correct.
15    Q. And you didn't review any medical records
16 that noted a conversation with you about the
17 patient, correct?
18    A. Not that I recall.
19    Q. Is there any documents that you could
20 review to refresh your recollection as to whether
21 or not you discussed Mr. Armbruster with Dr. Shah
22 at any point?
23    A. Yes, I could look at the medical record
24 again.

54

1    Q. Okay. Any others?
2    A. I cannot think of any.
3    Q. If you had a discussion with a physician
4 -- strike that. If you had a discussion with a
5 Wexford Medical Director or a site physician, your
6 expectation is that that would be documented in
7 the patient's medical record; is that correct?
8    A. Not necessarily.
9    Q. Tell me the circumstances in which it
10 would be documented and the circumstances in which
11 it wouldn't be documented, according to your
12 expectations?
13    A. If we had a discussion with a patient,
14 about a patient that regarded an urgent
15 Utilization Management request or something of
16 that nature I would expect something like that
17 would be documented in a medical record.
18       Or if I'd asked for some kind of
19 specific testing that, or asked them to maybe
20 contact a specialist to clarify some concerns,
21 that may or may not have been documented in
22 medical records. It's not of real significance.
23       But by and large many of the times
24 that they consulted me or we review the patient's

55

1 concerns or the plan of care that they may try to,
2 they may be crafted for that particular patient at
3 that point in time, most of it's just a curbside
4 consult of sorts.
5    Q. Would any documentation be created of
6 that conversation whether in the patient's medical
7 record or somewhere else?
8    A. No.
9       MS. KINKADE: Objection, form.
10       THE WITNESS: Not likely.
11 BY MS. GRADY:
12    Q. You said, you just mentioned a phrase
13 that I'd like you to explain. You said you might
14 ask a patient, or sorry, a physician to contact a
15 specialist for a consult?
16    A. Well, that's, that's possible. But what
17 I mean is that should a, say a patient saw a
18 specialist and the specialist had some
19 recommendations or, that may not, that may be
20 difficult to institute within our environment, and
21 I asked them to contact them and clarify that and
22 make sure that they are both in agreement with the
23 plan of care.
24    Q. Is there a policy or practice in effect

56

1 at Southwestern or anywhere else in Illinois by
2 which Medical Directors can consult with
3 specialists for a patient who has not been
4 referred to be evaluated or treated by a
5 specialist?
6    A. They can, they may always call a
7 specialist and ask them questions. There's
8 nothing prohibiting them from doing that.
9 However, if they wish to make an appointment for
10 off-site care then it does require review by
11 Utilization Management in some fashion.
12    Q. How are Medical Directors or anyone --
13 strike that. How are Medical Directors informed
14 that they have the ability to call a specialist to
15 consult?
16    A. Well, we do this with their initial
17 orientation and ongoing educational initiatives.
18 Or I may call them up and make sure that they are
19 aware of how they can access care for their
20 patients when needed.
21    Q. Are they allowed to consult with any
22 specialist at any site or are there particular
23 specialists that they are advised or required to
24 consult with?

57

1    A.  They are allowed to consult with any
2  specialist that they deem is clinically
3  appropriate.
4    Q.  And are they given any guidance regarding
5  the discretion to consult with any specialist they
6  deem appropriate?
7    A.  Define guidance.
8    Q.  Are they given any guidance about
9  direction about who to contact, when to contact
10 for a consultation, anything like that?
11   A.  We have guidelines in place in the
12 Medical Policies and Procedures Manual that offers
13 them some guidance in terms of making that type of
14 decision.  However, based upon their education and
15 credentialing we expect that they can make those
16 types of clinical decisions on their own.
17   Q.  Okay.  The policies that you're referring
18 to are the medical policies and procedures,
19 correct?  Is that correct?
20   A.  I don't know which ones you have.
21   Q.  Well, are you referring to written
22 policies or some other form of policy or practice?
23   A.  We have written policies, medical
24 policies and procedures, that provide the

58

1  guidelines for those types of decisions.
2    Q.  Okay.  Anything else?
3    A.  There's always availability of the
4  Regional Medical Directors or any of the Corporate
5  Medical Directors for questions if they have
6  specific questions regarding somebody, or in
7  general.
8    Q.  Well, I'm not talking just in general how
9  they provide care.  I'm talking specifically about
10 this policy that you testified Wexford has of
11 permitting Medical Directors to consult with any
12 specialist that they deem clinically appropriate.
13   A.  Yes, they can contact, they can call a
14 specialist if they wanted to, but any time an
15 off-site visit was required then it would require
16 interaction with Utilization Management.
17   Q.  I understand the Utilization Management
18 piece, and I'm confining my question specifically
19 to consultation that does not include an on-site
20 eval, well, I understand the Utilization
21 Management deals with instances when a patient is
22 sent off-site for evaluation or treatment,
23 correct?
24   A.  Yes.

59

1    Q.  But it was your testimony earlier that
2  Wexford's policy is to permit doctors to consult
3  with any specialist they deem clinically
4  appropriate so long as that does not require
5  off-site visits by the patient for evaluation or
6  care, correct?
7    A.  We have no policy that prohibits them
8  from doing that.
9    Q.  So Wexford has no policy either way,
10 right?
11   A.  Not to my knowledge.  That's common
12 clinical practice.
13   Q.  Okay.  The prior Rule 30(b)(6)
14 depositions you sat for, did any of them to your
15 knowledge concern a case that arose out of
16 Southwestern Illinois Correctional Center?
17   A.  Not that I recall at this time.
18   Q.  Okay.
19       (Break taken at this time.)
20   (Exhibits Nos. 2 and 3 marked for
21   identification.)
22 BY MS. GRADY:
23   Q.  Okay.  The court reporter has just handed
24 you what's been marked as Exhibit Two and Exhibit

60

1  Three.  Exhibit Two is a copy of the contract that
2  was produced to us in this case, and Exhibit Three
3  are some pages that are duplicates of what's in
4  Exhibit Two but in unredacted format.  So I'm
5  going to have some questions that we'll need to
6  refer to Exhibit Three because of redactions, but
7  we can look at Exhibit Two starting off for now.
8  First, this, are you familiar with what, with
9  Exhibit Two?
10   A.  Yes.
11   Q.  Can you tell me what it is?
12   A.  This is the contract between the
13 Department of Corrections and Wexford Health
14 Sources for the provision care to its adult
15 facilities here in Illinois.
16   Q.  Is there a separate contract for juvenile
17 facilities?
18   A.  Not with Wexford.
19   Q.  Okay.  And on the first page of this
20 contract is signed by a number of people including
21 Daniel Kahn.  Do you see that?
22   A.  Yes.
23   Q.  Who is that?
24   A.  The CEO, currently the CEO of Wexford

Transcript of Roderick Matticks, M.D., Corporate Designee

Conducted on May 30, 2018

61

1  Health Sources.
2      Q.  And in 2011, May of 2011 when this
3  contract was signed, do you know what his job
4  title was at that time?
5      A.  It says here EVP and COO.
6      Q.  Is this the contract that is currently in
7  effect to govern the relationship between the
8  Illinois Department of Corrections and Wexford
9  Health Sources?
10     A.  To my knowledge unless there's some
11 amendments or changes, extensions, or other
12 activities that I'm just not particularly aware
13 of.
14     Q.  Okay.  And this was the operating
15 contract as of 2014, correct?
16     A.  To my knowledge, yes.
17     Q.  The reason I'm asking about 2014 is
18 that's the time, as you likely saw from your
19 review of the medical records, that's the time
20 that Mr. Armbruster contends he was denied
21 appropriate care.  So I will continue referencing
22 that year, but just for your knowledge that's why
23 the year is important to us.  Okay?
24     A.  Yes.

62

1      Q.  Okay.  The Section 1.3 of this contract
2  on page Wexford three, Section 1.4, 1.5 and 1.6
3  all deal with termination of the contract.  Has
4  the IDOC ever taken steps to terminate this
5  contract for any reason?
6          MS. KINKADE:  Objection, form.
7          THE WITNESS:  Not to my knowledge.
8  BY MS. GRADY:
9      Q.  And have you, have you ever taken steps
10 to terminate the contract for any reason?  And by
11 you I'm referring to Wexford on whose behalf
12 you've agreed to provide testimony.
13     A.  Not to my knowledge or recall.
14     Q.  Sorry.  One other category of care that
15 we can exempt from today is vision care, so
16 optometric and ophthalmological care we're not
17 going to discuss today.  Okay?
18     A.  I see.
19     Q.  Under Wexford Four, this deals with
20 section two of the contract.  And under the very
21 top paragraph the contract provides that the
22 vendor, that refers to you, Wexford, is to arrange
23 and provide for services on-site and as necessary
24 off-site at local hospitals, outpatient

63

1  facilities, and consultative physician offices.
2  Do you see that?
3      A.  I'm sorry, which section?
4      Q.  It's the very top paragraph under section
5  two, description of supplies and services.
6      A.  Yes.
7      Q.  Why don't you just take a moment to
8  review that top paragraph in full?
9      A.  Beginning vendors to provide medical?
10     Q.  Well --
11     A.  Yes.  Thank you.
12     Q.  That, that's the, that's the portion of
13 the paragraph I'm, yes.
14     A.  Terrific.
15        (Witness reviewing document.)
16        Okay.
17     Q.  You agree that pursuant to this contract
18 it is Wexford's responsibility to arrange for
19 patients to receive off-site at local
20 hospitals, outpatient facilities, and consultative
21 physician offices as necessary, correct?
22     A.  Yes.
23     Q.  And is it your understanding of the
24 contract that it is Wexford's decision when those

64

1  off-site visits are, in fact, necessary?
2      A.  It is Wexford's primary decision, yes.
3      Q.  Tell me what you mean by that.
4      A.  Well, the IDOC Medical Director does have
5  the ability to authorize or mandate that
6  somebody's care is provided off-site.
7      Q.  Under this contract does the IDOC Medical
8  Director retain any responsibility to ensure that
9  patients receive appropriate, receive off-site
10 care as necessary?
11     A.  Just by nature of this contract that's so
12 designated.
13     Q.  You're saying that's designated to
14 Wexford or that's designated to the IDOC Medical
15 Director?
16     A.  The IDOC Medical Director provides the
17 oversight of this specific contract.
18     Q.  Okay.  So just so I understand, you agree
19 that Wexford is, has primary responsibility to
20 ensure that patients are sent off-site to local
21 hospitals, outpatient facilities, and consultative
22 physician's offices as necessary, correct?
23     A.  Yes.
24     Q.  And that it is Wexford's responsibility

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

65

1 in the, to determine when those visits are in fact
2 necessary, correct?
3     A. Yes.
4     Q. Okay. And you agree that the contract
5 requires the vendor to provide similar services,
6 similar care as is provided to members of the
7 general public, although there is a recognition
8 that the methods of delivery may differ from
9 methods used to provide services to members of the
10 public, correct?
11     A. Correct.
12     Q. And in exchange for those services and
13 the others laid out in this contract, Wexford
14 receives payments from the State, correct?
15     A. Hopefully.
16     Q. Well, I mean, that's the consideration.
17 Wexford is taking on this responsibility to
18 provide adequate, provide medical care for
19 patients in IDOC facilities, and in exchange for
20 giving that service they are paid a monthly
21 annual, or in some other way, sum of money,
22 correct?
23     A. Correct.
24     Q. And the, you mentioned the IDOC Medical

66

1 Director. That was Dr. Shicker as of 2014,
2 correct?
3     A. Yes, to my recall that's correct.
4     Q. Under, on page Wexford five, section
5 2.2.1.12 --
6     A. Oh, the top of the page?
7     Q. Yes. And I'll just tell you that to my
8 reading, and you can tell me if you disagree,
9 section two deals almost exclusively with the
10 vendor's responsibilities under the contract. So
11 I believe that this is a responsibility put onto
12 the vendor to maintain IDOC management
13 informational systems of offenders and provide
14 vendor access -- oh. No, I'm sorry. I'm sorry.
15 I was incorrect about that.
16     This section 2.2.1 deals with the
17 State of Illinois functions. And I still have a
18 question. So the State of Illinois is required to
19 maintain IDOC management informational systems for
20 offenders and provide vendor access to MIS for
21 required informational functioning. What is MIS?
22 Or the Management Informational Systems, what is
23 that?
24     A. It's the computer system maintained by

67

1 IDOC and its software systems.
2     Q. Is that Offender 360?
3     A. I believe that's what they're referring
4 to here.
5     Q. Does Wexford staff at Southwestern or
6 anyone else utilize that system?
7     A. Yes.
8     Q. Can you give me an idea what the purpose
9 of their utilization of that system is?
10     A. Most likely from scheduling of a patient,
11 finding out, you know, where they're located, how
12 they can issue call passes and those types of
13 things. And for my purposes for clarification I
14 just usually refer to them as patients as just,
15 you know, patient advocate. That's just what I do
16 so I, offenders and patients are the same people.
17     Q. Section 2.2.2 deals with the vendor
18 responsibilities, and under that first section,
19 still in Wexford five, the vendor is tasked
20 according to the contract with providing safe and
21 cost effective on-site medical and mental health
22 services.
23     Off-site services will be reserved for
24 specialty and emergency care that cannot be

68

1 provided on-site. Do you agree that that is
2 Wexford's responsibility in operating within the
3 IDOC Correctional Centers for adults?
4     A. Yes.
5     Q. And the 2.2.2.1 deals with the particular
6 services that, quote, may be included as
7 comprehensive medical and mental health services.
8 I'd like you to review those and let me know once
9 you've had a chance to review them.
10     (Witness reviewing document.)
11     A. Okay.
12     Q. So just so I'm clear, does this, does
13 this section, according to Wexford, does it
14 require that all of these things be provided
15 on-site? And I'll just let you know that I'm most
16 interested in A, B, F, G and H.
17     A. My interpretation says these services may
18 include but are not limited to, so these are
19 services that are provided to our patients, so.
20 You want A, B, say again. C? No.
21     Q. A, B, F, --
22     A. F.
23     Q. -- G and H.
24     A. G and H.

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

18 (69 to 72)

69

1    Q.   And my question, my question though is
2  more a general one.  Is it your understanding that
3  these are required, according to the contract, to
4  be provided on-site at IDOC facilities or that it
5  is permissive as one of the services that may be
6  included?  I'm just, I don't understand this
7  language.
8    A.   These are the services that are, that we
9  are required to provide, be it on-site or
10 off-site.  It doesn't, either way the services
11 need to be provided.
12   Q.   Oh, okay.  And so what does it mean the
13 spectrum of medical subspecialties?  What does
14 that mean?
15   A.   It just means whatever subspecialty is
16 required for the treatment of that particular
17 patient's issue at that time.  Point in time.  So
18 it could include gastroenterology or urology or
19 gynecology or, any of the specialties are
20 available to us.
21   Q.   And how is that different from section B?
22   A.   I don't think there's real significant
23 differences.  There's a bit of redundancy in those
24 two, A and B.

70

1    Q.   Okay.  Okay.  Section 2.2.2.4 requires
2  the vendor to provide training on policies
3  governing the operations of the Correctional
4  Centers.  Do you see that section?
5    A.   Yes.
6    Q.   Is that the IDOC's policies and
7  procedures, Wexford's policies and procedures, or
8  both?
9    A.   This is, in my interpretation more
10 referenced to IDOC policies and procedures.
11   Q.   Okay.  So it's your understanding that
12 this section requires Wexford to train its staff
13 on IDOC policies, correct?
14   A.   Yes.
15   Q.   And those are primarily Administrative
16 Directives and Institutional Directives?
17   A.   Correct.
18   Q.   And does Wexford provide that training?
19   A.   Yes.
20   Q.   Section 2.2.2.7 also deals with
21 Administrative Directives and requires compliance
22 with those Administrative Directives, correct?
23   A.   Yes.
24   Q.   Can you tell me what, if any, steps

71

1  Wexford takes to implement that section of the
2  contract?
3    A.   This typically occurs at the orientation
4  period.  It initially occurs at the orientation
5  period when we bring a staff member on-site.  I'll
6  allow them time to review and go over all of the
7  Administrative Directives.
8         We also do provide ongoing training in
9  terms of compliance with the specific AD's that
10 are relative to Healthcare, such as chronic
11 clinics, how to comply with the Administrative
12 Directives regarding care at chronic clinics.
13   Q.   And is training provided by Wexford when
14 Administrative Directives are changed or amended?
15   A.   Yes, in concert with IDOC because IDOC
16 provides some of that training at the, typically
17 at the quarterly Medical Director meetings also.
18   Q.   Tell me about those quarterly meetings.
19   A.   They happen quarterly.
20   Q.   Thank you.  Who attends them?  Let me
21 first ask who is responsible for ensuring that
22 they happen?  Is that Wexford or IDOC?
23   A.   IDOC is the one I'm referring to.  What
24 happens is once a quarter IDOC headed up by the

72

1  Office of Health Services and the Agency Medical
2  Director established an agenda that, and we
3  require that all the Medical Directors attend the
4  meeting.  It's usually held here in Springfield,
5  and that's where a lot of these educational
6  initiatives are held.
7         And then following that, Wexford
8  Health typically has its own quarterly Medical
9  Director meetings after that, and we again provide
10 more additional training.
11   Q.   Any other steps that Wexford takes to
12 ensure that its staff complies with the
13 Administrative Directives?
14   A.   Yes.  We have site managers that assist
15 with some oversight, you know, if there's any
16 questions or concerns with regard to how those
17 AD's are being met.  We have Regional Managers
18 that are available to help clarify any concerns
19 with Administrative Directives, and of course the
20 Regional Medical Directors are available.
21   Q.   Any others?
22   A.   Mostly with the Illinois team that
23 consists of the Vice President of Operations and
24 Director of Operations as well as the Regional

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

73

1 Managers are part of the team that ensures
2 compliance with these.
3    Q.  Okay.  Any others?
4    A.  No, not that I recall.
5    Q.  Site managers, what are those?
6    A.  I'm sorry, what do you mean what are
7 those?
8    Q.  Are those Medical Directors or someone
9 else?
10    A.  No.  They're, they're Operations
11 Directors.
12    Q.  Is there one assigned to each site?
13    A.  Yes.
14    Q.  And what, do they have, are they medical
15 personnel?
16    A.  Not necessarily.
17    Q.  Who --
18    A.  Some are and some aren't.
19    Q.  Who is the current Site Manager for
20 Southwestern Illinois Correctional Center?
21    A.  I believe at the present it's Alan
22 Karraker.  K-a-r-r-a-k-e-r.
23    Q.  And what is, what does, does he have any
24 job title in addition to Site Manager?

75

1 helps manage that.  Those are mostly just
2 administrative roles.
3    Q.  Okay.  And what policies or practices has
4 Wexford put into place regarding the Site
5 Manager's responsibility to ensure compliance with
6 the Administrative Directives and Institutional
7 Directives?
8    A.  Those fall, those typically fall under
9 the direction of the Operations Directors here in
10 Illinois, and they usually have quarterly meetings
11 also in which they bring all the site managers in,
12 some of the Director of Nurses if it's not the
13 current Site Manager, and review policies and
14 procedures and do educational initiatives.
15    Q.  Who is the Operations Director?  Is there
16 just one Operations Director for the State of
17 Illinois, or are there multiple?
18    A.  There's one.  And currently it's Rhonda
19 Dudley.
20    Q.  And who was it in 2014?
21    A.  In 2014 I'm not certain that we had
22 Operations Director.  We just had the Vice
23 President of Operations Cheri Laurent.
24 L-a-u-r-e-n-t.  Cheri with a C.

74

1    A.  Not that I know of.  He's not a Site
2 Manager.  I'm sorry, he's a Regional Manager.
3    Q.  Okay.  So my understanding from your
4 testimony was that one of the people tasked with
5 ensuring compliance was someone you referred to as
6 a quote, Site Manager?
7    A.  Correct.
8    Q.  And so tell me who is a Site Manager for
9 Southwestern Illinois Correctional Center?
10    A.  I'm sorry, I don't recall her name at the
11 present time.
12    Q.  Do you know whether she holds a job in
13 addition to Site Manager?
14    A.  I don't know that.
15    Q.  It's my understanding that Site Managers
16 are typically either Directors of Nursing or a
17 Lead Wexford Nurse.  Is that consistent with your
18 understanding or different from your
19 understanding?
20    A.  Typically that, that's what happens.  If
21 there's a Director of Nurses that's a Wexford
22 employee, DON, on-site they are typically
23 considered Site Managers.  There are times when we
24 may have to use a Medical Records Director who

76

1    Q.  Site Managers don't have any supervisory
2 responsibility over the Medical Director of the
3 site, correct?
4    A.  They may have some administrative
5 responsibilities that involve the Medical
6 Director, but certainly not anything that involves
7 clinical determination.
8    Q.  Okay.  So as it pertains to patient care
9 the Site Manager has no ability or authority to
10 supervise the Medical Director, correct?
11    A.  Yes.
12    Q.  You said the Regional Managers and
13 Regional Medical Directors are also available if
14 the, if anyone has questions about complying with
15 the AD's or ID's, right?
16    A.  Yes.
17    Q.  Who are the Regional, just tell me what a
18 Regional Manager is?
19    A.  A Regional Manager is an individual who
20 falls within the, the diagram of, why am I
21 blocking on the term?  Organizational diagram.
22 And they are responsible for the operations of the
23 facility in terms of managing hours, compliance,
24 and those types of things.  The clinical

---

**77**

1 responsibilities fall to the Regional Medical
2 Directors.
3     Q. Is Southwestern Illinois Correctional
4 Center NCCHC accredited?
5     A. To my knowledge it is, yes.
6     Q. When did it become NCCHC accredited?
7     A. They were one of the first ones, and I
8 believe it was about three years ago. Two or
9 three years ago if I recall. I think they have
10 accreditation with verification.
11     Q. What does that mean?
12     A. It means that the review team from NCCHC
13 come in and review their ongoing accreditation and
14 found some areas that they wanted them to improve
15 upon. And once they approved that then, or submit
16 the supporting documentation of that then they
17 decide whether it's full accreditation.
18     Q. So they have been verified?
19     A. When are you talking about?
20     Q. As of now. As of today.
21     A. I don't know the answer to that.
22     Q. When did Southwestern Illinois
23 Correctional Center first seek NCCHC
24 accreditation?

**78**

1     A. To the best of my recall it was two,
2 maybe two years ago or so. I don't recall the
3 specific dates.
4     Q. Can you tell me the process, you've been
5 involved in that process of seeking and obtaining
6 NCCHC accreditation as a Regional Medical
7 Director, correct?
8     A. Yes.
9     Q. Can you tell me the overview of that
10 process from the initial decision, once the
11 initial decision to seek NCCHC accreditation has
12 been made up until the very end?
13     A. The application is submitted to NCCHC for
14 accreditation purposes. We bring in a Wexford
15 Health team which assists with all the guidelines
16 and accreditation processes that occur on-site,
17 help them assure that they are also in compliance
18 with the NCCHC required accreditation topics and
19 systems, provide some guidance in regard to that.
20     And then the NCCHC team comes in and
21 provides a review of the facility with regard to
22 the specific guidelines required for NCCHC
23 certification, and then they gather all their
24 information in a two or three or four day visit.

**79**

1 They return to their NCCHC team and, up in
2 Chicago, make their recommendation. The NCCHC
3 Board then makes its determination whether full
4 accreditation is either denied or approved with
5 verification, meaning that a specific issue might
6 just need to be tweaked and/or dealt with or full
7 accreditation may be issued.
8     Then they come back in I think after
9 two years and re-accredit and pretty much do the
10 same process again, perhaps on a smaller scale.
11     Q. Okay. Did Southwestern Illinois
12 Correctional Center, it's your belief that they
13 were accredited with verification, correct?
14     A. Initially or --
15     Q. Yes.
16     A. -- currently?
17     Q. Initially. So they first began seeking
18 certification approximately two years ago, right?
19     A. Correct.
20     Q. And was that when they submitted the
21 application to the NCCHC?
22     A. Sometime prior to that, yes.
23     Q. And then NCCHC came for a site visit,
24 correct?

**80**

1     A. Correct.
2     Q. When did that occur?
3     A. Approximately two years ago.
4     Q. Okay. So the process started earlier
5 than that but the site visit happened about two
6 years ago?
7     A. Yes, approximately.
8     Q. So sometime in approximately 2016?
9     A. Okay.
10     Q. Well, that's, that's approximately two
11 years ago, right?
12     A. Yes.
13     Q. Okay. And the result of that site visit
14 was accreditation with verification, right?
15     A. As I recall that's what happened at that
16 time, yes.
17     Q. Has the NCCHC visited Southwestern
18 Illinois for a site visit or any other reason to
19 your knowledge?
20     A. Not that I know of or recall.
21     Q. What was the issue that kept Southwestern
22 Illinois Correctional Center from receiving full
23 accreditation?
24     A. I don't recall.

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

81

1    Q.  Wexford would have in its possession
2  custody or control of the results from the NCCHC
3  of that site visit, correct?
4        MS. KINKADE:  Objection.  Form.
5        THE WITNESS:  I'm sure they have that
6  information at the Corporate office.
7  BY MS. GRADY:
8    Q.  Okay.  Returning to compliance with
9  Administrative Directives, you listed the Vice
10 President of Operations, the Director of
11 Operations, and the Regional Manager as three
12 other people responsible for ensuring compliance
13 with the Administrative Directives, correct?
14   A.  Yes, that would assist with that.
15   Q.  And tell me how, according to Wexford's
16 policies and procedures, they actually, what are
17 they required to do to ensure compliance?
18   A.  Well, they are available should one have
19 questions with regard to what the Administrative
20 Directives says or how to implement it.  They
21 assist with that.  But most of these
22 Administrative Directives are actually related to
23 clinic, or chronic care, medical care, and so they
24 provide some assistance for, you know, with the

82

1  site administration should they have any questions
2  about that.
3    Q.  Okay.
4        (Exhibit No. 4 marked for identification.)
5  BY MS. GRADY:
6    Q.  The court reporter has handed you what's
7  been marked as Exhibit Four.  This is a copy of an
8  Administrative Directive promulgated by the
9  Illinois Department of Corrections governing
10 Offender Healthcare Services, correct?
11   A.  Yes.
12   Q.  Is this an Administrative Directive that
13 you're familiar with?
14   A.  Yes.
15   Q.  And this is an Administrative Directive
16 that Wexford is required to comply with, correct?
17   A.  Yes.
18   Q.  Under the second, on the second page of
19 this Administrative Directive the, under direction
20 the policy states that the Healthcare Services
21 program shall be directed by a designated
22 Healthcare authority whose scope of duties are
23 detailed in a written agreement, contract, or job
24 description that is reviewed annually and revised

83

1  when necessary.  Do you see that?
2    A.  Yes.
3    Q.  The designated Healthcare authority,
4  that's the Site Medical Director, correct?
5    A.  No, not necessarily.
6    Q.  Well, let's look at the contract.  Hold
7  on.  Okay.  If you would turn to Wexford 20 and
8  look at section, it's toward the top 2.4.1.12.
9  You see there that, this is the section related to
10 staff specifications, the on-site Medical Director
11 at the Center shall serve as the medical authority
12 and shall coordinate with the Healthcare Unit
13 Administrator in the execution of the duties under
14 this contract.
15       The provision goes on, the on-site
16 Medical Director shall operate the medical and
17 mental health program in accordance with State
18 regulations and Statutes, and in accordance with
19 accepted standards of medical practice.  Did I
20 read that portion of the section correctly?
21   A.  Yes.
22   Q.  And then it continues.  The on-site
23 Medical Director shall plan, implement, direct and
24 control all clinical aspects of the medical and

84

1  mental health program.  And it provides that the
2  Medical Director will also provide primary
3  healthcare services.  You agree that this
4  contract, that this is the responsibilities of the
5  on-site Medical Director for each of the IDOC
6  facilities?
7    A.  Yes.
8    Q.  And that those were the responsibilities
9  at all points between 2013 or 2014 and the present
10 regarding the Medical Director at Southwestern
11 Illinois Correctional Center, right?
12   A.  Yes.
13   Q.  Okay.  So tell me then, who is the
14 designated Healthcare authority as that term is
15 used in Administrative Directive 0403103 here in
16 Exhibit Four?
17       MS. KINKADE:  Objection.  Form.
18       THE WITNESS:  My interpretation of
19 this is that they're referring typically to the
20 Healthcare Unit Administrator or the Assistant
21 Warden of Programs.
22 BY MS. GRADY:
23   Q.  It's your, it's your testimony that this
24 Administrative Directive which you are, you as a

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

85

1  corporation are obliged to follow, that the
2  designated Healthcare authority refers to an
3  Assistant Warden of Programs?
4     A. Yes, that's what I said.
5     Q. Okay. To your knowledge does the
6  Assistant Warden of Programs at Southwestern
7  Illinois Correctional Center have any medical
8  training?
9     A. I don't know.
10    Q. Do you know of any Assistant Wardens of
11 Programs that have medical training?
12    A. I don't know. It depends on how you
13 define medical training.
14    Q. Okay. Let's define it by possessing a
15 license of any sort to provide medical care, be it
16 nursing care or physician care.
17    A. There are some who are psychologists but
18 I don't know if they're licensed.
19    Q. Okay. Do you know any Assistant, any
20 Assistant Warden of Programs who are physicians?
21    A. No.
22    Q. And is that true during your tenure at
23 Southwestern?
24    A. Yes.

86

1     Q. Can you tell me where, if anywhere,
2  Wexford or IDOC has created a document explaining
3  that the designated authority is the Assistant
4  Warden of Programs or Healthcare Unit
5  Administrator?
6     A. I'm not certain, but that is also
7  discussed in the NCCHC Guidelines.
8        (Exhibit No. 5 marked for identification.)
9  BY MS. GRADY:
10    Q. This is a copy of the Operations policies
11 and procedures promulgated by Wexford throughout
12 its sites as of June 20 of 2014, correct?
13    A. I do not know if these are the particular
14 ones. They were updated, I see here, date of
15 effective is April 7 of 2014. Okay.
16    Q. Now, can you tell me what these, what
17 this document is? Strike that. This is a
18 document that you're familiar with in your
19 employment with Wexford, correct?
20    A. Yes.
21    Q. What is this?
22    A. This is a document that provides
23 guidelines for some care within the Department of
24 Corrections and some subset guidelines basically

87

1  of the services that we provide for our patients.
2     Q. Okay. I'd like you to turn to, I'll use
3  the numbering on this handbook here because I
4  think it will be easier for us. I'd like you to
5  turn to page 48 of this document to the section
6  marked Relevant Health Authority. Responsible
7  Health Authority. Excuse me.
8        This policy states that Wexford,
9  requires Wexford to have a designated Health
10 Authority at each facility, correct?
11    A. Yes.
12    Q. And it further details that the
13 responsible Health Authority for the facility is
14 the Facility Medical Director, correct?
15    A. Yes.
16    Q. Okay. So according to Wexford's policy
17 the Medical Director, the Site Medical Director is
18 the responsible Health Authority as it pertains to
19 medical and clinical decisions, correct?
20    A. Correct.
21    Q. And can you tell me what, if any, role
22 according to Wexford's policies, the Healthcare,
23 the Health Services Administrator plays?
24    A. There is none.

88

1     Q. Okay. So you agree that Wexford's
2  policies put on the Medical Director the
3  responsibility for the Healthcare Services Program
4  at the, on-site, correct?
5     A. No.
6     Q. Tell me how that statement is
7  incorrect.
8     A. I believe that this refers to the
9  provision of the on-site Medical Director Center
10 serving as a medical authority, not the Healthcare
11 Unit Administrative authority or the authority of
12 the Healthcare at the site.
13    Q. And what's the difference between those
14 two services?
15    A. The IDOC provides a Healthcare authority
16 in terms of administration at the particular site,
17 but the Medical authority is designated to the
18 Site Medical Director or his designee or her.
19    Q. So I understand what you mean when you
20 refer to medical authority, but what do you mean
21 when you refer to someone tasked with
22 administration?
23    A. Those are individuals who are responsible
24 for the site Operations of the Healthcare Unit.

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

89

1    Q.  So scheduling and the like?
2    **A.  That would fall into that, yes.**
3    Q.  Nothing pertaining to the quality of
4    care, correct?
5    **A.  No, except if they have concerns or**
6    **questions then they are relayed to those who can**
7    **make those types of clinical determinations.**
8    Q.  And who can make clinical
9    interpretations?
10   **A.  The Medical Director.**
11   Q.  Okay.
12   **A.  Or myself, or the Agency Medical**
13   **Director.  Someone who's licensed as a physician**
14   **in the State of Illinois.**
15   Q.  Under, turning back to Exhibit Four,
16   Administrative Directive 04030103, the section B
17   under Offender Access on page two, section B
18   requires that offenders shall be referred for
19   specialty services if determined medically
20   necessary.  Do you see that?
21   **A.  No, I'm sorry.  Which did you say?**
22   Q.  Page two.
23   **A.  You said Bates 259?**
24   Q.  Yes.

90

1    **A.  Oh, thank you.  Where are we at now?**
2    Q.  So section three, Offender Access.
3    Toward the bottom.  And then section B.
4    **A.  3B, yes.**
5    Q.  So this Administrative Directive which is
6    binding on Wexford is, requires offender shall be
7    referred for specialty services if determined
8    medically necessary, correct?
9    **A.  Yes.**
10   Q.  Who has the authority to make the
11   decision about when specialty services are
12   medically necessary?
13   **A.  That would be the treating provider.**
14   Q.  And is there anything in this
15   Administrative Directive that constrains that
16   discretion or provides guidance?
17   **A.  There's guidance for other practitioners**
18   **at the site who should refer to the Facility**
19   **Medical Director if they were, if an individual**
20   **patient required off-site medical specialty**
21   **services.**
22   Q.  Okay.  Anything else?
23      (Witness reading to himself.)
24   **A.  You're looking for restrictions?**

91

1    Q.  I'm looking for guidance or restrictions
2    on their discretion.
3    **A.  Well, there's a guidance on how to**
4    **operate within that system.  Any restrictions,**
5    **meaning that if someone felt it was medically**
6    **necessary, that it wouldn't be, it wouldn't be**
7    **possible?**
8    Q.  No.  You said that the treating physician
9    has the power to determine whether or not
10   specialty services are medically necessary.  And
11   I'm asking, according to this policy is there
12   anything that gives guidance about how to make
13   that decision regarding whether specialty services
14   are, in fact, medically necessary?
15   **A.  No, this is procedural.**
16   Q.  Okay.  And what policies, either
17   Administrative or Institutional Directives or
18   Wexford's policies, provide any guidance to
19   Medical Directors about when specialty services
20   are or are not medically necessary?
21   **A.  Well, we have guidelines in the medical**
22   **policies and procedures that can provide some**
23   **guidance in terms of, you know, whether specialty**
24   **services are required.  But by and large each of**

92

1    **these decisions are made on a case-by-case basis**
2    **based upon the clinical presentation of the**
3    **patient at the time whether or not further**
4    **treatment is necessary of some sort or evaluation.**
5       (Exhibit No. 6 marked for identification.)
6    Q.  The court reporter just handed you what's
7    been marked as Exhibit Six, which is a copy of
8    medical policies and procedures produced to us in
9    this case.  Is this the document you were
10   referring to when you, in your answer just a
11   minute ago described policies that provided
12   guidance?
13   **A.  Yes.**
14   Q.  Okay.  And tell me, are you familiar with
15   this document through the course of your
16   employment with Wexford?
17   **A.  Yes.**
18   Q.  What is this document?
19   **A.  This is a document that provides guidance**
20   **with regard to a specific type of disease or**
21   **illness that one presents with, that can be**
22   **referred to if there are questions regarding how**
23   **best to handle ongoing care for that individual.**
24   Q.  Okay.  You had an opportunity to review

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

24 (93 to 96)

93

1 the medical records in this case, correct?
2    **A. Yes.**
3    Q. And you reviewed a record where Mr.
4 Armbruster complained of pain and tingling in his
5 arms?
6    **A. That was documented at one point in time.**
7 **I'd have to review it again.**
8    Q. Okay. Well, I'll represent to you that
9 that was the complaint that was noted in the file
10 the first time Mr. Armbruster saw Dr. Shah. Can
11 you, using with reference to Exhibit Six, tell me
12 what, if any, particular policies within that very
13 large document would provide any guidance either
14 way as to whether or not referral for specialty
15 services was medically necessary?
16    **A. Well, one could have referred to the pain**
17 **management section or, I mean, those are, that**
18 **appears to be the best option in here in terms of**
19 **back pain and management of that. Or Neurology**
20 **guidelines are a possibility.**
21        **This document is not all inclusive for**
22 **every visit or every condition that could be**
23 **presented to our practitioners, but that might be**
24 **one that one would refer to.**

94

1    Q. Okay. And I understand as you say that
2 there, it's not, it doesn't address everything.
3 I'm just trying to understand if this document
4 does address the situations relevant here. So
5 let's look first at Neurology. Gosh. Which I
6 think is on page 190. It's also Bates 520.
7        MS. KINKADE: What did you say?
8        MS. GRADY: Bates 520.
9        THE WITNESS: Okay.
10 BY MS. GRADY:
11    Q. Can you tell me whether any of the things
12 listed in this Neurology guideline would be
13 helpful in providing guidance to a physician
14 regarding a complaint of pain and tingling in the
15 arms?
16        MS. KINKADE: Objection. Form.
17        MS. GRADY: Yeah. Let me just make
18 sure it's clear.
19 BY MS. GRADY:
20    Q. Is there anything in this portion of the
21 medical policies and procedures that would provide
22 guidance to a physician as to whether or not pain
23 and tingling in the arms should be referred for
24 specialty services because medically necessary?

95

1        MS. KINKADE: Same objection.
2        THE WITNESS: Not specific in this
3 particular guideline with relation to what you're
4 describing.
5 BY MS. GRADY:
6    Q. Okay. And the other one was pain
7 management. Oh, sorry. Actually, before you
8 turn, I just want to understand sort of the layout
9 of this document. So there are three, under
10 Neurology guidelines anyway there are three
11 categories, or three columns. DX, Primary RX and
12 secondary (Wexford) RX. And what does DX stand
13 for?
14    **A. Diagnosis.**
15    Q. And what does Primary RX stand for?
16    **A. Typically the first line of treatment.**
17    Q. And what does secondary (Wexford) RX
18 refer to?
19    **A. Should the primary treatment options not**
20 **help resolve this case then one could consider**
21 **reviewing the secondary treatment options which**
22 **may involve Utilization Management or referral**
23 **off-site.**
24    Q. Are all of the secondary, are all of the

96

1 secondary lines of treatment involving referral or
2 only some of them?
3    **A. It depends. Some of them may, some of**
4 **them may not. It just depends on the particular**
5 **situation.**
6    Q. Okay. And is there any significance to
7 the fact that the word Wexford appears in
8 parentheses there?
9    **A. I think they're just referring that these**
10 **are the ones that would require some kind of**
11 **interaction with Utilization Management to help**
12 **with determining what's necessary.**
13    Q. Got it. Okay. And so to use these
14 policies a doctor must first have obtained a
15 diagnosis, is that right? Or obtained is a bad
16 word. But before these policies can be helpful a
17 doctor must first have reached a diagnosis for the
18 patient, correct?
19    **A. Or have some concern with regard to**
20 **differential diagnoses or whether, you know, if**
21 **they had questions regarding presentation then**
22 **they may refer to these documents as an option for**
23 **guidelines.**
24    Q. Okay. They could refer to these

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

25 (97 to 100)

97

1  documents as part of their process for
2  differential diagnosis even before they've reached
3  a definitive diagnosis?
4      **A.  That's possible.  That's certainly an**
5  **option.**
6      Q.  Okay.  Well, is that how they're intended
7  to be used?
8      **A.  Yes, primarily.**
9      Q.  Okay.  So now let's turn to pain
10  management.  That starts on Wexford 550.  And can
11  you look through this portion of the policy and
12  let me know all of the places that you see
13  something that would be helpful to the case as
14  we've discussed it?
15      **A.  Well, in a particular case like this the**
16  **question is whether it's acute or not, and if**
17  **there are some pain management options that may**
18  **actually resolve some of these symptoms, such as**
19  **pain, be it low back or upper back, it doesn't**
20  **really matter, finding whether it's acute or**
21  **chronic, how long it's been going on, what sort of**
22  **exercises or options may be considered.**
23      Q.  Okay.  So in this case the patient when
24  first reporting the pain and tingling reported

98

1  that the symptoms had been present for
2  approximately three weeks.  So given that, can you
3  tell me what portions of this policy would be
4  helpful in providing guidance to the physician as
5  to whether or not specialty services were
6  medically necessary?
7      **A.  Oh, I'm sorry.  You'll have to repeat**
8  **that one.**
9      Q.  Yes.  I think I'll have her read it back.
10      (Last question read back by the reporter.)
11      THE WITNESS:  We believe the option
12  here really recommends some pain management or
13  some anti-inflammatory medications which may
14  actually resolve the symptoms which that patient
15  was referring to, and it's still up to the
16  clinical discretion of the practitioner whether
17  any specialty services are required at any point
18  in time during the treatment algorithm that occurs
19  here.
20      This is just an algorithm that can
21  vary from it at any point in time when they're,
22  depending on the clinical presentation of the
23  patient at that time and the judgment that's made
24  by the practitioner.

99

1  BY MS. GRADY:
2      Q.  And they can, there's no constraint on
3  their decision to submit a request for specialty
4  care, is that correct?
5      **A.  There is no limitation anywhere in this**
6  **document that says they cannot do that.**
7      Q.  Okay.  Is there, not just this document,
8  but are there any policies or procedures in place
9  by Wexford to constrain the discretion of the
10  Medical Director to request a referral for
11  specialty care?
12      **A.  There are no policies or procedures in**
13  **place that state that they cannot do that.**
14      Q.  Okay.  So I think just the page that you
15  were talking about that provides guidance as to
16  whether referrals are medically necessary is page
17  Bates 552, correct?
18      **A.  Yes.  That gives them the option of some**
19  **acute care options that may actually resolve these**
20  **symptoms but the determination is still up to the**
21  **medical provider.**
22      Q.  And according to this guidance if the
23  pain, assuming that they fall under the acute box
24  as laid out on 552, which this policy refers to as

100

1  being present for less than 30 days, the first
2  question is whether the pain is mild to moderate,
3  correct?
4      **A.  Yes.**
5      Q.  Assuming that it is, there are, according
6  to this policy, two, two medications that are
7  suggested with an alternative, correct?
8      **A.  Yes.**
9      Q.  What are those medications?  What is
10  APAP?
11      **A.  Tylenol.**
12      Q.  And what is ECASA?
13      **A.  Aspirin.**
14      Q.  Okay.  And then according to this policy,
15  the next question, if these medications are
16  provided, asks whether or not the pain was
17  resolved, correct?
18      **A.  According to this guideline, yes.**
19      Q.  Okay.  Fair enough.  So according to this
20  guideline if the, if the, and does this refer
21  simply to the pain or does it refer to any
22  additional symptoms?
23      **A.  I think this is referring to the global**
24  **presentation of the patient.**

Transcript of Roderick Matticks, M.D., Corporate Designee

26 (101 to 104)

Conducted on May 30, 2018

---

101

1    Q.  Okay.  So if the patient's symptoms are
2 resolved then therapy may be ended, right?
3    **A.  Yes.**
4    Q.  And you called it a guideline a minute
5 ago, but this document is entitled Medical
6 Policies and Procedures, correct?
7    **A.  Correct.**
8    Q.  Okay.  And tell me what, if any, training
9 Medical Directors receive on this document?
10   **A.  When they are first, the initial**
11 **orientation process that occurs, these are**
12 **typically provided to them as options for, to**
13 **review and availability for referral for, you**
14 **know, care options, as well as other things like,**
15 **you know, they have access to Up-to-Date and other**
16 **current programs.**
17   Q.  Does Wexford have any policies regarding
18 ending treatment or therapy for a patient whose
19 symptoms are not resolved?
20   **A.  No.**
21   Q.  It has no policies either way?
22   **A.  Not that I recall.  You mean as to**
23 **whether or not, say, the symptoms are resolved and**
24 **we say you need to end therapy as a policy?**

---

102

1    Q.  Well, no, I'm not asking that question.
2 I'm saying do you agree that a patient's -- strike
3 that.  Do you agree that if a patient's symptoms
4 do not resolve treatment should not be ended?
5    MS. KINKADE:  Objection.  Form,
6 incomplete hypothetical.
7    THE WITNESS:  It depends on how you
8 define treatment.
9 BY MS. GRADY:
10   Q.  Well, any steps taken by medical staff to
11 address the symptoms.
12   MS. KINKADE:  Same objections.
13   THE WITNESS:  I believe it's fair to
14 address any symptoms or complaints that somebody
15 has, but it may not involve a specific treatment
16 or further evaluation.
17 BY MS. GRADY:
18   Q.  Okay.  So you, in your opinion it would
19 be acceptable for a doctor to take no further
20 action regarding a patient's symptoms even if
21 whatever treatment had been previously provided
22 did not resolve those symptoms?
23   MS. KINKADE:  Objection.  Form,
24 incomplete hypothetical.

---

103

1    THE WITNESS:  That is a long
2 hypothetical.  If a patient presents to a
3 physician with a particular complaint and the
4 physician evaluates the patient and comes up with
5 a plan for treatment of that patient, then they
6 will likely follow that through until there's
7 either resolution of the symptoms or it's
8 determined, pardon me, determined that some other
9 modality or, they can still function with that
10 without further treatment.
11 BY MS. GRADY:
12   Q.  Okay.
13   **A.  So you just don't ignore the symptoms.**
14   Q.  And do you agree that Wexford policy
15 requires a physician not to ignore symptoms?
16   **A.  I don't believe there's a specific policy**
17 **that says you should not ignore symptoms.  That is**
18 **part of our expectations, that they will treat the**
19 **patients appropriately according to their**
20 **trainings and licensing.**
21   Q.  Well, okay.  Sure.  But I'm not asking
22 about specifically you expect physicians to comply
23 with their licensing.  Are you saying that
24 ignoring a patient's symptoms would violate a

---

104

1 physician's licensing?
2    **A.  I think that would be an unethical thing**
3 **to do.**
4    Q.  Okay.  And a doctor ignoring a patient's
5 symptoms, that would be contrary to Wexford's
6 practice, right?
7    **A.  Yes.**
8    Q.  Okay.  According to this what is called a
9 policy document, these, if the symptoms are not
10 resolved then the next step advises to consider
11 other NSAIDS for 30 days, correct?
12   **A.  Are you on page 552 again?**
13   Q.  I am.
14   **A.  Yes.**
15   Q.  And in addition to considering the
16 extension of, what is an NSAID?
17   **A.  A non-steroidal, anti-inflammatory drug.**
18   Q.  And in addition to considering providing
19 NSAIDS for an additional 30 days, it instructs the
20 physician to reevaluate the severity of injury and
21 provide the patient education detailed in that
22 box, correct?
23   **A.  It recommends that, yes.**
24   Q.  Okay.  And if after doing that the pain

---

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

105

1  is still not resolved, then it guides the Medical
2  Director to reassess the patient's symptomology
3  and to inquire about compliance with medication
4  and the education piece, correct?
5      **A.  Yes.**
6      Q.  And to consider chronic pain?
7      **A.  Yes.**
8      Q.  Okay.  And under the chronic section it
9  advises the physician to define the etiology?
10 Etiology.
11     **A.  I'm sorry, where are you at?**
12     Q.  Under the right side of this document
13 still at 552 there's a chronic section for
14 symptoms greater than 30 days.
15     **A.  What box number are you referring to?**
16 **I'm sorry.**
17     Q.  Top right.
18     **A.  I must be blind.**
19     Q.  Chronic.
20     **A.  Oh, okay.  Thank you.**
21     Q.  And the next paragraph down refers you to
22 some things, and then the paragraph down as well.
23     **A.  Yes, thank you.  I'm sorry.  Would you**
24 **repeat your question?**

106

1      Q.  Yes.  My question is under, under the
2  chronic pathway this instructs to define the
3  etiology; is that correct?
4      **A.  This says etiology defined, correct.**
5      Q.  What does that mean?
6      **A.  Determine the potential cause that you**
7  **need to determine a cause for these symptoms.**
8      Q.  Then it says if physical findings,
9  consider collegial review.
10     **A.  Okay.**
11     Q.  What does it mean when it says physical
12 findings?
13     **A.  If you had had some neuropathic findings**
14 **or some specific findings that may indicate that**
15 **the etiology may involve something more severe,**
16 **what we call like red-flag symptoms, something of**
17 **that nature, they want you to consider that.**
18     Q.  Okay.  Okay.  Any other portions of this
19 policy that are relevant to guide the discretion
20 of a physician determining whether a patient's
21 complaint of pain and tingling for three weeks is
22 necessary to obtain specialty services?
23     MS. KINKADE:  Objection.  Form.
24     THE WITNESS:  Not as it pertains to

107

1  our topic at hand.
2  BY MS. GRADY:
3      Q.  Okay.  Can you turn back to page 520
4  which is the Neurology guidelines?
5      **A.  Okay.**
6      Q.  For the section marked headache, the
7  first line of treatment it advises to perform a
8  complete neurologic exam including fundus.  Do you
9  see that?
10     **A.  Yes.**
11     Q.  What is a complete neurologic exam?
12     **A.  Well, it depends on the particular**
13 **reference to the headache, but typically that**
14 **involves evaluation of the cranial nerve function,**
15 **reflexes, muscle strength testing, gait analyses,**
16 **those types of things.  Presence or absence of**
17 **other neurologic findings, you know, particularly**
18 **related to brain function.**
19     Q.  Okay.  And I'm particularly interested in
20 how, according to Wexford's policies, it defines a
21 complete neurologic exam.  So I want to make sure
22 that I have each one.  So you said evaluation of
23 the cranial nerves?
24     **A.  Can you read that back, please?  Is that**

108

1  **possible?**
2      MS. GRADY:  Yeah, let's read it back.
3      (Last question read back by the reporter.)
4      MS. GRADY:  Can you actually read back
5  his last answer where he started his list of
6  complete neurologic exam?
7      (Last answer read back by the reporter.)
8  BY MS. GRADY:
9      Q.  Okay.  So the listing I have so far of a
10 complete neurologic exam according to Wexford's
11 policies is an evaluation of the cranial nerve
12 function, the testing of reflexes, a testing of
13 muscle strength, gait analyses.  And then you
14 refer to other neurologic findings, but I want, I
15 would like you to be more specific.
16     **A.  Those are related to like cerebral or**
17 **cerebellar findings, functions of gait**
18 **disturbances.  It's pretty much included in that.**
19     Q.  Okay.  Anything else?
20     **A.  That's pretty comprehensive.**
21     Q.  Okay.
22     **A.  And those are examinations that the**
23 **typical clinician will perform.  And they have to**
24 **be tailored and outlined based upon that**

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

28 (109 to 112)

109

1 clinician's determination of the patient's
2 presentation at that point in time. So we don't
3 necessarily teach or have to teach a specific
4 neurological exam because these are things that
5 the physician or practitioner's expected to know.
6     Q. Is Wexford's practice to perform a
7 complete neurologic -- strike that. Is Wexford's
8 policy that a complete neurologic exam should be
9 performed in response to a patient who provides
10 neurological symptoms?
11    A. No.
12    Q. That is not Wexford's policy?
13    A. No.
14    Q. Tell me what Wexford's policy requires
15 regarding a patient who raises complaints of
16 neurological symptoms?
17    A. Our policy is that the practitioner
18 should determine what's necessary for that patient
19 and provide the appropriate testing for that,
20 whatever form of neurological exam they feel is
21 appropriate at that point in time for that
22 particular patient.
23    Q. And you allow them complete discretion to
24 determine what is appropriate in terms of what

110

1 must be included within an exam?
2     A. Yes.
3     Q. Okay. We can put these policies away for
4 now, but don't put them too far away.
5         MS. KINKADE: Can we go off the record
6 for a second?
7         MS. GRADY: Yeah.
8         (Discussion off the record.)
9         (Lunch break taken at this time.)
10 BY MS. GRADY:
11    Q. All right. We can get started. Before
12 we broke we were talking about the Administrative
13 Directive at Exhibit Four, and I'd like to turn
14 back to that again. The, on page 261 there is a
15 section six, review of sick call request. Do you
16 see that?
17    A. Yes.
18    Q. What are sick call requests?
19    A. Sick call requests are, is healthcare
20 requests initiated by the patient.
21    Q. Okay. And does Wexford have any policy
22 about whether or not those requests themselves
23 should be retained?
24    A. No, not to my knowledge.

111

1     Q. Do you know whether those requests are in
2 fact retained?
3     A. I do not.
4     Q. Okay. On page, then turning to the next
5 page of this document there's a section for
6 healthcare planning for general population
7 offenders. Can you review this section in its
8 entirety and let me know once you've finished?
9         (Witness reviewing document.)
10    A. Okay.
11    Q. Okay. Can you tell me generally, this is
12 a section that Wexford is obliged to comply with,
13 correct?
14    A. Yes.
15    Q. Can you tell me what this section sets
16 out as you understand it?
17    A. It sets out discharge instructions for
18 people who are leaving the facility, have been
19 discharged for one reason or another, and the
20 Healthcare staff provides pre-planning discharge
21 for them, including some testing that they may
22 request or would like to have prior to discharge.
23 Specifically more HIV testing.
24    Q. Okay. Is it, is it your interpretation

112

1 of this policy that this section, Healthcare
2 Planning For General Population Offenders, deals
3 primarily with HIV, or does it apply to other
4 patients as well?
5     A. Well, I wasn't finished with my answer.
6     Q. Oh, okay. I'm sorry. Please continue.
7     A. Thank you. It also ensures that those
8 who have medications that they take prior to
9 discharge have a continuing source of medications
10 at least for the next four weeks. We give them a
11 two-week supply of medication and a prescription
12 for two weeks, with the exception of HIV
13 medications, which is 30 days.
14         And then they complete, the Healthcare
15 staff also completes healthcare planning
16 documentation in the record.
17    Q. And that should be, this policy requires
18 that that documentation must be completed for
19 anyone for whom healthcare planning has occurred,
20 correct?
21    A. It appears to be, yes.
22    Q. And so that I understand you, the policy
23 as you interpret it requires healthcare planning
24 for patients with health conditions, correct?

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

113

1    A.  It deals primarily with the continuation
2  of medications that the patient was taking prior
3  to discharge and assisting those who have some
4  conditions that they require ongoing healthcare
5  planning.
6      Q.  And what conditions are those?
7      A.  Well, it depends on issues such as, it
8  could be hypertension, diabetes, mental health
9  issues, other things that would be prudent to have
10 follow-up care once they leave the facility.
11     Q.  And what's involved, what's required as
12 part of the healthcare planning as that term is
13 used in the Administrative Directive?
14     A.  You want me to read this entire Directive
15 to you?
16     Q.  No, I can read it.  I'm saying what does
17 Wexford require as part of its policies be
18 comprised as part of the healthcare planning?
19     A.  Well, that our staff follow these
20 Administrative Directives.
21     Q.  Okay.  Well, so under section 8B1 the
22 Administrative Directive advises that before the
23 patient is released Healthcare staff shall
24 complete healthcare planning for each offender as

115

1  contract for training its staff on this policy,
2  correct?
3      A.  The training involves that they should
4  follow these policies set out by the Department of
5  Corrections.
6      Q.  Okay.  So I'm just asking you what is
7  this policy?  What does it mean?  What's involved
8  in healthcare planning according to Wexford's
9  policy?
10     A.  Our policy is that we follow the
11 Administrative Directive.
12     Q.  Can you tell me what, okay.  So can you
13 tell me what it means to follow the Administrative
14 Directive as it relates to healthcare planning in
15 8B1?
16     A.  Yes.  It says complete healthcare
17 planning for each offender as indicated and offer
18 counseling and testing for HIV free of charge.
19 And I do not have the form that IDOC uses for
20 that.  That's the form that you should refer to.
21     Q.  Okay.  So other than just reading me the
22 text that appears on 8B1 you can't offer any
23 insight into how Wexford actually ensures or
24 implements this policy; is that correct?

114

1  indicated, correct?
2      A.  Yes.  They're referring to counseling and
3  testing for HIV, yes.
4      Q.  So that, when section 8B1 uses the phrase
5  healthcare planning it is Wexford's interpretation
6  that it refers exclusively to counseling and
7  testing for HIV?
8      A.  No, that includes that.  There are other
9  conditions, like I said; the hypertension,
10 diabetes, seizure disorders, other things like
11 that, that are, the discharge planning staff, most
12 likely the nurses, and if they're the Wexford
13 nurses, would need to complete that.
14     Q.  Okay.  And so what, according to
15 Wexford's policies, is required to take place as
16 part of this healthcare planning as that term is
17 used in section 8A and section 8B1?
18     A.  It's, whatever IDOC outlines is what's
19 necessary.
20     Q.  Well, Wexford is responsible for
21 implementing this policy as it relates to the
22 actions of its staff, correct?
23     A.  Yes.
24     Q.  And it's also responsible under the

116

1        MS. KINKADE:  Objection.  Form,
2  argumentative, misstates his testimony.
3  BY MS. GRADY:
4      Q.  Well, please correct me if I'm wrong.
5  I'd like to know everything that Wexford does
6  other than tell, tell its staff to follow IDOC
7  policies to give guidance about what it means to
8  complete healthcare planning as it's used in 8B1.
9      A.  Well, it seems to be pretty complete to
10 me here.  The form that exists at the Healthcare
11 Unit is specific for IDOC, and I do not have that
12 form with me.  They are required or expected to
13 follow that process, and that's taught at the
14 Healthcare Unit level.  These are the Nursing
15 staff, not the medical staff.
16     Q.  At Southwestern Illinois Correctional
17 Center it's, the Nursing staff is employed by
18 IDOC, Wexford, or both?
19     A.  Those are Wexford nurses.
20     Q.  Okay.  And so it's your testimony that
21 the contents of this healthcare planning that's
22 required by the Administrative Directive is
23 limited to what appears on DOC0088, is that
24 correct?

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

30 (117 to 120)

117

1          MS. KINKADE: Objection. Form,
2  misstates his testimony.
3          THE WITNESS: I do not know because I
4  do not have that form. I don't know.
5  BY MS. GRADY:
6     Q. Okay. Well, I don't have that form
7  either. That hasn't been produced to us. So
8  let's go back to the contract. That's Exhibit
9  Two.
10    A. Okay.
11    Q. Okay. And let's look specifically at
12  page, Wexford five, about halfway down. Section
13  2.2.2.7. Let me know once you've located that.
14    A. 2.2.2.7?
15    Q. Correct.
16    A. Okay.
17    Q. That requires the vendor to provide
18  medical examinations on every offender in
19  compliance with the applicable Administrative
20  Directives, correct?
21    A. It says, yes, with all applicable
22  Administrative Directives.
23    Q. Okay. With all applicable Administrative
24  Directives. And that would include Exhibit Four,

118

1  correct?
2     A. In what section in Exhibit Four?
3     Q. Well, is there a portion of Exhibit Four
4  that is not applicable to providing comprehensive
5  medical examinations?
6     A. It's a little double negative to me.
7  What do you, restate that.
8     Q. Do you agree that section four,
9  Administrative Directive 0403103, is an applicable
10  Administrative Directive as that term is used in
11  section 2.2.2.7 of the contract?
12    A. Yes, I would agree with that.
13    Q. Okay. And so Wexford is required to
14  provide healthcare in compliance with this
15  Administrative Directive, correct?
16    A. Okay.
17    Q. Well, do you agree?
18    A. This is an Administrative Directive, and
19  2.2.2.7 says provide comprehensive medical and
20  mental health examination on every offender in
21  compliance, but I'm not sure that this refers to
22  the comprehensive medical.
23          And we're not talking mental health,
24  so mental health services. The 2.2.,

119

1  comprehensive examination; that's different than
2  the healthcare planning.
3     Q. Okay. So it's your testimony that
4  Wexford is not required to follow this
5  Administrative Directive, is that correct?
6     A. That's not what I --
7          MS. KINKADE: Objection. Arg --
8          THE WITNESS: -- said. Sorry.
9          MS. KINKADE: Argumentative and
10  misstates his testimony.
11         THE WITNESS: I agree, that is a gross
12  misstatement of my testimony.
13         MS. GRADY: Read back my prior
14  question and answer.
15         (Last question and answer read back by the
16         reporter.)
17         MS. GRADY: So let me reask my
18  question.
19  BY MS. GRADY:
20    Q. Do you agree that Wexford is required to
21  provide healthcare in compliance with this
22  Administrative Directive?
23    A. I agree that our staff at the facility
24  are required to follow the Administrative

120

1  Directives of IDOC.
2     Q. And do you agree that Wexford is
3  responsible for ensuring that its staff provides
4  healthcare in compliance with this Administrative
5  Directive?
6     A. I agree that they should, yes.
7     Q. That's not my question.
8          MS. GRADY: Can you read back my
9  question?
10         (Last question read back by the reporter.)
11         THE WITNESS: And the answer was yes?
12         (Last answer read back by the reporter.)
13  BY MS. GRADY:
14    Q. Okay. So you agree with my statement,
15  correct? Let me restate it. Do you agree that
16  Wexford is responsible for ensuring that its staff
17  provide healthcare in compliance with
18  Administrative Directive 0403103?
19    A. Yes.
20    Q. Okay. In order to ensure that its staff
21  is in compliance with the Administrative Directive
22  Wexford must know what the Administrative
23  Directive means, correct?
24    A. Yes.

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

121

1    Q.  And so tell me what Wexford understands
2  the contents of healthcare planning to mean as
3  that phrase is used in section 8B1?
4    A.  That the staff, and these are nurses
5  we're talking about, would be responsible for
6  reviewing the healthcare needs problem list of the
7  patient prior to their discharge and advising them
8  on follow-up issues in which they may wish to
9  follow up on a particular illness or treatment
10 that we're providing for them, provide them with
11 medication upon discharge and prescription also,
12 and encourage them, you know, to follow up, and
13 offer HIV testing if they would so desire.
14   Q.  Okay.  Thank you.  If you would, turn
15 back to section two.
16   A.  In.
17   Q.  Which is the contract.
18   A.  Oh.
19   Q.  I'm sorry.  Not section two, Exhibit Two.
20 And on page Wexford five, section 2.2.2.9 requires
21 Wexford to provide record services to each
22 facility; is that correct?
23   A.  Yes.
24   Q.  Can you tell me whether the record

122

1  services that Wexford currently provides is
2  electronic paper or some combination of the two?
3    A.  It depends.  In the, in the female
4  facilities there's currently electronic medical
5  records, but in all other male adult facilities
6  there are paper records.
7    Q.  And was that the case with respect to
8  male facilities in 2014 as well?
9    A.  Yes.
10   Q.  Section 2.2.2.15 requires Wexford to
11 aggressively manage all off-site services for
12 appropriate utilization and cost effectiveness.
13 Can you tell me what Wexford understands this
14 provision to mean?
15   A.  We would need to make sure that any
16 utilization services that entail use of off-site
17 services should be managed so that they are
18 appropriately used.
19   Q.  What does that mean, appropriately used?
20   A.  That is medically necessary.
21   Q.  And can you tell me what that phrase in
22 turn means, medical necessary?
23   A.  That means that once the practitioner or
24 the physician who's taking care of a patient

123

1  evaluates a patient and formulates an
2  interpretation of what's actually going on and
3  determines medical necessity for the person, the
4  patient at that point in time can make that
5  judgment as to whether or not off-site care may
6  be, further care may be required.
7    Q.  Well, I guess I'm just asking in a more
8  abstract way.  What does it mean for something to
9  be medically necessary?
10   A.  It depends on the situation.  If it's, if
11 a situation, an illness or presentation is serious
12 enough or it requires treatment, ongoing care,
13 those types of things, that is sufficient to meet
14 their needs for the patient at that point in time.
15   Q.  Well, I just want to make sure I'm clear.
16 Because you're saying it's the physician's sole
17 discretion to determine when something is
18 medically necessary, correct?
19   A.  They're the ones that make that
20 determination, yes.
21   Q.  And that's what Wexford's policy is,
22 correct?
23   A.  Being what?
24   Q.  That it's the physician's discretion to

124

1  determine when something is quote, medically
2  necessary, correct?
3    A.  That physician is granted the authority
4  to make those decisions.
5    Q.  So my question though is, what if
6  anything do you tell Medical Directors about what
7  it means for something to be medically necessary?
8  For example, is there some way that -- well,
9  strike that.
10       What, if anything, do you tell Medical
11 Directors or any other member of your physician
12 staff about what it means for something to be
13 medically necessary?
14   A.  When we hire a physician or somebody and
15 credential them for the medical staff position at
16 one of our facilities they go through an
17 exhaustive review of credentials and backgrounds
18 and those types of things so that we know that
19 they are appropriately trained and licensed to be
20 able to make those decisions which are taught and
21 trained in the programs that, before they're
22 licensed.
23       The only, what we do is reinforce
24 medical necessity or discussion of needs,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

32 (125 to 128)

125

1 particularly as it relates to a Correctional
2 environment in our meetings and training and other
3 venues such as that. That decision is, should
4 have been solidly learned by that individual prior
5 to them being hired.
6     Q. So Wexford provides no training to
7 Medical Directors about what it means for
8 something to be medically necessary as that term
9 is used in its policies, correct?
10     A. No, that's not what I said.
11     Q. Okay. Please tell me how that statement
12 is incorrect.
13     A. We exhaustively review their background
14 and education and their licensing, and we also
15 provide training and orientation. We provide
16 ongoing training at quarterly meetings and other
17 venues, at which we might have the opportunity to
18 educate people.
19         So if there's a question that they
20 may, that, that we raise with regard to a decision
21 they may have made, we'll review that and have
22 further discussions and then determine what
23 corrective action, if anything, needs to be made.
24     Q. Okay. So at any part during the review

126

1 of the licensing do you discuss with the physician
2 what it means for something to be quote, medically
3 necessary?
4     A. Not during the review of licensing. I
5 mean, are you talking about reviewing, making sure
6 that they're licensed and everything? That's not
7 necessarily a part of that. But by nature of the
8 fact that they are licensed and trained and
9 educated then we have to presume and know that
10 they have the ability to make that decision.
11     Q. And during orientation what training do
12 you provide about what the phrase quote, medically
13 necessary, unquote, means?
14     A. Well, we may not have to determine, to
15 sit there and explain and have somebody feed back
16 to us what they feel is medically necessary.
17 Although we do review specific cases that may come
18 up within the Correctional Healthcare environment.
19         They will spend time with someone like
20 myself, a Regional Medical Director, during the
21 orientation period, watching as we examine
22 patients, document, and navigate our way through
23 the Correctional Healthcare system. And we
24 observe them doing that also. So during all those

127

1 times we discuss issues of what medically
2 necessary really is.
3     Q. And what do you tell them about what
4 medically necessary means?
5     A. I tell them that if it's needed for our
6 patient then we provide it.
7     Q. Okay. Can you tell me looking, back at
8 the contract section 2.2.2.15 what, if any,
9 policies relate, written policies, relate to this
10 section?
11     A. There's a Utilization Management policy
12 and procedure manual.
13     Q. Okay. Any others?
14     A. That's the one that outlines management
15 utilization services. There's some referenced in,
16 actually that's, that's really the main one there
17 that I can think of.
18     Q. Okay. And we'll get, we'll get to that
19 in just a minute. Turning to the next page,
20 Wexford six, section 2.2.2.17, requires Wexford to
21 provide network administration and management of
22 off-site services. Do you see that?
23     A. Yes.
24     Q. And it's Wexford's responsibility to

128

1 select the site of any services provided for
2 patients off-site?
3     A. No.
4     Q. Who selects that?
5     A. It depends on what services are available
6 in that geographic area. So many times the site
7 who needs to find a particular specialist or many
8 times they work with them, but there is a, they do
9 provide some contracting with various, you know,
10 healthcare providers.
11     Q. And when you say they you're referring to
12 Wexford?
13     A. Yes, the corporate office. But that
14 doesn't necessarily limit us completely.
15     Q. Okay. But I just mean as, it's either
16 IDOC or Wexford who's deciding when a patient goes
17 off-site for specialty care where they actually
18 go, right?
19     A. Not necessarily.
20     Q. Who else might decide that?
21     A. Oh, if we have an emergency where an
22 ambulance service comes and picks up somebody then
23 they're going to default to their nearest ER,
24 whatever is appropriate at that time, and that

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

33 (129 to 132)

129

1 decision is left up to them.
2    Q.  Okay.  Outside of the emergency situation
3 where an ambulance is utilized, who else is, who
4 else, is there anyone other than IDOC or Wexford
5 who has any role in selecting the place where
6 off-site services are provided?
7    A.  There may be times when an Emergency Room
8 needs to transfer somebody for tertiary care so
9 they make, they largely make that decision.  Or if
10 a specialist or a specialty hospital tertiary care
11 hospital needs to be utilized, sometimes those
12 recommendations are made or taken care of at the
13 treating hospital where they're at.  There are
14 other areas that that can occur.
15    Q.  Okay.  Are there other areas other than
16 the ambulance situation when someone other than
17 Wexford or IDOC is making the decision about the
18 site for a patient to receive specialty services
19 in the first instance?  In other words, not a
20 tertiary situation?
21    A.  Not typically.  I cannot think of a
22 situation in that would be required.
23    Q.  So who between IDOC and Wexford is tasked
24 with making that decision?

130

1    A.  Which decision?  About where --
2    Q.  Where to send them.
3    A.  It's typically the site or the provider
4 and it's made in unison with Utilization
5 Management many times.
6    Q.  Okay.
7    A.  Uh-huh.
8    Q.  You said that Wexford contracts with
9 certain providers?
10    A.  Yes.  To my knowledge they do, uh-huh.
11    Q.  And are those, well, does Wexford
12 contract with any providers at Southwestern
13 Illinois?  Are they like regional or is it a
14 contract that for prisoners -- strike that.  Why
15 don't you just tell me in general terms what those
16 contracts are?
17    A.  They may have a dermatology group that
18 they make a contract with so they'll actually see
19 our patients.  And then when we need dermatologic
20 consultations in that region, wherever it happens
21 to be, then we take them to there.
22    Q.  Is there money exchanged as part of that
23 contract?
24    A.  I don't know the answer to that.

131

1    Q.  In other words, my question is, is this
2 an agreement that you'll agree to see my patients
3 and in exchange I'll agree to send my patients
4 just to you and no one else?  Or is it I will give
5 you this much money in agreement for your agreeing
6 to see this many patients of mine?
7    A.  And again, I don't know the answer to
8 that.
9    Q.  You don't know either one?  You don't
10 know whether it's one over the other or something
11 else?
12    A.  No.
13    Q.  Are the contracts regional or are they
14 site-specific?
15    A.  Well, it depends on the group that
16 they're contracting with.  You may have a group in
17 Carbondale, Illinois that serves patient from
18 Pinckneyville, from Vienna, Shawnee, or Big Muddy,
19 so that could be regional.  It just depends on
20 what services are required and who's available and
21 willing to see our patients.
22    Q.  Okay.  Was there any, is there any
23 contract in place with one or more providers
24 regarding a provision of neurological services,

132

1 neurological specialty services, to patients,
2 including patients at Southwestern?
3    A.  That --
4       MS. KINKADE:  Object to form.
5       THE WITNESS:  -- I do not know.
6 BY MS. GRADY:
7    Q.  And was there one in effect in 2014?
8    A.  I do not know.
9    Q.  Was there a, is there a contract in
10 effect providing for the provision of Neurosurgery
11 services that covered patients, including those at
12 Southwestern Illinois?
13    A.  I do not know.
14    Q.  Do you know whether there are any
15 contracts Wexford maintains with neurosurgeons?
16    A.  I don't know.
17    Q.  And do you know whether there was any
18 such contract in 2014?
19    A.  Again, I do not know.
20    Q.  I just have to go through these
21 categories.  I'm sorry.  Do you know whether,
22 well, strike that.  Was there a contract between
23 Wexford and anyone providing radiological
24 services, including MRI's, that covered patients

---

133

1 at Southwestern Illinois in 2014?

2 **A. I do not know.**

3 Q. And was there a contract that Wexford

4 maintained with one or more orthopedic surgeons

5 regarding the provision of care to patients,

6 including patients at Southwestern Illinois, as of

7 2014?

8 **A. I do not know.**

9 Q. Okay. Do you know, do you, does Wexford

10 typically contract with emergency rooms for

11 emergent care?

12 **A. I don't know how they manage that.**

13 Q. Okay. When there is a contract regarding

14 a provision of care by a group of specialists how,

15 if at all, are Site Medical Directors informed of

16 that?

17 **A. The Site Medical Director would probably**

18 **learn of that if they said I wanted to use a**

19 **specific group or I'd like to use a specific group**

20 **for one reason or another, and they may come back**

21 **and say actually it would be better to use, or we**

22 **need to use a different group. If at all that**

23 **happens, that would be the potential way in which**

24 **it could happen.**

---

134

1 Q. Typically, Site Medical Directors don't

2 ask for a patient to be referred to a particular

3 physician or group, is that true?

4 **A. Typically that's true, yes.**

5 Q. And so who is making, who is the person

6 who selects the site? Is that a Utilization

7 Management physicians?

8 **A. Typically, the, if I were to ask for a**

9 **patient to go to an orthopedic surgeon there are**

10 **only a limited number of people who are willing to**

11 **provide that service for our patients, so we're**

12 **grateful that anybody would actually do it in most**

13 **cases.**

14 **But the health, the medical records**

15 **department is usually the ones that help schedule**

16 **those types of appointments, and they'll call the**

17 **offices and make the appointments for us. So the**

18 **Medical Director is by and large removed from that**

19 **process.**

20 Q. Wexford in section 2.2.2.18 is required

21 to process claims and pay for non-hospital

22 services and tertiary care in a timely manner. Do

23 you see that?

24 **A. Yes.**

---

135

1 Q. What does that mean?

2 **A. It means that they pay for non-hospital**

3 **services such as office call, office visits,**

4 **diagnostic services, other related expenses.**

5 **That's what that means.**

6 Q. Section 2.2.2.25 requires Wexford to

7 maintain records in the standard format in

8 covering and in accordance with State requirements

9 for record retention, offender comprehensive

10 medical and mental health services while

11 incarcerated, and it continues on. What does in

12 the standard format mean?

13 **A. Typically that refers to patient-oriented**

14 **medical record, which includes sections such as**

15 **identifying data, patient-related data, problem**

16 **lists, sections on clinic notes, sections on**

17 **mental health notes, sections on laboratory and**

18 **X-ray findings or sections that include**

19 **consultation findings and notes. That's just the**

20 **record as it's typically set up.**

21 Q. I see. So this doesn't refer to how a

22 provider in any particular instance is required to

23 document or record something, it refers to the

24 sort of process of how records are kept and

---

136

1 maintained?

2 **A. Correct.**

3 Q. Okay. Section 2.2.2.28 requires Wexford

4 to provide services in accordance with ACA

5 standards of care, medically accepted ACA

6 standards of care. Do you see that?

7 **A. Yes.**

8 Q. Do you know whether any of the other IDOC

9 facilities are ACA accredited?

10 **A. I don't believe so. I don't know of any**

11 **in my region. Up north, I don't know. I don't**

12 **know the answer to that. I think in the past some**

13 **of them have been, but they're more going with**

14 **NCCHC accreditation now.**

15 Q. Section 2.2.3 deals with a comprehensive

16 medical program. And if you can just read that

17 first paragraph along with the different services,

18 I have a question.

19 **A. You want me to read it aloud?**

20 Q. No. I just want you to read that

21 paragraph so you're familiar with it when I ask my

22 question.

23 **A. And you're referring to the paragraph**

24 **that begins vendor shall provide safe, cost**

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

137

1 effective medical care, dot, dot, dot?
2     Q.  Correct.
3     A.  Okay.
4        (Witness reviewing document.)
5        Okay.
6     Q.  Okay.  A lot of these are services I
7 don't think that are provided on-site at any IDOC
8 facilities like ophthalmological care, and some
9 others.  Do you know, does this paragraph refer to
10 things that are required to be provided on-site or
11 does it refer to things that must be provided by
12 Wexford either on-site or off-site?
13     A.  I believe it refers to those types of
14 services that should be, must be available to our
15 IDOC patients, be it on site or off-site.  We just
16 need to make sure that the care is provided.
17     Q.  Okay.  And radiological is included
18 within that as well, correct?
19     A.  Yes.
20     Q.  If you would turn to page Wexford seven.
21     A.  Okay.
22     Q.  Up toward the bottom of the page, 2.2.3.2
23 is a paragraph dealing with consultations.  And
24 the first sentence, it reads Wexford's corporate

138

1 office shall respond to consultation requests
2 within a specified time period.  Is this paragraph
3 dealing with the Utilization Management process or
4 does it refer to consultations by somebody else?
5     A.  This is referring to the Utilization
6 Management process.
7     Q.  So in it it refers to consultation
8 requests.  It's foreseeing a request by the site
9 physician or Medical Director; is that right?
10     A.  Yes.
11     Q.  Okay.  Can you turn to Wexford eight,
12 please?
13     A.  Okay.
14     Q.  The section of 2.2.3.5.2, which is at the
15 very bottom of the page, requires that Medical
16 Director to refer a patient to a community medical
17 facility to provide necessary treatment if the
18 patient cannot be properly treated in the
19 immediate area, correct?
20     A.  Yes.
21     Q.  And it says that the facility where the
22 prisoner is taken has to be approved by HFS and
23 IDOC.  Do you see that?
24     A.  Yes.

139

1     Q.  What's the process?
2     A.  I don't know.
3     Q.  Okay.  And if you would turn to the next
4 page, section 2.2.3.6.1 requires Wexford to
5 arrange for services to offenders who require
6 off-site hospitalization for routine admissions
7 and for emergency situations.  Do you see that?
8     A.  Yes.
9     Q.  Who is responsible within Wexford for
10 determining when a patient requires off-site
11 hospitalization for any reason?
12     A.  The Medical Director or the site treating
13 physician.
14     Q.  Okay.  And if the Medical Director is the
15 only physician working at the facility those two
16 positions are essentially summed into one,
17 correct?
18     A.  Yes.
19     Q.  And if you would look at the bottom,
20 section 2.2.3.11.  Just if you would review that
21 provision and let me know once you're finished.
22        (Witness reviewing document.)
23     A.  Okay.
24     Q.  So this sort of touches on what we talked

140

1 about before, the arranging with outside vendors.
2 This provision refers to policies and procedures
3 that are required to be developed regarding
4 referral methods.  What, what are those?
5     A.  Those are developed in order to assure
6 that the appropriate communication is had between
7 a hospital and coordinating referral to the
8 offender and so we know who's going where and why.
9     Q.  And are those written policies and
10 procedures?
11     A.  I don't know.  I don't recall seeing
12 these specific policies and procedures.  Unless
13 it's in the UM.  I'd have to review it.
14     Q.  Okay.  I've got it here for you.
15     A.  Great.
16        (Exhibit No. 7 marked for identification.)
17 BY MS. GRADY:
18     Q.  Before you get to reviewing to see if
19 that deals with the section of the contract, can
20 you tell me are you familiar with this document
21 that I've just handed you, Exhibit Seven?
22     A.  Yes.
23     Q.  What is it?
24     A.  The Utilization Management Policies and

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

141

1 Procedures.
2     Q.  Okay.  So if you would review this and
3 let me know whether there's anything in Exhibit
4 Seven that you think was a policy developed
5 dealing with section 2.2.3.11?
6        (Witness reviewing document.)
7     A.  Okay.  The referral to hospitals like for
8 **Emergency Department use and hospital uses**
9 **identified on page 1832 of Exhibit Seven discuss**
10 **basically in the after hours notification of**
11 **emergency and hospital, as well as on 1833, I**
12 **believe it covers some of that, emergency hospital**
13 **notification.  Which discusses how, you know,**
14 **when, when they are referred to the ER, how they**
15 **are scheduled, reporting, and things like that.**
16 **        Daily inpatient communication is done**
17 **according to Wexford 1834, so many of these**
18 **address aspects of what you're referring to in**
19 **that, on Exhibit Two.**
20     Q.  The contract?
21     **A.  Yes.**
22     Q.  Okay.  So this doesn't refer to policies
23 developed regarding a particular hospital or a
24 particular provider, correct?

142

1     **A.  Right, the global policy.**
2     Q.  Tell me what Wexford does to comply with
3 the first sentence of that section?
4     **A.  When it becomes necessary we've had, some**
5 **of the Corporate Directors will meet with**
6 **representatives from the emergency rooms to**
7 **discuss how, you know, how we would like our**
8 **patient care managed in terms of hand-off back to**
9 **the facility, or what to expect when they receive**
10 **our patients so they know what kind of services we**
11 **can provide upon return to the facilities; what**
12 **services may be required that need to be obtained**
13 **elsewhere that we cannot care for in our facility.**
14 **        So they're giving them a brief**
15 **description of what sort of services we can**
16 **provide, why we send a patient off to them and**
17 **those types of things.**
18     Q.  Okay.
19     **A.  Uh-huh.**
20     Q.  Can you turn in the next page, Wexford
21 10?  Under the section for medical records I want
22 to draw your attention to section 2.2.3.13.2.
23 Under this provision of the contract Wexford is
24 required to ensure medical records are complete

143

1 and filed promptly and contain accurate, legible
2 entries, correct?
3     **A.  Correct.**
4     Q.  What does it mean complete?
5     **A.  Well, that represents what the physician**
6 **interpreted as the components of that particular**
7 **examination.**
8     Q.  Tell me what you mean by that, what the
9 physician interpreted as the components of --
10     **A.  Well, they provide the information that's**
11 **necessary, you know, that meets the SOAP format**
12 **that, you know, describes the event and what their**
13 **assessment and plan were for that.**
14     Q.  Section 2.2.3.13.5 requires Wexford to
15 keep complete and accurate medical records
16 containing, well, that section in particular
17 requires Wexford to keep medical records that
18 contain the information laid out in section A
19 through L, correct?
20     **A.  Yes.**
21     Q.  Okay.  One of those sections is findings,
22 diagnoses, treatments and dispositions, correct?
23     **A.  Yes.**
24     Q.  And that's Wexford's policy to require

144

1 that be documented?
2     **A.  Yes.**
3     Q.  How, if any way, well, strike that.  What
4 if any actions does Wexford take to inform its
5 Medical Directors that that is a requirement?
6     **A.  Well, we provide that training at the**
7 **initial orientation.  We review these types of**
8 **concerns and teachings at the quarterly meetings**
9 **and other venues in which we have the educational**
10 **opportunity to address this with them.**
11     Q.  Is the requirement to document all
12 findings, diagnoses, treatment and dispositions
13 contained in any written policy?
14     **A.  As are appropriate for that particular**
15 **visit at that time, yes.**
16     Q.  I don't understand your answer.
17     **A.  Well, it depends on what their findings**
18 **are and what they feel is medically appropriate**
19 **should be included in that documentation.**
20        MS. GRADY:  Can you read back his
21 answer?
22     (Last answer read back by the reporter.)
23 BY MS. GRADY:
24     Q.  Okay.  I'm trying to understand whether

145

1  Wexford has included in its, in any written
2  policies its requirement that all findings,
3  diagnoses, treatments and dispositions be
4  documented?
5      A.  I don't know of any specific policy at
6  the present time that references that particular
7  issue.
8      Q.  Okay.  Can you turn to the next page?
9  Section 2.2.3.18 deals with radiological services,
10 correct?
11     A.  Yes.
12     Q.  And X-rays are available on-site at,
13 well, at Southwestern Illinois X-rays, X-ray
14 services are available on-site, correct?
15     A.  Yes, I believe so.
16     Q.  And was that true in 2014 as well?
17     A.  Yes.
18     Q.  Are magnetic resonance imaging tests
19 available on-site at Southwestern Illinois
20 Correctional Center?
21     A.  No.
22     Q.  And were, was there an MRI available
23 on-site at Southwestern Illinois Correctional
24 Center in 2014?

146

1      A.  No.
2      Q.  So that patient would have to be, so any
3  patient, to receive an MRI a patient would have to
4  be referred off-site, correct?
5      A.  Correct.
6      Q.  And do you know was there a typical place
7  where patients in that prison or area would be
8  referred for MRI imaging?
9      A.  Most likely St. Elizabeth's Hospital, in
10 that area of Bellville Memorial I think were the
11 sites that they used for those services.  I don't
12 recall any other facilities but there may have
13 been a radiology facility someplace that provided
14 those services.  I just don't recall at this time.
15     Q.  And under section 2.2.3.18.1 Wexford is
16 required to refer a patient to an off-site
17 healthcare facility if the patient requires a
18 procedure beyond the capability of the on-site
19 equipment, correct?
20     A.  Yes.
21     Q.  And so in this instance if a patient at
22 Southwestern Illinois Correctional Center required
23 an MRI he would have to be referred off-site?
24     A.  Yes.

147

1      Q.  Would that visit to St. Elizabeth's, or I
2  thought you said Bellview Memorial Hospital?
3      A.  Bellville.
4      Q.  Bellville.  Thank you.  But it's Memorial
5  Hospital?
6      A.  Yes.
7      Q.  Would that visit fall inside or out of
8  the annual hospital utilization threshold?
9      A.  That would most likely fall outside
10 because it's an outpatient procedure.
11     Q.  And that cost would be borne by Wexford,
12 correct?
13     A.  Yes.
14     Q.  Okay.  Can you turn to page, Wexford 23
15 on Exhibit Two?  Under section 2.6 the second
16 paragraph details a number of people that are sort
17 of required to be present.  So if you would just
18 review that, review that and let me know once
19 you've had a chance to review it.
20        (Witness reviewing document.)
21        MS. KINKADE:  Say again which section
22 you're referring to.
23        MS. GRADY:  On page Wexford 23 it's
24 section 2.6, the second paragraph in that section.

148

1        THE WITNESS:  Okay.
2  BY MS. GRADY:
3      Q.  Who is the, is the Regional Vice
4  President of Operations the same as the Director
5  of Operations?
6      A.  No.
7      Q.  Who is that person?
8      A.  Who, which position?
9      Q.  What's the identity of the Regional Vice
10 President of Operations?
11     A.  Cheri, well, currently it's Shannis Stock
12 Jones.
13     Q.  In 2014 that was Cheri, how do you say
14 her last name?
15     A.  Laurent.
16     Q.  Laurent.  Five Regional managers are
17 required.  Is that inclusive of Regional Medical
18 Directors?
19     A.  No.
20     Q.  Okay.  And who are those people?  By, let
21 me ask this.  Are those people divided into
22 different responsibilities?
23     A.  Different regions.
24     Q.  Different regions.

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

38 (149 to 152)

149

1  A. Yes.
2  Q. Thank you. Tell me who is the person
3 responsible for the region in which Southwestern
4 Illinois Correctional Center is located?
5  A. Currently it's Alan Karraker.
6  Q. And who was it in 2014?
7  A. As I recall I believe it might have been
8 Alan at that time then.
9  Q. Okay.
10  A. Uh-huh.
11  Q. Two Statewide Medical Directors, who are
12 those people?
13  A. Myself and Dr. Funk.
14  Q. Okay. Okay. And then I'm going to be
15 talking about Wexford 26, but the section that I
16 want to discuss has actually been redacted. So if
17 you would refer to Exhibit Three.
18    In exchange for the duties that we've
19 discussed today and the others laid out in the
20 contract Wexford was paid a little over $100
21 Million Dollars for the first year of this
22 contract, correct?
23    MS. KINKADE: I'm just going to object
24 to the form and foundation of this document. To

150

1 form of the question and foundation of the
2 document.
3    MS. GRADY: Okay. Well, just in
4 response to that objection, you guys are the ones
5 who made the redaction, so if, I think that these
6 are the exact same document. But of course if the
7 amounts underneath your redactions are, differ in
8 any way from what is depicted on Exhibit Three I
9 really, I mean, I think that we should know that.
10 Okay. So let me rephrase my question.
11 BY MS. GRADY:
12  Q. The first, do you know how much Wexford
13 received in payment for the first year of
14 contract, of contract work?
15  A. No.
16  Q. Do you have any reason to dispute that it
17 received $113,209,327 dollars in exchange for its
18 work in the first contract year?
19  A. I don't have any reason to dispute it.
20  Q. Do you know how much Wexford received in
21 exchange for work in the second year of the
22 contract?
23  A. No.
24  Q. Do you have any reason to dispute that it

151

1 received $121,254,395 dollars in exchange for its
2 work?
3  A. I do not have any reason.
4  Q. And by my calculation that would cover
5 the work done between 2012 to 2013. So for
6 contract year three do you know how much Wexford
7 was paid to perform its duties under the contract?
8  A. No.
9  Q. Do you have any reason to dispute that it
10 was paid $126,104,570?
11  A. No.
12  Q. Do you know how much Wexford was paid for
13 the fourth contract year of this document?
14  A. No.
15  Q. Do you have any reason to dispute that
16 Wexford was paid $128,626,661?
17  A. No.
18  Q. Do you know how much Wexford was paid for
19 the fifth contract year of this document?
20  A. No.
21  Q. Do you have any reason to dispute that it
22 was paid $133,771,727?
23  A. No.
24  Q. Do you know why the payments escalate?

152

1  A. I beg your pardon?
2  Q. Why do the payments get bigger as the
3 years go on?
4  A. I do not know.
5  Q. The page, the third page of this document
6 which is Bates stamped IDOC 996 and corresponds to
7 Wexford 28 in Exhibit Two provides for the price
8 paid to Wexford if the contract is renewed. Do
9 you know whether the contract was renewed?
10  A. When?
11  Q. At any point.
12  A. I believe it was extended.
13  Q. Do you know whether it was extended, it's
14 my understanding from the reading of this contract
15 that it can be extended either for the full five
16 years or incrementally a year at a time?
17  A. To my knowledge it's a year at a time.
18  Q. Okay. And by my count contract year six
19 would have covered the years 2016 to 2017. Do you
20 know what Wexford received in exchange for its
21 performance under this contract for contract year
22 six?
23  A. No.
24  Q. Do you have any reason to dispute that

153

1 Wexford received $133,771,727? Let me say that
2 again. Do you have any reason to dispute that
3 Wexford received $133,771,727 in exchange for its
4 performance of the contract?
5     A. No.
6     Q. So that number stays the same up until
7 contract year 10. Do you see that? According to
8 page three of Exhibit Three.
9     A. Yes.
10    Q. Do you know why that is?
11    A. No.
12    Q. Okay. The pricing under, the section 3.2
13 for type of pricing right, right above the
14 schedule E-rates.
15    A. Yes.
16    Q. It says that the pricing under this
17 contract is $1,363,436,031. Do you see that?
18    A. Yes.
19    Q. What is that?
20    A. That is a monetary signification of an
21 estimated number.
22    Q. That's the, that's the estimated amount
23 that Wexford would receive under the full
24 execution of this contract; is that right?

154

1     A. It appears to be so.
2     Q. What's the Bantry Group Corporation?
3     A. It's the parent corporation of Wexford
4 Health Sources.
5     Q. And does it have, does the Bantry Group
6 to your knowledge have any other children
7 corporate entities?
8     A. I don't know.
9     Q. Okay. Can you turn to, can you turn to
10 page Wexford 78? This is section 7.1.2 deals with
11 the Medical Services Quality Improvement
12 Committee, correct?
13    A. Yes.
14    Q. Under section 7.1.2.1.2 Wexford, or the
15 quality improvement, all right. Strike that.
16 This contract provision 7.1.2.1 calls for the
17 creation of a Quality Improvement Committee which
18 includes the Site Medical Director, correct?
19    A. Yes.
20    Q. And according to this provision is
21 chaired by the Agency Medical Director or his
22 designated staff. Do you see that?
23    A. Are you referring to CAO as the Agency
24 Medical Director?

155

1     Q. No, I'm referring to the very last phrase
2 of that term.
3     A. Oh. Yes.
4     Q. So who is the Agency Medical Director?
5     A. Currently?
6     Q. Does that refer to the IDOC Medical
7 Director?
8     A. Yes.
9     Q. And does this Quality Improvement
10 Committee, that refers to the Site Quality
11 Improvement Committee, correct?
12    A. Yes.
13    Q. Not the quarterly meetings that we talked
14 about earlier?
15    A. Yes.
16    Q. That's different. Okay. And one of the
17 things, according to provision 7.1.2.1.2, one of
18 the things that the Quality Improvement Committee
19 is required to review includes grievances,
20 correct? Under section 12 there. Subsection 12.
21    A. Yes.
22    Q. Tell me how they do that. Do they review
23 all prisoners' grievances or just ones related to
24 medical care?

156

1     A. Just those related to medical care.
2     Q. And who is responsible for identifying
3 the grievances that, of all the grievances
4 submitted by prisoners on any given period of
5 time, the grievances that deal with medical care?
6     A. I don't know. That's IDOC --
7     Q. Okay.
8     A. -- procedure.
9     Q. And who is responsible for -- strike
10 that. Does Wexford retain those grievances?
11    A. No.
12    Q. Who maintains the copies of those
13 grievances?
14    A. I don't know.
15    Q. Why doesn't Wexford keep copies of the
16 grievances?
17    A. The Healthcare Unit Administrator manages
18 those.
19    Q. But those are part of the review that's
20 required by the Quality Improvement Committee,
21 right?
22    A. Yes.
23    Q. And the Quality Improvement Committee
24 includes the Site Medical Director, right?

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

40 (157 to 160)

157

1      A.  Yes.

2      Q.  Okay.  So he reviews the grievances, he
3  just doesn't maintain them, is that correct?

4      A.  Not always, no, that's not correct.

5      A.  Well, tell me, tell me what you mean by
6  that.  Tell me how my statement was incorrect.

7      A.  The Healthcare Unit Administrator reviews
8  the grievances and many times resolves those
9  without any involvement at all of the Medical
10  Director.  It is not necessary.  It is only part
11  of, it is only those grievances that require some
12  input from the Medical Director as to what was
13  actually done or what might be medically necessary
14  that, that they may have a discussion with a
15  physician about that.  And they're just reviewed
16  on a monthly basis in toto at the QI meeting.

17      A.  So the contents of any, of any of these
18  grievances are not reviewed.

19      A.  By whom?

20      Q.  By the Quality Improvement Committee.

21      A.  The general topic, but not a specific
22  grievance necessarily, so.

23      Q.  Well, tell me what, tell me then what is
24  reviewed about grievances.  When you say the

158

1  general topic do you just acknowledge that there
2  are grievances that were filed, or what's
3  discussed about grievances pursuant to this
4  provision of the contract?

5      A.  Well, most of the grievances tend to be
6  about issues with regard to co-pays and those
7  types of things, and those are easily resolved by
8  the Healthcare Unit Administrators.

9           So at a QI meeting it might just be
10  informational purposes as to how many grievances
11  we had with regard to co-pays and the ones that
12  were with merit and these were the ones that
13  weren't.  Unless there was a significant medical
14  concern then it's probably primarily just a report
15  of numbers and activities.

16      Q.  Okay.  Let's take a break for one minute.

17           (Break taken at this time.)

18  BY MS. GRADY:

19      Q.  So we can go back on.  I want to talk a
20  little more about Exhibit Five which is the
21  Operations policies.  So you can put the contract
22  to the side for now.  Okay.  These, who develops
23  these policies?

24      A.  This is a subset.  And it is developed by

159

1  the Medical Advisory Committee of Wexford Health.

2      Q.  When you say this is a subset, I think
3  this is the full policies but, the full set of
4  Operations policies and procedures that was
5  produced to us.

6      A.  Oh, okay.  I was thinking about those.

7      Q.  Got it.

8      A.  Okay.

9      Q.  Okay.  So, sorry.  You said it's
10  developed by the, by the Medical Advisory
11  Committee?

12      A.  Correct.

13      Q.  And who is that?

14      A.  It's a committee of individuals primarily
15  made up of Corporate Directors, Regional Medical
16  Directors throughout the Corporate system who are
17  the primary voting members of this.  There's other
18  members on there such as the Vice President of
19  Operations and a few other folks out at
20  Pittsburgh.

21      Q.  Are all, how big is the committee?

22      A.  It's usually about 12 to 15.

23      Q.  Are all members physicians?

24      A.  No.

160

1      Q.  You said the Vice President of
2  Operations.  That person is traditionally not a
3  physician, is that right?

4      A.  Correct.

5      Q.  Is that person a nurse?

6      A.  It happens to be, so at that time Cheri
7  Laurent is.

8      Q.  Okay.  And then other than the Vice
9  President of Operations, which non-physicians by
10  role serve on the Board?  Or serve on the
11  Committee?

12      A.  I don't recall specifically.  I believe
13  the contracting supervisor, a staff, someone from
14  staffing is usually there.  These are non-voting
15  members.

16      Q.  Oh, okay.  So there are votes taken?

17      A.  Correct.

18      Q.  What sorts of things do they vote about?

19      A.  Whether we approve these, the document
20  as, as could be included in this.

21      Q.  So one of the things they vote about is
22  whether or not to approve the Operations policies
23  and procedures on behalf of Wexford?

24      A.  Yes.

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

41 (161 to 164)

161

1    Q.  Are you a member of the Committee?
2    A.  Yes.
3    Q.  And how long have you served as a member
4  of the Committee?
5    A.  Since 2012.
6    Q.  How frequently do they meet?
7    A.  It varies.  It could be as frequent as
8  quarterly, sometimes a little less.  Whenever the
9  need arises if there's meetings that need to come
10 up earlier, if there's a change or a new policy or
11 guideline added.
12   Q.  Other than meeting to vote on written
13 policies what other types of tasks does the Board
14 perform?
15   A.  None that I can recall at the present
16 time.
17   Q.  Are all Regional Medical Directors
18 members of the Committee?
19   A.  To my knowledge, yes.
20   Q.  Do you know how many other States Wexford
21 operates in in a Statewide capacity?
22   A.  At the present time three or four I
23 believe.
24   Q.  Okay.  I have Alabama, Florida, right?

162

1    A.  I'm not sure we're still doing Florida.
2    Q.  Okay.
3    A.  It would be Maryland, West Virginia,
4  Illinois.  Illinois by far is the largest.
5    Q.  Okay.
6    A.  Yes.
7    Q.  Does Wexford operate the contract in
8  Mississippi?
9    A.  No longer.
10   Q.  Okay.  So can I turn your attention to
11 the policy for access to care which is on Wexford
12 1425?
13   A.  Yes.
14   Q.  This is a policy that requires patients
15 to have unimpeded access to all healthcare
16 services at the facility, is that correct?
17   A.  Yes.
18   Q.  And that's a required policy by Wexford,
19 correct?
20   A.  Yes.
21   Q.  And can you just explain for me how these
22 policies, which typically break down into section
23 one policy and section two process, what that
24 means?

163

1    A.  Well, the policy describes the overall
2  statement in that particular area of concern, and
3  the process is the method in which we implement
4  that.
5    Q.  Great.  The section A under the process
6  portion of this policy states that the responsible
7  Health Authority for the facility will ensure the
8  timely and efficient response to all inmates'
9  healthcare needs, correct?
10   A.  Yes.
11   Q.  And the second section states that the
12 responsible Health Authority for the facility will
13 ensure that unreasonable barriers to health
14 services are avoided or eliminated, correct?
15   A.  Yes.
16   Q.  And in these Operations policies and
17 procedures the responsible Health Authority is
18 identified as the Site Medical Director, correct?
19   A.  In this case, yes.
20   Q.  Okay.  And so those are responsibilities
21 that fall to the Site Medical Director, correct?
22   A.  Correct.
23   Q.  Okay.  Can I turn your attention to the
24 policy for hospital and special, specialty care,

164

1  page 21, Bates number Wexford 1436?
2    A.  Yes.
3    Q.  And I asked you before about these
4  contracts with local hospitals and specialty
5  providers, and so we talked about that so I'm not
6  going to go back through that again.  But this
7  policy mirrors that requirement in the policy,
8  right?
9    A.  Yes.
10   Q.  And in the process portion of this
11 policy, for section C the policy states that
12 inmates will be referred to outside hospitals or
13 specialty care providers when healthcare required
14 for the inmate is beyond the capability of the
15 on-site healthcare system.
16       It is the Site Medical Director who is
17 delegated that authority to determine in the first
18 instance when a referral to an outside hospital or
19 specialty care provider is required by this
20 policy, correct?
21   A.  Yes.
22   Q.  And this policy is mandatory, correct?
23   A.  Yes.
24   Q.  Can you turn to page Wexford 1462?

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

42 (165 to 168)

165

1     A.  Yes.
2     Q.  Can you read the policy portion of this
3  policy which is entitled Patient Safety and, just
4  to yourself, and let me know once you're finished?
5     A.  Yes.
6     Q.  So the responsible Health Authority,
7  that's referring to the Site Medical Director,
8  right?
9     A.  Actually I believe that more, that refers
10 more to the administrative person at the site.
11    Q.  Why?  What about this indicates to you
12 that it's actually referring to the administrative
13 person?
14    A.  Well, because it talks about instituting
15 systems to ensure a safe work environment, avoid
16 adverse or near-miss clinical events.  And
17 typically the responsible Health Authority is
18 considered to be the Administrator on-site.
19        And there are evidently some contracts
20 that we have that are not run by the, in the same
21 manner as we do here in Illinois where the HCOA is
22 a State employee and not a Wexford employee.
23 Healthcare Unit Administrator.
24    Q.  But earlier we talked about that this

166

1  policy, this document itself in using, has defined
2  the phrase capital R, Responsible, capital H,
3  Health, capital A, Authority, right?  And it did
4  that in policy P-201, which is the very next page
5  on this document.
6     A.  Which Bates stamp are you referring to?
7     Q.  Wexford 1463.
8     A.  Okay.  Then that would define it as the
9  Medical Director, I agree.
10    Q.  Okay.  What does it mean the creation of
11 systems to ensure, well, let me just break it
12 down.  A safe work environment, is that referring
13 to an environment that's safe for staff or an
14 environment that's safe for patients?
15    A.  I would imagine it to be both.
16    Q.  Okay.  But it's not referring to like the
17 prisoners working at their job assignments within
18 the prison, right?
19    A.  Not to my knowledge, no.  It would,
20 although it depends on the contract in which
21 you're referring to.  But in Illinois that's not
22 generally the case.
23    Q.  Okay.  What does it mean to have systems
24 in place to avoid adverse and near-miss clinical

167

1  events?
2     A.  Well, it would be a system such as an
3  adverse drug reporting event or a medication
4  error, that would be in place to report and remedy
5  those types of situation that may occur.  That's,
6  that's one example of that.
7     Q.  Okay.  So medication errors is one that
8  has been put into effect.  Are there any other
9  systems, let me limit it to Southwestern Illinois.
10 Are there any other systems that have been
11 implemented in response to this policy?
12    A.  This policy, let's see.  I'm not
13 recalling any specific program that was in place
14 relative to Southwestern at this date and time
15 that the Medical Director would have put into
16 place.  I don't, I do not know or recall.
17    Q.  As you sit here today you're not aware of
18 any, correct?
19    A.  I do not recall any as I sit here today.
20 However, if I may backtrack, one example would be
21 like the QI meetings that occur monthly.  They're
22 examples of opportunities to identify any systems'
23 problems that could be remedied.
24    Q.  Okay.  Can you turn to Wexford 1471 for

168

1  me?
2     A.  Yes.
3     Q.  It's a policy regarding the training of
4  correctional staff?
5     A.  Correctional Officers.
6     Q.  Okay.  You agree that pursuant to this
7  policy Wexford is responsible for ensuring a
8  training program that trains Correctional Officers
9  about access to care?
10    A.  In the event that a particular contract
11 does not have a system in place to provide that
12 like we do in, IDOC provides all that, then
13 Wexford would help coordinate and provide that.
14 That does not apply here in Illinois.
15    Q.  So it's, it's your testimony that this
16 policy doesn't apply to Illinois, is that correct?
17    A.  My testimony is that this policy is
18 already enacted and taken care of by the Illinois
19 Department of Corrections training programs, so it
20 meets this need.
21    Q.  Okay.  But this policy specifically puts
22 on Wexford the responsibility to ensure that a
23 training program has been established and/or
24 approved by the responsible physician for

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

43 (169 to 172)

169

1 correctional officers who work with inmates
2 regarding a variety of subjects?
3      **A. Not in Illinois, this would not apply.**
4      Q. Okay. Can you tell me then, going back
5 to Exhibit Two, what provision in the contract
6 deals with training of correctional officers?
7      **A. No, I do not know it in toto to recall**
8 **that.**
9      Q. Okay. Well, it's your testimony that
10 the, it's, it's Wexford's contention that IDOC
11 bears the responsibility to train correctional
12 officers about access to care, correct?
13      **A. Yes.**
14      Q. Okay. So, and, and you were designated
15 to provide binding testimony on behalf of Wexford
16 about Wexford's contract with the Illinois
17 Department of Corrections, correct?
18      **A. Yes.**
19      Q. Okay. And so I'm asking you, it's not a
20 memory test for you to tell me without looking at
21 it what the provision is, but I'd like you to
22 direct me to where in the contract I can find this
23 specification that Illinois, or the IDOC is
24 responsible for the training of Correctional

170

1 Officers?
2          MS. KINKADE: I'm just going to object
3 to the extent that this does go outside the scope
4 of what he's been asked to testify here today in
5 that this contract is 282 pages long. If you want
6 to spend our time with him reviewing it you can,
7 but there's no correctional officer even named in
8 this case.
9          So to the extent that he's going to
10 testify with regard to the contract about IDOC
11 training of Correctional Officers, I do believe
12 it's outside the scope of his Corporate
13 representation.
14          MS. GRADY: Well, I disagree.
15 BY MS. GRADY:
16      Q. Doctor Matticks, you testified earlier
17 that this contract provides that IDOC will provide
18 training to correctional officers regarding access
19 to care, correct?
20      **A. I don't believe I testified that the**
21 **contract provides for that. Those are IDOC**
22 **policies and procedures, so they do that training**
23 **through IDOC.**
24      Q. Okay. So what, what policy does the IDOC

171

1 -- strike that. What is the policy where the IDOC
2 specifies that it has the responsibility to train
3 correctional officers on access to care and not
4 Wexford?
5      **A. I don't know. I don't know all the**
6 **IDOC's policies and procedures.**
7      Q. Okay. Are you aware of any written
8 policy where IDOC retains the responsibility to
9 train correctional officers?
10      **A. I'm not aware of any policy or procedures**
11 **with regard to IDOC and that specific task.**
12      Q. Okay. Wexford doesn't train correctional
13 officer in the State of Illinois, correct?
14      **A. Correct. In the State of Illinois IDOC**
15 **that I know of.**
16      Q. Well, you've been designated to provide
17 binding testimony on Wexford's behalf about the
18 training it provides, it provided, between January
19 1st, 2014 and January 2015 regarding topics 138 in
20 the 30(b)(6) notice, correct?
21      **A. Yes.**
22      Q. And one of the topics specifically that
23 you are designated to provide binding testimony
24 about was the systems in effect related to a

172

1 prisoner's request for medical attention or
2 medication, correct?
3      **A. Could you reference me to that citing?**
4      Q. That's topic three.
5      **A. Okay.**
6      Q. And so my question is between January
7 1st, 2014 and January 1st, 2015, did Wexford
8 provide any training to correctional officers
9 regarding access to care?
10      **A. None that I'm aware.**
11      Q. If you would, turn to page 1495 in the
12 Operations policy manual, Exhibit Five.
13      **A. Yes.**
14      Q. The policy deals with administrative
15 meetings, and under process section one notes that
16 they must be held at least quarterly?
17      **A. Yes.**
18      Q. Is this different from the Quality
19 Assurance Committee that's, that we discussed in
20 the contract?
21      **A. No, it pretty much refers to the Quality**
22 **Improvement Committee meetings.**
23      Q. Okay. Under this policy one of the
24 statistical reports that's required to be

Transcript of Roderick Matticks, M.D., Corporate Designee

44 (173 to 176)

Conducted on May 30, 2018

173

1 collected is the number of outpatient referrals,
2 correct?
3     A.  Yes.
4     Q.  And the number of outside
5 hospitalizations and services, correct?
6     A.  Yes.
7     Q.  How are those two things different?
8     A.  Outpatient referral may be a referral to
9 a cardiologist's office or some other specialist's
10 office, and outside hospitalization would
11 typically describe an inpatient service that was
12 providing for a patient and what was being done.
13     Q.  Outpatient referrals the cost is borne by
14 Wexford, right?
15     A.  Yes.
16     Q.  Hospitalizations are subject to the
17 Annual Hospital Utilization Threshold, right?
18     A.  It depends on where it's at, yes.
19     Q.  When you say it depends on where it's at,
20 do you mean it depends whether it's within the
21 IDOC or somewhere else?
22     A.  No.  It depends on University of Illinois
23 versus other hospitals.
24     Q.  Tell me about that.

174

1     A.  Well, at U of I they have a separate
2 contract, to my understanding, on hospitalization
3 of patients up there between IDOC and HFS and U of
4 I, UIC, but other hospitals are just straight
5 Medicaid services from my understanding.
6     Q.  So can you tell me what the Annual
7 Hospital Utilization Threshold is?
8     A.  My understanding of the threshold is that
9 it's a budgetary guesstimate as to what type of
10 utilization will likely occur in terms of annual
11 hospitalization, and as opposed to that, as a
12 consequence of the number crunching they have to
13 establish some budget guideline in which to place
14 in the contract.
15         So they guesstimate what the
16 guideline's going to be, and if it goes above or
17 below then they make some restitution to that one
18 way or the other.
19     Q.  I'm not sure if I'm on the same page as
20 you, so maybe I can try and say my understanding
21 and you can tell me if that's wrong.  My
22 understanding is that there's a certain amount
23 that the IDOC has said it will pay for
24 hospitalization services, and if the cost of

175

1 hospitalization services exceeds that amount
2 Wexford is responsible for all money that exceeds
3 that threshold amount.  If it either falls below,
4 if the total number of costs for hospital services
5 falls at or below that number then Wexford does
6 not owe money to anyone for those services.  Is
7 that --
8     A.  That pretty much sounds like what I said.
9     Q.  That's, it may very well have been.  I
10 just didn't understand it so I wanted to make sure
11 that we were on the same page.  Is that, that's
12 consistent with your understanding as well?
13     A.  I think that's a reasonable guesstimate
14 of how they come up with that number, yes.
15     Q.  Okay.  Are there universe, are there U of
16 I facilities in southern Illinois?
17     A.  Yes.
18     Q.  Where?
19     A.  Champaign, U of I is there.  We have a
20 University of Illinois in Springfield here.
21 There's U of I Rockford, U of I Peoria.  I think
22 those are all the ones that I know of.
23     Q.  And do any of those serve patients out of
24 Southwestern Illinois Correctional Center?

176

1     A.  Now I don't believe so.
2     Q.  Okay.  Can you turn to, oh.  Before we
3 turn actually can you tell me who receives a copy
4 of those monthly statistical reports?
5     A.  Which reports?
6     Q.  The monthly statistical reports set out
7 in policy, the policy on administrative meetings
8 one, Wexford 1495.
9     A.  Do you mean at the facility?
10     Q.  I just mean anyone.  The Committee, the
11 responsible Health Authority receives those
12 reports, correct?
13     A.  Yes.
14     Q.  Does anyone from Wexford corporate staff
15 receive a copy of those reports?
16     A.  Well, they have their own reports that
17 outline these numbers, so if it's a specific
18 report from a QI meeting, not likely.
19     Q.  Do you receive a copy of these monthly
20 statistical reports for Southwestern Illinois?
21     A.  I review them.  Usually there's an annual
22 governing body meeting that occurs which is a
23 culmination of the last year's monthly QI
24 meetings, at which I attend along with the Agency

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

45 (177 to 180)

177

1 Medical Director, and all that information is
2 reviewed, so I will have seen it at that point in
3 time. But generally speaking I don't, I don't
4 receive a copy of those on a monthly basis from
5 the facility.
6    Q. What is that meeting?
7    A. Annual governing body.
8    Q. And the governing body there refers to
9 what?
10    A. It's the, it's chaired by OHS Agency
11 Medical Director, the Wardens there, all the
12 Healthcare Unit staff, the administration's there,
13 the Medical Director's there. Dental and mental
14 health are all represented. Wexford Regional
15 Manager and Regional Medical Director attend. And
16 it's just a review of the years' activities.
17    Q. Okay. Can you turn to page 83, Wexford
18 1498?
19    A. Yes.
20    Q. This is a policy regarding review of the
21 services provided by primary care providers?
22    A. Yes.
23    Q. I'd like to look at the, under process,
24 section A, numbers three and four which lay out

178

1 the requirements regarding peer review, can you
2 review those and let me know once you've finished?
3    A. Three and four, is that what you asked
4 for?
5    Q. Correct.
6    (Witness reviewing document.)
7    A. Yes. Okay.
8    Q. So this policy is mandatory, correct?
9    A. Yes. But, it's superseded by IDOC
10 policies, but yes.
11    Q. Okay. You're saying this policy is not
12 in effect in the State of Illinois with respect to
13 IDOC facilities; is that correct?
14    A. IDOC, we follow IDOC Administrative
15 Directives and Institutional Directives.
16    Q. I understand that you follow IDOC
17 Institutional Directives. Is there anything in
18 those Administrative Directives and Institutional
19 Directives that renders sections three and four of
20 this policy null?
21    A. I don't know. I don't have a copy of the
22 AD's and ID's.
23    Q. Okay. Well, you were designated to give
24 binding testimony on Wexford's behalf about its

179

1 policies in effect from January 2014 through
2 January 2015 regarding the oversight of the
3 Medical Director and review of decisions by the
4 Medical Director at Southwestern Illinois
5 Correctional Center, correct?
6    A. Yes.
7    Q. Okay. So at Southwestern Illinois
8 Correctional Center, and throughout the State if
9 that's necessary to your testimony, is, does
10 Wexford maintain a policy of requiring one annual
11 peer review conducted by someone with a similar,
12 with similar credentials and one peer review
13 conducted by someone who is senior to the primary
14 care provider?
15    A. Yes, these are at a minimum.
16    Q. Okay. So, okay. The, section C under
17 process, which is right at the very bottom of the
18 page.
19    A. Yes.
20    Q. It says in order to separate utilization
21 review and other sensitive processes from
22 bonus-related issues, peer reviews are not to be
23 conducted for each provider at the same time the
24 annual evaluation is completed. Are primary care

180

1 providers paid a bonus?
2    A. No.
3    Q. So what does that mean, bonus-related
4 issues?
5    A. Oh, define bonus.
6    Q. Are they provided a lump sum of
7 compensation at any particular point in time that
8 is separate from their salary?
9    A. That may occur, yes.
10    Q. Okay. Can you tell me why you changed
11 your answer?
12    A. I wanted to understand what you meant by
13 bonus.
14    Q. Okay. What did, what, when I first used
15 the word bonus what did you think I meant?
16    A. Those related to utilization of services,
17 which it's not.
18    Q. Okay. So how often does Wexford make a
19 decision about whether or not to provide bonuses?
20 Using my definition, not yours.
21    A. That is usually negotiated at the hiring
22 process.
23    Q. Meaning whether they'll, do any of the
24 primary care providers receive an annual bonus?

181

1    A. I don't know. That's between the
2 staffing department, HR and them. I'm not aware
3 of that number.
4    Q. Are you aware of anyone who receives an
5 annual bonus?
6    A. Well, I have a bonus just for staying on
7 for the year.
8    Q. Okay. So there are some --
9    A. A retention bonus. But it has nothing to
10 do with quality or service utilization.
11    Q. And do you know whether, to your
12 knowledge have any Medical Directors ever received
13 a retention bonus? Site Medical Directors?
14    A. I don't know. I think there are some. I
15 don't know any of those details.
16    Q. Okay. And then when you said bonuses may
17 be negotiated through the, at the time of hiring,
18 was that like a sign-on bonus?
19    A. Yes, typically.
20    Q. Okay. Are there any other types of
21 bonuses that Wexford provides on any periodic, on
22 any basis?
23    A. Not that I'm aware of unless they make
24 some salary adjustment of some fashion.

182

1    Q. And leave those to the side sometimes
2 where there would be an incremental increase in
3 salary or you'd get a raise. I'm talking
4 specifically about a lump sum of money paid for
5 any reason.
6    A. It might be to retain, help retain staff
7 if it's necessary to adjust salaries to where they
8 should be or could be competitive with the outside
9 world.
10    Q. Okay. Can you turn to the next page,
11 Wexford 1499?
12    A. Yes.
13    Q. In this section under section C, this is
14 giving detail to the peer, the medical peer
15 review. It says the Corporate Medical Director
16 will be responsible for scheduling a peer review
17 of physicians at contract locations having a
18 single provider. Do you see that?
19    A. Yes.
20    Q. Does that refer simply to the scheduling
21 or does that refer to the completion of peer
22 reviews? I'm not quite sure about what that
23 provision refers to.
24    A. I'll need to digest this also.

183

1    Q. Okay.
2    (Witness reviewing document.)
3    A. This is most likely related to sites such
4 as a jail somewhere or other facilities where
5 there's just a physician providing services not
6 designated as a Medical Director, and the
7 Corporate Medical Director will just, will do the
8 peer review for that person.
9    Q. Okay.
10    A. That's my understanding of this as it's
11 written.
12    Q. Okay. You can put that exhibit to the
13 side.
14    (Exhibit No. 8 marked for identification.)
15 BY MS. GRADY:
16    Q. Okay. The court reporter just handed you
17 what's been marked Exhibit Eight. This is a copy
18 of -- well, strike that. Why don't you just leaf
19 through these and let me know if you recognize the
20 forms that comprise Exhibit Eight. Not the
21 actual, the exact documents as completed with
22 handwriting, but just the forms.
23    A. Yes.
24    Q. Okay. What are these documents?

184

1    A. These are copies of peer reviews that
2 were done provided by Wexford Health.
3    Q. And the person who signed these, but from
4 my review in every instance is Venario Santos?
5    A. Yes.
6    Q. Are you familiar with him?
7    A. Yes.
8    Q. Who is he?
9    A. He's the Medical Director at Centralia.
10 Is this one big stamp?
11    Q. Yes.
12    A. Wow. Somebody has a job.
13    Q. Well, I think that they applied it
14 electronically.
15    A. Oh, okay. Good.
16    Q. Okay. And these peer reviews don't
17 review the provision of medical care to any
18 particular patient over the course of a period of
19 time, right? In other words, they only assess a
20 particular visit at one moment, correct?
21    A. Yes.
22    Q. Okay. Is there any process by which a
23 medical -- strike that. Is there any process
24 other than in the event of a prisoner's death by

Transcript of Roderick Matticks, M.D., Corporate Designee

47 (185 to 188)

Conducted on May 30, 2018

185

1  which the course of a Medical Director's treatment
2  is subject to review?
3      **A.  A particular patient's care may be**
4  **reviewed if there is a question from the Agency**
5  **Medical Director or asked one of us to take a look**
6  **at a particular case and assist with review of the**
7  **record or with the care plan that was given by the**
8  **physician.**
9          **Then I'm thinking in here the**
10 **appropriate care plan, appropriate, I'm sorry.  Is**
11 **the care plan appropriate and well-documented**
12 **usually also includes the, you know, the**
13 **indication that there's going to be some kind of**
14 **follow-up care plan for that, in that particular**
15 **patient's visit.**
16     Q.  Okay.
17     **A.  Do you see where that says number seven?**
18     Q.  Why don't you give me the Bates number of
19 the page?
20     **A.  Let's do Bates --**
21     Q.  Well, these aren't, these are not Bates
22 stamped.
23         MS. KINKADE:  Yeah, they are.
24         THE WITNESS:  Where?

186

1          MS. KINKADE:  The bottom.
2          THE WITNESS:  Oh.  Yeah, 003.
3  BY MS. GRADY:
4      Q.  Okay.
5      **A.  All right.**
6      Q.  So you're referring to number seven on
7  that form?
8      **A.  Yes.**
9      Q.  But the, just looking at number three as
10 an example, this review is only of the sick call
11 provided -- strike that.  This review is only of
12 the document reflecting the February 18th, 2013
13 encounter between Dr. Shah and whoever this
14 patient was, correct?
15     **A.  Correct.**
16     Q.  Okay.  And there's, the peer review
17 process does not include as part of the review to
18 review additional encounters to determine whether
19 the care plan was followed or whether it was
20 modified if necessary?
21     **A.  That would be true.  It's just to**
22 **determine whether during this particular visit is**
23 **there some indication that a follow-up plan was in**
24 **place.**

187

1      Q.  Okay.  You can put those two aside.  I
2  want to talk to you next about Wexford's answers
3  to the Interrogatories in this case.
4          (Exhibit No. 9 marked for identification.)
5          I do actually have just a couple
6  foundation questions.  These are Interrogatories
7  provided to us on behalf of Wexford.  And if you
8  would turn to the last page, or the second to last
9  page rather, there is a verification there.  Do
10 you see that?
11     **A.  Yes.**
12     Q.  That is signed by Joe Abbott.  Do you
13 know who that is?
14     **A.  Yes.**
15     Q.  Who is that?
16     **A.  He's the Corporate Legal --**
17     Q.  I think he's the Risk Manager for
18 Wexford.
19     **A.  Okay.  Risk Management Legal --**
20     Q.  Okay.  He deals with, but you know he's
21 a, he's a --
22     **A.  -- Paralegal.**
23     Q.  -- Wexford employee?
24     **A.  Yes.**

188

1      Q.  Okay.
2      **A.  Paralegal is what I was looking for.**
3      Q.  Okay.  Interrogatory number 10 asks about
4  policies, procedures, or practices governing a
5  variety of topics.  Would you read those topics
6  and let me know once you're finished?
7          (Witness reviewing document.)
8      **A.  Am I just reading -- oh, you want me to**
9  **read the answer too?  Okay.**
10     Q.  Well, it probably wouldn't make it,
11 right.
12         (Witness reviewing document.)
13         (Off the record.)
14 BY MS. GRADY:
15     Q.  All right.  We can go back on.  Have you
16 had an opportunity to review this Interrogatory
17 and the response by Wexford?
18     **A.  Yes.**
19     Q.  Okay.  I just want to go through some of
20 these because you are designated as Wexford's
21 representative, so, and it seems she wants to
22 object so give her a minute to do that if you
23 would.  I have introduced today, with the
24 exception of the provider handbook which I will do

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

189

1  next, all of the policies and procedures that have
2  been produced to us for all of these topics with
3  the exception of the Quality Improvement Program.
4  In other words, I think there's a policy I did not
5  print out that was produced to us regarding
6  quality improvement.
7       So leaving that to the side, are you
8  aware of any written policies concerning any of
9  these topics laid out in section 10 that have not
10 been marked as exhibits other than the provider
11 handbook?
12      MS. KINKADE:  And I'm not objecting to
13 that question, so you can answer.
14      THE WITNESS:  Well, with the exception
15 of J Healthcare staffing levels at Southwestern I,
16 I don't know if we did cover that, but it appears
17 we've covered most of this.  I don't see anything
18 else.
19 BY MS. GRADY:
20   Q.  Okay.
21   **A.  Uh-huh.**
22   Q.  And there's just a couple that I want to
23 hit, particularly because I think you've been
24 particularly designated on those topics.  There

190

1  are no policies, there are no written policies
2  that were or are in effect between January 2013
3  and the present governing access to medical
4  evaluation or treatment by prisoners, correct?
5       MS. KINKADE:  Could you restate that
6  question?  Could you read it back?
7       (Last question read back by the reporter.)
8       MS. KINKADE:  I'm just going to object
9  to form.
10      THE WITNESS:  I would have to ask for
11 that to be rephrased.
12 BY MS. GRADY:
13   Q.  Okay.  We discussed the policy and the
14 Operations policy and procedure governing
15 Wexford's written policy on access to care,
16 correct?
17   **A.  Yes.**
18   Q.  Are there any other policies governing
19 access to care -- strike that.  Are there any
20 other written policies regarding access to care?
21   **A.  None that I'm aware of or I can think of.**
22   Q.  We discussed the medical policies and
23 procedures that Wexford promulgates, correct?
24   **A.  Yes.**

191

1    Q.  Are there any other written policies
2  governing provision of medical care to prisoners
3  that we, that do not appear in the exhibits that
4  are in front of you?
5    **A.  I don't know that I can recall.  None
6  that I know of.**
7    Q.  Are there, we reviewed the contract and
8  other things dealing with policies related to
9  medical services provided on-site at the
10 facilities, correct?
11   **A.  Yes.**
12   Q.  Are there any other written policies
13 governing the provision of medical services at
14 Southwestern that have not been marked as an
15 exhibit today?
16   **A.  None from Wexford.**
17   Q.  We discussed the Utilization Management
18 policies and procedures, correct?
19   **A.  Yes.**
20   Q.  Are there any other written policies
21 governing the transfer of prisoners to off-site
22 medical facilities for medical evaluation or
23 treatment that we did not review as an exhibit
24 today?

192

1    **A.  None that I can recall or know of.**
2    Q.  We talked about sick call requests,
3  correct?
4    **A.  Yes.**
5    Q.  Are there any other written policies
6  governing requests for attention, evaluation or
7  treatment that we have not, that have not been
8  marked as an exhibit today?
9    **A.  None that I can recall or think of from
10 Wexford, yes.  No.**
11   Q.  We discussed, no, I don't need to ask
12 that one.  We discussed how a Medical Director
13 would have his -- strike that.  Are there any
14 written policies governing a patient's complaints
15 of pain in the back that have not been marked as
16 an exhibit today?
17   **A.  No, none that I'm aware of.**
18   Q.  Are there any written policies governing
19 the diagnosis and treatment for spinal cord
20 compression or other damage to the spine that have
21 not been marked as an exhibit today?
22   **A.  No, Ma'am.**
23   Q.  Okay.
24      (Exhibit No. 10 marked for

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

193

1    identification.)
2         Okay.  I'm going to refer you to page
3  1690.
4         MS. COOK:  And we're on Exhibit 10,
5  right?
6         MS. GRADY:  Yes, of Exhibit 10.
7  BY MS. GRADY:
8      Q.  This lists things to consider when
9  deciding a course of treatment.  Do you see that?
10     A.  Yes.
11     Q.  And let me first back up and ask you, is
12  this a document that you're familiar with, Exhibit
13  Nine (sic)?
14     A.  Yes.
15     Q.  What is this document?
16     A.  That's a provider handbook.
17     Q.  Can you explain to me what that is?
18     A.  This is basically a background
19  information that we provide to our candidates and
20  practitioners that describes certain aspects
21  unique to healthcare provision and correctional
22  environment and some of the typical practices that
23  we may, you know, we may have some differences
24  between this and regular community medicine.  It's

194

1  an informational piece.
2         (Discussion off the record.)
3         MS. GRADY:  Yes, Exhibit 10.
4         MS. COOK:  We all agree Exhibit 10.
5  BY MS. GRADY:
6      Q.  Okay.  And so then, now jumping back in
7  to the page Wexford 1690, this lists the variables
8  that physicians should take into account when
9  deciding a course of treatment, right?
10     A.  Yes.
11     Q.  One of those variables is the length of
12  the prisoner's sentence.
13     A.  Yes.
14     Q.  How and why does this bear on a treatment
15  plan?
16     A.  It depends upon designing a patient care
17  plan when you have somebody who's going to be in
18  there over a longer period of time versus a
19  shorter period of time, you may have an illness
20  that would require a handoff to the community.
21         For instance, if I'm going to be
22  treating your hypertension or something and I only
23  have three months to treat you then I'm going to
24  consider how I'm going to treat your hypertension

195

1  and give you instructions on how to access care
2  when you leave the facility.
3      Q.  If treatment for a patient was medically
4  necessary would it be appropriate to deny the
5  patient that treatment based on the patient's
6  length of sentence?
7      A.  No.
8      Q.  That would be contrary to Wexford's
9  policies, correct?
10     A.  Yes.
11     Q.  I'd like to turn your attention to 1696.
12  This page discusses techniques for interactions
13  with prisoners, correct?
14     A.  Interviewing tips and techniques.
15     Q.  Okay.  I'd like to turn your attention to
16  section B, techniques.  And I'd like you to
17  specifically look at, read paragraph two under
18  section B.
19         (Witness reviewing document.)
20     A.  Okay.
21     Q.  Do you agree that Wexford, it's Wexford's
22  policy that medical, that physicians should review
23  the chart prior to encountering a patient?
24     A.  I agree that that's just good medical

196

1  practice anywhere.
2      Q.  Well, I agree with that statement as
3  well.  But it's particularly Wexford's policy?
4      A.  I'm not sure there's a policy that
5  specifically addresses that.  That's just common
6  medical knowledge right there to be able to do
7  that.
8      Q.  Okay.  Is it Wexford's practice to have
9  physicians review the chart prior to encountering
10  the patient?
11     A.  It is my practice to train them to do
12  that, to encourage them to do that.
13     Q.  Section three, I just, actually I'd like
14  you to read that and let me know once you've had a
15  chance to read it.
16     A.  Are you talking about B3?
17     Q.  Under B, paragraph three.
18         (Witness reviewing document.)
19     A.  Okay.
20     Q.  At the end of that paragraph it says no
21  diagnoses equals no treatment.  Do you see that?
22     A.  Yes.
23     Q.  What does that mean?
24     A.  That means not everything that someone

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

50 (197 to 200)

197

1 presents with is going to require a specific
2 course of action like a prescription or MRI's or
3 further testing. It would mean, a lot of that
4 just means it's reassurance or watchful waiting.
5 I mean, that's typical in community medicine as it
6 is here.
7    Q. Okay. Well, I'm familiar with close
8 observation or observation of a patient.
9    A. Uh-huh.
10    Q. But I'm not familiar with this phrase no
11 diagnosis equals no treatment. And I understood
12 that to mean that without a diagnosis treatment
13 should not be initiated. Is it your testimony
14 that that understanding is incorrect?
15    A. I think that that's probably not the best
16 statement way to describe that, but what it really
17 is talking about is if you don't have a condition
18 that requires a specific course of action then you
19 really shouldn't, you don't need to do it.
20       However, that doesn't mean that you
21 still don't educate the patient or tell them we
22 don't need to do this and here's why. It just
23 means that, for instance, if you come to me with a
24 sore throat and it's a viral condition, I will not

198

1 prescribe you antibiotics because you don't have a
2 bacterial infection so you don't need the
3 treatment, Penicillin.
4    Q. But then in that instance you've given a
5 diagnosis, it's just not a diagnosis that
6 necessitates treatment.
7    A. Well, that's, could mean why this is
8 probably not the best way to describe that.
9 However, that's how I interpret what they're
10 saying in this paragraph.
11    Q. Section four, I'm just concerned with the
12 first two sentences. Is that --
13    A. I beg your pardon? I'm sorry.
14    Q. I'm looking at section B, subsection
15 four, and particularly the first first two
16 sentences of that paragraph.
17    A. B4. Okay.
18    Q. You agree that Wexford's policy is that
19 physicians should document the patient's
20 complaints as close to verbatim as possible?
21    A. I believe that's good practice, yes.
22    Q. But that's Wexford's policy, right?
23    A. I don't believe that that's written
24 specifically in that terminology in the policy.

199

1    Q. Well, tell me what Wexford's policy is as
2 it relates to documentation of subjective
3 complaints.
4    A. I would have to look back at all these
5 exhibits. Why don't you give me a few minutes,
6 maybe I can find it.
7    Q. Okay.
8       (Off the record.)
9 BY MS. GRADY:
10    Q. We can go back on the record.
11    A. All right. Can we revisit the question,
12 please?
13    Q. Yes.
14       MS. GRADY: Can you re-read the last
15 question and answer?
16       (Last question and answer read back by the
17       reporter.)
18 BY MS. GRADY:
19    Q. Okay. So after having reviewed the
20 exhibits can you tell me what is Wexford's policy
21 as it relates to documenting a patient's
22 complaints?
23    A. After reviewing these documents I
24 couldn't find anything that related specifically

200

1 to that. These are generally training issues that
2 we as a Regional Medical Director would teach them
3 and, you know, to apply the appropriate
4 documentation for that visit.
5    Q. Okay. Do you agree that it is Wexford's
6 policy, whether written or not, that patients'
7 subjective complaints should be documented?
8    A. Yes.
9    Q. And do you agree that it is Wexford's
10 policy that the evaluations performed by the
11 physician should similarly be documented?
12    A. Yes.
13    Q. And do you agree that the outcomes of
14 those evaluations should be documented?
15    A. Yes.
16    Q. And do you agree that the physicians
17 assessment based on the complaints and examination
18 should also be documented?
19    A. Yes.
20    Q. And that's Wexford's policy, correct?
21    A. Yes. The unwritten, as far as I know,
22 unless there's one out there. I just don't have
23 access to it at the present time.
24    Q. Sure. And do you agree that it's also

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

51 (201 to 204)

201

1  Wexford's policy that the physician should
2  document the plan that he or she forms in response
3  to his or her assessment?
4      **A.  Yes.**
5      Q.  Okay.  All right.  You can put that to
6  the side.  Exhibit 10 to the side anyway.  Okay.
7  Let's talk about the Utilization Management
8  policy.  That's Exhibit Seven.  If you would turn
9  your attention to Wexford 1835.
10     **A.  Yes.**
11     Q.  This is the policy about requesting a
12 non-emergent referral by a specialist, correct?
13     **A.  To a specialist.  For a specialist.**
14     Q.  Right.  The procedure discusses what
15 happens if another, how a Medical Director on-site
16 is involved if another physician at the facility
17 completes a referral request.  Do you see how
18 that, do you see that that, steps addressing that
19 situation are included in the policy?
20         So like steps one and two, for
21 example, envision an instance where the Site
22 Medical Director, by the terms by my reading
23 anyway, envision a situation where the Site
24 Medical Director is reviewing a referral request

202

1  from someone else.
2      **A.  You're looking at 2A, section one?**
3      Q.  And section two.
4      **A.  And section one does not indicate if it's**
5  **another provider, it's just a Site Medical**
6  **Director.  Section two refers to the Site Medical**
7  **Director agrees with the request.**
8      Q.  Well --
9      **A.  I see.**
10     Q.  Let me back up and ask it this way.  Who
11 can complete a referral request?
12     **A.  Okay.  Any practitioner that's seeing the**
13 **patient can make that referral request, like a mid**
14 **level practitioner or a site physician may make**
15 **the request, and it's reviewed by the Medical**
16 **Director if there's a Medical Director on-site at**
17 **the time.**
18         **So this is referring to the fact that**
19 **the Site Medical Director may actually disagree**
20 **with that request promulgated by the mid level**
21 **practitioner in this case and, you know, can make**
22 **the notation as to why or whatever in the medical**
23 **record.  If they agree with it then it's forwarded**
24 **to the collegial review process.**

203

1      Q.  Okay.  I want to turn your attention back
2  to Exhibit Two.  And let's look at Wexford 130.
3  Let me know once you're there.
4      **A.  Yes.**
5      Q.  This is the contractual staffing
6  agreement that's broken down by facility.  And on
7  Wexford page 130 there is the staffing breakdown
8  for Southwestern Illinois Correctional Center,
9  correct?
10     **A.  Yes.**
11     Q.  And leaving to the side mental health
12 care, dentistry and vision, are there any
13 providers, or how many providers are there
14 contracted to work at Southwestern on a full or
15 part-time basis?
16     **A.  Our provider, are you referring to a**
17 **medical provider like mid level or --**
18     Q.  Well, I think, you used the phrase
19 practitioner I guess for who could complete a
20 referral request, right?
21     **A.  Correct.**
22     Q.  Okay.  So how, again leaving to the side
23 vision, dental, mental health, how many
24 practitioners, as you use that phrase, worked,

204

1  work at Southwestern as of, according to this
2  contract?  I'm sorry.  If we can just go off the
3  record.
4         (Break taken at this time.)
5  BY MS. GRADY:
6      Q.  Okay.  I'm just going to restate my
7  question again because I got distracted halfway
8  through it.  Again, leaving to the side vision,
9  dental, mental health, how many practitioners were
10 staffed at Southwestern according to the contract?
11     **A.  During this time period?**
12     Q.  Yes.
13     **A.  One.**
14     Q.  Okay.  And do you know whether in, at any
15 point in 2014 there was an additional practitioner
16 who worked at the facility?
17     **A.  None that I recall.  However, there may**
18 **have been a traveling Medical Director that came**
19 **in to provide some extra hours.  Sometimes that**
20 **happens.  But primarily it would be just one**
21 **practitioner.  That was Dr. Shah.**
22     Q.  Okay.  And is that true today or are
23 there additional practitioners on-site as well?
24     **A.  There's one, yes.**

Transcript of Roderick Matticks, M.D., Corporate Designee

52 (205 to 208)

Conducted on May 30, 2018

---

205

1    Q.  Okay.  And so at Southwestern Illinois
2  Correctional Center during 2014 only Dr. Shah
3  could complete a referral request, correct?
4    **A.  Yes, generally speaking.  Unless it was**
5  **one of those unusual circumstances.**
6    Q.  Where there was a traveling Medical
7  Director providing some coverage?
8    **A.  Correct.**
9    Q.  Okay.  And the, I'm not going to ask you
10 in detail about it, but the policy then goes on to
11 state what happens if a request submitted by a
12 Medical Director is denied and the Medical
13 Director wishes to further pursue that request,
14 correct?
15   **A.  With Utilization and Management, yes.**
16   Q.  Yes.  But that appeal process must be
17 initiated by the practitioner, correct?
18   **A.  Correct.**
19   Q.  Okay.  In, in this policy, the referral
20 request policy, there's a reference to InterQual
21 criteria.  What is that?
22   **A.  Those are standard reference manuals that**
23 **identify which specific conditions exist or**
24 **parameters exist that would warrant subsequent**

206

1  **care like continuing hospitalization or referrals**
2  **or those types of things, or appropriateness of**
3  **MRI.  There's standard criteria that are out**
4  **there.**
5    Q.  And who at Wexford, who at Wexford
6  actually accesses the InterQual criteria and
7  assesses whether the patient's case meets the
8  criteria?
9    **A.  I'm not sure who does that.  They have a**
10 **staff of Utilization Management nurses out there**
11 **who probably do some of that, but I don't really**
12 **know specifically.**
13   Q.  Do you know whether the InterQual
14 criteria, is that a program?
15   **A.  Yes.**
16   Q.  Is the program available to practitioners
17 on-site?
18   **A.  No, I don't think you'd want it to be.**
19   Q.  Why not?
20   **A.  It's a complex program to my knowledge.**
21 **It's really not necessary for them.  They just**
22 **need to focus on the medical necessity.  It's a**
23 **program that insurance companies use.**
24   Q.  Can you turn to page 1841, please?

207

1    **A.  Yes.**
2    Q.  This is the correctional site appeal
3  process.
4        MS. COOK:  I'm sorry, what page is
5  that?
6        MS. GRADY:  1841.
7  BY MS. GRADY:
8    Q.  My question was just, is this the policy
9  dealing with correctional site appeal processes?
10   **A.  I'm sorry.  Yes.**
11   Q.  Okay.  And this policy sets out in
12 general terms what happens again when the
13 Utilization Management staff deny a request for a
14 referral how, how a disagreement with that
15 decision can be appealed?
16   **A.  Yes.  It's not necessarily a true denial,**
17 **it's called an alternative treatment plan is**
18 **devised for that.  So either they create an**
19 **alternative treatment plan --**
20   Q.  Sorry.  You were, go ahead.  Complete
21 your answer.
22   **A.  I lost my train of thought.  Okay.  So**
23 **either the request is approved or an alternative**
24 **treatment plan is put into place for that.  And**

208

1  **that's the one that the Medical Director can agree**
2  **to or not agree to.  If they don't agree with**
3  **that, it's not appropriate for the patient at that**
4  **time, then they can appeal that to another**
5  **Corporate UM doctor or another Corporate Medical**
6  **Director.**
7    Q.  Okay.  You can put that to the side, I'm
8  done with that.  Okay.  I want to turn back to
9  exhibit, the Interrogatory responses.
10   **A.  Nine.**
11   Q.  That's Nine.  Okay.  And the one topic on
12 section, on question 10 that I didn't talk to you
13 about was the policy in place at Southwestern
14 regarding documentation of encounters with medical
15 evaluations of treatment to and requests for
16 treatment by prisoners.
17       So in other words, documentation of
18 medical encounters with prisoners.  Have we
19 discussed today all of Wexford's policies
20 governing documentation of medical encounters with
21 prisoners?
22   **A.  Yes, to my recall that's true.**
23   Q.  Are there any policies that we haven't
24 discussed today regarding the provision of MRI

209

1 studies for prisoners?

2     **A. None that we haven't discussed.**

3     Q. Are there any policies, does Wexford have

4 any policies regarding the provision of Neurology

5 or Neurosurgery services to prisoners that we

6 haven't discussed today?

7     **A. None that I'm aware of.**

8     Q. Are there any policies of Wexford

9 pertaining to complaints of neurological issues by

10 prisoners that we haven't discussed today?

11    **A. None that I'm aware of.**

12    Q. Are there any policies relating to

13 diagnosis and treatment for spinal cord

14 compression that we haven't discussed today?

15    **A. None that I'm aware of.**

16    Q. Is there any system through which a

17 prisoner could address the Medical Director's

18 decision not to seek a referral for specialty care

19 or evaluation?

20    **A. Well, they can put in another nursing**

21 **sick call, ask to be seen again. They can always**

22 **write a grievance to address that, and then it's**

23 **reviewed by the Healthcare Unit Administrator and**

24 **probably discussed with the practitioner, the**

210

1 **doctor. Beyond that, it's up to the discretion of**

2 **the Medical Director.**

3         (Exhibit No. 11 marked for

4         identification.)

5     Q. In case it helps, it's docket 59-1, pages

6 four through eight. Okay. The court reporter has

7 handed you what's been marked as Exhibit 11. So

8 this is a grievance submitted by Mr. Armbruster in

9 this case complaining about the treatment he

10 received from medical staff.

11         And my question is, my question is

12 this. In response, you see that the correctional

13 counselor -- strike that. You're familiar with

14 these forms in general?

15    **A. In general.**

16    Q. Okay. The correctional counselor, who I

17 understand to be an IDOC employee, submitted a

18 response on the same form lower on the grievance

19 on page, Armbruster ARB8.

20    **A. Okay.**

21    Q. And in that response he or she referred

22 to the Healthcare Unit Administrator?

23    **A. I'm sorry? Oh, yes.**

24    Q. And the Healthcare Unit Administrator

211

1 doesn't have any supervisory authority over the

2 Medical Director's decision regarding patient

3 care, correct?

4     **A. Generally speaking, no.**

5     Q. Okay.

6     **A. I mean yes, that's correct.**

7     Q. Okay. And there's nothing in this

8 response that would indicate that anyone

9 independently assessed Dr. Shah's decision not to

10 refer Mr. Armbruster for specialty care

11 evaluation, correct?

12         MS. KINKADE: Objection. Form,

13 foundation.

14         THE WITNESS: There's nothing in this

15 document discussing that.

16 BY MS. GRADY:

17    Q. Okay. And then if you would, turn to

18 page, the first page of this exhibit, which was a

19 response by the Grievance Officer, who again I

20 understand to still be employed by the IDOC and

21 not a medical person.

22         And this is a further response to the

23 grievance. You see in the response here under

24 facts reviewed that there is again a reference to

212

1 a statement from the Healthcare Unit

2 Administrator?

3     **A. Are you on page 0007?**

4     Q. Correct.

5     **A. Yes, I see it.**

6     Q. And then under recommendation it again

7 references the statement of the Healthcare Unit

8 Administrator?

9     **A. Correct.**

10    Q. And do you see anywhere, according to

11 this document, where there was an independent

12 assessment of Dr. Shah's decision not to refer the

13 patient for specialty care assessment?

14    **A. No.**

15    Q. Okay. And if, if a, and turning back to

16 the process by which a prisoner who disputed the

17 decision by a Medical Director not to refer him

18 for specialty care, one of the ways you said was

19 to go through nursing sick call?

20    **A. That would be one way.**

21    Q. Nurses don't have the ability to refer

22 patients for a specialty care evaluation, correct?

23    **A. Correct.**

24    Q. And, in fact, nurses can't submit

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

213

1 referral requests, correct?
2     **A.  Correct.**
3     Q.  If the sole practitioner on-site at the
4 facility was the Medical Director, the only way
5 that that prisoner could have his, his own request
6 to be referred for specialty care reviewed by the
7 Utilization Management staff is through the
8 submission of a referral request by the Medical
9 Director, right?
10     **A.  Correct.**
11     Q.  And there's no policy or system in place
12 to review those decisions not to refer a patient
13 for specialty care, correct?
14     **A.  There is no policy that dictates we**
15 **review every patient visit to determine if it was,**
16 **if there was reason or not to refer.  We cannot**
17 **review every patient visit that occurs.**
18     Q.  Who is the current Medical Director at
19 Southwestern Illinois Correctional Center?
20     **A.  Doctor Afuwate.  A-f-u-w-a-t-e.**
21     Q.  And how long has he been the Medical
22 Director there?
23     **A.  Oh, approximately a year.**
24     Q.  In 2014 Dr. Shah was the medical care

214

1 provider, correct?
2     **A.  Yes.**
3     Q.  When did he stop working for Wexford?
4     **A.  I think it was late 2015 or early '16 if**
5 **I recall.**
6     Q.  And what were the circumstances that he
7 stopped working for Wexford?
8     **A.  As I recall he wanted to retire.**
9     Q.  We received -- strike that.  Can you tell
10 me what are the policies, what are Wexford's
11 policies regarding -- strike that.  Does Wexford
12 audit the quality of medical care at the facility
13 for any period of time?  Strike that, that's a bad
14 question.  Are there audits that Wexford conducts?
15     **A.  No, no specific audits that I'm aware of**
16 **that I can recall.**
17     Q.  We've talked today about policies
18 regarding referral and transfer of prisoners to
19 off-site medical facilities, and we've also
20 discussed Utilization Management policies in
21 Exhibit Seven.
22          Are there any other policies that
23 Wexford maintains or maintained between January
24 2014 and January 2015 regarding referral of

215

1 patients for specialty care evaluation that we
2 haven't discussed today?
3     **A.  Can I ask that we hold that question?**
4 **Let me go back to the audit thing issue real**
5 **quick?**
6     Q.  Okay.
7     **A.  I'm trying to determine what kind of**
8 **audit you're talking about.  They do financial**
9 **audits to monitoring that.  They do the, review**
10 **the numbers of visits that occur on-site,**
11 **off-site.  I mean, those occur all the time.**
12          **But are you referring to an audit of**
13 **whether referrals should have been made for a**
14 **specific situation that wasn't?**
15     Q.  Yes.
16     **A.  Okay.  Then my answer stands.  Okay.  Can**
17 **we go back?  I'm sorry.**
18     Q.  Yes.  So we discussed at length today
19 policies regarding the referral and transfer,
20 well, the referral of prisoners for specialty care
21 evaluation.  And we also marked as Exhibit Seven
22 the written policies.
23          Did Wexford have any other policies in
24 effect between January 2014 and 2015 regarding

216

1 referral of patients for specialty care and
2 evaluation that we haven't discussed today or that
3 are not contained in Exhibit Seven?
4     **A.  None that I am aware of or recall.**
5     Q.  Okay.  One last thing.  If you go to
6 Exhibit Two, and I'm going to turn your attention
7 to Wexford 140.
8     **A.  Yes.**
9     Q.  I'd like you to review the job
10 description for on-site Medical Director as stated
11 here in the contract, which runs from 140 to 141.
12 And I'm going to ask you whether you agree that
13 that is, whether you agree that that's an accurate
14 description of the duties and responsibilities of
15 the on-site Medical Director.
16     (Witness reviewing document.)
17     **A.  Okay.**
18     Q.  Have you had the opportunity to review --
19     **A.  Yes.**
20     Q.  -- the job descriptions as laid out in
21 the contract for the on-site Medical Director?
22     **A.  Yes.**
23     Q.  Do you agree that that is an accurate
24 description of the duties and responsibilities for

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

55 (217 to 220)

---

217

1  the on-site Medical Director at Southwestern
2  Illinois Correctional Center?
3      **A.  Yes.**
4      Q.  And that that was, that was an accurate
5  description of the duties and responsibilities of
6  the Southwestern Illinois Medical Director as of
7  2014?
8      **A.  Yes.**
9      Q.  Let me just review my notes.  I think I'm
10 done.  Have you ever been asked to testify as a
11 Rule 30(b)(6) witness regarding Wexford's policies
12 on provisions of neurological care?
13     **A.  Yes.**
14     Q.  How many times?
15     **A.  I would estimate five or six perhaps.**
16     Q.  Do you keep a list of the cases that
17 you've been designated as a Rule 30(b)(6) witness?
18     **A.  Yes.**
19     Q.  And would you be willing to give those to
20 the attorneys for the Defendants to produce that
21 list in this case?
22     **A.  I'm fine with that, yes.**
23         MS. GRADY:  Okay.  With that, I don't
24 have anything further.

---

218

1          MS. COOK:  I don't have any questions.
2          MS. KINKADE:  Okay.  I have some.  But
3  trust me, it will be less.
4          MS. GRADY:  I hope it's less.
5  Otherwise we'll be here late.
6              EXAMINATION BY
7              MS. KINKADE:
8      Q.  Okay.  First I want to ask you, the
9  public indecency that you pled guilty to in 1993,
10 1994, was that a felony, a misdemeanor or
11 infraction?
12     **A.  It was a misdemeanor.  It was dismissed**
13 **because I got court supervision.**
14     Q.  Okay.  And so has that been resolved more
15 than 10 years from today?
16     **A.  Oh, yes.**
17     Q.  I'm going to kind of talk about your
18 experience in two categories, one with regard to
19 private healthcare and then the second category
20 with your Correctional healthcare.  Based on your
21 experience in private healthcare, does Wexford
22 provide adequate care to prisoners?
23     **A.  Yes.**
24     Q.  Based on your experience in Correctional

---

219

1  healthcare does Wexford provide adequate
2  healthcare to prisoners?
3      **A.  Yes.**
4      Q.  We've talked about the contract at
5  length.  To your knowledge has Wexford upheld
6  obligations in the contract from 2014 to present?
7      **A.  To the best of their ability.**
8      Q.  Part of the contract talks about how the
9  care to the prisoners should be similar to that of
10 outside care.  Do you remember talking about that?
11     **A.  Yes.**
12     Q.  And healthcare outside of Corrections, is
13 there, based on your experience are there other
14 doctors reviewing every patient's medical records
15 to determine if the doctor should have referred
16 that patient to a specialist?
17     **A.  No.**
18     Q.  Is the, is it common practice in private
19 healthcare to rely on the medical judgment of the
20 physician after they've reviewed and examined the
21 patient?
22     **A.  Yes.**
23     Q.  Is it the same practice in Correctional
24 medicine?

---

220

1      **A.  I'm sorry?**
2      Q.  Is that the same practice in Correctional
3  healthcare where you rely on the judgment of the
4  physician that does the examination of the
5  patient?
6      **A.  Yes.**
7      Q.  In this case in 2014 did Wexford provide
8  a physician to Southwestern Correctional Center
9  for the prisoners there?
10     **A.  Yes.**
11     Q.  And that was Dr. Bharat Shah?
12     **A.  Yes.**
13     Q.  B-h-a-r-a-t.  S-h-a-h.  Did he have the
14 educational background, training and experience to
15 hold the position of Medical Director?
16     **A.  Yes.**
17     Q.  Do you have any hesitation with regard to
18 his ability to assess a patient and perform a
19 treatment plan accordingly?
20     **A.  No, I did not.**
21     Q.  Did he have the ability to make medical
22 judgments about when a patient presents with a
23 symptom, his examination, and what an appropriate
24 treatment plan would be?

---

221

1    A.  Yes, I'm comfortable with that.

2    Q.  Did you also provide, Wexford provide,

3  nurses at Southwestern Correctional Center who had

4  the requisite training and experience to provide

5  nursing care to prisoners in 2014?

6    A.  To the best of my knowledge, yes.

7    Q.  The medical policies and procedures, you

8  mentioned the word guidelines.  Can you explain

9  how you applied, well, let me rephrase.  Can you

10  explain how you trained the doctors to utilize the

11  medical policies and procedures?

12    A.  These were presented to them during the

13  orientation periods and referred to various

14  educational initiatives, such as the quarterly

15  meetings.  Probably in part, definitely not in

16  toto at that time.

17      So they had knowledge and access to

18  that as well as access to other guidelines and

19  treatments such as the online resources that are

20  available today.

21    Q.  Do these guidelines override their

22  education and training and experience?

23    A.  No.

24    Q.  Would it be fair to say they could

222

1  supplement their education, experience and

2  training with the guidelines, if deemed

3  appropriate?

4      MS. GRADY:  Objection.  Form.  Go

5  ahead.

6      THE WITNESS:  Yes.

7  BY MS. KINKADE:

8    Q.  In private practice were you provided, or

9  in private practice what would you review if you

10  had questions about, any medical questions?

11    A.  Well, there are a number of opportunities

12  to review information such as the online

13  resources, other colleagues, you know, that we can

14  discuss things with.  Mostly textbooks that are

15  available, but most of them are online.  So most

16  everything is available online these days.

17    Q.  Do you stop any of your doctors from

18  obtaining and reviewing those exact same

19  publications to assist them in their job?

20    A.  No, we provide all the Medical Directors

21  with access to Up-to-Date.

22    Q.  Training materials?

23    A.  And training, right.  All those materials

24  are provided to them.  It's available on, at the

223

1  facilities too.

2    Q.  So would the medical policies and

3  procedures be something in addition to what a

4  doctor would have in his private practice?

5    A.  Yes, they would be.

6    Q.  In review of the medical records of this

7  case did Dr. Shah ever submit a referral for

8  Utilization Management for a referral for

9  Mr. Armbruster?

10    A.  I did not see one.

11    Q.  And what would that decision be based on,

12  the decision not to refer?

13      MS. GRADY:  Objection.  Form,

14  foundation.

15      THE WITNESS:  Say that again, please.

16  BY MS. KINKADE:

17    Q.  What would the decision not to refer a

18  case to Utilization Management be based on?

19      MS. GRADY:  Objection.  Foundation.

20      THE WITNESS:  That would be decided

21  upon by the clinical findings and indications

22  noted by, in this case Dr. Shah at that time, that

23  he was visiting with the patient.

24  BY MS. KINKADE:

224

1    Q.  Is it practical to create any sort of

2  policy or procedure to review every prisoner

3  appointment with any physician at every facility

4  in the State of Illinois?

5    A.  Not with the manpower we have, no.

6    Q.  Is it medically necessary?

7    A.  No.

8    Q.  You were asked about, in the medical

9  policies and procedures, the policy on

10  neurological symptoms.  Do you remember that

11  chart?

12    A.  Yes.

13    Q.  I think we talked about headaches as an

14  example.  That lists also, well, let me ask you

15  this.  Are doctors expected to be able to identify

16  and treat neurological symptoms without reviewing

17  the medical policies and procedures or are they

18  expected -- well, let me stop there.

19    A.  They are expected to be able to have the

20  knowledge base necessary to review neurological

21  cases without necessarily having to refer to that,

22  but it is available as a guideline should they

23  have questions.

24    Q.  For example, I think the neurological

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

225

1  symptoms included stroke.  Do you expect your
2  doctors to be able to identify and treat a stroke
3  without stopping and reviewing policies, fair?
4      A.  Yes.
5      Q.  Okay.  We talked about how doctors should
6  provide the care that's medically necessary.  And
7  I think you were asked about training on quote,
8  medical judgment, end quote.  I want to ask you
9  what is the training generally with regard to
10 medical judgment regardless if you use that
11 terminology or not?
12     A.  Well, medical judgment training actually
13 begins at the beginning of medical school and goes
14 all the way through medical school and through
15 Residency training.  It's just an acquisition of
16 skills and training that occur over a long period
17 of time that we, that is testimonied (sic) by
18 things like licensure and Board certification or
19 Residency training and past experience that one
20 would expect that they have the ability to make
21 the appropriate judgment calls.
22     Q.  And we referred to a policy that
23 mentioned no diagnosis equals no treatment.  How
24 do you train the doctor, and to be clear, are you

226

1  the person who would train the doctors in 2014 at
2  Southwestern?
3      A.  Yes, but he was there before I came on
4  board, so he was initially trained by somebody
5  else.
6      Q.  Okay.  Does, how do you train doctors
7  with regard to appropriate treatment?
8      A.  The initial training and orientation of a
9  doctor to a facility would involve days of meeting
10 with you going over these, these policies and
11 procedures such as what we went over today.  And
12 we'd spend time with them observing patient
13 interactions particularly.
14          I would, I would manage the patient
15 interactions for a day or two where they would
16 watch each visit and we would discuss each visit
17 and why I did what I did and how I documented what
18 I did.
19          And then that would be followed by a
20 period of me watching them deal with patient
21 interactions and how to answer certain questions
22 with regard to uniqueness of IDOC environment and
23 those types of things, and then would let them,
24 you know, pick up the pace and do more and more,

227

1  so.
2      Q.  And as part of your Exhibit Eight, which
3  is the peer review records for Dr. Shah, is that
4  right?
5          MS. GRADY:  What exhibit is it?
6          MS. KINKADE:  Eight.
7          THE WITNESS:  Yes.
8  BY MS. KINKADE:
9      Q.  Does that appear to be 157 pages?
10     A.  I don't know.  I suppose.  I can't really
11 tell.
12     Q.  If you look at the Bates on the bottom.
13     A.  Oh, it's Bates 157 and begins at one, so
14 if they're truly sequential yes, there are.
15     Q.  And the time frame of these records
16 appear to be from April 2013 until November 2014,
17 is that right?
18     A.  Yes.
19     Q.  And is the purpose, one of the purposes
20 of this peer review is to ensure that the
21 appropriate medical judgement is being used and
22 adequate care is being given?
23     A.  Yes.
24     Q.  Do you remember in 2014 at Southwestern

228

1  if there was any practice between the Healthcare
2  Unit Administrator and the Medical Director about
3  review of patient records?
4      A.  It was quite common that the HCUA
5  reviewed a lot of these records.  That particular
6  HCUA was pretty cognizant of that and reviewed
7  many of the visits.
8      Q.  And how is HCUA able to do that?
9      A.  Well, they have, they can acquire the
10 charts any time so they can look through their,
11 you mean how was she able to get to the record or?
12     Q.  Yeah.  You're answering my question.
13     A.  Oh, okay.
14     Q.  And would, if the HCUA had any cause for
15 concern would you be a resource that she could
16 contact?
17          MS. GRADY:  Object to form and
18 foundation.
19          THE WITNESS:  Yes.
20 BY MS. KINKADE:
21     Q.  If anyone that worked in the Healthcare
22 Unit saw something that caused concern, we'll say
23 specifically with Dr. Shah, if they had cause for
24 concern could they contact you?

Transcript of Roderick Matticks, M.D., Corporate Designee

58 (229 to 232)

Conducted on May 30, 2018

229

1          MS. GRADY:  Same objections.
2          THE WITNESS:  Yes, they could.
3   BY MS. KINKADE:
4      Q.  Can you explain the relationship between
5   Wexford policies and IDOC policies?
6      **A.  IDOC policies are the ones that are, that**
7   **supercede any of the Wexford policies and**
8   **procedures.**
9      Q.  So we're clear, has, is it Wexford's
10  policy or practice to ever have a doctor not refer
11  a patient for specialty imaging or treatment to
12  save money?
13     **A.  No.**
14     Q.  What is the policy for referring a
15  patient for specialty appointments or imaging?
16     **A.  The determination is made by the**
17  **physicians treating the patient whether it's**
18  **medically necessary or not in which the**
19  **appropriate test is ordered or requested.**
20     Q.  You were asked about the Medical Director
21  job description, the contract.  Are any of those
22  responsibilities delegated or shared with anyone
23  else to your knowledge?
24         MS. GRADY:  Before you answer can you

230

1   just read back that question, please?
2          (Last question read back by the reporter.)
3          THE WITNESS:  Well, they may be
4   delegated and shared if they are on vacation or
5   unavailable, and we have a traveling Medical
6   Director, another one of us go in to perform those
7   duties in their absence.
8   BY MS. KINKADE:
9      Q.  And you spoke before about medical care
10  versus administrative roles.  Are any of the
11  administrative roles of the Medical Director
12  delegated or shared with anyone else?
13     **A.  Yes, in the same fashion they could be.**
14     Q.  If a patient were to report that they had
15  an emergency is there always, does Wexford provide
16  somebody a healthcare provider?  Let me start
17  over.  If a patient were to declare that they were
18  experiencing a medical emergency at any time 24/7,
19  does Wexford provide a healthcare provider to
20  address those issues?
21         MS. GRADY:  Objection.  Form.
22         THE WITNESS:  Define a healthcare
23  provider.
24  BY MS. KINKADE:

231

1      Q.  Either a doctor or a nurse or, a doctor
2   or nurse.
3      **A.  Yes.**
4          MS. KINKADE:  That's all that I have.
5          MS. COOK:  I have no follow-up.
6          MS. GRADY:  Okay.  I have just a
7   couple.
8          FURTHER EXAMINATION BY
9              MS. GRADY:
10     Q.  You agree that the number of pages
11  contained in a peer review is not determinative of
12  the quality of the peer review, correct?
13         MS. KINKADE:  Objection.  Form,
14  foundation.
15         THE WITNESS:  Well, the end result is
16  what the peer review says, not just the number of
17  pages.
18  BY MS. GRADY:
19     Q.  Right.  So in other words, if I wrote my
20  name on 150 pages of paper that wouldn't be a good
21  quality review of the quality of my legal work,
22  right?
23     **A.  If that's all you wrote I agree.**
24     Q.  Okay.  You testified about in the outside

232

1   world, the non-Correctional healthcare world,
2   doctors rely on medical judgment regarding
3   referrals for specialist care.  In the, outside of
4   the Correctional setting patients can make
5   appointments with primary care physicians for a
6   second opinion, correct?
7      **A.  That depends.  It depends on their**
8   **insurance company, what kind of setting that they**
9   **have that they can actually do that.  But they**
10  **could, yes, I suppose.**
11     Q.  And in some cases a patient can even
12  contact a specialist as their primary contact for
13  whatever health complaint they have, right?
14     **A.  It is possible, yes.**
15     Q.  That's not possible in IDOC, correct?
16     **A.  That's correct.**
17     Q.  You testified that if a member of the
18  medical staff had concerns they could contact you.
19  If I had concerns could I also contact you?  I
20  don't mean that facetiously.  I mean, if I had
21  concerns about the performance of a member of the
22  Wexford medical staff at a facility would I be
23  able to contact you?
24     **A.  You probably could find me, yes.**

233

1    Q.  Okay.  So there's nothing, there's no
2  policy that makes it special for medical staff as
3  opposed to anybody else to be able to contact you
4  with a concern about the medical care?
5    **A.  There are no policy.**
6         MS. GRADY:  Okay.  I don't have
7  anything else.
8      (Witness conferring with Ms. Kinkade.)
9         MS. KINKADE:  I don't even know if
10 it's worth it, but whatever.  That's fine.  I have
11 nothing else.
12        MS. GRADY:  All right.
13        THE WITNESS:  Waive.
14
15        FURTHER DEPONENT SAYETH NOT
16          SIGNATURE WAIVED
17
18     (Deposition end time:  4:20 p.m.)
19
20
21
22
23
24

234

1        CERTIFICATE OF REPORTER
2
3      I, Kathy L. Johnson, a Certified Court
4  Reporter, within and for the State of Illinois,
5  DO HEREBY CERTIFY that the witness whose
6  testimony appears in the foregoing deposition was
7  duly sworn by me to testify to the truth and
8  nothing but the truth; that the testimony of said
9  witness was taken by stenographic means by me to
10 the best of my ability and thereafter reduced to
11 print under my direction.
12     I further certify that I am neither
13 attorney nor counsel for, nor related, nor
14 employed by any of the parties to the action in
15 which this deposition was taken; further, that I
16 am not a relative or employee of any attorney or
17 counsel employed by the parties hereto, or
18 financially interested in this action.
19
20
21  _Kathy Johnson_
22  Kathy Johnson
23  Lic. No.:  084-03071
24

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                                                     60

## A

**a-f-u-w-a-t-e**
213:20
**abbott**
187:12
**aberdeen**
3:5
**ability**
5:22, 32:7,
56:14, 64:5,
76:9, 126:10,
212:21, 219:7,
220:18, 220:21,
225:20, 234:10
**able**
124:20, 196:6,
224:15, 224:19,
225:2, 228:8,
228:11, 232:23,
233:3
**above**
153:13, 174:16
**absence**
9:5, 12:18,
107:16, 230:7
**abstract**
123:8
**aca**
28:11, 136:4,
136:5, 136:9
**acceptable**
102:19
**accepted**
83:19, 136:5
**access**
56:19, 66:14,
66:20, 89:17,
90:2, 101:15,
162:11, 162:15,
168:9, 169:12,
170:18, 171:3,
172:9, 190:3,
190:15, 190:19,
190:20, 195:1,
200:23, 221:17,
221:18, 222:21
**accesses**
206:6

**accordance**
83:17, 83:18,
135:8, 136:4
**according**
54:11, 67:20,
68:13, 69:3,
81:15, 87:16,
87:22, 91:11,
99:22, 100:5,
100:14, 100:18,
100:19, 103:19,
104:8, 107:20,
108:10, 114:14,
115:8, 141:17,
153:7, 154:20,
155:17, 204:1,
204:10, 212:10
**accordingly**
220:19
**account**
194:8
**accreditation**
77:10, 77:13,
77:17, 77:24,
78:6, 78:11,
78:14, 78:16,
78:18, 79:4,
79:7, 80:14,
80:23, 136:14
**accredited**
77:4, 77:6,
79:13, 136:9
**accurate**
5:23, 143:1,
143:15, 216:13,
216:23, 217:4
**ach**
15:12, 15:18,
16:2, 16:3,
16:6, 17:1,
17:10, 17:12,
17:13, 20:14,
20:21, 21:1,
21:9, 21:12,
21:14, 22:1,
22:6, 22:12,
34:17, 37:6
**acknowledge**
158:1

**acquire**
228:9
**acquisition**
225:15
**action**
11:12, 33:1,
33:4, 33:6,
102:20, 125:23,
197:2, 197:18,
234:14, 234:18
**actions**
51:4, 51:7,
114:22, 144:4
**activities**
7:8, 9:15,
29:4, 61:12,
158:15, 177:16
**actual**
183:21
**actually**
12:6, 22:10,
39:18, 45:22,
46:20, 50:5,
81:16, 81:22,
95:7, 97:18,
98:14, 99:19,
108:4, 115:23,
123:2, 127:16,
128:17, 130:18,
133:21, 134:12,
149:16, 157:13,
165:9, 165:12,
176:3, 187:5,
196:13, 202:19,
206:6, 225:12,
232:9
**acute**
97:16, 97:20,
99:19, 99:23
**ad's**
71:9, 72:17,
76:15, 178:22
**added**
161:11
**addition**
73:24, 74:13,
104:15, 104:18,
223:3

**additional**
34:3, 72:10,
100:22, 104:19,
186:18, 204:15,
204:23
**address**
94:2, 94:4,
102:11, 102:14,
141:18, 144:10,
209:17, 209:22,
230:20
**addresses**
196:5
**addressing**
201:18
**adequate**
65:18, 218:22,
219:1, 227:22
**adjust**
19:14, 182:7
**adjustment**
181:24
**administration**
82:1, 88:16,
88:22, 127:21
**administration's**
177:12
**administrative**
11:14, 14:16,
70:15, 70:21,
70:22, 71:7,
71:11, 71:14,
72:13, 72:19,
75:2, 75:6,
76:4, 81:9,
81:13, 81:19,
81:22, 82:8,
82:12, 82:15,
82:19, 84:15,
84:24, 88:11,
89:16, 90:5,
90:15, 91:17,
110:12, 113:13,
113:20, 113:22,
115:11, 115:13,
116:22, 117:19,
117:22, 117:23,
118:9, 118:10,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018
61

118:15, 118:18,
119:5, 119:22,
119:24, 120:4,
120:18, 120:21,
120:22, 165:10,
165:12, 172:14,
176:7, 178:14,
178:18, 230:10,
230:11
**administrator**
17:16, 83:13,
84:20, 86:5,
87:23, 156:17,
157:7, 165:18,
165:23, 209:23,
210:22, 210:24,
212:2, 212:8,
228:2
**administrators**
158:8
**admissions**
139:6
**adult**
60:14, 122:5
**adults**
68:3
**advanced**
15:1, 15:3,
28:16
**adverse**
165:16, 166:24,
167:3
**advised**
56:23
**advises**
104:10, 105:9,
107:7, 113:22
**advising**
121:7
**advisory**
159:1, 159:10
**advocate**
67:15
**affect**
5:22
**affidavits**
40:3, 40:4,
40:8, 40:9

**affiliated**
23:10
**after**
19:18, 34:4,
72:9, 79:8,
104:24, 141:10,
199:19, 199:23,
219:20
**afuwate**
213:20
**again**
5:17, 19:18,
22:11, 53:24,
68:20, 72:9,
79:10, 93:7,
104:12, 110:14,
131:7, 132:19,
147:21, 153:2,
164:6, 203:22,
204:7, 204:8,
207:12, 209:21,
211:19, 211:24,
212:6, 223:15
**against**
43:24, 44:11
**agencies**
29:14
**agency**
6:20, 6:21,
72:1, 89:12,
154:21, 154:23,
155:4, 176:24,
177:10, 185:4
**agenda**
6:17, 72:2
**aggressively**
122:11
**ago**
27:14, 40:16,
43:4, 77:8,
77:9, 78:2,
79:18, 80:3,
80:6, 80:11,
92:11, 101:5
**agree**
46:2, 47:8,
48:8, 48:12,
48:16, 48:20,

49:3, 49:7,
49:10, 49:14,
49:20, 63:17,
64:18, 65:4,
68:1, 84:3,
88:1, 102:2,
102:3, 103:14,
118:8, 118:12,
118:17, 119:11,
119:20, 119:23,
120:2, 120:6,
120:14, 120:15,
131:2, 131:3,
166:9, 168:6,
194:4, 195:21,
195:24, 196:2,
198:18, 200:5,
200:9, 200:13,
200:16, 200:24,
202:23, 208:1,
208:2, 216:12,
216:13, 216:23,
231:10, 231:23
**agreed**
32:9, 32:19,
44:5, 46:12,
48:4, 48:23,
62:12
**agreeing**
131:5
**agreement**
21:23, 55:22,
82:23, 131:2,
131:5, 203:6
**agrees**
202:7
**ahead**
207:20, 222:5
**aid**
14:19, 29:8,
29:10
**al**
1:12
**alabama**
161:24
**alan**
73:21, 149:5,
149:8

**algorithm**
98:18, 98:20
**all**
7:7, 9:15,
11:21, 16:15,
20:16, 25:24,
27:17, 30:23,
36:14, 41:6,
41:17, 45:4,
45:19, 46:22,
47:4, 52:8,
62:3, 68:14,
71:6, 72:3,
75:11, 78:15,
78:23, 83:24,
84:9, 93:21,
95:24, 97:12,
110:11, 117:21,
117:23, 122:5,
122:11, 126:24,
133:15, 133:22,
144:11, 145:2,
154:15, 155:23,
156:3, 157:9,
159:21, 159:23,
161:17, 162:15,
163:8, 168:12,
171:5, 175:2,
175:22, 177:1,
177:11, 177:14,
186:5, 188:15,
189:1, 189:2,
194:4, 199:4,
199:11, 201:5,
208:19, 215:11,
222:20, 222:23,
225:14, 231:4,
231:23, 233:12
**allow**
32:20, 71:6,
109:23
**allowed**
56:21, 57:1
**almost**
66:9
**along**
136:17, 176:24
**aloud**
46:5, 136:19

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

62

already
5:6, 44:21,
168:18
also
3:30, 8:11,
10:16, 16:21,
18:23, 34:9,
36:6, 70:20,
71:8, 71:17,
75:11, 76:13,
78:17, 84:2,
86:6, 94:6,
112:7, 112:15,
114:24, 121:11,
125:14, 126:24,
182:24, 185:12,
200:18, 200:24,
214:19, 215:21,
221:2, 224:14,
232:19
alternative
100:7, 207:17,
207:19, 207:23
although
65:7, 126:17,
166:20
always
56:6, 58:3,
157:4, 209:21,
230:15
ambulance
128:22, 129:3,
129:16
amended
71:14
amendments
61:11
american
27:6, 27:10
amount
153:22, 174:22,
175:1, 175:3
amounts
150:7
analyses
107:15, 108:13
annual
47:18, 65:21,

147:8, 173:17,
174:6, 174:10,
176:21, 177:7,
179:10, 179:24,
180:24, 181:5
annually
82:24
another
4:20, 10:15,
41:1, 111:19,
133:20, 201:15,
201:16, 202:5,
208:4, 208:5,
209:20, 230:6
answer
5:2, 5:16,
26:18, 26:19,
51:19, 51:20,
77:21, 92:10,
108:5, 108:7,
112:5, 119:14,
119:15, 120:11,
120:12, 130:24,
131:7, 136:12,
144:16, 144:21,
144:22, 180:11,
188:9, 189:13,
199:15, 199:16,
207:21, 215:16,
226:21, 229:24
answering
228:12
answers
5:7, 187:2
anti-inflammatory
98:13, 104:17
antibiotics
198:1
anticipated
52:19
anybody
134:12, 233:3
anymore
21:10
anyone
10:1, 22:2,
22:7, 28:7,
52:16, 52:24,

56:12, 67:6,
76:14, 112:19,
129:4, 132:23,
175:6, 176:10,
176:14, 181:4,
211:8, 228:21,
229:22, 230:12
anything
26:4, 53:7,
57:10, 58:2,
76:6, 90:14,
90:22, 91:12,
94:20, 108:19,
124:6, 124:10,
125:23, 141:3,
178:17, 189:17,
199:24, 217:24,
233:7
anyway
4:15, 30:22,
95:10, 201:6,
201:23
anywhere
56:1, 86:1,
99:5, 196:1,
212:10
apap
100:10
appeal
205:16, 207:2,
207:9, 208:4
appealed
207:15
appear
45:20, 191:3,
227:9, 227:16
appeared
3:10, 3:18,
3:27
appears
93:18, 96:7,
112:21, 115:22,
116:23, 154:1,
189:16, 234:6
applicable
117:19, 117:21,
117:23, 118:4,
118:9

application
78:13, 79:21
applied
184:13, 221:9
apply
1:21, 112:3,
168:14, 168:16,
169:3, 200:3
appointment
56:9, 224:3
appointments
134:16, 134:17,
229:15, 232:5
appropriate
51:10, 51:15,
57:3, 57:6,
58:12, 59:4,
61:21, 64:9,
109:19, 109:21,
109:24, 122:12,
128:24, 140:6,
144:14, 144:18,
185:10, 185:11,
195:4, 200:3,
208:3, 220:23,
222:3, 225:21,
226:7, 227:21,
229:19
appropriately
103:19, 122:18,
122:19, 124:19
appropriateness
206:2
approve
9:7, 160:19,
160:22
approved
9:4, 77:15,
79:4, 138:22,
168:24, 207:23
approximately
14:24, 15:7,
18:8, 19:3,
19:19, 21:5,
21:18, 24:1,
24:17, 27:14,
31:5, 31:20,
32:1, 35:20,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                        63

| | | | |
|---|---|---|---|
| 35:22, 36:11, 36:13, 37:4, 38:19, 39:12, 40:15, 40:16, 79:18, 80:3, 80:7, 80:8, 80:10, 98:2, 213:23 | **arrangement** 11:7 **arranging** 140:1 **arthur** 8:4 **aside** 22:11, 187:1 | **aspirin** 100:13 **assess** 184:19, 220:18 **assessed** 211:9 **assesses** 206:7 | **attends** 71:20 **attention** 142:22, 162:10, 163:23, 172:1, 192:6, 195:11, 195:15, 201:9, 203:1, 216:6 |

**april**
86:15, 227:16
**arb8**
210:19
**area**
29:2, 128:6,
138:19, 146:7,
146:10, 163:2
**areas**
77:14, 129:14,
129:15
**aren't**
38:5, 73:18,
185:21
**arg**
119:7
**argumentative**
116:2, 119:9
**arises**
161:9
**armbruster**
1:5, 50:18,
50:22, 50:23,
53:10, 53:21,
61:20, 93:4,
93:10, 210:8,
210:19, 211:10,
223:9
**armbruster's**
53:5
**arms**
93:5, 94:15,
94:23
**arose**
59:15
**around**
16:7, 21:5
**arrange**
62:22, 63:18,
139:5

**ask**
4:23, 5:6,
5:13, 19:6,
22:9, 25:14,
25:23, 26:5,
35:2, 45:15,
46:1, 46:5,
55:14, 56:7,
71:21, 134:2,
134:8, 136:21,
148:21, 190:10,
192:11, 193:11,
202:10, 205:9,
209:21, 215:3,
216:12, 218:8,
224:14, 225:8
**asked**
4:18, 17:9,
18:4, 19:14,
24:23, 25:3,
25:22, 32:17,
32:19, 54:18,
54:19, 55:21,
164:3, 170:4,
178:3, 185:5,
217:10, 224:8,
225:7, 229:20
**asking**
5:2, 5:14,
46:16, 46:23,
50:4, 61:17,
91:11, 102:1,
103:21, 115:6,
123:7, 169:19
**asks**
100:16, 188:3
**aspects**
47:14, 50:10,
83:24, 141:18,
193:20

**assessment**
52:1, 143:13,
200:17, 201:3,
212:12, 212:13
**assigned**
73:12
**assignments**
166:17
**assist**
12:10, 72:14,
81:14, 81:21,
185:6, 222:19
**assistance**
12:5, 12:7,
16:20, 18:19,
81:24
**assistant**
3:12, 15:4,
84:20, 85:3,
85:6, 85:10,
85:19, 85:20,
86:3
**assisting**
113:3
**assists**
78:15
**assume**
5:1
**assuming**
99:23, 100:5
**assurance**
172:19
**assure**
78:17, 140:5
**attached**
2:21
**attend**
72:3, 176:24,
177:15
**attended**
38:21, 38:23

**attorney**
3:12, 234:13,
234:16
**attorneys**
33:8, 217:20
**audible**
5:7
**audit**
214:12, 215:4,
215:8, 215:12
**audits**
214:14, 214:15,
215:9
**authority**
49:19, 76:9,
82:22, 83:3,
83:11, 84:14,
85:2, 86:3,
87:6, 87:7,
87:10, 87:13,
87:18, 88:10,
88:11, 88:15,
88:17, 88:20,
90:10, 124:3,
163:7, 163:12,
163:17, 164:17,
165:6, 165:17,
166:3, 176:11,
211:1
**authorize**
64:5
**authorized**
9:6
**availability**
58:3, 101:13
**available**
7:12, 10:24,
15:24, 69:20,
72:18, 72:20,
76:13, 81:18,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

64

128:5, 131:20,
137:14, 145:12,
145:14, 145:19,
145:22, 206:16,
221:20, 222:15,
222:16, 222:24,
224:22
**avoid**
165:15, 166:24
**avoided**
163:14
**award**
43:20
**aware**
8:17, 8:18,
25:6, 56:19,
61:12, 167:17,
171:7, 171:10,
172:10, 181:2,
181:4, 181:23,
189:8, 190:21,
192:17, 209:7,
209:11, 209:15,
214:15, 216:4
**away**
110:3, 110:4

**B**

**b) (6**
35:13, 35:17,
36:3, 36:7,
36:12, 37:21,
38:5, 40:14,
43:1, 44:20,
59:13, 171:20,
217:11, 217:17
**b-a-r-r-o-w-s**
42:15
**b-h-a-r-a-t**
220:13
**b3**
196:16
**b4**
198:17
**back**
13:9, 26:17,
26:19, 31:1,
44:5, 51:3,

51:18, 51:20,
79:8, 89:15,
93:19, 97:19,
98:9, 98:10,
107:3, 107:24,
108:2, 108:3,
108:4, 108:7,
110:14, 117:8,
119:13, 119:15,
120:8, 120:10,
120:12, 121:15,
126:15, 127:7,
133:20, 142:8,
144:20, 144:22,
158:19, 164:6,
169:4, 188:15,
190:6, 190:7,
192:15, 193:11,
194:6, 199:4,
199:10, 199:16,
202:10, 203:1,
208:8, 212:15,
215:4, 215:17,
230:1, 230:2
**background**
6:6, 14:3,
14:7, 125:13,
193:18, 220:14
**backgrounds**
124:17
**backtrack**
167:20
**bacterial**
198:2
**bad**
40:6, 96:15,
214:13
**bantry**
154:2, 154:5
**barriers**
163:13
**barrows**
42:15
**base**
224:20
**based**
15:19, 51:14,
57:14, 92:2,

108:24, 195:5,
200:17, 218:20,
218:24, 219:13,
223:11, 223:18
**basic**
4:14
**basically**
86:24, 141:10,
193:18
**basis**
26:15, 92:1,
157:16, 177:4,
181:22, 203:15
**bates**
89:23, 94:6,
94:8, 99:17,
152:6, 164:1,
166:6, 185:18,
185:20, 185:21,
227:12, 227:13
**bear**
194:14
**bears**
169:11
**became**
14:22, 15:3,
15:5, 16:11,
20:17, 21:1,
21:11
**because**
6:1, 17:9,
21:8, 34:10,
60:6, 71:15,
87:3, 94:24,
109:4, 117:3,
123:16, 147:10,
165:14, 188:20,
189:23, 198:1,
204:7, 218:13
**become**
18:4, 23:16,
25:3, 25:15,
25:24, 27:18,
77:6
**becomes**
142:4
**been**
6:2, 6:4,

20:20, 21:5,
21:18, 25:9,
28:6, 30:8,
31:10, 31:13,
33:13, 33:17,
33:19, 35:11,
35:16, 38:17,
39:9, 40:3,
42:15, 43:6,
44:19, 54:21,
56:3, 59:24,
77:18, 78:4,
78:12, 82:7,
92:7, 97:21,
98:1, 102:21,
111:18, 117:7,
125:4, 136:13,
146:13, 149:7,
149:16, 167:8,
167:10, 168:23,
170:4, 171:16,
175:9, 183:17,
189:2, 189:10,
189:23, 191:14,
192:7, 192:15,
192:21, 204:18,
210:7, 213:21,
215:13, 217:10,
217:17, 218:14
**before**
1:22, 4:12,
5:16, 29:7,
33:9, 44:23,
95:7, 96:16,
97:2, 110:11,
113:22, 124:21,
140:1, 140:18,
164:3, 176:2,
226:3, 229:24,
230:9
**beg**
152:1, 198:13
**began**
13:13, 15:1,
16:3, 16:24,
17:2, 17:13,
18:2, 19:17,
20:15, 36:10,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

65

79:17

**begin**
16:1, 16:6,
17:24, 21:16,
24:18

**beginning**
5:16, 63:9,
225:13

**begins**
136:24, 225:13,
227:13

**behalf**
3:10, 3:18,
3:27, 33:4,
41:15, 44:10,
46:3, 47:9,
47:23, 48:9,
48:13, 48:17,
48:21, 49:4,
49:8, 49:11,
49:15, 49:21,
50:3, 62:11,
160:23, 169:15,
171:17, 178:24,
187:7

**being**
4:4, 12:23,
15:10, 17:4,
18:13, 33:5,
35:12, 43:18,
49:24, 72:17,
100:1, 123:23,
125:5, 173:12,
227:21, 227:22

**belief**
79:12

**believe**
10:16, 11:8,
17:7, 19:23,
43:14, 53:8,
66:11, 67:3,
73:21, 77:8,
88:8, 98:11,
102:13, 103:16,
136:10, 137:13,
141:12, 145:15,
149:7, 152:12,
160:12, 161:23,

165:9, 170:11,
170:20, 176:1,
198:21, 198:23

**bellview**
147:2

**bellville**
146:10, 147:3,
147:4

**below**
174:17, 175:3,
175:5

**best**
5:15, 22:22,
36:24, 78:1,
92:23, 93:18,
197:15, 198:8,
219:7, 221:6,
234:10

**better**
133:21

**between**
6:19, 9:12,
20:23, 25:11,
31:9, 35:23,
46:6, 46:14,
60:12, 61:7,
84:9, 88:13,
129:23, 132:22,
140:6, 151:5,
171:18, 172:6,
174:3, 181:1,
186:13, 190:2,
193:24, 214:23,
215:24, 228:1,
229:4

**beyond**
146:16, 164:14,
210:1

**bharat**
220:11

**big**
131:18, 159:21,
184:10

**bigger**
152:2

**binding**
46:3, 46:17,
47:9, 47:23,

48:9, 48:13,
48:16, 49:4,
49:7, 49:10,
49:15, 49:21,
50:3, 90:6,
169:15, 171:17,
171:23, 178:24

**bit**
6:6, 15:23,
69:23

**blind**
105:18

**blocking**
76:21

**board**
14:14, 23:11,
23:14, 23:16,
23:19, 23:23,
24:2, 26:1,
26:24, 27:3,
27:6, 27:10,
27:13, 28:9,
33:9, 33:10,
34:20, 35:5,
79:3, 160:10,
161:13, 225:18,
226:4

**body**
28:4, 31:14,
33:3, 176:22,
177:7, 177:8

**bonus**
44:18, 180:1,
180:5, 180:13,
180:15, 180:24,
181:5, 181:6,
181:9, 181:13,
181:18

**bonus-related**
179:22, 180:3

**bonuses**
180:19, 181:16,
181:21

**borne**
147:11, 173:13

**both**
5:12, 16:12,
29:10, 37:12,

37:24, 38:7,
38:9, 39:20,
41:4, 55:22,
70:8, 116:18,
166:15

**bottom**
90:3, 137:22,
138:15, 139:19,
179:17, 186:1,
227:12

**box**
99:23, 104:22,
105:15

**boy**
30:21

**brain**
107:18

**break**
20:22, 59:19,
110:9, 158:16,
158:17, 162:22,
166:11, 204:4

**breakdown**
203:7

**brief**
142:14

**bring**
71:5, 75:11,
78:14

**broader**
47:2

**broadway**
3:22

**broke**
110:12

**broken**
203:6

**budget**
174:13

**budgetary**
174:9

**bunch**
30:18

**buprenorphine**
28:19

**busy**
15:18

_____
C
_____

**calculation**
151:4

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                                66

calendar
13:4
call
50:24, 56:6,
56:14, 56:18,
58:13, 67:12,
106:16, 110:15,
110:18, 110:19,
134:16, 135:3,
186:10, 192:2,
209:21, 212:19
called
1:18, 24:9,
39:3, 101:4,
104:8, 207:17
calls
154:16, 225:21
came
18:18, 79:23,
204:18, 226:3
can't
12:18, 12:22,
22:17, 115:22,
212:24, 227:10
candidates
193:19
cannot
47:23, 54:2,
67:24, 99:6,
99:13, 129:21,
138:18, 142:13,
213:16
cao
154:23
capability
146:18, 164:14
capacity
8:16, 161:21
capital
166:2, 166:3
carbondale
131:17
cardiac
28:16
cardiologist's
173:9
career
37:3, 39:11

case
1:8, 33:9,
39:5, 39:14,
40:18, 40:19,
40:20, 41:1,
41:18, 42:4,
42:6, 42:10,
42:12, 42:14,
42:16, 42:18,
42:19, 43:3,
43:4, 43:5,
43:7, 43:9,
43:11, 43:13,
43:16, 44:23,
59:15, 60:2,
92:9, 93:1,
95:20, 97:13,
97:15, 97:23,
122:7, 163:19,
166:22, 170:8,
185:6, 187:3,
202:21, 206:7,
210:5, 210:9,
217:21, 220:7,
223:7, 223:18,
223:22
case-by-case
92:1
cases
40:23, 41:7,
41:10, 41:13,
43:19, 126:17,
134:13, 217:16,
224:21, 232:11
cassiday
1:26, 3:20
cataract
40:22, 42:12,
43:4, 43:6, 43:9
categories
46:24, 95:11,
132:21, 218:18
category
12:16, 62:14,
218:19
cause
106:6, 106:7,
228:14, 228:23

caused
228:22
cchp's
25:15
center
14:22, 14:24,
18:5, 38:12,
48:7, 49:3,
59:16, 73:20,
74:9, 77:4,
77:23, 79:12,
80:22, 83:11,
84:11, 85:7,
88:9, 116:17,
145:20, 145:24,
146:22, 149:4,
175:24, 179:5,
179:8, 203:8,
205:2, 213:19,
217:2, 220:8,
221:3
centers
68:3, 70:4
centralia
184:9
ceo
60:24
cerebellar
108:17
cerebral
108:16
certain
75:21, 86:6,
130:9, 174:22,
193:20, 226:21
certainly
76:6, 97:4
certificate
2:23, 234:1
certification
24:8, 24:16,
24:19, 24:21,
26:7, 26:13,
26:24, 27:3,
27:10, 28:5,
28:19, 78:23,
79:18, 225:18
certifications
27:23, 28:3,

28:9, 28:10,
28:13
certified
14:14, 23:12,
23:14, 23:17,
23:19, 23:23,
24:2, 24:9,
24:12, 25:3,
25:5, 25:9,
26:1, 26:6,
27:18, 234:3
certify
234:5, 234:12
chaired
154:21, 177:10
champaign
175:19
chance
45:9, 45:18,
68:9, 147:19,
196:15
change
161:10
changed
71:14, 180:10
changes
61:11
charge
31:19, 115:18
chart
195:23, 196:9,
224:11
charts
228:10
cheri
75:23, 75:24,
148:11, 148:13,
160:6
chicago
3:7, 79:2
children
154:6
choose
27:21
chronic
71:10, 71:12,
81:23, 97:21,
105:6, 105:8,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

67

105:13, 105:19,
106:2
**circumstances**
54:9, 54:10,
205:5, 214:6
**citing**
172:3
**city**
41:22
**civil**
1:19, 35:14,
39:16
**claims**
134:21
**clair**
10:15, 11:2
**clarification**
67:13
**clarify**
12:21, 54:20,
55:21, 72:18
**clear**
5:10, 5:18,
68:12, 94:18,
123:15, 225:24,
229:9
**climbing**
19:12
**clinic**
14:16, 44:4,
44:13, 81:23,
135:16
**clinical**
7:7, 7:13,
17:17, 51:14,
57:16, 59:12,
76:7, 76:24,
83:24, 87:19,
89:7, 89:8,
92:2, 98:16,
98:22, 165:16,
166:24, 223:21
**clinically**
57:2, 58:12,
59:3
**clinician**
108:23
**clinician's**
109:1

**clinics**
11:21, 71:11,
71:12
**close**
197:7, 198:20
**cme**
26:14
**co-pays**
158:6, 158:11
**code**
1:19
**cognizant**
228:6
**colleague**
45:23
**colleagues**
222:13
**collected**
173:1
**collegial**
106:9, 202:24
**columns**
95:11
**com**
3:9, 3:26
**combination**
122:2
**come**
31:1, 77:13,
79:8, 126:17,
133:20, 161:9,
175:14, 197:23
**comes**
78:20, 103:4,
128:22
**comfortable**
221:1
**coming**
27:15
**commission**
24:6, 27:24
**committee**
154:12, 154:17,
155:10, 155:11,
155:18, 156:20,
156:23, 157:20,
159:1, 159:11,
159:14, 159:21,

160:11, 161:1,
161:4, 161:18,
172:19, 172:22,
176:10
**common**
59:11, 196:5,
219:18, 228:4
**communication**
140:6, 141:16
**community**
138:16, 193:24,
194:20, 197:5
**companies**
206:23
**company**
15:18, 24:23,
44:9, 232:8
**compensation**
180:7
**competence**
35:6
**competitive**
182:8
**complained**
93:4
**complaining**
210:9
**complaint**
93:9, 94:14,
103:3, 106:21,
232:13
**complaints**
41:2, 51:3,
51:24, 102:14,
109:15, 192:14,
198:20, 199:3,
199:22, 200:7,
200:17, 209:9
**complete**
23:2, 107:8,
107:11, 107:21,
108:6, 108:10,
109:7, 109:8,
109:23, 112:14,
113:24, 114:13,
115:16, 116:8,
116:9, 142:24,
143:4, 143:15,

202:11, 203:19,
205:3, 207:20
**completed**
23:7, 112:18,
179:24, 183:21
**completely**
128:14
**completes**
112:15, 201:17
**completing**
52:8
**completion**
182:21
**complex**
206:20
**compliance**
70:21, 71:9,
73:2, 74:5,
75:5, 76:23,
78:17, 81:8,
81:12, 81:17,
105:3, 117:19,
118:14, 118:21,
119:21, 120:4,
120:17, 120:21
**complies**
72:12
**comply**
71:11, 82:16,
103:22, 111:12,
142:2
**complying**
76:14
**components**
143:6, 143:9
**comprehensive**
68:7, 108:20,
118:4, 118:19,
118:22, 119:1,
135:9, 136:15
**compression**
192:20, 209:14
**comprise**
183:20
**comprised**
113:18
**computer**
66:24

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                                    68

concern
38:6, 38:10,
40:22, 59:15,
96:19, 158:14,
163:2, 228:15,
228:22, 228:24,
233:4
concerned
198:11
concerning
189:8
concerns
54:20, 55:1,
72:16, 72:18,
89:5, 144:8,
232:18, 232:19,
232:21
concert
71:15
condition
93:22, 197:17,
197:24
conditions
5:21, 112:24,
113:4, 113:6,
114:9, 205:23
conducted
35:12, 179:11,
179:13, 179:23
conducts
214:14
conferring
233:8
confining
58:18
confusion
4:17
connection
36:15
consequence
174:12
consider
25:19, 46:24,
95:20, 104:10,
105:6, 106:9,
106:17, 193:8,
194:24
consideration
65:16

considered
23:22, 74:23,
97:22, 165:18
considering
104:15, 104:18
consistent
74:17, 175:12
consistently
23:20, 25:10
consists
72:23
constrain
99:9
constrains
90:15
constraint
99:2
consult
55:4, 55:15,
56:2, 56:15,
56:21, 56:24,
57:1, 57:5,
58:11, 59:2
consultant
14:18
consultation
57:10, 58:19,
135:19, 138:1,
138:7
consultations
130:20, 137:23,
138:4
consultative
63:1, 63:20,
64:21
consulted
54:24
consulting
29:1
contact
54:20, 55:14,
55:21, 56:24,
57:9, 58:13,
228:16, 228:24,
232:12, 232:18,
232:19, 232:23,
233:3
contain
143:1, 143:18

contained
144:13, 216:3,
231:11
containing
143:16
contends
61:20
contention
169:10
contents
116:21, 121:2,
157:17
continuation
113:1
continue
26:21, 61:21,
112:6
continued
15:2, 43:17
continues
83:22, 135:11
continuing
112:9, 206:1
contracted
203:14
contracting
128:9, 131:16,
160:13
contracts
9:19, 9:20,
15:20, 16:15,
130:8, 130:16,
131:13, 132:15,
164:4, 165:19
contractual
11:7, 203:5
contrary
104:5, 195:8
control
81:2, 83:24
conversation
53:16, 55:6
coo
61:5
cook
3:13, 30:19,
193:4, 194:4,
207:4, 218:1,

231:5
coordinate
83:12, 168:13
coordinating
7:1, 140:7
coordination
6:16
copies
156:12, 156:15,
184:1
copy
60:1, 82:7,
86:10, 92:7,
176:3, 176:15,
176:19, 177:4,
178:21, 183:17
cord
192:19, 209:13
corporate
7:19, 9:5,
9:11, 9:16,
9:17, 9:20,
11:18, 15:5,
15:11, 16:10,
16:11, 16:14,
17:2, 20:17,
20:18, 21:1,
21:12, 21:13,
21:17, 21:24,
22:5, 22:12,
25:16, 25:18,
25:19, 34:17,
37:11, 37:13,
58:4, 81:6,
128:13, 137:24,
142:5, 154:7,
159:15, 159:16,
170:12, 176:14,
182:15, 183:7,
187:16, 208:5
corporation
85:1, 154:2,
154:3
correctional
14:22, 14:24,
15:2, 15:4,
18:5, 22:20,
24:9, 24:12,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                                69

25:3, 25:10,
26:6, 26:9,
26:15, 27:18,
27:24, 28:11,
29:15, 38:11,
48:7, 49:2,
59:16, 68:3,
70:3, 73:20,
74:9, 77:3,
77:23, 79:12,
80:22, 84:11,
85:7, 116:16,
125:1, 126:18,
126:23, 145:20,
145:23, 146:22,
149:4, 168:4,
168:5, 168:8,
169:1, 169:6,
169:11, 169:24,
170:7, 170:11,
170:18, 171:3,
171:9, 171:12,
172:8, 175:24,
179:5, 179:8,
193:21, 203:8,
205:2, 207:2,
207:9, 210:12,
210:16, 213:19,
217:2, 218:20,
218:24, 219:23,
220:2, 220:8,
221:3, 232:4
**corrections**
10:4, 32:3,
32:21, 60:13,
61:8, 82:9,
86:24, 115:5,
168:19, 169:17,
219:12
**corrective**
125:23
**correctly**
83:20
**corresponds**
152:6
**cost**
67:21, 122:12,
136:24, 147:11,

173:13, 174:24
**costs**
175:4
**could**
4:8, 12:4,
26:17, 32:2,
53:19, 53:23,
69:18, 93:16,
93:22, 95:20,
96:24, 113:8,
131:19, 133:24,
160:20, 161:7,
167:23, 172:3,
182:8, 190:5,
190:6, 198:7,
203:19, 205:3,
209:17, 213:5,
221:24, 228:15,
228:24, 229:2,
230:13, 232:10,
232:18, 232:19,
232:24
**couldn't**
21:9, 199:24
**counsel**
234:13, 234:17
**counseling**
114:2, 114:6,
115:18
**counselor**
210:13, 210:16
**count**
152:18
**county**
1:23, 10:9,
10:15, 10:16,
10:22, 11:2,
16:15, 17:6,
17:21, 19:20,
20:13, 20:16,
20:19, 20:24,
31:20
**couple**
187:5, 189:22,
231:7
**course**
37:2, 39:11,
72:19, 92:15,

150:6, 184:18,
185:1, 193:9,
194:9, 197:2,
197:18
**court**
1:1, 1:20,
3:32, 35:10,
40:6, 42:1,
42:17, 42:21,
59:23, 82:6,
92:6, 183:16,
210:6, 218:13,
234:3
**cover**
30:14, 151:4,
189:16
**coverage**
12:5, 16:21,
17:6, 20:4,
205:7
**covered**
20:5, 132:11,
132:24, 152:19,
189:17
**covering**
135:8
**covers**
141:12
**crafted**
55:2
**crafting**
51:5
**cranial**
107:14, 107:23,
108:11
**create**
207:18, 224:1
**created**
55:5, 86:2
**creation**
52:9, 154:17,
166:10
**credential**
124:15
**credentialing**
57:15
**credentials**
124:17, 179:12

**criteria**
205:21, 206:3,
206:6, 206:8,
206:14
**crunching**
174:12
**culmination**
176:23
**curbside**
55:3
**current**
12:15, 73:19,
75:13, 101:16,
213:18
**currently**
6:7, 6:22,
12:12, 12:19,
13:1, 23:14,
29:17, 30:2,
34:12, 60:24,
61:6, 75:18,
79:16, 122:1,
122:4, 148:11,
149:5, 155:5
**custody**
81:2
**customs**
48:5, 49:1

**D**

**daily**
141:16
**damage**
192:20
**damages**
43:20
**daniel**
60:21
**data**
135:15
**date**
86:14, 167:14
**dates**
78:3
**day**
39:13, 78:24,
226:15
**days**
13:6, 100:1,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                                                 70

104:11, 104:19,
105:14, 112:13,
222:16, 226:9
**deal**
15:21, 37:22,
62:3, 156:5,
226:20
**dealing**
137:23, 138:3,
141:5, 191:8,
207:9
**deals**
46:5, 49:13,
49:18, 58:21,
62:19, 66:9,
66:16, 67:17,
68:5, 70:20,
112:2, 113:1,
136:15, 140:19,
145:9, 154:10,
169:6, 172:14,
187:20
**dealt**
79:6
**death**
184:24
**decide**
24:21, 77:17,
128:20
**decided**
223:20
**deciding**
128:16, 193:9,
194:9
**decision**
15:15, 19:7,
19:9, 39:21,
57:14, 63:24,
64:2, 78:10,
78:11, 90:11,
91:13, 99:3,
125:3, 125:20,
126:10, 129:1,
129:9, 129:17,
129:24, 130:1,
180:19, 207:15,
209:18, 211:2,
211:9, 212:12,

212:17, 223:11,
223:12, 223:17
**decisions**
57:16, 58:1,
87:19, 92:1,
124:4, 124:20,
179:3, 213:12
**declare**
230:17
**deem**
57:2, 57:6,
58:12, 59:3
**deemed**
222:2
**default**
128:23
**defendant**
3:19, 36:8,
36:19, 36:22,
38:15, 38:17,
38:19, 39:6,
39:10, 41:7
**defendants**
1:14, 217:20
**define**
28:5, 57:7,
85:13, 85:14,
102:8, 105:9,
106:2, 166:8,
180:5, 230:22
**defined**
106:4, 166:1
**defines**
107:20
**definitely**
221:15
**definition**
180:20
**definitive**
97:3
**delegated**
164:17, 229:22,
230:4, 230:12
**delivery**
65:8
**denial**
207:16
**denied**
61:20, 79:4,

205:12
**dental**
46:13, 46:22,
47:4, 177:13,
203:23, 204:9
**dentistry**
203:12
**deny**
195:4, 207:13
**department**
7:16, 10:4,
14:18, 14:19,
16:4, 17:14,
29:8, 29:10,
60:13, 61:8,
82:9, 86:23,
115:4, 134:15,
141:8, 168:19,
169:17, 181:2
**departure**
15:14
**depending**
98:22
**depends**
39:13, 85:12,
96:3, 96:4,
102:7, 107:12,
113:7, 122:3,
123:10, 128:5,
131:15, 131:19,
144:17, 166:20,
173:18, 173:19,
173:20, 173:22,
194:16, 232:7
**depicted**
150:8
**deponent**
233:15
**deposition**
1:17, 4:1,
4:16, 35:12,
36:3, 36:6,
37:5, 37:14,
37:17, 40:1,
40:9, 46:9,
50:9, 52:14,
52:18, 233:18,
234:6, 234:15

**depositions**
1:22, 4:12,
36:11, 36:14,
36:18, 37:2,
37:20, 37:21,
37:22, 38:1,
38:3, 38:5,
38:6, 38:15,
59:14
**dermatitis**
42:18, 43:16
**dermatologic**
130:19
**dermatology**
130:17
**describe**
8:24, 173:11,
197:16, 198:8
**described**
12:16, 92:11
**describes**
143:12, 163:1,
193:20
**describing**
95:4
**description**
7:3, 63:5,
82:24, 142:15,
216:10, 216:14,
216:24, 217:5,
229:21
**descriptions**
216:20
**designated**
6:2, 6:5,
35:17, 41:14,
44:19, 45:4,
46:2, 46:17,
47:8, 49:24,
64:12, 64:13,
64:14, 82:21,
83:3, 84:14,
85:2, 86:3,
87:9, 88:17,
154:22, 169:14,
171:16, 171:23,
178:23, 183:6,
188:20, 189:24,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

71

217:17
**designed**
35:6, 51:13
**designee**
6:2, 36:3,
88:18
**designing**
194:16
**desire**
121:13
**detail**
182:14, 205:10
**detailed**
82:23, 104:21
**details**
87:12, 147:16,
181:15
**detention**
10:18
**determination**
76:7, 79:3,
99:20, 109:1,
123:20, 229:16
**determinations**
89:7
**determinative**
231:11
**determine**
65:1, 91:9,
106:6, 106:7,
109:18, 109:24,
123:17, 124:1,
125:22, 126:14,
164:17, 186:18,
186:22, 213:15,
215:7, 219:15
**determined**
89:19, 90:7,
103:8
**determines**
123:3
**determining**
12:10, 96:12,
106:20, 139:10
**developed**
140:3, 140:5,
141:4, 141:23,
158:24, 159:10

**develops**
158:22
**devised**
207:18
**dhs**
14:19, 15:3,
20:10, 21:4,
21:15, 21:19,
29:11
**diabetes**
113:8, 114:10
**diagnoses**
96:20, 143:22,
144:12, 145:3,
196:21
**diagnosis**
95:14, 96:15,
96:17, 97:2,
97:3, 192:19,
197:11, 197:12,
198:5, 209:13,
225:23
**diagnostic**
135:4
**diagram**
76:20, 76:21
**dictates**
213:14
**did**
13:4, 13:9,
13:22, 14:16,
14:21, 15:17,
16:1, 16:6,
16:9, 17:10,
17:24, 18:6,
18:15, 19:5,
19:11, 20:15,
21:4, 21:7,
21:16, 22:24,
23:2, 23:16,
24:15, 24:18,
24:21, 25:22,
27:19, 28:24,
29:11, 29:13,
29:14, 32:7,
33:3, 34:2,
34:19, 34:20,
34:24, 35:2,

37:5, 37:14,
37:17, 37:20,
37:21, 38:5,
38:10, 40:14,
41:22, 59:14,
77:6, 77:22,
79:11, 80:2,
83:19, 89:21,
94:7, 102:22,
166:3, 172:7,
180:14, 180:15,
189:4, 189:16,
191:23, 214:3,
215:23, 220:7,
220:13, 220:20,
220:21, 221:2,
223:7, 223:10,
226:17, 226:18
**didn't**
19:15, 42:16,
53:12, 53:15,
175:10, 208:12
**differ**
65:8, 150:7
**difference**
9:12, 88:13
**differences**
69:23, 193:23
**different**
15:20, 52:2,
69:21, 74:18,
119:1, 133:22,
136:17, 148:22,
148:23, 148:24,
155:16, 172:18,
173:7
**differential**
96:20, 97:2
**difficult**
55:20
**digest**
182:24
**direct**
7:18, 9:8,
11:24, 29:11,
37:12, 37:24,
38:6, 83:23,
169:22

**directed**
82:21
**direction**
57:9, 75:9,
82:19, 234:11
**directive**
82:8, 82:12,
82:15, 82:19,
84:15, 84:24,
89:16, 90:5,
90:15, 110:13,
113:13, 113:14,
113:22, 115:11,
115:14, 116:22,
118:9, 118:10,
118:15, 118:18,
119:5, 119:22,
120:5, 120:18,
120:21, 120:23
**directives**
70:16, 70:21,
70:22, 71:7,
71:12, 71:14,
72:13, 72:19,
75:6, 75:7,
81:9, 81:13,
81:20, 81:22,
91:17, 113:20,
117:20, 117:22,
117:24, 120:1,
178:15, 178:17,
178:18, 178:19
**directly**
10:23
**director's**
177:13, 185:1,
209:17, 211:2
**directors**
6:17, 7:11,
7:14, 7:17,
7:22, 11:18,
16:16, 25:18,
25:23, 26:2,
56:2, 56:12,
56:13, 58:4,
58:5, 58:11,
72:3, 72:20,
73:8, 73:11,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                                72

74:16, 75:9,
76:13, 77:2,
91:19, 101:9,
124:6, 124:11,
125:7, 133:15,
134:1, 142:5,
144:5, 148:18,
149:11, 159:15,
159:16, 161:17,
181:12, 181:13,
222:20
**disagree**
66:8, 170:14,
202:19
**disagreement**
207:14
**discharge**
111:17, 111:20,
111:22, 112:9,
113:3, 114:11,
121:7, 121:11
**discharged**
111:19
**disciplinary**
33:10
**discipline**
31:14, 33:18
**discovery**
1:17, 1:21
**discretion**
57:5, 90:16,
91:2, 98:16,
99:9, 106:19,
109:23, 123:17,
123:24, 210:1
**discuss**
47:16, 52:18,
62:17, 126:1,
127:1, 141:9,
142:7, 149:16,
222:14, 226:16
**discussed**
22:19, 28:15,
49:14, 49:20,
52:13, 53:21,
86:7, 97:14,
149:19, 158:3,
172:19, 190:13,

190:22, 191:17,
192:11, 192:12,
208:19, 208:24,
209:2, 209:6,
209:10, 209:14,
209:24, 214:20,
215:2, 215:18,
216:2
**discusses**
50:2, 141:13,
195:12, 201:14
**discussing**
50:1, 211:15
**discussion**
47:3, 53:9,
54:3, 54:4,
54:13, 110:8,
124:24, 157:14,
194:2
**discussions**
125:22
**disease**
92:20
**dismissed**
218:12
**disorders**
114:10
**dispositions**
143:22, 144:12,
145:3
**dispute**
40:19, 44:3,
44:16, 150:16,
150:19, 150:24,
151:9, 151:15,
151:21, 152:24,
153:2
**disputed**
212:16
**distracted**
26:18, 204:7
**district**
1:1, 1:2
**disturbances**
108:18
**divided**
148:21
**division**
1:3

**doc**
116:23
**docket**
210:5
**doctor**
6:24, 8:4,
18:6, 28:14,
96:14, 96:17,
102:19, 104:4,
170:16, 208:5,
210:1, 213:20,
219:15, 223:4,
225:24, 226:9,
229:10, 231:1
**doctors**
59:2, 219:14,
221:10, 222:17,
224:15, 225:2,
225:5, 226:1,
226:6, 232:2
**document**
44:22, 45:8,
45:11, 45:20,
50:13, 63:15,
68:10, 86:2,
86:17, 86:18,
86:22, 87:5,
92:9, 92:15,
92:18, 92:19,
93:13, 93:21,
94:3, 95:9,
99:6, 99:7,
101:5, 101:9,
104:9, 105:12,
111:5, 111:9,
126:22, 135:23,
137:4, 139:22,
140:20, 141:6,
144:11, 147:20,
149:24, 150:2,
150:6, 151:13,
151:19, 152:5,
160:19, 166:1,
166:5, 178:6,
183:2, 186:12,
188:7, 188:12,
193:12, 193:15,
195:19, 196:18,

198:19, 201:2,
211:15, 212:11,
216:16
**documentation**
55:5, 77:16,
112:16, 112:18,
144:19, 199:2,
200:4, 208:14,
208:17, 208:20
**documented**
54:6, 54:10,
54:11, 54:17,
54:21, 93:6,
144:1, 145:4,
200:7, 200:11,
200:14, 200:18,
226:17
**documenting**
199:21
**documents**
50:7, 50:14,
52:12, 53:19,
96:22, 97:1,
183:21, 183:24,
199:23
**does**
6:13, 9:17,
10:8, 56:10,
58:19, 59:4,
64:4, 64:7,
67:5, 68:12,
68:13, 69:12,
69:13, 70:18,
73:23, 77:11,
85:5, 94:4,
95:12, 95:15,
95:17, 100:20,
100:21, 101:17,
106:5, 106:11,
110:21, 112:3,
113:16, 115:7,
116:5, 122:19,
123:8, 130:11,
133:9, 135:1,
135:11, 137:9,
137:11, 138:4,
142:2, 143:4,
144:4, 154:5,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

73

155:6, 155:9,
156:10, 161:13,
162:7, 166:10,
166:23, 168:11,
168:14, 170:3,
170:24, 175:5,
176:14, 179:9,
180:3, 180:18,
182:20, 182:21,
186:17, 194:14,
196:23, 202:4,
206:9, 209:3,
214:11, 218:21,
219:1, 220:4,
226:6, 227:9,
230:15, 230:19

**doesn't**
69:10, 94:2,
97:19, 128:14,
135:21, 141:22,
156:15, 157:3,
168:16, 171:12,
197:20, 211:1

**doing**
5:5, 12:12,
56:8, 59:8,
104:24, 126:24,
162:1

**dollars**
149:21, 150:17,
151:1

**don**
74:22

**don't**
4:22, 12:14,
13:7, 19:23,
26:21, 28:6,
34:11, 43:10,
45:2, 57:20,
63:7, 69:6,
69:22, 74:10,
74:14, 76:1,
77:21, 78:2,
80:24, 85:9,
85:12, 85:18,
103:13, 103:16,
109:2, 110:4,
117:4, 117:6,

130:15, 130:24,
131:7, 131:9,
132:16, 133:12,
134:1, 136:10,
136:11, 137:7,
139:2, 140:11,
144:16, 145:5,
146:11, 146:14,
150:19, 154:8,
156:6, 156:14,
160:12, 167:16,
170:20, 171:5,
176:1, 177:3,
178:21, 181:1,
181:14, 181:15,
183:18, 184:16,
185:18, 189:16,
189:17, 191:5,
192:11, 197:17,
197:19, 197:21,
197:22, 198:1,
198:2, 198:23,
199:5, 200:22,
206:11, 206:18,
208:2, 212:21,
217:23, 218:1,
227:10, 232:20,
233:6, 233:9

**done**
22:18, 51:9,
141:16, 151:5,
157:13, 173:12,
184:2, 208:8,
217:10

**dot**
137:1

**double**
118:6

**down**
15:23, 19:14,
32:21, 105:21,
105:22, 117:12,
162:22, 166:12,
203:6

**dr**
3:27, 4:11,
6:22, 9:9, 9:10,
9:14, 9:17,

10:23, 51:1,
51:2, 51:4,
51:8, 51:13,
53:4, 53:9,
53:21, 66:1,
93:10, 149:13,
186:13, 204:21,
205:2, 211:9,
212:12, 213:24,
220:11, 223:7,
223:22, 227:3,
228:23

**draw**
142:22

**drug**
29:3, 104:17,
167:3

**dudley**
75:19

**duly**
4:4, 234:7

**duplicates**
60:3

**durable**
29:2

**during**
13:3, 32:10,
34:16, 37:6,
37:14, 52:24,
85:22, 98:18,
125:24, 126:4,
126:11, 126:20,
126:24, 186:22,
204:11, 205:2,
221:12

**duties**
7:3, 82:22,
83:13, 149:18,
151:7, 216:14,
216:24, 217:5,
230:7

**duty**
14:21, 18:3,
18:6

**dx**
95:11, 95:12

**E**

**e-rates**
153:14

**each**
45:2, 45:7,
46:1, 73:12,
84:5, 87:10,
91:24, 107:22,
113:24, 115:17,
121:21, 179:23,
226:16

**earlier**
49:14, 59:1,
80:4, 155:14,
161:10, 165:24,
170:16

**earliest**
41:20, 41:21

**early**
214:4

**easier**
87:4

**easily**
158:7

**east**
1:3, 41:24,
42:8

**ecasa**
100:12

**educate**
125:18, 197:21

**educated**
126:9

**education**
14:6, 57:14,
104:21, 105:4,
125:14, 221:22,
222:1

**educational**
6:18, 7:20,
56:17, 72:5,
75:14, 144:9,
220:14, 221:14

**effect**
47:20, 48:6,
49:2, 55:24,
61:7, 132:7,
132:10, 167:8,
171:24, 178:12,
179:1, 190:2,
215:24

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

74

| | | | |
|---|---|---|---|
| **effective**<br>67:21, 86:15,<br>137:1<br>**effectiveness**<br>122:12<br>**efficient**<br>4:15, 163:8<br>**effort**<br>11:12<br>**eight**<br>49:11, 138:11,<br>183:17, 183:20,<br>210:6, 227:2,<br>227:6<br>**either**<br>22:14, 33:2,<br>38:10, 59:9,<br>69:10, 74:16,<br>79:4, 91:16,<br>93:13, 101:21,<br>103:7, 117:7,<br>128:15, 131:9,<br>137:12, 152:15,<br>175:3, 207:18,<br>207:23, 231:1<br>**electronic**<br>122:2, 122:4<br>**electronically**<br>184:14<br>**elicited**<br>39:20<br>**eliminated**<br>163:14<br>**elizabeth's**<br>146:9, 147:1<br>**else**<br>30:22, 52:24,<br>55:7, 56:1,<br>58:2, 67:6,<br>73:9, 90:22,<br>108:19, 128:20,<br>129:3, 129:4,<br>131:4, 131:11,<br>138:4, 173:21,<br>189:18, 202:1,<br>226:5, 229:23,<br>230:12, 233:3,<br>233:7, 233:11 | **else's**<br>15:15, 19:8<br>**elsewhere**<br>142:13<br>**emergency**<br>67:24, 128:21,<br>129:2, 129:7,<br>133:10, 139:7,<br>141:8, 141:11,<br>141:12, 142:6,<br>230:15, 230:18<br>**emergent**<br>133:11<br>**employed**<br>6:7, 7:22,<br>15:11, 17:18,<br>17:20, 29:7,<br>116:17, 211:20,<br>234:14, 234:17<br>**employee**<br>74:22, 165:22,<br>187:23, 210:17,<br>234:16<br>**employing**<br>20:15<br>**employment**<br>6:6, 14:7,<br>14:8, 20:23,<br>37:6, 86:19,<br>92:16<br>**enacted**<br>168:18<br>**encounter**<br>186:13<br>**encountering**<br>195:23, 196:9<br>**encounters**<br>186:18, 208:14,<br>208:18, 208:20<br>**encourage**<br>121:12, 196:12<br>**encouraged**<br>25:24, 26:3,<br>27:17<br>**end**<br>78:12, 101:24,<br>196:20, 225:8,<br>231:15, 233:18 | **ended**<br>21:20, 101:2,<br>102:4<br>**ending**<br>101:18<br>**enough**<br>100:19, 123:12<br>**ensure**<br>64:8, 64:20,<br>72:12, 75:5,<br>81:17, 120:20,<br>142:24, 163:7,<br>163:13, 165:15,<br>166:11, 168:22,<br>227:20<br>**ensures**<br>73:1, 112:7,<br>115:23<br>**ensuring**<br>71:21, 74:5,<br>81:12, 120:3,<br>120:16, 168:7<br>**entail**<br>122:16<br>**entire**<br>113:14<br>**entirety**<br>5:14, 5:16,<br>39:1, 111:8<br>**entities**<br>154:7<br>**entitled**<br>101:5, 165:3<br>**entity**<br>44:9<br>**entries**<br>143:2<br>**environment**<br>55:20, 125:2,<br>126:18, 165:15,<br>166:12, 166:13,<br>166:14, 193:22,<br>226:22<br>**envision**<br>201:21, 201:23<br>**equals**<br>196:21, 197:11,<br>225:23 | **equipment**<br>29:2, 146:19<br>**er**<br>128:23, 141:14<br>**error**<br>167:4<br>**errors**<br>167:7<br>**escalate**<br>151:24<br>**essentially**<br>139:16<br>**establish**<br>174:13<br>**established**<br>72:2, 168:23<br>**estimate**<br>37:1, 217:15<br>**estimated**<br>153:21, 153:22<br>**et**<br>1:12<br>**ethics**<br>34:24<br>**etiology**<br>105:9, 105:10,<br>106:3, 106:4,<br>106:15<br>**eval**<br>58:20<br>**evaluated**<br>51:2, 56:4<br>**evaluates**<br>103:4, 123:1<br>**evaluation**<br>43:15, 58:22,<br>59:5, 92:4,<br>102:16, 107:14,<br>107:22, 108:11,<br>179:24, 190:4,<br>191:22, 192:6,<br>209:19, 211:11,<br>212:22, 215:1,<br>215:21, 216:2<br>**evaluations**<br>200:10, 200:14,<br>208:15<br>**even**<br>5:14, 97:2, |

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

75

102:20, 170:7,
232:11, 233:9
**event**
143:12, 167:3,
168:10, 184:24
**events**
165:16, 167:1
**eventually**
16:11
**ever**
17:18, 22:1,
22:7, 22:12,
30:8, 31:10,
31:13, 33:13,
33:17, 33:19,
35:4, 35:16,
37:5, 37:14,
37:17, 38:21,
39:6, 43:23,
44:10, 62:4,
62:9, 181:12,
217:10, 223:7,
229:10
**every**
22:19, 27:7,
93:22, 117:18,
118:20, 184:4,
213:15, 213:17,
219:14, 224:2,
224:3
**everything**
94:2, 116:5,
126:6, 196:24,
222:16
**evidence**
39:19
**evidently**
165:19
**evp**
61:5
**exact**
150:6, 183:21,
222:18
**exam**
34:20, 35:5,
107:8, 107:11,
107:21, 108:6,
108:10, 109:4,

109:8, 109:20,
110:1
**examination**
1:18, 2:4, 4:6,
34:21, 35:5,
118:20, 119:1,
143:7, 200:17,
218:6, 220:4,
220:23, 231:8
**examinations**
108:22, 117:18,
118:5
**examine**
126:21
**examined**
4:4, 219:20
**example**
124:8, 167:6,
167:20, 186:10,
201:21, 224:14,
224:24
**examples**
167:22
**exceeds**
175:1, 175:2
**except**
89:5
**exception**
23:21, 45:5,
112:12, 188:24,
189:3, 189:14
**exchange**
65:12, 65:19,
131:3, 149:18,
150:17, 150:21,
151:1, 152:20,
153:3
**exchanged**
130:22
**exclusively**
66:9, 114:6
**excuse**
16:22, 87:7
**execution**
83:13, 153:24
**exempt**
46:12, 62:15
**exercises**
97:22

**exhaustive**
124:17
**exhaustively**
125:13
**exhibit**
2:10, 2:11,
2:12, 2:13,
2:14, 2:15,
2:16, 2:17,
2:18, 2:19,
2:20, 35:9,
35:11, 45:19,
48:3, 48:10,
50:13, 59:24,
60:1, 60:2,
60:4, 60:6,
60:7, 60:9,
82:4, 82:7,
84:16, 86:8,
89:15, 92:5,
92:7, 93:11,
110:13, 117:8,
117:24, 118:2,
118:3, 121:19,
140:16, 140:21,
141:3, 141:9,
141:19, 147:15,
149:17, 150:8,
152:7, 153:8,
158:20, 169:5,
172:12, 183:12,
183:14, 183:17,
183:20, 187:4,
191:15, 191:23,
192:8, 192:16,
192:21, 192:24,
193:4, 193:6,
193:12, 194:3,
194:4, 201:6,
201:8, 203:2,
208:9, 210:3,
210:7, 211:18,
214:21, 215:21,
216:3, 216:6,
227:2, 227:5
**exhibits**
59:20, 189:10,
191:3, 199:5,

199:20
**exist**
205:23, 205:24
**exists**
116:10
**expect**
54:16, 57:15,
103:22, 142:9,
225:1, 225:20
**expectation**
54:6
**expectations**
54:12, 103:18
**expected**
109:5, 116:12,
224:15, 224:18,
224:19
**expenses**
135:4
**experience**
14:17, 17:4,
218:18, 218:21,
218:24, 219:13,
220:14, 221:4,
221:22, 222:1,
225:19
**experiencing**
230:18
**explain**
12:2, 55:13,
126:15, 162:21,
193:17, 221:8,
221:10, 229:4
**explaining**
86:2
**extend**
27:8
**extended**
152:12, 152:13,
152:15
**extension**
104:16
**extensions**
61:11
**extent**
170:3, 170:9
**extra**
204:19

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

76

| F | | | |
|---|---|---|---|
| **face-to-face** | **facts** | **female** | 139:21, 165:4, |
| 32:9 | 211:24 | 122:3 | 178:2, 188:6 |
| **facetiously** | **fair** | **few** | **first** |
| 232:20 | 5:3, 5:4, 34:2, | 4:14, 159:19, | 4:4, 4:16, 6:5, |
| **facilities** | 100:19, 102:13, | 199:5 | 12:15, 13:13, |
| 7:14, 10:9, | 221:24, 225:3 | **field** | 13:22, 16:1, |
| 10:12, 11:21, | **fall** | 22:20, 26:9 | 16:24, 17:1, |
| 16:9, 18:2, | 75:8, 77:1, | **fields** | 17:4, 17:13, |
| 60:15, 60:17, | 89:2, 99:23, | 24:3 | 19:6, 23:16, |
| 63:1, 63:20, | 147:7, 147:9, | **fifth** | 24:15, 24:18, |
| 64:21, 65:19, | 163:21 | 151:19 | 31:3, 31:6, |
| 69:4, 84:6, | **falls** | **figure** | 31:9, 46:4, |
| 122:4, 122:5, | 76:20, 175:3, | 34:9 | 60:8, 60:19, |
| 122:8, 124:16, | 175:5 | **file** | 67:18, 71:21, |
| 136:9, 137:8, | **familiar** | 93:9 | 77:7, 77:23, |
| 142:11, 146:12, | 24:5, 24:8, | **filed** | 79:17, 93:10, |
| 175:16, 178:13, | 35:13, 47:15, | 143:1, 158:2 | 94:5, 95:16, |
| 183:4, 191:10, | 60:8, 82:13, | **filled** | 96:14, 96:17, |
| 191:22, 214:19, | 86:18, 92:14, | 12:19, 12:22, | 97:24, 100:1, |
| 223:1 | 136:21, 140:20, | 12:23, 52:7 | 101:10, 107:7, |
| **facility** | 184:6, 193:12, | **finally** | 129:19, 136:17, |
| 10:18, 12:9, | 197:7, 197:10, | 21:20, 32:18 | 137:24, 142:3, |
| 12:14, 12:20, | 210:13 | **financial** | 149:21, 150:12, |
| 12:24, 20:2, | **family** | 47:14, 215:8 | 150:13, 150:18, |
| 76:23, 78:21, | 14:11, 14:14, | **financially** | 164:17, 180:14, |
| 87:10, 87:13, | 23:3, 23:12, | 234:18 | 193:11, 198:12, |
| 87:14, 90:18, | 27:6, 27:11, | **find** | 198:15, 211:18, |
| 111:18, 113:10, | 27:13 | 12:4, 128:7, | 218:8 |
| 119:23, 121:22, | **far** | 169:22, 199:6, | **five** |
| 138:17, 138:21, | 108:9, 110:4, | 199:24, 232:24 | 36:13, 36:21, |
| 139:15, 142:9, | 162:4, 200:21 | **finder** | 37:22, 38:3, |
| 142:13, 146:13, | **fashion** | 39:20 | 38:14, 48:21, |
| 146:17, 162:16, | 56:11, 181:24, | **finding** | 66:4, 67:19, |
| 163:7, 163:12, | 230:13 | 67:11, 97:20 | 117:12, 121:20, |
| 176:9, 177:5, | **february** | **findings** | 148:16, 152:15, |
| 195:2, 201:16, | 186:12 | 52:1, 106:8, | 158:20, 172:12, |
| 203:6, 204:16, | **federal** | 106:12, 106:13, | 217:15 |
| 213:4, 214:12, | 35:13, 42:1, | 106:14, 107:17, | **flip** |
| 224:3, 226:9, | 42:17, 42:21 | 108:14, 108:17, | 4:22 |
| 232:22 | **feed** | 135:18, 135:19, | **floor** |
| **fact** | 126:15 | 143:21, 144:12, | 1:26, 3:6 |
| 39:20, 64:1, | **feel** | 144:17, 145:2, | **florida** |
| 65:1, 91:14, | 47:22, 109:20, | 223:21 | 161:24, 162:1 |
| 96:7, 111:2, | 126:16, 144:18 | **fine** | **focus** |
| 126:8, 202:18, | **felony** | 217:22, 233:10 | 206:22 |
| 212:24 | 218:10 | **finish** | **focused** |
| | **felt** | 5:13, 5:15 | 22:9 |
| | 51:9, 91:5 | **finished** | **folks** |
| | | 111:8, 112:5, | 159:19 |

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                    77

follow
85:1, 103:6,
113:19, 115:4,
115:10, 115:13,
116:6, 116:13,
119:4, 119:24,
121:9, 121:12,
178:14, 178:16
follow-up
113:10, 121:8,
185:14, 186:23,
231:5
followed
186:19, 226:19
following
72:7
follows
4:5
foregoing
234:6
foreseeing
138:8
form
33:2, 55:9,
57:22, 62:6,
81:4, 84:17,
94:16, 102:5,
102:23, 106:23,
109:20, 115:19,
115:20, 116:1,
116:10, 116:12,
117:1, 117:4,
117:6, 132:4,
149:24, 150:1,
186:7, 190:9,
210:18, 211:12,
222:4, 223:13,
228:17, 230:21,
231:13
formal
31:13, 33:17
format
52:4, 52:5,
60:4, 135:7,
135:12, 143:11
forms
183:20, 183:22,
201:2, 210:14

formulates
123:1
forward
4:16
forwarded
202:23
found
77:14
foundation
149:24, 150:1,
187:6, 211:13,
223:14, 223:19,
228:18, 231:14
four
36:13, 36:21,
36:23, 37:21,
38:3, 38:14,
48:18, 62:19,
78:24, 82:7,
84:16, 89:15,
110:13, 112:10,
117:24, 118:2,
118:3, 118:8,
161:22, 177:24,
178:3, 178:19,
198:11, 198:15,
210:6
fourth
151:13
frame
13:8, 227:15
free
115:18
frequent
161:7
frequently
161:6
from
5:20, 9:3,
15:14, 17:7,
18:3, 23:20,
27:23, 28:4,
34:3, 46:12,
50:21, 52:17,
52:21, 56:8,
59:8, 61:18,
62:15, 65:8,
65:14, 67:10,

69:21, 74:3,
74:18, 77:12,
78:10, 80:22,
81:2, 98:21,
131:17, 131:18,
134:18, 142:6,
150:8, 152:14,
157:12, 160:13,
172:18, 174:5,
176:14, 176:18,
177:4, 179:1,
179:21, 180:8,
184:3, 185:4,
191:16, 192:9,
202:1, 210:10,
212:1, 216:11,
218:15, 219:6,
222:17, 227:16
front
39:18, 191:4
full
63:8, 77:17,
79:3, 79:6,
80:22, 152:15,
153:23, 159:3,
203:14
full-time
15:3, 18:21,
18:24, 20:7,
20:10, 20:12,
21:8
function
103:9, 107:14,
107:18, 108:12
functioning
66:21
functions
66:17, 108:17
fundus
107:8
funk
8:4, 10:23,
149:13
further
46:21, 87:12,
92:3, 102:16,
102:19, 103:10,
123:6, 125:22,

197:3, 205:13,
211:22, 217:24,
231:8, 233:15,
234:12, 234:15

---

**G**

---

g-e-r-r-y
50:19
gait
107:15, 108:13,
108:17
garcia
9:9, 9:17
gastroenterology
69:18
gather
78:23
gave
41:10
general
3:12, 14:3,
16:10, 58:7,
58:8, 65:7,
69:2, 111:6,
112:2, 130:15,
157:21, 158:1,
207:12, 210:14,
210:15
generally
46:5, 111:11,
166:22, 177:3,
200:1, 205:4,
211:4, 225:9
geographic
128:6
georgia
30:3, 30:6
gerry
1:5, 50:18
get
6:5, 32:18,
37:21, 50:5,
110:11, 127:18,
140:18, 152:2,
182:3, 228:11
give
7:2, 14:3,
14:6, 30:14,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                      78

37:1, 67:8,
112:10, 116:7,
131:4, 178:23,
185:18, 188:22,
195:1, 199:5,
217:19
**given**
36:6, 40:2,
51:10, 57:4,
57:8, 98:2,
156:4, 185:7,
198:4, 227:22
**gives**
91:12, 99:18
**giving**
65:20, 142:14,
182:14
**glaucoma**
40:21
**global**
100:23, 142:1
**go**
4:14, 6:3,
12:5, 45:7,
45:12, 71:6,
110:5, 117:8,
124:16, 128:18,
132:20, 134:9,
152:3, 158:19,
164:6, 170:3,
188:15, 188:19,
199:10, 204:2,
207:20, 212:19,
215:4, 215:17,
216:5, 222:4,
230:6
**goes**
83:15, 128:16,
174:16, 205:10,
225:13
**going**
4:14, 4:24,
6:3, 45:24,
47:17, 60:5,
62:17, 97:21,
123:2, 128:23,
136:13, 140:8,
149:14, 149:23,

164:6, 169:4,
170:2, 170:9,
174:16, 185:13,
190:8, 193:2,
194:17, 194:21,
194:23, 194:24,
197:1, 204:6,
205:9, 216:6,
216:12, 218:17,
226:10
**gone**
21:19, 39:6,
44:20
**good**
28:7, 184:15,
195:24, 198:21,
231:20
**gosh**
94:5
**got**
17:10, 26:18,
27:15, 30:19,
30:22, 96:13,
140:14, 159:7,
204:7, 218:13
**govern**
61:7
**governing**
70:3, 82:9,
176:22, 177:7,
177:8, 188:4,
190:3, 190:14,
190:18, 191:2,
191:13, 191:21,
192:6, 192:14,
192:18, 208:20
**graduate**
14:9, 14:11
**grady**
2:5, 2:7, 3:4,
4:7, 26:17,
26:20, 30:20,
30:24, 45:12,
45:17, 51:18,
51:21, 55:11,
59:22, 62:8,
81:7, 82:5,
84:22, 86:9,

94:8, 94:10,
94:17, 94:19,
95:5, 99:1,
102:9, 102:17,
103:11, 107:2,
108:2, 108:4,
108:8, 110:7,
110:10, 116:3,
117:5, 119:13,
119:17, 119:19,
120:8, 120:13,
132:6, 140:17,
144:20, 144:23,
147:23, 148:2,
150:3, 150:11,
158:18, 170:14,
170:15, 183:15,
186:3, 188:14,
189:19, 190:12,
193:6, 193:7,
194:3, 194:5,
199:9, 199:14,
199:18, 204:5,
207:6, 207:7,
211:16, 217:23,
218:4, 222:4,
223:13, 223:19,
227:5, 228:17,
229:1, 229:24,
230:21, 231:6,
231:9, 231:18,
233:6, 233:12
**graham**
14:23, 18:5,
18:15, 18:23,
19:2, 19:5, 19:8
**granted**
124:3
**grateful**
134:12
**great**
5:5, 15:21,
140:15, 163:5
**greater**
105:14
**grievance**
157:22, 209:22,
210:8, 210:18,

211:19, 211:23
**grievances**
155:19, 155:23,
156:3, 156:5,
156:10, 156:13,
156:16, 157:2,
157:8, 157:11,
157:18, 157:24,
158:2, 158:3,
158:5, 158:10
**gross**
119:11
**group**
38:1, 130:17,
131:15, 131:16,
133:14, 133:19,
133:22, 134:3,
154:2, 154:5
**guess**
123:7, 203:19
**guesstimate**
174:9, 174:15,
175:13
**guidance**
9:19, 57:4,
57:7, 57:8,
57:13, 78:19,
90:16, 90:17,
91:1, 91:3,
91:12, 91:18,
91:23, 92:12,
92:19, 93:13,
94:13, 94:22,
98:4, 99:15,
99:22, 116:7
**guide**
106:19
**guideline**
94:12, 95:3,
100:18, 100:20,
101:4, 161:11,
174:13, 224:22
**guideline's**
174:16
**guidelines**
25:7, 57:11,
58:1, 78:15,
78:22, 86:7,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

79

**86:23, 86:24,**
91:21, 93:20,
95:10, 96:23,
107:4, 221:8,
221:18, 221:21,
222:2
**guides**
105:1
**guilty**
31:19, 218:9
**guys**
150:4
**gynecology**
69:19

**H**

**had**
15:20, 16:15,
16:19, 17:8,
17:20, 18:1,
18:18, 18:19,
20:19, 21:15,
23:21, 25:7,
31:19, 32:2,
32:14, 33:8,
33:13, 44:3,
45:9, 45:18,
50:23, 51:9,
53:9, 54:3,
54:4, 54:13,
55:18, 68:9,
75:21, 75:22,
92:24, 96:21,
98:1, 102:21,
106:13, 140:6,
142:4, 147:19,
158:11, 188:16,
196:14, 216:18,
221:3, 221:17,
222:10, 228:14,
228:23, 230:14,
232:18, 232:19,
232:20
**half**
7:9, 8:6, 13:23
**halfway**
117:12, 204:7
**hand**
107:1

**hand-off**
142:8
**handbook**
87:3, 188:24,
189:11, 193:16
**handed**
35:10, 59:23,
82:6, 92:6,
140:21, 183:16,
210:7
**handle**
92:23
**handled**
11:17, 11:19
**handoff**
194:20
**handwriting**
183:22
**happen**
39:18, 40:14,
71:19, 71:22,
133:24
**happened**
35:21, 43:3,
80:5, 80:15
**happens**
71:24, 74:20,
130:20, 133:23,
160:6, 201:15,
204:20, 205:11,
207:12
**happy**
4:19
**has**
10:3, 28:7,
31:10, 35:10,
35:21, 39:5,
44:8, 56:3,
58:10, 59:9,
59:23, 62:3,
64:19, 72:8,
75:3, 76:9,
76:14, 78:11,
80:17, 82:6,
86:2, 90:10,
91:9, 101:21,
102:15, 112:19,
129:5, 138:22,

145:1, 149:16,
166:1, 167:8,
168:23, 171:2,
174:23, 181:9,
184:12, 210:6,
213:21, 218:14,
219:5, 229:9
**hasn't**
117:7
**haven't**
4:24, 28:4,
28:15, 40:11,
52:13, 208:23,
209:2, 209:6,
209:10, 209:14,
215:2, 216:2
**having**
182:17, 199:19,
224:21
**hcoa**
165:21
**hcua**
228:4, 228:6,
228:8, 228:14
**he's**
8:11, 74:1,
74:2, 170:4,
170:9, 184:9,
187:16, 187:17,
187:20, 187:21
**head**
5:9
**headache**
107:6, 107:13
**headaches**
224:13
**headed**
71:24
**health**
1:11, 15:9,
15:24, 27:18,
35:18, 36:15,
37:15, 46:14,
46:22, 47:5,
60:13, 61:1,
61:9, 67:21,
68:7, 72:1,
72:8, 78:15,

83:17, 84:1,
87:6, 87:7,
87:9, 87:13,
87:18, 87:23,
112:24, 113:8,
118:20, 118:23,
118:24, 134:14,
135:10, 135:17,
154:4, 159:1,
163:7, 163:12,
163:13, 163:17,
165:6, 165:17,
166:3, 176:11,
177:14, 184:2,
203:11, 203:23,
204:9, 232:13
**healthcare**
11:15, 11:16,
15:2, 15:4,
22:21, 24:6,
24:10, 24:13,
25:4, 25:10,
26:7, 26:10,
26:15, 28:1,
71:10, 82:10,
82:20, 82:22,
83:3, 83:12,
84:3, 84:14,
84:20, 85:2,
86:4, 87:22,
88:3, 88:10,
88:12, 88:15,
88:24, 110:19,
111:6, 111:20,
112:1, 112:14,
112:15, 112:19,
112:23, 113:4,
113:12, 113:18,
113:23, 113:24,
114:5, 114:16,
115:8, 115:14,
115:16, 116:8,
116:10, 116:14,
116:21, 118:14,
119:2, 119:21,
120:4, 120:17,
121:2, 121:6,
126:18, 126:23,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                                    80

128:10, 146:17,
156:17, 157:7,
158:8, 162:15,
163:9, 164:13,
164:15, 165:23,
177:12, 189:15,
193:21, 209:23,
210:22, 210:24,
212:1, 212:7,
218:19, 218:20,
218:21, 219:1,
219:2, 219:12,
219:19, 220:3,
228:1, 228:21,
230:16, 230:19,
230:22, 232:1
**hector**
9:9
**held**
22:13, 22:20,
72:4, 72:6,
172:16
**help**
4:15, 7:20,
10:16, 16:16,
17:9, 72:18,
78:17, 95:20,
96:11, 134:15,
168:13, 182:6
**helpful**
94:13, 96:16,
97:13, 98:4
**helps**
75:1, 210:5
**henry**
1:24
**her**
52:17, 52:22,
74:10, 88:18,
98:9, 148:14,
188:22, 201:3
**here**
5:23, 6:1,
10:5, 14:13,
42:17, 52:14,
60:15, 61:5,
67:4, 67:19,
72:4, 75:9,

84:15, 86:14,
87:3, 93:18,
94:4, 98:12,
98:19, 116:10,
140:14, 165:21,
167:17, 167:19,
168:14, 170:4,
175:20, 185:9,
197:6, 211:23,
216:11, 218:5
**here's**
197:22
**hereby**
234:5
**hereto**
234:17
**hernia**
40:20, 42:6,
43:4, 43:13
**hesitation**
220:17
**hfs**
14:19, 28:24,
29:1, 29:6,
138:22, 174:3
**hierarchy**
25:14
**him**
170:6, 184:6,
212:17
**himself**
50:23, 90:23
**hire**
124:14
**hired**
13:18, 13:22,
15:10, 17:1,
17:4, 125:5
**hiring**
180:21, 181:17
**his**
8:9, 51:3,
51:14, 61:3,
88:18, 93:4,
108:5, 116:2,
117:2, 119:10,
144:20, 154:21,
170:12, 192:13,

201:3, 213:5,
220:18, 220:23,
223:4
**history**
14:6, 14:8
**hit**
189:23
**hiv**
111:23, 112:3,
112:12, 114:3,
114:7, 115:18,
121:13
**hold**
83:6, 215:3,
220:15
**holds**
74:12
**hope**
4:15, 218:4
**hopefully**
65:15
**hospital**
23:8, 47:18,
47:19, 129:10,
129:11, 129:13,
140:7, 141:8,
141:11, 141:12,
141:23, 146:9,
147:2, 147:5,
147:8, 163:24,
164:18, 173:17,
174:7, 175:4
**hospitalization**
139:6, 139:11,
173:10, 174:2,
174:11, 174:24,
175:1, 206:1
**hospitalizations**
173:5, 173:16
**hospitals**
23:10, 62:24,
63:20, 64:21,
141:7, 164:4,
164:12, 173:23,
174:4
**hour**
1:25
**hours**
17:12, 21:10,

76:23, 141:10,
204:19
**housed**
38:11
**how**
8:1, 10:12,
11:6, 18:6,
23:5, 27:5,
30:17, 31:23,
35:20, 36:11,
36:21, 37:1,
37:8, 38:16,
38:23, 39:9,
41:9, 41:13,
56:12, 56:13,
56:19, 58:8,
67:11, 69:21,
71:11, 72:16,
81:15, 81:20,
85:12, 88:6,
91:3, 91:12,
92:22, 97:6,
97:21, 102:7,
107:20, 115:23,
125:11, 133:12,
133:14, 135:21,
135:24, 141:13,
141:14, 142:7,
144:3, 148:13,
150:12, 150:20,
151:6, 151:12,
151:18, 155:22,
157:6, 158:10,
159:21, 161:3,
161:6, 161:20,
162:21, 173:7,
175:14, 180:18,
192:12, 194:14,
194:24, 195:1,
198:9, 201:15,
201:17, 203:13,
203:22, 203:23,
204:9, 207:14,
213:21, 217:14,
219:8, 221:9,
221:10, 225:5,
225:23, 226:6,
226:17, 226:21,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                          81

228:8, 228:11
**however**
56:9, 57:14,
167:20, 197:20,
198:9, 204:17
**hpl**
17:8, 17:18,
17:20, 17:24,
18:1, 19:13,
19:18, 20:5,
32:17
**hr**
181:2
**human**
14:20, 16:4,
17:14
**hypertension**
113:8, 114:9,
194:22, 194:24
**hypothetical**
102:6, 102:24,
103:2

**I**

**i'll**
4:19, 5:15,
22:8, 22:9,
45:7, 50:3,
66:7, 68:15,
71:5, 87:2,
93:8, 98:9,
131:3, 182:24
**i've**
4:18, 140:14,
140:21
**id's**
76:15, 178:22
**idea**
30:14, 67:8
**identification**
35:9, 59:21,
82:4, 86:8,
92:5, 140:16,
183:14, 187:4,
193:1, 210:4
**identified**
49:19, 141:9,
163:18

**identify**
167:22, 205:23,
224:15, 225:2
**identifying**
135:15, 156:2
**identity**
148:9
**idfpr**
33:11
**idoc**
12:20, 46:6,
46:15, 47:6,
52:6, 62:4,
64:4, 64:7,
64:14, 64:16,
65:19, 65:24,
66:12, 66:19,
67:1, 68:3,
69:4, 70:10,
70:13, 71:15,
71:22, 71:23,
71:24, 84:5,
86:2, 88:15,
114:18, 115:19,
116:6, 116:11,
116:18, 120:1,
128:16, 129:4,
129:17, 129:23,
136:8, 137:7,
137:15, 138:23,
152:6, 155:6,
156:6, 168:12,
169:10, 169:23,
170:10, 170:17,
170:21, 170:23,
170:24, 171:1,
171:8, 171:11,
171:14, 173:21,
174:3, 174:23,
178:9, 178:13,
178:14, 178:16,
210:17, 211:20,
226:22, 229:5,
229:6, 232:15
**idoc's**
70:6, 171:6
**ignore**
103:13, 103:15,

103:17
**ignoring**
103:24, 104:4
**il**
3:7, 3:15, 3:17
**illinois**
1:2, 1:19,
1:20, 1:24,
1:27, 6:12, 7:5,
7:23, 9:23,
10:1, 10:3,
10:10, 13:19,
14:10, 14:12,
14:17, 22:3,
22:8, 22:16,
23:8, 23:9,
29:18, 30:4,
30:5, 31:4,
31:16, 31:21,
32:8, 34:20,
35:4, 37:18,
38:11, 41:24,
48:6, 49:2,
56:1, 59:16,
60:15, 61:8,
66:17, 66:18,
72:22, 73:20,
74:9, 75:10,
75:17, 77:3,
77:22, 79:11,
80:18, 80:22,
82:9, 84:11,
85:7, 89:14,
116:16, 130:13,
131:17, 132:12,
133:1, 133:6,
145:13, 145:19,
145:23, 146:22,
149:4, 162:4,
165:21, 166:21,
167:9, 168:14,
168:16, 168:18,
169:3, 169:16,
169:23, 171:13,
171:14, 173:22,
175:16, 175:20,
175:24, 176:20,
178:12, 179:4,

179:7, 203:8,
205:1, 213:19,
217:2, 217:6,
224:4, 234:4
**illness**
92:21, 121:9,
123:11, 194:19
**imagine**
166:15
**imaging**
145:18, 146:8,
229:11, 229:15
**immediate**
138:19
**immediately**
15:10
**impact**
32:7
**implement**
71:1, 81:20,
83:23, 163:3
**implemented**
167:11
**implementing**
114:21
**implements**
115:24
**important**
61:23
**imposed**
32:11
**improve**
77:14
**improvement**
154:11, 154:15,
154:17, 155:9,
155:11, 155:18,
156:20, 156:23,
157:20, 172:22,
189:3, 189:6
**incarcerated**
135:11
**include**
58:19, 68:18,
69:18, 117:24,
135:18, 186:17
**included**
68:6, 69:6,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                                   82

108:18, 110:1,
137:17, 144:19,
145:1, 160:20,
201:19, 225:1
**includes**
114:8, 135:14,
154:18, 155:19,
156:24, 185:12
**including**
44:9, 60:20,
107:8, 111:21,
132:2, 132:11,
132:24, 133:6
**inclusive**
93:21, 148:17
**incomplete**
102:6, 102:24
**incorrect**
66:15, 88:7,
125:12, 157:6,
197:14
**increase**
182:2
**increasingly**
17:11
**incremental**
182:2
**incrementally**
152:16
**indecency**
31:20, 218:9
**independent**
212:11
**independently**
211:9
**indiana**
30:16
**indicate**
106:14, 202:4,
211:8
**indicated**
114:1, 115:17
**indicates**
165:11
**indication**
185:13, 186:23
**indications**
223:21

**individual**
41:16, 76:19,
90:19, 92:23,
125:4
**individuals**
88:23, 159:14
**infection**
198:2
**inform**
33:3, 144:4
**informal**
31:14, 33:18
**information**
78:24, 81:6,
143:10, 143:18,
177:1, 193:19,
222:12
**informational**
35:1, 66:13,
66:19, 66:21,
66:22, 158:10,
194:1
**informed**
56:13, 133:15
**infraction**
218:11
**initial**
56:16, 78:10,
78:11, 101:10,
144:7, 226:8
**initially**
71:4, 79:14,
79:17, 226:4
**initiated**
110:20, 197:13,
205:17
**initiatives**
7:20, 56:17,
72:6, 75:14,
221:14
**injunctive**
43:14
**injury**
104:20
**inmate**
164:14
**inmates**
163:8, 164:12,

169:1
**inpatient**
141:16, 173:11
**input**
157:12
**inquire**
105:3
**inside**
147:7
**insight**
115:23
**instance**
22:18, 129:19,
135:22, 146:21,
164:18, 184:4,
194:21, 197:23,
198:4, 201:21
**instances**
44:6, 58:21
**instead**
5:9
**institute**
55:20
**instituting**
165:14
**institutional**
70:16, 75:6,
91:17, 178:15,
178:17, 178:18
**instructions**
111:17, 195:1
**instructs**
104:19, 106:2
**insurance**
44:8, 206:23,
232:8
**insured**
19:13
**intended**
97:6
**interaction**
58:16, 96:11
**interactions**
195:12, 226:13,
226:15, 226:21
**interested**
46:21, 47:3,
47:17, 68:16,

107:19, 234:18
**interpret**
112:23, 198:9
**interpretation**
46:7, 68:17,
70:9, 84:18,
111:24, 114:5,
123:2
**interpretations**
89:9
**interpreted**
143:6, 143:9
**interqual**
205:20, 206:6,
206:13
**interrogatories**
187:3, 187:6
**interrogatory**
188:3, 188:16,
208:9
**interviewing**
7:17, 195:14
**into**
20:18, 75:4,
89:2, 115:23,
139:16, 148:21,
162:22, 167:8,
167:15, 194:8,
207:24
**introduced**
188:23
**involve**
29:11, 29:14,
76:5, 95:22,
102:15, 106:15,
226:9
**involved**
10:19, 11:10,
25:17, 78:5,
113:11, 115:7,
201:16
**involvement**
10:20, 157:9
**involves**
26:14, 51:24,
76:6, 107:14,
115:3
**involving**
96:1

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

83

**iowa**
30:15
**issue**
41:4, 67:12,
69:17, 79:5,
80:21, 145:7,
215:4
**issued**
31:15, 45:22,
45:23, 79:7
**issues**
7:12, 113:7,
113:9, 121:8,
127:1, 158:6,
179:22, 180:4,
200:1, 209:9,
230:20
**its**
5:13, 5:16,
6:2, 10:4, 46:3,
60:14, 67:1,
70:12, 72:8,
72:12, 79:3,
81:1, 86:12,
111:7, 113:17,
114:22, 115:1,
116:6, 120:3,
120:16, 120:20,
125:9, 144:4,
145:1, 145:2,
150:17, 151:1,
151:7, 152:20,
153:3, 178:24
**itself**
32:16, 166:1

---
**J**
---

**jaclyn**
3:21
**jail**
10:15, 10:22,
11:3, 11:5,
15:1, 17:6,
17:22, 19:20,
20:13, 20:16,
20:24, 183:4
**jails**
10:9, 15:21,

25:7
**january**
171:18, 171:19,
172:6, 172:7,
179:1, 179:2,
190:2, 214:23,
214:24, 215:24
**jkinkade@cassiday**
3:26
**job**
5:6, 6:10,
13:12, 17:14,
22:13, 22:19,
61:3, 73:24,
74:12, 82:23,
166:17, 184:12,
216:9, 216:20,
222:19, 229:21
**joe**
187:12
**johnson**
1:22, 3:32,
234:3, 234:22
**jones**
148:12
**judgement**
227:21
**judges**
39:19
**judgment**
98:23, 123:5,
219:19, 220:3,
225:8, 225:10,
225:12, 225:21,
232:2
**judgments**
220:22
**jumping**
194:6
**june**
86:12
**jury**
39:17
**juvenile**
60:16

---
**K**
---

**k-a-r-r-a-k-e-r**
73:22

**kahn**
60:21
**kane**
10:16, 10:22
**kansas**
30:16, 30:22
**karraker**
73:22, 149:5
**kathy**
1:22, 3:32,
234:3, 234:22
**keep**
5:6, 5:8,
143:15, 143:17,
156:15, 217:16
**kentucky**
30:16
**kept**
80:21, 135:24
**kind**
54:18, 96:10,
142:10, 185:13,
215:7, 218:17,
232:8
**kinkade**
2:6, 3:21,
52:17, 52:21,
55:9, 62:6,
81:4, 84:17,
94:7, 94:16,
95:1, 102:5,
102:12, 102:23,
106:23, 110:5,
116:1, 117:1,
119:7, 119:9,
132:4, 147:21,
149:23, 170:2,
185:23, 186:1,
189:12, 190:5,
190:8, 211:12,
218:2, 218:7,
222:7, 223:16,
223:24, 227:6,
227:8, 228:20,
229:3, 230:8,
230:24, 231:4,
231:13, 233:8,
233:9

**kahn** see above... 

**knee**
41:1, 41:2,
41:18, 43:11
**knowledge**
10:10, 11:8,
35:16, 36:4,
36:24, 39:5,
39:10, 40:5,
42:2, 44:8,
59:11, 59:15,
61:10, 61:16,
61:22, 62:7,
62:13, 77:5,
80:19, 85:5,
110:24, 130:10,
152:17, 154:6,
161:19, 166:19,
181:12, 196:6,
206:20, 219:5,
221:6, 221:17,
224:20, 229:23

---
**L**
---

**l-a-u-r-e-n-t**
75:24
**laboratory**
135:17
**laid**
46:4, 48:3,
65:13, 99:24,
143:18, 149:19,
189:9, 216:20
**language**
69:7
**large**
11:22, 54:23,
91:24, 93:13,
134:18
**largely**
129:9
**largest**
162:4
**last**
26:18, 26:19,
27:12, 36:2,
36:5, 51:19,
51:20, 98:10,
108:3, 108:5,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

84

108:7, 119:15,
120:10, 120:12,
144:22, 148:14,
155:1, 176:23,
187:8, 190:7,
199:14, 199:16,
216:5, 230:2
**late**
214:4, 218:5
**laurent**
75:23, 148:15,
148:16, 160:7
**law**
1:25
**lawsuit**
39:10, 44:10
**lawsuits**
43:24
**lay**
177:24
**layout**
95:8
**lcook@atg**
3:17
**lead**
6:11, 6:13,
6:15, 7:4, 8:8,
8:11, 9:22,
13:15, 74:17
**leaf**
183:18
**learn**
133:18
**learned**
125:4
**least**
112:10, 172:16
**leave**
15:17, 21:7,
47:4, 113:10,
182:1, 195:2
**leaving**
21:24, 22:5,
22:11, 111:18,
189:7, 203:11,
203:22, 204:8
**led**
53:8

**leeman**
9:10, 9:14
**left**
20:13, 20:21,
129:1
**legal**
187:16, 187:19,
231:21
**legible**
143:1
**length**
194:11, 195:6,
215:18, 219:5
**less**
100:1, 161:8,
218:3, 218:4
**let**
4:18, 4:23,
5:13, 5:15,
19:6, 26:5,
34:23, 35:2,
45:8, 47:24,
68:8, 68:15,
71:20, 94:17,
97:12, 111:8,
117:13, 119:17,
120:15, 139:21,
141:3, 147:18,
148:20, 150:10,
153:1, 165:4,
166:11, 167:9,
178:2, 183:19,
188:6, 193:11,
196:14, 202:10,
203:3, 215:4,
217:9, 221:9,
224:14, 224:18,
226:23, 230:16
**let's**
13:9, 22:8,
30:14, 41:18,
46:3, 83:6,
85:14, 94:5,
97:9, 108:2,
117:8, 117:11,
158:16, 167:12,
185:20, 201:7,
203:2

**level**
116:14, 202:14,
202:20, 203:17
**levels**
189:15
**liaison**
6:19, 7:2
**lic**
234:23
**license**
23:22, 30:2,
31:7, 31:10,
31:15, 31:22,
31:23, 32:6,
32:12, 32:18,
32:22, 33:22,
34:21, 85:15
**licensed**
29:17, 29:21,
29:24, 30:8,
31:3, 33:19,
33:23, 34:15,
35:4, 85:18,
89:13, 124:19,
124:22, 126:6,
126:8
**licenses**
33:14, 34:3,
34:7
**licensing**
31:14, 33:3,
35:1, 103:20,
103:23, 104:1,
125:14, 126:1,
126:4
**licensure**
225:18
**life**
28:16
**like**
6:5, 11:20,
16:10, 28:11,
30:17, 34:10,
34:24, 41:22,
45:1, 45:7,
54:16, 55:13,
57:10, 68:8,
87:2, 87:4,

89:1, 97:15,
101:14, 106:16,
108:15, 108:16,
110:13, 111:22,
114:9, 114:10,
116:5, 126:19,
130:13, 133:19,
137:8, 141:7,
141:15, 142:7,
166:16, 167:21,
168:12, 169:21,
175:8, 177:23,
181:18, 195:11,
195:15, 195:16,
196:13, 197:2,
201:20, 202:13,
203:17, 206:1,
216:9, 225:18
**likely**
43:6, 55:10,
61:18, 67:10,
103:6, 114:12,
146:9, 147:9,
174:10, 176:18,
183:3
**limit**
48:4, 128:14,
167:9
**limitation**
48:8, 49:3,
99:5
**limited**
37:15, 47:10,
50:12, 68:18,
116:23, 134:10
**line**
95:16, 107:7
**lines**
96:1
**lisa**
3:13
**list**
108:5, 121:6,
217:16, 217:21
**listed**
30:10, 81:9,
94:12
**listing**
108:9

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

85

lists
135:16, 193:8, 194:7, 224:14
little
6:5, 10:19, 15:23, 16:12, 118:6, 149:20, 158:20, 161:8
lived
15:19
llp
1:26, 3:20
local
62:24, 63:19, 64:20, 164:4
located
67:11, 117:13, 149:4
locations
182:17
loevy
3:3
long
18:6, 23:5, 31:23, 59:4, 97:21, 103:1, 161:3, 170:5, 213:21, 225:16
longer
13:5, 162:9, 194:18
look
46:3, 53:23, 60:7, 83:6, 83:8, 94:5, 97:11, 117:11, 139:19, 177:23, 185:5, 195:17, 199:4, 203:2, 227:12, 228:10
looking
90:24, 91:1, 127:7, 169:20, 186:9, 188:2, 198:14, 202:2
lost
207:22
lot
9:17, 15:22,

72:5, 137:6, 197:3, 228:5
lou
6:24
louis
1:3, 3:24, 41:24, 42:8
low
97:19
lower
210:18
lump
180:6, 182:4
lunch
110:9

**M**

m-a-t-t-i-c-k-s
4:10
ma'am
192:22
made
11:7, 52:11, 78:12, 92:1, 98:23, 125:21, 125:23, 129:12, 130:4, 150:5, 159:15, 215:13, 229:16
magnetic
145:18
main
127:16
maintain
26:12, 26:22, 27:1, 27:2, 30:2, 34:6, 34:7, 66:12, 66:19, 135:7, 157:3, 179:10
maintained
66:24, 133:4, 136:1, 214:23
maintaining
26:14
maintains
132:15, 156:12, 214:23

maintenance
27:9
make
5:7, 5:8, 26:4, 55:22, 56:9, 56:18, 57:15, 79:2, 89:7, 89:8, 90:10, 91:12, 94:17, 107:21, 122:15, 123:4, 123:15, 123:19, 124:4, 124:20, 126:10, 129:9, 130:18, 134:17, 137:16, 174:17, 175:10, 180:18, 181:23, 188:10, 202:13, 202:14, 202:21, 220:21, 225:20, 232:4
makes
79:3, 233:2
making
57:13, 126:5, 129:17, 129:24, 134:5
male
122:5, 122:8
males
32:20
malpractice
19:12
manage
75:1, 122:11, 133:12, 226:14
managed
122:17, 142:8
management
8:15, 8:18, 53:12, 54:15, 56:11, 58:16, 58:17, 58:21, 66:12, 66:19, 66:22, 93:17, 93:19, 95:7, 95:22, 96:11, 97:10, 97:17,

98:12, 127:11, 127:14, 127:21, 130:5, 134:7, 138:3, 138:6, 140:24, 187:19, 191:17, 201:7, 205:15, 206:10, 207:13, 213:7, 214:20, 223:8, 223:18
manager
73:19, 73:24, 74:2, 74:6, 74:8, 74:13, 75:13, 76:9, 76:18, 76:19, 81:11, 177:15, 187:17
manager's
75:5
managers
72:14, 72:17, 73:1, 73:5, 74:15, 74:23, 75:11, 76:1, 76:12, 148:16
manages
156:17
managing
76:23
mandate
64:5
mandatory
164:22, 178:8
manner
134:22, 165:21
manpower
224:5
manual
57:12, 127:12, 172:12
manuals
205:22
many
8:1, 10:12, 30:17, 35:21, 36:11, 36:21, 37:1, 37:8,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                                      86

38:16, 38:23,
39:9, 41:9,
41:13, 54:23,
128:6, 128:7,
130:5, 131:6,
141:17, 157:8,
158:10, 161:20,
203:13, 203:23,
204:9, 217:14,
228:7
**map**
30:22
**marked**
35:9, 35:11,
59:20, 59:24,
82:4, 82:7,
86:8, 87:6,
92:5, 92:7,
107:6, 140:16,
183:14, 183:17,
187:4, 189:10,
191:14, 192:8,
192:15, 192:21,
192:24, 210:3,
210:7, 215:21
**maryland**
162:3
**materials**
222:22, 222:23
**matter**
97:20
**matters**
6:4
**matticks**
1:18, 2:3, 4:3,
4:10, 4:11,
170:16
**may**
1:24, 7:12,
8:23, 10:24,
12:9, 26:15,
28:14, 42:15,
46:23, 47:1,
54:21, 55:1,
55:2, 55:19,
56:6, 56:18,
61:2, 65:8,
68:6, 68:17,

69:5, 74:24,
76:4, 79:7,
95:22, 96:3,
96:4, 96:22,
97:17, 97:22,
98:13, 99:19,
101:2, 102:15,
106:14, 106:15,
111:21, 121:8,
123:5, 123:6,
125:20, 125:21,
126:14, 126:17,
129:7, 130:17,
131:16, 133:20,
142:12, 146:12,
157:14, 167:5,
167:20, 173:8,
175:9, 180:9,
181:16, 185:3,
193:23, 194:19,
202:14, 202:19,
204:17, 230:3
**maybe**
36:13, 54:19,
78:2, 174:20,
199:6
**meaks**
6:22
**mean**
6:13, 8:16,
12:2, 12:14,
27:19, 28:6,
32:15, 51:11,
55:17, 64:3,
65:16, 69:12,
69:14, 73:6,
77:11, 88:19,
88:20, 93:17,
101:22, 106:5,
106:11, 115:7,
121:2, 122:14,
122:19, 123:8,
126:5, 128:15,
135:1, 135:12,
143:4, 143:8,
150:9, 157:5,
166:10, 166:23,
173:20, 176:9,

176:10, 180:3,
196:23, 197:3,
197:5, 197:12,
197:20, 198:7,
211:6, 215:11,
228:11, 232:20
**meaning**
79:5, 91:5,
180:23
**means**
69:15, 77:12,
115:13, 116:7,
120:23, 122:22,
122:23, 124:7,
124:12, 125:7,
126:2, 126:13,
127:4, 135:2,
135:5, 162:24,
196:24, 197:4,
197:23, 234:9
**meant**
12:15, 16:23,
32:6, 180:12,
180:15
**medicaid**
174:5
**medically**
89:19, 90:8,
90:12, 91:5,
91:10, 91:14,
91:20, 93:15,
94:24, 98:6,
99:16, 122:20,
123:9, 123:18,
124:1, 124:7,
124:13, 125:8,
126:2, 126:12,
126:16, 127:1,
127:4, 136:5,
144:18, 157:13,
195:3, 224:6,
225:6, 229:18
**medication**
105:3, 112:11,
121:11, 167:3,
167:7, 172:2
**medications**
5:21, 98:13,

100:6, 100:9,
100:15, 112:8,
112:9, 112:13,
113:2
**medicine**
14:10, 14:12,
14:13, 23:3,
23:10, 23:12,
24:3, 27:6,
27:11, 27:13,
29:18, 29:22,
30:1, 30:9,
31:4, 31:7,
31:15, 32:8,
33:14, 33:20,
33:24, 34:3,
34:8, 34:15,
34:22, 35:7,
193:24, 197:5,
219:24
**meet**
19:15, 123:13,
142:5, 161:6
**meeting**
6:18, 53:1,
72:4, 157:16,
158:9, 161:12,
176:18, 176:22,
177:6, 226:9
**meetings**
6:16, 7:2,
71:17, 71:18,
72:9, 75:10,
125:2, 125:16,
144:8, 155:13,
161:9, 167:21,
172:15, 172:22,
176:7, 176:24,
221:15
**meets**
143:11, 168:20,
206:7
**member**
11:11, 71:5,
124:11, 161:1,
161:3, 232:17,
232:21
**members**
65:6, 65:9,

159:17, 159:18,
159:23, 160:15,
161:18
**memorial**
146:10, 147:2,
147:4
**memory**
169:20
**menard**
14:22, 18:3,
18:7, 18:21,
32:17, 32:21
**mental**
46:13, 46:22,
47:5, 67:21,
68:7, 83:17,
84:1, 113:8,
118:20, 118:23,
118:24, 135:10,
135:17, 177:13,
203:11, 203:23,
204:9
**mentioned**
55:12, 65:24,
221:8, 225:23
**merit**
158:12
**met**
52:21, 72:17
**method**
163:3
**methods**
65:8, 65:9,
140:4
**michigan**
30:15
**mid**
202:13, 202:20,
203:17
**might**
12:17, 55:13,
79:5, 93:23,
125:17, 128:20,
149:7, 157:13,
158:9, 182:6
**mild**
100:2
**million**
149:21

**mine**
15:16, 19:10,
131:6
**minimum**
179:15
**minute**
92:11, 101:4,
127:19, 158:16,
188:22
**minutes**
199:5
**mirrors**
164:7
**mis**
66:20, 66:21
**misdemeanor**
218:10, 218:12
**miss**
52:16, 52:21
**mississippi**
30:3, 30:5,
162:8
**missouri**
30:3, 30:5,
30:16
**misstatement**
119:12
**misstates**
116:2, 117:2,
119:10
**mo**
3:24
**modality**
103:9
**moderate**
100:2
**modifications**
45:6
**modified**
32:2, 32:14,
186:20
**moment**
63:7, 184:20
**monetary**
153:20
**money**
43:20, 43:23,
44:5, 44:10,

65:21, 130:22,
131:5, 175:2,
175:6, 182:4,
229:12
**monitoring**
215:9
**monthly**
65:20, 157:16,
167:21, 176:4,
176:6, 176:19,
176:23, 177:4
**months**
18:8, 36:5,
40:16, 43:3,
194:23
**more**
6:15, 16:9,
17:11, 22:9,
42:16, 69:2,
70:9, 72:10,
106:15, 108:15,
111:23, 123:7,
131:23, 133:4,
136:13, 158:20,
165:9, 165:10,
218:14, 226:24
**most**
9:14, 9:19,
36:23, 38:15,
41:19, 55:3,
67:10, 68:15,
81:21, 114:11,
134:12, 146:9,
147:9, 158:5,
183:3, 189:17,
222:15
**mostly**
47:12, 72:22,
75:1, 222:14
**move**
4:16
**moved**
20:18
**mri**
145:22, 146:3,
146:8, 146:23,
206:3, 208:24
**mri's**
132:24, 197:2

**much**
7:9, 9:18,
79:9, 108:18,
131:5, 150:12,
150:20, 151:6,
151:12, 151:18,
172:21, 175:8
**muddy**
131:18
**multiple**
51:2, 75:17
**muscle**
107:15, 108:13
**must**
96:14, 96:17,
105:18, 110:1,
112:18, 120:22,
137:11, 137:14,
172:16, 205:16
**mutual**
21:23
**myself**
89:12, 126:20,
149:13

**N**
**name**
4:8, 42:4,
42:10, 42:14,
42:19, 74:10,
148:14, 231:20
**named**
36:19, 36:22,
38:15, 38:17,
39:6, 39:9,
170:7
**national**
9:10, 24:5,
24:6, 27:24
**nature**
54:16, 64:11,
106:17, 126:7
**navigate**
126:22
**ncchc**
24:22, 25:7,
28:10, 77:4,
77:6, 77:12,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                          88

77:23, 78:6,
78:11, 78:13,
78:18, 78:20,
78:22, 79:1,
79:2, 79:21,
79:23, 80:17,
81:2, 86:7,
136:14
**near-miss**
165:16, 166:24
**nearest**
128:23
**nebraska**
30:15
**necessarily**
54:8, 73:16,
83:5, 109:3,
126:7, 128:14,
128:19, 157:22,
207:16, 224:21
**necessary**
7:18, 12:1,
62:23, 63:21,
64:1, 64:10,
64:22, 65:2,
83:1, 89:20,
90:8, 90:12,
91:6, 91:10,
91:14, 91:20,
92:4, 93:15,
94:24, 96:12,
98:6, 99:16,
106:22, 109:18,
114:19, 122:20,
122:22, 123:9,
123:18, 124:2,
124:7, 124:13,
125:8, 126:3,
126:13, 126:16,
127:2, 127:4,
138:17, 142:4,
143:11, 157:10,
157:13, 179:9,
182:7, 186:20,
195:4, 206:21,
224:6, 224:20,
225:6, 229:18
**necessitates**
198:6

**necessity**
123:3, 124:24,
206:22
**need**
9:2, 9:4, 12:3,
30:21, 60:5,
69:11, 79:6,
101:24, 106:7,
114:13, 122:15,
130:19, 133:22,
137:16, 142:12,
161:9, 168:20,
182:24, 192:11,
197:19, 197:22,
198:2, 206:22
**needed**
12:5, 12:7,
16:20, 56:20,
127:5
**needs**
19:15, 121:6,
123:14, 124:24,
125:23, 128:7,
129:8, 129:11,
163:9
**negative**
118:6
**negotiated**
180:21, 181:17
**neither**
234:12
**nerve**
107:14, 108:11
**nerves**
107:23
**network**
127:21
**neurologic**
107:8, 107:11,
107:17, 107:21,
108:6, 108:10,
108:14, 109:7,
109:8
**neurological**
41:4, 109:4,
109:10, 109:16,
109:20, 131:24,
132:1, 209:9,

217:12, 224:10,
224:16, 224:20,
224:24
**neurology**
93:19, 94:5,
94:12, 95:10,
107:4, 209:4
**neuropathic**
106:13
**neurosurgeons**
132:15
**neurosurgery**
132:10, 209:5
**new**
161:10
**next**
5:12, 5:16,
19:17, 100:15,
104:10, 105:21,
111:4, 112:10,
127:19, 139:3,
142:20, 145:8,
166:4, 182:10,
187:2, 189:1
**nine**
18:8, 27:14,
49:13, 49:16,
49:20, 193:13,
208:10, 208:11
**nod**
5:9
**non-correctional**
11:20, 232:1
**non-emergent**
201:12
**non-hospital**
134:21, 135:2
**non-idoc**
10:9
**non-physicians**
160:9
**non-steroidal**
104:17
**non-voting**
160:14
**none**
37:16, 38:13,
87:24, 161:15,

172:10, 190:21,
191:5, 191:16,
192:1, 192:9,
192:17, 204:17,
209:2, 209:7,
209:11, 209:15,
216:4
**nonetheless**
45:24
**nor**
234:13
**normally**
45:3
**north**
1:26, 3:22,
10:16, 136:11
**northern**
8:6
**nos**
59:20
**notary**
1:23
**notation**
202:22
**note**
52:3, 52:4,
52:5, 52:7
**noted**
53:16, 93:9,
223:22
**notes**
135:16, 135:17,
135:19, 172:15,
217:9
**nothing**
56:8, 89:3,
181:9, 211:7,
211:14, 233:1,
233:11, 234:8
**notice**
35:11, 46:9,
171:20
**notification**
141:10, 141:13
**november**
227:16
**now**
14:19, 34:10,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                              89

35:3, 38:2,
42:16, 60:7,
77:20, 86:16,
90:1, 97:9,
110:4, 136:14,
158:22, 176:1,
194:6
**nsaid**
104:16
**nsaids**
104:11, 104:19
**null**
178:20
**number**
45:5, 47:10,
48:10, 60:20,
105:15, 134:10,
147:16, 153:6,
153:21, 164:1,
173:1, 173:4,
174:12, 175:4,
175:5, 175:14,
181:3, 185:17,
185:18, 186:6,
186:9, 188:3,
222:11, 231:10,
231:16
**numbering**
87:3
**numbers**
45:19, 158:15,
176:17, 177:24,
215:10
**numbness**
51:3
**nurse**
18:19, 74:17,
160:5, 231:1,
231:2
**nurses**
74:21, 75:12,
114:12, 114:13,
116:19, 121:4,
206:10, 212:21,
212:24, 221:3
**nursing**
50:24, 74:16,
85:16, 116:14,

116:17, 209:20,
212:19, 221:5

---
O
---
**oath**
4:4
**object**
132:4, 149:23,
170:2, 188:22,
190:8, 228:17
**objecting**
189:12
**objection**
55:9, 62:6,
81:4, 84:17,
94:16, 95:1,
102:5, 102:23,
106:23, 116:1,
117:1, 119:7,
150:4, 211:12,
222:4, 223:13,
223:19, 230:21,
231:13
**objections**
102:12, 229:1
**objective**
52:1
**obligations**
219:6
**obliged**
85:1, 111:12
**observation**
197:8
**observe**
126:24
**observing**
226:12
**obtain**
22:24, 24:15,
26:6, 34:2,
34:21, 106:22
**obtained**
31:7, 31:9,
96:14, 96:15,
142:12
**obtaining**
78:5, 222:18
**occur**
7:8, 9:15,

78:16, 80:2,
129:14, 167:5,
167:21, 174:10,
180:9, 215:10,
215:11, 225:16
**occurred**
112:19
**occurs**
71:3, 71:4,
98:18, 101:11,
176:22, 213:17
**off**
32:18, 45:12,
45:14, 60:7,
110:5, 110:8,
142:16, 188:13,
194:2, 199:8,
204:2
**off-site**
56:10, 58:15,
58:22, 59:5,
62:24, 63:19,
64:1, 64:6,
64:9, 64:20,
67:23, 69:10,
90:20, 95:23,
122:11, 122:16,
123:5, 127:22,
128:2, 128:17,
129:6, 137:12,
137:15, 139:6,
139:10, 146:4,
146:16, 146:23,
191:21, 214:19,
215:11
**offender**
67:2, 82:10,
89:17, 90:2,
90:6, 113:24,
115:17, 117:18,
118:20, 135:9,
140:8
**offenders**
66:13, 66:20,
67:16, 89:18,
111:7, 112:2,
139:5
**offer**
115:17, 115:22,

121:13
**offers**
57:12
**office**
9:6, 9:16,
17:17, 52:17,
52:22, 72:1,
81:6, 128:13,
135:3, 138:1,
173:9, 173:10
**officer**
170:7, 171:13,
211:19
**officers**
168:5, 168:8,
169:1, 169:6,
169:12, 170:1,
170:11, 170:18,
171:3, 171:9,
172:8
**offices**
1:25, 63:1,
63:21, 64:22,
134:17
**often**
27:5, 180:18
**oh**
30:21, 38:19,
66:6, 66:14,
69:12, 90:1,
95:7, 98:7,
105:20, 112:6,
121:18, 128:21,
155:3, 159:6,
160:16, 176:2,
180:5, 184:15,
186:2, 188:8,
210:23, 213:23,
218:16, 227:13,
228:13
**ohio**
30:17
**ohs**
177:10
**oklahoma**
30:15
**on-call**
15:22, 16:18,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

90

20:4
**on-site**
12:6, 12:17,
12:19, 13:1,
13:4, 20:3,
20:24, 26:2,
58:19, 62:23,
67:21, 68:1,
68:15, 69:4,
69:9, 71:5,
74:22, 78:16,
83:10, 83:15,
83:22, 84:5,
88:4, 88:9,
137:7, 137:10,
137:12, 145:12,
145:14, 145:19,
145:23, 146:18,
164:15, 165:18,
191:9, 201:15,
202:16, 204:23,
206:17, 213:3,
215:10, 216:10,
216:15, 216:21,
217:1
**once**
45:8, 68:8,
71:24, 77:15,
78:10, 111:8,
113:10, 117:13,
122:23, 139:21,
147:18, 165:4,
178:2, 188:6,
196:14, 203:3
**one**
4:20, 5:12,
8:2, 10:13,
10:15, 11:8,
13:5, 16:9,
27:2, 35:11,
37:9, 38:24,
39:15, 40:19,
41:19, 41:20,
42:16, 45:19,
46:4, 46:20,
47:10, 48:3,
48:10, 49:19,
50:13, 52:20,

62:14, 69:2,
69:5, 71:23,
73:12, 74:4,
75:16, 75:18,
77:7, 81:18,
92:21, 93:6,
93:16, 93:24,
95:6, 95:20,
98:8, 107:22,
111:19, 124:16,
127:14, 127:16,
131:4, 131:9,
131:10, 131:23,
132:7, 133:4,
133:20, 139:16,
143:21, 155:16,
155:17, 158:16,
160:21, 162:23,
167:6, 167:7,
167:20, 171:22,
172:15, 172:23,
174:17, 176:8,
179:10, 179:12,
184:10, 184:20,
185:5, 192:12,
194:11, 200:22,
201:20, 202:2,
202:4, 204:13,
204:20, 204:24,
205:5, 208:1,
208:11, 212:18,
212:20, 216:5,
218:18, 223:10,
225:19, 227:13,
227:19, 230:6
**ones**
28:22, 57:20,
77:7, 86:14,
96:10, 123:19,
134:15, 150:4,
155:23, 158:11,
158:12, 175:22,
229:6
**ongoing**
26:15, 27:9,
43:17, 56:17,
71:8, 77:13,
92:23, 113:4,

123:12, 125:16
**online**
34:24, 221:19,
222:12, 222:15,
222:16
**only**
11:23, 40:23,
48:4, 96:2,
124:23, 134:10,
139:15, 157:10,
157:11, 184:19,
186:10, 186:11,
194:22, 205:2,
213:4
**onto**
66:11
**operate**
83:16, 91:4,
162:7
**operates**
161:21
**operating**
61:14, 68:2
**operations**
10:22, 11:2,
25:17, 70:3,
72:23, 72:24,
73:10, 75:9,
75:15, 75:16,
75:22, 75:23,
76:22, 81:10,
81:11, 86:10,
88:24, 148:4,
148:5, 148:10,
158:21, 159:4,
159:19, 160:2,
160:9, 160:22,
163:16, 172:12,
190:14
**ophthalmological**
62:16, 137:8
**opinion**
51:7, 51:17,
102:18, 232:6
**opportunities**
167:22, 222:11
**opportunity**
15:24, 32:16,

32:18, 92:24,
125:17, 144:10,
188:16, 216:18
**opposed**
41:7, 41:15,
174:11, 233:3
**option**
93:18, 96:22,
97:5, 98:11,
99:18
**options**
95:19, 95:21,
97:17, 97:22,
99:19, 101:12,
101:14
**optometric**
62:16
**order**
34:21, 50:8,
120:20, 140:5,
179:20
**ordered**
229:19
**organizational**
76:21
**organizations**
28:11
**orient**
7:15
**orientation**
56:17, 71:3,
71:4, 101:11,
125:15, 126:11,
126:21, 144:7,
221:13, 226:8
**orthopedic**
41:4, 41:5,
133:4, 134:9
**others**
28:12, 28:21,
54:1, 65:13,
72:21, 73:3,
127:13, 137:9,
149:19
**otherwise**
218:5
**our**
5:10, 6:16,

55:20, 68:19,
87:1, 93:23,
103:18, 107:1,
109:17, 113:19,
115:10, 119:23,
124:16, 125:2,
126:22, 127:5,
130:19, 131:21,
134:11, 137:14,
142:7, 142:10,
142:13, 170:6,
193:19, 203:16
**out**
9:5, 15:19,
34:9, 43:23,
46:4, 48:3,
50:21, 52:7,
59:15, 65:13,
67:11, 99:24,
111:16, 111:17,
115:4, 143:18,
147:7, 149:19,
159:19, 175:23,
176:6, 177:24,
189:5, 189:9,
200:22, 206:3,
206:10, 207:11,
216:20
**outcome**
43:8, 43:10
**outcomes**
200:13
**outline**
176:17
**outlined**
27:10, 108:24
**outlines**
114:18, 127:14
**outpatient**
62:24, 63:20,
64:21, 147:10,
173:1, 173:8,
173:13
**outside**
10:1, 22:2,
22:7, 22:15,
129:2, 140:1,
147:9, 164:12,

164:18, 170:3,
170:12, 173:4,
173:10, 182:8,
219:10, 219:12,
231:24, 232:3
**over**
4:14, 6:3,
17:7, 20:14,
40:19, 45:7,
71:6, 76:2,
131:10, 149:20,
184:18, 194:18,
211:1, 225:16,
226:10, 226:11,
230:17
**overall**
163:1
**override**
221:21
**overseeing**
11:1, 11:11
**oversight**
9:15, 9:18,
10:14, 16:17,
64:17, 72:15,
179:2
**overview**
78:9
**owe**
175:6
**own**
43:24, 57:16,
72:8, 176:16,
213:5

---

**P**

**p**
166:4
**pace**
226:24
**page**
2:4, 60:19,
62:2, 66:4,
66:6, 82:18,
87:5, 89:17,
89:22, 94:6,
99:14, 99:16,
104:12, 107:3,

110:14, 111:4,
111:5, 117:12,
121:20, 127:19,
137:20, 137:22,
138:15, 139:4,
141:9, 142:20,
145:8, 147:14,
147:23, 152:5,
153:8, 154:10,
164:1, 164:24,
166:4, 172:11,
174:19, 175:11,
177:17, 179:18,
182:10, 185:19,
187:8, 187:9,
193:2, 194:7,
195:12, 203:7,
206:24, 207:4,
210:19, 211:18,
212:3
**pages**
60:3, 170:5,
210:5, 227:9,
231:10, 231:17,
231:20
**paid**
43:23, 44:10,
65:20, 149:20,
151:7, 151:10,
151:12, 151:16,
151:18, 151:22,
152:8, 180:1,
182:4
**pain**
51:3, 93:4,
93:16, 93:19,
94:14, 94:22,
95:6, 97:9,
97:17, 97:19,
97:24, 98:12,
99:23, 100:2,
100:16, 100:21,
104:24, 105:6,
106:21, 192:15
**panel**
33:10
**paper**
122:2, 122:6,

231:20
**paperwork**
53:13
**paragraph**
62:21, 63:4,
63:8, 63:13,
105:21, 105:22,
136:17, 136:21,
136:23, 137:9,
137:23, 138:2,
147:16, 147:24,
195:17, 196:17,
196:20, 198:10,
198:16
**paralegal**
187:22, 188:2
**parameters**
205:24
**pardon**
25:5, 103:8,
152:1, 198:13
**parent**
154:3
**parentheses**
96:8
**part**
44:13, 73:1,
97:1, 103:18,
113:12, 113:17,
113:18, 114:16,
125:24, 126:7,
130:22, 156:19,
157:10, 186:17,
219:8, 221:15,
227:2
**part-time**
20:7, 20:9,
20:11, 21:15,
21:19, 203:15
**parted**
19:15
**participate**
9:24
**particular**
6:4, 12:8,
16:20, 44:22,
44:23, 55:2,
56:22, 68:5,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                                        92

69:16, 86:13,
88:16, 93:12,
95:3, 96:4,
97:15, 103:3,
107:12, 109:22,
121:9, 128:7,
134:2, 135:22,
141:23, 141:24,
143:6, 143:16,
144:14, 145:6,
163:2, 168:10,
180:7, 184:18,
184:20, 185:3,
185:6, 185:14,
186:22, 228:5
**particularly**
48:7, 61:12,
107:17, 107:19,
125:1, 189:23,
189:24, 196:3,
198:15, 226:13
**parties**
46:12, 48:4,
48:23, 234:14,
234:17
**parts**
22:10
**passes**
67:12
**past**
136:12, 225:19
**pathway**
106:2
**patient's**
12:10, 51:24,
54:7, 54:24,
55:6, 69:17,
101:1, 102:2,
102:3, 102:20,
103:24, 104:4,
105:2, 106:20,
109:1, 185:3,
185:15, 192:14,
195:5, 198:19,
199:21, 206:7,
219:14
**patient-oriented**
135:13

**patient-related**
135:15
**patients**
22:15, 56:20,
63:19, 64:9,
64:20, 65:19,
67:14, 67:16,
68:19, 87:1,
103:19, 112:4,
112:24, 126:22,
128:2, 130:19,
131:2, 131:3,
131:6, 131:21,
132:1, 132:2,
132:11, 132:24,
133:5, 133:6,
134:11, 137:15,
142:10, 146:7,
162:14, 166:14,
174:3, 175:23,
200:6, 212:22,
215:1, 216:1,
232:4
**pay**
44:5, 134:21,
135:2, 174:23
**payment**
150:13
**payments**
65:14, 151:24,
152:2
**peer**
178:1, 179:11,
179:12, 179:22,
182:14, 182:16,
182:21, 183:8,
184:1, 184:16,
186:16, 227:3,
227:20, 231:11,
231:12, 231:16
**penicillin**
198:3
**people**
60:20, 67:16,
74:4, 81:12,
111:18, 125:18,
134:10, 147:16,
148:20, 148:21,

149:12
**peoria**
15:19, 175:21
**perform**
107:7, 108:23,
109:6, 151:7,
161:14, 220:18,
230:6
**performance**
152:21, 153:4,
232:21
**performed**
109:9, 200:10
**perhaps**
28:10, 47:21,
79:10, 217:15
**period**
13:5, 32:10,
71:4, 71:5,
126:21, 138:2,
156:4, 184:18,
194:18, 194:19,
204:11, 214:13,
225:16, 226:20
**periodic**
181:21
**periods**
221:13
**peripherally**
10:19, 11:9
**permissive**
69:5
**permit**
59:2
**permitting**
58:11
**person**
8:3, 123:3,
134:5, 148:7,
149:2, 160:2,
160:5, 165:10,
165:13, 183:8,
184:3, 211:21,
226:1
**personnel**
73:15
**pertaining**
89:3, 209:9

**pertains**
48:17, 76:8,
87:18, 106:24
**petition**
33:2
**pharmacy**
17:17, 29:3
**phrase**
55:12, 114:4,
121:3, 122:21,
126:12, 155:1,
166:2, 197:10,
203:18, 203:24
**physical**
106:8, 106:11
**physician**
9:5, 12:20,
13:1, 13:5,
14:4, 14:15,
14:18, 14:21,
17:5, 17:16,
18:3, 18:12,
54:3, 54:5,
55:14, 63:1,
63:21, 85:16,
89:13, 91:8,
94:13, 94:22,
98:4, 103:3,
103:4, 103:15,
104:20, 105:9,
106:20, 109:5,
122:24, 124:3,
124:11, 124:14,
126:1, 134:3,
138:9, 139:13,
139:15, 143:5,
143:9, 157:15,
160:3, 168:24,
183:5, 185:8,
200:11, 201:1,
201:16, 202:14,
219:20, 220:4,
220:8, 224:3
**physician's**
64:22, 104:1,
123:16, 123:24
**physicians**
7:19, 18:16,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                                93

18:18, 20:5,
20:6, 27:18,
85:20, 103:22,
134:7, 159:23,
182:17, 194:8,
195:22, 196:9,
198:19, 200:16,
229:17, 232:5
**pick**
226:24
**picks**
128:22
**piece**
58:18, 105:4,
194:1
**pinckneyville**
131:18
**pittburgh**
9:16
**pittsburgh**
9:6, 159:20
**place**
57:11, 75:4,
99:8, 99:13,
114:15, 129:5,
131:23, 146:6,
166:24, 167:4,
167:13, 167:16,
168:11, 174:13,
186:24, 207:24,
208:13, 213:11
**placed**
31:21
**places**
97:12
**plaintiff**
1:7, 3:10,
45:24
**plan**
12:11, 51:5,
51:13, 51:22,
52:1, 52:9,
52:11, 55:1,
55:23, 83:23,
103:5, 143:13,
185:7, 185:10,
185:11, 185:14,
186:19, 186:23,

194:15, 194:17,
201:2, 207:17,
207:19, 207:24,
220:19, 220:24
**planning**
111:6, 112:2,
112:15, 112:19,
112:23, 113:5,
113:12, 113:18,
113:24, 114:5,
114:11, 114:16,
115:8, 115:14,
115:17, 116:8,
116:21, 119:2,
121:2
**play**
8:14, 8:22,
8:23, 9:1, 10:5
**plays**
87:23
**please**
4:18, 5:7,
26:16, 107:24,
112:6, 116:4,
125:11, 138:12,
199:12, 206:24,
223:15, 230:1
**pled**
31:19, 218:9
**pocket**
43:24
**point**
19:13, 28:23,
53:5, 53:22,
55:3, 69:17,
93:6, 98:17,
98:21, 109:2,
109:21, 123:4,
123:14, 152:11,
177:2, 180:7,
204:15
**points**
84:9
**policy-making**
49:18
**population**
111:6, 112:2
**portion**
46:8, 63:12,

83:20, 94:20,
97:11, 118:3,
163:6, 164:10,
165:2
**portions**
50:12, 98:3,
106:18
**position**
15:14, 16:14,
20:18, 21:9,
124:15, 148:8,
220:15
**positions**
139:16
**possessing**
85:14
**possession**
81:1
**possibility**
93:20
**possible**
55:16, 91:7,
97:4, 108:1,
198:20, 232:14,
232:15
**potential**
106:6, 133:23
**power**
91:9
**practical**
224:1
**practically**
32:5
**practice**
14:15, 29:18,
29:22, 30:1,
30:8, 31:3,
31:7, 31:15,
32:7, 33:14,
33:19, 33:23,
34:3, 34:8,
34:15, 34:22,
35:6, 44:14,
55:24, 57:22,
59:12, 83:19,
104:6, 109:6,
196:1, 196:8,
196:11, 198:21,

219:18, 219:23,
220:2, 222:8,
222:9, 223:4,
228:1, 229:10
**practices**
48:5, 48:24,
75:3, 188:4,
193:22
**practitioner**
9:4, 18:20,
98:16, 98:24,
109:17, 122:23,
202:12, 202:14,
202:21, 203:19,
204:15, 204:21,
205:17, 209:24,
213:3
**practitioner's**
109:5
**practitioners**
90:17, 93:23,
193:20, 203:24,
204:9, 204:23,
206:16
**pre-planning**
111:20
**preparation**
50:2, 50:4,
50:15
**prepare**
50:8, 52:13
**prescribe**
198:1
**prescribing**
28:20
**prescription**
112:11, 121:11,
197:2
**presence**
107:16
**present**
3:30, 23:20,
25:11, 27:7,
52:24, 73:21,
74:11, 84:9,
98:1, 100:1,
145:6, 147:17,
161:15, 161:22,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

94

190:3, 200:23, 219:6
**presentation**
51:10, 51:12, 51:14, 92:2, 96:21, 98:22, 100:24, 109:2, 123:11
**presented**
32:16, 33:9, 50:11, 50:23, 93:23, 221:12
**presents**
92:21, 103:2, 197:1, 220:22
**president**
25:17, 72:23, 75:23, 81:10, 148:4, 148:10, 159:18, 160:1, 160:9
**presume**
126:9
**pretty**
7:9, 9:18, 10:18, 79:9, 108:18, 108:20, 116:9, 172:21, 175:8, 228:6
**previously**
34:15, 102:21
**price**
152:7
**pricing**
153:12, 153:13, 153:16
**primarily**
8:5, 11:11, 15:20, 29:2, 50:14, 70:15, 97:8, 112:3, 113:1, 158:14, 159:14, 204:20
**primary**
9:14, 64:2, 64:19, 84:2, 95:11, 95:15, 95:19, 159:17,

177:21, 179:13, 179:24, 180:24, 232:5, 232:12
**print**
189:5, 234:11
**prior**
14:2, 15:10, 35:18, 59:13, 79:22, 111:22, 112:8, 113:2, 119:13, 121:7, 125:4, 195:23, 196:9
**prison**
146:7, 166:18
**prisoner**
43:21, 138:22, 209:17, 212:16, 213:5, 224:2
**prisoner's**
172:1, 184:24, 194:12
**prisoners**
38:10, 130:14, 155:23, 156:4, 166:17, 190:4, 191:2, 191:21, 195:13, 208:16, 208:18, 208:21, 209:1, 209:5, 209:10, 214:18, 215:20, 218:22, 219:2, 219:9, 220:9, 221:5
**prisons**
10:5, 18:2, 25:8
**private**
14:15, 44:14, 218:19, 218:21, 219:18, 222:8, 222:9, 223:4
**probably**
41:21, 44:20, 133:17, 158:14, 188:10, 197:15, 198:8, 206:11, 209:24, 221:15,

232:24
**probation**
23:22, 31:22, 31:24, 32:6, 32:12, 32:19
**problem**
121:6, 135:15
**problems**
167:23
**procedural**
91:15
**procedure**
1:20, 35:14, 127:12, 146:18, 147:10, 156:8, 190:14, 201:14, 224:2
**procedures**
57:12, 57:18, 57:24, 70:7, 70:10, 75:14, 81:16, 86:11, 91:22, 92:8, 94:21, 99:8, 99:12, 101:6, 140:2, 140:10, 140:12, 141:1, 159:4, 160:23, 163:17, 170:22, 171:6, 171:10, 188:4, 189:1, 190:23, 191:18, 221:7, 221:11, 223:3, 224:9, 224:17, 226:11, 229:8
**process**
8:15, 8:18, 8:22, 10:6, 12:22, 78:4, 78:5, 78:10, 79:10, 80:4, 97:1, 101:11, 116:13, 134:19, 134:21, 135:24, 138:3, 138:6, 139:1, 162:23, 163:3, 163:5,

164:10, 172:15, 177:23, 179:17, 180:22, 184:22, 184:23, 186:17, 202:24, 205:16, 207:3, 212:16
**processes**
78:16, 179:21, 207:9
**produce**
217:20
**produced**
60:2, 92:8, 117:7, 159:5, 189:2, 189:5
**professionals**
37:15
**program**
14:11, 82:21, 83:17, 84:1, 88:3, 136:16, 167:13, 168:8, 168:23, 189:3, 206:14, 206:16, 206:20, 206:23
**programs**
84:21, 85:3, 85:6, 85:11, 85:20, 86:4, 101:16, 124:21, 168:19
**prohibiting**
56:8
**prohibits**
59:7
**promptly**
143:1
**promulgated**
82:8, 86:11, 202:20
**promulgates**
190:23
**properly**
138:18
**prospective**
7:17
**provide**
5:22, 6:3,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

95

6:15, 6:19,
7:18, 10:4,
10:8, 10:14,
10:17, 10:21,
11:24, 12:6,
12:17, 16:21,
16:22, 17:9,
17:21, 21:9,
32:9, 32:20,
46:2, 46:17,
47:1, 47:9,
47:23, 48:9,
48:12, 48:16,
48:20, 49:4,
49:7, 49:10,
49:15, 49:21,
50:2, 57:24,
58:9, 62:12,
62:23, 63:9,
65:5, 65:9,
65:18, 66:13,
66:20, 69:9,
70:2, 70:18,
71:8, 72:9,
78:19, 81:24,
84:2, 85:15,
87:1, 91:18,
91:22, 93:13,
94:21, 104:21,
109:19, 117:17,
118:14, 118:19,
119:21, 120:17,
121:10, 121:21,
125:15, 126:12,
127:6, 127:21,
128:9, 134:11,
136:4, 136:24,
138:17, 142:11,
142:16, 143:10,
144:6, 168:11,
168:13, 169:15,
170:17, 171:16,
171:23, 172:8,
180:19, 193:19,
204:19, 218:22,
219:1, 220:7,
221:2, 221:4,
222:20, 225:6,

230:15, 230:19
**provided**
9:24, 17:6,
18:19, 22:2,
22:7, 28:8,
29:1, 43:18,
47:5, 47:12,
47:13, 64:6,
65:6, 68:1,
68:14, 68:19,
69:4, 69:11,
71:13, 92:11,
100:16, 101:12,
102:21, 128:1,
129:6, 137:7,
137:10, 137:11,
137:16, 146:13,
171:18, 177:21,
180:6, 184:2,
186:11, 187:7,
191:9, 222:8,
222:24
**provider**
19:24, 20:1,
20:3, 24:10,
24:13, 25:4,
25:10, 26:7,
90:13, 99:21,
130:3, 135:22,
141:24, 164:19,
179:14, 179:23,
182:18, 188:24,
189:10, 193:16,
202:5, 203:16,
203:17, 214:1,
230:16, 230:19,
230:23
**providers**
27:19, 128:10,
130:9, 130:12,
131:23, 164:5,
164:13, 177:21,
180:1, 180:24,
203:13
**provides**
9:14, 9:18,
11:22, 62:21,
64:16, 71:16,

78:21, 84:1,
86:22, 88:15,
90:16, 92:19,
99:15, 109:9,
111:20, 120:3,
122:1, 125:6,
152:7, 168:12,
170:17, 170:21,
171:18, 181:21
**providing**
16:17, 17:5,
20:4, 22:14,
37:12, 37:23,
38:6, 67:20,
94:13, 98:4,
104:18, 118:4,
121:10, 132:10,
132:23, 173:12,
183:5, 205:7
**provision**
22:15, 60:14,
83:15, 88:9,
122:14, 131:24,
132:10, 133:5,
133:14, 139:21,
140:2, 142:23,
154:16, 154:20,
155:17, 158:4,
169:5, 169:21,
182:23, 184:17,
191:2, 191:13,
193:21, 208:24,
209:4
**provisions**
1:19, 47:20,
217:12
**prudent**
113:9
**psychologists**
85:17
**public**
1:23, 14:18,
29:8, 29:10,
31:19, 65:7,
65:10, 218:9
**publications**
222:19
**purpose**
67:8, 227:19

**purposes**
67:13, 78:14,
158:10, 227:19
**pursuant**
1:18, 35:12,
63:17, 158:3,
168:6
**pursue**
205:13
**put**
66:11, 75:4,
88:2, 110:3,
110:4, 158:21,
167:8, 167:15,
183:12, 187:1,
201:5, 207:24,
208:7, 209:20
**puts**
168:21

---

**Q**

**qi**
157:16, 158:9,
167:21, 176:18,
176:23
**quality**
89:3, 154:11,
154:15, 154:17,
155:9, 155:10,
155:18, 156:20,
156:23, 157:20,
172:18, 172:21,
181:10, 189:3,
189:6, 214:10,
231:12, 231:21
**quarter**
71:24
**quarterly**
6:16, 7:1,
71:17, 71:18,
71:19, 72:8,
75:10, 125:16,
144:8, 155:13,
161:8, 172:16,
221:14
**question**
4:23, 5:1,
5:13, 5:17,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

96

16:23, 22:9,
28:7, 40:6,
45:16, 58:18,
66:18, 69:1,
97:16, 98:10,
100:2, 100:15,
102:1, 105:24,
106:1, 108:3,
119:14, 119:15,
119:18, 120:7,
120:9, 120:10,
124:5, 125:19,
131:1, 136:18,
136:22, 150:1,
150:10, 172:6,
185:4, 189:13,
190:6, 190:7,
199:11, 199:15,
199:16, 204:7,
207:8, 208:12,
210:11, 214:14,
215:3, 228:12,
230:1, 230:2
**questions**
4:18, 7:13,
46:16, 46:23,
47:22, 50:4,
56:7, 58:5,
58:6, 60:5,
72:16, 76:14,
81:19, 82:1,
89:6, 92:22,
96:21, 187:6,
218:1, 222:10,
224:23, 226:21
**quick**
215:5
**quite**
182:22, 228:4
**quote**
68:6, 74:6,
124:1, 126:2,
126:12, 225:7,
225:8

**R**

**radiological**
132:23, 137:17,

145:9
**radiology**
146:13
**raise**
125:20, 182:3
**raises**
109:15
**rates**
19:12
**rather**
187:9
**re-accredit**
79:9
**re-read**
199:14
**reached**
96:17, 97:2
**reaches**
39:20
**read**
26:17, 26:19,
45:1, 46:5,
51:16, 51:18,
51:20, 83:20,
98:9, 98:10,
107:24, 108:2,
108:3, 108:4,
108:7, 113:14,
113:16, 119:13,
119:15, 120:8,
120:10, 120:12,
136:16, 136:19,
136:20, 144:20,
144:22, 165:2,
188:5, 188:9,
190:6, 190:7,
195:17, 196:14,
196:15, 199:16,
230:1, 230:2
**reading**
45:11, 66:8,
90:23, 115:21,
152:14, 188:8,
201:22
**reads**
137:24
**real**
54:22, 69:22,

215:4
**really**
30:23, 97:20,
98:12, 127:2,
127:16, 150:9,
197:16, 197:19,
206:11, 206:21,
227:10
**reask**
119:17
**reason**
31:11, 33:15,
40:2, 61:17,
62:5, 62:10,
80:18, 111:19,
133:20, 139:11,
150:16, 150:19,
150:24, 151:3,
151:9, 151:15,
151:21, 152:24,
153:2, 182:5,
213:16
**reasonable**
175:13
**reassess**
105:2
**reassurance**
197:4
**recall**
6:24, 13:7,
22:17, 22:22,
28:22, 36:23,
37:16, 38:9,
38:13, 38:24,
39:23, 40:24,
41:12, 43:10,
43:22, 50:20,
53:6, 53:11,
53:18, 59:17,
62:13, 66:3,
73:4, 74:10,
77:9, 78:1,
78:2, 80:15,
80:20, 80:24,
101:22, 140:11,
146:12, 146:14,
149:7, 160:12,
161:15, 167:16,

167:19, 169:7,
191:5, 192:1,
192:9, 204:17,
208:22, 214:5,
214:8, 214:16,
216:4
**recalling**
167:13
**receive**
63:19, 64:9,
101:9, 129:18,
142:9, 146:3,
153:23, 176:15,
176:19, 177:4,
180:24
**received**
150:13, 150:17,
150:20, 151:1,
152:20, 153:1,
153:3, 181:12,
210:10, 214:9
**receives**
65:14, 176:3,
176:11, 181:4
**receiving**
80:22
**recent**
41:19, 41:20
**recertification**
27:7
**recognition**
65:7
**recognize**
183:19
**recollection**
38:16, 53:20
**recommendation**
79:2, 212:6
**recommendations**
55:19, 129:12
**recommends**
98:12, 104:23
**record**
4:9, 5:10,
5:17, 40:5,
45:3, 45:12,
45:14, 46:12,
50:11, 50:12,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                          97

50:17, 53:23,
54:7, 54:17,
55:7, 93:3,
110:5, 110:8,
112:16, 121:21,
121:24, 135:9,
135:14, 135:20,
135:23, 185:7,
188:13, 194:2,
199:8, 199:10,
202:23, 204:3,
228:11
**records**
50:21, 53:8,
53:15, 54:22,
61:19, 74:24,
93:1, 122:5,
122:6, 134:14,
135:7, 135:24,
142:21, 142:24,
143:15, 143:17,
219:14, 223:6,
227:3, 227:15,
228:3, 228:5
**recruiting**
7:15, 7:16
**red-flag**
106:16
**redacted**
149:16
**redaction**
150:5
**redactions**
60:6, 150:7
**reduced**
234:10
**redundancy**
69:23
**reevaluate**
104:20
**refer**
60:6, 67:14,
88:20, 88:21,
90:18, 93:24,
95:18, 96:22,
96:24, 100:20,
100:21, 108:14,
115:20, 135:21,

137:9, 137:11,
138:4, 138:16,
141:22, 146:16,
149:17, 155:6,
182:20, 182:21,
193:2, 211:10,
212:12, 212:17,
212:21, 213:12,
213:16, 223:12,
223:17, 224:21,
229:10
**reference**
93:11, 107:13,
172:3, 205:20,
205:22, 211:24
**referenced**
70:10, 127:15
**references**
145:6, 212:7
**referencing**
61:21
**referral**
9:3, 93:14,
95:22, 96:1,
99:10, 101:13,
140:4, 140:7,
141:7, 164:18,
173:8, 201:12,
201:17, 201:24,
202:11, 202:13,
203:20, 205:3,
205:19, 207:14,
209:18, 213:1,
213:8, 214:18,
214:24, 215:19,
215:20, 216:1,
223:7, 223:8
**referrals**
99:16, 173:1,
173:13, 206:1,
215:13, 232:3
**referred**
56:4, 74:5,
89:18, 90:7,
92:22, 93:16,
94:23, 134:2,
141:14, 146:4,
146:8, 146:23,

164:12, 210:21,
213:6, 219:15,
221:13, 225:22
**referring**
11:20, 11:21,
11:23, 39:17,
50:17, 57:17,
57:21, 62:11,
67:3, 71:23,
84:19, 92:10,
96:9, 98:15,
100:23, 105:15,
114:2, 128:11,
136:23, 138:5,
141:18, 147:22,
154:23, 155:1,
165:7, 165:12,
166:6, 166:12,
166:16, 166:21,
186:6, 202:18,
203:16, 215:12,
229:14
**refers**
62:22, 85:2,
88:8, 99:24,
105:21, 114:6,
118:21, 135:13,
135:23, 137:13,
138:7, 140:2,
155:10, 165:9,
172:21, 177:8,
182:23, 202:6
**reflecting**
186:12
**reflexes**
107:15, 108:12
**refresh**
53:20
**regard**
72:16, 78:19,
78:21, 81:19,
92:20, 96:19,
125:20, 158:6,
158:11, 170:10,
171:11, 218:18,
220:17, 225:9,
226:7, 226:22
**regarded**
54:14

**regarding**
7:13, 40:4,
41:1, 42:18,
46:7, 57:4,
58:6, 71:12,
75:4, 84:10,
91:13, 92:22,
94:14, 96:21,
101:17, 102:20,
109:15, 131:24,
133:5, 133:13,
140:3, 141:23,
168:3, 169:2,
170:18, 171:19,
172:9, 177:20,
178:1, 179:2,
189:5, 190:20,
208:14, 208:24,
209:4, 211:2,
214:11, 214:18,
214:24, 215:19,
215:24, 217:11,
232:2
**regardless**
225:10
**region**
130:20, 136:11,
149:3
**regional**
6:11, 6:13,
7:4, 7:6, 7:21,
8:9, 8:12, 9:22,
11:10, 13:14,
13:15, 13:18,
25:23, 58:4,
72:17, 72:20,
72:24, 74:2,
76:12, 76:13,
76:17, 76:18,
76:19, 77:1,
78:6, 81:11,
126:20, 130:13,
131:13, 131:19,
148:3, 148:9,
148:16, 148:17,
159:15, 161:17,
177:14, 177:15,
200:2

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

98

regions
148:23, 148:24
regular
193:24
regulations
48:5, 49:1,
83:18
reinforce
124:23
relate
127:9
related
26:14, 28:10,
28:11, 28:14,
37:10, 37:11,
47:12, 81:22,
83:9, 107:18,
108:16, 135:4,
155:23, 156:1,
171:24, 180:16,
183:3, 191:8,
199:24, 234:13
relates
11:12, 46:14,
48:10, 48:14,
48:21, 49:11,
114:21, 115:14,
125:1, 199:2,
199:21
relating
209:12
relation
95:3
relationship
61:7, 229:4
relative
71:10, 167:14,
234:16
relayed
89:6
released
32:4, 32:23,
33:3, 33:5,
33:22, 113:23
relevant
47:1, 87:6,
94:4, 106:19
relief
43:14

rely
219:19, 220:3,
232:2
remained
23:19
remedied
167:23
remedy
167:4
remember
40:21, 42:4,
42:10, 42:14,
42:19, 219:10,
224:10, 227:24
removed
134:18
renders
178:19
renewed
152:8, 152:9
rep
39:3
repayment
44:18
repeat
98:7, 105:24
rephrase
4:19, 4:23,
150:10, 221:9
rephrased
190:11
report
7:18, 158:14,
167:4, 176:18,
230:14
reported
97:24
reporter
2:23, 3:32,
26:19, 35:10,
51:20, 59:23,
82:6, 92:6,
98:10, 108:3,
108:7, 119:16,
120:10, 120:12,
144:22, 183:16,
190:7, 199:17,
210:6, 230:2,

234:1, 234:4
reporting
97:24, 141:15,
167:3
reports
172:24, 176:4,
176:5, 176:6,
176:12, 176:15,
176:16, 176:20
represent
93:8
representation
170:13
representative
41:14, 188:21
representatives
142:6
represented
177:14
represents
143:5
request
9:7, 25:16,
54:15, 99:3,
99:10, 110:15,
111:22, 138:8,
172:1, 201:17,
201:24, 202:7,
202:11, 202:13,
202:15, 202:20,
203:20, 205:3,
205:11, 205:13,
205:20, 207:13,
207:23, 213:5,
213:8
requested
229:19
requesting
201:11
requests
110:18, 110:19,
110:20, 110:22,
111:1, 138:1,
138:8, 192:2,
192:6, 208:15,
213:1
require
34:24, 35:4,

47:1, 56:10,
58:15, 59:4,
68:14, 72:3,
96:10, 113:4,
113:17, 139:5,
143:24, 157:11,
194:20, 197:1
required
15:21, 26:4,
26:6, 26:12,
47:5, 56:23,
58:15, 66:18,
66:21, 69:3,
69:9, 69:16,
78:18, 78:22,
81:17, 82:16,
90:20, 91:24,
98:17, 113:11,
114:15, 116:12,
116:22, 118:13,
119:4, 119:20,
119:24, 123:6,
129:22, 131:20,
134:20, 135:22,
137:10, 140:3,
142:12, 142:24,
146:16, 146:22,
147:17, 148:17,
155:19, 156:20,
162:18, 164:13,
164:19, 172:24
requirement
27:22, 144:5,
144:11, 145:2,
164:7
requirements
135:8, 178:1
requires
27:7, 65:5,
70:1, 70:12,
70:21, 87:9,
89:18, 90:6,
103:15, 109:14,
112:17, 112:23,
117:17, 121:20,
122:10, 123:12,
127:20, 135:6,
136:3, 138:15,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

99

139:4, 139:10,
143:14, 143:17,
146:17, 162:14,
197:18
**requiring**
179:10
**requisite**
221:4
**reserved**
67:23
**residency**
14:11, 23:2,
23:5, 225:15,
225:19
**resolution**
103:7
**resolve**
7:12, 95:20,
97:18, 98:14,
99:19, 102:4,
102:22
**resolved**
100:17, 101:2,
101:19, 101:23,
104:10, 105:1,
158:7, 218:14
**resolves**
157:8
**resonance**
145:18
**resource**
228:15
**resources**
221:19, 222:13
**respect**
47:10, 122:7,
178:12
**respond**
138:1
**response**
5:2, 46:23,
47:22, 109:9,
150:4, 163:8,
167:11, 188:17,
201:2, 210:12,
210:18, 210:21,
211:8, 211:19,
211:22, 211:23

**responses**
47:2, 208:9
**responsibilities**
7:4, 7:7, 9:23,
11:14, 16:8,
16:18, 46:7,
66:10, 67:18,
76:5, 77:1,
84:4, 84:8,
148:22, 163:20,
216:14, 216:24,
217:5, 229:22
**responsibility**
11:1, 12:15,
13:23, 16:10,
63:18, 64:8,
64:19, 64:24,
65:17, 66:11,
68:2, 75:5,
76:2, 88:3,
127:24, 168:22,
169:11, 171:2,
171:8
**responsible**
7:9, 8:5,
11:11, 22:13,
71:21, 76:22,
81:12, 87:6,
87:13, 87:18,
88:23, 114:20,
114:24, 120:3,
120:16, 121:5,
139:9, 149:3,
156:2, 156:9,
163:6, 163:12,
163:17, 165:6,
165:17, 166:2,
168:7, 168:24,
169:24, 175:2,
176:11, 182:16
**rest**
47:3
**restate**
22:4, 118:7,
120:15, 190:5,
204:6
**restitution**
174:17

**restrict**
48:24
**restrictions**
32:11, 90:24,
91:1, 91:4
**result**
80:13, 231:15
**resulted**
43:20
**results**
81:2
**retain**
64:8, 156:10,
182:6
**retained**
110:23, 111:2
**retains**
171:8
**retake**
27:1, 27:2
**retention**
135:9, 181:9,
181:13
**retest**
26:21, 27:5,
27:11
**retire**
214:8
**return**
79:1, 142:11
**returning**
81:8
**review**
12:8, 12:10,
29:3, 45:7,
45:18, 50:21,
51:24, 53:7,
53:15, 53:20,
54:24, 56:10,
61:19, 63:8,
68:8, 68:9,
71:6, 75:13,
77:12, 77:13,
78:21, 92:24,
93:7, 101:13,
106:9, 110:15,
111:7, 124:17,
125:13, 125:21,

125:24, 126:4,
126:17, 139:20,
140:13, 141:2,
144:7, 147:18,
147:19, 155:19,
155:22, 156:19,
176:21, 177:16,
177:20, 178:1,
178:2, 179:3,
179:11, 179:12,
179:21, 182:15,
182:16, 183:8,
184:4, 184:17,
185:2, 185:6,
186:10, 186:11,
186:16, 186:17,
186:18, 188:16,
191:23, 195:22,
196:9, 202:24,
213:12, 213:15,
213:17, 215:9,
216:9, 216:18,
217:9, 222:9,
222:12, 223:6,
224:2, 224:20,
227:3, 227:20,
228:3, 231:11,
231:12, 231:16,
231:21
**reviewed**
50:8, 50:10,
50:12, 50:14,
50:16, 52:12,
82:24, 93:3,
157:15, 157:18,
157:24, 177:2,
185:4, 191:7,
199:19, 202:15,
209:23, 211:24,
213:6, 219:20,
228:5, 228:6
**reviewing**
51:5, 63:15,
68:10, 95:21,
111:9, 121:6,
126:5, 137:4,
139:22, 140:18,
141:6, 147:20,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

100

170:6, 178:6,
183:2, 188:7,
188:12, 195:19,
196:18, 199:23,
201:24, 216:16,
219:14, 222:18,
224:16, 225:3
**reviews**
157:2, 157:7,
179:22, 182:22,
184:1, 184:16
**revised**
82:24
**revisit**
199:11
**revoked**
31:11, 33:15
**rhonda**
75:18
**right**
23:8, 29:15,
34:9, 34:12,
35:24, 41:11,
59:10, 76:15,
79:18, 80:11,
80:14, 84:11,
96:15, 101:2,
104:6, 105:12,
105:17, 110:11,
128:18, 138:9,
142:1, 153:13,
153:24, 154:15,
156:21, 156:24,
160:3, 161:24,
164:8, 165:8,
166:3, 166:18,
173:14, 173:17,
179:17, 184:19,
186:5, 188:11,
188:15, 193:5,
194:9, 196:6,
198:22, 199:11,
201:5, 201:14,
203:20, 213:9,
222:23, 227:4,
227:17, 231:19,
231:22, 232:13,
233:12

**risk**
187:17, 187:19
**rockford**
175:21
**roderick**
1:17, 2:3, 4:3,
4:10
**role**
8:14, 8:22,
8:23, 8:24,
10:5, 37:6,
87:21, 129:5,
160:10
**roles**
9:13, 75:2,
230:10, 230:11
**ronald**
3:19
**room**
129:7
**rooms**
133:10, 142:6
**routine**
139:6
**rule**
5:12, 35:12,
35:13, 35:17,
36:3, 36:12,
42:24, 44:20,
59:13, 217:11,
217:17
**rules**
1:20, 4:15,
48:5, 49:1
**run**
165:20
**runs**
216:11
**rushville**
10:18, 11:10,
11:13, 11:23
**rx**
95:11, 95:12,
95:15, 95:17

---
**S**
---

**s-h-a-h**
220:13

**s-o-a-p**
52:8
**safe**
67:20, 136:24,
165:15, 166:12,
166:13, 166:14
**safety**
165:3
**said**
11:9, 11:24,
16:1, 19:2,
20:14, 23:11,
27:17, 29:6,
32:22, 34:14,
38:4, 38:14,
55:12, 55:13,
76:12, 85:4,
89:23, 91:8,
107:22, 114:9,
119:8, 125:10,
130:8, 133:18,
147:2, 159:9,
160:1, 174:23,
175:8, 181:16,
212:18, 234:8
**salaries**
182:7
**salary**
19:14, 180:8,
181:24, 182:3
**same**
42:7, 42:13,
43:12, 67:16,
79:10, 95:1,
102:12, 148:4,
150:6, 153:6,
165:20, 174:19,
175:11, 179:23,
210:18, 219:23,
220:2, 222:18,
229:1, 230:13
**sangamon**
17:5, 17:21,
19:20, 20:13,
20:16, 20:19,
20:24
**santos**
184:4

**sarah**
3:4
**sarah@loevy**
3:9
**sat**
4:11, 27:12,
36:2, 36:12,
37:2, 37:22,
38:4, 39:1,
59:14
**save**
229:12
**saw**
32:18, 55:17,
61:18, 93:10,
228:22
**say**
5:8, 11:19,
20:20, 32:14,
34:2, 46:21,
50:16, 55:17,
68:20, 89:21,
94:1, 94:7,
101:23, 101:24,
128:11, 133:21,
147:21, 148:13,
153:1, 157:24,
159:2, 173:19,
174:20, 221:24,
223:15, 228:22
**sayeth**
233:15
**saying**
39:15, 64:13,
102:2, 103:23,
113:16, 123:16,
178:11, 198:10
**says**
61:5, 68:17,
81:20, 99:6,
103:17, 106:4,
106:8, 106:11,
115:16, 117:21,
118:19, 138:21,
153:16, 179:20,
182:15, 185:17,
196:20, 231:16
**scale**
79:10

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                                101

schade
1:26, 3:20
schedule
134:15, 153:14
scheduled
51:1, 141:15
scheduling
67:10, 89:1,
182:16, 182:20
school
14:10, 14:12,
23:9, 225:13,
225:14
scope
82:22, 170:3,
170:12
screening
7:16
second
3:14, 5:5,
45:13, 82:18,
110:6, 147:15,
147:24, 150:21,
163:11, 187:8,
218:19, 232:6
secondary
95:12, 95:17,
95:21, 95:24,
96:1
section
46:9, 62:1,
62:2, 62:20,
63:3, 63:4,
66:4, 66:9,
66:16, 67:17,
67:18, 68:13,
69:21, 70:1,
70:4, 70:12,
70:20, 71:1,
83:8, 83:9,
83:20, 87:5,
89:16, 89:17,
90:2, 90:3,
93:17, 105:8,
105:13, 107:6,
110:15, 111:5,
111:7, 111:12,
111:15, 112:1,

113:21, 114:4,
114:17, 117:12,
118:2, 118:8,
118:11, 121:3,
121:15, 121:19,
121:20, 122:10,
127:8, 127:10,
127:20, 134:20,
135:6, 136:3,
136:15, 138:14,
139:4, 139:20,
140:19, 141:5,
142:3, 142:21,
142:22, 143:14,
143:16, 143:18,
145:9, 146:15,
147:15, 147:21,
147:24, 149:15,
153:12, 154:10,
154:14, 155:20,
162:22, 162:23,
163:5, 163:11,
164:11, 172:15,
177:24, 179:16,
182:13, 189:9,
195:16, 195:18,
196:13, 198:11,
198:14, 202:2,
202:3, 202:4,
202:6, 208:12
sections
135:14, 135:16,
135:17, 135:18,
143:21, 178:19
secure
11:20
see
30:14, 30:22,
46:8, 51:1,
53:12, 60:21,
62:18, 63:2,
70:4, 83:1,
83:9, 86:14,
89:20, 97:12,
107:9, 110:16,
127:22, 130:18,
131:2, 131:6,
131:21, 134:23,

135:21, 136:6,
138:23, 139:7,
140:18, 153:7,
153:17, 154:22,
167:12, 182:18,
185:17, 187:10,
189:17, 193:9,
196:21, 201:17,
201:18, 202:9,
210:12, 211:23,
212:5, 212:10,
223:10
seeing
140:11, 202:12
seek
24:21, 77:23,
78:11, 209:18
seeking
24:18, 78:5,
79:17
seems
116:9, 188:21
seen
44:22, 177:2,
209:21
seizure
114:10
select
128:1
selecting
129:5
selects
128:4, 134:6
self
19:13
send
130:2, 131:3,
142:16
senior
179:13
sensitive
179:21
sent
58:22, 64:20
sentence
137:24, 142:3,
194:12, 195:6
sentences
198:12, 198:16

separate
60:16, 174:1,
179:20, 180:8
sequential
227:14
serious
123:11
serve
13:4, 83:11,
160:10, 175:23
served
44:23, 161:3
serves
131:17
service
16:22, 65:20,
128:22, 134:11,
173:11, 181:10
services
1:11, 12:6,
14:20, 16:4,
17:10, 17:15,
17:17, 29:1,
62:23, 63:5,
65:5, 65:9,
65:12, 67:22,
67:23, 68:6,
68:7, 68:17,
68:19, 69:5,
69:8, 69:10,
72:1, 82:10,
82:20, 84:3,
87:1, 87:23,
88:3, 88:14,
89:19, 90:7,
90:11, 90:21,
91:10, 91:13,
91:19, 91:24,
93:15, 94:24,
98:5, 98:17,
106:22, 118:24,
121:21, 122:1,
122:11, 122:16,
122:17, 127:15,
127:22, 128:1,
128:5, 129:6,
129:18, 131:20,
131:24, 132:1,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                   102

132:11, 132:24,
134:22, 135:3,
135:4, 135:10,
136:4, 136:17,
137:6, 137:14,
139:5, 142:10,
142:12, 142:15,
145:9, 145:14,
146:11, 146:14,
154:11, 162:16,
163:14, 173:5,
174:5, 174:24,
175:1, 175:4,
175:6, 177:21,
180:16, 183:5,
191:9, 191:13,
209:5
**serving**
7:2, 12:19,
88:10
**set**
115:4, 135:20,
159:3, 176:6
**sets**
111:15, 111:17,
207:11
**setting**
29:15, 232:4,
232:8
**settle**
43:24, 44:10
**seven**
21:14, 27:8,
49:8, 137:20,
140:21, 141:4,
141:9, 185:17,
186:6, 201:8,
214:21, 215:21,
216:3
**several**
4:11
**severe**
106:15
**severity**
104:20
**shah**
51:1, 51:2,
51:4, 51:8,

51:13, 53:4,
53:9, 53:21,
93:10, 186:13,
204:21, 205:2,
213:24, 220:11,
223:7, 223:22,
227:3, 228:23
**shah's**
211:9, 212:12
**shake**
5:9
**shall**
82:21, 83:11,
83:12, 83:16,
83:23, 89:18,
90:6, 113:23,
136:24, 138:1
**shannis**
148:11
**share**
7:6
**shared**
229:22, 230:4,
230:12
**shaw**
3:27
**shawnee**
131:18
**she**
74:12, 188:21,
201:2, 210:21,
228:11, 228:15
**shelby**
31:20
**shicker**
6:24, 66:1
**shorter**
194:19
**should**
47:21, 55:17,
81:18, 82:1,
90:18, 94:23,
95:19, 102:4,
103:17, 109:8,
109:18, 110:23,
112:17, 115:3,
115:20, 120:6,
122:17, 125:3,

137:14, 144:19,
150:9, 182:8,
194:8, 195:22,
197:13, 198:19,
200:7, 200:11,
200:14, 200:18,
201:1, 215:13,
219:9, 219:15,
224:22, 225:5
**shouldn't**
197:19
**sic**
193:13, 225:17
**sick**
50:24, 110:15,
110:18, 110:19,
186:10, 192:2,
209:21, 212:19
**side**
4:22, 22:1,
22:6, 47:6,
105:12, 158:22,
182:1, 183:13,
189:7, 201:6,
203:11, 203:22,
204:8, 208:7
**sides**
39:20
**sign-on**
44:18, 181:18
**signature**
233:16
**signature-c3wsm**
234:20
**signed**
60:20, 61:3,
184:3, 187:12
**significance**
54:22, 96:6
**significant**
69:22, 158:13
**signification**
153:20
**similar**
65:5, 65:6,
179:11, 179:12,
219:9
**similarly**
5:15, 200:11

**simply**
100:21, 182:20
**since**
36:10, 38:4,
38:17, 45:4,
161:5
**single**
182:18
**sit**
34:20, 35:5,
37:5, 37:14,
37:17, 126:15,
167:17, 167:19
**site**
9:3, 16:20,
43:17, 54:5,
56:22, 72:14,
73:5, 73:12,
73:19, 73:24,
74:1, 74:6,
74:8, 74:13,
74:15, 74:23,
75:4, 75:11,
75:13, 76:1,
76:3, 76:9,
79:23, 80:5,
80:13, 80:18,
81:3, 82:1,
83:4, 87:17,
88:12, 88:16,
88:18, 88:24,
90:18, 128:1,
128:6, 129:18,
130:3, 133:15,
133:17, 134:1,
134:6, 137:15,
138:8, 139:12,
154:18, 155:10,
156:24, 163:18,
163:21, 164:16,
165:7, 165:10,
181:13, 201:21,
201:23, 202:5,
202:6, 202:14,
202:19, 207:2,
207:9
**site-specific**
131:14

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                           103

| | | | |
|---|---|---|---|
| **sites** | 50:11, 51:4, | 129:16, 160:13, | **sorts** |
| 86:12, 146:11, | 54:18, 54:20, | 179:11, 179:13, | 55:4, 160:18 |
| 183:3 | 55:18, 56:11, | 196:24, 202:1 | **sounds** |
| **situation** | 57:13, 57:22, | **someplace** | 175:8 |
| 96:5, 123:10, | 60:3, 60:5, | 146:13 | **source** |
| 123:11, 129:2, | 61:10, 65:21, | **something** | 112:9 |
| 129:16, 129:20, | 71:16, 72:15, | 4:24, 33:1, | **sources** |
| 129:22, 167:5, | 73:18, 75:12, | 54:15, 54:16, | 15:9, 35:18, |
| 201:19, 201:23, | 76:4, 77:14, | 97:13, 106:15, | 36:16, 60:14, |
| 215:14 | 78:19, 81:24, | 106:16, 123:8, | 61:1, 61:9, |
| **situations** | 85:17, 86:23, | 123:17, 124:1, | 154:4 |
| 94:4, 139:7 | 86:24, 91:22, | 124:7, 124:12, | **south** |
| **six** | 92:4, 96:2, | 125:8, 126:2, | 3:14 |
| 15:7, 21:14, | 96:3, 96:10, | 131:10, 135:23, | **southern** |
| 40:16, 43:3, | 96:19, 97:17, | 194:22, 223:3, | 1:2, 7:9, |
| 48:23, 49:5, | 97:18, 98:12, | 228:22 | 10:13, 13:23, |
| 92:7, 93:11, | 98:13, 99:18, | **sometime** | 14:9, 14:12, |
| 110:15, 127:20, | 103:8, 105:22, | 79:22, 80:8 | 23:7, 23:9, |
| 152:18, 152:22, | 106:13, 106:14, | **sometimes** | 175:16 |
| 217:15 | 111:21, 113:3, | 129:11, 161:8, | **southwestern** |
| **skills** | 122:2, 124:8, | 182:1, 204:19 | 38:11, 48:6, |
| 225:16 | 127:15, 128:9, | **somewhere** | 49:2, 56:1, |
| **slow** | 136:12, 137:8, | 55:7, 173:21, | 59:16, 67:5, |
| 15:23 | 141:12, 142:4, | 183:4 | 73:20, 74:9, |
| **smaller** | 157:11, 165:19, | **sore** | 77:3, 77:22, |
| 79:10 | 173:9, 174:13, | 197:24 | 79:11, 80:17, |
| **soap** | 174:17, 181:8, | **sorry** | 80:21, 84:10, |
| 52:2, 52:4, | 181:14, 181:24, | 26:18, 38:1, | 85:6, 85:23, |
| 52:7, 143:11 | 185:13, 186:23, | 40:7, 55:14, | 116:16, 130:12, |
| **software** | 188:19, 193:22, | 62:14, 63:3, | 132:2, 132:12, |
| 67:1 | 193:23, 204:19, | 66:14, 73:6, | 133:1, 133:6, |
| **sole** | 205:7, 206:11, | 74:2, 74:10, | 145:13, 145:19, |
| 20:1, 20:3, | 218:2, 232:11 | 89:21, 95:7, | 145:23, 146:22, |
| 123:16, 213:3 | **somebody** | 98:7, 105:11, | 149:3, 167:9, |
| **solely** | 12:4, 58:6, | 105:16, 105:23, | 167:14, 175:24, |
| 20:23 | 102:14, 124:14, | 112:6, 119:8, | 176:20, 179:4, |
| **solidly** | 126:15, 128:22, | 121:19, 132:21, | 179:7, 189:15, |
| 125:4 | 129:8, 138:4, | 159:9, 185:10, | 191:14, 203:8, |
| **some** | 184:12, 194:17, | 198:13, 204:2, | 203:14, 204:1, |
| 6:19, 10:14, | 226:4, 230:16 | 207:4, 207:10, | 204:10, 205:1, |
| 10:17, 12:7, | **somebody's** | 207:20, 210:23, | 208:13, 213:19, |
| 14:16, 14:21, | 64:6 | 215:17, 220:1 | 217:1, 217:6, |
| 15:1, 16:20, | **someone** | **sort** | 220:8, 221:3, |
| 18:1, 18:18, | 15:15, 19:8, | 85:15, 92:4, | 226:2, 227:24 |
| 18:19, 26:16, | 52:17, 52:21, | 95:8, 97:21, | **speaking** |
| 33:2, 34:23, | 73:8, 74:5, | 135:24, 139:24, | 177:3, 205:4, |
| 44:5, 47:13, | 88:21, 89:13, | 142:15, 147:16, | 211:4 |
| 50:4, 50:10, | 91:5, 126:19, | 224:1 | **special** |
| | | | 163:24, 233:2 |

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                    104

specialist
54:20, 55:15,
55:18, 56:5,
56:7, 56:14,
56:22, 57:2,
57:5, 58:12,
58:14, 59:3,
128:7, 129:10,
201:12, 201:13,
219:16, 232:3,
232:12
specialist's
173:9
specialists
56:3, 56:23,
133:14
specialties
69:19
specialty
67:24, 89:19,
90:7, 90:11,
90:20, 91:10,
91:13, 91:19,
91:23, 93:14,
94:24, 98:5,
98:17, 99:3,
99:11, 106:22,
128:17, 129:10,
129:18, 132:1,
163:24, 164:4,
164:13, 164:19,
209:18, 211:10,
212:13, 212:18,
212:22, 213:6,
213:13, 215:1,
215:20, 216:1,
229:11, 229:15
specific
16:9, 54:19,
58:6, 64:17,
71:9, 78:3,
78:22, 79:5,
92:20, 95:2,
102:15, 103:16,
106:14, 108:15,
109:3, 116:11,
126:17, 133:19,
140:12, 145:5,

157:21, 167:13,
171:11, 176:17,
197:1, 197:18,
205:23, 214:15,
215:14
specifically
11:6, 13:7,
58:9, 58:18,
103:22, 111:23,
117:11, 160:12,
168:21, 171:22,
182:4, 195:17,
196:5, 198:24,
199:24, 206:12,
228:23
specification
169:23
specifications
83:10
specifics
47:14
specified
138:2
specifies
171:2
spectrum
69:13
spell
4:8
spelled
50:18
spend
126:19, 170:6,
226:12
spinal
192:19, 209:13
spine
192:20
spoke
230:9
spoken
52:17
springfield
1:27, 3:15,
14:13, 14:16,
15:19, 23:10,
42:17, 44:4,
44:13, 44:14,

72:4, 175:20
st
1:3, 3:24,
10:14, 11:2,
41:24, 42:8,
146:9, 147:1
staff
7:19, 11:10,
25:14, 50:24,
67:5, 70:12,
71:5, 72:12,
83:10, 102:10,
111:20, 112:15,
113:19, 113:23,
114:11, 114:22,
115:1, 116:6,
116:15, 116:17,
119:23, 120:3,
120:16, 120:20,
121:4, 124:12,
124:15, 154:22,
160:13, 166:13,
168:4, 176:14,
177:12, 182:6,
206:10, 207:13,
210:10, 213:7,
232:18, 232:22,
233:2
staffed
204:10
staffing
7:16, 16:19,
160:14, 181:2,
189:15, 203:5,
203:7
stamp
166:6, 184:10
stamped
152:6, 185:22
stand
95:12, 95:15
standard
135:7, 135:12,
205:22, 206:3
standards
83:19, 136:5,
136:6
stands
215:16

start
4:1, 13:9,
230:16
started
15:8, 17:11,
50:5, 80:4,
108:5, 110:11
starting
60:7
starts
97:10
state
1:24, 3:17,
4:8, 7:5, 7:8,
7:10, 7:22, 8:6,
9:20, 10:1,
10:5, 10:10,
13:19, 13:24,
14:17, 18:2,
22:3, 22:8,
22:16, 29:6,
29:10, 29:13,
29:18, 29:21,
31:4, 31:6,
31:16, 31:21,
32:8, 33:24,
37:18, 41:23,
46:11, 65:14,
66:17, 66:18,
75:16, 83:17,
89:14, 99:13,
135:8, 165:22,
171:13, 171:14,
178:12, 179:8,
205:11, 224:4,
234:4
stated
47:11, 216:10
statement
88:6, 120:14,
125:11, 157:6,
163:2, 196:2,
197:16, 212:1,
212:7
states
1:1, 15:20,
29:24, 30:9,
30:12, 33:15,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

105

| | | | |
|---|---|---|---|
| 33:18, 34:4, 34:7, 34:8, 34:10, 34:12, 34:16, 34:19, 34:24, 35:3, 82:20, 87:8, 161:20, 163:6, 163:11, 164:11 **statewide** 149:11, 161:21 **statistical** 172:24, 176:4, 176:6, 176:20 **status** 32:4 **statutes** 83:18 **staying** 181:6 **stays** 153:6 **stenographic** 234:9 **step** 46:20, 104:10 **steps** 62:4, 62:9, 70:24, 72:11, 102:10, 201:18, 201:20 **steven** 6:22 **sticking** 50:20 **still** 16:3, 20:19, 30:23, 66:17, 67:19, 98:15, 99:20, 103:9, 105:1, 105:13, 162:1, 197:21, 211:20 **stock** 148:11 **stop** 19:5, 19:7, 19:11, 20:15, 21:4, 214:3, | 222:17, 224:18 **stopped** 20:23, 214:7 **stopping** 225:3 **straight** 174:4 **street** 1:27, 3:5, 3:14 **strength** 107:15, 108:13 **strike** 22:8, 26:5, 28:8, 40:6, 53:3, 54:4, 56:13, 86:17, 102:2, 109:7, 124:9, 130:14, 132:22, 144:3, 154:15, 156:9, 171:1, 183:18, 184:23, 186:11, 190:19, 192:13, 210:13, 214:9, 214:11, 214:13 **stroke** 225:1, 225:2 **studies** 209:1 **subject** 6:4, 31:13, 33:17, 173:16, 185:2 **subjective** 199:2, 200:7 **subjects** 46:13, 169:2 **submission** 213:8 **submit** 77:15, 99:3, 212:24, 223:7 **submitted** 40:3, 40:5, 78:13, 79:20, 156:4, 205:11, 210:8, 210:17 **subsection** 155:20, 198:14 | **subsequent** 205:24 **subset** 86:24, 158:24, 159:2 **subspecialties** 69:13 **subspecialty** 69:15 **such** 71:10, 97:18, 113:7, 125:3, 132:18, 135:3, 135:14, 159:18, 167:2, 183:3, 221:14, 221:19, 222:12, 226:11 **suffer** 5:20 **sufficient** 123:13 **suggested** 100:7 **suite** 3:23 **sum** 65:21, 180:6, 182:4 **summarizes** 52:10 **summed** 139:16 **supercede** 229:7 **superseded** 178:9 **supervise** 7:14, 76:10 **supervised** 16:15, 18:13, 53:3 **supervising** 7:7, 22:14 **supervision** 10:17, 10:21, 18:17, 218:13 **supervisor** 8:9, 9:8, | 37:23, 38:7, 160:13 **supervisory** 76:1, 211:1 **supplement** 222:1 **supplies** 29:3, 63:5 **supply** 112:11 **support** 17:17, 28:17 **supporting** 77:16 **suppose** 227:10, 232:10 **supreme** 1:20 **sure** 5:7, 5:8, 55:22, 56:18, 81:5, 94:18, 103:21, 107:21, 118:21, 122:15, 123:15, 126:5, 137:16, 162:1, 174:19, 175:10, 182:22, 196:4, 200:24, 206:9 **surgeon** 43:15, 134:9 **surgeons** 133:4 **suspended** 31:11, 33:15 **sworn** 4:2, 4:4, 234:7 **symptom** 220:23 **symptomology** 105:2 **symptoms** 97:18, 98:1, 98:14, 99:20, 100:22, 101:1, 101:19, 101:23, 102:3, 102:11, 102:14, 102:20, |

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                        106

102:22, 103:7,
103:13, 103:15,
103:17, 103:24,
104:5, 104:9,
105:14, 106:7,
106:16, 109:10,
109:16, 224:10,
224:16, 225:1
**system**
66:24, 67:6,
67:9, 91:4,
126:23, 159:16,
164:15, 167:2,
168:11, 209:16,
213:11
**systems**
48:6, 49:1,
66:13, 66:19,
66:22, 67:1,
78:19, 165:15,
166:11, 166:23,
167:9, 167:10,
167:22, 171:24

**T**

**tailored**
108:24
**take**
5:21, 41:18,
45:24, 46:20,
63:7, 102:19,
112:8, 114:15,
130:21, 144:4,
158:16, 185:5,
194:8
**taken**
1:22, 51:8,
59:19, 62:4,
62:9, 102:10,
110:9, 129:12,
138:22, 158:17,
160:16, 168:18,
204:4, 234:9,
234:15
**takes**
71:1, 72:11
**taking**
1:21, 65:17,

113:2, 122:24
**talk**
158:19, 187:2,
201:7, 208:12,
218:17
**talked**
28:4, 40:11,
53:4, 139:24,
155:13, 164:5,
165:24, 192:2,
214:17, 219:4,
224:13, 225:5
**talking**
38:2, 46:21,
47:17, 58:8,
58:9, 77:19,
99:15, 110:12,
118:23, 121:5,
126:5, 149:15,
182:3, 196:16,
197:17, 215:8,
219:10
**talks**
165:14, 219:8
**target**
16:23
**task**
171:11
**tasked**
67:19, 74:4,
88:21, 129:23
**tasks**
161:13
**taught**
116:13, 124:20
**teach**
109:3, 200:2
**teachings**
144:8
**team**
72:22, 73:1,
77:12, 78:15,
78:20, 79:1
**technically**
8:10, 20:20
**techniques**
195:12, 195:14,
195:16

**tell**
12:1, 16:13,
30:12, 31:18,
32:5, 32:15,
33:7, 35:20,
44:2, 46:11,
48:3, 50:7,
50:20, 51:11,
54:9, 60:11,
64:3, 66:7,
66:8, 70:24,
71:18, 74:8,
76:17, 78:4,
78:9, 81:15,
84:13, 86:1,
86:16, 87:21,
88:6, 92:14,
93:11, 94:11,
98:3, 101:8,
109:14, 111:11,
111:15, 115:12,
115:13, 116:6,
121:1, 121:24,
122:13, 122:21,
124:6, 124:10,
125:11, 127:3,
127:5, 127:7,
130:15, 140:20,
142:2, 143:8,
149:2, 155:22,
157:5, 157:6,
157:23, 169:4,
169:20, 173:24,
174:6, 174:21,
176:3, 180:10,
197:21, 199:1,
199:20, 214:9,
227:11
**tend**
158:5
**tennessee**
30:16
**tenure**
37:15, 85:22
**term**
76:21, 84:14,
113:12, 114:16,
118:10, 125:8,

155:2
**terminate**
62:4, 62:10
**terminated**
21:22
**terminating**
21:20
**termination**
62:3
**terminology**
198:24, 225:11
**terms**
57:13, 71:9,
76:23, 88:16,
91:23, 93:18,
109:24, 130:15,
142:8, 174:10,
201:22, 207:12
**terrific**
63:14
**tertiary**
129:8, 129:10,
129:20, 134:22
**test**
27:1, 27:12,
27:15, 35:1,
35:6, 169:20,
229:19
**testified**
4:5, 39:15,
40:13, 42:18,
58:10, 170:16,
170:20, 231:24,
232:17
**testify**
41:22, 170:4,
170:10, 217:10,
234:7
**testifying**
41:6, 41:14,
42:24
**testimonied**
225:17
**testimony**
5:23, 6:3, 8:8,
36:6, 39:24,
40:1, 40:9,
40:10, 40:11,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

107

41:11, 46:3,
46:18, 47:9,
47:23, 48:9,
48:13, 48:17,
48:20, 49:4,
49:7, 49:10,
49:15, 49:21,
50:3, 52:19,
59:1, 62:12,
74:4, 84:23,
116:2, 116:20,
117:2, 119:3,
119:10, 119:12,
168:15, 168:17,
169:9, 169:15,
171:17, 171:23,
178:24, 179:9,
197:13, 234:6,
234:8
**testing**
26:8, 26:9,
27:8, 54:19,
107:15, 108:12,
109:19, 111:21,
111:23, 114:3,
114:7, 115:18,
121:13, 197:3
**tests**
27:2, 35:1,
145:18
**texas**
30:3, 30:5
**text**
115:22
**textbooks**
222:14
**th**
1:24, 186:12
**than**
7:1, 13:5,
30:9, 34:19,
35:4, 40:1,
40:8, 40:9,
47:2, 52:2,
52:16, 80:5,
100:1, 105:14,
115:21, 116:6,
119:1, 129:4,

129:15, 129:16,
160:8, 161:12,
184:24, 189:10,
218:15
**thank**
63:11, 71:20,
90:1, 105:20,
105:23, 112:7,
121:14, 147:4,
149:2
**that's**
5:17, 10:13,
28:7, 30:17,
36:24, 47:13,
55:16, 59:11,
61:18, 61:19,
61:22, 63:12,
64:11, 64:13,
64:14, 65:16,
66:3, 67:3,
67:15, 72:5,
74:20, 74:21,
80:10, 80:15,
83:4, 85:4,
97:4, 98:23,
108:20, 115:20,
116:13, 116:21,
117:8, 119:1,
119:6, 120:7,
123:21, 125:10,
126:6, 127:14,
127:16, 134:4,
135:5, 135:19,
143:10, 143:24,
153:22, 155:16,
156:6, 156:19,
157:4, 162:18,
165:7, 166:13,
166:14, 166:21,
167:5, 167:6,
172:4, 172:19,
172:24, 174:21,
175:9, 175:11,
175:13, 179:9,
181:1, 183:10,
193:16, 195:24,
196:5, 197:5,
197:15, 198:7,

198:9, 198:21,
198:22, 198:23,
200:20, 201:8,
202:12, 203:6,
208:1, 208:11,
208:22, 211:6,
214:13, 216:13,
225:6, 231:4,
231:23, 232:15,
232:16, 233:10
**their**
17:6, 56:16,
56:19, 57:14,
57:16, 67:9,
77:13, 78:23,
79:1, 79:2,
91:2, 97:1,
99:3, 103:19,
103:23, 121:7,
123:14, 125:13,
125:14, 128:23,
143:12, 144:17,
166:17, 176:16,
180:8, 219:7,
221:21, 222:1,
222:19, 228:10,
230:7, 232:7,
232:12
**them**
7:15, 9:13,
13:13, 16:17,
16:18, 16:24,
17:3, 17:5,
17:12, 21:9,
25:6, 26:3,
29:7, 30:14,
30:18, 30:23,
32:19, 36:23,
38:10, 38:16,
41:17, 44:5,
44:22, 54:19,
55:21, 56:7,
56:8, 56:18,
57:13, 59:7,
59:14, 67:14,
68:9, 71:6,
71:20, 77:14,
78:17, 96:2,

96:3, 96:4,
99:18, 101:12,
109:23, 110:4,
111:21, 112:10,
121:7, 121:10,
121:12, 124:15,
125:5, 126:24,
127:3, 127:5,
128:8, 129:1,
130:2, 130:21,
136:13, 142:14,
142:16, 144:10,
157:3, 176:21,
181:2, 196:11,
196:12, 197:21,
200:2, 206:21,
221:12, 222:15,
222:19, 222:24,
226:12, 226:20,
226:23
**themselves**
110:22
**then**
9:6, 10:24,
12:5, 12:9,
14:7, 14:10,
14:19, 14:22,
15:3, 15:5,
15:8, 16:21,
17:10, 20:15,
24:20, 27:11,
32:3, 35:2,
39:22, 56:10,
58:15, 72:7,
77:16, 78:20,
78:23, 79:3,
79:8, 79:23,
83:22, 84:13,
89:6, 90:3,
95:20, 96:21,
100:14, 101:2,
103:5, 104:10,
105:1, 105:22,
106:8, 108:13,
111:4, 112:14,
125:22, 126:9,
127:6, 128:22,
130:19, 130:21,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

108

149:8, 149:14,
157:23, 158:14,
160:8, 166:8,
168:12, 169:4,
174:17, 175:5,
181:16, 185:9,
194:6, 194:23,
197:18, 198:4,
202:23, 205:10,
208:4, 209:22,
211:17, 212:6,
215:16, 218:19,
226:19, 226:23
**therapy**
101:2, 101:18,
101:24
**there's**
10:15, 28:16,
30:17, 47:13,
56:7, 58:3,
61:10, 69:22,
69:23, 72:15,
74:21, 75:18,
90:17, 91:3,
99:2, 103:6,
103:16, 105:13,
111:5, 122:4,
125:19, 127:11,
127:15, 141:3,
159:17, 161:9,
161:10, 170:7,
174:22, 175:21,
176:21, 183:5,
185:13, 186:16,
189:4, 189:22,
196:4, 200:22,
202:16, 204:24,
205:20, 206:3,
211:7, 211:14,
213:11, 233:1
**thereafter**
234:10
**these**
34:7, 34:8,
41:6, 41:9,
41:13, 43:19,
44:21, 45:2,
45:4, 45:6,

46:1, 68:14,
68:17, 68:18,
69:3, 69:8,
72:5, 73:2,
81:21, 86:13,
86:16, 92:1,
96:9, 96:13,
96:16, 96:22,
96:24, 97:18,
99:19, 100:15,
101:11, 104:9,
106:7, 109:4,
110:3, 113:19,
115:4, 116:14,
121:4, 132:20,
137:6, 140:12,
141:17, 144:7,
150:5, 157:17,
158:12, 158:22,
158:23, 160:14,
160:19, 162:21,
163:16, 164:3,
176:17, 176:19,
179:15, 183:19,
183:24, 184:1,
184:3, 184:16,
185:21, 187:6,
188:20, 189:2,
189:9, 199:4,
199:23, 200:1,
210:14, 221:12,
221:21, 222:16,
226:10, 227:15,
228:5
**they'll**
130:18, 134:16,
180:23
**they're**
12:22, 67:3,
67:11, 73:10,
84:19, 85:18,
96:9, 97:6,
98:21, 114:2,
114:12, 123:19,
124:21, 126:6,
128:23, 129:13,
131:16, 136:13,
142:14, 157:15,

167:21, 198:9,
227:14
**they've**
97:2, 219:20
**thing**
104:2, 215:4,
216:5
**things**
38:8, 44:21,
67:13, 68:14,
76:24, 94:11,
101:14, 105:22,
107:16, 109:4,
113:9, 114:10,
123:13, 124:18,
137:10, 137:11,
141:15, 142:17,
155:17, 155:18,
158:7, 160:18,
160:21, 173:7,
191:8, 193:8,
206:2, 222:14,
225:18, 226:23
**think**
16:2, 22:17,
29:6, 30:19,
41:10, 54:2,
69:22, 77:9,
79:8, 87:4,
94:6, 96:9,
98:9, 99:14,
100:23, 104:2,
127:17, 129:21,
136:12, 137:7,
141:4, 146:10,
150:5, 150:9,
159:2, 175:13,
175:21, 180:15,
181:14, 184:13,
187:17, 189:4,
189:23, 190:21,
192:9, 197:15,
203:18, 206:18,
214:4, 217:9,
224:13, 224:24,
225:7
**thinking**
159:6, 185:9

**third**
152:5
**though**
8:12, 16:23,
69:1, 124:5
**thought**
147:2, 207:22
**three**
14:24, 19:3,
23:6, 36:5,
36:23, 39:23,
41:9, 41:10,
41:13, 45:6,
48:14, 60:1,
60:2, 60:6,
62:2, 77:8,
77:9, 78:24,
81:11, 90:2,
95:9, 95:10,
95:11, 98:2,
106:21, 149:17,
150:8, 151:6,
153:8, 161:22,
172:4, 177:24,
178:3, 178:19,
186:9, 194:23,
196:13, 196:17
**threshold**
47:18, 47:19,
147:8, 173:17,
174:7, 174:8,
175:3
**throat**
197:24
**through**
9:16, 24:22,
27:8, 33:2,
36:3, 37:17,
39:1, 44:21,
45:1, 45:20,
46:1, 49:19,
92:15, 97:11,
103:6, 124:16,
126:22, 132:20,
143:19, 164:6,
170:23, 179:1,
181:17, 183:19,
188:19, 204:8,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

109

209:16, 210:6,
212:19, 213:7,
225:14, 228:10
**throughout**
9:19, 86:11,
159:16, 179:8
**time**
4:1, 6:23,
13:5, 13:7,
13:16, 15:22,
15:23, 17:8,
18:10, 19:13,
19:16, 19:17,
20:4, 21:15,
21:20, 22:22,
23:21, 23:23,
27:7, 27:11,
27:12, 28:23,
31:9, 32:3,
32:10, 33:24,
34:16, 36:2,
36:24, 39:15,
55:3, 58:14,
59:17, 59:19,
61:4, 61:18,
61:19, 69:17,
71:6, 74:11,
80:16, 92:3,
93:6, 93:10,
98:18, 98:21,
98:23, 109:2,
109:21, 110:9,
123:4, 123:14,
126:19, 128:24,
138:2, 144:15,
145:6, 146:14,
149:8, 152:16,
152:17, 156:5,
158:17, 160:6,
161:16, 161:22,
167:14, 170:6,
177:3, 179:23,
180:7, 181:17,
184:19, 194:18,
194:19, 200:23,
202:17, 204:4,
204:11, 208:4,
214:13, 215:11,

221:16, 223:22,
225:17, 226:12,
227:15, 228:10,
230:18, 233:18
**timely**
134:22, 163:8
**times**
12:7, 35:21,
38:16, 39:9,
41:10, 51:2,
54:23, 74:23,
127:1, 128:6,
128:8, 129:7,
130:5, 157:8,
217:14
**tingling**
93:4, 94:14,
94:23, 97:24,
106:21
**tips**
195:14
**title**
6:10, 13:12,
19:23, 61:4,
73:24
**today**
5:23, 6:1,
22:19, 28:4,
28:15, 31:10,
35:18, 35:23,
40:11, 44:19,
44:23, 46:22,
47:4, 50:1,
52:14, 52:18,
62:15, 62:17,
77:20, 149:19,
167:17, 167:19,
170:4, 188:23,
191:15, 191:24,
192:8, 192:16,
192:21, 204:22,
208:19, 208:24,
209:6, 209:10,
209:14, 214:17,
215:2, 215:18,
216:2, 218:15,
221:20, 226:11
**today's**
50:8

**together**
20:16
**tom**
9:10
**too**
26:3, 110:4,
188:9, 223:1
**took**
17:7, 20:14,
33:1, 33:6, 51:4
**top**
62:21, 63:4,
63:8, 66:6,
83:8, 105:17
**topic**
45:5, 46:4,
46:13, 47:10,
48:2, 48:4,
48:10, 48:14,
48:18, 48:21,
48:23, 48:24,
49:5, 49:8,
49:11, 49:13,
49:16, 49:18,
49:22, 49:24,
50:1, 107:1,
157:21, 158:1,
172:4, 208:11
**topics**
45:2, 45:4,
45:6, 45:8,
45:19, 46:18,
49:14, 49:19,
78:18, 171:19,
171:22, 188:5,
189:2, 189:9,
189:24
**total**
30:13, 175:4
**toto**
157:16, 169:7,
221:16
**touches**
139:24
**toward**
83:8, 90:3,
137:22
**traditionally**
160:2

**train**
7:14, 70:12,
169:11, 171:2,
171:9, 171:12,
196:11, 207:22,
225:24, 226:1,
226:6
**trained**
124:19, 124:21,
126:8, 221:10,
226:4
**training**
16:16, 49:13,
70:2, 70:18,
71:8, 71:13,
71:16, 72:10,
85:8, 85:11,
85:13, 101:8,
115:1, 115:3,
125:2, 125:6,
125:15, 125:16,
126:11, 144:6,
168:3, 168:8,
168:19, 168:23,
169:6, 169:24,
170:11, 170:18,
170:22, 171:18,
172:8, 200:1,
220:14, 221:4,
221:22, 222:2,
222:22, 222:23,
225:7, 225:9,
225:12, 225:15,
225:16, 225:19,
226:8
**trainings**
103:20
**trains**
168:8
**transfer**
129:8, 191:21,
214:18, 215:19
**travel**
12:9, 15:21,
16:21
**traveling**
9:18, 204:18,
205:6, 230:5

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

110

**treat**
103:18, 194:23,
194:24, 224:16,
225:2
**treated**
56:4, 138:18
**treating**
90:13, 91:8,
129:13, 139:12,
194:22, 229:17
**treatment**
10:17, 58:22,
69:16, 92:4,
95:16, 95:19,
95:21, 96:1,
98:18, 101:18,
102:4, 102:8,
102:15, 102:21,
103:5, 103:10,
107:7, 121:9,
123:12, 138:17,
144:12, 185:1,
190:4, 191:23,
192:7, 192:19,
193:9, 194:9,
194:14, 195:3,
195:5, 196:21,
197:11, 197:12,
198:3, 198:6,
207:17, 207:19,
207:24, 208:15,
208:16, 209:13,
210:9, 220:19,
220:24, 225:23,
226:7, 229:11
**treatments**
143:22, 145:3,
221:19
**trial**
38:21, 39:2,
39:7, 39:16,
39:17, 39:19,
40:1, 40:10,
40:13, 41:11
**trials**
38:23, 39:18
**true**
85:22, 134:3,

134:4, 145:16,
186:21, 204:22,
207:16, 208:22
**truly**
227:14
**trust**
218:3
**truth**
234:7, 234:8
**truthful**
5:22
**try**
55:1, 174:20
**trying**
34:9, 40:20,
94:3, 144:24,
215:7
**turn**
83:7, 87:2,
87:5, 95:8,
97:9, 107:3,
110:13, 121:14,
122:22, 137:20,
138:11, 139:3,
142:20, 145:8,
147:14, 154:9,
162:10, 163:23,
164:24, 167:24,
172:11, 176:2,
176:3, 177:17,
182:10, 187:8,
195:11, 195:15,
201:8, 203:1,
206:24, 208:8,
211:17, 216:6
**turning**
48:2, 89:15,
111:4, 127:19,
212:15
**tweaked**
79:6
**two**
9:12, 13:6,
22:9, 29:14,
36:5, 37:9,
39:22, 48:2,
48:10, 59:24,
60:1, 60:4,

60:7, 60:9,
62:20, 63:5,
66:9, 69:24,
77:8, 78:1,
78:2, 78:24,
79:9, 79:18,
80:3, 80:5,
80:10, 88:14,
89:17, 89:22,
100:6, 112:12,
117:9, 121:15,
121:19, 122:2,
139:15, 141:19,
147:15, 149:11,
152:7, 162:23,
169:5, 173:7,
187:1, 195:17,
198:12, 198:15,
201:20, 202:3,
202:6, 203:2,
216:6, 218:18,
226:15
**two-week**
112:11
**tylenol**
100:11
**type**
39:24, 40:8,
40:10, 57:13,
92:20, 153:13,
174:9
**types**
57:16, 58:1,
67:12, 76:24,
89:7, 107:16,
123:13, 124:18,
134:16, 137:13,
142:17, 144:7,
158:7, 161:13,
167:5, 181:20,
206:2, 226:23
**typical**
108:23, 146:6,
193:22, 197:5
**typically**
6:18, 11:17,
51:23, 71:3,
71:16, 72:8,

74:16, 74:20,
74:22, 75:8,
84:19, 95:16,
101:12, 107:13,
129:21, 130:3,
133:10, 134:1,
134:4, 134:8,
135:13, 135:20,
162:22, 165:17,
173:11, 181:19

**U**

**uh-huh**
5:10, 130:7,
130:10, 142:19,
149:10, 189:21,
197:9
**uic**
174:4
**um**
9:5, 140:13,
208:5
**unavailable**
230:5
**under**
18:16, 62:19,
62:20, 63:4,
64:7, 66:4,
66:10, 67:18,
75:8, 82:18,
82:19, 83:13,
89:15, 89:17,
95:9, 99:23,
105:8, 105:12,
106:1, 113:21,
114:24, 142:21,
142:23, 146:15,
147:15, 151:7,
152:21, 153:12,
153:16, 153:23,
154:14, 155:20,
163:5, 172:15,
172:23, 177:23,
179:16, 182:13,
195:17, 196:17,
211:23, 212:6,
234:11
**underneath**
18:12, 150:7

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                          111

**understand**
4:19, 9:13,
58:17, 58:20,
64:18, 69:6,
88:19, 94:1,
94:3, 95:8,
111:16, 112:22,
144:16, 144:24,
175:10, 178:16,
180:12, 210:17,
211:20
**understanding**
25:2, 25:13,
41:3, 42:22,
63:23, 69:2,
70:11, 74:3,
74:15, 74:18,
74:19, 152:14,
174:2, 174:5,
174:8, 174:20,
174:22, 175:12,
183:10, 197:14
**understands**
121:1, 122:13
**understood**
4:24, 5:1,
12:24, 197:11
**unencumbered**
32:4, 33:23
**unethical**
104:2
**unimpeded**
162:15
**unique**
193:21
**uniqueness**
226:22
**unison**
130:4
**unit**
83:12, 84:20,
86:4, 88:11,
88:24, 116:11,
116:14, 156:17,
157:7, 158:8,
165:23, 177:12,
209:23, 210:22,
210:24, 212:1,

212:7, 228:2,
228:22
**united**
1:1
**universe**
175:15
**university**
14:10, 14:12,
23:8, 23:9,
173:22, 175:20
**unless**
61:10, 140:12,
158:13, 181:23,
200:22, 205:4
**unquote**
126:13
**unreasonable**
163:13
**unredacted**
60:4
**until**
24:1, 32:1,
34:4, 78:12,
103:6, 153:6,
227:16
**unusual**
205:5
**unwritten**
200:21
**up-to-date**
101:15, 222:21
**updated**
86:14
**upheld**
219:5
**upon**
51:14, 57:14,
77:15, 92:2,
108:24, 121:11,
142:11, 194:16,
223:21
**upper**
97:19
**urgent**
9:2, 9:7, 54:14
**urology**
69:18
**use**
52:6, 74:24,

87:2, 96:13,
122:16, 133:18,
133:19, 133:21,
133:22, 141:8,
203:24, 206:23,
225:10
**used**
65:9, 84:15,
97:7, 113:13,
114:17, 116:8,
118:10, 121:3,
122:18, 122:19,
125:9, 146:11,
180:14, 203:18,
227:21
**uses**
8:20, 114:4,
115:19, 141:8
**using**
93:11, 166:1,
180:20
**usually**
51:23, 67:14,
72:4, 75:10,
134:15, 159:22,
160:14, 176:21,
180:21, 185:12
**utilization**
8:14, 8:18,
29:3, 47:18,
47:19, 53:12,
54:15, 56:11,
58:16, 58:17,
58:20, 67:9,
95:22, 96:11,
122:12, 122:16,
127:11, 127:15,
130:4, 134:6,
138:3, 138:5,
140:24, 147:8,
173:17, 174:7,
174:10, 179:20,
180:16, 181:10,
191:17, 201:7,
205:15, 206:10,
207:13, 213:7,
214:20, 223:8,
223:18

**utilize**
67:6, 221:10
**utilized**
129:3, 129:11

**V**

**vacancies**
16:19
**vacancy**
12:3, 12:18
**vacation**
12:4, 230:4
**variables**
194:7, 194:11
**varies**
161:7
**variety**
169:2, 188:5
**various**
128:9, 221:13
**vary**
98:21
**venario**
184:4
**vendor**
62:22, 65:5,
66:12, 66:14,
66:20, 67:17,
67:19, 70:2,
117:17, 136:24
**vendor's**
66:10
**vendors**
63:9, 140:1
**venue**
42:7, 42:13
**venues**
125:3, 125:17,
144:9
**verbal**
5:7
**verbatim**
198:20
**verification**
77:10, 79:5,
79:13, 80:14,
187:9
**verified**
77:18

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

112

| | | | |
|---|---|---|---|
| **versus** | **voice** | **watch** | 12:7, 13:15, |
| 173:23, 194:18, | 5:8 | 226:16 | 13:18, 13:22, |
| 230:10 | **vote** | **watchful** | 15:11, 15:19, |
| **very** | 160:18, 160:21, | 197:4 | 16:2, 16:8, |
| 10:19, 15:18, | 161:12 | **watching** | 17:1, 17:18, |
| 21:15, 21:19, | **votes** | 126:21, 226:20 | 17:20, 18:12, |
| 62:20, 63:4, | 160:16 | **water** | 19:12, 19:22, |
| 78:12, 93:12, | **voting** | 26:16 | 20:1, 22:13, |
| 138:15, 155:1, | 159:17 | **way** | 23:11, 25:5, |
| 166:4, 175:9, | **vs** | 5:10, 35:2, | 25:6, 29:7, |
| 179:17 | 1:9 | 59:9, 65:21, | 30:13, 31:3, |
| **vice** | | 69:10, 93:14, | 31:23, 33:23, |
| 25:17, 72:23, | **W** | 101:21, 123:8, | 34:14, 34:16, |
| 75:22, 81:9, | **waiting** | 124:8, 126:22, | 35:4, 36:14, |
| 148:3, 148:9, | 197:4 | 133:23, 144:3, | 36:18, 36:21, |
| 159:18, 160:1, | **waive** | 150:8, 174:18, | 38:11, 38:15, |
| 160:8 | 233:13 | 197:16, 198:8, | 39:6, 41:6, |
| **vienna** | **waived** | 202:10, 212:20, | 41:10, 41:13, |
| 131:18 | 233:16 | 213:4, 225:14 | 42:24, 46:24, |
| **violate** | **want** | **ways** | 50:11, 50:14, |
| 103:24 | 30:23, 47:4, | 19:15, 212:18 | 77:7, 79:13, |
| **viral** | 68:20, 95:8, | **we'd** | 84:8, 86:14, |
| 197:24 | 106:17, 107:21, | 226:12 | 90:19, 92:9, |
| **virginia** | 108:14, 113:14, | **we'll** | 98:5, 99:15, |
| 162:3 | 123:15, 136:19, | 37:20, 60:5, | 110:12, 134:8, |
| **vision** | 136:20, 142:21, | 125:21, 127:18, | 143:13, 145:22, |
| 62:15, 203:12, | 149:16, 158:19, | 218:5, 228:22 | 146:10, 158:2, |
| 203:23, 204:8 | 170:5, 187:2, | **we're** | 158:12, 169:14, |
| **visit** | 188:8, 188:19, | 6:3, 62:16, | 175:11, 178:23, |
| 51:23, 52:10, | 189:22, 203:1, | 118:23, 121:5, | 184:2, 190:2, |
| 58:15, 78:24, | 206:18, 208:8, | 121:10, 134:11, | 204:9, 207:20, |
| 79:23, 80:5, | 218:8, 225:8 | 162:1, 193:4, | 214:6, 221:12, |
| 80:13, 80:18, | **wanted** | 229:9 | 222:8, 224:8, |
| 81:3, 93:22, | 58:14, 77:14, | **we've** | 225:7, 229:20, |
| 144:15, 147:1, | 133:18, 175:10, | 49:14, 49:20, | 230:14, 230:17 |
| 147:7, 184:20, | 180:12, 214:8 | 97:14, 142:4, | **weren't** |
| 185:15, 186:22, | **wants** | 149:18, 189:17, | 158:13 |
| 200:4, 213:15, | 188:21 | 214:17, 214:19, | **west** |
| 213:17, 226:16 | **warden** | 219:4 | 162:3 |
| **visited** | 84:21, 85:3, | **weeks** | **western** |
| 80:17 | 85:6, 85:20, | 98:2, 106:21, | 13:2 |
| **visiting** | 86:4 | 112:10, 112:12 | **wexford's** |
| 223:23 | **wardens** | **well-documented** | 10:22, 11:2, |
| **visits** | 85:10, 177:11 | 185:11 | 48:9, 48:13, |
| 59:5, 64:1, | **warrant** | **went** | 48:17, 48:21, |
| 65:1, 135:3, | 205:24 | 32:1, 33:9, | 49:4, 49:8, |
| 215:10, 228:7 | **wasn't** | 226:11 | 49:11, 49:15, |
| **vitale** | 112:5, 215:14 | **were** | 49:21, 50:3, |
| 3:19 | | 9:2, 12:3, | |

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018                                        113

59:2, 63:18,
63:24, 64:2,
64:24, 68:2,
70:7, 81:15,
87:16, 87:22,
88:1, 91:18,
104:5, 107:20,
108:10, 109:6,
109:7, 109:12,
109:14, 114:5,
114:15, 115:8,
123:21, 127:24,
137:24, 143:24,
169:10, 169:16,
171:17, 178:24,
187:2, 188:20,
190:15, 195:8,
195:21, 196:3,
196:8, 198:18,
198:22, 199:1,
199:20, 200:5,
200:9, 200:20,
201:1, 208:19,
214:10, 217:11,
229:9
**what's**
35:10, 51:22,
59:24, 60:3,
82:6, 88:13,
92:6, 96:12,
109:18, 113:11,
114:18, 115:7,
123:2, 139:1,
148:9, 154:2,
158:2, 183:17,
210:7
**whatever**
69:15, 102:21,
109:20, 114:18,
128:24, 202:22,
232:13, 233:10
**when**
7:18, 11:19,
12:1, 12:7,
13:9, 13:12,
13:18, 13:22,
16:1, 16:6,
16:10, 16:19,

16:24, 17:2,
17:13, 17:20,
17:24, 18:15,
19:17, 20:13,
20:15, 20:17,
20:20, 20:23,
20:24, 21:4,
21:11, 21:16,
22:24, 23:2,
23:16, 23:24,
24:15, 24:18,
27:12, 29:7,
31:3, 32:1,
32:14, 32:16,
32:17, 33:22,
36:2, 40:14,
50:16, 51:4,
56:20, 57:9,
58:21, 61:2,
63:24, 65:1,
71:5, 71:13,
74:23, 77:6,
77:19, 77:22,
79:20, 80:2,
83:1, 88:19,
88:21, 90:11,
91:19, 92:10,
97:23, 98:21,
101:10, 106:11,
114:4, 123:17,
124:1, 124:14,
128:11, 128:16,
129:7, 129:16,
130:19, 133:13,
136:21, 139:10,
141:14, 142:4,
142:9, 152:10,
157:24, 159:2,
164:13, 164:18,
173:19, 180:14,
181:16, 193:8,
194:8, 194:17,
195:2, 207:12,
214:3, 220:22
**whenever**
161:8
**where**
11:22, 22:18,

30:22, 41:22,
42:17, 67:11,
72:5, 86:1,
90:1, 93:3,
105:11, 108:5,
128:17, 128:21,
129:3, 129:5,
129:13, 130:1,
130:2, 138:21,
140:8, 146:7,
165:21, 169:22,
171:1, 171:8,
173:18, 173:19,
175:18, 182:2,
182:7, 183:4,
185:17, 185:24,
201:21, 201:23,
205:6, 212:11,
220:3, 226:15
**wherever**
130:20
**whether**
43:19, 46:1,
53:20, 55:6,
74:12, 77:17,
79:3, 91:9,
91:13, 91:23,
92:3, 93:14,
94:11, 94:22,
96:20, 97:16,
97:20, 98:5,
98:16, 99:16,
100:2, 100:16,
101:23, 106:20,
110:22, 111:1,
121:24, 123:5,
131:10, 132:14,
132:17, 132:21,
136:8, 141:3,
144:24, 152:9,
152:13, 160:19,
160:22, 173:20,
180:19, 180:23,
181:11, 186:18,
186:19, 186:22,
200:6, 204:14,
206:7, 206:13,
215:13, 216:12,

216:13, 229:17
**whew**
30:13
**which**
5:5, 14:19,
17:6, 22:13,
28:14, 29:6,
31:6, 33:19,
35:3, 38:1,
39:6, 39:19,
45:6, 46:24,
47:15, 48:2,
52:5, 52:10,
54:9, 54:10,
56:2, 57:20,
63:3, 75:11,
78:15, 84:24,
89:21, 90:5,
92:7, 94:5,
95:21, 98:13,
98:14, 99:24,
107:4, 112:13,
121:8, 121:17,
124:20, 125:17,
129:22, 130:1,
133:23, 135:14,
138:14, 141:13,
144:9, 147:21,
148:8, 149:3,
152:6, 154:17,
158:20, 160:9,
162:11, 162:22,
163:3, 165:3,
166:4, 166:6,
166:20, 174:13,
176:5, 176:22,
176:24, 177:24,
179:17, 180:17,
184:22, 185:1,
188:24, 205:23,
209:16, 211:18,
212:16, 216:11,
227:2, 229:18,
234:15
**while**
16:2, 16:3,
32:21, 135:10
**who**
6:21, 6:23,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

114

8:3, 9:8, 16:16,
18:20, 25:13,
38:10, 52:16,
56:3, 57:9,
60:23, 71:20,
71:21, 73:17,
73:19, 74:8,
74:24, 75:15,
75:20, 76:17,
76:19, 84:13,
85:17, 85:20,
88:23, 89:6,
89:8, 90:10,
90:18, 109:9,
109:15, 111:18,
112:8, 113:3,
128:4, 128:7,
128:20, 129:3,
129:5, 129:23,
134:5, 134:6,
134:10, 139:5,
139:9, 148:3,
148:7, 148:8,
148:20, 149:2,
149:6, 149:11,
150:5, 155:4,
156:2, 156:9,
156:12, 158:22,
159:13, 159:16,
164:16, 169:1,
176:3, 179:13,
181:4, 184:3,
184:8, 187:13,
187:15, 202:10,
203:19, 204:16,
206:5, 206:9,
206:11, 210:16,
211:19, 212:16,
213:18, 221:3,
226:1
**who's**
11:10, 11:11,
89:13, 122:24,
128:16, 131:20,
140:8, 194:17
**whoever**
186:13
**whom**
112:19, 157:19

**whose**
62:11, 82:22,
101:18, 234:5
**why**
15:17, 19:5,
19:11, 21:7,
24:21, 25:2,
34:6, 34:7,
61:22, 63:7,
76:20, 130:14,
140:8, 142:16,
151:24, 152:2,
153:10, 156:15,
165:11, 180:10,
183:18, 185:18,
194:14, 197:22,
198:7, 199:5,
202:22, 206:19,
226:17
**will**
4:15, 6:15,
12:5, 46:11,
46:20, 47:24,
48:3, 50:1,
61:21, 67:23,
84:2, 87:4,
103:6, 103:18,
108:23, 126:19,
131:4, 142:5,
163:7, 163:12,
164:12, 170:17,
174:10, 174:23,
177:2, 182:16,
183:7, 188:24,
197:24, 218:3
**willing**
131:21, 134:10,
217:19
**wisconsin**
30:15
**wish**
56:9, 121:8
**wishes**
205:13
**within**
7:13, 10:9,
11:2, 36:5,
45:20, 55:20,

68:2, 76:20,
86:23, 91:4,
93:12, 110:1,
126:18, 137:18,
138:2, 139:9,
166:17, 173:20,
234:4
**without**
33:4, 103:10,
157:9, 169:20,
197:12, 224:16,
224:21, 225:3
**witness**
2:3, 4:2,
30:21, 35:17,
36:7, 36:12,
39:4, 40:14,
41:7, 41:8,
43:1, 44:20,
45:11, 45:15,
55:10, 62:7,
63:15, 68:10,
81:5, 84:18,
90:23, 94:9,
95:2, 98:11,
102:7, 102:13,
103:1, 106:24,
111:9, 117:3,
119:8, 119:11,
120:11, 132:5,
137:4, 139:22,
141:6, 147:20,
148:1, 178:6,
183:2, 185:24,
186:2, 188:7,
188:12, 189:14,
190:10, 195:19,
196:18, 211:14,
216:16, 217:11,
217:17, 222:6,
223:15, 223:20,
227:7, 228:19,
229:2, 230:3,
230:22, 231:15,
233:8, 233:13,
234:5, 234:9
**won't**
46:4, 46:16

**word**
96:7, 96:16,
180:15, 221:8
**words**
129:19, 131:1,
184:19, 189:4,
208:17, 231:19
**work**
7:11, 7:15,
14:17, 14:21,
15:1, 15:2,
17:1, 18:6,
18:21, 18:23,
20:7, 20:8,
20:10, 20:11,
21:24, 22:5,
22:11, 28:14,
29:5, 29:9,
29:13, 29:14,
32:2, 32:17,
34:11, 36:15,
37:10, 37:11,
37:18, 37:23,
38:6, 38:7,
44:14, 128:8,
150:14, 150:18,
150:21, 151:2,
151:5, 165:15,
166:12, 169:1,
203:14, 204:1,
231:21
**worked**
15:7, 16:2,
18:15, 19:2,
203:24, 204:16,
228:21
**working**
13:1, 13:10,
13:13, 14:2,
15:8, 16:3,
16:6, 16:24,
17:2, 17:11,
17:13, 17:24,
18:3, 18:9,
18:16, 18:20,
19:5, 19:7,
19:18, 20:16,
20:23, 21:4,

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

115

21:8, 21:16,
33:8, 34:17,
36:10, 38:4,
38:17, 139:15,
166:17, 214:3,
214:7
**world**
182:9, 232:1
**worth**
233:10
**wouldn't**
54:11, 91:6,
188:10, 231:20
**wow**
184:12
**write**
209:22
**written**
52:5, 57:21,
57:23, 82:23,
127:9, 140:9,
144:13, 145:1,
161:12, 171:7,
183:11, 189:8,
190:1, 190:15,
190:20, 191:1,
191:12, 191:20,
192:5, 192:14,
192:18, 198:23,
200:6, 215:22
**wrong**
116:4, 174:21
**wrote**
231:19, 231:23

**X**

**x-ray**
135:18, 145:13
**x-rays**
145:12, 145:13

**Y**

**yeah**
94:17, 108:2,
110:7, 185:23,
186:2, 228:12
**year**
13:4, 40:16,

40:17, 43:4,
61:22, 61:23,
149:21, 150:13,
150:18, 150:21,
151:6, 151:13,
151:19, 152:16,
152:17, 152:18,
152:21, 153:7,
181:7, 213:23
**year's**
176:23
**years**
15:1, 15:8,
19:3, 21:14,
23:6, 27:8,
27:9, 27:14,
77:8, 77:9,
78:2, 79:9,
79:18, 80:3,
80:6, 80:11,
152:3, 152:16,
152:19, 177:16,
218:15
**you'd**
182:3, 206:18
**you'll**
98:7, 131:2
**you're**
5:5, 6:1, 14:3,
45:4, 57:17,
64:13, 82:13,
86:18, 90:24,
95:3, 123:16,
128:11, 136:21,
136:23, 139:21,
141:18, 147:22,
165:4, 166:21,
167:17, 178:11,
186:6, 188:6,
193:12, 202:2,
203:3, 210:13,
215:8, 228:12
**you've**
4:11, 6:1, 6:4,
27:15, 38:4,
44:19, 44:20,
45:9, 62:12,
68:9, 78:4,

111:8, 117:13,
147:19, 171:16,
178:2, 189:23,
196:14, 198:4,
217:17
**yours**
180:20
**yourself**
25:19, 41:15,
165:4

**$**

**$1,363,436,031**
153:17
**$100**
149:20
**$113,209,327**
150:17
**$121,254,395**
151:1
**$126,104,570**
151:10
**$128,626,661**
151:16
**$133,771,727**
151:22, 153:1,
153:3

**.**

**.1**
66:5, 66:16,
68:5, 83:8,
139:4, 146:15,
154:14, 154:16,
155:17
**.11**
139:20, 141:5
**.12**
66:5, 83:8
**.13**
142:22, 143:14
**.15**
122:10, 127:8
**.17**
127:20
**.18**
134:20, 145:9,
146:15

**.2**
67:17, 68:5,
70:1, 70:20,
117:13, 117:14,
118:11, 118:19,
121:20, 122:10,
127:8, 127:20,
134:20, 135:6,
136:3, 137:22,
138:14, 142:22,
154:10, 154:14,
154:16, 155:17
**.25**
135:6
**.28**
136:3
**.3**
136:15, 137:22,
138:14, 139:4,
139:20, 141:5,
142:22, 143:14,
145:9, 146:15
**.4**
70:1
**.5**
138:14, 143:14
**.6**
139:4
**.7**
70:20, 117:13,
117:14, 118:11,
118:19
**.9**
121:20

**0**

**0007**
212:3
**003**
186:2
**0088**
116:23
**01**
1:25, 4:1
**03071**
234:23
**04**
19:19

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

116

| | | | |
|---|---|---|---|
| **04030103**<br>89:16<br>**0403103**<br>84:15, 118:9,<br>120:18<br>**05**<br>16:7, 44:3<br>**084**<br>234:23<br>**09**<br>21:6 | **1377**<br>3:25<br>**138**<br>171:19<br>**14**<br>86:12<br>**140**<br>2:16, 216:7,<br>216:11<br>**141**<br>216:11<br>**1425**<br>162:12 | **1832**<br>141:9<br>**1833**<br>141:11<br>**1834**<br>141:17<br>**1835**<br>201:9<br>**1841**<br>206:24, 207:6<br>**187**<br>2:18<br>**19** | **145:9, 146:15**<br>**2.4**<br>83:8<br>**2.6**<br>147:15, 147:24<br>**20**<br>35:22, 37:4,<br>39:12, 83:7,<br>86:12, 233:18<br>**2000**<br>14:22, 18:1,<br>32:1 |

**1**

| | | | |
|---|---|---|---|
| **1**<br>210:5<br>**1.3**<br>62:1<br>**1.4**<br>62:2<br>**1.5**<br>62:2<br>**1.6**<br>62:2<br>**10**<br>2:19, 18:8,<br>27:9, 49:18,<br>49:22, 142:21,<br>153:7, 188:3,<br>189:9, 192:24,<br>193:4, 193:6,<br>194:3, 194:4,<br>201:6, 208:12,<br>218:15<br>**100**<br>3:22<br>**11**<br>2:20, 30:19,<br>30:20, 30:21,<br>45:5, 49:24,<br>210:3, 210:7<br>**111**<br>1:26<br>**12**<br>38:19, 45:20,<br>50:1, 155:20,<br>159:22<br>**130**<br>203:2, 203:7 | **1436**<br>164:1<br>**1462**<br>164:24<br>**1463**<br>166:7<br>**1471**<br>167:24<br>**1495**<br>172:11, 176:8<br>**1498**<br>177:18<br>**1499**<br>182:11<br>**15**<br>38:20, 39:12,<br>159:22<br>**150**<br>231:20<br>**157**<br>227:9, 227:13<br>**1580**<br>3:23<br>**16**<br>1:9, 214:4<br>**1690**<br>193:3, 194:7<br>**1696**<br>195:11<br>**17**<br>15:20, 30:13,<br>30:23, 34:15<br>**18**<br>186:12<br>**183**<br>2:17 | 31:20, 31:21<br>**190**<br>94:6<br>**192**<br>2:19<br>**1988**<br>23:1<br>**1990**<br>31:5<br>**1991**<br>23:4, 23:18,<br>23:20<br>**1993**<br>31:21, 218:9<br>**1994**<br>24:1, 31:21,<br>44:3, 218:10<br>**1st**<br>171:19, 172:7<br><br>**2**<br><br>**2.2**<br>66:5, 66:16,<br>67:17, 68:5,<br>70:1, 70:20,<br>117:13, 117:14,<br>118:11, 118:19,<br>118:24, 121:20,<br>122:10, 127:8,<br>127:20, 134:20,<br>135:6, 136:3,<br>136:15, 137:22,<br>138:14, 139:4,<br>139:20, 141:5,<br>142:22, 143:14, | **2002**<br>24:1, 32:3,<br>32:22, 33:22,<br>34:4<br>**2003**<br>19:19<br>**2004**<br>16:7, 17:3<br>**2005**<br>17:3<br>**2006**<br>21:17, 21:18<br>**2008**<br>21:6, 21:11<br>**2009**<br>21:11<br>**201**<br>166:4<br>**2011**<br>61:2<br>**2012**<br>13:11, 14:2,<br>15:10, 20:20,<br>35:23, 36:11,<br>151:5, 161:5<br>**2013**<br>24:17, 25:11,<br>84:9, 151:5,<br>186:12, 190:2,<br>227:16<br>**2014**<br>6:23, 6:24,<br>13:3, 13:4,<br>61:15, 61:17,<br>66:1, 75:20,<br>75:21, 84:9, |

Transcript of Roderick Matticks, M.D., Corporate Designee
Conducted on May 30, 2018

117

| | | | |
|---|---|---|---|
| 86:12, 86:15, 122:8, 132:7, 132:18, 133:1, 133:7, 145:16, 145:24, 148:13, 149:6, 171:19, 172:7, 179:1, 204:15, 205:2, 213:24, 214:24, 215:24, 217:7, 219:6, 220:7, 221:5, 226:1, 227:16, 227:24 **2015** 171:19, 172:7, 179:2, 214:4, 214:24, 215:24 **2016** 80:8, 152:19 **2017** 152:19 **2018** 1:24 **21** 164:1 **210** 2:20 **217** 3:16 **218** 2:6 **23** 147:14, 147:23 **231** 2:7 **234** 2:23 **24** 230:18 **241** 3:25 **243** 3:8 **25** 37:4 **259** 89:23 **26** 149:15 | **261** 110:14 **28** 152:7 **282** 170:5 **2a** 202:2 **2nd** 1:26 ___**3**___ **3.2** 153:12 **30** 1:24, 35:13, 35:17, 36:3, 36:7, 36:12, 37:21, 38:5, 40:14, 43:1, 44:20, 59:13, 100:1, 104:11, 104:19, 105:14, 112:13, 171:20, 217:11, 217:17 **311** 3:5 **312** 3:8 **314** 3:25 **35** 2:10 **360** 67:2 **3b** 90:4 **3rd** 3:6 ___**4**___ **4** 233:18 **48** 87:5 ___**5**___ **500** 3:14 | **520** 94:6, 94:8, 107:3 **524** 3:16 **544** 1:9 **550** 97:10 **552** 99:17, 99:24, 104:12, 105:13 **59** 2:11, 2:12, 210:5 **5900** 3:8 ___**6**___ **60607** 3:7 **62701** 1:27 **62706** 3:15 **63102** 3:24 **6533** 3:16 **6th** 1:26 ___**7**___ **7.1** 154:10, 154:14, 154:16, 155:17 **78** 154:10 ___**8**___ **82** 2:13 **83** 177:17 **86** 2:14 **8a** 114:17 | **8b1** 113:21, 114:4, 114:17, 115:15, 115:22, 116:8, 121:3 ___**9**___ **9** 1:25, 4:1 **92** 2:15 **93** 31:21 **94** 31:21 **996** 152:6 |