**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| GERRY ARMBRUSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16 C 0544 |
| | ) | |
| WEXFORD HEALTH SOURCES, *et al.*, | ) | Judge Michael J. Reagan |
| | ) | |
| Defendants. | ) | Mag. Judge Stephen C. Williams |

# <u>Exhibit 10</u>



# Transcript of Stephen Sanders, M.D.

**Date:** May 23, 2018
**Case:** Armbruster -v- Wexford Health Sources, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

1 (1 to 4)

---

**Page 1**

```
 1           IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF ILLINOIS
 3              EAST ST. LOUIS DIVISION
 4               Cause No. 16 C 0544
 5
 6   GERRY ARMBRUSTER,
 7             Plaintiff,
 8        vs.
 9   WEXFORD HEALTH SOURCES, ET
10   AL.,
11             Defendants.
12
13        DEPOSITION OF STEPHEN SANDERS, M.D.
14          Taken on behalf of the Plaintiff
15                  May 23, 2018
16
17          Jo Ann Dickson, CCR 1085
18
19   (Whereupon, the deposition commenced at 1:00 p.m.)
20
21
22
23
24
```

---

**Page 2**

```
 1           IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF ILLINOIS
 3              EAST ST. LOUIS DIVISION
 4               Cause No. 16 C 0544
 5
 6   GERRY ARMBRUSTER,
 7             Plaintiff,
 8        vs.
 9   WEXFORD HEALTH SOURCES, ET
10   AL.,
11             Defendants.
12
13           DEPOSITION OF WITNESS, STEPHEN SANDERS, M.D.,
14   produced, sworn, and examined on the 23rd day of May, 2018,
15   between the hours of 1:00 p.m. and 4:20 p.m. of that day,
16   at 621 South New Ballas Road, St. Louis, Missouri, before
17   JO ANN DICKSON, Certified Court Reporter within and for the
18   State of Missouri, in a certain cause now pending before
19   the United States District Court, Southern District of
20   Illinois, East St. Louis Division, wherein Gerry Armbruster
21   is the Plaintiff, and Wexford Health Sources, et. al. are
22   the Defendants.
23
24
```

---

**Page 3**

```
 1              A P P E A R A N C E S
 2
 3   For the Plaintiff:
 4   Sarah Grady
 5   Loevy & Loevy
 6   311 N. Aberdeen Street, Third Floor
 7   Chicago, Illinois  60607
 8   (312) 243-5900
 9   Sarah@loevy.com
10
11   For the Defendants:
12   Jaclyn A. Kinkade
13   Cassiday Schade, LLP
14   100 North Broadway, Suite 1580
15   St. Louis, Missouri  63102
16   (314) 241-1377
17   Jkinkade@cassiday.com
18
19
20
21
22
23
24
```

---

**Page 4**

```
 1              A P P E A R A N C E S
 2
 3   Telephonically for Defendant Vitale:
 4   Max Boose
 5   Office of the Illinois Attorney General
 6   500 South 2nd Street
 7   Springfield, Illinois  62704
 8   (217) 782-1090
 9   Mboose@atg.state.il.us
10
11   The Court Reporter:
12   Ms. Jo Ann Dickson
13
14
15
16
17
18
19
20
21
22
23
24
```

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

---

5

1  QUESTIONS BY:                              PAGE NO.

2  Direct Examination by Ms. Grady                6

3  Cross-Examination by Mr. Boose              122

4  Cross-Examination by Ms. Kinkade            122

5  Redirect Examination by Ms. Grady           135

6  Recross-Examination by Mr. Boose            139

7

8           INDEX OF EXHIBITS

9  PLAINTIFF'S                              PAGE MKD.

10 NO.

11 Exhibit 1 CV                                  7

12 Exhibit 2 Report                             62

13 Exhibit 3 Compilation of medical             69

14 records

15 Exhibit 4 Neuroscience Department            74

16 records

17 Exhibit 5 Hospital records                   75

18 Exhibit 6 Rate sheet                         79

19 Exhibit 7 Gateway ER records                113

20

21

22

23

24

---

6

1         IT IS HEREBY STIPULATED AND AGREED, by and

2  between counsel for Plaintiff and counsel for Defendants,

3  that the deposition of STEPHEN SANDERS, M.D. may be taken

4  in shorthand by Jo Ann Dickson, a certified shorthand

5  reporter, and afterwards transcribed into typewriting; and

6  the signature of the witness is expressly reserved.

7                * * * * *

8         STEPHEN SANDERS, M.D.,

9  of lawful age, being produced, sworn and examined on

10 behalf of the Plaintiff, deposes and says:

11         DIRECT EXAMINATION

12 BY MS. GRADY:

13     Q   Can you please spell your name and state it

14 for the record.

15     A   S-T-E-P-H-E-N, S-A-N-D-E-R-S, Stephen Sanders.

16     Q   Thank you, Dr. Sanders.  My name is Sarah

17 Grady.  I'm an attorney for the plaintiff in this case,

18 Gary Armbruster.  Have you ever been deposed before?

19     A   Yes.

20     Q   Okay.  So you probably know how things go, but

21 I'll go over the rules that I think are helpful to make

22 this process go as quickly as possible anyway.

23         The first is if you have any confusion about

24 my questions or anything that I'm asking, please just let

---

7

1  me know and I'm happy to rephrase, okay?

2     A   Huh-uh.

3     Q   The second is that I ask you to keep your

4  answers audible and verbal.  So please make sure you're

5  you're saying yes or no instead of a nod or an nuh-huh or

6  huh-huh.

7     A   Yes.

8     Q   And the third is I ask that you please let me

9  finish my question before you start your answer even if you

10 know where I'm going with my question.  That's for the

11 report to keep everything clear, okay?

12    A   Yes.

13    Q   And the last is that the attorney for the

14 defendants may be objecting to some of my questions, but

15 you should still go ahead and answer unless she instructs

16 you otherwise.

17    A   Yes.

18    Q   Do you suffer from any conditions or take any

19 medications that would interfere with your memory or

20 ability to provide accurate testimony today?

21    A   No.

22        (Thereupon, Plaintiff Exhibit 1 was marked for

23 identification.)

24 BY MS. GRADY:

---

8

1     Q   The court reporter just handed you what's been

2  marked as Exhibit 1.  This a copy of a CV that was produced

3  to us by the defendants along with your report in this

4  case.  Is this a current CV for you?

5     A   Yes.

6     Q   Have your credentials changed in any way not

7  reflected in Exhibit 1?

8     A   No.

9     Q   Can you tell me where you obtained your

10 undergraduate degree.

11    A   I went to University of Missouri, Columbia and

12 got a partial degree in agricultural, and then I went to

13 veterinary medicine and graduated in 1983.

14    Q   Okay.

15    A   That's my only undergraduate.  So technically

16 I don't have an undergraduate degree.

17    Q   I understand.  How many years were you

18 enrolled as an undergraduate student at University of

19 Missouri at Columbia?

20    A   Two years.

21    Q   Between 1977 and 1992, you were educated and

22 then worked in the field of veterinary medicine, correct?

23    A   Yes.

24    Q   For the record, what is that, what's the

---

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

9

1   field?
2       A   Animal medicine.
3       Q   Anything about your experience or training as
4   a veterinarian in forming your opinions in this case?
5       A   No.
6       Q   On Exhibit 1, your dates of attendance at the
7   Saint Louis University School of Medicine as printed there
8   appear to be from 1988 to 1982.  Is that supposed to read
9   1992?
10      A   What did you say, deets?
11      Q   Dates.
12      A   Oh, dates.  That should be '92.
13      Q   Okay.  And following your graduation from
14  medical school you completed a residency in internal
15  medicine, correct?
16      A   Yes.
17      Q   As part of that residency did you complete an
18  internship year?
19      A   It's really combined one internship year with
20  two resident years.  We call them all residency.
21      Q   Okay.  Following your residency did you
22  complete a fellowship?
23      A   I did not.
24      Q   You currently work at Saint John's Mercy

10

1   Medical Group, is that correct?
2       A   No.  The name has changed to Mercy Clinic.
3   That's our -- where did you get this?  It needs an update.
4   So Mercy Clinic is your our multi-specialty group that we
5   formed about eight years ago.  So that's still here at
6   Mercy Hospital.
7       Q   And in nineteen -- so when did it become Mercy
8   Medical --
9       A   Mercy Clinic.
10      Q   Mercy Clinic.  When did it become Mercy
11  Clinic?
12      A   2010.
13      Q   Prior to that --
14      A   Mercy Medical Group.
15      Q   And what's the difference?
16      A   Mercy Medical Group was our clinical group of
17  internal medicine and primary care physicians.  Mercy
18  Clinic is a much larger multi-specialty group.  We have 700
19  physicians there.
20      Q   What was the reason for the decision to join
21  with a larger multi-specialty clinic rather than remain as
22  a specialized group?
23      A   For me personally?
24      Q   Do you know what the --

11

1       A   Yeah.  So we took the primary group and it
2   became the multi-specialty group.  It's really the
3   economics of medicine, doing medicine correctly and better.
4       Q   Did anything about your job duties and
5   responsibilities as a physician seeing patients change with
6   that new name and new formation?
7       A   No.  It just gets better and easier and better
8   for patients.
9       Q   Is that because administratively it's easier
10  to refer patients to other specialties now that you're part
11  of Mercy Clinic?
12      A   It's a more cohesive group, a more helpful
13  group for patients with medical problems.
14      Q   How so?
15      A   It's easier to find people.  We have one
16  united health record.  All the records are in one place.
17  More efficient on testing, better on testing.
18      Q   What do you mean better on testing?
19      A   For instance, if there's a cardiology patient
20  with a problem, I can talk to the cardiologist.  I can
21  order the tests because I see those guys all the time.
22  Communicate through the record.  Things get done faster and
23  probably better for the patient.
24      Q   It's easier to communicate with doctors

12

1   between specialties?
2       A   Uh-huh.  Yep.  And the hospital also.  The
3   hospital is part of, you know, is another entity that is
4   integrated with Mercy Clinic.
5       Q   Easier to refer patients to be seen by other
6   specialties?
7       A   Yes.
8       Q   Okay.  So we talked about the Mercy Clinic and
9   the Mercy Medical Group.  Is the Mercy Medical Center
10  something different?
11      A   Mercy Hospital Saint Louis.  So underneath
12  Mercy, we have 37 hospitals.  And we have Mercy Clinic with
13  three big divisions.  So we have 1500 physicians.
14  Oklahoma, Kansas, Arkansas, Missouri.  And so in the east
15  division, Mercy Hospital, we have Saint Anthony's, we have
16  Jefferson, Lincoln and Washington.  So the hospitals are
17  integrated and Mercy Clinic physicians, and we're all
18  really one working unit underneath Mercy.
19      Q   Okay.  And what I'm looking at is on Exhibit 1
20  you are listed -- you have listed as one of your jobs --
21      A   Yes.
22      Q   -- medical director of the JFK and Meacham
23  Park Clinic at Saint John's Mercy Medical Center.
24      A   So Saint John's Mercy Medical Center, we

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

13

1 changed that name to Mercy Hospital Saint Louis. It's a
2 branding thing. So in '98 while I was still doing that, it
3 was Saint John's Medical Center.
4     Q   Okay. Let's talk about your job as medical
5 director. Was that medical director of the hospital at
6 large or some other entity?
7     A   The JFK?
8     Q   Correct.
9     A   So that's our indigent clinic. So it's where
10 we provide medical care for underserved, underinsured and
11 uninsured patients.
12     Q   And how is it that you became medical director
13 there?
14     A   The job was open. It's also part of the
15 teaching program. So the residents -- you know, I've been
16 on the teaching program here at Mercy in that whole time
17 period. So each clinic needed a director. So my partner
18 and I did that. There was another doctor did it with me.
19     Q   Did you apply for the job?
20     A   No. I was here. So I was a resident here and
21 I was finishing. So I knew the clinic, the clinic knew me.
22 The administration people knew me.
23     Q   And tell me, did you see patients as part of
24 your job as medical director at the Mercy Medical Center?

14

1     A   Yes, we would see patients with the resident
2 physician. They would see them and then we would see them
3 together.
4     Q   How many residents -- were they residents of a
5 variety of specialties or only internal medicine?
6     A   The ones that I rounded with were internal
7 medicine. The clinic also has OB, family practice.
8     Q   Leaving to the side residents, how many
9 physicians worked at the clinic during your tenure as
10 medical director?
11     A   Back then it was just Dr. Rui and myself,
12 Dr. Daniel Rui, R-U-I. It was just the two of us then.
13     Q   And was his job title also medical director?
14     A   Yeah. And then we would involve whatever
15 specialty physicians we needed, but they weren't
16 technically in the clinic.
17     Q   And during that time how did you divide your
18 time between the clinic and Mercy Medical Group?
19     A   I would work my mornings four days a week in
20 the clinic and all the afternoons and a full day in the
21 office.
22     Q   And was your job as the medical director of
23 the clinic different in terms of what you were doing seeing
24 patients, diagnosing them, working with residents, was it

15

1 any different from your work during that time as a staff
2 physician at Mercy Medical Group?
3     A   In general internal medicine patients bring in
4 the same problems, yeah.
5     Q   So roughly the same?
6     A   They would be the same.
7     Q   And did you have any responsibilities for
8 administration in the clinic during that time?
9     A   Yes. So equipment, schedules. Only things
10 that had to do with the JFK Clinic. The residents that
11 were coming, we would review their work.
12     Q   Did you work with residents as a staff
13 physician at the Mercy Medical Group during that time
14 period, 1995 to '98?
15     A   I have always had residents that rotate with
16 me. That's the other teaching staff. So the residents
17 come up here to my office one or you days per week for
18 three hours.
19     Q   And how many residents do you work with?
20     A   Usually one on Tuesday and one on most
21 Fridays. So one or two. And then they rotate every year.
22     Q   Okay. Why did you stop working as medical
23 director at the clinic?
24     A   I wanted to do full-time practice.

16

1     Q   Was it your decision to stop practicing?
2     A   Yes.
3     Q   So you've referenced your work as a member of
4 the teaching staff in the internal medicine department at
5 Mercy hospital?
6     A   Yes.
7     Q   Do you teach doctrinal classes?
8     A   What kind of classes?
9     Q   Doctrinal classes. Do you teach in a
10 classroom setting?
11     A   No, that's all up here in the office.
12     Q   And we talked about the residents who come and
13 do rounds with you in the office.
14     A   Yes.
15     Q   Is there other duties and responsibilities
16 that you have as a member of the teaching staff?
17     A   No.
18     Q   You've listed here that you were a member of
19 the QI committee with Mercy Medical Group. What is that?
20     A   Quality improvement. So quality has to do
21 with appropriate testing, outcomes, diabetes, congestive
22 heart failure are some medical outcomes. The quality of
23 our physicians.
24     Q   Was that committee focused on the quality of

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

17

1 internal medicine physicians or physicians in a variety of
2 specialties?
3    A    That would have been internal medicine, family
4 practice and OB/GYN.  At that time those comprised Mercy
5 Medical Group.
6    Q    Forgive my ignorance, but what's the
7 difference between family practice and internal medicine?
8    A    The training is a little different.
9 Ultimately we can do the same thing.  Basically primary
10 care.  Family practice residents can deliver babies and
11 they can see children, and internal medicine physicians
12 tend not to do that.
13    Q    Why did you decide to join the committee?
14    A    I was on the board and it was the right thing
15 to do.  I mean quality is important.  So as you get a group
16 of physicians together, quality is important.  So if we see
17 that it's important, you might as well be on the committee
18 to help guide the way the group goes.
19    Q    Why is quality important?
20    A    It has to do with how we treat patients, so
21 treat them appropriately and effectively in doing our
22 thing.
23    Q    Did you have to apply to be part of the
24 committee or what was part of that application process?

18

1    A    No.  Just discussion.  You know, some people
2 are going off and other people -- so any member of the
3 Mercy Medical Group could be a part of the committee.
4    Q    Okay.
5    A    Any practicing physician.
6    Q    And anything entail what was involved in
7 becoming chairman of that committee?
8    A    Somebody else rotated.  I mean, when you're in
9 a committee and you're on it long enough and somebody
10 rotates off, and we decide, the committee would decide who
11 will be chairman then.
12    Q    And you stopped being a member of that
13 committee in 2002, is that correct?
14    A    Yes.
15    Q    Why did you decide to leave that committee?
16    A    Because I had done it for five years.
17    Q    You've listed three different groups on which
18 you served as a member of the board of directors, correct?
19    A    Yes.
20    Q    So the Mercy Medical Group, that entity just
21 no longer exists today, correct?
22    A    It came into the Mercy Clinic, right.  So I
23 said 2010, but 2011 is probably more appropriate because
24 you can see that's when the Mercy Medical Group stopped and

19

1 Mercy Clinic started.
2    Q    How big was the Mercy Medical Group back
3 between 2002 and 2011, approximately?
4    A    We got to 140 physicians, approximately.
5    Q    And that was comprised of internal medicine,
6 family practice and OB/GYN?
7    A    Yes.
8    Q    And how many people were on the board of
9 directors?
10    A    That was a while back.  Probably nine.
11    Q    What was involved in joining the board?
12    A    Monthly meetings.  And then the committee went
13 with it, the QI committee went with it.  That's probably
14 it.
15    Q    Did you have to apply to become a member of
16 the board or be nominated?  How did you come to be a member
17 of the board of directors?
18    A    I was nominated and elected.
19    Q    Did you have to be renominated and reelected
20 in 2011 when Mercy Medical Group became Mercy Clinic?
21    A    Yes.
22    Q    And Mercy Clinic Saint Louis is comprised of
23 approximately how many physicians?
24    A    Probably 400.

20

1    Q    And approximately how big is the board?
2    A    We have, we're at ten members now.
3    Q    Are you currently on the board of directors?
4    A    No.  Just last month my board of directors on
5 the Mercy Clinic timed out because I had done two sessions.
6 So I did two three year sessions and then two years as the
7 chairman and that was the timeout.
8    Q    Okay.  You're not permitted to serve any
9 longer than that?
10    A    Right.
11    Q    But you are on the board of directors for the
12 Mercy Clinic East division?
13    A    Yes.  So the east is Lincoln, Jefferson,
14 Washington, here, Saint Anthony's, plus all the doctors
15 that go with it.
16    Q    And do you know approximately how many
17 physicians are a part of that practice?
18    A    700.
19    Q    Many are on the board?
20    A    We have 12 members.
21    Q    So the building that we're in today, that's
22 the Mercy Clinic Saint Louis -- in Saint Louis?
23    A    I'm going to quiz you on this later.
24        So this building here is Mercy Hospital Saint

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

6 (21 to 24)

---

21

1   Louis.  This is technically Tower A.  So there's not a
2   building that's Mercy Clinic.  So we have 87 locations, you
3   know, with our physicians.  It includes outpatient doctors
4   offices, all kinds of stuff.
5       Q   But this -- the doctors who are working in
6   this building are part of the Mercy Clinic Saint Louis,
7   right?
8       A   Most.  There's specialties here that are not
9   Mercy Clinic physicians that are on campus here.
10      Q   Okay.  Your work as a physician in this
11  building, you see patient in this building, correct?
12      A   Yes.
13      Q   Okay.  Your work as a physician in this
14  building is part of the Mercy Clinic Saint Louis?
15      A   Yes.
16      Q   And do you work as a physician in the Mercy
17  Clinic east division?
18      A   Yes.
19      Q   Where do you --
20      A   Here, Tower A, 189.
21      Q   So is east division just a larger portion of,
22  like it includes Saint Louis but other cities as well?
23      A   The east division is just Saint Louis.  But it
24  goes down to Jefferson.  Do you know where that is?

22

1       Q   Yes.
2       A   Festus.  So it goes down there.  It goes out
3   to Washington, which is not really Saint Louis.
4       Q   So I'm just trying to understand how these
5   entities are different, Mercy Clinic Saint Louis and Mercy
6   Clinic east division.
7       A   So in the east there's Mercy Clinic Saint
8   Louis.  There's Four Rivers division which out in
9   Washington.  So there's two divisions.  Just right now
10  there's a new south division which is with our addition of
11  Saint Anthony.
12      Q   Okay.
13      A   And then Mercy Clinic is just the physicians,
14  and Mercy Clinic East includes all the administrative
15  people, all the physicians, all the facilities, the
16  hospitals, everything together.  Everything that's Mercy
17  from Rolla on over.
18      Q   The last thing we haven't talked about on
19  Page 2 of Exhibit 1 is your work as a physician adviser in
20  the care coordination department of Mercy Medical Group.
21      A   Yes.
22      Q   Can you tell me first, what is the care
23  coordination department?
24      A   That's the department that, so it includes

23

1   social services in the hospital about providing appropriate
2   transitions when people leave the hospital while people are
3   here.  So it includes insurance authorization.  It includes
4   arranging nursing home, home health care.  So it's the
5   people that do the arranging for the hospital patients.
6       Q   And you served as a physician adviser?
7       A   Yes.
8       Q   Were you compensated for that work?
9       A   Yes.
10      Q   Okay.  So that was like employment in addition
11  to being a physician?
12      A   Yes.
13      Q   What did that entail?
14      A   I would meet with them once a week for about
15  45 minutes with the care coordinating department, and it
16  was issues that needed physician input, for instance, about
17  coding to get paid.  We would work denials from insurance
18  companies, you know, to make sure we had the appropriate
19  coding, RAC audits for Medicare.
20      Q   How is it that you came to join that group or
21  that department?
22      A   Somebody said hey, you should join this, we
23  need a physician adviser.  And I said okay.
24      Q   And were you the only physician adviser?

24

1       A   Yes.
2       Q   Did you have to apply or did you --
3       A   I did not.
4       Q   Okay.  Why did you stop serving as the
5   physician adviser?
6       A   Over those, what, is it ten years?  Over those
7   ten years the department was actually quite large.  It was
8   rolling into a different department of the hospital, and my
9   practice had also gotten a lot busier.
10      Q   You weren't compensated for your role on the
11  board of directors on any of these groups?
12      A   I am not.
13      Q   Part of your practice involves referring
14  patients to other specialists for evaluation and care,
15  correct?
16      A   Yes.
17      Q   Do you consider yourself a specialist?
18      A   Not technically by medical definition, no.
19      Q   Okay.  I just want to make sure that I'm using
20  the correct terminology.
21      A   Yes, ma'am.
22      Q   Can you give me an idea how often in your
23  practice you refer patients for specialty care for
24  evaluation?

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

7 (25 to 28)

---

25

1    **A    Probably once or twice each day, but that**
2    **would include follow-ups, too, so if people have a**
3    **cardiologist that they see and we have to redo their**
4    **referral.  Probably once or twice per day.**
5        Q    How many patients do you see on an average
6    day?
7    **A    Twenty to twenty-three.**
8        Q    And you serve in almost all of those cases as
9    their primary care physician, is that correct?
10   **A    Yes.**
11       Q    Would you consider it a referral if you sent a
12   patient for imaging?
13   **A    No.**
14       Q    And by imaging I'm including -- sorry.  I'm
15   just getting over a cold.
16           By imaging I mean to include x-ray and MRI.
17   The medical use of the term imaging usually includes those
18   things?
19   **A    Yes.**
20       Q    Okay.  You don't consider that a referral?
21   **A    No.**
22       Q    Okay.  But you have the power or the authority
23   to order an imaging study for a patient, correct?
24   **A    Yes.**

---

26

1        Q    And fair to say that's a substantial part of
2    your practice?
3    **A    Yes.**
4        Q    Okay.  Can you tell me about how often as a
5    part of your practice you send a patient to have imaging
6    performed?
7    **A    If you include everything, two or three times**
8    **a day.**
9        Q    When you do order a patient to have imaging
10   performed, do you -- you get a radiologist report --
11   **A    Yes.**
12       Q    -- in response.  Do you review that report?
13   **A    Yes.**
14       Q    Do you review the imaging?
15   **A    Yes.  We can get it.  In our room we have a**
16   **computer screen that gets the imaging as soon as it's done.**
17       Q    Do you consider yourself qualified to review
18   and interpret MRI results?
19   **A    No.**
20       Q    Can you give me an idea of how you go about
21   determining if and when a referral is appropriate.
22   **A    Generally it will be what the patient's**
23   **symptoms are.  If I have a diagnosis and I have a treatment**
24   **and it's appropriate, then I don't need a referral.  And by**

---

27

1    **appropriate I mean in the realm of things that I treat**
2    **normally.**
3        Q    So can you, is there some way for you to
4    describe for me in general terms what the universe is on
5    things that it's appropriate for you to treat?
6    **A    As an internist?**
7        Q    Correct.
8    **A    Almost everything that's not surgery and**
9    **babies and eyes.  So we do a lot of cardiac disease,**
10   **hypertension, diabetes, high cholesterol, injuries,**
11   **sporting injuries, neurologic problems.  As internists**
12   **we're qualified to do all of that.**
13       Q    Not qualified to deliver babies?
14   **A    Right.**
15       Q    Not qualified to diagnose or treat
16   ophthalmological issues?
17   **A    Diagnose, yes.  Treat, oftentimes I would not.**
18       Q    And not qualified to perform surgery, is that
19   correct?
20   **A    Right.**
21       Q    That would include neurosurgery, correct?
22   **A    Absolutely.**
23       Q    You agree that it would be inappropriate to
24   wait to refer a patient that you suspected needed care by a

---

28

1    specialist until you made a definitive diagnosis?
2            MS. KINKADE:  Objection, form, incomplete
3    hypothetical.
4            MR. BOOSE:  Join.
5            THE WITNESS:  Repeat that, please.
6    BY MS. GRADY:
7        Q    Do you agree that it would be inappropriate to
8    wait to refer a patient to a specialist until you had come
9    to a definitive diagnosis?
10           MS. KINKADE:  Same objections.
11           MR. BOOSE:  Same objections.
12           THE WITNESS:  Oftentimes we will refer people
13   that don't have a definitive diagnosis but kind of a
14   category of illness, like I know it's a cardiac problem, I
15   don't know a specific diagnosis, I need assistance from a
16   specialist.
17   BY MS. GRADY:
18       Q    And that would include you may need assistance
19   in discovering what the problem is, diagnosing the problem?
20   **A    Yes.**
21       Q    Is that true for patients suffering
22   neurological issues as well?
23   **A    Yes.**
24           MS. KINKADE:  Objection, form.  Incomplete

---

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

---

29

1 hypothetical.
2          MR. BOOSE:  Join.
3          THE WITNESS:  Are you speaking for me or for
4 all physicians, because all physicians would be different.
5 So each physician has a different skill set, internal
6 medicine versus family practice versus somebody else.
7 BY MS. GRADY:
8      Q   Sure.  Fair caveat.
9          So is there a physician -- let's -- let's
10 leave to the side neurologists and neurosurgeons.
11     **A   Okay.**
12     Q   For other categories of doctors, is there any
13 category of doctors for whom it would be appropriate for
14 them to wait to refer a patient to a neurologist or
15 neurosurgeon until they came to a definitive diagnosis?
16         MS. KINKADE:  Objection, form, incomplete
17 hypothetical.
18         MR. BOOSE:  Join.
19         THE WITNESS:  I'm not sure I understand the
20 point of the question I mean.
21 BY MS. GRADY:
22     Q   Well, understanding the point doesn't matter.
23 Understanding the question --
24     **A   I don't understand the question.**

---

30

1      Q   -- is a deeper problem.
2          So I guess what I'm trying to get at is in
3 your opinion as an expert, is it appropriate for a doctor
4 who is not the specialist in the field of relevant medicine
5 to wait to refer a patient to the specialist who is in the
6 field of relevant medicine until they have decided exactly
7 what is wrong with that patient, if they've identified the
8 field of relevant medicine that's implicated?
9          MS. KINKADE:  Same objection.
10         THE WITNESS:  It might be appropriate to wait
11 until a definitive diagnosis --
12         MR. BOOSE:  Same objection.
13         THE WITNESS:  For instance, I may refer to a
14 GI doctor to have a test done, a colonoscopy, because the
15 patient has this and I want a test done.
16 BY MS. GRADY:
17     Q   So in that case you've referred even though
18 you don't have a definitive diagnosis?
19     **A   No.  I'm saying that I might wait until I have**
20 **a definitive diagnosis and then make a referral because I**
21 **want a test done.**
22     Q   Any other circumstance where it would be
23 appropriate to wait?
24         MS. KINKADE:  Same objections.

---

31

1          MR. BOOSE:  Same objection.
2          THE WITNESS:  I guess I don't see it as
3 waiting.  I mean, in the course of my practice I will, if I
4 get the appropriate diagnosis and a treatment plan, then I
5 should do that.  It's easier for the patients.  It's more
6 efficient.  You know, again that depends on the scope of
7 the practice for the physician.  So I wouldn't look at it
8 as waiting.
9          THE COURT REPORTER:  Doctor, will you do me a
10 favor.  When she objects, pause for just a second, because
11 he's going to probably jump right in.
12         THE WITNESS:  I will.
13         THE COURT REPORTER:  Thank you.
14         MR. BOOSE:  Totally appreciate it.  Thank you.
15         MS. GRADY:  If it will help, I mean, we can
16 just agree that where the Wexford defendants object, that
17 the IDOC defendants can join.
18         MR. BOOSE:  That's fine, but particularly,
19 Doctor, since I'm not able to provide any nonverbal
20 indications that I'm about to object, if you could just
21 wait a breath in between the question -- a breath longer, I
22 guess, between the question.
23         THE WITNESS:  I'll do that.
24         MR. BOOSE:  That can help me not step on you

---

32

1 and get it before the court reporter.
2          THE WITNESS:  Not a big deal.  I'll do that.
3          MR. BOOSE:  All right.  Thank you, sir.
4 BY MS. GRADY:
5      Q   You said that as part of your practice you
6 deal with patients who have neurological issues often, is
7 that a fair summary?
8      **A   Yes.**
9      Q   Tell me more about that.
10     **A   So we'll see patients with diabetic**
11 **neuropathy, carpal tunnel, ulnar tunnel, neurologic**
12 **injuries, like sporting injuries that have neurologic**
13 **implications.  People with neck pain, radicular pain.**
14     Q   What is radicular pain, for the record?
15     **A   Pressing on a nerve root on one side.**
16 **Headaches, seizures.**
17     Q   Are patients -- strike that.
18         Do you refer patients with neurological issues
19 to a neurologist or neurosurgeon for treatment?
20     **A   Yes.**
21     Q   Are you qualified as an internist to treat a
22 spinal cord compression?
23     **A   A spinal cord compression would typically be a**
24 **surgical problem and would involve a surgeon for treatment.**

---

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

33

1    Q    So you would not be qualified to treat that
2  condition, correct?
3    A    No.
4    Q    Are you qualified to diagnose that condition?
5    A    Yes.
6    Q    And have you ever diagnosed a patient with
7  spinal cord compression?
8    A    Yes.
9    Q    How many times?
10   A    Thirty, forty.  I've been doing this for 25
11  years.
12   Q    Tell me how you were able in those instances,
13  all of the ways that you were able to diagnose that the
14  patient was suffering spinal cord compression.
15   A    So the history, number one, prior imaging that
16  they had done, and then the exam mostly.  So the exam would
17  be you'd have neurological symptoms below the level of the
18  compression.
19   Q    And as part of your exam would you always,
20  sometimes or never order imaging for those patients that
21  you diagnose with spinal cord compression?
22   A    Sometimes.
23   Q    Have you successfully diagnosed spinal cord
24  compression for a patient without doing imaging?

34

1    A    It depends on what you mean by successful.  So
2  if I make my diagnosis and I get imaging to confirm that
3  diagnosis and it is, then I would say that's successful.
4    Q    I would agree.  So you've been able to reach a
5  definitive diagnosis of spinal cord compression without MRI
6  imaging?
7    A    Yes, but in that case imaging is used to
8  confirm the diagnosis.  So the answer is yes.  I wouldn't
9  diagnose it and not do an MRI.
10   Q    I see.  Are you familiar with a differential
11  diagnosis?
12   A    Yes.
13   Q    Can you tell me what that is?
14   A    So after the history and the physical exam,
15  they're the things that you still consider likely
16  possibilities for the patient's problem.
17   Q    In your practice for patients for whom spinal
18  cord compression was in the differential diagnosis, did you
19  order imaging for those patients?
20       MS. KINKADE:  Objection, form.
21       THE WITNESS:  So that's probably a diagnosis
22  that if it -- there's nothing else that really looks like
23  that.
24  BY MS. GRADY:

35

1    Q    Tell me what you mean by that.
2    A    So I mean if they really fit.  After I'm all
3  said and done, of spinal cord compression there's not a
4  whole lot that looks like that.  So then it's a matter of
5  is the cord compression from a tumor, an infection or
6  trauma or spinal stenosis.  So it really, wouldn't
7  really -- there are some things that really don't have a
8  differential.  Plenty of times when we're done, there's one
9  thing on the differential.
10   Q    Okay.  But if spinal cord compression was on
11  your differential, whether it's the only thing or
12  whatever --
13   A    Yeah, I would order an MRI scan.
14   Q    And do you agree that the standard of care
15  requires that?
16       MS. KINKADE:  Objection, form.
17       THE WITNESS:  If the exam and history all
18  support spinal -- cord compression, yes.
19  BY MS. GRADY:
20   Q    Okay.  I think we're saying the same thing,
21  but just to be clear, if at the end of your exam, which
22  includes the patient's report of history, the patient's
23  report of symptoms, a review of prior relevant medical
24  records and your exam, spinal cord compression appears as

36

1  part of the differential diagnosis, you agree that the
2  standard of care requires an MRI be ordered for the
3  patient?
4       MS. KINKADE:  Objection, form.
5       THE WITNESS:  Yes.
6  BY MS. GRADY:
7    Q    You said with regard to spinal cord
8  compression there's not a whole lot that looks like it.
9    A    Huh-uh.
10   Q    Tell me what you mean by that.  Well, first
11  let me back up.  What does spinal cord compression look
12  like as you use that phrase?
13   A    So if you compress the spinal cord, all the
14  nerves below that are effected.  So you would have symptoms
15  in, if it's a cervical cord compression, you would have
16  symptoms in both arms, both legs, probably on the trunk.
17  You would have neurologic findings that went with that.
18  And typically people would have pain in the neck and
19  limited range of motion in the neck because it hurts.
20   Q    It's possible to have full range of motion in
21  the C spine and still have spinal cord compression?
22   A    Not likely.
23   Q    But it's possible?
24   A    Unlikely.  So if I saw somebody with full

---

37

1  range of motion, I would probably take spinal stenosis --
2  or cord compression off the list.
3      Q   Okay.  Are you aware of any literature that
4  supports your testimony that it's unlikely?
5      A   No.
6      Q   And if -- well, strike that.
7          The patients that you saw that had -- that you
8  diagnose as having spinal cord compression -- strike that.
9          The symptoms that would be present in the
10 extremities below the area of the compression, one of those
11 symptoms, a common symptom that appears as a result of
12 spinal cord compression would be tingling?
13     A   Yes.
14     Q   Another common symptom that would appear on
15 the extremities below the level of the cord compression
16 would be numbness?
17     A   Huh-uh.
18     Q   Is that a yes?
19     A   Yes.  Sorry.
20     Q   Thank you.  Another common symptom in the
21 extremities below the level of the cord compression would
22 be weakness?
23     A   Yes.
24     Q   And another common symptom in the extremities

---

38

1  below the level of the cord compression would be pain,
2  correct?
3      A   Yes.
4      Q   And those symptoms could be intermittent but
5  persistent, is that correct?
6          MS. KINKADE:  Objection, form.
7
8  BY MS. GRADY:
9      Q   Let me just clarify what I mean by
10 intermittent, because I may not be using that term as you
11 use it in the medical field.  By intermittent I mean that
12 the pain would not be the exact same level, steady
13 throughout the day every day until the cord compression was
14 resolved, but that it would on some days, at some times and
15 some days be great, on some days at some times be less, and
16 sort of go up and down in level over a period of time.
17 That's what I mean by intermittent.
18     A   There could be some fluctuation, but they
19 would be there all the time.
20     Q   So when a patient reports -- strike that.
21         When a patient reports symptoms to you, do you
22 start in your role as a physician to form a differential
23 diagnosis that you refine as you conduct your exam?
24     A   Yes.

---

39

1      Q   When a patient reports tingling to you, that's
2  happened to you in your practice probably frequently,
3  right?
4      A   Yes.
5      Q   And does spinal cord compression become one of
6  the things in response to that report that is part of that
7  differential diagnosis you're working through your exam to
8  address?
9          MS. KINKADE:  Objection, form, incomplete
10 hypothetical.
11         THE WITNESS:  Answer?
12         MS. KINKADE:  You can answer, yes.
13         THE WITNESS:  Yes, but it all depends on where
14 the tingling is located.  It's just a one beginning
15 symptom.  So, I mean, in the beginning the list is 100
16 things, so I suppose it would still be on the list with
17 tingling.
18 BY MS. GRADY:
19     Q   And it would be on that long differential list
20 with numbness as well, correct?
21     A   Yeah.
22     Q   And it would be on that long list with
23 weakness as well, correct?
24         MS. KINKADE:  Objection, form, incomplete

---

40

1  hypothetical.
2          THE WITNESS:  Depending on where the weakness
3  is.  Remember, we're talking about all four limbs.  Right.
4  BY MS. GRADY:
5      Q   So would a patient's -- a spinal cord
6  compression can produce weakness that the patient reports
7  in one of the limbs, is that true?
8      A   No.
9      Q   So in your opinion if a patient reports
10 experiencing weakness in his right hand, you can exclude
11 spinal cord compression?
12     A   It would make it a lot less likely.
13     Q   But it's possible?
14     A   Not really, because if you compress the cord
15 on the side to get one limb, the other limb usually goes
16 with it.  Remember, it's a whole bundle.  All the nerves
17 that go down from there, so you press on one side to get
18 the arm, the leg's right there too.
19         So it would be unusual, it would be unlikely
20 that one hand come from a spinal cord compression, or
21 one limb if you want to call it that.  It's much more
22 likely that it would be a nerve, a radicular symptom.
23     Q   You agree that those symptoms are neurological
24 symptoms?

---

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

41

1      A    Which ones clinically?
2      Q    Pain, weakness.  Well, let's leave pain to the
3  side.  Weakness, tingling, numbness.
4      A    Yes, neurologic symptoms.
5      Q    And so you told me earlier that the symptoms
6  would cause -- the symptoms of weakness, tingling and
7  numbness would cause spinal cord compression to be on the
8  differential diagnosis but that it would be a very long
9  list, correct?
10     A    Yes.
11     Q    And so your exam is the way that you get from
12  a long list to a much shorter list, is that correct?
13     A    Yes, and the history.
14     Q    And that exam becomes critical?
15     A    Yes.
16         MR. BOOSE:  Objection, form.
17 BY MS. GRADY:
18     Q    Tell me with a patient reporting those
19  symptoms, symptoms of weakness, numbness and tingling,
20  would you complete a neurological exam?
21     A    Yes.
22     Q    And tell me what you would do as part of your
23  neurological exam.
24     A    Where are the symptoms?  So, again, it depends

42

1  on where the symptoms are, one on one leg, both legs, both
2  arms, all of the above, head on down.  It depends.
3      Q    Well, tell me about how it would depend if the
4  symptoms were reported in one or both upper extremities
5  versus one upper extremity.
6      A    So if people have symptoms in one extremity,
7  you can do a more limited exam, because remember, it could
8  be carpal tunnel, it could be ulnar tunnel, it could be a
9  disc on a nerve, it could be something in a spinal cord.
10 So it could be a little bit more focused, but still, you
11 know, you'd probably complete a full neurologic exam.
12     Q    So tell me what that entails.
13     A    So we've got the cranial nerves.
14     Q    What does that mean?
15     A    The nerves in the head.  There's 12 cranial
16 nerves.
17     Q    So you grossly view them?
18     A    It's eyes, facial movement, hearing, eye
19 motion, swallowing, tongue, gag reflex, sensation on the
20 face.
21     Q    Okay.  What's next?
22     A    Strength.
23     Q    Strength of what?
24     A    Limbs, so grip, flexing, holding their arms

43

1  up.  Walking.  Hip and knee strength.
2      Q    How do you determine the hip and knee
3  strength?
4      A    Hip strength will be lifting up the leg
5  against resistance, straightening out the leg against
6  resistance.
7      Q    Is that different than a straight leg raise?
8      A    Yes.
9      Q    What's a straight leg raise?
10     A    If something is pressing on a nerve in the
11 spine and you raise the leg, it will shoot tingling or pain
12 down the leg.  So if like a disc, for instance.  So a
13 patient's laying flat --
14     Q    Yeah, I'm just asking about the actual test
15 is.
16     A    Passively lift the leg with the patient
17 relaxed and hold it up for half a minute, and if they
18 report pain down the leg and tingling, it would be a
19 positive test.  It would imply something pressing on the
20 nerve to the leg.
21     Q    So the hip and knee strength, is that testing
22 the strength of -- that's testing the strength of the
23 muscles?
24     A    Yes.

44

1      Q    Okay.  Tell me what else.
2      A    What else.
3      Q    As part of your complete neurological exam.  I
4  have cranial nerve --
5      A    Sensation.
6      Q    Okay.
7      A    And wherever we're examining we do light
8  touch, like a cotton ball, we do vibration, temperature
9  sensation, and sometimes pinprick.
10     Q    Anything else?
11     A    There's a cerebella exam for balance and gait,
12 coordination.
13     Q    How do you that?
14     A    Finger to nose.  Have them tap with their hand
15 on their knee, tap, turn their hand over, tap their foot on
16 the ground.  They stand and put their feet together, close
17 their eyes.
18     Q    Anything else?
19     A    Mental status, which is about their thinking
20 and their speech and their language and conversation,
21 interaction.  And then gait, so we watch them walk.
22     Q    Okay.  The mental status, does the spinal cord
23 compression typically, in the patients that you've seen and
24 diagnosed have spinal cord compression, does that fact,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

---

**45**

1  does that issue effect their mental status?
2       **A   No.**
3       Q   So the outcome of that part of the
4  neurological exam wouldn't really tell us much about the
5  presence or absence of the spinal cord compression,
6  correct?
7       **A   Correct.**
8       Q   What about cranial nerves?
9       **A   That would usually not be effected.**
10      Q   Can you tell me what if anything the test
11  related to the strength of the extremities, the flexing and
12  walking, what information that would give you?
13      **A   It's information about the muscles themselves.**
14  **So muscular disease can effect strength.  And you need**
15  **nerves going to the muscles to make them strong.**
16      Q   So that could indicate a nerve issue?
17      **A   If you have weakness it might be a nerve issue**
18  **or a muscle issue.**
19      Q   What about the, is the hip and knee strength
20  the same thing just on the lower extremities or is that --
21      **A   Yeah.**
22      Q   What about the sensation, what information
23  does that give you about the neurological issue?
24      **A   Basically to have sensation you have to have**

**46**

1  **from the brain to the spinal cord all the way out to the**
2  **skin.  So really test the whole, it's part of the nerve**
3  **path.**
4       Q   And what about that balance and the gait and
5  the coordination?
6       **A   So you need sensation in your legs to have**
7  **balance.  So, you know, it ties together sensation, but**
8  **also the coordination and all that in the brain, in the**
9  **cerebellar mostly, for balance.**
10      Q   And what about the gait, what information does
11  that give you?
12      **A   Again, it ties together with their strength**
13  **and their nerve function and their cerebellar function,**
14  **which is part of balance.  So it really tests all that.  It**
15  **doesn't just isolate the one portion of the exam.**
16      Q   Does any of the things you've described here
17  evaluate the deep tendon reflexes?
18      **A   Did I say that?  No, I didn't.  No, reflexes**
19  **is the other one, yes.  So that's another one of the**
20  **neurologic exam.  Sorry.**
21      Q   That's okay.  And what information does that
22  give you about the potential neurologic issue?
23      **A   So to have a reflex you have to have -- so we**
24  **touch a tendon and it sends a message to the brain.  So it**

**47**

1  **has to have that path.  And then the brain has reflex and**
2  **it sends it back down to make the muscle contract.  So that**
3  **whole thing has to be intact.**
4       Q   Do you need to take that?
5       **A   Nope.**
6       Q   Do you agree that with a patient complaining
7  of weakness, numbness or tingling or some combination of
8  all three, that the parts of this neurological exam as you
9  described them are all required by the standard of care?
10          MS. KINKADE:  Objection, form, incomplete
11  hypothetical.
12          THE WITNESS:  It would depend on where it is.
13  For instance, if people have tingling in one hand and pain
14  in the wrist, we typically will just examine the arm, so
15  more of a focused neurologic exam.
16
17  BY MS. GRADY:
18      Q   And I did understand you to be saying you
19  could do a more focused exam.  What I understood your
20  testimony to be is that you would still do these things as
21  you've testified to them, but you wouldn't necessarily do
22  them with all parts of the body, you would focus on the
23  part of the body where the symptoms are being reported
24  from?

**48**

1       **A   Yes.  But, again, if patients have that really**
2  **focused neurologic problem, we may not do all the cranial**
3  **nerves.**
4       Q   Okay.  So then leaving to the side cranial
5  nerves, do you agree that evaluating the strength of the
6  extremity or extremities where the symptoms are being
7  reported, testing the sensation, looking at the balance and
8  coordination, assessing their mental status, gait and
9  reflexes are all required as part of a neurological exam by
10  the standard of care?
11          MS. KINKADE:  Objection to form, incomplete
12  hypothetical.
13          THE WITNESS:  Again, not all that would be
14  required if it's, you know, if they have tingling on their
15  face or tingling in one hand or, you know, a finger or the
16  bottom of their one foot.  So we may not do all of that by
17  the standard of care.
18  BY MS. GRADY:
19      Q   Okay.  Does the standard of care require any
20  of those things?
21          MS. KINKADE:  Same objections.
22          THE WITNESS:  Yeah.  I mean, the standard of
23  care is to be appropriate to the symptoms that people have.
24  BY MS. GRADY:

---

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

13 (49 to 52)

49

1    Q   Well, sure.  But the standard of care has to
2  be a little more specific than that, right?  You certainly
3  as a physician don't train other physicians simply to treat
4  people appropriately and provide no other training to
5  doctors.  You treat them about what -- you train them about
6  what that means, right?
7    **A   Yeah, but the standard of care is very**
8  **dependent on the illness or the symptoms.  So pain and**
9  **numbness and tingling is a very nebulous thing.  So you**
10 **have to say pain, numbness, tingling here, then you have a**
11 **standard of care.**
12   Q   Sure.  So let's start with pain, numbness and
13 tingling bilaterally at the low extremities.
14   **A   Okay.**
15   Q   What is required by the standard of care to be
16 part of the neurological exam in response to that
17 complaint?
18       MS. KINKADE:  Objection, form, incomplete
19 hypothetical.
20       THE WITNESS:  So if I saw pain, numbness and
21 tingling in both lower extremities, then it would be
22 probably all of that exam, because you have to bring in
23 gait, you have to do sensation, reflexes, the cerebella
24 exam because we're talking about the legs.  Mental status

50

1  is a simple observation.  You know, cranial nerves.  As
2  soon as you put it on both sides, then it would be probably
3  the standard of care to do all of that.
4  BY MS. GRADY:
5    Q   What about a person complaining of weakness,
6  tingling and/or numbness bilaterally in the upper
7  extremities, what does the standard of care require be part
8  of a neurological exam in that instance?
9        MS. KINKADE:  Objection, form, incomplete
10 hypothetical.
11       THE WITNESS:  I think again bilaterally you
12 would probably have to do the whole exam.
13 BY MS. GRADY:
14   Q   And the standard of care would require that,
15 right?
16       MS. KINKADE:  Same objections.
17       THE WITNESS:  Yes.
18 BY MS. GRADY:
19   Q   What about a patient complaining of tingling,
20 numbness and weakness or some combination of those three in
21 one of the upper extremities?
22       MS. KINKADE:  Objection, form, incomplete
23 hypothetical.
24       THE WITNESS:  That could be more focused.

51

1  BY MS. GRADY:
2    Q   Tell me what would be required to be part of
3  the neurological exam as part of the standard of care for a
4  patient reporting tingling, numbness and/or weakness in one
5  upper extremity?
6        MS. KINKADE:  Same objections.
7        THE WITNESS:  It would require probably the
8  strength, sensation, reflexes on that side.  Probably that
9  would be the minimum standard of care.
10 BY MS. GRADY:
11   Q   You agree that patients with spinal cord
12 compression could have full range of motion in their joints
13 in the upper and lower extremities?
14       MS. KINKADE:  Objection, form.
15       THE WITNESS:  It would not effect the joint
16 range of motion.
17 BY MS. GRADY:
18   Q   So we're saying the same thing, right?
19   **A   The cord compression.**
20   Q   Let me say it this way, full range of motion
21 in the joints in your upper and lower extremities neither
22 rules in or out spinal cord compression?
23   **A   Right.**
24   Q   Did you receive any training in surgery as

52

1  part of your medical education?
2    **A   No.**
3        **I take that back.  In medical school we were**
4  **required to do rotation.  So I did a neurosurgery rotation.**
5  **I did a general surgery rotation, a GYN rotation.  So that**
6  **was in medical school.**
7    Q   Got it.  Do you, when you're in medical
8  school, do you perform procedures as part of those
9  rotations?
10   **A   Limited, but sort of part of the team.**
11   Q   Okay.
12   **A   You get to sew up at end, hold a clamp.**
13   Q   That's exciting.
14   **A   It is exciting just to be there.**
15   Q   Performing surgery was not part of your duties
16 as an internal medicine resident, correct?
17   **A   It was not.**
18   Q   And you haven't performed surgery since
19 graduating from medical school, right?
20   **A   Right.**
21   Q   What about your neurology training, let's talk
22 about that.  Can you give me an overview of what neurology
23 training, including in that neurosurgery training, you
24 received during medical school?

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

53

1      A   So we would get neuroanatomy.  We would get,
2   there was neurology lectures.  That was probably a whole,
3   that was a whole year, neurology lectures.  Neurosurgery
4   rotation.
5          And then in residency, while we're -- we would
6   do rotation, we did two neurology rotations where we would
7   rotate with our neurologists on hospital rounds and office
8   rounds.
9      Q   And was that like for a period of time, like
10  with those --
11     A   It would probably be a month at a time.
12     Q   You agree that spinal cord compression is a
13  serious medical condition?
14     A   Yes.
15     Q   Do you agree that documentation is an
16  important part of your work as a clinician?
17     A   Yes.
18     Q   Can you tell me why?
19     A   It's for referencing later.  Some people had
20  multiple visits we can reference later.  It's for
21  communication with other physicians.
22     Q   Do you agree that the standard of care
23  requires accurate documentation?
24     A   Yes.

54

1      Q   Do you agree that the standard of care
2   requires thorough documentation?
3          MS. KINKADE:  Objection, form.
4          THE WITNESS:  Yes.
5   BY MS. GRADY:
6      Q   Are you familiar with the phrase if you don't
7   document it, it didn't happen?
8      A   Yes.
9      Q   Okay.  Can you tell me what you understand
10  that phrase to mean.
11     A   It's straightforward.  It's exactly like it
12  is.
13     Q   If it's not in the records, it's as if it
14  never happened, correct?
15     A   It is as if it never happened.  Could it, yes.
16  Is it useful in the future, probably not.  I mean, we have
17  a recollection of things that were done and maybe something
18  little was not written down, but for the purposes of
19  carrying for patients, it's hard to go back and say yeah,
20  it was this or this, right.
21     Q   And impossible if you don't have a
22  recollection, right?
23     A   Right.
24     Q   I just want to talk about your general

55

1   background.  Prior to this case have you ever been retained
2   as an expert to offer opinions on care other than your own?
3      A   Yes.
4      Q   How many times has that happened?
5      A   Two.
6      Q   And in either of those cases were you retained
7   by Wexford or doctors that you knew to be employed by
8   Wexford?
9      A   No.
10     Q   In those cases, did those pertain to lawsuits
11  that had been filed?
12     A   One was an insurance case and one was a
13  malpractice.
14     Q   When you say an insurance case --
15     A   Motor vehicle accident.  Insurance company not
16  paying.
17     Q   And in the insurance case were you retained by
18  the plaintiff or the defendant?
19     A   Which one is the insurance company?
20     Q   I would imagine that the insurance company
21  would be the defendant being sued for not paying for
22  whatever.
23     A   Then it was the plaintiff.  It was the
24  patient.

56

1      Q   Okay.  And in the malpractice case were you
2   retained by the patient or the doctor?
3      A   The doctor.
4      Q   Do you know, was he the defendant in that
5   case, being accused of malpractice?
6      A   Yes.
7      Q   Did you write a -- did you write a report as
8   part of your expert work in either instances?
9      A   The malpractice case.
10     Q   When were you retained in the insurance case?
11     A   Within the last year.  Yeah, within the last
12  year.
13     Q   And what about the malpractice case?
14     A   It's probably four, five years ago.
15     Q   Did you testify as part of either of these
16  cases?
17     A   No.
18     Q   Did you sit for a deposition as part of either
19  of those cases?
20     A   Yes, both.
21     Q   Both cases?
22     A   Huh-uh.
23     Q   What insurance company was it that retained
24  you, do you know?

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

15 (57 to 60)

---

57

1    A   Insurance company.  No, it wasn't --
2    Q   Oh, no, I'm sorry.  You said it was a patient.
3    A   Yeah.
4    Q   My apologies.
5        So when was the most recent deposition?  I
6  imagine that would be the insurance case?
7    A   Yes.
8    Q   When did that happen?
9    A   Within the last year.  I don't know that I can
10  give you a specific --
11   Q   Okay.  Can you give me a general overview of
12  your opinions in the insurance case.  What was the issue
13  that she was suffering?
14   A   Is that necessary?
15       MS. KINKADE:  Just generally.  You don't have
16  to go into details.
17       THE WITNESS:  No names?
18  BY MS. GRADY:
19   Q   Yeah, you don't have to tell me the names.
20   A   It was a neck and shoulder injury after a car
21  accident.
22   Q   Did it involve spinal cord compression?
23   A   No.
24   Q   Did it involve whether imaging was appropriate

---

58

1  or required?
2    A   No.
3    Q   Did it involve whether referral to a
4  neurologist or other specialist was appropriate or
5  required?
6    A   No.
7    Q   And what about the malpractice case, can you
8  give me in very general terms the subject of your opinions?
9    A   It was none of those things.
10   Q   Okay.  Did it deal with a neurological issue?
11   A   It did not.
12   Q   We've talked about times that you've testified
13  or been deposed as an expert.  Have you ever been deposed
14  for any other reason?
15   A   I was deposed as a defendant.
16   Q   And when did that happen?
17   A   That was ten years ago.
18   Q   Have you been deposed as a defendant once or
19  more than once?
20   A   Once.
21   Q   And what was the issue in that lawsuit?
22   A   Spinal cord compression.
23   Q   Really?
24   A   Yeah.  Don't get all excited.

---

59

1    Q   Tell me what the allegations were as you
2  understand them?
3    A   So I saw him with GI symptoms three weeks
4  before that.  And then he came to our emergency room and he
5  had a thoracic disc rupture with cord compression that was
6  new.  And then he had surgery and, you know, included
7  everybody in the lawsuit and I stayed.  Not by my choice.
8  I was dismissed with prejudice.  Does that mean they can't
9  refile?
10   Q   Yes.
11   A   On the day of trial.  I'm sorry.  It was
12  settled with prejudice.
13   Q   It would still have been dismissed with
14  prejudice.
15   A   Yeah.
16   Q   But to your knowledge the case was settled?
17   A   Yes.
18   Q   And did you personally pay any money to settle
19  the case?
20   A   I did not.
21   Q   That was an insurance company who paid on your
22  behalf?
23   A   Yes, malpractice.
24   Q   Do you know whether that -- was that a lawsuit

---

60

1  in the State of Missouri?
2    A   Yes, here.
3    Q   And do you remember the plaintiff's name?
4    A   I don't remember his last name.  Maybe I'll
5  remember.
6    Q   Do you know whether it was state court or
7  federal court?
8    A   It was in Clayton.
9    Q   That was where the trial was scheduled to
10  happen?
11   A   Yes.
12   Q   Have you ever sat for a deposition as a
13  witness or what's referred to as a treater, a treating
14  physician?
15   A   I don't -- what does that mean?
16   Q   That means have you -- so you've talked about
17  times that you were deposed as an expert where you weren't
18  involved in the care, times where you were deposed as
19  defendant where you're involved in the lawsuit.  I'm asking
20  any other depositions that we haven't talked about already.
21   A   No.
22   Q   Have you ever testified in a trial for any
23  reason?
24   A   There was a trial where a young lady took my

---

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

---

61

1 DEA number and was writing scripts. And I went to court
2 and testified on my behalf and against her.
3     Q     That was a criminal case?
4     A     Yes. It was about narcotic prescriptions.
5 That was probably -- that's probably eight or ten years
6 ago, too. She was a medical assistant at Missouri Baptist
7 and a patient of mine. And that's when we had prescription
8 pads. And she took one and she was writing prescriptions.
9     Q     Any other times that you have testified in
10 court?
11     A     No, ma'am.
12     Q     Have you ever authored any publications on any
13 topics?
14     A     I have not.
15     Q     We talked about the lawsuit where you were
16 named as a defendant that you sat for a deposition in.
17 Have you been named as a defendant in any other lawsuit?
18     A     No.
19     Q     Other than the instance that we already
20 discussed, to your knowledge has an insurance company,
21 malpractice insurance company ever paid money on your
22 behalf?
23     A     No.
24     Q     Have you ever filed a lawsuit?

---

62

1     A     I have not.
2     Q     You're licensed to practice medicine by the
3 State of Missouri, is that right?
4     A     Yes.
5     Q     Have you ever been licensed to practice
6 medicine in any other state?
7     A     I have not.
8     Q     Has your license ever been suspended or
9 revoked for any reason?
10     A     No.
11     Q     Have you ever been subject to official or
12 unofficial discipline by the licensing board?
13     A     No.
14         (Thereupon, Plaintiff Exhibit 2 was marked for
15 identification.)
16 BY MS. GRADY:
17     Q     Okay. The court reporter has just handed you
18 what's been marked as Exhibit 2. This is a copy of a
19 report that was produced to us by defense counsel in this
20 case. This is a copy of your final report, right?
21     A     Yes.
22     Q     When was your final report completed?
23     A     There's no date on here. I don't know.
24     Q     Can you give me an approximate time?

---

63

1     A     A month ago, roughly.
2     Q     In order to write this report, you relied on
3 all of the information that you had received about the
4 case, including the materials you reviewed, right?
5     A     Yes.
6     Q     When were you retained by the defendants as an
7 expert in this case?
8     A     Two months ago.
9     Q     When you were retained by the defendants, what
10 were you told about the facts of the case?
11     MS. KINKADE: Objection. Rule 26 privilege.
12     MS. GRADY: I think though -- it's fine if
13 you're going to instruct him not to answer. I don't think
14 it's privileged because I think it is -- he's just
15 testified he relied on all of the facts that he learned
16 about the case, and that's one of the exempted categories.
17         It's up to you, however you want to instruct
18 him. But I think it fits under our Rule 26(b)(4)(c)(2),
19 the facts or data that the party's attorney provided and
20 the expert considered in forming the opinions he expressed.
21     MS. KINKADE: But the form of your question
22 was not limited that way. So I will instruct you, based on
23 the way that question was asked, not to answer as it's
24 privileged as the rule states that you only testify to

---

64

1 facts that you relied on and not all of our communications.
2 BY MS. GRADY:
3     Q     Are you going to take Ms. Kinkade's advice not
4 to answer the question?
5     A     I will take her advice.
6     Q     Okay. What was your understanding of your
7 assignment as an expert in the case?
8     A     To look at -- what's the document where the
9 accusations are?
10     Q     That would be maybe the complaint?
11     A     Yes, to look at that and address those issues.
12     Q     Let me just make sure that I've asked the
13 question in the right way. And wait for Ms. Kinkade to
14 object again in case she contends that my question is still
15 inappropriate.
16         When you were retained by the defendants, were
17 you told about the facts of this case? I'm not asking
18 about what you were told. I'm just asking yes or no, were
19 you told about the facts of the case.
20     MS. KINKADE: You can answer that one.
21     THE WITNESS: Oh, okay. I had a phone call.
22 BY MS. GRADY:
23     Q     So don't tell me -- she's instructed you not
24 to tell me what the facts were.

---

**65**

1      A   So, yes.
2      Q   Okay.  Did you ever or do you now have
3  any hesitation about any of the opinions that appear in
4  Exhibit 2?
5      A   I do not.
6      Q   At the time that you submitted this report,
7  did you have any additional opinions about this case that
8  you did not put into your report?
9      A   No.
10     Q   Okay.  Let's look at, first at the materials
11 that you've listed as having reviewed.
12     A   Yes.
13     Q   You've listed on there five sets of records.
14 If you would just review those and let me know once you've
15 done that.  I'm going to ask you if that's a complete list.
16     A   To make my opinion, those are the things that
17 I reviewed.
18     Q   Okay.  So prior to submitting this final
19 report, you reviewed the records that you have listed here,
20 correct?
21     A   Huh-uh.
22     Q   You also reviewed the plaintiff's complaint in
23 this case, correct?
24     A   Huh-uh.

---

**66**

1      Q   Is that a yes?
2      A   Yes.
3      Q   Are there any other documents that you have
4  not listed here that you reviewed prior to your submission
5  of this report?
6      A   No.
7      Q   Are there any materials that you received,
8  whether you reviewed them or not, prior to your submission
9  of this report?
10     A   Other than these?
11     Q   Correct.
12     A   No.
13     Q   Did you receive the materials listed here all
14 at one time?
15     A   Yes.
16     Q   Did you ask for any additional materials at
17 any time?
18         MS. KINKADE:  I'm going to object.  I think
19 we're getting into conversations between the attorney and
20 the expert.  So I believe that's privileged as well.
21         Do not give any testimony regarding our
22 conversations unless they're facts that you relied on in
23 coming to your opinion.
24         THE WITNESS:  I will take your advice and not

---

**67**

1  answer.
2  BY MS. GRADY:
3      Q   Okay.  Let me ask you this, are there any
4  materials that you thought would be helpful to have in
5  drafting your report that you did not have?
6      A   No.
7      Q   Are there any materials that you can think of
8  as you sit here today that you would think would have been
9  helpful to have had while you were preparing your report in
10 this case?
11     A   No.
12     Q   You did not review the deposition testimony of
13 Gary Armbruster, correct?
14     A   It was after this.
15     Q   Okay.  Good.  So I am going to ask you about
16 what you got after you submitted your report, but thank you
17 for clarifying.
18         Prior to the submission of your final report,
19 you did not review the deposition testimony of Gary
20 Armbruster, correct?
21     A   Right.
22     Q   Prior to the submission of your report, you
23 did not review the deposition testimony of Dr. Shah,
24 correct?

---

**68**

1      A   I did.  Yeah, I had Shah.  I had his
2  deposition for this, right?
3      Q   It has to be your testimony.
4      A   Yes, Dr. Shah, yeah, I read his as part of
5  this.  Isn't that --
6      Q   You agree that Dr. Shah's deposition is not
7  listed as one of the materials --
8      A   No, I take that back.  His information is in
9  the prison records, yeah.
10     Q   Okay.  So prior to submission of the final
11 report, you did not review deposition testimony by
12 Dr. Shah, is that correct?
13     A   No.
14     Q   Just so the record is clear, my statement is
15 correct, that you did not review the deposition testimony
16 of Dr. Shah prior to the submission of your report,
17 correct?
18     A   Correct.
19     Q   Okay.  You did not review the deposition
20 testimony of any of the nurses in this case prior to your
21 submission of the -- of your report, correct?
22     A   Did not.
23     Q   Did you review any MRI images prior to your
24 submission of this report?

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

69

1      A   The images, no.  The reports are in there.
2      Q   Yes, the actual images.
3      A   I did not.
4      Q   You did review the plaintiff's complaint.  Did
5  you review a March 2015 letter from Dr. Bailey prior to the
6  submission of your report?
7      A   No.
8      Q   Okay.  I want to go through the materials that
9  you have listed here.  The first that you listed is full
10 context of the Illinois Correctional Center Clinic records
11 May through September 2014.  What does that mean, full
12 context?
13     A   Everything that was sent to me, which is
14 nurses notes.  It's the nurses -- the nurse clinic notes,
15 the doctor visits.
16     Q   You did not review records from
17 Mr. Armbruster's medical care in prison prior to May of
18 2014, correct?
19     A   No.
20     Q   You didn't review medical records relating to
21 Mr. Armbruster's medical care in prison after
22 September 2014, correct?
23     A   Did not.
24         (Thereupon, Plaintiff Exhibit 3 was marked for

70

1  identification.)
2  BY MS. GRADY:
3      Q   I'm going to hand you what's been marked as
4  Plaintiff's Exhibit 3.  This a copy of a compilation of
5  records from the full medical file that was produced in
6  this case.
7          Can you look through this and tell me whether
8  are any -- I'm not going to -- I don't need you to review
9  the substance of each note.  I'd like you to go through and
10 look briefly at each page and tell me whether there are any
11 additional records that you recall reviewing as part of the
12 prison records you reviewed that does not appear in this
13 exhibit.
14     A   Is this part of the big stack from the -- like
15 where do these come from?
16     Q   Well, these come from records that were -- so
17 the reason for my question is that I don't know from
18 looking at this exactly what you looked at and what you
19 didn't look at.
20     A   Okay.
21     Q   So I pulled records that are from May to
22 September of 2014 excepting the medication administration
23 records.
24     A   Okay.

71

1      Q   And I think that that's a complete set of all
2  the records that would fall under what you detailed here,
3  again with the caveat of whether or not you reviewed -- do
4  you know whether you reviewed the medication administration
5  record for that time frame?
6      A   That was about this thick (indicating).
7      Q   So did you receive those records?
8      A   Yes, from the Illinois -- is this Illinois
9  Correctional Center?
10     Q   Correct.
11     A   Yeah.  So the reason I'm asking that is I
12 don't know that I can tell you whether I saw this in that
13 record or did not.
14     Q   Okay.
15     A   If that's what you're asking.
16         MS. GRADY:  Sure.  And let's go off the record
17 for a second.
18         (Thereupon, a discussion was held off the
19 record, after which the following proceedings were had:)
20 BY MS. GRADY:
21     Q   How were you provided documents by the defense
22 attorneys?  Were you provided those documents via email
23 or --
24     A   Mr. Dugan brought them by in a box.

72

1      Q   So he brought paper copies?
2      A   Yes.
3      Q   And do you still have those paper copies?
4      A   At home.
5      Q   I think what we would ask then is that you
6  transmit those documents to the defense lawyers in this
7  case --
8      A   Okay.
9      Q   -- so that we can learn exactly what documents
10 you did see and what documents you didn't see.
11     A   Okay.
12     Q   And that includes all of these categories of
13 documents, right?  You haven't thrown any of the documents
14 away?
15     A   No, I have all of them.
16         MS. GRADY:  Okay.  Great.  And if he sends
17 them, great.
18 BY MS. GRADY:
19     Q   Okay.  So you don't have to look through that
20 whole record then.
21     A   Okay.
22     Q   At least not yet.
23     A   I read it once.  It was torture.
24     Q   I do have a question though.  Let's look at

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

---

73

1  just the second page of this document.  This is a record,
2  just for the record, it's P360.  This is a record created
3  by Dr. Shah.  I find his writing very difficult to read.
4  Do you agree?
5      A   Yes.
6      Q   How did you discern what he wrote in these
7  records?
8      A   It took a long time.  I mean, we used to do
9  paper records too.  So basically it was taking time and
10 thinking and reading.  And, you know, sometimes a note here
11 will have a word over there and you can read it.  So it
12 just takes a long time.
13     Q   Okay.  You were also provided, looking back at
14 Exhibit 2, you were also provided Gateway records from May
15 of 2011?
16     A   Yes.
17     Q   You agree that there was nothing in the
18 plaintiff's second amended complaint about the treatment
19 that Mr. Armbruster received in May of 2011, right?
20     A   (Witness nods his head.)
21     Q   Is that yes?
22     A   Right.
23     Q   Any idea why you were given those records?
24     A   I don't know why I was given them, but they're

---

74

1  pertinent.  In the history, if someone has similar symptoms
2  in the past, those symptoms are pertinent.
3      Q   You didn't see any reflection in the
4  records -- well, you didn't see any reflection in anything
5  that you reviewed that Dr. Shah at any point was aware of
6  that visit, correct?
7      A   I don't know if he was.  I have not seen
8  anything that would say he was or was not.
9      Q   The Saint Mary's Hospital records from
10 September 26th, 2014, I'm not going to ask you to go
11 through them, but we have two different sets of documents
12 that were produced in this case.  One was produced by the
13 hospital and one was produced by the neuroscience
14 department.
15         Do you have any idea which set -- this is the
16 hospital, which is a couple hundred pages, almost 200, and
17 the neuroscience I think was about 80.  Do you have any
18 idea --
19     A   May I see the heading?
20     Q   Sure.
21         MS. GRADY:  I'll mark this as Exhibit 4.  This
22 is the set of records that came from the neuroscience
23 department.
24         (Thereupon, Plaintiff Exhibit 4 was marked for

---

75

1  identification.)
2         THE WITNESS:  I cannot confidently say if I
3  saw this or --
4         (Thereupon, Plaintiff Exhibit 5 was marked for
5  identification.)
6  BY MS. GRADY:
7      Q   Just to interrupt you, Doctor, for the record,
8  I just marked as Exhibit 5 the documents produced to us
9  from, I think, the actual hospital.
10     A   So these encounters are October of '14.  So a
11 lot of this looks like a discharge summary.  And then the
12 rest of it looks like outpatient after he was discharged.
13     Q   Okay.
14     A   So think I -- I don't know whether I can tell
15 you for sure.  I think I did not see these.
16     Q   Okay.
17     A   Because these are all afterwards.
18     Q   You only saw Saint Mary's records for
19 September 26th, 2014, correct?
20     A   Is that this?
21     Q   Well, no.  I think maybe they both actually
22 include records that are --
23     A   So I did see records from Saint Mary's.
24     Q   But only for September 26th, is that right?

---

76

1      A   That hospitalization, yes.
2      Q   Okay.  And then you saw emergency room records
3  from a January 2015 encounter when Mr. Armbruster went to
4  the emergency room with cold or flu like symptoms, correct?
5      A   Yes.
6      Q   You agree that that encounter didn't appear
7  anywhere in plaintiff's second amended complaint?
8      A   Say that again, the question.
9      Q   You agree that Mr. Armbruster's care in
10 January of 2015 when he reported cold or flu like symptoms,
11 that was not part of plaintiff's allegations as laid out in
12 the complaint, right?
13     A   One of his allegations was about permanent
14 damage.  So a later medical record.  And for whatever
15 reason that physician included a normal neurologic exam and
16 a normal neuro review of systems.  So I think it was
17 pertinent.
18     Q   You didn't receive any records from a visit
19 with Dr. Bailey in March of 2015, correct?
20     A   No.
21     Q   You didn't receive any radiological reports
22 regarding Mr. Armbruster's cervical spine at imaging from a
23 March 2015 visit, correct?
24     A   No.

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

77

1     Q   Those records have been helpful to you in
2   reaching your opinions in this case?
3         MS. KINKADE:  Objection, form.
4         THE WITNESS:  Yes.
5   BY MS. GRADY:
6     Q   Did you receive them after submitting your
7   final report?
8     A   No.  I have some other information in my head,
9   but I think it was Bailey's -- I have a Bailey's deposition
10  after that, right, the deposition of Bailey?  Yeah.
11    Q   So let's talk about all the records that you
12  reviewed after you submitted your report in this case.  One
13  of those things is Dr. Bailey's transcript?
14    A   Yes.
15    Q   What other documents did you receive after you
16  submitted your report?
17    A   I should have just brought them all.  Then I
18  have seen Mr. Armbruster's deposition.  I have a letter --
19  I have the summary of Dr. Brown.
20    Q   The report from Dr. Brown?
21    A   The initial report.  I know his deposition was
22  yesterday, so I do not have that report.
23    Q   Okay.  What else have you received since
24  issuing your report?

78

1     A   That's all I can recall right now.
2     Q   Did you receive a report from Dr. Petkovich?
3     A   Yes.
4     Q   Did you receive -- did you receive deposition
5   testimony from Dr. Shah?
6     A   Yes.
7     Q   Did you receive deposition testimony
8   transcripts for any of the nurses?
9     A   No.
10    Q   Did you receive exhibits with Dr. Bailey's
11  deposition transcript?
12    A   Yes.
13    Q   Did you review them?
14    A   Yes.  Keep everybody straight.
15    Q   Did reviewing any of those documents change
16  any of the opinions that you've detailed in your report in
17  Exhibit 2?
18    A   No.
19    Q   Okay.  Would it have been helpful to have the
20  deposition transcript of Dr. Bailey prior to submitting
21  this report?
22    A   It would be helpful to have everything before
23  submitting a report.
24    Q   Why?

79

1     A   We work on having all the information.
2         (Thereupon, Plaintiff Exhibit 6 was marked for
3   identification.)
4   BY MS. GRADY:
5     Q   I'm going to hand you what's been marked as
6   Exhibit 6.  This a copy of the -- some additional things
7   that were disclosed to us with your report.  Is this an
8   accurate reflection on Page 1 of Exhibit 6 of your hourly
9   rate?
10    A   Yes.
11    Q   And is that the same hourly rate that you
12  charged in your other cases where you were retained as an
13  expert?
14    A   Yes.
15    Q   This was disclosed to us, I believe, on
16  May 4th.  Can you tell me whether as of that date you --
17  it's correct that you had spent a total of four hours
18  working on this case?
19    A   Yes.
20    Q   And that would include both reviewing all
21  material that you were provided, forming your conclusions,
22  and then creating the final report in Exhibit 2?
23    Q   Since May 4th, have you spent any additional
24    Q   Since May 4th, have you spent any additional

80

1   hours on this case?
2     A   Yes.
3     Q   How many?
4     A   Five, approximate.
5     Q   And what have you spent that time doing?
6     A   The additional depositions that were provided.
7   Reviewing things before meeting today.
8     Q   Do you intend to bill the defendants for that
9   time?
10    A   Yes.
11    Q   Okay.  You can put this aside.  I want to talk
12  specifically about some of the things in your report.
13        (Thereupon, a recess was taken, after which
14  the following proceedings were had:)
15  BY MS. GRADY:
16    Q   Okay.  So on Exhibit 2, which is your report,
17  if you would take that out.  The first paragraph under the
18  listing of materials that you reviewed details the May 2011
19  encounter that Mr. Armbruster had at Gateway Regional
20  Medical Center, is that correct?
21    A   Yes.
22    Q   You agree that you have not disclosed an
23  opinion in your report on the cause of Gary Armbruster's
24  tingling, correct?

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

81

1    A   You mean a specific diagnosis, I have not.
2    Q   Okay.
3    A   In this report.  Is that what you mean?
4    Q   That's what I mean.
5    A   Okay.
6    Q   You're not -- strike that.
7    A   Are you talking about in that paragraph about
8    the May 2nd, 2011 visit?
9    Q   Well, I'm asking broadly whether anywhere in
10   this report you've disclosed -- you've written down an
11   opinion that you have reached to a reasonable degree of
12   medical certainty about what caused the tingling in
13   Mr. Armbruster's hand -- strike that.  Sorry.  Let me
14   rephrase that.
15       You agree that there's nothing in your report
16   where you have detailed an opinion about the cause of the
17   right arm pain that Mr. Armbruster reported in May of 2011?
18   A   I wrote most commonly from a ruptured cervical
19   disc.
20   Q   So I read that to talk in generalities about a
21   common cause.
22   A   Yes.
23   Q   So that's why I'm asking.
24   A   It's not a definitive diagnosis.

82

1    Q   Okay.  So you have not reached a diagnosis to
2    a reasonable degree of medical certainty about --
3    A   Correct.
4    Q   -- what caused Mr. Armbruster's report of
5    right arm pain in May of 2011?
6    A   Yes, ma'am.
7    Q   And that last statement you state, many times
8    with conservative, nonsurgical treatment these will heal
9    but may leave some residual tingling in the hand.  Do you
10   see that statement in your report?
11   A   Yes.
12   Q   And when you say these, you're referring to
13   ruptured cervical discs, correct?
14   A   Yes.
15   Q   Can you tell me what is a ruptured cervical
16   disc.
17   A   So the disc is, have a rubbery tissue between
18   each one of the vertebra.  And when we talk about it
19   rupturing, it comes out from where it's supposed to be and
20   kind of protrudes out from its space.
21   Q   How does a ruptured cervical disc relate to
22   spinal cord compression?
23   A   It is one of the causes of spinal cord
24   compression.

83

1    Q   Spinal cord compression cannot heal without
2    surgical intervention, correct?
3    A   It can.
4    Q   Fair enough.  Spinal cord compression
5    typically does not heal on its own, is that correct?
6    A   It can.
7    Q   Okay.  Let me ask it this way, did you rely on
8    any studies or other authoritative literature for your
9    statement that many times with conservative, nonsurgical
10   treatment, these, referring to ruptured cervical discs,
11   will heal but may leave some residual tingling in the hand?
12   A   No.  It's my experience in practice.  I don't
13   think you need a paper to tell you about that.  I don't
14   need a paper to tell me about that.
15   Q   Okay.  What percentage of the ruptured
16   cervical discs that you've treated in your practice have
17   healed with conservative, nonsurgical treatment?
18   A   So the one I'm talking about there is
19   radicular pain and not a spinal cord compression.  So
20   that's pressing on a nerve root.
21   Q   So when you say these as you use in that
22   sentence, you're actually referring to a ruptured cervical
23   disc causing radicular right arm pain that is not a spinal
24   cord compression?

84

1    A   Yes.
2    Q   And the word radicular means that it's not a
3    spinal cord compression, is that right?
4    A   Yes.  And that's 90 percent of the discs that
5    rupture are radicular pain and not cord compression.
6    Q   Just want to make sure I understand the
7    terminology.
8    A   Yeah.
9    Q   Radicular refers to the cause of the pain, is
10   that right?
11   A   Radicular is a description.  It's a nerve
12   root.  Radical means root.  So it's pressing on a nerve
13   root.  So that's our description of the discs that go to
14   the side and not against the spinal cord.
15   Q   So then these refers to ruptured cervical disc
16   caused by -- ruptured cervical disc that result in
17   radicular right arm pain.  What percentage of those, in
18   your practice, have healed through conservative,
19   nonsurgical treatment?
20   A   The majority of them will.
21   Q   What percentage?
22   A   Seventy percent.
23   Q   And how many have you treated?
24   A   Hundreds.

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

85

1    Q    And when you say may leave some residual
2 tingling, what do you mean, may?
3    A    So some people, it's healed, and they tell me
4 months or years later that they have a little bit of
5 tingling in their, like a fingertip.  So people can have
6 some of that discomfort that remains.
7    Q    The residual tingling that you're referring to
8 in that paragraph is minor?
9    A    Yes.
10    Q    And it's --
11    A    Yeah, because the ones that are not minor,
12 those would get surgery.
13    Q    And is it constant or is it intermittent?
14    A    It may be either one.  Some people it's just
15 positional.  They turn their head wrong and they have
16 tingling.
17    Q    In your review of all of the materials that
18 you have reviewed up to today, you didn't see any evidence
19 of any report of residual tingling in Mr. Armbruster's hand
20 between June 2011 and December 2011, correct?
21    A    June 2011 and when?
22    Q    December 2011.
23    A    No.
24    Q    And in your review of any of the materials

86

1 that you reviewed thus far in the case up to today, did you
2 review any evidence of Mr. Armbruster reporting tingling in
3 his hand at any point in 2012?
4    A    No.
5    Q    In your review all of the records that you
6 reviewed thus far in the case, did you review any evidence
7 that Mr. Armbruster reported tingling in his right hand at
8 any point in 2013?
9    A    No, ma'am.
10    Q    And in your review of the records did you
11 review any evidence that Mr. Armbruster reported tingling
12 in his right hand at any point before May 1st, 2014?
13    A    No.
14    Q    Are you giving me another pen?
15    A    Yes, ma'am.
16    Q    It's not because I needed a pen.
17    A    It's going to go all over you in a minute.
18 Let me have that one.
19    Q    The first sentence of that next paragraph you
20 state, it is common that symptoms, whether real or not,
21 reported by a patient may not be substantiated by an
22 abnormal exam.  Why did you include the phrase whether real
23 or not?
24    A    So we're seeing a patient for the first time.

87

1 Patients have symptoms, and we want to know if they have an
2 abnormal exam.  Occasionally people make things up.
3 Occasionally people have symptoms that are psychosomatic.
4 So we like to have a symptom supported by an exam.
5    Q    You agree you haven't disclosed any opinions
6 about whether or not Mr. Armbruster's symptoms were
7 psychosomatic, correct?
8    A    I have not.
9    Q    And you agree you haven't disclosed any
10 opinion about whether Mr. Armbruster made his symptoms up,
11 correct?
12    A    I have not.
13    Q    Are you familiar with the term malingering?
14    A    Yes.
15    Q    And what do you understand that phrase to
16 mean?
17    A    That people make up symptoms so they can have
18 some gain, a reward, getting out of some duty, something
19 like that.
20    Q    So you've just testified that you like to have
21 an exam that drives your treatment decisions.  Is it
22 appropriate for a physician in the absence of any evidence
23 of malingering, which I'm using to describe making things
24 up, or any evidence that symptoms are psychosomatic, is it

88

1 appropriate for the physician to disregard those symptoms
2 if the exam is normal?
3         MS. KINKADE:  Objection to form, incomplete
4 hypothetical.
5         THE WITNESS:  We may not disregard them.  We
6 format them to have -- then you have -- then I have a
7 symptom, or a physician can have a symptom in their head
8 but doesn't have an abnormal finding on exam.  So we
9 typically don't disregard them, no.
10 BY MS. GRADY:
11    Q    Well, do you agree that it would be
12 appropriate in the instance where the exam that you've
13 conducted is not abnormal but has not explained the symptom
14 for the physician to conduct further examination to
15 understand what the symptom is, in the absence of evidence
16 that the patient's symptoms are psychosomatic or that the
17 patient is malingering?
18         MS. KINKADE:  Objection, form, improper
19 hypothetical.
20         THE WITNESS:  What was the question in there?
21 BY MS. GRADY:
22    Q    Do you agree that it is appropriate for a
23 physician whose exam does not explain the symptoms being
24 reported to do further examination to discover the cause of

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

---

89

1 those symptoms?
2          MS. KINKADE: Same objection.
3          THE WITNESS: It might be appropriate to do
4 further testing, yes. We would not just disregard the
5 symptom.
6 BY MS. GRADY:
7      Q   When you say it might be appropriate, tell me
8 the circumstances in which it would not be appropriate.
9      A   To do further testing?
10     Q   Correct.
11     A   It would not be appropriate if you know that
12 the patient is malingering or not real or making it up.
13 For instance, people might have a symptom in the room, they
14 walk out the door, you see them in the hallway, they don't
15 have it anymore, a limp or something like that, they don't
16 have it anymore. That would be the time when it would be
17 appropriate to not do any testing.
18     Q   So evidence that a patient is malingering
19 would be an instance to not do further testing. And I
20 think you probably already said that evidence that a
21 patient's symptoms are psychosomatic is another reason not
22 to do any further testing despite an exam that does not
23 explain a patient's reported symptoms, correct?
24     A   Yes.

---

90

1      Q   Are there any other circumstances in which it
2 would be appropriate for the physician not to do further
3 testing when the exam does not explain the symptoms?
4          MS. KINKADE: Object to form, incomplete
5 hypothetical.
6          THE WITNESS: What do you mean by testing?
7 Testing might be further exam.
8 BY MS. GRADY:
9      Q   Correct.
10     A   A repeat exam later. It might be imaging, it
11 might be blood tests, that kind of thing.
12     Q   Correct, a further examination as that word is
13 broadly defined. So let me just make sure that my question
14 is clear.
15         In your opinion are there any other
16 circumstances, other than evidence suggesting a patient is
17 malingering or evidence suggesting that a patient's
18 symptoms are psychosomatic, that would make it appropriate
19 for a physician not to do any further examination when the
20 examination conducted to date does not explain the
21 patient's reported symptoms?
22         MS. KINKADE: Same objection.
23         THE WITNESS: It would -- I can't think of
24 anything else, no.

---

91

1 BY MS. GRADY:
2      Q   Okay. The next sentence of your report is
3 that Mr. Armbruster's complaints, which you detail there,
4 were not substantiated by abnormal neurological exam --
5 neurologic exam.
6         Is it neurological exam or neurologic?
7      A   Either one.
8      Q   Okay. And when you're referring to those
9 complaints, are you referring to those complaints as the
10 complaints that he lodged over the period of time from May
11 to September 2014 when he was under the care of Dr. Shah or
12 are you referring to a particular point in time?
13     A   I was referring to that time.
14     Q   But the whole time, the May to September 2014
15 time frame, or are you referring to a particular visit on a
16 particular day?
17     A   So it's probably taken as a whole paragraph.
18 If you want to just dissect that one sentence, it would be
19 over the whole time.
20     Q   Okay. And that -- you agree that that opinion
21 relies on -- strike that.
22         Mr. Armbruster's complaints were not
23 substantiated by the abnormal -- by the neurologic exam
24 that Dr. Shah conducted, correct?

---

92

1      A   Yes.
2      Q   And you agree that you haven't disclosed any
3 opinion in your report as to whether or not the neurologic
4 exam that Dr. Shah performed at any point between May and
5 September of 2014 was adequate, correct?
6      A   I have not.
7      Q   Tell me what you mean by Mr. Armbruster's
8 symptoms were inconsistent.
9      A   If you looked at the doctor's visits each
10 time, they were not the same each time.
11     Q   Okay. Let's look at Exhibit 3. And turning
12 to page, I'm going to refer to some Bates numbers at the
13 bottom of this page, P360.
14     A   Okay.
15     Q   On May 4th. Mr. Armbruster's complaint as
16 documented in the medical record is pain and tingling in
17 the arms.
18     A   Yes.
19     Q   Let's turn to Page 363.
20         MS. KINKADE: Did you say 363?
21         MS. GRADY: Correct.
22         THE WITNESS: So I'll also add, so when we're
23 seeing people in a record, his symptoms include what the
24 nurse was talking about, too. So I'm presuming that since

---

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

93

1 they do a nurse review and then the doctor sees them, that,
2 so, yes, the doctor wrote down pain and tingling in the
3 arms, but as he has this information available, like our
4 medical assistant will gather some information, we'll look
5 at that and then we'll build on that.
6     So when he's seeing that, that would include
7 all of these symptoms. So pain in the shoulder blade, my
8 arms and fingers tingle, hurts all the time. So as a
9 physician I would include those. Now, I would put it in my
10 note. He may have chose not to go in his note and
11 handwrite. He may just -- but on a physician visit like
12 that, in my mind it would include those symptoms, too.
13 BY MS. GRADY:
14     Q   So on May 13th Mr. Armbruster, according to
15 this medical record, reports that his arms and fingers
16 tingle and it hurts all the time. That's on P359. And
17 then on May 14th he reports pain and tingling in his arms.
18 Those aren't inconsistent reports of symptoms, right?
19     A   No.
20     Q   And then on May 20th, P363, this nurse at the
21 bottom on May 20th has reported that Mr. Armbruster, under
22 the subjective portion, that Mr. Armbruster reports that
23 the fingers on his right hand are numb, my right side
24 tingles down to my waist, I have little grasp on my right

94

1 hand, my left side -- actually I'm not sure whether it says
2 left or right -- tingles to waist. My knees hurt. I can
3 barely walk.
4     Anything inconsistent about that report
5 from -- as compared to the May 13th or 14th visit?
6     MS. KINKADE:   I'm just going to object to the
7 extent that the question differs from the records.
8 BY MS. GRADY:
9     Q   Okay. You can answer.
10     A   Say that again, the question.
11     MS. KINKADE:   Just I'm objecting to the extent
12 that the question differs from the records.
13
14 BY MS. GRADY:
15     Q   Well, you can look at the record right here.
16 So on P363, and I think -- I actually can't read whether
17 it's left or right side on some of this.
18     A   My right side tingles down to my waist. I
19 have little grip in my right hand. Yeah, it looks like RT.
20 My left side tingles to the waist.
21     Q   My knees hurt, I can barely walk.
22     A   Right.
23     Q   Okay. So that record --
24     A   So that is actually additional symptoms but

95

1 different than the first time.
2     Q   But so what's inconsistent about that?
3     A   Could I use the word different, inconsistent?
4     Q   Well, you said that the symptoms were
5 inconsistent. So that's what I'm trying to explore, what
6 you mean by that and go through.
7     A   Right.
8     Q   So additional symptoms, to my reading, don't
9 necessarily mean inconsistent. As you get worse you get
10 more additional symptoms. But would that be inconsistent
11 in your view, having additional symptoms would become an
12 inconsistent report?
13     MR. BOOSE:   Objection, form.
14     MS. KINKADE:   Join.
15     THE WITNESS:   Just that they're not the same.
16 BY MS. GRADY:
17     Q   So that's what you mean by inconsistent?
18     A   Yeah.
19     Q   Okay. So that could refer to Mr. Armbruster
20 reporting additional symptoms over time, right?
21     A   Yes.
22     Q   Okay. The next sentence of your report --
23     A   So if I could add one more. You know, on 6/3
24 MD, vague body ache.

96

1     Q   And are you assuming, in finding that that's
2 inconsistent, are you assuming that Mr. Armbruster said the
3 words I'm suffering a, quote, vague body ache?
4     A   Typically when we put complain of, it's CO,
5 we're repeating what the patient said.
6     Q   Would your opinions change if vague was a
7 gloss that Dr. Shah used and not the word that
8 Mr. Armbruster had used?
9     MS. KINKADE:   Objection, form.
10     THE WITNESS:   I don't use vague. I use mild.
11 But if the patient tells me I hurt a little, then I might
12 write little or mild. So Dr. Shah chose vague.
13 BY MS. GRADY:
14     Q   Sorry, I'm not sure that I understand. It's
15 your understanding -- strike that.
16     A   If you go through --
17     Q   Sorry, before we move on, and then I'll give
18 you a chance, you don't actually know what Mr. Armbruster
19 said here, right?
20     A   No. I would take that as a physician reported
21 patient symptom.
22     Q   So you are understanding this to be the words
23 that Mr. Armbruster used to report his subjective symptoms?
24     A   When physicians write under that part of the

97

1  chart complains of, that's usually what the patient has
2  told the physician.  If it's exact words, it's usually in
3  quotation marks.
4      Q   Well, so what did Mr. Armbruster report to
5  Dr. Shah?
6      A   Vague whatever he says.
7      Q   You think that he used the word vague?
8      A   Probably not.  It's not in quotation marks.
9  I'm saying that as a physician, a physician writes down
10 what the patient says, why are you here, and we write C
11 slash O.
12     Q   So what does vague refer to?
13     A   Mild.  Nondescript.  Like I said, I don't use
14 vague, but that's the way I would interpret that.
15     Q   Okay.  You see that in -- just one minute.  I
16 lost my place.
17         Okay.  If you would turn to Page 368.
18 Dr. Shah again at that page documents vague LBP.  What do
19 you understand that to refer to?
20     A   Low back pain.
21     Q   What's the next line there, if you can read
22 it?
23     A   I'm not sure the line is right below
24 that.

98

1      Q   I'm not sure either.
2      A   It may be hand tingly and numb.
3      Q   And so to your reading does vague refer just
4  to the lower back pain or to the tingling and numbness as
5  well?
6      A   I would say the whole thing.
7      Q   Okay.  Can you turn the page before.  And just
8  to be clear, your reading of the word vague is that the
9  patient, as part of his subjective report of his
10 complaints, is reporting mild symptoms, correct?
11     A   Yes.
12     Q   Okay.  So if you can turn to the page before
13 this.  This is a record generated by someone other than
14 Dr. Shah, a nurse.
15     A   Huh-uh.
16     Q   Is that a yes?
17     A   Yes.
18     Q   And it's, you know, less than an hour before
19 Dr. Shah sees the patient, correct?
20     A   Yes.
21     Q   Under the objective portion of this exam Nurse
22 Maston reports that it took five minutes for the offender
23 to print and sign refusal.  Do you see that?
24     A   Yes.

99

1      Q   And do you have any information about the
2  reason behind that?
3      A   No.
4      Q   Would it be helpful to inform your opinions in
5  this case about what Ms. Maston observed about the reason
6  it took Mr. Armbruster so long to print and sign his name?
7      A   It would be good to know that.
8      Q   Would it have any impact on your opinions in
9  this case if Ms. Maston reported -- Ms. Maston or
10 Mr. Armbruster reported that the reason it took him five
11 minutes is because he was unable to grasp the pen
12 sufficiently?
13         MS. KINKADE:  Objection, form, assumes facts
14 not in evidence.
15         MR. BOOSE:  Objection, form.
16         THE WITNESS:  Is that what she said?
17 BY MS. GRADY:
18     Q   Well, I'm asking.  Respectfully, I get to ask
19 the questions at the deposition.
20         Would it change any of your opinions if one or
21 both of those witnesses to this event testified to those
22 things?
23     A   Maybe.  But then you would want to see the
24 exam to support that.

100

1      Q   You'd want to see what Dr. Shah's testing of
2  grip strength or other strength in the upper extremities
3  was?
4      A   More observation, right.
5      Q   And the standard of care would require him to
6  perform that portion of the neurologic exam, correct?
7         MS. KINKADE:  Objection to form.
8         THE WITNESS:  We would usually do that, at
9  least on a focal exam -- or a focus exam, excuse me.  So if
10 there is a neurologic exam, nonfocal, right, this is the
11 same date?
12 BY MS. GRADY:
13     Q   Yes.  But turning back again to 367, under the
14 subjective portion Mr. Armbruster, according to
15 Ms. Maston's note, reports can barely walk, no grip of
16 hand, tingling and numbness, could not pick daughter up
17 with his right arm.  When he walk, feels sharp pain in his
18 lower back all the way across back.  Do you see those
19 portions of her report?
20     A   Yes.
21     Q   That wouldn't be vague reports of pain,
22 correct?
23         MS. KINKADE:  Objection, form.
24         THE WITNESS:  According to the nurse would not

101

1  be.
2  BY MS. GRADY:
3      Q   It would be -- let's assume for a minute that
4  Gary Armbruster actually used those exact words when
5  reporting this to Ms. Maston on the morning of May 28th,
6  2014.
7          It would violate the standard of care for any
8  medical care provider to describe those reports as vague,
9  correct?
10         MS. KINKADE:  Objection, form, incomplete
11  hypothetical.
12         THE WITNESS:  So this gets to the difference
13  between what the nurses write down and then when the doctor
14  is seeing him.  So they disagree, right.  I can't argue
15  with that.
16  BY MS. GRADY:
17     Q   Right.  But that wasn't my question.  I'm not
18  asking about whether the reports of the subjective portion
19  of the exam conflict or don't conflict with each other.
20  I'm just asking you, looking just at P367, and let's assume
21  for purposes of my question that Mr. Armbruster used the
22  verbatim words that appear in this medical record.
23         Do you agree that it would be against the
24  standard of care for a medical care provider, hearing the

102

1  reports as written on this record, to record under the
2  subjective portion of the medical record that the patient
3  reports vague back pain?
4      A   Yes.
5          MS. KINKADE:  I just want to restate my
6  objection to that question.
7  BY MS. GRADY:
8      Q   What does it mean for the results of a
9  neurologic exam to be nonfocal?
10     A   I would presume that someone like you could
11  make an assessment by minimal examination.  So you could
12  say that the patient walked and talked normally.  You could
13  say that he used all four limbs, it wasn't one side or the
14  other.  It's not more specific than that.  It's kind of a
15  general neurologic impression more than exam.
16     Q   Let's turn to Page P372.  It's 6/17/14 is
17  the --
18     A   Okay.
19     Q   Okay.  This is an encounter between Dr. Shah
20  and Mr. Armbruster in which Dr. Shah documents, quote, from
21  the medical record, quote, patient argumentative.  I think
22  that says argumentative.  And please let me know if you
23  disagree.  I don't have the benefit of the deposition
24  transcript in front of me where he goes over what he says

103

1  he wrote here.  And -- well, sorry, bear with me for one
2  minute.
3          Okay.  So on Page P372, Dr. Shah is noting
4  that the patient is argumentative, correct?
5      A   Yes.
6      Q   And he notes that the patient -- let's go off
7  the record for one second.
8          (Thereupon, a recess was taken, after which
9  the following proceedings were had:)
10  BY MS. GRADY:
11     Q   Okay.  So on June 17th, 2014, according to
12  Dr. Shah's medical record on P372, he documents that
13  Mr. Armbruster is argumentative because he wants to go to
14  the hospital, correct?
15     A   I don't know that I read that.
16     Q   Well, I can represent to you that I asked
17  Dr. Shah in his deposition what was contained on this
18  medical record, and he said that -- I'll just mark it for
19  you -- that this portion of the medical record refers to
20  wants to go out to the hospital.
21     A   Okay.  Wants to go out, okay.
22     Q   And then the next line down and to the left,
23  there again Dr. Shah has documented that Mr. Armbruster's
24  subjective complaints is of, quote, vague tingling and

104

1  numbness, correct?
2      A   Yes.
3          MS. KINKADE:  What did you say?  Can you
4  repeat that question.
5          THE WITNESS:  There was no question.
6          MS. GRADY:  I asked him, and here to the left,
7  Dr. Shah again reports that Mr. Armbruster in the
8  subjective portion of his exam reports complaints of,
9  quote, vague tingling and numbness, and he said yes.
10         MS. KINKADE:  Were you again representing that
11  that's what he said in his deposition or are you just
12  referring to the document?
13         THE WITNESS:  Wants to go out for --
14         MS. KINKADE:  Right.  That she represented in
15  his deposition testimony.
16         MS. GRADY:  Right.  I think that that's just
17  from the reading of the document.
18         MS. KINKADE:  Okay.
19  BY MS. GRADY:
20     Q   Let's go back to your report, Exhibit 2.
21     A   So may I add one other thing that I didn't get
22  to add when talking about his symptoms?  So the other part
23  that I put in there is that, you know, by June 23rd, and
24  I'm looking at the whole record, by June 23rd, feel better.

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

27 (105 to 108)

105

1 He still has numbness but he feels better.
2        And, again, that may not mean inconsistent,
3 but they weren't exactly the same the whole time that he
4 was there. This was the June 23rd, feel better.
5    Q   Okay. I see that on P375.
6    A   Uh-hum.
7    Q   I believe he does note that -- well, I'm just
8 looking at the medical record and not referencing his
9 deposition testimony. Do you know what's written on that
10 second line there?
11       Okay. I found it. I'll represent to you that
12 on P375, for the record, according to Dr. Shah's testimony,
13 is minimal numbness of tingling, minimal numbness of tip of
14 fingers.
15   A   Um-hum.
16   Q   So according to the patient, the numbness
17 remains, correct?
18   A   Yes, but it's better.
19   Q   Would you agree that numbness that is
20 present -- strike that.
21       Do you agree that numbness that a patient
22 feels between May 13th, 2014 and June 23rd, 2014 is
23 persistent?
24       MS. KINKADE: Objection, form, incomplete

106

1 hypothetical.
2        THE WITNESS: The symptom, yes.
3 BY MS. GRADY:
4    Q   Okay. Let's go back to your report now,
5 Exhibit 2. The next sentence of your report states that
6 the symptoms of right arm pain and tingling may relate to a
7 cervical disc, but could certainly be chronic back to 2011?
8    A   Yes.
9    Q   So first I just want to make sure I'm clear.
10 That sentence refers specifically to Gary Armbruster's
11 symptoms, correct?
12   A   Yes.
13   Q   You're referring to him in particular, not
14 just that generally speaking symptoms of these kinds of
15 things can relate to a cervical disc?
16   A   Yes.
17   Q   Okay. And when you say may relate to a
18 cervical disc, that could include spinal cord compression,
19 correct?
20   A   No. As I said above, that's a radicular
21 symptom. That's like the first paragraph, where a
22 radicular symptom does not typically include spinal cord
23 compression.
24   Q   Well, let me make sure again that I'm clear.

107

1 I understand radicular to be a word that is used once you
2 know the cause of the pain, correct?
3    A   No. We'll use radicular symptoms to describe
4 those. When people have a pain and tingling down like this
5 on their hand, we can use the term radicular symptom.
6    Q   Okay. So is it your testimony that a patient
7 with spinal cord compression can never have radicular
8 symptoms?
9    A   Yes, because we would call them different
10 symptoms.
11   Q   So the actual symptom is reported by the
12 patient could be the same, but it would be described as a
13 different word other than radicular, correct?
14   A   Yes, because that's a term we would use, not
15 the patient.
16   Q   I understand.
17       And is there a particular word that you would
18 use to describe the symptoms that the patient would be
19 feeling that you suspect were caused by a spinal cord
20 compression?
21   A   Myelopathic.
22   Q   Okay. Let me ask you this, are you reaching
23 an opinion -- as stated in this sentence here, are you
24 reaching an opinion to a reasonable degree of medical

108

1 certainty as to the cause of Mr. Armbruster's symptoms of
2 right arm pain and tingling?
3    A   No.
4    Q   And you agree that nowhere in your report have
5 you disclosed an opinion where you reach -- strike that.
6        Nowhere in your report have you disclosed an
7 opinion reached to a reasonable degree of medical certainty
8 about the cause of the symptoms Mr. Armbruster reported
9 between May and September of 2014, correct?
10   A   I am not.
11   Q   And you say it could be chronic back to 2011.
12 You're not opining that Mr. Armbruster's symptoms were in
13 fact caused by any event that occurred in 2011, is that
14 correct?
15   A   That's a subtle difference. I'm saying that
16 it's possible that those symptoms could go back to that
17 time period.
18   Q   Could go back to 2012, right?
19   A   2011. May 2nd, '11.
20   Q   Well, I mean, what differentiates May 2011
21 from any other point in time?
22   A   Because that's when he was actually seen by
23 someone with those radicular symptoms.
24   Q   So there's nothing about the symptoms as

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

109

1   documented in the medical records at Exhibit 3 that
2   indicates to you when they began, correct?
3        A   No, except history is really important. So if
4   somebody has right hand tingling in 2011 and has it again
5   as part of his symptoms in 2014, they could be the same.
6            If you have documentation between then to show
7   me that there was no tingling, you know, with medical
8   visits between 2011 and 2014, otherwise as a diagnostician,
9   we have to include that maybe 2014 symptoms go back to
10  2011.
11       Q   Well, of course one of the ways that you could
12  ascertain whether or not the patient felt tingling between
13  2011 and 2014 is to ask the patient whether they felt
14  tingling --
15       A   Yes.
16       Q   -- between those times, right?
17       A   Yes.
18       Q   In fact, the only way to know whether a
19  patient felt tingling, whether Gary Armbruster felt
20  tingling between May 2nd, 2011 and May 2014 is through his
21  own reports of the tingling, right?
22       A   If there's no other medical records in between
23  time, then, yes, that's the only thing --
24       Q   Please complete your answer.

110

1        A   That's the only thing you can rely on.
2        Q   But really the medical record would just
3   reflect Mr. Armbruster's prior report about whether or not
4   he was feeling tingling at any point in time, right? Is
5   that right?
6        A   Yes.
7        Q   So it all comes from Mr. Armbruster?
8            MS. KINKADE: Objection to form.
9            THE WITNESS: Yes, but that's not the same
10  thing we're saying about the symptoms.
11  BY MS. GRADY:
12       Q   Well, I understand that there's a difference
13  between symptoms that are subjectively reported by a
14  patient and exam that is something done by a doctor to
15  assess the cause of those symptoms, right?
16       A   Yes.
17       Q   So I'm just asking about the presence or
18  absence of a symptom. The only way to know that is -- a
19  symptom of tingling, the only way to know that is through
20  the patient?
21       A   And the record. And, yes, the record is what
22  the patient says.
23       Q   Right.
24       A   So if there's records in between that say no

111

1   tingling, then, you know, you could presume that resolved.
2        Q   And if there are no records that say tingling,
3   you could also presume it resolved, right?
4        A   No.
5        Q   So if there are records where there's no
6   documentation of tingling, that provides you evidence that
7   the tingling from May 2011 resolved, correct?
8        A   Yes.
9        Q   And you're not aware of any evidence in this
10  case that would contradict Mr. Armbruster's testimony that
11  he did not experience tingling between May 2011 -- after
12  May 2nd, 2011 prior to May 2014?
13           MS. KINKADE: Objection, form.
14           THE WITNESS: I didn't see anything that would
15  argue either way.
16  BY MS. GRADY:
17       Q   Well, you reviewed Mr. Armbruster's deposition
18  transcript after you submitted your report in this case,
19  correct?
20       A   Yes.
21       Q   And do you recall what he said on this topic
22  when asked by Ms. Kinkade at his deposition?
23       A   I don't specifically.
24       Q   Okay. The last sentence in that paragraph

112

1   states that the other symptoms, trouble walking, leg pain
2   and tingling to the waist, would not necessarily be
3   associated with a ruptured disc in the spine.
4            So let me first ask you about the medicine.
5   Ruptured disc in the spine, that refers to something that
6   includes spinal cord compression, correct? I believe we
7   talked about this earlier.
8        A   Yes.
9        Q   Ruptured cervical disc could actually be a
10  couple of different things. One of the things that it can
11  cause is spinal cord compression?
12       A   Yes.
13       Q   Okay. And so as I understand this -- this
14  sentence, it's your opinion in -- it's your opinion that
15  the presence of those three symptoms do not rule out every
16  other issue except ruptured disc, correct?
17           MS. KINKADE: Objection, form.
18           THE WITNESS: No, that's not true. So this
19  refers to his ruptured disc, okay.
20  BY MS. GRADY:
21       Q   Okay.
22       A   Which is the spinal cord compression. So
23  these other things, trouble walking, leg pain and tingling
24  to the waist, could be associated with other things.

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

113

1    They're not necessarily associated with ruptured disc in
2    the spine.
3        Q   That is what I meant to say, but you said it
4    much more clearly than I did.  But, conversely, I mean,
5    they're not -- they can be associated with ruptured disc,
6    correct?
7        A   Yes, as a cord compression.
8            (Thereupon, Plaintiff Exhibit 7 was marked for
9    identification.)
10   BY MS. GRADY:
11       Q   The first page of these aren't important, so
12   I'll just sort of put this haphazardly here.  I'm going to
13   hand you what's been marked as Plaintiff's Exhibit 7.
14   These are records from the Gateway emergency department
15   from September 26th, 2014.
16       A   Okay.
17       Q   I'm going ask you to turn to P25, which is
18   like the second to last page.  This is a document created
19   by the emergency room physician.  I think -- you can feel
20   free to review it again.  This is one of the documents you
21   reviewed in preparation for your case, right?
22       A   Yes.
23       Q   You can feel free to review it again if that's
24   helpful.  But I want to draw your attention specifically to

114

1    P25 where I believe the timeline of Mr. Armbruster's care
2    on September 26th is recorded, at least beginning until
3    he's transferred.
4        A   Yes.
5        Q   And you see that at 10:03 there's a notation
6    that the patient was medically screened?
7        A   Huh-uh.
8        Q   And based on your understanding of the field
9    of emergency medicine, that would be a time when the
10   patient's history was collected?
11       A   I don't know what medically screened means.
12   Arrived in ED on 9:40, so 20 minutes later medically
13   screened.  Probably.  That's typically the nurse at the
14   front desk or something like that.
15       Q   Okay.  Fair to say based on these medical
16   records that at some point between 9:40 and approximately
17   10:03, give or take a few minutes, he has a history taken.
18   Is that fair to say?
19       A   Yes.
20       Q   And that would include a report of the
21   patient's symptoms?
22       A   Yes.
23       Q   And then at 11:38 Mr. Armbruster is taken for
24   an MRI of his C spine without contrast?

115

1        A   Okay.
2        Q   Do you see that on the record at P25?
3        A   Oh, down at the bottom, yes.
4        Q   And I don't have the images and I don't
5    believe you reviewed them, right?
6        A   No.
7        Q   But we have the report.
8        A   Yes.
9        Q   That C spine MRI --
10       A   Yes.
11       Q   -- which is at P6, documents spinal cord
12   compression, right?
13       A   Yes.
14       Q   Pretty severe spinal cord compression,
15   correct?
16       A   Has moderate to severe canal stenosis, so
17   that's narrowing of the bony part of the disc itself, and
18   then mass effect on the cervical cord.  So, yes, he has
19   spinal cord compression.
20       Q   Do you agree that it's severe?
21       A   I couldn't make assessment.  It doesn't say
22   that.
23       Q   There's signal change?
24       A   Yeah, signal change elevates it to a more

116

1    severe problem, yes.
2        Q   Okay.  And then let's turn to P24, if you
3    would.
4        A   Okay.
5        Q   This is, I guess, a report, a documentation --
6    a documentation of the report that the patient raises to
7    the ER at approximately 10:48 on 9/26, right?
8        A   Yes.
9        Q   This is before he's taken for the CT -- for
10   the MRI rather?
11       A   (Witness nods his head.)
12       Q   And he reports that he has had chronic
13   tingling in his fingers for five to six months.  Do you see
14   that?
15       A   Yes.
16       Q   And he reports that he's had low back pain for
17   five to six months?
18       A   Yes.
19       Q   And that his elbows hurt at times, times
20   several months, correct?
21       A   Yes.
22       Q   Did you see any other documentation regarding
23   the subjective complaints that Mr. Armbruster raised in the
24   emergency room medical staff on September 26th, 2014?

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

117

1      A   Under review of systems positive with pain on
2  movement, positive for tingling. That's probably the same.
3  That's on review of systems. Let's see. I don't recall
4  seeing a nursing assessment. I think in these records
5  there's not a nursing assessment. So, yes, that is his
6  subjective -- or objective -- subjective complaints, excuse
7  me.
8      Q   And tell me what -- so the review of systems,
9  that reflects that patient's report about things he is
10 feeling in his -- in different systems that you ask about
11 as you go through each system, right?
12     A   Yes.
13     Q   That's part of the subjective portion of your
14 exam?
15     A   Yes.
16     Q   Tell me what you see about the objective
17 neurological exam.
18     A   So very interesting to me is there no
19 neurologic exam by the emergency room doctor.
20     Q   Do you agree based on the documentation that
21 you reviewed in the Gateway medical records that it was
22 appropriate to order an MRI of Mr. Armbruster's C spine?
23     A   Yes, but I'm looking at -- from this record, I
24 don't exactly know why the doctor ordered it, if I look at

118

1  just the doctor, because there's no neurological exam on
2  there. Do you follow me?
3      Q   I do.
4      A   So I don't know that I could make an opinion
5  on that. And I don't see why that was on there.
6      Q   But you do see that following the subjective
7  review of symptoms there is a number of MRI's taken of
8  various parts of Mr. Armbruster's neurological system?
9      A   Yes.
10     Q   And those imaging studies were able to lead
11 staff, medical staff, to form a definitive diagnosis of the
12 cause of Mr. Armbruster's symptoms, right?
13     A   I'm looking at times on these. So they first
14 did a CT of head. They next did a lumbar spine. Then they
15 did the MRI scan of the neck, and then they did an MRI scan
16 of the head. So ultimately they did an MRI scan of the
17 neck and had a definitive diagnosis, yes.
18     Q   And spinal cord compression explains
19 Mr. Armbruster's reports of chronic tingling in his fingers
20 for five to six months, correct?
21     A   Yes. But I would also leave open that there
22 was six weeks that he was out of prison before he had this
23 done. So it's hard to say for sure that the full extent of
24 the cord edema and cord compression was for six months.

119

1      Q   Okay. And that's based on your understanding
2  that Mr. Armbruster was out of prison for six weeks?
3      A   I believe it was six weeks.
4      Q   Would it change your opinion if Mr. Armbruster
5  had only been out for less than two weeks?
6      A   Well, this is September. When did he get out?
7      Q   I believe he got around September 15th of
8  2014.
9      A   So any period of time that he was out
10 something new could happen for a disc and cord edema. I
11 think it would be unusual for people to have cord edema and
12 cord compression for six months and even be able to walk.
13     Q   And have you reviewed any evidence about
14 any -- about what happened during the two weeks between
15 when Mr. Armbruster was released from prison and when he
16 presented to the emergency room?
17     A   I have not.
18     Q   Would that change your opinion if this was --
19 let me just be clear, your opinion -- well, strike that.
20     A   So what was the day of his release?
21     Q   I think it was either September 14th or 15th.
22     A   Okay.
23     Q   The spinal cord compression would explain
24 Mr. Armbruster's complaints of low back pain for five or

120

1  six months, correct?
2      A   No. Spinal cord compression in the neck would
3  not typically give back pain.
4      Q   So it's your testimony that the doctor's
5  diagnosis of spinal cord compression does not address
6  Mr. Armbruster's subjective complaints of low back pain for
7  five to six months?
8      A   Right.
9      Q   The diagnosis of spinal cord compression would
10 explain pain at the elbows for several months, correct?
11     MS. KINKADE: Objection, form, assumes facts
12 not in evidence.
13     THE WITNESS: It might.
14
15 BY MS. GRADY:
16     Q   You would expect a patient with spinal cord
17 compression over a long period of time to have extremities
18 difficulty walking, is that your testimony?
19     A   Yes. With cord edema, yes.
20     Q   Just give me one minute.
21     You agree that an x-ray does not -- cannot
22 show spinal cord compression?
23     A   I agree.
24     Q   You agree that Mr. Armbruster reported

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

---

121

1  tingling in his fingers to Dr. Shah, correct?
2      A   Yes.
3      Q   You agree that Mr. Armbruster reported
4  complaints of lower back pain to Dr. Shah, correct?
5      A   Yes.
6      Q   You agree that doctor -- strike that.
7          You didn't review any evidence as part of your
8  work in this case that Dr. Shah made any conclusions that
9  Mr. Armbruster's symptoms were psychosomatic, correct?
10     A   I did not see anything to that effect, yes.
11     Q   Did you review any evidence in this case that
12 Dr. Shah determined that Mr. Armbruster was malingering?
13     A   No.
14     Q   You didn't review any evidence in this case
15 that suggested to you that Mr. Armbruster was malingering,
16 correct?
17     A   I did not.
18     Q   Is a ruptured cervical disc and a herniated
19 disc, are those the same things?
20     A   Yes.
21         MS. GRADY:  Okay.  I don't have anything else
22 at this time.
23         MS. KINKADE:  Max, you got anything?
24         MR. BOOSE:  Very briefly.

---

122

1          CROSS-EXAMINATION
2  BY MR. BOOSE:
3      Q   Doctor, I represent the correctional defendant
4  in this case, the warden, so you know who I am.  My name is
5  Max Boose.  I'm with the Attorney General's Office.
6      A   Yes, sir.
7      Q   You stated earlier that when you referred to
8  the symptoms being inconsistent, that meant that the same
9  symptoms were not present over time, is that about right
10 for what your testimony was?
11     A   Yes.
12     Q   What's the significance of that to you?
13         MS. GRADY:  Hold on.  I'm going to object to
14 the scope that this is eliciting opinions not disclosed in
15 the report.
16         Go ahead, Doctor.
17         THE WITNESS:  So I think the point of that
18 would be about symptoms of a severe -- like a spinal cord
19 compression, I would expect more significant symptoms,
20 progressive and more intense.
21         MR. BOOSE:  That's my only question.  Thank
22 you.
23         CROSS-EXAMINATION
24 BY MS. KINKADE:

---

123

1      Q   Okay.  I have a couple, and pardon they're not
2  organized.
3          You were asked several times about whether you
4  had reviewed literature in coming to your opinions in this
5  case.  What do you rely on in coming to your opinions in
6  this case?
7      A   So my clinical experience and then training in
8  patients that I've seen and taken care of directly.
9      Q   I believe previously you said you've had
10 hundreds of patients at least with a ruptured disc?
11     A   Yes, ma'am.
12     Q   Okay.  And anything else that you've relied on
13 in coming to your opinions?
14     A   I mean, there's directed reading all along the
15 way.  So for 20 years if there's something I need to know
16 anatomy wise or treatment wise, we do that, we have
17 Up-To-Date, which is the newest information that's
18 summarized in readable form.
19     Q   And given that you see patients with a broad
20 span of complaints, do you have to keep up-to-date in a
21 broad span of medical knowledge --
22     A   Yes.
23     Q   -- and education?
24     A   Yes.

---

124

1      Q   You were talking about how with certain
2  symptoms you're going to have a long list for your
3  differential diagnosis.  Do you remember that?
4      A   Yes.
5      Q   When you have this long list for your
6  differential diagnosis, do you write that long list down or
7  do you just have that in your mind?
8      A   It will be in my mind until I do my note.  And
9  then for my notes in particular, it will be the limited
10 differential that's left on the list and how we're going to
11 evaluate that.
12     Q   So what you note is your next steps, not all
13 possible conditions that could cause that symptom?
14     A   Exactly.
15         MS. GRADY:  Object to form.  Go ahead.
16 BY MS. KINKADE:
17     Q   You were asked whether certain documents would
18 be helpful in coming to an opinion in this case and
19 documents that you did not review.  Fair to say you would
20 review anything that you could?
21     A   Yes.
22     Q   The more knowledge the better?
23     A   Yes.
24     Q   However, based on the documents you did

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

32 (125 to 128)

125

1 review, were you able believe come to your opinions within
2 a reasonable degree of medical certainty and scientific
3 certainty?
4     A    Yes.
5         Q    And you were asked about if anything you
6 reviewed showed that Mr. Armbruster had residual complaints
7 of tingling from June of 2011 through May of 2014, and you
8 said no, correct?
9     A    Yes.
10        Q    Is that because you didn't have any records?
11     A    There are no records that I reviewed that
12 showed that.
13        Q    Okay.  You were also asked about what
14 Mr. Armbruster testified to in his deposition regarding the
15 2011 reported symptoms and subsequent time frame.  Do you
16 remember that testimony?
17     A    Say again.
18        Q    You were asked about Mr. Armbruster's
19 deposition testimony when he was asked about the symptoms
20 in 2011.  Do you remember being asked about that?
21     A    Yes.
22        Q    Okay.  Do you remember if Mr. Armbruster was
23 forthcoming at all in ever having these symptoms in 2011
24 when he was initially asked?

126

1         MS. GRADY:  Object to form.
2         THE WITNESS:  What I recall, and I would have
3 to look at it to be sure, is that he was unclear that he
4 was even seen then.
5 BY MS. KINKADE:
6        Q    Okay.  From the medical records that Dr. Shah
7 prepared and Mr. Armbruster's deposition testimony, is it
8 true that he never told Dr. Shah about his symptoms in
9 2011?
10        MS. GRADY:  I'm going to object to form and
11 scope.  Go ahead.
12        THE WITNESS:  There is no record on there that
13 Mr. Armbruster informed Dr. Shah of the 2011 emergency room
14 visit.
15 BY MS. KINKADE:
16        Q    How does it effect your ability to accurately
17 diagnose a patient when they withhold relevant medical
18 information from you?
19        MS. GRADY:  Object to scope.  Go ahead.
20        THE WITNESS:  If we're missing information
21 from the history, then it makes it harder.
22 BY MS. KINKADE:
23        Q    And you were asked about the best way to find
24 out if somebody had tingling from 2011 to 2014 would be to

127

1 ask the patient?
2     A    Yes.
3        Q    Is that the case when the patient is not a
4 reliable historian?
5         MS. GRADY:  Object to form and to scope.
6         THE WITNESS:  If they're not a reliable
7 historian, we still take the information and then we have
8 to decide what to do with it, take it with a grain of salt,
9 keep it on the side.
10 BY MS. KINKADE:
11        Q    Okay.  I also want to talk to you about the
12 word that you used for inconsistent symptoms.  So you were
13 asked about just a couple of visits in May where
14 Mr. Armbruster reported tingling and numbness.
15     A    Yes.
16        Q    On the May 28th record -- oh, sorry.  That's
17 Ms. Maston's.
18        Okay.  On the May 28th record --
19        MS. GRADY:  Can you give me a Bates number?
20        MS. KINKADE:  Yeah.  Let my finish.  Hold on.
21
22 BY MS. KINKADE:
23        Q    That was penned by Dr. Shah, and that's P368
24 and 369, we discussed that it talked about vague low back

128

1 pain, is that right?
2     A    Yes.
3        Q    And tingling and numbness?
4     A    Yes.
5        Q    Does this record indicate that the tingling
6 and numbness was in his hand?
7     A    No.
8        Q    On June 3rd of 2014, Bates 371, Mr. Armbruster
9 complained of a vague body ache.  Do you see any indication
10 of Mr. Armbruster complaining of tingling and numbness in
11 his hand?
12     A    No.
13        Q    On June 17th, 2014, Bates P372, note by
14 Dr. Shah, there was a follow-up for a lab.  He does mention
15 tingling and numbness, but does it mention that it was in
16 his hand?
17     A    No.
18        Q    And here again he's talking about back pain
19 and knee pain, is that right?
20     A    Yes.
21        Q    Okay.  And you already discussed that back
22 pain is not a common symptom of spinal cord compression?
23     A    Back pain would not be a common symptom of
24 spinal cord compression in the neck.

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

129

1    Q    And what about knee pain?
2         MS. GRADY:  I'm going to object to the scope.
3    It exceeds the scope of the report.
4         THE WITNESS:  I'm looking to see what his exam
5    of the knee showed.
6    BY MS. KINKADE:
7    Q    This is before he ordered the x-ray?
8    A    Yeah, so he ordered the x-ray.  He put on here
9    no neurologic deficit.  Yeah, so this would imply that the
10   pain was in the knees on exam, that he was suspecting
11   arthritis, and that would not be from a cervical spinal
12   cord stenosis.
13   Q    Okay.  So based on -- and you talked about how
14   on June 23rd, 2014, P375, that Mr. Armbruster stated that
15   the pain was minimal and that he was feeling better?
16   A    Yes.
17   Q    Is that right?
18        MS. GRADY:  Object to form to the extent it
19   misstates the record.
20   BY MS. KINKADE:
21   Q    So given -- are these complaints as now we've
22   gone through them through June 23rd, is that what you were
23   referring to when you were saying inconsistent?
24   A    Yes.

130

1         MS. GRADY:  Object to form.
2    BY MS. KINKADE:
3    Q    And inconsistent did not only mean additional,
4    it can also mean different?
5    A    Right.
6         MS. GRADY:  Object to form.
7    BY MS. KINKADE:
8    Q    Is that how you used it here?
9         MS. GRADY:  Object to form.
10        THE WITNESS:  Or even not mentioned.
11   BY MS. KINKADE:
12   Q    Okay.  So you talked a great deal about
13   Ms. Maston's note on May 28th, 2014 and how these symptoms
14   that she wrote would not be described as vague.  Do you
15   remember that?
16   A    Yes.
17   Q    Okay.  She doesn't call those symptoms vague,
18   does she?
19   A    No.
20   Q    Okay.  Is there anything to indicate to you
21   that when Dr. Shah saw Mr. Armbruster that he observed any
22   of the symptoms that Ms. Maston stated?
23   A    No.
24   Q    As a doctor if your nurse documents symptoms

131

1    that you do not observe yourself, do you rely on the
2    nurse's documentation or your own observation and
3    examination?
4         MS. GRADY:  Objection, scope.
5         THE WITNESS:  It would be my own observation.
6    BY MS. KINKADE:
7    Q    And why is that?
8         MS. GRADY:  Same objection.
9         THE WITNESS:  That's my level of expertise.
10   BY MS. KINKADE:
11   Q    And would diagnosing a treatment be outside of
12   a nurse's area of expertise?
13   A    Yes.
14   Q    If Mr. Armbruster is reporting significant
15   symptoms at 8:15 in the morning that are not observed by
16   Dr. Shah at 9 something in the morning the same day, would
17   that be inconsistent, or could it be inconsistent?
18        MS. GRADY:  Objection, scope.
19        THE WITNESS:  Yes.
20   BY MS. KINKADE:
21   Q    So you've mentioned that other things can
22   cause tingling and numbness other than a spinal cord
23   compression.  Is that true?
24   A    Yes.

132

1    Q    And specifically just if it's on one side of
2    the body you would expect something other than a spinal
3    cord compression?
4         MS. GRADY:  Objection, scope.
5         THE WITNESS:  Yes.
6    BY MS. KINKADE:
7    Q    If a patient reports that their tingling and
8    numbness is getting better, does that indicate to you that
9    the treatment is working?
10        MS. GRADY:  Same objection.
11        THE WITNESS:  Yes.
12   BY MS. KINKADE:
13   Q    Following up with one other thing, when
14   Mr. Armbruster reported to the emergency room and he
15   complained of elbow pain, was that inconsistent with what
16   he had reported at the department of corrections?
17        MS. GRADY:  Objection, scope.
18        THE WITNESS:  You're speaking of the Gateway
19   Regional, the September 26th?
20   BY MS. KINKADE:
21   Q    Yeah.
22   A    I'd have to look back there, but I don't
23   recall any elbow pain being in the medical records from the
24   prison.

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

133

1      Q    The fact that Gateway Regional, Doctor, did
2  not document -- well, let me first show you one thing.  I'm
3  on Page P21.  The triage assessment by the nurse that says
4  neuro, no deficits noted, does that indicate -- what does
5  that indicate, if anything?
6      **A    This would probably be the same as the**
7  **nonfocal exam, which from a nursing assessment, that's a**
8  **nursing assessment, right, would probably just be that**
9  **general observation, you know, how one speaks, how they**
10 **regard their mental status in general, if they move their**
11 **limbs.  I think you couldn't take it any more than a**
12 **nonfocal exam.**
13     Q    Okay.  Is the fact that there's no
14 neurological exam documented on the report for September
15 26th, 2014 at Gateway, can you say whether or not a
16 neurological exam was conducted?
17     **A    No.**
18     Q    Would you expect that a neurological exam was
19 conducted and not noted, or can you say?
20          MS. GRADY:  Objection, scope.
21          THE WITNESS:  I would expect my ER physician
22 to do a neurologic exam if someone talked about that, of
23 some sort.  So I would expect the ER physician to do a
24 neurologic exam of some sort with these symptoms reported.

134

1  BY MS. KINKADE:
2      Q    And does it have any bearing that they did
3  order an MRI if you would expect a neurological exam or
4  not?
5          MS. GRADY:  Objection, scope.
6          THE WITNESS:  Yes.  I suspect he saw something
7  and then did the MRI scan.
8  BY MS. KINKADE:
9      Q    All right.  If a neurological exam shows no
10 deficits, does that mean something to you as a doctor
11 trying to formulate a diagnosis?
12          MS. GRADY:  Objection, scope.
13          THE WITNESS:  If it's a good neurologic exam,
14 at least an adequate one, and there's no deficits, then
15 that is meaningful.
16 BY MS. KINKADE:
17     Q    How so?
18     **A    It gets back to the symptoms reported and then**
19 **doing an exam to support those and warrant any further**
20 **testing.**
21          MS. GRADY:  Show an objection to scope to the
22 last question, please.
23          MS. KINKADE:  Okay.  I don't think I have
24 anything else.

135

1               REDIRECT EXAMINATION
2  BY MS. GRADY:
3      Q    I have some.  One thing I forgot to ask you,
4  did the attorneys for the defendants ask you to make any
5  assumptions in reading any -- reaching any of your opinions
6  or conclusions in this case?
7      **A    No.**
8      Q    Did the attorneys provide you with any facts
9  about this case that you relied on in reaching your
10 opinions or conclusions in this case?
11     **A    Only the records that I reviewed.**
12     Q    You talked just now about the meaning of a
13 neurological exam and you said that an adequate
14 neurological is meaningful.
15          Do you agree that an inadequate neurological
16 exam may not give you information necessary to make
17 decisions about a patient's symptoms?
18     **A    Yes.**
19     Q    Have you ever in the course of your practice,
20 you talked about patients you treated with spinal cord
21 compression.  Did you refer all of those patients to either
22 a neurologist or a neurosurgeon?
23     **A    Yes, neurosurgeons usually.**
24     Q    Have you in the course of your practice ever

136

1  had occasion to determine the age of a spinal cord
2  compression?
3      **A    We can get a general impression, but, again,**
4  **it's mostly the symptom onset and the scan.**
5      Q    I think my question is a little different.
6      **A    Okay.**
7      Q    Your job when you see a patient is to take
8  their symptoms, your exam --
9      **A    Yes.**
10     Q    -- and the relevant history and other things
11 and determine what issue that patient has that requires
12 your attention?
13     **A    Yes.**
14     Q    That's your responsibility, you have to do
15 that, that's your job with respect to that patient, right?
16     **A    Yes.**
17     Q    So my question is, as part of your job as a
18 physician, have you ever been required to, in order to
19 treat a patient, date the spinal cord compression?
20     **A    No.**
21     Q    Nonfocal exam as you understand it, refers to
22 the type of exam that's performed, correct?
23     **A    Say again.**
24     A    A nonfocal neurological exam refers to the

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

**137**

1  type of exam that's performed, what happens as part of the
2  exam?
3      **A   It's the report of the exam.  So that means**
4  **that someone did some general looking and there was nothing**
5  **that was abnormal.  It's not a full neurological exam**
6  **though.**
7      Q   You talked about the importance or the impact
8  that it has on your care when a patient, quote, withholds
9  information.  So I want to talk to you about that.
10      First of all, do you mean have a memory of it
11  and intentionally not report it in response to questions?
12      **A   That would be withhold, yes.**
13      Q   So if a patient fails to recall prior medical
14  treatment or symptoms, that would not be withholding,
15  correct?
16      **A   Right.**
17      Q   And if a patient weren't asked questions that
18  prompted the response of this prior medical encounter or
19  symptoms, that wouldn't be withholding either, right?
20      **A   Correct.**
21      Q   And fair to say that you see patients who fail
22  to remember every medical encounter they ever had?
23      **A   Yes.**
24      Q   In fact, would you say that that's common for

**138**

1  most patients not to remember every encounter with medical
2  staff they've had in their life?
3      **A   It's common that patients may not recall that,**
4  **right.**
5      Q   It doesn't mean they're withholding
6  information from you, right?
7      **A   Right.**
8      Q   In fact, you worked to develop this electronic
9  health record and integrated system to help work with that
10  very common problem, right?
11      **A   Yes.**
12      Q   You talked a little bit about the document
13  that Ms. Maston creates as compared to the document that
14  Dr. Shah creates when they're seen, when Gary Armbruster is
15  seen by both of them on that same day.
16      Just so I'm clear, is any difference between
17  the standard of care for nurses and the standard of care
18  for doctors when it comes to documenting a patient's
19  subjective complaints?
20      **A   I have to say I don't know the standard care**
21  **for nursing.**
22      Q   Okay.  In your practice do you expect nurses
23  to accurately document a patient's subjective complaints?
24      **A   I expect them to write down what they heard.**

**139**

1      **Sometimes the skill — we have medical assistants, but even**
2  **nurses, sometimes the story is a little bit different when**
3  **I get it.  It's about how to ask questions and how to write**
4  **them down.  So sometimes it's different.**
5      Q   So I am totally on the same page with you that
6  doctors can ask more knowledgeable questions in response to
7  what's being reported.  But I am just trying to understand
8  whether in your mind there's a difference between what a
9  nurse is required to write down when a patient says I'm
10  having severe symptoms of X and what a doctor is required
11  to write down when a patient says that exact same phrase.
12      **A   If they say the exact same phrase, it should**
13  **be written the same.**
14      Q   And it should written accurately and
15  thoroughly, correct?
16      **A   Yes.**
17      MS. GRADY:  That's it.  That's all I have.
18      MS. KINKADE:  Max.
19      MR. BOOSE:  Please.
20          RECROSS-EXAMINATION
21  BY MR. BOOSE:
22      Q   Doctor, I just have a pair of questions that
23  are related.
24      **A   Yes, sir.**

**140**

1      Q   First of all, if a patient while describing
2  symptoms and history fails to recall prior treatment on a
3  similar area of his body, is that relevant to you in the
4  medical determinations by treating staff?
5      MS. GRADY:  Objection, form.
6      THE WITNESS:  Yes, it would be relevant.
7  BY MR. BOOSE:
8      Q   How so?
9      **A   You said failed to recall?**
10      Q   Yes.
11      MS. GRADY:  I'm going to object to scope.  Go
12  ahead.
13      THE WITNESS:  Then we're missing that bit of
14  information.
15  BY MR. BOOSE:
16      Q   All right.  And how -- just to finish it out,
17  how is missing that information impact -- how may that
18  missing information impact the treatment?
19      MS. GRADY:  Objection, incomplete hypothetical
20  and outside the scope.  Go ahead.
21      THE WITNESS:  That information might alter --
22  I mean, it's part of the history.  It might alter what you
23  include in the differential diagnosis.
24  BY MR. BOOSE:

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

141

1    Q   Similar question. If a patient while
2 describing symptoms and history fails to recall prior
3 treatment involving similar symptoms to what he's now being
4 seen for, is that relevant to medical determinations by the
5 treating staff?
6    A   Yes.
7    Q   And is that for similar reasons that we just
8 discussed?
9    A   Yes, sir.
10       MS. GRADY: Same objections.
11 BY MR. BOOSE:
12    Q   Sorry, Doctor, I didn't --
13    A   Yes.
14       MR. BOOSE: Thank you. Those are all my
15 questions.
16       MS. KINKADE: I have nothing else.
17       MS. GRADY: Okay.
18       MS. KINKADE: Would you like to review the
19 transcript? We can go off the record.
20       THE WITNESS: Yes, please.
21       THE COURT REPORTER: Max, what do you take for
22 your copy?
23       MR. BOOSE: If it's possible, if you would,
24 please, as the guiding light, but I believe an E-tran

142

1 without exhibits.
2       MS. GRADY: You know, I'm going to have to
3 check with the powers that be in my office and get back
4 with you.
5       THE COURT REPORTER: And what do you take for
6 your copy?
7       MS. KINKADE: E-tran.
8       (Thereupon, the deposition was concluded at
9 4:20 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

143

1              CERTIFICATE OF REPORTER
2          I, Jo Ann Dickson, Certified Shorthand
3 Reporter, Notary Public within and for the State of
4 Missouri, do hereby certify that the witness whose
5 testimony appears in the foregoing deposition was duly
6 sworn by me; the testimony of said witness was taken by me
7 to the best of my ability and thereafter reduced to
8 typewriting under my direction; that I am neither counsel
9 for, related to, nor employed by any of the parties to the
10 action in which this deposition was taken, and further that
11 I am not a relative or employee of any attorney or counsel
12 employed by the parties thereto, nor financially or
13 otherwise interested in the outcome of the action.
14
15
16
17
18
19
20       _____
21          Jo Ann Dickson, CCR, 1085
22
23
24

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

37

| A | | | |
|---|---|---|---|
| **aberdeen** | 75:9, 107:11 | **afternoons** | **agricultural** |
| 3:6 | **actually** | 14:20 | 8:12 |
| **ability** | 24:7, 75:21, | **afterwards** | **ahead** |
| 7:20, 126:16, | 83:22, 94:1, | 6:5, 75:17 | 7:15, 122:16, |
| 143:7 | 94:16, 94:24, | **again** | 124:15, 126:11, |
| **able** | 96:18, 101:4, | 31:6, 41:24, | 126:19, 140:12, |
| 31:19, 33:12, | 108:22, 112:9 | 46:12, 48:1, | 140:20 |
| 33:13, 34:4, | **add** | 48:13, 50:11, | **al** |
| 118:10, 119:12, | 92:22, 95:23, | 64:14, 71:3, | 1:10, 2:10, |
| 125:1 | 104:21, 104:22 | 76:8, 94:10, | 2:21 |
| **abnormal** | **addition** | 97:18, 100:13, | **all** |
| 86:22, 87:2, | 22:10, 23:10 | 103:23, 104:7, | 9:20, 11:16, |
| 88:8, 88:13, | **additional** | 104:10, 105:2, | 11:21, 12:17, |
| 91:4, 91:23, | 65:7, 66:16, | 106:24, 109:4, | 14:20, 16:11, |
| 137:5 | 70:11, 79:6, | 113:20, 113:23, | 20:14, 21:4, |
| **above** | 79:24, 80:6, | 125:17, 128:18, | 22:14, 22:15, |
| 42:2, 106:20 | 94:24, 95:8, | 136:3, 136:23 | 25:8, 27:12, |
| **absence** | 95:10, 95:11, | **against** | 29:4, 32:3, |
| 45:5, 87:22, | 95:20, 130:3 | 43:5, 61:2, | 33:13, 35:2, |
| 88:15, 110:18 | **address** | 84:14, 101:23 | 35:17, 36:13, |
| **absolutely** | 39:8, 64:11, | **age** | 38:19, 39:13, |
| 27:22 | 120:5 | 6:9, 136:1 | 40:3, 40:16, |
| **accident** | **adequate** | **ago** | 42:2, 46:1, |
| 55:15, 57:21 | 92:5, 134:14, | 10:5, 56:14, | 46:8, 46:14, |
| **according** | 135:13 | 58:17, 61:6, | 47:8, 47:9, |
| 93:14, 100:14, | **administration** | 63:1, 63:8 | 47:22, 48:2, |
| 100:24, 103:11, | 13:22, 15:8, | **agree** | 48:9, 48:13, |
| 105:12, 105:16 | 70:22, 71:4 | 27:23, 28:7, | 48:16, 49:22, |
| **accurate** | **administrative** | 31:16, 34:4, | 50:3, 58:24, |
| 7:20, 53:23, | 22:14 | 35:14, 36:1, | 63:3, 63:15, |
| 79:8 | **administratively** | 40:23, 47:6, | 64:1, 66:13, |
| **accurately** | 11:9 | 48:5, 51:11, | 71:1, 72:12, |
| 126:16, 138:23, | **advice** | 53:12, 53:15, | 72:15, 75:17, |
| 139:14 | 64:3, 64:5, | 53:22, 54:1, | 77:11, 77:17, |
| **accusations** | 66:24 | 68:6, 73:4, | 78:1, 79:1, |
| 64:9 | **adviser** | 73:17, 76:6, | 79:20, 85:17, |
| **accused** | 22:19, 23:6, | 76:9, 80:22, | 86:5, 86:17, |
| 56:5 | 23:23, 23:24, | 81:15, 87:5, | 93:7, 93:8, |
| **ache** | 24:5 | 87:9, 88:11, | 93:16, 100:18, |
| 95:24, 96:3, | **after** | 88:22, 91:20, | 102:13, 110:7, |
| 128:9 | 34:14, 35:2, | 92:2, 101:23, | 123:14, 124:12, |
| **across** | 57:20, 67:14, | 105:19, 105:21, | 125:23, 134:9, |
| 100:18 | 67:16, 69:21, | 108:4, 115:20, | 135:21, 137:10, |
| **action** | 71:19, 75:12, | 117:20, 120:21, | 139:17, 140:1, |
| 143:10, 143:13 | 77:6, 77:10, | 120:23, 120:24, | 140:16, 141:14 |
| **actual** | 77:12, 77:15, | 121:3, 121:6, | **allegations** |
| 43:14, 69:2, | 80:13, 103:8, | 135:15 | 59:1, 76:11, |
| | 111:11, 111:18 | **agreed** | 76:13 |
| | | 6:1 | |

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                                                 38

**almost**
25:8, 27:8,
74:16
**along**
8:3, 123:14
**already**
60:20, 61:19,
89:20, 128:21
**also**
12:2, 13:14,
14:7, 14:13,
24:9, 46:8,
65:22, 73:13,
73:14, 92:22,
111:3, 118:21,
125:13, 127:11,
130:4
**alter**
140:21, 140:22
**always**
15:15, 33:19
**amended**
73:18, 76:7
**anatomy**
123:16
**animal**
9:2
**ann**
1:17, 2:17,
4:12, 6:4,
143:2, 143:21
**another**
12:3, 13:18,
37:14, 37:20,
37:24, 46:19,
86:14, 89:21
**answer**
7:9, 7:15,
34:8, 39:11,
39:12, 63:13,
63:23, 64:4,
64:20, 67:1,
94:9, 109:24
**answers**
7:4
**anthony**
22:11
**anthony's**
12:15, 20:14

**anymore**
89:15, 89:16
**anything**
6:24, 9:3,
11:4, 18:6,
44:10, 44:18,
45:10, 74:4,
74:8, 90:24,
94:4, 111:14,
121:10, 121:21,
121:23, 123:12,
124:20, 125:5,
130:20, 133:5,
134:24
**anyway**
6:22
**anywhere**
76:7, 81:9
**apologies**
57:4
**appear**
9:8, 37:14,
65:3, 70:12,
76:6, 101:22
**appears**
35:24, 37:11,
143:5
**application**
17:24
**apply**
13:19, 17:23,
19:15, 24:2
**appreciate**
31:14
**appropriate**
16:21, 18:23,
23:1, 23:18,
26:21, 26:24,
27:1, 27:5,
29:13, 30:3,
30:10, 30:23,
31:4, 48:23,
57:24, 58:4,
87:22, 88:1,
88:12, 88:22,
89:3, 89:7,
89:8, 89:11,
89:17, 90:2,

90:18, 117:22
**appropriately**
17:21, 49:4
**approximate**
62:24, 80:4
**approximately**
19:3, 19:4,
19:23, 20:1,
20:16, 114:16,
116:7
**area**
37:10, 131:12,
140:3
**aren't**
93:18, 113:11
**argue**
101:14, 111:15
**argumentative**
102:21, 102:22,
103:4, 103:13
**arkansas**
12:14
**arm**
40:18, 47:14,
81:17, 82:5,
83:23, 84:17,
100:17, 106:6,
108:2
**armbruster**
1:6, 2:6, 2:20,
6:18, 67:13,
67:20, 73:19,
76:3, 80:19,
81:17, 86:2,
86:7, 86:11,
87:10, 93:14,
93:21, 93:22,
95:19, 96:2,
96:8, 96:18,
96:23, 97:4,
99:6, 99:10,
100:14, 101:4,
101:21, 102:20,
103:13, 104:7,
108:8, 109:19,
110:7, 114:23,
116:23, 119:2,
119:4, 119:15,

120:24, 121:3,
121:12, 121:15,
125:6, 125:14,
125:22, 126:13,
127:14, 128:8,
128:10, 129:14,
130:21, 131:14,
132:14, 138:14
**armbruster's**
69:17, 69:21,
76:9, 76:22,
77:18, 80:23,
81:13, 82:4,
85:19, 87:6,
91:3, 91:22,
92:7, 92:15,
103:23, 106:10,
108:1, 108:12,
110:3, 111:10,
111:17, 114:1,
117:22, 118:8,
118:12, 118:19,
119:24, 120:6,
121:9, 125:18,
126:7
**arms**
36:16, 42:2,
42:24, 92:17,
93:3, 93:8,
93:15, 93:17
**around**
119:7
**arranging**
23:4, 23:5
**arrived**
114:12
**arthritis**
129:11
**ascertain**
109:12
**aside**
80:11
**ask**
7:3, 7:8,
65:15, 66:16,
67:3, 67:15,
72:5, 74:10,
83:7, 99:18,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                          39

107:22, 109:13,
112:4, 113:17,
117:10, 127:1,
135:3, 135:4,
139:3, 139:6
**asked**
63:23, 64:12,
103:16, 104:6,
111:22, 123:3,
124:17, 125:5,
125:13, 125:18,
125:19, 125:20,
125:24, 126:23,
127:13, 137:17
**asking**
6:24, 43:14,
60:19, 64:17,
64:18, 71:11,
71:15, 81:9,
81:23, 99:18,
101:18, 101:20,
110:17
**assess**
110:15
**assessing**
48:8
**assessment**
102:11, 115:21,
117:4, 117:5,
133:3, 133:7,
133:8
**assignment**
64:7
**assistance**
28:15, 28:18
**assistant**
61:6, 93:4
**assistants**
139:1
**associated**
112:3, 112:24,
113:1, 113:5
**assume**
101:3, 101:20
**assumes**
99:13, 120:11
**assuming**
96:1, 96:2

**assumptions**
135:5
**attendance**
9:6
**attention**
113:24, 136:12
**attorney**
4:5, 6:17,
7:13, 63:19,
66:19, 122:5,
143:11
**attorneys**
71:22, 135:4,
135:8
**audible**
7:4
**audits**
23:19
**authored**
61:12
**authoritative**
83:8
**authority**
25:22
**authorization**
23:3
**available**
93:3
**average**
25:5
**aware**
37:3, 74:5,
111:9
**away**
72:14

---

**B**

**b) (4) (c) (2**
63:18
**babies**
17:10, 27:9,
27:13
**back**
14:11, 19:2,
19:10, 36:11,
47:2, 52:3,
54:19, 68:8,
73:13, 97:20,

98:4, 100:13,
100:18, 102:3,
104:20, 106:4,
106:7, 108:11,
108:16, 108:18,
109:9, 116:16,
119:24, 120:3,
120:6, 121:4,
127:24, 128:18,
128:21, 128:23,
132:22, 134:18,
142:3
**background**
55:1
**bailey**
69:5, 76:19,
77:10, 78:20
**bailey's**
77:9, 77:13,
78:10
**balance**
44:11, 46:4,
46:7, 46:9,
46:14, 48:7
**ball**
44:8
**ballas**
2:16
**baptist**
61:6
**barely**
94:3, 94:21,
100:15
**based**
63:22, 114:8,
114:15, 117:20,
119:1, 124:24,
129:13
**basically**
17:9, 45:24,
73:9
**bates**
92:12, 127:19,
128:8, 128:13
**bear**
103:1
**bearing**
134:2

**became**
11:2, 13:12,
19:20
**because**
11:9, 11:21,
18:16, 18:23,
20:5, 29:4,
30:14, 30:20,
31:10, 36:19,
38:10, 40:14,
42:7, 49:22,
49:24, 63:14,
75:17, 85:11,
86:16, 99:11,
103:13, 107:9,
107:14, 108:22,
118:1, 125:10
**become**
10:7, 10:10,
19:15, 39:5,
95:11
**becomes**
41:14
**becoming**
18:7
**been**
6:18, 8:1,
13:15, 17:3,
33:10, 34:4,
55:1, 55:11,
58:13, 58:18,
59:13, 61:17,
62:5, 62:8,
62:11, 62:18,
67:8, 70:3,
77:1, 78:19,
79:5, 113:13,
119:5, 136:18
**before**
2:16, 2:18,
6:18, 7:9, 32:1,
59:4, 78:22,
80:7, 86:12,
96:17, 98:7,
98:12, 98:18,
116:9, 118:22,
129:7
**began**
109:2

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

40

beginning
39:14, 39:15,
114:2
behalf
1:14, 6:10,
59:22, 61:2,
61:22
behind
99:2
being
6:9, 18:12,
23:11, 47:23,
48:6, 55:21,
56:5, 88:23,
122:8, 125:20,
132:23, 139:7,
141:3
believe
66:20, 79:15,
105:7, 112:6,
114:1, 115:5,
119:3, 119:7,
123:9, 125:1,
141:24
below
33:17, 36:14,
37:10, 37:15,
37:21, 38:1,
97:23
benefit
102:23
best
126:23, 143:7
better
11:3, 11:7,
11:17, 11:18,
11:23, 104:24,
105:1, 105:4,
105:18, 124:22,
129:15, 132:8
between
2:15, 6:2,
8:21, 12:1,
14:18, 17:7,
19:3, 31:21,
31:22, 66:19,
82:17, 85:20,
92:4, 101:13,

102:19, 105:22,
108:9, 109:6,
109:8, 109:12,
109:16, 109:20,
109:22, 110:13,
110:24, 111:11,
114:16, 119:14,
138:16, 139:8
big
12:13, 19:2,
20:1, 32:2,
70:14
bilaterally
49:13, 50:6,
50:11
bill
80:8
bit
42:10, 85:4,
138:12, 139:2,
140:13
blade
93:7
blood
90:11
board
17:14, 18:18,
19:8, 19:11,
19:16, 19:17,
20:1, 20:3,
20:4, 20:11,
20:19, 24:11,
62:12
body
47:22, 47:23,
95:24, 96:3,
128:9, 132:2,
140:3
bony
115:17
boose
4:4, 5:3, 5:6,
28:4, 28:11,
29:2, 29:18,
30:12, 31:1,
31:14, 31:18,
31:24, 32:3,
41:16, 95:13,

99:15, 121:24,
122:2, 122:5,
122:21, 139:19,
139:21, 140:7,
140:15, 140:24,
141:11, 141:14,
141:23
both
36:16, 42:1,
42:4, 49:21,
50:2, 56:20,
56:21, 75:21,
79:20, 99:21,
138:15
bottom
48:16, 92:13,
93:21, 115:3
box
71:24
brain
46:1, 46:8,
46:24, 47:1
branding
13:2
breath
31:21
briefly
70:10, 121:24
bring
15:3, 49:22
broad
123:19, 123:21
broadly
81:9, 90:13
broadway
3:14
brought
71:24, 72:1,
77:17
brown
77:19, 77:20
build
93:5
building
20:21, 20:24,
21:2, 21:6,
21:11, 21:14
bundle
40:16

busier
24:9

C

call
9:20, 40:21,
64:21, 107:9,
130:17
came
18:22, 23:20,
29:15, 59:4,
74:22
campus
21:9
can
6:13, 8:9,
11:20, 17:9,
17:10, 17:11,
18:24, 22:22,
24:22, 26:4,
26:15, 26:20,
27:3, 31:15,
31:17, 31:24,
34:13, 39:12,
40:6, 40:10,
42:7, 45:10,
45:14, 52:22,
53:18, 53:20,
54:9, 57:9,
57:11, 58:7,
62:24, 64:20,
67:7, 70:7,
71:12, 72:9,
73:11, 75:14,
78:1, 79:16,
80:11, 82:15,
83:3, 83:6,
85:5, 87:17,
88:7, 94:2,
94:9, 94:15,
94:21, 97:21,
98:7, 98:12,
100:15, 103:16,
104:3, 106:15,
107:5, 107:7,
110:1, 112:10,
113:5, 113:19,
113:23, 127:19,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                          41

130:4, 131:21,
133:15, 133:19,
136:3, 139:6,
141:19
**can't**
59:8, 90:23,
94:16, 101:14
**canal**
115:16
**cannot**
75:2, 83:1,
120:21
**car**
57:20
**cardiac**
27:9, 28:14
**cardiologist**
11:20, 25:3
**cardiology**
11:19
**care**
10:17, 13:10,
17:10, 22:20,
22:22, 23:4,
23:15, 24:14,
24:23, 25:9,
27:24, 35:14,
36:2, 47:9,
48:10, 48:17,
48:19, 48:23,
49:1, 49:7,
49:11, 49:15,
50:3, 50:7,
50:14, 51:3,
51:9, 53:22,
54:1, 55:2,
60:18, 69:17,
69:21, 76:9,
91:11, 100:5,
101:7, 101:8,
101:24, 114:1,
123:8, 137:8,
138:17, 138:20
**carpal**
32:11, 42:8
**carrying**
54:19
**case**
6:17, 8:4, 9:4,

30:17, 34:7,
55:1, 55:12,
55:14, 55:17,
56:1, 56:5,
56:9, 56:10,
56:13, 57:6,
57:12, 58:7,
59:16, 59:19,
61:3, 62:20,
63:4, 63:7,
63:10, 63:16,
64:7, 64:14,
64:17, 64:19,
65:7, 65:23,
67:10, 68:20,
70:6, 72:7,
74:12, 77:2,
77:12, 79:18,
80:1, 86:1,
86:6, 99:5,
99:9, 111:10,
111:18, 113:21,
121:8, 121:11,
121:14, 122:4,
123:5, 123:6,
124:18, 127:3,
135:6, 135:9,
135:10
**cases**
25:8, 55:6,
55:10, 56:16,
56:19, 56:21,
79:12
**cassiday**
3:13
**categories**
29:12, 63:16,
72:12
**category**
28:14, 29:13
**cause**
1:4, 2:4, 2:18,
41:6, 41:7,
80:23, 81:16,
81:21, 84:9,
88:24, 107:2,
108:1, 108:8,
110:15, 112:11,

118:12, 124:13,
131:22
**caused**
81:12, 82:4,
84:16, 107:19,
108:13
**causes**
82:23
**causing**
83:23
**caveat**
29:8, 71:3
**ccr**
1:17, 143:21
**center**
12:9, 12:23,
12:24, 13:3,
13:24, 69:10,
71:9, 80:20
**cerebella**
44:11, 49:23
**cerebellar**
46:9, 46:13
**certain**
2:18, 124:1,
124:17
**certainly**
49:2, 106:7
**certainty**
81:12, 82:2,
108:1, 108:7,
125:2, 125:3
**certificate**
143:1
**certified**
2:17, 6:4,
143:2
**certify**
143:4
**cervical**
36:15, 76:22,
81:18, 82:13,
82:15, 82:21,
83:10, 83:16,
83:22, 84:15,
84:16, 106:7,
106:15, 106:18,
112:9, 115:18,

121:18, 129:11
**chairman**
18:7, 18:11,
20:7
**chance**
96:18
**change**
11:5, 78:15,
96:6, 99:20,
115:23, 115:24,
119:4, 119:18
**changed**
8:6, 10:2, 13:1
**charged**
79:12
**chart**
97:1
**check**
142:3
**chicago**
3:7
**children**
17:11
**choice**
59:7
**cholesterol**
27:10
**chose**
93:10, 96:12
**chronic**
106:7, 108:11,
116:12, 118:19
**circumstance**
30:22
**circumstances**
89:8, 90:1,
90:16
**cities**
21:22
**clamp**
52:12
**clarify**
38:9
**clarifying**
67:17
**classes**
16:7, 16:8,
16:9

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018 42

classroom 16:10
clayton 60:8
clear 7:11, 35:21, 68:14, 90:14, 98:8, 106:9, 106:24, 119:19, 138:16
clearly 113:4
clinic 10:2, 10:4, 10:9, 10:10, 10:11, 10:18, 10:21, 11:11, 12:4, 12:8, 12:12, 12:17, 12:23, 13:9, 13:17, 13:21, 14:7, 14:9, 14:16, 14:18, 14:20, 14:23, 15:8, 15:10, 15:23, 18:22, 19:1, 19:20, 19:22, 20:5, 20:12, 20:22, 21:2, 21:6, 21:9, 21:14, 21:17, 22:5, 22:6, 22:7, 22:13, 22:14, 69:10, 69:14
clinical 10:16, 123:7
clinically 41:1
clinician 53:16
close 44:16
coding 23:17, 23:19
cohesive 11:12
cold 25:15, 76:4,

76:10
collected 114:10
colonoscopy 30:14
columbia 8:11, 8:19
com 3:9, 3:17
combination 47:7, 50:20
combined 9:19
come 15:17, 16:12, 19:16, 28:8, 40:20, 70:15, 70:16, 125:1
comes 82:19, 110:7, 138:18
coming 15:11, 66:23, 123:4, 123:5, 123:13, 124:18
commenced 1:19
committee 16:19, 16:24, 17:13, 17:17, 17:24, 18:3, 18:7, 18:9, 18:10, 18:13, 18:15, 19:12, 19:13
common 37:11, 37:14, 37:20, 37:24, 81:21, 86:20, 128:22, 128:23, 137:24, 138:3, 138:10
commonly 81:18
communicate 11:22, 11:24
communication 53:21

communications 64:1
companies 23:18
company 55:15, 55:19, 55:20, 56:23, 57:1, 59:21, 61:20, 61:21
compared 94:5, 138:13
compensated 23:8, 24:10
compilation 5:13, 70:4
complain 96:4
complained 128:9, 132:15
complaining 47:6, 50:5, 50:19, 128:10
complains 97:1
complaint 49:17, 64:10, 65:22, 69:4, 73:18, 76:7, 76:12, 92:15
complaints 91:3, 91:9, 91:10, 91:22, 98:10, 103:24, 104:8, 116:23, 117:6, 119:24, 120:6, 121:4, 123:20, 125:6, 129:21, 138:19, 138:23
complete 9:17, 9:22, 41:20, 42:11, 44:3, 65:15, 71:1, 109:24
completed 9:14, 62:22
compress 36:13, 40:14

compression 32:22, 32:23, 33:7, 33:14, 33:18, 33:21, 33:24, 34:5, 34:18, 35:3, 35:5, 35:10, 35:18, 35:24, 36:8, 36:11, 36:15, 36:21, 37:2, 37:8, 37:10, 37:12, 37:15, 37:21, 38:1, 38:13, 39:5, 40:6, 40:11, 40:20, 41:7, 44:23, 44:24, 45:5, 51:12, 51:19, 51:22, 53:12, 57:22, 58:22, 59:5, 82:22, 82:24, 83:1, 83:4, 83:19, 83:24, 84:3, 84:5, 106:18, 106:23, 107:7, 107:20, 112:6, 112:11, 112:22, 113:7, 115:12, 115:14, 115:19, 118:18, 118:24, 119:12, 119:23, 120:2, 120:5, 120:9, 120:17, 120:22, 122:19, 128:22, 128:24, 131:23, 132:3, 135:21, 136:2, 136:19
comprised 17:4, 19:5, 19:22
computer 26:16
concluded 142:8
conclusions 79:21, 121:8,

888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

43

135:6, 135:10
**condition**
33:2, 33:4,
53:13
**conditions**
7:18, 124:13
**conduct**
38:23, 88:14
**conducted**
88:13, 90:20,
91:24, 133:16,
133:19
**confidently**
75:2
**confirm**
34:2, 34:8
**conflict**
101:19
**confusion**
6:23
**congestive**
16:21
**conservative**
82:8, 83:9,
83:17, 84:18
**consider**
24:17, 25:11,
25:20, 26:17,
34:15
**considered**
63:20
**constant**
85:13
**contained**
103:17
**contends**
64:14
**context**
69:10, 69:12
**contract**
47:2
**contradict**
111:10
**contrast**
114:24
**conversation**
44:20
**conversations**
66:19, 66:22

**conversely**
113:4
**coordinating**
23:15
**coordination**
22:20, 22:23,
44:12, 46:5,
46:8, 48:8
**copies**
72:1, 72:3
**copy**
8:2, 62:18,
62:20, 70:4,
79:6, 141:22,
142:6
**cord**
32:22, 32:23,
33:7, 33:14,
33:21, 33:23,
34:5, 34:18,
35:3, 35:5,
35:10, 35:18,
35:24, 36:7,
36:11, 36:13,
36:15, 36:21,
37:2, 37:8,
37:12, 37:15,
37:21, 38:1,
38:13, 39:5,
40:5, 40:11,
40:14, 40:20,
41:7, 42:9,
44:22, 44:24,
45:5, 46:1,
51:11, 51:19,
51:22, 53:12,
57:22, 58:22,
59:5, 82:22,
82:23, 83:1,
83:4, 83:19,
83:24, 84:3,
84:5, 84:14,
106:18, 106:22,
107:7, 107:19,
112:6, 112:11,
112:22, 113:7,
115:11, 115:14,
115:18, 115:19,

118:18, 118:24,
119:10, 119:11,
119:12, 119:23,
120:2, 120:5,
120:9, 120:16,
120:19, 120:22,
122:18, 128:22,
128:24, 129:12,
131:22, 132:3,
135:20, 136:1,
136:19
**correct**
8:22, 9:15,
10:1, 13:8,
18:13, 18:18,
18:21, 21:11,
24:15, 24:20,
25:9, 25:23,
27:7, 27:19,
27:21, 33:2,
38:2, 38:5,
39:20, 39:23,
41:9, 41:12,
45:6, 45:7,
52:16, 54:14,
65:20, 65:23,
66:11, 67:13,
67:20, 67:24,
68:12, 68:15,
68:17, 68:18,
68:21, 69:18,
69:22, 71:10,
74:6, 75:19,
76:4, 76:19,
76:23, 79:17,
80:20, 80:24,
82:3, 82:13,
83:2, 83:5,
85:20, 87:7,
87:11, 89:10,
89:23, 90:9,
90:12, 91:24,
92:5, 92:21,
98:10, 98:19,
100:6, 100:22,
101:9, 103:4,
103:14, 104:1,
105:17, 106:11,

106:19, 107:2,
107:13, 108:9,
108:14, 109:2,
111:7, 111:19,
112:6, 112:16,
113:6, 115:15,
116:20, 118:20,
120:1, 120:10,
121:1, 121:4,
121:9, 121:16,
125:8, 136:22,
137:15, 137:20,
139:15
**correctional**
69:10, 71:9,
122:3
**corrections**
132:16
**correctly**
11:3
**cotton**
44:8
**could**
18:3, 31:20,
38:4, 38:18,
42:7, 42:8,
42:9, 42:10,
45:16, 47:19,
50:24, 51:12,
54:15, 95:3,
95:19, 95:23,
100:16, 102:10,
102:11, 102:12,
106:7, 106:18,
107:12, 108:11,
108:16, 108:18,
109:5, 109:11,
111:1, 111:3,
112:9, 112:24,
118:4, 119:10,
124:13, 124:20,
131:17
**couldn't**
115:21, 133:11
**counsel**
6:2, 62:19,
143:8, 143:11
**couple**
74:16, 112:10,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                          44

123:1, 127:13
**course**
31:3, 109:11,
135:19, 135:24
**court**
1:1, 2:1, 2:17,
2:19, 4:11, 8:1,
31:9, 31:13,
32:1, 60:6,
60:7, 61:1,
61:10, 62:17,
141:21, 142:5
**cranial**
42:13, 42:15,
44:4, 45:8,
48:2, 48:4, 50:1
**created**
73:2, 113:18
**creates**
138:13, 138:14
**creating**
79:22
**credentials**
8:6
**criminal**
61:3
**critical**
41:14
**cross-examination**
5:3, 5:4,
122:1, 122:23
**ct**
116:9, 118:14
**current**
8:4
**currently**
9:24, 20:3
**cv**
5:11, 8:2, 8:4

**D**

**damage**
76:14
**daniel**
14:12
**data**
63:19
**date**
62:23, 79:16,

90:20, 100:11,
136:19
**dates**
9:6, 9:11, 9:12
**daughter**
100:16
**day**
2:14, 2:15,
14:20, 25:1,
25:4, 25:6,
26:8, 38:13,
59:11, 91:16,
119:20, 131:16,
138:15
**days**
14:19, 15:17,
38:14, 38:15
**dea**
61:1
**deal**
32:2, 32:6,
58:10, 130:12
**december**
85:20, 85:22
**decide**
17:13, 18:10,
18:15, 127:8
**decided**
30:6
**decision**
10:20, 16:1
**decisions**
87:21, 135:17
**deep**
46:17
**deeper**
30:1
**deets**
9:10
**defendant**
4:3, 55:18,
55:21, 56:4,
58:15, 58:18,
60:19, 61:16,
61:17, 122:3
**defendants**
1:11, 2:11,
2:22, 3:11, 6:2,

7:14, 8:3,
31:16, 31:17,
63:6, 63:9,
64:16, 80:8,
135:4
**defense**
62:19, 71:21,
72:6
**deficit**
129:9
**deficits**
133:4, 134:10,
134:14
**defined**
90:13
**definition**
24:18
**definitive**
28:1, 28:9,
28:13, 29:15,
30:11, 30:18,
30:20, 34:5,
81:24, 118:11,
118:17
**degree**
8:10, 8:12,
8:16, 81:11,
82:2, 107:24,
108:7, 125:2
**deliver**
17:10, 27:13
**denials**
23:17
**department**
5:15, 16:4,
22:20, 22:23,
22:24, 23:15,
23:21, 24:7,
24:8, 74:14,
74:23, 113:14,
132:16
**depend**
42:3, 47:12
**dependent**
49:8
**depending**
40:2
**depends**
31:6, 34:1,

39:13, 41:24,
42:2
**deposed**
6:18, 58:13,
58:15, 58:18,
60:17, 60:18
**deposes**
6:10
**deposition**
1:13, 1:19,
2:13, 6:3,
56:18, 57:5,
60:12, 61:16,
67:12, 67:19,
67:23, 68:2,
68:6, 68:11,
68:15, 68:19,
77:9, 77:10,
77:18, 77:21,
78:4, 78:7,
78:11, 78:20,
99:19, 102:23,
103:17, 104:11,
104:15, 105:9,
111:17, 111:22,
125:14, 125:19,
126:7, 142:8,
143:5, 143:10
**depositions**
60:20, 80:6
**describe**
27:4, 87:23,
101:8, 107:3,
107:18
**described**
46:16, 47:9,
107:12, 130:14
**describing**
140:1, 141:2
**description**
84:11, 84:13
**desk**
114:14
**despite**
89:22
**detail**
91:3
**detailed**
71:2, 78:16,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

45

81:16
**details**
57:16, 80:18
**determinations**
140:4, 141:4
**determine**
43:2, 136:1,
136:11
**determined**
121:12
**determining**
26:21
**develop**
138:8
**diabetes**
16:21, 27:10
**diabetic**
32:10
**diagnose**
27:15, 27:17,
33:4, 33:13,
33:21, 34:9,
37:8, 126:17
**diagnosed**
33:6, 33:23,
44:24
**diagnosing**
14:24, 28:19,
131:11
**diagnosis**
26:23, 28:1,
28:9, 28:13,
28:15, 29:15,
30:11, 30:18,
30:20, 31:4,
34:2, 34:3,
34:5, 34:8,
34:11, 34:18,
34:21, 36:1,
38:23, 39:7,
41:8, 81:1,
81:24, 82:1,
118:11, 118:17,
120:5, 120:9,
124:3, 124:6,
134:11, 140:23
**diagnostician**
109:8

**dickson**
1:17, 2:17,
4:12, 6:4,
143:2, 143:21
**didn't**
46:18, 54:7,
69:20, 70:19,
72:10, 74:3,
74:4, 76:6,
76:18, 76:21,
85:18, 104:21,
111:14, 121:7,
121:14, 125:10,
141:12
**difference**
10:15, 17:7,
101:12, 108:15,
110:12, 138:16,
139:8
**different**
12:10, 14:23,
15:1, 17:8,
18:17, 22:5,
24:8, 29:4,
29:5, 43:7,
74:11, 95:1,
95:3, 107:9,
107:13, 112:10,
117:10, 130:4,
136:5, 139:2,
139:4
**differential**
34:10, 34:18,
35:8, 35:9,
35:11, 36:1,
38:22, 39:7,
39:19, 41:8,
124:3, 124:6,
124:10, 140:23
**differentiates**
108:20
**differs**
94:7, 94:12
**difficult**
73:3
**difficulty**
120:18
**direct**
5:2, 6:11

**directed**
123:14
**direction**
143:8
**directly**
123:8
**director**
12:22, 13:5,
13:12, 13:17,
13:24, 14:10,
14:13, 14:22,
15:23
**directors**
18:18, 19:9,
19:17, 20:3,
20:4, 20:11,
24:11
**disagree**
101:14, 102:23
**disc**
42:9, 43:12,
59:5, 81:19,
82:16, 82:17,
82:21, 83:23,
84:15, 84:16,
106:7, 106:15,
106:18, 112:3,
112:5, 112:9,
112:16, 112:19,
113:1, 113:5,
115:17, 119:10,
121:18, 121:19,
123:10
**discern**
73:6
**discharge**
75:11
**discharged**
75:12
**discipline**
62:12
**disclosed**
79:7, 79:15,
80:22, 81:10,
87:5, 87:9,
92:2, 108:5,
108:6, 122:14
**discomfort**
85:6

**discover**
88:24
**discovering**
28:19
**discs**
82:13, 83:10,
83:16, 84:4,
84:13
**discussed**
61:20, 127:24,
128:21, 141:8
**discussion**
18:1, 71:18
**disease**
27:9, 45:14
**dismissed**
59:8, 59:13
**disregard**
88:1, 88:5,
88:9, 89:4
**dissect**
91:18
**district**
1:1, 1:2, 2:1,
2:2, 2:19
**divide**
14:17
**division**
1:3, 2:3, 2:20,
12:15, 20:12,
21:17, 21:21,
21:23, 22:6,
22:8, 22:10
**divisions**
12:13, 22:9
**doctor**
13:18, 30:3,
30:14, 31:9,
31:19, 56:2,
56:3, 69:15,
75:7, 93:1,
93:2, 101:13,
110:14, 117:19,
117:24, 118:1,
121:6, 122:3,
122:16, 130:24,
133:1, 134:10,
139:10, 139:22,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

46

141:12
**doctor's**
92:9, 120:4
**doctors**
11:24, 20:14,
21:3, 21:5,
29:12, 29:13,
49:5, 55:7,
138:18, 139:6
**doctrinal**
16:7, 16:9
**document**
54:7, 64:8,
73:1, 104:12,
104:17, 113:18,
133:2, 138:12,
138:13, 138:23
**documentation**
53:15, 53:23,
54:2, 109:6,
111:6, 116:5,
116:6, 116:22,
117:20, 131:2
**documented**
92:16, 103:23,
109:1, 133:14
**documenting**
138:18
**documents**
66:3, 71:21,
71:22, 72:6,
72:9, 72:10,
72:13, 74:11,
75:8, 77:15,
78:15, 97:18,
102:20, 103:12,
113:20, 115:11,
124:17, 124:19,
124:24, 130:24
**does**
36:11, 39:5,
42:14, 44:22,
44:24, 45:1,
45:23, 46:10,
46:16, 46:21,
48:19, 50:7,
59:8, 60:15,
69:11, 70:12,

82:21, 83:5,
88:23, 89:22,
90:3, 90:20,
97:12, 98:3,
102:8, 105:7,
106:22, 120:5,
120:21, 126:16,
128:5, 128:14,
128:15, 130:18,
132:8, 133:4,
134:2, 134:10
**doesn't**
29:22, 46:15,
88:8, 115:21,
130:17, 138:5
**doing**
11:3, 13:2,
14:23, 17:21,
33:10, 33:24,
80:5, 134:19
**don't**
8:16, 25:20,
26:24, 28:13,
28:15, 29:24,
30:18, 31:2,
35:7, 49:3,
54:6, 54:21,
57:9, 57:15,
57:19, 58:24,
60:4, 60:15,
62:23, 63:13,
64:23, 70:8,
70:17, 71:12,
72:19, 73:24,
74:7, 75:14,
83:12, 83:13,
88:9, 89:14,
89:15, 95:8,
96:10, 96:18,
97:13, 101:19,
102:23, 103:15,
111:23, 114:11,
115:4, 117:3,
117:24, 118:4,
118:5, 121:21,
132:22, 134:23,
138:20
**done**
11:22, 18:16,

20:5, 26:16,
30:14, 30:15,
30:21, 33:16,
35:3, 35:8,
54:17, 65:15,
110:14, 118:23
**door**
89:14
**down**
21:24, 22:2,
38:16, 40:17,
42:2, 43:12,
43:18, 47:2,
54:18, 81:10,
93:2, 93:24,
94:18, 97:9,
101:13, 103:22,
107:4, 115:3,
124:6, 138:24,
139:4, 139:9,
139:11
**dr**
6:16, 14:11,
14:12, 67:23,
68:4, 68:6,
68:12, 68:16,
69:5, 73:3,
74:5, 76:19,
77:13, 77:19,
77:20, 78:2,
78:5, 78:10,
78:20, 91:11,
91:24, 92:4,
96:7, 96:12,
97:5, 97:18,
98:14, 98:19,
100:1, 102:19,
102:20, 103:3,
103:12, 103:17,
103:23, 104:7,
105:12, 121:1,
121:4, 121:8,
121:12, 126:6,
126:8, 126:13,
127:23, 128:14,
130:21, 131:16,
138:14
**drafting**
67:5

**draw**
113:24
**drives**
87:21
**dugan**
71:24
**duly**
143:5
**during**
14:9, 14:17,
15:1, 15:8,
15:13, 52:24,
119:14
**duties**
11:4, 16:15,
52:15
**duty**
87:18

### E

**e-tran**
141:24, 142:7
**each**
13:17, 25:1,
29:5, 70:9,
70:10, 82:18,
92:9, 92:10,
101:19, 117:11
**earlier**
41:5, 112:7,
122:7
**easier**
11:7, 11:9,
11:15, 11:24,
12:5, 31:5
**east**
1:3, 2:3, 2:20,
12:14, 20:12,
20:13, 21:17,
21:21, 21:23,
22:6, 22:7,
22:14
**economics**
11:3
**ed**
114:12
**edema**
118:24, 119:10,

Transcript of Stephen Sanders, M.D.

Conducted on May 23, 2018

47

119:11, 120:19
**educated**
8:21
**education**
52:1, 123:23
**effect**
45:1, 45:14,
51:15, 115:18,
121:10, 126:16
**effected**
36:14, 45:9
**effectively**
17:21
**efficient**
11:17, 31:6
**eight**
10:5, 61:5
**either**
55:6, 56:8,
56:15, 56:18,
85:14, 91:7,
98:1, 111:15,
119:21, 135:21,
137:19
**elbow**
132:15, 132:23
**elbows**
116:19, 120:10
**elected**
19:18
**electronic**
138:8
**elevates**
115:24
**eliciting**
122:14
**else**
18:8, 29:6,
34:22, 44:1,
44:2, 44:10,
44:18, 77:23,
90:24, 121:21,
123:12, 134:24,
141:16
**email**
71:22
**emergency**
59:4, 76:2,

76:4, 113:14,
113:19, 114:9,
116:24, 117:19,
119:16, 126:13,
132:14
**employed**
55:7, 143:9,
143:12
**employee**
143:11
**employment**
23:10
**encounter**
76:3, 76:6,
80:19, 102:19,
137:18, 137:22,
138:1
**encounters**
75:10
**end**
35:21, 52:12
**enough**
18:9, 83:4
**enrolled**
8:18
**entail**
18:6, 23:13
**entails**
42:12
**entities**
22:5
**entity**
12:3, 13:6,
18:20
**equipment**
15:9
**er**
5:19, 116:7,
133:21, 133:23
**et**
1:9, 2:9, 2:21
**evaluate**
46:17, 124:11
**evaluating**
48:5
**evaluation**
24:14, 24:24
**even**
7:9, 30:17,

119:12, 126:4,
130:10, 139:1
**event**
99:21, 108:13
**ever**
6:18, 33:6,
55:1, 58:13,
60:12, 60:22,
61:12, 61:21,
61:24, 62:5,
62:8, 62:11,
65:2, 125:23,
135:19, 135:24,
136:18, 137:22
**every**
15:21, 38:13,
112:15, 137:22,
138:1
**everybody**
59:7, 78:14
**everything**
7:11, 22:16,
26:7, 27:8,
69:13, 78:22
**evidence**
85:18, 86:2,
86:6, 86:11,
87:22, 87:24,
88:15, 89:18,
89:20, 90:16,
90:17, 99:14,
111:6, 111:9,
119:13, 120:12,
121:7, 121:11,
121:14
**exact**
38:12, 97:2,
101:4, 139:11,
139:12
**exactly**
30:6, 54:11,
70:18, 72:9,
105:3, 117:24,
124:14
**exam**
33:16, 33:19,
34:14, 35:17,
35:21, 35:24,

38:23, 39:7,
41:11, 41:14,
41:20, 41:23,
42:7, 42:11,
44:3, 44:11,
45:4, 46:15,
46:20, 47:8,
47:15, 47:19,
48:9, 49:16,
49:22, 49:24,
50:8, 50:12,
51:3, 76:15,
86:22, 87:2,
87:4, 87:21,
88:2, 88:8,
88:12, 88:23,
89:22, 90:3,
90:7, 90:10,
91:4, 91:5,
91:6, 91:23,
92:4, 98:21,
99:24, 100:6,
100:9, 100:10,
101:19, 102:9,
102:15, 104:8,
110:14, 117:14,
117:17, 117:19,
118:1, 129:4,
129:10, 133:7,
133:12, 133:14,
133:16, 133:18,
133:22, 133:24,
134:3, 134:9,
134:13, 134:19,
135:13, 135:16,
136:8, 136:21,
136:22, 136:24,
137:1, 137:2,
137:3, 137:5
**examination**
5:2, 5:5, 6:11,
88:14, 88:24,
90:12, 90:19,
90:20, 102:11,
131:3, 135:1
**examine**
47:14
**examined**
2:14, 6:9

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                               48

examining
44:7
exceeds
129:3
except
109:3, 112:16
excepting
70:22
excited
58:24
exciting
52:13, 52:14
exclude
40:10
excuse
100:9, 117:6
exempted
63:16
exhibit
5:11, 5:12,
5:13, 5:15,
5:17, 5:18,
5:19, 7:22, 8:2,
8:7, 9:6, 12:19,
22:19, 62:14,
62:18, 65:4,
69:24, 70:4,
70:13, 73:14,
74:21, 74:24,
75:4, 75:8,
78:17, 79:2,
79:6, 79:8,
79:22, 80:16,
92:11, 104:20,
106:5, 109:1,
113:8, 113:13
exhibits
5:8, 78:10,
142:1
exists
18:21
expect
120:16, 122:19,
132:2, 133:18,
133:21, 133:23,
134:3, 138:22,
138:24
experience
9:3, 83:12,

111:11, 123:7
experiencing
40:10
expert
30:3, 55:2,
56:8, 58:13,
60:17, 63:7,
63:20, 64:7,
66:20, 79:13
expertise
131:9, 131:12
explain
88:23, 89:23,
90:3, 90:20,
119:23, 120:10
explained
88:13
explains
118:18
explore
95:5
expressed
63:20
expressly
6:6
extent
94:7, 94:11,
118:23, 129:18
extremities
37:10, 37:15,
37:21, 37:24,
42:4, 45:11,
45:20, 48:6,
49:13, 49:21,
50:7, 50:21,
51:13, 51:21,
100:2, 120:17
extremity
42:5, 42:6,
48:6, 51:5
eye
42:18
eyes
27:9, 42:18,
44:17

_____ F _____
face
42:20, 48:15

facial
42:18
facilities
22:15
fact
44:24, 108:13,
109:18, 133:1,
133:13, 137:24,
138:8
facts
63:10, 63:15,
63:19, 64:1,
64:17, 64:19,
64:24, 66:22,
99:13, 120:11,
135:8
fail
137:21
failed
140:9
fails
137:13, 140:2,
141:2
failure
16:22
fair
26:1, 29:8,
32:7, 83:4,
114:15, 114:18,
124:19, 137:21
fall
71:2
familiar
34:10, 54:6,
87:13
family
14:7, 17:3,
17:7, 17:10,
19:6, 29:6
far
86:1, 86:6
faster
11:22
favor
31:10
federal
60:7
feel
104:24, 105:4,

113:19, 113:23
feeling
107:19, 110:4,
117:10, 129:15
feels
100:17, 105:1,
105:22
feet
44:16
fellowship
9:22
felt
109:12, 109:13,
109:19
festus
22:2
few
114:17
field
8:22, 9:1,
30:4, 30:6,
30:8, 38:11,
114:8
file
70:5
filed
55:11, 61:24
final
62:20, 62:22,
65:18, 67:18,
68:10, 77:7,
79:22
financially
143:12
find
11:15, 73:3,
126:23
finding
88:8, 96:1
findings
36:17
fine
31:18, 63:12
finger
44:14, 48:15
fingers
93:8, 93:15,
93:23, 105:14,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                                    49

116:13, 118:19,
121:1
**fingertip**
85:5
**finish**
7:9, 127:20,
140:16
**finishing**
13:21
**first**
6:23, 22:22,
36:10, 65:10,
69:9, 80:17,
86:19, 86:24,
95:1, 106:9,
106:21, 112:4,
113:11, 118:13,
133:2, 137:10,
140:1
**fit**
35:2
**fits**
63:18
**five**
18:16, 56:14,
65:13, 80:4,
98:22, 99:10,
116:13, 116:17,
118:20, 119:24,
120:7
**flat**
43:13
**flexing**
42:24, 45:11
**floor**
3:6
**flu**
76:4, 76:10
**fluctuation**
38:18
**focal**
100:9
**focus**
47:22, 100:9
**focused**
16:24, 42:10,
47:15, 47:19,
48:2, 50:24

**follow**
118:2
**follow-up**
128:14
**follow-ups**
25:2
**following**
9:13, 9:21,
71:19, 80:14,
103:9, 118:6,
132:13
**foot**
44:15, 48:16
**foregoing**
143:5
**forgive**
17:6
**forgot**
135:3
**form**
28:2, 28:24,
29:16, 34:20,
35:16, 36:4,
38:6, 38:22,
39:9, 39:24,
41:16, 47:10,
48:11, 49:18,
50:9, 50:22,
51:14, 54:3,
63:21, 77:3,
88:3, 88:18,
90:4, 95:13,
96:9, 99:13,
99:15, 100:7,
100:23, 101:10,
105:24, 110:8,
111:13, 112:17,
118:11, 120:11,
123:18, 124:15,
126:1, 126:10,
127:5, 129:18,
130:1, 130:6,
130:9, 140:5
**format**
88:6
**formation**
11:6
**formed**
10:5

**forming**
9:4, 63:20,
79:21
**formulate**
134:11
**forthcoming**
125:23
**forty**
33:10
**found**
105:11
**four**
14:19, 22:8,
40:3, 56:14,
79:17, 102:13
**frame**
71:5, 91:15,
125:15
**free**
113:20, 113:23
**frequently**
39:2
**fridays**
15:21
**from**
7:18, 9:8,
9:13, 15:1,
22:17, 23:17,
28:15, 35:5,
40:17, 40:20,
41:11, 46:1,
47:24, 52:19,
69:5, 69:16,
70:5, 70:14,
70:15, 70:16,
70:17, 70:21,
71:8, 73:14,
74:9, 74:22,
75:9, 75:23,
76:3, 76:18,
76:22, 77:20,
78:2, 78:5,
81:18, 82:19,
82:20, 91:10,
94:5, 94:7,
94:12, 102:20,
104:17, 108:21,
110:7, 111:7,

113:14, 113:15,
117:23, 119:15,
125:7, 126:6,
126:18, 126:21,
126:24, 129:11,
132:23, 133:7,
138:6
**front**
102:24, 114:14
**full**
14:20, 36:20,
36:24, 42:11,
51:12, 51:20,
69:9, 69:11,
70:5, 118:23,
137:5
**full-time**
15:24
**function**
46:13
**further**
88:14, 88:24,
89:4, 89:9,
89:19, 89:22,
90:2, 90:7,
90:12, 90:19,
134:19, 143:10
**future**
54:16

|          G          |

**gag**
42:19
**gain**
87:18
**gait**
44:11, 44:21,
46:4, 46:10,
48:8, 49:23
**gary**
6:18, 67:13,
67:19, 80:23,
101:4, 106:10,
109:19, 138:14
**gateway**
5:19, 73:14,
80:19, 113:14,
117:21, 132:18,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

50

133:1, 133:15
**gather**
93:4
**general**
4:5, 15:3,
27:4, 52:5,
54:24, 57:11,
58:8, 102:15,
133:9, 133:10,
136:3, 137:4
**general's**
122:5
**generalities**
81:20
**generally**
26:22, 57:15,
106:14
**generated**
98:13
**gerry**
1:6, 2:6, 2:20
**get**
10:3, 11:22,
17:15, 23:17,
26:10, 26:15,
30:2, 31:4,
32:1, 34:2,
40:15, 40:17,
41:11, 52:12,
53:1, 58:24,
85:12, 95:9,
99:18, 104:21,
119:6, 136:3,
139:3, 142:3
**gets**
11:7, 26:16,
101:12, 134:18
**getting**
25:15, 66:19,
87:18, 132:8
**gi**
30:14, 59:3
**give**
24:22, 26:20,
45:12, 45:23,
46:11, 46:22,
52:22, 57:10,
57:11, 58:8,

62:24, 66:21,
96:17, 114:17,
120:3, 120:20,
127:19, 135:16
**given**
73:23, 73:24,
123:19, 129:21
**giving**
86:14
**gloss**
96:7
**go**
6:20, 6:21,
6:22, 7:15,
20:15, 26:20,
38:16, 40:17,
54:19, 57:16,
69:8, 70:9,
71:16, 74:10,
84:13, 86:17,
93:10, 95:6,
96:16, 103:6,
103:13, 103:20,
103:21, 104:13,
104:20, 106:4,
108:16, 108:18,
109:9, 117:11,
122:16, 124:15,
126:11, 126:19,
140:11, 140:20,
141:19
**goes**
17:18, 21:24,
22:2, 40:15,
102:24
**going**
7:10, 18:2,
20:23, 31:11,
45:15, 63:13,
64:3, 65:15,
66:18, 67:15,
70:3, 70:8,
74:10, 79:5,
86:17, 92:12,
94:6, 113:12,
113:17, 122:13,
124:2, 124:10,
126:10, 129:2,

140:11, 142:2
**gone**
129:22
**good**
67:15, 99:7,
134:13
**got**
8:12, 19:4,
42:13, 52:7,
67:16, 119:7,
121:23
**gotten**
24:9
**graduated**
8:13
**graduating**
52:19
**graduation**
9:13
**grain**
127:8
**grasp**
93:24, 99:11
**great**
38:15, 72:16,
72:17, 130:12
**grip**
42:24, 94:19,
100:2, 100:15
**grossly**
42:17
**ground**
44:16
**group**
10:1, 10:4,
10:14, 10:16,
10:18, 10:22,
11:1, 11:2,
11:12, 11:13,
12:9, 14:18,
15:2, 15:13,
16:19, 17:5,
17:15, 17:18,
18:3, 18:20,
18:24, 19:2,
19:20, 22:20,
23:20
**groups**
18:17, 24:11

**guess**
30:2, 31:2,
31:22, 116:5
**guide**
17:18
**guiding**
141:24
**guys**
11:21
**gyn**
17:4, 19:6,
52:5

H

**had**
15:10, 15:15,
18:16, 20:5,
23:18, 24:9,
28:8, 33:16,
37:7, 53:19,
55:11, 59:5,
59:6, 61:7,
63:3, 64:21,
67:9, 68:1,
79:17, 80:19,
96:8, 116:12,
116:16, 118:17,
118:22, 119:5,
123:4, 123:9,
125:6, 126:24,
132:16, 136:1,
137:22, 138:2
**had:**
71:19, 80:14,
103:9
**half**
43:17
**hallway**
89:14
**hand**
40:10, 40:20,
44:14, 44:15,
47:13, 48:15,
70:3, 79:5,
81:13, 82:9,
83:11, 85:19,
86:3, 86:7,
86:12, 93:23,

94:1, 94:19,
98:2, 100:16,
107:5, 109:4,
113:13, 128:6,
128:11, 128:16
**handed**
8:1, 62:17
**handwrite**
93:11
**haphazardly**
113:12
**happen**
54:7, 57:8,
58:16, 60:10,
119:10
**happened**
39:2, 54:14,
54:15, 55:4,
119:14
**happens**
137:1
**happy**
7:1
**hard**
54:19, 118:23
**harder**
126:21
**has**
10:2, 14:7,
16:20, 17:20,
29:5, 30:15,
47:1, 47:3,
49:1, 55:4,
61:20, 62:8,
62:17, 68:3,
74:1, 88:13,
93:3, 93:21,
97:1, 103:23,
105:1, 109:4,
114:17, 115:16,
115:18, 116:12,
136:11, 137:8
**haven't**
22:18, 52:18,
60:20, 72:13,
87:5, 87:9, 92:2
**having**
37:8, 65:11,

79:1, 95:11,
125:23, 139:10
**he's**
31:11, 63:14,
93:6, 114:3,
116:9, 116:16,
128:18, 141:3
**head**
42:2, 42:15,
73:20, 77:8,
85:15, 88:7,
116:11, 118:14,
118:16
**headaches**
32:16
**heading**
74:19
**heal**
82:8, 83:1,
83:5, 83:11
**healed**
83:17, 84:18,
85:3
**health**
1:9, 2:9, 2:21,
11:16, 23:4,
138:9
**heard**
138:24
**hearing**
42:18, 101:24
**heart**
16:22
**held**
71:18
**help**
17:18, 31:15,
31:24, 138:9
**helpful**
6:21, 11:12,
67:4, 67:9,
77:1, 78:19,
78:22, 99:4,
113:24, 124:18
**her**
61:2, 64:5,
100:19
**here**
10:5, 13:16,

13:20, 15:17,
16:11, 16:18,
20:14, 20:24,
21:8, 21:9,
21:20, 23:3,
46:16, 49:10,
60:2, 62:23,
65:19, 66:4,
66:13, 67:8,
69:9, 71:2,
73:10, 94:15,
96:19, 97:10,
103:1, 104:6,
107:23, 113:12,
128:18, 129:8,
130:8
**hereby**
6:1, 143:4
**herniated**
121:18
**hesitation**
65:3
**hey**
23:22
**high**
27:10
**him**
59:3, 63:13,
63:18, 99:10,
100:5, 101:14,
104:6, 106:13
**hip**
43:1, 43:2,
43:4, 43:21,
45:19
**his**
14:13, 40:10,
60:4, 68:1,
68:4, 68:8,
73:3, 73:20,
76:13, 77:21,
86:3, 86:7,
86:12, 87:10,
92:23, 93:10,
93:15, 93:17,
93:23, 96:23,
98:9, 99:6,
100:17, 103:17,

104:8, 104:11,
104:15, 104:22,
105:8, 109:5,
109:20, 111:22,
112:19, 114:24,
116:11, 116:13,
116:19, 117:5,
117:10, 118:19,
119:20, 121:1,
125:14, 126:8,
128:6, 128:11,
128:16, 129:4,
140:3
**historian**
127:4, 127:7
**history**
33:15, 34:14,
35:17, 35:22,
41:13, 74:1,
109:3, 114:10,
114:17, 126:21,
136:10, 140:2,
140:22, 141:2
**hold**
43:17, 52:12,
122:13, 127:20
**holding**
42:24
**home**
23:4, 72:4
**hospital**
5:17, 10:6,
12:2, 12:3,
12:11, 12:15,
13:1, 13:5,
16:5, 20:24,
23:1, 23:2,
23:5, 24:8,
53:7, 74:9,
74:13, 74:16,
75:9, 103:14,
103:20
**hospitalization**
76:1
**hospitals**
12:12, 12:16,
22:16
**hour**
98:18

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

52

hourly
79:8, 79:11
hours
2:15, 15:18,
79:17, 80:1
how
6:20, 8:17,
11:14, 13:12,
14:4, 14:8,
14:17, 15:19,
17:20, 19:2,
19:8, 19:16,
19:23, 20:1,
20:16, 22:4,
23:20, 24:22,
25:5, 26:4,
26:20, 33:9,
33:12, 42:3,
43:2, 44:13,
55:4, 71:21,
73:6, 80:3,
82:21, 84:23,
124:1, 124:10,
126:16, 129:13,
130:8, 130:13,
133:9, 134:17,
139:3, 140:8,
140:16, 140:17
however
63:17, 124:24
huh-huh
7:6
huh-uh
7:2, 36:9,
37:17, 56:22,
65:21, 65:24,
98:15, 114:7
hundred
74:16
hundreds
84:24, 123:10
hurt
94:2, 94:21,
96:11, 116:19
hurts
36:19, 93:8,
93:16
hypertension
27:10

hypothetical
28:3, 29:1,
29:17, 39:10,
40:1, 47:11,
48:12, 49:19,
50:10, 50:23,
88:4, 88:19,
90:5, 101:11,
106:1, 140:19

**I**

i'll
6:21, 31:23,
32:2, 60:4,
74:21, 92:22,
96:17, 103:18,
105:11, 113:12
i've
13:15, 33:10,
64:12, 123:8
idea
24:22, 26:20,
73:23, 74:15,
74:18
identification
7:23, 62:15,
70:1, 75:1,
75:5, 79:3,
113:9
identified
30:7
idoc
31:17
ignorance
17:6
il
4:9
illinois
1:2, 2:2, 2:20,
3:7, 4:5, 4:7,
69:10, 71:8
illness
28:14, 49:8
images
68:23, 69:1,
69:2, 115:4
imagine
55:20, 57:6

imaging
25:12, 25:14,
25:16, 25:17,
25:23, 26:5,
26:9, 26:14,
26:16, 33:15,
33:20, 33:24,
34:2, 34:6,
34:7, 34:19,
57:24, 76:22,
90:10, 118:10
impact
99:8, 137:7,
140:17, 140:18
implicated
30:8
implications
32:13
imply
43:19, 129:9
importance
137:7
important
17:15, 17:16,
17:17, 17:19,
53:16, 109:3,
113:11
impossible
54:21
impression
102:15, 136:3
improper
88:18
improvement
16:20
inadequate
135:15
inappropriate
27:23, 28:7,
64:15
include
25:2, 25:16,
26:7, 27:21,
28:18, 75:22,
79:20, 86:22,
92:23, 93:6,
93:9, 93:12,
106:18, 106:22,

109:9, 114:20,
140:23
included
59:6, 76:15
includes
21:3, 21:22,
22:14, 22:24,
23:3, 25:17,
35:22, 72:12,
112:6
including
25:14, 52:23,
63:4
incomplete
28:2, 28:24,
29:16, 39:9,
39:24, 47:10,
48:11, 49:18,
50:9, 50:22,
88:3, 90:4,
101:10, 105:24,
140:19
inconsistent
92:8, 93:18,
94:4, 95:2,
95:3, 95:5,
95:9, 95:10,
95:12, 95:17,
96:2, 105:2,
122:8, 127:12,
129:23, 130:3,
131:17, 132:15
index
5:8
indicate
45:16, 128:5,
130:20, 132:8,
133:4, 133:5
indicates
109:2
indicating
71:6
indication
128:9
indications
31:20
indigent
13:9

infection
35:5
inform
99:4
information
45:12, 45:13,
45:22, 46:10,
46:21, 63:3,
68:8, 77:8,
79:1, 93:3,
93:4, 99:1,
123:17, 126:18,
126:20, 127:7,
135:16, 137:9,
138:6, 140:14,
140:17, 140:18,
140:21
informed
126:13
initial
77:21
initially
125:24
injuries
27:10, 27:11,
32:12
injury
57:20
input
23:16
instance
11:19, 23:16,
30:13, 43:12,
47:13, 50:8,
61:19, 88:12,
89:13, 89:19
instances
33:12, 56:8
instead
7:5
instruct
63:13, 63:17,
63:22
instructed
64:23
instructs
7:15
insurance
23:3, 23:17,

55:12, 55:14,
55:15, 55:17,
55:19, 55:20,
56:10, 56:23,
57:1, 57:6,
57:12, 59:21,
61:20, 61:21
intact
47:3
integrated
12:4, 12:17,
138:9
intend
80:8
intense
122:20
intentionally
137:11
interaction
44:21
interested
143:13
interesting
117:18
interfere
7:19
intermittent
38:4, 38:10,
38:11, 38:17,
85:13
internal
9:14, 10:17,
14:5, 14:6,
15:3, 16:4,
17:1, 17:3,
17:7, 17:11,
19:5, 29:5,
52:16
internist
27:6, 32:21
internists
27:11
internship
9:18, 9:19
interpret
26:18, 97:14
interrupt
75:7

intervention
83:2
into
6:5, 18:22,
24:8, 57:16,
65:8, 66:19
involve
14:14, 32:24,
57:22, 57:24,
58:3
involved
18:6, 19:11,
60:18, 60:19
involves
24:13
involving
141:3
isn't
68:5
isolate
46:15
issue
45:1, 45:16,
45:17, 45:18,
45:23, 46:22,
57:12, 58:10,
58:21, 112:16,
136:11
issues
23:16, 27:16,
28:22, 32:6,
32:18, 64:11
issuing
77:24
it's
9:19, 11:2,
11:9, 11:12,
11:15, 11:24,
13:1, 13:9,
13:14, 17:17,
23:4, 26:16,
26:24, 27:5,
28:14, 31:5,
35:4, 35:11,
36:15, 36:20,
36:23, 37:4,
39:14, 40:13,
40:16, 40:21,

42:18, 45:13,
46:2, 48:14,
53:19, 53:20,
54:11, 54:13,
54:19, 56:14,
63:12, 63:14,
63:17, 63:23,
69:14, 73:2,
79:17, 81:24,
82:19, 83:12,
84:2, 84:11,
84:12, 85:3,
85:10, 85:14,
86:16, 86:17,
91:17, 94:17,
96:4, 96:14,
97:2, 97:8,
98:18, 102:14,
102:16, 105:18,
108:16, 112:14,
115:20, 118:23,
120:4, 132:1,
134:13, 136:4,
137:3, 137:5,
138:3, 139:3,
139:4, 140:22,
141:23
its
82:20, 83:5
itself
115:17

J

jaclyn
3:12
january
76:3, 76:10
jefferson
12:16, 20:13,
21:24
jfk
12:22, 13:7,
15:10
jkinkade@cassiday
3:17
jo
1:17, 2:17,
4:12, 6:4,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

54

143:2, 143:21
**job**
11:4, 13:4,
13:14, 13:19,
13:24, 14:13,
14:22, 136:7,
136:15, 136:17
**jobs**
12:20
**john's**
9:24, 12:23,
12:24, 13:3
**join**
10:20, 17:13,
23:20, 23:22,
28:4, 29:2,
29:18, 31:17,
95:14
**joining**
19:11
**joint**
51:15
**joints**
51:12, 51:21
**jump**
31:11
**june**
85:20, 85:21,
103:11, 104:23,
104:24, 105:4,
105:22, 125:7,
128:8, 128:13,
129:14, 129:22
**just**
6:24, 8:1,
11:7, 14:11,
14:12, 18:1,
18:20, 20:4,
21:21, 21:23,
22:4, 22:9,
22:13, 24:19,
25:15, 31:10,
31:16, 31:20,
35:21, 38:9,
39:14, 43:14,
45:20, 46:15,
47:14, 52:14,
54:24, 57:15,

62:17, 63:14,
64:12, 64:18,
65:14, 68:14,
73:1, 73:2,
73:12, 75:7,
75:8, 77:17,
84:6, 85:14,
87:20, 89:4,
90:13, 91:18,
93:11, 94:6,
94:11, 95:15,
97:15, 98:3,
98:7, 101:20,
102:5, 103:18,
104:11, 104:16,
105:7, 106:9,
106:14, 110:2,
110:17, 113:12,
118:1, 119:19,
120:20, 124:7,
127:13, 132:1,
133:8, 135:12,
138:16, 139:7,
139:22, 140:16,
141:7

**K**

**kansas**
12:14
**keep**
7:3, 7:11,
78:14, 123:20,
127:9
**kind**
16:8, 28:13,
82:20, 90:11,
102:14
**kinds**
21:4, 106:14
**kinkade**
3:12, 5:4,
28:2, 28:10,
28:24, 29:16,
30:9, 30:24,
34:20, 35:16,
36:4, 38:6,
39:9, 39:12,
39:24, 47:10,

48:11, 48:21,
49:18, 50:9,
50:16, 50:22,
51:6, 51:14,
54:3, 57:15,
63:11, 63:21,
64:13, 64:20,
66:18, 77:3,
88:3, 88:18,
89:2, 90:4,
90:22, 92:20,
94:6, 94:11,
95:14, 96:9,
99:13, 100:7,
100:23, 101:10,
102:5, 104:3,
104:10, 104:14,
104:18, 105:24,
110:8, 111:13,
111:22, 112:17,
120:11, 121:23,
122:24, 124:16,
126:5, 126:15,
126:22, 127:10,
127:20, 127:22,
129:6, 129:20,
130:2, 130:7,
130:11, 131:6,
131:10, 131:20,
132:6, 132:12,
132:20, 134:1,
134:8, 134:16,
134:23, 139:18,
141:16, 141:18,
142:7
**kinkade's**
64:3
**knee**
43:1, 43:2,
43:21, 44:15,
45:19, 128:19,
129:1, 129:5
**knees**
94:2, 94:21,
129:10
**knew**
13:21, 13:22,
55:7

**know**
6:20, 7:1,
7:10, 10:24,
12:3, 13:15,
18:1, 20:16,
21:3, 21:24,
23:18, 28:14,
28:15, 31:6,
42:11, 46:7,
48:14, 48:15,
50:1, 56:4,
56:24, 57:9,
59:6, 59:24,
60:6, 62:23,
65:14, 70:17,
71:4, 71:12,
73:10, 73:24,
74:7, 75:14,
77:21, 87:1,
89:11, 95:23,
96:18, 98:18,
99:7, 102:22,
103:15, 104:23,
105:9, 107:2,
109:7, 109:18,
110:18, 110:19,
111:1, 114:11,
117:24, 118:4,
122:4, 123:15,
133:9, 138:20,
142:2
**knowledge**
59:16, 61:20,
123:21, 124:22
**knowledgeable**
139:6

**L**

**lab**
128:14
**lady**
60:24
**laid**
76:11
**language**
44:20
**large**
13:6, 24:7

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

55

**larger**
10:18, 10:21, 21:21
**last**
7:13, 20:4, 22:18, 56:11, 57:9, 60:4, 82:7, 111:24, 113:18, 134:22
**later**
20:23, 53:19, 53:20, 76:14, 85:4, 90:10, 114:12
**lawful**
6:9
**lawsuit**
58:21, 59:7, 59:24, 60:19, 61:15, 61:17, 61:24
**lawsuits**
55:10
**lawyers**
72:6
**laying**
43:13
**lbp**
97:18
**lead**
118:10
**learn**
72:9
**learned**
63:15
**least**
72:22, 100:9, 114:2, 123:10, 134:14
**leave**
18:15, 23:2, 29:10, 41:2, 82:9, 83:11, 85:1, 118:21
**leaving**
14:8, 48:4
**lectures**
53:2, 53:3

**left**
94:1, 94:2, 94:17, 94:20, 103:22, 104:6, 124:10
**leg**
42:1, 43:4, 43:5, 43:7, 43:9, 43:11, 43:12, 43:16, 43:18, 43:20, 112:1, 112:23
**leg's**
40:18
**legs**
36:16, 42:1, 46:6, 49:24
**less**
38:15, 40:12, 98:18, 119:5
**let**
6:24, 7:8, 36:11, 38:9, 51:20, 64:12, 65:14, 67:3, 81:13, 83:7, 86:18, 90:13, 102:22, 106:24, 107:22, 112:4, 119:19, 127:20, 133:2
**let's**
13:4, 29:9, 41:2, 49:12, 52:21, 65:10, 71:16, 72:24, 77:11, 92:11, 92:19, 101:3, 101:20, 102:16, 103:6, 104:20, 106:4, 116:2, 117:3
**letter**
69:5, 77:18
**level**
33:17, 37:15, 37:21, 38:1, 38:12, 38:16,

**131:9**
**license**
62:8
**licensed**
62:2, 62:5
**licensing**
62:12
**life**
138:2
**lift**
43:16
**lifting**
43:4
**light**
44:7, 141:24
**like**
21:22, 23:10, 28:14, 32:12, 34:22, 35:4, 36:8, 36:12, 43:12, 44:8, 53:9, 54:11, 70:9, 70:14, 75:11, 75:12, 76:4, 76:10, 85:5, 87:4, 87:19, 87:20, 89:15, 93:3, 93:11, 94:19, 97:13, 102:10, 106:21, 107:4, 113:18, 114:14, 122:18, 141:18
**likely**
34:15, 36:22, 40:12, 40:22
**limb**
40:15, 40:21
**limbs**
40:3, 40:7, 42:24, 102:13, 133:11
**limited**
36:19, 42:7, 52:10, 63:22, 124:9
**limp**
89:15

**lincoln**
12:16, 20:13
**line**
97:21, 97:23, 103:22, 105:10
**list**
37:2, 39:15, 39:16, 39:19, 39:22, 41:9, 41:12, 65:15, 124:2, 124:5, 124:6, 124:10
**listed**
12:20, 16:18, 18:17, 65:11, 65:13, 65:19, 66:4, 66:13, 68:7, 69:9
**listing**
80:18
**literature**
37:3, 83:8, 123:4
**little**
17:8, 42:10, 49:2, 54:18, 85:4, 93:24, 94:19, 96:11, 96:12, 136:5, 138:12, 139:2
**llp**
3:13
**located**
39:14
**locations**
21:2
**lodged**
91:10
**loevy**
3:5
**long**
18:9, 39:19, 39:22, 41:8, 41:12, 73:8, 73:12, 99:6, 120:17, 124:2, 124:5, 124:6
**longer**
18:21, 20:9,

31:21
**look**
31:7, 36:11, 64:8, 64:11, 65:10, 70:7, 70:10, 70:19, 72:19, 72:24, 92:11, 93:4, 94:15, 117:24, 126:3, 132:22
**looked**
70:18, 92:9
**looking**
12:19, 48:7, 70:18, 73:13, 101:20, 104:24, 105:8, 117:23, 118:13, 129:4, 137:4
**looks**
34:22, 35:4, 36:8, 75:11, 75:12, 94:19
**lost**
97:16
**lot**
24:9, 27:9, 35:4, 36:8, 40:12, 75:11
**louis**
1:3, 2:3, 2:16, 2:20, 3:15, 9:7, 12:11, 13:1, 19:22, 20:22, 21:1, 21:6, 21:14, 21:22, 21:23, 22:3, 22:5, 22:8
**low**
49:13, 97:20, 116:16, 119:24, 120:6, 127:24
**lower**
45:20, 49:21, 51:13, 51:21, 98:4, 100:18, 121:4
**lumbar**
118:14

**M**
**ma'am**
24:21, 61:11, 82:6, 86:9, 86:15, 123:11
**made**
28:1, 87:10, 121:8
**majority**
84:20
**make**
6:21, 7:4, 23:18, 24:19, 30:20, 34:2, 40:12, 45:15, 47:2, 64:12, 65:16, 84:6, 87:2, 87:17, 90:13, 90:18, 102:11, 106:9, 106:24, 115:21, 118:4, 135:4, 135:16
**makes**
126:21
**making**
87:23, 89:12
**malingering**
87:13, 87:23, 88:17, 89:12, 89:18, 90:17, 121:12, 121:15
**malpractice**
55:13, 56:1, 56:5, 56:9, 56:13, 58:7, 59:23, 61:21
**many**
8:17, 14:4, 14:8, 15:19, 19:8, 19:23, 20:16, 20:19, 25:5, 33:9, 55:4, 80:3, 82:7, 83:9, 84:23
**march**
69:5, 76:19,

76:23
**mark**
74:21, 103:18
**marked**
7:22, 8:2, 62:14, 62:18, 69:24, 70:3, 74:24, 75:4, 75:8, 79:2, 79:5, 113:8, 113:13
**marks**
97:3, 97:8
**mary's**
74:9, 75:18, 75:23
**mass**
115:18
**maston**
98:22, 99:5, 99:9, 101:5, 130:22, 138:13
**maston's**
100:15, 127:17, 130:13
**material**
79:21
**materials**
63:4, 65:10, 66:7, 66:13, 66:16, 67:4, 67:7, 68:7, 69:8, 80:18, 85:17, 85:24
**matter**
29:22, 35:4
**max**
4:4, 121:23, 122:5, 139:18, 141:21
**may**
1:15, 2:14, 6:3, 7:14, 28:18, 30:13, 38:10, 48:2, 48:16, 69:11, 69:17, 70:21, 73:14, 73:19,

74:19, 79:16, 79:24, 80:18, 81:8, 81:17, 82:5, 82:9, 83:11, 85:1, 85:2, 85:14, 86:12, 86:21, 88:5, 91:10, 91:14, 92:4, 92:15, 93:10, 93:11, 93:14, 93:17, 93:20, 93:21, 94:5, 98:2, 101:5, 104:21, 105:2, 105:22, 106:6, 106:17, 108:9, 108:19, 108:20, 109:20, 111:7, 111:11, 111:12, 125:7, 127:13, 127:16, 127:18, 130:13, 135:16, 138:3, 140:17
**maybe**
54:17, 60:4, 64:10, 75:21, 99:23, 109:9
**mboose@atg**
4:9
**md**
95:24
**meacham**
12:22
**mean**
11:18, 17:15, 18:8, 25:16, 27:1, 29:20, 31:3, 31:15, 34:1, 35:1, 35:2, 36:10, 38:9, 38:11, 38:17, 39:15, 42:14, 48:22, 54:10, 54:16, 59:8, 60:15, 69:11, 73:8, 81:1, 81:3,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                    57

81:4, 85:2,
87:16, 90:6,
92:7, 95:6,
95:9, 95:17,
102:8, 105:2,
108:20, 113:4,
123:14, 130:3,
130:4, 134:10,
137:10, 138:5,
140:22
**meaning**
135:12
**meaningful**
134:15, 135:14
**means**
49:6, 60:16,
84:2, 84:12,
114:11, 137:3
**meant**
113:3, 122:8
**medical**
5:13, 9:14,
10:1, 10:8,
10:14, 10:16,
11:13, 12:9,
12:22, 12:23,
12:24, 13:3,
13:4, 13:5,
13:10, 13:12,
13:24, 14:10,
14:13, 14:18,
14:22, 15:2,
15:13, 15:22,
16:19, 16:22,
17:5, 18:3,
18:20, 18:24,
19:2, 19:20,
22:20, 24:18,
25:17, 35:23,
38:11, 52:1,
52:3, 52:6,
52:7, 52:19,
52:24, 53:13,
61:6, 69:17,
69:20, 69:21,
70:5, 76:14,
80:20, 81:12,
82:2, 92:16,

93:4, 93:15,
101:8, 101:22,
101:24, 102:2,
102:21, 103:12,
103:18, 103:19,
105:8, 107:24,
108:7, 109:1,
109:7, 109:22,
110:2, 114:15,
116:24, 117:21,
118:11, 123:21,
125:2, 126:6,
126:17, 132:23,
137:13, 137:18,
137:22, 138:1,
139:1, 140:4,
141:4
**medically**
114:6, 114:11,
114:12
**medicare**
23:19
**medication**
70:22, 71:4
**medications**
7:19
**medicine**
8:13, 8:22,
9:2, 9:7, 9:15,
10:17, 11:3,
14:5, 14:7,
15:3, 16:4,
17:1, 17:3,
17:7, 17:11,
19:5, 29:6,
30:4, 30:6,
30:8, 52:16,
62:2, 62:6,
112:4, 114:9
**meet**
23:14
**meeting**
80:7
**meetings**
19:12
**member**
16:3, 16:16,
16:18, 18:2,

18:12, 18:18,
19:15, 19:16
**members**
20:2, 20:20
**memory**
7:19, 137:10
**mental**
44:19, 44:22,
45:1, 48:8,
49:24, 133:10
**mention**
128:14, 128:15
**mentioned**
130:10, 131:21
**mercy**
9:24, 10:2,
10:4, 10:6,
10:7, 10:9,
10:10, 10:14,
10:16, 10:17,
11:11, 12:4,
12:8, 12:9,
12:11, 12:12,
12:15, 12:17,
12:18, 12:23,
12:24, 13:1,
13:16, 13:24,
14:18, 15:2,
15:13, 16:5,
16:19, 17:4,
18:3, 18:20,
18:22, 18:24,
19:1, 19:2,
19:20, 19:22,
20:5, 20:12,
20:22, 20:24,
21:2, 21:6,
21:9, 21:14,
21:16, 22:5,
22:7, 22:13,
22:14, 22:16,
22:20
**message**
46:24
**might**
17:17, 30:10,
30:19, 45:17,
89:3, 89:7,

89:13, 90:7,
90:10, 90:11,
96:11, 120:13,
140:21, 140:22
**mild**
96:10, 96:12,
97:13, 98:10
**mind**
93:12, 124:7,
124:8, 139:8
**mine**
61:7
**minimal**
102:11, 105:13,
129:15
**minimum**
51:9
**minor**
85:8, 85:11
**minute**
43:17, 86:17,
97:15, 101:3,
103:2, 120:20
**minutes**
23:15, 98:22,
99:11, 114:12,
114:17
**missing**
126:20, 140:13,
140:17, 140:18
**missouri**
2:16, 2:18,
3:15, 8:11,
8:19, 12:14,
60:1, 61:6,
62:3, 143:4
**misstates**
129:19
**mkd**
5:9
**moderate**
115:16
**money**
59:18, 61:21
**month**
20:4, 53:11,
63:1
**monthly**
19:12

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

58

**months**
63:8, 85:4,
116:13, 116:17,
116:20, 118:20,
118:24, 119:12,
120:1, 120:7,
120:10
**more**
11:12, 11:17,
18:23, 31:5,
32:9, 40:21,
42:7, 42:10,
47:15, 47:19,
49:2, 50:24,
58:19, 95:10,
95:23, 100:4,
102:14, 102:15,
113:4, 115:24,
122:19, 122:20,
124:22, 133:11,
139:6
**morning**
101:5, 131:15,
131:16
**mornings**
14:19
**most**
15:20, 21:8,
57:5, 81:18,
138:1
**mostly**
33:16, 46:9,
136:4
**motion**
36:19, 36:20,
37:1, 42:19,
51:12, 51:16,
51:20
**motor**
55:15
**move**
96:17, 133:10
**movement**
42:18, 117:2
**mri**
25:16, 26:18,
34:5, 34:9,
35:13, 36:2,

68:23, 114:24,
115:9, 116:10,
117:22, 118:15,
118:16, 134:3,
134:7
**mri's**
118:7
**much**
10:18, 40:21,
41:12, 45:4,
113:4
**multi-specialty**
10:4, 10:18,
10:21, 11:2
**multiple**
53:20
**muscle**
45:18, 47:2
**muscles**
43:23, 45:13,
45:15
**muscular**
45:14
**myelopathic**
107:21
**myself**
14:11

---
**N**
---

**name**
6:13, 6:16,
10:2, 11:6,
13:1, 60:3,
60:4, 99:6,
122:4
**named**
61:16, 61:17
**names**
57:17, 57:19
**narcotic**
61:4
**narrowing**
115:17
**nebulous**
49:9
**necessarily**
47:21, 95:9,
112:2, 113:1

**necessary**
57:14, 135:16
**neck**
32:13, 36:18,
36:19, 57:20,
118:15, 118:17,
120:2, 128:24
**need**
23:23, 26:24,
28:15, 28:18,
45:14, 46:6,
47:4, 70:8,
83:13, 83:14,
123:15
**needed**
13:17, 14:15,
23:16, 27:24,
86:16
**needs**
10:3
**neither**
51:21, 143:8
**nerve**
32:15, 40:22,
42:9, 43:10,
43:20, 44:4,
45:16, 45:17,
46:2, 46:13,
83:20, 84:11,
84:12
**nerves**
36:14, 40:16,
42:13, 42:15,
42:16, 45:8,
45:15, 48:3,
48:5, 50:1
**neuro**
76:16, 133:4
**neuroanatomy**
53:1
**neurologic**
27:11, 32:11,
32:12, 36:17,
41:4, 42:11,
46:20, 46:22,
47:15, 48:2,
76:15, 91:5,
91:6, 91:23,

92:3, 100:6,
100:10, 102:9,
102:15, 117:19,
129:9, 133:22,
133:24, 134:13
**neurological**
28:22, 32:6,
32:18, 33:17,
40:23, 41:20,
41:23, 44:3,
45:4, 45:23,
47:8, 48:9,
49:16, 50:8,
51:3, 58:10,
91:4, 91:6,
117:17, 118:1,
118:8, 133:14,
133:16, 133:18,
134:3, 134:9,
135:13, 135:14,
135:15, 136:24,
137:5
**neurologist**
29:14, 32:19,
58:4, 135:22
**neurologists**
29:10, 53:7
**neurology**
52:21, 52:22,
53:2, 53:3, 53:6
**neuropathy**
32:11
**neuroscience**
5:15, 74:13,
74:17, 74:22
**neurosurgeon**
29:15, 32:19,
135:22
**neurosurgeons**
29:10, 135:23
**neurosurgery**
27:21, 52:4,
52:23, 53:3
**never**
33:20, 54:14,
54:15, 107:7,
126:8
**new**
2:16, 11:6,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                                           59

22:10, 59:6,
119:10
**newest**
123:17
**next**
42:21, 86:19,
91:2, 95:22,
97:21, 103:22,
106:5, 118:14,
124:12
**nine**
19:10
**nineteen**
10:7
**nod**
7:5
**nods**
73:20, 116:11
**nominated**
19:16, 19:18
**nondescript**
97:13
**none**
58:9
**nonfocal**
100:10, 102:9,
133:7, 133:12,
136:21, 136:24
**nonsurgical**
82:8, 83:9,
83:17, 84:19
**nonverbal**
31:19
**nope**
47:5
**nor**
143:9, 143:12
**normal**
76:15, 76:16,
88:2
**normally**
27:2, 102:12
**north**
3:14
**nose**
44:14
**notary**
143:3

**notation**
114:5
**note**
70:9, 73:10,
93:10, 100:15,
105:7, 124:8,
124:12, 128:13,
130:13
**noted**
133:4, 133:19
**notes**
69:14, 103:6,
124:9
**nothing**
34:22, 73:17,
81:15, 108:24,
137:4, 141:16
**noting**
103:3
**now**
2:18, 11:10,
20:2, 22:9,
65:2, 78:1,
93:9, 106:4,
129:21, 135:12,
141:3
**nowhere**
108:4, 108:6
**nuh-huh**
7:5
**numb**
93:23, 98:2
**number**
33:15, 61:1,
118:7, 127:19
**numbers**
92:12
**numbness**
37:16, 39:20,
41:3, 41:7,
41:19, 47:7,
49:9, 49:10,
49:12, 49:20,
50:6, 50:20,
51:4, 98:4,
100:16, 104:1,
104:9, 105:1,
105:13, 105:16,

105:19, 105:21,
127:14, 128:3,
128:6, 128:10,
128:15, 131:22,
132:8
**nurse**
69:14, 92:24,
93:1, 93:20,
98:14, 98:21,
100:24, 114:13,
130:24, 133:3,
139:9
**nurse's**
131:2, 131:12
**nurses**
68:20, 69:14,
78:8, 101:13,
138:17, 138:22,
139:2
**nursing**
23:4, 117:4,
117:5, 133:7,
133:8, 138:21

--- O ---

**ob**
14:7, 17:4,
19:6
**object**
31:16, 31:20,
64:14, 66:18,
90:4, 94:6,
122:13, 124:15,
126:1, 126:10,
126:19, 127:5,
129:2, 129:18,
130:1, 130:6,
130:9, 140:11
**objecting**
7:14, 94:11
**objection**
28:2, 28:24,
29:16, 30:9,
30:12, 31:1,
34:20, 35:16,
36:4, 38:6,
39:9, 39:24,
41:16, 47:10,

48:11, 49:18,
50:9, 50:22,
51:14, 54:3,
63:11, 77:3,
88:3, 88:18,
89:2, 90:22,
95:13, 96:9,
99:13, 99:15,
100:7, 100:23,
101:10, 102:6,
105:24, 110:8,
111:13, 112:17,
120:11, 131:4,
131:8, 131:18,
132:4, 132:10,
132:17, 133:20,
134:5, 134:12,
134:21, 140:5,
140:19
**objections**
28:10, 28:11,
30:24, 48:21,
50:16, 51:6,
141:10
**objective**
98:21, 117:6,
117:16
**objects**
31:10
**observation**
50:1, 100:4,
131:2, 131:5,
133:9
**observe**
131:1
**observed**
99:5, 130:21,
131:15
**obtained**
8:9
**occasion**
136:1
**occasionally**
87:2, 87:3
**occurred**
108:13
**october**
75:10

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                                60

off
18:2, 18:10,
37:2, 71:16,
71:18, 103:6,
141:19
offender
98:22
offer
55:2
office
4:5, 14:21,
15:17, 16:11,
16:13, 53:7,
122:5, 142:3
offices
21:4
official
62:11
often
24:22, 26:4,
32:6
oftentimes
27:17, 28:12
oh
9:12, 57:2,
64:21, 115:3,
127:16
oklahoma
12:14
once
23:14, 25:1,
25:4, 58:18,
58:19, 58:20,
65:14, 72:23,
107:1
one
9:19, 11:15,
11:16, 12:18,
12:20, 15:17,
15:20, 15:21,
32:15, 33:15,
35:8, 37:10,
39:5, 39:14,
40:7, 40:15,
40:17, 40:20,
40:21, 42:1,
42:4, 42:5,
42:6, 46:15,

46:19, 47:13,
48:15, 48:16,
50:21, 51:4,
55:12, 55:19,
61:8, 63:16,
64:20, 66:14,
68:7, 74:12,
74:13, 76:13,
77:12, 82:18,
82:23, 83:18,
85:14, 86:18,
91:7, 91:18,
95:23, 97:15,
99:20, 102:13,
103:1, 103:7,
104:21, 109:11,
112:10, 113:20,
120:20, 132:1,
132:13, 133:2,
133:9, 134:14,
135:3
ones
14:6, 41:1,
85:11
only
8:15, 14:5,
15:9, 23:24,
35:11, 63:24,
75:18, 75:24,
109:18, 109:23,
110:1, 110:18,
110:19, 119:5,
122:21, 130:3,
135:11
onset
136:4
open
13:14, 118:21
ophthalmological
27:16
opining
108:12
opinion
30:3, 40:9,
65:16, 66:23,
80:23, 81:11,
81:16, 87:10,
90:15, 91:20,

92:3, 107:23,
107:24, 108:5,
108:7, 112:14,
118:4, 119:4,
119:18, 119:19,
124:18
opinions
9:4, 55:2,
57:12, 58:8,
63:20, 65:3,
65:7, 77:2,
78:16, 87:5,
96:6, 99:4,
99:8, 99:20,
122:14, 123:4,
123:5, 123:13,
125:1, 135:5,
135:10
order
11:21, 25:23,
26:9, 33:20,
34:19, 35:13,
63:2, 117:22,
134:3, 136:18
ordered
36:2, 117:24,
129:7, 129:8
organized
123:2
other
11:10, 12:5,
13:6, 15:16,
16:15, 18:2,
21:22, 24:14,
29:12, 30:22,
40:15, 46:19,
49:3, 49:4,
53:21, 55:2,
58:4, 58:14,
60:20, 61:9,
61:17, 61:19,
62:6, 66:3,
66:10, 77:8,
77:15, 79:12,
83:8, 90:1,
90:15, 90:16,
98:13, 100:2,
101:19, 102:14,

104:21, 104:22,
107:13, 108:21,
109:22, 112:1,
112:16, 112:23,
112:24, 116:22,
131:21, 131:22,
132:2, 132:13,
136:10
otherwise
7:16, 109:8,
143:13
our
10:3, 10:4,
10:16, 13:9,
16:23, 17:21,
21:3, 22:10,
26:15, 53:7,
59:4, 63:18,
64:1, 66:21,
84:13, 93:3
out
20:5, 22:2,
22:8, 43:5,
46:1, 51:22,
76:11, 80:17,
82:19, 82:20,
87:18, 89:14,
103:20, 103:21,
104:13, 112:15,
118:22, 119:2,
119:5, 119:6,
119:9, 126:24,
140:16
outcome
45:3, 143:13
outcomes
16:21, 16:22
outpatient
21:3, 75:12
outside
131:11, 140:20
over
6:21, 22:17,
24:6, 25:15,
38:16, 44:15,
73:11, 86:17,
91:10, 91:19,
95:20, 102:24,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                        61

| | | | |
|---|---|---|---|
| 120:17, 122:9 | 117:1, 119:24, | 136:17, 137:1, | 102:2, 102:12, |
| **overview** | 120:3, 120:6, | 140:22 | 102:21, 103:4, |
| 52:22, 57:11 | 120:10, 121:4, | **partial** | 103:6, 105:16, |
| **own** | 128:1, 128:18, | 8:12 | 105:21, 107:6, |
| 55:2, 83:5, | 128:19, 128:22, | **particular** | 107:12, 107:15, |
| 109:21, 131:2, | 128:23, 129:1, | 91:12, 91:15, | 107:18, 109:12, |
| 131:5 | 129:10, 129:15, | 91:16, 106:13, | 109:13, 109:19, |
| **P** | 132:15, 132:23 | 107:17, 124:9 | 110:14, 110:20, |
| **p6** | **pair** | **particularly** | 110:22, 114:6, |
| 115:11 | 139:22 | 31:18 | 116:6, 120:16, |
| **pads** | **paper** | **parties** | 126:17, 127:1, |
| 61:8 | 72:1, 72:3, | 143:9, 143:12 | 127:3, 132:7, |
| **page** | 73:9, 83:13, | **partner** | 136:7, 136:11, |
| 5:1, 5:9, | 83:14 | 13:17 | 136:15, 136:19, |
| 22:19, 70:10, | **paragraph** | **parts** | 137:8, 137:13, |
| 73:1, 79:8, | 80:17, 81:7, | 47:8, 47:22, | 137:17, 139:9, |
| 92:12, 92:13, | 85:8, 86:19, | 118:8 | 139:11, 140:1, |
| 92:19, 97:17, | 91:17, 106:21, | **party's** | 141:1 |
| 97:18, 98:7, | 111:24 | 63:19 | **patient's** |
| 98:12, 102:16, | **pardon** | **passively** | 26:22, 34:16, |
| 103:3, 113:11, | 123:1 | 43:16 | 35:22, 40:5, |
| 113:18, 133:3, | **park** | **past** | 43:13, 88:16, |
| 139:5 | 12:23 | 74:2 | 89:21, 89:23, |
| **pages** | **part** | **path** | 90:17, 90:21, |
| 74:16 | 9:17, 11:10, | 46:3, 47:1 | 114:10, 114:21, |
| **paid** | 12:3, 13:14, | **patient** | 117:9, 135:17, |
| 23:17, 59:21, | 13:23, 17:23, | 11:19, 11:23, | 138:18, 138:23 |
| 61:21 | 17:24, 18:3, | 21:11, 25:12, | **patients** |
| **pain** | 20:17, 21:6, | 25:23, 26:5, | 11:5, 11:8, |
| 32:13, 32:14, | 21:14, 24:13, | 26:9, 27:24, | 11:10, 11:13, |
| 36:18, 38:1, | 26:1, 26:5, | 28:8, 29:14, | 12:5, 13:11, |
| 38:12, 41:2, | 32:5, 33:19, | 30:5, 30:7, | 13:23, 14:1, |
| 43:11, 43:18, | 36:1, 39:6, | 30:15, 33:6, | 14:24, 15:3, |
| 47:13, 49:8, | 41:22, 44:3, | 33:14, 33:24, | 17:20, 23:5, |
| 49:10, 49:12, | 45:3, 46:2, | 36:3, 38:20, | 24:14, 24:23, |
| 49:20, 81:17, | 46:14, 47:23, | 38:21, 39:1, | 25:5, 28:21, |
| 82:5, 83:19, | 48:9, 49:16, | 40:6, 40:9, | 31:5, 32:6, |
| 83:23, 84:5, | 50:7, 51:2, | 41:18, 43:16, | 32:10, 32:17, |
| 84:9, 84:17, | 51:3, 52:1, | 47:6, 50:19, | 32:18, 33:20, |
| 92:16, 93:2, | 52:8, 52:10, | 51:4, 55:24, | 34:17, 34:19, |
| 93:7, 93:17, | 52:15, 53:16, | 56:2, 57:2, | 37:7, 44:23, |
| 97:20, 98:4, | 56:8, 56:15, | 61:7, 86:21, | 48:1, 51:11, |
| 100:17, 100:21, | 56:18, 68:4, | 86:24, 88:17, | 54:19, 87:1, |
| 102:3, 106:6, | 70:11, 70:14, | 89:12, 89:18, | 123:8, 123:10, |
| 107:2, 107:4, | 76:11, 96:24, | 90:16, 96:5, | 123:19, 135:20, |
| 108:2, 112:1, | 98:9, 104:22, | 96:11, 96:21, | 135:21, 137:21, |
| 112:23, 116:16, | 109:5, 115:17, | 97:1, 97:10, | 138:1, 138:3 |
| | 117:13, 121:7, | 98:9, 98:19, | **pause** |
| | | | 31:10 |

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                                    62

| | | | |
|---|---|---|---|
| pay | permitted | 14:9, 14:15, | 114:16, 122:17 |
| 59:18 | 20:8 | 16:23, 17:1, | portion |
| paying | persistent | 17:11, 17:16, | 21:21, 46:15, |
| 55:16, 55:21 | 38:5, 105:23 | 19:4, 19:23, | 93:22, 98:21, |
| pen | person | 20:17, 21:3, | 100:6, 100:14, |
| 86:14, 86:16, | 50:5 | 21:9, 22:13, | 101:18, 102:2, |
| 99:11 | personally | 22:15, 29:4, | 103:19, 104:8, |
| pending | 10:23, 59:18 | 49:3, 53:21, | 117:13 |
| 2:18 | pertain | 96:24 | portions |
| penned | 55:10 | pick | 100:19 |
| 127:23 | pertinent | 100:16 | positional |
| people | 74:1, 74:2, | pinprick | 85:15 |
| 11:15, 13:22, | 76:17 | 44:9 | positive |
| 18:1, 18:2, | petkovich | place | 43:19, 117:1, |
| 19:8, 22:15, | 78:2 | 11:16, 97:16 | 117:2 |
| 23:2, 23:5, | phone | plaintiff | possibilities |
| 25:2, 28:12, | 64:21 | 1:7, 1:14, 2:7, | 34:16 |
| 32:13, 36:18, | phrase | 2:21, 3:3, 6:2, | possible |
| 42:6, 47:13, | 36:12, 54:6, | 6:10, 6:17, | 6:22, 36:20, |
| 48:23, 49:4, | 54:10, 86:22, | 7:22, 55:18, | 36:23, 40:13, |
| 53:19, 85:3, | 87:15, 139:11, | 55:23, 62:14, | 108:16, 124:13, |
| 85:5, 85:14, | 139:12 | 69:24, 74:24, | 141:23 |
| 87:2, 87:3, | physical | 75:4, 79:2, | potential |
| 87:17, 89:13, | 34:14 | 113:8 | 46:22 |
| 92:23, 107:4, | physician | plaintiff's | power |
| 119:11 | 11:5, 14:2, | 5:9, 60:3, | 25:22 |
| per | 15:2, 15:13, | 65:22, 69:4, | powers |
| 15:17, 25:4 | 18:5, 21:10, | 70:4, 73:18, | 142:3 |
| percent | 21:13, 21:16, | 76:7, 76:11, | practice |
| 84:4, 84:22 | 22:19, 23:6, | 113:13 | 14:7, 15:24, |
| percentage | 23:11, 23:16, | plan | 17:4, 17:7, |
| 83:15, 84:17, | 23:23, 23:24, | 31:4 | 17:10, 19:6, |
| 84:21 | 24:5, 25:9, | please | 20:17, 24:9, |
| perform | 29:5, 29:9, | 6:13, 6:24, | 24:13, 24:23, |
| 27:18, 52:8, | 31:7, 38:22, | 7:4, 7:8, 28:5, | 26:2, 26:5, |
| 100:6 | 49:3, 60:14, | 102:22, 109:24, | 29:6, 31:3, |
| performed | 76:15, 87:22, | 134:22, 139:19, | 31:7, 32:5, |
| 26:6, 26:10, | 88:1, 88:7, | 141:20, 141:24 | 34:17, 39:2, |
| 52:18, 92:4, | 88:14, 88:23, | plenty | 62:2, 62:5, |
| 136:22, 137:1 | 90:2, 90:19, | 35:8 | 83:12, 83:16, |
| performing | 93:9, 93:11, | plus | 84:18, 135:19, |
| 52:15 | 96:20, 97:2, | 20:14 | 135:24, 138:22 |
| period | 97:9, 113:19, | point | practicing |
| 13:17, 15:14, | 133:21, 133:23, | 29:20, 29:22, | 16:1, 18:5 |
| 38:16, 53:9, | 136:18 | 74:5, 86:3, | prejudice |
| 91:10, 108:17, | physicians | 86:8, 86:12, | 59:8, 59:12, |
| 119:9, 120:17 | 10:17, 10:19, | 91:12, 92:4, | 59:14 |
| permanent | 12:13, 12:17, | 108:21, 110:4, | preparation |
| 76:13 | | | 113:21 |

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                                      63

**prepared**
126:7
**preparing**
67:9
**prescription**
61:7
**prescriptions**
61:4, 61:8
**presence**
45:5, 110:17,
112:15
**present**
37:9, 105:20,
122:9
**presented**
119:16
**press**
40:17
**pressing**
32:15, 43:10,
43:19, 83:20,
84:12
**presume**
102:10, 111:1,
111:3
**presuming**
92:24
**pretty**
115:14
**previously**
123:9
**primary**
10:17, 11:1,
17:9, 25:9
**print**
98:23, 99:6
**printed**
9:7
**prior**
10:13, 33:15,
35:23, 55:1,
65:18, 66:4,
66:8, 67:18,
67:22, 68:10,
68:16, 68:20,
68:23, 69:5,
69:17, 78:20,
110:3, 111:12,

137:13, 137:18,
140:2, 141:2
**prison**
68:9, 69:17,
69:21, 70:12,
118:22, 119:2,
119:15, 132:24
**privilege**
63:11
**privileged**
63:14, 63:24,
66:20
**probably**
6:20, 11:23,
18:23, 19:10,
19:13, 19:24,
25:1, 25:4,
31:11, 34:21,
36:16, 37:1,
39:2, 42:11,
49:22, 50:2,
50:12, 51:7,
51:8, 53:2,
53:11, 54:16,
56:14, 61:5,
89:20, 91:17,
97:8, 114:13,
117:2, 133:6,
133:8
**problem**
11:20, 28:14,
28:19, 30:1,
32:24, 34:16,
48:2, 116:1,
138:10
**problems**
11:13, 15:4,
27:11
**procedures**
52:8
**proceedings**
71:19, 80:14,
103:9
**process**
6:22, 17:24
**produce**
40:6
**produced**
2:14, 6:9, 8:2,

62:19, 70:5,
74:12, 74:13,
75:8
**program**
13:15, 13:16
**progressive**
122:20
**prompted**
137:18
**protrudes**
82:20
**provide**
7:20, 13:10,
31:19, 49:4,
135:8
**provided**
63:19, 71:21,
71:22, 73:13,
73:14, 79:21,
80:6
**provider**
101:8, 101:24
**provides**
111:6
**providing**
23:1
**psychosomatic**
87:3, 87:7,
87:24, 88:16,
89:21, 90:18,
121:9
**public**
143:3
**publications**
61:12
**pulled**
70:21
**purposes**
54:18, 101:21
**put**
44:16, 50:2,
65:8, 80:11,
93:9, 96:4,
104:23, 113:12,
129:8

---

**Q**

**qi**
16:19, 19:13

**qualified**
26:17, 27:12,
27:13, 27:15,
27:18, 32:21,
33:1, 33:4
**quality**
16:20, 16:22,
16:24, 17:15,
17:16, 17:19
**question**
7:9, 7:10,
29:20, 29:23,
29:24, 31:21,
31:22, 63:21,
63:23, 64:4,
64:13, 64:14,
70:17, 72:24,
76:8, 88:20,
90:13, 94:7,
94:10, 94:12,
101:17, 101:21,
102:6, 104:4,
104:5, 122:21,
134:22, 136:5,
136:17, 141:1
**questions**
5:1, 6:24,
7:14, 99:19,
137:11, 137:17,
139:3, 139:6,
139:22, 141:15
**quickly**
6:22
**quite**
24:7
**quiz**
20:23
**quotation**
97:3, 97:8
**quote**
96:3, 102:20,
102:21, 103:24,
104:9, 137:8

---

**R**

**r-u-i**
14:12
**rac**
23:19

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

64

| | | | |
|---|---|---|---|
| **radical** | 72:23, 73:3, | 76:21, 77:6, | 70:16, 70:21, |
| 84:12 | 73:11, 81:20, | 77:15, 78:2, | 70:23, 71:2, |
| **radicular** | 94:16, 97:21, | 78:4, 78:7, | 71:7, 73:7, |
| 32:13, 32:14, | 103:15 | 78:10 | 73:9, 73:14, |
| 40:22, 83:19, | **readable** | **received** | 73:23, 74:4, |
| 83:23, 84:2, | 123:18 | 52:24, 63:3, | 74:9, 74:22, |
| 84:5, 84:9, | **reading** | 66:7, 73:19, | 75:18, 75:22, |
| 84:11, 84:17, | 73:10, 95:8, | 77:23 | 75:23, 76:2, |
| 106:20, 106:22, | 98:3, 98:8, | **recent** | 76:18, 77:1, |
| 107:1, 107:3, | 104:17, 123:14, | 57:5 | 77:11, 86:5, |
| 107:5, 107:7, | 135:5 | **recess** | 86:10, 94:7, |
| 107:13, 108:23 | **real** | 80:13, 103:8 | 94:12, 109:1, |
| **radiological** | 86:20, 86:22, | **recollection** | 109:22, 110:24, |
| 76:21 | 89:12 | 54:17, 54:22 | 111:2, 111:5, |
| **radiologist** | **really** | **record** | 113:14, 114:16, |
| 26:10 | 9:19, 11:2, | 6:14, 8:24, | 117:4, 117:21, |
| **raise** | 12:18, 22:3, | 11:16, 11:22, | 125:10, 125:11, |
| 43:7, 43:9, | 34:22, 35:2, | 32:14, 68:14, | 126:6, 132:23, |
| 43:11 | 35:6, 35:7, | 71:5, 71:13, | 135:11 |
| **raised** | 40:14, 45:4, | 71:16, 71:19, | **recross-examinat-** |
| 116:23 | 46:2, 46:14, | 72:20, 73:1, | **ion** |
| **raises** | 48:1, 58:23, | 73:2, 75:7, | 5:6, 139:20 |
| 116:6 | 109:3, 110:2 | 76:14, 92:16, | **redirect** |
| **range** | **realm** | 92:23, 93:15, | 5:5, 135:1 |
| 36:19, 36:20, | 27:1 | 94:15, 94:23, | **redo** |
| 37:1, 51:12, | **reason** | 98:13, 101:22, | 25:3 |
| 51:16, 51:20 | 10:20, 58:14, | 102:1, 102:2, | **reduced** |
| **rate** | 60:23, 62:9, | 102:21, 103:7, | 143:7 |
| 5:18, 79:9, | 70:17, 71:11, | 103:12, 103:18, | **reelected** |
| 79:11 | 76:15, 89:21, | 103:19, 104:24, | 19:19 |
| **rather** | 99:2, 99:5, | 105:8, 105:12, | **refer** |
| 10:21, 116:10 | 99:10 | 110:2, 110:21, | 11:10, 12:5, |
| **rd** | **reasonable** | 115:2, 117:23, | 24:23, 27:24, |
| 2:14, 104:23, | 81:11, 82:2, | 126:12, 127:16, | 28:8, 28:12, |
| 104:24, 105:4, | 107:24, 108:7, | 127:18, 128:5, | 29:14, 30:5, |
| 105:22, 129:14, | 125:2 | 129:19, 138:9, | 30:13, 32:18, |
| 129:22 | **reasons** | 141:19 | 92:12, 95:19, |
| **reach** | 141:7 | **recorded** | 97:12, 97:19, |
| 34:4, 108:5 | **recall** | 114:2 | 98:3, 135:21 |
| **reached** | 70:11, 78:1, | **records** | **reference** |
| 81:11, 82:1, | 111:21, 117:3, | 5:14, 5:16, | 53:20 |
| 108:7 | 126:2, 132:23, | 5:17, 5:19, | **referenced** |
| **reaching** | 137:13, 138:3, | 11:16, 35:24, | 16:3 |
| 77:2, 107:22, | 140:2, 140:9, | 54:13, 65:13, | **referencing** |
| 107:24, 135:5, | 141:2 | 65:19, 68:9, | 53:19, 105:8 |
| 135:9 | **receive** | 69:10, 69:16, | **referral** |
| **read** | 51:24, 66:13, | 69:20, 70:5, | 25:4, 25:11, |
| 9:8, 68:4, | 71:7, 76:18, | 70:11, 70:12, | 25:20, 26:21, |

26:24, 30:20,
58:3
**referred**
30:17, 60:13,
122:7
**referring**
24:13, 82:12,
83:10, 83:22,
85:7, 91:8,
91:9, 91:12,
91:13, 91:15,
104:12, 106:13,
129:23
**refers**
84:9, 84:15,
103:19, 106:10,
112:5, 112:19,
136:21, 136:24
**refile**
59:9
**refine**
38:23
**reflect**
110:3
**reflected**
8:7
**reflection**
74:3, 74:4,
79:8
**reflects**
117:9
**reflex**
42:19, 46:23,
47:1
**reflexes**
46:17, 46:18,
48:9, 49:23,
51:8
**refusal**
98:23
**regard**
36:7, 133:10
**regarding**
66:21, 76:22,
116:22, 125:14
**regional**
80:19, 132:19,
133:1

**relate**
82:21, 106:6,
106:15, 106:17
**related**
45:11, 139:23,
143:9
**relating**
69:20
**relative**
143:11
**relaxed**
43:17
**release**
119:20
**released**
119:15
**relevant**
30:4, 30:6,
30:8, 35:23,
126:17, 136:10,
140:3, 140:6,
141:4
**reliable**
127:4, 127:6
**relied**
63:2, 63:15,
64:1, 66:22,
123:12, 135:9
**relies**
91:21
**rely**
83:7, 110:1,
123:5, 131:1
**remain**
10:21
**remains**
85:6, 105:17
**remember**
40:3, 40:16,
42:7, 60:3,
60:4, 60:5,
124:3, 125:16,
125:20, 125:22,
130:15, 137:22,
138:1
**renominated**
19:19
**repeat**
28:5, 90:10,

104:4
**repeating**
96:5
**rephrase**
7:1, 81:14
**report**
5:12, 7:11,
8:3, 26:10,
26:12, 35:22,
35:23, 39:6,
43:18, 56:7,
62:19, 62:20,
62:22, 63:2,
65:6, 65:8,
65:19, 66:5,
66:9, 67:5,
67:9, 67:16,
67:18, 67:22,
68:11, 68:16,
68:21, 68:24,
69:6, 77:7,
77:12, 77:16,
77:20, 77:21,
77:22, 77:24,
78:2, 78:16,
78:21, 78:23,
79:7, 79:22,
80:12, 80:16,
80:23, 81:3,
81:10, 81:15,
82:4, 82:10,
85:19, 91:2,
92:3, 94:4,
95:12, 95:22,
96:23, 97:4,
98:9, 100:19,
104:20, 106:4,
106:5, 108:4,
108:6, 110:3,
111:18, 114:20,
115:7, 116:5,
116:6, 117:9,
122:15, 129:3,
133:14, 137:3,
137:11
**reported**
42:4, 47:23,
48:7, 76:10,

81:17, 86:7,
86:11, 86:21,
88:24, 89:23,
90:21, 93:21,
96:20, 99:9,
99:10, 107:11,
108:8, 110:13,
120:24, 121:3,
125:15, 127:14,
132:14, 132:16,
133:24, 134:18,
139:7
**reporter**
2:17, 4:11,
6:5, 8:1, 31:9,
31:13, 32:1,
62:17, 141:21,
142:5, 143:1,
143:3
**reporting**
41:18, 51:4,
86:2, 95:20,
98:10, 101:5,
131:14
**reports**
38:20, 38:21,
39:1, 40:6,
40:9, 69:1,
76:21, 93:15,
93:17, 93:18,
93:22, 98:22,
100:15, 100:21,
101:8, 101:18,
102:1, 102:3,
104:7, 104:8,
109:21, 116:12,
116:16, 118:19,
132:7
**represent**
103:16, 105:11,
122:3
**represented**
104:14
**representing**
104:10
**require**
48:19, 50:7,
50:14, 51:7,

100:5
**required**
47:9, 48:9,
48:14, 49:15,
51:2, 52:4,
58:1, 58:5,
136:18, 139:9,
139:10
**requires**
35:15, 36:2,
53:23, 54:2,
136:11
**reserved**
6:6
**residency**
9:14, 9:17,
9:20, 9:21, 53:5
**resident**
9:20, 13:20,
14:1, 52:16
**residents**
13:15, 14:4,
14:8, 14:24,
15:10, 15:12,
15:15, 15:16,
15:19, 16:12,
17:10
**residual**
82:9, 83:11,
85:1, 85:7,
85:19, 125:6
**resistance**
43:5, 43:6
**resolved**
38:14, 111:1,
111:3, 111:7
**respect**
136:15
**respectfully**
99:18
**response**
26:12, 39:6,
49:16, 137:11,
137:18, 139:6
**responsibilities**
11:5, 15:7,
16:15
**responsibility**
136:14

**rest**
75:12
**restate**
102:5
**result**
37:11, 84:16
**results**
26:18, 102:8
**retained**
55:1, 55:6,
55:17, 56:2,
56:10, 56:23,
63:6, 63:9,
64:16, 79:12
**review**
15:11, 26:12,
26:14, 26:17,
35:23, 65:14,
67:12, 67:19,
67:23, 68:11,
68:15, 68:19,
68:23, 69:4,
69:5, 69:16,
69:20, 70:8,
76:16, 78:13,
85:17, 85:24,
86:2, 86:5,
86:6, 86:10,
86:11, 93:1,
113:20, 113:23,
117:1, 117:3,
117:8, 118:7,
121:7, 121:11,
121:14, 124:19,
124:20, 125:1,
141:18
**reviewed**
63:4, 65:11,
65:17, 65:19,
65:22, 66:4,
66:8, 70:12,
71:3, 71:4,
74:5, 77:12,
80:18, 85:18,
86:1, 86:6,
111:17, 113:21,
115:5, 117:21,
119:13, 123:4,

125:6, 125:11,
135:11
**reviewing**
70:11, 78:15,
79:20, 80:7
**revoked**
62:9
**reward**
87:18
**right**
17:14, 18:22,
20:10, 21:7,
22:9, 27:14,
27:20, 31:11,
32:3, 39:3,
40:3, 40:10,
40:18, 49:2,
49:6, 50:15,
51:18, 51:23,
52:19, 52:20,
54:20, 54:22,
54:23, 62:3,
62:20, 63:4,
64:13, 67:21,
68:2, 72:13,
73:19, 73:22,
75:24, 76:12,
77:10, 78:1,
81:17, 82:5,
83:23, 84:3,
84:10, 84:17,
86:7, 86:12,
93:18, 93:23,
93:24, 94:2,
94:15, 94:17,
94:18, 94:19,
94:22, 95:7,
95:20, 96:19,
97:23, 100:4,
100:10, 100:17,
101:14, 101:17,
104:14, 104:16,
106:6, 108:2,
108:18, 109:4,
109:16, 109:21,
110:4, 110:5,
110:15, 110:23,
111:3, 113:21,

115:5, 115:12,
116:7, 117:11,
118:12, 120:8,
122:9, 128:1,
128:19, 129:17,
130:5, 133:8,
134:9, 136:15,
137:16, 137:19,
138:4, 138:6,
138:7, 138:10,
140:16
**rivers**
22:8
**road**
2:16
**role**
24:10, 38:22
**rolla**
22:17
**rolling**
24:8
**room**
26:15, 59:4,
76:2, 76:4,
89:13, 113:19,
116:24, 117:19,
119:16, 126:13,
132:14
**root**
32:15, 83:20,
84:12, 84:13
**rotate**
15:15, 15:21,
53:7
**rotated**
18:8
**rotates**
18:10
**rotation**
52:4, 52:5,
53:4, 53:6
**rotations**
52:9, 53:6
**roughly**
15:5, 63:1
**rounded**
14:6
**rounds**
16:13, 53:7,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

67

53:8
**rt**
94:19
**rubbery**
82:17
**rui**
14:11, 14:12
**rule**
63:11, 63:18,
63:24, 112:15
**rules**
6:21, 51:22
**rupture**
59:5, 84:5
**ruptured**
81:18, 82:13,
82:15, 82:21,
83:10, 83:15,
83:22, 84:15,
84:16, 112:3,
112:5, 112:9,
112:16, 112:19,
113:1, 113:5,
121:18, 123:10
**rupturing**
82:19

**S**
**s-a-n-d-e-r-s**
6:15
**s-t-e-p-h-e-n**
6:15
**said**
18:23, 23:22,
23:23, 32:5,
35:3, 36:7,
57:2, 89:20,
95:4, 96:2,
96:5, 96:19,
97:13, 99:16,
103:18, 104:9,
104:11, 106:20,
111:21, 113:3,
123:9, 125:8,
135:13, 140:9,
143:6
**saint**
9:7, 9:24,

12:11, 12:15,
12:23, 12:24,
13:1, 13:3,
19:22, 20:14,
20:22, 20:24,
21:6, 21:14,
21:22, 21:23,
22:3, 22:5,
22:7, 22:11,
74:9, 75:18,
75:23
**salt**
127:8
**same**
15:4, 15:5,
15:6, 17:9,
28:10, 28:11,
30:9, 30:12,
30:24, 31:1,
35:20, 38:12,
45:20, 48:21,
50:16, 51:6,
51:18, 79:11,
89:2, 90:22,
92:10, 95:15,
100:11, 105:3,
107:12, 109:5,
110:9, 114:16,
117:2, 121:19,
122:8, 131:8,
131:16, 132:10,
133:6, 138:15,
139:5, 139:11,
139:12, 139:13,
141:10
**sanders**
1:13, 2:13,
6:3, 6:8, 6:15,
6:16
**sarah**
3:4, 6:16
**sarah@loevy**
3:9
**sat**
60:12, 61:16
**saw**
36:24, 37:7,
49:20, 59:3,

71:12, 75:3,
75:18, 76:2,
130:21, 134:6
**say**
9:10, 26:1,
34:3, 46:18,
49:10, 51:20,
54:19, 55:14,
74:8, 75:2,
76:8, 82:12,
83:21, 85:1,
89:7, 92:20,
94:10, 98:6,
102:12, 102:13,
104:3, 106:17,
108:11, 110:24,
111:2, 113:3,
114:15, 114:18,
115:21, 118:23,
124:19, 125:17,
133:15, 133:19,
136:23, 137:21,
137:24, 138:20,
139:12
**saying**
7:5, 30:19,
35:20, 47:18,
51:18, 97:9,
108:15, 110:10,
129:23
**says**
6:10, 94:1,
97:6, 97:10,
102:22, 102:24,
110:22, 133:3,
139:9, 139:11
**scan**
35:13, 118:15,
118:16, 134:7,
136:4
**schade**
3:13
**scheduled**
60:9
**schedules**
15:9
**school**
9:7, 9:14,

52:3, 52:6,
52:8, 52:19,
52:24
**scientific**
125:2
**scope**
31:6, 122:14,
126:11, 126:19,
127:5, 129:2,
129:3, 131:4,
131:18, 132:4,
132:17, 133:20,
134:5, 134:12,
134:21, 140:11,
140:20
**screen**
26:16
**screened**
114:6, 114:11,
114:13
**scripts**
61:1
**second**
7:3, 31:10,
71:17, 73:1,
73:18, 76:7,
103:7, 105:10,
113:18
**see**
11:21, 13:23,
14:1, 14:2,
17:11, 17:16,
18:24, 21:11,
25:3, 25:5,
31:2, 32:10,
34:10, 72:10,
74:3, 74:4,
74:19, 75:15,
75:23, 82:10,
85:18, 89:14,
97:15, 98:23,
99:23, 100:1,
100:18, 105:5,
111:14, 114:5,
115:2, 116:13,
116:22, 117:3,
117:16, 118:5,
118:6, 121:10,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

68

123:19, 128:9,
129:4, 136:7,
137:21
**seeing**
11:5, 14:23,
86:24, 92:23,
93:6, 101:14,
117:4
**seen**
12:5, 44:23,
74:7, 77:18,
108:22, 123:8,
126:4, 138:14,
138:15, 141:4
**sees**
93:1, 98:19
**seizures**
32:16
**send**
26:5
**sends**
46:24, 47:2,
72:16
**sensation**
42:19, 44:5,
44:9, 45:22,
45:24, 46:6,
46:7, 48:7,
49:23, 51:8
**sent**
25:11, 69:13
**sentence**
83:22, 86:19,
91:2, 91:18,
95:22, 106:5,
106:10, 107:23,
111:24, 112:14
**september**
69:11, 69:22,
70:22, 74:10,
75:19, 75:24,
91:11, 91:14,
92:5, 108:9,
113:15, 114:2,
116:24, 119:6,
119:7, 119:21,
132:19, 133:14
**serious**
53:13

**serve**
20:8, 25:8
**served**
18:18, 23:6
**services**
23:1
**serving**
24:4
**sessions**
20:5, 20:6
**set**
29:5, 71:1,
74:15, 74:22
**sets**
65:13, 74:11
**setting**
16:10
**settle**
59:18
**settled**
59:12, 59:16
**seventy**
84:22
**several**
116:20, 120:10,
123:3
**severe**
115:14, 115:16,
115:20, 116:1,
122:18, 139:10
**sew**
52:12
**shah**
67:23, 68:1,
68:4, 68:12,
68:16, 73:3,
74:5, 78:5,
91:11, 91:24,
92:4, 96:7,
96:12, 97:5,
97:18, 98:14,
98:19, 102:19,
102:20, 103:3,
103:17, 103:23,
104:7, 121:1,
121:4, 121:8,
121:12, 126:6,
126:8, 126:13,

127:23, 128:14,
130:21, 131:16,
138:14
**shah's**
68:6, 100:1,
103:12, 105:12
**sharp**
100:17
**she**
7:15, 31:10,
57:13, 61:6,
61:8, 64:14,
99:16, 104:14,
130:14, 130:17,
130:18
**she's**
64:23
**sheet**
5:18
**shoot**
43:11
**shorter**
41:12
**shorthand**
6:4, 143:2
**should**
7:15, 9:12,
23:22, 31:5,
77:17, 139:12,
139:14
**shoulder**
57:20, 93:7
**show**
109:6, 120:22,
133:2, 134:21
**showed**
125:6, 125:12,
129:5
**shows**
134:9
**side**
14:8, 29:10,
32:15, 40:15,
40:17, 41:3,
48:4, 51:8,
84:14, 93:23,
94:1, 94:17,
94:18, 94:20,

102:13, 127:9,
132:1
**sides**
50:2
**sign**
98:23, 99:6
**signal**
115:23, 115:24
**signature**
6:6
**signature-zzp1g**
143:16
**significance**
122:12
**significant**
122:19, 131:14
**similar**
74:1, 140:3,
141:1, 141:3,
141:7
**simple**
50:1
**simply**
49:3
**since**
31:19, 52:18,
77:23, 79:24,
92:24
**sir**
32:3, 122:6,
139:24, 141:9
**sit**
56:18, 67:8
**six**
116:13, 116:17,
118:20, 118:22,
118:24, 119:2,
119:3, 119:12,
120:1, 120:7
**skill**
29:5, 139:1
**skin**
46:2
**slash**
97:11
**social**
23:1
**some**
7:14, 13:6,

16:22, 18:1,
27:3, 35:7,
38:14, 38:15,
38:18, 47:7,
50:20, 53:19,
77:8, 79:6,
80:12, 82:9,
83:11, 85:1,
85:3, 85:6,
85:14, 87:18,
92:12, 93:4,
94:17, 133:23,
133:24, 135:3,
137:4
**somebody**
18:8, 18:9,
23:22, 29:6,
36:24, 109:4,
126:24
**someone**
74:1, 98:13,
102:10, 108:23,
133:22, 137:4
**something**
12:10, 42:9,
43:10, 43:19,
54:17, 87:18,
89:15, 110:14,
112:5, 114:14,
119:10, 123:15,
131:16, 132:2,
134:6, 134:10
**sometimes**
33:20, 33:22,
44:9, 73:10,
139:1, 139:2,
139:4
**soon**
26:16, 50:2
**sorry**
25:14, 37:19,
46:20, 57:2,
59:11, 81:13,
96:14, 96:17,
103:1, 127:16,
141:12
**sort**
38:16, 52:10,

113:12, 133:23,
133:24
**sources**
1:9, 2:9, 2:21
**south**
2:16, 4:6,
22:10
**southern**
1:2, 2:2, 2:19
**space**
82:20
**span**
123:20, 123:21
**speaking**
29:3, 106:14,
132:18
**speaks**
133:9
**specialist**
24:17, 28:1,
28:8, 28:16,
30:4, 30:5, 58:4
**specialists**
24:14
**specialized**
10:22
**specialties**
11:10, 12:1,
12:6, 14:5,
17:2, 21:8
**specialty**
14:15, 24:23
**specific**
28:15, 49:2,
57:10, 81:1,
102:14
**specifically**
80:12, 106:10,
111:23, 113:24,
132:1
**speech**
44:20
**spell**
6:13
**spent**
79:17, 79:24,
80:5
**spinal**
32:22, 32:23,

33:7, 33:14,
33:21, 33:23,
34:5, 34:17,
35:3, 35:6,
35:10, 35:18,
35:24, 36:7,
36:11, 36:13,
36:21, 37:1,
37:8, 37:12,
39:5, 40:5,
40:11, 40:20,
41:7, 42:9,
44:22, 44:24,
45:5, 46:1,
51:11, 51:22,
53:12, 57:22,
58:22, 82:22,
82:23, 83:1,
83:4, 83:19,
83:23, 84:3,
84:14, 106:18,
106:22, 107:7,
107:19, 112:6,
112:11, 112:22,
115:11, 115:14,
115:19, 118:18,
119:23, 120:2,
120:5, 120:9,
120:16, 120:22,
122:18, 128:22,
128:24, 129:11,
131:22, 132:2,
135:20, 136:1,
136:19
**spine**
36:21, 43:11,
76:22, 112:3,
112:5, 113:2,
114:24, 115:9,
117:22, 118:14
**sporting**
27:11, 32:12
**springfield**
4:7
**st**
1:3, 2:3, 2:16,
2:20, 3:15
**stack**
70:14

**staff**
15:1, 15:12,
15:16, 16:4,
16:16, 116:24,
118:11, 138:2,
140:4, 141:5
**stand**
44:16
**standard**
35:14, 36:2,
47:9, 48:10,
48:17, 48:19,
48:22, 49:1,
49:7, 49:11,
49:15, 50:3,
50:7, 50:14,
51:3, 51:9,
53:22, 54:1,
100:5, 101:7,
101:24, 138:17,
138:20
**start**
7:9, 38:22,
49:12
**started**
19:1
**state**
2:18, 4:9,
6:13, 60:1,
60:6, 62:3,
62:6, 82:7,
86:20, 143:3
**stated**
107:23, 122:7,
129:14, 130:22
**statement**
68:14, 82:7,
82:10, 83:9
**states**
1:1, 2:1, 2:19,
63:24, 106:5,
112:1
**status**
44:19, 44:22,
45:1, 48:8,
49:24, 133:10
**stayed**
59:7

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

70

steady
38:12
stenosis
35:6, 37:1,
115:16, 129:12
step
31:24
stephen
1:13, 2:13,
6:3, 6:8, 6:15
steps
124:12
still
7:15, 10:5,
13:2, 34:15,
36:21, 39:16,
42:10, 47:20,
59:13, 64:14,
72:3, 105:1,
127:7
stipulated
6:1
stop
15:22, 16:1,
24:4
stopped
18:12, 18:24
story
139:2
straight
43:7, 43:9,
78:14
straightening
43:5
straightforward
54:11
street
3:6, 4:6
strength
42:22, 42:23,
43:1, 43:3,
43:4, 43:21,
43:22, 45:11,
45:14, 45:19,
46:12, 48:5,
51:8, 100:2
strike
32:17, 37:6,

37:8, 38:20,
81:6, 81:13,
91:21, 96:15,
105:20, 108:5,
119:19, 121:6
strong
45:15
student
8:18
studies
83:8, 118:10
study
25:23
stuff
21:4
subject
58:8, 62:11
subjective
93:22, 96:23,
98:9, 100:14,
101:18, 102:2,
103:24, 104:8,
116:23, 117:6,
117:13, 118:6,
120:6, 138:19,
138:23
subjectively
110:13
submission
66:4, 66:8,
67:18, 67:22,
68:10, 68:16,
68:21, 68:24,
69:6
submitted
65:6, 67:16,
77:12, 77:16,
111:18
submitting
65:18, 77:6,
78:20, 78:23
subsequent
125:15
substance
70:9
substantial
26:1
substantiated
86:21, 91:4,

91:23
subtle
108:15
successful
34:1, 34:3
successfully
33:23
sued
55:21
suffer
7:18
suffering
28:21, 33:14,
57:13, 96:3
sufficiently
99:12
suggested
121:15
suggesting
90:16, 90:17
suite
3:14
summarized
123:18
summary
32:7, 75:11,
77:19
support
35:18, 99:24,
134:19
supported
87:4
supports
37:4
suppose
39:16
supposed
9:8, 82:19
sure
7:4, 23:18,
24:19, 29:8,
29:19, 49:1,
49:12, 64:12,
71:16, 74:20,
75:15, 84:6,
90:13, 94:1,
96:14, 97:23,
98:1, 106:9,

106:24, 118:23,
126:3
surgeon
32:24
surgery
27:8, 27:18,
51:24, 52:5,
52:15, 52:18,
59:6, 85:12
surgical
32:24, 83:2
suspect
107:19, 134:6
suspected
27:24
suspecting
129:10
suspended
62:8
swallowing
42:19
sworn
2:14, 6:9,
143:6
symptom
37:11, 37:14,
37:20, 37:24,
39:15, 40:22,
87:4, 88:7,
88:13, 88:15,
89:5, 89:13,
96:21, 106:2,
106:21, 106:22,
107:5, 107:11,
110:18, 110:19,
124:13, 128:22,
128:23, 136:4
system
117:11, 118:8,
138:9
systems
76:16, 117:1,
117:3, 117:8,
117:10

T

take
7:18, 37:1,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                                                                   71

47:4, 52:3,
64:3, 64:5,
66:24, 68:8,
80:17, 96:20,
114:17, 127:7,
127:8, 133:11,
136:7, 141:21,
142:5
**taken**
1:14, 6:3,
80:13, 91:17,
103:8, 114:17,
114:23, 116:9,
118:7, 123:8,
143:6, 143:10
**takes**
73:12
**taking**
73:9
**talk**
11:20, 13:4,
52:21, 54:24,
77:11, 80:11,
81:20, 82:18,
127:11, 137:9
**talked**
12:8, 16:12,
22:18, 58:12,
60:16, 60:20,
61:15, 102:12,
112:7, 127:24,
129:13, 130:12,
133:22, 135:12,
135:20, 137:7,
138:12
**talking**
40:3, 49:24,
81:7, 83:18,
92:24, 104:22,
124:1, 128:18
**tap**
44:14, 44:15
**teach**
16:7, 16:9
**teaching**
13:15, 13:16,
15:16, 16:4,
16:16

**team**
52:10
**technically**
8:15, 14:16,
21:1, 24:18
**telephonically**
4:3
**tell**
8:9, 13:23,
22:22, 26:4,
32:9, 33:12,
34:13, 35:1,
36:10, 41:18,
41:22, 42:3,
42:12, 44:1,
45:4, 45:10,
51:2, 53:18,
54:9, 57:19,
59:1, 64:23,
64:24, 70:7,
70:10, 71:12,
75:14, 79:16,
82:15, 83:13,
83:14, 85:3,
89:7, 92:7,
117:8, 117:16
**tells**
96:11
**temperature**
44:8
**ten**
20:2, 24:6,
24:7, 58:17,
61:5
**tend**
17:12
**tendon**
46:17, 46:24
**tenure**
14:9
**term**
25:17, 38:10,
87:13, 107:5,
107:14
**terminology**
24:20, 84:7
**terms**
14:23, 27:4,

**58:8**
**test**
30:14, 30:15,
30:21, 43:14,
43:19, 45:10,
46:2
**testified**
47:21, 58:12,
60:22, 61:2,
61:9, 63:15,
87:20, 99:21,
125:14
**testify**
56:15, 63:24
**testimony**
7:20, 37:4,
47:20, 66:21,
67:12, 67:19,
67:23, 68:3,
68:11, 68:15,
68:20, 78:5,
78:7, 104:15,
105:9, 105:12,
107:6, 111:10,
120:4, 120:18,
122:10, 125:16,
125:19, 126:7,
143:5, 143:6
**testing**
11:17, 11:18,
16:21, 43:21,
43:22, 48:7,
89:4, 89:9,
89:17, 89:19,
89:22, 90:3,
90:6, 90:7,
100:1, 134:20
**tests**
11:21, 46:14,
90:11
**th**
74:10, 75:19,
75:24, 93:14,
93:17, 93:20,
93:21, 94:5,
101:5, 103:11,
105:22, 113:15,
114:2, 116:24,

119:7, 119:21,
127:16, 127:18,
128:13, 130:13,
132:19, 133:15
**than**
10:21, 20:9,
43:7, 49:2,
55:2, 58:19,
61:19, 66:10,
90:16, 95:1,
98:13, 98:18,
102:14, 102:15,
107:13, 113:4,
119:5, 131:22,
132:2, 133:11
**thank**
6:16, 31:13,
31:14, 32:3,
37:20, 67:16,
122:21, 141:14
**that's**
7:10, 8:15,
10:3, 10:5,
13:9, 15:16,
16:11, 18:24,
19:13, 20:21,
21:2, 22:16,
22:24, 26:1,
27:8, 30:8,
31:18, 34:3,
34:21, 38:17,
39:1, 43:22,
46:19, 46:21,
52:13, 61:5,
61:7, 63:16,
65:15, 66:20,
71:1, 71:15,
78:1, 81:4,
81:23, 83:20,
84:4, 84:13,
93:16, 95:5,
95:17, 96:1,
97:1, 97:14,
104:11, 104:16,
106:20, 106:21,
107:14, 108:15,
108:22, 109:23,
110:1, 110:9,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

112:18, 113:23,
114:13, 115:17,
117:2, 117:3,
117:13, 119:1,
122:21, 123:17,
124:10, 127:16,
127:23, 131:9,
133:7, 136:14,
136:15, 136:22,
137:1, 137:24,
139:17

**their**
15:11, 25:3,
25:9, 42:24,
44:14, 44:15,
44:16, 44:17,
44:19, 44:20,
45:1, 46:12,
46:13, 48:8,
48:14, 48:16,
51:12, 85:5,
85:15, 88:7,
107:5, 132:7,
133:10, 136:8,
138:2

**them**
9:20, 14:2,
14:24, 17:21,
23:14, 29:14,
42:17, 44:14,
44:21, 45:15,
47:9, 47:21,
47:22, 49:5,
59:2, 66:8,
71:24, 72:15,
72:17, 73:24,
74:11, 77:6,
77:17, 78:13,
84:20, 88:5,
88:6, 88:9,
89:14, 93:1,
107:9, 115:5,
129:22, 138:15,
138:24, 139:4

**themselves**
45:13

**then**
8:12, 8:22,

14:2, 14:11,
14:12, 14:14,
15:21, 18:11,
19:12, 20:6,
22:13, 26:24,
30:20, 31:4,
33:16, 34:3,
35:4, 44:21,
47:1, 48:4,
49:10, 49:21,
50:2, 53:5,
55:23, 59:4,
59:6, 72:5,
72:20, 75:11,
76:2, 77:17,
79:22, 84:15,
88:6, 93:1,
93:5, 93:17,
93:20, 96:11,
96:17, 99:23,
101:13, 103:22,
109:6, 109:23,
111:1, 114:23,
115:18, 116:2,
118:14, 118:15,
123:7, 124:9,
126:4, 126:21,
127:7, 134:7,
134:14, 134:18,
140:13

**there**
9:7, 10:19,
13:13, 13:18,
16:15, 22:2,
27:3, 29:9,
29:12, 35:7,
38:18, 38:19,
40:17, 40:18,
52:14, 53:2,
60:24, 65:13,
66:3, 66:7,
67:3, 67:7,
69:1, 70:10,
73:11, 73:17,
83:18, 88:20,
90:1, 90:15,
91:3, 97:21,
100:10, 103:23,

104:5, 104:23,
105:4, 105:10,
107:17, 109:7,
111:2, 111:5,
117:18, 118:2,
118:5, 118:7,
118:21, 125:11,
126:12, 128:14,
130:20, 132:22,
137:4

**there's**
11:19, 21:1,
21:8, 22:7,
22:8, 22:9,
22:10, 34:22,
35:3, 35:8,
36:8, 42:15,
44:11, 62:23,
81:15, 108:24,
109:22, 110:12,
110:24, 111:5,
114:5, 115:23,
117:5, 118:1,
123:14, 123:15,
133:13, 134:14,
139:8

**thereafter**
143:7

**thereto**
143:12

**thereupon**
7:22, 62:14,
69:24, 71:18,
74:24, 75:4,
79:2, 80:13,
103:8, 113:8,
142:8

**these**
22:4, 24:11,
47:20, 56:15,
66:10, 70:15,
70:16, 72:12,
73:6, 75:10,
75:15, 75:17,
82:8, 82:12,
83:10, 83:21,
84:15, 93:7,
106:14, 112:23,

113:11, 113:14,
114:15, 117:4,
118:13, 125:23,
129:21, 130:13,
133:24

**they**
14:2, 14:4,
14:15, 15:6,
15:21, 17:11,
25:3, 29:15,
30:6, 33:16,
35:2, 38:18,
43:17, 44:16,
48:14, 59:8,
75:21, 85:3,
85:4, 85:15,
87:1, 87:17,
89:13, 89:14,
89:15, 92:10,
93:1, 101:14,
105:3, 109:2,
109:5, 109:13,
113:5, 118:13,
118:14, 118:15,
118:16, 126:17,
133:9, 133:10,
134:2, 137:22,
138:24, 139:12

**they're**
34:15, 66:22,
73:24, 95:15,
113:1, 113:5,
123:1, 127:6,
138:5, 138:14

**they've**
30:7, 138:2

**thick**
71:6

**thing**
13:2, 17:9,
17:14, 17:22,
22:18, 35:9,
35:11, 35:20,
45:20, 47:3,
49:9, 51:18,
90:11, 98:6,
104:21, 109:23,
110:1, 110:10,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                                73

132:13, 133:2,
135:3
**things**
6:20, 11:22,
15:9, 25:18,
27:1, 27:5,
34:15, 35:7,
39:6, 39:16,
46:16, 47:20,
48:20, 54:17,
58:9, 65:16,
77:13, 79:6,
80:7, 80:12,
87:2, 87:23,
99:22, 106:15,
112:10, 112:23,
112:24, 117:9,
121:19, 131:21,
136:10
**think**
6:21, 35:20,
50:11, 63:12,
63:13, 63:14,
63:18, 66:18,
67:7, 67:8,
71:1, 72:5,
74:17, 75:9,
75:14, 75:15,
75:21, 76:16,
77:9, 83:13,
89:20, 90:23,
94:16, 97:7,
102:21, 104:16,
113:19, 117:4,
119:11, 119:21,
122:17, 133:11,
134:23, 136:5
**thinking**
44:19, 73:10
**third**
3:6, 7:8
**thirty**
33:10
**thoracic**
59:5
**thorough**
54:2
**thoroughly**
139:15

**those**
11:21, 17:4,
24:6, 25:8,
25:17, 33:12,
33:20, 34:19,
37:10, 38:4,
40:23, 41:18,
48:20, 50:20,
52:8, 53:10,
55:6, 55:10,
56:19, 58:9,
64:11, 65:14,
65:16, 71:7,
71:22, 72:3,
72:6, 73:23,
74:2, 77:1,
77:13, 78:15,
84:17, 85:12,
88:1, 89:1,
91:8, 91:9,
93:9, 93:12,
93:18, 99:21,
100:18, 101:4,
101:8, 107:4,
108:16, 108:23,
109:16, 110:15,
112:15, 118:10,
121:19, 130:17,
134:19, 135:21,
141:14
**though**
30:17, 63:12,
72:24, 137:6
**thought**
67:4
**three**
12:13, 15:18,
18:17, 20:6,
26:7, 47:8,
50:20, 59:3,
112:15
**through**
11:22, 39:7,
69:8, 69:11,
70:7, 70:9,
72:19, 74:11,
84:18, 95:6,
96:16, 109:20,

110:19, 117:11,
125:7, 129:22
**throughout**
38:13
**thrown**
72:13
**thus**
86:1, 86:6
**ties**
46:7, 46:12
**time**
11:21, 13:16,
14:17, 14:18,
15:1, 15:8,
15:13, 17:4,
38:16, 38:19,
53:9, 53:11,
62:24, 65:6,
66:14, 66:17,
71:5, 73:8,
73:9, 73:12,
80:5, 80:9,
86:24, 89:16,
91:10, 91:12,
91:13, 91:14,
91:15, 91:19,
92:10, 93:8,
93:16, 95:1,
95:20, 105:3,
108:17, 108:21,
109:23, 110:4,
114:9, 119:9,
120:17, 121:22,
122:9, 125:15
**timed**
20:5
**timeline**
114:1
**timeout**
20:7
**times**
26:7, 33:9,
35:8, 38:14,
38:15, 55:4,
58:12, 60:17,
60:18, 61:9,
82:7, 83:9,
109:16, 116:19,

118:13, 123:3
**tingle**
93:8, 93:16
**tingles**
93:24, 94:2,
94:18, 94:20
**tingling**
37:12, 39:1,
39:14, 39:17,
41:3, 41:6,
41:19, 43:11,
43:18, 47:7,
47:13, 48:14,
48:15, 49:9,
49:10, 49:13,
49:21, 50:6,
50:19, 51:4,
80:24, 81:12,
82:9, 83:11,
85:2, 85:5,
85:7, 85:16,
85:19, 86:2,
86:7, 86:11,
92:16, 93:2,
93:17, 98:4,
100:16, 103:24,
104:9, 105:13,
106:6, 107:4,
108:2, 109:4,
109:7, 109:12,
109:14, 109:19,
109:20, 109:21,
110:4, 110:19,
111:1, 111:2,
111:6, 111:7,
111:11, 112:2,
112:23, 116:13,
117:2, 118:19,
121:1, 125:7,
126:24, 127:14,
128:3, 128:5,
128:10, 128:15,
131:22, 132:7
**tingly**
98:2
**tip**
105:13
**tissue**
82:17

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

74

| | | | |
|---|---|---|---|
| title<br>14:13 | transcribed<br>6:5 | true<br>28:21, 40:7,<br>112:18, 126:8,<br>131:23 | **U** |
| today<br>7:20, 18:21,<br>20:21, 67:8,<br>80:7, 85:18,<br>86:1 | transcript<br>77:13, 78:11,<br>78:20, 102:24,<br>111:18, 141:19 | trunk<br>36:16 | uh-huh<br>12:2<br>uh-hum<br>105:6 |
| together<br>14:3, 17:16,<br>22:16, 44:16,<br>46:7, 46:12 | transcripts<br>78:8<br>transferred<br>114:3 | trying<br>22:4, 30:2,<br>95:5, 134:11,<br>139:7 | ulnar<br>32:11, 42:8<br>ultimately<br>17:9, 118:16 |
| told<br>41:5, 63:10,<br>64:17, 64:18,<br>64:19, 97:2,<br>126:8 | transitions<br>23:2<br>transmit<br>72:6 | tuesday<br>15:20<br>tumor<br>35:5 | um-hum<br>105:15<br>unable<br>99:11 |
| tongue<br>42:19 | trauma<br>35:6 | tunnel<br>32:11, 42:8 | unclear<br>126:3 |
| too<br>25:2, 40:18,<br>61:6, 73:9,<br>92:24, 93:12 | treat<br>17:20, 17:21,<br>27:1, 27:5,<br>27:15, 27:17,<br>32:21, 33:1,<br>49:3, 49:5,<br>136:19 | turn<br>44:15, 85:15,<br>92:19, 97:17,<br>98:7, 98:12,<br>102:16, 113:17,<br>116:2 | under<br>63:18, 71:2,<br>80:17, 91:11,<br>93:21, 96:24,<br>98:21, 100:13,<br>102:1, 117:1,<br>143:8 |
| took<br>11:1, 60:24,<br>61:8, 73:8,<br>98:22, 99:6,<br>99:10 | treated<br>83:16, 84:23,<br>135:20 | turning<br>92:11, 100:13 | undergraduate<br>8:10, 8:15,<br>8:16, 8:18 |
| topic<br>111:21 | treater<br>60:13 | twenty<br>25:7 | underinsured<br>13:10 |
| topics<br>61:13 | treating<br>60:13, 140:4,<br>141:5 | twenty-three<br>25:7 | underneath<br>12:11, 12:18 |
| torture<br>72:23 | treatment<br>26:23, 31:4,<br>32:19, 32:24,<br>73:18, 82:8,<br>83:10, 83:17,<br>84:19, 87:21,<br>123:16, 131:11,<br>132:9, 137:14,<br>140:2, 140:18,<br>141:3 | twice<br>25:1, 25:4 | underserved<br>13:10 |
| total<br>79:17 | | two<br>8:20, 9:20,<br>14:12, 15:21,<br>20:5, 20:6,<br>22:9, 26:7,<br>53:6, 55:5,<br>63:8, 74:11,<br>119:5, 119:14 | understand<br>8:17, 22:4,<br>29:19, 29:24,<br>47:18, 54:9,<br>59:2, 84:6,<br>87:15, 88:15,<br>96:14, 97:19,<br>107:1, 107:16,<br>110:12, 112:13,<br>136:21, 139:7 |
| totally<br>31:14, 139:5 | | type<br>136:22, 137:1 | |
| touch<br>44:8, 46:24 | | typewriting<br>6:5, 143:8 | |
| tower<br>21:1, 21:20 | | typically<br>32:23, 36:18,<br>44:23, 47:14,<br>83:5, 88:9,<br>96:4, 106:22,<br>114:13, 120:3 | understanding<br>29:22, 29:23,<br>64:6, 96:15,<br>96:22, 114:8,<br>119:1 |
| train<br>49:3, 49:5 | triage<br>133:3 | | |
| training<br>9:3, 17:8,<br>49:4, 51:24,<br>52:21, 52:23,<br>123:7 | trial<br>59:11, 60:9,<br>60:22, 60:24<br>trouble<br>112:1, 112:23 | | understood<br>47:19 |

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                        75

| | | | |
|---|---|---|---|
| uninsured<br>13:11<br>unit<br>12:18<br>united<br>1:1, 2:1, 2:19,<br>11:16<br>universe<br>27:4<br>university<br>8:11, 8:18, 9:7<br>unless<br>7:15, 66:22<br>unlikely<br>36:24, 37:4,<br>40:19<br>unofficial<br>62:12<br>until<br>28:1, 28:8,<br>29:15, 30:6,<br>30:11, 30:19,<br>38:13, 114:2,<br>124:8<br>unusual<br>40:19, 119:11<br>up-to-date<br>123:17, 123:20<br>update<br>10:3<br>upper<br>42:4, 42:5,<br>50:6, 50:21,<br>51:5, 51:13,<br>51:21, 100:2<br>use<br>25:17, 36:12,<br>38:11, 83:21,<br>95:3, 96:10,<br>97:13, 107:3,<br>107:5, 107:14,<br>107:18<br>used<br>34:7, 73:8,<br>96:7, 96:8,<br>96:23, 97:7,<br>101:4, 101:21,<br>102:13, 107:1, | 127:12, 130:8<br>useful<br>54:16<br>using<br>24:19, 38:10,<br>87:23<br>usually<br>15:20, 25:17,<br>40:15, 45:9,<br>97:1, 97:2,<br>100:8, 135:23<br> V <br>vague<br>95:24, 96:3,<br>96:6, 96:10,<br>96:12, 97:6,<br>97:7, 97:12,<br>97:14, 97:18,<br>98:3, 98:8,<br>100:21, 101:8,<br>102:3, 103:24,<br>104:9, 127:24,<br>128:9, 130:14,<br>130:17<br>variety<br>14:5, 17:1<br>various<br>118:8<br>vehicle<br>55:15<br>verbal<br>7:4<br>verbatim<br>101:22<br>versus<br>29:6, 42:5<br>vertebra<br>82:18<br>very<br>41:8, 49:7,<br>49:9, 58:8,<br>73:3, 117:18,<br>121:24, 138:10<br>veterinarian<br>9:4<br>veterinary<br>8:13, 8:22 | via<br>71:22<br>vibration<br>44:8<br>view<br>42:17, 95:11<br>violate<br>101:7<br>visit<br>74:6, 76:18,<br>76:23, 81:8,<br>91:15, 93:11,<br>94:5, 126:14<br>visits<br>53:20, 69:15,<br>92:9, 109:8,<br>127:13<br>vitale<br>4:3<br>vs<br>1:8, 2:8<br> W <br>waist<br>93:24, 94:2,<br>94:18, 94:20,<br>112:2, 112:24<br>wait<br>27:24, 28:8,<br>29:14, 30:5,<br>30:10, 30:19,<br>30:23, 31:21,<br>64:13<br>waiting<br>31:3, 31:8<br>walk<br>44:21, 89:14,<br>94:3, 94:21,<br>100:15, 100:17,<br>119:12<br>walked<br>102:12<br>walking<br>43:1, 45:12,<br>112:1, 112:23,<br>120:18<br>want<br>24:19, 30:15, | 30:21, 40:21,<br>50:12, 54:24,<br>63:17, 69:8,<br>80:11, 84:6,<br>87:1, 91:18,<br>99:23, 100:1,<br>102:5, 106:9,<br>113:24, 127:11,<br>137:9<br>wanted<br>15:24<br>wants<br>103:13, 103:20,<br>103:21, 104:13<br>warden<br>122:4<br>warrant<br>134:19<br>washington<br>12:16, 20:14,<br>22:3, 22:9<br>wasn't<br>57:1, 101:17,<br>102:13<br>watch<br>44:21<br>way<br>8:6, 17:18,<br>27:3, 41:11,<br>46:1, 51:20,<br>63:22, 63:23,<br>64:13, 83:7,<br>97:14, 100:18,<br>109:18, 110:18,<br>110:19, 111:15,<br>123:15, 126:23<br>ways<br>33:13, 109:11<br>we'll<br>32:10, 93:4,<br>93:5, 107:3<br>we're<br>12:17, 20:2,<br>20:21, 27:12,<br>35:8, 35:20,<br>40:3, 44:7,<br>49:24, 51:18,<br>53:5, 66:19, |

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

76

86:24, 92:22,
96:5, 110:10,
124:10, 126:20,
140:13
**we've**
42:13, 58:12,
129:21
**weakness**
37:22, 39:23,
40:2, 40:6,
40:10, 41:2,
41:3, 41:6,
41:19, 45:17,
47:7, 50:5,
50:20, 51:4
**week**
14:19, 15:17,
23:14
**weeks**
59:3, 118:22,
119:2, 119:3,
119:5, 119:14
**well**
17:17, 21:22,
28:22, 29:22,
36:10, 37:6,
39:20, 39:23,
41:2, 42:3,
49:1, 66:20,
70:16, 74:4,
75:21, 81:9,
88:11, 94:15,
95:4, 97:4,
98:5, 99:18,
103:1, 103:16,
105:7, 106:24,
108:20, 109:11,
110:12, 111:17,
119:6, 119:19,
133:2
**went**
8:11, 8:12,
19:12, 19:13,
36:17, 61:1,
76:3
**were**
8:17, 8:21,
14:4, 14:6,

14:23, 15:11,
16:18, 19:8,
23:8, 23:24,
33:12, 33:13,
42:4, 52:3,
54:17, 55:6,
55:17, 56:1,
56:10, 59:1,
60:17, 60:18,
61:15, 63:6,
63:9, 63:10,
64:16, 64:18,
64:24, 67:9,
70:16, 71:19,
71:21, 71:22,
73:13, 73:14,
73:23, 74:12,
79:7, 79:12,
79:21, 80:6,
80:14, 87:6,
91:4, 91:22,
92:8, 92:10,
95:4, 103:9,
104:10, 107:19,
108:12, 118:10,
121:9, 122:9,
123:3, 124:1,
124:17, 125:1,
125:5, 125:13,
125:18, 126:23,
127:12, 129:22,
129:23
**weren't**
14:15, 24:10,
60:17, 105:3,
137:17
**wexford**
1:9, 2:9, 2:21,
31:16, 55:7,
55:8
**what's**
8:1, 8:24,
10:15, 17:6,
42:21, 43:9,
60:13, 62:18,
64:8, 70:3,
79:5, 95:2,
97:21, 105:9,

113:13, 122:12,
139:7
**whatever**
14:14, 35:12,
55:22, 76:14,
97:6
**when**
10:7, 10:10,
18:8, 18:24,
19:20, 23:2,
26:9, 26:21,
31:10, 35:8,
38:20, 38:21,
39:1, 52:7,
55:14, 56:10,
57:5, 57:8,
58:16, 61:7,
62:22, 63:6,
63:9, 64:16,
76:3, 76:10,
82:12, 82:18,
83:21, 85:1,
85:21, 89:7,
89:16, 90:3,
90:19, 91:8,
91:11, 92:22,
93:6, 96:4,
96:24, 100:17,
101:4, 101:13,
104:22, 106:17,
107:4, 108:22,
109:2, 111:22,
114:9, 119:6,
119:15, 122:7,
124:5, 125:19,
125:24, 126:17,
127:3, 129:23,
130:21, 132:13,
136:7, 137:8,
138:14, 138:18,
139:2, 139:9,
139:11
**where**
7:10, 8:9,
10:3, 13:9,
21:19, 21:24,
30:22, 31:16,
39:13, 40:2,

41:24, 42:1,
47:12, 47:23,
48:6, 53:6,
60:9, 60:17,
60:18, 60:19,
60:24, 61:15,
64:8, 70:15,
79:12, 81:16,
82:19, 88:12,
102:24, 106:21,
108:5, 111:5,
114:1, 127:13
**wherein**
2:20
**whereupon**
1:19
**wherever**
44:7
**whether**
35:11, 57:24,
58:3, 59:24,
60:6, 66:8,
70:7, 70:10,
71:3, 71:4,
71:12, 75:14,
79:16, 81:9,
86:20, 86:22,
87:6, 87:10,
92:3, 94:1,
94:16, 101:18,
109:12, 109:13,
109:18, 109:19,
110:3, 123:3,
124:17, 133:15,
139:8
**which**
18:17, 22:3,
22:8, 22:10,
35:21, 41:1,
44:19, 46:14,
55:19, 69:13,
71:19, 74:15,
74:16, 80:13,
80:16, 87:23,
89:8, 90:1,
91:3, 102:20,
103:8, 112:22,
113:17, 115:11,

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018

77

123:17, 133:7,
143:10
**while**
13:2, 19:10,
23:2, 53:5,
67:9, 140:1,
141:1
**who**
16:12, 18:10,
21:5, 30:4,
30:5, 32:6,
59:21, 122:4,
137:21
**whole**
13:16, 35:4,
36:8, 40:16,
46:2, 47:3,
50:12, 53:2,
53:3, 72:20,
91:14, 91:17,
91:19, 98:6,
104:24, 105:3
**whom**
29:13, 34:17
**whose**
88:23, 143:4
**why**
15:22, 17:13,
17:19, 18:15,
24:4, 53:18,
73:23, 73:24,
78:24, 81:23,
86:22, 97:10,
117:24, 118:5,
131:7
**will**
18:11, 26:22,
28:12, 31:3,
31:9, 31:12,
31:15, 43:4,
43:11, 47:14,
63:22, 64:5,
66:24, 73:11,
82:8, 83:11,
84:20, 93:4,
124:8, 124:9
**wise**
123:16

**withhold**
126:17, 137:12
**withholding**
137:14, 137:19,
138:5
**withholds**
137:8
**within**
2:17, 56:11,
57:9, 125:1,
143:3
**without**
33:24, 34:5,
83:1, 114:24,
142:1
**witness**
2:13, 6:6,
28:5, 28:12,
29:3, 29:19,
30:10, 30:13,
31:2, 31:12,
31:23, 32:2,
34:21, 35:17,
36:5, 39:11,
39:13, 40:2,
47:12, 48:13,
48:22, 49:20,
50:11, 50:17,
50:24, 51:7,
51:15, 54:4,
57:17, 60:13,
64:21, 66:24,
73:20, 75:2,
77:4, 88:5,
88:20, 89:3,
90:6, 90:23,
92:22, 95:15,
96:10, 99:16,
100:8, 100:24,
101:12, 104:5,
104:13, 106:2,
110:9, 111:14,
112:18, 116:11,
120:13, 122:17,
126:2, 126:12,
126:20, 127:6,
129:4, 130:10,
131:5, 131:9,

131:19, 132:5,
132:11, 132:18,
133:21, 134:6,
134:13, 140:6,
140:13, 140:21,
141:20, 143:4,
143:6
**witnesses**
99:21
**word**
73:11, 84:2,
90:12, 95:3,
96:7, 97:7,
98:8, 107:1,
107:13, 107:17,
127:12
**words**
96:3, 96:22,
97:2, 101:4,
101:22
**work**
9:24, 14:19,
15:1, 15:11,
15:12, 15:19,
16:3, 21:10,
21:13, 21:16,
22:19, 23:8,
23:17, 53:16,
56:8, 79:1,
121:8, 138:9
**worked**
8:22, 14:9,
138:8
**working**
12:18, 14:24,
15:22, 21:5,
39:7, 79:18,
132:9
**worse**
95:9
**wouldn't**
31:7, 34:8,
35:6, 45:4,
47:21, 100:21,
137:19
**wrist**
47:14
**write**
56:7, 63:2,

96:12, 96:24,
97:10, 101:13,
124:6, 138:24,
139:3, 139:9,
139:11
**writes**
97:9
**writing**
61:1, 61:8,
73:3
**written**
54:18, 81:10,
102:1, 105:9,
139:13, 139:14
**wrong**
30:7, 85:15
**wrote**
73:6, 81:18,
93:2, 103:1,
130:14

---
**X**
---
**x-ray**
25:16, 120:21,
129:7, 129:8

---
**Y**
---
**yeah**
11:1, 14:14,
15:4, 35:13,
39:21, 43:14,
45:21, 48:22,
49:7, 54:19,
56:11, 57:3,
57:19, 58:24,
59:15, 68:1,
68:4, 68:9,
71:11, 77:10,
84:8, 85:11,
94:19, 95:18,
115:24, 127:20,
129:8, 129:9,
132:21
**year**
9:18, 9:19,
15:21, 20:6,
53:3, 56:11,
56:12, 57:9

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                        78

| | | | |
|---|---|---|---|
| **years** | **03** | **17** | **2012** |
| 8:17, 8:20, | 114:5, 114:17 | 102:16, 103:11, | 86:3, 108:18 |
| 9:20, 10:5, | **0544** | 128:13 | **2013** |
| 18:16, 20:6, | 1:4, 2:4 | **189** | 86:8 |
| 24:6, 24:7, | **1** | 21:20 | **2014** |
| 33:11, 56:14, | **1** | **1977** | 69:11, 69:18, |
| 58:17, 61:5, | 1:19, 2:15 | 8:21 | 69:22, 70:22, |
| 85:4, 123:15 | **10** | **1982** | 74:10, 75:19, |
| **yep** | 114:5, 114:17, | 9:8 | 86:12, 91:11, |
| 12:2 | 116:7 | **1983** | 91:14, 92:5, |
| **yesterday** | **100** | 8:13 | 101:6, 103:11, |
| 77:22 | 3:14, 39:15 | **1988** | 105:22, 108:9, |
| **yet** | **1085** | 9:8 | 109:5, 109:8, |
| 72:22 | 1:17, 143:21 | **1992** | 109:9, 109:13, |
| **you'd** | **1090** | 8:21, 9:9 | 109:20, 111:12, |
| 33:17, 42:11, | 4:8 | **1995** | 113:15, 116:24, |
| 100:1 | **11** | 15:14 | 119:8, 125:7, |
| **you're** | 108:19, 114:23 | **1st** | 126:24, 128:8, |
| 7:5, 11:10, | **113** | 86:12 | 128:13, 129:14, |
| 18:8, 18:9, | 5:19 | **2** | 130:13, 133:15 |
| 20:8, 39:7, | **12** | **20** | **2015** |
| 52:7, 60:19, | 20:20, 42:15 | 2:15, 93:20, | 69:5, 76:3, |
| 62:2, 63:13, | **122** | 93:21, 114:12, | 76:10, 76:19, |
| 71:15, 81:6, | 5:3, 5:4 | 123:15, 142:9 | 76:23 |
| 82:12, 83:22, | **13** | **200** | **2018** |
| 85:7, 91:8, | 93:14, 94:5, | 74:16 | 1:15, 2:14 |
| 106:13, 108:12, | 105:22 | **2002** | **21** |
| 111:9, 124:2, | **135** | 18:13, 19:3 | 133:3 |
| 132:18 | 5:5 | **2010** | **217** |
| **you've** | **1377** | 10:12, 18:23 | 4:8 |
| 16:3, 16:18, | 3:16 | **2011** | **23** |
| 18:17, 30:17, | **139** | 18:23, 19:3, | 1:15, 2:14, |
| 34:4, 44:23, | 5:6 | 19:20, 73:15, | 104:23, 104:24, |
| 46:16, 47:21, | **14** | 73:19, 80:18, | 105:4, 105:22, |
| 58:12, 60:16, | 75:10, 93:17, | 81:8, 81:17, | 129:14, 129:22 |
| 65:11, 65:13, | 94:5, 102:16, | 82:5, 85:20, | **24** |
| 65:14, 78:16, | 119:21 | 85:21, 85:22, | 116:2 |
| 81:10, 83:16, | **140** | 106:7, 108:11, | **241** |
| 87:20, 88:12, | 19:4 | 108:13, 108:19, | 3:16 |
| 123:9, 123:12, | **15** | 108:20, 109:4, | **243** |
| 131:21 | 119:7, 119:21, | 109:8, 109:10, | 3:8 |
| **young** | 131:15 | 109:13, 109:20, | **25** |
| 60:24 | **1500** | 111:7, 111:11, | 33:10, 113:17, |
| **yourself** | 12:13 | 111:12, 125:7, | 114:1, 115:2 |
| 24:17, 26:17, | **1580** | 125:15, 125:20, | **26** |
| 131:1 | 3:14 | 125:23, 126:9, | 63:11, 63:18, |
| **0** | **16** | 126:13, 126:24 | 74:10, 75:19, |
| **00** | 1:4, 2:4 | | 75:24, 113:15, |
| 1:19, 2:15 | | | |

Transcript of Stephen Sanders, M.D.
Conducted on May 23, 2018                                              79

| | | | |
|---|---|---|---|
| **114:2, 116:7,**<br>116:24, 132:19,<br>133:15<br>**28**<br>101:5, 127:16,<br>127:18, 130:13<br>**2nd**<br>4:6, 81:8,<br>108:19, 109:20,<br>111:12 | **40**<br>114:12, 114:16<br>**400**<br>19:24<br>**45**<br>23:15<br>**48**<br>116:7<br>**4th**<br>79:16, 79:24,<br>92:15 | **87**<br>21:2 | |

**3**

| | | | |
|---|---|---|---|
| **311**<br>3:6<br>**312**<br>3:8<br>**314**<br>3:16<br>**359**<br>93:16<br>**360**<br>73:2, 92:13<br>**363**<br>92:19, 92:20,<br>93:20, 94:16<br>**367**<br>100:13, 101:20<br>**368**<br>97:17, 127:23<br>**369**<br>127:24<br>**37**<br>12:12<br>**371**<br>128:8<br>**372**<br>102:16, 103:3,<br>103:12, 128:13<br>**375**<br>105:5, 105:12,<br>129:14<br>**38**<br>114:23<br>**3rd**<br>128:8 | | | |

**9**

**9**
114:12, 114:16
**90**
84:4
**92**
9:12
**98**
13:2, 15:14

**5**

**500**
4:6
**5900**
3:8

**6**

**60607**
3:7
**62**
5:12
**621**
2:16
**62704**
4:7
**63102**
3:15
**69**
5:13

**7**

**700**
10:18, 20:18
**74**
5:15
**75**
5:17
**782**
4:8
**79**
5:18

**8**

**8**
131:15
**80**
74:17

**4**

**4**
2:15, 142:9