**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| GERRY ARMBRUSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16 C 0544 |
| | ) | |
| WEXFORD HEALTH SOURCES, *et al.*, | ) | Judge Michael J. Reagan |
| | ) | |
| Defendants. | ) | Mag. Judge Stephen C. Williams |

# Exhibit 11



# Transcript of Frank Petkovich, M.D.

**Date:** May 29, 2018
**Case:** Armbruster -v- Wexford Health Sources, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
2            FOR THE SOUTHERN DISTRICT OF ILLINOIS
               EAST ST. LOUIS DIVISION
3  GERRY ARMBRUSTER,

4      Plaintiff,

5                            Cause No. 16 C 0544

6  vs.

7  WEXFORD HEALTH SOURCES, ET
   AL.,
8
       Defendants.
9
          DEPOSITION OF FRANK PETKOVICH, M.D.
10          Taken on behalf of the Plaintiff
                   May 29, 2018
11
             Jo Ann Dickson, CCR 1085
12
13  (Whereupon, the deposition commenced at 12:10 p.m.)
14
15
16
17
18
19
20
21
22
23
24
```

**Page 2**

```
1  QUESTIONS BY:                          PAGE NO.

2  Direct Examination by Ms. Grady            5
   Cross-Examination by Ms. Cook            204
3  Cross-Examination by Ms. Kinkade         207
   Redirect Examination by Ms. Grady        228
4
5              INDEX OF EXHIBITS
6  PLAINTIFF'S                          PAGE MKD.
   NO.
7
   Exhibit 1 CV                             7
8  Exhibit 2 January 2018 CV                8
   Exhibit 3 Testimony list                95
9  Exhibit 4 Report                       130
   Exhibit 5 Medical records              160
10  Exhibit 6 Medical records             189
   Exhibit 7 Letter                       197
11  Exhibit 8 4/17/18 letter              199
   Exhibit 9 Excerpt MRI image            202
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF ILLINOIS

3                 EAST ST. LOUIS DIVISION

4
5  GERRY ARMBRUSTER,

6      Plaintiff,                   Cause No. 16 C 0544

7  vs.

8  WEXFORD HEALTH SOURCES, ET
   AL.,
9
       Defendants.

10
11          DEPOSITION OF WITNESS, FRANK PETKOVICH, M.D.,

12  produced, sworn, and examined on the 29th day of May, 2018,

13  between the hours of 12:10 p.m. and 6:00 p.m. of that day,

14  at 2821 North Ballas Road, St. Louis, Missouri, before JO

15  ANN DICKSON, Certified Court Reporter within and for the

16  State of Missouri, in a certain cause now pending before

17  the United States District Court, Southern District of

18  Illinois, East St. Louis Division, wherein Gerry Armbruster

19  is the Plaintiff, and Wexford Health Sources, et. al. are

20  the Defendants.

21
22
23
24
```

**Page 4**

```
1              A P P E A R A N C E S

2  For the Plaintiff:

3  Sarah Grady
   Loevy & Loevy
4  311 N. Aberdeen Street, Third Floor
   Chicago, Illinois  60607
5  (312) 243-5900
   Sarah@loevy.com
6
   For the Defendants:
7
   Jaclyn A. Kinkade
8  Cassiday Schade, LLP
   100 North Broadway, Suite 1580
9  St. Louis, Missouri  63102
   (314) 241-1377
10  Jkinkade@cassiday.com
11
12  Telephonically for Defendant Vitale:

13  Lisa Cook
   Office of the Illinois Attorney General
14  500 South 2nd Street
   Springfield, Illinois  62704
15  (217) 782-1090
   Lcook@atg.state.il.us
16
17  The Court Reporter:

18  Ms. Jo Ann Dickson

19
20
21
22
23
24
```

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

**5**

1    IT IS HEREBY STIPULATED AND AGREED, by and
2  between counsel for Plaintiff and counsel for Defendants,
3  that the deposition of FRANK PETKOVICH, M.D. may be taken
4  in shorthand by Jo Ann Dickson, a certified shorthand
5  reporter, and afterwards transcribed into typewriting; and
6  the signature of the witness is expressly waived.
7    * * * * *
8    FRANK PETKOVICH, M.D.,
9  of lawful age, being produced, sworn and examined on
10  behalf of the Plaintiff, deposes and says:
11    DIRECT EXAMINATION
12  BY MS. GRADY:
13    Q   Good afternoon, Doctor.  Can you please state
14  and spell your name for the record.
15    **A   First name is Frank, F-R-A-N-K.  Last name is**
16  **Petkovich, P-E-T-K-O-V-I-C-H.  I'm a physician, M.D.,**
17  **orthopedic surgeon.**
18    Q   Thank you, Dr. Petkovich.  My name is Sarah
19  Grady.  I introduced myself, but I'll do it again for the
20  record.  I'm an attorney for the plaintiff in this case,
21  Gary Armbruster.
22    You've been deposed several times before, so
23  you're probably aware of the basic rules of how to go along
24  about a deposition, but I'll just go over them briefly.

**6**

1    The first is that if you have any confusion
2  about any of my questions or don't understand what I'm
3  asking, please feel free let me know and I'm happy to
4  rephrase.
5    On the flip-side, if you don't ask me to
6  rephrase my question or tell me that you're confused, I'll
7  assume that you've understood my question, okay?
8    **A   Okay.**
9    Q   The second, which you're doing a great job of
10  already, is that I ask you to keep your answers audible and
11  verbal.  So please make sure to say yes or no instead of a
12  nod or shake of the head or an uh-huh.  That way the record
13  can be clear, okay?
14    **A   Yes.**
15    Q   The third is one for both of us.  I'd ask that
16  you do your best to let me finish my question in its
17  entirety before beginning your answer, and I will do my
18  best to let you finish your answer entirely before
19  beginning my next question again.  That's so that the
20  record can be clear, okay?
21    **A   Yes.**
22    Q   Lastly, your attorneys will be objecting.
23  Well, the attorneys for the defendants may be objecting to
24  some of my questions.  But unless they instruct you

**7**

1  otherwise, you should go ahead and answer my question even
2  though there's been an objection, okay?
3    **A   Yes.**
4    Q   Do you suffer from any conditions or take any
5  medications that would interfere with either your memory or
6  your ability to provide truthful and accurate testimony?
7    **A   No.**
8    (Thereupon, Plaintiff Exhibit 1 was marked for
9  identification.)
10  BY MS. GRADY:
11    Q   You have just been handed what's been marked
12  as Exhibit 1.  This is copy of a CV produced to us by the
13  attorneys for the defendants.  Can you tell me -- can you
14  review this and tell me whether or not it's a current,
15  accurate curriculum vitae for you?
16    **A   It's not current.  I have a current copy --**
17  **this is as of July 1, 2016.  I have a current copy as of**
18  **January 1, 2018.  It's not substantially changed.  It just**
19  **goes through my educational background, practice history.**
20  **So I'll give you the new copy if you request.**
21    Q   Great.  I would love a new copy.  And I'm
22  actually going to mark it as an exhibit.  You wouldn't
23  happen to have two copies, would you?
24    **A   I do.**

**8**

1    Q   That would be fantastic.
2    **A   Do you want them both?**
3    Q   I'll keep the one that's not marked.  And I'll
4  just mark the one that you can have.
5    (Thereupon, Plaintiff Exhibit 2 was marked for
6  identification.)
7    MS. GRADY:  Okay.  For the record, Exhibit 2
8  has been marked.  That's a copy of the January 1st, 2018 CV
9  that Dr. Petkovich just handed me.  Let's go off the
10  record.
11    (Thereupon, a discussion was held off the
12  record, after which the following proceedings were had:)
13  BY MS. GRADY:
14    Q   The only difference that I see between
15  Exhibit 1 and Exhibit 2 is that you have updated your
16  certification with the American Board of Independent
17  Medical Examiners to include the year 2016 as well as 2011.
18  Is that correct?
19    **A   That is exactly -- that is correct, yes,**
20  **ma'am, because I went through the certification test again.**
21  **But you're right.  And it just goes through my educational**
22  **background, practice history.**
23    Q   Great.  I want to talk a little bit about your
24  background that you've listed here on Exhibit 2.  Can you

**9**

1  tell me what you obtained your BA in at the University of
2  Missouri at Saint Louis?
3      A   Biology.
4      Q   And that was a bachelor of arts, correct?
5      A   Yes.
6      Q   And did you go immediately to -- did you
7  enroll immediately in medical school at Saint Louis
8  University following your graduation from the University of
9  Missouri at Saint Louis?
10     A   Yes.
11     Q   After completing your M.D., you completed an
12  internship and residency.  Well, let's break them up.  You
13  completed an internship year at the University of Illinois
14  in Chicago, correct?
15     A   Yes.
16     Q   And at that time were you already enrolled as
17  a resident, or were you already planning to enroll as a
18  resident at the University of Missouri at Kansas City?
19     A   No, it was not planned at that time.
20     Q   And from my review of your CV, you completed
21  your internship year in 1974, correct?
22     A   Yes.
23     Q   And did not begin your residency until 1976,
24  correct?

**10**

1      A   Yes.
2      Q   What did you do for the two years or year and
3  some in between?
4      A   I thought I was going to get drafted.  So the
5  Vietnam war was going on at that time, and it was winding
6  down and had something called the Barry Plan which was a
7  lottery.  And so I thought I was going to get drafted.
8          I didn't get drafted.  And so what I ended up
9  doing was I lived in the Washington, DC area.  I lived in
10  the Washington, DC area through George Washington
11  University during that time where I did some emergency room
12  work.  And I also did some further training at George
13  Washington University.  So that would have been from 1974
14  to 1976.
15     Q   And your residency was focused on orthopedic
16  surgery, correct?
17     A   Yes.
18     Q   That includes all types of orthopedic surgery?
19     A   Yes, ma'am.  That includes orthopedics as a
20  specialty of medicine that deals with the musculoskeletal
21  system; i.e., the muscles, bones and joints of the upper
22  and lower extremities, and also spine conditions, including
23  cervical, thoracic and lumbar spine areas.
24     Q   During your residency did you specialize in

**11**

1  any area of orthopedic surgery in particular?
2      A   Not during my residency, because during
3  residency you rotate through all of the aspects, you know,
4  adult, pediatrics, spine, sports medicine, foot and ankle.
5  There are different divisions within orthopedics.  And part
6  of a residency program is you rotate though all of those
7  areas.  So you don't specialize in anything during
8  residency.
9      Q   Can you tell me, leaving to the side
10  pediatrics, what are the different areas of orthopedics.
11     A   Well, so basically what I've said, the
12  musculoskeletal system first.  Subspecialties in
13  orthopedics at the present time would include adult
14  reconstructive surgery, sports medicine, foot and ankle,
15  orthopedic oncology, musculoskeletal oncology, pediatric
16  orthopedics, spine.  Let's see.  I think I've -- I've gone
17  through basically -- that's basically it.  I mean, there
18  are subchapters within that, but that's basically it.
19     Q   And following -- at the time that you were a
20  resident, was the residency program for orthopedic surgery
21  four years?
22     A   It was -- it was changing to four years.  At
23  the time when I started, when I started, it was -- it was
24  two years of general surgery.  So I spent a year at the

**12**

1  University of Illinois.  So it was two years of general
2  surgery and then three years of orthopedics.
3          By the time I changed, it was -- it was one
4  and four.  So it was the same time, but the semantics were
5  changed a little bit.
6      Q   Okay.  And following your completion of your
7  residency, you at some point afterwards completed a
8  fellowship.
9          Well, let me back up.  Sorry.  After
10  completing your residency in 1980, what did you do?
11     A   I completed my residency in July of 1980.  And
12  I then went into practice, in private practice, in Saint
13  Louis, in Saint Louis, Missouri, Saint Louis, Missouri area
14  as a -- as a general orthopedic surgeon doing some spine.
15          As part of my training in Kansas City I did a
16  fair amount of spine surgery.  So as I started practice in
17  July 1980 I did some spine, but also general orthopedics.
18  And I did that for several years.  And then I went back to
19  do a spine fellowship in 19 -- let's see, I guess 1984
20  where I actually did a spine fellowship.  So I went back
21  and did a spine fellowship in New Orleans at Tulane
22  University in 1985.
23     Q   Why did you decide to enroll in a fellowship
24  program at Tulane University?

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

13

1    A   Well, because I was interested in doing spine
2  surgery.  I had been exposed to it as a resident.  And I
3  was interested in that.  And I had been in practice several
4  years.  And I was young enough at that time and didn't
5  really have any commitments where I was free to — I was
6  married, but I didn't really have any — two very small
7  children, so I was able to do that.  So I could actually,
8  you know — so I had — was fortunate in that respect.  So
9  I decided to pursue that.
10   Q   Did you maintain your private practice while
11 you were completing your fellowship?
12   A   No.  I was — I was with a group and the
13 patients stayed there.
14   Q   And when you completed your fellowship in
15 1985, you returned to the Saint Louis area, is that
16 correct?
17   A   Yes.
18   Q   And did you start a new private practice or
19 did you rejoin your old private practice?
20   A   No, I started a new practice.
21   Q   And how big was that practice?
22   A   I was in solo practice at that time.
23   Q   And was that practice that you opened the same
24 entity that you are practicing medicine with today, the

---

14

1  Petkovich Orthopedic and Spine Care?
2    A   No.  When I started practice — when I
3  finished my fellowship, I returned to Saint Louis and
4  opened my own practice, solo practice.  I continued at that
5  capacity for a number of years, solo practice.  And then in
6  1993 I joined another group called Orthopedic Associates,
7  which is now about a ten-man orthopedic group in the Saint
8  Louis area.
9        And I was part of that group for about eight
10 years.  During that period of time I still did some general
11 orthopedics, but I was doing primarily spinal surgery.  And
12 then that group went through some changes in 2001.  They
13 went though some changes.  They moved away from the
14 hospital and they were trying to transition more to
15 outpatient surgical procedures.
16        So my doing spine surgery, I really couldn't
17 do that at the time.  So when they moved, I stayed back.
18 And I stayed back and went back into solo practice.  And
19 then I, after — after several years, then I used the name
20 Petkovich Orthopedic and Spine.
21        So I think the word Petkovich Orthopedic and
22 Spine, as I recall, has only been — it's been in existence
23 since 2007.
24   Q   And are you in solo practice today or are

---

15

1  there additional doctors affiliated with your --
2    A   No, I'm in solo practice.
3    Q   And as of today, do you perform exclusively
4  spinal surgery or do you also perform general orthopedic
5  surgery?
6    A   I'm not doing any spine surgery as of now, for
7  about the past four to five years.  Because of an issue
8  with my eye for which I've had several surgical procedures,
9  I stopped doing spine surgery.  And since that time I've
10 had primarily an office based practice doing some very
11 limited non-spinal minor procedures.
12        So for the past four to five years I've had
13 primarily an office based practice for the reasons I've
14 said and I'm presently not doing any spine surgery.
15   Q   Okay.  I'm going to break that down.  When was
16 the last time you performed spinal surgery?
17   A   I can't give you a specific answer because I
18 don't — I don't know exactly the last time.  I — I don't
19 know the date of the last time.  I had some issues with my
20 eye, which I mentioned, for which I had several surgical
21 procedures.  And that went on starting about 10, 12 years
22 ago.  So I cut back for a period of time.  I started back
23 up.
24        So I don't know the exact date of the last

---

16

1  surgical procedure, last spine surgical procedure I
2  performed.  It was more than five years ago, somewhere in
3  that ballpark, but I don't know the exact date.
4    Q   Okay.  So that would have been sometime around
5  2013 or so, right?
6    A   Well, I don't know exactly.  It may be — it
7  may have been before then.  I don't have an exact date,
8  ma'am, for the reasons I said.
9    Q   Between -- that's fine.  Between 1985 and 1993
10 when you joined the group, Orthopedic Associates, were you
11 performing general orthopedic surgery or were you focused
12 primarily on spine surgery?
13   A   From 1985 to 1993, I was still doing some
14 general orthopedics, but I was doing more and more spine
15 surgery.  And then after I joined the group in 1993, I was
16 doing — I was part of a ten-man group where I was the only
17 person doing spine surgery in that group.
18        And so at one point in my practice it became
19 as high as 85, 90 percent spine related.  It was never 100
20 percent spine related because I didn't want it to be.  But
21 it was up to 85, 90 percent spine related.
22   Q   And you left that group in approximately 2001?
23   A   Yes.  I didn't really leave that group.  They
24 left and moved.

---

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

17

1    Q   I understand.  So in 2001 or thereabouts when
2  you began -- when you returned to solo practice, were
3  you -- what was the breakdown between spine surgery and
4  spinal related issues and other general orthopedic issues?
5    A   It was still primarily spine related, because
6  I had done so much spine surgery as part of that big group,
7  and that's what -- that's what pretty much my referral base
8  consisted of.  So after they moved away in 2001, I still
9  probably, you know, 80 -- 80 plus percentage of my practice
10  was still spine related.
11    Q   And back during that time frame before you
12  began ramping down due to the medical issue that you
13  described, approximately how many spinal surgeries would
14  you perform in a typical year?
15    A   I was doing three to four spine procedures per
16  week.  So that would be three to four per year, you know.
17  Maybe 200 a year.  175, 200 a year.  Sometimes more.
18    Q   And you said that when you began ramping down
19  and then stopped performing any spine surgeries that you
20  run an office based practice.  Can you tell me what that
21  practice consists of?
22    A   Yes.  So my practice now, as I said, is
23  primarily an office based practice.  What that consists of
24  is seeing people in the office, patients in the office,

---

18

1  general orthopedic conditions and spine related conditions
2  for -- for general orthopedic consultations, evaluations,
3  etc., etc.  Some old patients, etc.
4         And as part of my practice now, probably 15 to
5  20 percent of my practice is includes performing
6  independent medical evaluations and/or record reviews.
7    Q   How do patients come to you, leaving to the
8  side independent medical examinations or records review,
9  which we'll get to in a minute, how do patients come to
10  you?  Are they typically referred by another provider?
11    A   Partially.  They're referred to me by -- I've
12  been in practice 38 years, so I've been around a long time.
13  I've got a reputation, a good reputation, I think, where
14  people come to me.  So I see a lot of old patients.
15    I see -- I'm a former president of the Saint
16  Louis Orthopedic Society.  I see a lot of -- what I
17  presently see are a lot of complex patients seeking --
18  seeking opinions, seeking second and third opinions that
19  have nothing to do with workers' compensation or
20  medicolegal.
21         So I see a lot of patients in my practice now
22  referred by other physicians, family members, etc., etc.,
23  seeking second and third opinions.
24    Q   Opinions about what course of treatment is

---

19

1  appropriate?
2    A   Yes.
3    Q   And as part of your office based practice,
4  what percentage today are your -- again, leaving to the
5  side the independent medical examinations and the record
6  reviews that you do for legal cases, what percentage of
7  your patients are seeking opinions related to spinal issues
8  as compared to the percentage of patients that are seeking
9  opinions related to general orthopedic issues?
10    A   You know, I don't know that -- I really never
11  thought about that.  As you asked the question I was
12  anticipating what you were going to ask me.  I would say
13  it's roughly 50/50.  I see a lot of -- I see a lot of
14  people now with spine related conditions for opinions.  But
15  I also see people with other extremity conditions seeking
16  opinions.
17    Q   And can you tell me in the past few years
18  since you've stopped performing surgery, what types of
19  spinal issues patients have come to you seeking second or
20  third opinions about?
21    A   Presently -- presently cervical conditions,
22  thoracic conditions, lumbar conditions.  People coming in
23  with issues as far as disc herniations, stenosis, which
24  means narrowing of the spinal canal, infection, tumors.

---

20

1  You know, all -- it keeps going on and on.
2    Q   And are the opinions that they're seeking
3  about whether surgery is appropriate or not?
4    A   Sometimes.  Sometimes I'm seeing them to ask
5  my opinion whether or not they think surgery is
6  appropriate.  Sometimes they just want an opinion as to
7  what -- what is causing their issue.  They're looking
8  for -- seeking a diagnosis.
9    Q   As part of your office based practice that you
10  have been maintaining since stopping spinal surgery, do you
11  receive referrals from other orthopedic surgeons to perform
12  the follow-up care for patients who have recently undergone
13  surgery?
14    A   No.  I don't -- I don't typically see people
15  in follow-up after other surgeons have recently done
16  surgery.  Most of the time when people have surgery they
17  follow-up with whoever performed the surgery.  So I don't
18  see people in follow-up.
19         I've seen people in follow-up maybe a year or
20  so after someone else has performed surgery for maybe a
21  patient is unhappy or they're not getting the result they
22  anticipated, they want to get another opinion.  So I see
23  people in follow-up like that, but not immediately post-op.
24    Q   You used some words that I just want to make

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

21

1  sure get defined.  You said that when you're seeing
2  patients in your office based practice, they are coming to
3  you with sometimes cervical issues.  Can you explain what
4  that word means.
5      **A   So cervical is the neck.  So the cervical**
6  **spine are the -- is the portion of the spine between the**
7  **bottom of the head, so the bottom of the skull, to the top**
8  **of the thoracic spine, which is the ribcage area.**
9      Q   And when you say they're coming to you for
10  cervical issues, are you referring to the -- well, strike
11  that.  Let me back up.
12      It's my understanding -- and you're the
13  expert, so please explain how I'm misunderstanding this.
14  There is the spine which is compromised of bones separated
15  by the cartilaginous discs.  And then immediately adjacent
16  to that is the spinal cord which is a bundle of nervous
17  tissue.
18      Is that consistent with your understanding as
19  an orthopedic surgeon about what the spine versus the
20  spinal cord is?
21      **A   So the cervical spine, as you stated, okay, is**
22  **a group of seven vertebra.  So you have the skull, the**
23  **occiput, and then you have the seven cervical vertebra.  So**
24  **there are the bony vertebral bodies.**

---

22

1      **In between those vertebral bodies, you have**
2  **the disc, the intervertebral disc.  So the anatomy of the**
3  **disc, which I'm sure you know, I always explain to people**
4  **is like a jelly doughnut.  You have the central gelatinous**
5  **portion called the nucleus pulposus.  You have the outer**
6  **fibrous ring called the annulus fibrosus.  So the analogy,**
7  **a jelly doughnut.  The nucleus is like jelly.  The annulus**
8  **fibrous is like the dough.  And that's a cushion between**
9  **the vertebra.  So that's the basic anatomy of the vertebra**
10  **and the disc.**
11      **And then in the back of the vertebral bodies**
12  **you have the spinal canal.  And through the spinal canal**
13  **the spinal cord goes.  So in the cervical spine the spinal**
14  **cord goes.**
15      **Now, let's say the spinal cord is just a bunch**
16  **of nerves is really not correct.  The spinal cord is really**
17  **an extension of the brain.  So the spinal cord is an**
18  **extension of the brain.  And the spinal cord goes through**
19  **the cervical portion of the spine.  It goes through the**
20  **thoracic portion of the spine.  And then the spinal cord**
21  **ends at the bottom of the thoracic, upper lumbar area.**
22      **At the bottom of the spinal cord you have, all**
23  **the nerve roots come together and there's something called**
24  **the cauda equina, and those spread out forming the lumbar**

---

23

1  **nerve roots.  So the spinal cord ends at approximately**
2  **T12-L1.**
3      Q   Well, let me ask you this, when you were
4  performing spinal surgery, did your spinal surgery include
5  surgery on the spinal cord?
6      **A   Yes.  I -- I performed surgery -- I performed**
7  **surgery on the spine and the -- all the material around the**
8  **spinal cord as part of a spine surgeon.  As far as doing**
9  **intra-spinal cord surgery, I did not perform.  And that**
10  **would be something like spinal cord tumors, such as that, I**
11  **did not perform that.  That's something that a neurosurgeon**
12  **would do.**
13      **So I did -- I did surgery affecting the spinal**
14  **cord, but I did not do specific procedures on the spinal**
15  **cord.**
16      Q   Okay.  And if I understand your testimony
17  correctly, it is a neurosurgeon who is qualified to perform
18  those intraspinal cord surgeries, correct?
19      **A   Yes.**
20      Q   And not an orthopedic surgeon, correct?
21      **A   Yeah.  That's basically correct.  I mean, a**
22  **neurosurgeon performs surgery on the brain and on the**
23  **spinal cord itself for, you know, spinal cord tumors**
24  **affecting the cord itself, yes.  They do other things also,**

---

24

1  **but that's part of their domain, what I said.**
2      Q   Did you perform neurosurgery as part of your
3  internship or residency?
4      **A   Yes.**
5      Q   Tell me about that.
6      **A   Well, those are -- those are rotations.  Those**
7  **are rotations rotating through your -- rotating through**
8  **your internship.  You rotate through all the different**
9  **surgical subspecialties.  And as part of an orthopedic**
10  **residency you're working, on some occasions you're working**
11  **with neurosurgeons.  So that's just all part of training.**
12      **Since I've been in practice since 1980, I've**
13  **also worked a lot with neurosurgeons, so a lot of times**
14  **some of the complex spine procedures where an orthopedic**
15  **surgeon and a neurosurgeon will work together on a**
16  **procedure.  So I've worked, you know, even up until I**
17  **stopped doing spinal surgery, I worked with neurosurgeons**
18  **extensively.**
19      Q   Okay.  And we'll get to your experience in
20  your private practice.  I just want to start with your
21  education.
22      Other than the rotation that you performed in
23  neurosurgery, that would have been as part of your
24  internship year at the University of Illinois in Chicago,

---

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

25

1 right?

2      A   Yes.  Now, as far as I don't remember

3 whether -- I don't remember specifically rotations at the

4 University of Illinois Hospital at that time.  But the

5 answer is those are specific rotations you go through.  I

6 don't remember exactly.  The program has changed some since

7 that time.

8          So I remember being exposed to neurosurgery.

9 I'm not really sure exactly what the specific rotations

10 were at that time.  It used to be you could a take a month

11 of different subspecialties, but that's changed.

12      Q   Okay.  Are there any subspecialties in spinal

13 surgery?

14      A   Yes.

15      Q   Tell me about those.

16      A   Well, you can go on and on.  I mean, you

17 could -- and you could do -- I mean, there are some people

18 in spinal surgery that can exclusively do nothing but

19 cervical spine surgery.  There are some people that do, you

20 know, pediatrics, pediatric spine.  There are some people

21 that will do deformity type surgery.

22          So there's like -- there's aspects of spinal

23 surgery that deal with degenerative conditions.  There's

24 aspects of spinal surgery that will deal with more of

26

1 deformity type procedures, deformity being scoliosis,

2 scoliosis deformities, kyphotic deformities, etc., etc.  So

3 there's many different subspecialties within spine surgery.

4      Q   And is there any subspecialty that deals

5 exclusively or primarily with spinal cord compression?

6      A   I would say in all -- no.  I think that all

7 aspects of spinal surgery, spinal cord compression is part

8 of that.  Spinal cord, spinal canal stenosis, compression,

9 that's part of all of the -- all of what I said.

10      Q   And you use the word stenosis.  That's a

11 narrowing of the spinal cord space or a narrowing of the

12 spinal cord itself?

13      A   So stenosis means narrowing.  So stenosis

14 means narrowing of the canal.  It doesn't mean -- it

15 doesn't mean narrowing of the spinal cord.  Stenosis can

16 cause compression and narrowing of the spinal cord.  But

17 stenosis itself means narrowing, canal stenosis.

18      Q   And are you -- do you have any -- do you

19 consider yourself to have any subspecialty within the field

20 of spinal surgery at any point in your career?

21      A   I did.  When I was doing a lot of spine

22 surgery I was doing primarily adult -- adult reconstructive

23 spine surgery.

24      Q   Tell me what that means.

27

1      A   That means dealing with adults with problems

2 with degenerative conditions in the cervical, thoracic or

3 lumbar spine, including disc herniations, degenerative

4 disc, degenerative arthritis in the spine, spinal canal

5 stenosis, etc., etc.  So those are all adult degenerative

6 conditions, etc.

7      Q   You use the phrase disc herniation several

8 times.  Can you explain for the record what that means?

9      A   Okay.  So the the word hernia means violation

10 of a border.  And so the word hernia means violation of a

11 border.  So I already explained anatomically the anatomy of

12 a disc.  What a disc herniation means is a violation of

13 the -- of the nucleus pulposus beyond or through the

14 annulus fibrosis.  And it's a very -- it's a very broad

15 term.  The word -- and I use the word herniation to you

16 just to get my point across.

17          But the word herniation is probably, it is an

18 overused word, because now you can use -- like I defined to

19 you what a herniation is, any kind of herniation, being a

20 groin herniation or a spine herniation, that's what

21 herniation means, which I've defined.

22          And you can use the argument that any

23 degenerative disc has an element of herniation in it, which

24 is true.  So you can say that anybody with degenerative

28

1 disc disease has some element of herniation.  So I hope

2 I've answered your question.  But that's what the word

3 herniation means.  So it's using the word protrusion,

4 herniation pretty much interchangeable.

5      Q   I think it has, but let me tell you what my

6 understanding of a disc herniation is and then you can tell

7 me if that's inaccurate.  My understanding of a disc

8 herniation is that the disc is no longer located in a place

9 where it should be located, that it has protruded in one of

10 many different directions outside of its normal alignment

11 between the vertebra.  Is that consistent with your

12 understanding of the medicine?

13      A   That's part of it.  But, again, so I

14 defined -- I defined the anatomy of a disc.  So all of us

15 really in our early 20's start to develop some degenerative

16 disc changes, degenerative disc disease.  So what that

17 means is we all age in our early 20's.  Babies have a high

18 water content in their disc.  And people in their early

19 20's start to develop some desiccation or drying of the

20 disc.

21          So with that, they lose a little bit of water

22 content.  The annulus fibrosis starts to bulge a little bit

23 and you start to get a little bit of protrusion there.  And

24 that's just very, very early degenerative disc changes,

---

**29**

1 period.

2     Now, with that -- with that, you can start to

3 get a little bit of degenerative changes in the annulus

4 fibrosis where they're starting to protrude a little bit.

5 And some people would argue that that's -- some people

6 would say that's an early herniation. I don't consider

7 that a herniation. Most spine surgeons wouldn't consider

8 that a herniation. So -- but -- but from a matter of

9 semantics, somebody could argue that.

10     What I consider a herniation is beyond the

11 borders, where the disc is actually protruded out, outside

12 the borders of the annulus fibrosis. And that's what I

13 consider a disc herniation.

14    Q  Okay. Using your terminology as you've just

15 explained it, you agree that a herniated disc can protrude

16 from the annulus fibrous in a number of different

17 directions, correct?

18    A  Yes.

19    Q  Can you explain the different ways that the

20 protrusion can occur?

21    A  Well, it can -- so you have the, anatomically

22 you have the cervical spine, and you have the disc between.

23 And then right in back of that you have the canal. It's

24 like a pipe, okay. And so the disc can protrude. And you

**30**

1 can have just a little bit of a bulge, which is really many

2 times of no clinical significance. They're very common.

3 So it can protrude a little bit directly posteriorly, in

4 the back. It can protrude off to one side or the other or

5 both.

6     So and I mean a minor protrusion is, as I

7 mentioned, part of early degenerative disc changes are

8 very, very common. And we're starting to see people in

9 their early 20's.

10    Q  Right, I understand. I'm just trying to lay

11 the foundation of what a disc herniation is and where it

12 can occur. So I understand there are different degrees of

13 herniation that can occur and we'll get to that and what it

14 means for treatment.

15     But you say the herniation can occur

16 posteriorly, and that's toward what?

17    A  Just going directly in the back. So posterior

18 means back. So it's going directly in the back as opposed

19 to the side.

20    Q  And is there a term that refers to a

21 herniation that occurs from the side?

22    A  So going directly posteriorly would be like a

23 central bulge, central protrusion. To the side it could be

24 posterior or lateral.

**31**

1    Q  And does it ever protrude anteriorly?

2    A  No.

3    Q  Okay. Posteriorly protrudes into the spinal

4 canal, is that correct?

5    A  Yes.

6    Q  And can you tell me -- understanding again

7 that there are degrees of protrusion, can you tell me what

8 impact that has on the rest of the body?

9    A  Well, it depends upon, you know, what level

10 we're talking about, the cervical spine, the thoracic spine

11 or the lumbar spine.

12    Q  Well, let's focus on the cervical spine.

13    A  Okay. So if it would protrude -- so in the

14 cervical spine, you have the spinal -- the spinal canal has

15 the spinal cord, which as I said is an extension of the

16 brain. Off the spinal cord you have the cervical nerve

17 roots.

18     So if a -- if a disc protrusion could -- could

19 protrude back and impinge upon the spinal cord or it could

20 protrude off to the side and impinge on a nerve root into

21 the, what are called the foramen, which the foramen are the

22 sleeves where the nerves come out and go through.

23    Q  And so a herniated disc, a posteriorly

24 herniated disc causes stenosis of the spinal canal, is that

**32**

1 correct?

2    A  A posteriorly herniated disc could cause some

3 decreased size of the spinal canal and could cause some

4 stenotic changes in the canal, yes, that's possible.

5    Q  But my understanding of the term stenosis is

6 narrowing.

7    A  That's right.

8    Q  And so the degree of the herniation will cause

9 a greater degree of stenosis. But any posteriorly

10 herniated disc causes some degree of stenosis of the spinal

11 canal, correct?

12    A  Everything you said is true except many times

13 bulges are very, very small that they don't cause any

14 stenosis, because remember, so you have the spinal cord.

15 Then around the spinal cord you have the layers. You have

16 the arachnoid layer around the spinal cord and then you

17 have the dura, the outer layer. And then underneath the

18 dura you have the cerebral spinal fluid. So those are all

19 like a cushion. And so the spinal cord itself floats

20 inside that sheath there surrounding it.

21     And everybody is different. Some people have

22 very large spinal canals. Some people have smaller spinal

23 canals. So the posteriorly bulging disc in some cases

24 doesn't cause any stenosis because if somebody has a very

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

**33**

1 large canal.

2      Does that make sense?

3      Q   I think it does, but I want to make sure that

4 I'm understanding these terms as you use them.  The spinal

5 canal is the house in which the spinal cord, the arachnoid

6 layer, the dura and the cerebral spinal fluid all are

7 encased, correct?

8      A   That's correct.

9      Q   And so I understand then, every patient will

10 have a different amount of all of those things as I've just

11 described, and so herniation may not necessarily cause

12 spinal cord compression, it may not even reach the spinal

13 cord, all of those things are true.

14      But my understanding is that stenosis of the

15 spinal canal itself just refers to anything which decreases

16 the circumference or diameter of the house.  And it's my

17 understanding that any degree of herniation of a disc in

18 the cervical level would cause stenosis of the spinal

19 canal, correct?

20      A   And I think you're right.  I mean,

21 theoretically you're right.  If you have the disc there,

22 any bulge of the disc, it may be microscopic, but

23 theoretically any bulging of the disc by definition going

24 into that canal would decrease the volume of that canal

**34**

1 somewhat.

2      Q   And so it's your testimony that some degree of

3 posterior disc herniation may have no impact on the spinal

4 cord itself because it may not even reach the spinal cord,

5 is that correct?

6      A   Yes.

7      Q   Some degree of -- but posteriorly herniated

8 discs may cause spinal cord compression, correct?

9      A   Yes, they could.

10      Q   And what other than disc herniations -- strike

11 that.

12      Spinal cord compression is caused by posterior

13 disc herniation.  What other types of issues can cause

14 spinal cord compression in the cervical level?

15      A   Tumors, infection, fractures.  Let's see.

16 Tumor, infection, fractures.  Degenerative disc disease,

17 osteophytes, bone spurs.  All of those -- all of those

18 conditions could cause some compression on the spinal

19 canal.

20      Q   And all of those things -- would you agree

21 with me that all of those things have in common the

22 presence of a foreign body in the spinal canal?

23      A   Well, I don't know that I would use the

24 expression foreign body.  I mean, I think that -- you know,

**35**

1 obviously a tumor, an infection, bone spurs, all of those

2 can encroach upon the spinal canal.

3      Q   But I guess what I mean by that is even a

4 fracture would be the presence in the spinal canal of a

5 vertebrae or other bone that's not supposed to be in the

6 spinal canal?

7      A   That is true, yes.

8      Q   Okay.  So tell me then -- we've gone through

9 anatomically what happens when there's a posterior disc

10 herniation.  Can you tell me when there is a posterior disc

11 herniation or the presence of something else that causes a

12 compression of the spinal cord at the cervical level, what

13 symptoms do patients typically in your experience exhibit

14 or complain about?

15      A   Well, so we're talking about your -- your

16 questions are all about -- you're talking about the spinal

17 cord, you're not talking about cervical nerve roots,

18 because most of the time when you see people they'll have

19 symptoms consistent where a nerve root is being irritated,

20 like extremity pain, numbness, tingling, extremity pain,

21 etc.

22      As far as, typically as far as the spinal cord

23 is concerned, most of the time with a small bulge people

24 don't have any symptoms.  They would not have any symptoms

**36**

1 with regard to a compression on the spinal cord until they

2 had some significant compression.

3      I'm not sure I answered your question.  So if

4 you'll repeat it, I'll try to answer it more thoroughly.

5      Q   Well, I think that maybe phrasing it in a

6 different way might help.  So do you agree that a patient

7 suffering from spinal cord compression will not typically

8 experience pain at the site of the compression itself?

9      A   Yes.

10      Q   Do you agree that a patient with spinal cord

11 compression -- strike that.

12      Do you agree that a patient with cervical --

13 strike that.

14      Do you agree that a patient with spinal cord

15 compression at the cervical level could nevertheless have

16 full range of motion of the C spine?

17      A   Yes.

18      Q   Okay.  So for purposes of my question I sort

19 of want us to hypothetically work backwards.  And I

20 understand that as a doctor typically you'll see a patient

21 and you won't necessarily know what's wrong with them.

22 You'll listen to their complaints.  You'll work them up,

23 including imaging if appropriate.  And eventually you'll

24 come to a diagnosis and make a decision to treat.

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

37

1    I want us to assume for the current moment
2  that we already know that this patient who's appearing
3  before you has spinal cord compression, and if it helps, to
4  assume that they have significant spinal cord compression.
5    What I'm trying to understand is simply how
6  does that manifest in the patient in terms of the symptoms
7  that they would feel or report?
8    **A   Well, if someone had significant cervical**
9  **spinal cord compression, you would expect to have -- you**
10 **would expect them to then have some neurologic findings,**
11 **some difficulty walking, some difficulty as far as**
12 **dexterity of their upper and lower extremities, period.**
13    Q   Could a patient -- could a patient with
14 significant spinal cord compression manifest a numbness or
15 tingling of the extremities?
16    **A   You could get some numbness and tingling.**
17 **That typically involves a peripheral nerve being irritated.**
18 **But with spinal cord compression -- okay.  With cervical**
19 **spinal cord compression, you could get some radicular**
20 **symptoms, some nerve root irritation, some numbness and**
21 **tingling, yes.**
22    Q   You just used a phrase radicular.  Can you
23 explain that to us.
24    **A   Radicular means a shooting type pain.  So**

38

1  **typically if someone would have a spinal cord compression**
2  **in the cervical area, if they would have that, they would**
3  **have some compression on the spinal cord, but also as I**
4  **mentioned earlier, the nerve roots come off of that.  So**
5  **they may also have some compression of that nerve root over**
6  **that supplied area and have some symptoms.**
7    **So radicular means a shooting type pain like**
8  **an extremity type pain secondary to the nerve being**
9  **irritated.**
10    Q   From an anatomical standpoint, can significant
11 spinal cord compression cause nerve root compression?
12    **A   The spinal cord -- the nerves come out of the**
13 **spinal cord.  So just compression of the spinal cord itself**
14 **does not -- does not irritate the nerve root.  But the**
15 **point being is there's -- there's only so much room there.**
16 **Most the time if you have enough spinal cord compression,**
17 **whatever is compressing it, is also going to compress over**
18 **the nerve root that's coming off of that.**
19    Q   Okay.  And with nerve root compression, I
20 think you described this already, but typical presentations
21 of that in terms of the symptoms a patient would suffer or
22 report are extremity pain, numbness and tingling, is that
23 correct?
24    **A   Yeah, numbness, tingling, weakness in an**

39

1  **extremity.  Those could all be part of radicular symptoms.**
2    Q   And radicular -- this is the one phrase that I
3  will admit I really struggle with.  Does radicular refer to
4  the fact that it's caused by the compression of a nerve
5  root?
6    **A   Yes.**
7    Q   Okay.  Do you agree that spinal cord
8  compression is a serious medical condition?
9    **A   It can be, but sometimes it isn't.**
10    Q   Tell me the circumstances in which it is not a
11 serious medical condition.
12    **A   If it's -- if there's minor spinal cord**
13 **impingement -- we're talking about the cervical spine.  So**
14 **if that's minor spinal cord bulging or compression with no**
15 **neurologic findings, that's really of no clinical**
16 **significance.  Those are very, very common findings.**
17    Q   When you say that's a very, very common
18 finding, you're referring -- what are you referring to?
19    **A   I'm sorry.  So I'm referring to -- I'm**
20 **referring to degenerative -- we're talking cervical spine.**
21 **We're talking about degenerative cervical disc conditions**
22 **where you have some cervical disc bulging, perhaps some**
23 **mild herniation where it's going into the cervical spinal**
24 **canal.  Those are all very, very common conditions.  And**

40

1  **many, many times those are of no clinical significance.**
2    Q   Okay.  And you used the -- in defining a non
3  or a mild case, you said that that would occur if there was
4  minor spinal cord impingement with no neurological
5  findings.  Can you explain what you mean by neurological
6  findings?
7    **A   Yes, yes.  If someone had, you know, as far as**
8  **numbness, tingling, weakness in an extremity, difficulty**
9  **walking, difficulty with extremity dexterity, those would**
10 **all be things that would concern me, but -- period.  But**
11 **just -- just having, you know, a minor -- a minor or having**
12 **a bulge with some occasional discomfort, maybe a little bit**
13 **of occasional numbness and tingling, it goes away, that**
14 **would not necessarily concern me.**
15    Q   Okay.  So a patient who has some mild degree
16 of spinal cord impingement with no neurological symptoms,
17 in that circumstance they may have a spinal cord
18 compression but it is not a serious medical condition,
19 correct?
20    **A   Yeah.  They may have some spinal cord**
21 **compression with what I said, but that would not be what I**
22 **described as a significant medical condition.**
23    Q   Are there any other circumstances in which
24 spinal cord compression would not be considered in your

41

1  opinion a serious medical condition?
2      A  Well, what I said was very broad.  So, I mean,
3  that's -- I mean, so compression of the spinal canal,
4  spinal cord, what I said encompasses a broad spectrum,
5  okay.  So that's -- now -- period.
6          Now, there are obviously many other things --
7  there are other things that can cause significant spinal
8  cord compression that are -- that are problems.  You know,
9  fractures, dislocations, subluxations, again, tumors,
10  infections all causing a compression of spinal cord issues.
11  Severe, you know, narrowing secondary to progressive facet
12  joint disease, degenerative changes, or even an acute large
13  soft disc herniation causing compression.  So those could
14  all be possible problems of concern.
15      Q  Right.  And I understand that.  I understand
16  that this is a large universe of people who would have
17  minor spinal cord impingement with no neurological
18  symptoms.  I just want to make sure that I'm understanding
19  that that broad universe is the only universe in which in
20  your opinion spinal cord compression is not a serious
21  medical condition.  So let me try and restate it again so
22  we can make sure that we're on the same page.
23          Are there any circumstances other than minor
24  spinal cord impingement with no reported neurological

42

1  symptoms that -- strike that.
2          Other than minor spinal cord impingement with
3  no neurological symptoms, are there any other circumstances
4  which in your opinion renders spinal cord compression not a
5  serious medical condition?
6          MS. KINKADE:  Objection to form, misstates the
7  testimony.
8          THE WITNESS:  I'm not sure that I totally
9  understand your question, but I think everything I said.
10  And to even get beyond that, there are many times where
11  even, you know, even more than mild compression is of no
12  clinical significance.  So there's some times people can
13  have a large spinal canal can have some significant bulging
14  there with a normal neurologic examination which there's
15  really nothing to do for that.  So it's all relative.
16  BY MS. GRADY:
17      Q  You agree that the presence or absence of
18  neurological symptoms are the critical factor in
19  determining whether spinal cord compression is a serious
20  medical condition?
21      A  Yes.
22      Q  And in the course of your career, have you
23  diagnosed a patient with spinal cord compression?
24      A  Yes, many times.

43

1      Q  Can you give me an estimate of how many times
2  you've diagnosed a patient with spinal cord compression?
3      A  Thousands.  I've been in practice for 38
4  years.  I've seen -- I've seen many, many, many people with
5  an element of spinal cord impingement with some compression
6  of the spinal cord.  So that's thousands.
7      Q  How many patients have you seen where you have
8  diagnosed a spinal cord compression that in your opinion as
9  a doctor required treatment?
10      A  How many times?  Many times there too.  People
11  with -- people with fractures, cervical fractures,
12  subluxations.  People with severe degenerative disc disease
13  with -- with spinal canal compromise causing stenosis and
14  neurologic findings.  People with acute soft disc
15  herniations.  So I've seen all of those conditions in
16  people that required treatment.
17      Q  And, again, when you say neurological
18  findings, you're referring to the numbness, tingling,
19  difficulty walking, weakness, and other symptoms that we
20  discussed earlier, correct?
21      A  Yes.
22      Q  And subluxation, what is that?
23      A  Subluxation means -- you know what a disc
24  dislocation is.  So if a joint separates, that's a

44

1  dislocated.  Subluxation means it kind of rocks back and
2  forth.  So subluxation is a -- is almost like a disc
3  dislocation.
4          In the cervical spine, you think about it as
5  far as like facet joints.  The facet joints are little
6  joints in the back of the spine.  And sometimes the facet
7  joints can start to sublux and cause some compression on
8  the spinal canal.
9      Q  Have you ever diagnosed a patient with spinal
10  cord compression caused by disc herniation?
11      A  Yes.
12      Q  How many times has that happened?  And, again,
13  let me restrict my question.  How many times in the course
14  of your career have you diagnosed a patient with spinal
15  cord compression caused by a posteriorly herniated disc
16  that in your opinion required treatment to address?
17      A  Many times.  Again, there are -- there are
18  many -- we're talking about there are many types of
19  cervical disc herniations, whether they be central,
20  posterior or lateral, or a combination of all of the above.
21  There are many types of cervical disc herniations.  And
22  many times they cause some nerve root compression going off
23  to the side.  Many times they will cause some compression
24  of the spinal canal, sometimes with some spinal cord

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

45

1  compression.

2       So spinal cord compression is referred to as
3  myelopathy, where the spinal cord is being compressed. So
4  that's -- it's not uncommon with the conditions I
5  mentioned.

6       Q  What is the treatment for spinal cord
7  compression if in your opinion it does warrant treatment?

8       A  If it does -- if it does warrant treatment,
9  the treatment is to decompress the spinal canal.
10 Decompress the spinal canal means to take the pressure off
11 the spinal canal, to open it up. I always explain it to
12 people, you take like a pipe. And if you have a pipe
13 that's filled with calcium deposits. And you think of the
14 pipe as being the spinal canal and the calcium deposits
15 causing the stenosis.

16      So you go in there and you open the pipe up to
17 free everything up to let it breathe. When someone has
18 spinal cord stenosis for whatever reason, you're opening
19 that up to increase the size of the canal.

20      Now, it depends on what's causing the
21 stenosis. If the stenosis is just caused from degenerative
22 changes, bone spurs, etc. etc., you decompress the canal,
23 you free up all the nerves, etc.

24      Q  Let me just shortcut you there, because I

46

1  think my question was a general one. Do you agree that
2  spinal cord compression that does require treatment, the
3  treatment must be surgical?

4       A  Yes.

5       Q  And we've also talked about nerve root
6  compression today. Do you agree that nerve root condition
7  can be -- excuse me.

8       Do you agree that nerve root compression can
9  be a serious medical condition?

10      A  It can be, yes.

11      Q  And do you agree that that like spinal cord
12 compression turns on the presence or absence of
13 neurological symptoms?

14      MS. KINKADE: Objection to form, misstates his
15 testimony.

16      MS. GRADY: Yeah, the form was a bad one, so
17 let me rephrase that.

18 BY MS. GRADY:

19      Q  Do you agree that for nerve root compression,
20 the seriousness of that condition, like spinal cord
21 compression, turns on the presence or absence of
22 neurological symptoms?

23      MS. KINKADE: Same objection.

24      THE WITNESS: It could cause some neurologic

47

1  symptoms depending upon the degree.

2  BY MS. GRADY:

3       Q  And the presence or absence of neurological
4  symptoms is the important factor in determining whether
5  treatment is required?

6       A  Well, that's partially true. But you're using
7  the word symptoms. So people could have neurological
8  symptoms from a number things. So people can have
9  neurological symptoms, as you know, just from being -- like
10 we were talking about the cervical spine, just from a nerve
11 being a little bit irritated by some swelling, some edema
12 there. They could have a little bit of a bulge there
13 that's irritating a nerve root. So all of those things
14 could cause some neurological symptoms, many times just
15 some transient symptoms that will go away.

16      Q  And what you're saying is that just the fact a
17 patient has neurological symptoms doesn't mean he has nerve
18 root compression, correct?

19      A  No, that's right. Depending on what kind of
20 neurologic symptoms you're talking about. People can have,
21 I mean as an example, numbness and tingling. It could be
22 from a lot of things. It could be from holding your arm
23 over the chair in the wrong position, sitting at a desk
24 with your arm pressed against the table. I mean, there a

48

1  lot of things that cause neurologic symptoms that they go
2  away.

3       Q  Okay. Understood. But -- strike that.

4       Can you tell me when a patient reports --

5  strike that.

6       We talked about your experience operating on
7  disc -- herniated discs, and you testified that you have
8  done that quite frequently in your career, correct?

9       A  Yes.

10      Q  Have you performed surgery on a patient who's
11 been diagnosed with spinal cord compression in the course
12 of your career?

13      A  Yes.

14      Q  Can you tell me how many times you've done
15 that?

16      A  Well, again, many times, because spinal cord
17 compression can come from all the things we talked about.
18 So, you know, just, you know, most -- many times people
19 with severe multilevel degenerative cervical disc disease
20 will have some spinal canal compromise, some spinal cord
21 compression, many times some myelopathy that will need to
22 have some surgical treatment. That's very common.

23      Q  Okay. And how many times in the course of
24 your career have you operated on a patient with a

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

49

1 compressed spinal cord who was suffering neurological
2 symptoms?
3   A   Many times, again, for the reasons I said,
4 many times where people, you know, had -- had conditions
5 where the spinal canal was being compressed -- the spinal
6 canal was being compromised and you're getting some
7 compression on the spinal canal and/or the nerve roots,
8 that something that needed to be done surgically.
9       Q   In this case the spinal cord compression
10 surgery, which I know goes by a technical name, but the
11 surgery performed to address the spinal cord compression
12 was performed by a neurosurgeon.  Do you agree that
13 neurosurgeons are qualified to perform the types of surgery
14 required to address spinal cord compression?
15   A   Yes.
16       Q   And is it your opinion that you would have
17 been qualified to perform the type of surgery that
18 Mr. Armbruster received in this case?
19   A   Yes.
20       Q   Have you performed that type of surgery?
21   A   Yes.
22       Q   How many times?
23   A   Many times.  It's a very, very, very common
24 surgical procedure for any spine surgeon.  So how many

50

1 times have I done the procedure that Mr. Armbruster had, I
2 would say several hundred.
3       Q   You agree that tingling is a neurological
4 symptom, correct?
5   A   Yes.
6       Q   Do you agree that numbness is a neurological
7 symptom?
8   A   Yes.
9       Q   Do you agree that weakness is a neurological
10 symptom?
11   A   Yes.
12       Q   Do you agree that difficulty walking can be a
13 neurological symptom?
14   A   Yes.
15       Q   Do you agree that pain, shooting pain is a
16 neurological symptom?
17   A   Yes.
18       Q   In your practice you've encountered several
19 patients who have reported one or more of these symptoms to
20 you, correct?
21   A   Yes, but when you're using the word, you're
22 using the word neurological symptoms, etc., etc.,
23 neurologic just means involvement of some nerve tissue.  So
24 those are very, very broad question/statements with

51

1 saying.  So what I'm saying is all these neurologic
2 symptoms, they can be due from many, many things, as I
3 mentioned.  It could be like, again, resting your arm on
4 the table --
5       Q   But that wasn't actually my question.  My
6 question was true or false, you have encountered hundreds
7 of patients who have reported one or more of the symptoms
8 that we just went through?
9   A   Yes.
10       Q   And can you tell me how in your practice you
11 responded to those reported symptoms?
12       MS. KINKADE:  Objection to form.
13       THE WITNESS:  It would depend upon the history
14 they gave me.  It would depend upon their physical
15 examination.  And then putting all of that together, I
16 would establish a plan.
17 BY MS. GRADY:
18       Q   Tell me about the physical exam that you would
19 conduct in response to a patient who reported numbness,
20 tingling and weakness or some combination of those.
21   A   Okay.  So can you be more specific?  Numbness,
22 tingling, weakness where?
23       Q   Well, does that physical exam you would
24 perform depend on the answers to those questions?

52

1   A   No.  Part of it does.  So if someone had
2 numbness, weakness or tingling we'll say in the upper or
3 lower extremities, I would have them walk, number one,
4 stand on their heels and toes.  I would then have them take
5 their spine through, and cervical, lumbar areas through a
6 range of motion.
7       I would then examine their spine, see if they
8 had any acute -- any tenderness, muscle spasm.  And then I
9 would do a neurologic examination of their upper and lower
10 extremities, checking their motor strength, their deep
11 tendon reflexes, their muscle strength, their sensation to
12 pinprick and touch, going through all of that.  Check their
13 grip strength, etc.
14       And then if I was concerned, I would measure
15 the circumference of their upper arms, their forearms, if I
16 was concerned about some atrophy, measure their thigh and
17 calf circumferences if I was concerned about some atrophy.
18       If I wasn't concerned about that, they don't
19 necessarily need to be measured.  Then, of course, straight
20 leg raising, which is more of a, you know, a check on the
21 sciatic nerve, which is distal to the cervical area.  So
22 all of those are just part of a normal neurological
23 examination.
24       Q   Do you agree that the standard of care

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

**53**

1  requires those as part of a neurological exam?

2         MS. KINKADE:  Objection, form.

3         THE WITNESS:  Well, what I stated is all part

4  of -- all part of a neurological examination.  For a spine

5  related condition, for a spine related -- if someone had

6  spine related symptoms, then the examination would include

7  what I said.

8  BY MS. GRADY:

9     Q   Okay.  My question was slightly different.  Do

10  you agree that a patient complaining of numbness, tingling

11  and weakness in the upper or lower extremities -- strike

12  that.

13        Do you agree that for a patient complaining of

14  numbness, weakness and/or tingling in the upper or lower

15  extremities, a neurological exam is required by the

16  standard of care?

17     A   Yes.

18     Q   Do you agree that as part of the neurological

19  exam, the standard of care requires a doctor to assess the

20  deep tendon reflexes?

21     A   Yes.

22     Q   Do you agree that as part of a neurological

23  exam, the standard of care requires the physician to

24  examine the patient's muscle strength, at least in the area

---

**54**

1  where the patient was complaining of numbness, tingling

2  and/or weakness?

3     A   Yes.

4     Q   Do you agree that the standard of care

5  requires the physician to assess the sensation of the

6  patient or -- sorry.  My notes are sort of shorthand.  You

7  said one of the things you would do is assess the patient's

8  sensation to touch?

9     A   Pinprick and touch, yes.

10     Q   Do you agree that step is required as

11  part of a neurological exam for a patient complaining of

12  numbness, weakness and tingling according to the standard

13  of care?

14     A   Well, I would -- all of the things I mentioned

15  are part of a routine neurologic examination if you're --

16  if you're concerned about some type of a nerve root

17  compression and/or spinal cord compression.  So all of the

18  things I mentioned are part of that examination.

19     Q   Well, so you jumped somewhere and I want to

20  make sure I understand that.  A patient coming to you

21  complaining of numbness, weakness or tingling in the upper

22  or lower extremities, that would cause you to be concerned

23  about a possible nerve root or spinal cord compression, is

24  that true?

---

**55**

1     A   Well, if someone complained -- if someone

2  complained to me about numbness or tingling, I would think

3  that a nerve is being irritated, just for numbness or

4  tingling.  It could be peripheral nerve.  So if someone,

5  as an example, had numbness or tingling in their hand, they

6  could have -- they could have -- sorry.

7         (Thereupon, a recess was taken, after which

8  the following proceedings were had:)

9         THE WITNESS:  So somebody had numbness or

10  tingling in their hand, they could have -- that could be

11  due to a peripheral nerve condition like, you know,

12  peripheral nerve compression, carpal tunnel syndrome, ulnar

13  nerve compression, that could cause all that, or it could

14  be coming from higher up.

15        It could be coming from the cervical spine,

16  from a disc herniation and/or compression of part of the

17  spinal cord.  It could be coming from the nerve being

18  irritated as part of the brachial plexus.  So numbness and

19  tingling could be coming from any of those areas.

20  BY MS. GRADY:

21     Q   Okay.  And so it would be important as a

22  physician encountering a patient who's complaining of

23  numbness, tingling and/or weakness in the upper or lower

24  extremities to consider all of those as possible causes,

---

**56**

1  correct?

2     A   Yes.

3     Q   And to do that you would consider those as

4  part of your differential diagnosis, is that true?

5     A   Yes.

6     Q   And do you agree that not just spinal cord

7  orthopedic surgeons, but that all physicians encountering a

8  patient complaining of numbness, tingling and/or weakness

9  in the upper or lower extremities should consider those

10  issues as a possible cause of the numbness, tingling or

11  weakness?

12         MS. KINKADE:  Objection, form.

13         THE WITNESS:  Yes, basically.  I mean, it's

14  all part -- if someone had the appropriate symptoms, that's

15  part of a routine, you know, examination for symptoms.

16  BY MS. GRADY:

17     Q   Sure.  But that wasn't quite my question.  My

18  question was, if a patient was complaining of numbness,

19  weakness and/or tingling in the upper or lower extremities,

20  a primary care physician, in addition to an orthopedic

21  surgeon, should consider a nerve root compression or spinal

22  cord compression as one of the possible cause of those

23  symptoms, correct?

24     A   Yes.

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

57

1      MS. KINKADE:  Objection, form and incomplete
2  hypothetical.
3      THE WITNESS:  Yes.
4  BY MS. GRADY:
5      Q   Okay.  And one of the things you said as part
6  of the neurological exam that you would conduct is motor
7  something, and then I just lost it.  What was it?
8      A   I said motor strength.  So the strength of the
9  muscles.
10     Q   And how would you determine that?
11     A   So if you're doing the upper extremities, you
12  have someone to flex their biceps, then extend their
13  triceps.  So they pull their arm against you, push it away.
14  The grip strength, etc. etc.  So that's all part of
15  checking -- that would be examples of checking the muscle
16  strength of the upper extremities.  And then you would do
17  the same thing in the lower extremities, have someone stand
18  on their heels and toes, check their resistence, their
19  muscle strength.
20     Q   So muscle strength and motor strength, those
21  are the same thing?
22     A   Yes, ma'am, they are.
23     Q   And deep tendon reflexes, can you explain to
24  me what that means and how you assess it.

58

1      A   So deep tendon reflexes is a check of the
2  motor strength.  So in the upper extremity you have the
3  biceps, the triceps, brachial radialis, deep tendon
4  reflexes.  So the triceps is in the back of the elbow.  The
5  biceps is above the elbow.  The brachial radialis is at the
6  wrist.  So those three muscle groups are checked.
7          Then in the lower extremity you have the knee
8  jerks, the patella tendon reflexes and then the Achilles
9  tendon reflexes at the ankle.  So those are all the deep
10  tendon reflexes.  What that's really doing is measuring
11  motor strength.
12     Q   A patient can have spinal cord compression at
13  the cervical level and still have a straight leg raise exam
14  that is within normal limits, correct?
15     A   Yes.
16     Q   A patient can have spinal cord compression at
17  the cervical level and still have full range of motion of
18  their joints, is that correct?
19     A   I'm not sure what joints you're talking about,
20  but as a generalization, yes, someone could have spinal
21  cord compression, some degree of spinal cord compression in
22  the cervical area with full range of motion of their upper
23  extremities.
24     Q   Do you agree that a magnetic resonance imaging

59

1  test can diagnose posteriorly herniated discs that cause
2  spinal cord compression?
3      A   Yes.
4      Q   Is there any other tests that can definitively
5  diagnose that disease?
6      A   Yes.  A myelogram and a CT scan.
7      Q   Any others?
8      A   No.
9      Q   Okay.  I want to go back to Exhibit 2.  On
10  Page 2 you've listed the American Board of Independent
11  Medical Examiners.  Can you explain to me what that board
12  is.
13     A   That's a -- that's a medical -- medical
14  specialty board, and that is a -- that deals with -- that
15  deals with evaluation -- evaluation of individuals as far
16  as an independent medical examinations.  So that's --
17  that's what that board deals with.
18     Q   To join that board do you have to sit for an
19  examination?
20     A   Yes.
21     Q   Tell me about that examination.
22     A   So the certification by the American Board of
23  Independent Medical Examiners requires an individual to go
24  to certain courses, read books, go to courses, whatever,

60

1  then ultimately pass a written certification exam, which is
2  a fairly -- fairly difficult written examination, three to
3  four-hour examination.
4          And if a person passes that, then they can --
5  they become certified by the board.  So that's what that
6  certification process is.
7      Q   Can you tell me what, according to the board,
8  it means to be a, quote, independent medical examiner?
9      A   Well, the word independent medical examiner
10  is, as I explain to people, it's like, I use the analogy is
11  if you have -- you have a vehicle.  You have a car or truck
12  for a period of time.  A person has been going to a shop
13  for their vehicle.  And for whatever reason they or
14  somebody else wants them to go to another shop, another
15  mechanic.  Doesn't know them.  Doesn't know their vehicle.
16  They're getting an independent assessment of their vehicle.
17         An independent medical examination is supposed
18  to be the same thing.  So when I see someone for an
19  independent medical exam, my job is to -- evaluate that
20  person independently without any bias and give my medical
21  opinion as to what I think is going on and what I think
22  needs to be done, etc., etc.  So that's my definition of
23  what an independent medical exam is.
24     Q   Okay.  We'll get to your work as an

61

1 independent medical examiner, but first let me ask you
2 this, did the written certification exam that you
3 completed, did you complete that again in 2016?
4      A   Yes.
5      Q   And did that include any discussion of case
6 law or legal standards?
7      A   There are some legal questions, yes.
8      Q   Tell me about those.
9      A   Well, I don't — I don't remember the exact
10 questions.  It's a 50-question exam.
11      Q   I'm not asking you for the particular
12 questions.  I'm just saying tell me in general what sorts
13 of legal standards you are required to be familiar with in
14 order to sit for and pass the exam to join the American
15 Board of Independent of Medical Examiners.
16      A   So it's a written examination, as I said.
17 Most of the questions are medical questions as far as
18 various things we've talked about here today, questions —
19 various medical questions.  Some of the questions as far as
20 medicolegal, they include — let's see.  As an example that
21 comes to my mind offhand, the difference between impairment
22 and disability.  So that's one of the questions.
23          Impairment being a condition.  Anybody — any
24 two individuals that have the same — have the same injury,

62

1 the same pathology, those two people have the same
2 impairment.
3          But disability is relative from one person to
4 another, meaning a crushed — if a — if a — if an
5 accountant mashes his little finger, that's not as much of
6 a disability as if a concert pianist mashes their little
7 finger.  So that is one of the questions that comes to mind
8 that's asked on the test, to distinguish between impairment
9 and disability.  As far as other legal questions, I can't
10 think offhand what the other ones are.
11      Q   Did you receive any training or conduct any
12 research into deliberate indifference or other standards
13 used under the Eighth Amendment to the United States
14 Constitution?
15      A   I'm not sure I fully understand your question,
16 so not that I'm aware of.
17      Q   You first sat for the exam in 2011, correct?
18      A   Yes.
19      Q   Why did you decide to seek -- why did you
20 decide to seek certification with the American Board of
21 Independent Medical Examiners?
22      A   Because as I stated earlier, my practice —
23 I've been in practice a long time, and I wanted to — and I
24 performed some independent medical examinations for a long

63

1 period of time prior to 2011.  Probably started doing some,
2 you know, after being in practice four or five years.
3          Around 2011 I was having some issues with my
4 eye, as I stated, and I was starting to change my practice
5 some.  I was doing less surgery.  And at that time then I
6 wanted to do more independent medical examinations, and I
7 wanted to become certified by that board to add to my
8 credibility, if you will.
9      Q   You also were a member of the American Board
10 of Orthopedic Surgery, is that correct?
11      A   I was and still am.  I am a diplomat of the
12 American Board of Orthopedic Surgery, which means that I've
13 been certified by the American Board of Orthopedic Surgery.
14      Q   Does that mean you have a current
15 certification by that board?
16      A   Yes.
17      Q   Okay.  You first become certified by that
18 board in 1983, correct?
19      A   Yes.
20      Q   Can you tell me -- by my count you began
21 working in private practice in 1980.  Can you tell me why
22 you decided to seek board certification in 1983.
23      A   Well, because the going — in medical training
24 you go through your residency program.  And all boards are

64

1 different.  So in -- all boards are different when you take
2 the exam after you finish your residency.  So, you know, I
3 was licensed after I finished my residency.  I had been
4 licensed for a number of years.  I began practice.
5          And then in orthopedics, you have to be in
6 practice a minimum of two years and you have to go though a
7 written examination and then an oral examination, present
8 cases, etc.  So going through that process, then I became
9 certified by the American Board of Orthopedic Surgery.
10      Q   On the second page you listed a number of
11 society memberships.  Those require dues or other payment
12 to remain a member, correct?
13      A   Yes.
14      Q   Did any of those require an exam to join?
15      A   No, no, other than the American Board of
16 Orthopedic Surgery and the American Board of Independent
17 Medical Examiners, the rest of the societies I belong to do
18 not require an exam by itself.
19          But you have to be -- going back from that,
20 you have to be certified -- as an example, you have to be
21 certified by the American Board of Orthopedic Surgery to
22 become a member, to become a fellow of the American Academy
23 of Orthopedic Surgeons.  And you have to also be certified
24 by the American Board of Orthopedic Surgery to become a

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

65

1  fellow of the American College of Surgeons, etc.
2       Q   The hospital appointments, you've listed two
3  hospitals there, Missouri Baptist Medical Center and Saint
4  Luke's Hospital?
5       A   Yes.
6       Q   Can you tell me what all is involved in
7  receiving a hospital appointment?
8       A   You apply to the medical staff, okay.  And,
9  you know, I've been on the staff of these hospitals so many
10 years, I don't know exactly all the steps.  But you apply
11 to medical staff.  And then you get an appointment.  In my
12 case now, all of these hospitals, you have to update your
13 appointment every two years.
14      Q   Well, I'm familiar with admitting privileges.
15 Is that the same thing?
16      A   Yes.  Yes, as a generalization.  So you have
17 to be -- you have to -- you have to apply for staff
18 privileges at a hospital.  There are different types of
19 staff privileges.  So if -- so admitting privileges to a
20 hospital is pretty routine, to have the privileges to admit
21 a patient to a hospital.  And then having, you know, other
22 privileges depends upon what specialty you're in, etc.,
23 etc.  But that's all part of hospital privileges.
24      Q   Okay.  We talked earlier about the fact that

66

1  neurosurgeons perform spinal cord compression, and you
2  testified that you also perform spinal cord compression
3  surgery.
4       How do you determine in your practice whether
5  you versus a neurosurgeon should perform the spinal cord
6  compression back when you were performing those surgeries?
7       A   Yeah, it really wouldn't make any difference,
8  quite honestly.  In a situation like this, somebody that
9  comes in with an acute soft disc herniation in the cervical
10 area, you know, it would depend upon who referred them.  I
11 mean, somebody goes to the emergency room.  In this case,
12 they're referred to a neurosurgeon.  But in other cases
13 they might be referred to an orthopedic spine surgeon.  It
14 really doesn't make any difference where it comes from.
15      Q   You just used the word acute.  Can you tell me
16 what that word means as you use it?
17      A   Acute means something that's happened rather
18 recently.  So an acute process is a new acute process.
19 Like if someone falls off of a rock and fractures their
20 leg, that's an acute injury as a result of that.
21      Q   And what's the opposite of acute?
22      A   The opposite of acute would be chronic.
23      Q   What is the outside most time that an event
24 could occur such that a process would still be considered

67

1  acute?
2       A   Well, I don't know that I can give you a
3  specific answer to that.  But an acute -- an acute injury,
4  an acute incident, an acute injury to me would be something
5  that's happened within the past, you know, week or -- week
6  we'll say.
7       Q   And you used that phrase when you were talking
8  about that -- when you were testifying that it wouldn't
9  make a difference whether a spinal surgeon performed this
10 spinal cord compression surgery or whether it was performed
11 by a neurosurgeon.
12      Does the acute versus chronic nature of the
13 injury depend on whether a spinal surgeon is qualified to
14 perform that surgery?
15      A   No.  That really has nothing to do with -- I
16 think your question was -- I'm sorry, your question, are
17 you talking about an orthopedic spinal surgeon versus a
18 neurosurgeon?
19      Q   Correct.
20      A   It wouldn't make -- whether something was
21 acute or chronic would not make a difference as far as who
22 took care of something.  I've taken care of many acute
23 spinal conditions, spinal injuries.  I've taken care of
24 plenty chronic spinal conditions, spinal injuries.  And

68

1  most neurosurgeons, likewise, have taken care of plenty
2  acute and chronic spinal conditions.
3       Q   I just wanted to make sure I understood your
4  testimony.  It's not that the acute versus chronic nature
5  that makes it appropriate for a neurosurgeon as opposed to
6  an orthopedic surgeon to treat?
7       A   You're correct, yes.
8       Q   In the course of your work as an orthopedic
9  surgeon performing surgery on patients with severe spinal
10 cord compression, have you had the occasion to determine
11 the amount of damage to the patient's spinal cord?
12      A   I'm not sure I understand your question.  Can
13 you repeat it, please.
14      Q   Sure.  In your career treating patients
15 surgically for spinal cord compression, have you ever had
16 occasion to determine the amount of damage to the patient's
17 spinal cord as a result of that compression?
18      A   Yes.
19      Q   Tell me about that.
20      A   Well, it depends upon a patient's recovery.
21 If somebody has -- if someone has, as an example, if
22 someone has an acute problem where they have acute spinal
23 cord compression, then once they're decompressed, once that
24 pressure is taken off the spinal cord, their recovery would

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

69

1    in large part depend upon how long that compression had
2    been there.
3          If they have a dramatic recovery, that would
4    indicate that the process was rather acute, it hadn't been
5    there that long.
6    Q   So actually that hits on something else. So I
7    want to make sure my question is clear. First of all, I'm
8    not asking about whether you had occasion to date spinal
9    cord compression in the course of your practice. I will
10   ask you that, but that's not the question I'm asking now.
11         The question I'm asking now is whether in the
12   course of your practice you had occasion in a way that is
13   relevant to your treatment of the patient to determine
14   exactly the extent of the damage to the spinal cord that
15   was caused by the spinal cord compression.
16   A   Yes.
17   Q   Explain that to me, please.
18   A   Well, if somebody has spinal cord compression,
19   so if someone has significant spinal cord compression,
20   they're going have some neurologic findings. So they're
21   going to have some reflex changes, possibly some problem
22   with dexterity in their upper extremities, some ambulation
23   problems, etc. So those could all be part of spinal cord
24   compression, as I stated earlier.

---

70

1          So if somebody had those symptoms and you
2    worked it up further, had the MRI's, myelograms, CT, to
3    document that, then you would treat it appropriately.
4          As far as -- and I'm not fully understanding
5    your question. When you're decompressing this, you're
6    going into the spinal canal, as I said. And whether you go
7    in from the front or from the back, either anteriorly or
8    posteriorly, you're getting down to the spinal canal, you
9    want to decompress the spinal canal.
10         You're not going down and looking at the
11   spinal cord itself. You're decompressing all the tissue
12   around there. And you see what somebody's recovery is
13   after that. You keep an eye on them and see what their
14   neurologic recovery is.
15   Q   Right. So that's my question. As a spinal
16   surgeon you assess through the three ways that you
17   testified about, that spinal cord compression does exist.
18   And I assume that you make a decision whether or not
19   treatment is required.
20         After you perform surgery to decompress the
21   spine, how, if at all, is it relevant to you the level of
22   damage was done to the patient's spinal cord as a result of
23   the now resolved spinal cord compression?
24   A   It depends upon their neurologic recovery.

---

71

1    Q   So it is important to your treatment as an
2    orthopedic surgeon what level of damage was done to the
3    spinal cord, correct?
4    A   Yes.
5    Q   And you agree that the greater the damage done
6    to the spinal cord, the poorer -- strike that.
7          You agree that patients with spinal cord
8    compression, even after surgery, could suffer neurologic
9    symptoms, correct?
10   A   That is possible depending upon the amount of
11   compression they had, the length of the compression, all of
12   those are factors. But to answer your question, yes,
13   somebody with severe spinal cord compression could have
14   some residual neurologic deficit.
15   Q   And anatomically speaking that would be caused
16   by the damage to the spinal cord itself, correct?
17   A   Yes, that would be as a result of what you're
18   saying, yes, whatever the factor is causing the
19   compression.
20   Q   Okay. When in the course of your practice
21   have you been required in order to treat the patient to
22   actually date the age of the spinal cord compression?
23   A   Well, I don't know that I've ever been asked
24   to specifically give a date. But I can tell -- I can -- I

---

72

1    can get an idea how long the compression has been there
2    depending upon a person's neurologic recovery.
3    Q   Okay.
4    A   I can't look -- I can't look at an MRI and if
5    somebody has a spinal canal compromise secondary to a disc
6    protrusion, I can't look at that and tell how long that's
7    been there just by looking at that study most of the time.
8    Sometimes you can see some edema there. But many times you
9    can't specifically date that just looking at the
10   radiographic studies.
11   Q   But just to be clear, you've never as part of
12   your practice been required to as a doctor date the age of
13   a spinal cord compression, correct?
14   A   No, I can't give a specific date, but I can
15   see a patient and do surgery on that patient. And
16   depending upon their recovery, how much -- how much they
17   recover neurologically, I can then give an opinion as to,
18   you know, if somebody asked me how long do you think that's
19   been there, whether acute or chronic, depending upon the
20   patient's recovery.
21   Q   Right, you said that. But that's not my
22   question. My question is not whether you think you can do
23   that, whether you think you are able to date the spinal
24   cord compression. My question is as a doctor, as a

---

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

73

1  treating physician, have you ever been called on to do
2  that, to date a spinal cord compression?
3      A   Yes.
4      Q   For what purpose?
5      A   I've had patients ask me, you know, what do
6  you think caused this, I've got this, what do you think
7  happened.  As an example, somebody might have an issue and
8  they say, well, when do you think this occurred, I hurt
9  myself, whatever.  So I've been asked that question.
10          And the answer I'll give is what I have given
11 to you, you know, depending upon the recovery, it's either
12 a chronic process or rather acute process, etc.
13     Q   How many times have you done that?
14     A   Many times.  I mean, I've seen people many
15 times with regard to cervical spine, lumbar spine.  A
16 classic example is people with lumbar spine may have a foot
17 drop.  Some people come in with a foot drop secondary to a
18 lumbar disc herniation compressing the L5-S1 nerve root
19 there, they'll have a foot drop.
20          And somebody will come in with a foot drop,
21 and you can operate on them and you can decompress them and
22 over a period of months it will come back.  But there are
23 other people that have had a foot drop for two or three
24 years and it will never come back.  So I've been asked that

---

74

1  many times.
2      Q   Can you give me an estimate?
3      A   No, I have no idea.  Many times.  I've been in
4  practice a long time.  Lumbar disc herniations are very
5  common, as you know.  And I'm sure you know what a foot
6  drop is.  It's just what I said.  And they can happen.  It
7  depends on how acute versus chronic.
8      Q   I'm not asking about lumbar disc herniations.
9  I'm asking about the number of times in your practice you
10 have been called on to date a spinal cord compression for
11 any reason.  And you said many times.
12     A   Many times, ma'am.  I don't know that I can
13 give you a specific number, but many times.
14     Q   Well, I'm just asking you for your best
15 estimate.
16     A   I can't give you a number, you know.  More
17 than 100, let's just say that.
18     Q   More than 200?
19     A   I don't know.
20     Q   You can't say whether it's more or less than
21 200?
22     A   Well, I just don't know.  I don't want to say.
23 Many, many times.  Certainly -- yeah, probably more than
24 200.  These are, you know, can be fairly common conditions.

---

75

1  These are not uncommon conditions.
2      Q   Have you ever offered an opinion to a
3  reasonable degree of medical certainty as to the date of a
4  spinal cord compression before this case?
5      A   Yes.
6      Q   How many other times?
7      A   Again, the same thing I'm talking about, you
8  know.  People, you know, have -- people have an issue, a
9  problem, and, you know, how long has it's been going on,
10 what do you think, you know.  And I say, well, you know --
11 you know, I tell them the same thing I'm saying to you, you
12 know, they've got an issue here.  I don't know really
13 exactly how long it's been here.
14          But, you know, you know, you know, it depends
15 on their recovery.  If they get a good recovery, it
16 means -- again, the whole -- the whole process as far as
17 spinal canal decompression, the whole concept is to
18 decompress the spinal canal, to decompress the spinal cord
19 and/or the nerve roots to allow them to, quote, breathe,
20 unquote, to re-establish themselves.
21          And if they haven't been compressed for a long
22 period of time, then that means that they would be
23 rejuvenating more quickly.
24     Q   Right.  But, Doctor, that wasn't my question.

---

76

1  So I understand you've testified about times that patients
2  have asked you hey, how long, when did this happen, what
3  caused this.  Have you told patients in response to that
4  question, quote, I am offering this opinion to you to a
5  reasonable degree of medical certainty?
6      A   Well, no.  I don't go through -- I mean, I
7  don't -- I'm not saying that -- I don't say that to
8  patients I see in my office routinely.  I don't use -- I
9  don't talk to them like I'm an attorney making a
10 medicolegal document.  But people ask me that --
11     Q   I understand, but I'm limiting my question to
12 times that you have offered expressly an opinion to a
13 reasonable degree of medical certainty as to the date and
14 the age of a spinal cord compression.
15     A   Well, I think -- first of all, I think that
16 all of my opinions are within a reasonable degree of
17 medical certainly.  I think everything I say is within a
18 reasonable degree of medical certainty, number one.
19          Number two, I have many times asked people
20 what I think, the questions you asked, and I've given you
21 the answer which I've given you.
22     Q   Okay.  Can you tell me the last time that you
23 offered to anyone to a reasonable degree of medical
24 certainty expressly, in other words, saying I'm offering

---

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

77

1  this opinion to a reasonable degree of medical certainty,
2  can you tell me the last time you expressly offered to a
3  reasonable degree of medical certainty an opinion of the
4  age of a patient's spinal cord compression?
5      **A   I don't know if I can give you a specific**
6  **answer to that.  Within -- within -- within the last year.**
7      Q   Okay.  Tell me about that.
8      **A   Well, I don't know as far as HIPAA standards**
9  **where I can elaborate.  But I can think of one person**
10  **offhand that I -- that I was asked an opinion within --**
11  **within the last year.  So I don't know that there's a -- it**
12  **was a cervical condition.  And I don't -- from a HIPAA**
13  **point of view, I don't think I can elaborate.**
14      Q   Well, respectfully, Doctor, you've been
15  offered up as an expert in this case.  You understand that,
16  correct?
17      **A   Yes.**
18      Q   And you understand that by being offered up as
19  an expert the defendants have asked to call you to testify
20  to offer the jury what you purport to be expert opinions on
21  this case that you and you alone understand as a matter of
22  expertise.  Do you understand that?
23      **A   Yes.**
24      Q   And you understand that you and the defendants

78

1  at the end of the day will be asking the jurors to rely on
2  your testimony, that you are, in fact, qualified and able
3  to date a cervical spinal cord compression to the day
4  within a reasonable degree of medical certainty.  You
5  understand that as well, Doctor?
6      **A   Well --**
7      MS. KINKADE:  Object to form, misstates his
8  testimony.
9      THE WITNESS:  Well, I didn't say that.  I
10  didn't say within a day.  I said that I'm able to give an
11  opinion as to the relative time, day of an incident.  I'm
12  not saying that I can give a specific day, but I can give
13  an opinion as to the relative -- the relative acuteness of
14  a condition.
15  BY MS. GRADY:
16      Q   Okay.  Well, we'll get to the opinions that
17  you've disclosed.  But you agree that you're holding
18  yourself out as an expert on the age of spinal cord
19  compression, right?
20      **A   I'm holding myself out as someone with a --**
21  **with a lot of experience in dealing with spinal cord**
22  **compression.**
23      Q   And so what I'm asking you today is about your
24  experience in the times you have ever had an opportunity to

79

1  offer opinions about the age of spinal cord compressions.
2  And one of those things you said was that patients would
3  ask -- strike that.  I'll restart my question.
4      And I asked you about the times in the course
5  of your practice that you had an opportunity or a need to
6  date a patient's spinal cord compression.  And you
7  testified that you would do that in response to a patient's
8  question to you about the cause of the compression or when
9  it happened, right?
10      **A   Yes, yes.  Yes, I said that, yes.**
11      Q   Are there other circumstances in which you
12  have been required as a treating physician to date the age
13  of a spinal cord compression?
14      **A   Okay.  I've been asked to give opinions as far**
15  **as to -- as far as to the relative length of time of a**
16  **compression performing independent medical examinations.**
17  **So in those situations I'm not truly the treating**
18  **physician, but I've been offered to offer an opinion after**
19  **examining a person to give an opinion.  Okay.  So I've been**
20  **offered that, you know, relatively recently within the last**
21  **year.**
22      Q   Okay.  So as a treating physician are there
23  circumstances other than in response to a patient's
24  question about the cause or timing of the injury that you

80

1  have been required in order to treat the patient or perform
2  other work as a medical doctor to date a patient's spinal
3  cord compression by age?
4      **A   Well, for all -- for all the reasons I said**
5  **earlier, I've been asked, you know, situations, you know,**
6  **what do you think, Doctor, you know, how long has this been**
7  **going on, what do you think, etc., etc.  And I give, you**
8  **know, my opinion.**
9      **Many times when you see someone preoperatively**
10  **you can give somewhat of an opinion.  You don't know for**
11  **sure.  You can look at MRI's, myelograms, CT's.  Sometimes**
12  **you can get an idea of how long something has been there,**
13  **sometimes you can't.  But many times, you know, depending**
14  **upon a patient's recovery, you get more of an answer how**
15  **long it's been going on.**
16      Q   That's not my question.  Again, my question is
17  not how do you date the age of a patient's spinal cord
18  compression.  You don't have to date the age of a spinal
19  cord compression in order to operate on what's causing the
20  compression, correct?
21      **A   That is true, yes.**
22      Q   And you don't have to date the age of a spinal
23  cord compression in order to assess the patient's
24  neurological symptoms following up, is that correct?

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

81

1      THE WITNESS:  Would you repeat her last
2   question?
3      (Thereupon, the referred to question was read
4   back by the Court Reporter as recorded above.)
5      THE WITNESS:  Yeah, that's what I thought she
6   said.  Well, that's not exactly true, because in follow-up
7   I do want to see how that patient progresses
8   postoperatively.  And so I will document in the record so
9   and so is making a good neurological recovery, their motor
10  strength is returning, their sensation is returning, etc.,
11  etc.  So that is part of the routine follow-up care
12  postsurgical.
13  BY MS. GRADY:
14     Q   Yeah, I don't think that was my question.  So
15  let me just ask it this way, is it your testimony that you
16  cannot assess a patient neurologically unless you have
17  determined the age of the spinal cord compression?
18     **A   No.  You -- you don't -- to assess someone**
19  **neurologically, to examine someone neurologically, you**
20  **don't necessarily have to know whether something is an**
21  **acute or chronic problem.  You find that out as you go**
22  **along.  But to do a neurologic examination would be the**
23  **same.**
24     **Q   So then are there any other circumstances**

---

82

1   other than a patient's question in which it is required for
2   you to know the age of the spinal cord compression in order
3   to be able to treat that patient?
4      **A   Well, I'm not really sure what your question**
5   **is.  I mean, obviously everything I've said.  You know, I**
6   **mean, you're going to -- regardless if someone has a -- if**
7   **someone has a spine condition and it's neurologically or**
8   **from a stability point of view, etc., etc. warranted, then**
9   **you're going to treat the person.**
10     **Initially, you know, acute versus chronic, it**
11  **does make a difference.  It depends on what you're**
12  **treating.  I mean, if somebody comes in with an acute**
13  **fracture, you're going to treat them differently than if**
14  **someone comes in with a chronic condition.**
15     Q   Okay.  Tell me how -- and so you make those
16  decisions before you operate, the age of the spinal cord
17  compression?
18     **A   No.  Sometimes -- I mean, sometimes you do and**
19  **sometimes you don't.  It just depends on what we're talking**
20  **about.  So I mean, if someone comes in -- I'm just trying**
21  **think of examples.  I mean, an acute, if someone falls and**
22  **has an acute fracture, whatever, I mean, that's -- I mean**
23  **that's different than a chronic -- than a chronic**
24  **condition.**

---

83

1      Q   And how would you treat that patient
2   differently?  If the mechanism of injury is the exact same
3   and the degree of injury is the exact same, how would the
4   timing of the compression change your treatment decision?
5      MS. KINKADE:  Hold on.  You guys are going
6   fast and I can't ever get any objections in.  So just pause
7   for a second.  It might give her a break too.  My objection
8   is to form and incomplete hypothetical.
9      THE WITNESS:  You -- you wouldn't necessarily
10  treat someone differently whether -- whether -- whether
11  there was an acute process or a chronic process.  If you
12  identify a problem, then you would treat it accordingly.
13  BY MS. GRADY:
14     Q   Have you ever been called on in your capacity
15  as a retained expert -- and I'm going to differentiate
16  between these independent medical exams that you have done,
17  and we'll get to those, but in your capacity as a retained
18  expert being hired by one side of litigation or the other
19  side to give opinions, have you ever been asked and/or
20  given an opinion about the age of spinal cord compression
21  in any case other than this one?
22     **A   Yes.**
23     Q   How many times?
24     **A   Well, many times.  Many times I've seen**

---

84

1   **patients I'm asked to offer an opinion how long something**
2   **has been going on.  And my answer is, you know, I think**
3   **I've repeated myself several times now.  My answer is what**
4   **I've said.**
5      Q   Again, I'm not asking for your answer in
6   the --
7      **A   I can't give you a specific number, ma'am.  I**
8   **mean, I can't give a specific number, ma'am.  You know,**
9   **I've been in practice 38 years.  I've seen thousands of**
10  **patients.  People ask a lot of questions.  And I've been**
11  **asked these same questions you're asking me now many, many**
12  **times.**
13     Q   Okay.  And, again, I want to focus just on the
14  work that you have done as a retained expert, not as a
15  treating physician and not as an independent medical
16  examiner.
17     The reason I ask is you are the only doctor in
18  this case to give any opinion that they are either
19  qualified or, in fact, can give a date on the age of the
20  spinal cord compression in this case.
21     So it's obviously very important both to this
22  case and to my client that he understand how it is that
23  you're qualified to do that when Dr. Bailey and plaintiff's
24  expert and defendant's other expert have all testified that

---

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

85

1  it's just not possible under the medicine. So tell me --
2      A  So I'm not quite sure what your question is.
3  What's not possible under the medicine?
4      Q  So tell me what is -- tell me every case where
5  you have offered an opinion to a reasonable degree of
6  medical certainty as to the age of a patient's spinal cord
7  compression when you were retained as an expert in that
8  case.
9          MS. KINKADE:  Okay. Pause. I'm going to
10  object as it misstates the evidence. Sarah, your voice is
11  getting loud. I don't know if it's intentional or not.
12  But if you could keep it a little bit lower. And I believe
13  this has been asked and answered several times. Those are
14  my objections.
15  BY MS. GRADY:
16      Q  You can go ahead, Doctor.
17      A  So, Ms. Grady, you brought up -- in your
18  question you brought up other physicians. You brought up
19  Dr. Bailey's name, etc. here. In answer to your question,
20  looking at the radiographic studies, okay, just looking at
21  the radiographic studies --
22      Q  Doctor, that's not an answer to my question.
23  I'm not asking about this case. I'm asking you to tell me
24  every other case where you have been retained and paid

---

86

1  money and then, in fact, did offer an opinion to a
2  reasonable degree of medical certainty as to the age of a
3  patient's spinal cord compression.
4      A  I don't know how to answer your question any
5  more than what I've said. I don't know how to answer you.
6      Q  You can't name a single other case in which
7  you have been retained as an expert and paid money in order
8  to offer an opinion which you then did to a reasonable
9  degree of medical certainty about the age of a spinal cord
10  compression?
11      A  I've been asked that many times.
12          MS. KINKADE:  Objection, misstates his
13  testimony.
14  BY MS. GRADY:
15      Q  Give me the name of a single other case.
16      A  Well, I don't have names offhand. I see a lot
17  of patients here. I don't remember the exact names. I've
18  been asked -- I think when you asked your initial question,
19  I think you asked me, well, to exclude IME's, is that not
20  correct?
21      Q  Yes.
22      A  So I've been asked that many times as far --
23  on people I performed independent medical exams on. I've
24  been asked that many times by the individuals. I've been

---

87

1  asked that many times by attorneys during depositions for
2  people I've performed independent medical exam. And I've
3  given them the same answers I'm going you now as far as --
4  period. So I have been an expert opinion in those cases
5  and I've given those opinions.
6      Q  And, again, I would like you to list -- to
7  name one other case where you've offered an opinion to that
8  effect.
9      A  Well, if you look -- I mean many, many people
10  I've seen, have given many depositions where I've offered
11  opinions similar to you.
12      Q  And can you name a single one?
13      A  I -- well, I don't remember exact people's
14  names offhand, number one. But even if I did remember a
15  specific name, I wouldn't tell you because that would be a
16  HIPAA violation. So I think that's my answer to your
17  question.
18      Q  Okay. Sure. Let's restrict it to times when
19  you've written an expert report that you've produced
20  pursuant to Rule 26, or the lawyers who retained you
21  produced pursuant to a Rule 26 or any state law equivalent.
22          Can you tell me any other time that you wrote
23  in a report that you had an opinion to a reasonable degree
24  of medical certainty about the age of a spinal cord

---

88

1  compression in a published report?
2          MS. KINKADE:  Object to form.
3          THE WITNESS:  I don't know what Rule 26 is.
4  Can you tell me what that is?
5  BY MS. GRADY:
6      Q  Sure. You prepared a written report in this
7  case?
8      A  Yes.
9      Q  How many times have you prepared a written
10  report in your work as an expert prior to this one?
11      A  Many times.
12      Q  Okay. In all of those reports, those written
13  reports, tell me how many of those written reports have
14  included an opinion expressed to a reasonable degree of
15  medical certainty about the age of a patient's spinal cord
16  compression.
17      A  A number of times. I can't give you a
18  specific number, but a number of times.
19      Q  Okay. And can you tell me a single one?
20      A  Again, I can't -- I can't give a specific name
21  offhand, which I wouldn't if I could for the reasons I've
22  said as far as a HIPAA violation. But what I can think of
23  offhand just sitting here coming to mind, a woman I saw a
24  year ago with a -- with an acute lumbar condition, lumbar

---

89

1  disc herniation.  It was a -- it was a work-related
2  incident.  And it was my opinion that the lumbar disc
3  herniation had occurred acutely as a result of her
4  employment.
5         So that comes to mind, comes to me just
6  sitting here right now.  But there -- those are -- those
7  are not -- it's not uncommon for me to see people with
8  situations like that.
9      Q   And did that case involve spinal cord
10 compression?
11     A   That case did not involve spinal cord
12 compression.  That case was lumbar, involved lumbar nerve
13 root compression.  But that was -- as I described
14 anatomically the lumbar anatomy, that was below where the
15 spinal cord ends in the lower thoracic upper lumbar area,
16 L1.
17     Q   Right.  So can you give me a single case in
18 which you have expressed an opinion to a reasonable degree
19 of medical certainty in a written report about the age of a
20 patient's spinal cord compression?
21     A   I've seen -- I've seen people with cervical
22 spinal cord compression.  I've seen people with thoracic
23 spinal cord compression where I've given opinions, yes.
24     Q   In a written report?

---

90

1      A   Yes.
2      Q   Tell me about the last one before this one.
3      A   I don't remember exactly the last one.  But
4  people with some element of compression in either the
5  cervical or thoracic spine secondary to disc protrusions,
6  bone -- bone spurs, degenerative changes.  So I've given
7  opinions on all of those entities with regard to the
8  cervical, thoracic spine, upper lumbar areas.
9      Q   Okay.  You said you don't remember the last
10 one.  Tell me any instance in which you have in a written
11 report expressed an opinion to a reasonable degree of
12 medical certainty about the age of a patient's spinal cord
13 compression.
14     A   I -- I've done it many times.  I've done it --
15 I've done it many times.  I don't remember the names
16 offhand, but I've offered that opinion many times.
17     Q   Tell me any case you do remember.
18         MS. KINKADE:  Objection, asked and answered
19 numerous times.
20         THE WITNESS:  Ma'am, I don't remember the
21 exact names.
22 BY MS. GRADY:
23     Q   Okay.  Tell me the details of any case you
24 remember.

---

91

1      A   Coming -- coming -- coming to thought right
2  now is an individual employed in a steel factory that had
3  fallen and injured his cervical spine and had some cervical
4  spinal cord compression.
5      Q   And in that case what was the reason that you
6  were called on to date the spinal cord compression to a
7  reasonable degree of medical certainty?
8      A   I was asked to evaluate this person to give an
9  opinion.
10     Q   About the age of the spinal cord compression?
11     A   Well, the -- the -- I was asked to offer an
12 opinion as to what this person's underlying problem,
13 pathology was, and to -- how long -- how long it had been
14 going on.  So the -- the to try to give an opinion to the age,
15 the relative length that something had been going on.
16     Q   The age of the spinal cord compression?
17     A   Yeah, the age -- the age -- in this
18 individual's case it had to do with the cervical and the
19 thoracic spine.  And this individual had some compression
20 in both of those areas.  And I was asked to offer an
21 opinion as to, you know, the severity of the issue and to
22 give an idea how long this had been going on, whether it
23 was related to this person's cervical incident that
24 happened at work.

---

92

1         MS. KINKADE:  Is this a good time to take a
2  break for five minutes?
3         MS. GRADY:  Sure.
4         (Thereupon, a recess was taken, after which
5  the following proceedings were had:)
6  BY MS. GRADY:
7      Q   You testified that part of your work is
8  performing independent medical examinations, correct?
9      A   Yes.
10     Q   And do you receive income as part of that
11 work?
12     A   Yes.
13     Q   Who pays you?
14     A   Whoever requests me to see the individual.
15     Q   And that would typically be one of the parties
16 to the litigation, is that correct?
17     A   It would be either a -- it could be a -- it
18 could be an employer, it could be an insurance company.  It
19 could be a plaintiff attorney, it could be a defense
20 attorney.  It could be a fire department pension fund, it
21 could be a police department pension fund.  Those are six
22 examples right there.  So those -- union representatives.
23 So those are all people that have asked me to evaluate
24 people.  And whoever would ask me, they would compensate me

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

93

1  for it.

2      Q    So you're typically called on to examine

3  patients in your role as an independent medical examiner

4  after a dispute has arisen in some form, right?

5      A    I wouldn't always say a dispute.  I mean,

6  sometimes — sometimes with workers' compensation issues,

7  just to — to get an opinion whether or not in the case

8  something was work-related or not.  So there wouldn't

9  necessarily be a dispute, but maybe they would want some

10  clarification.  So I wouldn't say that there's always a

11  dispute involved.

12      Q    Okay.  Fair enough.  What percentage of your

13  case -- of your work as an IME deal with disputes that

14  include litigation or even binding arbitration of some sort

15  as compared to your work as an IME that deals with

16  examinations that aren't disputes?

17      A    I don't know if I can give you a percentage as

18  far as dispute versus not dispute.  But many times I've

19  seen — I've seen people for independent medical

20  evaluations, independent medical exams, where there is some

21  dispute involved.

22      Q    Okay.  But you can't give me an idea of

23  whether it's half of the time?

24      A    I don't know.  I would say — you know, I

94

1  would say — I would say maybe half the time.  We're

2  talking about — I've seen people for all the reasons I

3  mentioned a minute ago and — for all of those reasons.

4  And so that's, you know — you know, maybe half the time,

5  maybe more than last time a dispute is involved.

6      Q    In this case you were retained by the

7  attorneys for the defendants, correct?

8      A    Yes.

9      Q    And you offered your opinions to a reasonable

10  degree of medical certainty in a written report, correct?

11      A    Yes.

12      Q    And you never examined Mr. Armbruster,

13  correct?

14      A    That is correct.

15      Q    How many cases other than this one have you

16  offered opinions to a reasonable degree of medical

17  certainty in a written report without examining the

18  patient?

19      A    I've done it a number of times if the medical

20  records were clear enough to where I could just from

21  reviewing the records form an opinion.  So I've done it a

22  number of times.

23      Q    Can you give me an estimate?

24      A    Well, I don't know how I can give you a

95

1  number, but more than — more than 10, let's say that.

2      Q    What percentage of your income comes from work

3  as an expert witness, either an independent medical

4  examiner expert or a retained expert?

5      A    Well, as I think I stated earlier, part of my

6  practice includes performing independent medical

7  evaluations, independent medical exams and/or record

8  reviews.  That takes up approximately 15 to 20 percent of

9  my practice at the present time.  So as far as percentage

10  of my income, everything goes into the same tax ID number,

11  so I can't give you a specific breakdown who the — who

12  the — any more than I said as far as specific percentages.

13      Q    How long does a typical deposition of yours

14  last?

15      A    A typical deposition lasts, most of them last

16  around an hour or less.

17      Q    Okay.

18          (Thereupon, Plaintiff Exhibit 3 was marked for

19  identification.)

20  BY MS. GRADY:

21      Q    The court reporter's handed to you what's been

22  marked as Exhibit 3.  This is a copy of a list of cases

23  produced to us by the attorneys for the defendant that you

24  have testified at previously.  Do you agree that this is a

96

1  current list of all the cases within the past four years

2  that you have participated in a deposition for?

3      A    I don't — I don't know offhand.  I mean,

4  you've shown me a list here, a deposition list, and I don't

5  know how recent this is.  I see the last date on here is

6  March 26th, 2018.  So I'm not sure — I'm not sure whether

7  this is complete or not.

8          MS. GRADY:  Okay.  Well, I'll just state for

9  the record then that Rule 26 (a)(2)(b) requires a list of

10  every case where the expert has provided testimony within

11  the past four years.

12          The expert has just testified that he cannot

13  attest to the accuracy or completeness of this list.  So to

14  the extent that the list is either inaccurate or

15  incomplete, we would ask that the record be supplemented to

16  provide a complete and accurate list.

17  BY MS. GRADY:

18      Q    Let me ask you this, Doctor, have you sat for

19  any depositions before today since March 26th, 2018?

20      A    Yes, I think so.

21      Q    Okay.  Do you keep a list of all the

22  depositions that you sit for?

23      A    Well, just this list that you showed me here,

24  yes.

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

**97**

1    Q    Okay. This is a list that you maintain?
2    A    This -- well, I don't exactly know quite
3    honestly. My office keeps records. I really don't keep
4    these lists. But to answer your question, yes, my office
5    does keep a -- does keep a list of depositions performed.
6    Q    Okay. And you don't have any reason looking
7    at this list to believe that at least as of March 26th,
8    2018 that this list was somehow incomplete or inaccurate?
9    A    No, I don't have any reason to think that
10   that's any -- I mean, I don't know offhand, quite honestly,
11   but I have no reason to question the accuracy of this list.
12   Q    Do you know whether this list includes
13   instances in which you have given testimony at a trial?
14   A    I don't know.
15   Q    Do you keep a list of cases where you've given
16   testimony at trial?
17   A    I don't -- I don't keep a -- I don't keep a
18   specific list of that. As far as trial testimony, that's
19   been very limited.
20   Q    How many times have you testified at trial?
21   A    I think the last time I actually testified at
22   a trial was approximately two-and-a-half, three years ago.
23   Prior to that, you know, several times. But not a lot. I
24   don't think I've done anything for the past about three

---

**98**

1    years.
2    Q    Well, you just said that prior to three years
3    ago you've testified several times but not a lot. So can
4    you tell me how many times you've given testimony at trial?
5    A    I don't know. Ma'am, I don't remember exactly
6    how many times. I'm sitting here thinking. The last time
7    I testified at a trial was about three years ago. Prior to
8    that, I don't remember offhand. It was, you know, two or
9    three years prior to that. So, again, not a lot.
10   Q    Fair to say that you haven't written an expert
11   report in a case where you've offered opinions to a
12   reasonable degree of medical certainty without examining
13   the patient more than 20 times?
14   A    I think you asked me that earlier as far as a
15   report without -- without examining someone?
16   Q    Correct.
17   A    And I think I said earlier I said more than 10
18   times.
19   Q    Right. So I'm asking --
20   A    That's what I said. I can't give you an exact
21   number. You know, a number of times I've done this.
22   Certainly more than 10 times I've offered an opinion where
23   the records were -- where the records were complete enough
24   and thorough enough that I felt that I could offer an

---

**99**

1    opinion.
2    Q    Right. Again, you said that. That's not what
3    I was asking. Do you agree that -- have you given -- have
4    you written a report as an expert in a case where you
5    haven't seen the patient more than 100 times?
6    A    I don't know. I don't think -- I don't
7    think -- I wouldn't say more than 100 times. But I would
8    say less than 100 and more than 10, as I stated earlier.
9    Q    You can't give me any more accuracy than that?
10   A    No, I don't think so.
11   Q    It could be 99, it could be 11?
12   A    Well, I think it's more than 11, but I can't
13   be more specific than that.
14   Q    It could be 75, it could be 15?
15   A    I don't know.
16   Q    Have you ever been retained by anyone who
17   works for Wexford before?
18   A    Yes.
19   Q    How many times?
20   A    I think -- in fact, I'm sitting here thinking
21   maybe two other times offhand that I can think of.
22   Q    In both of those times you offered opinions to
23   a reasonable degree of medical certainty about the work
24   that Wexford's doctors or nurses had performed?

---

**100**

1    A    Well, I offered -- I offered an opinion, a
2    medical opinion after review of medical records. I
3    offered -- I offered an opinion as far as the work
4    performed, the care given by the healthcare providers, etc.
5    Q    Okay. In any of the cases where you've been
6    retained by Wexford, did you ever find that anyone violated
7    the standard of care -- strike that. Let me ask it in a
8    clear way.
9        In any of the prior cases where you have been
10   retained to work as an expert by Wexford, its insurer or
11   any its employees or attorneys, did you ever express a
12   written opinion to a reasonable degree of medical certainty
13   that any of the employees of Wexford violated the standard
14   of care in any way?
15   A    Not -- not that I recall.
16   Q    It was your opinion to a reasonable degree of
17   medical certainty as set forth in your written reports in
18   those cases where you worked with Wexford or their
19   attorneys that the employees of Wexford complied with the
20   standard of care in their treatment, correct?
21   A    As I recall in the cases -- in the cases that
22   I was asked to look at, two or three cases, I think, yes,
23   what you said.
24   Q    Has Wexford's attorneys ever asked you to work

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

**101**

1 as an expert on a case that you refused for any reason?
2       MS. KINKADE: I would object. That
3 communication would be privileged and not subject to the
4 rules of discovery in that case, therefore, it would not be
5 in this case either.
6       MS. GRADY: Well, I think it very clearly goes
7 to bias. It's not identifying any person in any other
8 case. And I think it's very clear. And I think that if he
9 doesn't answer, we're going to come back here and get an
10 answer. It's up to you.
11       MS. KINKADE: I think based on the way that
12 question was asked it is seeking privileged information.
13 So I will advise you not to answer that question.
14       MS. GRADY: And just so my record is clear,
15 I'm not asking the doctor to identify any particular case
16 or any particular patient or any particular issue in which
17 he has refused to work for Wexford. The federal rules
18 prohibit the identify of an expert in a particular case
19 that they have consulted with but not identified in a
20 written report. But I think the case law is very clear
21 that this type of question is admissible.
22 BY MS. GRADY:
23     Q   So with that said, Doctor, are you taking
24 Ms. Kinkade's advice not to answer the question?

---

**102**

1     A   Yes.
2       MS. GRADY: And just so the record is clear,
3 we will be asking for an adverse inference if we're not
4 able to ask that question.
5 BY MS. GRADY:
6     Q   Okay. Let me ask you this, can you tell me
7 for the number of cases in which you have not served as an
8 independent medical examiner but instead served as a
9 retained expert, what percentage of those cases have you
10 been retained by the plaintiff versus the percentage of the
11 cases you've been retained by defendant?
12     A   I don't keep track of that, ma'am. As I
13 stated earlier, I've been asked by all the parties I
14 mentioned earlier to perform independent medical exams and
15 independent medical evaluations. And I really don't keep
16 track. If it comes through an attorney's office, I don't
17 keep track of pay any attention. Whether it comes through
18 a plaintiff's attorney or defense attorney, I think that's
19 irrelevant. My job is to be honest, openminded and
20 independent, and that's what I try to do.
21     Q   Well, it's really important -- strike that.
22       Have you ever offered any opinions that any
23 employee of Wexford, regardless of who you were retained
24 by, violated the standard of care?

---

**103**

1     A   I've only -- I've only seen, as I'm thinking
2 now, two or three cases involving Wexford. And as I -- as
3 I -- in those cases, I do not remember any -- any violation
4 of the standard of care by the healthcare providers that I
5 can remember.
6     Q   Okay. Have you ever been retained by any
7 plaintiff's attorneys representing prisoners who alleged
8 that they were denied care by Wexford staff members?
9     A   Can you repeat that.
10     Q   At any point in time in your career have you
11 ever been retained by an attorney for the plaintiff who
12 alleged that they were denied care by one or more employees
13 of Wexford?
14     A   Well, as I stated a minute ago, I don't really
15 keep track of when somebody's a plaintiff or defense
16 attorney. I think that's irrelevant to me as a physician.
17 The only Wexford people I've seen have been the two or
18 three cases that I mentioned.
19     Q   And who were the doctors involved there, other
20 than Dr. Shah?
21     A   Who are the other physicians involved where?
22     Q   In those other cases where you were retained
23 by Wexler.
24     A   I don't remember the names offhand. It's been

---

**104**

1 over a considerable period of time. I don't remember their
2 names.
3     Q   Well, let's go through it. Your office would
4 maintain records as to who retained you in these cases,
5 correct?
6     A   I don't know. We don't typically ask people,
7 you know. If people -- if somebody wants me to evaluate
8 someone, I'm happy to do so. We don't typically ask them,
9 you know, further questions.
10     Q   Okay. I find that surprising, because in our
11 report, for example, you note -- at every deposition you
12 note who the attorneys are and, in fact, who they
13 represent. So you're familiar with Ms. Kinkade in this
14 case, correct?
15     A   No. I actually never met Ms. Kinkade prior to
16 today.
17     Q   But you noted in your report that Ms. Kinkade
18 was the person doing the questioning of Mr. Armbruster, and
19 you noted specifically in your report -- it's actually the
20 first report I've seen that notes it. You note
21 specifically in your report that Ms. Kincade is the
22 attorney for defense, i.e., Cassiday Schade?
23     A   Yes, I read that, because I read the
24 deposition. And I also noted your name in there, because

---

Case 3:16-cv-00544-MJR-MAB   Document 146-11   Filed 07/31/18   Page 29 of 124   Page ID #3075
Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

27 (105 to 108)

105

1  that's my job. I reviewed the deposition. And the front
2  page of the deposition lists the attorneys involved. It
3  lists your name and who you represent, lists Ms. Kincade's
4  name and who they represent. So when I dictated a synopsis
5  of the deposition, I repeated that just for clarification
6  of the records.
7      Q   So as you were reading Mr. Armbruster's
8  deposition, the first thing you noticed from the first page
9  was that Cassiday Schade was the law firm belonging to the
10 attorneys for the defendant, correct?
11     A   I noticed that. It's the front page of the
12 deposition where people are introduced, where the people
13 are introduced. The attorneys introduce themselves and who
14 they represent and my report states that.
15     Q   And you knew -- the first paragraph of your
16 report states that you received a letter from the office of
17 Mr. Dugan who, according to the address on Page 1 of your
18 report, works for Cassiday Schade.
19         Were you not aware when you were retained in
20 this case whether Cassiday Schade was the law firm for the
21 plaintiff or the defendants?
22     A   In this case -- in this case I believe
23 Mr. Dugan contacted me and asked me if I would review these
24 records. And then he sent me a letter with the records,

106

1  yes.
2      Q   Well, that wasn't quite my question. My
3  question was at the time that you were retained did you
4  know whether or not Cassiday Schade represented the
5  plaintiff or defendants in this case.
6      A   In this case, as I -- as I think I just said,
7  I tried to say, in this case I believe Mr. Dugan contacted
8  me and asked me if I would review these. And at that time,
9  he told me who he was, who his law firm represented, yes.
10     Q   Okay. So this is one of the rare cases in
11 which you knew when you were retained which side you were
12 retained by, is that your testimony?
13     A   Yes. In this case -- in this case, Mr. Dugan,
14 you know, called my office and wanted to refer someone to
15 me for a record review, an independent medical exam. So
16 this is -- this is more than just a routine independent
17 medical exam. It's got a lot more records.
18         And in this case Mr. Dugan called me to ask me
19 if I would review these records and then give my opinion as
20 to what I think was going on. I said, yes, I would. And
21 so at that time then -- I don't remember the specific
22 conversation --
23         MS. KINKADE: And I'm actually going to pause
24 you. We're getting into privileged conversations between

107

1  you and Mr. Dugan. So I'm going to object. It's
2  nonresponsive. And also object to the extent that this
3  question is seeking privileged communication. I believe
4  he's answered your question.
5          MS. GRADY: I think he has.
6          MS. KINKADE: So I'm going to advise you not
7  to answer any further.
8  BY MS. GRADY:
9      Q   Okay. Let's go through this Exhibit 3. On
10 the last page of this exhibit, the very last case listed is
11 Hoilmand versus Swindell. Was that a case in which you
12 were retained by one side versus the other -- or strike
13 that.
14         Who retained you in that case, the plaintiff
15 or the defendants?
16     A   I don't know. I don't remember that case.
17     Q   You don't recall what that case was about?
18     A   No, not offhand.
19     Q   What about the case immediately above that?
20     A   Yes.
21     Q   Who were you retained by, the plaintiff or the
22 defendant?
23     A   I was retained in that case by -- I'm trying
24 to think who -- what that is. I was retained in that

108

1  time -- at that time by an attorney representing, as I
2  recall, an insurance company.
3      Q   Who had been sued in the case?
4      A   Well, I'm not sure whether there was actually
5  a lawsuit involved or not. The only reason I remember that
6  is because Monnie is a strange name that I hadn't heard
7  before. As I recall there was a question whether some
8  medical -- medical conditions she had were related to an
9  automobile accident. I'm not sure there was even a lawsuit
10 involved. It was just -- I think it was just a record
11 review to offer my opinion.
12     Q   You were retained by the people under the name
13 Hendrickson, right?
14     A   No. I think -- I think in that case, again,
15 the reason I remember this is because of the name. This
16 was, I think this was an individual involved in an
17 automobile accident. Hendrickson would have been one of
18 the parties involved in the accident also, right? And I
19 think that in this case I was retained by a law firm
20 representing Hendrickson or their insurance company as I
21 recall.
22     Q   What about Cramer versus Hella Corp Center
23 USA, were you retained by the plaintiff or the defendants
24 in that case?

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

109

1    A   I don't remember.
2    Q   What about Timothy Pawlak versus Hobos on P
3 LLC?
4    A   I don't remember.
5    Q   You maintain billing records, is that correct?
6    A   Yes.
7    Q   And the billing records would show the law
8 firm or insurance company to whom you billed for the time
9 spent reviewing records on the case?
10   A   Yes.
11       MS. GRADY:  Okay.  We would request a copy of
12 those so we can determine who he was retained by in these
13 cases given that he's testified in almost every case that
14 he doesn't remember, but let's keep going.
15 BY MS. GRADY:
16   Q   Earnest versus Mid-State Tank Company, who
17 were you retained by in that case?
18   A   Where are you?  Where are you reading from,
19 ma'am.
20   Q   2/15/2018.
21   A   Okay.  Yeah, I don't -- I don't remember who
22 retained me on that.
23   Q   Chartier, C-H-A-R-T-I-E-R, versus Roof Bolt
24 Express?

110

1    A   I don't -- I don't remember who retained me.
2    Q   Daniel versus Reynolds Consumer Products?
3    A   I don't remember who retained me.
4    Q   Zimmerman versus CPI Corporation?
5    A   I do not remember who retained me.
6    Q   Rollberg versus Casey's General Store?
7    A   I don't remember who retained me.
8    Q   Kantarevic versus HJ Enterprise?
9    A   I don't remember.
10   Q   Can you tell me any of the cases on any of
11 these pages where you do recall who retained you?
12   A   No.  Just -- just the only one I can remember
13 offhand, again, I'm repeating myself, that woman you asked
14 me under 3/5/18, Monnie Bekemeier versus Hendrickson,
15 that's the only one I remember for the reasons I said.
16   Q   So the only cases you remember specifically
17 who you were retained by is this case in which you were
18 retained by defendants, correct?
19   A   Yes.
20   Q   The Bekemeier versus Hendrickson case in which
21 you were retained by the insurance company that had -- from
22 whom Hendrickson had coverage, correct?
23   A   Yes.
24   Q   And the two or three other cases in which you

111

1 were retained by Wexford or their attorneys, correct?
2    A   Yes.
3    Q   So out of the five cases you do remember, you
4 were retained in every case by the defendants, correct?
5    A   In those cases, yes.
6    Q   Okay.  Have you ever worked with Cassiday
7 Schade in particular before?
8    A   Yes, what I just mentioned to you, ma'am,
9 those other two or three cases.
10   Q   And can you describe for me what the issues in
11 those cases were that you were being asked to opine about?
12   A   I don't remember offhand.
13   Q   Were any of them spinal cord compression
14 issues?
15   A   I don't remember.
16   Q   How many cases have you been retained to
17 provide expert opinions on within the last year?
18   A   Well, as part of my practice, as I explained,
19 10 to 15 percent is performing independent medical
20 evaluations and/or record review.  So typically I perform,
21 you know, approximately two to three independent medical
22 evaluations in a week.  So in all of those cases I'm asked
23 to offer an opinion.  So I would say that number of times.
24   Q   And other than this case, how many other times

112

1 in the past year have you been retained to work as an
2 expert without providing an independent medical exam?
3    A   Well, you asked me -- again we're back to what
4 you asked me earlier.  You know, more than 10.
5    Q   No, just within the past year.
6    A   Oh, I would say within the past year, probably
7 more than -- more than three or four times.
8    Q   Okay.  Less than 10?
9    A   Yes.
10   Q   So are you saying it was approximately three
11 to four other times where you were retained as an expert to
12 give opinions without examining the patient within the past
13 year?
14   A   I would say -- I would say within the past
15 year less than ten.  I would say maybe up to -- maybe up to
16 nine but less than ten.
17   Q   You can't give us any more --
18   A   No.
19   Q   -- accurate estimate of just within the past
20 12 months how many times you have been retained to serve as
21 an expert?
22   A   No, just what I said.
23   Q   Have you been retained to work as an expert
24 within the past 12 months by Wexford other than this case?

113

1      A   Yes.
2      Q   How many times within the past 12 months?
3      A   I think maybe -- I don't know for sure.  Maybe
4  one or two other times.
5      Q   Were either of those cases dealing with spinal
6  cord compression?
7      A   Let me think.  One of those cases had some
8  spine conditions involved in it, yes.
9      Q   Tell me about that.
10     A   Well, I don't remember more specific than
11  that, because I see a lot of people.  And so I remember
12  offhand one that I looked at through -- where Wexford was
13  involved where there were some spinal conditions involved.
14  That's all I remember at this point.
15     Q   And did you sit for a deposition in that case?
16     A   I don't think so.
17     Q   Did you write a report in that case?
18     A   I think so, yes.
19     Q   Do you remember the name of the doctor?
20     A   No.
21     Q   Do you remember the name of the prisoner?
22     A   No.
23     Q   How do you advertise your services as an
24  expert?

114

1      A   I don't advertise my services.  I'm -- I'm --
2  my background is what I explained earlier.  I've had a lot
3  of experience.  People know who I am.  As far as
4  advertising as an expert.  But I'm
5  listed as being certified by the American Board of
6  Independent Medical Examiners.  So that comes out in a list
7  of those people certified by that board.  So that's the
8  extent of my advertisement.
9      Q   Do you state on your website that you can help
10  people with reviewing records in legal cases?
11     A   I don't know offhand what it says.  I think
12  it -- I think I'm listed as a -- as -- as being certified
13  by the American Board of Independent Medical Examiners.  So
14  I'm think I'm just listed in that capacity.
15     Q   It's your testimony that you don't advertise
16  on your website your services?
17     MS. KINKADE:  Objection, misstates his
18  testimony.
19     THE WITNESS:  Well, it states -- what I think
20  I said was that I'm certified by the American Board of
21  Independent Medical Examiners.  There's a book that comes
22  out people certified by that board.  I'm listed there as a
23  diplomat of that board.
24  BY MS. GRADY:

115

1      Q   No, I'm sorry, I'm asking about your website.
2  I'm not asking about the thing that gets published by the
3  board.  I'm asking about whether you advertise on your
4  website about your work as an expert.
5      A   Well, as far as my website, I haven't looked
6  at it for a long time.  But my website gives my brief
7  synopsis of my educational background.  I don't know
8  exactly what it says.  But I think it does states that one
9  of the things I do is perform independent medical exams.
10  So I think it probably states that on my website.
11     Q   So looking at Exhibit 3, I counted up the
12  depositions that are listed here.  And according to my
13  count, you sat for 53 deposition in 2014, 55 depositions in
14  2015, 60 depositions in 2016, and 48 depositions in 2017,
15  for a total of 216 depositions.  Do you have any reason to
16  believe that's not an accurate number?
17     A   No.
18     Q   Assuming that those depositions run an hour
19  each, that totals to a little over $205,000 of income.  And
20  if you average two hours for those, that's just shy of
21  $400,000 of income.
22     Do you have any reason to believe that at
23  least with the $205,000, that that's approximately the
24  amount of money you were paid to participate in the

116

1  depositions listed on this exhibit?
2      A   Well, I really wasn't -- what you just said,
3  the figure you said, you stated the number of depositions.
4  You've added them up.  I haven't added them up, okay?  So
5  the fee we've already talked about.  So most them go for
6  about an hour or less.  Some go more.  So as far as the
7  finances, it is what it is.  If I did 150 -- if I did 150
8  depositions, that would be almost 150,000, yes.
9      Q   Right.  So by my count, and I'll represent to
10  you this is correct, even if it's off by a couple, between
11  2014 and 2017 you sat for 216 depositions.  So the total,
12  assuming each deposition took an hour, to over $205,000.
13     A   That would be correct, yes.
14     Q   And can you tell me how much on average how
15  much work for a case you have before it gets to the
16  deposition?
17     MS. KINKADE:  Objection to form.
18     THE WITNESS:  Typically as far as before --
19  before a deposition, I may have seen someone for an
20  independent medical evaluation, independent medical exam.
21  And typically and many times that's it.  But sometimes when
22  there's a dispute, it will go to a deposition.
23  BY MS. GRADY:
24     Q   And you're paid for the time you spend

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

117

1  conducting the independent medical exam, correct?
2  **A   Well, I'm paid separately.  If I perform an**
3  **independent medical examination on an individual, I'm paid**
4  **for that.  If I'm — if I do a deposition, I'm paid for**
5  **that.  Some depositions may be for people that I treated as**
6  **patients, so they're not independent medical exams.  So**
7  **they're all different.  But the fee is different for an**
8  **independent medical exam and a deposition.**
9      Q   Well, how many of these depositions involve
10  work that you've -- that involve depositions that you have
11  sat for as a treating physician as opposed to a retained
12  expert, either an independent medical exam expert or an
13  expert retained to offer opinions without doing an exam?
14  **A   I don't know.**
15     Q   Okay.  Let's just look at a sample here.  On
16  the first page of Exhibit 3 you see that in the month of
17  April you sat for seven depositions, correct?
18  **A   So we're talking April 2014?**
19     Q   Correct.
20  **A   Okay.**
21     Q   And it's your testimony that this represents
22  only about 15 percent of the work that you do, including
23  both the deposition and any other work that you did in
24  connection with these cases?

118

1  **A   What I'm stating is that approximately — what**
2  **I'm stating is that 15 to 20 percent of my practice,**
3  **patients I see, individuals I see, 15 to 20 percent of that**
4  **includes performing independent medical evaluations and**
5  **examinations and/or record reviews.  So that's 15 to**
6  **20 percent of my practice.**
7      Q   Right.  So the other 80 to 85 percent of your
8  time as a doctor is spent actually treating patients that
9  you have not been retained by anyone to give opinions
10  about, correct?
11  **A   Yes.**
12     Q   How many days a week do you work?
13  **A   I have office hours four days a week, so full**
14  **days four days a week.  As I explained earlier, the type of**
15  **practice that I have, I see a limited number of complex**
16  **conditions.**
17     Q   I'm not asking about the work that you do
18  during that time.  I'm just asking you how many days a week
19  you work.
20  **A   So I have office hours four days a week.  Then**
21  **the fifth day I don't have office hours.  I usually use**
22  **that as a day to do dictation, etc.**
23     Q   Okay.  And what are your hours when do work?
24  **A   Office hours are 8:30 to 4:30.**

119

1      Q   And you don't work outside of those 8:30 to
2  4:30 hours, is that right?
3  **A   Well, sometimes.  I mean, that's when I have**
4  **office hours.  If I'm — if I'm — if I have to take care**
5  **of an emergent situation or something, something urgent, I**
6  **will work outside of those hours, yes.**
7      Q   Okay.  But on a typical day the hours that you
8  spend working are Monday through Thursday 8:30 a.m. to 4:30
9  p.m., is that correct?
10  **A   Those are my typical office hours, yes.**
11     Q   Sir, that wasn't my question.  That's why I'm
12  clarifying.  Can you tell me what your schedule is in terms
13  of the days that you work, not just the days that your
14  office is open for patients to walk in, but the days that
15  you actually work.
16  **A   Well, those days.  So I typically work, you**
17  **know, I have office hours Monday through Thursday 8:30 to**
18  **4:30.  So sometimes I leave the office at 5.  Sometimes I**
19  **don't leave the office until 6:30 or so.  And sometimes on**
20  **Fridays I do extra work as far as dictation and that.**
21  **Sometimes I do extra work, dictation, etc. on Saturdays.**
22  **So it all depends.  But I have office hours those four**
23  **days.**
24     Q   Has a court ever, to your knowledge, has a

120

1  court ever disqualified you as an expert for any reason?
2  **A   Not that I'm aware of.**
3      Q   Are you familiar with the Daubert hearing?
4  **A   No.**
5      Q   To your knowledge has a court ever found that
6  your opinions were not credible?
7  **A   Not that I'm aware of.**
8      Q   What percentage of your work deal with cases
9  in state court versus federal court?
10  **A   I don't -- I don't keep track of that, ma'am.**
11     Q   Is this the first case you've ever offered
12  opinions in that arose in federal court?
13  **A   No.  No.**
14     Q   Do most of your cases arise in state court?
15  **A   I believe so, yes.**
16     Q   Do you agree that -- strike that.
17         In your work as seeing patients in your work
18  as a treating physician, do you document your encounters?
19  **A   Yes.  You're asking me as a treating**
20  **physician?**
21     Q   Correct.
22  **A   Yes.  I dictate a report when I see that**
23  **individual, yes.**
24     Q   And do you include as part of that report the

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

121

1  patient's subjective complaints that have been raised to
2  you during that encounter?
3      A   Yes.
4      Q   And the objective findings that you observed?
5      A   Yes.
6      Q   And the testing that you performed -- or
7  evaluations that you performed rather?
8      A   Yes.
9      Q   And the results of those evaluations?
10     A   Yes.
11     Q   And your differential diagnosis, do you
12  document that as well?
13     A   Yes.  I dictate a report going through the
14  basics, yes.
15     Q   Well, when you say going through the basics,
16  what do you mean?
17     A   Well, what I think is relevant, you know, what
18  the -- going through -- I mean, I take a -- I take a
19  history from an individual, and then I will take a history
20  from that person, then I will perform a physical
21  examination, then I will dictate the history, important
22  part of the history, okay, and then I will dictate the
23  important part of physical examination.
24     Q   What do you mean the important part?

122

1      A   Well, what I just said, the portion that is
2  medically relevant and important.
3      Q   Do you agree that the standard of care
4  requires documentation of that?
5      A   Well, I do.  Again, I document -- the report
6  documents subjectively what I'm told, what my opinions are,
7  and, you know, document the significant objective physical
8  findings.
9      Q   Do you agree -- well, let's go back.
10         Do you agree that the standard of care
11  requires accurate documentation?
12     A   Well, you're using the word standard of care,
13  ma'am.  I think that appropriate medical care indicates
14  that someone, you know, appropriately document, let's put
15  it that way.
16     Q   Okay.  You don't agree that the standard of
17  care requires accurate documentation, is that your
18  testimony?
19     A   Well, of course I -- of course I -- what do
20  you define standard of care?  That becomes a very relative
21  term.  I think that most competent physicians are going to
22  take a medical history and they're going to document that
23  and they're going to do an appropriate physical examination
24  and are going to document that.

123

1          Most competent physicians aren't going to put
2  a lot redundant nonsense in a report.  They're going to put
3  important relevant material in there.  That's what most
4  competent physicians are going to do.
5      Q   That's not my question.
6      A   Well, it's an answer to your question.
7      Q   It's not an answer to my question.
8      A   Yes, it is.
9      Q   Is it your testimony that you cannot say
10  whether or not the standard of care requires accurate
11  documentation?  Yes or no to that.
12     A   Well, the standard of care requires doing --
13  yes, the standard of care requires doing an appropriate
14  history and examination and documenting that.
15     Q   That's not my question, so let me ask it
16  again.  Do you agree, yes or no, that the standard of care
17  requires accurate documentation?
18         MS. KINKADE:  I'm going to object to the
19  extent that this limits the doctor's ability to answer the
20  question.
21         THE WITNESS:  Yeah, I think the standard of
22  care does require good documentation, but good
23  documentation is -- what does good documentation mean?  So
24  I think that --

124

1  BY MS. GRADY:
2      Q   That's not an answer to my question, so I'll
3  ask it again, Doctor.
4      A   Okay.
5      Q   Do you agree that the standard of care
6  requires accurate documentation, yes or no?
7          MS. KINKADE:  I'm going to object as asked and
8  answered.  At this point it verges on harassment.
9          THE WITNESS:  Yes, I do.
10  BY MS. GRADY:
11     Q   Do you agree that the standard of care
12  requires documentation of steps of relevant medical
13  evaluation as performed during an examination?
14     A   No, I don't agree with that.
15     Q   Okay.  Do you agree that the standard of care
16  requires documentation of a doctor's differential diagnosis
17  following an encounter with a patient?
18     A   It depends upon what you're considering
19  differential diagnosis.  You're asking a lot of redundant
20  questions here.  The bottom line is I think that the
21  standard of care, again, requires taking -- taking a
22  history, documenting that, doing an examination,
23  documenting that, and putting the important facts there,
24  documenting that, and reviewing the records, reviewing the

Transcript of Frank Petkovich, M.D.

Conducted on May 29, 2018

---

125

1 tests and documenting that. I think that's what standard
2 of care is about.
3         I think standard of care does not include
4 putting a bunch of redundant material that's irrelevant in
5 a report. That is not standard of care.
6     Q   Relevant medical material should be documented
7 according to the standard of care, is that right?
8     A   Yes.
9     Q   Do you agree that documentation of relevant
10 medical information, whether subjective or objective, is
11 important?
12    A   Yes.
13    Q   Why?
14    A   Well, I think it's important because when
15 somebody is being seen you want to keep the records. If
16 you see the person again, you want to remember what you
17 said and what the exam showed, etc., somebody else picks up
18 the chart so they know what's going on.
19    Q   Have you authored any publications on any
20 topic?
21    A   I have not authored any specific — I have not
22 authored any publications to any type of quality medical
23 journal since I've been out of my fellowship. I mean, I've
24 authored little articles in — in news briefs in the

126

1 hospital, small comments and that, but I've not offered any
2 reports in — in, you know, in medical, specific medical
3 journals since I've been out of fellowship.
4     Q   Have you ever authored any publication,
5 regardless of where, on the issue of spinal cord
6 compression?
7     A   No.
8     Q   Have you ever been named as a defendant in a
9 lawsuit?
10    A   Yes.
11    Q   How many times?
12    A   I don't remember off hand. Maybe two or three
13 times.
14    Q   What were the allegations?
15    A   Well, the last time was approximately ten
16 years ago. It was involving a wrist fracture. And another
17 case that comes to mind was maybe, you know, about 15, 20
18 years ago. Two different cases as far as lumbar spine
19 conditions.
20    Q   Do either of those deal with spinal cord
21 compression?
22    A   No.
23    Q   They both dealt with lumbar issues related to
24 the spine?

127

1     A   These two cases that I can think of offhand,
2 yes.
3     Q   What was the outcome in the case involving the
4 wrist fracture?
5     A   The case involving the wrist fracture, I don't
6 know exactly what happened because it was a — it was an
7 insurance — an insurance company. I'm not sure what they
8 ended up doing with it, to be honest with you. It was an
9 insurance policy where I had no control over it and I'm not
10 sure what they did with it.
11    Q   Do you remember the name of the patient?
12    A   No.
13    Q   Do you know whether it settled?
14    A   I don't — I think it did settle. It was a
15 ridiculous situation. That's the only reason I remember
16 it. The way I remember it, what I just said, and I don't
17 remember what happened.
18    Q   When you say it was a ridiculous situation,
19 tell me what you mean by that.
20    A   Well, if you want to get into that, this guy
21 had broken his wrist and had a cast on his arm and then
22 went out and started doing heavy physical labor with his
23 cast on. And so then his wrist slipped and fell apart. So
24 it wasn't a real intelligent thing to do. So I'm not sure

128

1 exactly what happened.
2     Q   And what about the lumbar cases that you
3 testified about, what were the outcome in those cases?
4     A   Both of those went to court and both of those
5 I won.
6     Q   Other than the wrist fracture, are you aware
7 of any other case where an insurance company has paid money
8 on your behalf to settle a lawsuit against you?
9     A   No.
10    Q   Have you ever paid money out of your own
11 pocket to settle a lawsuit?
12    A   No.
13    Q   Have you ever filed a lawsuit?
14    A   No. No.
15    Q   You're licensed to practice medicine by the
16 state of Missouri and the state of Illinois, correct?
17    A   Yes.
18    Q   Have either of those licenses ever been
19 suspended or revoked for any reason?
20    A   No.
21    Q   Have you ever been the subject of official or
22 unofficial by either of those licensing bodies?
23    A   No.
24    Q   Have you ever been licensed to practice

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

33 (129 to 132)

129

1  medicine in any other states?
2      A  Yes.  When I was doing a fellowship in
3  Louisiana, I had a temporary license there.
4      Q  And during -- you don't still have a license
5  there, correct?
6      A  No.
7      Q  During the time that you were licensed by the
8  state of Louisiana, were you subject to any official or
9  unofficial discipline?
10      A  No.
11      Q  What was the reason that your -- what is the
12  reason you're no longer licensed to practice medicine --
13      A  Because it was temporary while I was doing a
14  fellowship there.
15      Q  Was your license ever suspended or revoked in
16  Louisiana for any reason?
17      A  No.
18      Q  Part of your work as a spinal surgeon during
19  the time that you were performing surgery was to order
20  MRI's or x-rays, correct?
21      A  Yes.
22      Q  And when you order an MRI or an x-ray, a
23  radiologist typically generates a report?
24      A  Yes.

130

1      Q  Do you review those reports?  Did you review
2  those reports typically when you were doing spinal surgery?
3      A  I would review the actual studies, the actual
4  films and the report, yes.
5      Q  And does that include MRI studies as well?
6      A  Yes.  All radiographic studies involving an
7  individual that was being seen by me, whether they be, you
8  know, a patient or an evaluation, independent medical
9  evaluation, I always like to review the actual radiographic
10  studies, including x-rays, MRI's, CT's, etc. and the
11  reports.
12      Q  Why is that?
13      A  Well, that's part of -- that's part of the
14  evaluation.  That's part of the exam, part of examining --
15  the radiographic studies are part of the process.
16      (Thereupon, Plaintiff Exhibit 4 was marked for
17  identification.)
18  BY MS. GRADY:
19      Q  The court reporter has handed you what's was
20  marked as Exhibit 4.  This was copy of a March 27, 2018
21  report that according to this document was written by you.
22  Can you review this and let me know whether this is in fact
23  your final report in this case.
24      I'm sorry, not your final report, because

131

1  there was an addendum.  But whether this a report
2  expressing your opinions to a reasonable degree of medical
3  certainty as of March 27th, 2018?
4      A  Yeah, this looks like the complete report.
5      Q  Can you tell me when you were first retained
6  in this case?
7      A  Let's me see here.  I have a letter dated
8  March 5, 2018 from Mr. Dugan.
9      Q  And in that letter were you told to make any
10  assumptions regarding this case?
11      A  No.
12      Q  In that letter were you given any facts that
13  you relied on to form your opinions in this case?
14      A  No.
15      Q  What was your understanding of your assignment
16  in this case?
17      A  Well, I don't know if I would use the word
18  assignment, but I was asked if I would review these medical
19  records and offer an opinion.
20      Q  Any opinion that you had about any of the
21  medical records?
22      A  Yeah, I was -- I was sent a letter from
23  Mr. Dugan, March 5, 2018.
24      MS. KINKADE:  Dr. Petkovich, I'm just going to

132

1  advise you not to read the letter into evidence here but to
2  testify based on your impression of what your assignment
3  was.
4      THE WITNESS:  No, I wasn't going to read the
5  letter.  But the bottom line is I received this letter and,
6  you know, with -- with medical records, which I have in
7  front of me, and I was asked to review them.
8  BY MS. GRADY:
9      Q  Okay.  Are all of the opinions that you
10  reached about your review of those records or anything else
11  that you reviewed in connection with that case are included
12  in this report and the addendum you wrote on April 17th,
13  2018, correct?
14      A  Yes.
15      Q  Okay.  Did you ever or do you now have any
16  hesitation about any of the opinions that you've laid out
17  in these reports?
18      A  No.
19      Q  At that time you submitted this report on
20  March 27th, 2018, you didn't have any additional opinions
21  about the case that don't appear in the report, correct?
22      A  That is correct.
23      Q  I want to talk to you about the materials that
24  you reviewed.  You list those on Page 5.  And I believe

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

133

1  Ms. Kinkade just sent me a list.  Are there any documents
2  that you reviewed in connection with this case that do not
3  appear on this list?
4      A   No.
5      Q   Strike that.  Let me ask it in a different
6  way.  I'm going to ask you whether you received any
7  materials after writing this report.  But we know from your
8  April 17th report that, in fact, you received additional
9  materials, I think, according to the report where you say
10 you got all of the images.
11      So as of March 27th, 2018, were there any
12 materials that you received that do not appear on Page 5
13 under Numbers 1 through 9?
14     A   As of my letter dated March 27th, 2018, the
15 material I reviewed is as outlined in that report.
16     Q   Are there any materials that you were given,
17 even if you didn't review them, prior to submitting your
18 final report?
19     A   Just what I have outlined in that report.
20     Q   Are there any materials that you asked for?
21 Did you ask for any additional records at any time?
22     A   No.
23     Q   Are there any documents that you can think of,
24 including the radiographic images -- strike that.

---

134

1      Let me ask you this first.  After issuing your
2  report on April 17th, 2018, did you recieve any additional
3  materials?
4      A   Yes.
5      Q   What materials were those?
6      A   I received a copy of the deposition of
7  Dr. Gregory Bailey, I received a copy of record review by
8  Dr. Peter Brown, and I received a copy of a review by a
9  Dr. Stephen Sanders.
10     Q   Any other documents?
11     A   No.
12     Q   You did not review any deposition testimony of
13 any of the nurses in this case, correct?
14     A   That is correct.
15     Q   You did not review the letter from Dr. Bailey,
16 is that correct?
17     A   I reviewed the deposition of Dr. Bailey.  Is
18 that not your question?
19     Q   Did you receive the exhibits to that
20 deposition?
21     A   I don't believe so.
22     Q   So that deposition involved questions that
23 Dr. Bailey asked.  But Dr. Bailey also wrote a letter in
24 this case.  Have you reviewed that letter?

---

135

1      A   I don't believe so.
2      Q   Okay.  Did you review any of the materials in
3  your report prior to today's deposition in order to help
4  you prepare for today's deposition?
5      A   Yes.
6      Q   What materials did you review?
7      A   Well, I reviewed the -- I reviewed my reports,
8  which I think you asked me about, and then I went through
9  some of these other records here, more specifically records
10 that I received, I just mentioned Dr. Bailey's deposition
11 and the report from Dr. Brown and the report from
12 Dr. Sanders.
13     Q   Sorry.  Go ahead.
14     A   No, that's it.  That's what I reviewed.  I
15 went through the record also, but I zeroed in on what I
16 just said.
17     Q   Okay.  Approximately how long did you spend
18 preparing for the deposition?
19     A   Spent approximately four4 hours.
20     Q   And do you intend to bill for that time?
21     A   Yes.
22     Q   Did reviewing Dr. Bailey's deposition
23 transcript change any of the opinions that you hold in this
24 case?

---

136

1      A   No.
2      Q   Did reviewing Dr. Brown's report change any of
3  the opinions that you hold in this case?
4      A   No.
5      Q   Did reviewing Dr. Sanders' report change any
6  of the opinions that you hold in this case?
7      A   No.
8      Q   Let's talk a little bit about this report.
9  The way I understand the structure of this report is that
10 the first five pages include a summary of the facts?
11     A   Which report are you talking about?
12     Q   The March 27th report, Exhibit 4.
13     A   Okay.
14     Q   The first five pages of this report recite the
15 facts that you reviewed?
16     A   Yes.
17     Q   And then Pages 6 and 7 list the opinions that
18 you hold as it relates to this case?
19     A   Yes.
20     Q   Okay.  Did you state in the first five pages
21 every fact on which your opinions rely?
22     A   Well, I -- I didn't state every fact.  I tried
23 to summarize reviewing the records where I reviewed, and
24 I summarized my opinions.  So I didn't state every

---

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

137

1  exact fact.
2      Q   Okay.  Just to be clear, you did not include
3  as part of your report every fact upon which your opinions
4  as laid out in Exhibit 4 rely, is that true?
5      A   Well, that's an extremely broad question.  I
6  mean, a lot of my opinions were based on my educational
7  background.  Every fact, everything that I depend upon goes
8  through, you know, four years of medical school, seven
9  years of residency.  You know, that's a long time.  As far
10 as what I base my opinion on, it's based upon all of that.
11 It's based upon all that and review of these records.  My
12 opinions are based on all of that.
13     Q   Is it your testimony that you completed seven
14 years of residency?
15     A   Yes.
16     Q   You've listed on Exhibit 2 your internship
17 year from 1973 to 1974.  That was one year, correct?
18     A   Yes.
19     Q   And then you worked as a resident at the
20 orthopedic surgery department at the University of Missouri
21 at Kansas City from 1976 to 1980, correct?
22     A   Right.
23     Q   That's four years, correct?
24     A   That's five years.  And as I said earlier, I

138

1  worked for two years, I was at George Washington
2  University.  I don't have that listed there.  But part of
3  that time I was officially doing some training there, some
4  extra training in general surgery and anesthesia.  At
5  that time I also worked in the emergency room.  So that's
6  all part of that time.
7      Q   Why didn't you list it on your CV?
8      A   Because I didn't take any credit for that
9  period of time.  So I didn't need that time, so I didn't
10 claim any kind of credit for it.
11     Q   Did you get compensated during that time?
12     A   I was compensated as a resident, yes.  I was
13 compensated by George Washington University as a resident.
14     Q   Okay.  So other than your experience on which
15 you base these opinions, are there any facts of this case
16 on which your opinions rely that you have not included on
17 Pages 1 through 5 of your report on Exhibit 4?
18     A   No.  I think that pretty well summarizes it.
19     Q   Okay.  Let's go through these.  On the fourth
20 paragraph -- fifth paragraph, sorry, the last paragraph of
21 Page 1 of Exhibit 4, you make a notation of a June 26th,
22 2011 encounter between Mr. Armbruster and staff at the
23 Gateway Regional Medical Center regarding a complaint of a
24 sore throat.  Do you see that?

139

1      A   Yes.
2      Q   Now, let's turn to Page 6 and 7 and tell me
3  what if any of the opinions that you've disclosed in this
4  report that June 2011 encounter is relevant to.
5      A   That June 26th, 2011 emergency department
6  visit is not relevant to any of those opinions on Page 6
7  and 7.
8      Q   Okay.  I want to ask you about some terms you
9  used on Page 2 of this report.  You say that
10 Mr. Armbruster, about halfway -- well, no, probably more
11 like three-quarters of the way down on that first block
12 paragraph, you talk about Mr. Armbruster.  You say
13 Mr. Armbruster underwent surgery on that date for anterior
14 cervical discectomy and decompression at the C5-C6 level
15 with anterior cervical fusion and instrumentation at the
16 the C5-C6 level.  I want to ask you some questions about
17 what those phrases mean.  Do you see where in your report
18 you've included that statement?
19     A   Yes.  Yes.
20     Q   Okay.  What is anterior cervical discectomy?
21     A   Okay.  So what that means is from an anterior
22 approach, from the front, from the front of your throat,
23 spine area, you're making an incision there, a transverse
24 incision, and you dissect down to the anterior vertebral --

140

1  the anterior vertebra.  And you retract the soft tissues
2  to the side and you're exposing the intervertebral disc.  In
3  this case it's C5-6.  And you put an appropriate marker in
4  there to identify your mark.
5          You, then, you do an anterior cervical
6  discectomy at that time.  So the way you do that, you
7  put a -- you put a pin, like a screw in C5.  You put one
8  screw in C6.  And then you put a retractor over that, and
9  then you spread the retractor.  And what that does, that
10 starts to open up the disc space.
11         And then you go in there and you bring a
12 microscope in to better visualize it.  And then you
13 surgically, elliptically excise that disc.  And then what
14 you do is you spread it a little bit more, and you're
15 opening up -- you're -- you're -- you're taking that disc
16 out.  You're going to the back of the vertebral body,
17 what's called the posterior longitudinal ligament, and
18 you're opening that up and you're dissecting, taking the
19 bone off there and you're decompressing, taking the
20 pressure off the spinal canal.  So that's what that means,
21 anterior cervical discectomy and decompression.  So then --
22     Q   Thanks.  I'm going to go to my next question.
23         The next thing you note is -- so what is
24 instrumentation at the C5-C6 level?

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

141

1       A   So what that means is so to do -- so what I've
2   just described as the discectomy, the decompression part of
3   the surgical procedure, okay.  And as you do that, you're
4   going to see the dura.  It's going to be right there.  You
5   decompress the canal.  Then you put a bone graft in that
6   space so it will fuse.
7       And then the instrumentation is whatever you
8   put in there to stabilize that level.  So it could be a
9   plate and screws.  There's other kind of fixation devices,
10  but you put a fixation device in there to stabilize those
11  levels so that fusion becomes solid.
12      Q   I see.  Okay.  And then you note some other --
13  you note some other things about the discharge from the
14  hospital.  The very last line of that paragraph states, the
15  radiology report for that study, referring to the study of
16  March 16th, 2015, showed good structural alignment and
17  position.
18      In that -- I understand that at the time that
19  you issued this report you didn't have the actual images
20  themselves, correct?
21      A   That is correct.
22      Q   So in reviewing the report, did you understand
23  that to refer to the spine?  The good structural alignment
24  and position, did you understand that to refer to the

142

1   spine, the spinal cord or both of them?
2       A   So that would have referred to the spinal
3   column.  So on the plain x-rays you're not going to see the
4   spinal cord, but you're going to see the bone graft, you're
5   going to see the alignment of the cervical spine, and
6   you're going to see the hardware in place.
7       Q   So that radiology report does not comment upon
8   the appearance of the spinal cord, correct?
9       A   That is correct.
10      Q   Okay.  The next paragraph details the date of
11  Dr. Shah's deposition and some of his background.  Can you
12  tell me, turning to Page 6 and 7, what if any relevance
13  those had to the opinions in this report on Exhibit 4?
14      A   Well, I think the relevance is that Dr. Shah
15  was the treating physician in the situation who saw
16  Mr. Armbruster.  And I think that his background and his
17  educational -- his educational background and experience,
18  to me, showed that he was qualified to evaluate and examine
19  Mr. Armbruster, and his opinions were -- his opinions were
20  backed up by his educational background.
21      Q   Tell me what you mean by that last part.
22      A   Okay.  Well, I don't know Dr. Shah personally,
23  but he is a board certified general surgeon.  So that's
24  what his educational background is.  So he was in practice

143

1   for a number of years.  So by having said that, I would
2   think that he's qualified as a physician for what he was
3   doing, working in this prison.
4       Q   But you didn't reach any opinions in this
5   report as to whether or not Dr. Shah was qualified to
6   provide medical care in the prison, correct?
7       A   Well, I listed on Page 2 of my report his
8   educational background.  So I listed his educational
9   background.  And then on Page 6 and 7 I gave my opinions,
10  what my report states, question one, where he was seen on a
11  number of occasions by Dr. Shah, etc., etc., etc.
12      Q   Right.  I mean, I can read the opinions you've
13  disclosed.  My question is -- well, let me ask it this way,
14  is there any opinion that would change -- are you
15  testifying that your opinions are based on your finding
16  that Dr. Shah's educational background was what it was?  In
17  other words, does your opinion that he acted within the
18  standard of care depend on his training?
19      A   Well, obviously part of it does.  I mean part
20  of it does, plus his -- plus the reports in the chart, in
21  his records.  So but, you know, so period.  So, you know,
22  part of my opinion is based upon his educational
23  background.
24      Q   All right.  Fair enough.  Let's turn Page 3.

144

1   You note on the first full paragraph, or the second
2   paragraph there, that the complaint lists, quote, multiple
3   subjective complaints by Mr. Armbruster.  You're aware of
4   the purpose of a complaint filed in a lawsuit, right?
5       A   Yes.
6       Q   It actually is required to make claims
7   complaining of what the issue that brings the lawsuit to
8   existence is, right?
9       A   Yes, to my understanding.
10      Q   Okay.  Can you tell me what you mean, why do
11  you use the word subjective here?
12      A   Well, subjective were complaints that
13  Mr. Armbruster had and he had.
14      Q   Okay.  But all plaintiffs' complaints are
15  subjective complaints, right?
16      A   Yeah, I think so.  Yeah, I agree with that.
17  Subjective just means the individual stating those, that's
18  what they're stating.
19      Q   Okay.  The next paragraph at the very bottom
20  you say -- do you want to take a break?
21      THE COURT REPORTER:  No, I'm good.  Thanks.
22      MS. GRADY:  Actually now is a good time.
23  Let's take a five minute break.
24      (Thereupon, a recess was taken, after which

145

1  the following proceedings were had:)
2  BY MS. GRADY:
3      Q   So let's turn back to Exhibit 4 on Page 3.
4      A   Let me see here.  Okay.
5      Q   That's the paragraph that starts with I
6  reviewed the medical records.
7      A   Yes.
8      Q   And you say from review of those medical
9  records and Dr. Shah's deposition, Dr. Shah never saw any
10  indication of any spinal cord condition or nerve root
11  condition while Mr. Armbruster was seen at the clinic.  Can
12  you tell me what you mean by that, never saw?
13      A   Dr. Shah reported a normal neurologic
14  examination when he saw Mr. Armbruster.
15      Q   So is it your opinion as expressed on Page 3
16  that there were no indications of any spinal cord condition
17  or nerve root condition or simply that whether or not
18  present they were not observed by Dr. Shah?
19      A   It's my opinion from reading those reports
20  that there were no indications of any neurologic deficit or
21  any spinal cord compression at that time.
22      Q   Okay.  And then just to be clear, that opinion
23  is based solely on the review of the medical records and
24  Dr. Shah's deposition, correct?

146

1      A   Yes.
2      Q   It does not take into account Mr. Armbruster's
3  testimony, correct?
4      A   No.
5      Q   Okay.  The next paragraph of your report
6  details a lot of Mr. Armbruster's history, including his
7  family status and his incarceration history.  Can you tell
8  me, turning to Page 6 and 7, what if any relevance that has
9  to any of your opinions that you've expressed in this
10  report on Exhibit 4?
11      A   Yeah, I don't know that his -- his -- his
12  family background has any relevance other than just doing a
13  thorough history is part of basic medical practice.
14      Q   Okay.  You agree that Dr. Shah never
15  documented Mr. Armbruster's family history, correct?
16      A   No, he did not, not that I'm aware of.
17      Q   And is it your opinion that by failing to --
18  well, strike that.
19          Is there any evidence in the record to suggest
20  that he obtained that history even if he didn't document
21  it?
22      A   I don't know.
23      Q   Just to be clear, you haven't reviewed any
24  evidence in the record suggesting that he collected this

147

1  history, correct?
2      A   Not -- not that I'm aware of.
3      Q   And is it your testimony that if he failed to
4  collect that history that he failed to conform to the
5  standard of care?
6      A   No.  I just, I think that's part of the past history which I was
7  stated, I think that's part of the past history which I was
8  asked to do, but I don't think that, I don't think that was
9  really relevant, that past history really relevant -- I
10  don't think a lot of that past history was really relevant
11  to Mr. Armbruster being seen by Dr. Shah.
12      Q   Okay.
13      A   The one part that was relevant is, you know,
14  obviously Mr. Armbruster did have a history of an incident
15  in 2011, and I don't know that that was ever mentioned in
16  the records when he saw Dr. Shah.
17      Q   Any others of history that was relevant?
18      A   Well, not that I recall offhand.
19      Q   Well, Dr. Petkovich, this is my only
20  opportunity to ask you questions before you take the stand
21  and express opinions to a reasonable degree of medical
22  certainty about why the jury should find for Dr. Shah in
23  this case.  So I want to make sure that you have the
24  opportunity to think about it.

148

1          And I want to make sure that aren't things
2  that you will recall after this deposition before you take
3  the stand about prior history that was relevant to your
4  opinions in this case, other than the 2011 visit that you
5  stated.
6      A   I don't -- I don't recall anything else, no,
7  ma'am.
8      Q   Okay.  You agree that there's no evidence in
9  the record -- in fact, it's your testimony that you didn't
10  see any evidence in the record that Dr. Shah was aware of
11  this 2011 visit between Mr. Armbruster and the staff at
12  Gateway Regional Medical Center, correct?
13      A   That's correct.
14      Q   And turning to Page 6 and 7, on Paragraph 2
15  you detail the care that Mr. Armbruster received there,
16  correct?
17      A   Yes.
18      Q   In your first sentence you note the date of
19  the encounter and the complaints that Mr. Armbruster
20  raises?
21      A   Yes.
22      Q   You note in the second sentence that
23  Mr. Armbruster was released after an evaluation and told to
24  follow-up with a physician, correct?

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

149

1     A   Yes.
2     Q   And then you note that Mr. Armbruster did not
3   return for follow-up visits after that emergency department
4   visit on May 2nd, 2011, correct?
5     A   Yes.
6     Q   And although, in fact, according to your own
7   record, he does, in fact, return to the Gateway Regional
8   Medical Center approximately six weeks later, right?
9     A   He returned six weeks later for a totally
10  different issue with a sore throat.
11    Q   Okay. So your statement there is specific
12  that he didn't return for a follow-up appointment with
13  respect to the May 2nd appointment?
14    A   Yes.
15    Q   And then in the last sentence of Paragraph 2,
16  you note that Mr. Armbruster did not tell medical personnel
17  at the prison about that emergency department visit,
18  correct?
19    A   Yes.
20    Q   In my review of Paragraph 2 and anywhere else
21  in the opinions that you've expressed in this report, I
22  don't see any opinion that you've expressed about how that
23  impacted Dr. Shah's care. If you can, please point to me
24  in your report, if you have one, of any disclosed opinion

150

1   that you've included detailing how Mr. Armbruster's 2011
2   encounter either impacted the care that should have been
3   performed or the care that Dr. Shah would have performed
4   had he been aware of that encounter?
5     A   I don't think it really changed the encounter
6   with Dr. Shah. I think it's part -- I think it's relevant
7   past medical history that Mr. Armbruster should have
8   disclosed, but I think -- I think it's relevant, but I
9   don't know that if I were Dr. Shah that I would have done
10  anything any different. So I don't think -- I don't think
11  that it really impacted, would have impacted the way he was
12  treated by Dr. Shah.
13    Q   Let's go back to the last paragraph on Page 3.
14  In this paragraph you detail -- in the first sentence you
15  detail, Mr. Armbruster states he went to the prison medical
16  clinic on numerous occasions with multiple complaints.
17        Are you talking specifically in the time frame
18  between May 2014 and September of 2014 or do you mean
19  generally over the course of his incarceration?
20    A   I meant generally over his time of
21  incarceration.
22    Q   And what relevance did the fact that he raised
23  complaints related to other health issues have on any of
24  the opinions that you disclosed in this case?

151

1     A   Well, it means to me that Mr. Armbruster
2   seemed to be going to the medical clinic on -- on numerous
3   occasions, many times for -- for reasons where he didn't
4   really need to be going to the medical clinic.
5     Q   Well, that's not an opinion that you've
6   disclosed in this case, so for the record I'm going to
7   object to the extent that defendants attempt to introduce
8   that opinion in this case. That's not my question.
9     A   Well, I think it's an answer to your question,
10  quite honestly. I mean, I zeroed in here, but I think that
11  he went there -- I did disclose. I said he was seen on
12  numerous occasions.
13    Q   Tell me where in that sentence you disclose an
14  opinion about whether or not Mr. Armbruster needed to be
15  seen on occasions other than between May 2104 and September
16  2014.
17    A   Well --
18        MS. KINKADE: Objection, argumentative.
19        THE WITNESS: -- it states right there, he was
20  seen in the prison's medical clinic on numerous occasions
21  with multiple complaints. He was seen during that time for
22  high blood pressure. He was also seen for diabetes. And
23  it goes on and on.
24  BY MS. GRADY:

152

1     Q   So nowhere other than those three sentences do
2   you contend that you have disclosed any opinion about
3   whether or not Mr. Armbruster needed to be seen on any
4   occasions before May of 2014 or after September of 2014,
5   correct?
6     A   Well, I mean, I think my report speaks for
7   itself. I don't know what else I can say.
8     Q   Well, I agree. But I don't think that you've
9   disclosed any opinion about care rendered by the IDOC or
10  any of its staff prior to May 2014. So if that's
11  incorrect, I'd like you specifically point me to any
12  sentence in the report where you offered an opinion about
13  Mr. Armbruster's need for care prior to May of 2014.
14    A   You know, I really have not -- I have not
15  documented that. I have not documented that specifically
16  in the report.
17    Q   Okay. And tell me, Dr. Petkovich, other than
18  being paid to offer opinions about whether or not
19  Wexford -- strike that.
20        Other than being retained by Wexford to offer
21  opinions about whether its employees did or did not violate
22  the standard of care in instances where you found they did
23  not, what other experience do you have in the field of
24  correctional healthcare?

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

153

1  A   As far as -- as far as I've told you instances
2  I've seen two or three times people through Wexford, prison
3  cases.  And my only other experience, I've had prisoners
4  when I was an intern resident at the University of
5  Illinois, Chicago, several times we had prisoners brought
6  in from Cooke County Hospital to the medical clinics.
7       And also when I was a resident in Kansas City,
8  several times we had residents brought into the orthopedic
9  clinics.  So those are examples.
10  Q   Well, are there any other experiences that you
11 have in the field of correctional healthcare?
12  A   No, I think that's pretty much it.  I think
13 that pretty much is it.
14  Q   The instances you were retained by Wexler, my
15 understanding was that you were retained to offer opinions
16 without examining the patient.  Have you ever been on site
17 at a facility where Wexler provided medical care to examine
18 a patient?
19  A   Not that I can recall.
20  Q   Have you ever been on site at a correctional
21 facility to provide medical care to any prisoner?
22  A   Not that I recall.
23  Q   And when patients come to see you as a
24 treating physician, it's your testimony that they typically

154

1  have already seen another doctor for the exact same issue
2  and they're coming to you for a second or a third opinion,
3  correct?
4   A   Are you asking me specifically as far as my,
5  in my routine day-to-day practice?
6   Q   Correct.
7   A   I see, sometimes I see people, old patients
8  that I've seen or family members.  And then a lot of people
9  I see are what I said earlier, second and third opinions.
10 So I see all of the above.
11  Q   Do you know whether prisoners have the ability
12 to obtain any second opinions?
13  A   I don't know the specifics of the prisoners,
14 quite honestly.  Well, as far as their medical care is,
15 other than reviewing these records, they're being seen as
16 these records, I'm not -- I'm not sure what they do beyond
17 that.
18  Q   Okay.  You're not aware of the system by
19 which, if any, by which prisoners could obtain a second
20 opinion, right?
21  A   I don't know.
22  Q   And are you aware of what medications
23 prisoners can have access to without needing to see a
24 doctor or other medical professional, including

155

1  over-the-counter medication?
2   A   So like what type of medications are you
3  talking about?
4   Q   So like Tylenol.  Do you know whether a
5  prisoner can obtain Tylenol without being seen by medical
6  staff?
7   A   I don't know specifically -- I don't know
8  specifically what medications they can take without seeing
9  a medical staff.
10  Q   Have you reviewed Wexler's formulary?
11  A   No.
12  Q   Do you know whether they can obtain any
13 over-the-counter medications without seeing a member of the
14 medical staff?
15  A   I don't know.
16  Q   You note at the very last full sentence on
17 Page 3, in Mr. Armbruster's deposition he stated that the
18 surgery helped him.  His grip strength and ambulation
19 recovered.
20       Is it your understanding of Mr. Armbruster's
21 deposition testimony that he testified that his ambulation
22 fully recovered?
23  A   I don't remember what he testified to, quite
24 honestly.  I remember, you know, the medical records

156

1  reviewed by the physicians, which I state in my report,
2  stated that he recovered, but I'm not sure what
3  Mr. Armbruster states.
4   Q   Did you, between the medical records and
5  Mr. Armbruster's testimony, did you find one more credible
6  than the other?
7   A   Yes.
8   Q   Tell me which one you found more credible.
9   A   Well, I think in my report from March 27th,
10 2016, I mentioned where Mr. Armbruster was seen by a
11 Dr. Kristina Naseer.  She's a physiatrist in Belleville,
12 Illinois.  He was seen by her in March 2015.
13  Q   This is not an answer to my question, Doctor.
14 I asked you whether you found, one, medical records or
15 Mr. Armbruster's deposition testimony, whether you found
16 one more credible then the other.
17  A   Well, I'm trying to answer your question,
18 ma'am.  The point being is Dr. Naseer is a physician.
19 She's a physiatrist.  She should know, and I think she
20 does -- she does --
21  Q   Again, Doctor, I'm not asking for the --
22  A   Wait a minute.  She obviously is more credible
23 with her educational background then Mr. Armbruster is,
24 period.  So I think that she knows a little bit more, a lot

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

157

1  more about neurology than Mr. Armbruster does.
2      Q    And did your opinions rely on those
3  credibility determination?
4      A    Yes, her -- her opinion and this Dr. Hsieh,
5  I'm not sure how to pronounce his name, H-S-I-E-H, both of
6  them stated that Mr. Armbruster had a normal neurologic
7  examination, and Dr. Naseer thought that Mr. Armbruster
8  could return to work without restrictions.
9      Q    So because of that, you discounted
10 Mr. Armbruster's testimony to the contrary, correct?
11         MS. KINKADE: Objection.  Assumes -- hold on.
12 Assumes facts not in evidence.  Argumentative.
13 BY MS. GRADY:
14     Q    You can answer, Doctor.
15     A    I didn't discount his deposition.  I think the
16 bottom line is these are two qualified physicians who have
17 made a comment, and I think they know a lot more about
18 medicine than Mr. Armbruster does.
19     Q    Okay.  Who between Dr. Naseer and
20 Dr. Armbruster actually experiences the neurological
21 symptoms he reports?  Would you agree with me that
22 Dr. Naseer doesn't experience the neurological symptoms on
23 Mr. Armbruster's body?
24     A    Well, she examined Mr. Armbruster.

---

158

1      Q    That's not my question, so let me ask it
2  again.  Do you agree that Mr. Naseer does not experience or
3  feel the neurological symptoms that Mr. Armbruster reports?
4      A    Obviously Dr. Naseer is not Mr. Armbruster.
5      Q    And so would not feel that Mr. Armbruster
6  reported, correct?
7      A    That's true.
8      Q    So between Dr. Naseer and Mr. Armbruster, who
9  would have a more accurate understanding of the symptoms
10 that Mr. Armbruster reported?
11         MS. KINKADE:  Just object as argumentive.
12 BY MS. GRADY:
13     Q    That's fine.  I'll withdraw it.
14         So you agree that Mr. Armbruster testified as
15 of the date of his deposition he continued to suffer from
16 difficulty walking, correct?
17     A    I don't have his deposition memorized, but as
18 I recall, that's what he stated.
19     Q    And you agree that he testified that he
20 continues to suffer from pain in his extremities, correct?
21     A    I think that's what he stated in his
22 deposition.
23     Q    And so is it your testimony that you
24 discounted that testimony or that you did not discount that

---

159

1  testimony?
2      A    No, I did not discount his testimony.  But I
3  don't think that he's accurate.  Two physicians have said
4  otherwise, i.e., Dr. Naseer and Dr. Hsieh, and I think that
5  their -- I think their opinions are more qualified than
6  Mr. Armbruster's.
7      Q    So it's your testimony that Dr. Naseer is more
8  credible than Mr. Armbruster on the level of pain that
9  Mr. Armbruster suffers from today, is that correct?
10     A    I think Dr. Naseer is more qualified.  I think
11 she's more qualified and more sincere, yes.
12     Q    Okay.  And your opinions rest on those
13 determinations, is that true?
14     A    Well, my opinions are what I just stated.
15     Q    But the opinions you've reached in this report
16 disclosed at Exhibit 4 rest on your determination that
17 Dr. Naseer and Dr. Hsieh, which is how you pronounce his
18 name, are more sincere than Mr. Armbruster, correct?
19     A    Yes.
20     Q    Okay.  I want to go to Page 4.  You stated
21 that as of the March '15 -- well, the March 2015 visit with
22 Dr. Naseer, Mr. Armbruster had a normal gait, is that
23 correct?
24     A    Yes.

---

160

1      Q    And did you also review Dr. Naseer's note that
2  the patient continues to have quite severe pain from his
3  neck traveling down to his arms?
4          MS. KINKADE:  Objection, assumes facts not in
5  evidence.
6          THE WITNESS:  I don't remember specifically
7  seeing that.  I remember reviewing her report.  I don't
8  remember what you just said at all, no.
9          MS. GRADY:  Okay.  Let me get it out.
10         (Thereupon, Plaintiff Exhibit 5 was marked for
11 identification.)
12 BY MS. GRADY:
13     Q    Okay.  I'm going to ask you to turn to page --
14 this is a copy of records from the Southern Illinois
15 Healthcare Foundation.  These are records that you
16 reviewed, maybe not with these Bates numbers, but records
17 that you reviewed to prepare your report, correct?
18     A    Yes.
19     Q    And if you would turn to the page that is
20 marked at the bottom right P64.
21     A    Okay.
22     Q    This is a note prepared by Dr. Naseer that's
23 dated on March 18th, 2015, correct?
24     A    I have it in front of me.

---

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

41 (161 to 164)

161

1    Q    Okay.  And this is one of the documents you
2  reviewed in preparation for your report, correct?
3    A    Yes.
4    Q    Okay.  Do you see on the second paragraph of
5  the history of present illness Dr. Naseer documents that
6  Mr. Armbruster continues to have quite severe pain from his
7  neck traveling down to his arms, do you see that?
8    A    Let me read here.  I'm sorry, ma'am, I've got
9  this record in front of me.  Where's your question?  Where
10  are you asking?
11    Q    It's actually, I guess, one paragraph, but it
12  sort of breaks.
13    A    Right.
14    Q    Right after the first break, on the second
15  line, it says, continues to have quite severe pain from his
16  neck traveling down to his arms.  Do you see that?
17    A    Yes.
18    Q    Okay.  You didn't note that in your report?
19    A    Well, those were -- those were -- those were
20  subjective complaints from Mr. Armbruster at that time.
21    Q    Is it -- okay.  And so you discounted the
22  subjective complaints, is that your testimony?
23    A    Well, I didn't discount it.  I tried to put it
24  all together.

162

1    Q    Okay.  But you didn't mention any complaints
2  of pain in the March 2015 visit with Dr. Naseer, right?
3    A    Well, that record speaks for itself.  So
4  it's -- that record speaks for itself.  Those were -- if
5  you look at the rest of the record, it's pretty much, you
6  know, she goes on to say that he's generally done well.
7    Q    Well, we'll get to the rest of the record.
8  And you had the opportunity to put into your report all of
9  the relevant facts and all of the opinions that you hold to
10  a reasonable degree of medical certainty, right, Doctor?
11    A    Yes.
12    Q    Okay.  So you didn't note the severe pain.  Is
13  it your testimony that that's not relevant to any of your
14  opinions one way or the other?
15    A    Well, I think it's all relevant to try to put
16  it all together.  Those were subjective complaints by
17  Mr. Armbruster at that time.
18    Q    And is it ever appropriate for a physician,
19  yourself or anyone else, to discount a patient's subjective
20  neurological complaints?
21    A    I don't -- I never disregard someone's
22  subjective complaints, but I put them in conjunction with
23  their physical findings and putting everything else
24  together.

163

1    Q    That wasn't my question, so let me ask it
2  again.  Do you agree that it's inappropriate for a
3  physician to disregard a patient's subjective neurological
4  symptoms?
5    A    I do not disregard people's subjective
6  complaints.
7    Q    Sir, that wasn't my question, so let me ask
8  you it again.
9         Do you agree that it is inappropriate for a
10  physician to disregard a patient's subjective neurological
11  symptoms?
12    A    Yes.
13    Q    Do you see here in her notes she notes
14  Mr. Armbruster reports extreme sensitivity down areas of
15  his arms?
16    A    Yes.
17    Q    And you don't see anywhere in this record
18  where she -- where that's -- strike that.
19         Do you see that in her physical examination
20  she notes tenderness on deep palpation across lumbar facet?
21    A    Yes.
22    Q    And that she observed decreased sensation in
23  non-dermatomal distribution in his hands bilaterally,
24  correct?

164

1    A    Yes.
2    Q    It's your testimony -- it's your opinion that
3  this is a normal neurological exam?
4    A    By her saying that he has decreased sensation
5  in non-dermatomal distribution in his hand bilaterally,
6  that's stating that his subjective complaints of decreased
7  sensation do not correlate with any dermatomal level.
8    Q    So that's subjective as well, her physical
9  examination?
10    A    That is subjective, yes.
11    Q    And so you discounted that?
12    A    I wouldn't discount it.  But I'm saying that
13  is subjective.  When you ask someone if they feel and they
14  tell you they do or they don't, that is subjective.
15    Q    Okay.  So it's your testimony that even though
16  that's an abnormal finding, that that didn't count, is that
17  right?
18    A    No, I didn't say.  I'm not saying it isn't an
19  abnormal finding.  I'm saying that's Mr. Armbruster's
20  subjective complaints at that time.
21    Q    Well, tell me how then, tell me how a
22  patient -- how can a physician objectively determine a
23  patient's sensation?
24    A    It can be very hard.  You can use a pinwheel

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

165

1  and see if somebody feels it, which is subjective, but you
2  can see if they get -- if they get, secondary to the
3  sensation, they get a retraction where you get a twitch
4  where you're retracting. But that's it.
5          I mean, basically it's pretty hard, other than
6  what I just said, it's pretty hard to tell whether somebody
7  truly does or does not have sensation.
8      Q   I can't tell from this record whether or not
9  the decreased sensation was done as a result of reflex, can
10 you?
11     A   It doesn't say reflex. It just talks about
12 sensations.
13     Q   Okay. So in your report you just noted normal
14 neurological examination. You made no mention of this or
15 why it was not relevant because it was subjective, correct?
16     A   Well, I didn't examine Mr. Armbruster at that
17 time. So I'm depending upon Dr. Naseer's report. And she
18 ultimately summarizes that this was a, I think she states
19 that this was a normal exam, and she makes the comment that
20 Mr. Armbruster should, could return to work without
21 restrictions.
22     Q   Tell where we says that it was a normal exam.
23     A   I don't know that she uses those words, so I'm
24 looking through it and I don't -- so I don't -- I don't see

166

1  that she uses the specific words normal. But my review of
2  these records, I would consider that to be a normal
3  recovery examination for someone following the surgical
4  procedure Mr. Armbruster had in 2000 -- September 2015.
5      Q   So you agree that it's not a normal
6  neurological examination without any further explanation,
7  right?
8      A   No, I wouldn't say that. No, I didn't say
9  that. I said that this examination to me indicates that
10 Mr. Armbruster has recovered from the surgical procedure in
11 September of 2000 --
12     Q   Well, but that's not my question, Doctor. My
13 question is is your statement normal neurological exam as
14 listed on Page 4 of your report that it's a normal
15 neurological examination for any patient or that it's a
16 normal neurological examination for a patient recovering
17 from spinal cord compression surgery?
18     A   The latter. I would say that a normal
19 recovery. Well, i think it's actually a very good recovery
20 for someone following the surgery that Mr. Armbruster had.
21     Q   Okay. And you see the doctor's
22 recommendations, Dr. Naseer's recommendations that the
23 patient would likely have chronic pain, correct?
24     A   I'm sorry, ma'am, where -- where are you

167

1  reading from right now?
2      Q   Under recommendations, after that break, the
3  one, two, three, starting at the end of the third line with
4  patient's history of myelomalacia, patient will likely have
5  chronic pain, and I recommend patient to be started back on
6  Gabapentin.
7      A   Yes, I see that.
8      Q   You didn't note that in your report, right?
9      A   No, I didn't note it. My experience is that I
10 don't think he should have chronic pain. My experience in
11 doing those surgical procedures, with what he has done,
12 with these neurological findings, I wouldn't expect him to
13 have chronic pain. I'd expect him --
14     Q   Sorry, I'm going move to strike on the grounds
15 that that was not a response to my question and is outside
16 the scope of the report.
17          My question was that you didn't note that
18 Dr. Naseer's observation that Mr. Armbruster would likely
19 have chronic pain, correct?
20     A   I did not put that in my report for the reason
21 I tried to answer, that I don't think Mr. Armbruster should
22 have chronic pain.
23     Q   You didn't say anywhere that you disagreed
24 with Dr. Naseer's opinion here in your report, correct?

168

1      A   Well, my report states that I think -- my --
2  my reading of her report is that he essentially had a
3  normal neurologic examination when he saw Dr. Naseer.
4      Q   Doctor, that's not an answer to my question.
5  I think that this deposition will go much more efficiently
6  if you actually answer the questions that I'm asking you.
7          You agree that nowhere in any page from
8  Page 1 to Page 7 of your report, which is listed as
9  Exhibit 4 in this case, have you disclosed an opinion that
10 you disagree with Dr. Naseer opinion regarding
11 Mr. Armbruster's chronic pain, correct?
12         MS. KINKADE: Objection, assumes facts not in
13 evidence, form and argumentative.
14         THE WITNESS: I do not state that specifically
15 in my report.
16 BY MS. GRADY:
17     Q   Gabapentin, what's that medication?
18     A   It's a medication that is used for, some
19 people use it for radicular type symptoms, like extremity
20 pain.
21     Q   That's a medication that deals with
22 neuropathy, right?
23     A   Yes. Yes, it is.
24     Q   And do you agree that it would be

169

1 inappropriate to prescribe Gabapentin for a patient who did
2 not have a medical need for that medication?
3 **A   I — I think — I think that ordering**
4 **Gabapentin, and many times in this case it was ordered by**
5 **the prescribing physician based upon the patient's**
6 **subjective complaints, not necessarily their objective**
7 **physical findings.  And in this case I think that that was**
8 **prescribed by Dr. Naseer based upon Mr. Armbruster's**
9 **subjective complaints.**
10 Q   Okay.  So you agree that doctors should
11 prescribe medication based solely on a patient's objective
12 complaints?
13 **A   I didn't say that, but I think in this case I**
14 **would not have prescribed Gabapentin for Mr. Armbruster.**
15 Q   You would have withheld that medication, is
16 that testimony?
17 **A   I'm not aware that Mr. Armbruster needed to be**
18 **on Gabapentin at this time.  At the time of his evaluation**
19 **he was six months from the time of his surgery.  He had, in**
20 **my opinion, an essentially normal neurological examination**
21 **from my review of the records, and I do not believe that he**
22 **should have needed any medication at that time.**
23 Q   You reviewed records from May of 2015 when
24 Dr. Hsieh encountered Mr. Armbruster, correct?

170

1 A   Yes.
2 Q   And you reviewed the records where mister --
3 where Dr. Hsieh noted an irrelevant gait, correct?
4 **A   I'm not sure I remember — what do you mean by**
5 **irregular date?**
6 Q   Well, that would be very relevant to your
7 opinions, right?
8 **A   Okay.  I'm sorry, I didn't — I don't follow**
9 **your question.**
10 Q   Do you recall reviewing a report by Dr. Hsieh
11 that Mr. Armbruster suffered from an irregular gait?
12 **A   Oh, I thought you said date.  I'm sorry.**
13 Q   Irregular gait.
14 **A   If Mr. Armbruster truly did have an abnormal**
15 **gait, that could be of significance, yes.**
16 Q   That would change your opinions in this case?
17 **A   Well, I won't say it would change them, no.**
18 **It would be important.  I'm not saying it would change my**
19 **opinions, but I'm saying if Mr. Armbruster truly had an**
20 **abnormal gait, I would look into that further.**
21 Q   Why do you use that word, truly have?  Why do
22 you use that word truly?
23 **A   Because I don't know — because I don't know**
24 **whether he — was that subjective on Mr. Armbruster's case**

171

1 or did he truly have an abnormal gait.
2 Q   Let's turn to page, in that exhibit I gave to
3 you, Exhibit 5, let's turn to Page 53, if you would.  I'm
4 sorry, I might have that wrong.  No, I do.  It's 55.  And
5 it continues on to Page 56.  This is a May 14th, 2015
6 encounter between Mr. Armbruster and Dr. Hsieh, correct?
7 **A   Yes.**
8 Q   And this is one of the documents you reviewed
9 as part of your review of this case?
10 **A   I think so, yes.  I don't remember the**
11 **specific document, but it looks like it.**
12 Q   Okay.  And this portion of the record refers
13 to a physical exam, right?
14 **A   Yes.**
15 Q   And that typically refers to the objective
16 findings that the physician has last observed, correct?
17 **A   Yes.**
18 Q   Under neck, do you see that Dr. Hsieh observed
19 some stiffness of neck and a scar in the front neck from
20 prior surgery?
21 **A   Yes.**
22 Q   And then turning to the next page, you see
23 that under neurologic Dr. Hsieh notes observing an
24 irregular gait, walking in a limping way, do you see that?

172

1 **A   Which page are you on now?**
2 Q   I'm on the top of Page P56.
3 **A   Okay.**
4 Q   Do you see where Dr. Hsieh notes that he
5 observes an irregular gait, walking in a limping way?
6 **A   Yes.**
7 Q   You did not note that in your report, right?
8 **A   I did not state that in my report.**
9 Q   Despite, as you just testified to, that it
10 would be highly relevant, correct?
11 **A   Well, I'm saying it could be relevant, it**
12 **needs to be further investigated.  But as I also recall,**
13 **looking at Dr. Hsieh's reports, I think he stated that he**
14 **thought Mr. Armbruster had a normal neurologic examination.**
15 Q   Tell me where you find Dr. Hsieh's conclusion
16 that he had a normal exam on May of 2015.
17 **A   I don't remember exactly where — where he**
18 **stated that.**
19 Q   Well, I don't think he stated that anywhere.
20 So if you reviewed a record where Dr. Hsieh has concluded
21 that on May 14th, 2015 Mr. Armbruster had a normal
22 neurological exam, I'd like you to let me know.
23 **A   Well, I don't know that he said it on that**
24 **date, ma'am.  I don't have all these records memorized, but**

173

1  from my review of these records and Dr. Hsieh's reports,
2  it's my understanding that Dr. Hsieh believed that
3  Mr. Armbruster had a normal neurologic examination.
4      Q    It's your testimony that Dr. Hsieh believed he
5  had a normal neurological exam?
6      A    Yes.
7      Q    Tell me all of the conversations that you had
8  with Dr. Hsieh about this case.
9      A    I've not had any conversations with Dr. Hsieh,
10 but I reviewed these medical records.
11     Q    So your understanding about what Dr. Hsieh did
12 or did not believe is confined solely to the medical
13 records that he generated in his review of Mr. Armbruster,
14 correct?
15     A    Yes.
16     Q    The next two paragraphs of your opinion on
17 Exhibit 4 relates to Mr. Armbruster's incarceration
18 history. Again, you'll agree that tat has no relevance to
19 any of the opinions that you expressed in this case, except
20 for the fact that the reason Dr. Shah and Mr. Armbruster
21 encountered one another was because Mr. Armbruster was in
22 prison, right?
23     A    I'm sorry, what page are you on, ma'am?
24     Q    I'm on Page 4.

174

1      A    Okay.
2      Q    And you've noted about Mr. Armbruster's arrest
3  history on August 2015 in the second paragraph of Page 4.
4      A    Yes.
5      Q    You agree that that has no relevance to any of
6  your opinions, correct?
7      A    Well, I mean, I think it's relevant in the
8  sense that Mr. Armbruster was healthy enough to be involved
9  in a burglary where he was, you know, arrested in a tire
10 shop lifting tires, etc., so I think it is relevant.
11     Q    What were you told about the nature of
12 Mr. Armbruster's crime?
13     A    Just what I read, he was arrested August 27th,
14 2015 when he was in a tire shop in Granite City Illinois.
15 He was arrested for allegations of burglary, period.
16     Q    And so you relied on those facts in reaching
17 your opinions in this case?
18     A    Yes, I did rely on those facts.
19     Q    And if those facts were not true, that change
20 your opinions in this case?
21     A    No, I wouldn't say they would change my
22 opinion. I think this just reaffirms my opinion. You've
23 already asked me about the other physicians that
24 were treating Mr. Armbruster. And I think that what I

175

1  believe Dr. Naseer and Dr. Hsieh thought that he had a
2  normal neurologic examination, that was my interpretation
3  of their records.
4          I think the fact that Mr. Armbruster was
5  arrested breaking into a tire shop, further confirms his —
6  his ability to get around quite well.
7      Q    You haven't disclosed any opinion related to
8  how breaking into a tire shop has any bearing on
9  Mr. Armbruster's neurological recovery in this case,
10 correct?
11     A    Well, I'm giving my opinion now, that I'm
12 stating that if he was able to, you know—
13     Q    That's an answer to my question, Doctor, so
14 let me ask it again. You agree that you haven't disclosed
15 in your report any opinion as to how Mr. Armbruster's
16 alleged actions in a different case impacted his
17 neurological recovery, correct?
18     A    I think my report speaks for itself.
19     Q    I agree. Can you tell me whether or not
20 Mr. Armbruster -- can you tell whether Mr. Armbruster's
21 March 2010 visit to Gateway Regional Medical Center had any
22 bearing on your opinions in this case?
23     A    March 2010?
24     Q    Right. You detail that on the third full

176

1  paragraph of Page 4.
2      A    This is just part of Mr. Armbruster's record
3  where he was, had seen, had been seen with Gateway Regional
4  Medical Center with a complaint of suicidal ideation. And
5  it went on to state, my report states that he had a long
6  history of drug abuse and depression. So I think that's
7  all part of his past medical history.
8      Q    Okay. Any other relevance?
9      A    Well, I think just what I said.
10     Q    Okay. The next paragraph notes that Dr. Hsieh
11 examined Mr. Armbruster on January 21st, 2015 and that
12 Mr. Armbruster had a normal neurological examination at
13 that time with a normal gait. I've reviewed these records
14 and I can't find that one. So can you locate for me the
15 record that you reviewed that detailed for you the
16 examination Dr. Hsieh performed on January 21st, 2015.
17     A    Well, it's my opinion from reviewing those
18 records from Dr. Hsieh on January 21, 2015 that
19 Mr. Armbruster had a normal neurologic examination at that
20 time. So that's my opinion from review of those records.
21     Q    But I can't see any neurological exam that was
22 performed on January 21st, 2015. So your report clearly
23 states that there was one. So I would like you to locate
24 that for me.

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

177

1  A  Well, I don't have that actual report in front
2  of me.  If you have the report, I'll look at it.  But I
3  have a lot of records here and I don't remember the report.
4  Q  Sure.  I've handed you what I think is a
5  complete list all the medical records generated by
6  Dr. Hsieh in Exhibit 5, and there's records from
7  January 2015 that begin at P58.
8  A  Okay.
9  Q  And I don't see any physical exam detailed
10  there.  Do you?
11  A  Well, let's see here.  So I'm looking at
12  the Page that you mentioned to me.  This is Page 58,
13  correct?
14  Q  Correct.
15  A  So this date is, this is March 31, 2015,
16  correct?
17  Q  Okay.  We talked about March 31, 2015.  But
18  your report clearly states that in the note from
19  January 21st, 2015, Mr. Armbruster's height was 5'3" and
20  weight 217 pounds.  I reviewed the physical examination and
21  Mr. Armbruster had a normal neurologic examination at that
22  time with a normal gait.
23  A  Okay.  Yeah, and I — I'm not sure that I
24  don't have a typographical error in my report.  But I'm—

178

1  I'm not really finding on -- on the date that I mentioned,
2  I'm not finding that report from January 2015.
3  Q  Okay.  I think it may be a typographical
4  error, too, because you've listed, you clearly listed
5  attributing to January 21st, 2015 Mr. Armbruster's weight
6  as being 217 pounds.  And I think according to this record
7  at that exam his weight was 205 pounds.
8  A  Okay.
9  Q  His weight was 217 pounds in March of 2015.
10  A  Okay.  So excuse me, it's a typographical
11  error.  I'm sorry.
12  Q  No, that's fine.  I want to make sure that I'm
13  not missing any records that you reviewed.  And I actually
14  still have not had the opportunity to look at exactly what
15  it was that you reviewed.
16  But you agree that on January 21st, 2015
17  Mr. Armbruster is diagnosed with secondary peripheral
18  neuropathy, correct?
19  A  Yes.  Those are -- those are problems listed
20  on that date.
21  Q  Well, those are part of the assessment of the
22  patient from that date, correct?
23  A  They're a problem list.  They're a problem
24  list here.  If you go through that list, it's a problem

179

1  list.  So neuropathy, hypertension, some of those things
2  are like -- like neck pain, that's a subjective complaint.
3  That's really not truly a problem.  That's not really a
4  diagnosis.  Neck pain is a symptom, it's not a diagnosis.
5  Q  I think we're looking in two different places.
6  A  Okay.
7  Q  I'm talking about the assessment that beings
8  at the very bottom of P58 and continues to P59.  Those are
9  assessments that Dr. Hsieh has made of Mr. Armbruster's
10  conditions, correct?
11  A  Okay.  I see.  I was looking at a different
12  place.  Okay.  Sorry.  Okay.
13  Q  Oaky.  And so Dr. Hsieh determines that --
14  Dr. Hsieh's assessment on January 21st, 2015 is that
15  Mr. Armbruster suffers from secondary peripheral
16  neuropathy, right?
17  A  That's what this report states, yes.
18  Q  You don't have any reason to believe that he
19  did not in fact assess that Mr. Armbruster suffered from
20  that condition on January 21st, 2015, right.
21  A  I see the report.  I mean, I don't have any
22  reason to disagree with the report.  I mean, this is what
23  Dr. Hsieh wrote in his report.
24  Q  And it would be inappropriate -- no, strike

180

1  that.
2  All right.  Let's turn to Page 6 of your
3  report.  You've reached all of the opinions listed here to
4  a reasonable degree of medical certainty, correct?
5  A  Yes.
6  Q  And s your opinion to a reasonable degree of
7  medical certainty that there was no evidence in the medical
8  record of any neurological symptoms reported by
9  Mr. Armbruster, is that correct?
10  A  Okay.  I'm sorry.  I'm sorry, ma'am, where are
11  you reading from?
12  Q  Page 6, Paragraph 1.
13  A  Yeah.  From my review of those records, there
14  were no neurologic symptoms Mr. Armbruster when he saw
15  Dr. Shah.  According to the medical notes -- according to
16  Dr. Shah's medical notes and his deposition.
17  Q  Okay.  So I'm not clear.  You started that
18  sentence by saying on review of those records, and then
19  concluded that sentence by saying according to Dr. Shah's
20  medical notes and deposition.  Just to clarify, does that
21  opinion rest solely on the review of the records or rest
22  solely on the review of the records and Dr. Shah's
23  deposition?
24  A  Everything you said.  My opinions are based

Transcript of Frank Petkovich, M.D.

46 (181 to 184)

Conducted on May 29, 2018

---

181

1 upon my review of those medical records and Dr. Shah's
2 reports and his deposition.
3     Q    And you agree that Mr. Armbruster's deposition
4 testimony provides evidence that he was reporting
5 neurologic symptoms to Dr. Shah, correct?
6     A    Well, I think that's apparently -- apparently
7 Mr. Armbruster's claiming that, but that's not
8 substantiated by Dr. Shah's medical records and Dr. Shah's
9 deposition.
10    Q    But that wasn't my question and that's not
11 what you said here.  You agree that Mr. Armbruster, at his
12 deposition Mr. Armbruster testified that he was suffering
13 neurological symptoms that he reported to Dr. Shah,
14 correct?
15    A    Yeah.  Well, where are you reading from now?
16    Q    No, I'm just asking you.  You reviewed
17 Mr. Armbruster's deposition, correct?
18    A    Yes.  And as I stated earlier, I don't have
19 his deposition memorized, but, yes, I did review his
20 deposition.
21    Q    And you agree that at his deposition
22 Mr. Armbruster testified that he reported neurological
23 symptoms to Dr. Shah, correct?
24    A    Yes.

---

182

1     Q    And so your opinion that there were no --
2 there was no evidence of any neurological symptoms for
3 Mr. Armbruster, that does not consider Mr. Armbruster's
4 testimony, correct?
5     A    No, my opinions are based upon the medical
6 record and the deposition of Dr. Shah.
7     Q    Not Mr. Armbruster's deposition?
8     A    That is correct.
9     Q    Why did you rely on Dr. Shah's deposition but
10 not Mr. Armbruster's?
11    A    Well, for the reasons I stated earlier.  I
12 think that -- I reviewed -- the medical records, I think,
13 speak for themselves.  Dr. Shah's records speak for
14 themselves.  Dr. Shah reported a normal neurologic
15 examination.
16        And then Dr. Shah's deposition, I think,
17 speaks for itself, what he stated.  Dr. Shah is a general
18 surgeon.  I think he's qualified to examine people,
19 qualified to do a neurologic examination.  For all of those
20 reasons I believe -- I believe Dr. Shah is stating.
21    Q    So you believe Dr. Shah's testimony over
22 Mr. Armbruster's?
23    A    I think Dr. Shah is a more credible witness.
24 And I think -- I think Dr. Shah has nothing to gain by

---

183

1 being honest and forthright.
2     Q    Well, I agree with that last sentence
3 actually.
4         MS. KINKADE:  I'm going to object.  This is
5 argumentative.  This is outside the scope of his testimony
6 and -- well, I'll follow up with it.
7         MS. GRADY:  There's not a question pending
8 though.  I mean, I don't think it's outside the scope.
9         THE WITNESS:  Ma'am, would you repeat her last
10 question and my response to that.
11 BY MS. GRADY:
12    Q    Well, hold on.  That's fine, we can read back
13 the testimony, but I get to ask my question.  My question
14 is, did you discount -- strike that.
15        Did you -- did your opinion that you did not
16 see any evidence of neurological symptoms for
17 Mr. Armbruster, did that opinion rely on your decision to
18 credit Dr. Shah's testimony over Mr. Armbruster's
19 testimony?
20    A    My opinion is based upon the medical records,
21 okay, as I stated, and also the fact that Dr. Shah --
22 Dr. Shah examined Mr. Armbruster with what he stated was a
23 normal neurologic examination and Dr. Shah's deposition.
24    Q    Okay.  But --

---

184

1         MS. KINKADE:  Hold on.  He wanted you to read
2 back the last question and answer.
3         (Thereupon, the referred to portion was read
4 back by the Court Reporter as recorded above.)
5         THE WITNESS:  Okay.
6 BY MS. GRADY:
7     Q    So my question though was not why you --
8 strike that.
9         We already established that your opinion that
10 you saw no evidence of any neurological symptoms from
11 Mr. Armbruster did not take into account his deposition
12 testimony, correct?
13    A    I read his deposition.  My job as a physician
14 is to try to put everything together.  So after trying to
15 put everything together, my opinions are as I outlined in
16 my report.
17    Q    Well, but you already testified that you agree
18 that Mr. Armbruster at his deposition testified that he
19 suffered neurologic symptoms that he reported to Dr. Shah,
20 correct?
21    A    I didn't say suffered neurological symptoms.
22 You said that.  I said he had subjective complaints.  He
23 had subjective neurological complaints.
24    Q    That's not my question.  You had testified

---

Transcript of Frank Petkovich, M.D.

Conducted on May 29, 2018

---

185

1  earlier, you agreed with me that in his deposition he
2  testified, Mr. Armbruster gave deposition testimony that
3  he suffered neurological symptoms that he reported to
4  Dr. Shah, correct?
5       **A   Mr. Armbruster stated that he had subjective**
6  **complaints.  That doesn't mean he truly suffered from**
7  **those, ma'am.  There's a big difference.**
8       Q   Can you tell me what the difference between a
9  neurological symptom and a subjective complaint is, Doctor?
10      **A   You're using the word suffering.  He had**
11 **subjective complaints.  That's not the same thing as**
12 **suffering.  I can have subjective complaints that I have a**
13 **problem, but I'm not truly suffering if I'm not.  It's**
14 **based upon a subjective complaint.**
15      Q   Fine.  I'll change the word.  Do you agree
16 with me that Mr. Armbruster in his deposition testified
17 that he experienced neurological symptoms that he reported
18 to Dr. Shah.  Do you agree?
19      **A   I agree that he had subjective complaints.  He**
20 **is stating that he had subjective complaints when he say**
21 **Dr. Shah.**
22      Q   Okay.  And you agree that that -- that that is
23 evidence of neurological symptoms?
24      **A   I think that -- I think his subjective -- his**

---

186

1  **subjective complaints could be consistent with some**
2  **neurologic symptoms.**
3       Q   Okay.  You didn't note that in your opinion
4  where you state that according to Dr. Shah's medical
5  records and deposition you saw no evidence of any
6  neurologic symptoms from Mr. Armbruster, correct?
7       **A   Yes.**
8       Q   And that's because that opinion relied only on
9  the medical records and Dr. Shah's testimony, right?
10      **A   No, it relies on everything.**
11      Q   Well, then why did you say according to
12 Dr. Shah's medical notes and deposition?
13      **A   Because I think Dr. Shah's medical notes, he**
14 **summarized in his notes what he thought.  He was the**
15 **examining physician.  He summarized -- after talking with**
16 **Mr. Armbruster, Dr. Shah gave his summarized opinions as**
17 **far as what he thought was going on.**
18      Q   So when you said that you do not see any
19 evidence of any neurologic symptoms for Mr. Armbruster
20 according to Dr. Shah's medical notes and deposition, you
21 didn't mean that you reached that opinion according to
22 Dr. Shah's medical notes and deposition, is that your
23 testimony here today now?
24      MS. KINKADE:  Objection, argumentative,

---

187

1  misstates his testimony.
2       THE WITNESS:  I mean, I think I've already
3  given my testimony.  The bottom line is I think that my
4  opinion, reviewing Dr. Shah's notes, that Mr. Armbruster --
5  that Mr. Armbruster, in Dr. Shah's opinion at the time that
6  he evaluated Mr. Armbruster, did not have any true
7  neurologic symptoms and had a normal neurologic physical
8  examination at that time.
9  BY MS. GRADY:
10      Q   You agree that the symptoms that
11 Mr. Armbruster reported were neurological symptoms,
12 correct?
13      **A   I think that the subjective complaints that**
14 **Mr. Armbruster had could be consistent with some neurologic**
15 **symptoms.**
16      Q   Okay.  Why don't you define for me what you
17 mean when you use the word neurological symptoms.
18      **A   Okay.  Neurologic can mean a lot of different**
19 **things.  It can mean everything we talked about earlier,**
20 **numbness, tingling, weakness, etc.  Those could all be**
21 **neurologic subjective complaints.  Those could all be**
22 **neurologic symptoms.**
23      Q   Okay.  Just define the word symptom.  What
24 does that mean?

---

188

1       **A   A symptom is when someone presents with**
2  **certain conditions, like a cough or a sneeze or shortness**
3  **of breath.  Those are all -- those are all symptoms.**
4  **Difficulty straightening up your neck could be a symptom.**
5  **Difficulty holding -- holding your head up could be a**
6  **system.  Those are not necessarily subjective complaints.**
7       **So the bottom line -- the bottom line is if**
8  **someone says they have something, that's a subjective**
9  **complaint, but that's not necessarily a symptom.  It could**
10 **be, but not necessarily a symptom.**
11      Q   In order to know whether the complaint is or
12 is not a symptom, you would have to investigate further,
13 correct?
14      **A   Yes.**
15      Q   Did you see any evidence in Dr. Shah's record
16 that he affirmatively ruled -- determined that
17 Mr. Armbruster's subjective complaints as you described
18 them were not truly held?
19      **A   Yes, Dr. Shah stated that Mr. Armbruster had a**
20 **normal neurologic examination, and based upon that he did**
21 **not believe any further diagnostic evaluation was**
22 **necessary.**
23      Q   Tell me where you see Dr. Shah document that
24 he did not believe any further diagnostic testing was

---

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

189

1  necessary.
2     **A   Again, I mean, I went though the medical**
3  **records. I went through Dr. Shah's deposition. I can't**
4  **give you the exact page. But after -- after reviewing**
5  **that, that's my opinion. I think Dr. Shah stated that he**
6  **had a normal neurologic examination.**
7     (Thereupon, Plaintiff Exhibit 6 was marked for
8  identification.)
9
10 BY MS. GRADY:
11    Q   Okay. The court reporter has handed you
12 what's been marked as Exhibit 6, which is the medical
13 records excluding the medication administration records for
14 Mr. Armbruster from May to September of 2014.
15    Please tell me anywhere that you see in
16 Exhibit 6 where Dr. Shah documents that he had made a
17 decision to do no further diagnostic testing.
18    **A   Well, I don't know that he -- again, I don't**
19 **know that he says that word specifically. But the fact --**
20 **the bottom line is if he did not order any further**
21 **diagnostic evaluation, then he didn't -- he didn't want to**
22 **do any further -- he didn't recommend any further**
23 **diagnostic evaluation.**
24    Q   So you assume that he made that conscious

---

190

1  decision, correct?
2     **A   Well, obviously if a physician sees someone**
3  **and thinks they need further diagnostic evaluation, they're**
4  **going to state it or it. If you don't state that,**
5  **then that means you don't think that.**
6     Q   And it would be a violation of the standard of
7  care for Dr. Shah to have failed to order further
8  diagnostic testing if he believed further diagnostic
9  testing was appropriate?
10    **A   Well, I wouldn't use violation of standard of**
11 **care. That's a word you seem to use repeatedly. I**
12 **think the bottom line here is Dr. Shah felt that**
13 **Mr. Armbruster, in his opinion, had a normal neurologic**
14 **examination. I think he reaffirms that in his deposition.**
15    **And with those physical findings, the normal**
16 **appropriate medical care would not do any further**
17 **diagnostic evaluation with those negative physical**
18 **findings.**
19    Q   This isn't my phrase. This is a phrase you
20 use, Doctor, on Page 7 of your report, you've reached an
21 opinion to a reasonable degree of medical certainty that
22 the, quote, standard of care was met for Mr. Armbruster's
23 treatments and clinic visit. So, again, that's a word
24 that -- you stand by that opinion to a reasonable degree of

---

191

1  medical certainty, correct?
2     **A   I do. And said that one time in this report.**
3  **You've said that repeatedly. And I'm stating that at the**
4  **end of my report, yes.**
5     Q   So my question is -- I mean, that's your
6  wholesale conclusion, that Dr. Shah met the standard of
7  care with regard to Mr. Armbruster's treatments and clinic
8  visits, correct?
9     **A   Yes.**
10    Q   So all I'm asking is that you agree it would
11 be a violation of the standard of care if Dr. Shah had
12 determined additional diagnostic testing was necessary but
13 failed to document or order that testing, correct?
14    MS. KINKADE: Objection, incomplete
15 hypothetical.
16    THE WITNESS: I don't -- I don't know --
17 obviously Dr. Shah did not believe any further diagnostic
18 evaluation was necessary. But having said that, if you
19 want to use the word standard of care, that's your
20 prerogative.
21    But the bottom line is in this case Dr. Shah
22 did not believe any further diagnostic evaluation or
23 treatment was necessary. He did not order any further
24 diagnostic evaluation or treatment for Mr. Armbruster.

---

192

1  BY MS. GRADY:
2     Q   You agree that at no time did Dr. Shah
3  determine a cause of Mr. Armbruster's tingling, correct?
4     **A   He did not list a specific diagnosis. As I**
5  **stated earlier, there are many things that can cause**
6  **numbness and tingling, many transient things. And my take**
7  **on review of the medical records, Dr. Shah did not believe**
8  **the numbness and tingling Mr. Armbruster complained of was**
9  **of any clinical significance.**
10    Q   Well, tell me where, if anywhere, you see
11 documented that Dr. Shah made a determination that the
12 tingling, despite being persistent, was of no clinical
13 significance.
14    **A   I think by the basic fact that Dr. Shah did**
15 **not recommend any further treatment means that he did not**
16 **believe it was of any clinical significance.**
17    Q   Because it would be a violation of the
18 standard of care for him to fail to follow-up if he
19 believed the tingling --
20    **A   Well --**
21    Q   Let me finish my question, Doctor. If he
22 believed that the tingling was of clinical significance and
23 had not found any cause, correct?
24    **A   Well, my answer to that is, in Dr. Shah's**

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

193

1  case, and I see people all the time with -- with -- with
2  subjective complaints that I think will go away that are of
3  no clinical significance and in that case don't recommend
4  any further treatment.
5       And I think there was the case here. Dr. Shah
6  did not believe that any further diagnostic evaluation or
7  treatment was necessary for Mr. Armbruster.
8       Q   All right. I want to take you through a few
9  pages of these records here in Exhibit 6.
10      Actually scratch that. You state -- going
11 back to your report. On Page 6 of your report you state
12 that you do not believe it was necessary for Mr. Armbruster
13 to be referred for orthopedic or neurosurgical
14 consultation. It is my opinion there was no need for an
15 MRI. Do you see that opinion there?
16      A   Yes.
17      Q   That opinion depends upon your opinion that
18 Mr. Armbruster was not suffering from spinal cord
19 compression at the time that he was seen by Dr. Shah in
20 2014, correct?
21      A   Yes, based upon -- based upon Mr. Armbruster
22 having a normal neurological examination, if he had a
23 normal neurological examination, that means by definition
24 that he did not have any spinal cord compression at that

194

1  time, therefore, an MRI was not indicated or necessary.
2       Q   A normal neurological examination could only
3  rule out spinal cord compression if it was adequate,
4  correct?
5       A   Well -- well, the examination, of course the
6  examination would have to be adequate, but it would also, a
7  normal neurologic examination would also rule out other
8  things. But obviously the neurologic examination would
9  have to be adequate, yes.
10      Q   Okay. Let's turn Page 7. Your last statement
11 in this last -- strike that.
12      Your last sentence of Paragraph 4 states, his
13 recovery further indicates this was not a chronic condition
14 present prior to the time Mr. Armbruster was seen in the
15 emergency department at Gateway Regional Center on
16 September 26th, 2014.
17      My first question is, you reached this opinion
18 to a reasonable degree of medical certainty, correct?
19      A   Yes.
20      Q   And it is your opinion that Mr. Armbruster did
21 not have spinal cord compression before September 26th,
22 2014, correct?
23      A   Yes.
24      Q   And that opinion depends, as set forth in this

195

1  report, entirely on your opinion about the state of
2  Mr. Armbruster's recovery, correct?
3       A   Yes, it's based -- it's based -- it's
4  primarily upon Mr. Armbruster's recovery. Again, that's
5  based upon review of the medical record, review of
6  Dr. Shah's deposition. But the fact that Mr. Armbruster
7  has made such a miraculous neurologic recovery indicates
8  the short -- the relative short duration of the spinal cord
9  compression.
10      Q   How did Dr. Shah's deposition inform you about
11 Mr. Armbruster's recovery?
12      A   Well, it does not really respond to recovery,
13 you're correct, putting everything together as far as the
14 clinic notes from Dr. Shah and the deposition, which I
15 already talked about, as far as -- as far as
16 Mr. Armbruster's neurologic findings at that time. But
17 you're right, Dr. Shah's deposition is not addressing
18 Mr. Armbruster's recovery.
19      But Mr. Armbruster's recovery, the basic fact
20 is -- I mean, it's pretty basic neurology, you know, that
21 we talked about earlier. I used the example of a foot
22 drop, etc. Now, when you compress a nerve, the spinal cord
23 is very, very sensitive tissue. It doesn't take much
24 trauma. And, you know, the purpose of the surgical

196

1  procedure is to go in there and decompress it if you want
2  to free it up.
3       And when that comes back, I mean just when it
4  comes back miraculously like it did here, that just means
5  it wasn't there that long.
6       Q   Well, I mean, we'll get to the miraculous, as
7  you say, recovery.
8       A   That's just --
9       Q   Doctor, let me finish my question, please.
10 We'll get to the miraculous recovery as you opine. But I
11 want to make sure that I am very clear. You have reached
12 an opinion to a reasonable degree of medical certainty
13 about the age of Mr. Armbruster's spinal cord compression,
14 and that opinion depends upon the status of his recovery,
15 is that correct?
16      A   That is correct.
17      Q   And it depends only on the status of his
18 recovery, is that correct?
19      A   Well, yes, putting all of that together with
20 the postoperative clinic notes, etc., yes.
21      Q   Okay. You read Dr. Bailey's testimony,
22 correct?
23      A   Yes.
24      Q   And you read -- strike that.

197

1    (Thereupon, Plaintiff Exhibit 7 was marked for
2 identification.)
3 BY MS. GRADY:
4    Q    This a copy of a letter written by Dr. Bailey,
5 the neurosurgeon, who performed Mr. Armbruster's surgery in
6 March of 2015.
7    A    Yes.
8    Q    You've not seen this before, is that correct?
9    A    No, I have not.
10    Q    If you would take a minute and review it,
11 please.
12       MS. COOK:  Are you marking that as an exhibit?
13       MS. GRADY:  Yes.  It's Exhibit 7, and it's
14 P274.
15       MS. COOK:  I have the letter.
16 BY MS. GRADY:
17    Q    Let me know once you've finished reviewing it,
18 please.
19    A    Okay.  I read it.
20    Q    Okay.  You see that Dr. Bailey opined in this
21 letter that the most likely reason for Mr. Armbruster's
22 current issues is the lack of appropriate treatment while
23 patient was in prison for five months?
24    A    Well, that's what -- that's what this letter

198

1 states.  Yes, I read this letter and that's what that
2 states.
3    Q    Well, and you reviewed Dr. Bailey's testimony
4 where he agreed that he wrote this letter and that he held
5 these opinions, correct?
6    A    Well, I don't remember exactly what his --
7 what he stated word for word, but I read, just now read
8 this letter and I read his deposition before.
9    Q    Okay.  But you dispute that, that
10 Mr. Armbruster received a lack of appropriate treatment
11 while in prison?
12    A    I dispute that, yes.
13    Q    And you dispute that the significant
14 myelomalacia of the spinal cord was likely from the
15 long-term compression while the patient was in prison,
16 correct?
17    A    Yes.
18    Q    But you didn't actually see the compression in
19 person, right?
20    A    I saw -- I saw the MRI, yes.
21    Q    You agree it was a very significant spinal
22 cord compression, correct?
23    A    Yes.
24    Q    One of the factors that can cause a spinal

199

1 cord compression to be so severe is duration of the
2 compression, correct?
3    A    No, not necessarily.  It depends upon the
4 incident.  So you can have -- you can have various degrees
5 of compression with acute versus chronic conditions.  So it
6 doesn't necessarily equate with duration.
7    Q    I agree.  But you agree that duration can
8 cause an increase in severity of the spinal cord
9 compression?
10    A    Well, I mean, duration, I think as I stated
11 earlier, duration can decrease recovery.  Prolonged
12 duration can decrease recovery.
13    Q    Okay.  And you reviewed Dr. Bailey's
14 deposition testimony where he testified about the imaging
15 from March of 2015?  Did you review that portion of the
16 testimony?
17    A    What page were you on?
18    Q    I'm just asking you in general did you
19 review --
20    A    Yeah, I reviewed -- I reviewed -- yes, I did
21 review that.
22       (Thereupon, Plaintiff Exhibit 8 was marked for
23 identification.)
24 BY MS. GRADY:

200

1    Q    I'm going to hand you what's marked as
2 Exhibit 8.  You were subsequently given those images to
3 review, is that correct?
4    A    Yes.
5    Q    And did you review them on -- did you review
6 them on April 17th?
7    A    Yes.
8    Q    Okay.  And in your opinion that didn't change
9 any of the opinions as you stated in your March 27th,
10 report, correct?
11    A    Well, it didn't -- it didn't change my
12 opinions.  It further substantiated, enforced my opinions.
13    Q    What opinions did it further substantiate?
14    A    Well, it further -- it showed -- it showed the
15 initial severity of the condition.  It showed the
16 postoperative x-rays showing good structural alignment.  It
17 showed, following the surgery, the spinal canal to be
18 patent, open, without further central compression, etc.  So
19 it showed everything working adequately.
20    Q    Okay.  Did it have any impact on your opinions
21 about the age of Mr. Armbruster's spinal cord compression?
22    A    No.  It's -- no, it did not.
23    Q    Did it have any impact on your opinions about
24 the standard of care that Dr. Shah gave to Mr. Armbruster?

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

201

1       A    No.

2       Q    Did it have any impact on your opinions about
3   Mr. Armbruster's neurological recovery following the
4   surgery?

5       A    No.  This letter just addressed my review of
6   those radiographic studies.  It didn't -- it didn't go into
7   Mr. Armbruster's neurological recovery.

8       Q    Right.  I guess I just meant did the MRI
9   studies impact your opinions one way or the other about
10  Mr. Armbruster's neurological status following his surgery?

11      A    It showed that -- it showed that he had been
12  adequately decompressed centrally from the -- from the disc
13  herniation.

14      Q    That the spinal issue had been addressed,
15  correct?

16      A    It showed that the spinal cord compression had
17  been addressed.

18      Q    Right, that the cord was no longer actively
19  being compressed, correct?

20      A    Yes.  Yes.

21      Q    Did it have any other impact on
22  Mr. Armbruster's neurological recovery?

23      A    The only other things I recall looking at
24  that, it showed where he still had some, there was a little

---

202

1   bit of residual degenerative changes in the foramen on both
2   sides.  And that was something that if I had done his
3   surgery, I would have decompressed those while I had it
4   exposed.  Dr. Bailey chose not to do that.

5           So the residual MRI did show some residual
6   foraminal stenotic changes, which are chronic, degenerative
7   changes secondary to the -- secondary to the degenerative
8   changes around the facet joints and the foramen.

9           (Thereupon, Plaintiff Exhibit 9 was marked for
10  identification.)

11  BY MS. GRADY:

12      Q    The court reporter has handed you what's been
13  marked as Exhibit 9.  This is an excerpt of an MRI image
14  that was an exhibit to Dr. Bailey's deposition where he
15  marked what he felt was an image that demonstrated
16  persistent myelopathy.  Do you see that?

17      A    Yes.

18      Q    And you reviewed this image, correct?

19      A    Yes.

20      Q    This is an image that was taken on March 16th,
21  2015.  And according to Dr. Bailey, that image showed
22  signal change in the spinal cord?

23      A    Yes.

24      Q    Do you agree with that?

---

203

1       A    I see a little signal change there, yes.

2       Q    Okay.  You can put that to the side.

3           You agree that if Mr. Armbruster suffered from
4   spinal cord compression at any point between May of 2014
5   and September of 2014, an MRI would depict it, correct?

6       A    Yes.

7       Q    And you agree that if Mr. Armbruster had
8   suffered neurological symptoms at any point between May
9   2014 and September of 2014, the standard of care required
10  him to be sent to an MRI, for an MRI to rule out spinal
11  cord compression?

12      A    Again, using these words standard of care, I
13  would have -- I would have done a good neurologic
14  examination.  And with today's technology, I think the
15  appropriate thing would have been to order an MRI.

16          You could have done other things within the
17  standard of care.  You could have gotten a CT myelogram,
18  you could have done other studies.  So you wouldn't have to
19  get an MRI to be standard of care.

20          But I think with a -- you would have done a
21  neurologic examination.  And if he had an abnormal
22  neurologic examination, you would have worked it up further
23  by one of the means I mentioned.

24      Q    Thank you.  Just give me one second.

---

204

1           The imaging studies that you received, was
2   that something that you asked for or something you were
3   provided?

4       A    I was provided -- I asked for them and was
5   provided.

6           MS. GRADY:  Okay.  I don't have anything else.

7           MS. KINKADE:  Lisa, do you have anything?

8           MS. COOK:  Yeah, I just had a couple of
9   questions just to follow-up on some things that stuck out
10  to me.

11          CROSS-EXAMINATION

12  BY MS. COOK:

13      Q    I wanted to ask you a little bit about your
14  opinion regarding the neurological examination.  So like on
15  Page 4 where you wrote about a normal neurological
16  examination, could you describe what you meant by that.

17      A    Yes.  A normal neurologic examination would be
18  everything I mentioned earlier, everything I mentioned
19  earlier as far as his -- his gait, his motor examination.
20  Okay.  So his gait, his balance, his neurologic
21  examination, motor strength, sensation, strength in his
22  upper and lower extremities.  Those would all be part of a
23  normal neurologic examination.

24      Q    So even if the records don't say normal

---

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

205

1  neurological examination, how are you able to reach that
2  conclusion?
3  **A   By what -- by what -- by Dr. Shah.  Dr. Shah**
4  **stated that he had a normal neurologic examination.  And**
5  **Dr. Shah did not list any -- any other abnormal findings in**
6  **his medical records.**
7        MS. GRADY:  I'm just going to object to scope
8  to that last question based on the answer.
9  BY MS. COOK:
10     Q   I'm sorry, your -- well, so I'll reask.
11        So if, for instance, you know, Dr. Naseer did
12  not necessarily write normal neurological examination, how
13  are you able to opine on whether the plaintiff had a normal
14  neurological examination?
15     **A   Okay.  Okay.  So in my case, ma'am, I don't --**
16  **you know, I don't -- I don't list every negative study.**
17  **You know, when I, you know, you know, when I issue a**
18  **report, I don't just go on and on off a lot of negative**
19  **studies.  I generally put, you know, the positive findings**
20  **in there, okay.**
21        **So the bottom line is, you know, I did not**
22  **examine Mr. Armbruster during these times that he saw**
23  **Dr. Shah and that he saw Dr. Naseer.  So I'm basing -- I'm**
24  **basing my opinions on their reports, what they stated.**

206

1  **They did not state any really, what I consider to be**
2  **abnormal findings.**
3        **And then again in Dr. Shah's deposition he**
4  **stated that he had a normal neurological examination.  So**
5  **obviously I wasn't there at that time and I have to take**
6  **their word for it.**
7     Q   And you were asked about the credibility of
8  Mr. Armbruster versus the doctors who treated him with
9  regards to the neurologic examination, so Mr. Armbruster's
10  subjective complaints versus objective findings.
11        So my question is, so are you able to make
12  objective findings even if they contradict Mr. Armbruster's
13  complaints?
14     **A   Well, yeah.  The examiner is able to make**
15  **objective findings in putting those in -- in -- in -- well,**
16  **whoever is examining Mr. Armbruster could do the objective**
17  **physical findings and put that in correlation with his**
18  **subjective complaints.**
19        **Obviously -- obviously I didn't examine**
20  **Mr. Armbruster, so I did not perform an evaluation of**
21  **Mr. Armbruster, so I'm going by the medical records as far**
22  **his objective findings, right?**
23     Q   Okay.  And so if I understood your previous
24  testimony, it's not that you discounted what Mr. Armbruster

207

1  complained of, his objective complaints, it's that you saw
2  objective findings that somewhat contraindicated those, is
3  that correct?
4        MS. GRADY:  Object to form.
5        THE WITNESS:  Yes, ma'am, that is correct.
6        MS. COOK:  Okay.  Those are all the questions
7  that I had.
8             CROSS-EXAMINATION
9  BY MS. KINKADE:
10     Q   Okay.  I have a couple.  Excuse that they're
11  not in perfect order.
12        You were asked about what is a serious medical
13  condition with regard to spinal cord compression, and I
14  believe you used the word neurological findings, but then I
15  also heard questions about neurological symptoms.
16        So just so we're clear, is it a serious
17  medical can if there are neurological complaints without
18  any neurological findings?
19     A   No.
20     Q   Okay.  And, again, going back and forth with,
21  I think there's some disagreement about neurological
22  symptoms versus neurological findings.  Is it correct that
23  your testimony was neurological findings are the key in the
24  diagnostic process and treatment plan?

208

1        MS. GRADY:  Object to form.
2        THE WITNESS:  Yes, neurologic findings,
3  objective physical findings on examination.
4  BY MS. KINKADE:
5     Q   And why are objective findings the most
6  important part for you?
7     **A   Because -- because, I mean, they would be**
8  **findings based upon a neurologic examination, not based**
9  **upon subjective complaints.  So, I mean, I -- yeah, just**
10  **what I said.  I mean, they're based upon objective**
11  **findings, not subjective complaints.**
12     Q   And are you -- I'll get to that in a second.
13        So you were asked about other doctors'
14  neurological findings and how in your report you described
15  it as normal?
16     **A   Yes.**
17     Q   Is your report quoting all the medical records
18  that you've reviewed or is it just a list of your opinions?
19     **A   Okay.  My report is a list of my opinions**
20  **after review of all those medical records and radiographic**
21  **studies.**
22     Q   If you were quoting doctors' reports in your
23  report, would you have used quotation marks to indicate
24  that you were quoting a record?

Transcript of Frank Petkovich, M.D.

53 (209 to 212)

Conducted on May 29, 2018

209

1    MS. GRADY:  Objection, form leading.
2    THE WITNESS:  Yes.
3  BY MS. KINKADE:
4    Q    Did you do that?
5    **A    No.**
6    Q    Okay.  And do you have the experience and the
7  training and the education to review medical records and
8  form your own opinions about what they say?
9    **A    Yes.**
10    Q    Is that what you did here?
11    **A    Yes.**
12    Q    And I see in front of you a stack of medical
13  records I would say well over a foot tall.  Is that a fair
14  assessment?
15    **A    Yes.**
16    Q    Are those the records you reviewed?
17    **A    Yes.**
18    Q    And is that what those -- would you say over
19  1,000 pages easy?
20    **A    Yes.**
21    Q    Are those the records that you were attempting
22  to summarize in your seven page report and opinions?
23    MS. GRADY:  Object to form, scope, misstates
24  prior testimony.

210

1    THE WITNESS: Yes.
2  BY MS. KINKADE:
3    Q    So setting aside what other doctors have put
4  in their reports, what is your opinion with regard to
5  Mr. Armbruster's neurological recovery in this case?
6    **A    I think he's made a remarkable neurological**
7  **recovery.  I think that he had a large disc herniation at**
8  **C5-6.  And I think he went to the emergency room at**
9  **Gateway.  I think they did a very appropriate job of**
10  **evaluating him.  I think that he had emergency surgery, I**
11  **think, which was the appropriate thing to do.  I think he's**
12  **made a miraculous recovery.**
13    **I looked at those follow-up studies.  They**
14  **showed the spinal canal very open, very well centrally**
15  **decompressed.  On the MRI there is that one little area**
16  **there which could be consistent with a little bit of, it**
17  **hasn't fully recovered yet, the spinal cord.  That could**
18  **still -- that was taken six months after the surgery.  That**
19  **could improve for a couple of years after the surgery.**
20    **So I think based upon -- based upon all of**
21  **that, I think he's had a great recovery from the surgery,**
22  **from the disc herniation at C5-6 and the surgery, I think**
23  **he's had a very good recovery.**
24    Q    And based on that recovery you opine that you

211

1  believe that the spinal cord compression was acute versus
2  chronic, is that right?
3    **A    Definitely.  That's just sort of the basic**
4  **physiology of a nerve function.  If a nerve is compressed**
5  **for a long period of time, a nerve -- the spinal cord is**
6  **unforgiving, you know.  So you compress a spinal cord very**
7  **long, you've got a problem.**
8    **And so when somebody recovers that**
9  **tremendously, I mean that means it wasn't compressed very**
10  **long.  Ms. Grady asked me earlier as far as what I define**
11  **acute as.  I mean, it's a relative term.  This man went to**
12  **the emergency room that night and an MRI showed that.**
13    **I can't give you an exact time when that**
14  **herniation occurred, but it wasn't there very long.  It may**
15  **have been there as long as two or three -- several days,**
16  **but it wasn't there very long.**
17    MS. GRADY:  I'm just going to move to strike
18  that last answer to the extent it introduces a novel
19  opinion not disclosed in his report.
20  BY MS. KINKADE:
21    Q    An acute versus chronic, those are medical
22  terms that are commonly used, is that right?
23    **A    Yes.**
24    MS. GRADY:  Object to form and to scope.

212

1    THE WITNESS:  Yes.
2  BY MS. KINKADE:
3    Q    Those aren't terms that you've created?
4    **A    No.**
5    MS. GRADY:  Same objection.
6  BY MS. KINKADE:
7    Q    And those aren't terms that are novel in
8  giving medical opinions?
9    MS. GRADY:  Same objection.
10    THE WITNESS:  That is correct.
11  BY MS. KINKADE:
12    Q    If a patient had a chronic spinal cord
13  compression over many months, what recovery would you
14  expect to see in that patient?
15    MS. GRADY:  Object to scope.
16    THE WITNESS:  You would see a very limited
17  recovery.  You would see -- the spinal cord would be --
18  would be -- would have a lot of permanent damage to the
19  spinal cord.  You would see it gray, sort of atrophied, the
20  tissue.  The spinal cord would be narrowed and atrophied
21  and would look very pale.
22    And this postoperative MRI looked very, very
23  good except for that one little area there.  So, I mean, it
24  looked good.  So you wouldn't -- with a prolonged -- with

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

54 (213 to 216)

213

1  any length of time, it would not come back.
2  BY MS. KINKADE:
3      Q   You mentioned that the MRI was only -- let's
4  see, September, October, November, yeah, six months, six
5  months after the surgery.  How long would you expect to see
6  a patient could still show signs of improvement post-op in
7  a decompression surgery like the one Mr. Armbruster had?
8      A   Two years.
9      Q   And is that consistent with what Dr. Bailey
10 opined as well?
11     A   I don't remember what he specifically said,
12 but that's been my experience.
13     Q   The best way to determine -- well, fair to say
14 you haven't been provided any medical records after May of
15 2015 for Mr. Armbruster?
16     A   That is correct.
17         MS. GRADY:  Object to form.
18 BY MS. KINKADE:
19     Q   The best way to know what Mr. Armbruster's
20 residual symptoms are, if any, would be to examine him
21 after the two year mark post-op?
22     A   Yes.
23     Q   Were you ready and willing to do that in this
24 case?

214

1      A   Yes.
2      Q   Did you provide multiple dates in May of this
3  year, 2018, that you were willing to give Mr. Armbruster an
4  independent medical evaluation?
5      A   Yes.
6          MS. GRADY:  I'm just going to object to this
7  line of questioning as being outside the scope, but go
8  ahead.
9
10 BY MS. KINKADE:
11     Q   Yes?
12     A   Yes.
13     Q   And in doing that examination, what would you
14 have been looking for?
15     A   Well, I would have -- I would have -- I would
16 have done a neurologic examination on him.  So I would
17 have, if I had seen him, I would have gotten an x-ray of
18 his cervical spine, which I think would have shown the
19 graft to have been fully incorporated and fused, which I'm
20 sure it is by now.
21         You know, I would have expected him to have,
22 you know, based upon his records to have essentially a
23 normal neurologic examination.  I would have expected him
24 to have been ambulatory without any difficulty and have an

215

1  essentially normal neurologic examination with regard to
2  his upper and lower extremities.
3      Q   And that would have been based on, not
4  your review of the records but your firsthand encounter
5  with Mr. Armbruster?
6          MS. GRADY:  Object to form.
7          THE WITNESS:  Yes.
8  BY MS. KINKADE:
9      Q   And you still would have been able to give
10 your deposition in this case in May of 2018 after that
11 examination?
12     A   Yes.
13         MS. GRADY:  Object to form.  This is all
14 leading.
15 BY MS. KINKADE:
16     Q   Would you have gone into that examination with
17 your mind made up or would you have been openminded to see
18 what if any residual symptoms Mr. Armbruster had?
19     A   I always try to be openminded.  My process is,
20 you know, when I examine someone is to take a detailed
21 history from them in their words and then to examine them,
22 perform a physical examination, objective physical
23 findings, and then try to put all of it together, and I
24 would formulate a report with my opinions.

216

1      Q   You were asked about who retained you in
2  numerous cases.  How is it medically relevant who retained
3  you in any case?
4      A   I don't think it is.
5      Q   Would it have framed your opinion either way
6  who retained you in your cases?
7      A   No.
8      Q   Is that why you don't remember sitting here
9  today who retained you in those cases?
10         MS. GRADY:  Object to form.
11         THE WITNESS:  Well, that's generally true.
12 And today, I think I mentioned earlier, you know, the
13 records I received.  But that's -- that's really all that I
14 remember.
15 BY MS. KINKADE:
16     Q   You were asked a lot about you reviewing
17 Mr. Armbruster's deposition?
18     A   Yes.
19     Q   Was Mr. Armbruster a good historian about his
20 medical care prior to being incarcerated?
21     A   No.
22         MS. GRADY:  Object to scope.
23 BY MS. KINKADE:
24     Q   Explain that.

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

55 (217 to 220)

---

217

1      A    As I recall -- again, I don't have his
2   deposition memorized, but as I recall, he could not
3   remember a lot of his medical history.
4      Q    What about with regard to his appointments
5   with either the nurses or Dr. Shah during May through
6   September 2014, was he a good historian?
7      A    No, he did not appear to be.
8         MS. GRADY:  Same objection, scope.
9   BY MS. KINKADE:
10     Q    Did you read anything in his deposition that
11  showed any medical training or expertise in neurology?
12        MS. GRADY:  Same objection.
13        THE WITNESS:  No.
14  BY MS. KINKADE:
15     Q    Or did Mr. Armbruster testify that he had any
16  training, experience or knowledge with orthopedics?
17     A    No.
18     Q    Did those, his poor history and his lack of
19  education and training in the subject matter, did you take
20  that into account when assessing his testimony with regard
21  to the records and the doctors' records?
22        MS. GRADY:  Object to form and scope.
23        THE WITNESS:  Yes.
24  BY MS. KINKADE:

---

218

1      Q    Have you had the occasion where a patient
2   comes in and tells you what they're symptoms are and in
3   fact the diagnosis is something different?
4      A    Yes.
5         MS. GRADY:  Object to form.
6   BY MS. KINKADE:
7      Q    Is that -- I'll move on.
8         You mentioned that you don't believe
9   Mr. Armbruster should have chronic pain.  Why is that?
10        MS. GRADY:  Object to scope.
11        THE WITNESS:  Because I've done that surgical
12  procedure many times.  And it's been my experience that --
13  that people have a great recovery following that surgery.
14  In this case, the only difference in this case was that --
15  many times that surgical procedure is done with less --
16  with less dramatic spinal cord compression.
17        But so, I mean, that's all been well
18  documented that was all well decompressed.  So the surgery
19  itself appeared to go very, very well.  In my experience
20  most people recover very well after that surgery and are
21  able to do pretty much do what they want to.
22  BY MS. KINKADE:
23     Q    I want to show you that record.  So I want to
24  direct your attention to Dr. Naseer's records.  What did

---

219

1   you mark that as?  Of course that's one I did not mark.
2         MS. GRADY:  I think it's Exhibit 5.
3         MS. KINKADE:  I think it's 5 as well.
4         THE WITNESS:  So you're talking about
5   Exhibit 5?
6   BY MS. KINKADE:
7      Q    Yes, the medical records from Dr. Naseer.  Let
8   me direct you to, I believe, Page 56.
9      A    Let me find them here.
10     Q    Okay.
11     A    Here it is, on top here.
12     Q    Okay.
13     A    What page are we on, ma'am?
14     Q    It's P56.
15     A    Okay.  I got it.
16     Q    I believe you were asked about the
17  neurological portion at the top of this page about
18  irregular gait, walking in limping way.
19     A    Yes.
20     Q    I want to direct your attention to the bottom
21  of this page where it says discussion notes after
22  assessment Number 4, impotence.
23     A    Yes.
24     Q    The discussion reads, lengthy discussion with

---

220

1   patient.  He insists to have Norco.  I'm going to pause for
2   a second.  What's Norco?
3      A    Norco is a narcotic analgesic pain -- it's a
4   narcotic.
5      Q    Or Hydrocodone.  So let me be clear.  The
6   record says Norco or Hydrocodone.
7      A    Yes.
8      Q    I'm going to pause for a second there.  What
9   is Hydrocodone?
10     A    Hydrocodone is a narcotic analgesic.
11     Q    Back to the record.  It states, from this
12  office, he got to have for the rest of his life.  He claims
13  that Drs. Bailey and Naseer all denied his refills of this
14  quote, pain pill, end quote.
15        I had Ms. S. Trice, T-R-I-C-E, to discuss him
16  for the situation.  Subsequently he waned, quote, Viagra,
17  unquote.  We gave a coupon with prescription.
18        Did I read that correctly?
19     A    You did.  So he wanted -- he's talking about
20  narcotic analgesic.  And, you know, Hydrocodone, Percodan,
21  Percocet, they're all the same generic for the narcotic
22  analgesics which are narcotics as we talked about.  But
23  then the Viagra is a different medication.
24     Q    Are those narcotic pain pills appropriate in

---

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

---

221

1  this case for Mr. Armbruster's treatment?
2       MS. GRADY:  Object to scope.
3       THE WITNESS:  Absolutely not.  Dr. Bailey, I
4  think, I think he stopped -- told him to stop taking it
5  around November after the surgery.  My -- my experience
6  after a surgical procedure like Mr. Armbruster had,
7  patients, they should be off their narcotic analgesic
8  within three or four weeks.
9  BY MS. KINKADE:
10      Q   Did you see anywhere in the records where a
11  doctor had told Mr. Armbruster that he had to have a
12  narcotic for the rest of his life?
13      MS. GRADY:  I'll object to scope.
14      THE WITNESS:  No.  That would be -- that would
15  be contraindicated.  Not a smart thing to do.
16
17  BY MS. KINKADE:
18      Q   Why is that?
19      MS. GRADY:  Object to scope.
20      THE WITNESS:  Because they're dangerous --
21  they're dangerous drugs.  They're what you read in the
22  paper, all the drug abuse going on, all the problems in
23  this country right now, in the world.  I mean, those drugs
24  are overused.

---

222

1       And, you know, most people -- like I said,
2  this a straightforward surgical procedure.  Most people
3  within three to four weeks are off of it.
4  BY MS. KINKADE:
5       Q   Exhibit 7 you were given which is a letter
6  from Dr. Bailey.  Had you read this before today?
7       A   No.
8       Q   Did you read in Dr. Bailey's deposition
9  testimony that he did not review Mr. Armbruster's medical
10  records when he drafted this letter?
11      A   Yes.
12      Q   Is that a common practice in the medical
13  field?
14      MS. GRADY:  I'll object to scope.
15      THE WITNESS:  I would have thought -- first of
16  all, I don't know who Dr. Bailey directed this letter to.
17  I'm not sure who he directed the letter to.  I think it's
18  kind of -- it was kind of foolish for -- for mister -- for
19  Dr. Bailey to make these comments without reviewing the
20  medical records.  So that's my opinion.
21  BY MS. KINKADE:
22      Q   Is this a practice that you do yourself, write
23  letters without review of a patient's medical records?
24      MS. GRADY:  Same objection.

---

223

1       THE WITNESS:  No.
2  BY MS. KINKADE:
3       Q   Why wouldn't you do that?
4       MS. GRADY:  Same objection.
5       THE WITNESS:  Well, I mean, I just don't -- I
6  try not to make statements that are not based upon some
7  reasoning behind it.  I think Dr. Bailey did a very good
8  job on this man's surgery, but I think that Dr. Bailey, you
9  know, he's making comments about what happened four to six
10  months before.  He wasn't there.  He didn't review the
11  medical records.  I think it's kind of foolish for him to
12  make those kind of comments without reviewing the records.
13  BY MS. KINKADE:
14      Q   You did mention that you would have done
15  additional decompression if you would have performed the
16  surgery?
17      A   Yes.
18      Q   What do you mean by that?
19      MS. GRADY:  Objection, scope.
20      THE WITNESS:  I just noticed on the -- and I
21  don't know that it really effects his recovery, but I just
22  noticed on his postoperative MRI just shows where off to
23  the side there, I think the radiologist discusses it, off
24  to the side there where he's been adequately decompressed,

---

224

1  but off to the side of the foramen there, he's got a little
2  bit of bone spurs there.
3       And this was done late at night, in the middle
4  of the night, and people, you know, your team there, people
5  want to go home.  I mean, optimally it doesn't take much to
6  put a Kerrison Rongeur -- it's a surgical instrument that
7  reaches in there and kind of grabs those bone spurs.
8       So, you know, it's not a big deal, but the MRI
9  does show where he's got a little bit of stenotic changes
10  there.  I don't think he's symptomatic from those.  Those
11  are obviously chronic things that have been there a long
12  time.  Had I done the surgery, I would have trimmed those
13  up at the time.
14  BY MS. KINKADE:
15      Q   How do you know that those were chronic?
16      MS. GRADY:  Object to scope.
17      THE WITNESS:  Because they're part of --
18  they're part of the degenerative disc process.  The only
19  reason I mention that, because the radiologist in his
20  report discusses those.  So in case somebody says what are
21  those, well, that's what they were.
22       I don't think they're probably of any clinical
23  significance now.  They show up here on the x-rays.  But I
24  think they're probably of no clinical significance at this

---

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

225

1  point. I'm just saying that's what they are. They're just
2  a little off to the side there. When the canal's trimmed
3  up, you've got a little bit of a ledge there, and, you
4  know, I would have trimmed it up a little.
5  BY MS. KINKADE:
6      Q   In response to Ms. Grady's questioning, and
7  you had the court reporter read it back to you, that you
8  said Dr. Shah has nothing to gain by being honest and
9  forthright.
10         Did you misspeak when you said that, because
11 it was not consistent with what your testimony was?
12     A   I'm not sure what your question is.
13        MS. GRADY: You don't have to -- I'm not going
14 to use that against Dr. Petkovich.
15        THE WITNESS: Well, say it again because I'm
16 not sure --
17 BY MS. KINKADE:
18     Q   Just to make it clear, you said Dr. Shah had
19 nothing to gain by being honest and forthright. Did you in
20 fact mean he had nothing to lose by being honest and
21 forthright?
22     A   Yes.
23     Q   It's been many hours. I just wanted to
24 clarify that.

226

1         You reviewed the opinions of Dr. Brown?
2     A   Yes.
3     Q   Do you agree with those opinions?
4         MS. GRADY: I'm going to object to scope. I
5  think we're very far afield of the questions I've asked.
6  It's something that wasn't disclosed in his report. It
7  hasn't been disclosed in any written opinions at any point
8  since that.
9         And given that it's both outside of my direct
10 and outside of his Rule 26(a) disclosures, I don't think
11 we're going to pay the $900 for him to continue to testify
12 about these undisclosed opinions that aren't going to be
13 admissible in court, but go ahead.
14 BY MS. KINKADE:
15     Q   Okay. What specifically -- we're running
16 short on time and I don't want to keep us over an hour, but
17 what specifically do you disagree about with Dr. Brown's
18 report?
19     A   Well, I think that Dr. Brown made some
20 comments about -- I mean, I think that mister -- based upon
21 my review of the records, I think that Mr. Armbruster was
22 treated appropriately by Dr. Shah. I think Dr. Brown,
23 again, makes comments about, I think he said if somebody
24 has complaints of neck pain that you should order an MRI.

227

1  I think he makes that comment or something like that, which
2  is absurd, quite honestly.
3         I mean, you examine people. You don't do a
4  bunch of unnecessary tests on people. That's one of the
5  reasons -- you know, that's just inappropriate. That's one
6  of the reasons healthcare costs have skyrocketed.
7         So with a normal neurologic examination
8  performed by a competent physician, you don't get an MRI.
9  You learn in medical school, you treat -- you treat and
10 examine patients, you don't treat x-rays.
11        So, I mean, the point is with those kind of
12 physical findings, if I had seen -- if I had seen
13 Mr. Armbruster, I mean, I spent my career as a spine
14 surgeon. If I saw Mr. Armbruster as a patient, I wouldn't
15 have ordered any tests on him. With a normal neurological
16 examination, I wouldn't have ordered any tests or an MRI.
17     Q   And then lastly, in Dr. Bailey's deposition he
18 did speak some about dating Mr. Armbruster's injury and
19 testified that the signal changes that appeared on the
20 films in September of 2014 could conceivably have been
21 there as short as 24 hours. Do you remember reading that
22 testimony?
23     A   Yes, yes.
24     Q   Do you agree with that testimony?

228

1     A   Yes.
2         MS. GRADY: I'm going to object to scope.
3         THE WITNESS: Yes.
4         MS. KINKADE: I think that's all the questions
5  I have.
6         REDIRECT EXAMINATION
7  BY MS. GRADY:
8      Q   I have just a couple to follow-up. You talked
9  about neurological findings. Tell me what neurological
10 findings are as compared to neurological symptoms.
11     A   So, again, we talked about -- we talked about
12 subjective complaints and we talked about symptoms. We
13 defined what symptoms were. Now, neurological findings are
14 the objective physical findings. I mean, motor strength,
15 sensation, you know, the gait, balance, the deep tendon
16 reflexes, coordination. These are all -- those are all
17 part of a neurologic evaluation, neurologic exam.
18     Q   But I thought you said that neurological
19 symptoms were only those subjective complaints that you
20 could verify through exam, right?
21     A   I used -- I used -- I used the example -- I
22 used the example -- I mean, I used the examination in my
23 example of symptoms being like cough, sneeze. Those are
24 all symptoms. Those are all symptoms, cough, sneeze, etc.,

Transcript of Frank Petkovich, M.D.

Conducted on May 29, 2018

58 (229 to 232)

---

**229**

1  as opposed to, you know, we talked about symptoms,
2  subjective complaints is how -- when I talked about that.
3          As far as neurologic findings, they're what I
4  said, you know, they're hardcore.  And as I recall, looking
5  at another finding I didn't mention earlier, when this man
6  went into the emergency room at Saint Elizabeth's
7  Hospital -- when he went to the emergency at Gateway
8  Regional Medical Center in Granite City --
9      Q   Doctor, I'm not asking --
10     A   -- he had ataxia.
11     Q   Excuse me, Doctor.  I'm not going to allow you
12  to expand your scope of your opinions any further.  I'm not
13  asking about Mr. Armbruster in any way, shape or form.
14          I'm asking you to differentiate the medical
15  terms neurological symptoms with neurological findings.
16  Please do so without discussing your opinions about
17  Mr. Armbruster in any way.
18     A   So symptoms are -- symptoms would be objective
19  physical findings of what I've defined.  So symptoms would
20  be what somebody's subjective complaints are.  Those would
21  be their subjective complaints.  And their symptoms would
22  be findings associated with that, whether they were, their
23  symptoms are dropping -- they're dropping something, that
24  would be a symptom, if they say they're dropping something.

**230**

1  Or if they say they have an altered gait.  That's what I
2  was trying to say.  If they have an altered imbalance, an
3  ataxia that would be a symptom.  So, okay.
4      Q   Okay.  You testified that you would be
5  openminded as to the state of Mr. Armbruster's neurological
6  recovery, correct?
7      A   Yes.
8      Q   It's your opinion that as of today
9  Mr. Armbruster has made a miraculous recovery, correct?
10     A   Yes.
11     Q   And you've reached that opinion to a
12  reasonable degree of medical certainty, correct?
13     A   Yes.
14     Q   And, in fact, you also determined, according
15  to your testimony earlier, that Mr. Armbruster is not
16  credible, correct?
17     MS. KINKADE:  Objection, misstates his
18  testimony.
19     THE WITNESS:  I think that there's some -- I
20  think that he's not as credible -- you asked me as far as
21  the treating physicians that treated him.  And I think that
22  his report is not as credible as their evaluation and
23  examination.
24     MS. GRADY:  I don't have anything else.  Lisa.

**231**

1          CO-COUNSEL:
2          MS. COOK:  Yes.  No, I don't have any
3  additional questions.
4          THE COURT REPORTER:  Signature.
5          MS. KINKADE:  Would you like to read?
6          THE WITNESS:  No, I'll waive.
7          (Thereupon, the deposition was concluded at
8  6:00 p.m.)

**232**

1          CERTIFICATE OF REPORTER
2          I, Jo Ann Dickson, Certified Shorthand
3  Reporter, Notary Public within and for the State of
4  Missouri, do hereby certify that the witness whose
5  testimony appears in the foregoing deposition was duly
6  sworn by me; the testimony of said witness was taken by me
7  to the best of my ability and thereafter reduced to
8  typewriting under my direction; that I am neither counsel
9  for, related to, nor employed by any of the parties to the
10  action in which this deposition was taken, and further that
11  I am not a relative or employee of any attorney or counsel
12  employed by the parties thereto, nor financially or
13  otherwise interested in the outcome of the action.
14
15
16
17  _____
18  Jo Ann Dickson, CCR, 1085
19
20
21
22
23
24

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                    59

**A**

a) (2) (b
96:9
**aberdeen**
4:5
**ability**
7:6, 123:19,
154:11, 175:6,
232:7
**able**
13:7, 72:23,
78:2, 78:10,
82:3, 102:4,
175:12, 205:1,
205:13, 206:11,
206:14, 215:9,
218:21
**abnormal**
164:16, 164:19,
170:14, 170:20,
171:1, 203:21,
205:5, 206:2
**above**
44:20, 58:5,
81:4, 107:19,
154:10, 184:4
**absence**
42:17, 46:12,
46:21, 47:3
**absolutely**
221:3
**absurd**
227:2
**abuse**
176:6, 221:22
**academy**
64:22
**access**
154:23
**accident**
108:9, 108:17,
108:18
**according**
54:12, 60:7,
105:17, 115:12,
125:7, 130:21,
133:9, 149:6,

178:6, 180:15,
180:19, 186:4,
186:11, 186:20,
186:21, 202:21,
230:14
**accordingly**
83:12
**account**
146:2, 184:11,
217:20
**accountant**
62:5
**accuracy**
96:13, 97:11,
99:9
**accurate**
7:6, 7:15,
96:16, 112:19,
115:16, 122:11,
122:17, 123:10,
123:17, 124:6,
158:9, 159:3
**achilles**
58:8
**across**
27:16, 163:20
**acted**
143:17
**action**
232:10, 232:13
**actions**
175:16
**actively**
201:18
**actual**
130:3, 130:9,
141:19, 177:1
**actually**
7:22, 12:20,
13:7, 29:11,
51:5, 69:6,
71:22, 97:21,
104:15, 104:19,
106:23, 108:4,
118:8, 119:15,
144:6, 144:22,
157:20, 161:11,
166:19, 168:6,

178:13, 183:3,
193:10, 198:18
**acute**
41:12, 43:14,
52:8, 66:9,
66:15, 66:17,
66:18, 66:20,
66:21, 66:22,
67:1, 67:3,
67:4, 67:12,
67:21, 67:22,
68:2, 68:4,
68:22, 69:4,
72:19, 73:12,
74:7, 81:21,
82:10, 82:12,
82:21, 82:22,
83:11, 88:24,
199:5, 211:1,
211:11, 211:21
**acutely**
89:3
**acuteness**
78:13
**add**
63:7
**added**
116:4
**addendum**
131:1, 132:12
**addition**
56:20
**additional**
15:1, 132:20,
133:8, 133:21,
134:2, 191:12,
223:15, 231:3
**address**
44:16, 49:11,
49:14, 105:17
**addressed**
201:5, 201:14,
201:17
**addressing**
195:17
**adequate**
194:3, 194:6,
194:9

**adequately**
200:19, 201:12,
223:24
**adjacent**
21:15
**administration**
189:13
**admissible**
101:21, 226:13
**admit**
39:3, 65:20
**admitting**
65:14, 65:19
**adult**
11:4, 11:13,
26:22, 27:5
**adults**
27:1
**adverse**
102:3
**advertise**
113:23, 114:1,
114:4, 114:15,
115:3
**advertisement**
114:8
**advertising**
114:4
**advice**
101:24
**advise**
101:13, 107:6,
132:1
**affecting**
23:13, 23:24
**affiliated**
15:1
**affirmatively**
188:16
**afield**
226:5
**after**
8:12, 9:11,
12:9, 14:19,
16:15, 17:8,
20:15, 20:20,
55:7, 63:2,
64:2, 64:3,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

60

70:13, 70:20,
71:8, 79:18,
92:4, 93:4,
100:2, 133:7,
134:1, 144:24,
148:2, 148:23,
149:3, 152:4,
161:14, 167:2,
184:14, 186:15,
189:4, 208:20,
210:18, 210:19,
213:5, 213:14,
213:21, 215:10,
218:20, 219:21,
221:5, 221:6
**afternoon**
5:13
**afterwards**
5:5, 12:7
**again**
5:19, 6:19,
8:20, 19:4,
28:13, 31:6,
41:9, 41:21,
43:17, 44:12,
44:17, 48:16,
49:3, 51:3,
61:3, 75:7,
75:16, 80:16,
84:5, 84:13,
87:6, 88:20,
98:9, 99:2,
108:14, 110:13,
112:3, 122:5,
123:16, 124:3,
124:21, 125:16,
156:21, 158:2,
163:2, 163:8,
173:18, 175:14,
189:2, 189:18,
190:23, 195:4,
203:12, 206:3,
207:20, 217:1,
225:15, 226:23,
228:11
**against**
47:24, 57:13,
128:8, 225:14

**age**
5:9, 28:17,
71:22, 72:12,
76:14, 77:4,
78:18, 79:1,
79:12, 80:3,
80:17, 80:18,
80:22, 81:17,
82:2, 82:16,
83:20, 84:19,
85:6, 86:2,
86:9, 87:24,
88:15, 89:19,
90:12, 91:10,
91:14, 91:16,
91:17, 196:13,
200:21
**ago**
15:22, 16:2,
88:24, 94:3,
97:22, 98:3,
98:7, 103:14,
126:16, 126:18
**agree**
29:15, 34:20,
36:6, 36:10,
36:12, 36:14,
39:7, 42:17,
46:1, 46:6,
46:8, 46:11,
46:19, 49:12,
50:3, 50:6,
50:9, 50:12,
50:15, 52:24,
53:10, 53:13,
53:18, 53:22,
54:4, 54:10,
56:6, 58:24,
71:5, 71:7,
78:17, 95:24,
99:3, 120:16,
122:3, 122:9,
122:10, 122:16,
123:16, 124:5,
124:11, 124:14,
124:15, 125:9,
144:16, 146:14,
148:8, 152:8,

157:21, 158:2,
158:14, 158:19,
163:2, 163:9,
166:5, 168:7,
168:24, 169:10,
173:18, 174:5,
175:14, 175:19,
178:16, 181:3,
181:11, 181:21,
183:2, 184:17,
185:15, 185:18,
185:19, 185:22,
187:10, 191:10,
192:2, 198:21,
199:7, 202:24,
203:2, 203:7,
226:3, 227:24
**agreed**
5:1, 185:1,
198:4
**ahead**
7:1, 85:16,
135:13, 214:8,
226:13
**al**
1:9, 3:11, 3:23
**alignment**
28:10, 141:16,
141:23, 142:5,
200:16
**allegations**
126:14, 174:15
**alleged**
103:7, 103:12,
175:16
**allow**
75:19, 229:11
**almost**
44:2, 109:13,
116:8
**alone**
77:21
**along**
5:23, 81:22
**already**
6:10, 9:16,
9:17, 27:11,
37:2, 38:20,

116:5, 154:1,
174:23, 184:9,
184:17, 187:2,
195:15
**also**
10:12, 10:22,
12:17, 15:4,
19:15, 23:24,
24:13, 38:3,
38:5, 38:17,
46:5, 63:9,
64:23, 66:2,
104:24, 107:2,
108:18, 134:23,
135:15, 138:5,
151:22, 153:7,
160:1, 172:12,
183:21, 194:6,
194:7, 207:15,
230:14
**altered**
230:1, 230:2
**although**
149:6
**always**
22:3, 45:11,
93:5, 93:10,
130:9, 215:19
**ambulation**
69:22, 155:18,
155:21
**ambulatory**
214:24
**amendment**
62:13
**american**
8:16, 59:10,
59:22, 61:14,
62:20, 63:9,
63:12, 63:13,
64:9, 64:15,
64:16, 64:21,
64:22, 64:24,
65:1, 114:5,
114:13, 114:20
**amount**
12:16, 33:10,
68:11, 68:16,

Transcript of Frank Petkovich, M.D.

Conducted on May 29, 2018

61

71:10, 115:24
**analgesic**
220:3, 220:10,
220:20, 221:7
**analgesics**
220:22
**analogy**
22:6, 60:10
**anatomical**
38:10
**anatomically**
27:11, 29:21,
35:9, 71:15,
89:14
**anatomy**
22:2, 22:9,
27:11, 28:14,
89:14
**anesthesia**
138:4
**ankle**
11:4, 11:14,
58:9
**ann**
1:17, 3:19,
4:28, 5:4,
232:2, 232:18
**annulus**
22:6, 22:7,
27:14, 28:22,
29:3, 29:12,
29:16
**another**
14:6, 18:10,
20:22, 60:14,
62:4, 126:16,
154:1, 173:21,
229:5
**answer**
6:17, 6:18,
7:1, 15:17,
25:5, 36:4,
67:3, 71:12,
73:10, 76:21,
77:6, 80:14,
84:2, 84:3,
84:5, 85:19,
85:22, 86:4,

86:5, 87:16,
97:4, 101:9,
101:10, 101:13,
101:24, 107:7,
123:6, 123:7,
123:19, 124:2,
151:9, 156:13,
156:17, 157:14,
167:21, 168:4,
168:6, 175:13,
184:2, 192:24,
205:8, 211:18
**answered**
28:2, 36:3,
85:13, 90:18,
107:4, 124:8
**answers**
6:10, 51:24,
87:3
**anterior**
139:13, 139:15,
139:20, 139:21,
139:24, 140:1,
140:5, 140:21
**anteriorly**
31:1, 70:7
**anticipated**
20:22
**anticipating**
19:12
**anybody**
27:24, 61:23
**anyone**
76:23, 99:16,
100:6, 118:9,
162:19
**anything**
11:7, 33:15,
97:24, 132:10,
148:6, 150:10,
204:6, 204:7,
217:10, 230:24
**anywhere**
149:20, 163:17,
167:23, 172:19,
189:15, 192:10,
221:10
**apart**
127:23

**apparently**
181:6
**appear**
132:21, 133:3,
133:12, 217:7
**appearance**
142:8
**appeared**
218:19, 227:19
**appearing**
37:2
**appears**
232:5
**apply**
65:8, 65:10,
65:17
**appointment**
65:7, 65:11,
65:13, 149:12,
149:13
**appointments**
65:2, 217:4
**approach**
139:22
**appropriate**
19:1, 20:3,
20:6, 36:23,
56:14, 68:5,
122:13, 122:23,
123:13, 140:3,
162:18, 190:9,
190:16, 197:22,
198:10, 203:15,
210:9, 210:11,
220:24
**appropriately**
70:3, 122:14,
226:22
**approximately**
16:22, 17:13,
23:1, 95:8,
97:22, 111:21,
112:10, 115:23,
118:1, 126:15,
135:17, 135:19,
149:8
**april**
117:17, 117:18,

132:12, 133:8,
134:2, 200:6
**arachnoid**
32:16, 33:5
**arbitration**
93:14
**area**
10:9, 10:10,
11:1, 12:13,
13:15, 14:8,
21:8, 22:21,
38:2, 38:6,
52:21, 53:24,
58:22, 66:10,
89:15, 139:23,
210:15, 212:23
**areas**
10:23, 11:7,
11:10, 52:5,
55:19, 90:8,
91:20, 163:14
**aren't**
93:16, 123:1,
148:1, 212:3,
212:7, 226:12
**argue**
29:5, 29:9
**argument**
27:22
**argumentative**
151:18, 157:12,
168:13, 183:5,
186:24
**argumentive**
158:11
**arise**
120:14
**arisen**
93:4
**arm**
47:22, 47:24,
51:3, 57:13,
127:21
**armbruster's**
105:7, 146:2,
146:6, 146:15,
150:1, 152:13,
155:17, 155:20,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

62

156:5, 156:15,
157:10, 157:23,
159:6, 164:19,
168:11, 169:8,
170:24, 173:17,
174:2, 174:12,
175:9, 175:15,
175:20, 176:2,
177:19, 178:5,
179:9, 181:3,
181:7, 181:17,
182:3, 182:7,
182:10, 182:22,
183:18, 188:17,
190:22, 191:7,
192:3, 195:2,
195:4, 195:11,
195:16, 195:18,
195:19, 196:13,
197:5, 197:21,
200:21, 201:3,
201:7, 201:10,
201:22, 206:9,
206:12, 210:5,
213:19, 216:17,
221:1, 222:9,
227:18, 230:5

**arms**
52:15, 160:3,
161:7, 161:16,
163:15

**arose**
120:12

**around**
16:4, 18:12,
23:7, 32:15,
32:16, 63:3,
70:12, 95:16,
175:6, 202:8,
221:5

**arrest**
174:2

**arrested**
174:9, 174:13,
174:15, 175:5

**arthritis**
27:4

**articles**
125:24

**arts**
9:4

**aside**
210:3

**ask**
6:5, 6:10,
6:15, 19:12,
20:4, 23:3,
61:1, 69:10,
73:5, 76:10,
79:3, 81:15,
84:10, 84:17,
92:24, 96:15,
96:18, 100:7,
102:4, 102:6,
104:6, 104:8,
106:18, 123:15,
124:3, 133:5,
133:6, 133:21,
134:1, 139:8,
139:16, 143:13,
147:20, 158:1,
160:13, 163:1,
163:7, 164:13,
175:14, 183:13,
204:13

**asked**
19:11, 62:8,
71:23, 72:18,
73:9, 73:24,
76:2, 76:19,
76:20, 77:10,
77:19, 79:4,
79:14, 80:5,
83:19, 84:1,
84:11, 85:13,
86:11, 86:18,
86:19, 86:22,
86:24, 87:1,
90:18, 91:8,
91:11, 91:20,
92:23, 98:14,
100:22, 100:24,
101:12, 102:13,
105:23, 106:8,
110:13, 111:11,
111:22, 112:3,
112:4, 124:7,

131:18, 132:7,
133:20, 134:23,
135:8, 147:8,
156:14, 174:23,
204:2, 204:4,
206:7, 207:12,
208:13, 211:10,
216:1, 216:16,
219:16, 226:5,
230:20

**asking**
6:3, 61:11,
69:8, 69:10,
69:11, 74:8,
74:9, 74:14,
78:1, 78:23,
84:5, 84:11,
85:23, 98:19,
99:3, 101:15,
102:3, 115:1,
115:2, 115:3,
118:17, 118:18,
120:19, 124:19,
154:4, 156:21,
161:10, 168:6,
181:16, 191:10,
199:18, 229:9,
229:13, 229:14

**aspects**
11:3, 25:22,
25:24, 26:7

**assess**
53:19, 54:5,
54:7, 57:24,
70:16, 80:23,
81:16, 81:18,
179:19

**assessing**
217:20

**assessment**
60:16, 178:21,
179:7, 179:14,
209:14, 219:22

**assessments**
179:9

**assignment**
131:15, 131:18,
132:2

**associated**
229:22

**associates**
14:6, 16:10

**assume**
6:7, 37:1,
37:4, 70:18,
189:24

**assumes**
157:11, 157:12,
160:4, 168:12

**assuming**
115:18, 116:12

**assumptions**
131:10

**ataxia**
229:10, 230:3

**atrophied**
212:19, 212:20

**atrophy**
52:16, 52:17

**attempt**
151:7

**attempting**
209:21

**attention**
102:17, 218:24,
219:20

**attest**
96:13

**attorney**
4:21, 5:20,
76:9, 92:19,
92:20, 102:18,
103:11, 103:16,
104:22, 108:1,
232:11

**attorney's**
102:16

**attorneys**
6:22, 6:23,
7:13, 87:1,
94:7, 95:23,
100:11, 100:19,
100:24, 103:7,
104:12, 105:2,
105:10, 105:13,
111:1

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

63

**attributing**
178:5
**audible**
6:10
**august**
174:3, 174:13
**authored**
125:19, 125:21,
125:22, 125:24,
126:4
**automobile**
108:9, 108:17
**average**
115:20, 116:14
**aware**
5:23, 62:16,
105:19, 120:2,
120:7, 128:6,
144:3, 146:16,
147:2, 148:10,
150:4, 154:18,
154:22, 169:17
**away**
14:13, 17:8,
40:13, 47:15,
48:2, 57:13,
193:2

**B**

**ba**
9:1
**babies**
28:17
**bachelor**
9:4
**back**
12:9, 12:18,
12:20, 14:17,
14:18, 15:22,
17:11, 21:11,
22:11, 29:23,
30:4, 30:17,
30:18, 31:19,
44:1, 44:6,
58:4, 59:9,
64:19, 66:6,
70:7, 73:22,
73:24, 81:4,

101:9, 112:3,
122:9, 140:16,
145:3, 150:13,
167:5, 183:12,
184:2, 184:4,
193:11, 196:3,
196:4, 207:20,
213:1, 220:11,
225:7
**backed**
142:20
**background**
7:19, 8:22,
8:24, 114:2,
115:7, 137:7,
142:11, 142:16,
142:17, 142:20,
142:24, 143:8,
143:9, 143:16,
143:23, 146:12,
156:23
**backwards**
36:19
**bad**
46:16
**bailey**
84:23, 134:7,
134:15, 134:17,
134:23, 197:4,
197:20, 202:4,
202:21, 213:9,
220:13, 221:3,
222:6, 222:16,
222:19, 223:7,
223:8
**bailey's**
85:19, 135:10,
135:22, 196:21,
198:3, 199:13,
202:14, 222:8,
227:17
**balance**
204:20, 228:15
**ballas**
3:18
**ballpark**
16:3
**baptist**
65:3

**barry**
10:6
**base**
17:7, 137:10,
138:15
**based**
15:10, 15:13,
17:20, 17:23,
19:3, 20:9,
21:2, 101:11,
132:2, 137:6,
137:10, 137:11,
137:12, 143:15,
143:22, 145:23,
169:5, 169:8,
169:11, 180:24,
182:5, 183:20,
185:14, 188:20,
193:21, 195:3,
195:5, 205:8,
208:8, 208:10,
210:20, 210:24,
214:22, 215:3,
223:6, 226:20
**basic**
5:23, 22:9,
146:13, 192:14,
195:19, 195:20,
211:3
**basically**
11:11, 11:17,
11:18, 23:21,
56:13, 165:5
**basics**
121:14, 121:15
**basing**
205:23, 205:24
**bates**
160:16
**bearing**
175:8, 175:22
**became**
16:18, 64:8
**because**
8:20, 11:2,
13:1, 15:7,
15:17, 16:20,
17:5, 27:18,

32:14, 32:24,
34:4, 35:18,
45:24, 48:16,
62:22, 63:23,
81:6, 87:15,
104:10, 104:23,
104:24, 108:6,
108:15, 113:11,
125:14, 127:6,
129:13, 130:24,
138:8, 157:9,
165:15, 170:23,
173:21, 178:4,
186:8, 186:13,
192:17, 208:7,
218:11, 221:20,
224:17, 224:19,
225:10, 225:15
**become**
60:5, 63:7,
63:17, 64:22,
64:24
**becomes**
122:20, 141:11
**before**
3:18, 3:20,
5:22, 6:17,
6:18, 16:7,
17:11, 37:3,
75:4, 82:16,
90:2, 96:19,
99:17, 108:7,
111:7, 116:15,
116:18, 116:19,
147:20, 148:2,
152:4, 194:21,
197:8, 198:8,
222:6, 223:10
**began**
17:2, 17:12,
17:18, 63:20,
64:4
**begin**
9:23, 177:7
**beginning**
6:17, 6:19
**behalf**
1:14, 5:10,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

64

| | | | |
|---|---|---|---|
| 128:8 | 192:22 | **binding** | **bone** |
| **behind** | **belleville** | 93:14 | 34:17, 35:1, |
| 223:7 | 156:11 | **biology** | 35:5, 45:22, |
| **being** | **belong** | 9:3 | 90:6, 140:19, |
| 5:9, 25:8, | 64:17 | **bit** | 141:5, 142:4, |
| 26:1, 27:19, | **belonging** | 8:23, 12:5, | 224:2, 224:7 |
| 35:19, 37:17, | 105:9 | 28:21, 28:22, | **bones** |
| 38:8, 38:15, | **below** | 28:23, 29:3, | 10:21, 21:14 |
| 45:3, 45:14, | 89:14 | 29:4, 30:1, | **bony** |
| 47:9, 47:11, | **best** | 30:3, 40:12, | 21:24 |
| 49:5, 49:6, | 6:16, 6:18, | 47:11, 47:12, | **book** |
| 55:3, 55:17, | 74:14, 213:13, | 85:12, 136:8, | 114:21 |
| 61:23, 63:2, | 213:19, 232:7 | 140:14, 156:24, | **books** |
| 77:18, 83:18, | **better** | 202:1, 204:13, | 59:24 |
| 111:11, 114:5, | 140:12 | 210:16, 224:2, | **border** |
| 114:12, 125:15, | **between** | 224:9, 225:3 | 27:10, 27:11 |
| 130:7, 147:11, | 3:17, 5:2, | **block** | **borders** |
| 152:18, 152:20, | 8:14, 10:3, | 139:11 | 29:11, 29:12 |
| 154:15, 155:5, | 16:9, 17:3, | **blood** | **both** |
| 156:18, 178:6, | 21:6, 22:1, | 151:22 | 6:15, 8:2, |
| 183:1, 192:12, | 22:8, 28:11, | **board** | 30:5, 84:21, |
| 201:19, 214:7, | 29:22, 61:21, | 8:16, 59:10, | 91:20, 99:22, |
| 216:20, 225:8, | 62:8, 83:16, | 59:11, 59:14, | 117:23, 126:23, |
| 225:19, 225:20, | 106:24, 116:10, | 59:17, 59:18, | 128:4, 142:1, |
| 228:23 | 138:22, 148:11, | 59:22, 60:5, | 157:5, 202:1, |
| **beings** | 150:18, 151:15, | 60:7, 61:15, | 226:9 |
| 179:7 | 156:4, 157:19, | 62:20, 63:7, | **bottom** |
| **bekemeier** | 158:8, 171:6, | 63:9, 63:12, | 21:7, 22:21, |
| 110:14, 110:20 | 185:8, 203:4, | 63:13, 63:15, | 22:22, 124:20, |
| **believe** | 203:8 | 63:18, 63:22, | 132:5, 144:19, |
| 85:12, 97:7, | **beyond** | 64:9, 64:15, | 157:16, 160:20, |
| 105:22, 106:7, | 27:13, 29:10, | 64:16, 64:21, | 179:8, 187:3, |
| 107:3, 115:16, | 42:10, 154:16 | 64:24, 114:5, | 188:7, 189:20, |
| 115:22, 120:15, | **bias** | 114:7, 114:13, | 190:12, 191:21, |
| 132:24, 134:21, | 60:20, 101:7 | 114:20, 114:22, | 205:21, 219:20 |
| 135:1, 169:21, | **biceps** | 114:23, 115:3, | **brachial** |
| 173:12, 175:1, | 57:12, 58:3, | 142:23 | 55:18, 58:3, |
| 179:18, 182:20, | 58:5 | **boards** | 58:5 |
| 182:21, 188:21, | **big** | 63:24, 64:1 | **brain** |
| 188:24, 191:17, | 13:21, 17:6, | **bodies** | 22:17, 22:18, |
| 191:22, 192:7, | 185:7, 224:8 | 21:24, 22:1, | 23:22, 31:16 |
| 192:16, 193:6, | **bilaterally** | 22:11, 128:22 | **break** |
| 193:12, 207:14, | 163:23, 164:5 | **body** | 9:12, 15:15, |
| 211:1, 218:8, | **bill** | 31:8, 34:22, | 83:7, 92:2, |
| 219:8, 219:16 | 135:20 | 34:24, 140:16, | 144:20, 144:23, |
| **believed** | **billed** | 157:23 | 161:14, 167:2 |
| 173:2, 173:4, | 109:8 | **bolt** | **breakdown** |
| 190:8, 192:19, | **billing** | 109:23 | 17:3, 95:11 |
| | 109:5, 109:7 | | |

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                              65

breaking
175:5, 175:8
breaks
161:12
breath
188:3
breathe
45:17, 75:19
brief
115:6
briefly
5:24
briefs
125:24
bring
140:11
brings
144:7
broad
27:14, 41:2,
41:4, 41:19,
50:24, 137:5
broadway
4:14
broken
127:21
brought
85:17, 85:18,
153:5, 153:8
brown
134:8, 135:11,
226:1, 226:19,
226:22
brown's
136:2, 226:17
bulge
28:22, 30:1,
30:23, 33:22,
35:23, 40:12,
47:12
bulges
32:13
bulging
32:23, 33:23,
39:14, 39:22,
42:13
bunch
22:15, 125:4,

227:4
bundle
21:16
burglary
174:9, 174:15

**C**

c-h-a-r-t-i-e-r
109:23
c5
140:7
c5-6
140:3, 210:8,
210:22
c5-c6
139:14, 139:16,
140:24
c6
140:8
calcium
45:13, 45:14
calf
52:17
call
77:19
called
10:6, 14:6,
22:5, 22:6,
22:23, 31:21,
73:1, 74:10,
83:14, 91:6,
93:2, 106:14,
106:18, 140:17
can't
15:17, 62:9,
72:4, 72:6,
72:9, 72:14,
74:16, 74:20,
80:13, 83:6,
84:7, 84:8,
86:6, 88:17,
88:20, 93:22,
95:11, 98:20,
99:9, 99:12,
112:17, 165:8,
176:14, 176:21,
189:3, 211:13
canal
19:24, 22:12,

26:8, 26:14,
26:17, 27:4,
29:23, 31:4,
31:14, 31:24,
32:3, 32:4,
32:11, 33:1,
33:5, 33:15,
33:19, 33:24,
34:19, 34:22,
35:2, 35:4,
35:6, 39:24,
41:3, 42:13,
43:13, 44:8,
44:24, 45:9,
45:10, 45:11,
45:14, 45:19,
45:22, 48:20,
49:5, 49:6,
49:7, 70:6,
70:8, 70:9,
72:5, 75:17,
75:18, 140:20,
141:5, 200:17,
210:14
canal's
225:2
canals
32:22, 32:23
cannot
81:16, 96:12,
123:9
capacity
14:5, 83:14,
83:17, 114:14
car
60:11
care
14:1, 20:12,
52:24, 53:16,
53:19, 53:23,
54:4, 54:13,
56:20, 67:22,
67:23, 68:1,
81:11, 100:4,
100:7, 100:14,
100:20, 102:24,
103:4, 103:8,
103:12, 119:4,

122:3, 122:10,
122:12, 122:13,
122:17, 122:20,
123:10, 123:12,
123:13, 123:16,
123:22, 124:5,
124:11, 124:15,
124:21, 125:2,
125:3, 125:5,
125:7, 143:6,
143:18, 147:5,
148:15, 149:23,
150:2, 150:3,
152:9, 152:13,
152:22, 153:17,
153:21, 154:14,
190:7, 190:11,
190:16, 190:22,
191:7, 191:11,
191:19, 192:18,
200:24, 203:9,
203:12, 203:17,
203:19, 216:20
career
26:20, 42:22,
44:14, 48:8,
48:12, 48:24,
68:14, 103:10,
227:13
carpal
55:12
cartilaginous
21:16
cases
19:6, 32:23,
64:8, 66:12,
87:4, 94:15,
95:22, 96:1,
97:15, 100:5,
100:9, 100:18,
100:21, 100:22,
102:7, 102:9,
102:11, 103:2,
103:3, 103:18,
103:22, 104:4,
106:10, 109:13,
110:10, 110:16,
110:24, 111:3,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                    66

111:5, 111:9,
111:11, 111:16,
111:22, 113:5,
113:7, 114:10,
117:24, 120:8,
120:14, 126:18,
127:1, 128:2,
128:3, 153:3,
216:2, 216:6,
216:9
**casey's**
110:6
**cassiday**
4:13, 104:22,
105:9, 105:18,
105:20, 106:4,
111:6
**cast**
127:21, 127:23
**cauda**
22:24
**cause**
1:6, 3:8, 3:20,
26:16, 32:2,
32:3, 32:8,
32:13, 32:24,
33:11, 33:18,
34:8, 34:13,
34:18, 38:11,
41:7, 44:7,
44:22, 44:23,
46:24, 47:14,
48:1, 54:22,
55:13, 56:10,
56:22, 59:1,
79:8, 79:24,
192:3, 192:5,
192:23, 198:24,
199:8
**caused**
34:12, 39:4,
44:10, 44:15,
45:21, 69:15,
71:15, 73:6,
76:3
**causes**
31:24, 32:10,
35:11, 55:24

**causing**
20:7, 41:10,
41:13, 43:13,
45:15, 45:20,
71:18, 80:19
**ccr**
1:17, 232:18
**center**
65:3, 108:22,
138:23, 148:12,
149:8, 175:21,
176:4, 194:15,
229:8
**central**
22:4, 30:23,
44:19, 200:18
**centrally**
201:12, 210:14
**cerebral**
32:18, 33:6
**certain**
3:20, 59:24,
188:2
**certainly**
74:23, 76:17,
98:22
**certainty**
75:3, 76:5,
76:13, 76:18,
76:24, 77:1,
77:3, 78:4,
85:6, 86:2,
86:9, 87:24,
88:15, 89:19,
90:12, 91:7,
94:10, 94:17,
98:12, 99:23,
100:12, 100:17,
131:3, 147:22,
162:10, 180:4,
180:7, 190:21,
191:1, 194:18,
196:12, 230:12
**certificate**
232:1
**certification**
8:16, 8:20,
59:22, 60:1,

60:6, 61:2,
62:20, 63:15,
63:22
**certified**
3:19, 5:4,
60:5, 63:7,
63:13, 63:17,
64:9, 64:20,
64:21, 64:23,
114:5, 114:7,
114:12, 114:20,
114:22, 142:23,
232:2
**certify**
232:4
**cervical**
10:23, 19:21,
21:3, 21:5,
21:10, 21:21,
21:23, 22:13,
22:19, 25:19,
27:2, 29:22,
31:10, 31:12,
31:14, 31:16,
33:18, 34:14,
35:12, 35:17,
36:12, 36:15,
37:8, 37:18,
38:2, 39:13,
39:20, 39:21,
39:22, 39:23,
43:11, 44:4,
44:19, 44:21,
47:10, 48:19,
52:5, 52:21,
55:15, 58:13,
58:17, 58:22,
66:9, 73:15,
77:12, 78:3,
89:21, 90:5,
90:8, 91:3,
91:18, 91:23,
139:14, 139:15,
139:20, 140:5,
140:21, 142:5,
214:18
**chair**
47:23

**change**
63:4, 83:4,
135:23, 136:2,
136:5, 143:14,
170:16, 170:17,
170:18, 174:19,
174:21, 185:15,
200:8, 200:11,
202:22, 203:1
**changed**
7:18, 12:3,
12:5, 25:6,
25:11, 150:5
**changes**
14:12, 14:13,
28:16, 28:24,
29:3, 30:7,
32:4, 41:12,
45:22, 69:21,
90:6, 202:1,
202:6, 202:7,
202:8, 224:9,
227:19
**changing**
11:22
**chart**
125:18, 143:20
**chartier**
109:23
**check**
52:12, 52:20,
57:18, 58:1
**checked**
58:6
**checking**
52:10, 57:15
**chicago**
4:6, 9:14,
24:24, 153:5
**children**
13:7
**chose**
202:4
**chronic**
66:22, 67:12,
67:21, 67:24,
68:2, 68:4,
72:19, 73:12,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                    67

74:7, 81:21,
82:10, 82:14,
82:23, 83:11,
166:23, 167:5,
167:10, 167:13,
167:19, 167:22,
168:11, 194:13,
199:5, 202:6,
211:2, 211:21,
212:12, 218:9,
224:11, 224:15
**circumference**
33:16, 52:15
**circumferences**
52:17
**circumstance**
40:17
**circumstances**
39:10, 40:23,
41:23, 42:3,
79:11, 79:23,
81:24
**city**
9:18, 12:15,
137:21, 153:7,
174:14, 229:8
**claim**
138:10
**claiming**
181:7
**claims**
144:6, 220:12
**clarification**
93:10, 105:5
**clarify**
180:20, 225:24
**clarifying**
119:12
**classic**
73:16
**clear**
6:13, 6:20,
69:7, 72:11,
94:20, 100:8,
101:8, 101:14,
101:20, 102:2,
137:2, 145:22,
146:23, 180:17,

196:11, 207:16,
220:5, 225:18
**clearly**
101:6, 176:22,
177:18, 178:4
**client**
84:22
**clinic**
145:11, 150:16,
151:2, 151:4,
151:20, 190:23,
191:7, 195:14,
196:20
**clinical**
30:2, 39:15,
40:1, 42:12,
192:9, 192:12,
192:16, 192:22,
193:3, 224:22,
224:24
**clinics**
153:6, 153:9
**co-counsel**
231:1
**collect**
147:4
**collected**
146:24
**college**
65:1
**column**
142:3
**com**
4:8, 4:17
**combination**
44:20, 51:20
**come**
18:7, 18:9,
18:14, 19:19,
22:23, 31:22,
36:24, 38:4,
38:12, 48:17,
73:17, 73:20,
73:22, 73:24,
101:9, 153:23,
213:1
**comes**
61:21, 62:7,

66:9, 66:14,
82:12, 82:14,
82:20, 89:5,
95:2, 102:16,
102:17, 114:6,
114:21, 126:17,
196:3, 196:4,
218:2
**coming**
19:22, 21:2,
21:9, 38:18,
54:20, 55:14,
55:15, 55:17,
55:19, 88:23,
91:1, 154:2
**commenced**
1:19
**comment**
142:7, 157:17,
165:19, 227:1
**comments**
126:1, 222:19,
223:9, 223:12,
226:20, 226:23
**commitments**
13:5
**common**
30:2, 30:8,
34:21, 39:16,
39:17, 39:24,
48:22, 49:23,
74:5, 74:24,
222:12
**commonly**
211:22
**communication**
101:3, 107:3
**company**
92:18, 108:2,
108:20, 109:8,
109:16, 110:21,
127:7, 128:7
**compared**
19:8, 93:15,
228:10
**compensate**
92:24
**compensated**
138:11, 138:12,

138:13
**compensation**
18:19, 93:6
**competent**
122:21, 123:1,
123:4, 227:8
**complain**
35:14
**complained**
55:1, 55:2,
192:8, 207:1
**complaining**
53:10, 53:13,
54:1, 54:11,
54:21, 55:22,
56:8, 56:18,
144:7
**complaint**
138:23, 144:2,
144:4, 176:4,
179:2, 185:9,
185:14, 188:9,
188:11
**complaints**
36:22, 121:1,
144:3, 144:12,
144:14, 144:15,
148:19, 150:16,
150:23, 151:21,
161:20, 161:22,
162:1, 162:16,
162:20, 162:22,
163:6, 164:6,
164:20, 169:6,
169:9, 169:12,
184:22, 184:23,
185:6, 185:11,
185:12, 185:19,
185:20, 186:1,
187:13, 187:21,
188:6, 188:17,
193:2, 206:10,
206:13, 206:18,
207:1, 207:17,
208:9, 208:11,
226:24, 228:12,
228:19, 229:2,
229:20, 229:21

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                                          68

| | | | |
|---|---|---|---|
| **complete** 61:3, 96:7, 96:16, 98:23, 131:4, 177:5 **completed** 9:11, 9:13, 9:20, 12:7, 12:11, 13:14, 61:3, 137:13 **completeness** 96:13 **completing** 9:11, 12:10, 13:11 **completion** 12:6 **complex** 18:17, 24:14, 118:15 **complied** 100:19 **compress** 38:17, 195:22, 211:6 **compressed** 45:3, 49:1, 49:5, 75:21, 201:19, 211:4, 211:9 **compressing** 38:17, 73:18 **compressions** 79:1 **compromise** 43:13, 48:20, 72:5 **compromised** 21:14, 49:6 **conceivably** 227:20 **concept** 75:17 **concern** 40:10, 40:14, 41:14 **concerned** 35:23, 52:14, 52:16, 52:17, | 52:18, 54:16, 54:22 **concert** 62:6 **concluded** 172:20, 180:19, 231:7 **conclusion** 172:15, 191:6, 205:2 **condition** 39:8, 39:11, 40:18, 40:22, 41:1, 41:21, 42:5, 42:20, 46:6, 46:9, 46:20, 53:5, 55:11, 61:23, 77:12, 78:14, 82:7, 82:14, 82:24, 88:24, 145:10, 145:11, 145:16, 145:17, 179:20, 194:13, 200:15, 207:13 **conditions** 7:4, 10:22, 18:1, 19:14, 19:15, 19:21, 19:22, 25:23, 27:2, 27:6, 34:18, 39:21, 39:24, 43:15, 45:4, 49:4, 67:23, 67:24, 68:2, 74:24, 75:1, 108:8, 113:8, 113:13, 118:16, 126:19, 179:10, 188:2, 199:5 **conduct** 51:19, 57:6, 62:11 **conducting** 117:1 **confined** 173:12 | **confirms** 175:5 **conform** 147:4 **confused** 6:6 **confusion** 6:1 **conjunction** 162:22 **connection** 117:24, 132:11, 133:2 **conscious** 189:24 **consider** 26:19, 29:6, 29:7, 29:10, 29:13, 55:24, 56:3, 56:9, 56:21, 166:2, 182:3, 206:1 **considerable** 104:1 **considered** 40:24, 66:24 **considering** 124:18 **consisted** 17:8 **consistent** 21:18, 28:11, 35:19, 186:1, 187:14, 210:16, 213:9, 225:11 **consists** 17:21, 17:23 **constitution** 62:14 **consultation** 193:14 **consultations** 18:2 **consulted** 101:19 **consumer** 110:2 **contacted** 105:23, 106:7 | **contend** 152:2 **content** 28:18, 28:22 **continue** 226:11 **continued** 14:4, 158:15 **continues** 158:20, 160:2, 161:6, 161:15, 171:5, 179:8 **contradict** 206:12 **contraindicated** 207:2, 221:15 **contrary** 157:10 **control** 127:9 **conversation** 106:22 **conversations** 106:24, 173:7, 173:9 **cook** 2:3, 4:20, 197:12, 197:15, 204:8, 204:12, 205:9, 207:6, 231:2 **cooke** 153:6 **coordination** 228:16 **copies** 7:23 **copy** 7:12, 7:16, 7:17, 7:20, 7:21, 8:8, 95:22, 109:11, 130:20, 134:6, 134:7, 134:8, 160:14, 197:4 **corp** 108:22 **corporation** 110:4 |

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                        69

**correctional**
152:24, 153:11, 153:20
**correctly**
23:17, 220:18
**correlate**
164:7
**correlation**
206:17
**costs**
227:6
**cough**
188:2, 228:23, 228:24
**could**
13:7, 25:10, 25:17, 29:9, 30:23, 31:18, 31:19, 32:2, 32:3, 34:9, 34:18, 36:15, 37:13, 37:16, 37:19, 39:1, 41:13, 46:24, 47:7, 47:12, 47:14, 47:21, 47:22, 51:3, 55:4, 55:6, 55:10, 55:13, 55:15, 55:17, 55:19, 58:20, 66:24, 69:23, 71:8, 71:13, 85:12, 88:21, 92:17, 92:18, 92:19, 92:20, 92:21, 94:20, 98:24, 99:11, 99:14, 141:8, 154:19, 157:8, 165:20, 170:15, 172:11, 186:1, 187:14, 187:20, 187:21, 188:4, 188:5, 188:9, 194:2, 203:16, 203:17, 203:18, 204:16, 206:16,

210:16, 210:17, 210:19, 213:6, 217:2, 227:20, 228:20
**couldn't**
14:16
**counsel**
5:2, 232:8, 232:11
**count**
63:20, 115:13, 116:9, 164:16
**counted**
115:11
**country**
221:23
**county**
153:6
**couple**
116:10, 204:8, 207:10, 210:19, 228:8
**coupon**
220:17
**course**
18:24, 42:22, 44:13, 48:11, 48:23, 52:19, 68:8, 69:9, 69:12, 71:20, 79:4, 122:19, 150:19, 194:5, 219:1
**courses**
59:24
**court**
1:1, 3:1, 3:19, 3:21, 4:27, 81:4, 95:21, 119:24, 120:1, 120:5, 120:9, 120:12, 120:14, 128:4, 130:19, 144:21, 184:4, 189:11, 202:12, 225:7, 226:13, 231:4
**coverage**
110:22

**cpi**
110:4
**cramer**
108:22
**created**
212:3
**credibility**
63:8, 157:3, 206:7
**credible**
120:6, 156:5, 156:8, 156:16, 156:22, 159:8, 182:23, 230:16, 230:20, 230:22
**credit**
138:8, 138:10, 183:18
**crime**
174:12
**critical**
42:18
**cross-examination**
2:3, 2:4, 204:11, 207:8
**crushed**
62:4
**ct**
59:6, 70:2, 203:17
**ct's**
80:11, 130:10
**current**
7:14, 7:16, 7:17, 37:1, 63:14, 96:1, 197:22
**curriculum**
7:15
**cushion**
22:8, 32:19
**cut**
15:22
**cv**
2:11, 2:12, 7:12, 8:8, 9:20, 138:7

---
**D**

---

**damage**
68:11, 68:16,

**cpi** (col4 begins)
69:14, 70:22, 71:2, 71:5, 71:16, 212:18
**dangerous**
221:20, 221:21
**daniel**
110:2
**date**
15:19, 15:24, 16:3, 16:7, 69:8, 71:22, 71:24, 72:9, 72:12, 72:14, 72:23, 73:2, 74:10, 75:3, 76:13, 78:3, 79:6, 79:12, 80:2, 80:17, 80:18, 80:22, 84:19, 91:6, 96:5, 139:13, 142:10, 148:18, 158:15, 170:5, 170:12, 172:24, 177:15, 178:1, 178:20, 178:22
**dated**
131:7, 133:14, 160:23
**dates**
214:2
**dating**
227:18
**daubert**
120:3
**day**
3:16, 3:17, 78:1, 78:3, 78:10, 78:11, 78:12, 118:21, 118:22, 119:7
**day-to-day**
154:5
**days**
118:12, 118:13, 118:14, 118:18, 118:20, 119:13, 119:14, 119:16,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

70

119:23, 211:15
**dc**
10:9, 10:10
**deal**
25:23, 25:24,
93:13, 120:8,
126:20, 224:8
**dealing**
27:1, 78:21,
113:5
**deals**
10:20, 26:4,
59:14, 59:15,
59:17, 93:15,
168:21
**dealt**
126:23
**decide**
12:23, 62:19,
62:20
**decided**
13:9, 63:22
**decision**
36:24, 70:18,
83:4, 183:17,
189:17, 190:1
**decisions**
82:16
**decompress**
45:9, 45:10,
45:22, 70:9,
70:20, 73:21,
75:18, 141:5,
196:1
**decompressed**
68:23, 201:12,
202:3, 210:15,
218:18, 223:24
**decompressing**
70:5, 70:11,
140:19
**decompression**
75:17, 139:14,
140:21, 141:2,
213:7, 223:15
**decrease**
33:24, 199:11,
199:12

**decreased**
32:3, 163:22,
164:4, 164:6,
165:9
**decreases**
33:15
**deep**
52:10, 53:20,
57:23, 58:1,
58:3, 58:9,
163:20, 228:15
**defendant**
4:19, 95:23,
102:11, 105:10,
107:22, 126:8
**defendant's**
84:24
**defendants**
1:11, 3:13,
3:24, 4:10, 5:2,
6:23, 7:13,
77:19, 77:24,
94:7, 105:21,
106:5, 107:15,
108:23, 110:18,
111:4, 151:7
**defense**
92:19, 102:18,
103:15, 104:22
**deficit**
71:14, 145:20
**define**
122:20, 187:16,
187:23, 211:10
**defined**
21:1, 27:18,
27:21, 28:14,
228:13, 229:19
**defining**
40:2
**definitely**
211:3
**definition**
33:23, 60:22,
193:23
**definitively**
59:4
**deformities**
26:2

**deformity**
25:21, 26:1
**degenerative**
25:23, 27:2,
27:3, 27:4,
27:5, 27:23,
27:24, 28:15,
28:16, 28:24,
29:3, 30:7,
34:16, 39:20,
39:21, 41:12,
43:12, 45:21,
48:19, 90:6,
202:1, 202:6,
202:7, 224:18
**degree**
32:8, 32:9,
32:10, 33:17,
34:2, 34:7,
40:15, 47:1,
58:21, 75:3,
76:5, 76:13,
76:16, 76:18,
76:23, 77:1,
77:3, 78:4,
83:3, 85:5,
86:2, 86:9,
87:23, 88:14,
89:18, 90:11,
91:7, 94:10,
94:16, 98:12,
99:23, 100:12,
100:16, 131:2,
147:21, 162:10,
180:4, 180:6,
190:21, 190:24,
194:18, 196:12,
230:12
**degrees**
30:12, 31:7,
199:4
**deliberate**
62:12
**demonstrated**
202:15
**denied**
103:8, 103:12,
220:13

**department**
92:20, 92:21,
137:20, 139:5,
149:3, 149:17,
194:15
**depend**
51:13, 51:14,
51:24, 66:10,
67:13, 69:1,
137:7, 143:18
**depending**
47:1, 47:19,
71:10, 72:2,
72:16, 72:19,
73:11, 80:13,
165:17
**depends**
31:9, 45:20,
65:22, 68:20,
70:24, 74:7,
75:14, 82:11,
82:19, 119:22,
124:18, 193:17,
194:24, 196:14,
196:17, 199:3
**depict**
203:5
**deposed**
5:22
**deposes**
5:10
**deposition**
1:13, 1:19,
3:15, 5:3, 5:24,
95:13, 95:15,
96:2, 96:4,
104:11, 104:24,
105:1, 105:2,
105:5, 105:8,
105:12, 113:15,
115:13, 116:12,
116:16, 116:19,
116:22, 117:4,
117:8, 117:23,
134:6, 134:12,
134:17, 134:20,
134:22, 135:3,
135:4, 135:10,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                          71

| | | | |
|---|---|---|---|
| 135:18, 135:22, | **described** | 69:22 | 149:12, 151:3, |
| 142:11, 145:9, | 17:13, 33:11, | **diabetes** | 157:15, 161:18, |
| 145:24, 148:2, | 38:20, 40:22, | 151:22 | 161:23, 162:1, |
| 155:17, 155:21, | 89:13, 141:2, | **diagnose** | 162:12, 164:16, |
| 156:15, 157:15, | 188:17, 208:14 | 59:1, 59:5 | 164:18, 165:16, |
| 158:15, 158:17, | **desiccation** | **diagnosed** | 166:8, 167:8, |
| 158:22, 168:5, | 28:19 | 42:23, 43:2, | 167:9, 167:17, |
| 180:16, 180:20, | **desk** | 43:8, 44:9, | 167:23, 169:13, |
| 180:23, 181:2, | 47:23 | 44:14, 48:11, | 170:8, 184:21, |
| 181:3, 181:9, | **despite** | 178:17 | 186:3, 186:21, |
| 181:12, 181:17, | 172:9, 192:12 | **diagnosis** | 189:21, 189:22, |
| 181:19, 181:20, | **detail** | 20:8, 36:24, | 198:18, 200:8, |
| 181:21, 182:6, | 148:15, 150:14, | 56:4, 121:11, | 200:11, 201:6, |
| 182:7, 182:9, | 150:15, 175:24 | 124:16, 124:19, | 206:19, 223:10, |
| 182:16, 183:23, | **detailed** | 179:4, 192:4, | 229:5 |
| 184:11, 184:13, | 176:15, 177:9, | 218:3 | **difference** |
| 184:18, 185:1, | 215:20 | **diagnostic** | 8:14, 61:21, |
| 185:2, 185:16, | **detailing** | 188:21, 188:24, | 66:7, 66:14, |
| 186:5, 186:12, | 150:1 | 189:17, 189:21, | 67:9, 67:21, |
| 186:20, 186:22, | **details** | 189:23, 190:3, | 82:11, 185:7, |
| 189:3, 190:14, | 90:23, 142:10, | 190:8, 190:17, | 185:8, 218:14 |
| 195:6, 195:10, | 146:6 | 191:12, 191:17, | **different** |
| 195:14, 195:17, | **determination** | 191:22, 191:24, | 11:5, 11:10, |
| 198:8, 199:14, | 157:3, 159:16, | 193:6, 207:24 | 24:8, 25:11, |
| 202:14, 206:3, | 192:11 | **diameter** | 26:3, 28:10, |
| 215:10, 216:17, | **determinations** | 33:16 | 29:16, 29:19, |
| 217:2, 217:10, | 159:13 | **dickson** | 30:12, 32:21, |
| 222:8, 227:17, | **determine** | 1:17, 3:19, | 33:10, 36:6, |
| 231:7, 232:5, | 57:10, 66:4, | 4:28, 5:4, | 53:9, 64:1, |
| 232:10 | 68:10, 68:16, | 232:2, 232:18 | 65:18, 82:23, |
| **depositions** | 69:13, 109:12, | **dictate** | 117:7, 126:18, |
| 87:1, 87:10, | 164:22, 192:3, | 120:22, 121:13, | 133:5, 149:10, |
| 96:19, 96:22, | 213:13 | 121:21, 121:22 | 150:10, 175:16, |
| 97:5, 115:12, | **determined** | **dictated** | 179:5, 179:11, |
| 115:13, 115:14, | 81:17, 188:16, | 105:4 | 187:18, 218:3, |
| 115:15, 115:18, | 191:12, 230:14 | **dictation** | 220:23 |
| 116:1, 116:3, | **determines** | 118:22, 119:20, | **differential** |
| 116:8, 116:11, | 179:13 | 119:21 | 56:4, 121:11, |
| 117:5, 117:9, | **determining** | **didn't** | 124:16, 124:19 |
| 117:10, 117:17 | 42:19, 47:4 | 10:8, 13:4, | **differentiate** |
| **deposits** | **develop** | 13:6, 16:20, | 83:15, 229:14 |
| 45:13, 45:14 | 28:15, 28:19 | 16:23, 78:9, | **differently** |
| **depression** | **device** | 78:10, 132:20, | 82:13, 83:2, |
| 176:6 | 141:10 | 133:17, 136:22, | 83:10 |
| **dermatomal** | **devices** | 136:24, 138:7, | **difficult** |
| 164:7 | 141:9 | 138:8, 138:9, | 60:2 |
| **describe** | **dexterity** | 141:19, 143:4, | **difficulty** |
| 111:10, 204:16 | 37:12, 40:9, | 146:20, 148:9, | 37:11, 40:8, |

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                          72

40:9, 43:19,
50:12, 158:16,
188:4, 188:5,
214:24
**diplomat**
63:11, 114:23
**direct**
2:2, 5:11,
218:24, 219:8,
219:20, 226:9
**directed**
222:16, 222:17
**direction**
232:8
**directions**
28:10, 29:17
**directly**
30:3, 30:17,
30:18, 30:22
**disability**
61:22, 62:3,
62:6, 62:9
**disagree**
168:10, 179:22,
226:17
**disagreed**
167:23
**disagreement**
207:21
**disc**
19:23, 22:2,
22:3, 22:10,
27:3, 27:4,
27:7, 27:12,
27:23, 28:1,
28:6, 28:7,
28:8, 28:14,
28:16, 28:18,
28:20, 28:24,
29:11, 29:13,
29:15, 29:22,
29:24, 30:7,
30:11, 31:18,
31:23, 31:24,
32:2, 32:10,
32:23, 33:17,
33:21, 33:22,
33:23, 34:3,

34:10, 34:13,
34:16, 35:9,
35:10, 39:21,
39:22, 41:13,
43:12, 43:14,
43:23, 44:2,
44:10, 44:15,
44:19, 44:21,
48:7, 48:19,
55:16, 66:9,
72:5, 73:18,
74:4, 74:8,
89:1, 89:2,
90:5, 140:2,
140:10, 140:13,
140:15, 201:12,
210:7, 210:22,
224:18
**discectomy**
139:14, 139:20,
140:6, 140:21,
141:2
**discharge**
141:13
**discipline**
129:9
**disclose**
151:11, 151:13
**disclosed**
78:17, 139:3,
143:13, 149:24,
150:8, 150:24,
151:6, 152:2,
152:9, 159:16,
168:9, 175:7,
175:14, 211:19,
226:6, 226:7
**disclosures**
226:10
**discomfort**
40:12
**discount**
157:15, 158:24,
159:2, 161:23,
162:19, 164:12,
183:14
**discounted**
157:9, 158:24,

161:21, 164:11,
206:24
**discovery**
101:4
**discs**
21:15, 34:8,
48:7, 59:1
**discuss**
220:15
**discussed**
43:20
**discusses**
223:23, 224:20
**discussing**
229:16
**discussion**
8:11, 61:5,
219:21, 219:24
**disease**
28:1, 28:16,
34:16, 41:12,
43:12, 48:19,
59:5
**dislocated**
44:1
**dislocation**
43:24, 44:3
**dislocations**
41:9
**dispute**
93:4, 93:5,
93:9, 93:11,
93:18, 93:21,
94:5, 116:22,
198:9, 198:12,
198:13
**disputes**
93:13, 93:16
**disqualified**
120:1
**disregard**
162:21, 163:3,
163:5, 163:10
**dissect**
139:24
**dissecting**
140:18
**distal**
52:21

**distinguish**
62:8
**distribution**
163:23, 164:5
**district**
1:1, 1:2, 3:1,
3:2, 3:21
**division**
1:3, 3:3, 3:22
**divisions**
11:5
**doctor**
5:13, 36:20,
43:9, 53:19,
72:12, 72:24,
75:24, 77:14,
78:5, 80:2,
80:6, 84:17,
85:16, 85:22,
96:18, 101:15,
101:23, 113:19,
118:8, 124:3,
154:1, 154:24,
156:13, 156:21,
157:14, 162:10,
166:12, 168:4,
175:13, 185:9,
190:20, 192:21,
196:9, 221:11,
229:9, 229:11
**doctor's**
123:19, 124:16,
166:21
**doctors**
15:1, 99:24,
103:19, 169:10,
206:8, 208:13,
208:22, 210:3,
217:21
**document**
70:3, 76:10,
81:8, 120:18,
121:12, 122:5,
122:7, 122:14,
122:22, 122:24,
130:21, 146:20,
171:11, 188:23,
191:13

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                                    73

**documentation**
122:4, 122:11,
122:17, 123:11,
123:17, 123:22,
123:23, 124:6,
124:12, 124:16,
125:9
**documented**
125:6, 146:15,
152:15, 192:11,
218:18
**documenting**
123:14, 124:22,
124:23, 124:24,
125:1
**documents**
122:6, 133:1,
133:23, 134:10,
161:1, 161:5,
171:8, 189:16
**does**
31:1, 33:2,
33:3, 37:6,
38:14, 39:3,
45:7, 45:8,
46:2, 51:23,
52:1, 63:14,
67:12, 70:17,
82:11, 95:13,
97:5, 115:8,
123:22, 123:23,
125:3, 130:5,
140:9, 142:7,
143:17, 143:19,
143:20, 146:2,
149:7, 156:20,
157:1, 157:18,
158:2, 165:7,
180:20, 182:3,
187:24, 195:12,
224:9
**doesn't**
26:14, 26:15,
32:24, 47:17,
60:15, 66:14,
101:9, 109:14,
157:22, 165:11,
185:6, 195:23,

199:6, 224:5
**doing**
6:9, 10:9,
12:14, 13:1,
14:11, 14:16,
15:6, 15:9,
15:10, 15:14,
16:13, 16:14,
16:16, 16:17,
17:15, 23:8,
24:17, 26:21,
26:22, 57:11,
58:10, 63:1,
63:5, 104:18,
117:13, 123:12,
123:13, 124:22,
127:8, 127:22,
129:2, 129:13,
130:2, 138:3,
143:3, 146:12,
167:11, 214:13
**domain**
24:1
**done**
17:6, 20:15,
48:8, 48:14,
49:8, 50:1,
60:22, 70:22,
71:2, 71:5,
73:13, 83:16,
84:14, 90:14,
90:15, 94:19,
94:21, 97:24,
98:21, 150:9,
162:6, 165:9,
167:11, 202:2,
203:13, 203:16,
203:18, 203:20,
214:16, 218:11,
218:15, 223:14,
224:3, 224:12
**dough**
22:8
**doughnut**
22:4, 22:7
**down**
10:6, 15:15,
17:12, 17:18,

70:8, 70:10,
139:11, 139:24,
160:3, 161:7,
161:16, 163:14
**drafted**
10:4, 10:7,
10:8, 222:10
**dramatic**
69:3, 218:16
**drop**
73:17, 73:19,
73:20, 73:23,
74:6, 195:22
**dropping**
229:23, 229:24
**drs**
220:13
**drug**
176:6, 221:22
**drugs**
221:21, 221:23
**drying**
28:19
**due**
17:12, 51:2,
55:11
**dues**
64:11
**dugan**
105:17, 105:23,
106:7, 106:13,
106:18, 107:1,
131:8, 131:23
**duly**
232:5
**dura**
32:17, 32:18,
33:6, 141:4
**duration**
195:8, 199:1,
199:6, 199:7,
199:10, 199:11,
199:12
**during**
10:11, 10:24,
11:2, 11:7,
14:10, 17:11,
87:1, 118:18,

121:2, 124:13,
129:4, 129:7,
129:18, 138:11,
151:21, 205:22,
217:5

**E**

**each**
115:19, 116:12
**earlier**
38:4, 43:20,
62:22, 65:24,
69:24, 80:5,
95:5, 98:14,
98:17, 99:8,
102:13, 102:14,
112:4, 114:2,
118:14, 137:24,
154:9, 181:18,
182:11, 185:1,
187:19, 192:5,
195:21, 199:11,
204:18, 204:19,
211:10, 216:12,
229:5, 230:15
**early**
28:15, 28:17,
28:18, 28:24,
29:6, 30:7, 30:9
**earnest**
109:16
**east**
1:3, 3:3, 3:22
**easy**
209:19
**edema**
47:11, 72:8
**education**
24:21, 209:7,
217:19
**educational**
7:19, 8:21,
115:7, 137:6,
142:17, 142:20,
142:24, 143:8,
143:16, 143:22,
156:23
**effect**
87:8

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                                    74

| | | | |
|---|---|---|---|
| **effects** | **enrolled** | **125:17, 130:10,** | |
| 223:21 | 232:12 | 9:16 | 143:11, 174:10, |
| **efficiently** | **employee** | **enterprise** | 187:20, 195:22, |
| 168:5 | 102:23, 232:11 | 110:8 | 196:20, 200:18, |
| **eight** | **employees** | **entirely** | 228:24 |
| 14:9 | 100:11, 100:13, | 6:18, 195:1 | **evaluate** |
| **eighth** | 100:19, 103:12, | **entirety** | 60:19, 91:8, |
| 62:13 | 152:21 | 6:17 | 92:23, 104:7, |
| **either** | **employer** | **entities** | 142:18 |
| 7:5, 70:7, | 92:18 | 90:7 | **evaluated** |
| 73:11, 84:18, | **employment** | **entity** | 187:6 |
| 90:4, 92:17, | 89:4 | 13:24 | **evaluating** |
| 95:3, 96:14, | **encased** | **equate** | 210:10 |
| 101:5, 113:5, | 33:7 | 199:6 | **evaluation** |
| 117:12, 126:20, | **encompasses** | **equina** | 59:15, 116:20, |
| 128:18, 128:22, | 41:4 | 22:24 | 124:13, 130:8, |
| 150:2, 216:5, | **encounter** | **equivalent** | 130:9, 130:14, |
| 217:5 | 121:2, 124:17, | 87:21 | 148:23, 169:18, |
| **elaborate** | 138:22, 139:4, | **error** | 188:21, 189:21, |
| 77:9, 77:13 | 148:19, 150:2, | 177:24, 178:4, | 189:23, 190:3, |
| **elbow** | 150:4, 150:5, | 178:11 | 190:17, 191:18, |
| 58:4, 58:5 | 171:6, 215:4 | **essentially** | 191:22, 191:24, |
| **element** | **encountered** | 168:2, 169:20, | 193:6, 206:20, |
| 27:23, 28:1, | 50:18, 51:6, | 214:22, 215:1 | 214:4, 228:17, |
| 43:5, 90:4 | 169:24, 173:21 | **establish** | 230:22 |
| **elizabeth's** | **encountering** | 51:16 | **evaluations** |
| 229:6 | 55:22, 56:7 | **established** | 18:2, 18:6, |
| **elliptically** | **encounters** | 184:9 | 93:20, 95:7, |
| 140:13 | 120:18 | **estimate** | 102:15, 111:20, |
| **else** | **encroach** | 43:1, 74:2, | 111:22, 118:4, |
| 20:20, 35:11, | 35:2 | 74:15, 94:23, | 121:7, 121:9 |
| 60:14, 69:6, | **end** | 112:19 | **even** |
| 125:17, 132:10, | 78:1, 167:3, | **et** | 7:1, 24:16, |
| 148:6, 149:20, | 191:4, 220:14 | 1:8, 3:10, 3:23 | 33:12, 34:4, |
| 152:7, 162:19, | **ended** | **etc** | 35:3, 41:12, |
| 162:23, 204:6, | 10:8, 127:8 | 18:3, 18:22, | 42:10, 42:11, |
| 230:24 | **ends** | 26:2, 27:5, | 71:8, 87:14, |
| **emergency** | 22:21, 23:1, | 27:6, 35:21, | 93:14, 108:9, |
| 10:11, 66:11, | 89:15 | 45:22, 45:23, | 116:10, 133:17, |
| 138:5, 139:5, | **enforced** | 50:22, 52:13, | 146:20, 164:15, |
| 149:3, 149:17, | 200:12 | 57:14, 60:22, | 204:24, 206:12 |
| 194:15, 210:8, | **enough** | 64:8, 65:1, | **event** |
| 210:10, 211:12, | 13:4, 38:16, | 65:22, 65:23, | 66:23 |
| 229:6, 229:7 | 93:12, 94:20, | 69:23, 73:12, | **eventually** |
| **emergent** | 98:23, 98:24, | 80:7, 81:10, | 36:23 |
| 119:5 | 143:24, 174:8 | 81:11, 82:8, | **ever** |
| **employed** | **enroll** | 85:19, 100:4, | 31:1, 44:9, |
| 91:2, 232:9, | 9:7, 9:17, | 118:22, 119:21, | 68:15, 71:23, |
| | 12:23 | | |

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                    75

73:1, 75:2,
78:24, 83:6,
83:14, 83:19,
99:16, 100:6,
100:11, 100:24,
102:22, 103:6,
103:11, 111:6,
119:24, 120:1,
120:5, 120:11,
126:4, 126:8,
128:10, 128:13,
128:18, 128:21,
128:24, 129:15,
132:15, 147:15,
153:16, 153:20,
162:18
**every**
33:9, 65:13,
85:4, 85:24,
96:10, 104:11,
109:13, 111:4,
136:21, 136:22,
136:24, 137:3,
137:7, 205:16
**everybody**
32:21
**everything**
32:12, 42:9,
45:17, 76:17,
82:5, 95:10,
137:7, 162:23,
180:24, 184:14,
184:15, 186:10,
187:19, 195:13,
200:19, 204:18
**evidence**
85:10, 132:1,
146:19, 146:24,
148:8, 148:10,
157:12, 160:5,
168:13, 180:7,
181:4, 182:2,
183:16, 184:10,
185:23, 186:5,
186:19, 188:15
**exact**
15:24, 16:3,
16:7, 61:9,

83:2, 83:3,
86:17, 87:13,
90:21, 98:20,
137:1, 154:1,
189:4, 211:13
**exactly**
8:19, 15:18,
16:6, 25:6,
25:9, 65:10,
69:14, 75:13,
81:6, 90:3,
97:2, 98:5,
115:8, 127:6,
128:1, 172:17,
178:14, 198:6
**exam**
51:18, 51:23,
53:1, 53:15,
53:19, 53:23,
54:11, 57:6,
58:13, 60:1,
60:19, 60:23,
61:2, 61:10,
61:14, 62:17,
64:2, 64:14,
64:18, 87:2,
106:15, 106:17,
112:2, 116:20,
117:1, 117:8,
117:12, 117:13,
125:17, 130:14,
164:3, 165:19,
165:22, 166:13,
171:13, 172:16,
172:22, 173:5,
176:21, 177:9,
178:7, 228:17,
228:20
**examination**
2:2, 2:5, 5:11,
42:14, 51:15,
52:9, 52:23,
53:4, 53:6,
54:15, 54:18,
56:15, 59:19,
59:21, 60:2,
60:3, 60:17,
61:16, 64:7,

81:22, 117:3,
121:21, 121:23,
122:23, 123:14,
124:13, 124:22,
145:14, 157:7,
163:19, 164:9,
165:14, 166:3,
166:6, 166:9,
166:15, 166:16,
168:3, 169:20,
172:14, 173:3,
175:2, 176:12,
176:16, 176:19,
177:20, 177:21,
182:15, 182:19,
183:23, 187:8,
188:20, 189:6,
190:14, 193:22,
193:23, 194:2,
194:5, 194:6,
194:7, 194:8,
203:14, 203:21,
203:22, 204:14,
204:16, 204:17,
204:19, 204:21,
204:23, 205:1,
205:4, 205:12,
205:14, 206:4,
206:9, 208:3,
208:8, 214:13,
214:16, 214:23,
215:1, 215:11,
215:16, 215:22,
227:7, 227:16,
228:6, 228:22,
230:23
**examinations**
18:8, 19:5,
59:16, 62:24,
63:6, 79:16,
92:8, 93:16,
118:5
**examine**
52:7, 53:24,
81:19, 93:2,
142:18, 153:17,
165:16, 182:18,
205:22, 206:19,

213:20, 215:20,
215:21, 227:3,
227:10
**examined**
3:16, 5:9,
94:12, 157:24,
176:11, 183:22
**examiner**
60:8, 60:9,
61:1, 84:16,
93:3, 95:4,
102:8, 206:14
**examiners**
8:17, 59:11,
59:23, 61:15,
62:21, 64:17,
114:6, 114:13,
114:21
**examining**
79:19, 94:17,
98:12, 98:15,
112:12, 130:14,
153:16, 186:15,
206:16
**example**
47:21, 55:5,
61:20, 64:20,
68:21, 73:7,
73:16, 104:11,
195:21, 228:21,
228:22, 228:23
**examples**
57:15, 82:21,
92:22, 153:9
**exams**
83:16, 86:23,
93:20, 95:7,
102:14, 115:9,
117:6
**except**
32:12, 173:19,
212:23
**excerpt**
2:19, 202:13
**excise**
140:13
**exclude**
86:19

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

76

excluding
189:13
exclusively
15:3, 25:18,
26:5
excuse
46:7, 178:10,
207:10, 229:11
exhibit
2:11, 2:12,
2:13, 2:14,
2:15, 2:16,
2:17, 2:18,
2:19, 7:8, 7:12,
7:22, 8:5, 8:7,
8:15, 8:24,
35:13, 59:9,
95:18, 95:22,
107:9, 107:10,
115:11, 116:1,
117:16, 130:16,
130:20, 136:12,
137:4, 137:16,
138:17, 138:21,
142:13, 145:3,
146:10, 159:16,
160:10, 168:9,
171:2, 171:3,
173:17, 177:6,
189:7, 189:12,
189:16, 193:9,
197:1, 197:12,
197:13, 199:22,
200:2, 202:9,
202:13, 202:14,
219:2, 219:5,
222:5
exhibits
2:7, 134:19
exist
70:17
existence
14:22, 144:8
expand
229:12
expect
37:9, 37:10,
167:12, 167:13,

212:14, 213:5
expected
214:21, 214:23
experience
24:19, 35:13,
36:8, 48:6,
78:21, 78:24,
114:3, 138:14,
142:17, 152:23,
153:3, 157:22,
158:2, 167:9,
167:10, 209:6,
213:12, 217:16,
218:12, 218:19,
221:5
experienced
185:17
experiences
153:10, 157:20
expert
21:3, 77:15,
77:19, 77:20,
78:18, 83:15,
83:18, 84:14,
84:24, 85:7,
86:7, 87:4,
87:19, 88:10,
95:3, 95:4,
96:10, 96:12,
98:10, 99:4,
100:10, 101:1,
101:18, 102:9,
111:17, 112:2,
112:11, 112:21,
112:23, 113:24,
114:4, 115:4,
117:12, 117:13,
120:1
expertise
77:22, 217:11
explain
21:3, 21:13,
22:3, 27:8,
29:19, 37:23,
40:5, 45:11,
57:23, 59:11,
60:10, 69:17,
216:24

explained
27:11, 29:15,
111:18, 114:2,
118:14
explanation
166:6
exposed
13:2, 25:8,
202:4
exposing
140:2
express
100:11, 109:24,
147:21
expressed
88:14, 89:18,
90:11, 145:15,
146:9, 149:21,
149:22, 173:19
expressing
131:2
expression
34:24
expressly
5:6, 76:12,
76:24, 77:2
extend
57:12
extension
22:17, 22:18,
31:15
extensively
24:18
extent
69:14, 96:14,
107:2, 114:8,
123:19, 151:7,
211:18
extra
119:20, 119:21,
138:4
extreme
163:14
extremely
137:5
extremities
10:22, 37:12,
37:15, 52:3,

52:10, 53:11,
53:15, 54:22,
55:24, 56:9,
56:19, 57:11,
57:16, 57:17,
58:23, 69:22,
158:20, 204:22,
215:2
extremity
19:15, 35:20,
38:8, 38:22,
39:1, 40:8,
40:9, 58:2,
58:7, 168:19
eye
15:8, 15:20,
63:4, 70:13

F

f-r-a-n-k
5:15
facet
41:11, 44:5,
44:6, 163:20,
202:8
facility
153:17, 153:21
fact
39:4, 47:16,
65:24, 78:2,
84:19, 86:1,
99:20, 104:12,
130:22, 133:8,
136:21, 136:22,
137:1, 137:3,
137:7, 148:9,
149:6, 149:7,
150:22, 173:20,
175:4, 179:19,
183:21, 189:19,
192:14, 195:6,
195:19, 218:3,
225:20, 230:14
factor
42:18, 47:4,
71:18
factors
71:12, 198:24

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

77

**factory**
91:2
**facts**
124:23, 131:12,
136:10, 136:15,
138:15, 157:12,
160:4, 162:9,
168:12, 174:16,
174:18, 174:19
**fail**
192:18
**failed**
147:3, 147:4,
190:7, 191:13
**failing**
146:17
**fair**
12:16, 93:12,
98:10, 143:24,
209:13, 213:13
**fairly**
60:2, 74:24
**fallen**
91:3
**falls**
66:19, 82:21
**false**
51:6
**familiar**
61:13, 65:14,
104:13, 120:3
**family**
18:22, 146:7,
146:12, 146:15,
154:8
**fantastic**
8:1
**far**
19:23, 23:8,
25:2, 35:22,
37:11, 40:7,
44:5, 59:15,
61:17, 61:19,
62:9, 67:21,
70:4, 75:16,
77:8, 79:14,
79:15, 86:22,
87:3, 88:22,

93:18, 95:9,
95:12, 97:18,
98:14, 100:3,
114:3, 115:5,
116:6, 116:18,
119:20, 126:18,
137:9, 153:1,
154:4, 154:14,
186:17, 195:13,
195:15, 204:19,
206:21, 211:10,
226:5, 229:3,
230:20
**fast**
83:6
**federal**
101:17, 120:9,
120:12
**fee**
116:5, 117:7
**feel**
6:3, 37:7,
158:3, 158:5,
164:13
**feels**
165:1
**fell**
127:23
**fellow**
64:22, 65:1
**fellowship**
12:8, 12:19,
12:20, 12:21,
12:23, 13:11,
13:14, 14:3,
125:23, 126:3,
129:2, 129:14
**felt**
98:24, 202:15
**few**
19:17, 193:8
**fibrosis**
27:14, 28:22,
29:4, 29:12
**fibrosus**
22:6
**fibrous**
22:6, 22:8,

29:16
**field**
26:19, 152:23,
153:11, 222:13
**fifth**
118:21, 138:20
**figure**
116:3
**filed**
128:13, 144:4
**filled**
45:13
**films**
130:4, 227:20
**final**
130:23, 130:24,
133:18
**finances**
116:7
**financially**
232:12
**find**
81:21, 100:6,
104:10, 147:22,
156:5, 172:15,
176:14, 219:9
**finding**
39:18, 143:15,
164:16, 164:19,
178:1, 178:2,
229:5
**findings**
37:10, 39:15,
39:16, 40:5,
40:6, 43:14,
43:18, 69:20,
121:4, 122:8,
162:23, 167:12,
169:7, 171:16,
190:15, 190:18,
195:16, 205:5,
205:19, 206:2,
206:10, 206:12,
206:15, 206:17,
206:22, 207:2,
207:14, 207:18,
207:22, 207:23,
208:2, 208:3,

208:5, 208:8,
208:11, 208:14,
215:23, 227:12,
228:9, 228:10,
228:13, 228:14,
229:3, 229:15,
229:19, 229:22
**fine**
16:9, 158:13,
178:12, 183:12,
185:15
**finger**
62:5, 62:7
**finish**
6:16, 6:18,
64:2, 192:21,
196:9
**finished**
14:3, 64:3,
197:17
**fire**
92:20
**firm**
105:9, 105:20,
106:9, 108:19,
109:8
**first**
5:15, 6:1,
11:12, 61:1,
62:17, 63:17,
69:7, 76:15,
104:20, 105:8,
105:15, 117:16,
120:11, 131:5,
134:1, 136:10,
136:14, 136:20,
139:11, 144:1,
148:18, 150:14,
161:14, 194:17,
222:15
**firsthand**
215:4
**five**
15:7, 15:12,
16:2, 63:2,
92:2, 111:3,
136:10, 136:14,
136:20, 137:24,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                              78

144:23, 197:23
**fixation**
141:9, 141:10
**flex**
57:12
**flip-side**
6:5
**floats**
32:19
**floor**
4:5
**fluid**
32:18, 33:6
**focus**
31:12, 84:13
**focused**
10:15, 16:11
**follow**
170:8, 183:6
**follow-up**
20:12, 20:15,
20:17, 20:18,
20:19, 20:23,
81:6, 81:11,
148:24, 149:3,
149:12, 192:18,
204:9, 210:13,
228:8
**following**
8:12, 9:8,
11:19, 12:6,
55:8, 80:24,
92:5, 124:17,
145:1, 166:3,
166:20, 200:17,
201:3, 201:10,
218:13
**foolish**
222:18, 223:11
**foot**
11:4, 11:14,
73:16, 73:17,
73:19, 73:20,
73:23, 74:5,
195:21, 209:13
**foramen**
31:21, 202:1,
202:8, 224:1

**foraminal**
202:6
**forearms**
52:15
**foregoing**
232:5
**foreign**
34:22, 34:24
**form**
42:6, 46:14,
46:16, 51:12,
53:2, 56:12,
57:1, 78:7,
83:8, 88:2,
93:4, 94:21,
116:17, 131:13,
168:13, 207:4,
208:1, 209:1,
209:8, 209:23,
211:24, 213:17,
215:6, 215:13,
216:10, 217:22,
218:5, 229:13
**former**
18:15
**forming**
22:24
**formulary**
155:10
**formulate**
215:24
**forth**
44:2, 100:17,
194:24, 207:20
**forthright**
183:1, 225:9,
225:19, 225:21
**fortunate**
13:8
**found**
120:5, 152:22,
156:8, 156:14,
156:15, 192:23
**foundation**
30:11, 160:15
**four**
11:21, 11:22,
12:4, 15:7,

15:12, 17:15,
17:16, 63:2,
96:1, 96:11,
112:7, 112:11,
118:13, 118:14,
118:20, 119:22,
137:8, 137:23,
221:8, 222:3,
223:9
**four-hour**
60:3
**four4**
135:19
**fourth**
138:19
**fracture**
35:4, 82:13,
82:22, 126:16,
127:4, 127:5,
128:6
**fractures**
34:15, 34:16,
41:9, 43:11,
66:19
**frame**
17:11, 150:17
**framed**
216:5
**frank**
1:13, 3:15,
5:3, 5:8, 5:15
**free**
6:3, 13:5,
45:17, 45:23,
196:2
**frequently**
48:8
**fridays**
119:20
**front**
70:7, 105:1,
105:11, 132:7,
139:22, 160:24,
161:9, 171:19,
177:1, 209:12
**full**
36:16, 58:17,
58:22, 118:13,

144:1, 155:16,
175:24
**fully**
62:15, 70:4,
155:22, 210:17,
214:19
**function**
211:4
**fund**
92:20, 92:21
**further**
10:12, 70:2,
104:9, 107:7,
166:6, 170:20,
172:12, 175:5,
188:12, 188:21,
188:24, 189:17,
189:20, 189:22,
190:3, 190:7,
190:8, 190:16,
191:11, 191:22,
191:23, 192:15,
193:4, 193:6,
194:13, 200:12,
200:13, 200:14,
200:18, 203:22,
229:12, 232:10
**fuse**
141:6
**fused**
214:19
**fusion**
139:15, 141:11

---

**G**

---

**gabapentin**
167:6, 168:17,
169:1, 169:4,
169:14, 169:18
**gain**
182:24, 225:8,
225:19
**gait**
159:22, 170:3,
170:11, 170:13,
170:15, 170:20,
171:1, 171:24,
172:5, 176:13,

177:22, 204:19,
204:20, 219:18,
228:15, 230:1
**gary**
5:21
**gateway**
138:23, 148:12,
149:7, 175:21,
176:3, 194:15,
210:9, 229:7
**gave**
51:14, 143:9,
171:2, 185:2,
186:16, 200:24,
220:17
**gelatinous**
22:4
**general**
4:21, 11:24,
12:1, 12:14,
12:17, 14:10,
15:4, 16:11,
16:14, 17:4,
18:1, 18:2,
19:9, 46:1,
61:12, 110:6,
138:4, 142:23,
182:17, 199:18
**generalization**
58:20, 65:16
**generally**
150:19, 150:20,
162:6, 205:19,
216:11
**generated**
173:13, 177:5
**generates**
129:23
**generic**
220:21
**george**
10:10, 10:12,
138:1, 138:13
**gerry**
1:4, 3:5, 3:22
**get**
10:4, 10:7,
10:8, 18:9,

20:22, 21:1,
24:19, 27:16,
28:23, 29:3,
30:13, 37:16,
37:19, 42:10,
60:24, 65:11,
72:1, 75:15,
78:16, 80:12,
80:14, 83:6,
83:17, 93:7,
101:9, 127:20,
138:11, 160:9,
162:7, 165:2,
165:3, 175:6,
183:13, 196:6,
196:10, 203:19,
208:12, 227:8
**gets**
115:2, 116:15
**getting**
20:21, 49:6,
60:16, 70:8,
85:11, 106:24
**give**
7:20, 15:17,
43:1, 60:20,
67:2, 71:24,
72:14, 72:17,
73:10, 74:2,
74:13, 74:16,
77:5, 78:10,
78:12, 79:14,
79:19, 80:7,
80:10, 83:7,
83:19, 84:7,
84:8, 84:18,
84:19, 86:15,
88:17, 88:20,
89:17, 91:8,
91:14, 91:22,
93:17, 93:22,
94:23, 94:24,
95:11, 98:20,
99:9, 106:19,
112:12, 112:17,
118:9, 189:4,
203:24, 211:13,
214:3, 215:9

**given**
73:10, 76:20,
76:21, 83:20,
87:3, 87:5,
87:10, 89:23,
90:6, 97:13,
97:15, 98:4,
99:3, 100:4,
109:13, 131:12,
133:16, 187:3,
200:2, 222:5,
226:9
**gives**
115:6
**giving**
175:11, 212:8
**go**
5:23, 5:24,
7:1, 8:9, 9:6,
25:5, 25:16,
31:22, 45:16,
47:15, 48:1,
59:9, 59:23,
59:24, 60:14,
63:24, 64:6,
70:6, 76:6,
81:21, 85:16,
104:3, 107:9,
116:5, 116:6,
116:22, 122:9,
135:13, 138:19,
140:11, 140:22,
150:13, 159:20,
168:5, 178:24,
193:2, 196:1,
201:6, 205:18,
214:7, 218:19,
224:5, 226:13
**goes**
7:19, 8:21,
22:13, 22:14,
22:18, 22:19,
40:13, 49:10,
66:11, 95:10,
101:6, 137:7,
151:23, 162:6
**going**
7:22, 10:4,

10:5, 10:7,
15:15, 19:12,
20:1, 30:17,
30:18, 30:22,
33:23, 38:17,
39:23, 44:22,
52:12, 60:12,
60:21, 63:23,
64:8, 64:19,
69:20, 69:21,
70:6, 70:10,
75:9, 80:7,
80:15, 82:6,
82:9, 82:13,
83:5, 83:15,
84:2, 85:9,
87:3, 91:14,
91:15, 91:22,
101:9, 106:20,
106:23, 107:1,
107:6, 109:14,
121:13, 121:15,
121:18, 122:21,
122:22, 122:23,
122:24, 123:1,
123:2, 123:4,
123:18, 124:7,
125:18, 131:24,
132:4, 133:6,
140:16, 140:22,
141:4, 142:3,
142:4, 142:5,
142:6, 151:2,
151:4, 151:6,
160:13, 167:14,
183:4, 186:17,
190:4, 193:10,
200:1, 205:7,
206:21, 207:20,
211:17, 214:6,
220:1, 220:8,
221:22, 225:13,
226:4, 226:11,
226:12, 228:2,
229:11
**gone**
11:16, 35:8,
215:16

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

80

**good**
5:13, 18:13,
75:15, 81:9,
92:1, 123:22,
123:23, 141:16,
141:23, 144:21,
144:22, 166:19,
200:16, 203:13,
210:23, 212:23,
212:24, 216:19,
217:6, 223:7
**got**
18:13, 73:6,
75:12, 106:17,
133:10, 161:8,
211:7, 219:15,
220:12, 224:1,
224:9, 225:3
**gotten**
203:17, 214:17
**grabs**
224:7
**graduation**
9:8
**grady's**
225:6
**graft**
141:5, 142:4,
214:19
**granite**
174:14, 229:8
**gray**
212:19
**great**
6:9, 7:21,
8:23, 210:21,
218:13
**greater**
32:9, 71:5
**gregory**
134:7
**grip**
52:13, 57:14,
155:18
**groin**
27:20
**grounds**
167:14

**group**
13:12, 14:6,
14:7, 14:9,
14:12, 16:10,
16:15, 16:16,
16:17, 16:22,
16:23, 17:6,
21:22
**groups**
58:6
**guess**
12:19, 35:3,
161:11, 201:8
**guy**
127:20
**guys**
83:5

---
**H**
---

**h-s-i-e-h**
157:5
**had:**
8:12, 55:8,
92:5, 145:1
**hadn't**
69:4, 108:6
**half**
93:23, 94:1,
94:4
**halfway**
139:10
**hand**
55:5, 55:10,
126:12, 164:5,
200:1
**handed**
7:11, 8:9,
95:21, 130:19,
177:4, 189:11,
202:12
**hands**
163:23
**happen**
7:23, 74:6,
76:2
**happened**
44:12, 66:17,
67:5, 73:7,

79:9, 91:24,
127:6, 127:17,
128:1, 223:9
**happens**
35:9
**happy**
6:3, 104:8
**harassment**
124:8
**hard**
164:24, 165:5,
165:6
**hardcore**
229:4
**hardware**
142:6
**has**
8:8, 14:22,
20:20, 25:6,
27:23, 28:1,
28:5, 28:9,
31:8, 31:14,
32:24, 37:3,
40:15, 44:12,
45:17, 47:17,
60:12, 67:15,
68:21, 68:22,
69:18, 69:19,
72:1, 72:5,
75:9, 80:6,
80:12, 82:6,
82:7, 82:22,
84:2, 85:13,
93:4, 96:10,
96:12, 100:24,
101:17, 107:5,
119:24, 120:5,
128:7, 130:19,
146:8, 146:12,
164:4, 166:10,
167:11, 171:16,
172:20, 173:18,
174:5, 175:8,
179:9, 182:24,
189:11, 195:7,
202:12, 225:8,
226:24, 230:9
**hasn't**
210:17, 226:7

**haven't**
75:21, 98:10,
99:5, 115:5,
116:4, 146:23,
175:7, 175:14,
213:14
**having**
40:11, 63:3,
65:21, 143:1,
191:18, 193:22
**he's**
107:4, 109:13,
143:2, 159:3,
162:6, 182:18,
210:6, 210:11,
210:21, 210:23,
220:19, 223:9,
223:24, 224:1,
224:9, 224:10,
230:20
**head**
6:12, 21:7,
188:5
**health**
1:8, 3:10,
3:23, 150:23
**healthcare**
100:4, 103:4,
152:24, 153:11,
160:15, 227:6
**healthy**
174:8
**heard**
108:6, 207:15
**hearing**
120:3
**heavy**
127:22
**heels**
52:4, 57:18
**height**
177:19
**held**
8:11, 188:18,
198:4
**hella**
108:22
**help**
36:6, 114:9,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                    81

135:3
**helped**
155:18
**helps**
37:3
**hendrickson**
108:13, 108:17,
108:20, 110:14,
110:20, 110:22
**her**
81:1, 83:7,
89:3, 156:12,
156:23, 157:4,
160:7, 163:13,
163:19, 164:4,
164:8, 168:2,
183:9
**here**
8:24, 61:18,
75:12, 75:13,
85:19, 86:17,
88:23, 89:6,
96:4, 96:5,
96:23, 98:6,
99:20, 101:9,
115:12, 117:15,
124:20, 131:7,
132:1, 135:9,
144:11, 145:4,
151:10, 161:8,
163:13, 167:24,
177:3, 177:11,
178:24, 180:3,
181:11, 186:23,
190:12, 193:5,
193:9, 196:4,
209:10, 216:8,
219:9, 219:11,
224:23
**hereby**
5:1, 232:4
**hernia**
27:9, 27:10
**herniated**
29:15, 31:23,
31:24, 32:2,
32:10, 34:7,
44:15, 48:7,

59:1
**herniation**
27:7, 27:12,
27:15, 27:17,
27:19, 27:20,
27:21, 27:23,
28:1, 28:3,
28:4, 28:6,
28:8, 29:6,
29:7, 29:8,
29:10, 29:13,
30:11, 30:13,
30:15, 30:21,
32:8, 33:11,
33:17, 34:3,
34:13, 35:10,
35:11, 39:23,
41:13, 44:10,
55:16, 66:9,
73:18, 89:1,
89:3, 201:13,
210:7, 210:22,
211:14
**herniations**
19:23, 27:3,
34:10, 43:15,
44:19, 44:21,
74:4, 74:8
**hesitation**
132:16
**hey**
76:2
**high**
16:19, 28:17,
151:22
**higher**
55:14
**highly**
172:10
**him**
155:18, 167:12,
167:13, 192:18,
203:10, 206:8,
210:10, 213:20,
214:16, 214:17,
214:21, 214:23,
220:15, 221:4,
223:11, 226:11,

227:15, 230:21
**hipaa**
77:8, 77:12,
87:16, 88:22
**hired**
83:18
**historian**
216:19, 217:6
**history**
7:19, 8:22,
51:13, 121:19,
121:21, 121:22,
122:22, 123:14,
124:22, 146:6,
146:7, 146:13,
146:15, 146:20,
147:1, 147:4,
147:6, 147:7,
147:9, 147:10,
147:14, 147:17,
148:3, 150:7,
161:5, 167:4,
173:18, 174:3,
176:6, 176:7,
215:21, 217:3,
217:18
**hits**
69:6
**hj**
110:8
**hobos**
109:2
**hoilmand**
107:11
**hold**
83:5, 135:23,
136:3, 136:6,
136:18, 157:11,
162:9, 183:12,
184:1
**holding**
47:22, 78:17,
78:20, 188:5
**home**
224:5
**honest**
102:19, 127:8,
183:1, 225:8,

225:19, 225:20
**honestly**
66:8, 97:3,
97:10, 151:10,
154:14, 155:24,
227:2
**hope**
28:1
**hospital**
14:14, 25:4,
65:2, 65:4,
65:7, 65:18,
65:20, 65:21,
65:23, 126:1,
141:14, 153:6,
229:7
**hospitals**
65:3, 65:9,
65:12
**hour**
95:16, 115:18,
116:6, 116:12,
226:16
**hours**
3:17, 115:20,
118:13, 118:20,
118:21, 118:23,
118:24, 119:2,
119:4, 119:6,
119:7, 119:10,
119:17, 119:22,
135:19, 225:23,
227:21
**house**
33:5, 33:16
**how**
5:23, 13:21,
17:13, 18:7,
18:9, 21:13,
37:5, 43:1,
43:7, 43:10,
44:12, 44:13,
48:14, 48:23,
49:22, 49:24,
51:10, 57:10,
57:24, 66:4,
69:1, 70:21,
72:1, 72:6,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                    82

72:16, 72:18,
73:13, 74:7,
75:6, 75:9,
75:13, 76:2,
80:6, 80:12,
80:14, 80:17,
81:7, 82:15,
83:1, 83:3,
83:23, 84:1,
84:22, 86:4,
86:5, 88:9,
88:13, 91:13,
91:22, 94:15,
94:24, 95:13,
96:5, 97:20,
98:4, 98:6,
99:19, 111:16,
111:24, 112:20,
113:2, 113:23,
116:14, 117:9,
118:12, 118:18,
126:11, 135:17,
149:22, 150:1,
157:5, 159:17,
164:21, 164:22,
175:8, 175:15,
195:10, 205:1,
205:12, 208:14,
213:5, 216:2,
224:15, 229:2

**hsieh**
157:4, 159:4,
159:17, 169:24,
170:3, 170:10,
171:6, 171:18,
171:23, 172:4,
172:20, 173:2,
173:4, 173:8,
173:9, 173:11,
175:1, 176:10,
176:16, 176:18,
177:6, 179:9,
179:13, 179:23

**hsieh's**
172:13, 172:15,
173:1, 179:14

**hundred**
50:2

**hundreds**
51:6

**hurt**
73:8

**hydrocodone**
220:5, 220:6,
220:9, 220:10,
220:20

**hypertension**
179:1

**hypothetical**
57:2, 83:8,
191:15

**hypothetically**
36:19

---

**I**

**i'll**
5:19, 5:24,
6:6, 7:20, 8:3,
36:4, 73:10,
79:3, 96:8,
116:9, 124:2,
158:13, 177:2,
183:6, 185:15,
205:10, 208:12,
218:7, 221:13,
222:14, 231:6

**i've**
11:11, 11:16,
15:8, 15:9,
15:12, 15:13,
18:11, 18:12,
18:13, 20:19,
24:12, 24:16,
27:21, 28:2,
33:10, 43:3,
43:4, 43:15,
62:23, 63:12,
65:9, 67:22,
67:23, 71:23,
73:5, 73:6,
73:9, 73:14,
73:24, 74:3,
76:20, 76:21,
79:14, 79:18,
79:19, 80:5,
82:5, 83:24,

84:3, 84:4,
84:9, 84:10,
86:5, 86:11,
86:17, 86:22,
86:23, 86:24,
87:2, 87:5,
87:10, 88:21,
89:21, 89:22,
89:23, 90:6,
90:14, 90:15,
90:16, 93:18,
93:19, 94:2,
94:19, 94:21,
97:24, 98:21,
98:22, 102:13,
103:1, 103:17,
104:20, 114:2,
125:23, 126:1,
126:3, 141:1,
153:1, 153:2,
153:3, 154:8,
161:8, 173:9,
176:13, 177:4,
187:2, 218:11,
226:5, 229:19

**id**
95:10

**idea**
72:1, 74:3,
80:12, 91:22,
93:22

**ideation**
176:4

**identification**
7:9, 8:6,
95:19, 130:17,
160:11, 189:8,
197:2, 199:23,
202:10

**identified**
101:19

**identify**
83:12, 101:15,
101:18, 140:4

**identifying**
101:7

**idoc**
152:9

**il**
4:25

**illinois**
1:2, 3:2, 3:22,
4:6, 4:21, 4:23,
9:13, 12:1,
24:24, 25:4,
128:16, 153:5,
156:12, 160:14,
174:14

**illness**
161:5

**image**
2:19, 202:13,
202:15, 202:18,
202:20, 202:21

**images**
133:10, 133:24,
141:19, 200:2

**imaging**
36:23, 58:24,
199:14, 204:1

**imbalance**
230:2

**ime**
93:13, 93:15

**ime's**
86:19

**immediately**
9:6, 9:7,
20:23, 21:15,
107:19

**impact**
31:8, 34:3,
200:20, 200:23,
201:2, 201:9,
201:21

**impacted**
149:23, 150:2,
150:11, 175:16

**impairment**
61:21, 61:23,
62:2, 62:8

**impinge**
31:19, 31:20

**impingement**
39:13, 40:4,
40:16, 41:17,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                                 83

41:24, 42:2,
43:5
**important**
47:4, 55:21,
71:1, 84:21,
102:21, 121:21,
121:23, 121:24,
122:2, 123:3,
124:23, 125:11,
125:14, 170:18,
208:6
**impotence**
219:22
**impression**
132:2
**improve**
210:19
**improvement**
213:6
**inaccurate**
28:7, 96:14,
97:8
**inappropriate**
163:2, 163:9,
169:1, 179:24,
227:5
**incarcerated**
216:20
**incarceration**
146:7, 150:19,
150:21, 173:17
**incident**
67:4, 78:11,
89:2, 91:23,
147:14, 199:4
**incision**
139:23, 139:24
**include**
8:17, 11:13,
23:4, 53:6,
61:5, 61:20,
93:14, 120:24,
125:3, 130:5,
136:10, 137:2
**included**
88:14, 132:11,
138:16, 139:18,
150:1

**includes**
10:18, 10:19,
18:5, 95:6,
97:12, 118:4
**including**
10:22, 27:3,
36:23, 117:22,
130:10, 133:24,
146:6, 154:24
**income**
92:10, 95:2,
95:10, 115:19,
115:21
**incomplete**
57:1, 83:8,
96:15, 97:8,
191:14
**incorporated**
214:19
**incorrect**
152:11
**increase**
45:19, 199:8
**independent**
8:16, 18:6,
18:8, 19:5,
59:10, 59:16,
59:23, 60:8,
60:9, 60:16,
60:17, 60:19,
60:23, 61:1,
61:15, 62:21,
62:24, 63:6,
64:16, 79:16,
83:16, 84:15,
86:23, 87:2,
92:8, 93:3,
93:19, 93:20,
95:3, 95:6,
95:7, 102:8,
102:14, 102:15,
102:20, 106:15,
106:16, 111:19,
111:21, 112:2,
114:6, 114:13,
114:21, 115:9,
116:20, 117:1,
117:3, 117:6,

117:8, 117:12,
118:4, 130:8,
214:4
**independently**
60:20
**index**
2:7
**indicate**
69:4, 208:23
**indicated**
194:1
**indicates**
122:13, 166:9,
194:13, 195:7
**indication**
145:10
**indications**
145:16, 145:20
**indifference**
62:12
**individual**
59:23, 91:2,
91:19, 92:14,
108:16, 117:3,
120:23, 121:19,
130:7, 144:17
**individual's**
91:18
**individuals**
59:15, 61:24,
86:24, 118:3
**infection**
19:24, 34:15,
34:16, 35:1
**infections**
41:10
**inference**
102:3
**inform**
195:10
**information**
101:12, 125:10
**initial**
86:18, 200:15
**initially**
82:10
**injured**
91:3

**injuries**
67:23, 67:24
**injury**
61:24, 66:20,
67:3, 67:4,
67:13, 79:24,
83:2, 83:3,
227:18
**inside**
32:20
**insists**
220:1
**instance**
90:10, 205:11
**instances**
97:13, 152:22,
153:1, 153:14
**instead**
6:11, 102:8
**instruct**
6:24
**instrument**
224:6
**instrumentation**
139:15, 140:24,
141:7
**insurance**
92:18, 108:2,
108:20, 109:8,
110:21, 127:7,
127:9, 128:7
**insurer**
100:10
**intelligent**
127:24
**intend**
135:20
**intentional**
85:11
**interchangeable**
28:4
**interested**
13:1, 13:3,
232:13
**interfere**
7:5
**intern**
153:4

internship
9:12, 9:13,
9:21, 24:3,
24:8, 24:24,
137:16
interpretation
175:2
intervertebral
22:2, 140:2
into
5:5, 12:12,
14:18, 31:3,
31:20, 33:24,
39:23, 62:12,
70:6, 95:10,
106:24, 127:20,
132:1, 146:2,
153:8, 162:8,
170:20, 175:5,
175:8, 184:11,
201:6, 215:16,
217:20, 229:6
intra-spinal
23:9
intraspinal
23:18
introduce
105:13, 151:7
introduced
5:19, 105:12,
105:13
introduces
211:18
investigate
188:12
investigated
172:12
involve
89:9, 89:11,
117:9, 117:10
involved
65:6, 89:12,
93:11, 93:21,
94:5, 103:19,
103:21, 105:2,
108:5, 108:10,
108:16, 108:18,
113:8, 113:13,

134:22, 174:8
involvement
50:23
involves
37:17
involving
103:2, 126:16,
127:3, 127:5,
130:6
irregular
170:5, 170:11,
170:13, 171:24,
172:5, 219:18
irrelevant
102:19, 103:16,
125:4, 170:3
irritate
38:14
irritated
35:19, 37:17,
38:9, 47:11,
55:3, 55:18
irritating
47:13
irritation
37:20
isn't
39:9, 164:18,
190:19
issue
15:7, 17:12,
20:7, 73:7,
75:8, 75:12,
91:21, 101:16,
126:5, 144:7,
149:10, 154:1,
201:14, 205:17
issued
141:19
issues
15:19, 17:4,
19:7, 19:9,
19:19, 19:23,
21:3, 21:10,
34:13, 41:10,
56:10, 63:3,
93:6, 111:10,
111:14, 126:23,

150:23, 197:22
issuing
134:1
its
6:16, 28:10,
100:10, 100:11,
152:10, 152:21
itself
23:23, 23:24,
26:12, 26:17,
32:19, 33:15,
34:4, 36:8,
38:13, 64:18,
70:11, 71:16,
152:7, 162:3,
162:4, 175:18,
182:17, 218:19

**J**

jaclyn
4:12
january
2:12, 7:18,
8:8, 176:11,
176:16, 176:18,
176:22, 177:7,
177:19, 178:2,
178:5, 178:16,
179:14, 179:20
jelly
22:4, 22:7
jerks
58:8
jkinkade@cassiday
4:17
jo
1:17, 3:18,
4:28, 5:4,
232:2, 232:18
job
6:9, 60:19,
102:19, 105:1,
184:13, 210:9,
223:8
join
59:18, 61:14,
64:14
joined
14:6, 16:10,

16:15
joint
41:12, 43:24
joints
10:21, 44:5,
44:6, 44:7,
58:18, 58:19,
202:8
journal
125:23
journals
126:3
july
7:17, 12:11,
12:17
jumped
54:19
june
138:21, 139:4,
139:5
jurors
78:1
jury
77:20, 147:22

**K**

kansas
9:18, 12:15,
137:21, 153:7
kantarevic
110:8
keep
6:10, 8:3,
70:13, 85:12,
96:21, 97:3,
97:5, 97:15,
97:17, 102:12,
102:15, 102:17,
103:15, 109:14,
120:10, 125:15,
226:16
keeps
20:1, 97:3
kerrison
224:6
key
207:23
kincade
104:21

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                      85

**kincade's**
105:3
**kind**
27:19, 44:1,
47:19, 138:10,
141:9, 222:18,
223:11, 223:12,
224:7, 227:11
**kinkade**
2:4, 4:12,
42:6, 46:14,
46:23, 51:12,
53:2, 56:12,
57:1, 78:7,
83:5, 85:9,
86:12, 88:2,
90:18, 92:1,
101:2, 101:11,
104:13, 104:15,
104:17, 106:23,
107:6, 114:17,
116:17, 123:18,
124:7, 131:24,
133:1, 151:18,
157:11, 158:11,
160:4, 168:12,
183:4, 184:1,
186:24, 191:14,
204:7, 207:9,
208:4, 209:3,
210:2, 211:20,
212:2, 212:6,
212:11, 213:2,
213:18, 214:10,
215:8, 215:15,
216:15, 216:23,
217:9, 217:14,
217:24, 218:6,
218:22, 219:3,
219:6, 221:9,
221:17, 222:4,
222:21, 223:2,
223:13, 224:14,
225:5, 225:17,
226:14, 228:4,
230:17, 231:5
**kinkade's**
101:24

**knee**
58:7
**knew**
105:15, 106:11
**knowledge**
119:24, 120:5,
217:16
**knows**
156:24
**kristina**
156:11
**kyphotic**
26:2

---

**L**

**l1**
89:16
**l5-s1**
73:18
**labor**
127:22
**lack**
197:22, 198:10,
217:18
**laid**
132:16, 137:4
**large**
32:22, 33:1,
41:12, 41:16,
42:13, 69:1,
210:7
**last**
5:15, 15:16,
15:18, 15:19,
15:24, 16:1,
76:22, 77:2,
77:6, 77:11,
79:20, 81:1,
90:2, 90:3,
90:9, 94:5,
95:14, 95:15,
96:5, 97:21,
98:6, 107:10,
111:17, 126:15,
138:20, 141:14,
142:21, 149:15,
150:13, 155:16,
171:16, 183:2,

183:9, 184:2,
194:10, 194:11,
194:12, 205:8,
211:18
**lastly**
6:22, 227:17
**lasts**
95:15
**late**
224:3
**later**
149:8, 149:9
**lateral**
30:24, 44:20
**latter**
166:18
**law**
61:6, 87:21,
101:20, 105:9,
105:20, 106:9,
108:19, 109:7
**lawful**
5:9
**lawsuit**
108:5, 108:9,
126:9, 128:8,
128:11, 128:13,
144:4, 144:7
**lawyers**
87:20
**lay**
30:10
**layer**
32:16, 32:17,
33:6
**layers**
32:15
**lcook@atg**
4:25
**leading**
209:1, 215:14
**learn**
227:9
**least**
53:24, 97:7,
115:23
**leave**
16:23, 119:18,

119:19
**leaving**
11:9, 18:7,
19:4
**ledge**
225:3
**left**
16:22, 16:24
**leg**
52:20, 58:13,
66:20
**legal**
19:6, 61:6,
61:7, 61:13,
62:9, 114:10
**length**
71:11, 79:15,
91:15, 213:1
**lengthy**
219:24
**less**
63:5, 74:20,
95:16, 99:8,
112:8, 112:15,
112:16, 116:6,
218:15, 218:16
**let**
6:3, 6:16,
6:18, 12:9,
21:11, 23:3,
28:5, 41:21,
44:13, 45:17,
45:24, 46:17,
61:1, 81:15,
96:18, 100:7,
102:6, 113:7,
123:15, 130:22,
133:5, 134:1,
143:13, 145:4,
158:1, 160:9,
161:8, 163:1,
163:7, 172:22,
175:14, 192:21,
196:9, 197:17,
219:7, 219:9,
220:5
**let's**
8:9, 9:12,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                      86

11:16, 12:19,
22:15, 31:12,
34:15, 61:20,
74:17, 87:18,
95:1, 104:3,
107:9, 109:14,
117:15, 122:9,
122:14, 131:7,
136:8, 138:19,
139:2, 143:24,
144:23, 145:3,
150:13, 171:2,
171:3, 177:11,
180:2, 194:10,
213:3
**letter**
2:17, 2:18,
105:16, 105:24,
131:7, 131:9,
131:12, 131:22,
132:1, 132:5,
133:14, 134:15,
134:23, 134:24,
197:4, 197:15,
197:21, 197:24,
198:1, 198:4,
198:8, 201:5,
222:5, 222:10,
222:16, 222:17
**letters**
222:23
**level**
31:9, 33:18,
34:14, 35:12,
36:15, 58:13,
58:17, 70:21,
71:2, 139:14,
139:16, 140:24,
141:8, 159:8,
164:7
**levels**
141:11
**license**
129:3, 129:4,
129:15
**licensed**
64:3, 64:4,
128:15, 128:24,

129:7, 129:12
**licenses**
128:18
**licensing**
128:22
**life**
220:12, 221:12
**lifting**
174:10
**ligament**
140:17
**like**
20:23, 22:4,
22:7, 22:8,
23:10, 25:22,
27:18, 29:24,
30:22, 32:19,
35:20, 38:7,
44:2, 44:5,
45:12, 46:11,
46:20, 47:9,
51:3, 55:11,
60:10, 66:8,
66:19, 76:9,
87:6, 89:8,
130:9, 131:4,
139:11, 140:7,
152:11, 155:2,
155:4, 168:19,
171:11, 172:22,
176:23, 179:2,
188:2, 196:4,
204:14, 213:7,
221:6, 222:1,
227:1, 228:23,
231:5
**likely**
166:23, 167:4,
167:18, 197:21,
198:14
**likewise**
68:1
**limited**
15:11, 97:19,
118:15, 212:16
**limiting**
76:11
**limits**
58:14, 123:19

**limping**
171:24, 172:5,
219:18
**line**
124:20, 132:5,
141:14, 157:16,
161:15, 167:3,
187:3, 188:7,
189:20, 190:12,
191:21, 205:21,
214:7
**lisa**
4:20, 204:7,
230:24
**list**
2:13, 87:6,
95:22, 96:1,
96:4, 96:9,
96:13, 96:14,
96:16, 96:21,
96:23, 97:1,
97:5, 97:7,
97:8, 97:11,
97:12, 97:15,
97:18, 114:6,
132:24, 133:1,
133:3, 136:17,
138:7, 177:5,
178:23, 178:24,
179:1, 192:4,
205:5, 205:16,
208:18, 208:19
**listed**
8:24, 59:10,
64:10, 65:2,
107:10, 114:5,
114:12, 114:14,
114:22, 115:12,
116:1, 137:16,
138:2, 143:7,
143:8, 166:14,
168:8, 178:4,
178:19, 180:3
**listen**
36:22
**lists**
97:4, 105:2,
105:3, 144:2

**litigation**
83:18, 92:16,
93:14
**little**
8:23, 12:5,
28:21, 28:22,
28:23, 29:3,
29:4, 30:1,
30:3, 40:12,
44:5, 47:11,
47:12, 62:5,
62:6, 85:12,
115:19, 125:24,
136:8, 140:14,
156:24, 201:24,
203:1, 204:13,
210:15, 210:16,
212:23, 224:1,
224:9, 225:2,
225:3, 225:4
**lived**
10:9
**llc**
109:3
**llp**
4:13
**locate**
176:14, 176:23
**located**
28:8, 28:9
**loevy**
4:4
**long**
18:12, 62:23,
62:24, 69:1,
69:5, 72:1,
72:6, 72:18,
74:4, 75:9,
75:13, 75:21,
76:2, 80:6,
80:12, 80:15,
84:1, 91:13,
91:22, 95:13,
115:6, 135:17,
137:9, 176:5,
196:5, 211:5,
211:7, 211:10,
211:14, 211:15,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                              87

211:16, 213:5,
224:11
**long-term**
198:15
**longer**
28:8, 129:12,
201:18
**longitudinal**
140:17
**look**
72:4, 72:6,
80:11, 87:9,
100:22, 117:15,
162:5, 170:20,
177:2, 178:14,
212:21
**looked**
113:12, 115:5,
210:13, 212:22,
212:24
**looking**
20:7, 70:10,
72:7, 72:9,
85:20, 97:6,
115:11, 165:24,
172:13, 177:11,
179:5, 179:11,
201:23, 214:14,
229:4
**looks**
131:4, 171:11
**lose**
28:21, 225:20
**lost**
57:7
**lot**
18:14, 18:16,
18:17, 18:21,
19:13, 24:13,
26:21, 47:22,
48:1, 78:21,
84:10, 86:16,
97:23, 98:3,
98:9, 106:17,
113:11, 114:2,
123:2, 124:19,
137:6, 146:6,
147:10, 154:8,

156:24, 157:17,
177:3, 187:18,
205:18, 212:18,
216:16, 217:3
**lottery**
10:7
**loud**
85:11
**louis**
1:3, 3:3, 3:18,
3:22, 4:15, 9:2,
9:7, 9:9, 12:13,
13:15, 14:3,
14:8, 18:16
**louisiana**
129:3, 129:8,
129:16
**love**
7:21
**lower**
10:22, 37:12,
52:3, 52:9,
53:11, 53:14,
54:22, 55:23,
56:9, 56:19,
57:17, 58:7,
85:12, 89:15,
204:22, 215:2
**luke's**
65:4
**lumbar**
10:23, 19:22,
22:21, 22:24,
27:3, 31:11,
52:5, 73:15,
73:16, 73:18,
74:4, 74:8,
88:24, 89:2,
89:12, 89:14,
89:15, 90:8,
126:18, 126:23,
128:2, 163:20

**M**

**ma'am**
8:20, 10:19,
16:8, 57:22,
74:12, 84:7,

84:8, 90:20,
98:5, 102:12,
109:19, 111:8,
120:10, 122:13,
148:7, 156:18,
161:8, 166:24,
172:24, 173:23,
180:10, 183:9,
185:7, 205:15,
207:5, 219:13
**made**
157:17, 165:14,
179:9, 189:16,
189:24, 192:11,
195:7, 210:6,
210:12, 215:17,
226:19, 230:9
**magnetic**
58:24
**maintain**
13:10, 97:1,
104:4, 109:5
**maintaining**
20:10
**make**
6:11, 20:24,
33:2, 33:3,
36:24, 41:18,
41:22, 54:20,
66:7, 66:14,
67:9, 67:20,
67:21, 68:3,
69:7, 70:18,
82:11, 82:15,
131:9, 138:21,
144:6, 147:23,
148:1, 178:12,
196:11, 206:11,
206:14, 222:19,
223:6, 223:12,
225:18
**makes**
68:5, 165:19,
226:23, 227:1
**making**
76:9, 81:9,
139:23, 223:9
**man**
211:11, 229:5

**man's**
223:8
**manifest**
37:6, 37:14
**many**
17:13, 26:3,
28:10, 30:1,
32:12, 40:1,
41:6, 42:10,
42:24, 43:1,
43:4, 43:7,
43:10, 44:12,
44:13, 44:17,
44:18, 44:21,
44:22, 44:23,
47:14, 48:14,
48:16, 48:18,
48:21, 48:23,
49:3, 49:4,
49:22, 49:23,
49:24, 51:2,
65:9, 67:22,
72:8, 73:13,
73:14, 74:1,
74:3, 74:11,
74:12, 74:13,
74:23, 75:6,
76:19, 80:9,
80:13, 83:23,
83:24, 84:11,
86:11, 86:22,
86:24, 87:1,
87:9, 87:10,
88:9, 88:11,
88:13, 90:14,
90:15, 90:16,
93:18, 94:15,
97:20, 98:4,
98:6, 99:19,
111:16, 111:24,
112:20, 113:2,
116:21, 117:9,
118:12, 118:18,
126:11, 151:3,
169:4, 192:5,
192:6, 212:13,
218:12, 218:15,
225:23

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                      88

march
96:6, 96:19,
97:7, 130:20,
131:3, 131:8,
131:23, 132:20,
133:11, 133:14,
136:12, 141:16,
156:9, 156:12,
159:21, 160:23,
162:2, 175:21,
175:23, 177:15,
177:17, 178:9,
197:6, 199:15,
200:9, 202:20
mark
7:22, 8:4,
140:4, 213:21,
219:1
marked
7:8, 7:11, 8:3,
8:5, 8:8, 95:18,
95:22, 130:16,
130:20, 160:10,
160:20, 189:7,
189:12, 197:1,
199:22, 200:1,
202:9, 202:13,
202:15
marker
140:3
marking
197:12
marks
208:23
married
13:6
mashes
62:5, 62:6
material
23:7, 123:3,
125:4, 125:6,
133:15
materials
132:23, 133:7,
133:9, 133:12,
133:16, 133:20,
134:3, 134:5,
135:2, 135:6

matter
29:8, 77:21,
217:19
may
1:15, 3:16,
5:3, 6:23, 16:6,
16:7, 33:11,
33:12, 33:22,
34:3, 34:4,
34:8, 38:5,
40:17, 40:20,
73:16, 116:19,
117:5, 149:4,
149:13, 150:18,
151:15, 152:4,
152:10, 152:13,
169:23, 171:5,
172:16, 172:21,
178:3, 189:14,
203:4, 203:8,
211:14, 213:14,
214:2, 215:10,
217:5
maybe
17:17, 20:19,
20:20, 36:5,
40:12, 93:9,
94:1, 94:4,
94:5, 99:21,
112:15, 113:3,
126:12, 126:17,
160:16
mean
11:17, 23:21,
25:16, 25:17,
26:14, 26:15,
30:6, 33:20,
34:24, 35:3,
40:5, 41:2,
41:3, 47:17,
47:21, 47:24,
56:13, 63:14,
66:11, 73:14,
76:6, 82:5,
82:6, 82:12,
82:18, 82:20,
82:21, 82:22,
84:8, 87:9,

93:5, 96:3,
97:10, 119:3,
121:16, 121:18,
121:24, 123:23,
125:23, 127:19,
137:6, 139:17,
142:21, 143:12,
143:19, 144:10,
145:12, 150:18,
151:10, 152:6,
165:5, 170:4,
174:7, 179:21,
179:22, 183:8,
185:6, 186:21,
187:2, 187:17,
187:18, 187:19,
187:24, 189:2,
191:5, 195:20,
196:3, 196:6,
199:10, 208:7,
208:9, 208:10,
211:9, 211:11,
212:23, 218:17,
221:23, 223:5,
223:18, 224:5,
225:20, 226:20,
227:3, 227:11,
227:13, 228:14,
228:22
meaning
62:4
means
19:24, 21:4,
26:13, 26:14,
26:17, 26:24,
27:1, 27:8,
27:9, 27:10,
27:12, 27:21,
28:3, 28:17,
30:14, 30:18,
37:24, 38:7,
43:23, 44:1,
45:10, 50:23,
57:24, 60:8,
63:12, 66:16,
66:17, 75:16,
75:22, 139:21,
140:20, 141:1,

144:17, 151:1,
190:5, 192:15,
193:23, 196:4,
203:23, 211:9
meant
150:20, 201:8,
204:16
measure
52:14, 52:16
measured
52:19
measuring
58:10
mechanic
60:15
mechanism
83:2
medically
122:2, 216:2
medication
155:1, 168:17,
168:18, 168:21,
169:2, 169:11,
169:15, 169:22,
189:13, 220:23
medications
7:5, 154:22,
155:2, 155:8,
155:13
medicine
10:20, 11:4,
11:14, 13:24,
28:12, 85:1,
85:3, 128:15,
129:1, 129:12,
157:18
medicolegal
18:20, 61:20,
76:10
member
63:9, 64:12,
64:22, 155:13
members
18:22, 103:8,
154:8
memberships
64:11
memorized
158:17, 172:24,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                      89

181:19, 217:2
**memory**
7:5
**mention**
162:1, 165:14,
223:14, 224:19,
229:5
**mentioned**
15:20, 30:7,
38:4, 45:5,
51:3, 54:14,
54:18, 94:3,
102:14, 103:18,
111:8, 135:10,
147:15, 156:10,
177:12, 178:1,
203:23, 204:18,
213:3, 216:12,
218:8
**met**
104:15, 190:22,
191:6
**microscope**
140:12
**microscopic**
33:22
**mid-state**
109:16
**middle**
224:3
**might**
36:6, 66:13,
73:7, 83:7,
171:4
**mild**
39:23, 40:3,
40:15, 42:11
**mind**
61:21, 62:7,
88:23, 89:5,
126:17, 215:17
**minimum**
64:6
**minor**
15:11, 30:6,
39:12, 39:14,
40:4, 40:11,
41:17, 41:23,

42:2
**minute**
18:9, 94:3,
103:14, 144:23,
156:22, 197:10
**minutes**
92:2
**miraculous**
195:7, 196:6,
196:10, 210:12,
230:9
**miraculously**
196:4
**missing**
178:13
**missouri**
3:18, 3:20,
4:15, 9:2, 9:9,
9:18, 12:13,
65:3, 128:16,
137:20, 232:4
**misspeak**
225:10
**misstates**
42:6, 46:14,
78:7, 85:10,
86:12, 114:17,
187:1, 209:23,
230:17
**mister**
170:2, 222:18,
226:20
**misunderstanding**
21:13
**mkd**
2:8
**moment**
37:1
**monday**
119:8, 119:17
**money**
86:1, 86:7,
115:24, 128:7,
128:10
**monnie**
108:6, 110:14
**month**
25:10, 117:16

**months**
73:22, 112:20,
112:24, 113:2,
169:19, 197:23,
210:18, 212:13,
213:4, 213:5,
223:10
**more**
14:14, 16:2,
16:14, 17:17,
25:24, 36:4,
42:11, 50:19,
51:7, 51:21,
52:20, 63:6,
74:16, 74:18,
74:20, 74:23,
75:23, 80:14,
86:5, 94:5,
95:1, 95:12,
98:13, 98:17,
98:22, 99:5,
99:7, 99:8,
99:9, 99:12,
99:13, 103:12,
106:16, 106:17,
112:4, 112:7,
112:17, 113:10,
116:6, 135:9,
139:10, 140:14,
156:5, 156:8,
156:16, 156:22,
156:24, 157:1,
157:17, 158:9,
159:5, 159:7,
159:10, 159:11,
159:18, 168:5,
182:23
**most**
20:16, 29:7,
35:18, 35:23,
38:16, 48:18,
61:17, 66:23,
68:1, 72:7,
95:15, 116:5,
120:14, 122:21,
123:1, 123:3,
197:21, 208:5,
218:20, 222:1,

222:2
**motion**
36:16, 52:6,
58:17, 58:22
**motor**
52:10, 57:6,
57:8, 57:20,
58:2, 58:11,
81:9, 204:19,
204:21, 228:14
**move**
167:14, 211:17,
218:7
**moved**
14:13, 14:17,
16:24, 17:8
**mri**
2:19, 72:4,
129:22, 130:5,
193:15, 194:1,
198:20, 201:8,
202:5, 202:13,
203:5, 203:10,
203:15, 203:19,
210:15, 211:12,
212:22, 213:3,
223:22, 224:8,
226:24, 227:8,
227:16
**mri's**
70:2, 80:11,
129:20, 130:10
**much**
17:6, 17:7,
28:4, 38:15,
62:5, 72:16,
116:14, 116:15,
153:12, 153:13,
162:5, 168:5,
195:23, 218:21,
224:5
**multilevel**
48:19
**multiple**
144:2, 150:16,
151:21, 214:2
**muscle**
52:8, 52:11,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

90

53:24, 57:15,
57:19, 57:20,
58:6
**muscles**
10:21, 57:9
**musculoskeletal**
10:20, 11:12,
11:15
**must**
46:3
**myelogram**
59:6, 203:17
**myelograms**
70:2, 80:11
**myelomalacia**
167:4, 198:14
**myelopathy**
45:3, 48:21,
202:16
**myself**
5:19, 73:9,
78:20, 84:3,
110:13

**N**

**name**
5:14, 5:15,
5:18, 14:19,
49:10, 85:19,
86:6, 86:15,
87:7, 87:12,
87:15, 88:20,
104:24, 105:3,
105:4, 108:6,
108:12, 108:15,
113:19, 113:21,
127:11, 157:5,
159:18
**named**
126:8
**names**
86:16, 86:17,
87:14, 90:15,
90:21, 103:24,
104:2
**narcotic**
220:3, 220:4,
220:10, 220:20,

220:21, 220:24,
221:7, 221:12
**narcotics**
220:22
**narrowed**
212:20
**narrowing**
19:24, 26:11,
26:13, 26:14,
26:15, 26:16,
26:17, 32:6,
41:11
**naseer**
156:11, 156:18,
157:7, 157:19,
157:22, 158:2,
158:4, 158:8,
159:4, 159:7,
159:10, 159:17,
159:22, 160:22,
161:5, 162:2,
168:3, 168:10,
169:8, 175:1,
205:11, 205:23,
219:7, 220:13
**naseer's**
160:1, 165:17,
166:22, 167:18,
167:24, 218:24
**nature**
67:12, 68:4,
174:11
**necessarily**
33:11, 36:21,
40:14, 52:19,
81:20, 83:9,
93:9, 169:6,
188:6, 188:9,
188:10, 199:3,
199:6, 205:12
**necessary**
188:22, 189:1,
191:12, 191:18,
191:23, 193:7,
193:12, 194:1
**neck**
21:5, 160:3,
161:7, 161:16,

171:18, 171:19,
179:2, 179:4,
188:4, 226:24
**need**
48:21, 52:19,
79:5, 138:9,
151:4, 152:13,
169:2, 190:3,
193:14
**needed**
49:8, 151:14,
152:3, 169:17,
169:22
**needing**
154:23
**needs**
60:22, 172:12
**negative**
190:17, 205:16,
205:18
**neither**
232:8
**nerve**
22:23, 23:1,
31:16, 31:20,
35:17, 35:19,
37:17, 37:20,
38:4, 38:5,
38:8, 38:11,
38:14, 38:18,
38:19, 39:4,
44:22, 46:5,
46:6, 46:8,
46:19, 47:10,
47:13, 47:17,
49:7, 50:23,
52:21, 54:16,
54:23, 55:3,
55:4, 55:11,
55:12, 55:13,
55:17, 56:21,
73:18, 75:19,
89:12, 145:10,
145:17, 195:22,
211:4, 211:5
**nerves**
22:16, 31:22,
38:12, 45:23

**nervous**
21:16
**neurologic**
37:10, 39:15,
42:14, 43:14,
46:24, 47:20,
48:1, 50:23,
51:1, 52:9,
54:15, 69:20,
70:14, 70:24,
71:8, 71:14,
72:2, 81:22,
145:13, 145:20,
157:6, 168:3,
171:23, 172:14,
173:3, 175:2,
176:19, 177:21,
180:14, 181:5,
182:14, 182:19,
183:23, 184:19,
186:2, 186:6,
186:19, 187:7,
187:14, 187:18,
187:21, 187:22,
188:20, 189:6,
190:13, 194:7,
194:8, 195:7,
195:16, 203:13,
203:21, 203:22,
204:17, 204:20,
204:23, 205:4,
206:9, 208:2,
208:8, 214:16,
214:23, 215:1,
227:7, 228:17,
229:3
**neurological**
40:4, 40:5,
40:16, 41:17,
41:24, 42:3,
42:18, 43:17,
46:13, 46:22,
47:3, 47:7,
47:9, 47:14,
47:17, 49:1,
50:3, 50:6,
50:9, 50:13,
50:16, 50:22,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

91

52:22, 53:1,
53:4, 53:15,
53:18, 53:22,
54:11, 57:6,
80:24, 81:9,
157:20, 157:22,
158:3, 162:20,
163:3, 163:10,
164:3, 165:14,
166:6, 166:13,
166:15, 166:16,
167:12, 169:20,
172:22, 173:5,
175:9, 175:17,
176:12, 176:21,
180:8, 181:13,
181:22, 182:2,
183:16, 184:10,
184:21, 184:23,
185:3, 185:9,
185:17, 185:23,
187:11, 187:17,
193:22, 193:23,
194:2, 201:3,
201:7, 201:10,
201:22, 203:8,
204:14, 204:15,
205:1, 205:12,
205:14, 206:4,
207:14, 207:15,
207:17, 207:18,
207:21, 207:22,
207:23, 208:14,
210:5, 210:6,
219:17, 227:15,
228:9, 228:10,
228:13, 228:18,
229:15, 230:5
**neurologically**
72:17, 81:16,
81:19, 82:7
**neurology**
157:1, 195:20,
217:11
**neuropathy**
168:22, 178:18,
179:1, 179:16
**neurosurgeon**
23:11, 23:17,

23:22, 24:15,
49:12, 66:5,
66:12, 67:11,
67:18, 68:5,
197:5
**neurosurgeons**
24:11, 24:13,
24:17, 49:13,
66:1, 68:1
**neurosurgery**
24:2, 24:23,
25:8
**neurosurgical**
193:13
**never**
16:19, 19:10,
72:11, 73:24,
94:12, 104:15,
145:9, 145:12,
146:14, 162:21
**nevertheless**
36:15
**new**
7:20, 7:21,
12:21, 13:18,
13:20, 66:18
**news**
125:24
**next**
6:19, 140:22,
140:23, 142:10,
144:19, 146:5,
171:22, 173:16,
176:10
**night**
211:12, 224:3,
224:4
**nine**
112:16
**nod**
6:12
**non**
40:2
**non-dermatomal**
163:23, 164:5
**non-spinal**
15:11
**nonresponsive**
107:2

**nonsense**
123:2
**nor**
232:9, 232:12
**norco**
220:1, 220:2,
220:3, 220:6
**normal**
28:10, 42:14,
52:22, 58:14,
145:13, 157:6,
159:22, 164:3,
165:13, 165:19,
165:22, 166:1,
166:2, 166:5,
166:13, 166:14,
166:16, 166:18,
168:3, 169:20,
172:14, 172:16,
172:21, 173:3,
173:5, 175:2,
176:12, 176:13,
176:19, 177:21,
177:22, 182:14,
183:23, 187:7,
188:20, 189:6,
190:13, 190:15,
193:22, 193:23,
194:2, 194:7,
204:15, 204:17,
204:23, 204:24,
205:4, 205:12,
205:13, 206:4,
208:15, 214:23,
215:1, 227:7,
227:15
**north**
3:18, 4:14
**notary**
232:3
**notation**
138:21
**note**
104:11, 104:12,
104:20, 140:23,
141:12, 141:13,
144:1, 148:18,
148:22, 149:2,

149:16, 155:16,
160:1, 160:22,
161:18, 162:12,
167:8, 167:9,
167:17, 172:7,
177:18, 186:3
**noted**
104:17, 104:19,
104:24, 165:13,
170:3, 174:2
**notes**
54:6, 104:20,
163:13, 163:20,
171:23, 172:4,
176:10, 180:15,
180:16, 180:20,
186:12, 186:13,
186:14, 186:20,
186:22, 187:4,
195:14, 196:20,
219:21
**nothing**
18:19, 25:18,
42:15, 67:15,
182:24, 225:8,
225:19, 225:20
**noticed**
105:8, 105:11,
223:20, 223:22
**novel**
211:18, 212:7
**november**
213:4, 221:5
**now**
3:20, 14:7,
15:6, 17:22,
18:4, 18:21,
19:14, 22:15,
25:2, 27:18,
29:2, 41:5,
41:6, 45:20,
65:12, 69:10,
69:11, 70:23,
84:3, 84:11,
87:3, 89:6,
91:2, 103:2,
132:15, 139:2,
144:22, 167:1,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

92

172:1, 175:11,
181:15, 186:23,
195:22, 198:7,
214:20, 221:23,
224:23, 228:13
**nowhere**
152:1, 168:7
**nucleus**
22:5, 22:7,
27:13
**number**
14:5, 29:16,
47:8, 52:3,
64:4, 64:10,
74:9, 74:13,
74:16, 76:18,
76:19, 84:7,
84:8, 87:14,
88:17, 88:18,
94:19, 94:22,
95:1, 95:10,
98:21, 102:7,
111:23, 115:16,
116:3, 118:15,
143:1, 143:11,
219:22
**numbers**
133:13, 160:16
**numbness**
35:20, 37:14,
37:16, 37:20,
38:22, 38:24,
40:8, 40:13,
43:18, 47:21,
50:6, 51:19,
51:21, 52:2,
53:10, 53:14,
54:1, 54:12,
54:21, 55:2,
55:3, 55:5,
55:9, 55:18,
55:23, 56:8,
56:10, 56:18,
187:20, 192:6,
192:8
**numerous**
90:19, 150:16,
151:2, 151:12,

151:20, 216:2
**nurses**
99:24, 134:13,
217:5

---

**O**

**oaky**
179:13
**object**
78:7, 85:10,
88:2, 101:2,
107:1, 107:2,
123:18, 124:7,
151:7, 158:11,
183:4, 205:7,
207:4, 208:1,
209:23, 211:24,
212:15, 213:17,
214:6, 215:6,
215:13, 216:10,
216:22, 217:22,
218:5, 218:10,
221:2, 221:13,
221:19, 222:14,
224:16, 226:4,
228:2
**objecting**
6:22, 6:23
**objection**
7:2, 42:6,
46:14, 46:23,
51:12, 53:2,
56:12, 57:1,
83:7, 86:12,
90:18, 114:17,
116:17, 151:18,
157:11, 160:4,
168:12, 186:24,
191:14, 209:1,
212:5, 212:9,
217:8, 217:12,
222:24, 223:4,
223:19, 230:17
**objections**
83:6, 85:14
**objective**
121:4, 122:7,
125:10, 169:6,

169:11, 171:15,
206:10, 206:12,
206:15, 206:16,
206:22, 207:1,
207:2, 208:3,
208:5, 208:10,
215:22, 228:14,
229:18
**objectively**
164:22
**observation**
167:18
**observed**
121:4, 145:18,
163:22, 171:16,
171:18
**observes**
172:5
**observing**
171:23
**obtain**
154:12, 154:19,
155:5, 155:12
**obtained**
9:1, 146:20
**obviously**
35:1, 41:6,
82:5, 84:21,
143:19, 147:14,
156:22, 158:4,
190:2, 191:17,
194:8, 206:5,
206:19, 224:11
**occasion**
68:10, 68:16,
69:8, 69:12,
218:1
**occasional**
40:12, 40:13
**occasions**
24:10, 143:11,
150:16, 151:3,
151:12, 151:15,
151:20, 152:4
**occiput**
21:23
**occur**
29:20, 30:12,

30:13, 30:15,
40:3, 66:24
**occurred**
73:8, 89:3,
211:14
**occurs**
30:21
**october**
213:4
**off**
8:9, 8:11,
30:4, 31:16,
31:20, 38:4,
38:18, 44:22,
45:10, 66:19,
68:24, 116:10,
126:12, 140:19,
140:20, 205:18,
221:7, 222:3,
223:22, 223:23,
224:1, 225:2
**offer**
77:20, 79:1,
79:18, 84:1,
86:1, 86:8,
91:11, 91:20,
98:24, 108:11,
111:23, 117:13,
131:19, 152:18,
152:20, 153:15
**offered**
75:2, 76:12,
76:23, 77:2,
77:15, 77:18,
79:18, 79:20,
85:5, 87:7,
87:10, 90:16,
94:9, 94:16,
98:11, 98:22,
99:22, 100:1,
100:3, 102:22,
120:11, 126:1,
152:12
**offering**
76:4, 76:24
**offhand**
61:21, 62:10,
77:10, 86:16,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

93

87:14, 88:21,
88:23, 90:16,
96:3, 97:10,
98:8, 99:21,
103:24, 107:18,
110:13, 111:12,
113:12, 114:11,
127:1, 147:18
**office**
4:21, 15:10,
15:13, 17:20,
17:23, 17:24,
19:3, 20:9,
21:2, 76:8,
97:3, 97:4,
102:16, 104:3,
105:16, 106:14,
118:13, 118:20,
118:21, 118:24,
119:4, 119:10,
119:14, 119:17,
119:18, 119:19,
119:22, 220:12
**official**
128:21, 129:8
**officially**
138:3
**oh**
112:6, 170:12
**old**
13:19, 18:3,
18:14, 154:7
**once**
68:23, 197:17
**oncology**
11:15
**one**
6:15, 8:3, 8:4,
12:3, 16:18,
28:9, 30:4,
39:2, 46:1,
46:16, 50:19,
51:7, 52:3,
54:7, 56:22,
57:5, 61:22,
62:3, 62:7,
76:18, 77:9,
79:2, 83:18,

83:21, 87:7,
87:12, 87:14,
88:10, 88:19,
90:2, 90:3,
90:10, 92:15,
94:15, 103:12,
106:10, 107:12,
108:17, 110:12,
110:15, 113:4,
113:7, 113:12,
115:8, 137:17,
140:7, 143:10,
147:13, 149:24,
156:5, 156:8,
156:14, 156:16,
161:1, 161:11,
162:14, 167:3,
171:8, 173:21,
176:14, 176:23,
191:2, 198:24,
201:9, 203:23,
203:24, 210:15,
212:23, 213:7,
219:1, 227:4,
227:5
**ones**
62:10
**only**
8:14, 14:22,
16:16, 38:15,
41:19, 84:17,
103:1, 103:17,
108:5, 110:12,
110:15, 110:16,
117:22, 127:15,
147:19, 153:3,
186:8, 194:2,
196:17, 201:23,
213:3, 218:14,
224:18, 228:19
**open**
45:11, 45:16,
119:14, 140:10,
200:18, 210:14
**opened**
13:23, 14:4
**opening**
45:18, 140:15,

140:18
**openminded**
102:19, 215:17,
215:19, 230:5
**operate**
73:21, 80:19,
82:16
**operated**
48:24
**operating**
48:6
**opine**
111:11, 196:10,
205:13, 210:24
**opined**
197:20, 213:10
**opportunity**
78:24, 79:5,
147:20, 147:24,
162:8, 178:14
**opposed**
30:18, 68:5,
117:11, 229:1
**opposite**
66:21, 66:22
**optimally**
224:5
**oral**
64:7
**order**
61:14, 71:21,
80:1, 80:19,
80:23, 82:2,
86:7, 129:19,
129:22, 135:3,
188:11, 189:20,
190:4, 190:7,
191:13, 191:23,
203:15, 207:11,
226:24
**ordered**
169:4, 227:15,
227:16
**ordering**
169:3
**orleans**
12:21
**orthopedic**
5:17, 10:15,

10:18, 11:1,
11:15, 11:20,
12:14, 14:1,
14:6, 14:7,
14:20, 14:21,
15:4, 16:10,
16:11, 17:4,
18:1, 18:2,
18:16, 19:9,
20:11, 21:19,
23:20, 24:9,
24:14, 56:7,
56:20, 63:10,
63:12, 63:13,
64:9, 64:16,
64:21, 64:23,
64:24, 66:13,
67:17, 68:6,
68:8, 71:2,
137:20, 153:8,
193:13
**orthopedics**
10:19, 11:5,
11:10, 11:13,
11:16, 12:2,
12:17, 14:11,
16:14, 64:5,
217:16
**osteophytes**
34:17
**other**
17:4, 18:22,
19:15, 20:11,
20:15, 23:24,
24:22, 30:4,
34:10, 34:13,
35:5, 40:23,
41:6, 41:7,
41:23, 42:2,
42:3, 43:19,
59:4, 62:9,
62:10, 62:12,
64:11, 64:15,
65:21, 66:12,
73:23, 75:6,
76:24, 79:11,
79:23, 80:2,
81:24, 82:1,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                    94

83:18, 83:21,
84:24, 85:18,
85:24, 86:6,
86:15, 87:7,
87:22, 94:15,
99:21, 101:7,
103:19, 103:21,
103:22, 107:12,
110:24, 111:9,
111:24, 112:11,
112:24, 113:4,
117:23, 118:7,
128:6, 128:7,
129:1, 134:10,
135:9, 138:14,
141:9, 141:12,
141:13, 143:17,
146:12, 148:4,
150:23, 151:15,
152:1, 152:17,
152:20, 152:23,
153:3, 153:10,
154:15, 154:24,
156:6, 156:16,
162:14, 165:5,
174:23, 176:8,
194:7, 201:9,
201:21, 201:23,
203:16, 203:18,
205:5, 208:13,
210:3
**others**
59:7, 147:17
**otherwise**
7:1, 159:4,
232:13
**our**
28:15, 28:17,
104:10
**out**
22:24, 29:11,
31:22, 38:12,
78:18, 78:20,
81:21, 111:3,
114:6, 114:22,
125:23, 126:3,
127:22, 128:10,
132:16, 137:4,

140:16, 160:9,
194:3, 194:7,
203:10, 204:9
**outcome**
127:3, 128:3,
232:13
**outer**
22:5, 32:17
**outlined**
133:15, 133:19,
184:15
**outpatient**
14:15
**outside**
28:10, 29:11,
66:23, 119:1,
119:6, 167:15,
183:5, 183:8,
214:7, 226:9,
226:10
**over**
5:24, 38:5,
38:17, 47:23,
73:22, 104:1,
115:19, 116:12,
127:9, 140:8,
150:19, 150:20,
182:21, 183:18,
209:13, 209:18,
212:13, 226:16
**over-the-counter**
155:1, 155:13
**overused**
27:18, 221:24
**own**
14:4, 128:10,
149:6, 209:8

---

**P**

**p-e-t-k-o-v-i-c-h**
5:16
**page**
2:1, 2:8,
41:22, 59:10,
64:10, 105:2,
105:8, 105:11,
105:17, 107:10,
117:16, 132:24,

133:12, 138:21,
139:2, 139:6,
139:9, 142:12,
143:7, 143:9,
143:24, 145:3,
145:15, 146:8,
148:14, 150:13,
155:17, 159:20,
160:13, 160:19,
166:14, 168:7,
168:8, 171:2,
171:3, 171:5,
171:22, 172:1,
172:2, 173:23,
173:24, 174:3,
176:1, 177:12,
180:2, 180:12,
189:4, 190:20,
193:11, 194:10,
199:17, 204:15,
209:22, 219:8,
219:13, 219:17,
219:21
**pages**
110:11, 136:10,
136:14, 136:17,
136:20, 138:17,
193:9, 209:19
**paid**
85:24, 86:7,
115:24, 116:24,
117:2, 117:3,
117:4, 128:7,
128:10, 152:18
**pain**
35:20, 36:8,
37:24, 38:7,
38:8, 38:22,
50:15, 158:20,
159:8, 160:2,
161:6, 161:15,
162:2, 162:12,
166:23, 167:5,
167:10, 167:13,
167:19, 167:22,
168:11, 168:20,
179:2, 179:4,
218:9, 220:3,

220:14, 220:24,
226:24
**pale**
212:21
**palpation**
163:20
**paper**
221:22
**paragraph**
105:15, 138:20,
139:12, 141:14,
142:10, 144:1,
144:2, 144:19,
145:5, 146:5,
148:14, 149:15,
149:20, 150:13,
150:14, 161:4,
161:11, 174:3,
176:1, 176:10,
180:12, 194:12
**paragraphs**
173:16
**part**
11:5, 12:15,
14:9, 16:16,
17:6, 18:4,
19:3, 20:9,
23:8, 24:1,
24:2, 24:9,
24:11, 24:23,
26:7, 26:9,
28:13, 30:7,
39:1, 52:1,
52:22, 53:1,
53:3, 53:4,
53:18, 53:22,
54:11, 54:15,
54:18, 55:16,
55:18, 56:4,
56:14, 56:15,
57:5, 57:14,
65:23, 69:1,
69:23, 72:11,
81:11, 92:7,
92:10, 95:5,
111:18, 120:24,
121:22, 121:23,
121:24, 129:18,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

95

130:13, 130:14, 130:15, 137:3, 138:2, 138:6, 141:2, 142:21, 143:19, 143:22, 146:13, 147:7, 147:13, 150:6, 171:9, 176:2, 176:7, 178:21, 204:22, 208:6, 224:17, 224:18, 228:17
**partially**
18:11, 47:6
**participate**
115:24
**participated**
96:2
**particular**
11:1, 61:11, 101:15, 101:16, 101:18, 111:7
**parties**
92:15, 102:13, 108:18, 232:9, 232:12
**pass**
60:1, 61:14
**passes**
60:4
**past**
15:7, 15:12, 19:17, 67:5, 96:1, 96:11, 97:24, 112:1, 112:5, 112:6, 112:12, 112:14, 112:19, 112:24, 113:2, 147:7, 147:9, 147:10, 150:7, 176:7
**patella**
58:8
**patent**
200:18
**pathology**
62:1, 91:13
**patient**
20:21, 33:9,

36:6, 36:10, 36:12, 36:14, 36:20, 37:2, 37:6, 37:13, 38:21, 40:15, 42:23, 43:2, 44:9, 44:14, 47:17, 48:4, 48:10, 48:24, 51:19, 53:10, 53:13, 54:1, 54:6, 54:11, 54:20, 55:22, 56:8, 56:18, 58:12, 58:16, 65:21, 69:13, 71:21, 72:15, 80:1, 81:7, 81:16, 82:3, 83:1, 94:18, 98:13, 99:5, 101:16, 112:12, 124:17, 127:11, 130:8, 153:16, 153:18, 160:2, 164:22, 166:15, 166:16, 166:23, 167:4, 167:5, 169:1, 178:22, 197:23, 198:15, 212:12, 212:14, 213:6, 218:1, 220:1, 227:14
**patient's**
53:24, 54:7, 68:11, 68:16, 68:20, 70:22, 72:20, 77:4, 79:6, 79:7, 79:23, 80:2, 80:14, 80:17, 80:23, 82:1, 85:6, 86:3, 88:15, 89:20, 90:12, 121:1, 162:19, 163:3, 163:10, 164:23, 167:4, 169:5,

169:11, 222:23
**patients**
13:13, 17:24, 18:3, 18:7, 18:9, 18:14, 18:17, 18:21, 19:7, 19:8, 19:19, 20:12, 21:2, 35:13, 43:7, 50:19, 51:7, 68:9, 68:14, 71:7, 73:5, 76:1, 76:3, 76:8, 79:2, 84:1, 84:10, 86:17, 93:3, 117:6, 118:3, 118:8, 119:14, 120:17, 153:23, 154:7, 221:7, 227:10
**pause**
83:6, 85:9, 106:23, 220:1, 220:8
**pawlak**
109:2
**pay**
102:17, 226:11
**payment**
64:11
**pays**
92:13
**pediatric**
11:15, 25:20
**pediatrics**
11:4, 11:10, 25:20
**pending**
3:20, 183:7
**pension**
92:20, 92:21
**people**
17:24, 18:14, 19:14, 19:15, 19:22, 20:14, 20:16, 20:18, 20:19, 20:23,

22:3, 25:17, 25:19, 25:20, 28:18, 29:5, 30:8, 32:21, 32:22, 35:18, 35:23, 41:16, 42:12, 43:4, 43:10, 43:11, 43:12, 43:14, 43:16, 45:12, 47:7, 47:8, 47:20, 48:18, 49:4, 60:10, 62:1, 73:14, 73:16, 73:17, 73:23, 75:8, 76:10, 76:19, 84:10, 86:23, 87:2, 87:9, 89:7, 89:21, 89:22, 90:4, 92:23, 92:24, 93:19, 94:2, 103:17, 104:6, 104:7, 105:12, 108:12, 113:11, 114:3, 114:7, 114:10, 114:22, 117:5, 153:2, 154:7, 154:8, 168:19, 182:18, 193:1, 218:13, 218:20, 222:1, 222:2, 224:4, 227:3, 227:4
**people's**
87:13, 163:5
**per**
17:15, 17:16
**percent**
16:19, 16:20, 16:21, 18:5, 95:8, 111:19, 117:22, 118:2, 118:3, 118:6, 118:7
**percentage**
17:9, 19:4,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

96

19:6, 19:8, 93:12, 93:17, 95:2, 95:9, 102:9, 102:10, 120:8

**percentages**
95:12

**percocet**
220:21

**percodan**
220:20

**perfect**
207:11

**perform**
15:3, 15:4, 17:14, 20:11, 23:9, 23:11, 23:17, 24:2, 49:13, 49:17, 51:24, 66:1, 66:2, 66:5, 67:14, 70:20, 80:1, 102:14, 111:20, 115:9, 117:2, 121:20, 206:20, 215:22

**performed**
15:16, 16:2, 20:17, 20:20, 23:6, 24:22, 48:10, 49:11, 49:12, 49:20, 62:24, 67:9, 67:10, 86:23, 87:2, 97:5, 99:24, 100:4, 121:6, 121:7, 124:13, 150:3, 176:16, 176:22, 197:5, 223:15, 227:8

**performing**
16:11, 17:19, 18:5, 19:18, 23:4, 66:6, 68:9, 79:16, 92:8, 95:6, 111:19, 118:4,

129:19

**performs**
23:22

**perhaps**
39:22

**period**
14:10, 15:22, 29:1, 37:12, 40:10, 41:5, 60:12, 63:1, 73:22, 75:22, 87:4, 104:1, 138:9, 143:21, 156:24, 174:15, 211:5

**peripheral**
37:17, 55:4, 55:11, 55:12, 178:17, 179:15

**permanent**
212:18

**persistent**
192:12, 202:16

**person**
16:17, 60:4, 60:12, 60:20, 62:3, 77:9, 79:19, 82:9, 91:8, 101:7, 104:18, 121:20, 125:16, 198:19

**person's**
72:2, 91:12, 91:23

**personally**
142:22

**personnel**
149:16

**peter**
134:8

**petkovich**
1:13, 3:15, 5:3, 5:8, 5:16, 5:18, 8:9, 14:1, 14:20, 14:21, 131:24, 147:19, 152:17, 225:14

**phrase**
27:7, 37:22,

39:2, 67:7, 190:19

**phrases**
139:17

**phrasing**
36:5

**physiatrist**
156:11, 156:19

**physical**
51:14, 51:18, 51:23, 121:20, 121:23, 122:7, 122:23, 127:22, 162:23, 163:19, 164:8, 169:7, 171:13, 177:9, 177:20, 187:7, 190:15, 190:17, 206:17, 208:3, 215:22, 227:12, 228:14, 229:19

**physician**
5:16, 53:23, 54:5, 55:22, 56:20, 73:1, 79:12, 79:18, 79:22, 84:15, 103:16, 117:11, 120:18, 120:20, 142:15, 143:2, 148:24, 153:24, 156:18, 162:18, 163:3, 163:10, 164:22, 169:5, 171:16, 184:13, 186:15, 190:2, 227:8

**physicians**
18:22, 56:7, 85:18, 103:21, 122:21, 123:1, 123:4, 156:1, 157:16, 159:3, 174:23, 230:21

**physiology**
211:4

**pianist**
62:6

**picks**
125:17

**pill**
220:14

**pills**
220:24

**pin**
140:7

**pinprick**
52:12, 54:9

**pinwheel**
164:24

**pipe**
29:24, 45:12, 45:14, 45:16

**place**
28:8, 142:6, 179:12

**places**
179:5

**plain**
142:3

**plaintiff**
1:5, 1:14, 3:7, 3:23, 4:2, 5:2, 5:10, 5:20, 7:8, 8:5, 92:19, 95:18, 102:10, 103:11, 103:15, 105:21, 106:5, 107:14, 107:21, 108:23, 130:16, 160:10, 189:7, 197:1, 199:22, 202:9, 205:13

**plaintiff's**
2:8, 84:23, 102:18, 103:7

**plaintiffs**
144:14

**plan**
10:6, 51:16, 207:24

**planned**
9:19

**planning**
9:17

**plate**
141:9

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

97

**please**
5:13, 6:3,
6:11, 21:13,
68:13, 69:17,
149:23, 189:15,
196:9, 197:11,
197:18, 229:16
**plenty**
67:24, 68:1
**plexus**
55:18
**plus**
17:9, 143:20
**pocket**
128:11
**point**
12:7, 16:18,
26:20, 27:16,
38:15, 77:13,
82:8, 103:10,
113:14, 124:8,
149:23, 152:11,
156:18, 203:4,
203:8, 225:1,
226:7, 227:11
**police**
92:21
**policy**
127:9
**poor**
217:18
**poorer**
71:6
**portion**
21:6, 22:5,
22:19, 22:20,
122:1, 171:12,
184:3, 199:15,
219:17
**position**
47:23, 141:17,
141:24
**positive**
205:19
**possible**
32:4, 41:14,
54:23, 55:24,
56:10, 56:22,

71:10, 85:1,
85:3
**possibly**
69:21
**post-op**
20:23, 213:6,
213:21
**posterior**
30:17, 30:24,
34:3, 34:12,
35:9, 35:10,
44:20, 140:17
**posteriorly**
30:3, 30:16,
30:22, 31:3,
31:23, 32:2,
32:9, 32:23,
34:7, 44:15,
59:1, 70:8
**postoperative**
196:20, 200:16,
212:22, 223:22
**postoperatively**
81:8
**postsurgical**
81:12
**pounds**
177:20, 178:6,
178:7, 178:9
**practice**
7:19, 8:22,
12:12, 12:16,
13:3, 13:10,
13:18, 13:19,
13:20, 13:21,
13:22, 13:23,
14:2, 14:4,
14:5, 14:18,
14:24, 15:2,
15:10, 15:13,
16:18, 17:2,
17:9, 17:20,
17:21, 17:22,
17:23, 18:4,
18:5, 18:12,
18:21, 19:3,
20:9, 21:2,
24:12, 24:20,

43:3, 50:18,
51:10, 62:22,
62:23, 63:2,
63:4, 63:21,
64:4, 64:6,
66:4, 69:9,
69:12, 71:20,
72:12, 74:4,
74:9, 79:5,
84:9, 95:6,
95:9, 111:18,
118:2, 118:6,
118:15, 128:15,
128:24, 129:12,
142:24, 146:13,
154:5, 222:12,
222:22
**practicing**
13:24
**preoperatively**
80:9
**preparation**
161:2
**prepare**
135:4, 160:17
**prepared**
88:6, 88:9,
160:22
**preparing**
135:18
**prerogative**
191:20
**prescribe**
169:1, 169:11
**prescribed**
169:8, 169:14
**prescribing**
169:5
**prescription**
220:17
**presence**
34:22, 35:4,
35:11, 42:17,
46:12, 46:21,
47:3
**present**
11:13, 64:7,
95:9, 145:18,

161:5, 194:14
**presentations**
38:20
**presently**
15:14, 18:17,
19:21
**presents**
188:1
**president**
18:15
**pressed**
47:24
**pressure**
45:10, 68:24,
140:20, 151:22
**pretty**
17:7, 28:4,
65:20, 138:18,
153:12, 153:13,
162:5, 165:5,
165:6, 195:20,
218:21
**previous**
206:23
**previously**
95:24
**primarily**
14:11, 15:10,
15:13, 16:12,
17:5, 17:23,
26:5, 26:22,
195:4
**primary**
56:20
**prior**
63:1, 88:10,
97:23, 98:2,
98:7, 98:9,
100:9, 104:15,
133:17, 135:3,
148:3, 152:10,
152:13, 171:20,
194:14, 209:24,
216:20
**prison**
143:3, 143:6,
149:17, 150:15,
153:2, 173:22,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

98

197:23, 198:11,
198:15
**prison's**
151:20
**prisoner**
113:21, 153:21,
155:5
**prisoners**
103:7, 153:3,
153:5, 154:11,
154:13, 154:19,
154:23
**private**
12:12, 13:10,
13:18, 13:19,
24:20, 63:21
**privileged**
101:3, 101:12,
106:24, 107:3
**privileges**
65:14, 65:18,
65:19, 65:20,
65:22, 65:23
**probably**
5:23, 17:9,
18:4, 27:17,
63:1, 74:23,
112:6, 115:10,
139:10, 224:22,
224:24
**problem**
68:22, 69:21,
75:9, 81:21,
83:12, 91:12,
178:23, 178:24,
179:3, 185:13,
211:7
**problems**
27:1, 41:8,
41:14, 69:23,
178:19, 221:22
**procedure**
16:1, 24:16,
49:24, 50:1,
141:3, 166:4,
166:10, 196:1,
218:12, 218:15,
221:6, 222:2

**procedures**
14:15, 15:8,
15:11, 15:21,
17:15, 23:14,
24:14, 26:1,
167:11
**proceedings**
8:12, 55:8,
92:5, 145:1
**process**
60:6, 64:8,
66:18, 66:24,
69:4, 73:12,
75:16, 83:11,
130:15, 207:24,
215:19, 224:18
**produced**
3:16, 5:9,
7:12, 87:19,
87:21, 95:23
**products**
110:2
**professional**
154:24
**program**
11:6, 11:20,
12:24, 25:6,
63:24
**progresses**
81:7
**progressive**
41:11
**prohibit**
101:18
**prolonged**
199:11, 212:24
**pronounce**
157:5, 159:17
**protrude**
29:4, 29:15,
29:24, 30:3,
30:4, 31:1,
31:13, 31:19,
31:20
**protruded**
28:9, 29:11
**protrudes**
31:3

**protrusion**
28:3, 28:23,
29:20, 30:6,
30:23, 31:7,
31:18, 72:6
**protrusions**
90:5
**provide**
7:6, 96:16,
111:17, 143:6,
153:21, 214:2
**provided**
96:10, 153:17,
204:3, 204:4,
204:5, 213:14
**provider**
18:10
**providers**
100:4, 103:4
**provides**
181:4
**providing**
112:2
**public**
232:3
**publication**
126:4
**publications**
125:19, 125:22
**published**
88:1, 115:2
**pull**
57:13
**pulposus**
22:5, 27:13
**purport**
77:20
**purpose**
73:4, 144:4,
195:24
**purposes**
36:18
**pursuant**
87:20, 87:21
**pursue**
13:9
**push**
57:13

**put**
122:14, 123:1,
123:2, 140:3,
140:7, 140:8,
141:5, 141:8,
141:10, 161:23,
162:8, 162:15,
162:22, 167:20,
184:14, 184:15,
203:2, 205:19,
206:17, 210:3,
215:23, 224:6
**putting**
51:15, 124:23,
125:4, 162:23,
195:13, 196:19,
206:15

———— Q ————
**qualified**
23:17, 49:13,
49:17, 67:13,
78:2, 84:19,
84:23, 142:18,
143:2, 143:5,
157:16, 159:5,
159:10, 159:11,
182:18, 182:19
**quality**
125:22, 200:24
**questioning**
104:18, 214:7,
225:6
**questions**
2:1, 6:2, 6:24,
35:16, 51:24,
61:7, 61:10,
61:12, 61:17,
61:18, 61:19,
61:22, 62:7,
62:9, 76:20,
84:10, 84:11,
104:9, 124:20,
134:22, 139:16,
147:20, 168:6,
204:9, 207:6,
207:15, 226:5,
228:4, 231:3

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

99

| | | | |
|---|---|---|---|
| **quickly** 75:23 | **ramping** 17:12, 17:18 | **real** 127:24 | 99:23, 100:12, 100:16, 131:2, |
| **quite** 48:8, 56:17, 66:8, 85:2, 97:2, 97:10, 106:2, 151:10, 154:14, 155:23, 160:2, 161:6, 161:15, 175:6, 227:2 | **range** 36:16, 52:6, 58:17, 58:22 **rare** 106:10 **rather** 66:17, 69:4, 73:12, 121:7 **re-establish** 75:20 **reach** | **really** 13:5, 13:6, 14:16, 16:23, 19:10, 22:16, 25:9, 28:15, 30:1, 39:3, 39:15, 42:15, 58:10, 66:7, 66:14, 67:15, 75:12, 82:4, | 147:21, 162:10, 180:4, 180:6, 190:21, 190:24, 194:18, 196:12, 230:12 **reasoning** 223:7 **reasons** 15:13, 16:8, 49:3, 80:4, |
| **quotation** 208:23 **quote** 60:8, 75:19, 76:4, 144:2, 190:22, 220:14, 220:16 | 33:12, 34:4, 143:4, 205:1 **reached** 132:10, 159:15, 180:3, 186:21, 190:20, 194:17, 196:11, 230:11 | 97:3, 102:15, 102:21, 103:14, 116:2, 147:9, 147:10, 150:5, 150:11, 151:4, 152:14, 178:1, 179:3, 195:12, 206:1, 216:13, | 88:21, 94:2, 94:3, 110:15, 151:3, 182:11, 182:20, 227:5, 227:6 **recall** 14:22, 100:15, 100:21, 107:17, |
| **quoting** 208:17, 208:22, 208:24 | **reaches** 224:7 **reaching** | 223:21 **reask** 205:10 | 108:2, 108:7, 108:21, 110:11, 147:18, 148:2, |
| **R** | 174:16 **read** | **reason** 45:18, 60:13, | 148:6, 153:19, 153:22, 158:18, |
| **radialis** 58:3, 58:5 **radicular** 37:19, 37:22, 37:24, 38:7, 39:1, 39:2, 39:3, 168:19 **radiographic** 72:10, 85:20, 85:21, 130:6, 130:9, 130:15, 133:24, 201:6, 208:20 | 59:24, 81:3, 104:23, 132:1, 132:4, 143:12, 161:8, 174:13, 183:12, 184:1, 184:3, 184:13, 196:21, 196:24, 197:19, 198:1, 198:7, 198:8, 217:10, 220:18, 221:21, 222:6, 222:8, 225:7, | 74:11, 84:17, 91:5, 97:6, 97:9, 97:11, 101:1, 108:5, 108:15, 115:15, 115:22, 120:1, 127:15, 128:19, 129:11, 129:12, 129:16, 167:20, 173:20, 179:18, 179:22, 197:21, 224:19 | 170:10, 172:12, 201:23, 217:1, 217:2, 229:4 **receive** 20:11, 62:11, 92:10, 134:19 **received** 49:18, 105:16, 132:5, 133:6, 133:8, 133:12, 134:6, 134:7, |
| **radiologist** 129:23, 223:23, 224:19 | 231:5 **reading** 105:7, 109:18, | **reasonable** 75:3, 76:5, | 134:8, 135:10, 148:15, 198:10, 204:1, 216:13 |
| **radiology** 141:15, 142:7 **raise** 58:13 **raised** 121:1, 150:22 **raises** 148:20 **raising** 52:20 | 145:19, 167:1, 168:2, 180:11, 181:15, 227:21 **reads** 219:24 **ready** 213:23 **reaffirms** 174:22, 190:14 | 76:13, 76:16, 76:18, 76:23, 77:1, 77:3, 78:4, 85:5, 86:2, 86:8, 87:23, 88:14, 89:18, 90:11, 91:7, 94:9, 94:16, 98:12, | **receiving** 65:7 **recent** 96:5 **recently** 20:12, 20:15, 66:18, 79:20 **recess** 55:7, 92:4, |

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

100

144:24
**recieve**
134:2
**recite**
136:14
**recommend**
167:5, 189:22, 192:15, 193:3
**recommendations**
166:22, 167:2
**reconstructive**
11:14, 26:22
**record**
5:14, 5:20, 6:12, 6:20, 8:7, 8:10, 8:12, 18:6, 19:5, 27:8, 81:8, 95:7, 96:9, 96:15, 101:14, 102:2, 106:15, 108:10, 111:20, 118:5, 134:7, 135:15, 146:19, 146:24, 148:9, 148:10, 149:7, 151:6, 161:9, 162:3, 162:4, 162:5, 162:7, 163:17, 165:8, 171:12, 172:20, 176:2, 176:15, 178:6, 180:8, 182:6, 188:15, 195:5, 208:24, 218:23, 220:6, 220:11
**recorded**
81:4, 184:4
**records**
2:15, 2:16, 18:8, 94:20, 94:21, 97:3, 98:23, 100:2, 104:4, 105:6, 105:24, 106:17, 106:19, 109:5, 109:7, 109:9,

114:10, 124:24, 125:15, 131:19, 131:21, 132:6, 132:10, 133:21, 135:9, 136:23, 137:11, 143:21, 145:6, 145:9, 145:23, 147:16, 154:15, 154:16, 155:24, 156:4, 156:14, 160:14, 160:15, 160:16, 166:2, 169:21, 169:23, 170:2, 172:24, 173:1, 173:10, 173:13, 175:3, 176:13, 176:18, 176:20, 177:3, 177:5, 177:6, 178:13, 180:13, 180:18, 180:21, 180:22, 181:1, 181:8, 182:12, 182:13, 183:20, 186:5, 186:9, 189:3, 189:13, 192:7, 193:9, 204:24, 205:6, 206:21, 208:17, 208:20, 209:7, 209:13, 209:16, 209:21, 213:14, 214:22, 215:4, 216:13, 217:21, 218:24, 219:7, 221:10, 222:10, 222:20, 222:23, 223:11, 223:12, 226:21
**recover**
72:17, 218:20
**recovered**
155:19, 155:22, 156:2, 166:10, 210:17
**recovering**
166:16
**recovers**
211:8

**recovery**
68:20, 68:24, 69:3, 70:12, 70:14, 70:24, 72:2, 72:16, 72:20, 73:11, 75:15, 80:14, 81:9, 166:3, 166:19, 175:9, 175:17, 194:13, 195:2, 195:4, 195:7, 195:11, 195:12, 195:18, 195:19, 196:7, 196:10, 196:14, 196:18, 199:11, 199:12, 201:3, 201:7, 201:22, 210:5, 210:7, 210:12, 210:21, 210:23, 210:24, 212:13, 212:17, 218:13, 223:21, 230:6, 230:9
**redirect**
2:5, 228:6
**reduced**
232:7
**redundant**
123:2, 124:19, 125:4
**refer**
39:3, 106:14, 141:23, 141:24
**referral**
17:7
**referrals**
20:11
**referred**
18:10, 18:11, 18:22, 45:2, 66:10, 66:12, 66:13, 81:3, 142:2, 184:3, 193:13
**referring**
21:10, 39:18, 39:19, 39:20,

43:18, 141:15
**refers**
30:20, 33:15, 171:12, 171:15
**refills**
220:13
**reflex**
69:21, 165:9, 165:11
**reflexes**
52:11, 53:20, 57:23, 58:1, 58:4, 58:8, 58:9, 58:10, 228:16
**refused**
101:1, 101:17
**regard**
36:1, 73:15, 90:7, 191:7, 207:13, 210:4, 215:1, 217:4, 217:20
**regarding**
131:10, 138:23, 168:10, 204:14
**regardless**
82:6, 102:23, 126:5
**regards**
206:9
**regional**
138:23, 148:12, 149:7, 175:21, 176:3, 194:15, 229:8
**rejoin**
13:19
**rejuvenating**
75:23
**related**
16:19, 16:20, 16:21, 17:4, 17:5, 17:10, 18:1, 19:7, 19:9, 19:14, 53:5, 53:6, 91:23, 108:8,

126:23, 150:23, 175:7, 232:9
**relates**
136:18, 173:17
**relative**
42:15, 62:3, 78:11, 78:13, 79:15, 91:15, 122:20, 195:8, 211:11, 232:11
**relatively**
79:20
**released**
148:23
**relevance**
142:12, 142:14, 146:8, 146:12, 150:22, 173:18, 174:5, 176:8
**relevant**
69:13, 70:21, 121:17, 122:2, 123:3, 124:12, 125:6, 125:9, 139:4, 139:6, 147:9, 147:10, 147:13, 147:17, 148:3, 150:6, 150:8, 162:9, 162:13, 162:15, 165:15, 170:6, 172:10, 172:11, 174:7, 174:10, 216:2
**relied**
131:13, 174:16, 186:8
**relies**
186:10
**rely**
78:1, 136:21, 137:4, 138:16, 157:2, 174:18, 182:9, 183:17
**remain**
64:12
**remarkable**
210:6

**remember**
25:2, 25:3, 25:6, 25:8, 32:14, 61:9, 86:17, 87:13, 87:14, 90:3, 90:9, 90:15, 90:17, 90:20, 90:24, 98:5, 98:8, 103:3, 103:5, 103:24, 104:1, 106:21, 107:16, 108:5, 108:15, 109:1, 109:4, 109:14, 109:21, 110:1, 110:3, 110:5, 110:7, 110:9, 110:12, 110:15, 110:16, 111:3, 111:12, 111:15, 113:10, 113:11, 113:14, 113:19, 113:21, 125:16, 126:12, 127:11, 127:15, 127:16, 127:17, 155:23, 155:24, 160:6, 160:7, 160:8, 170:4, 171:10, 172:17, 177:3, 198:6, 213:11, 216:8, 216:14, 217:3, 227:21
**rendered**
152:9
**renders**
42:4
**repeat**
36:4, 68:13, 81:1, 103:9, 183:9
**repeated**
84:3, 105:5
**repeatedly**
190:11, 191:3
**repeating**
110:13

**rephrase**
6:4, 6:6, 46:17
**reported**
41:24, 50:19, 51:7, 51:11, 51:19, 145:13, 158:6, 158:10, 180:8, 181:13, 181:22, 182:14, 184:19, 185:3, 185:17, 187:11
**reporter**
3:19, 4:27, 5:5, 81:4, 130:19, 144:21, 184:4, 189:11, 202:12, 225:7, 231:4, 232:1, 232:3
**reporter's**
95:21
**reporting**
181:4
**reports**
48:4, 88:12, 88:13, 100:17, 126:2, 130:1, 130:2, 130:11, 132:17, 135:7, 143:20, 145:19, 157:21, 158:3, 163:14, 172:13, 173:1, 181:2, 205:24, 208:22, 210:4
**represent**
104:13, 105:3, 105:4, 105:14, 116:9
**representatives**
92:22
**represented**
106:4, 106:9
**representing**
103:7, 108:1, 108:20
**represents**
117:21

**reputation**
18:13
**request**
7:20, 109:11
**requests**
92:14
**require**
46:2, 64:11, 64:14, 64:18, 123:22
**required**
43:9, 43:16, 44:16, 47:5, 49:14, 53:15, 54:10, 61:13, 70:19, 71:21, 72:12, 79:12, 80:1, 82:1, 144:6, 203:9
**requires**
53:1, 53:19, 53:23, 54:5, 59:23, 96:9, 122:4, 122:11, 122:17, 123:10, 123:12, 123:13, 123:17, 124:6, 124:12, 124:16, 124:21
**research**
62:12
**residency**
9:12, 9:23, 10:15, 10:24, 11:2, 11:3, 11:6, 11:8, 11:20, 12:7, 12:10, 12:11, 24:3, 24:10, 63:24, 64:2, 64:3, 137:9, 137:14
**resident**
9:17, 9:18, 11:20, 13:2, 137:19, 138:12, 138:13, 153:4, 153:7

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

102

**residents**
153:8
**residual**
71:14, 202:1,
202:5, 213:20,
215:18
**resistence**
57:18
**resolved**
70:23
**resonance**
58:24
**respect**
13:8, 149:13
**respectfully**
77:14
**respond**
195:12
**responded**
51:11
**response**
51:19, 76:3,
79:7, 79:23,
167:15, 183:10,
225:6
**rest**
31:8, 64:17,
159:12, 159:16,
162:5, 162:7,
180:21, 220:12,
221:12
**restart**
79:3
**restate**
41:21
**resting**
51:3
**restrict**
44:13, 87:18
**restrictions**
157:8, 165:21
**result**
20:21, 66:20,
68:17, 70:22,
71:17, 89:3,
165:9
**results**
121:9

**retained**
83:15, 83:17,
84:14, 85:7,
85:24, 86:7,
87:20, 94:6,
95:4, 99:16,
100:6, 100:10,
102:9, 102:10,
102:11, 102:23,
103:6, 103:11,
103:22, 104:4,
105:19, 106:3,
106:11, 106:12,
107:12, 107:14,
107:21, 107:23,
107:24, 108:12,
108:19, 108:23,
109:12, 109:17,
109:22, 110:1,
110:3, 110:5,
110:7, 110:11,
110:17, 110:18,
110:21, 111:1,
111:4, 111:16,
112:1, 112:11,
112:20, 112:23,
117:11, 117:13,
118:9, 131:5,
152:20, 153:14,
153:15, 216:1,
216:2, 216:6,
216:9
**retract**
140:1
**retracting**
165:4
**retraction**
165:3
**retractor**
140:8, 140:9
**return**
149:3, 149:7,
149:12, 157:8,
165:20
**returned**
13:15, 14:3,
17:2, 149:9
**returning**
81:10

**review**
7:14, 9:20,
18:8, 100:2,
105:23, 106:8,
106:15, 106:19,
108:11, 111:20,
130:1, 130:3,
130:9, 130:22,
131:18, 132:7,
132:10, 133:17,
134:7, 134:8,
134:12, 134:15,
135:2, 135:6,
137:11, 145:8,
145:23, 149:20,
160:1, 166:1,
169:21, 171:9,
173:1, 173:13,
176:20, 180:13,
180:18, 180:21,
180:22, 181:1,
181:19, 192:7,
195:5, 197:10,
199:15, 199:19,
199:21, 200:3,
200:5, 201:5,
208:20, 209:7,
215:4, 222:9,
222:23, 223:10,
226:21
**reviewed**
105:1, 132:11,
132:24, 133:2,
133:15, 134:17,
134:24, 135:7,
135:14, 136:15,
136:23, 145:6,
146:23, 155:10,
156:1, 160:16,
160:17, 161:2,
169:23, 170:2,
171:8, 172:20,
173:10, 176:13,
176:15, 177:20,
178:13, 178:15,
181:16, 182:12,
198:3, 199:13,
199:20, 202:18,

208:18, 209:16,
226:1
**reviewing**
94:21, 109:9,
114:10, 124:24,
135:22, 136:2,
136:5, 136:23,
141:22, 154:15,
160:7, 170:10,
176:17, 187:4,
189:4, 197:17,
216:16, 222:19,
223:12
**reviews**
18:6, 19:6,
95:8, 118:5
**revoked**
128:19, 129:15
**reynolds**
110:2
**ribcage**
21:8
**ridiculous**
127:15, 127:18
**right**
8:21, 16:5,
25:1, 29:23,
30:10, 32:7,
33:20, 33:21,
41:15, 47:19,
70:15, 72:21,
75:24, 78:19,
79:9, 89:6,
89:17, 91:1,
92:22, 93:4,
98:19, 99:2,
108:13, 108:18,
116:9, 118:7,
119:2, 125:7,
137:22, 141:4,
143:12, 143:24,
144:4, 144:8,
144:15, 149:8,
151:19, 154:20,
160:20, 161:13,
161:14, 162:2,
162:10, 164:17,
166:7, 167:1,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

103

167:8, 168:22,
170:7, 171:13,
172:7, 173:22,
175:24, 179:16,
179:20, 180:2,
186:9, 193:8,
195:17, 198:19,
201:8, 201:18,
206:22, 211:2,
211:22, 221:23,
228:20
**ring**
22:6
**road**
3:18
**rock**
66:19
**rocks**
44:1
**role**
93:3
**rollberg**
110:6
**rongeur**
224:6
**roof**
109:23
**room**
10:11, 38:15,
66:11, 138:5,
210:8, 211:12,
229:6
**root**
31:20, 35:19,
37:20, 38:5,
38:11, 38:14,
38:18, 38:19,
39:5, 44:22,
46:5, 46:6,
46:8, 46:19,
47:13, 47:18,
54:16, 54:23,
56:21, 73:18,
89:13, 145:10,
145:17
**roots**
22:23, 23:1,
31:17, 35:17,

38:4, 49:7,
75:19
**rotate**
11:3, 11:6,
24:8
**rotating**
24:7
**rotation**
24:22
**rotations**
24:6, 24:7,
25:3, 25:5, 25:9
**roughly**
19:13
**routine**
54:15, 56:15,
65:20, 81:11,
106:16, 154:5
**routinely**
76:8
**rule**
87:20, 87:21,
88:3, 96:9,
194:3, 194:7,
203:10, 226:10
**ruled**
188:16
**rules**
5:23, 101:4,
101:17
**run**
17:20, 115:18
**running**
226:15

---

**S**

**s**
28:15, 28:17,
28:19, 30:9
**said**
11:11, 15:14,
16:8, 17:18,
17:22, 21:1,
24:1, 26:9,
31:15, 32:12,
40:3, 40:21,
41:2, 41:4,
42:9, 49:3,

53:7, 54:7,
57:5, 57:8,
61:16, 70:6,
72:21, 74:6,
74:11, 78:10,
79:2, 79:10,
80:4, 81:6,
82:5, 84:4,
86:5, 88:22,
90:9, 95:12,
98:2, 98:17,
98:20, 99:2,
100:23, 101:23,
106:6, 106:20,
110:15, 112:22,
114:20, 116:2,
116:3, 122:1,
125:17, 127:16,
135:16, 137:24,
143:1, 151:11,
154:9, 159:3,
160:8, 165:6,
166:9, 170:12,
172:23, 176:9,
180:24, 181:11,
184:22, 186:18,
191:2, 191:3,
191:18, 208:10,
213:11, 222:1,
225:8, 225:10,
225:18, 226:23,
228:18, 229:4,
232:6
**saint**
9:2, 9:7, 9:9,
12:12, 12:13,
13:15, 14:3,
14:7, 18:15,
65:3, 229:6
**same**
12:4, 13:23,
41:22, 46:23,
57:17, 57:21,
60:18, 61:24,
62:1, 65:15,
75:7, 75:11,
81:23, 83:2,
83:3, 84:11,

87:3, 95:10,
154:1, 185:11,
212:5, 212:9,
217:8, 217:12,
220:21, 222:24,
223:4
**sample**
117:15
**sanders**
134:9, 135:12,
136:5
**sarah**
4:3, 5:18,
85:10
**sarah@loevy**
4:8
**sat**
62:17, 96:18,
115:13, 116:11,
117:11, 117:17
**saturdays**
119:21
**saw**
88:23, 142:15,
145:9, 145:12,
145:14, 147:16,
168:3, 180:14,
184:10, 186:5,
198:20, 205:22,
205:23, 207:1,
227:14
**say**
6:11, 19:12,
21:9, 22:15,
26:6, 27:24,
29:6, 30:15,
39:17, 43:17,
50:2, 52:2,
67:6, 73:8,
74:17, 74:20,
74:22, 75:10,
76:7, 76:17,
78:9, 78:10,
93:5, 93:10,
93:24, 94:1,
95:1, 98:10,
99:7, 99:8,
106:7, 111:23,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

104

112:6, 112:14,
112:15, 121:15,
123:9, 127:18,
133:9, 139:9,
139:12, 144:20,
145:8, 152:7,
162:6, 164:18,
165:11, 166:8,
166:18, 167:23,
169:13, 170:17,
174:21, 184:21,
185:20, 186:11,
196:7, 204:24,
209:8, 209:13,
209:18, 213:13,
225:15, 229:24,
230:1, 230:2

**saying**
47:16, 51:1,
61:12, 71:18,
75:11, 76:7,
76:24, 78:12,
112:10, 164:4,
164:12, 164:18,
164:19, 170:18,
170:19, 172:11,
180:18, 180:19,
225:1

**says**
5:10, 114:11,
115:8, 161:15,
165:22, 188:8,
189:19, 219:21,
220:6, 224:20

**scan**
59:6

**scar**
171:19

**schade**
4:13, 104:22,
105:9, 105:18,
105:20, 106:4,
111:7

**schedule**
119:12

**school**
9:7, 137:8,
227:9

**sciatic**
52:21

**scoliosis**
26:1, 26:2

**scope**
167:16, 183:5,
183:8, 205:7,
209:23, 211:24,
212:15, 214:7,
216:22, 217:8,
217:22, 218:10,
221:2, 221:13,
221:19, 222:14,
223:19, 224:16,
226:4, 228:2,
229:12

**scratch**
193:10

**screw**
140:7, 140:8

**screws**
141:9

**second**
6:9, 18:18,
18:23, 19:19,
64:10, 83:7,
144:1, 148:22,
154:2, 154:9,
154:12, 154:19,
161:4, 161:14,
174:3, 203:24,
208:12, 220:2,
220:8

**secondary**
38:8, 41:11,
72:5, 73:17,
90:5, 165:2,
178:17, 179:15,
202:7

**see**
8:14, 11:16,
12:19, 18:14,
18:15, 18:16,
18:17, 18:21,
19:13, 19:15,
20:14, 20:18,
20:22, 30:8,
34:15, 35:18,

36:20, 52:7,
60:18, 61:20,
70:12, 70:13,
72:8, 72:15,
76:8, 80:9,
81:7, 86:16,
89:7, 92:14,
96:5, 113:11,
117:16, 118:3,
118:15, 120:22,
125:16, 131:7,
138:24, 139:17,
141:4, 141:12,
142:3, 142:4,
142:5, 142:6,
145:4, 148:10,
149:22, 153:23,
154:7, 154:9,
154:10, 154:23,
161:4, 161:7,
161:16, 163:13,
163:17, 163:19,
165:1, 165:2,
165:24, 166:21,
167:7, 171:18,
171:22, 171:24,
172:4, 176:21,
177:9, 177:11,
179:11, 179:21,
183:16, 186:18,
188:15, 188:23,
189:15, 192:10,
193:1, 193:15,
197:20, 198:18,
202:16, 203:1,
209:12, 212:14,
212:16, 212:17,
212:19, 213:4,
213:5, 215:17,
221:10

**seeing**
17:24, 20:4,
21:1, 120:17,
155:8, 155:13,
160:7

**seek**
62:19, 62:20,
63:22

**seeking**
18:17, 18:18,
18:23, 19:7,
19:8, 19:15,
19:19, 20:2,
20:8, 101:12,
107:3

**seem**
190:11

**seemed**
151:2

**seen**
20:19, 43:4,
43:7, 43:15,
73:14, 83:24,
84:9, 87:10,
89:21, 89:22,
93:19, 94:2,
99:5, 103:1,
103:17, 104:20,
116:19, 125:15,
130:7, 143:10,
145:11, 147:11,
151:11, 151:15,
151:20, 151:21,
151:22, 152:3,
153:2, 154:1,
154:8, 154:15,
155:5, 156:10,
156:12, 176:3,
193:19, 194:14,
197:8, 214:17,
227:12

**sees**
190:2

**semantics**
12:4, 29:9

**sensation**
52:11, 54:5,
54:8, 81:10,
163:22, 164:4,
164:7, 164:23,
165:3, 165:7,
165:9, 204:21,
228:15

**sensations**
165:12

**sense**
33:2, 174:8

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

105

| | | | |
|---|---|---|---|
| **sensitive** | **settle** | 190:12, 191:6, | 50:15 |
| 195:23 | 127:14, 128:8, | 191:11, 191:17, | **shop** |
| **sensitivity** | 128:11 | 191:21, 192:2, | 60:12, 60:14, |
| 163:14 | **settled** | 192:7, 192:11, | 174:10, 174:14, |
| **sent** | 127:13 | 192:14, 193:5, | 175:5, 175:8 |
| 105:24, 131:22, | **seven** | 193:19, 195:14, | **short** |
| 133:1, 203:10 | 21:22, 21:23, | 200:24, 205:3, | 195:8, 226:16, |
| **sentence** | 117:17, 137:8, | 205:5, 205:23, | 227:21 |
| 148:18, 148:22, | 137:13, 209:22 | 217:5, 225:8, | **shortcut** |
| 149:15, 150:14, | **several** | 225:18, 226:22 | 45:24 |
| 151:13, 152:12, | 5:22, 12:18, | **shah's** | **shorthand** |
| 155:16, 180:18, | 13:3, 14:19, | 142:11, 143:16, | 5:4, 54:6, |
| 180:19, 183:2, | 15:8, 15:20, | 145:9, 145:24, | 232:2 |
| 194:12 | 27:7, 50:2, | 149:23, 180:16, | **shortness** |
| **sentences** | 50:18, 84:3, | 180:19, 180:22, | 188:2 |
| 152:1 | 85:13, 97:23, | 181:1, 181:8, | **should** |
| **separated** | 98:3, 153:5, | 182:9, 182:13, | 7:1, 28:9, |
| 21:14 | 153:8, 211:15 | 182:16, 182:21, | 56:9, 56:21, |
| **separately** | **severe** | 183:18, 183:23, | 66:5, 125:6, |
| 117:2 | 41:11, 43:12, | 186:4, 186:9, | 147:22, 150:2, |
| **separates** | 48:19, 68:9, | 186:12, 186:13, | 150:7, 156:19, |
| 43:24 | 71:13, 160:2, | 186:20, 186:22, | 165:20, 167:10, |
| **september** | 161:6, 161:15, | 187:4, 187:5, | 167:21, 169:10, |
| 150:18, 151:15, | 162:12, 199:1 | 188:15, 189:3, | 169:22, 218:9, |
| 152:4, 166:4, | **severity** | 192:24, 195:6, | 221:7, 226:24 |
| 166:11, 189:14, | 91:21, 199:8, | 195:10, 195:17, | **show** |
| 194:16, 194:21, | 200:15 | 206:3 | 109:7, 202:5, |
| 203:5, 203:9, | **shah** | **shake** | 213:6, 218:23, |
| 213:4, 217:6, | 103:20, 142:14, | 6:12 | 224:9, 224:23 |
| 227:20 | 142:22, 143:5, | **shape** | **showed** |
| **serious** | 143:11, 145:9, | 229:13 | 96:23, 125:17, |
| 39:8, 39:11, | 145:13, 145:18, | **she** | 141:16, 142:18, |
| 40:18, 41:1, | 146:14, 147:11, | 81:5, 108:8, | 200:14, 200:15, |
| 41:20, 42:5, | 147:16, 147:22, | 156:19, 156:20, | 200:17, 200:19, |
| 42:19, 46:9, | 148:10, 150:3, | 156:22, 156:24, | 201:11, 201:16, |
| 207:12, 207:16 | 150:6, 150:9, | 157:24, 162:6, | 201:24, 202:21, |
| **seriousness** | 150:12, 173:20, | 163:13, 163:18, | 210:14, 211:12, |
| 46:20 | 180:15, 181:5, | 163:20, 163:22, | 217:11 |
| **serve** | 181:13, 181:23, | 165:17, 165:18, | **showing** |
| 112:20 | 182:6, 182:14, | 165:19, 165:23, | 200:16 |
| **served** | 182:17, 182:20, | 166:1 | **shown** |
| 102:7, 102:8 | 182:23, 182:24, | **she's** | 96:4, 214:18 |
| **services** | 183:21, 183:22, | 156:11, 156:19, | **shows** |
| 113:23, 114:1, | 184:19, 185:4, | 159:11 | 223:22 |
| 114:16 | 185:18, 185:21, | **sheath** | **shy** |
| **set** | 186:16, 188:19, | 32:20 | 115:20 |
| 100:17, 194:24 | 188:23, 189:5, | **shooting** | **side** |
| **setting** | 189:16, 190:7, | 37:24, 38:7, | 11:9, 18:8, |
| 210:3 | | | |

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

106

19:5, 30:4,
30:19, 30:21,
30:23, 31:20,
44:23, 83:18,
83:19, 106:11,
107:12, 140:2,
203:2, 223:23,
223:24, 224:1,
225:2
**sides**
202:2
**signal**
202:22, 203:1,
227:19
**signature**
5:6, 231:4
**signature-oby**
232:16
**significance**
30:2, 39:16,
40:1, 42:12,
170:15, 192:9,
192:13, 192:16,
192:22, 193:3,
224:23, 224:24
**significant**
36:2, 37:4,
37:8, 37:14,
38:10, 40:22,
41:7, 42:13,
69:19, 122:7,
198:13, 198:21
**signs**
213:6
**similar**
87:11
**simply**
37:5, 145:17
**since**
14:23, 15:9,
19:18, 20:10,
24:12, 25:6,
96:19, 125:23,
126:3, 226:8
**sincere**
159:11, 159:18
**single**
86:6, 86:15,

87:12, 88:19,
89:17
**sir**
119:11, 163:7
**sit**
59:18, 61:14,
96:22, 113:15
**site**
36:8, 153:16,
153:20
**sitting**
47:23, 88:23,
89:6, 98:6,
99:20, 216:8
**situation**
66:8, 119:5,
127:15, 127:18,
142:15, 220:16
**situations**
79:17, 80:5,
89:8
**six**
92:21, 149:8,
149:9, 169:19,
210:18, 213:4,
223:9
**size**
32:3, 45:19
**skull**
21:7, 21:22
**skyrocketed**
227:6
**sleeves**
31:22
**slightly**
53:9
**slipped**
127:23
**small**
13:6, 32:13,
35:23, 126:1
**smaller**
32:22
**smart**
221:15
**sneeze**
188:2, 228:23,
228:24

**societies**
64:17
**society**
18:16, 64:11
**soft**
41:13, 43:14,
66:9, 140:1
**solely**
145:23, 169:11,
173:12, 180:21,
180:22
**solid**
141:11
**solo**
13:22, 14:4,
14:5, 14:18,
14:24, 15:2,
17:2
**somebody**
29:9, 32:24,
55:9, 60:14,
66:8, 66:11,
68:21, 69:18,
70:1, 71:13,
72:5, 72:18,
73:7, 73:20,
82:12, 104:7,
125:15, 125:17,
165:1, 165:6,
211:8, 224:20,
226:23
**somebody's**
70:12, 103:15,
229:20
**somehow**
97:8
**someone**
20:20, 37:8,
38:1, 40:7,
45:17, 52:1,
53:5, 55:1,
55:4, 56:14,
57:12, 57:17,
58:20, 60:18,
66:19, 68:21,
68:22, 69:19,
78:20, 80:9,
81:18, 81:19,

82:6, 82:7,
82:14, 82:20,
82:21, 83:10,
98:15, 104:8,
106:14, 116:19,
122:14, 164:13,
166:3, 166:20,
188:1, 188:8,
190:2, 215:20
**someone's**
162:21
**something**
10:6, 22:23,
23:10, 23:11,
35:11, 49:8,
57:7, 66:17,
67:4, 67:20,
67:22, 69:6,
80:12, 81:20,
84:1, 91:15,
93:8, 119:5,
188:8, 202:2,
204:2, 218:3,
226:6, 227:1,
229:23, 229:24
**sometime**
16:4
**sometimes**
17:17, 20:4,
20:6, 21:3,
39:9, 44:6,
44:24, 72:8,
80:11, 80:13,
82:18, 82:19,
93:6, 116:21,
119:3, 119:18,
119:19, 119:21,
154:7
**somewhat**
34:1, 80:10,
207:2
**somewhere**
16:2, 54:19
**sore**
138:24, 149:10
**sorry**
12:9, 39:19,
54:6, 55:6,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                    107

67:16, 115:1,
130:24, 135:13,
138:20, 161:8,
166:24, 167:14,
170:8, 170:12,
171:4, 173:23,
178:11, 179:12,
180:10, 205:10
**sort**
36:18, 54:6,
93:14, 161:12,
211:3, 212:19
**sorts**
61:12
**sources**
1:8, 3:10, 3:23
**south**
4:22
**southern**
1:2, 3:2, 3:21,
160:14
**space**
26:11, 140:10,
141:6
**spasm**
52:8
**speak**
182:13, 227:18
**speaking**
71:15
**speaks**
152:6, 162:3,
162:4, 175:18,
182:17
**specialize**
10:24, 11:7
**specialty**
10:20, 59:14,
65:22
**specific**
15:17, 23:14,
25:5, 25:9,
51:21, 67:3,
72:14, 74:13,
77:5, 78:12,
84:7, 84:8,
87:15, 88:18,
88:20, 95:11,

95:12, 97:18,
99:13, 106:21,
113:10, 125:21,
126:2, 149:11,
166:1, 171:11,
192:4
**specifically**
25:3, 71:24,
72:9, 104:19,
104:21, 110:16,
135:9, 150:17,
152:11, 152:15,
154:4, 155:7,
155:8, 160:6,
168:14, 189:19,
213:11, 226:15,
226:17
**specifics**
154:13
**spectrum**
41:4
**spell**
5:14
**spend**
116:24, 119:8,
135:17
**spent**
11:24, 109:9,
118:8, 135:19,
227:13
**spine**
10:22, 10:23,
11:4, 11:16,
12:14, 12:16,
12:17, 12:19,
12:20, 12:21,
13:1, 14:1,
14:16, 14:20,
14:22, 15:6,
15:9, 15:14,
16:1, 16:12,
16:14, 16:17,
16:19, 16:20,
16:21, 17:3,
17:5, 17:6,
17:10, 17:15,
17:19, 18:1,
19:14, 21:6,

21:8, 21:14,
21:19, 21:21,
22:13, 22:19,
22:20, 23:7,
23:8, 24:14,
25:19, 25:20,
26:3, 26:21,
26:23, 27:3,
27:4, 27:20,
29:7, 29:22,
31:10, 31:11,
31:12, 31:14,
36:16, 39:13,
39:20, 44:4,
44:6, 47:10,
49:24, 52:5,
52:7, 53:4,
53:5, 53:6,
55:15, 66:13,
70:21, 73:15,
73:16, 82:7,
90:5, 90:8,
91:3, 91:19,
113:8, 126:18,
126:24, 139:23,
141:23, 142:1,
142:5, 214:18,
227:13
**sports**
11:4, 11:14
**spread**
22:24, 140:9,
140:14
**springfield**
4:23
**spurs**
34:17, 35:1,
45:22, 90:6,
224:2, 224:7
**st**
1:3, 3:3, 3:18,
3:22, 4:15,
176:11, 176:16,
176:22, 177:19,
178:5, 178:16,
179:14, 179:20
**stability**
82:8

**stabilize**
141:8, 141:10
**stack**
209:12
**staff**
65:8, 65:9,
65:11, 65:17,
65:19, 103:8,
138:22, 148:11,
152:10, 155:6,
155:9, 155:14
**stand**
52:4, 57:17,
147:20, 148:3,
190:24
**standard**
52:24, 53:16,
53:19, 53:23,
54:4, 54:12,
100:7, 100:13,
100:20, 102:24,
103:4, 122:3,
122:10, 122:12,
122:16, 122:20,
123:10, 123:12,
123:13, 123:16,
123:21, 124:5,
124:11, 124:15,
124:21, 125:1,
125:3, 125:5,
125:7, 143:18,
147:5, 152:22,
190:6, 190:10,
190:22, 191:6,
191:11, 191:19,
192:18, 203:9,
203:12, 203:17,
203:19
**standards**
61:6, 61:13,
62:12, 77:8
**standpoint**
38:10
**start**
13:18, 24:20,
28:15, 28:19,
28:23, 29:2,
44:7

started
11:23, 12:16,
13:20, 14:2,
15:22, 63:1,
127:22, 167:5,
180:17
starting
15:21, 29:4,
30:8, 63:4,
167:3
starts
28:22, 140:10,
145:5
state
3:20, 4:25,
5:13, 87:21,
96:8, 114:9,
120:9, 120:14,
128:16, 129:8,
136:20, 136:22,
136:24, 156:1,
168:14, 172:8,
176:5, 186:4,
190:4, 193:10,
193:11, 195:1,
206:1, 230:5,
232:3
stated
21:21, 53:3,
62:22, 63:4,
69:24, 95:5,
99:8, 102:13,
103:14, 116:3,
147:7, 148:5,
155:17, 156:2,
157:6, 158:18,
158:21, 159:14,
159:20, 172:13,
172:18, 172:19,
181:18, 182:11,
182:17, 183:21,
183:22, 185:5,
188:19, 189:5,
192:5, 198:7,
199:10, 200:9,
205:4, 205:24,
206:4
statement
139:18, 149:11,

166:13, 194:10
statements
50:24, 223:6
states
1:1, 3:1, 3:21,
62:13, 105:14,
105:16, 114:19,
115:8, 115:10,
129:1, 141:14,
143:10, 150:15,
151:19, 156:3,
165:18, 168:1,
176:5, 176:23,
177:18, 179:17,
194:12, 198:1,
198:2, 220:11
stating
118:1, 118:2,
144:17, 144:18,
164:6, 175:12,
182:20, 185:20,
190:12, 191:3
status
146:7, 196:14,
196:17, 201:10
stayed
13:13, 14:17,
14:18
steel
91:2
stenosis
19:23, 26:8,
26:10, 26:13,
26:15, 26:17,
27:5, 31:24,
32:5, 32:9,
32:10, 32:14,
32:24, 33:14,
33:18, 43:13,
45:15, 45:18,
45:21
stenotic
32:4, 202:6,
224:9
step
54:10
stephen
134:9

steps
65:10, 124:12
stiffness
171:19
still
14:10, 16:13,
17:5, 17:8,
17:10, 58:13,
58:17, 63:11,
66:24, 129:4,
178:14, 201:24,
210:18, 213:6,
215:9
stipulated
5:1
stop
221:4
stopped
15:9, 17:19,
19:18, 24:17,
221:4
stopping
20:10
store
110:6
straight
52:19, 58:13
straightening
188:4
straightforward
222:2
strange
108:6
street
4:5, 4:22
strength
52:10, 52:11,
52:13, 53:24,
57:8, 57:14,
57:16, 57:19,
57:20, 58:2,
58:11, 81:10,
155:18, 204:21,
228:14
strike
21:10, 34:10,
36:11, 36:13,
42:1, 48:3,

48:5, 53:11,
71:6, 79:3,
100:7, 102:21,
107:12, 120:16,
133:5, 133:24,
146:18, 152:19,
163:18, 167:14,
179:24, 183:14,
184:8, 194:11,
196:24, 211:17
structural
141:14, 141:23,
200:16
structure
136:9
struggle
39:3
stuck
204:9
studies
72:10, 85:20,
85:21, 130:3,
130:5, 130:6,
130:10, 130:15,
201:6, 201:9,
203:18, 204:1,
205:19, 208:21,
210:13
study
72:7, 141:15,
205:16
subchapters
11:18
subject
101:3, 128:21,
129:8, 217:19
subjective
121:1, 125:10,
144:3, 144:11,
144:12, 144:15,
144:17, 161:20,
161:22, 162:16,
162:19, 162:22,
163:3, 163:5,
163:10, 164:6,
164:8, 164:10,
164:13, 164:14,
164:20, 165:1,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

109

165:15, 169:6,
169:9, 170:24,
179:2, 184:22,
184:23, 185:5,
185:9, 185:11,
185:12, 185:14,
185:19, 185:20,
185:24, 186:1,
187:13, 187:21,
188:6, 188:8,
188:17, 193:2,
206:10, 206:18,
208:9, 208:11,
228:12, 228:19,
229:2, 229:20,
229:21

**subjectively**
122:6

**sublux**
44:7

**subluxation**
43:22, 43:23,
44:1, 44:2

**subluxations**
41:9, 43:12

**submitted**
132:19

**submitting**
133:17

**subsequently**
200:2, 220:16

**subspecialties**
11:12, 24:9,
25:11, 25:12,
26:3

**subspecialty**
26:4, 26:19

**substantially**
7:18

**substantiate**
200:13

**substantiated**
181:8, 200:12

**such**
23:10, 66:24,
195:7

**sued**
108:3

**suffer**
7:4, 38:21,
71:8, 158:15,
158:20

**suffered**
170:11, 179:19,
184:19, 184:21,
185:3, 185:6,
203:3, 203:8

**suffering**
36:7, 49:1,
181:12, 185:10,
185:12, 185:13,
193:18

**suffers**
159:9, 179:15

**suggest**
146:19

**suggesting**
146:24

**suicidal**
176:4

**suite**
4:14

**summarize**
136:23, 209:22

**summarized**
136:24, 186:14,
186:15, 186:16

**summarizes**
138:18, 165:18

**summary**
136:10

**supplemented**
96:15

**supplied**
38:6

**supposed**
35:5, 60:17

**sure**
6:11, 21:1,
22:3, 25:9,
33:3, 36:3,
41:18, 41:22,
42:8, 54:20,
56:17, 58:19,
62:15, 68:3,
68:12, 68:14,

69:7, 74:5,
80:11, 82:4,
85:2, 87:18,
88:6, 92:3,
96:6, 108:4,
108:9, 113:3,
127:7, 127:10,
127:24, 147:23,
148:1, 154:16,
156:2, 157:5,
170:4, 177:4,
177:23, 178:12,
196:11, 214:20,
222:17, 225:12,
225:16

**surgeon**
5:17, 12:14,
21:19, 23:8,
23:20, 24:15,
49:24, 56:21,
66:13, 67:9,
67:13, 67:17,
68:6, 68:9,
70:16, 71:2,
129:18, 142:23,
182:18, 227:14

**surgeons**
20:11, 20:15,
29:7, 56:7,
64:23, 65:1

**surgeries**
17:13, 17:19,
23:18, 66:6

**surgery**
10:16, 10:18,
11:1, 11:14,
11:20, 11:24,
12:2, 12:16,
13:2, 14:11,
14:16, 15:4,
15:5, 15:6,
15:9, 15:14,
15:16, 16:11,
16:12, 16:15,
16:17, 17:3,
17:6, 19:18,
20:3, 20:5,
20:10, 20:13,

20:16, 20:17,
20:20, 23:4,
23:5, 23:6,
23:7, 23:9,
23:13, 23:22,
24:17, 25:13,
25:18, 25:19,
25:21, 25:23,
25:24, 26:3,
26:7, 26:20,
26:22, 26:23,
48:10, 49:10,
49:11, 49:13,
49:17, 49:20,
63:5, 63:10,
63:12, 63:13,
64:9, 64:16,
64:21, 64:24,
66:3, 67:10,
67:14, 68:9,
70:20, 71:8,
72:15, 129:19,
130:2, 137:20,
138:4, 139:13,
155:18, 166:17,
166:20, 169:19,
171:20, 197:5,
200:17, 201:4,
201:10, 202:3,
210:10, 210:18,
210:19, 210:21,
210:22, 213:5,
213:7, 218:13,
218:18, 218:20,
221:5, 223:8,
223:16, 224:12

**surgical**
14:15, 15:8,
15:20, 16:1,
24:9, 46:3,
48:22, 49:24,
141:3, 166:3,
166:10, 167:11,
195:24, 218:11,
218:15, 221:6,
222:2, 224:6

**surgically**
49:8, 68:15,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

110

140:13
**surprising**
104:10
**surrounding**
32:20
**suspended**
128:19, 129:15
**swelling**
47:11
**swindell**
107:11
**sworn**
3:16, 5:9,
232:6
**symptom**
50:4, 50:7,
50:10, 50:13,
50:16, 179:4,
185:9, 187:23,
188:1, 188:4,
188:9, 188:10,
188:12, 229:24,
230:3
**symptomatic**
224:10
**symptoms**
35:13, 35:19,
35:24, 37:6,
37:20, 38:6,
38:21, 39:1,
40:16, 41:18,
42:1, 42:3,
42:18, 43:19,
46:13, 46:22,
47:1, 47:4,
47:7, 47:8,
47:9, 47:14,
47:15, 47:17,
47:20, 48:1,
49:2, 50:19,
50:22, 51:2,
51:7, 51:11,
53:6, 56:14,
56:15, 56:23,
70:1, 71:9,
80:24, 157:21,
157:22, 158:3,
158:9, 163:4,

163:11, 168:19,
180:8, 180:14,
181:5, 181:13,
181:23, 182:2,
183:16, 184:10,
184:19, 184:21,
185:3, 185:17,
185:23, 186:2,
186:6, 186:19,
187:7, 187:10,
187:11, 187:15,
187:17, 187:22,
188:3, 203:8,
207:15, 207:22,
213:20, 215:18,
218:2, 228:10,
228:12, 228:13,
228:19, 228:23,
228:24, 229:1,
229:15, 229:18,
229:19, 229:21,
229:23
**syndrome**
55:12
**synopsis**
105:4, 115:7
**system**
10:21, 11:12,
154:18, 188:6

**T**

**t-11**
23:2
**t-r-i-c-e**
220:15
**table**
47:24, 51:4
**take**
7:4, 25:10,
45:10, 45:12,
52:4, 64:1,
92:1, 119:4,
121:18, 121:19,
122:22, 138:8,
144:20, 144:23,
146:2, 147:20,
148:2, 155:8,
184:11, 192:6,

193:8, 195:23,
197:10, 206:5,
215:20, 217:19,
224:5
**taken**
1:14, 5:3,
55:7, 67:22,
67:23, 68:1,
68:24, 92:4,
144:24, 202:20,
210:18, 232:6,
232:10
**takes**
95:8
**taking**
101:23, 124:21,
140:15, 140:18,
140:19, 221:4
**talk**
8:23, 76:9,
132:23, 136:8,
139:12
**talked**
46:5, 48:6,
48:17, 61:18,
65:24, 116:5,
177:17, 187:19,
195:15, 195:21,
220:22, 228:8,
228:11, 228:12,
229:1, 229:2
**talking**
31:10, 35:15,
35:16, 35:17,
39:13, 39:20,
39:21, 44:18,
47:10, 47:20,
58:19, 67:7,
67:17, 75:7,
82:19, 94:2,
117:18, 136:11,
150:17, 155:3,
179:7, 186:15,
219:4, 220:19
**talks**
165:11
**tall**
209:13

**tank**
109:16
**tat**
173:18
**tax**
95:10
**team**
224:4
**technical**
49:10
**technology**
203:14
**telephonically**
4:19
**tell**
6:6, 7:13,
7:14, 9:1, 11:9,
17:20, 19:17,
24:5, 25:15,
26:24, 28:5,
28:6, 31:6,
31:7, 35:8,
35:10, 39:10,
48:4, 48:14,
51:10, 51:18,
59:21, 60:7,
61:8, 61:12,
63:20, 63:21,
65:6, 66:15,
68:19, 71:24,
72:6, 75:11,
76:22, 77:2,
77:7, 82:15,
85:1, 85:4,
85:23, 87:15,
87:22, 88:4,
88:13, 88:19,
90:2, 90:10,
90:17, 90:23,
98:4, 102:6,
110:10, 113:9,
116:14, 119:12,
127:19, 131:5,
139:2, 142:12,
142:21, 144:10,
145:12, 146:7,
149:16, 151:13,
152:17, 156:8,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

111

164:14, 164:21, 165:6, 165:8, 165:22, 172:15, 173:7, 175:19, 175:20, 185:8, 188:23, 189:15, 192:10, 228:9

**tells**
218:2

**temporary**
129:3, 129:13

**ten**
112:15, 112:16, 126:15

**ten-man**
14:7, 16:16

**tenderness**
52:8, 163:20

**tendon**
52:11, 53:20, 57:23, 58:1, 58:3, 58:8, 58:9, 58:10, 228:15

**term**
27:15, 30:20, 32:5, 122:21, 211:11

**terminology**
29:14

**terms**
33:4, 37:6, 38:21, 119:12, 139:8, 211:22, 212:3, 212:7, 229:15

**test**
8:20, 59:1, 62:8

**testified**
48:7, 66:2, 70:17, 76:1, 79:7, 84:24, 92:7, 95:24, 96:12, 97:20, 97:21, 98:3, 98:7, 109:13, 128:3, 155:21,

155:23, 158:14, 158:19, 172:9, 181:12, 181:22, 184:17, 184:18, 184:24, 185:2, 185:16, 199:14, 227:19, 230:4

**testify**
77:19, 132:2, 217:15, 226:11

**testifying**
67:8, 143:15

**testimony**
2:13, 7:6, 23:16, 34:2, 42:7, 46:15, 68:4, 78:2, 78:8, 81:15, 86:13, 96:10, 97:13, 97:16, 97:18, 98:4, 106:12, 114:15, 114:18, 117:21, 122:18, 123:9, 134:12, 137:13, 146:3, 147:3, 148:9, 153:24, 155:21, 156:5, 156:15, 157:10, 158:23, 158:24, 159:1, 159:2, 159:7, 161:22, 162:13, 164:2, 164:15, 169:16, 173:4, 181:4, 182:4, 182:21, 183:5, 183:13, 183:18, 183:19, 184:12, 185:2, 186:9, 186:23, 187:1, 187:3, 196:21, 198:3, 199:14, 199:16, 206:24, 207:23, 209:24, 217:20, 222:9, 225:11, 227:22, 227:24, 230:15, 230:18,

232:5, 232:6

**testing**
121:6, 188:24, 189:17, 190:8, 190:9, 191:12, 191:13

**tests**
59:4, 125:1, 227:4, 227:15, 227:16

**th**
3:16, 96:6, 96:19, 97:7, 131:3, 132:12, 132:20, 133:8, 133:11, 133:14, 134:2, 136:12, 138:21, 139:5, 141:16, 156:9, 160:23, 171:5, 172:21, 174:13, 194:16, 194:21, 200:6, 200:9, 202:20

**than**
16:2, 24:22, 34:10, 41:23, 42:2, 42:11, 64:15, 74:17, 74:18, 74:20, 74:23, 79:23, 82:1, 82:13, 82:23, 83:21, 86:5, 94:5, 94:15, 95:1, 95:12, 98:13, 98:17, 98:22, 99:5, 99:7, 99:8, 99:9, 99:12, 99:13, 103:20, 106:16, 111:24, 112:4, 112:7, 112:8, 112:15, 112:16, 112:24, 113:10, 128:6, 138:14, 146:12, 148:4, 151:15, 152:1,

152:17, 152:20, 154:15, 156:6, 157:1, 157:18, 159:5, 159:8, 159:18, 165:5

**thank**
5:18, 203:24

**thanks**
140:22, 144:21

**their**
20:7, 24:1, 28:18, 30:9, 36:22, 37:12, 51:14, 52:4, 52:5, 52:7, 52:9, 52:10, 52:11, 52:12, 52:15, 52:16, 55:5, 55:10, 57:12, 57:13, 57:18, 58:18, 58:22, 60:13, 60:15, 60:16, 62:6, 66:19, 68:24, 69:22, 70:13, 70:24, 72:16, 75:15, 81:9, 81:10, 100:18, 100:20, 104:1, 108:20, 111:1, 154:14, 159:5, 162:23, 169:6, 175:3, 205:24, 206:6, 210:4, 215:21, 221:7, 229:21, 229:22, 230:22

**them**
5:24, 8:2, 9:12, 20:4, 33:4, 36:21, 36:22, 37:10, 52:3, 52:4, 60:14, 60:15, 66:10, 70:13, 73:21, 75:11, 75:19, 76:9, 82:13, 87:3,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

112

95:15, 104:8,
111:13, 116:4,
116:5, 132:7,
133:17, 142:1,
157:6, 162:22,
170:17, 188:18,
200:5, 200:6,
204:4, 215:21,
219:9
**themselves**
75:20, 105:13,
141:20, 182:13,
182:14
**then**
12:2, 12:12,
12:18, 14:5,
14:12, 14:19,
16:7, 16:15,
17:19, 21:15,
21:23, 22:11,
22:20, 28:6,
29:23, 32:15,
32:16, 32:17,
33:9, 35:8,
37:10, 51:15,
52:4, 52:7,
52:8, 52:14,
52:19, 53:6,
57:7, 57:12,
57:16, 58:7,
58:8, 60:1,
60:4, 63:5,
64:5, 64:7,
64:8, 65:11,
65:21, 68:23,
70:3, 72:17,
75:22, 81:24,
82:8, 83:12,
86:1, 86:8,
96:9, 105:24,
106:19, 106:21,
118:20, 121:19,
121:20, 121:21,
121:22, 127:21,
127:23, 135:8,
136:17, 136:24,
137:19, 140:5,
140:8, 140:9,

140:11, 140:12,
140:13, 140:21,
141:5, 141:7,
141:12, 143:9,
145:22, 149:2,
149:15, 154:8,
156:16, 156:23,
164:21, 170:20,
171:22, 180:18,
182:16, 186:11,
189:21, 190:5,
206:3, 207:14,
215:21, 215:23,
220:23, 227:17
**theoretically**
33:21, 33:23
**there's**
7:2, 22:23,
25:22, 25:23,
26:3, 35:9,
38:15, 39:12,
42:12, 42:14,
93:10, 114:21,
116:22, 141:9,
148:8, 177:6,
183:7, 185:7,
207:21, 230:19
**thereabouts**
17:1
**thereafter**
232:7
**therefore**
101:4, 194:1
**thereto**
232:12
**thereupon**
7:8, 8:5, 8:11,
55:7, 81:3,
92:4, 95:18,
130:16, 144:24,
160:10, 184:3,
189:7, 197:1,
199:22, 202:9,
231:7
**these**
33:4, 50:19,
51:1, 65:9,
65:12, 74:24,

75:1, 83:16,
84:11, 97:4,
104:4, 105:23,
106:8, 106:19,
109:12, 110:11,
117:9, 117:24,
127:1, 131:18,
132:17, 135:9,
137:11, 138:15,
138:19, 154:15,
154:16, 157:16,
160:15, 160:16,
166:2, 167:12,
172:24, 173:1,
173:10, 176:13,
193:9, 198:5,
203:12, 205:22,
222:19, 226:12,
228:16
**they**
6:24, 14:12,
14:13, 14:14,
14:17, 16:23,
17:8, 18:10,
20:5, 20:6,
20:16, 20:21,
20:22, 21:2,
23:24, 28:21,
32:13, 34:9,
35:24, 36:1,
37:4, 37:7,
38:2, 38:5,
40:17, 40:20,
44:19, 44:22,
44:23, 47:12,
48:1, 51:2,
51:14, 52:7,
52:18, 55:5,
55:6, 55:10,
57:13, 57:22,
60:4, 60:5,
60:13, 61:20,
66:13, 68:22,
69:3, 71:11,
72:16, 73:8,
74:6, 75:15,
75:21, 75:22,
84:18, 92:24,

93:9, 101:19,
103:8, 103:12,
104:12, 105:4,
105:14, 125:18,
126:23, 127:7,
127:10, 130:7,
145:18, 152:22,
153:24, 154:16,
155:8, 155:12,
157:17, 164:13,
164:14, 165:2,
165:3, 174:21,
188:8, 190:3,
205:24, 206:1,
206:12, 208:7,
209:8, 210:9,
210:13, 218:21,
221:7, 224:21,
224:23, 225:1,
229:22, 229:24,
230:1, 230:2
**they'll**
35:18, 73:19
**they're**
18:11, 20:2,
20:7, 20:21,
21:9, 29:4,
30:2, 60:16,
66:12, 68:23,
69:20, 117:6,
117:7, 122:22,
122:23, 123:2,
144:18, 154:2,
154:15, 178:23,
190:3, 207:10,
208:10, 218:2,
220:21, 221:20,
221:21, 224:17,
224:18, 224:22,
224:24, 225:1,
229:3, 229:4,
229:23, 229:24
**they've**
75:12
**thigh**
52:16
**thing**
57:17, 57:21,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

113

60:18, 65:15,
75:7, 75:11,
105:8, 115:2,
127:24, 140:23,
185:11, 203:15,
210:11, 221:15
**things**
23:24, 33:10,
33:13, 34:20,
34:21, 40:10,
41:6, 41:7,
47:8, 47:13,
47:22, 48:1,
48:17, 51:2,
54:7, 54:14,
54:18, 57:5,
61:18, 79:2,
115:9, 141:13,
148:1, 179:1,
187:19, 192:5,
192:6, 194:8,
201:23, 203:16,
204:9, 224:11
**thinking**
98:6, 99:20,
103:1
**thinks**
190:3
**third**
4:5, 6:15,
18:18, 18:23,
19:20, 154:2,
154:9, 167:3,
175:24
**thoracic**
10:23, 19:22,
21:8, 22:20,
22:21, 27:2,
31:10, 89:15,
89:22, 90:5,
90:8, 91:19
**thorough**
98:24, 146:13
**thoroughly**
36:4
**though**
7:2, 11:6,
14:13, 64:6,

164:15, 183:8,
184:7, 189:2
**thought**
10:4, 10:7,
19:11, 81:5,
91:1, 157:7,
170:12, 172:14,
175:1, 186:14,
186:17, 222:15,
228:18
**thousands**
43:3, 43:6,
84:9
**three**
12:2, 17:15,
17:16, 58:6,
60:2, 70:16,
73:23, 97:22,
97:24, 98:2,
98:7, 98:9,
100:22, 103:2,
103:18, 110:24,
111:9, 111:21,
112:7, 112:10,
126:12, 152:1,
153:2, 167:3,
211:15, 221:8,
222:3
**three-quarters**
139:11
**throat**
138:24, 139:22,
149:10
**through**
7:19, 8:20,
8:21, 10:10,
11:3, 11:17,
14:12, 22:12,
22:18, 22:19,
24:7, 24:8,
25:5, 27:13,
31:22, 35:8,
51:8, 52:5,
52:12, 63:24,
64:8, 70:16,
76:6, 102:16,
102:17, 104:3,
107:9, 113:12,

119:8, 119:17,
121:13, 121:15,
121:18, 133:13,
135:8, 135:15,
137:8, 138:17,
138:19, 153:2,
165:24, 178:24,
189:3, 193:8,
217:5, 228:20
**thursday**
119:8, 119:17
**times**
5:22, 24:13,
27:8, 30:2,
32:12, 40:1,
42:10, 42:12,
42:24, 43:1,
43:10, 44:12,
44:13, 44:17,
44:22, 44:23,
47:14, 48:14,
48:16, 48:18,
48:21, 48:23,
49:3, 49:4,
49:22, 49:23,
50:1, 72:8,
73:13, 73:14,
73:15, 74:1,
74:3, 74:9,
74:11, 74:12,
74:13, 74:23,
75:6, 76:1,
76:12, 76:19,
78:24, 79:4,
80:9, 80:13,
83:23, 83:24,
84:3, 84:12,
85:13, 86:11,
86:22, 86:24,
87:1, 87:18,
88:9, 88:11,
88:17, 88:18,
90:14, 90:15,
90:16, 90:19,
93:18, 94:19,
94:22, 97:20,
97:23, 98:3,
98:4, 98:6,

98:13, 98:18,
98:21, 98:22,
99:5, 99:7,
99:19, 99:21,
99:22, 111:23,
111:24, 112:7,
112:11, 112:20,
113:2, 113:4,
116:21, 126:11,
126:13, 151:3,
153:2, 153:5,
153:8, 169:4,
205:22, 218:12,
218:15
**timing**
79:24, 83:4
**timothy**
109:2
**tingling**
35:20, 37:15,
37:16, 37:21,
38:22, 38:24,
40:8, 40:13,
43:18, 47:21,
50:3, 51:20,
51:22, 52:2,
53:10, 53:14,
54:1, 54:12,
54:21, 55:2,
55:4, 55:5,
55:10, 55:19,
55:23, 56:8,
56:10, 56:19,
187:20, 192:3,
192:6, 192:8,
192:12, 192:19,
192:22
**tire**
174:9, 174:14,
175:5, 175:8
**tires**
174:10
**tissue**
21:17, 50:23,
70:11, 195:23,
212:20
**tissues**
140:1

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

114

**today**
13:24, 14:24, 15:3, 19:4, 46:6, 61:18, 78:23, 96:19, 104:16, 159:9, 186:23, 216:9, 216:12, 222:6, 230:8
**today's**
135:3, 135:4, 203:14
**toes**
52:4, 57:18
**together**
22:23, 24:15, 51:15, 161:24, 162:16, 162:24, 184:14, 184:15, 195:13, 196:19, 215:23
**told**
76:3, 106:9, 122:6, 131:9, 148:23, 153:1, 174:11, 221:4, 221:11
**too**
43:10, 83:7, 178:4
**took**
67:22, 116:12
**top**
21:7, 172:2, 219:11, 219:17
**topic**
125:20
**total**
115:15, 116:11
**totally**
42:8, 149:9
**totals**
115:19
**touch**
52:12, 54:8, 54:9
**toward**
30:16

**track**
102:12, 102:16, 102:17, 103:15, 120:10
**training**
10:12, 12:15, 24:11, 62:11, 63:23, 138:3, 138:4, 143:18, 209:7, 217:11, 217:16, 217:19
**transcribed**
5:5
**transcript**
135:23
**transient**
47:15, 192:6
**transition**
14:14
**transverse**
139:23
**trauma**
195:24
**traveling**
160:3, 161:7, 161:16
**treat**
36:24, 68:6, 70:3, 71:21, 80:1, 82:3, 82:9, 82:13, 83:1, 83:10, 83:12, 227:9, 227:10
**treated**
117:5, 150:12, 206:8, 226:22, 230:21
**treating**
68:14, 73:1, 79:12, 79:17, 79:22, 82:12, 84:15, 117:11, 118:8, 120:18, 120:19, 142:15, 153:24, 174:24, 230:21
**treatment**
18:24, 30:14,

43:9, 43:16, 44:16, 45:6, 45:7, 45:8, 45:9, 46:2, 46:3, 47:5, 48:22, 69:13, 70:19, 71:1, 83:4, 100:20, 191:23, 191:24, 192:15, 193:4, 193:7, 197:22, 198:10, 207:24, 221:1
**treatments**
190:23, 191:7
**tremendously**
211:9
**trial**
97:13, 97:16, 97:18, 97:20, 97:22, 98:4, 98:7
**trice**
220:15
**triceps**
57:13, 58:3, 58:4
**tried**
106:7, 136:22, 161:23, 167:21
**trimmed**
224:12, 225:2, 225:4
**truck**
60:11
**true**
27:24, 32:12, 33:13, 35:7, 47:6, 51:6, 54:24, 56:4, 80:21, 81:6, 137:4, 158:7, 159:13, 174:19, 187:6, 216:11
**truly**
79:17, 165:7, 170:14, 170:19, 170:21, 170:22,

**truthful**
7:6
**try**
36:4, 41:21, 91:14, 102:20, 162:15, 184:14, 215:19, 215:23, 223:6
**trying**
14:14, 30:10, 37:5, 82:20, 107:23, 156:17, 184:14, 230:2
**tulane**
12:21, 12:24
**tumor**
34:16, 35:1
**tumors**
19:24, 23:10, 23:23, 34:15, 41:9
**tunnel**
55:12
**turn**
139:2, 143:24, 145:3, 160:13, 160:19, 171:2, 171:3, 180:2, 194:10
**turning**
142:12, 146:8, 148:14, 171:22
**turns**
46:12, 46:21
**twitch**
165:3
**two**
7:23, 10:2, 11:24, 12:1, 13:6, 61:24, 62:1, 64:6, 65:2, 65:13, 73:23, 76:19, 98:8, 99:21, 100:22, 103:2,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                                    115

103:17, 110:24,
111:9, 111:21,
113:4, 115:20,
126:12, 126:18,
127:1, 138:1,
153:2, 157:16,
159:3, 167:3,
173:16, 179:5,
211:15, 213:8,
213:21
**two-and-a-half**
97:22
**tylenol**
155:4, 155:5
**type**
25:21, 26:1,
37:24, 38:7,
38:8, 49:17,
49:20, 54:16,
101:21, 118:14,
125:22, 155:2,
168:19
**types**
10:18, 19:18,
34:13, 44:18,
44:21, 49:13,
65:18
**typewriting**
5:5, 232:8
**typical**
17:14, 38:20,
95:13, 95:15,
119:7, 119:10
**typically**
18:10, 20:14,
35:13, 35:22,
36:7, 36:20,
37:17, 38:1,
92:15, 93:2,
104:6, 104:8,
111:20, 116:18,
116:21, 119:16,
129:23, 130:2,
153:24, 171:15
**typographical**
177:24, 178:3,
178:10

---

**U**

**uh-huh**
6:12

**ulnar**
55:12
**ultimately**
60:1, 165:18
**uncommon**
45:4, 75:1,
89:7
**under**
62:13, 85:1,
85:3, 108:12,
110:14, 133:13,
167:2, 171:18,
171:23, 232:8
**undergone**
20:12
**underlying**
91:12
**underneath**
32:17
**understand**
6:2, 17:1,
23:16, 30:10,
30:12, 33:9,
36:20, 37:5,
41:15, 42:9,
54:20, 62:15,
68:12, 76:1,
76:11, 77:15,
77:18, 77:21,
77:22, 77:24,
78:5, 84:22,
136:9, 141:18,
141:22, 141:24
**understanding**
21:12, 21:18,
28:6, 28:7,
28:12, 31:6,
32:5, 33:4,
33:14, 33:17,
41:18, 70:4,
131:15, 144:9,
153:15, 155:20,
158:9, 173:2,
173:11
**understood**
6:7, 48:3,
68:3, 206:23
**underwent**
139:13

**undisclosed**
226:12
**unforgiving**
211:6
**unhappy**
20:21
**union**
92:22
**united**
1:1, 3:1, 3:21,
62:13
**universe**
41:16, 41:19
**university**
9:1, 9:8, 9:13,
9:18, 10:11,
10:13, 12:1,
12:22, 12:24,
24:24, 25:4,
137:20, 138:2,
138:13, 153:4
**unless**
6:24, 81:16
**unnecessary**
227:4
**unofficial**
128:22, 129:9
**unquote**
75:20, 220:17
**until**
9:23, 24:16,
36:1, 119:19
**update**
65:12
**updated**
8:15
**upon**
31:9, 31:19,
35:2, 47:1,
51:13, 51:14,
65:22, 66:10,
68:20, 69:1,
70:24, 71:10,
72:2, 72:16,
72:19, 73:11,
80:14, 124:18,
137:3, 137:7,
137:10, 137:11,

142:7, 143:22,
165:17, 169:5,
169:8, 181:1,
182:5, 183:20,
185:14, 188:20,
193:17, 193:21,
195:4, 195:5,
196:14, 199:3,
208:8, 208:9,
208:10, 210:20,
214:22, 223:6,
226:20
**upper**
10:21, 22:21,
37:12, 52:2,
52:9, 52:15,
53:11, 53:14,
54:21, 55:23,
56:9, 56:19,
57:11, 57:16,
58:2, 58:22,
69:22, 89:15,
90:8, 204:22,
215:2
**urgent**
119:5
**usa**
108:23
**use**
26:10, 27:7,
27:15, 27:18,
27:22, 33:4,
34:23, 60:10,
66:16, 76:8,
118:21, 131:17,
144:11, 164:24,
168:19, 170:21,
170:22, 187:17,
190:10, 190:11,
190:20, 191:19,
225:14
**used**
14:19, 20:24,
25:10, 37:22,
40:2, 62:13,
66:15, 67:7,
139:9, 168:18,
195:21, 207:14,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

116

208:23, 211:22,
228:21, 228:22
**uses**
165:23, 166:1
**using**
28:3, 29:14,
47:6, 50:21,
50:22, 122:12,
185:10, 203:12
**usually**
118:21

**V**

**various**
61:18, 61:19,
199:4
**vehicle**
60:11, 60:13,
60:15, 60:16
**verbal**
6:11
**verges**
124:8
**verify**
228:20
**versus**
21:19, 66:5,
67:12, 67:17,
68:4, 74:7,
82:10, 93:18,
102:10, 107:11,
107:12, 108:22,
109:2, 109:16,
109:23, 110:2,
110:4, 110:6,
110:8, 110:14,
110:20, 120:9,
199:5, 206:8,
206:10, 207:22,
211:1, 211:21
**vertebra**
21:22, 21:23,
22:9, 28:11,
140:1
**vertebrae**
35:5
**vertebral**
21:24, 22:1,

22:11, 139:24,
140:16
**very**
13:6, 15:10,
27:14, 28:24,
30:2, 30:8,
32:13, 32:22,
32:24, 39:16,
39:17, 39:24,
41:2, 48:22,
49:23, 50:24,
74:4, 84:21,
97:19, 101:6,
101:8, 101:20,
107:10, 122:20,
141:14, 144:19,
155:16, 164:24,
166:19, 170:6,
179:8, 195:23,
196:11, 198:21,
210:9, 210:14,
210:23, 211:6,
211:9, 211:14,
211:16, 212:16,
212:21, 212:22,
218:19, 218:20,
223:7, 226:5
**viagra**
220:16, 220:23
**vietnam**
10:5
**view**
77:13, 82:8
**violate**
152:21
**violated**
100:6, 100:13,
102:24
**violation**
27:9, 27:10,
27:12, 87:16,
88:22, 103:3,
190:6, 190:10,
191:11, 192:17
**visit**
139:6, 148:4,
148:11, 149:4,
149:17, 159:21,

162:2, 175:21,
190:23
**visits**
149:3, 191:8
**visualize**
140:12
**vitae**
7:15
**vitale**
4:19
**voice**
85:10
**volume**
33:24
**vs**
1:7, 3:9

**W**

**wait**
156:22
**waive**
231:6
**waived**
5:6
**walk**
52:3, 119:14
**walking**
37:11, 40:9,
43:19, 50:12,
158:16, 171:24,
172:5, 219:18
**waned**
220:16
**want**
8:2, 8:23,
16:20, 20:6,
20:22, 20:24,
24:20, 33:3,
36:19, 37:1,
41:18, 54:19,
59:9, 69:7,
70:9, 74:22,
81:7, 84:13,
93:9, 125:15,
125:16, 127:20,
132:23, 139:8,
139:16, 144:20,
147:23, 148:1,

159:20, 178:12,
189:21, 191:19,
193:8, 196:1,
196:11, 218:21,
218:23, 219:20,
224:5, 226:16
**wanted**
62:23, 63:6,
63:7, 68:3,
106:14, 184:1,
204:13, 220:19,
225:23
**wants**
60:14, 104:7
**war**
10:5
**warrant**
45:7, 45:8
**warranted**
82:8
**washington**
10:9, 10:10,
10:13, 138:1,
138:13
**wasn't**
51:5, 52:18,
56:17, 75:24,
106:2, 116:2,
119:11, 127:24,
132:4, 163:1,
163:7, 181:10,
196:5, 206:5,
211:9, 211:14,
211:16, 223:10,
226:6
**water**
28:18, 28:21
**way**
6:12, 36:6,
69:12, 81:15,
100:8, 100:14,
101:11, 122:15,
127:16, 133:6,
136:9, 139:11,
140:6, 143:13,
150:11, 162:14,
171:24, 172:5,
201:9, 213:13,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                    117

213:19, 216:5,
219:18, 229:13,
229:17
**ways**
29:19, 70:16
**we'll**
18:9, 24:19,
30:13, 52:2,
60:24, 67:6,
78:16, 83:17,
162:7, 196:6,
196:10
**we're**
30:8, 31:10,
35:15, 39:13,
39:20, 39:21,
41:22, 44:18,
82:19, 94:1,
101:9, 102:3,
106:24, 112:3,
117:18, 179:5,
207:16, 226:5,
226:11, 226:15
**we've**
35:8, 46:5,
61:18, 116:5
**weakness**
38:24, 40:8,
43:19, 50:9,
51:20, 51:22,
52:2, 53:11,
53:14, 54:2,
54:12, 54:21,
55:23, 56:8,
56:11, 56:19,
187:20
**website**
114:9, 114:16,
115:1, 115:4,
115:5, 115:6,
115:10
**week**
17:16, 67:5,
111:22, 118:12,
118:13, 118:14,
118:18, 118:20
**weeks**
149:8, 149:9,

221:8, 222:3
**weight**
177:20, 178:5,
178:7, 178:9
**went**
8:20, 12:12,
12:18, 12:20,
14:12, 14:13,
14:18, 15:21,
51:8, 127:22,
128:4, 135:8,
135:15, 150:15,
151:11, 176:5,
189:2, 189:3,
210:8, 211:11,
229:6, 229:7
**wexford**
1:8, 3:10,
3:23, 99:17,
100:6, 100:10,
100:13, 100:18,
100:19, 101:17,
102:23, 103:2,
103:8, 103:13,
103:17, 111:1,
112:24, 113:12,
152:19, 152:20,
153:2
**wexford's**
99:24, 100:24
**wexler**
103:23, 153:14,
153:17
**wexler's**
155:10
**what's**
7:11, 36:21,
45:20, 66:21,
80:19, 85:3,
95:21, 125:18,
130:19, 140:17,
168:17, 189:12,
200:1, 202:12,
220:2
**whatever**
38:17, 45:18,
59:24, 60:13,
71:18, 73:9,

82:22, 141:7
**when**
11:23, 13:14,
14:2, 14:17,
15:15, 16:10,
17:1, 17:2,
17:18, 20:16,
21:1, 21:9,
23:3, 26:21,
35:9, 35:10,
35:18, 39:17,
43:17, 45:17,
48:4, 50:21,
60:18, 64:1,
66:6, 67:7,
67:8, 70:5,
71:20, 73:8,
76:2, 79:8,
80:9, 84:23,
85:7, 86:18,
87:18, 103:15,
105:4, 105:19,
106:11, 116:21,
118:23, 119:3,
120:22, 121:15,
125:14, 127:18,
129:2, 129:22,
130:2, 131:5,
145:14, 147:16,
153:4, 153:7,
153:23, 164:13,
168:3, 169:23,
174:14, 180:14,
185:20, 186:18,
187:17, 188:1,
195:22, 196:3,
205:17, 211:8,
211:13, 215:20,
217:20, 222:10,
225:2, 225:10,
229:2, 229:5,
229:7
**where**
10:11, 12:20,
13:5, 16:16,
18:13, 24:14,
28:9, 29:4,
29:11, 30:11,

31:22, 35:19,
39:22, 39:23,
42:10, 43:7,
45:3, 49:4,
49:5, 51:22,
54:1, 66:14,
68:22, 77:9,
85:4, 85:24,
87:7, 87:10,
89:14, 89:23,
93:20, 94:20,
96:10, 97:15,
98:11, 98:22,
98:23, 99:4,
100:5, 100:9,
100:18, 103:21,
103:22, 105:12,
109:18, 110:11,
112:11, 113:12,
113:13, 126:5,
127:9, 128:7,
133:9, 136:23,
139:17, 143:10,
151:3, 151:13,
152:12, 152:22,
153:17, 156:10,
161:9, 163:18,
165:3, 165:4,
165:22, 166:24,
170:2, 170:3,
172:4, 172:15,
172:17, 172:20,
174:9, 176:3,
180:10, 181:15,
186:4, 188:23,
189:16, 192:10,
198:4, 199:14,
201:24, 202:14,
204:15, 218:1,
219:21, 221:10,
223:22, 223:24,
224:9
**where's**
161:9
**wherein**
3:22
**whereupon**
1:19

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

118

**whether**
7:14, 20:3,
20:5, 25:3,
42:19, 44:19,
47:4, 66:4,
67:9, 67:10,
67:13, 67:20,
69:8, 69:11,
70:6, 70:18,
72:19, 72:22,
72:23, 74:20,
81:20, 83:10,
91:22, 93:7,
93:23, 96:6,
97:12, 102:17,
105:20, 106:4,
108:4, 108:7,
115:3, 123:10,
125:10, 127:13,
130:7, 130:22,
131:1, 133:6,
143:5, 145:17,
151:14, 152:3,
152:18, 152:21,
154:11, 155:4,
155:12, 156:14,
156:15, 165:6,
165:8, 170:24,
175:19, 175:20,
188:11, 205:13,
229:22
**which**
6:9, 8:12,
10:6, 14:7,
15:8, 15:20,
18:9, 19:23,
21:8, 21:14,
21:16, 22:3,
27:21, 27:23,
30:1, 31:15,
31:21, 33:5,
33:15, 39:10,
40:23, 41:19,
42:4, 42:14,
49:10, 52:20,
52:21, 55:7,
60:1, 63:12,
76:21, 79:11,

82:1, 86:6,
86:8, 88:21,
89:18, 90:10,
92:4, 97:13,
101:16, 102:7,
106:11, 107:11,
110:17, 110:20,
110:24, 132:6,
135:8, 136:11,
136:21, 137:3,
138:14, 138:16,
144:24, 147:7,
154:19, 156:1,
156:8, 159:17,
165:1, 168:8,
172:1, 189:12,
195:14, 202:6,
210:11, 210:16,
214:18, 214:19,
220:22, 222:5,
227:1, 232:10
**while**
13:10, 129:13,
145:11, 197:22,
198:11, 198:15,
202:3
**who**
20:12, 23:17,
40:15, 41:16,
49:1, 50:19,
51:7, 51:19,
66:10, 67:21,
87:20, 92:13,
95:11, 99:16,
102:23, 103:7,
103:11, 103:19,
103:21, 104:4,
104:12, 105:3,
105:4, 105:13,
105:17, 106:9,
107:14, 107:21,
107:24, 108:3,
109:12, 109:16,
109:21, 110:1,
110:3, 110:5,
110:7, 110:11,
110:17, 114:3,
142:15, 157:16,

157:19, 158:8,
169:1, 197:5,
206:8, 216:1,
216:2, 216:6,
216:9, 222:16,
222:17
**who's**
37:2, 48:10,
55:22
**whoever**
20:17, 92:14,
92:24, 206:16
**whole**
75:16, 75:17
**wholesale**
191:6
**whom**
109:8, 110:22
**whose**
232:4
**why**
12:23, 62:19,
63:21, 119:11,
125:13, 130:12,
138:7, 144:10,
147:22, 165:15,
170:21, 182:9,
184:7, 186:11,
187:16, 208:5,
216:8, 218:9,
221:18, 223:3
**will**
6:17, 6:22,
24:15, 25:21,
25:24, 32:8,
33:9, 36:7,
39:3, 44:23,
47:15, 48:20,
48:21, 63:8,
69:9, 73:20,
73:22, 73:24,
78:1, 81:8,
101:13, 102:3,
116:22, 119:6,
121:19, 121:20,
121:21, 121:22,
141:6, 148:2,
167:4, 168:5,

193:2
**willing**
213:23, 214:3
**winding**
10:5
**withdraw**
158:13
**withheld**
169:15
**within**
3:19, 11:5,
11:18, 26:3,
26:19, 58:14,
67:5, 76:16,
76:17, 77:6,
77:10, 77:11,
78:4, 78:10,
79:20, 96:1,
96:10, 111:17,
112:5, 112:6,
112:12, 112:14,
112:19, 112:24,
113:2, 143:17,
203:16, 221:8,
222:3, 232:3
**without**
60:20, 94:17,
98:12, 98:15,
112:2, 112:12,
117:13, 153:16,
154:23, 155:5,
155:8, 155:13,
157:8, 165:20,
166:6, 200:18,
207:17, 214:24,
222:19, 222:23,
223:12, 229:16
**witness**
3:15, 5:6,
42:8, 46:24,
51:13, 53:3,
55:9, 56:13,
57:3, 78:9,
81:1, 81:5,
83:9, 88:3,
90:20, 95:3,
114:19, 116:18,
123:21, 124:9,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

119

132:4, 151:19,
160:6, 168:14,
182:23, 183:9,
184:5, 187:2,
191:16, 207:5,
208:2, 209:2,
210:1, 212:1,
212:10, 212:16,
215:7, 216:11,
217:13, 217:23,
218:11, 219:4,
221:3, 221:14,
221:20, 222:15,
223:1, 223:5,
223:20, 224:17,
225:15, 228:3,
230:19, 231:6,
232:4, 232:6
**woman**
88:23, 110:13
**won**
128:5
**won't**
36:21, 170:17
**word**
14:21, 21:4,
26:10, 27:9,
27:10, 27:15,
27:17, 27:18,
28:2, 28:3,
47:7, 50:21,
50:22, 60:9,
66:15, 66:16,
122:12, 131:17,
144:11, 170:21,
170:22, 185:10,
185:15, 187:17,
187:23, 189:19,
190:11, 190:23,
191:19, 198:7,
206:6, 207:14
**words**
20:24, 76:24,
143:17, 165:23,
166:1, 203:12,
215:21
**work**
10:12, 24:15,

36:19, 36:22,
60:24, 68:8,
80:2, 84:14,
88:10, 91:24,
92:7, 92:11,
93:13, 93:15,
95:2, 99:23,
100:3, 100:10,
100:24, 101:17,
112:1, 112:23,
115:4, 116:15,
117:10, 117:22,
117:23, 118:12,
118:17, 118:19,
118:23, 119:1,
119:6, 119:13,
119:15, 119:16,
119:20, 119:21,
120:8, 120:17,
129:18, 157:8,
165:20
**work-related**
89:1, 93:8
**worked**
24:13, 24:16,
24:17, 70:2,
100:18, 111:6,
137:19, 138:1,
138:5, 203:22
**workers**
18:19, 93:6
**working**
24:10, 63:21,
119:8, 143:3,
200:19
**works**
99:17, 105:18
**world**
221:23
**wouldn't**
7:22, 29:7,
66:7, 67:8,
67:20, 83:9,
87:15, 88:21,
93:5, 93:8,
93:10, 99:7,
164:12, 166:8,
167:12, 174:21,

190:10, 203:18,
212:24, 223:3,
227:14, 227:16
**wrist**
58:6, 126:16,
127:4, 127:5,
127:21, 127:23,
128:6
**write**
113:17, 205:12,
222:22
**writing**
133:7
**written**
60:1, 60:2,
61:2, 61:16,
64:7, 87:19,
88:6, 88:9,
88:12, 88:13,
89:19, 89:24,
90:10, 94:10,
94:17, 98:10,
99:4, 100:12,
100:17, 101:20,
130:21, 197:4,
226:7
**wrong**
36:21, 47:23,
171:4
**wrote**
87:22, 132:12,
134:23, 179:23,
198:4, 204:15

| X |
|---|

**x-ray**
129:22, 214:17
**x-rays**
129:20, 130:10,
142:3, 200:16,
224:23, 227:10

| Y |
|---|

**yeah**
23:21, 38:24,
40:20, 46:16,
66:7, 74:23,
81:5, 81:14,

91:17, 109:21,
123:21, 131:4,
131:22, 144:16,
146:11, 177:23,
180:13, 181:15,
199:20, 204:8,
206:14, 208:9,
213:4
**year**
8:17, 9:13,
9:21, 10:2,
11:24, 17:14,
17:16, 17:17,
20:19, 24:24,
77:6, 77:11,
79:21, 88:24,
111:17, 112:1,
112:5, 112:6,
112:13, 112:15,
137:17, 213:21,
214:3
**years**
10:2, 11:21,
11:22, 11:24,
12:1, 12:2,
12:18, 13:4,
14:5, 14:10,
14:19, 15:7,
15:12, 15:21,
16:2, 18:12,
19:17, 43:4,
63:2, 64:4,
64:6, 65:10,
65:13, 73:24,
84:9, 96:1,
96:11, 97:22,
98:1, 98:2,
98:7, 98:9,
126:16, 126:18,
137:8, 137:9,
137:14, 137:23,
137:24, 138:1,
143:1, 210:19,
213:8
**yet**
210:17
**you'll**
36:4, 36:20,

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018

120

36:22, 36:23,
173:18
**you're**
5:23, 6:6, 6:9,
8:21, 21:1,
21:12, 24:10,
33:20, 33:21,
35:16, 35:17,
39:18, 43:18,
45:18, 47:6,
47:16, 47:20,
49:6, 50:21,
50:24, 54:15,
54:16, 57:11,
58:19, 65:22,
68:7, 70:5,
70:8, 70:10,
70:11, 71:17,
78:17, 82:6,
82:9, 82:11,
82:13, 84:11,
84:23, 93:2,
104:13, 116:24,
120:19, 122:12,
124:18, 124:19,
128:15, 129:12,
139:23, 140:2,
140:14, 140:15,
140:16, 140:18,
140:19, 141:3,
142:3, 142:4,
142:6, 144:3,
154:18, 165:4,
185:10, 195:13,
195:17, 219:4
**you've**
5:22, 6:7,
8:24, 19:18,
29:14, 43:2,
48:14, 50:18,
59:10, 65:2,
72:11, 76:1,
77:14, 78:17,
87:7, 87:19,
96:4, 97:15,
98:3, 98:4,
98:11, 100:5,
102:11, 116:4,

117:10, 120:11,
132:16, 137:16,
139:3, 139:18,
143:12, 146:9,
149:21, 149:22,
150:1, 151:5,
152:8, 159:15,
174:2, 174:22,
178:4, 180:3,
190:20, 191:3,
197:8, 197:17,
208:18, 211:7,
212:3, 225:3,
230:11
**young**
13:4
**yours**
95:13
**yourself**
26:19, 78:18,
162:19, 222:22

---

**Z**

**zeroed**
135:15, 151:10
**zimmerman**
110:4

---

**$**

**$205,000**
115:19, 115:23,
116:12
**$400,000**
115:21
**$900**
226:11

---

**0**

**00**
3:17, 231:8
**0544**
1:6, 3:8

---

**1**

**1,000**
209:19
**10**
1:19, 3:17,

15:21, 95:1,
98:17, 98:22,
99:8, 111:19,
112:4, 112:8
**100**
4:14, 16:19,
74:17, 99:5,
99:7, 99:8
**1085**
1:17, 232:18
**1090**
4:24
**11**
99:11, 99:12
**12**
1:19, 3:17,
15:21, 23:2,
112:20, 112:24,
113:2
**130**
2:14
**1377**
4:16
**14**
171:5, 172:21
**15**
18:4, 95:8,
99:14, 109:20,
111:19, 117:22,
118:2, 118:3,
118:5, 126:17,
159:21
**150**
116:7
**150,000**
116:8
**1580**
4:14
**16**
1:6, 3:8,
141:16, 202:20
**160**
2:15
**17**
2:18, 132:12,
133:8, 134:2,
200:6
**175**
17:17

**18**
2:18, 160:23
**189**
2:16
**19**
12:19
**197**
2:17
**1973**
137:17
**1974**
9:21, 10:13,
137:17
**1976**
9:23, 10:14,
137:21
**1980**
12:10, 12:11,
12:17, 24:12,
63:21, 137:21
**1983**
63:18, 63:22
**1984**
12:19
**1985**
12:22, 13:15,
16:9, 16:13
**199**
2:18
**1993**
14:6, 16:9,
16:13, 16:15
**1st**
8:8

---

**2**

**20**
18:5, 28:15,
28:17, 28:19,
30:9, 95:8,
98:13, 118:2,
118:3, 118:6,
126:17, 159:21
**200**
17:17, 74:18,
74:21, 74:24
**2000**
166:4, 166:11

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                                        121

| | | | |
|---|---|---|---|
| **2001**<br>14:12, 16:22,<br>17:1, 17:8<br>**2007**<br>14:23<br>**2010**<br>175:21, 175:23<br>**2011**<br>8:17, 62:17,<br>63:1, 63:3,<br>138:22, 139:4,<br>139:5, 147:15,<br>148:4, 148:11,<br>149:4, 150:1<br>**2013**<br>16:5<br>**2014**<br>115:13, 116:11,<br>117:18, 150:18,<br>151:16, 152:4,<br>152:10, 152:13,<br>189:14, 193:20,<br>194:16, 194:22,<br>203:4, 203:5,<br>203:9, 217:6,<br>227:20<br>**2015**<br>115:14, 141:16,<br>156:12, 159:21,<br>160:23, 162:2,<br>166:4, 169:23,<br>171:5, 172:16,<br>172:21, 174:3,<br>174:14, 176:11,<br>176:16, 176:18,<br>176:22, 177:7,<br>177:15, 177:17,<br>177:19, 178:2,<br>178:5, 178:9,<br>178:16, 179:14,<br>179:20, 197:6,<br>199:15, 202:21,<br>213:15<br>**2016**<br>7:17, 8:17,<br>61:3, 115:14,<br>156:10<br>**2017**<br>115:14, 116:11 | **2018**<br>1:15, 2:12,<br>3:16, 7:18, 8:8,<br>96:6, 96:19,<br>97:8, 109:20,<br>130:20, 131:3,<br>131:8, 131:23,<br>132:13, 132:20,<br>133:11, 133:14,<br>134:2, 214:3,<br>215:10<br>**202**<br>2:19<br>**204**<br>2:3<br>**205**<br>178:7<br>**207**<br>2:4<br>**21**<br>176:11, 176:16,<br>176:18, 176:22,<br>177:19, 178:5,<br>178:16, 179:14,<br>179:20<br>**2104**<br>151:15<br>**216**<br>115:15, 116:11<br>**217**<br>4:24, 177:20,<br>178:6, 178:9<br>**228**<br>2:5<br>**24**<br>227:21<br>**241**<br>4:16<br>**243**<br>4:7<br>**26**<br>87:20, 87:21,<br>88:3, 96:6,<br>96:9, 96:19,<br>97:7, 138:21,<br>139:5, 194:16,<br>194:21, 226:10,<br>232:16 | **27**<br>130:20, 131:3,<br>132:20, 133:11,<br>133:14, 136:12,<br>156:9, 174:13,<br>200:9<br>**274**<br>197:14<br>**2821**<br>3:18<br>**29**<br>1:15, 3:16<br>**2nd**<br>4:22, 149:4,<br>149:13<br>**3**<br>**3/5/18**<br>110:14<br>**30**<br>118:24, 119:1,<br>119:2, 119:8,<br>119:17, 119:18,<br>119:19<br>**31**<br>177:15, 177:17<br>**311**<br>4:5<br>**312**<br>4:7<br>**314**<br>4:16<br>**38**<br>18:12, 43:3,<br>84:9<br>**4**<br>**4**<br>118:24, 119:2,<br>119:8, 119:18<br>**48**<br>115:14<br>**5**<br>**5'3**<br>177:19<br>**50**<br>19:13, 61:10 | **500**<br>4:22<br>**53**<br>115:13, 171:3<br>**55**<br>115:13, 171:4<br>**56**<br>171:5, 172:2,<br>219:8, 219:14<br>**58**<br>177:7, 177:12,<br>179:8<br>**59**<br>179:8<br>**5900**<br>4:7<br>**6**<br>**6**<br>3:17, 119:19,<br>231:8<br>**60**<br>115:14<br>**60607**<br>4:6<br>**62704**<br>4:23<br>**63102**<br>4:15<br>**64**<br>160:20<br>**7**<br>**75**<br>99:14<br>**782**<br>4:24<br>**8**<br>**8**<br>118:24, 119:1,<br>119:8, 119:17<br>**80**<br>17:9, 118:7<br>**84**<br>12:19<br>**85**<br>16:19, 16:21, |

Transcript of Frank Petkovich, M.D.
Conducted on May 29, 2018                                          122

```
118:7
               9
90
16:19, 16:21
95
2:13
99
99:11
```