# Exhibit 2

Declaration of Sarah Grady

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| GERRY ARMBRUSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16 C 0544 |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| et al., | ) | Hon. Michael J. Reagan, C.J. |
| | ) | |
| Defendants. | ) | Hon. Mark A. Beatty, M.J. |

## DECLARATION OF SARAH GRADY

I, Sarah Grady, declare under penalty of perjury that the following is true and correct:

1. I am the attorney for Plaintiff Gerry Armbruster.

2. As part of this case, I have consulted with Dr. Peter Brown, Plaintiff's Federal Rule of Civil Procedure 26(a)(2)(B) retained expert. Dr. Brown is familiar with the relevant issues involved in this particular action, has practiced in the same area of healthcare and medicine that is at issue in this action for more than six years, and is qualified by his education, training, and experience to render opinions in the subject area of this case.

3. Dr. Brown has determined in a written report, which is attached hereto as Exhibit 2.A, that there is a reasonable and meritorious cause for the filing of a claim against Bharat Shah and Wexford Health Sources, Inc. under 735 ILCS 5/2-622. Dr. Brown made this determination after a review of the relevant medical records of Gerry Armbruster and other relevant materials involved in this action.

4. I have reason to believe that Dr. Brown is knowledgeable about the appropriate standards of care in situations like that involved in the instant case.

5. Based on my consultation with Dr. Brown and after reviewing his written report, I conclude that there is a reasonable and meritorious cause for filing this action.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

          Respectfully submitted,

          /s/ Sarah Grady
          Sarah Grady
          Attorney for Plaintiff

Jon Loevy
Sarah Grady
Katie Roche
Adair Crosley
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900
sarah@loevy.com

## **CERTIFICATE OF SERVICE**

      I, Sarah Grady, an attorney, certify that on January 31, 2019, I caused the foregoing Declaration of Sarah Grady to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

                                           /s/ Sarah Grady
                                           Sarah Grady
                                           Attorney for Plaintiff

# Exhibit 2.A

Report of Dr. Peter Brown

# PETER W. BROWN, M.D.

**747 Altos Oaks**                                               **Family Practice, Board Certified**
**Los Altos, Ca. 94024-5402**
**Phone:**
**Fax:**
**E-mail:**

May 4, 2018

*Armbruster v. Shah, et al.*, No. 16 CV 544

## Introduction

      Attorneys for the law firm Loevy & Loevy, representing Plaintiff Gerry Armbruster in this matter, contacted me to review Mr. Armbruster's medical records and related documents and provide an expert opinion on the treatment Mr. Armbruster received at Southwestern Illinois Prison while under the care of Wexford Health Sources, Inc. Mr. Armbruster was seen by Dr. Bharat Shah and nurses Susan Hardin, Leanda Davis, Phyllis Maston, Lynne Johnson, Loretta Wilford, and Rhonda Bennett between May 2014 and September 2014. He reported symptoms indicative of neurological injury but did not receive appropriate testing or treatment. It is my opinion, to a reasonable degree of medical certainty, that Mr. Armbruster was not provided minimally adequate care at SWICC when staff failed to adequately evaluate, diagnosis, and treat Mr. Armbruster, or refer Mr. Armbruster to a specialist. The delay in diagnosis and treatment of Mr. Armbruster's severe spinal stenosis, and the failure to refer Mr. Armbruster to be evaluated by a specialist in a reasonable amount of time, caused permanent injury resulting in lasting pain and suffering.

      A copy of my curriculum vitae, compensation rate, and prior testimony can be found in Attachment A to this report.

      All of my opinions are expressed to a reasonable degree of medical certainty. I reserve the right to amend and/or supplement my opinions regarding this case upon disclosure of additional information or documentation.

## Documents Reviewed

- Illinois Department of Corrections medical records
- Gateway Regional Medical Center medical records and imaging results
- SSM Healthcare medical records and imaging results
- Southern Illinois Healthcare Foundation medical records
- Second Amended Complaint (Document 58)
- Deposition of Gerry Armbruster

1

- Deposition of Bharat Shah

## Expert Witness Qualifications

I am currently a family medicine doctor at a private practice in Los Altos, California, a staff physician at El Camino Hospital in Mountain View, California, and a Senior Federal Aviation Administration Medical Examiner.

I received a degree in biology from Stanford University in 1966 and graduated from Northwestern University Medical School in 1970. After completing my internship rotation at the University of Connecticut Hartford Hospital in 1971, I served as a Lieutenant in the Navy Medical Corps from 1972-1974. I was a general medical officer at the Guantanamo Bay, Cuba Naval Base from 1972-1973 and the U.S. Naval Hospital in Annapolis, Maryland from 1973-1974. While stationed in Guantanamo Bay I also handled the fleet sick call.

I've been at my current private family practice in Los Altos since 1975 and the Senior Medical Examiner for the Federal Aviation Administration since 1978. My family practice provides a broad spectrum of care including pediatrics, geriatrics, adult medicine, gynecology, preventative medicine, minor surgery, surgery assistance, internal medicine, and emergency medicine. My extensive surgical assisting includes general surgery, neurosurgery, GYN, and orthopedic surgery. I also have ten years of Emergency Room experience and eight years of obstetrical experience in addition to my private practice.

I have been a staff physician at El Camino Hospital in Mountain View, California since 1975 and was a staff physician at Stanford Hospital in Palo Alto, California from 1976-1978. During my time at El Camino Hospital, I served as the Chief, Vice Chief, and Secretary of the Department of Family Practice from 1987-88, 1986-87, and 1985-86, respectively, and was a consultant regarding Emergency Room coverage issues from 1991-1992. I also served as the Medical Director of the AC2 Medical Clinic from July 2014-February 2018 and as a consultant to One Health Plan from 1999-2005.  I was board certified by the American Board of Family Practice beginning in 1977 and the National Board of Physicians and Surgeons since September 2016. I'm also a member of the American Academy of Family Practice, Santa Clara County Medical Society, and the California Academy of Family Practice.

**Facts and Opinions**

Spinal Cord Compression

The spinal cord is a bundle of nerve tissue that transmits nerve signals from the brain to various parts of the body and transmits neural signals back to the brain, and coordinates the body's automatic reflexes. The spinal cord extends from the medulla oblongata (the base of the brain) to the first lumbar vertebrae. The spinal cord is extremely sensitive and is encased by the spine: a series of 24 presacral vertebrae (bony structures) with cartilaginous intervertebral discs, as well as the sacrum (5 fused vertebrae) and the coccyx (the tailbone, 4 vertebrae).

The spine is divided into five sections: cervical, thoracic, lumbar, sacrum, and coccyx. The medical profession has given names to each vertebra. The first 7 vertebrae, C1-C7, are found in the cervical spine. The next 12 vertebrae, T1-T12, are found in the thoracic spine, while the final 5 vertebrae, L1-L5, are found in the lumbar spine. C5 is positioned at the level of the thyroid cartilage (the Adam's apple). C6 is inferior to C5. These vertebrae provide the neck structural support. The C6 nerve root exits the spinal column between C5 and C6 vertebrae, and innervates arm, elbow, forearm, wrist, and the hand.

Spinal cord compression is a serious medical condition that occurs when pressure is put directly on the spinal cord. Patients with spinal cord compression typically experience weakness, numbness or tingling, and pain.

The onset of a patient's symptoms can be abrupt or gradual, depending on the mechanism of injury. But when a spinal cord is compressed, it affects the cord's ability to transmit impulses from the brain to other parts of the body and transmit neural impulses back to the brain, including upper and lower extremities. When the spinal cord compression is severe, it causes cord change. Cord change can appear and increase over time if the spinal cord is not decompressed.

Magnetic resonance imaging (MRI) is used to detect spinal cord compression and to determine its severity. An MRI can also help to detect other neurological issues. Any qualified physician would know that when a patient has neurological symptoms consistent with a herniated disc or spinal stenosis, MRI imaging is required and at minimum, a referral to a neurologist or neurosurgeon.

Gerry Armbruster's Treatment at Southwestern Illinois Prison

Gerry Armbruster was incarcerated at SWICC, a prison in Illinois. I've been told by Mr. Armbruster's attorneys that Wexford Health Sources, Inc., a medical care company that contracts with prisons and jails nationwide, hired the medical staff who worked at the prison and was responsible for providing medical care to

3

inmates at SWICC, including referrals to specialists outside the prison for tests or treatments.

In May 2014, while picking up trays as part of his job detail in the prison, Mr. Armbruster suddenly began experiencing numbness, tingling, and pain in his right arm, hands, and fingers. Armbruster Deposition p. 40, P359. Mr. Armbruster was first seen for this issue on May 13, 2014, when Nurse Loretta Wilford documented his complaints of pain, tingling, and numbness, and referred Mr. Armbruster to see Dr. Bharat Shah, SWICC's medical director.

Before working at SWICC, Dr. Shah worked as a general surgeon. He described his role at SWICC as a primary care doctor, providing first-line evaluations and treatment, and referring to specialists if further evaluation or treatment is required. Shah Deposition p. 96.

Dr. Shah saw Mr. Armbruster on 5/14/14. Dr. Shah's medical record confirms that Mr. Armbruster reported pain and tingling in his arms, with numbness at his fingertips and an inability to grip his right hand. P360. At the time that Mr. Armbruster saw Dr. Shah, he couldn't hold a pen in his right hand. Armbruster Deposition p. 41. Mr. Armbruster also complained of pain in his back and legs. Dr. Shah observed that Mr. Armbruster had gait issues. These symptoms with his cervical symptoms would have raised a flag of a possible spinal cord compression. The combination of upper and lower extremity symptoms would indicate spinal cord compression unless proven otherwise.

Mr. Armbruster's reports of tingling, pain, numbness, and gait problems were clearly neurological symptoms, and Dr. Shah recognized them as such. Shah Deposition p. 34-35. Neurological symptoms can be caused by spinal cord compression or herniated disc. A physician with Dr. Shah's training and experience would know that cervical cord compression and herniated disc would be important diagnoses to exclude as part of a differential diagnosis.

A physician with Dr. Shah's training would have known that at a minimum, a focused neurological exam was required to address the potential neurological pathology that was causing the symptoms. Dr. Shah's exam was woefully insufficient. Although he apparently noted that Mr. Armbruster's hand grip was "full," a phrase that is not typically used in the medical community to reflect the outcome of a test regarding grip strength, he took no other steps to determine whether any of Mr. Armbruster's other extremities were weak. Testing Mr. Armbruster's range of motion in his C spine, LS spine, and his joints would not exclude spinal cord compression or disc herniation as a cause of Mr. Armbruster's symptoms.

Dr. Shah did note that there were no *gross* neurological deficits in Mr. Armbruster's arms or lumbosacral spine. This wouldn't have excluded spinal cord compression or disc herniation as a cause of Mr. Armbruster's symptoms. In fact,

4

Mr. Armbruster's symptoms were caused by spinal cord compression from a posteriorly protruding disc, something that required MRI imaging to diagnose.

Dr. Shah also apparently performed a straight leg raise, a test which uses passive motion to determine whether a patient's back pain is caused by a herniated disc in the lumbar region. Although I have no criticism of the fact that Dr. Shah performed this test, Mr. Armbruster's report of tingling in his arms already suggested that nerve injury in the lumbar region was unlikely, as damage to a nerve affects only those parts of the body which are level or below the site of the nerve damage. In any event, the fact that the test was negative did not rule out spinal cord compression or disc herniation as a cause of Mr. Armbruster's symptoms. And lower extremity symptoms suggest proximal cord compression. The presence or absence of vertebral muscle spasms provides no information about whether Mr. Armbruster was suffering from spinal cord compression. And Mr. Armbruster's lower extremity symptoms do suggest cord compression.

Given Mr. Armbruster's report of symptoms, as well as the report that the onset of the symptoms occurred abruptly as Mr. Armbruster was bending down to retrieve some trays, it is my opinion that on 5/14/14, Mr. Armbruster was likely suffering from spinal cord compression. In any event, any minimally competent physician exercising medical judgment would have referred Mr. Armbruster to a neurologist/neurosurgeon, obtained an MRI, or referred to the emergency room for a neurological work up.

Instead, Dr. Shah prescribed back exercises and Ibuprofen, and ordered nursing staff to monitor Mr. Armbruster's blood pressure. Although I have no complaints about the decision to monitor Mr. Armbruster's blood pressure since the blood pressure measured during his visit with Dr. Shah was slightly hypertensive, that action did not address Mr. Armbruster's symptoms in any way.

Dr. Shah documented in his medical record that there was no evidence of neurological deficit. But that statement is directly contradicted by the note's documentation of Mr. Armbruster's complaints of pain, tingling, numbness, and right hand weakness in his right arm. These symptoms are evidence of a neurological deficit and addressing those complaints was required in order to ensure that Mr. Armbruster received basically adequate care. He did not. In fact, Dr. Shah admitted that he did not determine the cause of Mr. Armbruster's tingling and numbness, but took no further action, including a neurological or radiological consultation, to address it. Shah Deposition p. 236.

Between 5/14-5/21/14, Mr. Armbruster's blood pressure was checked twice daily. During this time, he complained daily to medical staff that his tingling, numbness, and weakness was persistent. Armbruster Deposition p. 54, P363-365. Despite these reports, the only nurse that documented Mr. Armbruster's complaints was Nurse Phyllis Maston. This is inappropriate. It is a nurse's responsibility to document all medical complaints, especially in a situation like this one where

persistent neurological symptoms indicate the obvious need for a neurological consultation for Mr. Armbruster.

Dr. Shah did review the nursing notes, including Nurse Maston's 5/20 note that Mr. Armbruster complained that the fingers on his hand were numb, that his right side tingled down to his waist, that he had little grip in his hand, and that he could barely walk. Shah Deposition p. 257, P365. Dr. Shah also reviewed Nurse Maston's subsequent 5/20 note where she documented her own observation that Mr. Armbruster's gait was altered. And he saw her 5/28 note that Mr. Armbruster continued to complain of difficulty walking, taking a shower, or putting on clothing, an inability to pick up his daughter due to pain, numbness and tingling in his fingers, with no grip in his right hand, and that she personally observed that it took Mr. Armbruster 5 minutes to print and sign his name. P364-367. That information would have led any minimally competent physician with Dr. Shah's training and background to know that a prompt referral to a neurologist/neurosurgeon, obtained an MRI, or referral to the emergency department was required in order to address the persistent neurological symptoms.

The reason that a prompt referral to a neurologist was required is because of the severe risk of harm faced by patients reporting the symptoms that Mr. Armbruster reported during this time. Those risks include paralysis and persistent impaired neural functioning. These risks are well known to surgeons or primary care practitioners like Dr. Shah.

When Dr. Shah next saw Mr. Armbruster on 5/28/14, less than one hour after Nurse Maston reported seeing Mr. Armbruster experience severe difficulty writing and signing his name, it was in the context of a "hypertension clinic." Of course, regardless of the reason of the encounter, all minimally competent physicians know that neurological symptoms like those Mr. Armbruster continued to report to medical staff—a number of which were documented in the medical records—require attention. Dr. Shah did not address Mr. Armbruster's neurological symptoms. The only portion of Dr. Shah's 5/28 medical record that has any bearing on Mr. Armbruster's neurological symptoms is his entry that a neurologic exam was nonfocal. P369.

A complete neurological exam would include assessment of the following: orientation to person, place, and time, examination of cranial nerves, sensory exam to light touch and pinprick, checking deep tendon reflexes in both upper and lower extremities, and examination for muscle strength and coordination. There is no indication in the medical record that Dr. Shah performed any of these assessments. P368-369. In fact, Dr. Shah said at his deposition that he would not typically perform a detailed neurological exam as part of a hypertension exam, but Mr. Armbruster's complaints of his persistent neurological symptoms mandated an exam. Shah Deposition p. 252.

In fact, the medical record has no explanation at all of what, if anything, Dr. Shah did as part of a neurological exam on May 28, and Dr. Shah has said that he cannot remember seeing Mr. Armbruster on that day. This itself falls well outside of the generally accepted standards of medical practice. All minimally competent physicians are trained on the importance of documentation, including documentation of both normal and abnormal findings, and the physician's differential diagnosis. The reason that adequate documentation is critical to ensuring that a patient receives adequate medical care is because it allows the physician to reflect on his thinking during an earlier encounter with the patient and provide continuity of care, and allows another physician who sees the patient to know what has occurred earlier in time. It is common for a full-time physician like Dr. Shah not to recall every detail of a prior encounter, given the volume of patients most physicians see in any given day. Because of that, thorough documentation is critical. In the medical world, there is a well-accepted saying: "if you didn't document it, it didn't happen." Without an explanation of what neurological exam Dr. Shah performed and what findings he reached as a result, his note that a neurologic exam was "nonfocal" has no real meaning.

Additionally, it is not clear what Dr. Shah means by "nonfocal." Describing the results of a neurological exam as "nonfocal," is not language used by primary care practitioners or, to my knowledge, any other member of the medical profession. It is not used to describe a normal neurological exam. Notably Dr. Shah used the phrase "within normal limits" (WNL) to describe the results of the funduscopic exam but not the neurological exam. P369. As all primary care physicians with the experience and training of Dr. Shah know, significant neurological signs and symptoms like those that Mr. Armbruster had required a full neurological exam, a referral to neurology or neurosurgery, the ordering of an MRI, or referral to the emergency room.

Dr. Shah did not refer Mr. Armbruster to a neurologist. He did not refer him to a radiologist. He did not even address Mr. Armbruster's complaints, documented by Nurse Maston less than one hour earlier, that his neurological symptoms have gotten worse and he can barely walk, take a shower, or get dressed. The only treatment Dr. Shah provided was medication to address Mr. Armbruster's high blood pressure, prescribing him HCTZ (a diuretic) and Lisinopril (a blood pressure medication), and to continue his Ibuprofen prescription. P368. None of these medications would have addressed Mr. Armbruster's spinal cord compression or the neurological symptoms that he was feeling as a result.

Dr. Shah also ordered a CBC, CMP, and an EKG as a routine part of Mr. Armbruster's hypertension care. These tests were fine for his hypertensive care but had nothing at all to do with his neurological complaints and would have no significance in the work up of his neurological symptoms.

On 6/3/14, Dr. Shah saw Mr. Armbruster for a follow-up appointment to review his lab results. At that encounter, Mr. Armbruster told Dr. Shah that the

Ibuprofen wasn't helping his symptoms. Shah Deposition p. 239. Dr. Shah again notes without explanation that Mr. Armbruster's neurological system was "nonfocal," which is inappropriate for the reasons identified above. P371. Dr. Shah ordered a hemoglobin A1C test for Mr. Armbruster in response to an earlier high blood sugar level reading. He also switched Mr. Armbruster's Ibuprofen prescription to Naprosyn.

Again on 6/3, Dr. Shah failed to address Mr. Armbruster's continued neurological symptoms in any way. He did not refer Mr. Armbruster to a neurologist/neurosurgeon, obtain an MRI, or refer him to the emergency room. He made no assessment of Mr. Armbruster's weakness. Dr. Shah still had not determined what was causing the symptoms, and yet his treatment provided absolutely no response to these persistent symptoms. Dr. Shah's actions toward Mr. Armbruster were woefully insufficient and certainly a substantial departure from the accepted standard of care for patients reporting neurological symptoms consistent with spinal cord compression.

On 6/17/14, when Mr. Armbruster returned to the clinic for a follow-up appointment to review his hemoglobin A1C test, he complained to Dr. Shah that he was not getting help and requested a referral to a hospital for further treatment. Dr. Shah refused his request. Dr. Shah documented that Mr. Armbruster continued to complain of numbness, tingling, and pain. Dr. Shah referred to Mr. Armbruster's complaints as vague, but he also documented specifically that Mr. Armbruster complained of weakness in his legs. P372. Dr. Shah did not evaluate the level of Mr. Armbruster's weakness, do a neurological exam, or take any other steps to address it. Specifically, he did not refer him to a neurologist or neurosurgeon, or request an MRI to rule in or rule out spinal cord compression, or refer him to the emergency room for treatment and evaluation of possible spinal cord compression.

Dr. Shah did order an X-ray for Mr. Armbruster's knees, which he acknowledged would provide no information about weakness, tingling, or numbness. Shah Deposition p.261-262. In sum, Dr. Shah took absolutely no steps to address Mr. Armbruster's neurological symptoms.

On 6/23/14, Dr. Shah reviewed Mr. Armbruster's X-ray report and noted the findings. Mr. Armbruster reported feeling better on that day, although he did continue to complain of numbness in his fingers. P375. Mr. Armbruster explained that although his symptoms generally grew worse over the months that he was at SWICC and never fully resolved, they would be more or less tolerable depending on the day. Armbruster Deposition p. 81. In response to Mr. Armbruster's continued neurological complaints and symptoms, Dr. Shah took no steps to evaluate or address that complaint. He did not refer Mr. Armbruster to a neurologist or neurosurgeon, did not ask for an MRI to address Mr. Armbruster's neurological symptoms, or send him to the emergency room for a neurological work up. In fact, he did nothing at all to diagnose his serious neurological complaints.

8

Mr. Armbruster returned to the health care unit on 7/2/14 for another follow-up visit to discuss his knee X-rays. P376. Mr. Armbruster continued to complain of numbness and pain. Dr. Shah notes that there is no gross neurological disease in Mr. Armbruster's hands and fingers. This is an observation that one could expect with the spinal cord compression that Mr. Armbruster had. Any primary care physician exercising medical judgment, having found no explanation for these persistent and potentially serious neurological symptoms, would have consulted with a neurologist or neurosurgeon, requested an MRI, or referred to the emergency room for a full neurological work up.

Dr. Shah took no further steps to assess Mr. Armbruster's serious bilateral upper and lower extremity complaints. Yet he told Mr. Armbruster that he had no neurological deficits. This is extremely concerning, given that the only action taken by Dr. Shah to assess Mr. Armbruster's neurological complaints was to observe him grossly. No competent physician makes a final determination that a patient has no neurological deficits based solely on visual inspection. Despite persistent neurological symptoms over the course of several months, Dr. Shah never performed a complete neurological exam or referred Mr. Armbruster for a full neurological work up. Dr. Shah explained that he meant that he had found no neurological deficits, but Mr. Armbruster's complaints of bilateral upper and lower extremity symptoms demonstrated neurological deficits, and Dr. Shah took no action to address them. Shah Deposition p. 271-272.

Dr. Shah said that he suspected that Mr. Armbruster had neuropathy or arthritis on 6/25/14, diagnoses he did not document anywhere in his medical record. While Mr. Armbruster may have had arthritis, a differential diagnosis would also include herniated disc and spinal cord compression. MRI imaging would have indicated which of these was causing Mr. Armbruster's neurological symptoms. Dr. Shah offered no explanation for why he did not refer Mr. Armbruster to a neurologist or neurosurgeon, request MRI imaging, or refer him to a emergency room for evaluation or treatment even after admitting that he suspected a neurological disorder as the likely cause of Mr. Armbruster's symptoms. In fact, Dr. Shah provided no treatment or follow-up care at all. This response—doing nothing in the face of continued and persistent serious neurological symptoms and signs—shows a blatant disregard for patient well-being.

Mr. Armbruster received no additional attention for his neurological symptoms, which he continued to experience throughout the following months of his incarceration at SWICC. He was never referred to a neurologist/neurosurgeon, taken for an MRI, or referred to the emergency department to determine whether spinal cord compression was present. Mr. Armbruster was released from SWICC on 9/15/14 and after receiving his insurance card went to the emergency department at Gateway Regional Medical Center on 9/26/14. He voiced to medical staff at Gateway the same complaints that he had voiced to Dr. Shah over the course of several months. Dr. Arendell, the emergency room physician, ordered a number of imaging tests, including an MRI of Mr. Armbruster's cervical spine without contrast.

That MRI showed that Mr. Armbruster had severe spinal cord compression caused by a posteriorly protruding disc at the C5-C6 space. The cervical canal was narrowed to 5 mm, putting severe pressure on the spinal cord and causing severe cord change.

After Mr. Armbruster's MRI images were reviewed, Mr. Armbruster was diagnosed with severe myelopathy C5-C6 and referred to Dr. Gregory Bailey, a neurosurgeon with St. Mary's Hospital for emergency surgery that same day. On 9/26/14, Dr. Bailey performed surgery on Mr. Armbruster to decompress the spinal cord, and replaced the herniated disc with a bone graft.

Had Mr. Armbruster received an MRI of his cervical spine when he first began complaining of neurological symptoms, or at least been referred to a neurologist or neurosurgeon for evaluation, it is my opinion that he would have received the surgery performed on 9/26/14 months earlier. Dr. Shah's failure to refer Mr. Armbruster for evaluation and treatment by a neurologist or neurosurgeon, to order MRI imaging for him, or to refer him to the emergency department fell substantially outside of the generally accepted standard of care for primary care physicians. Primary care physicians with the level of training and expertise of Dr. Shah know that if they cannot fully work up persistent neurological symptoms, including weakness, numbness, and tingling in the upper extremities with lower extremity symptoms as well, a referral for evaluation by neurology or neurosurgery, a request for an MRI, or a referral to the emergency room is required.

Dr. Shah's refusal to refer Mr. Armbruster to neurology, neurosurgery, or the emergency room, or request an MRI caused a substantial delay of several months in Mr. Armbruster's treatment. Delay in diagnosis and treatment of a spinal cord compression may lead to persistent neurological deficits, even after surgery is finally performed, like it did in Mr. Armbruster's case. Mr. Armbruster said at his deposition that he continues to suffer numbness, tingling, weakness, and pain in his arms and legs. Had Dr. Shah acted appropriately and exercised appropriate medical judgment, it is my opinion that Mr. Armbruster's outcome would likely have been better than it is now. Although the surgery prevented progression of signs and symptoms it did not result in complete recovery. Mr. Armbruster currently has persistent neurological signs and symptoms that cause persistent disability.

Sincerely,

*[signature]* 5/4/18

Peter W. Brown, M.D.