IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| GERRY ARMBRUSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:16-CV-544-SMY-MAB |
| | ) | |
| BHARAT SHAH, | ) | |
| LORETTA WILFORD, | ) | |
| WEXFORD HEALTH SOURCES, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATIONS

**BEATTY, Magistrate Judge:**

The matter has been referred to United States Magistrate Judge Mark A. Beatty by United States District Judge Staci M. Yandle pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and SDIL-LR 72.1(a) for a Report and Recommendation on the Motion for Summary Judgment (Doc. 132). It is recommended that the District Court adopt the following findings of fact and conclusions of law, and the Motion for Summary Judgment (Doc. 132) be granted in part and denied in part**.**

### PROCEDURAL BACKGROUND

In this lawsuit, Plaintiff Gerry Armbruster alleges that he suffered a spinal cord compression in May 2014 while he was incarcerated at Southwestern Illinois Correctional Center ("SWICC") Defendants Dr. Bharat Shah, Nurse Loretta Wilford, and Wexford Health Sources, Inc., failed to properly diagnose and treat his condition prior to his release in September 2014. The Third Amended Complaint is the operative complaint in this matter, and the following claims remain pending:

Count 1:   Eighth Amendment claim for deliberate indifference to a serious medical need against Defendants Wexford, Dr. Shah, and Nurse Wilford;

Count 2:   Eighth Amendment claim for failure to intervene against Defendants Wexford, Dr. Shah, and Nurse Wilford;

Count 3:   Medical negligence under Illinois state law against Wexford and Dr. Shah; and

Count 4:   Respondeat Superior against Wexford.

(Doc. 123; *see also* ).

Defendants filed a motion for summary judgment along with a 36-page memorandum and over 1,200 pages of exhibits on June 22, 2018 (Docs. 132, 133). Plaintiff filed his 58-page response in opposition to the motion for summary judgment along with over 1,300 pages of exhibits on August 8, 2018 (Doc. 157). Defendants then filed a twelve page reply (Doc. 162), as well as, a fourteen-page response to Plaintiff's statement of material facts (Doc. 161).

## FACTUAL BACKGROUND

### A.  The Parties

Plaintiff Gerry Armbruster was a prisoner at SWICC from January 16, 2013 through September 15, 2014 (Doc. 133-1; Doc. 157-1). Wexford Health Sources, Inc. (Wexford) is a private medical care company that entered into a contract with the Illinois Department of Corrections (IDOC) in 2011 to provide medical care to prisoners in IDOC custody, including those at SWICC (Doc. 158-1). Defendant Dr. Bharat Shah was employed by Wexford as the Medical Director at SWICC (Doc. 133-2; Doc. 157-2). Defendant Loretta Wilford was employed by Wexford as a registered nurse at SWICC (Doc. 133-8; Doc. 157-3).

## B.  Spinal Cord Compression[1]

The human spine is composed of bones called vertebrae stacked on top of one another (Doc. 157-9). The spine is divided into five sections: the cervical vertebrae in the neck, the thoracic vertebrae in the upper back; the lumbar vertebrae in the lower back; the sacrum in the pelvis, and the coccyx (Doc. 157-9; Doc. 157-10, p. 8; Doc. 157-12, pp. 8). In between the body of each vertebrae are discs, which are like jelly doughnuts that support the spine and act as shock absorbers (Doc. 157-10, p. 7; Doc. 157-12, p. 8). Toward the back of each vertebrae is a hollow passage that collectively form a tunnel called the spinal canal through which the spinal cord runs (Doc. 157-9; Doc. 157-12, pp. 8, 10). The spinal cord runs from the base of the brain down to the middle of the back, just below the rib cage (Doc. 157-10, p. 8; Doc. 157-12, pp. 8, 10). It is the body's information super-highway, relaying messages between the brain and the body that allow people to move and feel sensation (Doc. 157-10, p. 9).

Spinal cord compression is caused by any condition that puts pressure on the spinal cord (Doc. 157-9). Even slight compression of the spinal cord can "significantly affect the flow" of information traveling between the brain and other parts of the body (Doc. 157-10, p. 9; *see also* Doc. 157-9). Depending on the cause of the compression, symptoms may develop suddenly (acute) or gradually (chronic) (Doc. 157-9). For example, one of the most common causes of spinal cord

---

[1] The information in this paragraph was primarily taken from the report of Plaintiff's expert witness, Dr. Peter Brown (Doc. 157-9), the deposition of Defendants' expert witnesses, Dr. Stephen Sanders and Dr. Frank Petkovich (Doc. 157-11, Doc. 157-12), and the deposition of Plaintiff's treating neurosurgeon, Dr. Gregory Bailey (Doc. 157-10). It was supplemented generally with information from the following websites:
AM. ASS'N. OF NEUROLOGICAL SURGEONS, *Anatomy of the Spine and Peripheral Nervous System*, https://www.aans.org/en/Patients/Neurosurgical-Conditions-and-Treatments/Anatomy-of-the-Spine-and-Peripheral-Nervous-System (last visited July 19, 2019); JOHN HOPKINS MEDICINE, *Spinal Cord Compression*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/spinal-cord-compression (last visited July 19, 2019); UNIV. OF ROCHESTER MED. CTR., *Spinal Cord Compression*, https://www.urmc.rochester.edu/encyclopedia/content.aspx?ContentTypeID=134&ContentID=13 (last visited July 19, 2019).

compression is normal wear and tear on the spine. In this instance, the compression happens gradually, and it can take years to cause symptoms. Tumors or infections may cause symptoms that develop over days or weeks. And an injury to the spine, including a herniated disc, can cause immediate symptoms.

The compression will affect the function of all the nerves that are level with or below the site of the compression (Doc. 157-9; Doc. 157-10, pp. 8, 9, 11). Common neurologic symptoms of spinal cord compression include pain, numbness, tingling, and/or weakness in the arms, hands, legs, or feet (Doc. 157-10, p. 8; Doc. 157-12, p. 12). When the compression is significant, the patient will likely have weakness that manifests as difficulty walking and loss of dexterity in their upper and lower extremities (Doc. 157-12, pp. 12, 20; Doc. 157-10, p. 8). A significant compression also causes damage to the spinal cord itself, known as "cord change" or "signal change" (Doc. 157-9; Doc. 157-10, pp. 6, 7, 13–14). If the compression is not promptly addressed, the cord change gets progressively worse and the damage may be irreversible (Doc. 157-10, p. 13; Doc. 157-12, p. 20).

The only way to definitively diagnose spinal cord compression and determine its severity is with diagnostic imaging, such as an MRI (Doc. 157-3, p. 18; Doc. 157-9; Doc. 157-10, pp. 8, 9; Doc. 157-11, p. 11; Doc. 157-12, p. 17).[2] If treatment is required for the spinal cord compression, the only appropriate treatment is surgical decompression (Doc. 157-9; Doc. 157-10, p. 8; Doc. 157-11, p. 10; Doc. 157-12, p. 14).

---

[2] A myelogram could also be used to diagnose spinal cord compression (Doc. 157-10, p. 8; Doc. 157-12, p. 17). However, Armbruster's treating neurosurgeon Dr. Gregory Bailey said myelograms were used "in the old days before they had MRIs," and MRIs are superior to the myelogram because the MRI shows the spinal cord itself (Doc. 157-10, p. 8).

### C.  The Onset of Armbruster's Symptoms

In May 2014, Armbruster suddenly began experiencing numbness, tingling, and pain in his right arm, hands, and fingers (Doc. 157-7 pp. 11–12). He testified that he remembered trying to write a letter and being unable to hold a pen because "it was stinging so bad and it was so difficult" (*Id.* at p. 12). He also remembered "having problems holding a cup" (*Id.* at p. 21).

The nurse sick call calendar for May 13th shows that Armbruster asked to be seen for a "[self-reported] pinched nerve" (Doc. 157-13, p. 5). He saw Nurse Wilford and complained to her of "pain in the right shoulder blade, and my arms and fingers tingle, and it hurts all the time" (Doc. 133-1, p. 230; Doc. 157-4, p. 37). He indicated the pain started three weeks earlier when he was picking up trays as part of his job detail in the prison. Nurse Wilford encouraged Armbruster to be more active and referred him to see Dr. Shah.

The next day, Armbruster saw Dr. Shah for the first time about his neurological symptoms (Doc. 133-1, p. 231; Doc. 157-3, p. 55, 57, 59, 60–61). Dr. Shah documented, in pertinent part, that Armbruster complained of pain and tingling in his arms, numbness in his fingertips, and pain in his back and in his legs. Armbruster also reported he couldn't grip with his right hand. Dr. Shah observed that Armbruster walked with back pain but was not in acute distress, which according to Dr. Shah meant he was not "writhing with pain . . . restless or fidgeting."

Dr. Shah examined Armbruster and documented that he had "full" range of movement in his cervical spine, meaning he moved his head up and down and side to side without pain or restriction (Doc. 133-1, p. 231; Doc. 157-3, p. 55, 57, 59, 60–61). He had "full" range of movement and no deformities in his lumbosacral spine. Armbruster had "no gross neurological deficit of arms." The medical record itself does not indicate what this means, but Dr. Shah testified it meant Armbruster could feel the doctor touching him, could feel pinprick sensation, and there were no

spasms when his muscles were palpated. Dr. Shah documented Armbruster's hand grip and range of motion were "full," despite Armbruster's complaint to the contrary. Dr. Shah also noted Armbruster had "full" range of movement in all joints, could do a straight leg raise to 90 degrees without pain,[3] and had no spasms of paravertebral muscles, meaning the muscles along his spine in his back did not spasm when they were palpated.

Dr. Shah's assessment was that Armbruster had arthritis in his spine or a lumbar sprain (Doc. 133-1, p. 231; Doc. 157-3, pp. 55, 56, 58, 61, 62). Dr. Shah advised Armbruster to perform back and hand exercises and continued his pre-existing ibuprofen therapy. And because Armbruster's blood pressure was slightly elevated, Dr. Shah ordered that Armbruster's blood pressure be checked twice a day for one week. Dr. Shah testified that hypertension can cause symptoms of neuropathy so he wanted to determine whether hypertension was the cause of Armbruster's condition. Dr. Shah further testified he did not believe Armbruster had "any significant problem," including a spinal cord compression, because he did not detect any objective neurological deficits (*Id.* at pp. 58, 62).

But all of the expert witnesses in this case agree that when a patient complains of numbness, tingling, and/or weakness in the upper or lower extremities, a physician should absolutely consider spinal cord compression as one of the possible causes of those symptoms. (Doc. 157-9; Doc. 157-10, p. 9; Doc. 157-11, p. 13; Doc. 157-12, p. 16). In other words, spinal cord compression should be considered as part of the differential diagnosis.

All of the expert witnesses also agree that when a patient complains of numbness, tingling, and weakness in the upper and lower extremities, the standard of care requires a neurological exam

---

[3] The straight leg test is used to determine whether a patient's back pain is caused by a herniated disc in the lumbar region (Doc. 157-9, p. 6).

(Doc. 157-9; Doc. 157-11, p. 11; Doc. 157-12, p. 16). In this instance, based on Armbruster's complaints, the neurological exam should have, at a minimum, tested sensation to pinprick and touch; checked deep tendon reflexes in both upper and lower extremities (including at the elbows, wrists, knee, and Achilles tendon); and tested muscle strength and coordination in the upper and lower extremities (Doc. 157-9; Doc. 157-11, pp. 13–14; Doc. 157-12, pp. 15–17). To test the strength in the patient's arms, the doctor should have the patient flex their bicep and extend their tricep, test the patient's strength against resistance, and test their grip strength (Doc. 157-12, pp. 15–17; *see also* Doc. 157-11, p. 13). For the legs, the doctor should observe the patient walk, have the patient stand on their toes and then their heels, and test their strength against resistance (Doc. 157-12, pp. 15–17; *see also* Doc. 157-11, p. 13).

Armbruster's expert witness, Dr. Peter Brown, opined that the neurological exam Dr. Shah conducted on May 14th was "woefully insufficient" (Doc. 157-9). For example, there is no indication in the medical records that he tested Armbruster's deep tendon reflexes or his sensation (*see* Doc. 133-1, p. 231). Aside from a notation that Armbruster's grip strength was "full,"[4] there is no indication Dr. Shah assessed the strength or coordination of Armbruster's arms or legs (*see id.*). Additionally, Dr. Brown explained, and other experts agreed, that many of Dr. Shah's findings—such as the full range of motion in Armbruster's cervical spine, lumbar spine, and his joints, the negative straight leg test, and the presence or absence of vertebral muscle spasms—did nothing to rule in or rule out spinal cord compression as the cause of Armbruster's symptoms (Doc. 157-9; *see also* Doc. 157-12, p. 17; Doc. 157-11, p. 15).

According to Dr. Brown, "the combination of upper and lower extremity symptoms," that

---

[4] According to Dr. Brown, "full" is not a phrase typically used in the medical community to reflect the outcome of a test regarding grip strength (Doc. 157-9, p. 5).

Armbruster was experiencing "would indicate spinal cord compression unless otherwise proven"
(Doc. 157-9, p. 5). Given Armbruster's reported symptoms and abrupt onset, Dr. Brown is of the
opinion that Armbruster was likely suffering from a spinal cord compression on May 14, 2014
(Doc. 157-9). Dr. Brown further opined that "any minimally competent physician exercising
medical judgment would have referred Mr. Armbruster to a neurologist/neurosurgeon, obtained an
MRI, or referred to the emergency room for a neurological work up." (Doc. 157-9).

**D.  Armbruster's Continued Complaints and Ensuing Medical Care**

For one week following his appointment on May 14th with Dr. Shah, the nursing staff
checked Armbruster's blood pressure twice a day (*see* Doc. 133-1, pp. 232–36). Armbruster says
he complained every time about the progressively increasing numbness, tingling, and pain that he
was suffering in his shoulders, fingers, and arms (Doc. 157-7 at pp. 14–15). But none of the nurses
who checked his blood pressure, including Nurse Wilford, documented any such complaints, with
one exception: on May 20th, Nurse Phyllis Maston noted that Armbruster said, "My fingers on my
right hand are numb. My right side tingles down to my waist. I have little grip on my right hand.
My left side tingles to waist. My knees hurt. I can b[are]ly walk" (Doc. 133-1, pp. 234-235; *see
also id.* at pp. 232, 233, 236). Nurse Maston also noted that Armbruster had a "cumbersome walk,
stance, gait" and walked slightly bent over (*Id.* at 234–35). She also noted he was scheduled for a
follow-up appointment with Dr. Shah on May 28th in the Hypertension Chronic Clinic (*Id.*).

The nurse sick call calendar for May 28th indicates Armbruster asked to be seen because
he "[couldn't] walk very good" (Doc. 157-13, p. 8). He was seen by Nurse Maston on May 28th
at 8:15 a.m. (Doc. 133-1, p. 238). She noted Armbruster reported tingling and numbness in the
fingertips of both of his hands, no grip in his right hand, and that he could "barely walk."
Armbruster told Nurse Maston the pain "happened spontaneously" and his symptoms had been

progressively getting worse over the past month. He could not pick up his two-year-old daughter with his right arm, and he was having difficulty taking a shower and putting on clothes. Nurse Maston observed Armbruster having difficulty walking and noted his report of very "sharp pain in lower back all the way across [his] back." Nurse Maston also personally observed that it took Armbruster five minutes to print and sign his name. She referred Armbruster to see Dr. Shah due to "difficulty walking, numbness, [and] severe pain."

Approximately an hour later, Armbruster was seen in the Hypertension Chronic Clinic (Doc. 133-1, pp. 236, 239–40). Nurse Maston took Armbruster's vital signs, and she once again noted "Difficulty walking. Numbness and tingling in fingers. No grip in [right] hand." Dr. Shah testified he would have reviewed the nursing staff's previous notes, which presumably included all of Nurse Maston's notes (Doc. 157-3, p. 66). Dr. Shah documented, in pertinent part, that Armbruster reported "vague" low back pain, groin pain, tingling and numbness (Doc. 133-1, pp. 239–40; Doc. 157-3, pp. 62–64, 65).[5] Dr. Shah documented that the neurological exam was "nonfocal," which he testified meant "no evidence of any focal abnormality" (Doc. 133-1, pp. 239–40; Doc. 157-3, pp. 62–64, 65).[6]

There is no indication or explanation in the medical records of what Dr. Shah did as part of the neurological exam. (Doc. 133-1, pp. 239–40; Doc. 157-3, pp. 62–64, 65). According to

---

[5] It is unclear what is meant by the word "vague." Dr. Shah testified at his deposition that "vague low back pain" meant Armbruster "just said some pain." (Doc. 157-3, p. 63). Counsel then asked "so it is the same as mild then" and Dr. Shah responded "yes" (*Id.*). However, Dr. Shah testified later in his deposition that when he wrote "vague" it was in reference to the patient's description of his symptoms, meaning the patient gave a vague description regarding the nature, intensity, and location of his pain, as opposed to a more detailed description (*Id.* at p. 65).

[6] A focal neurologic deficit is a problem with nerve, spinal cord, or brain function. U.S. NATIONAL LIBRARY OF MEDICINE, MEDLINE PLUS, *Focal Neurologic Deficits*, https://medlineplus.gov/ency/article/003191.htm (last visited July 19, 2019). It affects a specific location, such as the left side of the face, right arm, or even a small area such as the tongue. *Id.* Examples of focal neurologic problem include weakness, loss of muscle control or tone, involuntary movements, numbness, and loss of coordination or fine motor control. *Id.* Speech, vision, and hearing problems are considered focal neurological deficits. *Id.* In contrast, a "nonfocal" problem is *not* specific to a certain area of the brain. *Id.* It may include a general loss of consciousness or an emotional problem. *Id.*

Plaintiff's expert Dr. Brown, this in and of itself falls below the standard of care (Doc. 157-9). Dr. Brown explained that all physicians are trained on the importance of documentation because "adequate documentation . . . allows the physician to reflect on his thinking during an earlier encounter with the patient and provide continuity of care, and allows another physician who sees the patient to know what has occurred earlier in time." (*Id.* at p. 8). Dr. Brown further explained that describing the results of a neurological exam as "nonfocal" is not language used by primary care practitioners or any member of the medical profession (*Id.*). Significantly, it is not a term used to denote a normal neurological exam (*Id.*). Consequently, without an explanation of what neurological exam was performed and what findings were reached, Dr. Shah's note that the neurological exam was "nonfocal" has no real meaning (*Id.*).

Dr. Shah prescribed Armbruster blood pressure medications and an increased dosage of ibuprofen (Doc. 133-1, pp. 239–40; Doc. 157-3, pp. 62–64, 65). Dr. Shah also ordered the routine blood and urine tests and the EKG required for every first-time patient in the Hypertension Chronic Clinic. However, Armbruster's expert opined that the information contained in Nurse Maston's notes "would have led any minimally competent physician with Dr. Shah's training and background to know that a prompt referral to a neurologist/neurosurgeon, . . . an MRI, or referral to the emergency department was required in order to address the persistent neurological symptoms" (Doc. 157-9, p. 7). Prompt action was required because of the severe risk of harm faced by patients reporting the symptoms that Armbruster did, including paralysis and irreversibly impaired neural functioning (*Id.*).

Armbruster saw Dr. Shah on June 3, 2014, to follow up on his test results (Doc. 133-1, p. 242; Doc. 157-3, pp. 61, 65–66). Nurse Wilford took Armbruster's vital signs but did not document any other notes. Dr. Shah documented that Armbruster complained of "vague body ache."

Armbruster also told Dr. Shah that ibuprofen was not helping his symptoms. Dr. Shah once again noted without explanation that the neurological exam was "nonfocal." Dr. Shah's assessment was "hypertension, borderline diabetes mellitus." He switched Armbruster's prescription for ibuprofen to Naprosyn, and he also ordered a lab test to rule out diabetes based on Armbruster's elevated blood sugar level reading. A well-known complication of diabetes is peripheral neuropathy, including tingling and numbness in the hands and feet (Doc. 133-7, p. 12).

Nurse Wilford drew Armbruster's blood for the lab test on June 5th (Doc. 133-1, p. 243). She did not document any notes from the encounter other than to say it occurred (*see id.*). Armbruster followed-up with Dr. Shah regarding the diabetes test on June 17, 2014 (Doc. 133-1, p. 243; Doc. 157-3, pp. 66–67; Doc. 157-4, p. 41). Nurse Wilford took Armbruster's vital signs but did not document any other notes. Dr. Shah noted that Armbruster continued to complain of "vague tingling and numbness," backache, and knee pains. The only indication of that a neurologic exam was performed is Dr. Shah's note that "range of movement slightly painful." Dr. Shah also noted that Armbruster was "argumentative" and "said he did not get help and wants to go out to hospital outside for help" (Doc. 133-1, p. 243; Doc. 157-3, pp. 66–67).

Armbruster explained "[t]here came a time where I was so pissed off because I need his help and he wouldn't do nothing. . . . I had no idea what was the matter with me. None. . . . All I knew is I couldn't walk right. My hands and elbows and wrists and shoulder blade, everything was jacked up. I don't know what he was supposed to do, but he sure didn't do anything." (Doc. 157-7, p. 20). Armbruster testified he remembers telling the doctor he was unable to clean himself properly after going to the bathroom and that he had to crawl to the shower (*Id.* at p. 33). He also testified his condition was obvious and "anybody [who was] blind could have seen how bad I was and send me to the hospital" (*Id.* at p. 33, 34). He said he walked hunched over and his right leg

would drag as he walked (*Id.* at p. 33, 40). In fact, his right leg dragged so badly that he tore a hole in his shoe (*Id.* at p. 33). He said he knew something was wrong and he begged for help, to no avail (*Id.*).

Dr. Shah's assessment of Armbruster on June 17th was "history of gunshot wound both legs, hypertension controlled, vague complaints of numbness, no evidence of metabolic disorder," meaning diabetes was ruled out (Doc. 133-1, p. 243; Doc. 157-3, pp. 66–67). He continued the Naprosyn and ordered an x-ray of both knees in order "to make sure there was nothing significant going on besides arthritis." However, he acknowledged at his deposition the x-ray of Armbruster's knees would provide no information as to what was causing the tingling (Doc. 157-3, p. 261-62).

The nurse sick call calendar for June 20, 2014, indicates Armbruster asked to be seen for pain in his fingertips and because his "balance is off" (Doc. 157-13, p. 9). The medical record from the June 20th sick call visit with Nurse Wilford, however, states that Armbruster simply asked to get his prescription for indigestion renewed (Doc. 133-1, p. 245). There are no notes about any neurological symptoms (*Id.*). Armbruster was referred to Dr. Shah, whom he saw three days later on June 23, 2014 (Doc. 133-1, p. 246; Doc. 157-3, pp. 67–68). Dr. Shah documented that Armbruster was being seen to have his prescription for indigestion renewed. He also documented, in pertinent part, "Patient feels better. Minimal numbness of tip of fingers. [Blood pressure] controlled." Dr. Shah also wrote "no neurologic deficit," but there's no indication of what he did to assess Armbruster in order to reach that conclusion. He also documented that Armbruster had mild pain in his right knee with movement. Dr. Shah reviewed the results of the x-rays taken of Armbruster's knees with him. Dr. Shah's assessment was that Armbruster had arthritis in his right knee, self-reported numbness in his fingers, and chronic indigestion. The only treatment prescribed was medication for his indigestion.

For his part, Armbruster testified that his symptoms were constant but there were some days where they were more tolerable than others (Doc. 157-7, pp. 21–22). "What I remember is there was no coming and going. It was on every day. It just kept getting worse. . . . It was constant all the time. It was pure hell." (*Id.*).

Approximately one week later, on July 2, 2014, Armbruster saw Dr. Shah again (Doc. 133-1, p. 247; Doc. 157-3, p. 69). The doctor wrote that Armbruster "continues to complain of numbness and pain of the fingers without any other symptoms." Dr. Shah documented that Armbruster had "no gross neurological disease or deficit," full range of motion in his cervical spine, and full range of motion in his knees with mild pain. Dr. Shah's assessment was that Armbruster had posttraumatic arthritis in his knees, no neurological deficits, and self-reported numbness and pain in his hands and fingers. He wrote "patient has been told there's no neurological deficit for the symptoms of vague numbness and pain on the tips of his fingers."

Even though Dr. Shah acknowledged that tingling, numbness, difficulty walking are neurological symptoms of spinal cord compression (Doc. 157-3, pp. 10, 11), he testified he never considered spinal cord compression as the cause of Armbruster's symptoms because he did not detect any objective neurological deficits (*Id.* at pp. 58, 62, 70, 76). He testified that as of July 2nd, he suspected Armbruster's symptoms were caused by neuropathy or arthritis (*Id.* at p. 69). Despite this suspicion, Dr. Shah took no action to address the neurological issue or refer Armbruster for an evaluation by a specialist or diagnostic testing (*see* Doc. 133-1, p. 247). In fact, Dr. Shah provided no further treatment for Armbruster on that day and simply instructed him to follow-up as needed (*Id.*).

Armbruster was scheduled for a follow-up appointment on August 1, 2014 (Doc. 133-1, p. 248). The notes from that appointment, which were written by Nurse Wilford, simply say, "no

need to be seen by M.D. To be seen [as needed] as written on June 23, 2014" (*Id.*). Nurse Wilford testified at her deposition that when Armbruster showed up to the Healthcare Unit for his appointment, she looked through his chart to figure out what was being followed up on (Doc. 157-4, p. 43). She saw that the doctor had not ordered a follow-up appointment, and she therefore determined that the appointment must have been scheduled by mistake (*Id.*). Consequently, Armbruster was not seen that day (*Id.*).

Armbruster was seen in the Hypertension Clinic on August 7, 2014 (Doc. 133-1, pp. 248, 258–59; Doc. 157-3, p. 71). Nothing was documented by the nurse or Dr. Shah about complaints from Armbruster relating to his neurological symptoms (*see id.*).

The nurse sick call calendar for September 4th indicates Armbruster requested to be seen because he "need[ed] new meds" (Doc. 157-13, p. 10). He was seen by Nurse Maston and she documented that Armbruster needed to renew his prescription for Naprosyn (Doc. 133-1, p. 250). She also noted he reported throbbing pain in his back that he rated as a 10 (*Id.*). She indicated he had no swelling, no bulging, and no tenderness; there were no signs of obvious discomfort; and his back was "WNL," meaning "within normal limits" (*Id.*). He was referred to see Dr. Shah (*Id.*).

Armbruster was called to see Dr. Shah on September 9th (Doc. 133-1, p. 251). Nurse Wilford took his vital signs but did not document any other notes. Nurse Maston then documented that Armbruster said he was scheduled to be released from prison in six days so he did not need to be seen by the doctor. He signed a Medical Services Refusal form and left the Healthcare Unit (Doc. 133-1, p. 373). There are no notes in the medical record regarding any neurological symptoms (*see* Doc. 133-1, p. 251).

**E.  Armbruster's Release from SWICC**

Armbruster was released from prison on September 15, 2014 (Doc. 157-7, p. 23).

Armbruster testified his symptoms had not abated by the time he was released. In fact, he said "I barely made it to the vehicle when I walked out of Southwestern. My mom had to help me." (*Id.*). Eleven days after his release from SWICC—once he got his insurance card— Armbruster went to the emergency department at Gateway Regional Medical Center in Granite City, Illinois at approximately 9:30 a.m. to seek treatment for his ongoing neurological symptoms (Doc. 133-7, p. 23; Doc. 133-14, p. 18). He reported pain in his lower back, that his finger tips were "on fire, sting, and tingle," and that his equilibrium was off (Doc. 133-14, p. 18). He stated his symptoms had been ongoing since May (*Id.*). Armbruster had an MRI at Gateway, which showed "very significant" spinal cord compression and significant signal change at the C5-C6 level of the cervical spine (*Id.* at p. 3; Doc. 133-15, p. 3; Doc. 157-10, p. 5, 13).

He was immediately referred to Dr. Gregory Bailey, a neurosurgeon, and taken by ambulance to St. Mary's Hospital in St. Louis, Missouri (Doc. 157-7, p. 24; Doc. 157-14, pp. 20–21; Doc. 157-15, pp. 5–6). Dr. Bailey noted Armbruster reported he had been having issues for months with his hand, a burning sensation, aching, "spongy" legs, and difficulty walking (Doc. 157-15, p. 3). Dr. Bailey further noted that on physical examination, Armbruster had "weakness of triceps and significant weakness of intrinsic function, weakness of lower extremities, proximal, hyperreflexia" (*Id.*). Dr. Bailey determined that emergency spinal decompression surgery was necessary because of the severity of the compression (Doc. 157-10, p. 13). "When you have that degree of compression of the spinal cord, the longer you wait, the more damage you're going to have to the spinal cord that's over time irreversible" (*Id.*). By approximately 8:15 p.m. on September 26—less than twelve hours after he went to the emergency department at Gateway—Armbruster was undergoing emergency surgery (Doc. 157-14, pp. 20–21; Doc. 157-15, pp. 5–6).

An MRI taken six months post-surgery showed persistent spinal cord damage, "which may

or may not improve" (Doc. 157-10, pp. 22–23). According to Dr. Bailey, the spinal cord can heal for up to two years, but there is usually no additional improvement after two years (*Id.*). At his deposition on October 24, 2017, which was approximately three years post-surgery, Armbruster testified he continues to have pain in his fingertips and the same tingling and numbness he had prior to surgery, but it is not as intense (Doc. 157-7, pp. 25, 30, 32). He also testified he continues to have impaired functioning on his right side, which he said "doesn't want to work sometimes still to this day. So like if I get in a hurry or I'm excited and I try to run, that doesn't go very well for me." (*Id.* at p. 30).

## F.  Nurse Wilford

Nurse Wilford testified at her deposition that she independently recalled Armbruster because "he would come to sick call and complain of numbness and tingling in his arm, and he did it frequently," meaning "once a week at least" (Doc. 157-4, pp. 4, 5). She also said Armbruster "complained to anybody that would listen to him about his arm and his hand, and he didn't want to come to sick call because he didn't want to pay the price." (*Id.* at p. 5). She later added, "some of those guys would wear the hell out of you. Those are the ones that would stick in your mind, and he was one of them." (*Id.* at pp. 6–7). She also mentioned another man who had skin problems as one of the inmates that "wear the hell out of you." (*Id.* at p. 7).

When pressed as to how many times Armbruster complained to her about his symptoms, she responded "on a regular basis . . . I feel that it's safe to say at least once a week" (*Id.* at p. 5). She indicated that sometimes it was at sick call and other times it was when he encountered her elsewhere at the prison, for example, in the lunch line or walking to and from his dorm (*Id.* at pp. 5, 6). Nurse Wilford did not document the times Armbruster complained to her in an informal, non-medical setting, such as in the lunch line (Doc. 157-4, p. 6). All she did was tell him to fill out

a sick call request (*Id.*).

The medical records demonstrate, and Nurse Wilford confirmed, that she encountered Armbruster in a medical setting on ten occasions between May 13 and September 9, 2014. (*see* Doc. 133-1, pp. 230, 232, 233, 242, 243, 245, 246, 248; *see also* Doc. 157-4, pp. 37–38). She saw him at sick call on May 13, 2014; she took his blood pressure on May 16th and May 18th; she took his vital signs at his appointment with Dr. Shah on June 3rd; she drew his blood for lab tests on June 5th; she took his vital signs at his appointment with Dr. Shah on June 17th; she saw him at sick call on June 20th; and she took his vital signs at his appointment with Dr. Shah on June 23rd; she saw him when he reported to the Healthcare Unit on August 1; and she took his vital signs at his appointment on September 9th. Aside from the May 13th sick call, Nurse Wilford did not document any complaints from Armbruster regarding pain, numbness, and weakness in his upper and lower extremities (*see* Doc. 133-1, pp. 230, 232, 233, 242, 243, 245, 246).

After she had a chance to review the medical records at her deposition, Nurse Wilford stated that, based on her notes in the medical records, Armbruster must not have complained to her about pain, numbness, or weakness in his extremities during their medical encounters following the May 13th sick call (Doc. 157-4, pp. 40–42). She further stated that if he had complained about those symptoms, she would have written it down because those symptoms are cause for concern and "something you don't just brush off" (*Id.* at p. 40). When questioned as to whether she asked Armbruster about his symptoms at these medical encounters, she answered no, "because that didn't stand out in my mind . . . [b]ecause he didn't stand out in my mind" (Doc. *Id.* at pp. 40, 42).

Plaintiff's counsel pointed out that these statements were not consistent with her previous testimony that she remembered Armbruster because he complained relentlessly to the medical staff

about his symptoms (Doc. 157-4, p. 42). Nurse Wilford rationalized that Armbruster must "have started complaining later," as in sometime in July or August, because she "just [could not] see [the nurses] listening to somebody all the time and not writing down or trying to do anything about it" (*Id.*). After further reflection, she theorized that during her previous testimony she was trying to compare Armbruster to the man with the skin problems—as in, the man with the skin problems stood out to her because he complained a lot, while Armbruster did *not* stand out to her because he did *not* complain a lot (*Id.* at pp. 44, 47, 52). She stated that she got the two men mixed up; it was the man with the skin problems who complained incessantly and she did not remember Armbruster complaining a lot (*Id.* at 44, 47, 52).

Nurse Wilford testified that it is an emergency when a patient is suffering severe spinal cord compression with cord change, and complaining of pain, numbness, tingling, weakness, and difficulty walking (Doc. 157-4, p. 32). She stated that the appropriate treatment is to put a cervical collar on the patient and put the patient on a backboard in order to limit their movement, and send the patient to the nearest emergency room (*Id.* at pp. 32, 33).

## G.  Wexford Staffing and Policies

Each IDOC facility has a physician who is designated as the on-site medical director. The on-site medical directors are supervised by the regional medical director (Doc. 157-6, p. 4). When the facility has only one physician, that physician also functions as the medical director (*see id.* at pp. 53–54). That was the case with Dr. Shah at SWICC; he was the sole physician at the facility and therefore the medical director as well (*see id.* at pp. 53, 56).

The contract between the IDOC and Wexford states that the on-site medical director at each facility is the "medical authority" and is responsible for "direct[ing] and control[ling] all clinical aspects of the medical and mental health program." (Doc. 158-1). In its Operations Policies

and Procedures manual, Wexford similarly designated the on-site Medical Director at each facility as the "Responsible Health Authority" and indicated that the medical director is "responsible for making and reviewing all medical/clinical decisions" (Doc. 157-22).

When it comes to referring an inmate to an off-site medical facility, physician, or specialist, the decision is left to the discretion of the treating practitioner (Doc. 157-6, p. 25). Wexford's Medical Policies and Procedures Manual offers the practitioners some guidance in terms of making that type of decision (*Id.* at p. 25). Wexford also provides training, ongoing education, and opportunities for discussion with on-site medical directors regarding what is medically necessary in the correctional healthcare environment (*Id.* at pp. 33–34). "But by and large," the decision of whether to refer a patient to an outside provider is made by the treating practitioner on a case-by-case basis based upon the clinical presentation of the patient and medical necessity (*Id.* at p. 25). There is no written policy that constrains or limits the ability of the treating practitioner to request a referral (*Id.* at p. 27).

If the practitioner decides an off-site referral is needed, that decision must undergo further review (Doc. 157-6, p. 16). In facilities with more than one practitioner, the medical director must review all referral requests (*Id.* at p. 53; Doc. 157-23).[7] If the medical director agrees with the referral request, then it is forwarded to the Utilization Management group (also known as the collegial review process), which is a group of Wexford physicians tasked with managing off-site services for appropriate utilization and cost effectiveness (Doc. 157-6, pp. 33, 53). Only if the referral request is approved by Utilization Management is an off-site appointment arranged for the patient (Doc. 157-23). When there is only one doctor at a facility, as was the case with Dr. Shah

---

[7] Armbruster cites to pages P000582 and P000714 of the contract between the IDOC and Wexford for the proposition that "The contract expressly delegated final decision making authority to refer or deny a consultation request for specialist evaluation or treatment to the site medical director" (Doc. 157, p. 22, ¶ 70). However, those pages of the contract were not produced to the Court (*see* Doc. 158-1).

at SWICC, his referral requests were sent straight to Utilization Management (*see* Doc. 157-6, pp. 55–56).

On the other hand, if the medical director decides that no off-site referral is needed, Wexford does not review or audit those decisions (Doc. 157-6, p. 56). The only recourse an inmate has is to put in another sick call request and ask to be seen again, or to file a grievance, which would be reviewed by the Healthcare Unit Administrator and "probably discussed with the practitioner" (*Id.* at p. 55). If any of the healthcare staff, such as the nurses or Healthcare Unit Administrator, were concerned about the course of treatment, they could contact the Regional Medical Director (*Id.* at p. 59).

## LEGAL STANDARD

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted).

In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, but instead to determine whether there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir.1994). The court may not "choose between competing inferences or balance the relative weight of conflicting evidence." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-

moving party." *Id.* "Only if the court can say, on that sympathetic reading of the record, that no finder of fact could reasonably rule in the unsuccessful movant's favor may the court properly enter summary judgment against that movant." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015).

<u>ANALYSIS</u>

### A.  STATUTE OF LIMITATIONS AS TO WEXFORD AND LORETTA WILFORD

Defendants Wexford and Nurse Wilford first argue that all claims against them should be dismissed because they are time-barred (Doc. 133, p. 17).

The statute of limitations for Armbruster's § 1983 claims and the medical malpractice claims is two years. *E.g., Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013); 735 ILL. COMP. STAT. 5/13-212. Because the ongoing denial of medical care alleged by Armbruster constitutes a continuing violation, the statute of limitations would normally begin to run on the date he was released from prison when he was no longer under Dr. Shah's care, which was September 15, 2014 (Doc. 133, p. 17; Doc. 157, p. 25). *See Turley*, 729 F.3d at 651 ("For continuing Eighth Amendment violations, the two-year period starts to run (that is, the cause of action accrues) from the date of the last incidence of that violation, not the first.") (citation omitted); *Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017) (holding statute of limitations for claim regarding ongoing denial of medical care began to run when prisoner was transferred to a different prison); *Jones v. Dettro*, 720 N.E.2d 343, 346 (Ill. App. Ct. 1999) ("The continuous-course-of-negligent-treatment rule extends the statute of limitations . . . . Once a physician's treatment is discontinued, the statutory period begins to run.") (citing *Cunningham v. Huffman*, 609 N.E.2d 321, 325 (Ill. 1993)).

However, as Armbruster pointed out (Doc. 157), Defendants failed to take into account that the statute of limitations is tolled while a prisoner exhausts the administrative grievance

process as required by the Prison Litigation Reform Act, 28 U.S.C. § 1997e(a) (*see* Docs. 133, 162). *Turley*, 729 F.3d at 651.[8] Armbruster put forth evidence that he filed a grievance prior to his release from SWICC and that grievance was not fully exhausted until the ARB responded on November 5, 2014 (Doc. 157-20; *see also* Doc. 80). Thus, the statute of limitations on his § 1983 claims did not begin to run until November 5, 2014, and it did not expire until two years later on November 5, 2016. Armbruster's original complaint and his First Amended Complaint were respectively filed in May 2016 and October 2016 (Doc. 1; Doc. 33)—well before the expiration of the limitations period. Consequently, Armbruster's claims against Wexford and Nurse Wilford are not untimely. The portion of the motion for summary judgment pertaining to the statute of limitations is denied.

## B.  DELIBERATE INDIFFERENCE AGAINST DR. SHAH, NURSE WILFORD, AND WEXFORD (COUNT 1)

"It is well established that persons in criminal custody are entirely dependent on the state for their medical care." *Mitchell v. Kallas*, 895 F.3d 492, 496 (7th Cir. 2018) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). The Supreme Court has thus recognized that the Eighth Amendment's proscription against cruel and unusual punishment creates an obligation for prison officials to provide inmates with adequate medical care. *Gabb v. Wexford Health Sources, Inc.*, No. 18-2351, 2019 WL 2498640, at *3 (7th Cir. June 17, 2019) (citing *Estelle*, 429 U.S. at 102–03); *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, (1994)). In order to prevail on an Eighth Amendment claim for deliberate indifference,

---

[8] In the previous briefing and Order on the issue of exhaustion, the parties assumed without discussion that the exhaustion requirement of 28 U.S.C. § 1997e(a) applied to Armbruster's § 1983 claims as well as his state-law claims for medical malpractice (*see* Docs. 50, 51, 59). The Court followed suit in its Order denying the motion for summary judgment on the issue of exhaustion (Doc. 80). Armbruster has once again made the same assumption in responding to Defendants' argument regarding the statute of limitations (Doc. 157). Defendants raise no issue with Armbruster's assumption in their reply brief (*see* Doc. 162). In fact, their reply brief makes absolutely no mention of the statute of limitations issue in any capacity (*see* Doc. 162).

the plaintiff must demonstrate he suffered from an objectively serious medical condition and that the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *E.g., Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012)

### 1. Serious Medical Need

Defendants first argue they are entitled to summary judgment because Armbruster was not suffering from a serious medical need while he was incarcerated at SWICC. (Doc. 133, pp. 21–24; Doc. 162, pp. 1–2). The Court, however, is wholly unconvinced by their argument.

"An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Importantly, "[a] medical condition need not be life-threatening to be serious." *Id.* It can be a condition that "significantly affects an individual's daily activities" or a condition that would result in further significant injury or chronic and substantial pain if left untreated. *Hayes v. Snyder*, 546 F.3d 516, 522–23 (7th Cir. 2008).

Here, Armbruster has come forward with sufficient evidence that he was suffering from an objectively serious medical condition while incarcerated at SWICC. The medical records demonstrate Armbruster complained of pain and tingling in his arms, numbness in his fingers, and pain in his back and legs. He also complained he had no grip in his right hand, and Nurse Maston documented that she personally observed it took Armbruster five minutes to print and sign his name. He complained that he was having trouble walking, which was also corroborated by Dr. Shah and Nurse Maston's personal observations. Armbruster also complained he was having trouble with basic tasks like picking up his daughter, taking a shower, putting on clothes, and wiping himself after using the bathroom. Armbruster testified his symptoms began in May 2014

and continued through his release on September 15, 2014. Furthermore, Armbruster's expert witness, Dr. Peter Brown, opined that as of May 14, 2014, Armbruster was likely suffering from a spinal cord compression.

There is no question a spinal cord compression accompanied by neurological symptoms, such as pain, numbness, and weakness in the arms and legs, is a serious medical need (*see* Doc. 157-9; Doc. 157-11, p. 16; Doc. 157-12, pp. 12–13). *See also Zirko v. Parthasarathi Ghosh, M.D.*, No. 10 C 08135, 2015 WL 6447768, at *11 (N.D. Ill. Oct. 26, 2015) (finding herniated disc that caused intense, radiating pain throughout plaintiff's lower back and legs and caused numbness and tingling sensations in his right leg was a serious medical condition); *Perez v. Sullivan*, No. 01-C-519-C, 2002 WL 32362248, at *4 (W.D. Wis. Apr. 30, 2002), *aff'd,* 52 Fed. Appx. 275 (7th Cir. 2002) ("Unquestionably, a spinal injury [consisting of a herniated disc and pinched nerve] is a serious medical condition that carries a risk of grave and permanent impairment.")

Although we will never know for certain if Armbruster was suffering from a spinal cord compression while he was incarcerated at SWICC because an MRI was not performed, a jury could still conclude Armbruster had a serious medical need based on his reported symptoms *alone*. Even a lay person would recognize that a 40-year-old man whose fingers and arms suddenly went numb, who repeatedly complained of excruciating pain and worsening symptoms, and who had visible difficulty walking and using a pencil would require a doctor's attention.

### 2.  Deliberate Indifference

A prison official exhibits deliberate indifference when they know of a serious risk to the prisoner's health exists but they consciously disregard that risk. *Holloway*, 700 F.3d at 1073 (citation omitted). "The standard is a subjective one: The defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the

inference." *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (quoting *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016)). The deliberate indifference standard "requires more than negligence and it approaches intentional wrongdoing." *Holloway*, 700 F.3d at 1073. It is "essentially a criminal recklessness standard, that is, ignoring a known risk." "essentially a criminal recklessness standard, that is, ignoring a known risk." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (citation omitted).

### a.  Dr. Shah

Armbruster alleges Dr. Shah was deliberately indifferent to his serious medical need because he had notice of Armbruster's medical needs, knew the risk of harm if Armbruster did not receive appropriate medical care, yet failed to provide Armbruster with any proper medical care or access to medical care (Doc. 123)

"There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Holloway*, 700 F.3d at 1073 (citation omitted). For that reason, a medical professional is entitled to deference in treatment decisions so long as they are based on professional judgment. *McGee*, 721 F.3d at 481 (citing *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). "By definition a treatment decision that is based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Rasho*, 856 F.3d at 476 (quoting *Zaya*, 836 F.3d at 805). *See also Roe*, 631 F.3d 843 at 859 ("[I]t is implicit in the professional judgment standard itself . . . that inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments.") "But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional

judgment as the basis for a treatment decision." *Zaya*, 836 F.3d at 805. "[W]here evidence exists that the defendant knew better than to make the medical decision that he did, then summary judgment is improper." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)).

In determining whether medical care evidences deliberate indifference to serious medical needs, the court looks at the "totality of an inmate's medical care." *Petties,* 836 F.3d at 728. The "[f]irst, and most obvious" circumstance in which a medical professional's actions may constitute deliberate indifference "is a [doctor's] decision to ignore a request for medical assistance." *Id.* at 729. A jury can also infer deliberate indifference when "a risk from a particular course of medical treatment (or lack thereof) is obvious." *Id.* And in cases "where unnecessary risk may be imperceptible to a lay person," a jury can find deliberate indifference when there is proof that the medical professional's decision was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* In other words, "no minimally competent professional would have so responded under those circumstances." *Roe*, 631 F.3d at 860 (citing *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 989 (7th Cir. 1998)).

Because the permissible bounds of competent medical judgment are not always clear, even among the medical community, "it can be challenging to draw a line between an acceptable difference of opinion . . . and an action that reflects sub-minimal competence." *Petties*, 836 F.3d at 729. The Seventh Circuit has identified a number of circumstances that might suggest deliberate indifference, including when a doctor persists in a course of treatment known to be ineffective; when a doctor "chooses an easier and less efficacious treatment" based on cost

or convenience rather than medical judgment; and an inexplicable delay in treatment which serves no penological interest. *Id.* at 730, 733.

Here, the evidence construed in a light most favorable to Armbruster suggests that Dr. Shah "knew better" than to pursue the course of treatment he chose. To begin with, Dr. Shah's own testimony "indicates knowledge of necessary treatment he failed to provide." *Petties*, 836 F.3d at 731. There is also expert testimony that Dr. Shah's chosen course of treatment radically departed from accepted professional standards. And the medical records themselves demonstrate that Dr. Shah eventually stopped trying altogether to diagnose Armbruster's condition or provide appropriate treatment.

On May 14, 2014, Armbruster had an appointment with Dr. Shah at which he was walking abnormally and reporting pain, numbness, and tingling in his arms and fingers; weakness in his hand; and pain in his legs and back. Dr. Shah testified at his deposition that a patient who is experiencing spinal cord compression would likely have sensory and motor disturbances, such as pain, tingling, numbness, lack of sensation, weakness, and difficulty moving (Doc. 157-3, pp. 10, 11). He also testified surgery is required to treat severe spinal cord compressions, and if the compression is not promptly addressed, the damage gets progressively worse and may be irreversible (*Id.* at pp. 19, 20, 22). Dr. Shah also testified the only way to diagnose a spinal cord compression is with imaging, such as an MRI (*Id.* at p. 18).

This testimony makes clear he was aware of the risk of spinal cord compression when Armbruster showed up to his appointment on May 14th. Dr. Shah's testimony also supports a reasonable inference that he knew, when a patient reports symptom like Armbruster's, spinal cord compression should always be ruled out as the cause. Furthermore, all of the expert witnesses in this case agreed that, if a patient reported tingling, numbness, and weakness in his upper and lower

extremities, a physician with Dr. Shah's training and experience would know that spinal cord compression was a *possible cause* of the symptoms and take the steps necessary to rule it out (Doc. 157-9; Doc. 157-10, p. 9; Doc. 157-11, pp. 12–13; Doc. 157-12, p. 16).

However, according to Dr. Shah, he did not consider spinal cord compression as the potential cause of Armbruster's reported symptoms because he did not detect any objective neurological deficits (Doc. 157-3, p. 58, 62, 70, 76). But Dr. Shah's explanation is suspect and a jury could reasonably decide not to give it any credit. For one, Dr. Shah documented in the medical record that he observed Armbruster's difficulty walking, which is an objective finding of a neurological deficit. Additionally, there is evidence the neurological exam Dr. Shah conducted was deficient. In particular, Armbruster's expert witness, Dr. Peter Brown, opined that Dr. Shah's neurological exam was "woefully insufficient" given the lack of documentation that Dr. Shah tested Armbruster's reflexes, sensation, or muscle strength. All of the expert witnesses agreed these are basic elements of a neurological exam that should have been performed given the nature of Armbruster's complaints. Dr. Shah's explanation is also undermined by Dr. Gregory Bailey's testimony that it is possible to have severe spinal cord compression without any symptoms (Doc. 157-10, pp. 9–10).

In the opinion of Armbruster's expert, "any minimally competent physician exercising medical judgment" would order an MRI, refer the patient to a neurologist or neurosurgeon, or send him to the emergency room for a neurological work up in order to rule out spinal cord compression (Doc. 157-9, p. 6). Dr. Shah did *none* of these things. He simply ordered ibuprofen, back exercises, and blood pressure monitoring. However, Armbruster's expert and his treating neurosurgeon both opined the treatment ordered by Dr. Shah would not allow him to rule in or rule out spinal cord compression nor make a final determination as to the cause of Armbruster's pain, numbness,

tingling, and weakness (Doc. 157-9, p. 6; Doc. 157-10, pp. 23, 29).

For these reasons, a jury could find that as of May 14, 2014, Dr. Shah failed to promptly and properly evaluate Armbruster's condition and his inaction substantially and unreasonably delayed necessary treatment, thereby acting with deliberate indifference to Armbruster's serious medical needs. *Conley v. Birch*, 796 F.3d 742, 747, 748 (7th Cir. 2015). The same holds true for Armbruster's second appointment with Dr. Shah on May 28, 2014. By that time, Armbruster's symptoms had been ongoing for approximately one month and were getting worse. In fact, they were so bad he reported he was unable to pick up his daughter with his right arm, had difficulty showering and putting on clothes, and could barely walk.

Armbruster's expert opined that his complaints mandated a detailed neurological exam (Doc. 157-9, p. 7). Dr. Shah claimed that he performed a neurological exam—which included observing Armbruster walk, testing his reflexes, testing his sensation, and inspecting the parts of the body he was complaining about—but he did not find any objective indication that Armbruster had neurological issues (Doc. 157-3, pp. 16, 64). However, again here, a jury is entitled to give little or no credit to Dr. Shah on this point. Dr. Shah testified that he has no independent recollection of the appointments with Armbruster, which makes his treatment notes the most probative evidence of the what occurred at the appointment. *Conley*, 796 F.3d at 747. Those notes lack any indication whatsoever as to what was included in the neurological exam or whether it addressed the issues documented by Nurse Maston. The only note in the medical records says "Neurological exam: nonfocal" (Doc. 133-1, p. 240), which as previously discussed, is of no use to any third party reviewing the note. Furthermore, Dr. Shah's stated excuse that there were no objective findings of a neurological issue is directly contradicted by the medical records. Nurse Maston and Dr. Shah both documented they personally observed Armbruster having difficulty

walking, and Nurse Mason also observed it took Armbruster an extraordinarily long time to write his name.

In the opinion of Armbruster's expert, the complaints documented by Nurse Maston would have prompted "any minimally competent physician with Dr. Shah's training and background" to immediately refer Armbruster to a neurologist or neurosurgeon, to order an MRI, or send him to the emergency room for a neurological workup (Doc. 157-9, p. 7). But once again, Dr. Shah did none of these things. He only prescribed Armbruster blood pressure medications and ibuprofen and ordered routine blood tests. Armbruster's expert and his treating neurosurgeon both opined that the tests ordered by Dr. Shah did nothing to allow him to rule in or rule out spinal cord compression nor make a final determination as to the cause of Armbruster's pain, numbness, tingling, and weakness (Doc. 157-9, p. 6; Doc. 157-10, pp. 23, 29).

By his fourth appointment with Dr. Shah on June 17th, the evidence supports an inference that Dr. Shah chose a course of treatment that he knew was ineffective for diagnosing or treating Armbruster's condition. The hypertension medication Armbruster had been prescribed had not resolved his symptoms and diabetes had also been ruled out as the cause. As Armbruster tells it, he was literally begging the doctor to help him and send him to an outside physician or hospital. Dr. Shah, however, refused Armbruster's request. All the doctor did was order an x-ray of Armbruster's knees, which he admitted would provide no information as to the cause of the tingling and numbness in Armbruster's arms (Doc. 157-3, p. 67; *see also* Doc. 157-9, p.  9; Doc. 157-10, pp. 22, 29). There is no indication from the medical records that Dr. Shah even performed a neurological exam of any kind. In other words, Dr. Shah did *nothing* to address Armbruster's neurological symptoms and failed to take any steps to definitively diagnose Armbruster's condition.

By his sixth appointment on July 2nd, the evidence supports an inference that Dr. Shah turned a blind eye to Armbruster's serious medical need. Armbruster's symptoms had been ongoing for approximately two months and Dr. Shah admitted that he suspected Armbruster's symptoms were caused by some sort of neuropathy or arthritis in his spine (Doc. 157-3, p. 69). However, Dr. Shah took absolutely no steps confirm or refute his suspicion. He did not order diagnostic testing nor did he refer Armbruster to a specialist. Dr. Shah did not provide any treatment whatsoever to Armbruster that day and simply instructed him to follow-up as needed. Dr. Shah thus chose to ignore Armbruster's *persistent* reports of severe, progressively worsening symptoms and gave up trying to investigate, diagnose, or treat Armbruster's condition, leaving him to suffer until his release from SWICC.

For these reasons, a reasonable jury could conclude that Dr. Shah was deliberately indifferent to Armbruster's serious medical need and Dr. Shah is not entitled to summary judgment.

### b. Nurse Wilford

Armbruster alleges Nurse Wilford was deliberately indifferent because she did not document his complaints about pain, numbness, and weakness, or do anything to help him (Doc. 123, p. 4).

It is undisputed that Armbruster first complained to Nurse Wilford about his symptoms at a sick call on May 13, 2014. It is also undisputed that Nurse Wilford immediately referred him to the doctor and he was seen by Dr. Shah the next day. Nurse Wilford argues that her actions in May 13th were appropriate, and she was not deliberately indifferent (Doc. 133, pp. 29–30). Armbruster does not appear to dispute this argument (*see* Doc. 157, pp. 40–42). He instead takes issue with Nurse Wilford's inaction on all occasions following the sick call encounter on May 13th (*see id.*).

According to Nurse Wilford, the reason she did not document any complaints or take any action was because Armbruster never complained to her about his neurological symptoms following the sick call encounter on May 13th (Doc. 162, pp. 5–6). But a reasonable jury could conclude otherwise. First and foremost, Nurse Wilford changed her story. As outlined above in the Factual Background, Nurse Wilford initially testified that Armbruster persistently complained to her approximately once a week about his symptoms. Her initial story is consistent with Armbruster's own testimony that he frequently complained to medical personnel about his symptoms. Armbruster also testified that some of his problems, like the difficulty he had walking, were obvious to anyone who saw him.

The medical records also tend to suggest that Nurse Wilford was aware of Armbruster's complaints. Following the sick call visit on May 13th, Nurse Wilford saw Armbruster on nine more occasions over the course of the next four months (from May 14 to September 15, 2014). During that same time frame, other nurses and Dr. Shah documented complaints of pain or neurological symptoms in Armbruster's chart on no less than nine occasions (*see* Doc. 133-1, pp. 231–51). That means Armbruster's reported symptoms were documented all over his chart—the same chart Nurse Wilford reviewed and took notes in when she saw Armbruster, which makes it seemingly implausible that Nurse Wilford was unaware of Armbruster's complaints. Consequently, a genuine issue of material fact exists as to whether Nurse Wilford was aware of Armbruster's serious medical condition.

Nurse Wilford next argues that even assuming she knew about Armbruster's condition, her failure to document his complaints and take action still did not amount to deliberate indifference (Doc. 133, p. 29; Doc. 162, p. 6). She points out that he was always referred to Dr. Shah and remained under his care, and there is nothing else she could have done for Armbruster's complaints

(Doc. 133, p. 29; Doc. 162, p. 6). But that is simply not true. "Although a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient." *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). "[A] nurse confronted with an inappropriate or questionable practice should not simply defer to that practice, but rather has a professional obligation to the patient to take appropriate action," for example, by discussing the nurse's concerns with the treating physician or by contacting an administrator. *Id.* (citation and internal quotation marks omitted). While Nurse Wilford testified she did not believe Armbruster needed any additional medical attention beyond what Dr. Shah was providing, a jury reasonably could disbelieve her. Considering the facts in the light most favorable to Armbruster and drawing all inferences in his favor, a jury might reasonably conclude that Nurse Wilford *repeatedly* encountered Armbruster in severe pain and complaining that his arm was numb, that he was having trouble walking, and that he needed help beyond what Dr. Shah was providing, but Nurse Wilford did, literally, nothing about it. "'A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury *or unnecessarily prolonged his pain*,' and 'even brief, unexplained delays in treatment may constitute deliberate indifference.'" *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (quoting *Perez v. Fenoglio,* 792 F.3d 768, 777–78 (7th Cir. 2015)) (emphasis in original).

Consequently, a reasonable jury could conclude that Nurse Wilford acted with deliberate indifference to Armbruster's serious medical needs and she is not entitled to summary judgment on his claim of deliberate indifference.

### c. **Wexford**

Wexford is a private corporation that has contracted to provide essential government

services, namely to provide medical care to prisoners in IDOC custody, and can thus be held liable under § 1983 for constitutional violations based on the *Monell* theory of municipal liability. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014)). Under *Monell*, Wexford cannot be held vicariously liable for the actions of its agents or employees in violating an individual's constitutional right. *Id.* at 789 ("*Respondeat superior* liability does not apply to private corporations under § 1983."). Wexford can be held liable only for its own constitutional violations. *Id.* "The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?" *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (*en banc*). An action is one of the "institution itself," when the constitutional injury was caused by (1) an official policy adopted and promulgated by its employees, (2) a practice or custom that, although not officially authorized, is widespread and well-settled; or (3) an official with final policy-making authority. *Glisson*, 849 F.3d at 381. *Accord Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009).

Here, Armbruster argues his constitutional injuries were the byproduct of an unlawful widespread custom and action by an official with policy-making authority (Doc. 157, pp. 42–43).

### i. Widespread custom

*Monell* claims based on a widespread practice require proof of "a series of violations." *J.K.J. v. Polk Cty.*, No. 18-1498, 2019 WL 2610999, at *9 (7th Cir. June 26, 2019) (quoting *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003)). "[P]roof of isolated acts of misconduct will not suffice." *J.K.J.*, 2019 WL 2610999, at *9 (quoting *Palmer*, 327 F.3d at 596). *See also Thomas*, 604 F.3d at 303 ("[T]he plaintiff must demonstrate that there is a policy at issue rather than a random event."). But beyond saying that "a series of violations" is necessary, there are no "bright-

line rules" or "clear consensus as to how frequently such conduct must occur to impose *Monell* liability[.]" *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006) (quoting *Cosby v. Ward,* 843 F.2d 967, 983 (7th Cir. 1988)).

Here, Armbruster has produced grievance records from January to September 2014, showing that ten other prisoners also complained that Dr. Shah provided them with inadequate medical care for their serious medical needs (Doc. 157-21). Three of the grievances concern back injuries (*Id.* at pp. 2–11). And according to Armbruster, four of the grievances contain allegations "that they, like Armbruster, were denied medical care based on their upcoming dates of release" (Doc. 157, pp. 43–44).

To the extent Armbruster is alleging there was a practice at SWICC of denying medical treatment to inmates who were set to be released in the near future, none of the four grievances he cited to actually supports that claim. In the first of the four grievances, which was filed on March 9, 2014, the inmate indicates he suffered a back injury on February 13, 2014, which caused pain in his lower back and all the way down his left leg (Doc. 157-21, pp. 8–10). He further states he saw Dr. Shah three times in three weeks and Dr. Shah did nothing but give him Motrin (*Id.*). The inmate goes on to say: "I will be released on 5-1-14 and will be seen by my family physician to discuss further medical treatment which could result in legal action being taken." (Doc. 157-21, pp. 9–10). While it is true the prisoner mentioned his release date, it was to essentially to warn the prison it might be subject to litigation. He did not say anything from which it can be reasonably inferred that he mentioned his release date because he believed Dr. Shah was acting pursuant to a practice of denying medical care to inmates with impending release dates. Consequently, this grievance fails to lend any support to Armbruster's claim.

The other three grievances that mention release dates concern treatment for hepatitis C

(Doc. 157-21, pp. 25–34). In responding to two of those grievances, prison officials explicitly stated the inmates did not meet the "length of stay" criteria for receiving treatment for hepatitis C. In other words, there is an official protocol that dictates an inmate must have a certain amount of time remaining on his sentence to receive testing and treatment for hepatitis C (Doc. 157-21, pp. 25–31). *See, e.g., Roe v. Elyea*, 631 F.3d 843, 850 (7th Cir. 2011) (describing IDOC medical director's testimony that under the IDOC's policy for hepatitis C, treatment was only provided to inmates who could complete a course of treatment while still incarcerated). In the third grievance concerning hepatitis C, the inmate mentioned in the grievance that he had twenty-two months left in [his] sentence" (*see* Doc. 157-21, pp. 32–34), presumably to demonstrate that he had sufficient time left on his sentence to receive treatment. In the response to that grievance, prison officials indicated the inmate was denied treatment because "certain criteria were not met," but they did not specifically identify those criteria (*Id.*). Perhaps it was his length of stay, perhaps it was not. Either way, he was denied treatment because he failed to meet specific criteria outlined in the official protocol for inmates with hepatitis C.

Armbruster, on the other hand, had a back injury, not hepatitis C. There is no indication there is a written protocol for treating back injuries that specifies the time left on a prisoner's sentence determines whether they are eligible for treatment. Simply put, the circumstances of the inmates with hepatitis C who were denied treatment are materially different than Armbruster's circumstances, and thus their grievances fail to lend any support to Armbruster's claim. Accordingly, Armbruster failed to put forth evidence sufficient to create a material issue of fact and no reasonable jury could conclude there was a widespread and well-settled practice at SWICC of denying medical treatment to inmates with impending release dates.

That leaves Armbruster's claim that there was a general practice at SWICC of denying

adequate medical care to inmates suffering from all manner of serious medical conditions. The only evidence he puts forth to support this claim is the grievance records of the ten other inmates. Armbruster asserts that two district court cases from the Northern District of Illinois "establish that a handful of other allegations of deficient care—even when those allegations concern medical conditions not identical to the one at issue in the case—is sufficient to survive summary judgment on a *Monell* claim against a prison medical care provider." (Doc. 157, p. 44) (citing *Piercy v. Warkins*, 2017 WL 1477959, at *12-13 (N.D. Ill. Apr. 25, 2017); *Awalt v. Marketti*, 74 F. Supp. 3d 909, 939 (N.D. Ill. 2014)). He further asserts that because his evidence "is as substantial, and in many respects more substantial, than the evidence provided by the plaintiffs in *Awalt* and *Piercy*, this Court should deny Wexford's request for summary judgment" (Doc. 157, p. 44).

The Court's own review of *Awalt* and *Piercy* cases, however, strongly suggests that Armbruster's argument is off-base. The plaintiffs in *Awalt* and *Piercy* had evidence that went *far beyond* a collection of grievances from other prisoners, like Armbruster has proffered. In *Awalt*, the plaintiff hired a physician as an expert witness, who reviewed all inmate and medical files produced by the defendants. *Awalt v. Marketti*, 74 F. Supp. 3d 909, 925, 938–39 (N.D. Ill. 2014), *supplemented*, 75 F. Supp. 3d 777 (N.D. Ill. 2014). The expert identified 24 detainees booked at the Jail within the three months leading up to and including the plaintiff's incarceration who identified a medical issue at intake. *Id.* After reviewing the medical records of those inmates, the expert opined that seven of the detainees, or 29%, were denied timely access to care or received care that fell far below the standard. *Id.* The expert further opined that in his experience, this rate of failure suggested there was a systemic failure to provide medical care at the Jail. *Id.*

The plaintiff in *Piercy* also retained an expert physician, who reviewed the medical records of 455 inmates at the jail. *Piercy v. Warkins*, No. 14 CV 7398, 2017 WL 1477959, at *4 (N.D. Ill.

Apr. 25, 2017). He opined that the medical records of 107 of those inmates "showed clear evidence of inadequate medical care or no medical care at all." *Id.* He also reviewed sworn statements from twenty inmates and opined that thirteen of them received inadequate medical care. *Id.* The court concluded that the expert had identified enough deficiencies in the medical care at the jail that a reasonable jury could conclude there was a widespread practice of ignoring inmates' medical problems and providing substandard care. *Id.* at *12–13. *See also Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (affirming verdict against Cook County where there was evidence of a widespread practice of failing to review inmates' medical requests, including the sworn testimony of a number of inmates, correctional officers, low-level employees of the healthcare services provider in the jail, and upper-level management of the healthcare services provider); *Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006) (reversing summary judgment and holding plaintiff had provided sufficient evidence of a widespread practice of failing to provide timely methadone treatment where he pointed to the delay in his own case, testimony from a pharmacist about delays inherent in the methadone verification procedures, and testimony from two jail employees about widespread delays that they witnessed)

Here, in contrast, Armbruster is relying solely on grievances of other inmates. The grievances are, at best, a collection of self-assessments from prisoners, who are not qualified medical professionals, that they received inadequate medical care. Unlike the plaintiffs in *Awalt* and *Piercy*, Armbruster has not offered any competent evidence regarding the quality of the medical care these ten other inmates received. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 536 (3d Cir. 2017) ("Based upon these observations, we think that medical expert testimony may be necessary to establish deliberate indifference in an adequacy of care claim where, as laymen, the jury would not be in a position to determine that the particular treatment or diagnosis fell below

a professional standard of care."); *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016) (affirming district court's grant of summary judgment for the defendant when "no expert testified that [defendant's] chosen course of treatment was a substantial departure from accepted medical judgment, and the decision was not so obviously wrong that a layperson could draw the required inference about the doctor's state of mind without expert testimony.").

Even if the Court assumes these ten other inmates did, in fact, receive inadequate medical care, Armbruster has not put forth evidence sufficient to establish it was due to a widespread practice. The Seventh Circuit has emphasized "that the word 'widespread' must be taken seriously." *Phelan v. Cook Cty.*, 463 F.3d 773, 790 (7th Cir. 2006), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). "It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan*, 463 F.3d at 790. "The plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.*

If Armbruster's evidence is credited, there were eleven instances of inadequate medical care over the course of nine months, including his own (January to September 2014). But there is *no evidence* as to how many inmates were at SWICC during the relevant time period, or how many of them sought medical care. Without those numbers to provide some context, the Court cannot infer that eleven instances of inadequate medical care constitutes a widespread practice or systemic failure.

Accordingly, Wexford is entitled to summary judgment on Armbruster's claim of deliberate indifference based on a widespread practice.

ii. <u>Actions of an official with policy-making authority</u>

Armbruster alleges that Dr. Shah had final policy-making authority regarding submission or denial of consultation requests at SWICC (Doc. 157, pp. 44–45).

"It is well-established that when a particular course of action is directed by those who set municipal policy, the municipality is responsible under section 1983, even if the action in question is undertaken only once." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986)). But just because an individual is the *decisionmaker* on a particular issue does not necessarily make him the *policymaker* on that issue. *Valentino*, 575 F.3d at 675. "Not every municipal official with discretion is a final policymaker; authority to make final policy in a given area requires more than mere discretion to act." *Milestone v. City of Monroe, Wis*., 665 F.3d 774, 780 (7th Cir. 2011). It requires delegation to the individual by the municipality to make policy on its behalf in a particular area or on a particular issue. *Ball v. City of Indianapolis*, 760 F.3d 636, 643 (7th Cir. 2014); *Valentino*, 575 F.3d at 675. *See also Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 987 (7th Cir. 2013) ("[T]he mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority. There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire.")

The Seventh Circuit has identified a number of factors that can shed light on whether an official is a final policymaker, including (1) relevant laws, ordinances, rules and regulations, and operational practices; (2) whether the official's decisionmaking is constrained by policies of other officials or legislative bodies; (3) whether his decisions are subject to review by a higher official or other authority; and (4) "whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Milestone*, 665 F.3d at 780; *Valentino*, 575 F.3d at

675.

Here, it is clear Dr. Shah was the *decisionmaker* when it came to deciding whether to submit an off-site referral request for an inmate. But it is also clear he is not the *policymaker*. The deposition of Wexford's corporate representative made clear Dr. Shah was, at best, a mid-level employee in the Wexford corporate hierarchy. He was subject to supervision by the regional medical director. The corporate representative deposition also revealed there were myriad corporate policies, procedures, and expectations that Dr. Shah was expected to follow in providing medical care to inmates at SWICC. There is no indication Dr. Shah had any part in drafting these policies or that Wexford delegated any authority to Dr. Shah to make policies on behalf of the corporation. By all appearances, the policies were drafted by individuals much higher in the corporate hierarchy than a facility medical director.

When it came to deciding whether to request an off-site referral, Dr. Shah's decisions were guided, at least in part, by those corporate policies and procedures as well as the ongoing training and education provided to him by the corporation. If he determined an off-site referral was warranted, he did not have the power to simply arrange that appointment. Instead, his decision had to be reviewed and approved by Utilization Management. On the other hand, when he determined an off-site referral was not warranted, that decision was not automatically subject to review by Utilization Management. However, there were other opportunities for review, at least to some extent. The prisoner could file a grievance, in which case the doctor's decision would be reviewed by the Healthcare Unit Administrator and/or other prison officials. A member of the healthcare staff could also contact the Regional Medical Director and ask him to review the decision. But even if Dr. Shah's decision not to request an off-site referral was completely unreviewed, that fact alone does not render him a policymaker. *See Ball,* 760 F.3d at 643 ("But simply because a

municipal employee has decisionmaking authority, even unreviewed authority, with respect to a particular matter does not render him a policymaker as to that matter."); *Kristofek*, 712 F.3d at 987 ("[T]he mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority. There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire.").

There is simply no evidence from which a reasonable jury could find that Dr. Shah makes final policy for Wexford. Instead, the evidence shows Dr. Shah was tasked with guiding the medical care provided at SWICC pursuant to the policies set by Wexford. Accordingly, Wexford is entitled to summary judgment on Armbruster's claim that his constitutional injury was caused by an official with final policymaking authority.

## C.  FAILURE TO INTERVENE AGAINST DR. SHAH, NURSE WILFORD, AND WEXFORD (COUNT 2)

Armbruster alleges that Dr. Shah, Nurse Wilford, and Wexford failed to intervene to ensure that he received adequate medical care (Doc. 123, pp. 13–14). In order to prevail on this claim, Armbruster must show that Defendants knew he was receiving constitutionally deficient medical care and had a realistic opportunity to prevent the harm from occurring but failed to do so. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

Armbruster concedes that summary judgment is appropriate as to Dr. Shah and Wexford on his claim for failure to intervene (Doc. 157, p. 49). Accordingly, the motion for summary judgment will be granted for these Defendants on this claim.

Armbruster, however, argues that Nurse Wilford is not entitled to summary judgment on his claim for failure to intervene (Doc. 157, pp. 50–51). The Court agrees. As previously discussed above, considering the facts in the light most favorable to Armbruster and drawing all inferences

in his favor, a jury might reasonably conclude that Nurse Wilford repeatedly encountered Armbruster in severe pain and complaining that his arm was numb, that he was having trouble walking, and that he needed help beyond what Dr. Shah was providing. It was also clear, even to a lay person, that Dr. Shah's course of treatment was blatantly inappropriate. Yet, Nurse Wilford did not take any action to address Armbruster's untreated medical needs, including confronting Dr. Shah or raising the issue with her supervisors.

Accordingly, Nurse Wilford is not entitled to summary judgment on Armbruster's claim of failure to intervene.

## D. MEDICAL MALPRACTICE AGAINST DR. SHAH AND WEXFORD (COUNT 3) & RESPONDEAT SUPERIOR AGAINST WEXFORD (COUNT 4)

Armbruster brought state law medical malpractice claims against Defendant Shah for professional negligence and against Wexford for institutional negligence in Count 3. Armbruster also brought a medical malpractice claim against Wexford based on respondeat superior liability in Count 4.

Defendants primarily argue they are entitled to summary judgment on Armbruster's medical malpractice claim because the affidavit and report from Dr. Gregory Bailey that Armbruster attached to his Third Amended Complaint does not comply with 735 ILL. COMP. STAT. 5/2- 622(a) (Doc. 133, pp. 33–35). That statute requires medical malpractice claims to be supported by an affidavit from the plaintiff's attorney and a written report from a qualified, licensed physician who has reviewed the case and determined "there is a reasonable and meritorious cause for the filing of such action." 735 ILL. COMP. STAT. 5/2- 622(a).

After Defendants filed their motion for summary judgment, however, District Judge Michael Reagan allowed Armbruster to add the report of his retained expert witness Dr. Peter Brown to his Third Amended Complaint in order to bring himself into compliance with section 2-

622(a) (Doc. 198). *See also Hahn v. Walsh*, 762 F.3d 617, 634 (7th Cir. 2014) (quoting *Cammon v. W. Suburban Hosp. Med. Ctr.,* 704 N.E.2d 731, 738–39 (Ill. App. Ct. 1998)). ("Section 2–622 is a pleading requirement designed to reduce frivolous lawsuits, not a substantive defense which may be employed to bar plaintiffs who fail to meet its terms.") Therefore, this argument is now moot.

The only other argument Defendants made in their motion for summary judgment is a very cursory, three-sentence argument that there is no evidence the care provided (or not provided) by Dr. Shah or Wexford was the proximate cause of any alleged injury and therefore summary judgment should be granted in their favor (Doc. 133, p. 35). This argument is a non-starter. Under Illinois law, one of the elements a plaintiff must show in order to prove a claim of medical malpractice is that an injury was proximately caused by the defendant's negligent deviation from the standard of care. *Sullivan v. Edward Hosp.*, 806 N.E.2d 645, 653 (Ill. 2004) (citing *Purtill v. Hess*, 489 N.E.2d 867, 872 (Ill. 1986)). Proximate cause defined as "a cause that, in the natural or ordinary course of events, produced the plaintiff's injury." Illinois Pattern Jury Instruction, Civil, No. 15. Here, there is evidence if significant spinal cord compression is not addressed promptly, the damage to the spinal cord may be irreversible. There is also evidence from which a reasonable jury could conclude that Armbruster's compression was not addressed for a number of months. Armbruster testified at his deposition he continued to suffer from numbness, tingling, weakness, and pain in his arms and legs three years after his spinal decompression surgery. And Armbruster's expert witness opined that if Armbruster's spinal cord compression had been diagnosed and treated promptly, his outcome "would likely have been better than it is now" (Doc. 157-9, p. 11). This evidence is sufficient to establish a genuine issue of material fact as to whether Armbruster's injury was proximately caused by the Defendants' medical negligence.

Accordingly, Dr. Shah and Wexford are not entitled to summary judgment on Armbruster's claim of medical malpractice.

<u>CONCLUSION</u>

It is **RECOMMENDED** that Defendants' motion for summary judgment (Doc. 132) should be **GRANTED IN PART AND DENIED IN PART**.

It should be **GRANTED** as to Wexford Health Sources, Inc. on Count 1 for deliberate indifference. It should also be **GRANTED**, per Armbruster's concession, as to Dr. Bharat Shah and Wexford Health Sources, Inc. on Count 2 for failure to intervene.

It should be **DENIED** as to Dr. Bharat Shah and Nurse Loretta Wilford on Count 1 for deliberate indifference. It should be **DENIED** as to Nurse Loretta Wilford on Count 2 for failure to intervene. It should also be **DENIED** as to Dr. Bharat Shah and Wexford Health Sources, Inc. on Count 3 for medical malpractice.

This matter should proceed to trial on the following claims against the following Defendants:

Count 1:   Eighth Amendment claim for deliberate indifference to a serious medical need against Defendants Dr. Shah and Nurse Wilford;

Count 2:   Eighth Amendment claim for failure to intervene against Defendant Nurse Wilford;

Count 3:   Medical negligence under Illinois state law against Wexford and Dr. Shah; and

Count 4:   Respondeat Superior against Wexford.

Pursuant to 28 U.S.C. § 636(b)(1) and SDIL-LR 73.1(b), **OBJECTIONS** to this Report and Recommendation/Proposed Findings of Fact and Conclusions of Law are due fourteen (14) days after service (*see* attached Notice).

**DATED: July 23, 2019**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**